No. 24-565

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD

*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellee,*

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 1 of 7**

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Baird and Richard Gallardo, | No. 2:19-cv-00617-KJM-AC |
| Plaintiffs, | ORDER |
| v. | |
| Rob Bonta, et al., | |
| Defendants. | |

Plaintiffs Mark Baird and Richard Gallardo have brought this facial constitutional challenge to two California firearm laws under the Second Amendment.  These laws impose criminal liability on people who carry handguns openly without permits, which are available in the counties where Baird and Gallardo live, but not all counties.  They and the defendant, Attorney General of California, all have moved for summary judgment.

In cases like this one, the Supreme Court has instructed district courts to decide first whether the plaintiffs' conduct is protected by the plain text of the Second Amendment, and if it is, then whether the state has proven its laws are "consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).  The plain text of the Second Amendment protects what the Supreme Court has described as the right of "ordinary, law-abiding citizens" to carry firearms in public for self-defense.  *Id.* at 2122.  Here, California's laws place a burden on that conduct, meaning the state

1    must show those laws are consistent with this country's historical tradition of firearm regulation.

2    *Id.* at 2130.

3          It is not an easy task to make principled decisions about similarities and differences

4    between modern regulations and laws passed hundreds of years ago, as required here.  The

5    historical record reveals no obviously correct answers.  But the state has cited many historical

6    statutes and regulations, which—like California's modern laws—limited how people could carry

7    weapons in public in analogous circumstances based on analogous goals, such as preserving the

8    peace.  Those historical laws also were similarly restrictive, if not more so.  Baird and Gallardo

9    have not refuted the state's evidence.  For these reasons, as explained in full below, the court

10   concludes the state has shown what it must to prove its laws are constitutional.  The defendant's

11   motion for summary judgment is **granted**, and the plaintiffs' cross-motion is **denied**.

12   **I.     STATE STATUTES AND LICENSING SYSTEM**

13         In California, it is ordinarily a crime for people to carry firearms outside their homes and

14   businesses unless they have a license.  *See* Cal. Pen. Code §§ 25850(a), 26350(a), 26150, 26155.

15   There are several exceptions to this general rule.  Current and retired peace officers, military

16   personnel, and federal officers, for example, need no license; nor do security guards or private

17   investigators; licensed hunters may carry firearms on hunting trips.  *See id.* §§ 26000 *et seq.*  The

18   state also has created narrow exceptions for a few extraordinary circumstances in which firearms

19   might be necessary for self-defense.  For example, people can carry loaded firearms in public

20   without a license if they or their property are in danger and if they have notified law enforcement

21   but it has not arrived.  *See id.* § 26045.  Nor does the state punish those who carry loaded firearms

22   while making or attempting to make a lawful arrest.  *Id.* § 26050.  But ordinarily, a license from a

23   local law enforcement agency is a prerequisite to carrying a firearm in public.  *See id.* §§ 26150,

24   26155.

25         State law currently requires license applicants to satisfy three criteria: "good moral

26   character," residence or work in the relevant city or county, and completion of a "course of

27   training."  *Id.* §§ 26150(a)(1)–(3), 26155(a)(1)–(3).  The state once required applicants to

28   demonstrate "good cause" for a license as well, but after the United States Supreme Court

decided the *Bruen* case and struck down a similar "proper cause" requirement in New York, the

California Attorney General instructed prosecutors not to enforce that part of the state's licensing

statute. *See* Office of the Attorney General, Legal Alert (June 24, 2022) (citing *Bruen*,

142 S. Ct. 2111).[1]  This instruction mooted any dispute about California's former "good cause"

law. *See* Order, *Flanagan v. Bonta*, No. 18-55717, 2023 WL 1771160 (9th Cir. Feb. 1, 2023)

(dismissing a challenge to the "good cause" requirement as moot).  The state also requires

applicants to submit fingerprints. *See* Cal. Pen. Code § 26185.  It does not issue licenses to

anyone the California Department of Justice determines is legally prohibited from possessing,

owning or purchasing a gun. *See* Cal. Pen. Code § 26195.[2]

    At this point, two types of licenses are available.  First are concealed-carry licenses: local

law enforcement agencies can issue licenses for a person "to carry concealed a pistol, revolver, or

other firearm capable of being concealed upon the person," and those licenses are viable

throughout the state. *See* Cal. Pen. Code §§ 26150(b)(1), 26155(b)(1).  Second are open-carry

licenses: in counties with a population of less than 200,000 by the most recent federal census,

local authorities can issue licenses to carry the same types of weapons "loaded and exposed," but

only in that county. *See id.* §§ 26150(b)(2), 26155(b)(2).  In practical terms, California allows

local authorities to issue licenses to carry handguns anywhere within its borders, but unless the

license holder lives or works in a county with fewer than 200,000 residents, the state requires that

---

[1] https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf (last visited Dec. 27, 2022).

[2] The Governor of California also recently approved a series of changes to the state's firearms regulations, including some that changed the state's licensing requirements.  For example, one new law replaced the "good moral character" requirement with a defined list of circumstances in which people are "disqualified" from receiving a license. *See* 2023 Cal. Legs. Serv. Ch. 249 § 10 (S.B. 2) (amending Penal Code section 26150); *id.* § 21 (adding Penal Code section 26202).  People are "disqualified" if they are "reasonably likely to be a danger to self, others, or the community at large" or if they have been convicted of contempt of court, hate crimes, or making criminal threats, and in many other circumstances. *Id.* § 21 (adding Penal Code section 26202).  Applicants must also be "the recorded owner . . . of the firearm for which the license will be issued" and must be 21 or older. *Id.* § 10.  These changes were not in effect at the time of the operative complaint, *see* Def.'s Opp'n at 3, ECF No. 98, and Baird and Gallardo do not challenge them, so the court will not discuss them further in this order.

1    guns remain concealed. Thirty California counties have populations below 200,000.[3] Twenty-

2    eight counties have populations above 200,000.[4] About 2 million people, roughly 5 percent of the

3    state's population, live in counties with populations below 200,000; the other 95 percent live in

4    California counties with populations above 200,000. *See id.* The counties in this second group

5    include those that are home to California's largest and most prominent cities, including Los

6    Angeles, San Diego, San Jose, San Francisco, Fresno, Sacramento and Oakland. *See id.*

7    **II.    LEGAL AND PROCEDURAL BACKGROUND**

8        Baird and Gallardo originally filed this case more than four years ago. Since then, the law

9    concerning the Second Amendment as determined by the Supreme Court and federal appellate

10   courts has been changing almost constantly. The history of this case is entangled with the

11   changing federal law. An introduction to the changing precedent and its foundation is necessary

12   to understand the parties' cross-motions and this court's decision.

13       In 2008, the Supreme Court took a careful look at the Second Amendment for the first

14   time in many decades. *See generally District of Columbia v. Heller*, 554 U.S. 570 (2008). A

15   Court majority held for the first time that individuals have a constitutional right to possess

16   handguns in their homes for self-defense, while leaving many other questions unanswered. *See*

17   *id.* at 592. The Court did not decide, for example, whether people have any constitutional right to

18   carry firearms outside their homes, and it cautioned that "the right secured by the Second

19   Amendment is not unlimited." *Id.* at 626. It suggested, but did not decide, that several

---

[3] In ascending order of population, these counties are Alpine, Sierra, Modoc, Mono, Trinity, Mariposa, Inyo, Plumas, Colusa, Del Norte, Glenn County, Lassen, Amador, Siskiyou, Calaveras, Tuolumne, San Benito, Tehama, Lake, Yuba, Mendocino, Sutter, Nevada, Humboldt, Napa, Madera, Imperial, Shasta, and El Dorado counties. U.S. Census Bureau, "Annual Estimates of the Resident Population for Counties: April 1, 2020 to July 1, 2022 (CO-EST2022-POP)," https://www.census.gov/data/datasets/time-series/demo/popest/2020s-counties-total.html (last visited Dec. 27, 2023). The court takes judicial notice of these estimates. *See, e.g.*, *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996).

[4] In ascending order of population, these counties are Butte, Yolo, Marin County, California, Santa Cruz, Merced, San Luis Obispo, Placer, Monterey, Santa Barbara, Solano, Tulare, Sonoma, Stanislaus, San Mateo, San Joaquin, Ventura, San Francisco, Kern, Fresno, Contra Costa, Sacramento, Alameda, Santa Clara, San Bernardino, Riverside, Orange, San Diego, and Los Angeles counties. *See* Census Bureau Annual Estimates, *supra* note 3.

1   longstanding "prohibitions on carrying concealed weapons" were lawful. *Id.* The Court also

2   expressed its sense that "prohibitions on the possession of firearms by the mentally ill" were

3   constitutional, as were "laws forbidding the carrying of firearms in sensitive places such as

4   schools and government buildings, or laws imposing conditions and qualifications on the

5   commercial sale of arms," but again, it did not decide these questions, and it did not explain

6   further. *Id.* at 626–27. It did not intend these examples of "presumptively lawful regulatory

7   measures" as a comprehensive list of permissible restrictions. *See id.* at 627 n.26. Finally, the

8   Court did not decide whether lower courts such as this one should employ "any of the standards

9   of scrutiny" that have "applied to enumerated constitutional rights" in other situations. *Id.* at 628.

10  Rather, it declined to "establish a level of scrutiny for evaluating Second Amendment

11  restrictions," although it rejected a proposal for a "freestanding" balancing test. *See id.* at 634.

12      Although the Supreme Court's decision in *Heller* broke new ground, it had relatively few

13  immediate consequences for state firearm regulations. That is because the District of Columbia is

14  not a state and so the *Heller* decision did not have the effect of applying the Second Amendment

15  to the states, which the Supreme Court had long declined to do. *See, e.g.*, *Presser v. Illinois*,

16  116 U.S. 252, 264–65 (1886); *United States v. Cruikshank*, 92 U.S. 542, 553 (1875). But on the

17  same day the Supreme Court issued its decision in *Heller*, several plaintiffs filed a lawsuit

18  challenging state and local regulations like the D.C. laws the Supreme Court had just stricken

19  down. *See* Compl., *McDonald v. City of Chicago*, No. 08-3645 (N.D. Ill. June 26, 2008), ECF

20  No. 1. When these cases reached the Supreme Court, it confirmed "the Second Amendment right

21  is fully applicable to the states." *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)

22  (plurality opinion); *see also id.* at 805 (Thomas, J., concurring in part and concurring in the

23  judgment)

24  (agreeing with the plurality's holding). As in *Heller*, however, the Court did not decide whether

25  any particular "longstanding regulatory measures" violated the Second Amendment. *Id.* at 786

26  (plurality opinion). Nor did the Court clarify how lower court judges should evaluate state laws

27  and regulations in response to Second Amendment challenges.

28      In the next dozen years, then, although lower courts settled on a two-part test for

adjudicating Second Amendment challenges, cases about carrying firearms outside the home—

cases such as this one—divided the federal courts of appeals and split several appellate panels, including in the Ninth Circuit. In 2014, for example, a divided three-judge Ninth Circuit panel held that individual persons had a Second Amendment right to carry concealed handguns "outside the home for the lawful purpose of self-defense." *Peruta v. County of San Diego*, 742 F.3d 1144, 1166 (9th Cir. 2014) (alterations omitted). Two years, later, however, the Ninth Circuit rejected that conclusion in a divided en banc decision. *See generally Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc). The en banc majority held "the Second Amendment does not preserve or protect a right of a member of the general public to carry concealed firearms in public." *Id.* at 924. Another two years later, another divided three-judge panel held individual persons have a Second Amendment right to carry firearms openly in public for self-defense. *See generally Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018). As before, the Ninth Circuit agreed to rehear that appeal en banc. *See* 915 F.3d 681 (9th Cir. 2019). Before the en banc court heard oral arguments, however, the Supreme Court agreed to take up a case about a similar law in New York, so the Circuit stayed the en banc proceedings. *See* Order, No. 12-17808 (9th Cir. Feb. 14, 2019), Dkt. No. 209 (citing *N.Y. Rifle & Pistol Ass'n v. City of New York*, No. 18-280).[5]

While the en banc proceedings were stayed, Baird and Gallardo filed this case. Shortly thereafter, the Supreme Court remanded the New York case, finding changes to New York laws had rendered that case moot. 140 S. Ct. 1525 (2020) (per curiam). The Ninth Circuit then lifted the stay in *Young v. Hawaii* and scheduled oral arguments. *See* No. 12-17808 (9th Cir. Apr. 30, 2020), Dkt. No. 227. Baird and Gallardo pressed forward with a motion for a preliminary injunction in this case while those en banc proceedings were pending. *See generally* First Mot. Prelim. Inj., ECF No. 14. This court surveyed the conflicting out-of-circuit authority and the conflicting Ninth Circuit opinions, and noted the pending en banc proceedings in *Young v. Hawaii*, before concluding Baird and Gallardo had not shown they were likely to succeed on the merits of their claims. They had, however, raised "serious questions" about their Second Amendment rights. *See* Order (Aug. 31, 2020) at 5–8, ECF No. 33. This meant they could be

---

[5] That New York case was distinct from *New York Rifle and Pistol Association v. Bruen*, No. 20-843, decided later, as explained below.

1    entitled to a preliminary injunction only if they showed the balance of hardships tipped sharply in

2    their favor, among other prerequisites.  *See id.* at 4 (citing *All. for the Wild Rockies v. Cottrell*,

3    642 F.3d 1127, 1131–35 (9th Cir. 2011)).  The court found they had not so shown and denied

4    their motion.  *Id.* at 10.  But the court expressly permitted Baird and Gallardo to renew their

5    motion if the Ninth Circuit en banc issued a favorable decision in *Young*.  *Id.*  In the meantime,

6    discovery began here.  *See* Sched. Order, ECF No. 39.

7           The Ninth Circuit issued its en banc opinion in *Young v. Hawaii* in March 2021, while

8    discovery was underway.  992 F.3d 765 (9th Cir. 2021) (en banc).  The Circuit held "Hawai'i's

9    restrictions on the open carrying of firearms reflect longstanding prohibitions."  *Id.* at 773.  For

10   that reason, the court concluded, openly carrying firearms in public was "outside the historical

11   scope of the Second Amendment."  *Id.*  This resolution clearly was unfavorable to Baird and

12   Gallardo.  They nevertheless renewed their motion for a preliminary injunction, *see* Second Mot.

13   Prelim. Inj., ECF No. 40, and this court heard oral arguments in July 2021, Mins., ECF No. 50.

14          In the meantime, the Supreme Court had granted a petition for certiorari in the case now

15   known as *Bruen*.  *See* 141 S. Ct. 2566.  At oral arguments on Baird and Gallardo's renewed

16   motion for a preliminary injunction, the state urged this court to stay this case until the Supreme

17   Court issued its decision in *Bruen*.  Hr'g Tr. at 13–14, ECF No. 52.  Baird and Gallardo initially

18   thought *Bruen* had no "bearing on this case," *see id.* at 14–15, but later reconsidered and joined

19   the state's request for a stay, *see* Stip. & Order, ECF No. 58.  The court granted that request and

20   stayed the case until *Bruen* was resolved.  *Id.*

21          The Supreme Court issued its opinion in *Bruen* in June 2022, holding the Second

22   Amendment gives "ordinary, law-abiding" people a right to carry firearms in public for self-

23   defense.  142 S. Ct. at 2122.  The Court also rejected the two-part test that most courts of appeals

24   had adopted.  It directed lower courts instead to use a test focused on "the historical tradition" of

25   firearms regulation.  *Id.* at 2127.  After *Bruen*, the Court granted certiorari in *Young*, vacated the

26   Ninth Circuit's en banc decision, and remanded that case for further consideration.  142 S. Ct.

27   2895 (2022).  The Circuit remanded the case to the district court in turn, 45 F.4th 1087 (9th Cir.

1  2022), but the parties stipulated to dismissal and the court granted that request, *see* Stip. & Order,

2  No. 12-336 (D. Haw. Dec. 15, 2022), ECF No. 89.

3          After the Court filed its opinion in *Bruen*, this court lifted the stay here, ECF No. 59,

4  Baird and Gallardo amended their complaint, ECF No. 68, and they renewed their request for a

5  preliminary injunction, ECF No. 65.  The court denied that motion in late 2022, s*ee* Order

6  (Dec. 8. 2022), ECF No. 83, finding Baird and Gallardo had not shown the balance of hardships

7  and public interest favored an injunction, necessary conditions for injunctive relief under *Winter v.*

8  *Natural Resources Defense Council*. *Id.* at 10–15 (citing 555 U.S. 7 (2008)).  Baird and Gallardo

9  then pursued an interlocutory appeal.  ECF No. 84.  Meanwhile, the parties completed discovery

10  and filed and briefed cross-motions for summary judgment here.  *See* Order (Nov. 23, 2023), ECF

11  No. 82; Def.'s Mot., ECF No. 90; Def.'s Mem., ECF No. 90-1; Pls.' Mot., ECF No. 96; Pls.'

12  Mem., ECF No. 96-1.  The court heard oral argument on November 3, 2023.  Mins., ECF No. 104.

13  Amy Bellantoni appeared for Baird and Gallardo, and Laura Haddad appeared for the Attorney

14  General.

15          After briefing was complete and after this court heard oral argument, the Ninth Circuit

16  issued its mandate in Baird and Gallardo's appeal related to their motion for a preliminary

17  injunction.  *See generally* 81 F.4th 1036; *see also* Mandate, ECF No. 109.  The Circuit held this

18  court had erred in denying the motion without deciding whether Baird and Gallardo were likely to

19  succeed on the merits of their claims.  *See* 81 F.4th at 1042, 1044–46.  The Circuit remanded the

20  case to this court to consider that question.  *See id.* at 1046–48.  The Circuit also required

21  California to "identify a historical analogue that curtails the right to peaceably carry handguns

22  openly for self-defense to a comparable degree, with a comparable severity, and with a

23  comparable blanket enforcement to California's open-carry ban."  *Id.* at 1047.  Additionally, the

24  Circuit ordered this court to act "expeditiously."  *Id.* at 1047–48.  Considering and resolving

25  Baird and Gallardo's motion for a preliminary injunction now, however, rather than the pending

26  cross-motions for summary judgment, would delay this action unnecessarily.  The parties' cross-

27  motions are briefed, fully argued and ready for decision.  Resolving those motions will moot the

28  preliminary injunction motion, because Baird and Gallardo either will have succeeded or not.  For

1    that reason, the court begins with the summary judgment motions rather than with the preliminary

2    injunction.

## III.    CLAIMS AND EVIDENCE

4         Both Baird and Gallardo live in counties with populations below the 200,000-person limit,

5    so local authorities can grant them licenses to carry firearms openly in public in those counties.

6    Pls.' Resp. Stmt. Facts Nos. 4, 5, 9, 10, ECF No. 96-2.  Both men claim local authorities have not

7    published applications for open-carry licenses and will not grant them those licenses.  Baird Decl.

8    ¶¶ 7–8, ECF No. 96-4; Gallardo Decl. ¶¶ 6–7, ECF No. 96-5.  The reasons are unclear.  Baird and

9    Gallardo have not sued any local licensing authorities, and neither side appears to have sought

10   any information from the local authorities.  Nor has any party cited evidence about the local

11   authorities' decisions or policies.  For these reasons, the court previously dismissed Baird and

12   Gallardo's claims that licenses to carry firearms openly are not truly available to them as a

13   practical matter; the court will not revisit those "as-applied" claims in this order.  *See Baird v.*

14   *Bonta*, 644 F. Supp. 3d 726, 731 (E.D. Cal. 2022), *rev'd and remanded in part on other grounds*,

15   81 F.4th 1036 (9th Cir. 2023).

16        Local authorities can also grant Baird and Gallardo licenses to carry concealed firearms in

17   public.  Until the most recent hearing on the parties' pending cross-motions for summary

18   judgment, the record did not make clear whether Baird and Gallardo have licenses or are

19   exempted from the general ban on carrying concealed handguns in public.  Baird testified in his

20   deposition that he has applied to county authorities for multiple permits to carry concealed

21   firearms, most recently in 2021, and his most recent application was granted.  *See* Baird Dep. at

22   14, Haddad Decl. Ex. 2, ECF No. 90-4.  He denies now, however, that he has a permit to carry a

23   concealed firearm.  Baird Decl. ¶¶ 7–8.  At hearing on the pending cross-motions, Baird's counsel

24   explained his license has expired.  California does not argue otherwise.  Gallardo testified in his

25   deposition he is exempted from the state's license requirement by virtue of a federal credential.

26   *See* Gallardo Dep. at 15, 27, Haddad Ex. 3, ECF No. 90-4.  But in a later declaration, he claimed

27   he could not rely on any exemption to the state's licensing requirements.  *See* Gallardo Decl. ¶ 5.

28   At hearing on the pending cross-motions, his counsel clarified his federal credential does not

1   allow him to carry a firearm openly in all the places he wishes.  Again, California does not argue

2   otherwise.

3          For these reasons, the court finds it is undisputed that Baird and Gallardo both could apply

4   to local authorities for permits to carry firearms openly and concealed in public.  It also is

5   undisputed the state will not now, after *Bruen*, allow local licensing authorities to deny Baird and

6   Gallardo a license based on any failure to show "good cause."  Baird and Gallardo nevertheless

7   contend the state's system of licensing and criminal punishments is unconstitutional.  Their

8   claims can be interpreted in a number of ways.  As their counsel clarified at hearing on the

9   parties' pending cross-motions, their lawsuit rests on two basic theories.

10          First, they contend it is unconstitutional for California to impose criminal liability on

11   people who carry firearms in public.  *See, e.g.*, Second Am. Compl. ¶¶ 70–71, ECF No. 68.  As

12   explained above, however, if people have a license, California law does not impose criminal

13   liability for carrying handguns in public.  *See* Cal. Pen. Code §§ 26150, 26155.  For that reason,

14   the court understands Baird and Gallardo's first theory as an argument that the Second

15   Amendment prohibits California from requiring licenses: in their words, they object "to having to

16   seek permission from the government before being lawfully able to exercise a preexisting right."

17   Pls.' Mem. at 2; *see also* Baird Decl. ¶¶ 15–19; Gallardo Decl. ¶¶ 10–13.

18          Second, Baird and Gallardo contend California cannot dictate how people carry firearms

19   in public, such as openly or concealed—what they refer to as limits on the "modality" of gun

20   carrying.  Pl.'s Mem. at 6; *see also* Second Am. Compl. ¶¶ 25, 37; Pls.' Mem. at 2–3; Baird Decl.

21   ¶ 5; Gallardo Decl. ¶ 5.  The court construes this theory as an argument that California cannot

22   constitutionally require people to conceal any firearms they carry in public in counties with

23   populations larger than 200,000, as Baird and Gallardo would be required to do if they were to

24   enter one of these larger counties.

25          The state contends for its part that the challenged firearms laws are constitutional for two

26   reasons.  First, it argues that "the text of the Second Amendment does not compel *unlicensed*

27   open carry."  Def.'s Mem. at 5 (emphasis in original).  Nor, in the state's view, does "the plain

28   text of the Second Amendment . . . require any right to *openly* carry when concealed carry (and

1   open carry under more limited circumstances) is authorized." *Id.* at 6 (emphasis in original). In

2   short, the state contends, because it "accommodates the right to public carry through its concealed

3   carry licensing regime, the reasonable restrictions that California imposes on the open-carry of

4   weapons, and the licensing requirements in place in the counties where Plaintiffs reside, do not

5   interfere with the plain text of the Second Amendment." *Id.* at 7. California therefore asks this

6   court to hold an analysis of the historical tradition of firearm regulations is unnecessary because

7   the Second Amendment does not protect Baird and Gallardo's conduct. *See id.*

8          Second, the state contends, "[e]ven if Plaintiffs could show that California's open-carry

9   restrictions implicate the Second Amendment," the state argues its "restrictions are consistent

10  with the Nation's tradition of firearms regulation." *Id.* It argues governments regulated the

11  public carry of weapons throughout English and American history, *id.* at 11–17; governments

12  commonly applied stricter regulations in more densely populated areas, *id.* at 17; and these

13  historical regulations are similar to California's modern laws both because they imposed a similar

14  burden and because they rested on similar justifications, *id.* at 17–20.

15         The state supports its arguments with references to hundreds of historical laws and

16  regulations. Baird and Gallardo objected that the state had not presented these statutes in

17  admissible or complete form. *See, e.g.*, Pls.' Mem. at 14–16. To ensure the record was clear and

18  complete, the court instructed California to file the full text of all relevant statutory provisions,

19  which it now has done. *See generally* Updated Req. J. Not., ECF No. 105.[6] The court also grants

20  the state's request to take judicial notice of those statutes and overrules Baird and Gallardo's

21  objections to that request, ECF No. 106, to the extent the court has considered those statutes in

22  this order.

23         Baird and Gallardo did not object at hearing when the court instructed the state to

24  supplement its request for judicial notice, and the state requests judicial notice only of what it

25  already had cited in its briefing, without offering any new citations or research. But Baird and

26  Gallardo now object the court's directive to file the statutes was error. Their objections fall into

---

[6] When citing materials collected in this request, the court refers for convenience to the numbers in the left-most column of the table in ECF No. 105.

11

1  two categories.  First, they argue the state's updated request was untimely, contradicted this

2  District's local rules and deprived them of a full opportunity to respond.  *See id.* at 1–3, 5–6.  The

3  local rules permit a party to supplement its reply with the court's prior approval, as in this case.

4  *See* E.D. Cal. L.R. 230(m).  The court also permitted Baird and Gallardo to respond to the state's

5  supplemental notice, which they have done in their objections, which include both procedural and

6  substantive objections.  *See, e.g.*, Objs. Updated Req. J. Not. at 6–10 (contending state's evidence

7  does not satisfy its obligations under *Bruen*).  The court has considered these objections below,

8  which parallel arguments in the principal briefs.  Second, Baird and Gallardo argue the court

9  improperly relieved the state of its burden of proof and became an "advocate" for the state's

10  position by inviting the state to update its request for judicial notice.  *See id.* at 4.  The court has

11  not relieved the state of its evidentiary burden or assumed an advocate's role, but rather as the

12  trial court where this case begins has ensured the record is complete and clear.  The court merely

13  instructed the state to update its request for judicial notice after considering Baird and Gallardo's

14  original objection that the state's evidence was inadmissible and incomplete.  *See, e.g.*, Pls.'

15  Mem. at 14–16.  Nor has the court given latitude only to the state in its attempt to ensure the

16  record is complete.  The court has considered, for example, Baird and Gallardo's own

17  supplements to their expert's opinions over the state's objections, which the court also overrules.

18  *See* Cal. Opp'n at 19.

19        In addition to its citations to historical statutes, the state relies on the opinions of three

20  historians and a retired law enforcement officer, retained to explain the context of the cited laws

21  and how to interpret them.  First, the state cites opinions by Robert Spitzer, Ph.D., a historian and

22  professor of political science who has studied and written about gun policy for more than thirty

23  years.  *See generally* Spitzer Decl., ECF No. 90-6; Spitzer Surrebuttal, ECF No. 98-5.  In his

24  opinion, "[t]he carrying of weapons of all sorts, but especially guns, fighting knives (long, thin-

25  bladed knives), and various types of clubs has been subject to wide-ranging regulation and

26  restriction from the seventeenth century through the early twentieth century."  Spitzer Decl. at 5.

27  Not only were these "restrictions on the concealed carrying of these weapons . . . ubiquitous in

28  America."  *Id.*  "[T]he open carrying of weapons was often restricted" as well.  *Id.*  Spitzer

1    describes modern weapons laws as largely "a more flexible form of government regulation" than

2    their harsher historical counterparts. *Id.*

3         Second, Brennan Rivas, Ph.D., an historian who has studied historical weapons

4    regulations in the United States, filed a declaration in support of California's motion. *See*

5    *generally* Rivas Decl., ECF No. 90-5; Rivas Surrebuttal. Decl., ECF No. 98-4. She opines that

6    Americans have historically distinguished "military arms" from "deadly weapons" and have long

7    regulated how and whether people may carry deadly weapons in public places, especially in

8    towns and cities. *See, e.g.*, Rivas Decl. at 3–4 (summarizing opinions). She also explains how

9    weapons changed over time and what effects those changes had on gun violence, public

10   perceptions and weapons laws. *See, e.g., id.*

11        Third, the state cites opinions of Saul Cornell, Ph.D., about "the history of firearms

12   regulation in the Anglo-American legal tradition, . . . the regulation of public . . . carry of arms at

13   the national and state levels" and "California's regulatory history." Cornell Decl. Ex. A at 1, ECF

14   No. 90-1; *see also* Cornell Surrebuttal, ECF No. 98-6. Cornell offers opinions about the

15   importance of context, including English common law concepts of "peace" and the state's power

16   "to promote public health and safety," Cornell Decl. Ex. A at 2, 4; how the Second Amendment's

17   contemporaries would have understood its terms, *see id.* at 7–8; how different firearms and

18   firearms violence were many years ago, *see id.* at 10–14; how nineteenth century American courts

19   interpreted early firearms regulations, *see id.* at 14–16; and the origins of modern regulations in

20   the United States and California, *see id.* at 17–24.

21        Finally, the state cites the declaration of Kim Raney, a retired California police chief who

22   offers opinions "on how restrictions on the open carry of firearms affect public safety." Raney

23   Decl. at 6, ECF No. 90-8. He explains his understanding of the burdens of California gun laws

24   and their justifications. Baird and Gallardo object broadly to Raney's opinions as irrelevant in

25   light of the Supreme Court's rejection of "interest-balancing" tests in *Bruen*. *See, e.g.*, Pls.'

26   Mem. at 19–10; Pls.' Reply at 6–7. The state does not rely on Raney's declaration to argue the

27   challenged laws satisfy any of the "means–ends" tests the Supreme Court has directed lower

28   courts to use in other circumstances. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163

1    (2015) ("Content-based laws—those that target speech based on its communicative content—are

2    presumptively unconstitutional and may be justified only if the government proves that they are

3    narrowly tailored to serve compelling state interests."). Rather, the state relies on Raney's

4    opinions when it compares the justifications and burdens to those of historical regulations. *See,*

5    *e.g.*, Cal. Mem. at 18–20. As discussed further below, the Supreme Court directed lower courts to

6    consider those justifications and burdens. *See Bruen*, 142 S. Ct. at 2133.

7        Baird and Gallardo urge this court to disregard almost all the statutes and regulations cited

8    in the state's motion. They argue, for example, that most of the statutes cited in California's

9    motion and experts' reports were passed many years after the Second Amendment was adopted

10   and for that reason do not show what laws the Second Amendment permitted when it was

11   adopted. *See* Pls.' Mem. at 9–13. Similarly, in Baird and Gallardo's reading of the Supreme

12   Court's decisions, statutes passed after the Civil War, can only confirm—not contradict—the

13   conclusions one might draw from laws and regulations in effect at the time the Second

14   Amendment was adopted. *See id.* at 18. Baird and Gallardo similarly contend English laws and

15   history predating the Second Amendment are irrelevant. *See id.* at 17–18. And they urge the

16   court to disregard as irrelevant many other categories of evidence, such as laws about "affrays,"

17   brandishing and disorderly conduct, *id.* at 18–19; public safety, *id.* at 19–20; "dangerous" and

18   "unusual" weapons, *id.* at 17; concealed weapons, *id.* at 20; and race or other similar

19   discriminatory classifications, *id.* at 18.

20       Baird and Gallardo also cite the opinions of their retained expert, Clayton Cramer, who

21   holds Bachelor's and Master's degrees in history and who has published research about the

22   Second Amendment and firearms history. *See generally* Cramer Decl., ECF No. 96-3. Cramer

23   does not advance affirmative opinions about the historical tradition of firearm regulation, but

24   rather critiques Spitzer's, Rivas's and Cornell's opinions. Cramer argues, for example, the

25   statutes Spitzer cites in his declaration did not actually prohibit people from carrying weapons

26   openly, *see id.* at 15–17,[7] he argues Cornell has misrepresented the sources he cites, such as

---

[7] To avoid confusion, the pages cited in this declaration are those applied by the CM/ECF system at the top right of the page.

1    military censuses and historical court opinions, *see id.* at 36–37, and he argues Rivas has invented

2    an ahistorical distinction between "deadly weapons" and other firearms, *see id.* at 65–73.

3         Baird and Gallardo also attach two papers to their opposition: a "working draft" of a paper

4    by Mark W. Smith, an attorney and author, ECF No. 96-7, and an article published by David

5    Kopel, also an attorney and author, in the Charleston Law Review, ECF No. 96-9.  Like Baird

6    and Gallardo, Smith contends courts must consider evidence from "the Founding period," not the

7    years following the Civil War, when they interpret the Second Amendment.  *See, e.g.*, ECF No.

8    96-7 at 4–5.  Kopel argues British "abuses" in the 1770s—import bans on firearms and gun

9    powder and the violent confiscation of firearms and gunpowder—are an essential context for the

10   Second Amendment because they show analogous "abuses" would be unconstitutional today.

11   *See, e.g.*, ECF No. 96-9 at 285–86.

12        In its analysis and in reaching its conclusions, the court has considered the complete

13   record, including the declarations submitted by the parties.

14   **IV.    LEGAL STANDARDS**

15        The legal rule that applies to motions for summary judgment is undisputed and well-

16   known.  A party may move for and obtain summary judgment if "there is no genuine dispute as to

17   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

18   56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving

19   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it

20   "might affect the outcome of the suit under the governing law."  *Id.*  The court views the record in

21   the light most favorable to the nonmoving party and draws reasonable inferences in that party's

22   favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes

23   v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Cross-motions for summary judgment are

24   evaluated separately under the same standard, "giving the nonmoving party in each instance the

25   benefit of all reasonable inferences."  *Am. Civil Liberties Union of Nev. v. City of Las Vegas*,

26   333 F.3d 1092, 1097 (9th Cir. 2003).

27        Although the parties disagree whether some evidence is relevant or material, and although

28   they vigorously dispute the history of firearms regulation in the United States and England,

1   neither side has identified a genuine dispute of material fact to be resolved at trial.[8]  It remains

2   only to determine who is entitled to judgment as a matter of law.

3          Baird and Gallardo challenge California's laws on their face.  A facial challenge is "the

4   most difficult challenge to mount successfully" because the challenge must show the law is not

5   valid in any set of circumstances.  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "Facial

6   challenges also run contrary to the fundamental principle of judicial restraint that courts should

7   neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor

8   'formulate a rule of constitutional law broader than is required by the precise facts to which it is

9   to be applied.'"  *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008)

10  (quoting *Ashwander v. TVA*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring)).  "Finally,

11  facial challenges threaten to short circuit the democratic process by preventing laws embodying

12  the will of the people from being implemented in a manner consistent with the Constitution."  *Id.*

13  Courts therefore must "keep in mind that 'a ruling of unconstitutionality frustrates the intent of

14  the elected representatives of the people.'"  *Id.* (quoting *Ayotte v. Planned Parenthood of N. New*

15  *Eng.*, 546 U.S. 320, 329 (2006)).

16         The constitutional rights in dispute here are those explained in *Bruen* and *Heller*.  In those

17  cases the Court held the Second Amendment protects an individual person's right to keep and

18  bear arms for self-defense, both inside and outside the home.  *Bruen*, 142 S. Ct. at 2122; *Heller*,

19  554 U.S. at 592.  This protection is "fully applicable to the States."  *McDonald*, 561 U.S. at 750.

20  "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution

21  presumptively protects that conduct."  *Bruen*, 142 S. Ct. at 2126.  "To justify its regulation, the

22  government . . . must demonstrate that the regulation is consistent with this Nation's historical

23  tradition of firearm regulation."  *Id.*  And in the broader context of a facial challenge, a state

24  firearms law typically will be upheld if it operates constitutionally in at least some circumstances.

25  *See Salerno*, 481 U.S. at 745.  Specific unconstitutional applications may be addressed in specific

26  cases.  *See Bruen*, 142 S. Ct. at 2138 n.9 (declining to resolve hypothetical as-applied disputes).

---

[8] As noted above, the court and the parties clarified at hearing the record discrepancies about Baird's and Gallardo's own handgun permits.

1      This latter history-and-tradition requirement was first announced in *Bruen* only a little

2  more than a year ago, and lower federal courts have struggled to apply it since then. The same

3  requirement also is the parties' primary focus in their pending cross motions. The court therefore

4  reviews that requirement and its origins more thoroughly in the two subsections below.

5        **A.**    **Courts must identify analogous statutes and regulations in the historical**
6                **tradition of firearms regulation.**

7      The Supreme Court offered sparse practical guidance in *Bruen* for how to decide whether

8  state regulations are consistent with the historical tradition of firearm regulation. It expected

9  some cases would be "straightforward." *Id.* at 2131. For example, the Court majority wrote

10 states were likely to prove there is a longstanding historical tradition of banning guns from

11 specific "sensitive places," such as legislative assemblies, polling places, and courthouses. *See*

12 *id.* at 2133. It expected lower courts would have no trouble concluding modern regulations about

13 other analogous "sensitive places" were constitutional. *See id.* In fact, federal district courts

14 since *Bruen* have found a number of restrictions on firearms in modern "sensitive places" are

15 analogous to historical restrictions. *See, e.g.*, *Kipke v. Moore*, ___ F. Supp. 3d ___, No. 23-1293,

16 2023 WL 6381503, at *7–14 (D. Md. Sept. 29, 2023) (museums, healthcare facilities, parks and

17 mass transit facilities, schools, stadiums, racetracks, amusement parks and casinos, but not places

18 where alcohol is sold, not public demonstrations and not private property); *Goldstein v. Hochul*,

19 ___ F. Supp. 3d ___, No. 22-8300, 2023 WL 4236164, at *9–14 (S.D.N.Y. June 28, 2023) (places

20 of worship), *appeal filed*, No. 23-995 (2d Cir. July 6, 2023).

21     The Supreme Court majority also wrote in *Bruen* that it expected some restrictions would

22 prove to be straightforwardly unconstitutional. It identified three types of evidence it said likely

23 would favor that conclusion. First, if "a challenged regulation addresses a general societal

24 problem that has persisted since the 18th century, the lack of a distinctly similar historical

25 regulation addressing that problem is relevant evidence that the challenged regulation is

26 inconsistent with the Second Amendment." 142 S. Ct. at 2131. Second, "if earlier generations

27 addressed the societal problem, but did so through materially different means, that also could be

28 evidence that a modern regulation is unconstitutional." *Id.* And third, "if some jurisdictions

1  actually attempted to enact analogous regulations during this timeframe, but those proposals were

2  rejected on constitutional grounds, that rejection surely would provide some probative evidence

3  of unconstitutionality." *Id.*

4      The Court cited the laws in dispute in *Heller* and *Bruen* as examples of straightforwardly

5  unconstitutional restrictions. The "general societal problem" in *Heller* was "firearm violence in

6  densely populated communities." *Id.* The District of Columbia had "employed a regulation—a

7  flat ban on the possession of handguns in the home—that the Founders themselves could have

8  adopted to confront that problem." *Id.* But no evidence in *Heller* showed people had flatly

9  banned handguns from the home in the founding era. *See id.* In *Bruen*, the "general societal

10 problem" was "handgun violence" in "urban areas." *Id.* New York's solution was a "proper

11 cause" requirement, i.e., demonstrating "a special need for self-protection distinguishable from

12 that of the general community." *Id.* at 2156 (quoting *In re Klenosky*, 428 N.Y.S.2d 256, 257

13 (App. Div. 1980)). The Court found no similar restrictions in the historical record New York had

14 offered. It found governments historically had "limited the intent for which one could carry arms,

15 the manner by which one carried arms, or the exceptional circumstances under which one could

16 not carry arms." *Id.* With the exceptions of a few "outliers," the Court determined the record

17 included neither broad prohibitions on "the public carry of commonly used firearms for personal

18 defense" nor a demand for proof of a "special need." *Id.*

19      The Supreme Court did not expect every case to be straightforward. *Id.* at 2134. It

20 anticipated many likely would be difficult. For difficult cases, a more "nuanced approach" would

21 be necessary. *Id.* at 2132. The Supreme Court chose not to "provide an exhaustive survey of the

22 features that render regulations relevantly similar under the Second Amendment," but it offered

23 "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-

24 defense." *Id.* at 2132–33. That is, do modern and historical regulations "impose a comparable

25 burden on the right of armed self-defense"? *Id.* at 2133. And is that burden "comparably

26 justified"? *Id.* Beyond these "metrics," however, the Court could offer only generalities: it was

27 not putting governments in a "straightjacket" and it was not giving governments a "blank check."

18

1    *Id.* It called for a "well-established and representative historical *analogue*, not a historical *twin*,"

2    not a "dead ringer." *Id.* (emphasis in original).

3         Not surprisingly, lower courts have not understood the Court's guidance consistently. To

4    some, the test is quite strict. In *Teter v. Lopez*, for example, the plaintiffs challenged Hawaii's

5    ban on butterfly knives. 76 F.4th 938 (9th Cir. 2023). The state cited historical laws banning

6    everything from "Bowie knives" and "Arkansas Toothpicks" to "sling shots" and "sword-canes."

7    *See id.* at 951–52. A Georgia statute passed in 1837, for example, prohibited Bowie knives and

8    "any other kind of knives." *Id.* at 952. But the Ninth Circuit held these laws were not analogous

9    to Hawaii's statute. Most prohibited only the concealed carrying of these knives, none regulated

10   butterfly knives in particular, and few targeted small knives in particular. *See id.* at 953. The

11   circuit thus reversed the district court's decision granting summary judgment to the state. *See id.*

12   at 954–55.

13        The Fifth Circuit's decision in *United States v. Rahimi* similarly applied a strict test. *See*

14   *generally* 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023). The defendant had been

15   charged with possessing a handgun in violation of 28 U.S.C. § 922(g)(8), which makes it

16   unlawful for a person to possess a firearm or ammunition if that person previously was subject to

17   a domestic violence restraining order. *See* 61 F.4th at 449. The defendant argued this prohibition

18   was unconstitutional. *See id.* In response, the government cited several "surety" laws, which

19   several colonies codified from the common law tradition at about the time the Second

20   Amendment was ratified. *See id.* at 459–60. A person could "demand surety" from another

21   based on suspicion a crime was intended or likely. *Id.* at 459. If that second person did not post a

22   bond, they could not carry a weapon in public absent a special need. *Id.* The Fifth Circuit agreed

23   the surety laws were passed for reasons very much like those that motivated § 922(g)(8):

24   protecting specific people from harm by others. *See id.* at 459–60. The Fifth Circuit also agreed

25   the surety laws resembled § 922(g)(8) in that they required a civil proceeding and could result in

26   the forfeiture of weapons. *Id.* at 460. But the Fifth Circuit rejected the government's proposed

27   analogy to those laws: it found, unlike § 922(g)(8), they permitted a person to prevent the state

1    from seizing a firearm by posting a bond.  *See id.*  As noted, however, the Supreme Court granted

2    the United States' petition for certiorari, and recently heard oral arguments.[9]

3          Other courts have accepted broader analogies to historical gun regulations.  In *United*

4    *States v. Alaniz*, for example, the Ninth Circuit upheld a federal sentencing enhancement

5    increasing the Guideline sentencing range for drug trafficking if the defendant possessed a

6    "dangerous weapon (including a firearm)."  *See* 69 F.4th 1124, 1126, 1128–30 (9th Cir. 2023)

7    (quoting U.S.S.G. § 2D1.1).  The Circuit found evidence of a "longstanding tradition" of

8    punishing those who committed robberies and burglaries while possessing a firearm.  *Id.* at 1130.

9    "Like burglary or robbery," the panel wrote, "drug trafficking plainly poses substantial risks of

10   confrontation that can lead to immediate violence."  *Id.*  It did not matter there was no evidence of

11   similar enhancements for other crimes that resembled modern prohibitions on drug trafficking,

12   such as historical prohibitions on smuggling.  *See id.* at 1129–30.

13         The district court's decision in *Kipke*, cited above, is another case in the same vein.  The

14   state prohibited firearms in museums but cited no founding-era restrictions on weapons in

15   museums specifically.  *See* 2023 WL 6381503, at *7.  The district court nevertheless found

16   museums were like schools in that "they serve an educational purpose and are often geared

17   toward children."  *Id.*  The state had cited "historical statutes that demonstrate a historical

18   tradition of firearm regulation in places of gathering for education, literary, or scientific

19   purposes," so the modern restriction was constitutional.  *Id.* at *8.

20         As these cases illustrate, again, it can be difficult to make principled decisions about

21   similarities and differences between modern and historical regulations.  That the relevant history

22   pointed to by the Supreme Court is hundreds of years behind us makes understanding and

23   faithfully comparing these historical laws to our own a daunting if not impossible task for a

24   generalist judge.  It is little wonder that before *Bruen*, lower courts tended to avoid "extensive

---

[9] *See* Oral Argument Transcript, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023), *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/22-915_986b.pdf (last visited Dec. 26, 2023).

1   historical analysis" when they could.  142 S. Ct. at 2179 (Breyer, J. dissenting) (quoting *Young*,

2   992 F.3d at 784–85).

3           The Supreme Court's sparse guidance for interpreting the relevant history in *Bruen* does

4   include some general directives.  It warns, for example, "when it comes to interpreting the

5   Constitution, not all history is created equal."  *Id.* at 2136 (majority opinion).  "The Second

6   Amendment was adopted in 1791; the Fourteenth in 1868.  Historical evidence that long predates

7   either date may not illuminate the scope of the right if linguistic or legal conventions changed in

8   the intervening years."  *Id.*  Ancient historical practices might have become "obsolete" by the

9   time the Constitution and Second Amendment were adopted.  *Id.* (quoting *Dimick v. Schiedt*,

10  293 U.S. 474, 477 (1935)).  The Supreme Court also urged lower courts to "be careful when

11  assessing evidence concerning English common-law rights."  *Id.*  "The common law, of course,

12  developed over time.  And English common-law practices and understandings at any given time

13  in history cannot be indiscriminately attributed to the Framers of our own Constitution."  *Id.*

14  (citations omitted).

15          The Supreme Court also expressed skepticism about "postenactment history."  *Id.*  It

16  agreed "a regular course of practice can liquidate [and] settle the meaning of disputed or

17  indeterminate terms [and] phrases."  *Id.* (quoting *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326

18  (2020)).  It also recognized if "a governmental practice has been open, widespread, and

19  unchallenged since the early days of the Republic, the practice should guide our interpretation of

20  an ambiguous constitutional provision."  *Id.* at 2137 (quoting *N.L.R.B. v. Noel Canning*, 573 U.S.

21  513, 572 (2014) (Scalia, J., concurring in the judgment)).  But it warned that if later history

22  contradicts the text of the Second Amendment itself, "the text controls."  *Id.*  While recognizing

23  the significance of the Fourteenth Amendment as applying the Second  Amendment to the states,

24  the Court opined that discussions of the right to keep and bear arms from after the Civil War "do

25  not provide as much insight into its original meanings as earlier sources," *id.* (quoting *Heller*, 554

26  U.S. at 614), though that later history can at least confirm what earlier history implies, *id.* (citing

27  *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) and *Heller*, 554 U.S. at 605–10).

As some Justices noted, the Court's opinion in *Bruen* left two "methodological" questions unanswered. *Id.* at 2162 (Barrett J., concurring); *see also id.* 2137–38 (majority opinion); *id.* at 2179–80 (Breyer J., dissenting). First, it is not clear how and in what circumstances lower courts should consider evidence that postdates the ratification of a particular constitutional provision in interpreting that provision. *See id.* at 2162–63 (Barrett, J., concurring). In the case of the Second Amendment, how long after 1791 may district courts look for evidence of historical analogues? *See id.* at 2163. What types of evidence about what historical practices are most and least informative? *See id.* Second, and of particular import here, in cases challenging state laws under the Second Amendment, courts of course are not enforcing the Second Amendment against states directly. *Id.* at 2137 (majority opinion). States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Id.* In general, "individual rights enumerated in the Bill of Rights and made applicable to the states through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* But the Supreme Court acknowledges "an ongoing scholarly debate on whether courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* (emphasis added).

In *Bruen*, the Court found it was not necessary to weigh in on that debate because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." *Id.* at 2138; *see also id.* at 2163 (Barrett, J., concurring). The Court did not explain that conclusion in any detail. This left several difficult questions unanswered. For example, what should a lower court do if evidence from the late 1700s contradicts evidence from the reconstruction era? Or what if evidence from the late 1700s is absent, but evidence from the late nineteenth century is plentiful and compelling? The Court did offer some guidelines for drawing analogies, as noted, but until the Supreme Court offers more clarity, courts like this one are left to muddle their way.

As Justice Breyer wrote for the three dissenting justices in *Bruen*, judges are, as a group, not accustomed to "resolving difficult historical questions." *Id.* at 2177. This is not to say history

1   is completely beyond our reach.  Judges will hear and resolve disputes about historical traditions

2   of firearm regulation without producing professional historical research, just as we hear "antitrust

3   cases without producing cutting-edge microeconomic research" and "decide issues of toxic-tort

4   causation without ever donning lab coats."  William Baude & Stephen Sachs, *Originalism and the*

5   *Law of the Past*, 37 Law & History Rev. 809, 816 (2019).  By the same token, just as judges and

6   court staff can bungle econometrics and misunderstand organic chemistry, they can fall victim to

7   errors professional historians might easily avoid.

8         Out of a desire to avoid such errors, this court initially ordered the parties to show cause

9   why it should not appoint an independent expert historian under Federal Rule of Evidence 706.[10]

10  *See* 644 F. Supp. 3d at 738.  The parties argued an independent expert was unnecessary, among

11  other reasons because the parties' own retained experts could explain the historical record.  *See*

12  *generally* Pls.' Resp., ECF No. 88; Def.'s Resp., ECF No. 87.  Having reviewed the parties'

13  responses and the current record, the court discharges its previous order to show cause.  In

14  reviewing the record and the parties' filings, the court has taken steps—as it would in any case

15  involving subject matter with which it is unfamiliar—to inform its assessment of the evidence,

16  the historical record and the many filed experts' opinions; it has consulted a few publicly

17  available resources describing the fundamental conventions of historical scholarship with an

18  audience of legal professionals in mind, summarized in the following paragraphs.  The court

19  similarly has reviewed a collection of historical essays by scholars with contrasting views about

20  the Second Amendment and its history, some of which are cited below.  *See generally* Jennifer

21  Tucker et al., eds., *A Right to Bear Arms?* (2019).

22        Based on its review of these resources, the court accepts the proposition that an argument

23  from history, like any that draws from another "established discipline," is convincing only if "it

24  abides by the conventions of that discipline."  Martin S. Flaherty, *History "Lite" in Modern*

25  *American Constitutionalism*, 95 Colum. L. Rev. 523, 551 (1995).  "Just as scientific testimony

---

[10] "On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing. But the court may only appoint someone who consents to act."  Fed. R. Evid. 706(a).

1   must adhere to the scientific method, so too must historical testimony adhere to the historical

2   method."  Jonathan D. Martin, Note, *Historians at the Gate: Accommodating Expert Historical*

3   *Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1521 (2003).

4          One historian wrote several years ago that historians, unlike legal professionals, can tend

5   to "focus on the differentness and irretrievability" of the past.  Laura Kalman, *Border Patrol:*

6   *Reflections on the Turn to History in Legal Scholarship*, 66 Fordham L. Rev. 87, 103 (1997).

7   "Visiting an earlier period is, as historians like to say, rather like visiting a foreign country.  One

8   can read the words and follow the events, but understanding them requires an authentic feel for

9   the culture."  Larry D. Kramer, *When Lawyers Do History*, 72 Geo. Wash. L. Rev. 387, 390

10   (2003); *see also* David Lowenthal, *The Past Is a Foreign Country* (1985).

11          The foreignness of the past can at times be obvious:  A student interpreting a fragmented

12   text written in a forgotten language and an ancient alphabet is "unlikely to forget that she is

13   dealing with the artifact of a culture different from her own."  H. Jefferson Powell, *Rules for*

14   *Originalists*, 73 Va. L. Rev. 659, 672–73 (1987).  The foreignness of the history that judges and

15   lawyers are likely to encounter can be easier to overlook.  A lawyer or judge might feel a kinship

16   or common heritage with those who wrote the Constitution.  *See id.* at 673.  And "the very ease

17   with which we can bridge the gap between our thought and that of the founders makes it too easy

18   to assume that there is no gap, that the historical distance between 1987 and 1787 or 1868 is

19   effectively zero."  *Id.*

20          "This is a false assumption.  The 1787 Constitution and the first twelve amendments were

21   written and ratified by people whose intellectual universe was distant from ours in deeply

22   significant ways."  *Id.*  "The differences between us just as often touch the most profound

23   questions in life, everything from rules of friendship and business to attitudes about fundamental

24   values to the way in which perceptions of reality itself are constructed and experienced."  Kramer

25   (2003), *supra*, at 397.  "[T]he founders thought, argued, reached decisions, and wrote about the

26   issues that mattered to them, not about our contemporary problems."  Powell (1987), *supra*, at

27   669.  For an historical analogy to be persuasive, it cannot be distorted by "anachronism or

28   reductionism or lack of context or simple misstatement."  Kramer (2003), *supra*, at 395.  "To

1    understand what a particular historical actor meant when he wrote about the right to bear arms

2    requires scholars to immerse themselves in the surviving evidence from this period and to analyze

3    published and unpublished sources, private comments as well as public statements."  Saul

4    Cornell, *Commonplace or Anachronism: The Standard Model,*[11] *The Second Amendment, and*

5    *the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 225

6    (1999).

7         Moreover, "[c]omplex historical assertions are always probabilistic in character."  *Powell*

8    (1987), *supra*, at 678.  "At best, history yields probabilities, not certainties."  *Id.* (italics omitted).

9    "The historical distance between the present and 1787, or even 1870, is great enough so as to

10   reduce to a practical nullity the possibility that [the founders'] opinions and divisions would

11   precisely parallel our own."  *Id.* at 677.  "[O]ne must respect the limits of historical interpretation,

12   which preserve a healthy space for concluding that something remained open or was not fully

13   appreciated or understood."  Kramer (2003) at 407.

14        Heeding these admonitions is no easy task.  "One needs continually to monitor and

15   double-check one's intuitions and interpretations."  *Id.* at 397.  This is particularly true of the

16   Second Amendment, "to the unending chagrin and frustration of professional historians."  *Id.*; *see*

17   *also, e.g.*, Jennifer Tucker, Introduction at 8, in Tucker (2019), *supra* ("Debates about firearms

18   history seem especially vulnerable to 'presentism': the anachronistic Introduction of present-day

19   perspectives into depictions or interpretations of the past."); Jack Rakove, *The Second*

20   *Amendment: The Highest Stage of Originalism*, 76 Chi.-Ken  L. Rev. 103, 105 (2000)

21   ("[H]istorical operations in the Second Amendment theater of combat are often mounted by

22   campaigners not intimately familiar with the terrain.  These are raiders who know what they are

23   looking for, and having found it, they care little about collateral damage to the surrounding

24   countryside that historians better know as context.").  The sharply divided "culture" of guns in

---

[11] As discussed in more detail below, the "standard model" is a term some legal scholars
have used to describe an interpretation of the Second Amendment that protects and individual
right to keep and bear arms.

1    modern America complicates the exercise further still.  *See, e.g.*, Joseph Blocher, "Firearm

2    Localism," 123 Yale L.J. 82, 90–107 (2013) (discussing competing "cultures").

3         For all these reasons, it would be unreasonable to expect "professional quality history" in

4    judicial opinions.  Saul Cornell, *Originalism on Trial: The Use and Abuse of History in* District of

5    Columbia v. Heller, 69 Ohio St. L.J. 625, 639 (2008); *see also* Transcript of Remarks by Gordon

6    S. Wood & Scott D. Gerber, *The Supreme Court and the Uses of History*, 39 Ohio N.U. L. Rev.

7    435, 443–44 (2013); Kramer (2003), *supra*, at 391.  Courts of course do their best to assess the

8    positions of the parties, their attorneys and the experts those parties retain, as the Supreme Court

9    noted in *Bruen*, 142 S. Ct. at 2130 n.6.  A generalist judge should hesitate to reject the work of

10   those who have devoted their careers to the study of history.  Kramer (2003), *supra*, at 390–91;

11   Flaherty (1995) at 553–54.  Historians themselves normally begin by mastering the "secondary

12   literature," the work of expert colleagues who have gone before.  Kramer (2003), at 390; *see also*

13   Schrag Decl. ¶¶ 13, 34, *Miller v. Bonta*, No. 19-1537 (S.D. Cal. Aug. 29, 2022), ECF No. 129-

14   1.[12]  That is because,"[i]f historical scholarship in a given area has settled on a certain account, or

15   more likely, on a framework for debate, historical assertions that acknowledge that account or

16   framework will simply be more persuasive."  Flaherty (1995), *supra*, at 554.

17       **B.**      ***Heller*, *McDonald*, and *Bruen* settled the law but did not close the evidentiary**
18                **record.**

19         It is difficult, if not impossible, to assess the history of the Second Amendment without

20   running head-on into one such "framework for debate"—a broad agreement among many

21   historians that the Supreme Court has misinterpreted the Second Amendment's history as

22   protecting an individual right to self-defense.  The trail to that conclusion begins in the many

23   briefs the parties have filed over the course of this litigation, runs through the parties' expert

24   reports and ends in those experts' own scholarship.  *See, e.g.*, Reply in Support of Second Mot.

25   Prelim. Inj. at 1, ECF No. 46 (contrasting *Heller* with later Ninth Circuit historical analyses);

26   Cornell (1999), *supra*, at 225.  Other federal courts have confronted this phenomenon as well.

---

[12] The court takes judicial notice of this declaration, which the state has cited in this case.
*See, e.g.*, State's Resp. Order to Show Cause at 6, ECF No. 87.

1    *See, e.g.*, *United States v. Gibson*, No. 23-20084, 2023 WL 8292372, at *3 (W.D. Tenn. Nov. 8,

2    2023); *United States v. Bullock*, ___ F. Supp. 3d ___, No. 18-165, 2023 WL 4232309, at *5 (S.D.

3    Miss. June 28, 2023).

4         This court, of course, must and will follow the Supreme Court's decision in *Heller*. The

5    right to keep and bear arms is a fundamental constitutional right, not a "second-class" right. *E.g.*,

6    *McDonald*, 561 U.S. at 780. Protecting that right is part of every federal judge's duty to

7    "faithfully and impartially discharge all the duties incumbent upon [them] under the Constitution

8    and laws of the United State States." 28 U.S.C. § 453. One way judges faithfully and impartially

9    discharge their duties is by not closing their eyes to conflicting evidence.

10        Regardless of whether historical scholars are correct about the history of the Second

11   Amendment and the Supreme Court's analysis, however, this is a new and a different case than

12   *Heller, McDonald* and *Bruen*. None of the Supreme Court's previous decisions addressed the

13   California laws Baird and Gallardo now challenge. The Supreme Court set forth the basic legal

14   test in *Heller*, *McDonald*, and *Bruen*. But it did not proscribe the record this court must use to

15   adjudicate Baird and Gallardo's challenge to California's laws. Rather, the Court trusted lower

16   courts would deploy the same "'evidentiary principles and default rules'" they have used to

17   resolve "particular cases or controversies" many times before. 142 S. Ct. at 2130 n.6 (quoting

18   Baude & Sachs (2019), *supra*, at 810–11). District courts may "decide a case based on the

19   historical record compiled by the parties" in that case. *Id.* If a state cites no history in response to

20   a plaintiff's assertion of a Second Amendment right, a court has no obligation to search through

21   history for reasons to uphold the state's laws. *See Baird*, 81 F.4th at 1047 ("It is the parties' duty,

22   not the court's, to collect and present historic analogues.").[13] But, as California has here, a state

23   may rely on its own evidence and its own record in each new case; California is not bound by

24   New York's failure to cite evidence or make certain arguments in *Bruen*, and it is not confined to

---

[13] As discussed above, courts do have authority to appoint independent experts. *See* Fed. R. Evid. 706(a). Even though the court here has determined it need not appoint such an expert, doing so may be appropriate in another case if necessary to obtain opinions on how to evaluate confusing and contradictory historical evidence. *Cf., e.g.*, *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999) (affirming appointment of independent expert "to assist the court in evaluating contradictory evidence" in medical dispute).

1    the District of Columbia's record in *Heller*.  The point is, this court must and will follow the legal

2    dictates of *Heller* and *Bruen*, but it has no obligation to perpetuate any mistaken or incomplete

3    accounts of what happened in the past that the parties and their amici presented to the Supreme

4    Court in those cases.  Otherwise, the Supreme Court would not have written that historical

5    analysis often requires "nuanced judgments about which evidence to consult and how to interpret

6    it" when it instructed lower courts like this one to answer the questions presented in each case.

7    *Bruen*, 142 S. Ct. at & 2130 & n.6 (emphasis omitted) (quoting *McDonald*, 561 U.S. at 803–04)

8    (Scalia, J., concurring)).

9        Moreover, lower courts can assist the Supreme Court by clearly and fairly identifying any

10   relevant conflicts in any given case.  Judges on lower courts manifest their respect for the

11   Supreme Court not only by following the Court's precedents, but also "in the respectful

12   expression of difference—that too is the essence of the judicial craft."  J. Harvie Wilkinson III, *Of*

13   *Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 255–56 (2009).  The

14   Supreme Court relies in part on the lower courts to identify problems that might justify a second

15   look at its decisions.  *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 284–86

16   (2022); *Pearson v. Callahan*, 555 U.S. 223, 234–35 (2009); *Payne v. Tennessee*, 501 U.S. 808,

17   829–30 (1991).  In crafting and issuing this order, this court manifests its respect for the Supreme

18   Court and its awesome responsibilities.

19       There is a second and more practical reason to think carefully about the historical debate

20   as well.  Some participants in that debate also have weighed in here.  As noted above, California

21   has retained Robert Spitzer and Saul Cornell, two historians who have expressed disagreement

22   with the Supreme Court's historical reasoning in *Heller*.  *See generally* Cornell Decl., ECF No.

23   90-7; Spitzer Decl., ECF No. 90-6.  Brennan Rivas, the state's third historical expert witness, also

24   has publicly criticized the reasoning the Supreme Court ultimately adopted in *Bruen*.  *See*

25   Brennan Rivas, "Gun Control, Texas Style" (Dec. 1, 2021).[14]  By contrast, the plaintiffs' retained

26   expert, Clayton Cramer, embraces the Court's historical conclusions and publicly favors a broad

---

[14] https://aggressivehistorian.com/2021/12/01/gun-control-texas-style/ (last visited Dec. 28, 2023).

1    interpretation of the Second Amendment.  *See generally* Cramer Decl., ECF No. 96-3; *see also,*

2    *e.g.*, Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second*

3    *Amendment*, 6 Georgetown J. L. & Pub. Policy 511 (2008) (claiming "the founding generation—

4    and at least two generations after them—did not understand 'bear arms' as limited to military or

5    collective militia duty").  He has written of his hope to win "the battle" for gun rights "not just in

6    the courts, but in the hearts and minds of the American people as well," Clayton Cramer, "Gun

7    Control and the Death of a Thousand Cuts," Shotgun News (Jan. 1, 2011),[15] and he publishes

8    similar sentiments on his personal blog, *see, e.g.*, Clayton Cramer, "*Miller v. Bonta* (S.D. Cal.

9    2023) Victory (Oct. 19, 2023).[16]

10          When historians serve as retained experts, they like lawyers "can be guilty of 'law-office

11   history.'"  Martin (2003), *supra*, at 1528.  "[T]he longer and more intimately involved historians

12   are in a case, the greater the possibility that they may begin unconsciously tailoring the research

13   to fit a predetermined conclusion." *Id.* at 1542 (quoting Paul Soifer, *The Litigation Historian:*

14   *Objectivity, Responsibility, and Sources*, Pub. Historian, Spring 1983, at 47, 50).  But zealous

15   identification with a cause need not render an expert's opinions unreliable, nor the cause unjust.

16   *Cf. id.* at 1527–30 (documenting expert witnesses' roles—and misgivings about those roles—in

17   *Brown v. Board of Education* and later cases).  Understanding the broader context of an expert's

18   scholarship and opinions, however, may be necessary to put those opinions in perspective.  So in

19   this case: Cornell's and Spitzer's opinions may be reliable even though they have often disagreed

20   with the Supreme Court and criticized its conclusions about history; Cramer's views may be

21   unreliable or not credible despite his agreement with the Supreme Court's interpretation of

22   historical evidence.

23          In short, understanding the debate about the historical reasoning in *Heller*, *McDonald*, and

24   *Bruen* is indispensable to understanding the historical record in this case.  In reviewing that

---

[15] Cramer republished the text of this article on his personal website:
http://www.claytoncramer.com/popular/DeathOfAThousandCuts.html (last visited Dec. 28, 2023).

[16] http://claytonecramer.blogspot.com/2023/10/miller-v-bonta-sdcal-2023-victory.html (last visited Dec. 28, 2023).

1    debate the court participates in an exercise courts elsewhere are carrying out, and keeping that

2    debate in mind assists this court in weighing the opinions of the parties' retained expert witnesses.

3    The court now turns to the debate with those purposes in mind.

4            C.    **The "standard model" draws criticism.**

5            There is no dispute that most historians—an "overwhelming majority" by one account—

6    remain "unconvinced" by what is known as the "Standard Model" of Second Amendment rights.

7    Patrick Charles, *The Reasonable Regulation Right to Arms: The Gun-Rights Second Amendment*

8    *Before the Standard Model*, at 168 & n.10, in Tucker (2019), *supra*; *see also, e.g.*, Robert J.

9    Spitzer, *Lost and Found: Researching the Second Amendment*, 76 Chicago Kent L. Rev. 349

10   (2000).  The "standard model" moniker was first imported from the lingo of the physical sciences

11   in a law review article published in 1995.  *See* Glenn H. Reynolds, *A Critical Guide to the Second*

12   *Amendment*, 62 Tenn. L. Rev. 461, 463 & n.9 (1995).  ("[T]here is sufficient consensus on many

13   issues that one can properly speak of a 'Standard Model' in Second Amendment theory, much as

14   physicists and cosmologists speak of a 'Standard Model' in terms of the creation and evolution of

15   the Universe.").  It connotes the theory that the Second Amendment protects individuals' right to

16   keep and carry weapons "to defend themselves from outlaws of all kinds" and "as a check on

17   government tyranny and on the power of a standing army."  *Id.* at 467.

18           For many years before the suggestion the "standard model" applied, most legal experts

19   understood the Second Amendment as preserving a communal or state right connected to the

20   militia, not an individual right.  *See, e.g.*, Charles (2019), *supra* at 168–69; Eric M. Ruben &

21   Darrell A.H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80:2

22   Law & Contemp. Problems 1, 1–3 (2017).  After having no reason to develop a jurisprudence for

23   more than 100 years, federal courts adopted this communal view after the Supreme Court upheld

24   a conviction for possessing a sawed-off shotgun in *United States v. Miller*.  *See, e.g.*, Charles

25   (2019) (citing 307 U.S. 174 (1939)); *see also, e.g.*, *Hickman v. Block*, 81 F.3d 98, 100 (9th Cir.

26   1996) ("We follow our sister circuits in holding that the Second Amendment is a right held by the

27   states, and does not protect the possession of a weapon by a private citizen."), *abrogated by*

28   *Heller*, 554 U.S. 570.  In *Miller*, the Court wrote, the Second Amendment was adopted with the

1  "obvious purpose to assure the continuation and render possible the effectiveness" of militias.

2  307 U.S. at 178 (citing U.S. Const. Art. 1, § 8).  The Court then interpreted and applied the

3  Second Amendment "with that end in view."  *Id.*

4    After *Miller*, it was "a matter of ordinary professional reason that Congress had the

5  power" to pass gun controls, even if they prevented individual people from keeping and carrying

6  guns.  Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller,

7  122 Harvard L. Rev. 191, 204 (2008).  President Lyndon B. Johnson called for federal gun

8  control legislation against that backdrop in the 1960s, and Congress appeared "ready to take

9  action" in the wake of rising crime, struggles over the Vietnam War, and the assassinations of

10  President John F. Kennedy, Martin Luther King Jr. and Senator Robert Kennedy, among others.

11  *Id.* at 202–03.

12    At the same time, however, resistance to regulation was growing.  *Id.* at 207–08; Charles

13  (2019), *supra*, at 170–73; Tucker (2019), *supra*, at 3.  In 1965, for example, an attorney published

14  an essay relying on eighteenth-century history to claim individual people had rights protected by

15  the Second Amendment.  Charles (2019), *supra*, at 172–73 (citing Robert A. Sprecher, *The Lost*

16  *Amendment*, 51 Am. Bar. Ass'n J. 554 (1965)).  In a 1975 magazine article, Ronald Reagan, then

17  Governor of California, also claimed the Second Amendment protected an individual right.

18  Siegel (2008), *supra*, at 210 (quoting Ronald Reagan, "Ronald Reagan Champions Gun

19  Ownership," Guns & Ammo Sept. 1975, at 34).  The same year, the head of the National Rifle

20  Association's Institute for Legislative Action expressed similar views in testimony before

21  Congress.  *Id.* at 208–09 (citing Firearms Legislation: Hearing Before the Subcomm. on Crime of

22  the H. Comm. on the Judiciary, 94th Cong. 2845–47 (1975) (statement of Harlon Carter)).

23    Scholarly debates about the Second Amendment did not begin in earnest until the 1980s

24  and 1990s.  *See* Tucker (2019), *supra*, at 3.  In those years, many legal scholars, along with some

25  historians, published articles contending the Second Amendment protects an individual right.

26  Ruben & Miller (2017), *supra*, at 3; *see also* Spitzer (2000), *supra*, at 376–77.  These articles

27  often relied on interpretations of historical English and colonial sources, such as the Statute of

Northampton,[17] the English Declaration of Rights,[18] and similar colonial statutes, in addition to the Second Amendment's text and context. *See generally, e.g.*, Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983); Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285 (1983); David I. Caplan, *Restoring the Balance: The Second Amendment Revisited*, 5 Fordham Urb. L.J. 31 (1976). A 1989 article in the Yale Law Journal by Professor Sanford Levinson raised the profile of the individual rights position. *See* Sanford Levinson, *The Embarrassing Second Amendment*, 99 Yale L.J. 638, 658 (1989) ("It is time for the Second Amendment to enter full scale into the consciousness of the legal academy."); *see also, e.g.*, Rakove (2000), *supra*, at 103–04 & n.3 (citing Levinson's article). The increasing body of scholarship is what led Professor Reynolds to declare in his 1995 law review article that the individual-rights theory had become the "standard." *See* Reynolds (1995), *supra*, at 463.

Such pronouncements hardly resolved the matter. In the year 2000, the Chicago-Kent Law School sponsored a conference, which made clear there was no consensus the Second Amendment protected an individualist right, as apparent in an article by Lois Schwoerer, for example. *See* Tucker (2019), *supra*, at 4, 5, 8; Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27 (2000); *see also, e.g.*, Carl T. Bogus, *The History and Politics of Second Amendment Scholarship: A Primer*, 76 Chi.-Kent L. Rev. 3 (2000) (discussing symposium and its origins). Like Schwoerer, Spitzer posited the "standard model" was supported by substandard historical research, which had, in his view, proliferated unchecked in law journals thanks to a lack of expert fact-checking and peer-review, an incentive to publish novel ideas rather than correct ideas, partisan political pressures and debates about proposed gun controls. *See generally, e.g.*, Spitzer (2000), *supra*; Robert Spitzer, *The Politics of Gun Control* (1995).

---

[17] The Statute of Northampton, discussed further below, was passed in 1328, "shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne." *Bruen*, 142 S. Ct. at 2139. It imposed restrictions on when and where people could carry arms. *See id.*

[18] Article VII of the English Declaration of Rights, also discussed further below, was enacted in 1689 in response to the Stuart Kings' efforts to consolidate power in armies and militias. *See, e.g.*, *Heller*, 554 U.S. at 592–93.

More recent scholarship joins the debate in full, with a number of leading historians rejecting the individual rights theory.  S*ee generally, e.g.*, Lois D. Schwoerer, *Gun Culture in Early Modern England* (2016) ("standard model" rests on misguided interpretations of Statute of Northampton, English Bill of Rights, and surrounding history); Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 Law & Contemp. Problems 11 (2017) (documenting longstanding limits on how and when people could carry guns in the American colonies; sharply and repeatedly criticizing the "standard model"); *see also* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, Yale L.J. Forum 121 (2015); Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004).[19]

At the same time, many legal and historical scholars have continued to support the history behind the "standard model," including law professor emerita Joyce Malcolm.  *See, e.g.*, Joyce Lee Malcolm, "The Right to Be Armed: The Common Law Legacy in England and America," in *A Right to Bear Arms?* (Tucker et al. eds. 2019); *see also, e.g.*, Brief of Amici Curiae Professors of Second Amendment Law, et al., *N.Y. State Rifle & Pistol Ass'n*, No. 20-843 (expressing the opinions of Randy Barnett, Royce Barondes, Nicholas Johnson, Donald Kilmer, Michael O'Shea, Joseph Olson and Eugene Volokh—several law professors—that "[n]ineteenth-century sources and case law . . . support the right of ordinary citizens to carry for self-defense beyond the home," among other opinions).

Scholars who find support for an individual right in the Second Amendment cite evidence from the founding era showing people carried weapons for individual purposes unrelated to the militia.  *See, e.g.*, Brief of Amici Curiae Professors of Second Amendment Law, et al., *N.Y. State Rifle & Pistol Ass'n*, *supra*, at 6–7.  They also rely on similar evidence from English history and

---

[19] This is by no means a comprehensive list of those who doubt the validity of the "standard model."  Many others have joined with their own critiques.  *See generally, e.g.*, Charles (2019), *supra*; Charles (2012), *supra*; Rakove (2000), *supra*; Bogus (2000), *supra*.

1  point out that American colonists saw themselves as inheritors of that tradition.  *See, e.g.*, *id.*

2  at 7–15.  Even those who reject the "standard model" acknowledge the history of private arms use

3  for self-defense.  *See, e.g.*, Charles (2012), *supra*, at 1732–33 & nn.16–18.

4        Scholars on both sides of the debate submitted amicus briefs in *Heller*.  *Compare, e.g.*,

5  Brief of the Cato Institute and History Professor Joyce Lee Malcolm as Amici Curiae in Support

6  of Respondent, *District of Columbia v. Heller*, No. 07-290, *with, e.g.*, Brief of Amici Curiae Jack

7  N. Rakove, Saul Cornell, David T. Konig, William J. Novak, Lois G. Schwoerer, et al., in

8  Support of Petitioners, *District of Columba v. Heller*, No. 07-290.  The Supreme Court drew

9  heavily on this research, both in the majority and dissenting opinions.  *See, e.g.*, 554 U.S. at 592

10  (citing work by Malcolm and Schwoerer); *id.* at 671 (Stevens, J., dissenting) (citing work by

11  Cornell); *id.* at 685 (Breyer, J., dissenting) (same).  In the end, the Court majority largely adopted

12  the "standard model."  *See, e.g.*, 554 U.S. at 592 (holding Second Amendment guarantees "the

13  individual right to possess and carry weapons in case of confrontation").

14        Following *Heller,* several of the historians referenced above questioned the majority's

15  reasoning.  *See* Cornell (2008), *supra* at 627–31 (pointing out that majority had dismissed the

16  opinions of one of most "prolific and influential popular legal writers of his day" as an outlier

17  position, while simultaneously elevating a minority view later "disowned by its authors"); *see also*

18  *id.* at 632–36 (noting legal readers would have understood Second Amendment's preamble— "A

19  well regulated Militia, being necessary to the security of a free State"—not as a justification, but

20  rather as statement of the amendment's true purpose or focus);[20] David T. Konig, *Why the Second*

21  *Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written*

22  *Constitutions in Revolutionary America*, 56 UCLA L. Rev. 1295, 1341–42 (2009)

23  (criticizing *Heller* majority for relying on "radical philosophy outside the mainstream of the

24  times"); Lois G. Schwoerer, "English and American Gun Rights" at 144, 150 in *A Right to Bear*

25  *Arms?* (Jennifer Tucker et al. eds. 2019) (Article VII of the English Declaration of Rights, which

---

      [20] Cornell's criticisms of the majority's opinion in *Bruen* are harsh as well.  *See, e.g.*, Saul Cornell, "Cherry-Picked History and Ideology-Driven Outcomes: Bruen's Originalist Distortions," SCOTUSblog (Jun. 27, 2022), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/ (last visited Dec. 28, 2023).

1   the Supreme Court saw as a precursor or inspiration for the Second Amendment, focused not on

2   individual rights and self-defense, but rather on "the defense of the nation"); Charles (2012),

3   *supra*, at 1827–42 (describing "domino effect" of influential historical errors).

4        Others have focused on tools that were unavailable to the Supreme Court in 2008 when it

5   decided *Heller*.  Most prominent among these tools is "corpus linguistics," whose proponents

6   describe it as an "empirical approach to the study of language that involves large, electronic

7   databases of text," such as "books, magazines, newspapers, and even transcripts of spoken

8   language."  Thomas R. Lee & Stephen Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788,

9   828 (2018) (footnotes omitted).  Database searches can show how frequently words are used in

10   one sense or another, what words are more commonly used together, and what words appear in

11   what contexts, among other things.  *See id.* at 831–32.  Several years after *Heller*, linguistics

12   experts used these databases to test whether the words "keep and bear arms" were used in ways

13   that might suggest whether the Second Amendment would have been understood as protecting an

14   individual or collective right.  Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear*

15   *Arms*, 46 Hastings Const. L.Q. 509 (2019); Alison L. LaCroix, "Historical Semantics and the

16   Meaning of the Second Amendment," *The Panorama* (Aug. 3, 2018);[21] *see also* Josh Blackman &

17   James C. Phillips, Corpus Linguistics and the Second Amendment, *Harvard Law Review Blog*

18   (Aug. 7, 2018).[22]  They determined "[f]ounding era sources almost always use *bear arms* in an

19   unambiguously military sense," Baron (2019), *supra*, at 510 (emphasis in original), contrary to

20   the majority's conclusion in *Heller* that the phrase "in no way connotes participation in a

21   structured military organization," 554 U.S. at 584.

22        Many of these experts urged the Supreme Court to reconsider its pronouncements in

23   *McDonald* and *Bruen*.  In *McDonald* specifically, a group of historians, including Schwoerer,

24   Charles, and Spitzer, urged the Court to revisit the history of the English Bill of Rights and

25   related history.  *See generally* Brief for English/Early American Historians as Amici Curiae in

[21] http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment/ (last visited Dec. 28, 2023).

[22] https://harvardlawreview.org/blog/2018/08/corpus-linguistics-and-the-second-amendment/ (last visited Dec. 28, 2023).

1    Support of Respondents, *McDonald v. City of Chicago*, No. 08-1521.  They expressed what they

2    said was the "overwhelming consensus among leading English historians" that the Court majority

3    had misinterpreted English history.  *Id.* at 7.  Another group of legal historians, including Cornell,

4    submitted an amicus brief collecting evidence to show "that states and municipalities have long

5    enjoyed authority to enact reasonable non-discriminatory gun safety regulations, including bans

6    on the possession of particularly dangerous classes of weapons."  Brief of Thirty-Four

7    Professional Historians and Legal Historians as Amici Curiae in Support of Respondents at 2,

8    *McDonald v. City of Chicago*, No. 08-1521.  In *McDonald*, decided in 2010, the Court

9    acknowledged "there is certainly room for disagreement about *Heller*'s analysis of the history of

10   the right to keep and bear arms," but "nothing written since *Heller*" persuaded the Court to

11   "reopen the question there decided."  561 U.S. at 788.  In *Bruen*, a group of linguistics experts

12   urged the Court to revisit its conclusions about the meaning of the phrase "keep and bear arms"

13   based on the new evidence from corpus linguistics searches.  *See generally* Brief for Corpus

14   Linguistics Professors and Experts as Amici Curiae Supporting Respondents, *N.Y. State Rifle &*

15   *Pistol Ass'n v. Bruen*, No. 20-843.  The dissenting justices in *Bruen* cited the corpus linguistics

16   amicus brief while the justices in the majority did not.  See 142 S. Ct. at 109–10 (Breyer, J.,

17   dissenting).

18        As Cornell puts it in the declaration he submitted in this case, "research is still ongoing:

19   new materials continue to emerge; and since *Bruen* was decided, additional evidence about the

20   history of regulation has surfaced and new scholarship interpreting it has appeared in leading law

21   reviews and other scholarly venues."  Cornell Decl. Ex. A at 6 (citing *Symposium—The 2nd*

22   *Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in*

23   *Public*, 55 U.S. Davis L. Rev. 2495 (2022); *New Histories of Gun Rights and Regulations: Essays*

24   *on the Place of Guns in American Law and Society* (Joseph Blocher, Jacob D. Charles & Darrell

25   A.H. Miller eds. 2023).  In his opinion, "much more work needs to be done to fill out this

26   picture."  *Id.*

27        In sum, although the Supreme Court's decisions in *Heller*, *McDonald* and *Bruen* settle the

28   law this court must and will follow, these decisions did not settle the debate among historians of

1  England, of colonial America, of firearms regulation, or of linguistics about what the Second

2  Amendment meant to the people who adopted it in the founding era or, indirectly, in the

3  reconstruction era.  Nor does this court read the Supreme Court's decisions in *Heller*, *McDonald*

4  and *Bruen* as closing the historical record that this court and other lower courts must review and

5  interpret, in this case and others, about particular state firearm laws and regulations.  Newly

6  identified and different historical evidence, and new and different interpretations of that evidence

7  by those who know it best, might prove decisive in this case and others even though that evidence

8  and those opinions do not change the law as articulated by the Supreme Court and the federal

9  courts of appeals.

10  **V.    DISCUSSION**

11      The court turns to the parties' motions and evidence, keeping the foregoing in mind.  As a

12  threshold matter, the court finds the Second Amendment's plain text covers Baird's and

13  Gallardo's conduct, i.e., carrying firearms in public.  California law prohibits people from

14  carrying firearms in public without a license and allows for open firearms carrying in only some

15  counties.

16      California argues otherwise, as noted above.  *See* Def.'s Mem. at 5–7.  To repeat, by the

17  state's reading, "the text of the Second Amendment does not compel *unlicensed* open carry," *id.*

18  at 5 (emphasis in original), and does not bestow a right to carry firearms openly in all

19  circumstances, *see id.* at 6.  "[T]he term 'bear,'" it contends, as used in the Second Amendment,

20  "requires some form of public carry but does not require open carry."  *Id.*  In support, the state

21  cites the Supreme Court's observation in *Bruen* that several "antebellum state-court decisions

22  evince a consensus view that States could not altogether prohibit the public carry of 'arms'

23  protected by the Second Amendment or state analogues."  142 S. Ct. at 2147.  The state similarly

24  cites the Supreme Court's footnote cautioning against reading the majority opinion as invalidating

25  "shall-issue" firearms licensing regulations, *id.* at 2138 n.9, as well as Justice Kavanaugh's

26  concurring opinion, which makes a similar point, *see id.* at 2161.

27      As explained further below, there is a long history of government restrictions on how guns

28  can be carried.  Many state licensing regimes are likely consistent with that historical tradition.

37

1  But this does not mean the Second Amendment offers no protection to those who would carry

2  firearms openly in public.  Under *Bruen*, the Second Amendment protects the right of "ordinary,

3  law-abiding," individual people "to 'bear' arms in public for self-defense." *Id.* at 2135 (majority

4  opinion).  For present purposes, the state does not dispute that Baird and Gallardo are ordinary,

5  law-abiding citizens who wish to carry handguns in public for self-defense.  *See* Baird Decl. ¶ 5;

6  Gallardo Decl. ¶ 5.  California law limits where and how Baird and Gallardo can carry firearms in

7  public, so the Second Amendment "presumptively protects" their conduct in the face of that law.

8  *Id.* at 2130.  Thus, to prevail here, California must show its regulations are "consistent with the

9  Nation's historical tradition of firearm regulation." *Id.* at 2126, 2130.

10      This brings the court to the two questions posed by the parties' cross motions, previewed

11  in the legal and procedural background above.  First, can California require people to obtain a

12  license before they carry handguns in public, regardless of whatever more specific restrictions the

13  state might impose?  Second, if so, are the specific terms of California's licensing system for

14  open carry of handguns consistent with the country's history of firearm regulations?  And in both

15  instances the question is facial: are the state's laws unconstitutional in all circumstances?  The

16  court answers these questions in the next two subsections.

17      **A.    California may require a license of those who carry handguns in public.**

18      The Supreme Court has all but confirmed that states may require people to obtain licenses

19  before they carry firearms in public.  In *Heller*, after interpreting the Second Amendment's

20  "operative clause"—i.e., that "the right of the people to keep and bear Arms, shall not be

21  infringed"—the Court cautioned that this right, like others guaranteed in the Bill of Rights, was

22  "not unlimited."  554 U.S. at 595.  By way of example, the Court noted, the First Amendment

23  prohibits Congress from making any law "abridging the freedom of speech," but Congress did not

24  violate the First Amendment when it criminalized offering images depicting the sexual abuse of

25  children.  *See generally United States v. Williams*, 553 U.S. 285 (2008), *cited in Heller*, 554 U.S.

26  at 595.  Likewise, the Second Amendment does not "protect the right of citizens to carry arms for

27  *any sort* of confrontation."  *Heller*, 554 U.S. at 595 (emphasis in original).  "From Blackstone

28  through the 19th-century cases, commentators and courts routinely explained that the right was

1    not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

2    purpose." *Id.* at 626. In *Heller*, the Supreme Court expressed no doubts that governments could

3    prohibit concealed weapons, could keep weapons from those who suffer from mental illnesses or

4    have been convicted of a felony, could prohibit weapons in schools and government buildings,

5    could impose "conditions and qualifications on the commercial sale of arms," and could impose

6    other similar limits. *Id.* at 626–27 & n.26. If a state can impose these restrictions, it stands to

7    reason it could impose the restrictions with a licensing system.

8            As the Supreme Court put it in *Bruen*, the Second Amendment protects the right of

9    "ordinary, law-abiding citizens" to possess handguns in the home and in public for self-defense.

10   *Bruen*, 142 S. Ct. at 2122. For that reason, people who are not "ordinary, law-abiding citizens"

11   cannot claim these Second Amendment protections under the Supreme Court's decisions in *Bruen*

12   and *Heller*. If states must not infringe the rights of "ordinary, law-abiding citizens" to possess

13   handguns in the home and in public for self-defense, but may forbid others from possessing the

14   same guns, the Second Amendment must allow states to distinguish "ordinary, law-abiding

15   citizens" from others somehow, including by requiring a license.

16           The Court majority confirmed as much in *Bruen* and made clear its opinion should not be

17   interpreted as upending most states' licensing systems. *See* 142 S. Ct. at 2138 n.9. The nearly

18   universal "shall-issue" systems in states other than New York and California required merely "a

19   background check" or a "firearms safety course," conditions the majority described as "designed

20   to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible

21   citizens.'" *Id.* The majority noted just one caveat: "any permitting scheme can be put toward

22   abusive ends," so it did not "rule out constitutional challenges to shall-issue regimes where, for

23   example, lengthy wait times in processing license applications or exorbitant fees deny ordinary

24   citizens their right to public carry." *Id.*

25           Justice Alito made a similar point in his concurring opinion. "All that we decide in this

26   case is that the Second Amendment protects the right of law-abiding people to carry a gun outside

1   the home for self-defense and that the Sullivan Law,[23] which makes that virtually impossible for

2   most New Yorkers, is unconstitutional." *Id.* at 2159. "Our holding decides nothing about who

3   may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.* at 2157.

4   "Nor have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may

5   be imposed on the possession or carrying of guns." *Id.* at 2157 (citation omitted).

6          Justice Kavanaugh concurred and wrote separately, joined by Chief Justice Roberts, to

7   underscore "the Court's decision does not prohibit states from imposing licensing requirements

8   for carrying a handgun for self-defense." *Id.* at 2161. Rather, they clarified, the Court addressed

9   "only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are

10  employed by 6 States including New York." *Id.* The states that impose "objective" requirements,

11  such as fingerprinting, a background check, mental health records check, and training, could

12  continue to impose those requirements. *Id.* In fact, the petitioners seeking vindication of their

13  Second Amendment rights in *Bruen* had conceded at oral arguments that objective licensing

14  schemes were constitutional. *Id.* at 2162. Thus in the future, the 43 states that used "objective

15  shall-issue licensing regimes" could "continue to do so." *Id.* Similarly, the 6 states that had

16  imposed a "good cause" or "proper cause" requirement, like California, could also require

17  licenses if they employed only "objective licensing requirements like those used by the 43 shall-

18  issue States." *Id.* Even if no other justice in the majority agreed with Justices Kavanaugh and

19  Roberts, the three dissenting justices believed New York's law was constitutional. *See id.* at 2164

20  (Breyer, J. dissenting). For that reason, Justice Kavanaugh's concurrence controlled: states may

21  not demand "good" or "proper" cause, but may continue issuing and requiring licenses. *See*

22  *Marks v. United States*, 430 U.S. 188, 193 (1977).

23         California no longer demands "good cause" or "proper cause" for handgun licenses, and

24  no evidence in the record shows the state—rather than local officials—charges exorbitant fees or

25  forces people to wait a long time for a license. For these reasons, the Court's decisions in *Heller*

26  and *Bruen* do not prohibit California from requiring Baird and Gallardo to obtain a license before

---

[23] The "Sullivan Law" was the predecessor to the modern statute under review in *Bruen*.
*See id.* at 2122–23 (majority opinion).

40

1   carrying a gun in public.  If anything, *Bruen* confirms a state like California may require a license

2   without violating the Second Amendment.

3          Other federal district courts have reached the same conclusion in adjudicating challenges

4   to state licensing and registration laws after *Bruen*.  *See, e.g.*, *Cupp v. Harris*, No. 16-00523, 2023

5   WL 5488420, at *5–6 & n.4 (E.D. Cal. Aug. 24, 2023), *reconsideration denied*, 2023 WL

6   6626118 (E.D. Cal. Oct. 11, 2023); *Frey v. Nigrelli*, ___ F. Supp. 3d ___, No. 21-05334, 2023

7   WL 2473375, at *12 (S.D.N.Y. Mar. 13, 2023).  But in some of these decisions, courts did not

8   rely solely on that conclusion.  In *Frey*, for example, the district court did not stop after

9   concluding that New York City could use an objective licensing system, but rather continued and

10  considered whether cities and other local governments could impose their own regulations.  *See*

11  2023 WL 2473375, at *13.  The public's and the parties' interests in completeness and certainty

12  persuade this court to engage in further analysis here.  That is, the court will consider directly

13  whether licensing systems in general are "consistent with this Nation's historical tradition of

14  firearm regulation."  *See Bruen*, 142 S. Ct. at 2126.

15         Upon consideration, the court concludes California has proven licensing systems fit

16  comfortably within the historical tradition of firearm regulation.  California points to a number of

17  historical statutes to illustrate how states and colonies made relevant distinctions in both the

18  founding and reconstruction eras.  Many of these statutes effectively codified presumptions, some

19  dubious, about which people were not "ordinary, law-abiding citizens."  For example, there was

20  long a presumption that only criminals carried some weapons, such as small pistols and large

21  knives.  *See, e.g.*, Cornell Decl. Ex. A at 14 (describing "concealed carry" as "a dastardly and

22  cowardly practice to most Americans in antebellum America"); Rivas Decl. at 4–6 ("A

23  characteristic feature of deadly weapons was their association with crime and needless bloodshed;

24  as a result, the people habitually carrying them were presumed to be ruffians, burglars, and

25  assassins—those ready to settle personal difficulties with blood rather than by reason and law.").

26  Some states and colonies therefore banned concealed weapons or concealed weapons carrying

27  outright, and many others placed restrictions on weapons associated with crimes and illegal

28  violence.  *See, e.g.*, Spitzer Decl. at 6–9; Cornell Decl. Ex. A at 15–16; *see also, e.g.*, Def.'s

41

1    Updated Req. J. Not. No. 5 (1686 New Jersey enactment); *id.* No. 23 (1801 Tennessee

2    enactment). Other historical laws assumed essentially that people were lawbreakers if they

3    carried weapons while moving about in large groups. *See, e.g.*, Spitzer Decl. at 11–12; *see also,*

4    *e.g.*, Defs.' Updated Req. J. Not. No. 14 (1771 New Hampshire enactment); *id.* No. 11

5    (1750 Massachusetts enactment). Historical surety statutes placed heavier restrictions on some

6    than others, by requiring those who posed a danger or threat to others based on a specific

7    complaint to post a bond before they carried weapons in public. *See Bruen*, 142 S. Ct. at 2148.

8    Many states and local governments also used licensing systems or levied taxes on specific

9    weapons, some prohibitive, although licenses were much less common until later in the nineteenth

10    century. *See* Spitzer Decl. at 17–26; Rivas Decl. at 31–35.

11          An account of American firearm restrictions inevitably runs into historical restrictions

12    based on racial prejudice and ugly biases. As one scholar notes in an article California cites,

13    "[t]he landscape of American history is littered with facially racist, misogynistic, homophobic,

14    xenophobic, and other demeaning, marginalizing, and subordinating laws. . . . The history books

15    teem with tales of these heinous American legacies. But legacies they are." Jacob D. Charles, *On*

16    *Sordid Sources in Second Amendment Litigation*, Stan. L. Rev. Online, 30, 30 (2023) (footnote

17    omitted), *cited in* Def.'s Opp'n at 11 n.9. "Within the Anglo-American legal tradition there have

18    been laws expressly disarming specific marginalized groups, like African-Americans, Native

19    Americans, and religious minorities." *Id.* at 31 & n.3; *see also* Spitzer Decl. at 18, 31–32. White

20    European settlers often prohibited non-whites from carrying weapons. Spitzer Decl. at 18, 31–32.

21    Virginia, for example, prohibited any "negro or mulatto" from possessing or carrying guns and

22    other weapons and required Catholics to swear an oath of loyalty. *See, e.g.*, Cornell Decl. at 10;

23    Charles (2023) at 31 & n.3; Def.'s Updated Req. J. Not. No. 19 (1792 Virginia enactment).

24          The court acknowledges these stains in the historical record and faces them head on.

25    Some government officials, including the state in this case, cite these discriminatory laws as

26    evidence that modern firearms regulations fit a historical tradition of making distinctions based on

27    status. *See* Def.'s Mem. at 15 & n.9; State Defs.' Mem. at 21 & n.4; *Antonyuk v. Hochul*, No. 22-

28    986 (N.D.N.Y. Oct. 13, 2022), ECF No. 48; United States's Suppl. Opp'n Mot. Dismiss at 6,

1   *United States v. Guthery*, No. 22-173 (E.D. Cal. Mar. 6, 2023), ECF No. 46; *cf.*, *Antonyuk v.*

2   *Chiumento*, ___ F.4th ___, No. 22-2908, 2023 WL 8518003, at *33 n.46 (2d Cir. Dec. 8, 2023)

3   ("As the district court pointed out, many 18th-century restrictions aimed at keeping firearms away

4   from people perceived as dangerous were based on readily ascertainable—but overbroad and

5   discriminatory—racial, religious, or political categories.  Judgments based on 'objective'

6   characteristics are not inherently more fair than individualized determinations.").  This court

7   cannot accept that approach, at least not without significant qualifications.  It simply cannot be

8   the racist and biased laws of the past justify a modern law if similarly discriminatory.  *See United*

9   *States v. Guthery*, No. 22-00173, 2023 WL 2696824, at *8 (E.D. Cal. Mar. 29, 2023).

10     Here, the California Attorney General is not defending a facially discriminatory law, and

11   he emphasizes his disagreement with the biased laws of the past, offering them "only as

12   additional examples" of restrictions in the historical tradition.  Def.'s Mem. at 15 n.9.  Despite its

13   reservations, this court is persuaded that in the circumstances of this case, at least, it should take

14   account of the history of discriminatory regulations rather than completely ignore it.

15     It is impossible to extract ourselves completely from the biases of our past.  Facially

16   discriminatory laws are relatively easy to spot, but racism and bias likely infected many other

17   laws as well, and the implicitly discriminatory laws might be very difficult to separate from the

18   others.  Facially neutral laws may have been passed with a racist or discriminatory motive, neutral

19   laws enforced selectively in practice, and laws perhaps should have been passed but were not.

20   *See, e.g.*, Franita Tolson, *Parchment Rights*, 135 Harv. L. Rev. Forum 525 (2022) (describing

21   history of Colfax Massacre[24] and its legacy); Robert J. Cottrol & Raymond T. Diamond, *The*

22   *Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309, 354–55

23   (1991) (describing racial history of facially neutral gun control statutes).  "If *Bruen* forces

24   reliance on regulations passed in the days when the law protected race-based chattel slavery,

---

[24] The Colfax Massacre took place during Reconstruction, in April 1873, when a well-armed white mob slaughtered "between 50 and 150" members of a poorly-armed black militia guarding the Grant Parish Courthouse in Colfax, Louisiana, from which Republicans had been attempting to assert control over the parish.  *Id.*

1   some of those regulations will surely be infected with America's original sin."  Charles (2023),

2   *supra*, at 43.

3        Rather than relying on history selectively or through a sterilized modern lens, the Supreme

4   Court has instructed lower courts to ascertain and follow the "original meaning of the

5   constitutional text."  *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d

6   1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).  It wrote in *Heller*, for example,

7   that courts are "guided by the principle that '[t]he Constitution was written to be understood by

8   the voters.'"  554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).  As

9   some Second Amendment scholars have said, "under a test that demands sole reliance on history

10  and tradition, 'it is hard to justify ignoring these unseemly laws, which after all help demonstrate

11  the principles the Framers thought relevant.'"  Charles (2023), *supra*, at 38 (quoting Joseph

12  Blocher & Caitlan Carberry, "Historical Gun Laws Targeting 'Dangerous' Groups and Outsiders,

13  in Blocher (2023), *supra*.[25]

14       In some cases, this one included, a court cannot understand what the Second Amendment

15  permitted and forbade at the time it was adopted without considering the racist or discriminatory

16  laws commonly accepted at the time.  *See Kanter v. Barr*, 919 F.3d 437, 457–58 & n.7 (7th Cir.

17  2019) (Barrett, J., dissenting) (although facially discriminatory laws are almost certainly

18  unconstitutional today, not to mention repugnant, they can demonstrate what people in the past

19  thought their governments could do without violating the Second Amendment).  And as reviewed

20  above, historical assessment must unearth the context and the circumstances of a historical text's

21  creation to properly understand it.  *See, e.g.*, Kramer (2003), *supra*, at 392; Flaherty (1995),

22  *supra*, at 550; Powell (1987), *supra*, at 674–75.  Cutting discriminatory laws from the picture

23  would make that picture incomplete or misleading.  Excluding racist and discriminatory laws

24  from the record might even perpetuate inequality today.  *See* Charles (2023) at 38–39 ("It would

25  be a sad irony if the fact that our forebears were so explicitly racist in regulating guns meant that

---

[25] Manuscript available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696 (last visited Dec. 28, 2023).

1   contemporary Americans, including Black Americans who favor stricter gun regulation, were

2   prevented from regulating guns today for their own safety.").

3       For these reasons it is appropriate to remember in this case that the American tradition of

4   firearms regulations included discriminatory restrictions based on class, religion, and race.  States

5   and colonies passed laws that prevented people from keeping and bearing arms based at times on

6   false and repugnant but widely accepted categorical assumptions.  But the acceptance of these

7   laws further demonstrates the Second Amendment did not prevent American governments from

8   placing sometimes heavy and often categorical burdens on the right to keep and bear arms.

9       Finally, the state has cited many licensing requirements passed by state and local

10  governments, both inside and outside California, soon after the Fourteenth Amendment was

11  adopted.  *See, e.g.*, Cal. Mem. at 13–17 (citing Spitzer Decl. at 10, 17–18; Cornell Decl. Ex. A at

12  20–21).  Other courts and historians have relied on similar evidence.  *See, e.g.*, *Antonyuk*,

13  2023 WL 8518003, at *26–27 & nn.27–33 (surveying this evidence and citing Brief of Amicus

14  Curiae Patrick J. Charles in Support of Neither Party, *N.Y. State Rifle & Pistol Ass'n v. Bruen*,

15  No. 20-843 (2022), among other sources).  No evidence in this record shows these licensing laws

16  were successfully challenged on constitutional grounds, if they were even challenged in the first

17  place.  *See id.* at *28 ("Strikingly, moreover, these laws and ordinances did not merely exist—

18  they appear to have existed without constitutional qualms or challenges.").  This historical

19  evidence strongly confirms the evidence the state has cited from the eighteen century and earlier

20  in the nineteenth century.  It shows licensing requirements are a "[l]ong settled and established

21  practice" with "great weight in a proper interpretation" of the Second Amendment.  *Chiafalo*,

22  140 S. Ct. at 2326 (quoting *The Pocket Veto Case*, 179 U.S. 655, 689 (1929)).  Firearm licenses

23  are part of "our whole experience as a Nation." *Id.* (quoting *N.L.R.B. v. Noel Canning*, 573 U.S.

24  513, 557 (2014)).

25      Viewed in perspective, then, the American tradition of firearms regulation is a patchwork

26  history of bans, presumptions, taxes, licenses, and bonds that governments have used to keep

27  weapons away from people who were not "ordinary, law-abiding citizens."  Rather than relying

28  on such a patchwork, California requires everyone to obtain a license before they carry handguns

1    in public, and it relies on specific, objective criteria to identify those who are not "ordinary, law-

2    abiding citizens."  The state's licensing system also fits comfortably within the history of

3    licensing regimes adopted after the Fourteenth Amendment took effect.  Baird and Gallardo

4    cannot prevail in their claim that California violates the Second Amendment simply by requiring

5    people to obtain a license.

6           This conclusion withstands Baird and Gallardo's argument that California has

7    criminalized a natural right.  *See, e.g.*, Pls.' Mem. at 2–3; Pls.' Reply at 1–2, 4–5.  It has not.

8    California imposes criminal penalties only on those who carry guns in public without a license,

9    and only then against people who cannot rely on a statutory exception, such as the exception for

10   reasonable responses to imminent threats to safety and property.  Nor can Baird and Gallardo

11   obtain summary judgment by denying that their lawsuit challenges the licensing system and

12   refocusing on the criminal code, as they do in their reply.  *See* Pls.' Reply at 8.  Their pleadings

13   plainly contend licenses themselves are unconstitutional.  *See, e.g.*, Second Am. Compl. ¶ 8 ("No

14   permission from the government, licensing, registration, or any other action was required (or even

15   imagined) for people to exercise the God-bestowed, preexisting right that was later codified in the

16   Second Amendment."); Pls.' Mem. at 3 ("[T]he State failed to identify an historical analogue for

17   requiring ordinary people to apply for and obtain a license to exercise the right to 'bear Arms.'");

18   *id.* at 20 ("Licensing is also repugnant to the plain text of the Second Amendment . . . ."); Pls.'

19   Reply at 8 ("Licensing a 'preexisting and guaranteed right' is an oxymoron.").  Even if the court

20   were to consider plaintiff's eleventh-hour argument, American governments have used criminal

21   laws to enforce their firearms restrictions for hundreds of years.  *See* Def.'s Opp'n at 10–15;

22   Spitzer Decl. at 6–17; Rivas Decl. at 17–30.  The New York licensing system in *Bruen* also

23   imposed criminal penalties, and the Supreme Court did not doubt that New York could continue

24   to enforce it, provided the state renounced its "proper cause" requirement.  *See, e.g.*, 142 S. Ct.

25   2122 (summarizing law); *see also id.* at 2162 (Kavanaugh, J., concurring) ("[T]he 6 States

26   including New York potentially affected by today's decision may continue to require licenses for

27   carrying handguns for self-defense so long as those States employ objective licensing

28   requirements like those used by the 43 shall-issue States.").

Nor are Baird and Gallardo correct in their argument that California's licensing system continues to be enforced as an unconstitutionally discretionary "may-issue" regime.  The defendant, the California Attorney General, has made clear the state will no longer require "good cause," as noted above.  And as the Supreme Court noted in *Bruen*, a state law is not unconstitutionally discretionary just because it uses some specific forbidden words, but rather because its effect is to restrict constitutional rights.  *See id.* at 2123 n.1 (citing Connecticut, Delaware and Rhode Island laws with "discretionary criteria" that however "appear to operate like [the laws in] 'shall issue' jurisdictions"); *id.* at 2123 (explaining New York courts' interpretation of the "proper cause" requirement at issue, noting the absence of a statutory definition).  California may require people to obtain licenses before they carry firearms openly in public without violating the Second Amendment.

**B.    California's open-carry licensing system is consistent with the historical tradition reflected in the record before the court.**

The next question is whether California's licensing system violates the Second Amendment by preventing people, including Baird and Gallardo, from carrying handguns openly in about half of California's counties.  Baird and Gallardo argue California must defend its laws specifically as restrictions on openly carrying firearms in public.  *See supra* notes 3–4.  That is, they contend the state cannot rely on historical restrictions on carrying concealed weapons, but must instead cite only restrictions on carrying weapons openly.  *See, e.g.*, Pls.' Mem. at 20.  California argues the right in question is not the right to carry firearms in some specific way, such as openly or concealed, but rather the right to carry firearms in public for self-defense in general.  *See, e.g.*, Def.'s Mem. at 6 ("[T]he term 'bear' in 'to keep and bear arms' requires some form of public carry but does not require open carry."); Def.'s Opp'n at 5 ("[N]ot all forms of public carry are required. . . . [S]tates can restrict some forms of public carry if it allows others." (emphasis omitted)).  These competing positions illustrate how the scope of a plaintiff's rights can be pivotal in Second Amendment cases.  In general, plaintiffs who assert rights under the Second Amendment will have an incentive to define the challenged state laws and their own rights narrowly and in turn to demand similarly specific evidence from the government.  States will

47

1  have an incentive to define the plaintiffs' rights and its own laws broadly and to offer broader

2  evidence.

3          Defining a plaintiff's Second Amendment rights may be difficult in some cases, but in this

4  one, the Court's opinion in *Bruen* makes the decision relatively simple.  The plaintiffs in *Bruen*

5  focused their complaint on laws that prevented them from carrying handguns for self-defense

6  outside their homes and businesses.  142 S. Ct. at 2125; *see also* 354 F. Supp. 3d 143, 146

7  (N.D.N.Y. 2018) (citing *Bruen* complaint).  The Court accepted that framing, but considered the

8  statute as a whole.  *See* 142 S. Ct. at 2122–24.  People could carry a concealed pistol or revolver

9  for self-defense outside their homes and businesses if they demonstrated a "special need for self-

10  protection distinguishable from that of the general community."  *Id.* at 2123 (citation omitted).

11  The Supreme Court confirmed the plaintiffs had a right to carry handguns publicly for self-

12  defense without showing "proper cause," as the state did not show that requirement was

13  consistent with the historical tradition of firearm regulation.  *Id.* at 2156.

14          The Court in *Bruen* did not decide, however, whether the plaintiffs had a right to carry

15  handguns openly or concealed.  Nor did the Court consider what other restrictions the state might

16  lawfully impose on that right, such as banning handguns from specific sensitive places.  *See*

17  142 S. Ct. at 2133.  But as California points out, Cal. Opp'n at 5, the Court construed the right in

18  question broadly as "the right to carry handguns publicly for their self-defense," and the Court

19  suggested strongly that states could adopt regulations very much like California's without

20  violating the Second Amendment:

21              The historical evidence from antebellum America does demonstrate
22              that the *manner* of public carry was subject to reasonable regulation.
23              Under the common law, individuals could not carry deadly weapons
24              in a manner likely to terrorize others. Similarly, although surety
25              statutes did not directly restrict public carry, they did provide
26              financial incentives for responsible arms carrying. Finally, States
27              could lawfully eliminate one kind of public carry—concealed
28              carry—so long as they left open the option to carry openly.

29  142 S. Ct. at 2150 (emphasis in original).  In sum, the Supreme Court's decision in *Bruen* shows

30  lower courts must accept a plaintiff's claims as they are framed but should consider state laws as

1     a whole, along with their practical effects.  For cases about the right to carry handguns in public,

2     like this one, it is appropriate to consider whether a state's law is a "reasonable regulation" on

3     "the manner of public carry" in line with tradition and history.  *Id.* (emphasis omitted).

4          Additionally, Baird and Gallardo repeatedly refer to the state's laws as a "ban."  *See, e.g.*,

5     Pls.' Mem. at 6 (header for section II).  California does not ban the carrying of firearms for self-

6     defense in public.  People can carry handguns in public throughout California if they obtain a

7     license.  Local law enforcement agencies may issue licenses for concealed carry in any county

8     based on objective criteria.  Local authorities also may issue licenses to carry guns openly to

9     those who live and work in counties with populations below 200,000.  Additionally, people may

10    carry firearms without a license for self-defense in a few limited circumstances.  The question,

11    then, is whether California may require people who carry handguns in public to conceal those

12    handguns if they live in, work in, or enter a county with a population greater than 200,000.  That

13    limit must fit the historical tradition of firearm regulations if it is to stand.  The court considers

14    first the backdrop of English and early colonial history, then regulations of colonial and

15    antebellum America, and finally post-Civil War laws before finally evaluating whether that

16    history shows California's laws are consistent with the historical tradition of firearm regulation.

17          **1.    The English history of firearms regulations is a relevant backdrop but**
18          **does not itself show whether the state's regulation is constitutional.**

19          As the state argues and the parties' experts discuss, the earliest arms restrictions that might

20    have some bearing on the American tradition were established hundreds of years ago, long before

21    European colonists first came to North America.  *See* Def.'s Mem. at 11–12; Spitzer Decl. at 11–

22    12 (citing colonial laws that "mirrored" English statutes); Cornell Decl. Ex. A at 2–3 (discussing

23    English common law); *see also, e.g.*, *Bruen*, 142 S. Ct. at 2139–40 (reviewing English statutes

24    and history); Cornell (2017), *supra* at 18–19 (same); Charles (2012), *supra*, at 1801–03 (same);

25    Blocher (2013), *supra*, at 112 (same).  The most commonly cited of these laws, the Statute of

26    Northampton, was passed in 1328.  *Bruen*, 142 S. Ct. at 2139; Cornell (2017), *supra* at 18.

27    "Precisely what the Statute of Northampton prohibited is a matter of debate."  Blocher (2013),

28    *supra*, at 112.  We know comparatively little about the daily lives of English kings in the 1300s

1    and even less about the everyday people who lived under their laws.  It is difficult to say what the

2    Statute of Northampton might mean for this country's historical traditions.  The weapons and

3    armor people used in those times bore little resemblance to the handguns Baird and Gallardo

4    would like to carry.  *See, e.g.*, *Bruen*, 142 S. Ct. at 2140.  "Although gunpowder-fired weapons

5    were known in England as early as the late thirteenth century, they were used almost entirely in

6    war." Schwoerer (2019), *supra*, at 140.  Over the centuries since the 1300s, the Statute of

7    Northampton has been paraphrased and adapted to many circumstances.  *See, e.g.*, Cornell

8    (2017), *supra*, at 18–20.  Generalized comparisons are unhelpful.

9          The Supreme Court has said, however, the history of the English Bill of Rights, passed in

10   the late 1600s, and the years leading up to its codification are "particularly instructive." *Bruen*,

11   142 S. Ct. at 2140 (citing *Heller*, 554 U.S. at 592).  It has described Article VII of that Bill of

12   Rights as "the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593.  California thus

13   cites and discusses Article VII in its motion.  *See* Def.'s Mem. at 11–12.  But the history of

14   Article VII is unenlightening in this case.  A few details about the history and context of Article

15   VII help explain why.

16         The members of the body that debated and proposed the Declaration of Rights, known as

17   the Convention, met in England in early 1689.  Schwoerer (2019), *supra* at 142.  "Their target

18   was to limit the power of the crown." *Id.*  They listed twenty-three grievances. *Id.*  Three were

19   related to the military.  The first declared "the Acts concerning the Militia are grievous to the

20   Subject." *Id.*  That is, the committee members decried laws that had given King Charles II and

21   King James II power over the militia, which those monarchs had used to seize weapons and

22   harass their enemies. *Id.*  The second grievance was against standing armies. *Id.*  The

23   Convention declared standing armies "against Law" in times of peace. *Id.*  Third, the Convention

24   declared "it is necessary for the public Safety that the Subjects, which are Protestants, should

25   provide and keep arms for their common Defence; and the arms which have been seized, and

26   taken from them be restored." *Id.*  This was "[a]lmost certainly" a response to James II's

27   treatment of some Protestant members of parliament. *Id.*

1    This third grievance eventually became Article VII of the English Bill of Rights.  *See id.*

2    at 143–44.  In its final version, it provided "Protestant subjects may have Armes for their defence

3    Suitable to their Condition and as allowed by law."  *Id.* at 144.  In context, the limitation to

4    Protestants is unsurprising.  "A national fear and loathing of Roman Catholicism and of persons

5    who practiced it were the major reasons for the revolution," i.e., the revolution of 1688–1689 that

6    led to the Convention and King James II's flight to France.  *Id.* at 143.  The reference to

7    "Condition" also is comprehensible, given "the hierarchical nature of early modern English

8    society and its attendant social and economic prejudices."  *Id.* at 144.  The limiting phrase "as

9    allowed by law" emphasized that Parliament, not the crown, was sovereign and prohibited the

10   crown from disarming subjects in the future.  *See id.*  The omission of any reference to the

11   "public Safety" was "almost certainly" a concession to Prince William, because its inclusion

12   "implied he was unable to protect the nation."  *Id.* at 143.  The word "Armes" likely referred to

13   "war equipment."  *Id.* (quoting Gary Wills, *To Keep and Bear Arms*, 42 N.Y. Review of Books

14   64–65 (Sept. 21, 1995)).  Finally, it is uncertain why the final version of Article VII used the

15   phrase "for their defence" rather than "for their common Defense."  Some historians believe the

16   final version, "for their defence," referred specifically to "the use of force against a tyrannical

17   government and against 'outside forces.'"  *Id.* (quoting Patrick J. Charles, *Arms for Their*

18   *Defence"? An Historical, Legal, and Textual Analysis of the English Right to Have Arms and*

19   *Whether the Second Amendment Should be Incorporated in* McDonald v. City of Chicago,

20   57 Cleveland State L. Rev. 351, 390 (2009)).

21   No party in this case has established a strong connection between the English Bill of

22   Rights and the Second Amendment.  Although in this country during the founding era, the Anti-

23   Federalists protested the Federalists' proposal to set up a standing army just as the members of

24   the 1689 Convention decried the king's standing army, records of the American debates of 1787

25   and 1788 include no references to Article VII.  *Id.* at 146.  Neither the Federalist Papers nor the

26   Anti-Federalist Papers refer to Article VII, although Federalist No. 26 does invoke Article V,

27   which prohibits a standing army in peacetime.  *Id.* at 147.  Madison did make a scant notation

28   referencing Article VII in papers related to his draft Bill of Rights in 1789, but it is unclear from

1    those notes whether he thought of Article VII as a model, and the Senate debates about the

2    proposed Bill of Rights "were kept secret." *Id.* at 149.

3            People who read the Second Amendment in the 1790s might very well have understood it

4    as an adaptation of Article VII of the English Bill of Rights. Baird and Gallardo invite that

5    comparison implicitly. *See* Pls.' Mem. at 21–22. From the circumstances of its creation, Article

6    VII seems to have been a Protestant upper class's effort to preserve its power against the crown

7    and the minority adherents of a mostly foreign faith. Did the American colonists see themselves

8    as heirs to these protections, even if they did not experience equivalent tension rooted in religion?

9    Would they also have understood that inheritance as more than just a right to resist tyrants, but

10   also a right to carry weapons in public? And if so, would they have understood also that their

11   elected representatives could place limits on when and where they could bear arms, or not? And

12   are any of those historically acceptable limits comparable to California's firearms licenses in

13   purpose and effect? On balance, this court cannot find the English history and its legacy offer

14   helpful guidance here.

15           But as the state argues, *see* Def.'s Mem. at 11–12, and as Cornell explains in his

16   declaration, there are other "continuities between English law and the common law in America,"

17   Cornell Decl. Ex. A at 3. Each of the new American states "adopted multiple aspects of the

18   common law, focusing primarily on those features of English law that had been in effect in the

19   English colonies for generations." *Id.* One of these aspects was "the concept of peace." *Id.*

20   "The right of the people to pass laws to promote public health and safety is one of the most

21   fundamental rights in the pantheon of American rights." *Id.* at 4. "Although modern lawyers and

22   jurists are accustomed to thinking of this concept under the rubric of state police power, the

23   Founding generation viewed it as a right, not a power," that is, "the right of the people to regulate

24   their own internal police." *Id.* at 4–5. Cornell cites, for example, the contrast between "wild and

25   savage liberty" in nature with a "civil society" governed by "laws and regulations that promoted

26   *ordered* liberty." *Id.* at 7 (emphasis original; quotation marks omitted).

27           In Cornell's opinion, people saw "the right to keep and bear arms" and "the right of the

28   people to regulate arms" as complementary. *Id.* He offers a contrast between the First and

52

1  Second Amendments to illustrate his point.  The First Amendment bars the government from

2  "abridging" several rights it lists, whereas the Second Amendment uses the word "infringed."  At

3  the time the Bill of Rights was adopted, the word "abridged" was understood as a synonym for

4  "reduce" in this context.  *Id.*  The word "infringe," by contrast, meant something more like

5  "destroy."  *Id.*; *see also id.* at 8 (collecting contemporary dictionary definitions).  Cornell believes

6  the contrasting choices in vocabulary were meaningful: the government could not even reduce

7  rights protected by the First Amendment, whereas it was forbidden by the Second Amendment

8  only from destroying the right to keep and bear arms, not from regulating.  *See id.* at 7.  To that

9  end, "early American governments enacted laws to preserve the rights of law-abiding citizens to

10  keep and bear arms and promote the equally vital goals of promoting public safety."  *Id.* at 10.

11  Individual states, for example, "imposed loyalty oaths, disarming those who refused to take such

12  oaths."  *Id.* at 10.  But "[n]o state imposed a similar oath as pre-requisite to the exercise of First

13  Amendment-type liberties."  *Id.*  In Cornell's view, "some forms of prior restraint, impermissible

14  in the case of expressive freedoms protected by the First Amendment or comparable state

15  provisions, were understood by the Founding generation to be perfectly consistent with the

16  constitutional right to keep and bear arms."  *Id.*

17        Clayton Cramer disagrees with this interpretation of the First and Second Amendments

18  and their history, but he sets up a straw man and attacks an extreme and nonsensical version of

19  the argument Cornell actually advances.  *See, e.g.*, Cramer Decl. at 33–36 (suggesting Cornell's

20  position would permit legislatures to criminalize any conduct at whim, such as anti-miscegenation

21  laws and the internment of Japanese Americans).  His criticisms also set up a false dichotomy

22  between the total adoption of all English common law or none, *see, e.g.*, *id.* at 32–34, and often

23  unhelpfully target Cornell's character or intelligence rather than his conclusions and arguments,

24  *see, e.g.*, *id.* at 58 ("Cornell fails to understand what we were supposed to have learned in high

25  school Civics classes . . . .").

26        It bears noting that Cornell is not alone in his assessment of the historical context.  As one

27  prominent scholar of the American revolution summarized many years ago, "it is nearly

28  inconceivable that eighteenth-century notions of the police power of state and local governments

53

1   would have precluded their regulation in the name of some vague threat of tyranny." Rakove

2   (2000), *supra*, at 110.  American colonial "traditions of governance permitted legislatures and

3   institutions of local government to act vigorously in the pursuit of public health and safety." *Id.*

4        In sum, English history itself offers relatively little direct guidance in this case.  But it

5   does offer a relevant backdrop: members of the founder generation who adopted the Second

6   Amendment in the late eighteenth century probably would not have understood it as preventing

7   them from exercising what they saw as an inherited common law right to organize and regulate

8   their own health and safety.

9           **2.**    **Colonial and early state laws severely restricted or prohibited specific**
10                  **types and means of public firearms carrying.**

11       Colonial and state laws from before the Civil War are a more fruitful source of evidence

12  about the American tradition than the English history and common law.  Without some context,

13  however, these laws can be misread.  When many people conjure early America, they may think

14  of hardscrabble lives eked out on the frontier, unspoiled wildernesses, armed gangs of outlaws,

15  and conflicts between colonists and Native Americans.  *See, e.g.*, Cornell Decl. Ex. A at 11, 20 &

16  nn.43–44; Blocher (2013) at 84, 117–18.  The reality is more complicated, as were the people's

17  conceptions of firearms at the time.

18       Americans in the eighteenth and early nineteenth centuries used a variety of weapons for a

19  variety of purposes.  Hunting knives, rifles, muskets and shotguns were the tools of the trade in

20  rural and remote or agricultural places.  People used them to drive away pests, to hunt, and to

21  protect themselves and their animals.  Rivas Decl. at 5.  These functional weapons were

22  commonly also used for militia service, and people carried them when they were called to join a

23  "posse."  *See id.*  Most of these weapons were bulky and could not easily be concealed, so people

24  carried them openly, and for the most part, they had different and nobler connotations than

25  smaller weapons, like knives and pistols, which were better suited to the purposes of ruffians,

26  burglars, and assassins.  *See id.* at 4–6.  As noted, carrying concealed weapons in public was "a

27  dastardly and cowardly practice to most Americans in antebellum America."  Cornell Decl. Ex. A

28  at 14.  People used different words to describe these weapons, as well.  The larger weapons that

1    served as the tools of rural life and the militia usually were called "arms."  Rivas Decl. at 4.

2    Smaller, concealable weapons were often called "deadly" weapons.  *Id.* at 5.  As both Rivas and

3    Cramer explain, that general rule does not hold uniformly, *see id.* at 5 n.1; Cramer Decl. at 65–73,

4    but the trend is clear and accurately describes the historical context, *see* Rivas Surrebuttal at 4–7.

5             Gun violence and gun deaths of the nature we contend with in the United States today

6    were not a widespread social problem in the American colonies or in the United States' early

7    history.  Cornell Decl. Ex. A at 11.  White European settlers in North America in the late 1700s

8    contended with relatively low gun violence.  *Id.*  There are many reasons.  Rivas Decl. at 11–12;

9    Cornell Decl. Ex. A at 11–12; Randolph Roth, "Why Guns Are and Are Not the Problem: The

10   Relationship between Guns and Homicide in American History," in *A Right to Bear Arms?*

11   (Jennifer Tucker, et al. eds. 2019).  Many people lived in largely homogenous rural places, and

12   many shared religious traditions and social expectations with their neighbors.  Cornell Decl. Ex.

13   A at 11–12.  Guns were not nearly as effective in those days.  *Id.* at 12.  They were almost always

14   loaded one shot at a time through the muzzle in a time-consuming process.  *Id.* at 12–13; Rivas

15   Decl. at 9–10.  The gunpowder the guns required was corrosive and attracted moisture.  Cornell

16   Decl. Ex. A at 13.  This meant guns were commonly stored unloaded.  *Id.*  More than 90 percent

17   of firearms also were long guns, not handguns, and could not be easily concealed.  *Id.* (citing

18   Randolph Roth, Transcript: Why is the United States the Most Homicidal in the Affluent World,

19   Nat'l Inst. Justice (Dec. 1, 2013)).[26]  In all, the weapons people normally carried openly in public

20   were not useful for self-defense, or for committing crimes, for that matter.  *See, e.g.*, Cornell

21   Decl. Ex. A at 13–14.

22            Smaller guns were available, but like long guns, they usually were loaded through the

23   muzzle one shot at a time, and it took more than fifteen seconds to reload them.  Rivas Decl. at 9,

24   10.  Some also were quite large, a foot long or more, and were intended for use on a saddle.  *Id.* at

25   9.  Others were smaller and could be carried on a belt, in a coat or in a case.  *Id.*  Travelers

26   commonly carried mid-sized pistols for self-defense in this way.  *Id.*  Even smaller "pocket

27   pistols" also were available.  *Id.*  They fit in the pockets of the clothes people ordinarily wore, and

---

[26] https://nij.ojp.gov/media/video/24061#transcript--0 (last visited Dec. 28, 2023).

1    could be extremely lethal at close range.  *Id.*  The skill necessary to load and fire these weapons,

2    combined with their size, made them an unlikely choice for unplanned crimes of passion, and as

3    they were commonly stored unloaded, they were less likely to discharge accidentally at home as

4    well.  *See* Cornell Decl. Ex. A at 13–14.  Rather than gun violence, the "pressing problem

5    Americans faced at the time of the Second Amendment was that citizens were reluctant to

6    purchase military style weapons." *Id.* at 12.  Those kinds of weapons, useful for militia service,

7    were relatively expensive and less so for domestic tasks than the alternatives, such as fowling

8    pieces and lighter hunting muskets.  *Id.*

9         Moreover, knives and other edged weapons, not guns, were the most dangerous weapons

10   of the eighteenth and early nineteenth centuries.  Rivas Decl. at 7; *see also, e.g.*, Rakove (2000),

11   *supra*, at 110.  One very common large knife was the "bowie" knife, a weapon with a long,

12   curved blade that was double-edged near the tip.  Rivas Decl. at 7.  It was named for nineteenth

13   century Texas revolutionary Jim Bowie, who used a knife of that type in a famous melee, and

14   who later died at the Alamo.  *Id.*  A bowie knife was easily concealed in a pocket or waistband.

15   *Id.*  Other common knives included dirks, which had a straight blade; daggers, which usually had

16   double-edged blades; navajas, with large folding blades; and "Arkansas toothpicks," sharply

17   tapered double-edged knives the size of a bowie knife.  *Id.*  According to one mid-nineteenth

18   century newspaper report, large knives were ubiquitous in southern states.  *Id.* at 8 & n.10 (citing

19   "The Bowie-Knife In the South," *San Francisco Evening Bulletin* (San Francisco, California),

20   October 18, 1861).

21        American weapons restrictions passed in the seventeenth, eighteen, and early nineteenth

22   centuries reflect these realities.  Many governments banned or severely curtailed the possession

23   and carrying of large knives and other "dangerous" or "concealed" weapons that were neither

24   useful as the tools of daily life nor commonly employed in militia service; as noted, concealed

25   weapons were associated with crime and violence.  *See id.* at 8 & nn.11–12; Spitzer Decl. at 6–9;

26   see also, e.g., Def.'s Updated Req. J. Not. No. 35 (1820 Indiana enactment).  In the late 1600s, for

27   example, New Jersey made it illegal to carry several specific concealable weapons, such as

28   pocket pistols, daggers, dirks, and other "unlawful" or "unusual" weapons.  Def.'s Updated Req.

1   J. Not. No. 5 (1686 New Jersey enactment).  Governments in several states passed similar laws in

2   the early 1800s, including Indiana, Maine, Tennessee, Massachusetts, and Mississippi.  *See, e.g.*,

3   *id.* Nos. 23, 35, 37, 38, 41, 45, 53, 54, 59.  Although these restrictions varied in their details, they

4   often mentioned specific "dangerous weapons," and many made exceptions for travelers or for

5   those who reasonably feared an assault.  *See, e.g.*, *id.* Nos. 35, 37, 41.  At least one state allowed

6   people to carry these weapons if they posted a surety.  *Id.* No. 23 (1801 Tennessee enactment).

7   　　　Other colonial and state laws prohibited people from carrying any weapon—"concealed"

8   and "dangerous" or not—in a way that would cause fear or terror or that posed an unusual risk of

9   violence.  Brandishing weapons often was illegal, for example, but sometimes simply displaying

10  a particular weapon was prohibited as well.  *See* Spitzer Decl. at 6, 11–17; Rivas Decl. at 25–29.

11  Other restrictions focused on specific places, such as fairs and markets.  Massachusetts, North

12  Carolina, New York, Virginia, New Jersey, and New Hampshire passed laws in this category as

13  early as the 1600s and 1700s.  Spitzer Decl. at 11–12 & nn.22, 24, 25, 29; Def.'s Updated Req. J.

14  Not. Nos. 7, 11, 14, 15.  Tennessee passed a similar law in 1801, Maine in 1821, and Mississippi

15  in 1837.  Spitzer Decl. at 12–13 & nn.31–32.   Some of these laws were patterned on the Statute

16  of Northampton and the English common law.  *Id.* at 11–12; Cornell (2017), *supra*, at 27–32.  A

17  1694 Massachusetts law, for example, prohibited riding or going "armed Offensively" before

18  authorities.  Def.'s Updated Req. J. Not. No. 7.  States and colonies also singled out people for

19  stricter regulations based on race, religion and other characteristics, now understood as

20  discriminatory as discussed above.  Spitzer Decl. at 18, 31–32.

21  　　　In addition to laws that regulated the possession and carrying of weapons, colonial and

22  state governments passed laws limiting when and how guns could be discharged, especially in

23  cities and towns.  *Id.* at 18, 26–28.  In the 1700s, Philadelphia began imposing penalties on people

24  who discharged guns without a license, as did the District of Southwark, and Pennsylvania itself.

25  *See id.* at 27 & nn.89–93.  Cities and towns in South Carolina, New Hampshire, New York, Ohio,

26  and other states followed that lead in the early 1800s.  *Id.* at 27–28 & nn.95–98.  Gunpowder

27  storage licensing restrictions also were common.  *Id.* at 29–30.  Guns of the time were useless

28  without gunpowder, so in effect, these restrictions regulated the use of the guns themselves.  And

1    more broadly, many cities and towns enacted restrictions that placed tighter controls on arms

2    carrying than in more rural places. *See, e.g.*, Blocher (2017), *supra*, at 112–21.

3         States similarly made exceptions to their firearms laws for people traveling outside their

4    more populated areas. As noted, travelers commonly carried mid-sized and larger pistols outside

5    urban areas. Rivas Decl. at 9. "Public carry laws often featured modified rules for long-distance

6    travelers venturing beyond the safety of their local communities." *Id.* at 38. "When exposed to

7    the dangers of the highway bushwhacker or the prowling coyote that went along with nineteenth-

8    century horseback travel, laws generally allowed the carrying of weapons—including those

9    statutorily restricted as deadly weapons." *Id.* The reasoning behind these exceptions seems to

10   have been that common presumptions about intentions in urban areas might not be accurate in

11   remote and unpopulated areas. *See id.* at 40.

12        Views on firearms and permissible regulations also differed regionally, from north to

13   south. "In the slave South a more expansive view of open carry developed, while prohibitions on

14   concealed carry . . . posed no constitutional problems." Cornell Decl. Ex. A at 14; *see also*

15   Cornell (2017), *supra*, at 34–36. For example, in *State v. Reid*, the Alabama Supreme Court

16   concluded the state's prohibition on concealed weapons was a legitimate exercise of its police

17   power. *See* Cornell Decl. Ex. A at 16; *State v. Reid*, 1 Ala. 612, 621 (1840). People with a

18   legitimate reason to carry a firearm, such as an emergency, would not conceal their weapon. *See*

19   1 Ala. at 621. Courts in Tennessee and Arkansas likewise drew a line between concealed

20   weapons and protected arms. *See* Cornell (2017), *supra*, at 36–37 (citing *Aymette v. State*,

21   21 Tenn. 154 (1840); *State v. Buzzard*, 4 Ark. 18 (1842)). "Firearms with little or no value to the

22   preservation of the militia," such as pocket pistols, "were treated as ordinary property and subject

23   to the full range of the state's police powers, including in the case of some especially dangerous

24   weapons, prohibition." *Id.* at 36.

25        Northern states favored a narrower rule that originally emerged in Massachusetts.

26   Cornell Decl. Ex. A at 14–15; Cornell (2017), *supra*, at 39. As noted above, that state adapted

27   the Statute of Northampton in the late 1700s and forbade riding and going armed "offensively, to

28   the fear or terror of the good citizens of the Commonwealth." Cornell (2017), *supra*, at 39 &

58

n.184.  About forty years later, Massachusetts revised the law and required a surety from those who carried specific concealed or dangerous weapons in public, but it made an exception for people who had a reasonable cause to fear an assault or property damage.  *Id.* at 39 & n.189. Many other states passed similar laws in the years and decades that followed.  *See id.* at 40–41 & n.193.  A law like this one eventually came before the Texas Supreme Court after the Civil War, which upheld the law based in part on its exception for imminent threats.  *See id.* at 41–42.

Rivas perceives a slightly different division in nineteenth century judicial decisions. Under the more common conception of public weapons carrying, states could prohibit people from carrying concealed weapons because the Second Amendment and its state-law counterparts protected the appropriate uses of militia arms, not "deadly weapons."  Rivas Decl. at 17 & n.46. Under the second theory, which in Rivas's opinion was uncommon, carrying weapons openly was "permissible" for self-defense, so statutes that prohibited people from carrying weapons only for self-defense could not stand.  *See id.* at 17 & n.45.  Many nineteenth century state courts concluded the federal and state constitutions allowed government regulation of how people carried their weapons in public.  *See* Rivas Surrebuttal at 11–13.

In *Bruen*, the Supreme Court surveyed several nineteenth century laws and related court decisions and reached similar conclusions.  *See* 142 S. Ct. at 2146–47.  It found that on the record before it in that case, the "history reveal[ed] a consensus that States could not ban public carry altogether."  *Id.* at 2146.  Instead, the Court held, "the manner of public carry was subject to reasonable regulation."  *Id.* at 2150.  States could stop people from carrying weapons in ways that were frightening and dangerous as long as an effective option remained available for self-defense. *See id.*  That option was to carry weapons openly in the nineteenth century.  *See id.*  As explained above, the types of weapons that people could carry openly did not normally suggest any evil intent or danger.

This is not to say, however, that nineteenth century Americans universally approved of those who carried their weapons in public.  State laws passed in the first half of the nineteenth century sometimes expressly condemned the habitual practice of going armed in public.  *See* Rivas Decl. at 24 & nn. 66–67 (citing an 1838 Virginia enactment and an 1813 Louisiana

1  enactment).  As one state appellate court wrote in 1843, although it was not a crime to carry a gun

2  openly in public, a gun was nonetheless "an 'unusual weapon,' wherewith to be armed and clad."

3  *State v. Huntley*, 25 N.C. 418 (1843), *cited in* Rivas Decl. at 24.  "No man amongst us carries it

4  about with him, as one of his every day accoutrements—as part of his dress—and never we trust

5  will the day come when any deadly weapon will be worn or wielded in our peace loving and law-

6  abiding State, as an appendage of manly equipment." *Id.*

7      Considering these historical strands together, the court discerns three broad trends in the

8  laws and regulations California has cited.  First, restrictions on functional weapons, especially

9  those commonly used for legitimate purposes, such as muskets and other long guns, were

10  narrower than restrictions on weapons that could be concealed, such as large knives and small

11  pistols.  Concealed weapons were perceived as inherently dangerous, illegitimate, or both.  People

12  accepted harsh restrictions and outright prohibitions based on this distinction, as did the courts,

13  because people retained the right to carry weapons for self-defense and militia service.  Second,

14  when governments did place harsh restrictions on functional weapons with legitimate uses, those

15  restrictions usually called for some additional element of unusual danger or evil purpose, such as

16  surety laws and laws that prohibited guns in larger groups.  These restrictions also included racial,

17  religious, and class-based prohibitions,  now impermissible, which prevented many people from

18  carrying any weapons at all.  Fundamentally, the types of regulations put into effect show people

19  commonly accepted harsh restrictions on public arms-carrying based on popular categorical

20  distinctions about what was frightening or dangerous.  Third, different and more specific rules

21  were adopted in more populous places where guns and the ammunition required to use them

22  could cause more serious problems than in sparse rural areas.  States also made exceptions for

23  travelers, recognizing their different needs for personal security in remoter and more rural places.

24  **3.    Simliar laws and regulations were passed after the Civil War and the**
25  **Fourteenth Amendment, but in a new context.**

26      The Supreme Court has looked to laws from the years surrounding the Fourteenth

27  Amendment's adoption to help round out the relevant history and tradition.  *See Bruen*, 142 S. Ct.

28  at 2137–38, 2150–53; *Heller*, 554 U.S. at 614–19.  Lower federal courts have as well. *See, e.g.*,

1   *Antonyuk*, 2023 WL 8518003, at *16 (collecting authority from the Third, Seventh and Eleventh

2   Circuits). The court therefore disagrees with Baird and Gallardo that evidence from these years is

3   essentially irrelevant. Evidence from later years "cannot provide much insight into the meaning

4   of the Second Amendment when it contradicts earlier evidence," *Bruen*, 142 S. Ct. at 2154 (citing

5   *Heller*, 554 U.S. at 614), but this court finds that is not the situation in this case. Evidence from

6   after the Civil War and adoption of the Fourteenth Amendment—the constitutional source of

7   Baird and Gallardo's right to assert a Second Amendment claim against the state—reinforces the

8   conclusions the court has drawn from the law and regulations that went before. This evidence

9   shows what people understood the Second Amendment to mean when that amendment became

10  enforceable against state and local laws like California's.

11      Again, historical context is essential to a fair understanding. The Civil War "was a time

12  of violence, turmoil, and political instability." Rivas Decl. at 12. Homicide rates in the United

13  States began diverging from rates in the rest of the Western world. *Id.* "The most severe

14  violence occurred in the former Confederate States, where military defeat, emancipation, and

15  reconstruction inflamed white supremacism and set the stage for racist paramilitaries, lynchings,

16  and widespread electoral fraud." *Id.* "A lack of faith in governing institutions and a failure to

17  become a cohesive citizenry drove both the war itself and the coinciding bloodshed." *Id.*

18      In addition, "[t]he limitations of early firearms as murder weapons were overcome by a

19  burst of innovation in the arms industry between the late 1840s and the end of the Civil War."

20  Roth (2019), *supra*, at 122. These years saw the invention of the breech-loading rifle, the self-

21  expanding bullet, the repeating rifle, and finally the "first truly modern rifle." *Id.* "The

22  limitations on early handguns were overcome in the same period." *Id.* Samuel Colt patented his

23  first revolver design in 1836. Rivas Decl. at 10. Unlike earlier pistol designs, these new

24  revolvers were breech loading, which meant ammunition was loaded from the back of the barrel,

25  and they could fire multiple shots without reloading as well. *Id.* Smith and Wesson introduced a

26  seven-shot breech loading revolver in the 1850s, the same year Colt's patent expired. *See id.*;

27  Roth (2019), *supra*, at 122–23. Smith and Wesson's gun was "a near perfect murder weapon—

28  lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time."

1   *Id.* at 123.  Manufacturers of these new weapons sold them first to the United States Military,

2   then to civilians in "the urban middle class, the urban poor, and former slaves."  *Id.*; *see also*

3   Rivas Decl. at 12–13.  The country was in the midst of a "homicide crisis" by the 1860s and

4   1870s, and the arms industry exploited that crisis "by promoting the need for personal

5   protection."  Roth (2019), *supra*, at 123.  "[M]any working-class and middle-class Americans and

6   former slaves were afraid they might become victims of violence, and so armed themselves as

7   fast as they could with the new weapons, specially revolvers."  Roth (2019), *supra*, at 123; *see*

8   *also* Rivas Decl. at 13–14.

9          As gun violence grew more prevalent and weapons grew more dangerous, Americans

10  began to change their opinions about what types of weapons and what types of weapons carrying

11  were frightening or dangerous.  In general, Americans criticized those who carried weapons

12  publicly as the nineteenth century wore on.  *See* Rivas Decl. at 15.  "Even though they were

13  particularly opposed to the concealment of them beneath one's clothes, there was an overarching

14  opposition to having weapons in public at all—even when carried openly."  *Id.*  Carrying

15  weapons habitually was a "relic of barbarism."  *Id.* (quoting The Cattlemen, Fort Worth Daily

16  Democrat, March 5, 1883).  And so, by the late nineteenth century, many newspapers had

17  published emphatic denunciations of firearms-carrying.  *See id.* at 15–16; *see also, e.g.*, "The

18  Revolver Must Go," Clarksville Weekly Chronicle (Tennessee) May 24, 1884, at 1 (reprinted

19  from Gainesville Register (Texas) ("[T]here seems to be a well-developed crusade in the

20  newspapers, against the deadly pistol, the Southern Press especially."))[27]  Public opinions about

21  open firearms carrying seems to have so drastically changed that pants often included secret

22  pockets specially designed for hiding small handguns.  *See* Rivas Decl. at 19.  Concealing

23  weapons was likely more acceptable than displaying them in many places.

24          During these years, states continued to pass firearms regulations.  "Republicans sought to

25  protect the rights of African Americans to bear arms, but were equally insistent on enacting

26  strong racially neutral regulations aimed at public safety."  Cornell Decl. Ex. A at 17.  As in

---

[27] https://chroniclingamerica.loc.gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ (last visited Dec. 28, 2023).

1    previous years, governmental bodies made exceptions for urgent needs for self-defense. *See*

2    Rivas Decl. at 20–21. States also continued to pass laws like those surveyed above barring

3    brandishing or displaying weapons in intimidating or frightening ways. *See* Spitzer Decl. at 13–

4    17. But more prominently, "[t]he rise in the circulation of handguns in society . . . was

5    accompanied by the rapid spread of concealed carry restrictions, beginning in the early 1800s but

6    then escalating in the post-Civil War period with the spread of multi-shot handguns, precisely

7    because of their contribution to increasing interpersonal violence." *Id.* at 6–7. "By the start of

8    the twentieth century, every state in the country (with the apparent sole exception of New

9    Hampshire) prohibited or severely restricted concealed gun and other weapons carrying." *Id.* at 7.

10   Open carry restrictions followed a similar pattern. "From 1860 to 1900, 24 states enacted anti-

11   open carry laws, and 9 states did so in the early 1900s (a few states enacted laws in both

12   centuries)." *Id.* at 8 (citations omitted). State courts generally upheld these laws, as long as they

13   made exceptions for emergencies and members of the militia or military. *See* Rivas Decl. at 20–

14   23. California was no exception to the tightening regulatory trend. Many state and local laws

15   restricted public weapons carrying. *See* Cornell Decl. Ex. A at 20–25; Rivas Decl. at 36–38.

16       Law enforcement and policing also changed. "[A]s America modernized, urbanized, and

17   became a more diverse and highly mobile society" in the nineteenth century, "traditional

18   community-based mechanisms of law enforcement eroded." Cornell Decl. Ex. A at 19.

19   American governments turned to professional police forces and administrative agencies, which

20   people had come to believe "were better suited to maintaining social order and the peace in the

21   urban world of nineteenth century America." *Id.*; *see also, e.g.*, *Antonyuk*, 2023 WL 8518003, at

22   *28–30 (holding similarly and collecting similar evidence).

23       It was under these circumstances that modern firearms license and permitting regimes

24   were first introduced. *See* Cornell Decl. Ex. A at 19. "At least 29 states enacted 61 licensing

25   requirement laws for individuals as a pre-requisite for their weapons ownership during this time;

26   17 of those states did so in the 1800s." Spitzer Decl. at 17 (citation omitted). Many other local

27   jurisdictions passed licensing laws as well. *See id.* at 19–24. But these licensing regimes did not

28   necessarily tighten firearms controls; in some respects, they relaxed the states' strict regulations

1   forbidding some weapons outright or made those regulations more flexible.  *See id.* at 18.

2   Sometimes licensing schemes replaced bans; sometimes they did not.  *See id.*  "The jurisdictions

3   enacting licensing for [public firearms carrying] were now allowing firearms or other dangerous

4   weapons or substances to be used or possessed with the granting of a license to do so, when their

5   possession or use would otherwise be subject to criminal penalties."  *Id.*  Licenses were "in most

6   instances a more flexible form of government regulation of the activities and weapons in

7   question."  *Id.* at 18–19.  And as noted above, no evidence in the record shows any of these

8   licensing systems were subjected to any successful constitutional challenges, or any challenges at

9   all, which strongly confirms that licensing systems as a whole are part of the historical tradition of

10  firearm regulation.

11          In sum, laws and regulations passed after the Fourteenth Amendment's adoption changed,

12  but did not contradict laws passed in the colonies and early in the nineteenth century.

13  Consistently, over many years, American governments recognized the right to bear arms but

14  circumscribed that right in recognition of the need to preserve the peace and public safety.  As

15  violence increased and weapons became more deadly, as America urbanized and grew more

16  diverse, and as policing professionalized, common ideas about what was socially acceptable

17  changed.  No longer was it as useful or common to draw distinctions between concealed or

18  "deadly" weapons and acceptable firearms.  It was more common than before to carry concealed

19  weapons.  Some of the most common weapons that many people purchased for self-defense could

20  be concealed.  Licensing and permit regimes were a natural reaction to this reality, and in many

21  cases they were more flexible and permissive than the laws that had gone before.

22          **4.     California has demonstrated its open-carry restrictions are consistent**
23                 **with the historical tradition.**

24          Although the Supreme Court observed that some Second Amendment cases will be

25  "straightforward," *see Bruen*, 142 S. Ct. at 2131–33, this is not an obviously straightforward case.

26          When the Supreme Court discussed "straightforward" cases in *Bruen*, it first mentioned

27  evidence about laws addressing a common "general societal problem."  *See id.*  If the challenged

28  law or regulation addresses a "general societal problem that has persisted since the 18th century,"

1   but there is no "distinctly similar historical regulation addressing that problem," or if the

2   historical solution is "materially different" from the challenged regulation, that is "relevant

3   evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*

4       The "general societal problem" addressed by California's licensing system resembles a

5   problem that Americans faced in 1791, only in the simplest sense: then, as now, weapons carried

6   openly in public can risk fright, intimidation and violence.  But California has persuasively

7   demonstrated how difficult it is to draw parallels between the modern and historical problems.

8   As reviewed above, expectations about what types of gun-carrying is dangerous or frightening

9   have changed drastically.  Handguns differ fundamentally from the weapons in common use in

10  the founding era.  Modern handguns are more reliable, simpler to use, easier to conceal, and more

11  lethal than the firearms in common use when the Second Amendment was adopted.  Modern

12  weapons also differ widely, both in form and connotation, from the ancient weapons that could

13  easily be concealed, such as knives and pocket pistols.  Comparisons between the modern and

14  historical responses to the general societal problem defy simple analysis as well.  Is a modern

15  licensing system that permits ordinary people to carry concealed, reliable, breech-loading

16  semiautomatic handguns in their cars comparable to historical regulations that permitted white

17  land-owning men to openly carry fowling pieces and unloaded muskets on horse saddles because

18  neither use inspired fear in witnesses?  The record does not offer any easy answer.

19      The Supreme Court also mentioned in *Bruen* that cases might be straightforward if "some

20  jurisdictions actually attempted to enact analogous restrictions during the timeframe, but those

21  proposals were rejected on constitutional grounds."  142 S. Ct. at 2131.  California's evidence

22  shows how difficult it would be to draw any confident conclusions along those lines in this case.

23  For example, some nineteenth century American courts upheld bans on concealed weapons but

24  not weapons carried openly.  *See id.* at 2146–47.  But these decisions rested on the presumption

25  that it was "beyond the constitutional pale in antebellum America to altogether prohibit public

26  carry."  *Id.* at 2147 (citing *Nunn v. State*, 1 Ga. 243 (1846)).  Does this mean California could

27  prohibit some forms of public gun carrying but not others?  Or that it could prohibit concealed

28  weapons?  The answer again is not obvious.

1    The court therefore must follow the Supreme Court's instruction to consider (1) "whether

2 modern and historical regulations impose a comparable burden" on those who carry firearms in

3 public for self-defense and (2) "whether that regulatory burden is comparably justified." *Id.* at

4 2133. Or as the Ninth Circuit put the question in its decision on Baird and Gallardo's preliminary

5 injunction motion, has California identified "a historical analogue that curtails the right to

6 peaceably carry handguns openly for self-defense to a comparable degree, with a comparable

7 severity, and with a comparable blanket enforcement"? 81 F.4th at 1047.

8    In one sense, California's regulation might seem to be the reverse of the historical

9 tradition. Rather than placing heavier restrictions on concealed and concealable weapons,

10 California limits open handgun carrying more strictly than concealed carrying. In context,

11 however, the historical regulations on concealed weapons and concealed carrying are analogous

12 to California's modern system.

13    As California has shown, for many years before and after the Second Amendment was

14 adopted, American governments placed limits on how people could carry the weapons for self-

15 defense in public. The only available concealed and concealable weapons, like knives and pocket

16 pistols, were associated with aggression, violence and crime. They often were banned

17 completely. When governments did not ban those weapons, they often required people to carry

18 them openly or in circumstances that telegraphed a lawful intent, such as when traveling in

19 remote areas, and governments still imposed penalties on those who used concealable weapons in

20 ways that by societal norms were intimidating or threatening. Some governments also required

21 people to provide a surety. By contrast, restrictions on weapons commonly used for legitimate

22 purposes, such as muskets and other long guns, were narrower or absent. These weapons could

23 be carried openly because by prevailing norms, doing so communicated no evil intents, no risk of

24 violence, no threat. So, when governments did place restrictions on functional weapons with

25 legitimate uses, those restrictions usually called for some additional indication of unusual danger

26 or evil purpose, such as an assembly of many people or intent to intimidate. In all, historical

27 restrictions depended on public conceptions about the types of weapons and public weapons

28 carrying were threatening, intimidating, risky or otherwise unacceptable.

1       These historical conceptions are not an identical match with our own.  Presumptions about

2    why people carry concealed and concealable weapons are different now than in the founding and

3    reconstruction eras, as are the weapons themselves.  As time passed and technology improved, all

4    firearms, both large and small, could be loaded more quickly and conveniently, and they could be

5    fired many times before reloading.  They were more effective in committing murder, but they also

6    were more effective for self-defense, and many people bought them and carried them for that

7    reason.  Today, handguns are "the quintessential self-defense weapon" in the minds of many

8    Americans, *Heller*, 554 U.S. at 629, not the accessories of ruffians and assassins.  So modern

9    states, including California, allow people to carry handguns in public even though they can be

10    concealed.  Their concealable nature connotes no evil intent; nor does the bearer's decision to

11    conceal them.

12       Appearances and generalizations play a role today, as they did in the past.  State and

13    colonial governments did not allow people to carry firearms in ways that intimidated or suggested

14    evil purposes.  Brandishing and display prohibitions, laws patterned on the Statute of

15    Northampton, and prohibitions on firearms in large groups are examples from this category.

16    Governments historically adopted different and more specific rules—gunpowder storage

17    requirements and gun discharge rules, for example—in places where guns and their ammunition

18    could cause unusual problems.  For similar reasons they permitted travelers to carry a wider

19    variety of weapons than those who lived in cities.  Today, by contrast, the open carrying of

20    firearms by those who are not law enforcement officers is threatening or intimidating, especially

21    in more heavily populated places.  *See, e.g.*, Blocher (2017), *supra*, at 90–103; *see also* Raney

22    Decl. at 9; Rivas Decl. at 19–20; Def.'s Mem. at 18.

23       In sum, California has proven an historical tradition of imposing categorical limits on how

24    guns are carried in public based on categorical cultural and societal expectations, including limits

25    derived from the differences between urban and rural areas.  California also has proven the

26    burden of these laws was heavy, including outright bans on specific types of weapons and

27    weapons carrying.  California's licensing system is similarly justified by reference to widespread

28    and categorical expectations about what is intimidating, frightening and dangerous.

1    This is not to say California has identified a historical "twin" for its challenged regulation.

2   *Bruen*, 142 S. Ct. at 2133.  There is no twin, no "dead ringer."  *Id.*  But California's licensing

3   system serves a similar purpose as historical restrictions on how people could carry firearms in

4   public, and it imposes a similar or lesser burden: now as in the founding era, "ordinary, law-

5   biding citizens" in California can carry arms in public for self-defense without fearing criminal

6   prosecution, and they can do it anywhere in the state.  Now, as in the founding era, the

7   government imposes restrictions on how people carry those weapons, and those restrictions are

8   categorical and based on widely accepted societal norms.  People can carry handguns publicly

9   anywhere in California for self-defense if they obtain a permit and if they conceal their weapon.

10   With a permit, they can also carry their handguns openly in counties with lower populations, and

11   they can carry weapons openly in emergencies, even without a permit, such as when it is

12   necessary to protect life or property.  In a few words, California does not prevent "ordinary, law-

13   abiding citizens" from carrying handguns in public for self-defense.

14   **5.       Baird and Gallardo have not refuted the state's evidence.**

15   Baird and Gallardo argue California cannot constitutionally require them to carry

16   handguns in a specific way, namely concealed.  *See, e.g.*, Pls.' Reply at 2–3.  This contention is

17   unpersuasive for the simple reason that American governments have imposed restrictions on how

18   people carry guns since the founding era, as the Supreme Court has twice held.  *See Bruen*,

19   142 S. Ct. at 2156 ("The Second Amendment guaranteed to 'all Americans' the right to bear

20   commonly used arms in public subject to certain reasonable, well-defined restrictions, . . . for

21   example, . . . [restrictions on] the manner by which one carried arms, or the exceptional

22   circumstances under which one could not carry arms . . . .");  *Heller*, 554 U.S. at 626 ("[T]he

23   majority of the 19th-century courts to consider the question held that prohibitions on carrying

24   concealed weapons were lawful under the Second Amendment or state analogues").  The

25   Supreme Court did not hold otherwise when it referred in *Heller* to its previous definition of

26   "bear" as including carrying a gun "in a pocket."  *See* 554 U.S. at 583; *see also* Pls.' Reply at 3.

27   The Court was offering examples, not listing requirements.  It was asking, in other words,

28   whether a person would be "bearing" a weapon if he were carrying it in his pocket.  The answer

1    was "yes." *See* 544 U.S. at 583–84.  It was not asking whether the Second Amendment

2    prohibited any restrictions on carrying arms in pockets.

3           Nor can the court agree with Baird and Gallardo's contention that California has deprived

4    people of an effective right to self-defense in public.  *See, e.g.*, Pls.' Reply at 3.  Baird and

5    Gallardo argue some weapons might be difficult to conceal in tight clothing, but they do not

6    explain why those who wish to defend themselves with handguns cannot choose not to wear tight

7    clothing, if that is their position.  Baird and Gallardo also argue handguns might be difficult to

8    remove quickly from wherever they are concealed, but the record here as well includes no

9    evidence to suggest handguns are ineffective for self-defense when concealed.

10          As noted above, Baird and Gallardo cannot prevail by claiming licenses are not actually

11   available.  The court dismissed their as-applied challenge and it is no longer part of this case.  At

12   the same time, nothing  prevents them from arguing in a future case that licenses are practically

13   unavailable or that local officials do not accept or process license applications.  The Supreme

14   Court has not "rule[d] out constitutional challenges to shall-issue regimes where, for example,

15   lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens

16   their right to public carry."  *Bruen*, 142 S. Ct. at 2138 n.9.

17          Finally, Baird and Gallardo and their expert contend California has cited irrelevant

18   statutes from long before and long after the time the Second Amendment was adopted or have

19   misinterpreted the evidence.  *See, e.g.*, Pls.' Mem. at 11–20; Cramer Decl., *passim*.  The court

20   disagrees that California's evidence is irrelevant, for the reasons above.  The court has reviewed

21   Cramer's declaration and his criticisms of the opinions of California's retained experts,  finds

22   them poorly reasoned and suggesting a lack of true expertise.  For example, he digresses into an

23   irrelevant discussion of the role of mental illness in firearms violence, Cramer Decl. at 55–58;

24   criticizes Rivas for citing a newspaper and implies the newspaper does not exist, but the

25   newspaper's archives are available in a digital database, *see* Rivas Surrebuttal at 15–16; and

26   levels hyperbolic attacks sounding in partisan politics rather than historical expertise, *see, e.g.*,

27   Cramer Decl. at 58 ("Of course, California's politicians would rather focus on guns rather than

28   ask how deinstitutionalization in the 1960s created cities awash in homeless often mentally ill

69

1  drug addicts, sidewalks with discarded hypodermic needles and human feces and random acts of

2  mass murder.").  The court finds in contrast, the responses of Rivas, Spitzer, and Cornell to

3  Cramer's criticisms are measured, persuasive and thorough.  *See generally* Rivas Surrebuttal,

4  ECF No. 98-4; Spitzer Surrebuttal, ECF No. 98-5; Cornell Surrebuttal, ECF No. 98-6.  Baird and

5  Gallardo have not rebutted the state's substantial showing, which satisfies its burden.

6  **VI.    CONCLUSION**

7       California's motion for summary judgment is **granted**.  Baird and Gallardo's motion for

8  summary judgment is **denied**.

9       Because California is entitled to judgment as a matter of law, Baird and Gallardo's motion

10 for a preliminary injunction is **denied as moot**.

11      This order resolves ECF Nos. 65, 90 and 96 and **closes** the case.

12      IT IS SO ORDERED.

13 DATED:  December 28, 2023.

CHIEF UNITED STATES DISTRICT JUDGE

1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Mark Baird and Richard Gallardo,                No. 2:19-cv-00617-KJM-AC

12                    Plaintiffs,                      ORDER

13           v.

14    Rob Bonta in his official capacity as Attorney
      General of the State of California, et al.,
15

16                    Defendants.

17

18          While this case is pending, plaintiffs Mark Baird and Richard Gallardo ask the court to

19    enjoin two California laws that impose criminal liability on people who carry handguns openly in

20    public.  To obtain that relief, they must show the balance of equities tips in their favor and a

21    preliminary injunction is in the public interest, among other things.  *Winter v. Nat. Res. Def.*

22    *Council, Inc.*, 555 U.S. 7, 20 (2008).  They have not, so **their motion is denied**.  In addition, they

23    have not shown they have standing to pursue all of the claims in their complaint.  Their complaint

24    is **dismissed in part for lack of jurisdiction on the court's own motion**, as explained in detail

25    below.

26    **I.    BACKGROUND**

27          Baird and Gallardo would like to carry loaded handguns openly for self-defense outside

28    their homes.  *See* Second Am. Compl. ¶ 3, ECF No. 68; Baird Decl. ¶ 5, ECF No. 65-1; Gallardo

                                          1

1   Decl. ¶ 6, ECF No. 65-2.  In this action they challenge two California criminal statutes imposing

2   criminal liability on those who carry handguns openly in public.  First, California Penal Code

3   section 25850 makes it a crime to carry "a loaded firearm on the person or in a vehicle while in

4   any public place or on any public street in an incorporated city or in any public place or on any

5   public street in a prohibited area of unincorporated territory."  Cal. Penal Code § 25850(a).

6   Second, Penal Code section 26350 makes it a crime to carry "an exposed and unloaded handgun"

7   on the person or in a vehicle in several public places, such as on a "public street in an

8   incorporated city or city and county."  *Id.* §§ 26350(a)(1), (a)(2).[1]

9        These general prohibitions are subject to several exceptions.  For example, a "peace

10   officer or any honorably retired peace officer" can openly carry a handgun in many

11   circumstances.  *Id.* §§ 25900, 26361.  A licensed hunter can openly carry unloaded handguns to

12   and from a "hunting expedition."  *Id.* § 26366.  People can also keep firearms in their homes and

13   businesses.  *See Peruta v. Cty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc),

14   *abrogated in part on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.

15   2111 (2022).  These are, again, just examples; there are several other exceptions in the Penal

16   Code.  *See, e.g.*, Cal. Penal Code §§ 26361–26392; *see also Peruta*, 824 F.3d at 925–26

17   (summarizing several exceptions).  Federal laws also exempt certain current and former federal

18   officers from some of California's prohibitions.  *See* 18 U.S.C. §§ 926B, 926C.

19        In addition to these exceptions, a person can apply "for a license to carry a pistol,

20   revolver, or other firearm capable of being concealed upon the person."  Cal. Penal Code

21   § 26155(a); *see also* Cal. Penal Code § 26150.  Local city and county law enforcement agencies

22   administer this licensing regime.  *See id.* §§ 26150, 26155.  Applicants must live in the relevant

23   city or county, complete a training course, and be "of good moral character."  *Id.* §§ 26150(a)(1)–

24   (4); 26155(a)(1)–(4).  The statutes formerly imposed a "good cause" requirement as well, but

25   earlier this year, after the Supreme Court struck down a similar requirement in New York, the

---

[1] The Penal Code lists three places: "(A) A public place or public street in an incorporated
city or city and county. (B) A public street in a prohibited area of an unincorporated area of a
county or city and county. (C) A public place in a prohibited area of a county or city and county."
Cal. Penal Code §§ 26350(a)(1)(A)–(C), (a)(2)(A)–(C).

2

1    California Attorney General—the defendant in this case—instructed prosecutors not to enforce

2    that part of the licensing statute.  *See* Office of the Attorney General, Legal Alert (June 24, 2022)

3    (citing *Bruen*, 142 S. Ct. 2111).[2]

4        The Penal Code sections giving local authorities the power to issue licenses define a two-

5    part system.  *See id.* §§ 26150(b), 26155(b).  City and county law enforcement agencies in any

6    California county can issue licenses to carry a concealed handgun on the person.  *Id.*

7    §§ 26150(b)(1), 26155(b)(1).  But in counties with a population of less than 200,000, authorities

8    can also issue licenses to carry handguns "loaded and exposed in only that county."  *See id.*

9    §§ 26150(b)(2), 26155(b)(2).

10       Baird and Gallardo filed this case in 2019.  *See generally* Compl., ECF No. 1.  They

11   sought declaratory and injunctive relief and moved for a preliminary injunction.  *See* Compl. at

12   55–58 (prayer for relief); First Mot. Prelim. Inj., ECF No. 14.  The court denied that motion.  *See*

13   *generally* Prev. Order, ECF No. 33.  Although Baird and Gallardo then raised serious questions

14   about whether California's firearms regime violated the Second Amendment, they did not show

15   the balance of interests tipped sharply in their favor, as the court found would have been

16   necessary to obtain a preliminary injunction.  *See id.* at 5–10.  The court noted, however, that a

17   number of appeals pending in the Ninth Circuit raised similar questions, so the court permitted

18   Baird and Gallardo to renew their motion if the circuit eventually issued a decision favoring their

19   position.  *See id.* at 10.  The court also dismissed several of their claims with leave to amend.  *See*

20   *id.* at 10–18.

21       The Ninth Circuit then issued its opinion in *Young v. Hawaii*, 992 F.3d 765 (9th Cir.

22   2021) (en banc), which upheld a Hawaii firearm licensing scheme against a similar constitutional

23   challenge.  The plaintiffs amended their complaint.  *See generally* Am. Compl., ECF No. 34.

24   They also moved again for a preliminary injunction.  Mot. Prelim. Inj., ECF No. 40.  In response,

25   the state moved for summary judgment.  ECF No. 56.  Before the court could resolve those

26   motions, however, the Supreme Court granted the petition for certiorari in *Bruen*, so the parties

---

[2] https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf (last visited Dec. 7, 2022).

3

1   jointly requested a stay while *Bruen* was pending.  ECF No. 58.  After the Supreme Court issued

2   its decision in *Bruen*, it also vacated the Ninth Circuit's decision in *Young*, *see* 142 S. Ct. 2895

3   (2022), and the Ninth Circuit then remanded the case to the district court for further proceedings,

4   45 F.4th 1087 (2022).  This court then lifted the stay here, the plaintiffs renewed their motion for

5   a preliminary injunction, and amended their complaint.  *See generally* Second Am. Compl., ECF

6   No. 68; Mot., ECF No. 65.[3]

7        In both their complaint and motion, Baird and Gallardo ask the court to enjoin the

8   enforcement of Penal Code sections 26350 and 25850 "against individuals who carry a handgun

9   open and exposed in public throughout the State of California."  Mot. at 2; *see also* Second Am.

10  Compl. at 17.  They do not ask for any relief related to concealed handguns.  The state opposes

11  their motion, *see generally* Opp'n, ECF No. 69, which is now fully briefed, *see generally* Reply,

12  ECF No. 73.  The court submitted the motion after hearing oral arguments on November 4, 2022.

13  At the hearing, Amy Bellantoni appeared for Baird and Gallardo.  Ryan Davis and R. Matthew

14  Wise appeared for the state.

15  **II.    JURISDICTION**

16       "The first question, as always, is whether this court has jurisdiction."  *Tomer v. Gates*,

17  811 F.2d 1240, 1242 (9th Cir. 1987) (per curiam).  The state does not argue this court lacks

18  jurisdiction.  *See* Status Rep. at 5, ECF No. 72.  But a federal court must ensure it has jurisdiction

19  even if the parties voice no doubts.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

20       Several limits on this court's jurisdiction are derived from the Constitution's references to

21  "Cases" and "Controversies" in Article III.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

22  352 (2006).  One of these limits is constitutional standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330,

23  338 (2016).  To have standing, plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly

24  traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

---

[3] The parties agree the pending motion for a preliminary injunction should be evaluated on the basis of the claims and allegations in the operative Second Amended Complaint.  The court treats the operative complaint as the controlling pleading.  *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 927 (9th Cir. 2012) (en banc) ("[T]he general rule is that an amended complaint super[s]edes the original complaint and renders it without legal effect . . . .").

4

1    favorable judicial decision." *Id.* They must satisfy these requirements for each claim they assert

2    and for each form of relief they seek. *DaimlerChrysler*, 547 U.S. at 352.

3           Baird and Gallardo have standing to contest the state law generally in a facial challenge.

4    *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (describing facial challenges). They

5    contend the Second Amendment countenances no limitations on their right to carry handguns

6    openly in public, and they claim the Second Amendment precludes California's scheme of

7    prohibitions, exceptions, and licenses for carrying handguns openly in public. *See* Second Am.

8    Compl. ¶ 8; Baird Decl. ¶ 7; Gallardo Decl. ¶ 7. They describe their right to carry loaded

9    handguns openly in public as "God-bestowed," as a right they can exercise without "permission

10   from the government, licensing, registration, or any other action," and as a right the Second

11   Amendment to the United States Constitution protects against "any encroachment." Second Am.

12   Compl. ¶ 8 (emphasis omitted). At hearing, their counsel described this facial challenge as their

13   principal or primary claim. Baird and Gallardo have standing to assert this facial claim: they are

14   subject to the challenged Penal Code sections, and an injunction or declaration would relieve

15   them of these constraints.

16          Although Baird and Gallardo have standing to assert these broad facial challenges, and

17   although their counsel focused on their challenges at the hearing on their current motion, their

18   complaint can also be interpreted as asserting claims that are more specific to their personal

19   circumstances. Each lives in a county with a population of less than 200,000, meaning the local

20   permitting authorities have authority to issue permits to carry loaded handguns openly in those

21   jurisdictions. *See* Baird Decl. ¶¶ 2, 7; Gallardo Decl. ¶¶ 2, 7; Cal. Penal Code §§ 26155(b)(2),

22   26150(b)(2). Baird and Gallardo argue, however, that there is no way to apply for such a permit

23   in practice. *See* Baird Decl. ¶ 7; Gallardo Decl. ¶ 7. They also suspect their local sheriffs' offices

24   would deny their applications outright even if they could apply. *See* Baird Decl. ¶ 7; Gallardo

25   Decl. ¶ 7. In this sense, their complaint raises a challenge to the state's statutes as applied. *See*

26   *Calvary Chapel Bible Fellowship v. Cty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020)

27   ("How the statute has been interpreted and applied by local officials is the province of an as-

28   applied challenge . . . .").

5

1    The court does not have jurisdiction over an as-applied challenge along these lines. Baird

2    and Gallardo have not shown they have standing to assert claims on behalf of people who live in

3    larger counties. *Cf., e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–44

4    (1977) (discussing third-party standing); *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir.

5    2017) (per curiam) (same). As for their claim that licensing authorities would reflexively deny all

6    open-carry permit applications, they have brought this case against the wrong defendant. They

7    have sued the state's Attorney General, but California does not give its Attorney General

8    authority to issue permits. As a result, Baird and Gallardo have not shown a favorable decision

9    would redress their alleged injury. They do not have standing to assert any as-applied challenges.

10   *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1074 (9th Cir.

11   2010) (reaching same conclusion in case against wrong agency). Their complaint is dismissed to

12   this extent. Plaintiffs may seek to amend their complaint to bring an as-applied challenge if they

13   choose, but only if the amendment would show at least one plaintiff had standing to challenge the

14   statutes as applied at the time the case began. *See Northstar Fin. Advisors Inc. v. Schwab Invs.*,

15   779 F.3d 1036, 1043–48 (9th Cir. 2015).

16   **III.    PRELIMINARY INJUNCTION**

17       **A.    Legal Standard**

18   To obtain a preliminary injunction, Baird and Gallardo must establish four things "by a

19   clear showing": they are "likely to succeed on the merits," they are "likely to suffer irreparable

20   harm in the absence of preliminary relief," "the balance of equities tips in [their] favor," and "an

21   injunction is in the public interest." *City & Cty. of San Francisco v. United States Citizenship &*

22   *Immigr. Servs.*, 944 F.3d 773, 788–89 (9th Cir. 2019) (emphasis omitted) (first quoting *Mazurek*

23   *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); then quoting *Winter*, 555 U.S. at 20).

24   "Alternatively, 'serious questions going to the merits and a balance of hardships that tips sharply

25   towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also

26   shows that there is a likelihood of irreparable injury and that the injunction is in the public

27   interest.'" *Id.* at 789 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.

28   2011)). When the party opposing an injunction is the state, as is true in this case, the balance of

1    equities and public interests "merge." *E.g.*, *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Roman v.*

2    *Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020) (per curiam).

3           Preliminary injunctions are ordinarily intended "merely to preserve the relative positions

4    of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390,

5    395 (1981). When a plaintiff asks to change the status quo rather than preserve it, district courts

6    exercise greater caution. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

7    To obtain an injunction that instructs an opposing party to change its behavior, thus altering the

8    status quo, a plaintiff must show "extreme or very serious damage" will occur unless the

9    requested injunction is granted. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (quoting

10   *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

11   Such affirmative pretrial relief is not appropriate in "doubtful" cases. *Garcia*, 786 F.3d at 740

12   (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th

13   Cir. 2011)).

14          The parties advance conflicting arguments about their respective burdens. For the first

15   part of the *Winter* test, showing a likelihood of success on the merits, Baird and Gallardo argue

16   their only burden is to prove their conduct "falls within the plain language of the Second

17   Amendment." Reply at 1. If so, then in their view, the state must "show that the challenged

18   regulations are consistent with this Nation's historical traditions of firearm regulation." *Id.* The

19   state acknowledges it must ultimately "put forth the relevant historical evidence to prevail at final

20   judgment." Opp'n at 12. It also argues, however, that Baird and Gallardo must "show that they

21   are likely to prevail on the merits," a task the state describes as impossible given the uncertainties

22   of history, the expertise and time required to study that history, and how fundamentally *Bruen*

23   changes Second Amendment law. *See id.* at 12–13.

24          The parties cite no Ninth Circuit or Supreme Court authority allocating the parties'

25   burdens for preliminary injunction motions in a post-*Bruen* Second Amendment challenge. This

26   court is aware of no such authority. The Supreme Court did not reach that question in *Bruen*

27   because the district court had dismissed the complaint for failure to state a claim. *See generally*

1  354 F. Supp. 3d 143 (N.D.N.Y. 2018), *aff'd*, 818 F. App'x 99 (2d Cir. 2020), *rev'd*, 142 S. Ct.

2  2111.

3        The Supreme Court's opinion in *Bruen* does, however, signal the path forward.  The Court

4  first rejected the two-part test lower courts had previously adopted.  *See* 142 S. Ct. at 2126–30.  It

5  settled instead on an historical test: "When the Second Amendment's plain text covers an

6  individual's conduct, the Constitution presumptively protects that conduct.  The government must

7  then justify its regulation by demonstrating that it is consistent with the Nation's historical

8  tradition of firearm regulation."  *Id.* at 2129–30.  The Court justified this rule in part by

9  comparing it to the rules it has adopted for First Amendment claims.  *See id.* at 2130.  By drawing

10  this connection, the Supreme Court was not broadly pronouncing that the government's burdens

11  in Second Amendment cases mirror its burdens in First Amendment cases.  The Court's analogy

12  nevertheless suggests First Amendment cases can offer insights about the parties' burdens when a

13  plaintiff alleges a law or regulation violates the Second Amendment.

14        Federal appellate decisions in First Amendment cases do in fact offer useful insights.

15  When a plaintiff moves for a preliminary injunction in a First Amendment case, there is a tension

16  between the plaintiff's burden of showing it is likely to succeed on the merits and the

17  government's ultimate burden "of justifying its speech-restrictive law" at trial.  *Thalheimer v.*

18  *City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011), *overruled in part on other grounds by*

19  *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en

20  banc); *see also Ashcroft v. A.C.L.U.*, 542 U.S. 656, 666 (2004).  Under the Supreme Court's

21  decision in *Bruen*, the parties' burdens create the same tension: the plaintiff must show it is likely

22  to succeed on the merits, but the government must ultimately "justify its regulation by

23  demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

24  142 S. Ct. at 2129–30.  The Supreme Court and the Ninth Circuit have alleviated this tension in

25  First Amendment cases by essentially accelerating the government's obligations.  *See A.C.L.U.*,

26  542 U.S. at 666; *Thalheimer*, 645 F.3d at 1116.  Unless the government "justifies the restriction"

27  under the standard that would apply at trial, the plaintiff is "deemed likely to prevail," *A.C.L.U.*,

28  542 U.S. at 666.  In this limited way, "the burdens at the preliminary injunction stage track the

1    burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418,

2    429 (2006).

3         The similarities between the test adopted in *Bruen* and the government's burden in First

4    Amendment cases suggest strongly that the Supreme Court would require the government, not the

5    plaintiffs, to identify historical analogs in response to a motion for a preliminary injunction in

6    Second Amendment cases.  Other district courts have assumed this is so.  *See, e.g.*, *Rigby v.*

7    *Jennings*, ___ F. Supp. 3d ___, No. 21-1523, 2022 WL 4448220, at *8 (D. Del. Sept. 23, 2022)

8    (finding plaintiffs were likely to succeed on the merits after finding defendants had not

9    demonstrated challenged statutes were consistent with historical tradition); *Nat'l Ass'n for Gun*

10   *Rts., Inc. v. City of San Jose*, ___ F. Supp. 3d ___, No. 22-00501, 2022 WL 3083715, at *4 (N.D.

11   Cal. Aug. 3, 2022) (generalizing rule to all "cases where the government bears the burden as to

12   the ultimate question of the challenged law's constitutionality" in Second Amendment challenge);

13   *see also Antonyuk v. Hochul*, ___ F. Supp. ___, No. 22-0986, 2022 WL 5239895, at *12

14   (N.D.N.Y. Oct. 6, 2022) (adopting this scheme in response to motion for temporary restraining

15   order).

16        California argues otherwise, citing *Ramos v. Wolf*.  *See* Opp'n at 12 (citing 975 F.3d 872

17   (9th Cir. 2020)).  In *Ramos*, the plaintiffs alleged the President had adopted a racially

18   discriminatory immigration policy in violation of the Equal Protection Clause.  *See id.* at 883.

19   The district court granted the plaintiffs' motion for a preliminary injunction, *see id.* at 884–87, but

20   the Ninth Circuit reversed, *id.* at 899.  In the Circuit's assessment, there was "no evidentiary

21   support for the conclusion" that the policy change "was motivated by racial animus." *Id.*  The

22   Circuit emphasized that the plaintiffs could succeed on their Equal Protection Clause challenge at

23   trial only by offering "proof of racially discriminatory intent or purpose." *Id.* at 896 (alterations

24   omitted) (quoting *Village of Arlington Heights v. Metro. Housing Development Corp.*, 429 U.S.

25   252, 265 (1977)).  Here, by contrast, the government would bear the burden of proof at trial to

26   show its regulations are justified by history and tradition.  *See Bruen*, 142 S. Ct. at 2130.  *Ramos*

27   is not controlling, and the plaintiffs' differing burdens at trial in that case deprive the Circuit's

28   reasoning of persuasive force.

9

1    In sum, for the first part of the preliminary injunction test, Baird and Gallardo must show

2    they are likely to prove "the Second Amendment's plain text covers" conduct regulated by

3    California Penal Code sections 25850 and 26350. *Bruen*, 142 S. Ct. at 2129–30. If they do, the

4    state bears the burden to show it is likely to "justify its regulation by demonstrating that it is

5    consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. In all other

6    respects, the plaintiffs bear the burden of proof: they must show they are likely to suffer

7    irreparable harm absent a preliminary injunction, and they must show the balance of harms and

8    public interests favor a preliminary injunction. *See Winter*, 555 U.S. at 20.

9    **B.    Discussion**

10    It is not necessary to decide whether California's Penal Code restricts conduct within the

11    Second Amendment's plain text under *Bruen* or whether the challenged Penal Code sections are

12    within the nation's historical tradition of firearms regulation. Nor is it necessary to decide

13    whether Baird and Gallardo would suffer irreparable harm if the court does not enter a

14    preliminary injunction. As explained below, they have not shown the balance of harms and

15    public interest favor a preliminary injunction.

16    A court cannot enter a preliminary injunction if the moving party does not show "the

17    balance of equities tips in [its] favor," and "an injunction is in the public interest." *Winter*,

18    555 U.S. at 20. *Winter* itself illustrates this point forcefully. The plaintiffs alleged the U.S. Navy

19    had not adequately considered how harmful its training exercises were to marine mammals. *See*

20    *id.* at 15–17. They brought claims under a collection of federal environmental protection laws.

21    *See id.* at 16–17. When the case reached the Supreme Court, it turned on one question: how to

22    balance the harms and public interest. *See id.* at 20–31. The Supreme Court did not "address the

23    underlying merits." *Id.* at 31. It also assumed without deciding the plaintiffs would suffer an

24    irreparable harm. *See id.* at 23–24. The Court vacated the preliminary injunction because the

25    district and circuit courts had "significantly understated the burden the preliminary injunction

26    would impose on the Navy's ability to conduct realistic training exercises, and the injunction's

27    consequent adverse impact on the public interest in national defense." *Id.* at 24. The Court also

1    concluded a permanent injunction along the same lines would have been an abuse of discretion as

2    well, even if the plaintiffs eventually prevailed on the merits.  *See id.* at 32.

3         Turning back to this case, Baird and Gallardo argue that without an injunction, they and

4    others in California will be denied the constitutional right to carry handguns openly in public.  *See*

5    Mem. at 9; Reply at 6.  They claim that without an injunction, they cannot defend themselves

6    with handguns in public and will lose the peace of mind that comes with carrying a handgun.  *See*

7    Mem. at 9.  These arguments overstate the harms they will likely suffer without a preliminary

8    injunction.  Baird and Gallardo will not be without a means to defend themselves with handguns

9    in public while the case is pending.  They and others in California may carry concealed handguns

10   in public.  If a person cannot rely on one of the many exceptions to the Penal Code's general

11   prohibitions, as Baird and Gallardo each can, then that person may apply for a license, which

12   California now issues under objective criteria.

13        The Supreme Court left no doubt in *Bruen* that it was not deciding whether states could

14   regulate firearms using objective criteria like those California now imposes.  The Court strongly

15   implied that objective criteria and "shall-issue" licensing regimes are constitutional.  The majority

16   explained in the margin that "nothing" in the Court's opinion "should be interpreted to suggest

17   the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."  142 S. Ct. at 2138 n.9.

18   "[I]t appears that these shall-issue regimes, which often require applicants to undergo a

19   background check or pass a firearms safety course, are designed to ensure only that those bearing

20   arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Id.* (quoting *District of*

21   *Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

22        Separate concurring opinions by three Justices in *Bruen* reinforce this point.  Justice Alito,

23   who joined the majority's opinion, underscored that the Court had decided "nothing about who

24   may lawfully possess a firearm or the requirements that must be met to buy a gun."  *Id.* at 2157

25   (Alito, J., concurring).  Nor had the Court "disturbed anything that [it] said in *Heller* or

26   *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the

27   possession or carrying of guns."  *Id.*  Justice Kavanaugh, who also joined the majority opinion,

28   wrote similarly in a separate concurring opinion:"[T]he 6 States including New York [and

11

1  California] potentially affected by today's decision may continue to require licenses for carrying

2  handguns for self-defense so long as those States employ objective licensing requirements like

3  those used by the 43 shall-issue States." *Id.* at 2162 (Kavanaugh, J., concurring). In Justice

4  Kavanaugh's view, the Court's opinion in *Bruen* does not prohibit states from "requir[ing] a

5  license applicant to undergo fingerprinting, a background check, a mental health records check,

6  and training in firearms handling and in laws regarding the use of force, among other possible

7  requirements." *Id.* The Chief Justice joined Justice Kavanaugh's opinion. *Id.* at 2161.

8      In short, six Justices took care to explain why the Court's opinion did not bar the vast

9  majority of states from continuing to enforce their firearms licensing regimes. Two of the

10 Justices whose votes were necessary to make up the six-member majority also wrote specifically

11 that states like New York and California could continue using background checks and imposing

12 training requirements, among other criteria. As a result, in this case, the only harm most people

13 will likely face absent a preliminary injunction is (1) a requirement to obtain a license, which

14 requirement the majority did not question in *Bruen* and (2) having to conceal any handguns they

15 may wish to carry in public.

16     Baird and Gallardo have not shown that this harm outweighs the harms that would likely

17 result from an immediate preliminary injunction. If California cannot enforce sections 25850 and

18 26350 against those who carry handguns openly in public, then it would lose its primary means of

19 limiting public handgun carrying to "ordinary, law-abiding citizens." *Bruen*, 142 S. Ct. at 2122.

20 A person who could not obtain a license to carry a concealed handgun—due, for example, to a

21 lack of "good moral character" or refusal to complete a "course of training"—could circumvent

22 the state's laws by carrying the same gun openly. *See* Cal. Penal Code § 26150(a)(1), (4).

23     California also cites an unrebutted declaration from a former police chief and past

24 president of the California Police Chiefs Association, who opines that "restrictions on the open

25 carry of firearms greatly enhance public safety." Raney Decl. ¶21, ECF No. 69-2. In his opinion,

26 based on "39 years of law-enforcement experience" and other work, "the restrictions on the open

27 carry of firearms in California have been critical to the safety of law-enforcement officers, our

28 communities, and those people who would want to openly carry firearms in public." *Id.* ¶¶ 2, 22.

1    To that same end, the state also cites academic research showing violent crime, property crime,

2    and murder rates are higher in states that impose fewer restrictions on firearm carrying in public.

3    *See* Opp'n at 18–19. The plaintiffs offer no countervailing evidence to show, for example, that

4    crime rates are the same or lower when firearms regulations are relaxed. They instead criticize

5    the cited studies as focusing on concealed firearms, whereas their complaint focuses on open

6    carry alone. *See* Reply at 9. These criticisms limit the state's evidence, but they do not eliminate

7    its persuasive force. *See, e.g.*, Wise Decl. Ex. 4 at 7–13 (collecting theories of increased violent

8    crime, including some that do not depend on whether guns are concealed). The plaintiffs bear the

9    burden to prove an injunction is in the public interest, and they have offered no countervailing

10   evidence, so the cited studies weigh against issuing a preliminary injunction despite their

11   limitations.

12          Baird and Gallardo argue public safety concerns such as these are irrelevant, citing the

13   Supreme Court's observation that many constitutional rights carry "controversial public safety

14   implications." *Bruen*, 142 S. Ct. at 2126 n.3 (quoting *McDonald*, 561 U.S. at 783 (plurality op.)).

15   Under *Bruen*, the state could not defend its laws at trial by arguing they advance a compelling

16   state interest in public safety. *See id.* at 2127 (rejecting "means-end scrutiny in the Second

17   Amendment context"). But Baird and Gallardo are not seeking final judgment; rather, they are

18   seeking a preliminary injunction, and the Supreme Court has held that a court may not enter a

19   preliminary injunction unless the moving party shows the balance of harms and public interest

20   weigh in its favor. *See Winter*, 555 U.S. at 20, 32. Public safety is part of that balance.

21          Finally, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by

22   representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S.

23   1301, 1303 (2012) (Roberts, J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W.*

24   *Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

25          This court denied Baird's and Gallardo's previous motion for a preliminary injunction for

26   similar reasons. *See* Order (Aug. 31, 2020) at 8–10, ECF No. 33. As this court wrote in its

27   previous order, preliminary assessments of the merits can turn out to be incorrect. *See id.* at 9;

28   *see also Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015), *aff'd*,

13

1    637 F. App'x 401 (9th Cir. 2016). The moving plaintiff must persuade the court that the benefits

2    of a potential mistake outweigh the costs. *See Tracy*, 118 F. Supp. 3d at 1193. Courts hesitate

3    when those costs are likely far-reaching, difficult to estimate, and potentially deadly. *See id.*

4    Baird and Gallardo ask the court to force California to allow anyone to carry a loaded handgun

5    openly in public without a permit while they attempt to prove the state's licensing regime is

6    unconstitutional. They have not shown such a broad injunction would serve the public interest.

7        The affirmative character of the plaintiffs' proposal advises caution as well. As noted

8    above, when a plaintiff asks to change the status quo rather than preserve it, district courts must

9    exercise greater caution. *See, e.g.*, *Garcia*, 786 F.3d at 740. "The status quo means the last,

10   uncontested status which preceded the pending controversy." *Id.* at 740 n.4 (quoting *N.D. ex rel.*

11   *Parents v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 n.6 (9th Cir. 2010)). This case began in

12   2019; California's current regime had been operative since 2012, so the existing regime is the

13   "status quo." *Compare* 2010 Cal. Stats. Ch. 711, §§ 6, 10 (S.B. 1080) (West), *with* Compl., ECF

14   No. 1. As explained above, the preliminary injunction Baird and Gallardo propose would upend

15   that regime. This is so even if their injunction could be described as "prohibitive" in that it would

16   prohibit certain criminal prosecutions; what matters is whether the injunction preserves or alters

17   the status quo. *See, e.g.*, *Doe*, 28 F.4th at 111 (rejecting recharacterization of changes to status

18   quo as "prohibitory"); *see also Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005) ("It

19   is not at all difficult to envision situations where a mandatory injunction would preserve the status

20   quo and a prohibitory injunction would alter the status quo." (citation omitted)).

21       For these reasons, Baird and Gallardo must show this is not a "doubtful" case and that the

22   preliminary injunction they propose is necessary to avoid "extreme or very serious damage."

23   *Doe*, 28 F.4th at 111 (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879). They have not done so;

24   as explained above, the harm they seek to avoid is (1) compliance with an objective permitting

25   scheme and (2) concealing any handguns carried in public. This is also a "doubtful" case.

26   Deciding whether the state's laws are constitutional will require a difficult investigation and

27   careful consideration of historical firearm regulations. Opp'n at 12 (citing Schrag Decl., *Miller v.*

28   *Becerra*, No. 19-1537 (S.D. Cal. Aug. 29, 2022), ECF No. 129-1). The Ninth Circuit's extensive

14

1    discussion of historical open-carry regulations in *Young* has been vacated, so it is no longer the

2    binding law in this circuit.  And as Justice Barrett pointed out in her concurring opinion in *Bruen*,

3    a number of "unsettled questions" and a "scholarly debate" further complicate this historical

4    exercise.  *See* 142 S. Ct. 2163 (Barrett, J., concurring).  This court is indeed "ill equipped to

5    conduct the type of searching historical surveys that the [Supreme] Court's approach requires."

6    *Id.* at 2179 (Breyer, J., dissenting).  Baird and Gallardo have not proven it would be better to

7    upend the status quo than leave it in place while the court adjudicates their claims.

8        Because Baird and Gallardo have not shown their proposed preliminary injunction would

9    serve the public interest, and because their proposal does not appropriately balance the likely

10   harms, their motion is denied.  *See Winter*, 555 U.S. at 20, 32.

## IV.    CONCLUSION AND ORDER TO SHOW CAUSE

12       The Second Amended Complaint is **dismissed in part for lack of subject matter**

13   **jurisdiction** as explained in section II above.  The motion for a preliminary injunction (ECF No.

14   65) is **denied**.

15       On the court's own motion, to facilitate the court's considerations of any obligations it has

16   following *Bruen*, the parties are **ordered to show cause within thirty days** why the court should

17   not appoint its own expert witness to collect and survey evidence of the "historical tradition that

18   delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, as

19   relevant to this case, *see* Fed. R. Evid. 706(a).  In their responses, each party may submit

20   nominations of potential experts if they wish.  *See id.*  The parties may also address the court's

21   tentative observation that an appointed expert could provide a more thorough, rigorous, and

22   balanced perspective than those the parties have offered to date.  *Cf., e.g.*, *United States v.*

23   *Bullock*, No. 18-cr-165, 2022 WL 16649175, at *2–3 (S.D. Miss. Oct. 27, 2022) (ordering

24   similarly in felony case based on 18 U.S.C. § 922 charge with motion to dismiss pending, after

25   identifying and summarizing "a serious disconnect between the legal and historical

26   communities")[4]; *but cf., e.g.*, *United States v. Kelly*, No. 22-0037, 2022 WL 17336578, at *3

---

[4] The parties have not yet filed their responses to the court's order in *Bullock*; it appears the responses currently are due by December 12, 2022.

1  (M.D. Tenn. Nov. 16, 2022) (in criminal prosecution, observing "[p]ending gun cases must be

2  decided, which means, now, that they must be decided through the methodology set forth in

3  *Bruen*, whether the courts are actually well-suited to that inquiry or not.").

4      IT IS SO ORDERED.

5  DATED:  December 7, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE