No. 24-565

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARK BAIRD

*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee,*

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## APPELLANT'S EXCERPTS OF RECORD
### VOLUME 2 of 7

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

ER-89

1

```
 1

 2                   IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF CALIFORNIA
 3

 4     MARK BAIRD, ET AL.,
              PLAINTIFFS,
 5

       VS.                            SACRAMENTO, CALIFORNIA
 6                                    NO. 2:19-CV-00617
       ROB BONTA, IN HIS OFFICIAL     FRI., NOV. 03, 2023
 7     CAPACITY AS ATTORNEY           11:43 A.M.
       GENERAL OF THE STATE OF
 8     CALIFORNIA,
              DEFENDANT.
 9     _____/

10                      TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
11                        ---oOo---

12

13     APPEARANCES:

14      FOR THE PLAINTIFFS:          THE BELLANTONI LAW FIRM, PLLC
                                     2 OVERHILL ROAD, SUITE 400
15                                   SCARSDALE, NY  10583
                                     BY:  AMY L. BELLANTONI
16                                   ATTORNEY AT LAW

17      FOR THE DEFENDANT:           CALIFORNIA DEPARTMENT OF
                                     JUSTICE
18                                   300 SO. SPRING STREET
                                     SUITE 1702
19                                   LOS ANGELES, CA  90013
                                     BY: LARA HADDAD
20                                   ATTORNEY AT LAW

21

22      OFFICIAL COURT REPORTER:     KIMBERLY M. BENNETT,
                                     CSR, RPR, RMR, CRR
23                                   501 I STREET
                                     SACRAMENTO, CA 95814

24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
        PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

2

```
1          (CALL TO ORDER OF THE COURT, 11:43 A.M.)

2              THE CLERK:  CALLING CIVIL CASE 19-617, BAIRD, ET AL.

3    VERSUS BONTA.

4        THIS IS ON CALENDAR FOR DEFENDANT'S MOTION FOR SUMMARY

5    JUDGMENT.

6              THE COURT:  ALL RIGHT.  GOOD MORNING.

7        APPEARANCES, PLEASE, FOR PLAINTIFFS.

8              MS. BELLANTONI:  GOOD MORNING.  AMY BELLANTONI FOR

9    THE PLAINTIFFS.

10             THE COURT:  GOOD MORNING, MS. BELLANTONI.

11       AND MR. BAIRD IS MONITORING BY TELEPHONE --

12             MS. BELLANTONI:  YES.

13             THE COURT:  -- WITH THE COURT'S PERMISSION.

14             MS. BELLANTONI:  THANK YOU, YOUR HONOR, FOR ALLOWING

15   HIM TO DO THAT.  I APPRECIATE THAT.

16             THE COURT:  ALL RIGHT.  AND FOR THE DEFENSE.

17             MS. HADDAD:  LARA HADDAD FOR THE STATE ATTORNEY

18   GENERAL.

19             THE COURT:  GOOD MORNING, MS. HADDAD.

20       I HAVE SEVERAL QUESTIONS AND THEN I WOULD ALLOW BRIEF

21   WRAP-UP ARGUMENT IF YOU THINK THERE IS SOMETHING NOT COVERED BY

22   THE RECORD.

23       ONE QUESTION, MS. HADDAD.  JUST SO I'M CLEAR, AT THIS POINT

24   ARE ALL OF THE LAWS CITED IN THE STATE'S APPENDIX IN THE

25   RECORD?  I KNOW YOU OFFERED TO PROVIDE THEM, BUT HAVE THEY BY
```

3

1    NOW GOTTEN INTO THE RECORD?

2            MS. HADDAD:  NO, YOUR HONOR.  MY APOLOGIES.

3        SO THE ONLY -- THE ONLY -- THE PRINTED VERSIONS OF THE LAWS

4    THAT WE SUBMITTED WITH OUR REQUEST FOR JUDICIAL NOTICE, WE

5    HAVEN'T SUPPLEMENTED THOSE.  BUT THE TEXT OF MANY OF THE LAWS

6    ARE IN MR. SPITZER'S EXPERT REPORT AS WELL AND HIS EXHIBITS.

7    AND I'M HAPPY TO SUBMIT THE REST AS SOON AS -- AS SOON AS WE'RE

8    ABLE TO.

9            THE COURT:  AND THE PLAINTIFFS HAVE RECEIVED THOSE?

10           MS. HADDAD:  FOR THE -- EVERYTHING I JUST DESCRIBED,

11   YES, THE REQUEST FOR JUDICIAL NOTICE.  AND THOSE EXHIBITS, THEY

12   WERE SERVED.  BUT WE HAVE NOT SERVED THEM WITH ANY TEXT OF LAWS

13   THAT WE HAVE NOT PROVIDED TO THIS COURT.

14           THE COURT:  WELL I WOULD ACCEPT YOUR OFFER, AS STATED

15   IN YOUR -- IN ONE OF YOUR FOOTNOTES, TO PROVIDE.  I JUST --

16   TRIAL COURTS LAY FOUNDATIONS.  IT FEELS TO ME AS IF -- GIVEN

17   THAT THERE IS A REFERENCE THAT THE -- THE ENTIRE SET SHOULD BE

18   IN THE RECORD.

19       SO IS THAT A ZIP FILE?

20           MS. HADDAD:  SO WE HAVE NOT FILED IT YET, BUT WE

21   WILL.  AND I WOULD JUST ASK THAT YOU GIVE US A FEW DAYS TO PULL

22   THAT TOGETHER.

23           THE COURT:  ALL RIGHT.  SO ANY PROBLEM WITH THAT,

24   MS. BELLANTONI?

25           MS. BELLANTONI:  NO, YOUR HONOR.  JUST SO I'M CLEAR,

4

1   SO THEN WITHIN A FEW DAYS OR SO, EVERY STATUTE OR REGULATION

2   UPON WHICH THE STATE IS RELYING WILL BE PROVIDED IN ITS FULL

3   TEXT SO THAT THE COURT CAN REFER TO THE TEXT OF THE STATUTE; IS

4   THAT CORRECT?

5           THE COURT:  CORRECT.

6           MS. BELLANTONI:  THANK YOU.

7           THE COURT:  YEAH.

8           MS. HADDAD:  THAT'S CORRECT.  WE'LL SUBMIT A

9   SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE.  IT WILL FOLLOW THE

10  SAME FORMAT AS OUR REQUEST FOR JUDICIAL NOTICE.

11          THE COURT:  ALL RIGHT.

12          MS. BELLANTONI:  YOUR HONOR, IF I COULD HAVE A FEW

13  DAYS SUBSEQUENT TO THAT TO TAKE A LOOK AT THE ACTUAL TEXT.  AND

14  IF ANY SUPPLEMENTAL, I GUESS, OBJECTIONS NEED TO BE MADE BY

15  PLAINTIFFS, OR JUST TO CLARIFY OUR POSITION ON ANYTHING, I

16  WOULD ASK WE BE ABLE TO DO THAT.

17          THE COURT:  ALL RIGHT.  SO, SAY BY NEXT WEDNESDAY,

18  MS. HADDAD, YOU WOULD MAKE YOUR FILING?

19          MS. HADDAD:  YES, YOUR HONOR.  NEXT WEDNESDAY WOULD

20  BE FINE.

21          THE COURT:  THEN PLAINTIFFS BY END OF THE WEEK?

22  MS. BELLANTONI, IS THAT SUFFICIENT?

23          MS. BELLANTONI:  THAT SHOULD BE FINE, YOUR HONOR.

24  THANK YOU.

25          THE COURT:  ALL RIGHT.  VERY GOOD.  THAT'S THE

5

1   COURT'S ORDER.

2       ALL RIGHT.  JUST A COUPLE OF QUESTIONS ABOUT THE STATE OF

3   THE RECORD.  MR. BAIRD DID TESTIFY AT DEPOSITION THAT HE HAS

4   APPLIED FOR MULTIPLE PERMITS, MOST RECENTLY IN 2021, AND HE

5   SAID HIS MOST RECENT APPLICATION WAS GRANTED.  BUT NOW I

6   UNDERSTAND THERE IS A DECLARATION -- HIS DECLARATION SAYS THAT

7   HE HAS -- THAT HE DOES NOT HAVE A PERMIT TO CARRY A CONCEALED

8   FIREARM.

9       IS THERE A FACTUAL DISPUTE THERE?

10          MS. BELLANTONI:  HIS CONCEALED CARRY APPLICATION WAS

11  GRANTED AND HAS SINCE EXPIRED.  HE'S NOT REAPPLIED FOR A

12  CONCEALED CARRY LICENSE.

13          THE COURT:  SO IT'S BASED ON -- HE DOESN'T HAVE A

14  PERMIT NOW ONLY BECAUSE IT EXPIRED?

15          MS. BELLANTONI:  CORRECT.

16          THE COURT:  ALL RIGHT.  AGREE WITH THAT

17  CHARACTERIZATION, MS. HADDAD?

18          MS. HADDAD:  YES, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  AND THEN MR. GALLARDO -- IS

20  IT GALLARDO OR GALLARDO?

21          MS. BELLANTONI:  GALLARDO.

22          THE COURT:  GALLARDO TESTIFIED AT DEPOSITION THAT

23  HE'S EXEMPTED FROM THE STATE'S LICENSE REQUIREMENT BY VIRTUE OF

24  A FEDERAL CREDENTIAL, BUT NOW CLAIMS IN HIS DECLARATION THAT HE

25  CAN'T RELY ON ANY EXEMPTION TO THE STATE'S LICENSING

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

6

1    REQUIREMENTS.

2        IS THAT A FACTUAL DISCREPANCY?

3            MS. BELLANTONI:  UNDER THE FEDERAL LEOSA STATUTE,

4    MR. GALLARDO IS ABLE TO CARRY CONCEALED.

5        AS AN ASIDE, YOUR HONOR, THERE ARE CERTAIN LOCAL PROHIBITED

6    AREAS THAT I DON'T BELIEVE ARE AT ISSUE HERE.  BUT THE FEDERAL

7    STATUTE DOES ONLY ALLOW HIM TO CARRY CONCEALED, IT DOES NOT

8    ALLOW OPEN CARRY.

9            THE COURT:  SO IT'S IN THAT SENSE THAT HE CLAIMS HE

10   CAN'T RELY ON ANY EXEMPTION?

11           MS. BELLANTONI:  YES.

12           THE COURT:  UNDERSTOOD, MS. HADDAD?

13           MS. HADDAD:  YES, YOUR HONOR.

14           THE COURT:  ALL RIGHT.  SO, MS. BELLANTONI, WHAT I --

15   I WANT TO MAKE CERTAIN I UNDERSTAND THE NATURE OF PLAINTIFFS'

16   CLAIMS BECAUSE IT SEEMS TO ME THERE MIGHT BE VARIOUS BASES.

17       SO ARE PLAINTIFFS CONTENDING THE SECOND AMENDMENT PREVENTS

18   CALIFORNIA FROM REQUIRING ANYONE TO OBTAIN A LICENSE BEFORE

19   CARRYING FIREARMS OPENLY IN PUBLIC?  IS THAT WHAT PLAINTIFFS

20   ARE CONTENDING?

21           MS. BELLANTONI:  WHAT WE'RE CONTENDING IS THAT THE

22   TWO STATUTES THAT WE ARE CHALLENGING, 25850 AND 26350, HAVE NO

23   HISTORICAL ANALOGUE AND VIOLATE THE PLAIN TEXT AND THE HISTORY

24   IN THIS NATION OF FIREARMS REGULATION.

25       I BELIEVE THE LICENSING ISSUE COMES INTO PLAY WHEN THE

ER-95

7

1   STATE ATTEMPTS TO ARGUE THAT NOTWITHSTANDING THESE CRIMINAL

2   STATUTES THAT THERE IS A -- AN ALTERNATIVE LICENSING REGIME.

3   BUT -- AND WE'VE ADDRESSED THAT.  AND THEIR EXPERTS HAVE SHOWN

4   THAT LICENSING WAS NOT EVEN AROUND IN CIVIL LATE 1800S AND

5   EARLY 1900S.  SO IN THAT RESPECT, LICENSING ALSO VIOLATES THE

6   PLAIN TEXT OF THE SECOND AMENDMENT AND HAS NO HISTORICAL

7   ANALOGUE.

8       BUT WHAT WE ARE ALLEGING --

9           THE COURT:  SO THAT -- SO THAT DOES MEAN, AT LEAST IN

10  PART, THAT FROM YOUR POINT OF VIEW CALIFORNIA CAN'T REQUIRE

11  ANYONE TO OBTAIN A LICENSE BEFORE ENGAGING IN OPEN CARRY; IS

12  THAT RIGHT?

13          MS. BELLANTONI:  WELL, IF YOU PUT IT THAT WAY, YES,

14  YOUR HONOR.  THAT -- YES, LICENSING IS CONTRARY TO THE PLAIN

15  TEXT, PARTICULARLY IN CALIFORNIA WHICH REMAINS AN OUTLIER STATE

16  IN THAT IT STILL IS A "MAY ISSUE" LICENSING REGIME, AND

17  PERMISSION -- REQUIRING PERMISSION BEFORE AN INDIVIDUAL

18  EXERCISES THE NATURAL RIGHT IS REPUGNANT TO THE CONSTITUTION.

19          THE COURT:  SO IT'S NOT JUST THAT CALIFORNIA CAN'T

20  LIMIT OPEN CARRY TO THOSE WHO LIVE OR WORK IN THE SMALLER

21  COUNTIES, POPULATIONS BELOW 200,000?

22          MS. BELLANTONI:  WE'RE CHALLENGING THE ENTIRE -- THE

23  ENTIRETY OF THE TWO CRIMINAL STATUTES, YOUR HONOR.  AND IT --

24  LICENSING ASIDE, THE STATE MUST COME UP WITH AN HISTORICAL

25  ANALOGUE FOR -- FOR THEIR TWO CRIMINAL STATUTES.  AND THEY

8

1    CAN'T POINT TO CALIFORNIA'S MODERN LICENSING REGULATIONS AS

2    THEIR HISTORICAL ANALOGUE.  THAT'S -- THEY HAVE TO LOOK BACK TO

3    THE FOUNDING ERA AND WHETHER THERE WAS A HISTORY OR TRADITION

4    OF BANNING OPEN CARRY, WHICH WOULD REALLY MAKE NO SENSE AND

5    RENDER THE PLAIN TEXT MEANINGLESS.

6         THE COURT:  SO I'M -- I'LL GET INTO THE HISTORY,

7    TEXT, TRADITION.  BUT JUST ONE FINAL QUESTION.  TO THE EXTENT

8    PLAINTIFFS ARGUE THAT OPEN CARRY LICENSES ARE UNAVAILABLE AS A

9    PRACTICAL MATTER, DO PLAINTIFFS ACKNOWLEDGE THE COURT HAS

10   DISMISSED THAT CLAIM, NO AMENDMENT SINCE I DID, AND SO I

11   CAN'T -- I'M NOT ENTERTAINING ANY CLAIM ALONG THAT LINE,

12   UNDERSTOOD?

13        MS. BELLANTONI:  I UNDERSTAND THAT YOU DISMISSED THE

14   AS APPLIED CHALLENGES, YES, YOUR HONOR.

15        THE COURT:  SO FOR YOU, MS. HADDAD, LOOKING AT WHAT

16   BRUEN REQUIRES THIS COURT TO DO, IS IT THE ATTORNEY GENERAL'S

17   POSITION THAT THE SECOND AMENDMENT DOES NOT PROTECT THE RIGHT

18   TO CARRY HANDGUNS OPENLY IN PUBLIC FOR SELF-DEFENSE?

19        MS. HADDAD:  NO, YOUR HONOR.  THERE IS A SELF-DEFENSE

20   EXCEPTION IN THE PENAL CODE, THAT -- IT'S PENAL CODE

21   SECTION 26045(A), WHICH HAS A CARVEOUT.  IT PROVIDES THAT

22   ANYONE MAY OPENLY CARRY A FIREARM WITHOUT A LICENSE IF THAT

23   PERSON REASONABLY BELIEVES THAT ANY PERSON OR THE PROPERTY OF

24   ANY PERSON IS IN IMMEDIATE GRAVE DANGER, AND THAT THE CARRYING

25   OF THE WEAPON IS NECESSARY FOR THE PRESERVATION OF THAT PERSON

9

1 OR PROPERTY.

2     WHAT THE ATTORNEY GENERAL -- WHAT THE ATTORNEY GENERAL'S

3 POSITION IS, HOWEVER, IS THAT THE STATE MAY REGULATE THE MANNER

4 OF PUBLIC CARRY.  CONCEALED CARRY HAS A "SHALL ISSUE" LICENSING

5 REGIME, AS WE'VE EXPLAINED IN OUR BRIEFING, AND IT MAY LIMIT

6 PUBLIC CARRY -- THE OPEN CARRY OF WEAPONS WHEN NOT -- WHEN IT

7 DOESN'T FALL INTO ONE OF THE EXCEPTIONS DETAILED IN OUR BRIEF

8 OR THIS SELF-DEFENSE EXCEPTION THAT I'VE DETAILED HERE, THE

9 STATE MAY LAWFULLY LIMIT IT.

10     SO IT'S NOT A BAN ON PUBLIC CARRY, IT IS A RESTRICTION ON

11 THE OPEN CARRY OF WEAPONS.

12         THE COURT:  ALL RIGHT.  THEN LOOKING AT WHAT I THINK

13 YOU PRESENT AS TEXTUAL ARGUMENTS, BUT I WANT TO CLARIFY THAT

14 WITH YOU, YOU POINT TO BRUEN, AND THE -- MAKE THE POINT THAT

15 SEVERAL ANTEBELLUM STATE-COURT DECISIONS EVINCE A CONSENSUS

16 VIEW THAT STATES COULD NOT ALTOGETHER PROHIBIT THE PUBLIC CARRY

17 OF ARMS PROTECTED BY THE SECOND AMENDMENT OR STATE ANALOGUES.

18 BUT THAT'S A CONCLUSION BASED ON HISTORICAL RECORD, CORRECT,

19 NOT ABOUT WHAT THE PLAIN TEXT PROTECTS?

20         MS. HADDAD:  YES, YOUR HONOR, THAT'S CORRECT.

21         THE COURT:  SO IS IT FAIR TO INTERPRET THE ATTORNEY

22 GENERAL'S ARGUMENT ABOUT RESTRICTIONS ON OPEN CARRY AS

23 ARGUMENTS ABOUT HISTORICAL TRADITION?

24         MS. HADDAD:  YES, YOUR HONOR, WITH IT -- AND BASED ON

25 EXISTING CASE LAW THAT HAS INTERPRETED THE SECOND AMENDMENT,

10

1    THAT HAS OBSERVED THAT WHEN IT COMES TO THE MANNER OF CARRY,

2    STATES CANNOT RESTRICT PUBLIC CARRY ALTOGETHER, BUT IT

3    LEAVES -- BUT EXISTING CASE LAW LEAVES OPEN FOR STATES TO

4    RESTRICT PUBLIC CARRY IN CERTAIN WAYS, PROVIDED THAT THERE IS

5    A -- THAT THERE IS AN AVENUE FOR LEGITIMATE PUBLIC CARRY, WHICH

6    WE HAVE HERE.

7           THE COURT:  JUST A THRESHOLD QUESTION FOR YOU,

8    MS. BELLANTONI.

9    I'VE LOOKED AT YOUR BRIEFING WITH RESPECT TO THE SECOND

10   AMENDMENT AND THE FOURTEENTH AMENDMENT.  AND I -- I THINK YOU

11   SAY THAT BRUEN AT LEAST CLARIFIES THE COURT DOESN'T NEED TO

12   THINK ABOUT TWO ERAS -- SECOND AMENDMENT FOUNDING ERA,

13   FOURTEENTH AMENDMENT RECONSTRUCTION ERA, SOME PEOPLE CALL IT

14   THE SECOND FOUNDING -- BUT YOU'RE SAYING IT DOESN'T -- THERE IS

15   NO DIFFERENCE IN THE HISTORICAL CONTEXT FOR THE PURPOSES OF --

16   OF THIS CASE; IS THAT RIGHT?

17          MS. BELLANTONI:  SO FOR THE PURPOSES OF INTERPRETING

18   THE BILL OF RIGHTS THERE HAS BEEN NO SUPREME COURT CASE, NOR

19   HAS THE STATE CITED ANY, THAT HAS LOOKED TO THE

20   POST-RATIFICATION ERA AND/OR THE FOURTEENTH AMENDMENT

21   RATIFICATION AS THE PRIMARY SOURCE OF INTERPRETING WHAT THE

22   SCOPE OF ANY PARTICULAR RIGHT IS.

23   AS BRUEN MAKES CLEAR, THE SCOPE OF THE SECOND AMENDMENT AND

24   THE BILL OF RIGHTS IS PEGGED TO THE RATIFICATION AND THE PUBLIC

25   UNDERSTANDING OF THE RIGHT AT THAT POINT IN TIME.  AND WHILE

11

1   THE SUPREME COURT IN BOTH THE SECOND AMENDMENT AND WITH RESPECT

2   TO THE FIRST, THE FOURTH, THE FIFTH, THE SIXTH AND THE EIGHTH

3   AMENDMENTS, WHEN THEY'VE LOOKED TO 1868 OR POST-RATIFICATION

4   REGULATIONS, IT'S SIMPLY AND ONLY BEEN TO CONFIRM THE ORIGINAL

5   TEXT AND THE ORIGINAL MEANING AS THE PUBLIC UNDERSTOOD IT AT

6   THE TIME THAT IT WAS RATIFIED IN 1791.  AND FOR ANY OTHER VIEW

7   TO BE TAKEN WOULD LEAD TO A TWISTED DICHOTOMY OF A TWO-TIERED

8   SYSTEM WHERE THE FEDERAL GOVERNMENT IS PROHIBITED FROM DOING

9   CERTAIN THINGS BUT THE STATES ARE PROHIBITED FROM INTERFERING

10  WITH RIGHTS IN A DIFFERENT WAY.  AND THAT'S JUST NOT CONSISTENT

11  WITH SUPREME COURT PRECEDENCE AND IT REALLY MAKES NO SENSE AT

12  ALL.

13          THE COURT:  JUST CHECKING, MS. HADDAD, ARE YOU

14  HEARING ANY DEVELOPMENT OF THE PLAINTIFFS' ARGUMENT IN WHAT

15  MS. BELLANTONI JUST SAID, OR HAVE YOU HAD A CHANCE TO FULLY

16  ADDRESS THAT IN YOUR REPLY?

17          MS. HADDAD:  WE HAVE -- WE'VE ADDRESSED THIS IN THE

18  OPPOSITION, BUT I JUST WANT TO MAKE CLEAR THAT THERE -- THERE

19  IS NOTHING TO SUGGEST THAT LAWS THAT WERE ENACTED OR IN EFFECT

20  AT THE TIME OF THE RATIFICATION OF THE FOURTEENTH AMENDMENT ARE

21  IRRELEVANT TO THIS COURT'S ANALYSIS.  THAT WOULD -- THAT --

22  UNDER PLAINTIFFS' INTERPRETATION THAT WOULD RENDER MEANINGLESS

23  LOOKING AT ANY LAWS THAT WERE IN EFFECT IN 1868 EVEN IF THEY

24  CONFIRM -- EVEN IF THEY COMPORT WITH LAWS FROM 1791.  IT JUST

25  MAKES NO SENSE.  AND THAT GOES AGAINST NOT ONLY THE LANGUAGE OF

12

1    BRUEN BUT ALSO THE LANGUAGE FROM THE MOST RECENT NINTH CIRCUIT

2    PANEL WHICH INTERPRETED BRUEN.

3           MS. BELLANTONI:  WELL, JUST TO CLARIFY, I DID SAY

4    THAT THE COURT -- THE SUPREME COURT HAS LOOKED TO THE LAWS

5    AROUND POST-RATIFICATION, INCLUDING LAWS IN 1868, BUT IT'S ONLY

6    TO CONFIRM THE ORIGINAL PUBLIC UNDERSTANDING OF THE RIGHT AT

7    THE TIME THAT THE BILL OF RIGHTS WAS RATIFIED IN 1791.

8        AND BRUEN MAKES CLEAR THAT TO THE EXTENT THAT

9    POST-RATIFICATION OR MODERN LAWS CONTRADICT THE PLAIN TEXT,

10   THAT THE PLAIN TEXT CONTROLS, AND THAT LAWS PASSED DURING THE

11   CIVIL WAR ERA ARE NOT A GREAT INDICATOR AND ARE NOT AS RELIABLE

12   AS THOSE THAT WERE PASSED IN AND AROUND THE RATIFICATION AND

13   THE PUBLIC UNDERSTANDING AT THAT TIME.

14          THE COURT:  ALL RIGHT.  I UNDERSTAND YOUR RESPECTIVE

15   POSITIONS ON THAT.  IF YOU WANT TO SAY MORE THAT YOU THINK IS

16   NOT IN THE BRIEFING, YOU CAN IN WRAP-UP.

17       SO I WANT TO MAKE CERTAIN I'M -- I'M -- I'VE GOT YOUR

18   POSITIONS RIGHT -- YOUR FUNDAMENTAL POSITIONS.

19       SO FIRST, FOR YOU, MS. BELLANTONI, IT'S FAIR TO SAY THE

20   PLAINTIFFS HERE ARGUE THE ATTORNEY GENERAL CANNOT RELY ON LAWS

21   OR REGULATIONS ABOUT CONCEALED OR CONCEALABLE WEAPONS IN

22   ATTEMPTING TO MEET ITS BURDEN, CORRECT?

23       I THINK THAT'S WHAT YOU'RE SAYING, INCLUDING ON PAGE 20 OF

24   YOUR BRIEF.

25          MS. BELLANTONI:  YES.  SO TO THE EXTENT THEIR EXPERTS

13

1    RELY ON LAWS THAT AS A GROUPING OUTLAWED DIRKS AND DAGGERS AND

2    PISTOLS AND CONCEALABLE WEAPONS, PISTOLS ARE, EVEN IN HELLER,

3    AND BRUEN AGAIN RECOGNIZED, AND MCDONALD RECOGNIZED THAT A

4    HANDGUN IS A WEAPON IN COMMON USE.

5        SO TO THE EXTENT THERE WAS AN OUTLAWING OF PISTOLS AT SOME

6    POINT IN TIME, THOSE REGULATIONS CANNOT BE RELIED ON BY THE

7    COURT BECAUSE PISTOLS ARE WEAPONS IN COMMON USE AND THE MOST

8    POPULAR WEAPON FOR SELF-DEFENSE BY AMERICANS IN THIS COUNTRY.

9            THE COURT:  MS. HADDAD, IN CONTRAST, THE ATTORNEY

10   GENERAL IS ARGUING CALIFORNIA MAY PLACE RESTRICTIONS ON THE

11   RIGHT TO BEAR ARMS AS LONG AS IT PRESERVES THE RIGHT TO CARRY

12   WEAPONS IN PUBLIC FOR SELF-DEFENSE.  IS THAT A FAIR

13   DISTILLATION?

14           MS. HADDAD:  YES.  AND AS LONG AS IT PRESERVES THE

15   RIGHT -- IT PRESERVES A "SHALL ISSUE" LICENSING REGIME FOR SOME

16   MANNER OF CARRY, IN THIS CASE CONCEALED CARRY, WHICH ALLOWS FOR

17   A MORE REGULAR CARRYING OF WEAPONS OUTSIDE OF THE CIRCUMSTANCES

18   THAT PENAL CODE SECTION 26045(A) SETS FORTH.

19           THE COURT:  SO FOR BOTH OF YOU, BEFORE BRUEN, THE

20   NINTH CIRCUIT LOOKED AT THE SECOND AMENDMENT AND DISTINGUISHED

21   THE RIGHT TO CARRY FIREARMS OPENLY FROM THE RIGHT TO CARRY

22   CONCEALED FIREARMS IN THE PERUTA CASE, 2016, THE EN BANC

23   DECISION.

24       SHOULD THIS COURT MAKE THAT SAME DISTINCTION HERE NOW,

25   MS. BELLANTONI, OR HAS BRUEN COMPLETELY REWRITTEN THE -- THE

14

1   LANDSCAPE?

2        MS. BELLANTONI:  SO JUST TO REITERATE, THE ISSUE HERE

3   IS WHETHER THE TWO CRIMINAL STATUTES AT ISSUE HAVE A -- AN

4   HISTORICAL ANALOGUE THAT IS CONSISTENT WITH THE PLAIN TEXT.

5        TO THE EXTENT THAT THERE IS DELINEATION IN THE MODALITY OF

6   PUBLIC CARRY, I WOULD SAY THAT THAT IS AN ARTIFICIAL CONSTRUCT.

7   AND THAT IF WE LOOK TO HELLER, AND THE DEFINITION THAT THE

8   SUPREME COURT IN HELLER GAVE WITH REGARD TO BEARING ARMS, THAT

9   DEFINITION COVERS WEARING A WEAPON ON YOUR PERSON OR CARRYING

10  IT IN YOUR POCKET, AND THAT ENCOMPASSES OPEN CARRY AND

11  CONCEALED CARRY.

12       AND WHEN WE LOOK TO THE BRUEN DECISION, NEW YORK STATE IS A

13  CONCEALED CARRY STATE AND ALSO BANS OPEN CARRY FOR NOW.  AND

14  WHAT THE BRUEN COURT DID IN THEIR DECISION WAS TO SAY THAT

15  PUBLIC CARRY IS COVERED BY THE PLAIN TEXT OF THE SECOND

16  AMENDMENT AND IS PRESUMPTIVELY PROTECTED.  THEY ALSO MADE NO

17  DISTINCTION BETWEEN OPEN CARRY AND CONCEALED CARRY.

18       AND TO THE EXTENT THAT THERE WERE ANTEBELLUM -- A HANDFUL

19  OF ANTEBELLUM STATES THAT MADE THAT DISTINCTION, FOR ONE, THE

20  SUPREME COURT SPOKE TO THE ANTEBELLUM EXAMPLES BECAUSE THEY HAD

21  BEEN RAISED BY NEW YORK STATE.  TWO, IT WAS NOT A NATIONAL

22  TRADITION TO MAKE THAT DELINEATION BETWEEN THE MODALITY OF

23  CARRY.  AND TO THE EXTENT THAT THESE STATES DECIDED TO DO THAT,

24  THAT DELINEATION IS FLAGRANTLY IN CONFLICT WITH THE PLAIN TEXT

25  OF THE SECOND AMENDMENT BECAUSE THE AMENDMENT ITSELF MAKES NO

15

1   DISTINCTION BETWEEN OPEN CARRY AND CONCEALED CARRY.  AND THE

2   HELLER COURT PUT THAT TO REST WHEN THEY DEFINED THE SCOPE AS

3   ENCOMPASSING BOTH WEARING ON THE PERSON, WHICH WOULD BE OPEN

4   CARRY, AND WEARING IN THE POCKET, WHICH WOULD BE CONCEALED

5   CARRY.

6           THE COURT:  SO THIS COURT -- POST-BRUEN FOR SURE,

7   THIS COURT SHOULD NOT MAKE THAT DISTINCTION?

8           MS. BELLANTONI:  I DON'T -- I DON'T NECESSARILY THINK

9   THAT THAT'S AN ISSUE BEFORE THE COURT JUST AS WE'RE SPEAKING

10  BECAUSE THE STATUTES THAT WE'RE CHALLENGING CRIMINALIZE PUBLIC

11  CARRY PERIOD.

12      SO 25850 CRIMINALIZES THE LOADED CARRIAGE OF A HANDGUN IN

13  PUBLIC.  DOESN'T MAKE A DISTINCTION BETWEEN OPEN CARRY AND

14  CONCEALED CARRY.  AND 26350, TO THE EXTENT THAT IT BANS OPEN

15  CARRY, BUT UNLOADED, YOU KNOW, TO THAT EXTENT I THINK THAT --

16  THAT MAKING THE DISTINCTION WOULD COME INTO PLAY BECAUSE THAT

17  CERTAINLY WOULD DELINEATE A MANNER OF CARRY THAT IS NOT

18  SEPARATED OUT IN THE PLAIN TEXT.

19          THE COURT:  ALL RIGHT.  MS. HADDAD --

20          MS. HADDAD:  YOUR HONOR --

21          THE COURT:  -- ANYTHING TO SAY ABOUT WHETHER OR NOT

22  THE COURT SHOULD THINK ABOUT THAT DISTINCTION AT ALL?

23          MS. HADDAD:  WE -- WE CERTAINLY THINK THE COURT

24  SHOULD THINK ABOUT THE DISTINCTION.  IT IS INCORRECT TO SAY

25  THAT BRUEN CONFLATED ALL MANNERS -- ALL MANNER OF WHETHER OPEN

16

1    OR CONCEALED CARRY INTO PUBLIC CARRY.  THEY -- YOU KNOW, THE

2    BRUEN COURT ACKNOWLEDGED SEVERAL TIMES THAT -- THAT STATES

3    COULD RESTRICT OR BAN CONCEALED CARRY ONLY WHEN PUBLIC CARRY --

4    ONLY WHEN OPEN CARRY WAS PERMITTED BUT THEY COULD NOT PROHIBIT

5    BOTH.  THERE WOULD BE NO POINT IN MAKING THAT DISTINCTION IF

6    THERE WAS NO DISTINCTION BETWEEN THE DIFFERENT MANNERS OF

7    CARRY.

8        PLAINTIFFS HERE HAVE THE RIGHT TO PUBLICLY CARRY, THEY JUST

9    CAN'T DO IT IN EVERY -- IN THE EXACT SAME WAY THAT THEY WANT OR

10   IN THE EXACT WAY THAT THEY WISH TO.  BUT AS A DISTRICT COURT IN

11   NEW YORK RECENTLY -- RECENTLY OBSERVED, THAT'S NOT

12   UNCONSTITUTIONAL.  THEY HAVE MULTIPLE AVENUES OPEN TO THEM TO

13   PUBLICLY CARRY.  AND CERTAINLY NOTHING IN BRUEN SUGGESTS AN

14   ANALYSIS OF THE HISTORY OF PROHIBITIONS OR RESTRICTIONS ON THE

15   OPEN CARRY OF WEAPONS.  THAT CASE -- THAT CASE FOCUSED SOLELY

16   ON THE CONCEALED CARRY OF WEAPONS.

17          THE COURT:  SO LET ME ASK -- HOLD THE THOUGHT.

18       JUST LOOKING AT THE -- THE HISTORY THAT YOU CITE TO ME, ARE

19   YOU POINTING ME TO ANY HISTORICAL REGULATION OR LAW IN EFFECT

20   IN 1791 THAT REQUIRED PERSONS TO OBTAIN A LICENSE OR SOME

21   SIMILAR PERMISSION BEFORE CARRYING A WEAPON IN PUBLIC?

22          MS. HADDAD:  SO FOR -- REGARDING LICENSING, YOUR

23   HONOR, NO LICENSING --

24          THE COURT:  OR SIMILAR PERMISSION.

25          MS. HADDAD:  SO THE -- THE LAWS THAT WERE IN EFFECT

17

1   AROUND 1791 WERE ACTUALLY FAR STRICTER THAN CALIFORNIA'S

2   LICENSING REGIME.  THEY -- THEY BANNED OR PROHIBITED THE CARRY

3   OF WEAPONS ALTOGETHER.

4       WE DO POINT TO CERTAIN LICENSING LAWS THAT WERE IN EFFECT

5   IN 1868, OR AROUND THE PERIOD OF THE RATIFICATION OF THE

6   FOURTEENTH AMENDMENT.  BUT I -- I -- YOU KNOW, WE WANT TO

7   STRESS -- AND I THINK WE MADE THIS POINT IN OUR BRIEFING --

8   THAT LICENSING IS A MORE FLEXIBLE APPROACH THAT WAS TAKEN BY

9   THE STATES.  CERTAINLY THERE IS A HISTORY AND TRADITION OF

10  BANNING OR PROHIBITING OR OTHERWISE RESTRICTING THE PUBLIC

11  CARRY OF WEAPONS, AND LICENSING WAS INTRODUCED AS -- AS A MORE

12  SOPHISTICATED WAY FOR STATES TO REGULATE THAT.

13      SO THE FACT THAT THERE ARE NO SPECIFIC LICENSING OR PERMIT

14  LAWS FROM 1791 DOES NOT INVALIDATE LAWS THAT IMPOSE A LESSER

15  BURDEN THAN LAWS THAT WERE IN EFFECT AROUND THE TIME OF THE

16  SECOND OR FOURTEENTH AMENDMENT.

17          THE COURT:  MS. BELLANTONI, ASSUME FOR SAKE OF

18  ARGUMENT THAT THE STATE CORRECTLY CHARACTERIZES THE

19  CIRCUMSTANCES IN 1791 AS MORE STRICT, DOES THAT MEAN A DIRECT

20  ANALOGUE IS NOT REQUIRED IF LICENSING IS LESS STRICT THAN WHAT

21  WAS IN -- THE NORMS IN PLACE IN 1791?

22          MS. BELLANTONI:  THERE IS NOT ONE STATUTE THAT HAS

23  BEEN CITED, LET ALONE A NATIONAL TRADITION, OF BANNING CARRY

24  ALTOGETHER IN 1791.

25      WHAT WOULD BE THE POINT OF CODIFYING THE SECOND AMENDMENT,

ER-106

18

1    WHICH STATES VERY CLEARLY THAT THE RIGHT TO KEEP AND BEAR ARMS

2    SHALL NOT BE INFRINGED IF BEARING ARMS WAS BANNED ALTOGETHER?

3    THAT ABSOLUTELY MAKES NO SENSE.  AND THERE IS NOT ANY EVIDENCE

4    IN THE RECORD OF ANYTHING OF THE NATURE THAT THE STATE HAS JUST

5    REPRESENTED TO THIS COURT EXISTING IN '91.  THAT WAS THE ENTIRE

6    POINT OF CODIFYING THE SECOND AMENDMENT, THE PREEXISTING, FREE,

7    OPEN, GOD-GIVEN RIGHT TO SELF-DEFENSE, TO HAVE ARMS AND TO

8    CARRY ARMS FOR SELF-DEFENSE.

9        SO ANY REGULATION THAT IS PLACED ON THAT FREE AND EXISTING

10   RIGHT MUST BE SCRUTINIZED AND MUST BE LOOKED AT IN THE CONTEXT

11   OF WHAT DID THAT RIGHT MEAN TO THE FOUNDERS WHO JUST CAME OUT

12   FROM UNDER A TYRANNICAL REGIME IN ENGLAND THAT ATTEMPTED TO

13   DISARM THEM.  WHAT SENSE DOES IT MAKE THAT THEY WOULD THEN GIVE

14   THAT POWER AND AUTHORITY BACK TO ANOTHER GOVERNMENT TO DICTATE

15   WHEN AND HOW AND WHO COULD DEFEND THEMSELVES AND DEFEND THEIR

16   LIVES.  MAKES NO SENSE.  AND THE RECORD IS DEVOID OF ANY SUCH

17   REGULATION IN 1791.

18           THE COURT:  JUST THINKING ABOUT THE TEXT, THE SECOND

19   AMENDMENT DOES NOT SAY THE RIGHT TO KEEP AND BEAR ARMS OPENLY

20   SHOULD NOT BE INFRINGED.

21           MS. BELLANTONI:  RIGHT.  SO WE'VE TALKED ABOUT THAT

22   BECAUSE IN THE HELLER CASE THE TERM BEAR ARMS HAS BEEN DEFINED.

23       AND SPECIFICALLY THEY TOOK IT FROM THE MUSCARELLO CASE, AND

24   JUSTICE GINSBURG'S DISSENT IN THAT CASE, AS TO WHAT THE

25   DEFINITION -- AS IT MEANT TO THOSE IN THE FOUNDING ERA, WHAT

1   DID THAT DEFINITION MEAN.  AND THAT DEFINITION ENCOMPASSED

2   WEARING OR CARRYING ON THE PERSON OR CARRYING IN THE POCKET

3   WHICH COVERS BOTH OPEN CARRY AND CONCEALED CARRY.  IT'S AN

4   OVERARCHING RIGHT TO BEAR ARMS AND NOT FOR THE GOVERNMENT TO

5   DICTATE THE MODALITY IN WHICH SOMEONE DECIDES THAT THEY'RE

6   GOING TO -- HOW THEY'RE GOING TO DEFEND THEIR LIFE BY CARRYING

7   THEIR ARMS.  MUCH LIKE THE FIRST AMENDMENT WHERE THE GOVERNMENT

8   CANNOT DICTATE WHICH RELIGION AN INDIVIDUAL MUST WORSHIP OR

9   WHICH VERSION OF THE BIBLE THEY MUST READ OR ADHERE TO, IT'S

10  THE INDIVIDUAL CHOICE.  IT'S A VERY PERSONAL CHOICE AND HAS

11  MANY FACTORS THAT ENTER INTO THAT CHOICE.

12      AND TO BE HONEST, YOUR HONOR, IT WOULD MAKE LITTLE SENSE

13  FOR AN INDIVIDUAL TO BE CRIMINALLY LIABLE SIMPLY BECAUSE A

14  PIECE OF -- AN ARTICLE OF CLOTHING WAS IN THE DECIDING FACTOR

15  BETWEEN BEING A CRIMINAL AND NOT BEING A CRIMINAL AND BEING

16  LAW-ABIDING.

17      SO, FOR INSTANCE, LET'S SAY OPEN CARRY AS IT IS HERE WAS

18  BANNED AND AN INDIVIDUAL WAS CARRYING CONCEALED BUT YET THEIR,

19  YOU KNOW, JACKET WAS OPENED AND ALL OF A SUDDEN NOW THEIR

20  HANDGUN CAN BE SEEN, WHICH COULD BE, YOU KNOW, THEN INTERPRETED

21  TO BE OPEN CARRY.  IT'S A NUANCE AND IT'S A -- IT'S A

22  DELINEATION THAT IS A -- IT'S A COMPLETELY FABRICATED

23  CONSTRUCT.  AND THE SECOND AMENDMENT DOESN'T NEED TO SAY OPEN

24  OR CONCEALED BECAUSE IT COVERS BOTH.  IT SAYS BEAR.  AND IT

25  INURES TO THE BENEFIT OF THE PEOPLE FOR THAT TO BE INTERPRETED,

20

1   AS IT WAS IN HELLER, BROADLY AND NOT NARROWLY IN SCOPE.

2           THE COURT:  BUT THE COURT IN HELLER DID SAY THE RIGHT

3   ISN'T UNLIMITED.

4           MS. BELLANTONI:  RIGHT.  SO THE RIGHT ISN'T

5   UNLIMITED.

6           THE COURT:  IT DOES NOT PROTECT THE RIGHT OF CITIZENS

7   TO CARRY ARMS FOR ANY SORT OF CONFRONTATION.

8           MS. BELLANTONI:  RIGHT.  LIKE BRANDISHING AND AFFRAY

9   AND TERRORIZING AND SHOOTING GUNS INTO THE AIR.  BUT THE

10  PEACEFUL CARRY -- WHETHER IT'S OPEN OR CONCEALED, THE PEACEFUL

11  CARRY IS ABSOLUTELY PROTECTED BECAUSE THAT'S THE --

12          THE COURT:  BUT HELLER ALSO -- BUT HELLER ALSO WENT

13  ON TO SAY GOVERNMENTS COULD PROHIBIT CONCEALED WEAPONS, COULD

14  KEEP WEAPONS FROM THOSE WHO SUFFER FROM MENTAL ILLNESS OR ARE

15  CONVICTED OF A FELONY, COULD PROHIBIT WEAPONS IN SCHOOLS AND

16  GOVERNMENT BUILDINGS --

17          MS. BELLANTONI:  THAT'S --

18          THE COURT:  -- COULD IMPOSE CONDITIONS AND

19  QUALIFICATIONS ON COMMERCIAL SALE.  RIGHT?  THAT'S ALL IN

20  HELLER.

21          MS. BELLANTONI:  SO COMMERCIAL SALE IS NOT AT ISSUE.

22  WE'RE TALKING ABOUT THE INDIVIDUAL RIGHT HERE.  AND NEITHER ARE

23  THE PROHIBITORS.  AND THE PROHIBITORS ARE ALL LAID OUT --

24  OBJECTIVE PROHIBITORS -- THEY'RE ALL LAID OUT IN 18 USC 922(G).

25  AND MY CLIENTS HAVE NONE OF THOSE PROHIBITORS.  THEY'RE NOT

21

1    DISQUALIFIED.  SO --

2            THE COURT:  SO HERE IS THE QUESTION EXTENDING THE

3    REASONING OF HELLER.  IF A STATE CAN IMPOSE THE RESTRICTIONS

4    THAT HELLER ACKNOWLEDGES ARE POSSIBLE, WHY IS IT NOT REASONABLE

5    THAT A STATE COULD IMPOSE RESTRICTIONS THROUGH A LICENSING

6    SYSTEM?

7            MS. BELLANTONI:  THE STATE CAN ONLY IMPOSE THOSE

8    RESTRICTIONS THAT ARE JUSTIFIED BY LOOKING BACK TO THE FOUNDING

9    ERA.  AND IF THOSE RESTRICTIONS EXISTED THEN, THEN THERE IS AN

10   HISTORICAL ANALOGUE.  AND IF THEY DID NOT THEN THE STATE CANNOT

11   IMPOSE THOSE RESTRICTIONS.

12           THE COURT:  AND IT'S NOT -- THE PLAINTIFFS AREN'T

13   SAYING -- MAKING CERTAIN I UNDERSTAND YOUR POSITION, PLAINTIFFS

14   ARE NOT SAYING THAT CALIFORNIA DOESN'T ALLOW PEOPLE TO CARRY

15   FIREARMS IN PUBLIC FOR SELF-DEFENSE, RIGHT?

16           MS. BELLANTONI:  OH, I'M SAYING THAT THEY DON'T ALLOW

17   IT.  THERE ARE TWO CRIMINAL STATUTES THAT -- THAT BAN THAT

18   RIGHT.  THE FACT THAT THERE IS NOW A LICENSING SCHEME -- WHICH

19   I WILL AGAIN SAY, IF YOU LOOK AT THE PLAIN TEXT OF THE

20   LICENSING STATUTES, 26150 AND 26155 STILL SAY "MAY."  SO THEY

21   CAN SAY "SHALL ISSUE" 'TIL THE COWS COME HOME, BUT THE LANGUAGE

22   OF THE STATUTE IS "MAY."  IT'S A "MAY ISSUE" LICENSING SCHEME.

23   SO DISCRETION IS STILL THERE.  IT'S STILL ASKING PERMISSION

24   FROM THE GOVERNMENT.

25           THE COURT:  THE ATTORNEY GENERAL HAS -- HAS MADE A

22

1    DETERMINATION NOT TO ENFORCE AND LANGUAGE IS CHANGING IN

2    JANUARY.  IS THAT RIGHT?

3              MS. HADDAD:  THAT'S CORRECT, YOUR HONOR.

4              THE COURT:  DO YOU ACKNOWLEDGE THAT, THE ATTORNEY

5    GENERAL'S EXPRESS DIRECTION NOT TO ENFORCE AND THE MODIFIED

6    LANGUAGE COMING ONLINE?

7              MS. BELLANTONI:  I -- AS I SIT HERE TODAY, I DON'T.

8    IT'S NOT THERE YET.  IT'S STILL PART OF THE STATUTE.

9        BUT EVEN IF THEY DO TRANSITION TO A "SHALL ISSUE," THE

10   BRUEN COURT DID NOT ANALYZE LICENSING REQUIREMENTS UNDER THE

11   TEXT, HISTORY, AND TRADITION ANALYSIS.  THEY SIMPLY COMMENTED

12   THAT SIX OF THE STATES, INCLUDING NEW YORK, IS -- ARE STILL

13   OUTLIERS IN THAT THEY STILL ARE DISCRETIONARY.

14       SO TO THAT EXTENT, TO AVOID CONFUSION ACROSS THE COUNTRY,

15   THEY INDICATED THAT THE "SHALL ISSUE" REGIMES WOULD STAY IN

16   PLACE AND THAT THEY WOULD STAY IF THERE WERE OBJECTIONABLE

17   FACTORS -- OBJECTIONABLE FACTORS -- I'M SORRY -- OBJECTIVE

18   FACTORS WOULD STAY IN PLACE.  BUT EVEN OBJECTIVE FACTORS ARE

19   SUBJECT TO THE TEXT, HISTORY, AND TRADITION ANALYSIS --

20             THE COURT:  BUT JUST SO I'M CLEAR --

21             MS. BELLANTONI:  -- IN LICENSING -- YES.

22             THE COURT:  -- DO YOU GIVE NO WEIGHT TO THE ATTORNEY

23   GENERAL'S POSITION THAT THE LAWS AS WRITTEN CURRENTLY WILL NOT

24   BE ENFORCED?

25             MS. BELLANTONI:  NO.

23

1          THE COURT:  ALL RIGHT.  SO THE COURT -- JUSTICE

2    KAVANAUGH AND THE CHIEF JUSTICE OPINED THAT 43 STATES WITH

3    OBJECTIVE LICENSING SYSTEMS COULD CONTINUE TO ENFORCE THOSE

4    LICENSING SYSTEMS.  THREE DISSENTERS WOULD HAVE UPHELD THE NEW

5    YORK LICENSING LAW.  BUT LOOKING AT THE WAY THE VOTES ALIGNED

6    IN THE DECISION, DON'T I APPLY WHAT'S KNOWN AS THE MARKS RULE,

7    LOOKING FOR THE POSITION TAKEN BY THOSE CONCURRING IN THE

8    JUDGMENT ON THE NARROWEST GROUNDS?

9          MS. BELLANTONI:  THE ONLY TWO STATUTES THAT ARE BEING

10   CHALLENGED HERE ARE 25850 AND 26350.  AND THE ISSUE HERE IS

11   WHETHER IS THERE A -- AN HISTORICAL ANALOGUE FOR CRIMINALIZING

12   PUBLIC CARRY, WHICH THERE IS NOT.  AND THE STATE HAS FAILED TO

13   MEET ITS BURDEN OF SHOWING THAT THERE IS ONE.  AND THEY CAN'T

14   JUSTIFY THE LACK OF HISTORICAL ANALOGUE BY POINTING TO

15   MODERN-DAY LICENSING REGULATIONS.  BECAUSE ON THAT NOTE, AGAIN,

16   THERE WAS NO LICENSING AT THE FOUNDING.  THEY WOULDN'T EVEN

17   HAVE CONTEMPLATED HAVING TO SEEK AND ASK PERMISSION IN ORDER TO

18   EXERCISE A PREEXISTING RIGHT.

19      NOBODY HAS TO GO ASK THE GOVERNMENT IF THEY COULD GO TO

20   CHURCH OR IF THEY COULD HAND OUT, YOU KNOW, PUBLIC POLITICAL

21   FLYERS ON A SIDEWALK.  THOSE ARE THINGS -- YOU WAKE UP IN THE

22   MORNING, YOU HAVE THE RIGHT TO DEFEND YOURSELF IF SOMEONE TRIES

23   TO ATTACK YOU AND TAKE YOUR LIFE FROM YOU.  YOU HAVE THE RIGHT

24   TO HAVE A WEAPON ON YOU IN ORDER TO DO THAT.

25      AND JUST WHILE WE'RE ON THAT, THAT 26045 CARVEOUT, IT

ER-12

24

1    REQUIRES THE INDIVIDUAL TO ESSENTIALLY BE A CRIMINAL AND CARRY

2    WITHOUT A LICENSE.  AND THEN IF THEY ARE ATTACKED, THEY HAVE A

3    DEFENSE.  BUT WHAT ABOUT THE SITUATION WHERE, YOU KNOW, THEY'RE

4    FOUND IN POSSESSION OF THEIR GUN AND THEY WEREN'T IN A

5    SELF-DEFENSE SITUATION AND THEY WEREN'T BEING IMMINENTLY

6    ATTACKED?

7         THE SECOND AMENDMENT DOESN'T REQUIRE -- AND THIS IS THE

8    PROPER CAUSE REGULATION THAT WAS STRICKEN BY BRUEN -- THEY

9    DON'T REQUIRE YOU TO HAVE AN IMMINENT, YOU KNOW, FEAR OF BEING

10   ATTACKED.  YOU DON'T HAVE TO SHOW THAT SOMEONE IS AFTER YOU OR

11   THAT YOU'RE SEPARATE FROM EVERYBODY ELSE IN SOCIETY.  THAT WAS

12   STRICKEN ALREADY.  SO TO THE EXTENT THE STATE IS RELYING ON

13   THAT EXCEPTION, IT'S -- IT -- IT'S BEEN STRICKEN BY, YOU KNOW,

14   ESSENTIALLY -- IN PRACTICE BY BRUEN BECAUSE IT'S THE SAME AS

15   THE PROPER CAUSE ANALYSIS.  AND IT'S A FALLACY BECAUSE IT

16   REQUIRES YOU TO BREAK THE LAW BY CARRYING A GUN AND THEN ONLY

17   PROVIDES A DEFENSE IF YOU ARE ACTUALLY ATTACKED.

18          THE COURT:  SO HELP -- JUST THINKING MORE ABOUT WHAT

19   THE COURT SAID IN BRUEN, ONLY ORDINARY LAW-ABIDING CITIZENS --

20   THAT'S BEEN A THEME IN THE RECENT SUPREME COURT JURISPRUDENCE

21   -- ONLY LAW-ABIDING CITIZENS CAN CARRY FIREARMS IN PUBLIC FOR

22   SELF-DEFENSE.  SO STATES HAVE TO HAVE THE ABILITY TO

23   DISTINGUISH ORDINARY LAW-ABIDING CITIZENS FROM OTHERS, CORRECT?

24          MS. BELLANTONI:  NO.  I DON'T AGREE WITH THAT.

25   EVERYONE STARTS OUT WITH THE RIGHT.  IT'S YOUR LIFE.  YOU HAVE

25

1    THE RIGHT TO DEFEND IT.  AND IF YOU'VE DONE SOMETHING, LET'S

2    SAY --

3              THE COURT:  SO IS THE PRESUMPTION -- THE PRESUMPTION

4    IS THAT EVERYONE IS AN ORDINARY LAW-ABIDING CITIZEN?

5              MS. BELLANTONI:  THE -- YES.  THE PRESUMPTION IS THAT

6    ALL AMERICANS HAVE THE RIGHT TO BEAR ARMS FOR SELF-DEFENSE.

7    THAT IS THE PRESUMPTION.  THAT'S THE CONDUCT THAT'S

8    PRESUMPTIVELY PROTECTED BY THE PLAIN TEXT OF THE SECOND

9    AMENDMENT.

10             THE COURT:  SO STATES CANNOT ENGAGE IN ANY EFFORT TO

11   DISTINGUISH THOSE THAT THE SUPREME COURT HAS ACKNOWLEDGED MAY

12   NOT -- MAY NOT HAVE THAT RIGHT BECAUSE OF A FELONY CONVICTION,

13   BECAUSE OF A MENTAL HEALTH CONDITION?  THE STATE HAS NO RIGHT

14   TO TRY TO MAKE ANY DISTINCTIONS TO IDENTIFY THOSE PERSONS WHO

15   MIGHT BE EXCEPTED?

16             MS. BELLANTONI:  SO, JUDGE, THE PROBLEM WITH THE

17   LICENSING SCHEME IS THAT IT -- IT --

18             THE COURT:  JUST ANSWER -- WHAT ABOUT -- JUST THINK

19   ABOUT DISTINCTIONS.

20             MS. BELLANTONI:  OKAY.  SO THERE ARE RULES.  LIKE I

21   TALKED ABOUT BEFORE, THE FEDERAL STATUTE 18 USC 922(G), THAT

22   LAYS OUT OBJECTIVE FACTORS FOR INDIVIDUALS WHO HAVE, BY ACTS OR

23   CONDITIONS OR EVENTS, DISQUALIFIED THEMSELVES FROM THE RIGHT

24   THAT'S PROTECTED BY THE SECOND AMENDMENT.  SO FELONY

25   CONVICTIONS, MISDEMEANOR DOMESTIC VIOLENCE CONVICTIONS.  BUT AS

26

1   WE SEE IN THE RAHIMI CASE, IN THE RANGE CASE THAT ARE GOING UP

2   TO THE SUPREME COURT, THAT EVEN THOSE MAY NOT HAVE A -- AN

3   HISTORICAL ANALOGUE AND THOSE ARE BEING CHALLENGED.  BUT

4   OBJECTIVELY THE STATE ALREADY HAS STATUTES THAT PUNISH

5   INDIVIDUALS WHO ARE PROHIBITED INDIVIDUALS FROM CARRYING.

6       THERE IS NO REASON TO PUNISH EVERYONE SIMPLY BECAUSE SOME

7   PEOPLE ARE PROHIBITED FROM CARRYING AND THAT'S WHAT THE

8   LICENSING DOES.  IT PUTS EVERYONE ON THE DEFENSIVE AND SAYS

9   EVERYONE IS PROHIBITED.  EVEN THOUGH THEY HAVEN'T DONE

10  ANYTHING, EVERYONE IS PROHIBITED UNTIL THEY PROVE THAT THEY'RE

11  NOT PROHIBITED TO THE -- YOU HAVE TO PROVE TO THE GOVERNMENT.

12  AND IT'S A SUBJECTIVE SCHEME.  AND EVEN IF IT WERE OBJECTIVE,

13  THERE IS STILL NO -- IT STILL VIOLATES THE PLAIN TEXT AND THE

14  INTENTION OF CODIFYING THE SECOND AMENDMENT TO MAKE SOMEONE GO

15  TO THE GOVERNMENT AND SAY I'M NOT PROHIBITED.

16      EVERYONE STARTS OUT WITH THE NATURAL RIGHT.  IT'S A NATURAL

17  RIGHT.  AND IT'S ONLY, YOU KNOW, THAT WE'VE HAD ALL THESE

18  REGULATIONS PILED ON TOP OF THE NATURAL RIGHT, NOW WE'RE TRYING

19  TO PEEL THEM BACK AND GET BACK TO THE NATURAL RIGHT OF BEING

20  ABLE TO JUST DEFEND YOURSELF.

21          THE COURT:  THAT COMES THROUGH IN YOUR BRIEFING.  I'M

22  VERY CLEAR ON THAT.  AND I KNOW HELLER TALKED ABOUT THAT.

23      SO THIS IS A NIT -- A RELATIVE NIT, BUT AT ONE POINT THE

24  PLAINTIFFS DO ARGUE THAT WEAPONS MIGHT BE DIFFICULT TO CONCEAL.

25  IT'S AN ARGUMENT.  IS THERE ANY EVIDENCE IN THE RECORD THAT

27

1   SUPPORTS THAT ARGUMENT THAT HANDGUNS ARE INEFFECTIVE FOR

2   SELF-DEFENSE WHEN CONCEALED?

3           MS. BELLANTONI:  NO, YOUR HONOR, IT WAS -- IT'S

4   REALLY ANECDOTAL FROM A COMMON SENSE PERSPECTIVE.  AND IT GOES

5   TO WHAT WE HAD TALKED ABOUT BEFORE IN THAT THE PLAIN TEXT

6   COVERS BOTH CONCEALED AND OPEN CARRY.  BUT IT'S COMMON -- IT'S

7   A COMMON SENSE, YOU KNOW, ANECDOTAL PIECE OF INFORMATION THAT

8   IF AN INDIVIDUAL IS UNDER DURESS AND ATTEMPTING TO ACCESS THEIR

9   FIREARM WHERE TIMING IS OF THE ESSENCE, AND AN EMERGENT

10  SITUATION, IT'S MUCH EASIER TO ACCESS A FIREARM THAT'S NOT

11  HIDDEN AND CONCEALED BENEATH CLOTHING AND LAYERS OF CLOTHING

12  AND IS OPEN AND ABLE TO BE ACCESSED MORE EXPEDITIOUSLY.

13          THE COURT:  ALL RIGHT.

14      MS. HADDAD, I ASKED MS. BELLANTONI QUITE A FEW QUESTIONS.

15  IF YOU HAVE SOMETHING TO SAY IN RESPONSE TO WHAT YOU'VE HEARD

16  THAT'S NOT IN YOUR BRIEFING, YOU CAN DO THAT.  I THINK MY

17  BOTTOM LINE QUESTION FOR YOU THAT I HAVEN'T ASKED IS, BASED ON

18  THE RECORD BEFORE THE COURT, WOULD YOU CONCEDE THE COURT COULD

19  CONCLUDE THERE IS NO HISTORICAL 1790S ANALOGUE TO THE STATE'S

20  LICENSING STATUTE?

21          MS. HADDAD:  TO LICENSING SPECIFICALLY?

22          THE COURT:  RIGHT.

23          MS. HADDAD:  WE WOULD CONCEDE THAT THERE IS NO

24  ANALOGUE.  THERE ARE LAWS THAT IMPOSE FAR GREATER BURDENS THAN

25  THE RELATIVE FLEXIBILITY OF A LICENSING SCHEME THAT IS HERE,

28

1    WHICH AS I THINK YOUR HONOR HAS CORRECTLY NOTED, THAT BRUEN

2    HAS -- THAT BRUEN HAS SANCTIONED -- THAT BRUEN HAS ALLOWED FOR

3    LICENSING SCHEMES THAT APPLY OBJECTIVE, NARROW RESTRICTIONS.

4    JUSTICE KAVANAUGH'S CONCURRENCE SPELLS THAT OUT QUITE CLEARLY.

5         SO IS THERE A LAW THAT SAYS, IN 1791, THERE WAS -- THAT

6    INDIVIDUALS COULD ONLY CARRY IF THEY OBTAINED A LICENSE FROM

7    THE STATE?  NO.  THERE WERE LAWS THAT INSTEAD PROHIBITED

8    CARRYING ALTOGETHER.  SO IN THAT RESPECT I WOULD -- I WOULD

9    JUST URGE YOUR HONOR TO STILL CONSIDER THE LAWS THAT WE HAVE

10   PUT FORTH BECAUSE THE BURDENS ARE NOT ONLY COMPARABLE, THE

11   BURDENS ARE -- IMPOSED WERE FAR GREATER THAN CALIFORNIA'S

12   SCHEME HERE.  THAT DOES NOT MAKE THEM IRRELEVANT TO THE

13   ANALYSIS.

14          THE COURT:  I UNDERSTAND THAT ARGUMENT.

15          MS. HADDAD:  THANK YOU.

16          THE COURT:  ALL RIGHT.  ANYTHING ELSE YOU WANT TO SAY

17   IN RESPONSE TO WHAT YOU HEARD FROM MS. BELLANTONI?

18          MS. HADDAD:  JUST A FEW -- JUST A FEW POINTS.

19      I UNDERSTAND PLAINTIFFS' POSITION THAT THE ATTORNEY

20   GENERAL'S LEGAL ALERT HAS NO WEIGHT.  HOWEVER, I THINK THAT THE

21   NINTH CIRCUIT'S DECISION IN FLANAGAN V. BONTA PUT THIS TO REST.

22   THAT DISMISSED AN APPEAL INVOLVING THE GOOD CAUSE REQUIREMENT

23   THAT'S IN THE STATUTES THAT ARE ABOUT TO BE AMENDED BY SB2.

24   THAT DISMISSED IT AS MOOT.

25      I ALSO WOULD LIKE TO POINT OUT THAT REGARDING THE ARGUMENT

ER-17

29

1　THAT CLOTHES -- THAT -- THAT WEAPONS COULD NOT BE CARRIED

2　CONCEALED UNDER CLOTHING, DR. RIVAS, OUR EXPERT, GAVE EXTENSIVE

3　-- DEVOTED AN EXTENSIVE PART OF HER REPORT TO THE PURPOSE OF

4　WEAPONS THAT WERE DEVELOPED DURING THE 17TH, 18TH AND 19TH

5　CENTURIES, AND THAT THEY WERE -- EXCUSE ME, THE 18TH AND 19TH

6　CENTURIES THEY WERE INTENDED TO BE CARRIED CONCEALED.  SO I

7　WOULD JUST DIRECT THIS COURT'S ATTENTION TO THAT PORTION OF HER

8　REPORT.

9　　　AND THEN I JUST -- RESPONDING TO PLAINTIFFS' CONTENTIONS

10　THAT THE STATE HAS NOT PUT FORTH LAWS DEMONSTRATING SIMILAR

11　BURDENS, THE -- BRUEN MADE CLEAR THAT -- AND THE -- AND THE

12　NINTH CIRCUIT RECENTLY ENDORSED THAT LANGUAGE, THAT NO ANALOGUE

13　NEED BE A DEAD RINGER OR AN HISTORICAL TWIN.

14　　　THE QUESTION -- SO SOME OF THESE LAWS MAY NOT HAVE THE SAME

15　LANGUAGE OR THE SAME BURDENS AS CALIFORNIA'S LAWS, BUT THE

16　BURDENS ARE STILL SIMILAR.  OFTEN THE BURDENS THAT WE HAVE

17　CITED -- THE LAWS THAT WE HAVE CITED TO IMPOSE GREATER BURDENS

18　THAN CALIFORNIA'S CURRENT LAWS, AND THE PURPOSES FOR THOSE LAWS

19　STILL REMAIN.

20　　　THERE IS NOTHING IN BRUEN -- THERE IS NOTHING IN BRUEN TO

21　SUGGEST THAT LAWS THAT WERE IN EFFECT IN -- IN -- AT THE TIME

22　OF THE RATIFICATION OF THE FOURTEENTH AMENDMENT IN 1868 ARE NOT

23　TO BE CONSIDERED.  BRUEN IN FACT SAYS THE OPPOSITE, AS DOES THE

24　NINTH CIRCUIT.

25　　　AND SO RESPONDING TO THOSE POINTS, I THINK -- I THINK THAT

ER-18

30

1   GETS TO EVERYTHING THAT PLAINTIFFS RAISED THAT I WANTED TO MAKE

2   SURE I RAISED HERE.

3       THERE IS ONE ADDITIONAL POINT.  IN OUR OPPOSITION BRIEFING

4   WE SET FORTH A SERIES OF LAWS THAT WE THOUGHT EXEMPLIFY THE

5   COMPARABLE BURDENS THAT CALIFORNIA'S LAWS PUT FORTH.  TWO

6   POINTS ON THAT.

7       FIRST, WE NEGLECTED TO INCLUDE IN THAT BULLET POINT LISTING

8   A LAW IDENTIFIED BY DR. SPITZER AT PAGE 7 OF HIS REPORT.  IT'S

9   AN 1837 GEORGIA LAW THAT RESTRICTED ALL CARRYING OF -- PUBLIC

10  CARRYING OF WEAPONS.  WE'LL INCLUDE THAT IN OUR UPDATED REQUEST

11  FOR JUDICIAL NOTICE.

12          THE COURT:  SO THAT'S YOUR BULLET POINT LIST ON --

13          MS. HADDAD:  YES.

14          THE COURT:  -- ON -- IT WOULD APPEAR PROBABLY ON PAGE

15  18?

16          MS. HADDAD:  I THINK THAT'S CORRECT.  AND IT GOES FOR

17  SEVERAL PAGES.

18          THE COURT:  PAGE 18 AT ECF PAGE -- PAGE 12 OF YOUR

19  BRIEF.

20          MS. HADDAD:  YES, YOUR HONOR.

21          THE COURT:  UNDERSTOOD.

22          MS. HADDAD:  AND THEN ONE -- ONE POINT THAT

23  PLAINTIFFS HAVE MADE THAT WE -- THAT WE TAKE GREAT ISSUE WITH

24  IS THAT THE LAWS THAT WE'VE CITED TO ONLY PENALIZE THE CARRYING

25  OF WEAPONS TO THE TERROR OF THE COUNTY, THERE WERE -- OR -- OR

31

1   THAT ARE OFFENSIVELY DISPLAYED, SOME OF THE -- SOME OF THE

2   LANGUAGE IN THE LAWS ARE PHRASED ARMED DEFENSIVELY.

3       FIRST OFF, THIS IS INCORRECT.  WE HAVE CITED TO LAWS THAT

4   BAN OR PROHIBIT OR SEVERELY RESTRICT THE PUBLIC CARRYING OF

5   WEAPONS REGARDLESS OF HOW THEY ARE CARRIED.

6       BUT SECONDLY, AS DR. SPITZER WENT TO DESCRIBE AT LENGTH IN

7   HIS -- IN HIS EXPERT REPORT, THOSE LAWS ARE ABSOLUTELY RELEVANT

8   BECAUSE THE IDEA IS THAT THE MERE PUBLIC APPEARANCE OF A WEAPON

9   IS UNLAWFUL.  AND THESE DATE BACK TO THE BRITISH STATUTE OF

10  NORTHAMPTON.  THE SAME LANGUAGE OF BEING -- OF LAWS INCLUDING

11  PHRASES THAT -- THE PROHIBITING OF BEING ARMED DEFENSIVELY, OR

12  PROHIBITING OF CARRYING TO THE TERRORIZING OF THE PEOPLE.  THE

13  MERE PUBLIC -- THE MERE CARRYING OF A WEAPON IN PUBLIC IN FRONT

14  OF OTHERS MEETS THOSE REQUIREMENTS.

15      SO THE LAWS THAT WE HAVE CITED CAN'T JUST BE DISREGARDED.

16  THEY -- THEY HAVE -- THEY CARRY THE COMPARABLE BURDENS.  AND

17  ALL OF THOSE LAWS THAT WE HAVE CITED HAVE SIMILAR SELF-DEFENSE

18  EXCEPTIONS TO THE ONE THAT I'VE CITED HERE THAT'S CURRENTLY IN

19  EFFECT IN CALIFORNIA.

20          THE COURT:  ALL RIGHT.  UNDERSTOOD.

21      MS. BELLANTONI, ANY -- ANY RESPONSE TO WHAT YOU'VE JUST

22  HEARD THAT'S NOT COVERED IN THE BRIEFING OR WHAT YOU SAID

23  PREVIOUSLY?

24          MS. BELLANTONI:  YES.  BRIEFLY, YOUR HONOR.

25      SO THE CASE CITED BY MR. SPITZER IN GEORGIA, NUNN VERSUS

32

1    STATE, WAS OVERRULED BY THE GEORGIA SUPREME COURT.  CAN'T BAN

2    CARRY ALTOGETHER.

3        AND I'LL REITERATE THAT THIS IS AN OPEN CARRY BAN.  SO EVEN

4    IF THE STATUTE IS CHANGED TO A "SHALL ISSUE" STATUTE, THERE IS

5    NO INDICATION THAT THE DOJ IS GOING TO START ISSUING AN

6    APPLICATION THAT ALLOWS FOR OPEN CARRY TO BE APPLIED FOR.  THE

7    ONLY APPLICATION WHICH ALL OF THE LICENSING OFFICERS ARE

8    REQUIRED TO USE, THE ONLY APPLICATION ISSUED BY THE DOJ IS

9    CONCEALED CARRY.  THERE ARE GEOGRAPHICAL RESTRICTIONS ON OPEN

10   CARRY THAT ONCE YOU STEP OUT OVER YOUR COUNTY OF ISSUANCE THAT

11   THAT OPEN CARRY LICENSE IS AUTOMATICALLY INVALIDATED.  AND,

12   AGAIN, THERE WAS NO LICENSING REQUIREMENT OR PROHIBITION

13   REQUIRED BACK IN 1791.

14       AND ALSO HELLER AND BRUEN SPEND A FEW PAGES TALKING ABOUT

15   THE STATUTE IN NORTHAMPTON AND HOW IT'S ABSOLUTELY NOT

16   COMPARABLE TO PEACEFUL PUBLIC CARRY.  AND THERE IS NOTHING IN

17   ANY STATUTE OR IN THE SUPREME COURT'S ANALYSIS THAT SEEMS TO

18   INDICATE THAT -- OR EVEN IMPLY THAT SIMPLY WEARING A HANDGUN

19   OPEN AND HOLSTERED IS GOING TO TERRORIZE PEOPLE.

20       CALIFORNIA AND HAWAII IN THE NINTH CIRCUIT ARE THE ONLY TWO

21   STATES OF ALL SEVEN STATES THAT OUTLAW AND BAN OPEN CARRY.

22   OPEN CARRY IS PRACTICED UNREMARKABLY THROUGHOUT THIS COUNTRY.

23   AND 27 STATES, MORE THAN HALF, ARE CONSTITUTIONAL CARRY AND

24   DON'T EVEN REQUIRE A PERMIT TO ENABLE PEOPLE TO PROTECT

25   THEIR -- THEMSELVES OUT IN PUBLIC.

33

1          THANK YOU.

2                THE COURT:  ALL RIGHT.  MS. HADDAD, ANY FINAL WORD?

3          THEY ARE CROSS-MOTIONS HERE, BUT SOMEONE HAS TO HAVE THE

4    LAST WORD.

5                MS. HADDAD:  WELL, JUST A FINE POINT.

6          PLAINTIFFS HAVE -- THERE IS NO EVIDENCE IN THE RECORD THAT

7    PLAINTIFFS HAVE REAPPLIED FOR AN OPEN CARRY PERMIT SINCE THE

8    ISSUANCE OF BRUEN.

9          AND THERE IS CERTAINLY NOTHING TO SUGGEST THAT WHEN SB2

10   TAKES EFFECT THAT -- THAT THE INDIVIDUAL COUNTIES ISSUING

11   LICENSES THAT MAKE THE DETERMINATION ON LIMITATION OF LICENSES

12   WON'T COMPLY WITH THE PLAIN LETTER OF THE LAW.  SO THE COUNTIES

13   THAT PLAINTIFFS LIVE IN, THAT WOULD APPLY TO THEM AS WELL.

14               THE COURT:  ALL RIGHT.

15               MS. BELLANTONI:  BUT, AGAIN, JUDGE, JUST TO -- JUST

16   BRIEFLY -- THESE ARE TWO CRIMINAL STATUTES.  SO IF THE

17   LICENSING, YOU KNOW -- YOU KNOW OUR POSITION ON LICENSING AND

18   WHETHER THAT HAS HISTORICAL ANALOGUE.  BUT EVEN IF LICENSING

19   WERE REQUIRED, WHAT'S THE PUNISHMENT FOR NOT BEING LICENSED?

20   IT'S NOT -- CAN'T BE GOING TO JAIL.  YOU CAN'T CRIMINALIZE AND

21   PROSECUTE SOMEONE FOR EXERCISING A NATURAL RIGHT AND THAT'S

22   WHAT THESE TWO STATUTES DO.  THEY CAN'T CRIMINALIZE A NATURAL

23   RIGHT.  CAN'T PUT PEOPLE IN JAIL FOR READING THE BIBLE ON THE

24   BENCH OUT IN PUBLIC.  YOU CAN'T PUT PEOPLE IN JAIL FOR

25   EXERCISING THEIR RIGHT TO SELF-DEFENSE BY CARRYING ARMS

ER-122

34

1   PEACEFULLY.

2           THE COURT:  I UNDERSTAND THAT POSITION.

3           MS. BELLANTONI:  THANK YOU.

4           THE COURT:  YOU UNDERSTAND -- I MEAN, THE CRIMINAL

5   STATUTES -- IT'S BEEN A REFRAIN, AND I -- YOU'VE SAID

6   EVERYTHING YOU HAVE TO SAY ABOUT THAT?

7           MS. HADDAD:  YES, YOUR HONOR.  I JUST WANT TO REPEAT

8   THAT PLAINTIFFS CAN CARRY CONCEALED THROUGHOUT THE STATE.

9           THE COURT:  ALL RIGHT.  THE MATTER WILL BE SUBMITTED

10  ONCE I SEE THE -- THE COMPILATION OF THE LAWS AND THE

11  PLAINTIFFS' RESPONSE.

12      YES?

13          MS. HADDAD:  I -- I APOLOGIZE.  I JUMPED -- I THINK I

14  JUMPED AHEAD OF MYSELF.  WOULD IT BE POSSIBLE TO HAVE UNTIL

15  THURSDAY TO SUBMIT THE LAWS --

16          THE COURT:  THAT'S FINE.  SO THURSDAY FOR --

17          MS. HADDAD:  FRIDAY IS A HOLIDAY.

18          THE COURT:  I'M SORRY.  WHICH IS THE HOLIDAY?

19          MS. HADDAD:  SO FRIDAY IS VETERANS DAY.

20          THE COURT:  RIGHT.  OKAY.  SO THURSDAY FOR THE

21  DEFENDANTS AND THEN --

22          MS. BELLANTONI:  MONDAY, YOUR HONOR?

23          THE COURT:  YEAH.

24          MS. BELLANTONI:  THANK YOU.

25          THE COURT:  THE 13TH.

35

1          MS. BELLANTONI:  THANK YOU SO MUCH.

2          MS. HADDAD:  THANK YOU.

3          THE COURT:  THANK YOU.

4          THE CLERK:  COURT IS IN RECESS.

5              (PROCEEDINGS ADJOURNED, 12:34 P.M.)

6                   ---oOo---

7    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

8    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

9

10                       /S/ KIMBERLY M. BENNETT
                         KIMBERLY M. BENNETT
11                       CSR NO. 8953, RPR, CRR, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHRIS COSCA  SBN 144546
COSCA LAW CORPORATION
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
(914) 367-0090
*Pro Hac Vice*

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK BAIRD and RICHARD GALLARDO, | Case No. 2:19-CV-00617-KJM-AC |
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSES, RESPONSE TO DEFENDANT'S REPLY, AND RESPONSES TO DEFENDANT'S SUPPLEMENTAL STATEMENT** |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, | **[Fed. R. Civ. P. 56, Local Rule 260(b)]** |
| Defendant. | Date:        November 3, 2023 |
| | Time:        10:00 a.m. |
| | Courtroom:   3 |
| | Judge:       Hon. Kimberly J. Mueller |
| | Trial Date:  None set |
| | Action Filed: April 9, 2019 |

## I.  PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSES

| No. | Defendant's Statement of Fact With Citation | Plaintiffs' Response With Citation | Defendant's Response to Plaintiffs' Objections | Plaintiffs' Reply to Defendant's Response |
|---|---|---|---|---|
| 1 | On June 24, 2022, the California Attorney General issued Legal Alert No. OAG-2022-02, which stated that *Bruen* "makes clear that the 'good cause' requirements such as those in California Penal Code sections 26150(a)(2) and 26155(a)(2) are inconsistent with the Second and Fourteenth Amendments. Under the Supremacy Clause of the United States Constitution, state and local officials must comply with clearly established federal law." Declaration of Lara Haddad [Haddad Decl.], Ex. 1, pp. 1-2. | **Objection and move to strike.** Only facts affecting the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The cited fact is irrelevant and immaterial to whether the State met its burden under the *Bruen* test of proving that the challenged government conduct – criminalizing the open carriage of a handgun for self-defense – is consistent with the plain text of the Second Amendment, and this Nation's history and tradition of firearm regulation. *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2126 (2022). **Denied as to form; Admit in part**, that state and local officials must | **Response to Objection:** The cited fact is relevant to the Court's Second Amendment analysis. See *Bruen*, 142 S. Ct. at 2150 ("States could lawfully eliminate one kind of public carry" so long as they left open an option). | **Reply to Response:** Defendant's cited portion of *Bruen* is a standalone comment by the Court re: regulations that existed in the Antebellum Period; no part of *Bruen* adopted such regulation as consistent with the plain text of the Second Amendment, which it is not, nor does the plain text distinguish between the modality of carry when 'bearing' arms. *Heller*'s definition and scope of 'bear' encompasses open and concealed carry. (*Heller*, 554 |

| | | | | |
|---|---|---|---|---|
| | | comply with clearly established federal law. | | U.S. at 584 ("wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person"). |
| 2 | Plaintiff Mark Baird has a license, issued by the Siskiyou County Sheriff, to carry a concealed firearm. Haddad Decl., Ex. 2 [Portion of Deposition of Mark Baird], p. 14. | **Objection and move to strike.** Only facts affecting the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The cited fact is irrelevant and immaterial to whether the State met its burden under the *Bruen* test of proving that the challenged government conduct– criminalizing the open carriage of a handgun for self-defense – is consistent with the | **Response to Objection:** The cited fact is relevant to the Court's Second Amendment analysis. See *Bruen*, 142 S. Ct. at 2150 ("States could lawfully eliminate one kind of public carry" so long as they left open an option). | **Reply to Response:** Defendant's citation is not a "fact" for this Court's consideration. Mark Baird does not presently hold a concealed carry license. Declaration of Mark Baird at ¶7. |

| | | | | |
|---|---|---|---|---|
| | | plain text of the Second Amendment, and this Nation's history and tradition of firearm regulation. *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2126 (2022). **Without waiving the stated objection, DENIED.** Declaration of Mark Baird at ¶7. | | |
| 3 | Plaintiff Mark Baird is seeking "the unpermitted and unrestricted open carry of a loaded firearm in the state of California." Haddad Decl., Ex. 2 [Portion of Deposition of Mark Baird], p. 16. | **ADMIT.** | | |
| 4 | Plaintiff Mark Baird lives in Siskiyou County. Second Amended Complaint [SAC], ¶ 13. | **ADMIT.** | | |
| 5 | Siskiyou County is a county with fewer than 200,000 people residing there. Haddad Decl., Ex. 3 [Portion of Deposition of Richard Gallardo], pp. 15, 27. | **ADMIT.** | | |
| 6 | Plaintiff Richard Gallardo has testified that he is authorized to carry a concealed firearm within California because of his status as a retired military police officer under the federal Law Enforcement Officers Safety Act. Haddad Decl., Ex. 3 [Portion of Deposition of Richard Gallardo], pp. 15, 27. | **Objection and move to strike.** Only facts affecting the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty* | **Response to Objection:** The cited fact is relevant to the Court's Second Amendment analysis.  See Bruen, 142 S. Ct. at 2150 ("States could lawfully eliminate one kind of public carry" so long as | **Reply to Response.** The cited portion of *Bruen* is a standalone comment by the Court re: regulations that existed in the Antebellum Period; no part of *Bruen* |

| | | *Lobby, Inc.*, 477 U.S. 242, 248 (1986). The cited fact is irrelevant and immaterial to whether the State met its burden under the *Bruen* test of proving that the challenged government conduct – criminalizing the open carriage of a handgun for self-defense – is consistent with the plain text of the Second Amendment, and this Nation's history and tradition of firearm regulation. *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2126 (2022). Without waiving the stated objection, see, Declaration of Richard Gallardo ["Gallardo Dec."] at ¶ 12. | they left open an option). Plaintiffs do not appear to deny the stated fact. | adopted such regulation as consistent with the plain text of the Second Amendment, which it is not, nor does the plain text distinguish between the modality of carry when 'bearing' arms. *Heller*'s definition and scope of 'bear' encompasses open and concealed carry. (*Heller*, 554 U.S. at 584 ("wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person"). |
| | Plaintiff Richard Gallardo has testified that he can carry | **Objection and move to strike.** Only facts affecting | **Response to Objection:** The cited fact is | **Reply to Response:** The cited |

| 7 | his firearm concealed even though he previously had a license to carry a concealed firearm revoked in 2019 for unlawfully bringing a firearm on state property and displaying it to coworkers. Haddad Decl., Ex. 3 [Portion of Deposition of Richard Gallardo], p. 17. | the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The cited fact is irrelevant and immaterial to whether the State met its burden under the *Bruen* test of proving that the challenged government conduct – criminalizing the open carriage of a handgun for self-defense – is consistent with the plain text of the Second Amendment, and this Nation's history and tradition of firearm regulation. *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2126 (2022). **Without waiving the stated objection, DENIED.** The defendant's statement is false and otherwise misleading. The testimony cited does not indicate that Mr. Gallardo's actions | relevant to the Court's Second Amendment analysis. See Bruen, 142 S. Ct. at 2150 ("States could lawfully eliminate one kind of public carry" so long as they left open an option). | portion of *Bruen* is a standalone comment by the Court re: regulations that existed in the Antebellum Period; no part of *Bruen* adopted such regulation as consistent with the plain text of the Second Amendment, which it is not, nor does the plain text distinguish between the modality of carry when 'bearing' arms. *Heller*'s definition and scope of 'bear' encompasses open and concealed carry. (*Heller*, 554 U.S. at 584 ("wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and |

| | | | | |
|---|---|---|---|---|
| | | were 'unlawful,' rather, it provides that Mr. Gallardo acted in accordance with California State law, possessed his firearm in his vehicle, and showed it to a co-worker who was considering applying for a concealed carry license, and at his co-worker's request. See, portions of the Deposition Transcript of Richard Gallardo attached to the Bellantoni Dec. as Ex. 5 at pp. 19-20; 38. | | ready for offensive or defensive action in a case of conflict with another person"). |
| 8 | Plaintiff Richard Gallardo is seeking "the ability to open carry without government permission." Haddad Decl., Ex. 3 [Portion of Deposition of Richard Gallardo], p. 29. | **ADMIT.** | | |
| 9 | Plaintiff Richard Gallardo lives in Shasta County. SAC, ¶ 14. | **ADMIT.** | | |
| 10 | Shasta County is a county with fewer than 200,000 people residing there. SAC, ¶ 14. | **ADMIT.** | | |

## II. PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSES TO PLAINTIFFS' COUNTERSTATEMENT OF FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

| No. | Plaintiffs' Counterstatement Statement of Material Fact in Support of Cross-Motion for Summary Judgment With Citation[1] | Defendant's Response With Citation | Plaintiffs' Reply |
|---|---|---|---|
| 11 | Mark Baird is a resident of Siskiyou, California, which has a population less than 200,000. Baird Dec. at ¶2 | **Admit.** | |
| 12 | Richard Gallardo is a resident of Shasta, California, which has a population less than 200,000. | **Admit.** | |
| 13 | Mark Baird and Richard Gallardo have no disqualifiers to the possession, transfer, receipt, or sale of firearms under state or federal law. Baird Dec. at ¶3; Gallardo Dec. at ¶3. | **Undisputed for purposes of this motion.** | |
| 14 | Mark Baird and Richard Gallardo seek to carry a handgun open and exposed on their person for self-defense, whether loaded or unloaded, throughout the State of California for self-defense.  Baird Dec. at ¶5, Gallardo Dec. at ¶5. | **Deny.** Defendant lacks sufficient knowledge in order to respond to this statement. | **Plaintiffs' Reply:** Defendant failed to identify any citation in the record to controvert the Plaintiffs' Counterstatement, which deems the statement **Admitted**. See, LR 260(b) ("Any party opposing a motion for summary judgment ... [must] …deny those that are disputed, including with each denial |

[1] Plaintiffs incorporate by reference those statements contained in the defendant's Statement of Facts to which Plaintiffs have responded "Admit."

| | | | a citation to the particular portions of any ... document relied upon in support of that denial"). |
|---|---|---|---|
| 15 | Prior to the passage of the Mulford Act of 1967, it was lawful throughout the State of California to carry a loaded handgun for self-defense. Baird Dec. ¶¶11-13. | **Deny.**  California, and cities and counties within California, have long regulated and prohibited openly carrying firearms, since at least the 19th century.  See, e.g., Defendant's RJN; Defendant's Appendix. | **Plaintiffs' Reply:** Defendant failed to identify any particular regulation in the record that contradicts Plaintiffs' sworn statement; nothing contained in Defendant's RJN or Appendix identifies a regulation that made it illegal to carry a loaded handgun throughout California for self-defense. Defendant's RJN; Defendant's Appendix. The only California regulations in the RJN are Ex. 20 (dueling), Ex. 27 (San Francisco, possessing burglar's tools/offensive weapons with intent to assault), Ex. 28 (1850, possessing burglar's tools/offensive weapons with intent to assault); Ex. 29 (banned <u>concealed</u> carry – and law was <u>repealed in 1870</u> see, Cramer & Olsen, "The Racist Origins of California's Concealed Weapon Permit Law"[2] citing, 8 California sess. laws (1869-70), ch. 63); Ex. 30 (Los Angeles 1878 banning public carry in LA is neither a National nor a statewide tradition, and is inconsistent with the plain text of the Second Amendment. *Bruen*, 142 S.Ct. at 2137 |

[2]February 14, 1870 https://archive.org/details/1869-1870/page/n5/mode/2up?view=theater&q=concealed

| | | | ("But to the extent later history contradicts what the text says, the text controls."). |
|---|---|---|---|
| 16 | After the passage of the Mulford Act of 1967, it remained lawful to open carry an unloaded handgun for self-defense throughout the State of California. Baird Dec. ¶¶11-13; Penal Code 25850. | **Deny.** After the passage of the Mulford Act, individuals could carry loaded firearms in public with a permit. | **Plaintiffs' Reply:** Defendant's denial is non-responsive and contains no citation to the record and is **deemed Admitted.** See, LR 260(b). |
| 17 | In 2012, it became a crime in California to carry an unloaded handgun open and exposed in public for self-defense. Baird Dec. ¶14; Penal Code 26350. | **Deny.** Penal Code section 26045(a) provides, "Nothing in Section 25850 is intended to preclude the carrying of any loaded firearm, under circumstances where it would otherwise be lawful, by a person who reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property." | **Plaintiffs' Reply:** Defendant's denial is non-responsive and contains no citation to the record and is **deemed Admitted**. See, LR 260(b). Defendant's citation to 26045 is not an exemption to Penal Code § 26350, 26350 is the subject of statement 17. Proving one is in "imminent, grave, danger" is not required to exercise the guaranteed right to bear arms, as protected by the plain text of the Second Amendment. See, *Bruen*, 142 S.Ct at 2155-56 (proper cause requirement violates the Second Amendment). |
| 18 | Mark Baird and Richard Gallardo do not fall into any of the exceptions to criminal sanctions under Penal Code sections 25850 and/or 26350. Baird Dec. ¶7; Gallardo Dec. at ¶6. | **Deny.** Penal Code section 26045 applies to Plaintiffs. Moreover, Plaintiffs have previously testified that they are permitted to carry concealed weapons in California; if they are permitted to carry concealed firearms in California, they are exempted from criminal sanctions. | **Plaintiffs' Reply:** Plaintiffs' Response. Defendant's statement contains no citation to the record and is therefore **deemed Admitted**. See, LR 260(b). Penal Code section 26045 is not an exemption to section 26350. |

| | | | |
|---|---|---|---|
| | | | Proving one is in "imminent, grave, danger" is not required to exercise the guaranteed right to bear arms, as protected by the plain text of the Second Amendment. See, *Bruen*, 142 S.Ct at 2155-56 (proper cause requirement violates the Second Amendment). Open carry is banned in California and Mark Baird does not hold a valid concealed carry license. Baird Dec. at ¶¶7-19. |
| 19 | Neither Mark Baird nor Richard Gallardo holds a concealed carry license in the State of California. Baird Dec. ¶7; Gallardo Dec. at ¶6 | **Deny.** Plaintiff Mark Baird testified in a sworn deposition dated August 31, 2021, that his application for a concealed firearm in 2021 "was successful." See ECF 90-4 at 12:2-9. | **Plaintiffs' Reply:** California concealed carry licenses are only valid for 2 years.[3] Mr. Baird's January 2021 CCW permit [ECF 90-4 at 14:5-7] expired in January 2023 by operation of law. As sworn to in his September 28, 2023 Declaration, Mark Baird does not hold a concealed carry license. Baird Dec. at ¶7. |
| 20 | Mark Baird and Richard Gallardo attempted to obtain an open carry license in their counties, but there is no process for applying for or obtaining an open carry license. Baird Dec. ¶8; Gallardo Dec. at ¶7 | **Deny.** Plaintiff Gallardo's declaration states, "I have attempted to obtain an open carry license in Shasta County, but there is no avenue for obtaining an open carry license in Shasta County or in any other county in California." ECF 96-5 at ¶ 8. Penal Code section 26150(b) provides, "The sheriff may issue a license under subdivision (a) in either of the following formats: (1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person. (2) Where the | **Plaintiffs' Reply:** Defendant's denial is non-responsive and contains no citation to the record and is **deemed Admitted.** See, LR 260(b). Under California Penal Code 26175 (a) (1), licensing officers cannot use any application form other than that published by the DOJ, there is no Open Carry license application form available from the DOJ and, even if there were an Open Carry |

[3] https://california.concealedcarry.com/california-ccw-faq/

| | | population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person." Thus, the process for applying for an open carry license is the same as the process set forth in Penal Code section 26150(a). | application, no Open Carry licenses are issued anywhere in California, nor will any be issued. Between 2012 and the present date, no Open Carry license have been issued in California and Defendant has produced no evidence that any Open Carry license has ever been issued in California. Baird Dec. at ¶¶8-10. |
|---|---|---|---|
| 21 | Since the passage of Penal Code 26350, no open carry licenses have been issued in California. Baird Dec. ¶9; Gallardo Dec. at ¶8. | **Deny.**  Defendant does not issue open carry licenses; licenses are issued by a county's sheriff or the head of a municipal police department of a city.  Defendant lacks information as to whether individual open carry licenses have been issued by specific counties. | **Plaintiffs' Reply:** Defendant's statement is non-responsive, contains no citation to the record, and is therefore **deemed Admitted**. See, LR 260(b). Defendant cannot "Deny" something he "lacks information" about. Penal Code section 26225 requires that a copy of all firearms licenses issued in each county (open carry and concealed carry) be "filed immediately" with Defendant's California Department of Justice ("DOJ"). As the statutory keeper of all licenses issued, Defendant knows that no open carry licenses have ever been issued. See also, ECF 90-4 at 13:16-14:3. |
| 22 | Throughout the course of this litigation, Defendant has presented no evidence that any open carry license has been issued in California since 2012. Baird Dec. ¶9; | **Admit.**  However, licenses are issued by a county's sheriff or the head of a municipal police department of a city.  See § 26150. | **Plaintiffs' Reply:** Penal Code section 26225 requires that a copy of all firearms licenses issued in each county (open carry and concealed carry) be "filed immediately" with |

| | | | |
|---|---|---|---|
| | Gallardo Dec. at ¶8. | | Defendant's DOJ. As the statutory keeper of all licenses issued, Defendant knows that no open carry licenses have ever been issued. |
| 23 | Even if open carry licenses were issued in California, the license would only be valid within the county of issuance under the State's licensing scheme. Baird Dec. ¶10; Gallardo Dec. at ¶9. | **Admit.** | |
| 24 | Mark Baird and Richard Gallardo should not have to apply for and obtain a discretionary license before being able to exercise the right to open carry a handgun for self-defense (bear arms). Baird Dec. ¶¶15-19; Gallardo Dec. at ¶¶10-13. | **Deny.**  California's licensing scheme comports with *Bruen*, which explicitly approved licensing regimes. *Bruen*, 142 S. Ct. at 2123-24; id. at 2138 n.9.  In addition, *Bruen* made clear that not all forms of public carry are required, and that a state may prohibit one type of public carry so long as it leaves open another avenue.  See id. at 2146, 2150.  And, under Second Amendment analysis, California's open carry laws are constitutional: Defendant has identified numerous historical analogues that impose a similar burden on individuals as California's open carry laws. See Defendant's RJN; ECF 90-3 (Defendant's Appendix); Defendant's Opposition Brief at 8-17. | **Plaintiffs' Reply:** *Bruen* did not analyze licensing requirements under the text, history, and tradition test; licensing is inconsistent with the plain text which states that the rights *Heller* declared as preexisting and guaranteed "shall not be infringed." *Heller*, 554 U.S. at 592 (plain text "guarantee[s] the individual right to possess and carry weapons in case of confrontation" and "codified a pre-existing right"). *Bruen* acknowledged objective, shall-issue regimes – it did not conduct any historical analysis of licensing nor did the Supreme Court place its imprimatur on a requirement that individuals seek and obtain government permission to exercise a preexisting and guaranteed constitutional right. California remains an |

'outlier' may-issue scheme. See, Penal Code 26150, 26155 (allowing unfettered discretion to the licensing authority, who "may issue a license"). Defendant's citation to *Bruen* is a standalone comment by the Court re: Antebellum Period regulations proffered by New York State as an analogue; no part of *Bruen* found that banning open carry was constitutional as long as concealed carry was an option. Such a regulation is patently inconsistent with the plain text of the Second Amendment, which does not distinguish between the modality of carry when guaranteeing the right to 'bear Arms.' *Heller*'s definition and scope of 'bear' encompasses open and concealed carry. (*Heller*, 554 U.S. at 584 ("wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person").

And Defendant has identified **zero** analogues for its ban/criminalization of open carry. See, Defendant's RJN; ECF 90-3 (Defendant's Appendix); Defendant's Opposition Brief at 8-17.

| | | | |
|---|---|---|---|
| 27 | If Mark Baird and Richard Gallardo carry a handgun open and exposed on their person for self-defense in California, whether loaded or unloaded, they will be arrested and suffer criminal sanctions under Penal Code sections 25850 and 26350. Baird Dec. ¶6; Gallardo Dec. at ¶5 | **Deny.** This purported fact is speculative as phrased and lacks additional supporting facts. In addition, California law provides that individuals will not face criminal sanctions if openly carry a weapon if based on the reasonable believe that immediate harm will come to any person or property. Penal Code section 26045(a) states, "Nothing in Section 25850 is intended to preclude the carrying of any loaded firearm, under circumstances where it would otherwise be | **Plaintiffs' Reply:** Defendant's statement is non-responsive and contains no citation to the record and is **deemed Admitted**. See, LR 260(b). Defendant cites Penal Code 26045, which is not an exemption to the enforcement of Penal Code section 26350. Proving one is in "imminent, grave, danger" is not required to exercise the guaranteed right to bear arms, as protected by the plain text of the Second Amendment. See, *Bruen*, 142 S.Ct at 2155-56 (proper cause requirement violates the Second Amendment). No "additional supporting facts" or qualifications are required to exercise the constitutional right to peaceable open carry. |

### III. PLAINTIFFS' RESPONSES TO DEFENDANT'S
### SUPPLEMENTAL STATEMENT OF FACTS

| No. | Defendant's Additional Statement of Facts With Citation | Plaintiffs' Response With Citation |
|---|---|---|
| 28[4] | Plaintiff Mark Baird testified in a sworn deposition dated August 31, 2021, that his application for a concealed firearm in 2021 "was successful." ECF 90-4 at 12:2-9. | **Denied in part.** California concealed carry licenses are only valid for 2 years. [5] Mark Baird's January 2021 CCW permit [ECF 90-4 at 14:5-7] expired in January 2023 by operation of law. As sworn to in his September 28, 2023 Declaration, Mark Baird does not hold a concealed carry license. Baird Dec. at ¶7. |
| 29 | Penal Code section 26045(a) provides, "Nothing in Section 25850 is intended to preclude the carrying of any loaded firearm, under circumstances where it would otherwise be lawful, by a person who reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property." | **Denied.** Penal Code section 26045 is not an exemption to the enforcement of Penal Code § 26350. Proving one is in "imminent, grave, danger" is not required to exercise the guaranteed right to bear arms, as protected by the plain text of the Second Amendment. See, *Bruen*, 142 S.Ct at 2155-56 (proper cause requirement violates the Second Amendment). No manifestation of "specific situations" is required for individuals to freely exercise the constitutional right to peaceable open carry. Plaintiffs are not required to subject themselves to (unconstitutional) criminal penalties to exercise a fundamental right. And Defendant provides no location of where this "magic gun" will be when Plaintiffs find themselves unarmed, in public, and under the "immediate, grave danger" of a violent attacker that is required under 26045(s) to excuse Plaintiffs from criminal penalties for possessing a loaded firearm for self-defense. |
| 30 | Penal Code section 26045(c) provides, "As used in this section, "immediate" means the brief interval before and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before | **Denied.** Penal Code section 26045 is not an exemption to the enforcement of Penal Code § 26350. Proving one is in "imminent, grave, danger" is not required to exercise the guaranteed right to bear arms, as protected by the plain text of the Second Amendment. See, *Bruen*, 142 S.Ct at |

---

[4] Defendant's "Supplemental Statements," numbered as "No. 1" in the original, is renumbered to "No. 28" for ease of reference and to continue the consecutive numbering of the statements made by the parties throughout this motion/counter-motion pursuant to Rule 56, Local Rule 260(b).

[5] https://california.concealedcarry.com/california-ccw-faq/

| | |
|---|---|
| the arrival of its assistance." | 2155-56 (proper cause requirement violates the Second Amendment). No manifestation of "specific situations" is required for individuals to freely exercise the constitutional right to peaceable open carry. Defendant provides no location of where this "magic gun" will be when Plaintiffs find themselves unarmed, in public, and under the "immediate, grave danger" of a violent attacker that is required under 26045(s) to excuse Plaintiffs from criminal penalties for possessing a loaded firearm for self-defense – but only after they first notify law enforcement before searching for this "magic gun" to use in self-defense of a surprise attack – this all presumes, of course, that the attacker is gracious enough to wait for each of these conditions to be met before unleashing his violence upon Plaintiffs. |

Dated: October 23, 2023

Respectfully submitted,
THE BELLANTONI LAW FIRM, PLLC

_/s/ Amy L. Bellantoni_
Amy L. Bellantoni, Esq.
*Counsel for Plaintiffs*
*Pro Hac Vice*
abell@bellantoni-law.com

ROB BONTA, State Bar No. 202668
Attorney General of California
MARK R. BECKINGTON, State Bar No. 126009
Supervising Deputy Attorney General
LARA HADDAD, State Bar No. 319630
Supervising Deputy Attorney General
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6250
 Fax:  (916) 731-2124
 E-mail:  Lara.Haddad@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his official
capacity as Attorney General of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK BAIRD and RICHARD GALLARDO,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,**<br><br>Defendants. | 2:19-cv-00617-KJM-AC<br><br>**DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  November 3, 2023<br>Time:  10:00 a.m.<br>Courtroom:  3<br>Judge:  The Honorable Kimberly J. Mueller<br>Trial Date:  None set.<br>Action Filed:  April 10, 2019 |

## DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Defendant respectfully requests that this Court take judicial notice of the following documents in support of his opposition to Plaintiffs' motion for summary judgment:

1. **Exhibit 1**: 1686, New Jersey, Grants, Concessions, and Original Constitutions of The Province of New Jersey 289–90 (1881).

2. **Exhibit 2**: 1694, Massachusetts, 1694 Mass. Laws 12, no. 6, An Act for Punishing of Criminal Offenders.  The attached exhibit is a printout from the Duke Center for Firearms Law, and is also available at https://firearmslaw.duke.edu/laws/1694-mass-laws-12-no-6-an-act-for-the-punishing-of-criminal-offenders/.

3. **Exhibit 3**: 1750, Massachusetts, 1750 Mass. Acts 544, ch. 17, § 1.

4. **Exhibit 4**: 1771, New Hampshire, Acts and Laws of His Majesty's Province of New-Hampshire 9–10 (1771), ch. 6, § 2.

5. **Exhibit 5**: 1786, Virginia, 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays, chap. 17, § 1.

6. **Exhibit 6**: 1786, Massachusetts, 1786 Mass. Acts 87, ch. 38.

7. **Exhibit 7**: 1792, Virginia, Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are Now in Force 187 (1803), ch. 103, §§ 8–9.

8. **Exhibit 8**: 1801, Tennessee, 1801 Tenn. Laws 259–60, ch. 22, § 6.

9. **Exhibit 9**: 1820, Indiana, 1820 Ind. Acts 39, ch. 23, § 1.

10. **Exhibit 10**: 1821, Maine, Revised Statutes of the State of Maine 709 (1840), tit. 12, ch. 169, § 16.

11. **Exhibit 11**: 1821, Tennessee, Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present Time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836).

12. **Exhibit 12**: 1835, Massachusetts, Theron Metcalf (Editor), Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in

Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836, 750 (1836) ch. 134, § 16.

13.    **Exhibit 13**: 1837, Mississippi, 1837 Miss. Laws 290–92, § 6.

14.    **Exhibit 14**: 1837, Mississippi—Town of Sharon, 1837 Miss. Laws 294, § 5.

15.    **Exhibit 15**: 1839, Mississippi—Town of Emery, 1839 Miss. Laws 385–86, ch. 168, § 5.

16.    **Exhibit 16**: 1840, Mississippi—Town of Hernando, 1840 Miss. Laws 180–81, ch. 111, § 5.

17.    **Exhibit 17**: 1847, Maine, The Revised Statutes of the State of Maine, Passed October 22, 1840, 709 (1847), tit. 12, ch. 169, § 16.

18.    **Exhibit 18**: 1852, Hawaii, 1852 Haw. Sess. Laws 19, § 1.

19.    **Exhibit 19**: 1854, Washington [Territory], 1854 Wash. Sess. Law 80, ch. 2, § 30.

20.    **Exhibit 20**:1855, California, William H. R. Wood (Editor), Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858, 334 (1861), art. 1904.

21.    **Exhibit 21**: 1858, District of Columbia, 1 William B. Webb, The Laws of the Corporation of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

22.    **Exhibit 22**: 1859, Washington [Territory], 1859 Wash. Sess. Laws 109, ch. 2, § 30.

23.    **Exhibit 23**: 1867, Arizona, An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1.

24.    **Exhibit 24**: 1868, Alabama, Wade Keyes & Fern Wood (Editors), Code of Alabama 883 (1876), ch. 3, § 4111.

25.    **Exhibit 25**: 1868, Florida, James F McClellan (Editor), A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive 403 (1881), § 13.

26.    **Exhibit 26**: 1868, Kansas, The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of

Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868), Crimes and Punishments, § 282.

27.   **Exhibit 27**: 1849, California—City of San Francisco, 1849 Cal. Stat. 245, div. 11, § 127.

28.   **Exhibit 28**: 1850, California, S. Garfielde (Editor), Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850–51–52–53, 663–64 (1853), ch. 125, div. 11, § 127.

29.   **Exhibit 29**:  1864, California, Theodore H. Hittell (Editor), The General Laws of the State of California, from 1850 to 1864, Inclusive 261 (1872), § 1585 [§ 1].

30.   **Exhibit 30**:  1878, California—Los Angeles, Ordinances of the City of Los Angeles, § 36, William M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles 85 (1878).  The attached exhibit is a printout from the Duke Center for Firearms Law, and is also available at https://firearmslaw.duke.edu/laws/william-m-caswell-revised-charter-and-compiled-ordinances-and-resolutions-of-the-city-of-los-angeles-page-85-image-83-1878-available-at-the-making-of-modern-law-primary-sources/.

31.   **Exhibit 31**: 1818, Missouri [Territory], Henry S. Geyer (Editor), *A Digest of the Laws of Missouri Territory* 374 (1818) § 3 [Slaves].

32.   **Exhibit 32**: 1871, Missouri—City of St. Louis, Everett W. Pattinson (Editor), *Revised Ordinance of the City of St. Louis* 491 (1871), art. 2, § 9.

33.   **Exhibit 33**: 1867, Alabama, 1866–1867 Ala. Laws 260 & 263, ch. 2, § 2(10).

34.   **Exhibit 34**:  Defendant's Appendix: Survey of Relevant Statutes (Pre-Founding—1930s) (filed as ECF 90-3).

## ARGUMENT

The Court may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  A court shall take judicial notice if requested by a party and supplied with the necessary information.  Fed. R. Evid. 201(d).

## I.   HISTORICAL LAWS

**Exhibits 1-33** are historical laws enacted throughout the United States, by states, territories, cities, towns, and other government entities.  "A trial court may presume that public records are authentic and trustworthy."  *Gilbrook v. City of* Westminster, 177 F.3d 839, 858 (9th Cir. 1999). The accuracy of these public records consisting of enacted legislation cannot reasonably be questioned, and judicial notice of these records is therefore appropriate.  Fed. R. Evid. 201(b).

## II.   APPENDIX: SURVEY OF LAWS

**Exhibit 34** is an appendix surveying a number of laws from the pre-founding era to the 1930s.  It lists the title and citation for each law, along with additional descriptive information.  The citations for each of the laws cannot reasonably be questioned.  Defendant requests judicial notice of the citations to each law listed herein.

Dated:  October 13, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General


*s/ Lara Haddad*
LARA HADDAD
Supervising Deputy Attorney General
*Attorneys for Defendant Rob Bonta in his official capacity as Attorney General of California*

EXHIBIT 1

# GRANTS, CONCESSIONS,

## AND

## ORIGINAL CONSTITUTIONS

### OF THE PROVINCE OF

# NEW JERSEY

### THE

# ACTS

Passed during the Proprietary Governments, and other material Transactions before the Surrender thereof to Queen Anne.

The Instrument of Surrender, and her formal Acceptance thereof

Lord CORNBURY'S COMMISSION and Instructions Consequent thereon.

Collected by some Gentlemen employed by the General Assembly. And afterwards

Published by virtue of an Act of the Legislature of the said Province

With proper Tables alphabetically Digested, containing the principal Matters in the Book.

New Jersey (Colony)

## By AARON LEAMING and JACOB SPICER.

PHILADELPHIA:

## Laws passed in 1686. 289

ny persons as they shall think fit, not exceeding seven, to make orders from time to time, such as may be suitable and beneficial for every town, village, hamlet, or neighbourhood, for preventing all harms by swine, in town, meadows, pastures and gardens, in any respect, and to impose penalties according to their best discretions.

### Chap. VIII.

## An Act appointing some new Commissioners of the Highways.

WHEREAS there was an act made in the year 1682, for the county of Monmouth, to enable Col. Lewis Morris, John Bound, and Joseph Parker, to lay out highways, passages, ferry's, and making bridges and such like; there being three of those persons disenabled for the true performance of the said services, *be it therefore enacted* by the Governor, Council and Deputies now met and assembled, and by the authority of the same, that John Frogmerton, John Slocame, and Nicholas Brown, in the stead and room of Col. Lewis Morris, John Bound, and Joseph Parker, be made capable and hereby invested with the same power to all intents and purposes in the said premises, as the aforesaid Col. Lewis Morris, John Bound, and Joseph Parker, were by the said acts.

### Chap. IX.

## An Act against wearing Swords, &c.

WHEREAS there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilladoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. *Be it therefore enacted* by the Governor, and Council, and Deputies now met in General Assembly, and by authority of the same, that no person or persons within this Province, presume to send any challenge in writing, by word of mouth,

19

## 290     Laws passed in 1686.

or message, to any person to fight, upon pain of being imprisoned during the space of six months, without bail or mainprize, and forfeit ten pounds; and whosoever shall except of such challenge, and not discover the same to the Governor, or some publick officer of the peace, shall forfeit the sum of ten pounds; the one moiety of the said forfeiture to be paid unto the Treasurer for the time being, for the public use of the Province, and the other moiety to such person or persons as shall discover the same, and make proof thereof in any court of record within this Province, to be recovered by the usual action of debt, in any of the said courts. *And be it further enacted* by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed (upon proof thereof before any justice of the peace) to the common gaol, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. *And be it further enacted* by the authority aforesaid, that no planter shall ride or go armed with sword, pistol, or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions thro' this Province, behaving themselves peaceably.

EXHIBIT 2



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

Search this website

# 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders.

## Subject(s):

- Carrying Weapons (https://firearmslaw.duke.edu/subjects/carrying-weapons/)

## Jurisdiction(s):

- Massachusetts (https://firearmslaw.duke.edu/jurisdictions/massachusetts/)

## Year(s):

1694

Further it is Enacted by the authority aforesaid, That every Justice of the Peace in the County where the Offence is committed , may cause to be staid and arrested all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere.

EXHIBIT 3

# ACTS

Passed at the Session begun and held at Boston,

on the Thirtieth day of May, A. D. 1750.

---

## CHAPTER 1.

AN ACT FOR IMPOWERING THE PROVINCE TREASURER TO BORROW
THE SUM OF FIVE THOUSAND POUNDS, FOR APPLYING THE SAME TO
DISCHARGE THE DEBTS OF THE PROVINCE AND DEFREY THE
CHARGES OF GOVERNMENT, AND FOR MAKING PROVISION FOR THE
REPAYMENT OF THE SUM SO BORROWED.

*Be it enacted by the Lieutenant-Governour, Council and House of Rep-
resentatives,*

[SECT. 1.]   That the treasurer of this province be and hereby is *Treasurer em-*
impowered to borrow from such person or persons as shall appear ready *powered to bor-*
to lend the same, a sum not exceeding five thousand pounds in Spanish *the province.*
mill'd dollars; and the sum so borrowed shall be a stock in the treas-
ury, to be applyed for defreying the charges of this government in
manner as in this act is after directed, and for every sum so borrowed,
the treasurer shall give a receipt of the form following; viz.,—

Province of the Massachusetts Bay,        day of        17   , received *Form of his re-*
from            the sum of            pounds, for the use and service of *ceipt for said*
the Province of the Massachusetts Bay; and in behalf of said Province, I do *money.*
hereby promise and oblige myself and my successors in the office of treasurer,
to repay the said        , his heirs or assigns, on or before the tenth
day of June, one thousand seven hundred and fifty-two, the aforesaid sum of
            pounds, with interest for the same, at and after the rate of six
per cent per annum.    Witness my hand,            , Treasurer.

—and no receipt shall be given for any sum less than fifty pounds; and
the treasurer is hereby directed to use his discretion in borrowing said
sum at such times as that he may be enabled to comply with the draughts
that may be made on the treasury in pursuance of this act.

*And be it further enacted,*

[SECT. 2.]   That the aforesaid sum of five thousand pounds shall be *£1,750 appro-*
issued out of the treasury in manner and for the purposes following; *priated for forts*
viz., the sum of seventeen hundred and fifty pounds, part of the afore- *and garrisons.*
said sum of five thousand pounds, shall be applyed for the service of the
several forts and garrisons within this province, pursuant to such orders
and grants as are or shall be made by this court for those purposes;
and the further sum of one thousand pounds, part of the aforesaid sum of *£1,000 for com-*
five thousand pounds, shall be applyed for the purchasing provisions *missary's stores.*
and the commissary's necessary disbursements for the service of the
several forts and garrisons within this province, pursuant to such grants

*And whereas* there are sometimes contingent and unforeseen charges that demand prompt payment,—

*Be it further enacted,* .

<span style="float:left">£100 for contin-<br>gent charges.</span> [SECT. 16.] That the sum of one hundred pounds, being the remaining part of the aforesaid sum of seven thousand eight hundred and sixty pounds, be applied to pay such contingent charges, and for no other purpose whatsoever.

*Provided always,*—

<span style="float:left">Remainder to<br>be and remain<br>as a stock in the<br>treasury.</span> [SECT. 17.] That the remainder of the sum which shall be brought into the treasury by the tax aforesaid, over and above what shall be sufficient to pay off the benefit tickets as aforesaid, shall be and remain as a stock in the treasury, to be applied as the general court of this province shall hereafter order, and to no other purpose whatsoever; any thing in this act to the contrary notwithstanding.

*And be it further enacted,*

<span style="float:left">Money to be<br>paid out of the<br>proper appro-<br>priations.</span> [SECT. 18.] That the treasurer is hereby directed and ordered to pay the sum of eight thousand and ten pounds, as aforesaid, out of such appropriations as shall be directed to by warrant, and no other, upon pain of refunding all such sum or sums as he shall otherwise pay; and the secretary to whom it belongs to keep the muster-rolls and accompts of charge, shall lay before the house of representatives, when they direct, such muster-rolls and accompts after payment thereof.

*And be it further enacted,*

<span style="float:left">Directors' al-<br>lowance to be<br>made by the<br>general court.</span> [SECT. 19.] That the directors or managers by this act appointed, shall have such allowances for their services as the general court shall hereafter order, and in case of the death, refusal or incapacity of attendance of any one or more of said managers, the vacancy shall be fill'd up by the governour and council. [*Passed February* 8; *published February* 16, 1750–51.

## CHAPTER 16.

### AN ACT FOR GRANTING THE SUM OF THREE HUNDRED POUNDS, FOR THE SUPPORT OF HIS HONOUR THE LIEUTENANT-GOVERNOUR AND COMMANDER-IN-CHIEF.

*Be it enacted by the Lieutenant-Governour, Council and House of Representatives,*

<span style="float:left">Governor's<br>grant.</span> That the sum of three hundred pounds be and hereby is granted unto his most excellent majesty, to be paid out of the publick treasury to his honour Spencer Phips, Esq[r]., lieutenant-governour and commander-in-chief in and over his majesty's province of the Massachusetts Bay, for his past services, and further to enable him to manage the publick affairs of the province. [*Passed February* 15;* *published February* 16, 1750–51.

## CHAPTER 17.

### AN ACT FOR PREVENTING AND SUPPRESSING OF RIOTS, ROUTS AND UNLAWFUL ASSEMBLIES.

<span style="float:left">Preamble.</span> WHEREAS the provision already made by law has been found insufficient to prevent routs, riots and tumultuous assemblies, and the evil consequences thereof; wherefore,—

* See the note to this chapter, *post.*

*Be it enacted by the Lieutenant-Governour, Council and House of Representatives,*

[Sect. 1.] That from and after the publication of this act, if any persons, to the number of twelve or more, being arm'd with clubs or other weapons, or if any number of persons, consisting of fifty or upwards, whether armed or not, shall be unlawfully, riotously or tumultuously assembled, any justice of the peace, field officer or captain of the militia, sheriff of the county or undersheriff, or any constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making, and shall openly make proclamation in these or the like words :— *Officers to make proclamation when persons are riotously assembled.*

"Our sovereign lord the king chargeth and commandeth all persons being assembled, immediately to disperse themselves, and peaceably to depart to their habitations, or to their lawful business ; upon the pains contained in the act of this province made in the twenty-fourth year of his majesty King George the Second, for preventing and suppressing of riots, routs and unlawful assemblies. God save the king. *Form of the proclamation.*

And if such persons so unlawfully assembled, shall, after proclamation made, not disperse themselves within one hour, it shall be lawful for every such officer or officers, and for such other persons as he or they shall command to be assisting, to seize such persons, and carry them before a justice of the peace ; and if such person shall be killed or hurt by reason of their resisting the persons so dispersing or seizing them, the said officer or officers and their assistants shall be indemnified and held guiltless.

[Sect. 2.] And all persons who, for the space of one hour after proclamation made as aforesaid,—or to whom proclamation ought to have been made, if the same had not been hindred,—shall unlawfully, routously, riotously and tumultuously continue together, or shall wilfully let or hinder any such officer, who shall be known, or shall openly declare himself to be such, from making the said proclamation, shall forfeit all their lands and tenements, goods and chattles, to his majesty· (or such a part thereof as shall be adjudged by the justices before whom such offence shall be tried), to be applied towards the support of the government of this province ; and shall be whipt thirty-nine stripes on the naked back at the publick whipping-post, and suffer one year's imprisonment, and once every three months during said imprisonment receive the same number of stripes on the naked back at the publick whipping-post as aforesaid. *Penalty for disobedience.*

[Sect. 3.] And if any such person or persons, so riotously assembled, shall demolish or pull down, or begin to demolish or pull down, any dwelling-house or other house parcel thereof, any house built for publick uses, any barn, mill, malt-house, store-house, shop or ship, he or they shall suffer the same pains and penalties as are before provided in this act.

*And be it further enacted,*

[Sect. 4.] That this act shall be read at every general sessions of the peace, and at the anniversary meeting of each town, within this province, annually ; and no person shall be prosecuted for any offence contrary to this act, unless prosecution be commenced within twelve months after the offence committed. *This act to be read at the anniversary meeting of the towns and general sessions of the peace.*

*Provided always,—*

[Sect. 5.] That where there shall appear any circumstances to mitigate or alleviate any of the offences against this act, in the judgment of the court before which such offence shall be tried, it shall and may be lawful for the judges of such court to abate the whole of the punishment *Judges empowered to abate the punishment of whipping, in case.*

69

ishment of whipping, or such part thereof as they shall judge proper; anything in this act to the contrary notwithstanding.

**Continuance of the act.** [Sect. 6.] This act to continue and be in force for the space of three years from the publication thereof, and no longer. [*Passed and published February* 14, 1750–51.

---

# CHAPTER 18.

AN ACT IN ADDITION TO AN ACT, INTITLED "AN ACT TO PREVENT DAMAGE BEING DONE ON THE BEACH, HUMOCKS AND MEADOWS BELONGING TO THE TOWN OF SCITUATE, LYING BETWEEN THE SOUTHERLY END OF THE 'THIRD CLIFT,' SO CALLED, AND THE MOUTH OF THE NORTH RIVER."

**Preamble.**
**1749-50, chap. 14.** WHEREAS in and by an act made and passed in the twenty-third year of his present majesty's reign, intitled " An Act to prevent damage being done on the beach, humocks and meadows belonging to the town of Scituate, lying between the southerly end of the 'Third Clift,' so called, and the mouth of the North River," the penalt[y][ie]s for turning or driving neat cattle, horse-kind, sheep or goats upon such beach, humocks or sedge-ground adjo[y][i]ning to said beach, to feed thereon, are to be recovered from him or them that shall so drive said cattle, horse-kind, sheep or goats, or from the owner or owners of them that shall so order them to be driven; and it is found, by experience, that proof thereof can seldom be obtained, whereby the good end and design of said act in a great measure is defeated,—

*Be it therefore enacted by the Lieutenant-Governour, Council and House of Representatives,*

**Neat cattle and other creatures to be impounded if found feeding on the meadows, &c.** [Sect. 1.] That if any neat cattle, horse-kind, sheep or goats shall be found feeding on said beach, humocks, meadows or sedge-ground adjoyning to said beach, it shall and may be lawful for any person to impound the same, such person to observe the rules and directions in the said act prescribed in case of impounding; and the owner or owners of them shall forfeit and pay to the impounder one shilling a head for all neat cattle and horse-kind, and twopence for every sheep or goat; and the said penalt[y][ie]s or forfeitures shall be paid, before the creatures, which shall or may be impounded by virtue of this act, be discharged or released by the pound-keeper.

*Provided, nevertheless,—*

**Rates to be paid for such impounded creatures.** [Sect. 2.] The owner or owners of the creatures so impounded may, if they think fit, replevie such creatures, on condition they give sufficient bond, with one or more suret[y][ie]s, to prosecute such replevin to effect before some justice of the peace in the same county, within fifteen days from the date of such replevin, and to pay all such forfeitures and costs as shall be awarded or adjudged against them. [*Passed February* 8; *published February* 16, 1750–51.

---

# CHAPTER 19.

AN ACT FOR GRANTING UNTO BENJAMIN CRABB THE SOLE PRIVI-LE[D]GE OF MAKING CANDLES OF COARSE SPERMACÆTI OYL.

**Preamble.** WHEREAS Benjamin Crabb, of Rehoboth, in the county of Bristol, has represented to this court that he, and no other person in the prov-

# EXHIBIT 4



DATE DOWNLOADED: Sun May 21 17:33:24 2023
SOURCE: Content Downloaded from *HeinOnline*


Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry
Acts of Parliament (1771).

ALWD 7th ed.
. Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with
Sundry Acts of Parliament (1771).

APA 7th ed.
(1771). Acts and Laws of His Majesty's Province of New-Hampshire: In New-England;
with Sundry Acts of Parliament. Portsmouth N.H., Printed by Daniel and Robert Fowle,
and sold at their Office near the State-House.

Chicago 17th ed.
Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry
Acts of Parliament. Portsmouth N.H., Printed by Daniel and Robert Fowle, and sold at
their Office near the State-House.

McGill Guide 9th ed.
Acts & Ls of His Majesty's Province of New-Hampshire: In New-Engl&; with Sundry Acts
of Parliament (Portsmouth N.H.: Printed by Daniel and Robert Fowle, and sold at their
Office near the State-House., 1771)


AGLC 4th ed.
Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry
Acts of Parliament (Printed by Daniel and Robert Fowle, and sold at their Office near
the State-House., 1771

MLA 9th ed.
Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry
Acts of Parliament. Portsmouth N.H., Printed by Daniel and Robert Fowle, and sold at
their Office near the State-House. HeinOnline.

OSCOLA 4th ed.
Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry
Acts of Parliament. Portsmouth N.H., Printed by Daniel and Robert Fowle, and sold at
their Office near the State-House.          Please note: citations are provided
as a general guideline. Users should consult their preferred citation format's style
manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

8　　*Temporary L A W S of the Province*

---

## C H A P. V.

# An Act for reviving an Act

Pass'd 29th
of Geo. 2.

entituled, *An Act in addition to an Act*, entituled, *An Act, for establishing Courts of publick Justice within this Province, made and pass'd in the seventeenth Year of His present Majesty's Reign.*

**Preamble.** *WHEREAS the before recited act is expired, the same being temporary, and the same having been found very beneficial whilst in force, and it appearing necessary that the same should be revived:*

BE IT ENACTED *by his* EXCELLENCY *the* GOVERNOR, COUNCIL, *and* ASSEMBLY, That the before recited act, and all and singular the paragraphs, clauses, articles, directions and powers in the said act contained, shall be, and hereby are revived, re-enacted, directed and ordered to abide and remain in full force, and accordingly *to* be exercised, practised and put in execution for and during the space of *twenty years* from the passing hereof, and no longer.

---

## C H A P. VI.

Pass'd 27th
of Geo. 2.

# An Act for preventing and suppressing of Riots, Routs, and unlawful Assemblies.

**§. 1.** BE IT ENACTED *by the* GOVERNOR, COUNCIL, *and* ASSEMBLY, *and by the* AUTHORITY *of the same,* IT IS *hereby* ENACTED *and* ORDAINED, That if three persons or more, shall assemble themselves with an intent to do any unlawful act,

**Rioters upon conviction to pay 50 l. or receive thirty stripes.** against the person of another, or against several persons, with force and violence, as to kill, beat, wound, or do any other personal injury, or against his, her or their estate or possession wrongfully, or to do any other unlawful act with force or violence against the peace, or to the manifest terror of the people, and being required and commanded by any magistrate, field officer, captain of the militia, sheriff, select-man or constable (in the town or parish to which such officers respectively in the exercise of their office are limited, ) by proclamation to be made in the king's name, in the form herein after directed, to disperse and peaceably depart to their habitations or lawful business, shall not so disperse and depart : or being so assembled, shall do any unlawful act, with force and violence, against the person of any one or more, or against his, her or their estate or possession, or against the public peace, order or interest, in manner as aforesaid, and shall be thereof convicted by due course of law, either before the court of general sessions of the peace, or superior court of judicature

*of* N E W-H A M P S H I R E.　　9

---

cature, every fuch offender fhall forfeit and pay for every fuch of-
fence, not exceeding the fum of *fifty pounds*, and in default of pay-
ing the fame, within twenty four hours after fentence, fhall be whipt
on the naked back at fome publick place, not exceeding thirty ftripes,
according to the circumftances aggravating or extenuating the of-
fence ; and fhall pay the legal cofts of profecution, and fhall ftand
committed till fentence performed. And the form and order of
the proclamation to be made as aforefaid, fhall be as follows, name-
ly, the officers aforefaid, or any of them, fhall among, or as near
as they, or any of them can fafely, come to the faid rioters and
command filence to be kept while proclamation is making, and fhall
then with a loud voice, openly make proclamation in thefe or the
like words ; "Our fovereign Lord the King chargeth and command-
" eth all perfons, being here affembled, immediately to difperfe
" themfelves, and peaceably to depart to their habitations, or to
" their lawful bufinefs, upon the pains contained in an act of this
" province, made in the twenty-feventh year of his Majefty King
" GEORGE the fecond, for preventing and fuppreffing of riots,
" routs, and unlawful affemblies.

*The manner of making proclamation.*

*The form of the proclamation.*

GOD *fave the KING.*

And if any three or more of the perfons fo unlawfully and rio-
toufly affembled, fhall continue together, and not difperfe them-
felves immediately after proclamation made as aforefaid, it fhall be
lawful for the officers aforefaid, or any of them, (within their re-
fpective limits as aforefaid,) to command affiftance, and to feize
fuch rioters, or any of them, and immediately to carry them be-
fore fome juftice of the peace for this province, who fhall demand
and take of each of them, fufficient fecurity for his or her appear-
ance before, and abiding and performing the fentence of the next
court of general feffions of the peace, or fuperior court of judica-
ture, (according as the nature and circumftances of the cafe may
require, on his or her offence,) and to ftand committed till fuch
fecurity fhall be given. And all perfons of age and ability, are here-
by required to aid and affift fuch officer or officers, being thereunto
commanded as aforefaid, to feize and apprehend fuch riotor or ri-
otors, and carry and keep him, her or them in cuftody, before a
juftice as aforefaid, and to convey him, her or them to the com-
mon goal, in default of giving fecurity as aforefaid, on pain of for-
feiting and paying the fum of *twenty pounds*, for every inftance
of refufing or neglecting to give fuch aid and affiftance. And
when three or more perfons fhall be fo unlawfully and riotoufly
affembled as aforefaid, and they or any of them, fhall prevent and
hinder proclamation to be made as aforefaid, and three or more of
them fhall continue together after fuch hindrance and impediment,
they and every of them, fhall be liable to the fame pains and pe-
nalties aforefaid, upon conviction as is above directed.

*If three or more fhall continue after proclamation is made, they may be apprehended before a juftice, &c.*

*Penalty on thofe who refufe to affift the officer in feizing riotors, &c.*

*Penalty for hindering proclamation to be made, and continuing together afterwards.*

§. 2. AND BE IT *further* ENACTED, That if twelve perfons or
more, being armed with clubs, or other weapons ; or if fifty per-
fons or more, whether armed or not, fhall be unlawfully, riotoufly,
tumultuoufly or routeroufly affembled, any of the officers aforefaid,

*Penalty and punifhment for high-handed riots, &c.*

C

fhall

**10**     *Temporary* L A W S *of the* P r o v i n c e

---

fhall make proclamation, in manner and form aforefaid; and if fuch perfons, fo unlawfully affembled, fhall not thereupon immediately difperfe themfelves, according to faid proclamation, each of them and every one who fhall wilfully hinder any fuch officer (who fhall be known, or fhall openly declare himfelf to be fuch) from making the faid proclamation, fhall forfeit and pay a fine not exceeding the fum of *five hundred pounds*, at the difcretion of the faid fuperior court, (which only fhall have cognizance of the offence) confidering the aggravations attending the fame, and fhall be whipt thirty ftripes on the naked back at the publick whipping-poft, and fuffer twelve months imprifonment, and once every three months, during faid twelve months, receive the fame number of ftripes as aforefaid.

*The fuperior court's power to remit or mitigate the corporal punifhment.*

*Provided neverthelefs,* It fhall be in the power of faid court, if they judge proper, upon confidering all circumftances, to remit or mitigate the punifhment of whipping in fuch cafes. And in cafe any rioters fhall, when fo riotoufly affembled, demolifh or pull down, or begin to demolifh or pull down, any dwelling houfe, or other houfe, or any part thereof, any houfe built for public ufe, any barn, fhop, or fhip, or other veffel, or any part thereof, or wound, maim, or do any bodily hurt or injury to any perfon, fuch rioters, or thofe of them who fhall be apprehended, fhall make

*Such rioters liable to anfwer all damages, &c.*

good all damages to the party or parties damnified or injured, upon an action of trefpafs profecuted for the fame, and fhall alfo fuffer the refpective pains and penalties inflicted by this act, according as the fact fhall come under one or the other of the cafes herein provided againft. And if any perfon or perfons fhall refcue any prifoner or prifoners convicted of any crime, out of his Majefty's

*Penalty on refcufors of prifoners or criminals.*

goal, or out of the cuftody of any officer or officers aforefaid, or any under or deputy fheriff, fuch offender or offenders, fhall be liable to, and fuffer the pains and penalties which fuch prifoner or prifoners fhould have fuffered, if he, fhe or they had not been fo refcued. But in cafe fuch refcous fhall be made before conviction of the perfon or perfons fo in prifon or cuftody, he, fhe, or they

*What the punifhment fhall be in cafe the refcous be made before conviction.*

committing the fame, fhall be liable to, and fuffer all or any of the pains and penalties aforefaid, inflicted on rioters, where the number amounts to twelve, or fifty as aforefaid, at the difcretion of the faid fuperior court, (which only fhall have cognizance of the offence,) having regard to the circumftances aggravating or alleviating the crime.

*Officers power to command affiftance.*

And any of faid officers fhall hereby have power to command affiftance in this cafe, as in manner aforefaid, and the perfon or perfons (being capable) who fhall refufe to give the fame, being thereto required or commanded as aforefaid, fhall be liable to the fame pains and penalties, as for refufing to give aid and affiftance in the cafe aforefaid.

*If any rioters, or refcuers fhall be killed in re-*

And in cafe any of the rioters in this act mentioned or defcribed, fhall be killed or hurt by reafon of their refifting the perfon or perfons endeavouring to difperfe them, or attempting to feize and

apprehend

*of* N E W-H A M P S H I R E.   11

apprehend them or any of them, the faid officers and their affift-
ants, and every of them, fhall be wholly indemnified and held
guiltlefs ; as alfo in the cafe of a refcous aforefaid.

*Provided neverthelefs,* Nothing in this act fhall be conftrued to
extend to any number of perfons, at any time affembled, or affem-
bling, for any lawful defign or purpofe, nor to any thing that fuch
perfons fhall do, which is or fhall be neceffary to and for their own
defence. And if any of the officers aforefaid, fhall malicioufly or
caufelefsly make proclamation in manner and form aforefaid, a-
gainft any perfons lawfully affembled, or caufe any perfons to be
apprehended wrongfully, under colour or pretence of their being
rioters, within the meaning and intent of this act, every fuch of-
ficer fhall forfeit and pay the fum of *one hundred pounds,* and fhall
be liable to an action of trefpafs on the cafe, to be profecuted by the
party or parties fo malicioufly and caufelefsly complained of, and to
pay all damages thereby fuftained, and double cofts to be taxed
with fuch damages.

All fines and forfeitures arifing by this act, to be for his Majefty's
ufe, towards the fupport of his government in this province.

This act to be read at the opening the courts aforefaid, at every
term, and at every annual town meeting. And no profecution
fhall be fuftained for any offence herein prohibited, after one year
from the time of committing the fact.

This act to continue and be in force for the term of three years
and no longer.

�ખ✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕✕

## C H A P.   VII.

# An Act to promote the Increafe
## of Sheep.

*W*HE R E A S the increafe of fheep would be of very great fer-
*vice to all his Majefty's fubjects in this province ; but by the
neglect of many perfons who keep fheep to take proper care of their
rams, who fuffer them to run at large with ewes at all feafons of the
year (which is found by experience to be very prejudicial to the in-
creafe of fheep,) by the yeaning of lambs in an unfuitable feafon :   By
which fheep are rather deftroyed than increafed :*
   For preventing of which,

*B*E it Enacted by the Governor, Council, *and* Assembly,
   That from and after the publication of this act, no ram fhall
be fuffered to go at large within this province, from the tenth day
of *Auguft,* to the fifteenth day of *November* annually, on the penalty
of *twenty fhillings* for each ram, and for every time any fhall be found
out of the owner's inclofure, between the days aforefaid to be paid
                                                            by

# EXHIBIT 5

[ 35 ]

same offenders come not as afore is said, and the proclamation made and returned, they shall be convict and at-tainted of the riot, assembly, or rout aforesaid : And moreover the Justices of Peace in every county or corporation, where such riot, assembly, or rout of people shall be made, in case the same be made in their presence, or if none be present, then the justices having notice thereof, together with the sheriff, under sheriff, or serjeant, of the same county or corporation, shall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth; as often as they shall be found in default of the execution of the said act ; and on such default of the justices and sheriff, under sheriff, or serjeant, a commission shall go from the General Court at the instance of the party grieved, to enquire as well of the truth of the case, and of the original matter for the party complain-ant, as of the default or defaults of the said justices, sheriff, under sheriff, or serjeant, in this behalf supposed, to be directed to sufficient and indifferent persons at the nomination of the Judges ; and the said commissioners presently shall return into the General Court the inquests and matters before them in this behalf taken and found : But no persons convicted of a riot, rout, and unlawful assembly, shall be imprisoned for such offence by a longer space of time than one year. Persons legally convicted of a riot, rout, or unlawful assembly, otherwise than in the manner directed by this act, shall be punished by imprisonment and amercement, at the discretion of a jury, under the like limitation.

## C H A P. XLIX.

### An ACT *forbidding and punishing* AFFRAYS.

BE it *enacted by the General Assembly*, That no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the courts of justice, or in executing of their office, and such as be in their company assisting them, be so hardy to come before the justices of any court, or either of their Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a court, nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison by any Justice on his own view, or proof by others, there to abide for so long a time as a jury, to be sworn for that purpose by the said Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth; but no person shall be impri-soned for such offence by a longer space of time than one month.

## C H A P. L.

### An ACT *against* C O N S P I R A T O R S.

BE it *declared and enacted by the General Assembly*, That conspirators be they that do confederate and bind themselves by oath, covenant, or other alliance, that every of them shall aid and bear the other falsely and ma-liciously, to move or cause to be moved any enticement or information against another on the part of the Common-wealth, and those who are convicted thereof at the suit of the Commonwealth, shall be punished by imprisonment and amercement, at the discretion of a jury.

## C H A P. LI.

### An ACT *against conveying or taking* PRETENSED TITLES.

BE it *enacted by the General Assembly*, That no person shall convey or take, or bargain to convey or take, any pretensed title to any lands or tenements, unless the person conveying or bargaining to convey, or those under whom he claims shall have been in possession of the same, or of the reversion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, shall forfeit the whole value of the lands or tenements, the one moiety to the Commonwealth, and the other to him who will sue as well for himself as for the Commonwealth : But any person lawfully possessed of lands or tenements, or of the reversion or remainder thereof, may nevertheless take or bargain to take the pretensed title of any other person, so far and so far only as it may confirm his former estate.

## C H A P. LII.

### An ACT *to punish* BRIBERY *and* EXTORTION.

BE it *enacted by the General Assembly*, That no Treasurer, Keeper of any Public Seal, Councillor of State, Counsel for the Commonwealth, Judge, or Attornies at law, practising either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Escheator, nor any officer of the Commonwealth, shall, in time to come, take, in any form, any manner of gift, brokage, or reward for doing his office, other than is, or shall be allowed by some act of General Assembly, passed after the institution of the Commonwealth, that is to say, after the fifteenth day of May, in the year of our Lord, one thousand seven hundred and seventy six ; and he that doth, shall pay unto the party grieved, the treble value of that he hath received, shall be amerced and imprisoned at the discretion of a jury, and shall be discharged from his office forever; and he who will sue in the said matter, shall have suit as well for the Commonwealth as for himself, and the third part of the amercement.

CHAP.

EXHIBIT 6

## 1786. — CHAPTER 38. 87

ART. *Sixtieth.* The Field Officers of each and every Regiment, shall appoint some suitable person, belonging to such Regiment, to receive such fines as may arise within the same, for any breach of any of the foregoing articles; and shall direct the same to be properly applied to the relief of such sick, wounded or necessitous soldiers as belong to such regiment; and such person shall account with such Officer for all fines received, and the application thereof. *(margin: Field-officers to appoint persons to receive fines, &c.)*

ART. *Sixty First.* All crimes not capital, and all disorders and neglects, which Officers and Soldiers may be guilty of, to the prejudice of good order and military discipline, tho' not mentioned in the foregoing articles, are to be taken cognizance of by a general or regimental Court martial, according to the nature and degree of the offence, and be punished at their discretion. *(margin: Crimes not mentioned in these articles, may be taken cognizance of.)*

ART. *Sixty Second.* Whenever any Officer or soldier shall be accused of a capital crime, or of having used violence or committed any offence against the person or property of the good people of this or either of the United States, such as is punishable by the known laws of the land, the commanding officer and officers of every regiment, troop or party, to which the person or persons so accused shall belong, are hereby required, upon application duly made by or in behalf of the party or parties injured, to use his utmost endeavours to deliver over such accused person or persons to the Civil Magistrate, and likewise to be aiding and assisting to the Officers of Justice in apprehending and securing the person or persons so accused, in order to bring them to trial. And if any commanding Officer or Officers shall willfully neglect, or shall refuse upon the application aforesaid, to deliver over such accused person or persons to the Civil Magistrate, or to be aiding and assisting to the Officers of Justice in apprehending such person or persons, such officer or officers so offending, shall be cashiered. *October 24, 1786.* *(margin: Any officer or soldier, accused of a crime punishable by the known laws of the land— / To be delivered over to the civil magistrate.)*

## 1786. — Chapter 38.

[September Session, ch. 8.]

### AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND EVIL CONSEQUENCES THEREOF. *Chap.* 38.

*Whereas the provision already made by Law, for the preventing routs, riots and tumultuous assemblies, and the evil consequences thereof, has been found insufficient;* *(margin: Preamble.)*

Digitized by Google

　　　　　1786. — Chapter 38.

*Be it therefore enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* that from and after the publication of this Act, if any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff or Deputy Sheriff of the County, or Constable of the Town, shall among the rioters, or as near to them as he can safely come, Command Silence, while Proclamation is making; and shall openly make Proclamation, in these or the like words:

*Proclamation to be made among rioters.*

### Commonwealth of *Massachusetts.*

*Form.*

By virtue of An Act of this Commonwealth, made and passed in the year of OUR LORD, One thousand seven hundred and eighty six, entitled, "An ACT for suppressing routs, riots, and tumultuous assemblies, and the evil consequences thereof," I am directed to charge and command, and I do accordingly charge and command, *all persons,* being here assembled, immediately to disperse themselves, and peaceably to depart to their habitations, or to their lawful business, upon the pains inflicted by the said ACT.

### GOD Save the COMMONWEALTH.

*If the persons assembled do not disperse, — officers empowered, &c.*

And if such persons, assembled as aforesaid, shall not disperse themselves within one hour after proclamation made, or attempted to be made, as aforesaid, it shall be lawful for every such officer to command sufficient aid, and he shall seize such persons, who shall be had before a Justice of the Peace; and the aforesaid Justice of the Peace, Sheriff or Deputy Sheriff, is hereby further empowered, to require the aid of a sufficient number of persons in arms, if any of the persons assembled as aforesaid shall appear armed: And if any such person or persons shall be killed or wounded, by reason of his or their resisting the persons endeavouring to disperse or seize them, the said Justice, Sheriff, Deputy Sheriff, Constable and their assistants, shall be indemnified and held guiltless.

*And be it further Enacted,* that if any person, being commanded by such Justice, Sheriff, Deputy Sheriff or Constable, as aforesaid, shall refuse or neglect to afford the assistance required, and shall be convicted thereof upon the oath of either of the said Officers, so command-

# EXHIBIT 7



HEINONLINE

DATE DOWNLOADED: Wed Apr 19 20:04:12 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force (1803).

ALWD 7th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public & Permanent Nature, as are Now in Force (1803).

APA 7th ed.
Virginia. (1803). Collection of All Such Acts of the General Assembly of Virginia, of
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace.

Chicago 17th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace.

McGill Guide 9th ed.
Virginia, Collection of All Such Acts of the General Assembly of Virginia, of a
Public & Permanent Nature, as are Now in Force (Richmond: Printed by Samuel
Pleasants, Jun., and Henry Pace., 1803)

AGLC 4th ed.
Virginia, Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force (Printed by Samuel Pleasants, Jun.,
and Henry Pace., 1803

MLA 9th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace. HeinOnline.

OSCOLA 4th ed.
Virginia. Collection of All Such Acts of the General Assembly of Virginia, of a
Public and Permanent Nature, as are Now in Force. Richmond, Printed by Samuel
Pleasants, Jun., and Henry Pace.        Please note: citations are provided as a
general guideline. Users should consult their preferred citation format's style
manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

A

# COLLECTION

OF

ALL SUCH

# ACTS

OF THE

# *GENERAL ASSEMBLY*

OF

# VIRGINIA,

OF A PUBLIC AND PERMANENT NATURE, AS
ARE NOW IN FORCE;

———

WITH A

# *NEW AND COMPLETE INDEX.*

———

TO WHICH ARE PREFIXED THE DECLARATION OF RIGHTS,
AND CONSTITUTION, OR FORM OF GOVERNMENT.

———

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY,
PASSED ON THE TWENTY-SIXTH DAY OF JANUARY, ONE
THOUSAND EIGHT HUNDRED AND TWO.

———

RICHMOND,

*PRINTED BY SAMUEL PLEASANTS, JUN. AND HENRY PACE,*

M,DCCC,III.

IN THE SEVENTEENTH YEAR OF THE COMMONWEALTH.   187

17 8 2.

I, A. B. *do fwear, that my removal into the State of Virginia, was with no intent of evading t e laws for preventing the further importation of flaves, nor have I brought with me any flaves, with an intention of felling them, nor ave any of the flaves which I have brought with me, been imp rted from Africa, or any of the Weft India Iflands, fince the firft day of* November, *one thoufand feven hundred and feventy-eight.*  So help me GOD.

Nor to any perfons claiming flaves by defcent, marriage or devife; nor to any citizens of this Commonwealth, being now the actual owners of flaves within any of the United States and removing fuch hither; nor to travellers and others making a tranfient ftay, and bringing flaves for neceffary attendance, and carrying them out again. *a*

V.  NO negro or mulatto fhall be a witnefs, except in pleas of the Commonwealth againft negroes or mulattoes, or in civil pleas, where negroes or mulattoes alone fhall be parties. *a* †

VI.  NO flave fhall go from the tenements of his mafter or other perfon with whom he lives, without a pafs, or fome letter or token, whereby it may appear that he is proceeding by authority from his mafter, employer, or overfeer: If he does, it fhall be lawful for any perfon to apprehend and carry him before a Juftice of the Peace, to be by his order punifhed with ftripes, or not, in his difcretion. *a*

VII.  AND if any flave fhall prefume to come and be upon the plantation of any perfon whatfoever, without leave in writing from his or her owner, or overfeer, not being fent upon lawful bufinefs, it fhall be lawful for the owner or overfeer of fuch plantation, to give or order fuch flave ten lafhes on his or her bare back for every fuch offence. *b*

VIII.  NO negro or mulatto whatfoever fhall keep or carry any gun, powder, fhot, club, or other weapon whatfoever, offenfive or defenfive, but all and every gun, weapon, and ammunition found in the poffeffion or cuftody of any negro or mulatto, may be feized by any perfon, and upon due proof thereof made before any Juftice of the Peace of the County or Corporation where fuch feizure fhall be, fhall by his order be forfeited to the feizor for his own ufe; and moreover, every fuch offender fhall have and receive by order of fuch Juftice, any number of lafhes not exceeding thirty-nine, on his or her bare back, well laid on, for every fuch offence. *b*

IX.  *PROVIDED neverthelefs,* That every free negro or mulatto, being a houfe-keeper, may be permitted to keep one gun, powder and fhot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and ufe guns, powder, fhot, and weapons, offenfive or defenfive, by licenfe from a Juftice of Peace of the County wherein fuch plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of fuch as are flaves. *b*

X.  EVERY perfon other than a negro, of whofe grand-fathers or grandmothers any one is, or fhall have been a negro, although all his other progenitors, except that defcending from the negro, fhall have been white perfons, fhall be deemed a mulatto; and fo every fuch perfon who fhall have one fourth part or more of negro blood, fhall in like manner be deemed a mulatto. *c*

XI.  RIOTS, routs, unlawful affemblies, trefpaffes and feditious fpeeches by a flave or flaves, fhall be punifhed with ftripes, at the difcretion of a Juftice of the Peace, and he who will, may apprehend and carry him, her, or them, before fuch Juftice. *d*

XII.  AND to prevent the inconveniences arifing from the meetings of flaves, *Be it further enacted,* That if any mafter, miftrefs, or overfeer of a family, fhall knowingly permit or fuffer any flave not belonging to him of her, to be and remain upon his or her plantation above four hours at any one time, without leave of the owner or overfeer of fuch flave, he or fhe fo permitting, fhall forfeit and pay three dollars for every fuch offence; and every owner or overfeer of a plantation, who fhall fo permit or fuffer more than five negroes or flaves, other than his or her own, to be and remain upon his or her plantation or quarter at any one time, fhall forfeit and pay one dollar for each negro or flave above that number; which faid feveral forfeitures fhall be to the informer, and recoverable with cofts, before any Juftice of Peace of the County or Corporation where fuch offence fhall be committed. *e*

(*a*) 1. 83, *ch.* 77, *fec.* 2, 3.  † *Altered by act of Dec. fefs.* 1800, *ch.* 70; *negroes or mulattoes, bond or free, are by that act made legal witneffes againft each other.*  (*b*) 22, Geo. 2, *ch.* 31, *fec.* 17, 18, 19.  (c) 1793, *ch.* 78.  (*d*) 16, *ch.* 7, *fec.* 4.  (*e*) 22, Geo. 2, *ch.* 31, *fec.* 12.

---

*Marginal notes:*

And of citizens claiming flaves by defcent, devife, or marriage, or being now the owners & removing them from another ftate, and travellers carrying them out again.

In what cafes negroes or mulattoes may or may not be witneffes.

Slaves not to go from home, without paffes.

Coming on the plantations of others without leave from their mafters, may be whipped.

Negroes and mulattoes not to keep or carry arms.

Except thofe living on the frontiers licenfed by the juftices of the peace.

Who fhall be deemed mulattoes.

Punifhment of flaves for riots, unlawful affemblies, feditious fpeeches, &c.

No perfon fhall permit the flaves of others to remain on his plantation.

ER-172

EXHIBIT 8



# HEINONLINE

DATE DOWNLOADED: Sun May 14 19:55:42 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1801 259 .

ALWD 7th ed.
, , 1801 259 .

Chicago 17th ed.
"," Tennessee - 4th General Assembly, 1st Session : 259-261

AGLC 4th ed.
" Tennessee - 4th General Assembly, 1st Session 259

OSCOLA 4th ed.
" 1801 259          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

( 259 )

grants, deeds, or mesne conveyances not being proved and registered within this state, it shall and may be lawful for such person or persons to prove and register his, her, or their grants, deeds or mesne convey-ances.

Sec. 2. *Be it enacted*, That this act shall be in force until the end of the next stated session of the general assembly.

## CHAP. XXI.

An ACT *to amend an act, entitled,* " An act to ascertain the boundaries of land, and for perpetuating testimony.—PASSED NOVEMBER 6, 1801.

*B*E *it enacted by the General Assembly of the State of Tennessee,* That all the privileges, benefits, and advantages arising under or accruing to others, by virtue of an act, entitled, " An act to ascertain the boundaries of land, and for perpetuating testimony, passed at Knoxville in the year 1799, shall extend to the citizens resident south of French Broad and Holston, and between the rivers Big Pigeon and Tennessee, holding or claiming, or that may hold or claim land by right of oc-cupancy, so far as may respect their rights to, or the conditional or boundary lines of their respective claims or rights of occupancy and pre-emption in that tract of country, any thing in the proviso to the fourth section of said recited act to the contrary notwithstanding.

## CHAP. XXII.

An ACT *for the restraint of idle and disorderly persons.*—PASSED NOVEMBER 13, 1801.

WHEREAS it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons :

Section 1. BE *it enacted by the General Assembly of the State of Tennessee,* That any person or persons who have no apparent means of subsistence, or neglect applying themselves to some honest calling for the support of themselves and families, every person so offending, who shall be found sauntering about neglecting his business, and endeavoring to maintain himself by gaming or other undue means, it shall and may be lawful for any justice of the peace of the county wherein such person may be found, on due proof made, to issue his warrant for such offending person, and cause him to be brought before said justice, who is hereby empow-ered, on conviction, to demand security for his good behaviour, and in case of refusal or neglect, to commit him to the goal of the county, for any term not exceeding five days, at the expiration of which time he shall be set at liberty if nothing criminal appears against him, the said offender paying all charges arising from such imprisonment; and if such person shall be guilty of the like offence from and after the space of thirty days, he, so offending, shall be deemed a vagrant, and be subject to one month's imprisonment, with all costs accruing thereon, which if he neglects or refuses to pay, he may be continued in prison until the next court of the county, who may proceed to try the said offender, and if found guilty by a verdict of a jury of good and lawful men, said court may proceed to hire the offender for any space of time not exceeding six months, to make satisfaction for all costs, but if such person or persons so offending, be of ill fame, so that he or they cannot be hired for the costs, nor give sufficient security for the same and his future good behaviour, in that case it shall and may be lawful for the said court to cause the offender to recive not exceeding thirty nine lashes, on his bare back, after which he shall be set at liberty, and the costs arising thereon shall become a county charge ; which punishment may

Digitized from Best Copy Available

( 260 )

be inflicted as often as the person may be guilty, allowing thirty days between the punishment and the offence.

Sec. 2. Be it enacted. That it shall not be lawful for any person or persons of ill fame or suspicious character, to remove him or themselves from one county to another in this state, without first obtaining a certificate from some justice of the peace of said county or captain of his company, setting forth his intention in removing, whether to settle in said county, or if travelling, to set forth his business and destination, and if such traveller should be desirous to stay in any county longer than ten days, he shall first apply to some justice of said county for leave, and obtain a certificate for that purpose, setting forth the time of his permission, and if such person shall be found loitering in said county after the expiration of his permit, or fail to obtain the same agreeable to the true intent and meaning of this act, such person or persons so offending, may be apprehended by any person or persons, and carried before some justice of the peace, who may enquire into his character and business; and fine him at his discretion, not exceeding ten dollars: but if said traveller shall be found on examination, to be a person of ill fame, and there is reason to suspect he is loitering in said county for evil purpose, attempting to acquire a living by gambling, or other bad practices, such justice shall have power to commit any person of like character, until he shall find good and sufficient security for his good behaviour, for any time not exceeding ten days, and said justice of the peace or court of the county shall proceed against such offender, in the same manner as is heretofore prescribed for vagrants.

Sec. 3 Be it enacted, That all and every keeper or keepers, exhibitor or exhibitors, of either of the gaming tables commonly called A, B, C. or E. O. tables, or faro bank, or of any other gaming cloth table, or bank of the same, or like kind, under any denomination whatever, shall be deemed and treated as a vagrant, and moreover it shall be the duty of any judge or justice of the peace, by warrant under his hand, to order such gaming table or cloth to be seized and publicly burned or destroyed; said warrant shall be directed to some one constable within the county, whose duty it shall be, forthwith to execute the same: Provided, That nothing herein contained, shall be so construed as to extend to billiard tables.

Sec. 4. Be it enacted, That it shall not be lawful for any house keeper to harbor any idle person of the character aforesaid, for any longer time than is heretofore specified, under the penalty of twenty dollars for every such offence, to be recovered by warrant before any justice of the peace of the county where the offence is committed.

Sec 5 Be it enacted, That it shall be the duty of each justice of the peace, on information being made on oath to him or them, that there is a person or persons of the aforesaid description, loitering in his or their county, then and in that case he or they shall issue his or their warrant against such person or persons agreeable to this act: And provided, he or they shall neglect or refuse so to do, it shall be deemed a misdemeanor in office, for which he or they shall be impeachable, and on conviction be removed from office.

Sec 6 Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his

Digitized from Best Copy Available

( 261 )

own view, or upon the information of any other person on oath, to bind such person or persons to their good behaviour, and if he or they fail to find securities, commit him or them to goal; and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.

Sec 7. *Be it enacted*, That if any person or persons shall unlawfully cut out or disable the tongue, put out an eye, slit a nose, bite or cut off a nose, ear or lip, or cut off or disable any limb or member, or stab any person whatsoever, in doing so, to maim, wound or disfigure in any of the manner before mentioned, such person or persons so offending, their counsellors, aiders and abettors, knowing of, and privy to the offence, shall be and are hereby declared to be felons, and shall suffer as in case of felony : *Provided nevertheless*, he or they shall be entitled to benefit of clergy, and be further liable to an action of damages to the party injured.

Sec. 8. *Be it enacted*, That all fines inflicted by this act, shall be one half to him that will sue for the same, and the other half to the use of the county.

Sec. 9. *Be it enacted*. That all laws and parts of laws, which come within the meaning and purview of this act, are hereby repealed.

### CHAP. XXIII.

*An* ACT *to authorise the several county courts of pleas and quarter sessions to remit and mitigate fines and forfeitures on recognizances as therein mentioned* —(PASSED OCTOBER 12, 1801.)

Section 1. BE it enacted by the General Assembly of the State of Tennessee, That the several courts of pleas and quarter sessions in this state, shall have power to remit or mitigate all fines by them inflicted, and all forfeitures on recognizances, previous to entering final judgment thereon : Provided, a majority, or any number not less than nine of the justices of said county be present when such remittance or mitigation shall be made.

Sec 2. *Be it enacted*, That so much of any other act as comes within the purview and meaning of this act is hereby repealed.

### CHAP. XXV.

*An* ACT *concerning administrations granted on the estates of persons dying intestate, therein mentioned* —(PASSED NOVEMBER 10, 1801.)

WHEREAS heretofore the courts of pleas and quarter sessions, during the being of the temporary government called Franklin, granted administrations on the estates of persons who died intestate, and have issued letters of administration accordingly, in virtue and by authority of which, the persons so administering, have proceeded to administer upon the goods and chattels, rights and credits of their intestates respectively : And whereas it will contribute to the peace and quiet of families, that administrations on such estates, so as aforesaid granted, be deemed and declared valid,

Sec 1. BE it enacted by the General Assembly of the State of Tennessee, That all administrations granted by any of the said courts of pleas and quarter sessions, and letters of administration by any of the aforesaid courts issued, on the estate or estates of any person who died intestate, and all proceedings in virtue of such letters of administration had and done, of, and concerning any such estate, agreeably to, and in conformi-

Digitized from Best Copy Available

ER-177

EXHIBIT 9



DATE DOWNLOADED: Fri Mar 31 09:16:42 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1819 39 .

ALWD 7th ed.
, , 1819 39 .

Chicago 17th ed.
"," Indiana - 4th Session : 39-40

AGLC 4th ed.
" Indiana - 4th Session 39

OSCOLA 4th ed.
" 1819 39             Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

[ 39 ]

## CHAPTER XXIII.

*AN ACT to prohibit the wearing of conceal-*
*ed weapons.*

### Approved, January 14, 1820.

Sec. 1.  *BE it enacted by the General*
*Assembly of the State of Indiana,* That
any person wearing any dirk, pistol, *Persons*
sword in cane, or any other unlawful *wearing con-*
weapon, concealed, shall be deemed *cealed weap-*
guilty of a misdemeanor, and on convic- *ns indicta-*
*ble*
tion thereof, by presentment or indict-
ment, shall be fined n any sum not ex-
ceeding one hundred dollars, for the use
of county seminaries: *Provided however,* *Proviso*
that this act shall not be so construed as
to affect travellers.

----

## CHAPTER XXIV.

*AN ACT supplemental to "an act for the*
*appointment of County Surveyors.*

### Approved, January 14, 1820.

Sec. 1.  *BE it enacted by the General*
*Assembly of the State of Indiana,* That *County sur-*
whenever any dispute may *veyor inter-*
arise about the division of any land *ested in par-*
within this state, wherein the county *tition Circuit*
surveyor of the county, where the lands *court to ap-*
lie, may be a party, or in any manner *point survey-*
interested, it shall be lawful for the Cir- *or*
cuit Court on application of either par-

Digitized from Best Copy Available

[ 40 ]

ty, to appoint some suitable person in said county, whose duty it shall be to proceed to divide the same, for which service, the person so appointed, shall be entitled to the same fees as county surveyors are entitled to, for similar services.

## CHAPTER XXV.

*AN ACT authorizing the arrest and securing fugitives from Justice.*

APPROVED, January 14, 1820.

SEC. 1. *BE it enacted by the General Assembly of the State of Indiana,* That if any person shall commit any crime in any of the United States, or the territories thereof, and shall flee into this state, it shall be lawful for any Judge of the Supreme or Circuit Court, or justice of the peace, within this state, on the oath or affirmation of any person charging such fugitive with a crime, to issue his warrant, and cause such fugitive to be arrested, and brought before him, and after hearing the proofs and allegations for and against such fugitive, if in the opinion of such Judge or justice, the proof is evident, or presumption strong, as to the guilt of the person charged, it shall be the duty of such Judge or Justice, to commit such fugitive from justice, to the common jail of the county, where such arrest may be made, for any length of time, not exceeding one month,

*Fugitives from justice to be apprehended*

*Justice to issue his warrant and proceedings thereon*

*Fugitive to be committed*

Digitized from Best Copy Available

EXHIBIT 10



DATE DOWNLOADED: Sat Feb 11 14:09:19 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1821 50 .

ALWD 7th ed.
, , 1821 50 .

Chicago 17th ed.
"," Maine - Public Acts, Revision of 1821, Regular Session : 50-682

AGLC 4th ed.
'' Maine - Public Acts, Revision of 1821, Regular Session 50.

OSCOLA 4th ed.
'' 1821 50

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# CHAPTER LXXVI.

### An Act describing the power of Justices of the Peace in Civil and Criminal Cases.

SEC. 1. **B**E *it enacted by the Senate, and House of Representatives, in Legislature assembled,* That it shall be within the power, and be the duty of every Justice of the Peace within his county, to punish by fine not exceeding five dollars, all assaults and batteries that are not of a high and aggravated nature, and to examine into all homicides, murders, treasons, and felonies done and committed in his county, and commit to prison all persons guilty, or suspected to be guilty of manslaughter, murder, treason or other capital offence ; and to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall. ride or go armed offensively, to the fear or terror of the good citizens of this State, or such others as may utter any menaces or threatening speeches ; and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties to appear and answer for his offence, at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county, at the discretion of the Justice, and as the nature or circumstances of the case may require : and for his keeping the peace, and being of the good behaviour, until the sitting of the Court he is to appear before ; and to hold to bail all persons guilty or suspected to be guilty of lesser offences which are not cognizable by a Justice of the Peace ; and require sureties for the good behaviour of dangerous and disorderly persons ; and commit all such persons as shall refuse so to recognize, and find such surety or sureties as aforesaid ; and take cognizance of, or examine into all other crimes, matters and offences, which by particular laws are put within his jurisdiction.

*General jurisdiction of Justices of the Peace, and their duty in criminal cases, in arresting, trying, recognizing and committing offenders.*

SEC. 2. *Be it further enacted,* That all fines and forfeitures accruing for the breach of any bye-law, in any town within this State, may be prosecuted for, and recovered before any Justice of the Peace in the town or county where the offence shall be committed, by complaint or information, in the same way and manner other criminal offences are prosecuted before the Justices of the Peace within this State.

*Breaches of the bye-laws of towns may be prosecuted before Justices of the Peace.*

SEC. 3. *Be it further enacted,* That any person aggrieved at the sentence given against him, by any justice of the Peace, may appeal therefrom to the next Circuit Court of Common Pleas to be held within the same county, and shall, before his appeal is granted, recognize to the State in such reasonable sum, not less than twenty dollars, as the Justice shall order, with sufficient surety or sureties for his prosecuting his appeal ; and shall be held to produce the copy of the whole process, and all writings filed before the Justice, at the Court appeal-

*Persons aggrieved may appeal to the C. Court of Com. Pleas.*

*Must recognize with sureties,*

*and produce copies of case at C. C. Common Pleas.*

**Failing to prosecute his appeal, his default to be entered.** ed to. And if he shall not there prosecute his appeal, and produce the copies as aforesaid, the Court shall order his default to be noted upon their record. And the said Court may

**Court may order such case to be laid before Grand Jury, or arrest appellant, and affirm sentence, &c.** order the same case to be laid before the Grand Jury, or may issue an attachment against the body of such appellant, and cause him thereby to be brought before them, and when he is so in Court, shall affirm the sentence of the Justice against him, with all additional costs.

**Justices may command assistance of sheriff, deputies and constables at riots, affrays, &c.** SEC. 4. *Be it further enacted,* That each Justice shall have authority to command the assistance of every Sheriff, Deputy Sheriff, Constable, and all other persons present at any affray, riot, assault or battery, and may fine any person refusing such assistance, in a sum not exceeding six dollars ; to be disposed of for the use of the town where the offence shall be committed ; and levied by warrant of distress on the offender's goods and chattels, and for want thereof on his body.

**Justices may, on their own view, (in absence of sheriff, deputies or constables,) require any person to apprehend offenders.** SEC. 5. *Be it further enacted,* That any Justice of the Peace for the preservation thereof, or upon view of the breach thereof, or upon view of any other transgression of law, proper to his cognizance, done or committed by any person or persons whatever, shall have authority, (in the absence of the Sheriff, Deputy Sheriff or Constable,) to require any person or persons to apprehend and bring before him such offender or of-

**Penalty for refusing to obey such Justice.** fenders. And every person so required, who shall refuse or neglect to obey the said Justice, shall be punished in the same manner as for refusing or neglecting to assist any Sheriff, Deputy Sheriff or Constable in the execution of his office as afore-

**If the Justice be *known* or *declared*—plea of ignorance of his office not admissible.** said. And no person who shall refuse or neglect to obey such Justice, to whom he shall be known, or declare himself to be a Justice of the Peace, shall be admitted to plead excuse on any pretence of ignorance of his office.

**Justices may grant subpoenas for witnesses in criminal causes :** SEC. 6. *Be it further enacted,* That Justices of the Peace within their respective counties, be, and they are hereby authorized and empowered to grant subpoenas for witnesses in all criminal causes pending before the Supreme Judicial Court and Circuit Court of Common Pleas, and before themselves

**But not on behalf of the State without consent of Attorney General, or County Attorney, except before himself.** or any other Justice : *Provided,* That no Justice of the Peace shall grant subpoenas for witnesses to appear in any Court, except before himself, to testify on behalf of the State, unless by the request of the Attorney General or County Attorney. And all Sheriffs, Constables and other officers are directed and empowered to serve any warrant issuing from a Justice of the Peace.

**Justices to account annually to State, County and Town Treasurers for all fines, &c.** SEC. 7. *Be it further enacted,* That the Justices of the Peace shall account annually with the Treasurer of the State, the Treasurer of their respective counties, and the town Treasurer, as the case may be, for all fines by them received or imposed, upon pain of forfeiting the sum of thirty dollars, to

**Penalty for neglect.** be sued for and recovered by the Treasurer of the State, the county or town Treasurer for the time being, to which the said fines may respectively belong.

SEC. 8. *Be it further enacted,* That all civil actions, wherein the debt or damage does not exceed twenty dollars, (and wherein the title of real estate is not in question, and specially pleaded by the defendant,) shall, and may be heard, tried, adjudged and determined by any Justice of the Peace within his county ; and the Justices are severally empowered to grant summons, capias and attachment, at the request of any person applying for the same, directed to some proper officer within the same county, empowered by law to execute the same. And such summons or capias and attachment shall be duly served by such officer, seven days at the least before the day therein set for trial, otherwise the party sued shall not be held to answer thereon; and if after such process shall be duly served, the party sued, after being duly called, shall not appear to answer to the same suit, the charge against him in the declaration shall be taken to be true, and the Justice shall give judgment against him for such damages as he shall find the plaintiff to have sustained, with costs; and if the person sued shall appear to defend the suit or oppose the same, the Justice shall award such damages as he shall find the plaintiff to have sustained : *Provided,* That no more damages than the sum of twenty dollars shall be awarded in any action originally brought or tried before a Justice of the Peace; but if the plaintiff shall not support his action, shall fail to prosecute, or become nonsuit, the Justice shall award to the party sued, his reasonable costs, taxed as the law directs. And upon all judgments given by a Justice of the Peace in civil actions, he shall award execution thereon in form by law prescribed.

*Justice's jurisdiction in civil actions, (where title to real estate is not in question,) to extend to 20 dollars.*

*Justices may issue summons, capias, attachment, &c.*

*—to be served seven days before trial.*

*Proceedings before Justice.*

*Judgment, &c. if plaintiff prevail.*

*Damages not to exceed 20 dollars.*

*Judgment in case defendant prevail.*

*Execution.*

SEC. 9. *Be it further enacted,* That the amount of the sum or several sums, specified, expressed or supposed to be demanded by the plaintiff in his declaration, shall not be considered as any objection against the Justice's jurisdiction, provided the ad damnum, or damage is not laid or stated to exceed twenty dollars.

*Justice to have jurisdiction where the ad damnum does not exceed 20 dollars.*

SEC. 10. *Be it further enacted,* That any party aggrieved at the judgment of any Justice of the Peace, in a civil action, where both parties have appeared and plead, may appeal therefrom to the next Circuit Court of Common Pleas to be held within the same county ; and shall before his appeal is allowed, recognize with a surety or sureties, in such reasonable sum as the Justice shall order, not exceeding thirty dollars, to pay all intervening damages and costs, and to prosecute his appeal with effect; and shall be held to produce a copy of the whole case, at the Court appealed to, and both parties shall be allowed to offer any evidence upon the trial at the Circuit Court of Common Pleas, in the same manner as if the cause had been originally commenced there. And no other appeal shall be had on such action after one trial at the Circuit Court of Common Pleas. And the Circuit Court of Common Pleas, when any person recognized as before men-

*Party aggrieved may appeal to C. C. Common Pleas.*

*—Must recognize to prosecute.*

*and produce copies at C. C. Pleas. Proceedings in that Court.*

*No further appeal.*

*Defendant in trespass failing to bring for-*

ward the action according to his recognizance.—Plaintiff to have his damages.

tioned to bring forward an action of trespass, doth neglect to do it, upon complaint thereof made in writing by the plaintiff, shall give judgment for such sum in damages, as the plaintiff hath declared for, together with all reasonable costs which accrued both in the same Court and before the Justice. And the Circuit Court of Common Pleas shall, when any appellant thereto shall fail to prosecute his appeal, or if he shall neglect to produce a copy of the case, affirm the former judgment upon the appellee's complaint, and award such additional damages as shall have arisen in consequence of the said appeal, and cost.

Appellant failing to prosecute, on complaint judgment may be affirmed.

In action of trespass when defendant *pleads title to real estate—*mode of proceeding before Justice.

SEC. 11. *Be it further enacted,* That when an action of trespass shall be brought before any Justice of the Peace, and the defendant shall plead the general issue, he shall not be allowed to offer any evidence that may bring the title of real estate in question. And when the defendant in any such action shall plead the title of himself or any other person in justification, the Justice upon having such plea plead, shall order the defendant to recognize to the adverse party in a reasonable sum, with sufficient surety or sureties to enter the said action at the next Circuit Court of Common Pleas to be holden within the same county, and to prosecute the same in the same manner as upon an appeal from a Justice's judgment; and if such pleader shall refuse so to recognize, the Justice shall render judgment against him, in the same manner as if he had refused to make answer to the same suit. And either party in such cause, shall be allowed to appeal from the judgment of the Circuit Court of Common Pleas, in the same manner as if the suit had been originally commenced there.

Appeal allowed in such cases from C. C. C. Pleas to S. J. Court.

General issue may be plead in all actions before Justices and special matter given in evidence except where *title to* real estate is relied on by defendant.

SEC. 12. *Be it further enacted,* That in all civil actions triable before a Justice of the Peace, except such actions of trespass wherein the defendant means to avail himself, by pleading the title of himself or any other person under whom he claims in justification of the trespass or trespasses alleged to be committed on real estate; the defendant shall be entitled to all evidence, under the general issue, which by law he might avail himself of under any special plea in excuse or justification, any law, usage or custom to the contrary notwithstanding.

Justices may grant subpœnas in *all* civil actions.

May adjourn their Courts by proclamation:

No Justice to be of counsel in any suit before himself.

SEC. 13. *Be it further enacted,* That each Justice of the Peace may grant subpœnas for witnesses in all civil actions and causes pending before the Supreme Judicial Court, Circuit Court of Common Pleas, Court of Sessions, and before him or any other Justices, and in all civil actions and causes pending before arbitrators or referees. And every Justice of the Peace shall have power by public proclamation to adjourn the trial of any action brought before him, from time to time, when equity may require it; but he shall not be of counsel to either party, or undertake to advise or assist any party in suit before him.

Sec. 14. *Be it further enacted,* That when an executor or administrator shall be guilty of committing waste, whereby he is rendered unable to pay the judgment recovered before any Justice of the Peace, against the goods and estate of the deceased in his hands, out of the same, the Justice may proceed against the proper goods and estate of such executor or administrator, in the same manner as the Circuit Court of Common Pleas are empowered to do. *In case of waste by executor or administrator, Justice may proceed as C. C. C. Pleas may in such cases.*

Sec. 15. *Be it further enacted,* That each Justice of the Peace shall keep a fair record of all his proceedings; and when any Justice of the Peace shall die before a judgment given by him is paid and satisfied, it shall be in the power of any Justice of the Peace in the same county to grant a scire facias upon the same judgment, to the party against whom such judgment was rendered up, for him to show cause if any he hath, why execution should not be issued against him. And although the costs and debt awarded by the deceased Justice when added together, shall amount to more than twenty dollars, it shall be no bar upon such scire facias, but judgment shall be given thereon for the whole debt and cost, together with the cost arising upon the scire facias. *Provided always,* That either party may appeal from the judgment as in other personal actions, where judgment is given by a Justice of the Peace. And every Justice of the Peace who shall have complaint made to him, that a judgment given by a Justice of the same county then deceased, remains unsatisfied, shall issue his summons to the person in whose possession the record of the same judgment is, directing him to bring and to produce to him the same record ; and if such person shall contemptuously refuse to produce the same record, or shall refuse to be examined respecting the same, upon oath, the Justice may punish the contempt by imprisonment, until he shall produce the same, or until he submits to be examined as aforesaid; and when the Justice is possessed of such record, he shall transcribe the same upon his own book of records, before he shall issue his scire facias ; and shall deliver the original back again to the person who shall have produced it, and a copy of such transcription, attested by the transcribing Justice, shall be allowed in evidence in all cases, where an authenticated copy of the orignal might be received. *Justice to keep record of his proceedings. When Justice shall die before a judgment given by him is satisfied, what proceedings to be had. Appeal allowed to either party. Justice to whom complaint is made in such cases, may summon the person possessing the record to produce it. Punishment for refusal so to do. Duty of the Justice when the record is produced, to transcribe it into his own records. Copy of such transcript to be evidence.*

Sec. 16. *Be it further enacted,* That all Justices of the Peace before whom actions may be commenced under former commissions, and such commissions shall expire before judgment shall be rendered thereon, or judgment being rendered, the same remains in whole or in part unsatisfied, such Justices of the Peace who shall hereafter have their said commissions seasonably renewed, and being duly qualified agreeably to the Constitution of this State, to act under such commissions, be and they hereby are authorized and empowered to render judgment, and issue execution on all such ac- *Justices, whose commissions expire before judgment or satisfaction, may proceed, under a new commission, seasonably obtained, to render judgment, &c.*

290 RECOVERY OF DEBTS.

tions, commenced as aforesaid, in the same manner as if the commissions under which such actions may be commenced, were in full force.

[Approved March 15, 1821.]

——— :oo: ———

## CHAPTER LXXVII.

An Act providing a speedy Method of recovering Debts, and for preventing unnecessary costs attending the same.

Justices may take recognizances for debts.

SEC. 1. BE it enacted by the Senate and House of Representatives, in Legislature assembled, That every Justice of the Peace in this State shall have power within his county to take recognizances for the payment of debts of any person who shall come before him for that purpose : which recognizance may be in substance as follows :—

Form of recognizance.

Know all men, that I, A. B. of        , in the County of        , do owe unto C. D. of        , the sum of        , to be paid to the said C. D. on the        day of        ; and if I shall fail of the payment of the debt aforesaid, by the time aforesaid, I will and grant that the said debt shall be levied of my goods and chattels, lands and tenements, and in want thereof of my body. Dated at        , this        day of        , in the year of our Lord        .   Witness, my hand and seal        A. B.

ss. Acknowledged the day and year last abovesaid. Before E. F. Justice of the Peace.

To be recorded by the Justice.

SEC. 2. Be it further enacted, That every Justice of the Peace taking any such recognizance, shall immediately record the same at large in a book to be kept by him for that purpose ; and after the same is recorded, may deliver it to the Conusee ; and upon the Conusee's lodging the same with the said Justice, at any time within three years from the time when the same is payable, and requesting a writ of execution, it shall be the duty of such Justice to issue a writ of execution thereon for such sum as shall appear to be due on the same ; which writ of execution shall be in substance as follows :

Execution may issue thereon within 3 years.

State of Maine.

(SEAL.)   To the Sheriff of the County of        , or his deputy, or either of the Constables of the town of        , in said County,                                                  Greeting.

Form of execution.

Because A. B. of        , in the County of        , on the        day of        , in the year of our Lord        before E. F. Esq. one of the Justices of the Peace for the said County of        , acknowledged that he was indebted to C. D. of        , in the county of        in the sum of        which he ought to have paid on the        day of        , and        remains unpaid as it is said        : We command you therefore, that of the goods, chattels or real estate of the said A. B. within your precinct, you cause to be paid and satisfied unto the said C. D. at the value

EXHIBIT 11

100                                    ARMS.

**Judge or justice to bind over persons going armed.** pistol, or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail; and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot, at common law.

## 1821—CHAPTER 13.

**Five dollars fine for carrying certain weapons.** SEC. 1. Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence, which may be recovered by warrant before any justice of the peace, in the name of the county for its use, in which the offence may have been committed; and it shall be the duty of a justice to issue a warrant on the application, on oath, of any person applying; and it shall be the duty of every judge, justice of the peace, sheriff, coroner, and constable within this state, to see that this act shall have its full effect: *Provided,* that nothing herein contained shall affect any per- **Officers to attend to this act.** son that may be on a journey to any place out of his county or state.

## 1825—CHAPTER. 19.

**Sheriff or other officer to arrest persons suspected of carrying arms to commit a breach of the peace.** SEC. 1. When any sheriff, coroner, or constable, shall know of his own knowledge, or upon the representation of any person, or if he or they, shall have good reason to suspect, any person of being armed with the intention of committing a riot or affray, or of wounding or killing any person, it shall be the duty of all such officers, immediately to arrest all such persons so suspected, and return them before some justice of the peace, whose duty it shall be, upon proof being made, that there was reasonable ground to suspect such person or persons for being armed, with intent to disturb or commit a breach of the peace, to bind such person or persons in a bond with two or more good and sufficient securities, in a sum of not less than two hundred and fifty dollars, and not exceeding two thousand dollars, conditioned for his or their good behavior and peaceable deportment for the term of twelve months thereafter.

**Justices to cause such persons to be arrested.** SEC. 2. If any justice of the peace shall know of his knowledge, or have reasonable cause to suspect, any person or persons of being armed with intent to commit a breach of the peace, it shall be the duty of such justice of the peace, to cause such offender or offenders, to be arrested and immediately brought before him or some other justice for examination, and upon its being satisfactorily made to appear, that such person or persons was armed or about to be armed with intent to commit a breach of the peace, such justice shall bind such offender or offenders in bond and security, as specified in the first section of this act.

**...nds, how** SEC. 3. The bonds by this act required to be given, shall be made payable to the chairman of the county court in which the same shall ... cuted, and his successors in office, and shall be filed in the office

Digitized by Google

EXHIBIT 12

THE

# REVISED STATUTES

OF THE

## Commonwealth of Massachusetts,

PASSED NOVEMBER 4, 1835;

TO WHICH ARE SUBJOINED,

AN ACT IN AMENDMENT THEREOF, AND AN ACT EXPRESSLY TO
REPEAL THE ACTS WHICH ARE CONSOLIDATED THEREIN,

BOTH PASSED IN FEBRUARY 1836;

AND TO WHICH ARE PREFIXED,

# THE CONSTITUTIONS

OF THE

## United States and of the Commonwealth of Massachusetts.

PRINTED AND PUBLISHED, BY VIRTUE OF A RESOLVE OF NOV. 3, 1835;

UNDER THE SUPERVISION AND DIRECTION OF

THERON METCALF AND HORACE MANN.



## Boston:

PUBLISHED BY DUTTON & WENTWORTH, STATE PRINTERS.

Nos. 10 & 12 Exchange Street.

................

1836.

said, may, on giving the security required, appeal to the court of common pleas, next to be held in the same county, or, in the city of Boston, to the municipal court.

**On appeal, witnesses to recognize.**
Sect. 10. The magistrate, from whose order an appeal is so taken, shall require such witnesses, as he may think necessary to support the complaint, to recognize for their appearance at the court to which the appeal is made.

**Proceedings on appeal.**
Sect. 11. The court, before which such appeal is prosecuted, may affirm the order of the justice, or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum, and for such time, as the court shall think proper, and may also make such order, in relation to the costs of prosecution, as may be deemed just and reasonable.

**Recognizance, when to remain in force.**
Sect. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs, which shall be ordered, by the court appealed to, to be paid by the appellant.

**Persons committed for not recognizing, how discharged.**
Sect. 13. Any person, committed for not finding sureties, or refusing to recognize, as required by the court or magistrate, may be discharged by any judge or justice of the peace, on giving such security as was required.

**Recognizances to be transmitted to the court.**
Sect. 14. Every recognizance, taken pursuant to the foregoing provisions, shall be transmitted by the magistrate to the court of common pleas for the county, or, in the city of Boston, to the municipal court, on or before the first day of the next term, and shall be there filed of record by the clerk.

**— when to be required on view of the court or magistrate.**
Sect. 15. Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person, who in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of good behavior, for a term not exceeding three months, and in case of refusal, may be committed, as before directed.

**Persons who go armed may be required to find sureties for the peace, &c. 1794, 26, § 2.**
Sect. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

**Court may remit part of penalty. 7 Mass. 397. 1810. 80.**
Sect. 17. Whenever, upon a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

**Surety may surrender his**
Sect. 18. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right

ER-194

EXHIBIT 13



DATE DOWNLOADED: Thu Apr 20 20:35:00 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1837 9 .

ALWD 7th ed.
, , 1837 9 .

Chicago 17th ed.
"," Mississippi - Called Session : 9-368

AGLC 4th ed.
'' Mississippi - Called Session 9

OSCOLA 4th ed.
'' 1837 9          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# L A W S

OF THE

# S T A T E  O F  M I S S I S S I P P I,

PASSED AT A CALLED SESSION,

OF THE

# L E G I S L A T U R E,

HELD IN THE

CITY OF JACKSON, IN APRIL AND MAY, 1837.

———— *H*₈

JACKSON:
PRINTED BY G. R. FALL.

1837.

**290**                      **LAWS OF MISSISSIPPI.**

rate town or city. any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Certain persons compelled to give evidence. § 6. *Be it further enacted,* That if any person shall offend against any of the provisions of this act, such person shall be a competent witness against any other person offending in the same transaction, and may be compelled to appear and give evidence before any justice of the peace, grand jury or court, in the same manner as other witnesses, but the testimony so given shall not be used in any prosecution or proceeding civil or criminal, against the person so testifying.

Duty of grand jurors, justices, &c. § 7. *Be it further enacted,* That it shall be the duty of all grand jurors, justices of the peace, constables, members of boards of county police, sheriffs, and other peace officers, without delay, to give information against, and prosecute every person who shall be guilty of a violation of any of the provisions of this act, and all costs and expenses they may incur on account of the same, shall be paid on conviction, by the defendant, and if he shall be unable to pay the same, or be acquitted, then such cost and expenses shall be paid out of the state treasury.

Survivor in a duel to § 8. *Be it further enacted,* That if any

LAWS OF MISSISSIPPI.                    291

duel shall be fought contrary to the provis- pay debts
ions of this act, or if any person shall be son he
guilty of fighting in any incorporate town kills.
or city, or any other town or public place
in this state, and the parties or either of
them shall use any rifle, shot gun, sword
cane, pistol, dirk, dirk knife, bowie knife, or
any other deadly weapon, contrary to the
provisions of this act, and either of the par-
ties combatant shall be killed, or shall die
within ninety days of any wound received
in any such duel or fight, the party surviving
shall be, and he is hereby held chargeable
with the payment of the debts of his antag-
onist so killed by him, and the estate of the
party so killed shall be exhonerated from
the payment of such debts, until the surviv-
ing party shall be first duly prosecuted to
insolvency, and the person or persons to
whom the combatant so killed in such duel,
or fight, shall be indebted, may prosecute to
judgment and execution any action of debt
or assumpsit against such surviving party,
which such person could have maintained
against such party so killed, and in his de-
claration it shall be sufficient to set forth in
substance the description of the judgment,
bill, bond, note, assumpsit, or account, by
which the deceased in his life time was in-
debted to the plaintiff, and to aver that the
defendant and the deceased had fought a
duel contrary to the provisions of this act, or
had fought in an incorporated city or town,
or other town or public place in this state,
and had in such fight used a rifle, shot gun,
sword, sword cane, pistol, dirk, dirk knife,
bowie knife, or other deadly weapon, con-
trary to the meaning and intent of this act,
and that in such duel or fight, the defendant
had unlawfully killed the deceased, or had

LAWS OF MISSISSIPPI.

given the deceased, in such duel or fight, a mortal wound, of which, within ninety days the deceased had died, and that in consideration of which the defendant had become bound to pay to the plaintiff the amount of money mentioned in such judgment, bill, bond, note, assumpsit, or account, and upon proving the same, the said plaintiff shall have verdict, judgment, and execution against the defendant, which shall appear to have been justly due, and owing from the deceased to the plaintiff, at the time of the commencement of such suit, any law usage or custom to the contrary notwithstanding.

Penalty for unlawfully using deadly weapons.
§ 9. *Be it further enacted,* That if any person having, or carrying any dirk, dirk knife, bowie knife, sword, sword cane, or other deadly weapon, shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in necessary self defence, or shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in the circuit or criminal court of the proper county, shall be fined in a sum not exceeding five hundred dollars, and be imprisoned not exceeding three months.

Duty of circuit judges.
§ 10. *Be it further enacted,* That it shall be the duty of the judges of the circuit courts to give this act in charge to the grand jury at each term of their respective courts, and that this act shall be in force and take

To take effect.
effect from and after the fourth day of July, one thousand eight hundred and thirty-seven.

Approved, May 13, 1837.

EXHIBIT 14



DATE DOWNLOADED: Thu Apr 20 20:35:00 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1837 9 .

ALWD 7th ed.
, , 1837 9 .

Chicago 17th ed.
"," Mississippi - Called Session : 9-368

AGLC 4th ed.
" Mississippi - Called Session 9

OSCOLA 4th ed.
" 1837 9          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# L A W S

OF THE

## S T A T E   O F   M I S S I S S I P P I,

### PASSED AT A CALLED SESSION,

OF THE

# L E G I S L A T U R E, .

HELD IN THE

CITY OF JACKSON, IN APRIL AND MAY, 1837.

————— #/s

JACKSON:
PRINTED BY G. R. FALL.
1837.

(116 of 217) Case 2:4-565 04/17/20 ER 203 led by: 10.3, Page 116 of 217
Case 2:19-cv-00617-KJM-AC   Document 98-3   Filed 10/13/23   Page 63 of 137

LAWS OF MISSISSIPPI. 293

AN ACT to incorporate the town of Sharon, in the county of Madison, and for other purposes.

§ 1. *Be it enacted by the legislature of the state of Mississippi,* That the town of Sharon, in the county of Madison be, and the same is hereby incorporated, and that the corporate limits of said town shall　u to the four cardinal points, and form o ⸺ mile and a half square, to be laid off in such manner, so that the centre of the town of Sharon, as at present laid off and surveyed, shall be the centre of the said corporate limits. *(Town of Sharon incorporated)*

§ 2. *Be it further enacted,* That every free white male person having attained the age of twenty-one years, and shall have resided within the corporate limits of said town, four months, and twelve months within this state next preceding an election, for town officers, shall be a qualified elector and eligible to any town office. *(Votes.)*

§ 3. *Be it further enacted,* That the qualified electors of said town, are hereby authorized to hold an election in the town of Sharon, on the first Wednesday in July next, between the hours of ten o'clock, A. M., and four o'clock P. M., for the porpose of electing five persons, as counsellors, a justice, treasurer, recorder, and constable, who shall serve until the first regular annual election, or until their successor shall be elected, and that the annual election shall be held in said town, in some suitable house on or near the public square, on the first Wednesday in January, in each and every year, between the hours of ten o'clock in the morning, and four o'clock in the evening, and that the justice of the peace elected in pursuance of this act, after being commissioned by the governor, shall by virtue of his *(First election.)*

294                    LAWS OF MISSISSIPPI.

office, be president of the council, and be
entitled to all the emoluments and immuni-
ties of other magistrates of said county, and
in case of his absence any member of the
council may be called to the chair and exe-
cute the duties of the president *pro tempore.*

General     § 4. *Be it further enacted,* That the pre-
powers.     sident and counsellors shall be a body cor-
porate and politic of the town of Sharon, by
the name and style of the president and
council of the town of Sharon, and as such
they and their successors in office shall be
capable of suing and being sued, of pleading
and being impleaded, of defending and be-
ing defended, in all manner of suits and ac-
tions either in law or equity, and also re-
ceive donations, give, grant, sell, convey
and contract, and do any and all other such
acts which are incident to bodies corporate
and politic.

By-laws.    § 5. *Be it further enacted,* That the pre-
sident and council shall have power to pass
all necessary by-laws for the good order and
government of said town, not inconsistent
with the constitution and laws of this state,
or the United States, whereby education and
morality may be promoted, and the retailing
and vending of ardent spirits, gambling and
every species of vice and immorality may be
suppressed, together with the total inhibi-
tion of the odious and savage practice of
wearing dirks, bowie knives, or pistols, and
in their corporate capacity they may inflict
a penalty on any person for a violation of
any such by-laws, not exceeding fifty dollars
for any offence, recoverable with cost before
any justice of the peace for said county, in
the name of the president and council, for
the use and benefit of said town.

Officers.   § 6. *Be it further enacted,* That the cor-

EXHIBIT 15



DATE DOWNLOADED: Fri Apr 21 16:52:00 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1839 384 .

ALWD 7th ed.
, , 1839 384 .

Chicago 17th ed.
"," Mississippi - Adjourned Session : 384-387

AGLC 4th ed.
'' Mississippi - Adjourned Session 384

OSCOLA 4th ed.
'' 1839 384          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

# LAWS

OF THE

## STATE OF MISSISSIPPI:

### PASSED AT AN ADJOURNED SESSION

OF THE LEGISLATURE,

HELD IN THE

CITY OF JACKSON,

**FROM JANUARY 7, TO FEBRUARY 16, A. D. 1839.**

JACKSON:

B. D. HOWARD, STATE PRINTER.

1839.

384         LAWS OF MISSISSIPPI.

## CHAPTER 168.

### AN ACT to Incorporate the Town of Emery, in the County of Holmes.

**Incorporation.**     SECTION 1. *Be it enacted, by the Legislature of the State of Mississippi,* That the town of E-mery, in the county of Holmes, be, and the **Limits.** same is hereby, incorporated, and that the corporate limits of the said town shall run to the four cardinal points, and form one mile square, to be laid off in such manner so that the centre of the said town, as at present laid off and surveyed, shall be the centre of the said corporate limits.

**Qualifications of voters, &c.**     SEC. 2. *And be it further enacted,* That every free white male person, having attained the age of twenty-one years, and having resided in the state twelve months, and in the corporate limits of said town four months next preceding an election for town officers, shall be a qualified elector, and eligible to any town office.

**Election of town-officers, when.**     SEC. 3. *And be it further enacted,* That the qualified electors of said town are hereby authorized to hold an election in the said town of Emery, on the first Monday in March next, between the hours of ten o'clock a. m. and four o'clock p. m., for the purpose of electing five persons as aldermen; also, a mayor, treasurer, **Term of service.** recorder, and constable; who shall serve until the first regular annual election, or until their **Annual elections, when held, &c.** successors are duly elected and qualified; and that the annual election shall be held in said town on the first Wednesday of January in each and every year, between the hours of ten o'clock in the morning and four o'clock in the

LAWS OF MISSISSIPPI. 385

evening; and that the mayor elected in pursuance of this act shall be commissioned by the governor as a justice of the peace; he shall preside at each meeting of the board of mayor and aldermen of said town, and by virtue of his office shall have power to perform all such duties, and receive like emoluments and immunities, as are performed and received by other magistrates in the said county; but in case of his absence from any meeting of the said board of aldermen, any member thereof may be called to the chair, and execute the duties of the president, pro tempore. *Mayor to be commissioned by governor. Duties, &c.*

*In absence of mayor, who to preside.*

SEC. 4. *And be it further enacted,* That the said mayor and aldermen shall be a body corporate and politic, by the name and style of the mayor and aldermen of the town of Emery; and, as such, they and their successors in office shall be capable of sueing and being sued, of pleading and being impleaded, of defending and being defended, in all manner of suits and actions either in law or equity; and also receive donations, purchase, give, grant, sell, convey, and contract, and do any and all other such acts as are incident to bodies corporate and politic. *Body corporate and politic—name and style.*

*Privileges, liabilities &c*

SEC. 5. *And be it further enacted,* That said mayor and aldermen shall have power to pass all necessary by-laws for the good order and government of said town, not inconsistent with the constitution and laws in this state and the United States, whereby education and morality may be promoted, and the retailing and vending of ardent spirits, gambling, and every species of vice and immorality, may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks and bowie-knives or pistols; and in their corporate *Powers of mayor and aldermen.*

386                        LAWS OF MISSISSIPPI.

capacity they may inflict a fine or penalty on any person for a violation of any such by-laws, not exceeding fifty dollars for any offence, recoverable, with costs, before any justice of the peace for said county, in the name of said corporation, for the use and benefit of said town.

**State laws, legalizing sale of liquor or gaming, not to apply to town.** And that no law of the state, now in force, or that hereafter may be passed, legalizing either retailing or vending spirituous liquors, or any species of gaming, shall apply in any respect to said corporation; nor shall the said mayor

**Authority not to be given to sell liquor or to game, unless upon petition, &c.** and aldermen have power by any by-laws to authorize any person to sell spirituous liquors either in large or small quantities, or to authorize any species of gaming in said corporation, unless upon petition, signed by at least three-fourths of the citizens of said town.

**District entitled to justice and constable.** SEC. 6. *And be it further enacted,* That the corporate limits of said town of Emery are hereby declared to be a district entitled to a justice of the peace and constable; and the said mayor and constable, when elected and com-

**Duties and emoluments** missioned by the governor, shall each be subject to perform all the duties, and receive all such profits, as are performed and received by other justices of the peace and constables of this state.

**Mayor to prescribe duties of treasurer & recorder.** SEC. 7. *And be it further enacted,* That the duties, responsibilities, and compensation, of the treasurer and recorder, shall be prescribed by the said mayor and aldermen.

**Town tax.** SEC. 8. *And be it further enacted,* That for the purposes of revenue, the said mayor and aldermen may tax such property as is liable to taxation under the existing laws of this state:

**Proviso.** *Provided,* such tax shall not exceed fifty cents on each white poll, fifty cents on each slave,

LAWS OF MISSISSIPPI. 387

'and twelve and one-half cents on every hundred dollars' worth of other personal and real estate, within the limits of said town, in any one year; and the money so raised shall be appropriated, by the said mayor and aldermen, exclusively for the use and benefit of said town.

SEC. 9. *And be it further enacted,* That the citizens of said town, subject to road duties, shall be exempt from such duties beyond its corporate limits; and the said mayor and aldermen may release them from such labor within said limits, upon their paying an equivalent therefor, not to exceed nine dollars in any one year. — *Citizens exempt from road duties out of corporation. May be released from working on streets, upon paying equivalent.*

SEC. 10. *And be it further enacted,* That if from any cause the said board should not be constituted as contemplated by this act, any three citizens of said town may call a meeting, at any time, for the purposes of such election, by giving ten days' previous notice, by advertisement set up in said town; and such election shall be as valid as though it had been held on the regular appointed days therefor. — *Should b'rd not be constituted, &c. three citizens may call meeting, &c. Validity of election.*

SEC. 11. *And be it further enacted,* That when said board has been organized, the said mayor may call a meeting at any time, by giving five days' notice; that a majority shall constitute a quorum; that in case of a tie, the mayor shall give the casting vote; and that the said board shall have power to fill all vacancies which may occur in their body from one annual election to the next succeeding one. — *When board organized, mayor may call meeting. Quorum. Mayor to give casting vote in ties. Board to fill vacancies.*

SEC. 12. *And be it further enacted,* That this act shall take effect and be in force from and after its passage. — *When act to take effect.*

Approved, February 15, 1839.

EXHIBIT 16



DATE DOWNLOADED: Fri Apr 21 18:04:04 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1840 179 .

ALWD 7th ed.
, , 1840 179 .

Chicago 17th ed.
"," Mississippi - Regular Session : 179-182

AGLC 4th ed.
'' Mississippi - Regular Session 179

OSCOLA 4th ed.
'' 1840 179          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# LAWS

OF THE

# STATE OF MISSISSIPPI,

## PASSED AT A REGULAR SESSION

### OF THE LEGISLATURE,

HELD IN THE

### CITY OF JACKSON,

IN THE MONTHS OF JANUARY AND FEBRUARY, A. D. 1840.

---

PRINTED BY AUTHORITY.

---

JACKSON:
C. M. PRICE, STATE PRINTER.
::::::::::::
1840.

words five years, be, and the same is hereby, repealed.

Sec. 5. *And be it further enacted,* That this act be in force from and after its passage.

Approved February 18th, 1840.

---

CHAPTER 111.

AN ACT to incorporate the Town of Hernando, in the County of De Soto.

SECTION 1. *Be it enacted by the Legislature of the State of Mississippi,* That the town of Hernando, in the county of De Soto, be, and the same is hereby, incorporated and bounded as follows, to wit; The whole of Section thirteen, in township three, and range eight, West, and the West half of Section eighteen, township three, and range seven. West. *(margin: Town incorporated. Boundary of town.)*

Sec. 2. *Be it further enacted,* That every free white male person, having attained the age of twenty-one years, and having resided in the State twelve months, and in the corporate limits of said town four months next preceding an election for town officers, shall be a qualified elector and eligible to any town office. *(margin: Qualifications of Electors.)*

Sec. 3. *Be it further enacted,* That the Sheriff of said county, for the time being, is hereby authorized to hold an election in said town of Hernando, on the first Monday in July next, (by giving ten days previous notice,) between the hours of ten o'clock, A. M., and four o'clock, P. M., for the purpose of electing five persons as aldermen; also, one mayor, treasu- *(margin: Duty of Sheriff to hold first Election for town officers; when, &c.)*

EXHIBIT 17



DATE DOWNLOADED: Fri Apr 21 19:11:54 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Revised Statutes of the State of Maine, Passed October 22, 1840 (1841).

ALWD 7th ed.
. Revised Statutes of the State of Maine, Passed October 22, 1840 (1841).

APA 7th ed.
(1841). Revised Statutes of the State of Maine, Passed October 22, 1840. Augusta,
W.R. Smith, Printers to the State.

Chicago 17th ed.
Revised Statutes of the State of Maine, Passed October 22, 1840. Augusta, W.R. Smith,
Printers to the State.

McGill Guide 9th ed.
Revised Statutes of the State of Maine, Passed October 22, 1840 (Augusta: W.R. Smith,
Printers to the State., 1841)

AGLC 4th ed.
Revised Statutes of the State of Maine, Passed October 22, 1840 (W.R. Smith, Printers
to the State., 1841

MLA 9th ed.
Revised Statutes of the State of Maine, Passed October 22, 1840. Augusta, W.R. Smith,
Printers to the State. HeinOnline.

OSCOLA 4th ed.
Revised Statutes of the State of Maine, Passed October 22, 1840. Augusta, W.R. Smith,
Printers to the State.            Please note: citations are provided as a
general guideline. Users should consult their preferred citation format's style manual for
proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

THE

# REVISED STATUTES

OF THE

## STATE OF MAINE,

PASSED OCTOBER 22, 1840;

TO WHICH ARE PREFIXED

## THE CONSTITUTIONS

OF THE

### United States and of the State of Maine,

AND TO WHICH ARE SUBJOINED THE OTHER

## PUBLIC LAWS OF 1840 AND 1841,

WITH AN

## APPENDIX.

———————

PRINTED AND PUBLISHED IN COMPLIANCE WITH A RESOLVE OF OCTOBER 22, 1840.

———————

### Augusta:

PUBLISHED BY WILLIAM R. SMITH & Co., PRINTERS TO THE STATE.
··········
1841.

TITLE XII.]        PREVENTION OF CRIMES.                    **709**

refusing to recognize, as required by the court or magistrate, may   Chap. 169.
be discharged by any judge or justice of the peace, on giving such   may be taken
security, as was required.                                           after commit-
                                                                     ment.

SECT. 14.  Every recognizance, taken pursuant to the foregoing   Return of such
provisions, shall be transmitted to the district court, on or before the   recognizance.
first day of the next ensuing term, and shall there be filed by the
clerk, as of record.

SECT. 15.  Whoever, in the presence of any magistrate, men-   When magis-
tioned in the second section of this chapter, or before any court of   trate may re-
                                                                      quire sureties,
record, shall make any affray or threaten to kill or beat another, or   without a for-
commit any violence against his person or property, or shall con-   mal complaint,
                                                                     &c.
tend, with hot and angry words, to the disturbance of the peace,
may be ordered, without process or any other proof, to recognize
for keeping the peace, or being of the good behavior for a term, not
exceeding three months, and, in case of refusal, may be committed
to prison as before directed.

SECT. 16.  Any person, going armed with any dirk, dagger,   Persons going
sword, pistol, or other offensive and dangerous weapon, without a   armed, without
                                                                    reasonable
reasonable cause to fear an assault on himself, or any of his family   cause.
or property, may, on the complaint of any person having cause to   1821, 76, § 1.
fear an injury or breach of the peace, be required to find sureties
for keeping the peace for a term, not exceeding one year, with the
right of appeal as before provided.

SECT. 17.  In a suit, on such recognizance taken in a criminal   Power of court,
case, if a forfeiture is found or confessed, the court, on petition,   to remit the
                                                                      penalty of a re-
may remit the penalty, or such part of it as they may think proper,   cognizance.
on such terms as they may think right.                               1821, 50, § 4.

SECT. 18.  Any surety in a recognizance may surrender the   Sureties on re-
principal in the same manner, as if he had been his bail in a civil   cognizances
                                                                     may surrender
cause, and, on such surrender, shall be discharged from all liability   their principals
for any act of the principal after such surrender, which would be a   as in case of
                                                                     bail in civil ac-
breach of the recognizance ; and, upon such surrender, the princi-   tions.
pal may recognize anew with sufficient surety or sureties for the
residue of the term, before any justice of the peace, and shall
thereupon be discharged.

---

# CHAPTER 170.

### OF THE POWER AND PROCEEDINGS OF JUSTICES OF THE PEACE IN CRIMINAL CASES.

SECT. 1. Justices may require aid, on view,   SECT. 6. Duty of justices, as to arrests, and
         without a warrant.                              examinations into treasons, felon-
      2. Their jurisdiction.                             ies, &c.
      3. When a justice shall issue his war-          7. Trial and sentence within their ju-
         rant.                                           risdiction.
      4. Examination, on trial, of the party         8. Respondent may appeal ; but re-
         accused.                                        quired to recognize.
      5. Of commitment or binding over to            9. To carry up copies of the case.
         a higher court.

180                LAWS OF MISSISSIPPI.

rer, recorder and constable, who shall serve until their successors are duly elected and qualified; and that the annual election shall be held in said town on the first Monday in July in each and every year, between the hours of ten o'clock in the morning and four o'clock in the evening, and that the mayor <span>Mayor to be comm'd. a Justice of the peace.</span> elected in pursuance of this act shall be commissioned by the Governor as a justice of the peace; he shall preside at each meeting of the Board of mayor and aldermen of said town, and by virtue of his office shall have power to perform all such duties, and receive like emoluments and immunities as are performed and received by other magistrates in said county; <span>Absence of the mayor at any meeting.</span> but in case of his absence from any meeting of the said Board of Aldermen, any member thereof may be called to the chair.

Sec. 4. *Be it further enacted,* That the said mayor and aldermen shall be a body corporate <span>Name and style in law.</span> and politic, by the name and style of the mayor and aldermen of the town of Hernando; and, <span>Powers.</span> as such, they and their successors in office shall be capable of suing and being sued, of pleading and being impleaded, of defending and being defended, in all manner of suits and actions, either in law or equity, and also receive donations, purchases, give, grant, sell, convey and contract, and do any and all other such acts as are incident to bodies corporate and politic.

Sec. 5. *Be it further enacted,* That said mayor and aldermen shall have power to pass all <span>Power to pass by-laws, etc.</span> necessary by-laws for the good order and government of said town, not inconsistent with the constitution and laws of this State, and the United States, whereby education and mo-

LAWS OF MISSISSIPPI. 181

rality may be promoted, and the retailing and vending ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the exhibition of the orders and savage practice of wearing dirks and bowie knives or pistols; and, in their corporate capacity, they may inflict a fine or penalty on any person for a violation of such by-laws, not exceeding fifty dollars for any offence, recoverable, with costs, before their mayor or any justice of the peace for said county, in the name of said corporation, for the use and benefit of said town. *Punishments and fines.*

Sec. 6. *Be it further enacted,* That the corporate limits of said town of Hernando are hereby declared to be a district, entitled to a justice of the peace and constable; and that said mayor and constable, when elected and commissioned by the Governor, shall each be subject to perform all the duties and receive all such profits, as are performed and received by other justices of the peace and constables of this State. *Corporate limits. Mayor and Constable to be commissioned.*

Sec. 7. *Be it further enacted,* That the duties, responsibilities, and compensation of the treasurer and recorder, shall be prescribed by the said mayor and aldermen. *Treasurer's duties and compensation.*

Sec. 8. *Be it further enacted,* That for the purposes of revenue, the said mayor and aldermen may tax such property as is liable to taxation under the existing laws of this State; *Provided,* such tax shall not exceed fifty cents on each white poll, fifty cents on each slave, and twelve and one half cents on every hundred dollars' worth of personal or real estate within the limits of said town, in any one year; and the money so raised shall be appro- *Town revenue—how to be raised. Limits of Tax. Manner of appropriating money.*

15

182                LAWS OF MISSISSIPPI.

priated by the said mayor and aldermen, exclusively, for the use and benefit of said town.

Sec. 9. *Be it further enacted*, That the citizens of said town, subject to road duties beyond its corporate limits, shall be exempt from such duties beyond its corporate limits; and the said mayor and aldermen may release them from such labour within said limits, upon their paying an equivalent therefor, not to exceed nine dollars in any one year.

*Citizens of town exempt from Road duties.*

*Terms of release from labor.*

Sec. 10. *Be it further enacted*, That if from any cause the said Board should not be constituted as contemplated by this act, any three citizens of said town may call a meeting at any time for the purpose of such election, by giving ten days previous notice, by advertisement set up in said town; and such election shall be as valid as though it had been held on the regular appointed days therefor.

*Should the Board from any cause not be organized,— then, three citizens may cause an election to be held.*

Sec. 11. *Be it further enacted*, That when said Board has been organized, the said mayor may call a meeting at any time by giving five days notice; that a majority shall constitute a *quorum*; that in case of a tie, the mayor shall give a casting vote; and that the said Board shall have power to fill all vacancies which may occur in their body, from one annual election to the next succeeding one.

*Mayor may call meetings of the Board.*

Sec. 12. *And be it further enacted*, That all acts and parts of acts coming within the meaning and purview of the provisions of this act, shall be null and void.

*Contravening acts, repealed.*

Approved February 18, 1840.

EXHIBIT 18



DATE DOWNLOADED: Sun Apr 23 23:57:28 2023
SOURCE: Content Downloaded from HeinOnline

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1845-1870 3 .

ALWD 7th ed.
, , 1845-1870 3 .

Chicago 17th ed.
"," Hawaii - Kingdom of Kamehameha III-V, Regular Sessions : 3-76

AGLC 4th ed.
" Hawaii - Kingdom of Kamehameha III-V, Regular Sessions 3

OSCOLA 4th ed.
" 1845-1870 3          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  https://heinonline.org/HOL/License
-- The search text of this PDF is generated from uncorrected OCR text.

(138 of 2170, Page 24-565 of 24/17/2024 R-225 by: 10.3, Page 138 of 217
Case 2:19-cv-00617-KJM-AC   Document 98-3   Filed 10/13/23   Page 85 of 137

# AN ACT

## TO PREVENT THE CARRYING OF DEADLY WEAPONS.

WHEREAS, the habit of carrying deadly weapons is dangerous to life and the public peace,

Therefore—

BE IT ENACTED *by the Nobles and Representatives of the Hawaiian Islands in Legislative Council assembled :*

SECTION 1.  Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons ; and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

SECTION 2.  The following persons are hereby declared to be authorized to bear arms, viz :—All persons holding official, military or naval rank either under this government or that of any nation at peace with this Kingdom, when worn for legitimate purposes.

SECTION 3.  This Act shall take effect and become a law on the day of its passage.

Approved this twenty-fifth day of May, A. D., 1852.

KAMEHAMEHA.

KEONI ANA.

EXHIBIT 19



DATE DOWNLOADED: Mon Apr 24 11:23:43 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1854 73 .

ALWD 7th ed.
, , 1854 73 .

Chicago 17th ed.
"," Washington - 1st Session : 73-319

AGLC 4th ed.
'' Washington - 1st Session 73

OSCOLA 4th ed.
'' 1854 73          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## 80 LAWS OF WASHINGTON.

years, nor less than one year, and be fined in any sum not exceeding one thousand dollars.

SEC. 27. Every person who shall perpetrate, or attempt to perpetrate, an assault, or an assault and battery, with intent to commit murder, manslaughter, mayhem, rape, robbery, burglary, or kidnapping, shall, on conviction thereof, be imprisoned in the penitentiary not more than fourteen years, nor less than one year; or be imprisoned in the county jail not more than one year, or less than six months, and be fined in any sum not exceeding one thousand dollars.

SEC. 28. Every person who shall assault and beat another with a cowhide or whip, having with him at the time a pistol, or other deadly weapon, shall on conviction thereof, be imprisoned in the county jail not more than one year, nor less than three months, and be fined in any sum not exceeding one thousand dollars.

SEC. 29. Every person who in a rude, insolent, and angry manner, shall unlawfully touch, strike, beat, or wound another, shall be deemed guilty of an assault and battery, and upon conviction thereof, shall be fined in any sum not exceeding one thousand dollars, to which may be added imprisonment not exceeding six months in the county jail.

SEC. 30. Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

SEC. 31. Every person who shall attempt to commit the crime of murder by drowning or strangling another person, or by any means not constituting an assault with intent to commit murder, shall on conviction thereof, be imprisoned in the penitentiary not more than ten years, nor less than one year.

SEC. 32. Every person who shall violently and unlawfully deprive another of the use of any bodily member, or who shall unlawfully and wilfully, disable the tongue or eye, or bite the nose, ear or lip, of another, shall be deemed guilty of simple mayhem, and on conviction thereof, shall be imprisoned in the county jail not more than one year, nor less than one month, and be fined in any sum not exceeding two thousand dollars, or fined only.

SEC. 33. Every person who shall unlawfully have carnal knowledge of a woman against her will, or of a female child under twelve years of age, shall be deemed guilty of a rape, and upon conviction thereof, shall be imprisoned in the penitentiary not more than thirty years, nor less than one year, and in prosecutions for such offence, proof of penetration shall be sufficient evidence of the commission thereof.

EXHIBIT 20



DATE DOWNLOADED: Mon Apr 24 11:29:38 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1855 153 .

ALWD 7th ed.
, , 1855 153 .

Chicago 17th ed.
"," California - 6th Session : 153-154

AGLC 4th ed.
'' California - 6th Session 153

OSCOLA 4th ed.
'' 1855 153          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

shall have verdict, judgment and execution against the defendant **Verdict.** which shall appear to have been justly due and owing from the deceased to the plaintiff at the time of the commencement of such suit, any law, usage or custom to the contrary notwithstanding ; *provided,* also, that any conveyance of, or lien upon property, executed with **Proviso.** the intention of avoiding the provisions of this Act, shall be deemed and held null and void.

SEC. 3. If any duel shall be fought contrary to the provisions of this Act, and either of the combatants shall be maimed or wounded, **Charges** the charges incurred by such maimed or wounded combatant, together **incurred.** with those for the support and maintenance of his family during his sickness, shall be regarded as debts to be recovered, as provided in section second of this Act. And if the party shall die within one year of any wound received in any such duel or fight, the party sur- **In case of** viving shall pay to the heir or heirs of such deceased, the sum of ten **death.** thousand dollars, to be recovered as provided in section second, for the recovery of the debts of the deceased.

SEC. 4. Any and every person who shall be present at the time of fighting any duel with deadly weapons, either as second, aid, sur- **Witnesses.** geon or spectator, or who shall advise or give assistance to such duel, shall be a competent witness against any person offending against any of the provisions of this Act, and may be compelled to appear and give evidence before any Justice of the Peace, Grand Jury or Court, in the same manner as other witnesses ; but the testimony so given shall not be used in any prosecution or proceeding, civil or criminal, against the person so testifying.

SEC. 5. Sections forty-one and forty-two of an act entitled An **Repeal.** Act concerning Crimes and Punishments, passed April eighteenth, eighteen hundred and fifty, are hereby repealed.

---

# CHAPTER CXXVIII.

## AN ACT

*Supplementary to and explanatory of an Act entitled an Act to prohibit Lotteries, Raffles, Gift Enterprises and other Schemes of a like Character, passed April 10th, 1855.*

[Approved April 27, 1855.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows :*

SECTION 1. The Act entitled An Act to prohibit Lotteries, Raf- **Hock Farm** fles, Gift Enterprises and other Schemes of a like character, passed **scheme.** April tenth, eighteen hundred and fifty-five, shall not be construed or held to prohibit or render unlawful the scheme or plan now proposed and maturing for the distribution of the property known as "Hock

154              LAWS OF THE STATE OF CALIFORNIA.

Farm," by sub-divisions, called the "Relief Fund of General John A. Sutter:" nor any lottery, raffle, gift enterprise or other schemes aforesaid, within the purview of said last mentioned Act, which was commenced and in part advanced before the passage thereof.

---

# CHAPTER CXXIX.

## AN ACT

### Concerning Lawful Fences.

[Approved April 27, 1855.]

*The People of the State of California, represented in Senate and Assembly do enact as follows:*

**Lawful fences. Wire fence.**   SECTION 1. Lawful fences are described as follows, viz.: First. Wire Fence shall be made of post, not less than twelve inches in circumference, set in the ground not less than eighteen inches, and not more than eight feet apart, with not less than three horizontal wires, each one-fourth of an inch in diameter—the first one shall be eighteen inches from the ground, the other two above this one, at intervals of one foot between each, all well stretched and securely fastened from one post to another, with one rail, slat, pole or plank, of suitable size and strength, securely fastened to the post not less than four a half feet from the ground. Second. **Post and rail fence.** Post and Rail Fence shall be made of post of the same size and at the same distance apart, and the same depth in the ground as above, with three rails, slats or planks, of suitable size and strength, the top one to be four feet and a half from the ground, the other two at equal distances between the first, and the ground all securely fastened to the post. Third. **Picket fence.** Picket Fence shall be the same height as above, made of pickets, each not less than six inches in circumference, not more than six inches apart, driven in the ground not less than ten inches, all well secured at the top by slats or caps. Fourth. **Ditch and pole fence.** Ditch and Pole Fence shall be made of a ditch not less than four feet wide on top, and three feet deep, embankment thrown upon the inside of the ditch, with substantial posts set in the embankment not more than eight feet apart, and a plank, pole, rail or slat securely fastened to said posts, at least five feet high from the bottom of the ditch. Fifth. **Pole fence.** Pole Fence shall be four and a half feet high, with stakes not less than three inches in diameter, set in the ground not less than eighteen inches, and where the stakes are placed seven feet apart, there shall be not less than six horizontal poles well secured to the stakes; if the stakes are six feet apart, five poles; if three or four feet, four poles; if two feet apart, three poles, and the stakes need not be less than two inches in diameter; if one foot apart, one pole, and stakes need not be more than two inches in

EXHIBIT 21



# HEINONLINE

DATE DOWNLOADED: Wed Oct 11 16:15:05 2023
SOURCE: Content Downloaded from HeinOnline

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
William B. Webb. Laws of the Corporation of the City of Washington, Digested and
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils (1868).

ALWD 7th ed.
Webb, William B. Ls of the Corporation of the City of Washington, Digested &
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils (1868).

APA 7th ed.
Webb, W. (1868). Laws of the Corporation of the City of Washington, Digested and
Arranged, under Appropriate Heads in Accordance with Joint Resolution of the City
Councils. Washington, Printed by R.A. Waters.

Chicago 17th ed.
Webb William B. Laws of the Corporation of the City of Washington, Digested and
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils. Washington, Printed by R.A. Waters.

McGill Guide 9th ed.
William B. Webb, Ls of the Corporation of the City of Washington, Digested &
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils (Washington: Printed by R.A. Waters., 1868)

AGLC 4th ed.
William B. Webb, Laws of the Corporation of the City of Washington, Digested and
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils (Printed by R.A. Waters., 1868

MLA 9th ed.
Webb, William B. Laws of the Corporation of the City of Washington, Digested and
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils. Washington, Printed by R.A. Waters. HeinOnline.

OSCOLA 4th ed.
Webb, William B. Laws of the Corporation of the City of Washington, Digested and
Arranged, under Appropriate Heads in Accordance with a Joint Resolution of the City
Councils. Washington, Printed by R.A. Waters.        Please note: citations are
provided as a general guideline. Users should consult their preferred citation
format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  https://heinonline.org/HOL/License

**418**                   WEAPONS, DANGEROUS.

Same, ¿8.     necessary, a clerk, whose pay shall be at the rate of
ninety dollars per month while so employed, payable
out of the Water Fund.

> NOTE.—By an ordinance approved August 19, 1859, or about that
> time, the Mayor was "authorized to purchase for the use of the
> Corporation, as a place of deposit and safe keeping for the materials
> used for the distribution of Potomac water throughout the city, the
> eastern half of lot 5, in square 382." This is the lot upon which the
> Central Guard House is erected; and in the same ordinance there is a
> provision for the erection of this building, with a room on its first
> floor for the Water Purveyor, in which to receive, inspect, and test
> materials, &c. There is no longer such an officer as the Water Pur-
> veyor, nor does the compiler of this Digest know to what extent
> either the Guard House or the pipe-yard are now used for the pur-
> poses of this ordinance; but it is thought proper to insert this infor-
> mation here in connection with the subject of the Potomac water.

---

## WEAPONS, (DANGEROUS.)

Unlawful to       **1.** It shall not be lawful for any person or persons to
carry concealed
weapons.      carry or have concealed about their persons any deadly
or dangerous weapons, such as dagger, pistol, bowie
Act of Nov. 18,   knife, dirk knife, or dirk, colt, slungshot, or brass or
1858,
other metal knuckles within the City of Washington;
and any person or persons who shall be duly convicted
of so carrying or having concealed about their persons
any such weapon shall forfeit and pay upon such con-
viction not less than twenty dollars nor more than fifty
Penalty.      dollars; which fines shall be prosecuted and recovered
in the same manner as other penalties and forfeitures
accruing to the city are sued for and recovered: *Pro-
vided*, That the Police officers when on duty shall be
exempt from such penalties and forfeitures.

ER-236

EXHIBIT 22



DATE DOWNLOADED: Wed Apr 26 12:25:31 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1859 106 .

ALWD 7th ed.
, , 1859 106 .

Chicago 17th ed.
"," Washington - 7th Regular Session : 106-110

AGLC 4th ed.
'' Washington - 7th Regular Session 106

OSCOLA 4th ed.
'' 1859 106          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

CRIMINAL PRACTICE ACT. 109

weapon, shall, on conviction thereof, be imprisoned in the county jail not more than one year nor less than three months, and be fined in any sum not exceeding one thousand dollars.

SEC. 29. Every person who in a rude, insolent and angry manner, shall unlawfully touch, strike, beat or wound another, shall be deemed guilty of an assault and battery, and upon conviction thereof, shall be fined in any sum not exceeding one thousand dollars, to which may be added imprisonment not exceeding six months in the county jail.

SEC. 30. Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

SEC. 31. Every person who shall attempt to commit the crime of murder by drowning or strangling another person, or by any means not constituting an assault with intent to commit murder, shall, on conviction thereof, be imprisoned in the penitentiary not more than ten years nor less than one year.

SEC. 32. Every person who shall violently and unlawfully deprive another of the use of any bodily member, or who shall unlawfully and wilfully disable the tongue or eye, or bite the nose, ear or lip of another, shall be deemed guilty of simple mayhem, and, on conviction thereof, shall be imprisoned in the county jail not more than one year nor less than one month, and be fined in any sum not exceeding two thousand dollars, or fined only.

SEC. 33. Every person who shall unlawfully have carnal knowledge of a woman against her will, or of a female child under twelve years of age, shall be deemed guilty of a rape, and, upon conviction thereof, shall be imprisoned in the penitentiary not more than thirty years nor less than one year, and in prosecutions for such offense, proof of penetration shall be sufficient evidence of the commission thereof.

SEC. 34. Every person who shall forcibly and feloniously take from the person of another any article of value, by violence or putting in fear, shall be deemed guilty of robbery, and, upon conviction thereof, shall be imprisoned in the penitentiary not more than fourteen years nor less than two years, and be fined in any sum not exceeding one thousand dollars.

SEC. 35. Every person who shall steal and take, or forcibly and unlawfully arrest any person, and convey such person to parts without the territory of Washington, or aid or abet therein, or who shall forcibly and unlawfully take or assist, or aid or abet, in forcibly and unlawfully taking or arresting any person, with intent to take such person to parts without

EXHIBIT 23

## AMENDMENTS.

AN ACT to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the Territory.

SECTION 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

SEC. 2. That any person or persons having or carrying any pistol or gun who shall, in the public streets or highways, discharge the same indiscriminately, thereby disturbing the peace and quiet, and endangering the lives of the inhabitants of any town or neighborhood in this Territory, such person or persons, upon conviction thereof, before any justice of the peace in the county where such offense may be committed, shall be fined in any sum not less than ten nor more than fifty dollars, and imprisonment in the county jail not less than two nor more than ten days, in the discretion of the justice of the peace, together with the cost of prosecution.

SEC. 3. It shall be the duty of all sheriffs, deputy sheriffs, constables and all peace officers and private citizens to see that the provisions of section second of this act are enforced, by informing on all persons violating its provisions, by having them arrested and brought before the proper officer for trial and punishment.

SEC. 4. It is hereby made the duty of all civil and peace officers in this Territory to be diligent in carrying into effect the provisions of section one of this act, as well also as all grand juries or grand jurors, to inquire into and make presentment of each and every offense against the provisions of said section one of this act which shall come within their knowledge. And it is also made the duty of all judges in this Territory to give said section one in charge of the grand juries at each term of their respective courts.

SEC. 5. This act shall take effect and be in force from and after its passage.

APPROVED September 30, 1867.

Digitized by Google

EXHIBIT 24



DATE DOWNLOADED: Mon May 8 19:30:58 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Wade; Wood Keyes, Fern M.; Roquemore, John D. Code of Alabama 1876 (1877).

ALWD 7th ed.
Keyes, Wade; Wood, Fern M.; Roquemore, John D. Code of Alabama 1876 (1877).

APA 7th ed.
Keyes, W. (1877). Code of Alabama 1876. Montgomery, Barrett & Brown, printers for the
State.

Chicago 17th ed.
Keyes Wade; Wood, Fern M.; Roquemore, John D. Code of Alabama 1876. Montgomery,
Barrett & Brown, printers for the State.

McGill Guide 9th ed.
Wade; Wood Keyes, Fern M.; Roquemore, John D., Code of Alabama 1876 (Montgomery:
Barrett & Brown, printers for the State., 1877)

AGLC 4th ed.
Wade; Wood Keyes, Fern M.; Roquemore, John D., Code of Alabama 1876 (Barrett & Brown,
printers for the State., 1877

MLA 9th ed.
Keyes, Wade, et al. Code of Alabama 1876. Montgomery, Barrett & Brown, printers for
the State. HeinOnline.

OSCOLA 4th ed.
Keyes, Wade; Wood, Fern M.; Roquemore, John D. Code of Alabama 1876. Montgomery,
Barrett & Brown, printers for the State.          Please note: citations are
provided as a general guideline. Users should consult their preferred citation
format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

THE

# CODE OF ALABAMA.

## 1876.

PREPARED BY

WADE KEYES AND FERN. M. WOOD;

—AND—

JOHN D. ROQUEMORE, Successor to Fern. M. Wood.

'ITH REFERENCES TO THE DECISIONS OF THE SUPREME COURT OF THE STATE
UPON THE CONSTRUCTION OF THE STATUTES; AND IN WHICH THE
GENERAL AND PERMANENT ACTS OF THE SESSION OF
1876-7 HAVE BEEN INCORPORATED.

MONTGOMERY, ALA.:
BARRETT & BROWN, PRINTERS FOR THE STATE.
1877.

CHAP. 4.]    OFFENSES AGAINST PUBLIC JUSTICE, &c.    883

§ 4110. *Carrying, concealed, brass knuckles and slung-shots.*—b Any b April 8, 1873, person who carries, concealed about his person, brass knuckles, p. 130. slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months.

§ 4111. *Carrying rifle or shot-gun walking canes.*—c Any person c Aug. 5, 1868, who shall carry a rifle or shot-gun walking cane, shall, upon con- p. 11. viction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

---

# CHAPTER 4.

### OFFENSES AGAINST PUBLIC JUSTICE, AND OFFICIAL DUTY.

§ 4112 (3557). *Perjury on trial for felony.*—Any person who, willfully and corruptly, swears or affirms falsely, in regard to any material matter or thing, on the trial of any person under an indictment for felony, must, on conviction, be imprisoned in the penitentiary, or sentenced to hard labor for the county, for not less than three, nor more than twenty years.(1)

§ 4113 (3558). *Perjury in other cases.*—Any person who, willfully and corruptly, swears or affirms falsely, in regard to any material matter or thing, upon any oath or affirmation authorized by law, (except on the trial of any person under an indictment for a felony,) must, on conviction, be imprisoned in the penitentiary, or sentenced to hard labor for the county, for not less than two, nor more than five years.(1)

§ 4114 (3559). *Subornation of perjury.*—Any person who corruptly procures another to commit the crime of perjury, as defined in the last two preceding sections, must be punished in the same manner and degree that the person suborned was liable to be punished.

§ 4115. *Perjury by retailer.*—a Any person who, having taken the a March 7, 1876, oath required by section 1545 of this Code, to obtain a license to p. 227, sec. 3. sell vinous or spirituous liquors, shall violate the same, shall be deemed guilty of perjury, and, on conviction, must be punished as prescribed in the second preceding section.

§ 4116 (3560). *Bribery of executive, legislative or judicial officer.*— Any person who corruptly offers, promises or gives to any executive, legislative or judicial officer, after his election or appointment, either before or after he has been qualified, any gift, gratuity or thing of value, with intent to influence his act, vote, opinion, decision or judgment, on any cause, matter or proceeding which may be then pending, or which may be by law brought before him in

1. To constitute perjury in swearing as to belief, it must appear that defendant knew to contrary of what he swore.—3 Ala. 602. False affidavit to petition for *habeas corpus*, and for writ of attachment; advice of attorney competent to show want of corruption.—44 Ib 17, 81. Form of indictment in Code for perjury, sufficient.—47 Ib. 47. In perjury for false swearing in a case, record of case must be produced; when secondary evidence allowable.—6 Ib. 324.

EXHIBIT 25



DATE DOWNLOADED: Mon May  8 19:10:12 2023
SOURCE: Content Downloaded from _HeinOnline_

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
James F. McClellan, Compiler. Digest of the Laws of the State of Florida, from the
Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One
Thousand Eight Hundred and Eighty-One Inclusive (1881).

ALWD 7th ed.
McClellan, James F., Compiler. Digest of the Ls of the State of Florida, from the
Year One Thous& Eight Hundred & Twenty-Two, to the Eleventh Day of March, One Thous&
Eight Hundred & Eighty-One Inclusive (1881).

APA 7th ed.
McClellan, J. (1881). Digest of the Laws of the State of Florida, from the Year One
Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand
Eight Hundred and Eighty-One Inclusive. Tallahassee, Fla, Printed at the Floridian
Book and job Office.

Chicago 17th ed.
McClellan James F., Compiler. Digest of the Laws of the State of Florida, from the
Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One
Thousand Eight Hundred and Eighty-One Inclusive. Tallahassee, Fla, Printed at the
Floridian Book and job Office.

McGill Guide 9th ed.
James F. McClellan, Compiler, Digest of the Ls of the State of Florida, from the Year
One Thous& Eight Hundred & Twenty-Two, to the Eleventh Day of March, One Thous& Eight
Hundred & Eighty-One Inclusive (Tallahassee, Fla: Printed at the Floridian Book and
job Office., 1881)


AGLC 4th ed.
James F. McClellan, Compiler, Digest of the Laws of the State of Florida, from the
Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One
Thousand Eight Hundred and Eighty-One Inclusive (Printed at the Floridian Book and
job Office., 1881

MLA 9th ed.
McClellan, James F., Compiler. Digest of the Laws of the State of Florida, from the
Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One
Thousand Eight Hundred and Eighty-One Inclusive. Tallahassee, Fla, Printed at the
Floridian Book and job Office. HeinOnline.

OSCOLA 4th ed.
McClellan, James F., Compiler. Digest of the Laws of the State of Florida, from the
Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One
Thousand Eight Hundred and Eighty-One Inclusive. Tallahassee, Fla, Printed at the
Floridian Book and job Office.          Please note: citations are provided as a

# DIGEST

OF THE

# LAWS OF THE STATE OF FLORIDA,

FROM THE YEAR

ONE THOUSAND EIGHT HUNDRED AND TWENTY-TWO,

TO THE

ELEVENTH DAY OF MARCH, ONE THOUSAND EIGHT HUN-
DRED AND EIGHTY-ONE, INCLUSIVE.

COMPILED BY

JAMES F. McCLELLAN,

OF THE MARIANNA BAR.

TALLAHASSEE, FLA.:

PRINTED AT THE FLORIDIAN BOOK AND JOB OFFICE.

1881.

CRIMES—MISDEMEANORS.                                403

struction or injury, and to procure the conviction of the offenders.  (d)

SEC. 10. A city or town, which pays any sum under the provisions of the preceding section, may recover the same against any or all of the persons who destroyed or injured such property.  (d) May recover of rioters.

SEC. 11. Whoever, whenever arrested upon a warrant of a magistrate issued against him for an alleged offence against the laws of this State, and whoever when arrested by a sheriff, deputy sheriff, constable, police officer, or watchman, while committing a criminal offence against the laws of this State, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, billies or other dangerous weapon, shall be punished by fine not exceeding fifty dollars, and by imprisonment in the county jail not exceeding one year.  (d) Persons engaged in breach of the peace, having weapons

SEC. 12. Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the county jail not exceeding six months.  (d) Sellers of slung-shot.

SEC. 13. Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket-knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.  (d) Carrying secret arms.

12 Fla., 135.

SEC. 14. Any person convicted of the publication of a libel shall be punished by imprisonment in the county jail not exceeding one year, or by fine not exceeding one thousand dollars, or by both such fine and imprisonment.  (d) Libel.

———

## CHAPTER 71.

CRIMES—MISDEMEANORS—OFFENCES AGAINST PUBLIC POLICY.

1. Penalties for lotteries.

2. Penalties for owner of building to allow lotteries to be sold therein, or to let money be won by throwing dice.

3. Penalty for selling lottery tickets.

4. Penalty for second offence.

5. All lottery prizes to be forfeited.

6. Penalty for keeping gaming houses and tables.

7. Penalty for telegraph operators to disclose messages.

8. Penalty for unfair practice in sale of land.

9. Penalty for selling by false weights.

10. Common cheat defined, and penalty for being.

(d) Secs. 8, 9, 10, 11, 14 and 15, Snb-Chap. 7, Chap. 1637, Act of Aug. 6, 1868.

EXHIBIT 26

(163 of 217) Case 2:19-cv-00617 04/17/2024 ER 250 v: 10.3, Page 163 of 217
378   CRIMES AND PUNISHMENTS.   [CH. 31
Case 2:19-cv-00617-KJM-AC   Document 98-3   Filed 10/13/23   Page 110 of 1

family, shall be deemed a vagrant, and, upon conviction thereof, may be fined in any sum not exceeding five hundred dollars, or by imprisonment in the county jail not exceeding one year.

<span style="float:left">County commissioners to regulate working of vagrants.</span>

SEC. 281. The board of county commissioners shall make such regulations for the working of vagrants as will keep them as nearly as possible in constant employment.

<span style="float:left">Carrying deadly weapon.</span>

SEC. 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon charge of misdemeanor, and upon conviction, shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

---

## ARTICLE X.

### General provisions.

§ 283. Attempting to commit offenses.
284. Person shall not be convicted, when.
285. Stealing in another state and bringing stolen articles into this state.
286. Defendant may plead former conviction or acquittal.
287. Principals in the second degree and accessories before the fact.
288. Accessories after the fact.
289. Committing second offense.
290. Convicts in other states liable to punishment for second conviction.
291. Imprisonment may be for lifetime, when; never less than one year.
292. No fine to be imposed when prisoner is sentenced to confinement and hard labor.
293. Punishment limited.
294. Misdemeanor, how punished when no other punishment is provided.
295. Fine may be imposed, when.
296. Acquittal a bar to prosecution for the same offense, and every degree thereof.
297. When defendant may be tried again.
298. Acquittal may be pleaded in bar, when.

§ 299. Person under sixteen years of age convicted of felony.
300. Civil rights suspended during imprisonment.
301. Convict under protection of the law.
302. Conviction shall not work corruption of blood, or forfeiture.
303. Person convicted of felony shall be disqualified from holding office, &c.
304. How disabilities may be removed.
305. Convict within the age of sixteen years shall have civil rights restored, in what case.
306. Civil action not merged in a felony.
307. Fines, penalties, &c., recovered by indictment.
308. Jurisdiction of district courts.
309. The term "infamous crime," how construed.
310. The terms "crime," "offense" and "criminal offense."
311. The term "personal property."
312. The terms "real property," or "real estate," include what.
313. The term "property" includes what.
314. The term "person," how construed.
315. What shall be sufficient intent.

<span style="float:left">Attempting to commit offenses.</span>

SEC. 283. Every person who shall attempt to commit an offense prohibited by law, and in such attempt shall do any act toward the commission of such offense, but shall

Digitized by Google

ER-251

EXHIBIT 27

ER-252




DATE DOWNLOADED: Mon May 15 12:52:05 2023
SOURCE: Content Downloaded from HeinOnline

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1849-1850 229 .

ALWD 7th ed.
, , 1849-1850 229 .

Chicago 17th ed.
"," California - 1st Session : 229-247


AGLC 4th ed.
" California - 1st Session 229

OSCOLA 4th ed.
" 1849-1850 229        Please note: citations are provided as a general
guideline. Users should consult their preferred citation format's style manual for
proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   https://heinonline.org/HOL/License
-- The search text of this PDF is generated from  uncorrected OCR text.

244 LAWS OF THE STATE OF CALIFORNIA.

Libel defined, and punishment therefor.

§ 120. A libel is a malicious defamation, expressed either by printing or by signs or pictures or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural defects of one who is alive, and thereby to expose him or her to public hatred, contempt, or ridicule : every person, whether the writer or the publisher, convicted of the offence, shall be fined in a sum not exceeding five thousand dollars, or imprisonment in the county

Truth of libel may be given in evidence.

jail not exceeding one year. In all prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libellous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted, and the jury shall have the right to determine the law and the fact.

ELEVENTH DIVISION.

OFFENCES AGAINST PUBLIC MORALITY, HEALTH, AND POLICE.

Bigamy defined, and punishment therefor pre-scribed.

§ 121. Bigamy consists in the having of two wives or two husbands at one and the same time, knowing that the former husband or wife is still alive. If any person or persons within this State, being married, or who shall hereafter marry, do at any time marry any person or persons, the former husband or wife being alive, the person so offending shall, on conviction thereof, be punished by fine not exceeding one thousand dollars, and be imprisoned in the County Jail not more than two years. It shall not be necessary to prove either of the said marriages by the register or certificate thereof, or other record evidence, but the same may be proved by such evidence as is admissible to prove a marriage in other cases, and when such second marriage shall have taken place without this State, cohabitation in this State, after such

To what cases not to apply.

second marriage, shall be deemed the commission of the crime of bigamy. Nothing herein contained shall extend to any person or persons whose husband or wife shall have been continually absent from such person or persons for the space of five years together, prior to the said second marriage, and he or she not knowing such husband or wife to be living within that time. Also, nothing herein contained shall extend to any person that is, or shall be at the time of such second marriage, divorced by lawful authority from the bonds of such former marriage, or to any person where the former marriage hath been, by lawful authority, declared void.

Knowingly marrying a married person.

§ 122. If any man or woman, being unmarried, shall knowingly marry the husband or wife of another, such man or woman shall, on conviction, be fined not less than one thousand dollars, or imprisoned in the County Jail not more than two years.

Incestuous marriage or adultery.

§ 123. Persons being within the degrees of consanguinity, within which marriages are declared by law to be incestuous and void, who shall intermarry with each other, or who shall commit fornication or adultery with each other, shall, on conviction, be punished by imprisonment in the State Prison not exceeding ten years.

Obstructing or injuring public highway or navigable stream.

§ 124. If any person shall obstruct or injure, or cause or procure to be obstructed or injured, any public road or highway, or common street or alley of any city, town, or village, or any public bridge or causeway, or public river or stream declared navigable by law, or shall continue such obstruction so as to render the same inconvenient or dangerous to pass, or shall erect or establish any offensive trade, manufacture, or business, or continue the same after it has been erected or established, or shall in any wise pollute or obstruct any water course, lake, pond, marsh, or common sewer, or continue such obstruction or pollution so as to render the same offensive or unwholesome to the county, city, town, village, or neighborhood thereabouts : every person so offending shall, upon conviction, be fined not exceeding one thousand dollars ; and every such nuisance may, by order of the Court before whom the conviction may take place, or of the District Court, be removed and abated by the Sheriff of the County.

Selling unwhole-some provisions.

§ 125. If any person or persons shall knowingly sell any flesh of any diseased animal, or other unwholesome provisions, or any poisonous or adulterated drink or liquors, every person so offending shall be fined not more than five hundred dollars, or imprisoned in the County Jail not more than six months.

FIRST SESSION.

245

§ 126. If any person shall intentionally deface, obliterate, tear down or destroy, in whole or in part, any copy or transcript, or extract from or of any law of the United States, or of this State, or any proclamation, advertisement, or notification, set up at any place in this State by authority of any law of the United States or of this State, or by order of any Court, such person, on conviction, shall be fined not more than one hundred dollars nor less than twenty dollars, or be imprisoned in the County Jail not more than one month: *Provided*, that this section shall not extend to defacing, tearing down, obliterating, or destroying any law, proclamation, publication, notification, advertisement, or order, after the time for which the same was by law to remain set up shall have expired. *Defacing or tearing down any proclamation, &c.*

§ 127. If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the County Jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the County Jail not more than three months. *Having possession of any instrument with intent to commit a burglary, &c.*

§ 128. Every male person above eighteen years of age who shall neglect or refuse to join the *posse comitatus* or power of the county, by neglecting or refusing to aid and assist in taking or arresting any person or persons against whom there may be issued any process, or by neglecting to aid and assist in retaking any person or persons who, after being arrested or confined, may have escaped from such arrest or imprisonment, or by neglecting or refusing to aid and assist in preventing any breach of the peace, or the commission of any criminal offence, being thereto lawfully required by any Sheriff, Deputy Sheriff, Coroner, Constable, Judge, or Justice of the Peace, or other officer concerned in the administration of justice, shall, upon conviction, be fined in any sum not less than fifty nor more than one thousand dollars. *Refusing to join the posse comitatus, &c.*

## TWELFTH DIVISION.

### OFFENCES COMMITTED BY CHEATS, SWINDLERS, AND OTHER FRAUDULENT PERSONS.

§ 129. All and every person who shall be a party to any fraudulent conveyance of any lands, tenements or hereditaments, goods or chattels, or any right or interest issuing out of the same, or to any bond, suit, judgment or execution, contract or conveyance had, made, or contrived with intent to deceive and defraud others, or to defeat, hinder, or delay creditors or others of their just debts, damages, or demands; or who, being parties as aforesaid, at any time shall wittingly and willingly put in, use, avow, maintain, justify, or defend the same or any of them as true and done, had or made in good faith, or upon good consideration, or shall alien, assign, or sell any of the lands, tenements, hereditaments, goods, chattels, or other things before mentioned, to him, her, or them conveyed as aforesaid, or any part thereof, he, she, or they so offending shall, on conviction, be fined in any sum not exceeding one thousand dollars. *Fraudulent conveyances to hinder or defraud creditors.*

§ 130. If any person, by false representations of his own wealth or mercantile correspondence and connexions, shall obtain a credit thereby, and defraud any person or persons of money, goods, chattels, or any valuable thing; or if any person shall cause or procure others to report falsely of his wealth or mercantile character, and by thus imposing upon any person or persons obtain credit and thereby fraudulently get into the possession of goods, wares, or merchandise, or other valuable thing, every such offender shall be deemed a swindler, and on conviction, shall be sentenced to return the property so fraudulently obtained, if it can be done, and shall be fined not exceeding one thousand dollars and imprisoned in the County Jail not more than six months. *Obtaining credit or defrauding by false representations.*

§ 131. If any person or persons shall knowingly and designedly, by any false pretence or pretences, obtain from any other person or persons any chose in action, money, goods, wares, chattels, effects, or other valuable thing, with intent to cheat or defraud any such person or persons of the same, every person *Obtaining money or goods, &c., by false pretences.*

ER-255

EXHIBIT 28




DATE DOWNLOADED: Sun Apr 23 23:29:37 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
S. Garfielde, Compiler; Snyder, F. A., Compiler. Compiled Laws of the State of California: Containing All the Acts of Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53 (1853).

ALWD 7th ed.
Garfielde, S., Compiler; Snyder, F. A., Compiler. Compiled Ls of the State of California: Containing All the Acts of Legislature of a Public & General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53 (1853).

APA 7th ed.
Garfielde, S. (1853). Compiled Laws of the State of California: Containing All the Acts of Legislature of Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. Benicia, Published by S. Garfielde.

Chicago 17th ed.
Garfielde S., Compiler; Snyder, F. A., Compiler. Compiled Laws of the State of California: Containing All the Acts of Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. Benicia, Published by S. Garfielde.

McGill Guide 9th ed.
S. Garfielde, Compiler; Snyder, F. A., Compiler, Compiled Ls of the State of California: Containing All the Acts of Legislature of a Public & General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53 (Benicia: Published by S. Garfielde., 1853)


AGLC 4th ed.
S. Garfielde, Compiler; Snyder, F. A., Compiler, Compiled Laws of the State of California: Containing All the Acts of Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53 (Published by S. Garfielde., 1853

MLA 9th ed.
Garfielde, S., Compiler, and F. A. Snyder, Compiler. Compiled Laws of the State of California: Containing All the Acts of Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. Benicia, Published by S. Garfielde. HeinOnline.

OSCOLA 4th ed.
Garfielde, S., Compiler; Snyder, F. A., Compiler. Compiled Laws of the State of California: Containing All the Acts of Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. Benicia, Published by S. Garfielde.        Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper

662                     COMPILED LAWS OF CALIFORNIA.

exertions to        tion on the part of any two persons to fight with any deadly weapon
prevent duel.       or weapons, and such officer shall not use and exert his official author-
                    ity to arrest the parties and prevent the duel, every such officer shall
                    be fined in a sum not exceeding one thousand dollars.

Libel defined,          SEC. 120. A libel is a malicious defamation, expressed either by
and punishment      printing or by signs or pictures or the like, tending to blacken the
therefor.
                    memory of one who is dead, or to impeach the honesty, integrity, vir-
                    tue, or reputation, or publish the natural defects of one who is alive,
                    and thereby to expose him or her to public hatred, contempt, or ridi-
                    cule: every person, whether the writer or publisher, convicted of the
                    offence, shall be fined in a sum not exceeding five thousand dollars,
                    or imprisonment in the county jail not exceeding one year.  In all
Truth of libel      prosecutions for libel, the truth may be given in evidence to the jury,
may be given
in evidence.        and if it shall appear to the jury that the matter charged as libellous
                    is true, and was published with good motives, and for justifiable ends,
                    the party shall be acquitted, and the jury shall have the right to de-
                    termine the law and the fact.


                              ELEVENTH DIVISION.

                 OFFENCES AGAINST PUBLIC MORALITY, HEALTH, AND POLICE.

Bigamy defined,         SECTION 121. Bigamy consists in the having of two wives or two
and punishment      husbands at one and the same time, knowing that the former husband
therefor
prescribed.         or wife is still alive.  If any person or persons within this state, be-
                    ing married, or who shall hereafter marry, do at any time marry any
                    person or persons, the former husband or wife being alive, the person
                    so offending shall, on conviction thereof, be punished by fine not
                    exceeding one thousand dollars, and be imprisoned in the county jail
                    not more than two years.  It shall not be necessary to prove either of
                    the said marriages by the register or certificate thereof, or other record
                    evidence, but the same may be proved by such evidence as is admissi-
                    ble to prove a marriage in other cases, and when such second mar-
                    riage shall have taken place without this state, cohabitation in this
                    state, after such second marriage, shall be deemed the commission of
To what cases       the crime of bigamy.  Nothing herein contained shall extend to any
not to apply.       person or persons whose husband or wife shall have been continually
                    absent from such person or persons for the space of five years togeth-
                    er, prior to the said second marriage, and he or she not knowing
                    such husband or wife to be living within that time.  Also, nothing
                    herein contained shall extend to any person that is, or shall be at
                    the time of such second marriage, divorced by lawful authority from
                    the bonds of such former marriage, or to any person where the form-
                    er marriage hath been, by lawful authority, declared void.

## COMPILED LAWS OF CALIFORNIA. 663

SEC. 122. If any man or woman, being unmarried, shall knowing- Knowingly marrying a married person. ly marry the husband or wife of another, such man or woman shall, on conviction, be fined not less than one thousand dollars, or imprisoned in the county jail not more than two years.

SEC. 123. Persons being within the degrees of consanguinity, Incestuous marriage or adultery. within which marriages are declared by law to be incestuous and void, who shall intermarry with each other, or who shall commit fornication or adultery with each other, shall, on conviction, be punished by imprisonment in the state prison not exceeding ten years.

SEC. 124. If any person shall obstruct or injure, or cause or pro- Obstructing or injuring public highway or navigable stream. cure to be obstructed or injured, any public road or highway, or common street or alley of any city, town, or village, or any public bridge or causeway, or public river or stream declared navigable by law, or shall continue such obstruction so as to render the same inconvenient or dangerous to pass, or shall erect or establish any offensive trade, manufacture, or business, or continue the same after it has been erected or established, or shall in any wise pollute or obstruct any water course, lake, pond, marsh, or common sewer, or continue such obstruction or pollution so as to render the same offensive or unwholesome to the county, city, town, village, or neighborhood thereabouts : every person so offending shall, upon conviction, be fined not exceeding one thousand dollars ; and every such nuisance may, by order of the court before whom the conviction may take place, or of the district court, be removed and abated by the sheriff of the county.

SEC. 125. If any person or persons shall knowingly sell any flesh Selling unwholesome provisions. of any diseased animal, or other unwholesome provisions, or any poisonous or adulterated drink or liquors, every person so offending shall be fined not more than five hundred dollars, or imprisoned in the county jail not more than six months.

SEC. 126. If any person shall intentionally deface, obliterate, tear Defacing or tearing down any proclamation, etc. down or destroy, in whole or in part, any copy or transcript, or extract from or of any law of the United States, or of this state, or any proclamation, advertisement, or notification, set up at any place in this state by authority of any law of the United States or of this state, or by order of any court, such person, on conviction, shall be fined not more than one hundred dollars nor less than twenty dollars, or be imprisoned in the county jail not more than one month : Provided, that this section shall not extend to defacing, tearing down, obliterating or destroying any law, proclamation, publication, notification, advertisement, or order, after the time for which the same was by law to remain set up, shall have expired.

SEC. 127. If any person shall be found having upon him or her any Having posses

664                     COMPILED LAWS OF CALIFORNIA.

*sion of any instrument with intent to commit a burglary, etc.* picklock, crow, key, bitt, or other instrument or tool, with intent felo-
niously to break and enter into any dwelling house, store, shop,
warehouse, or other building containing valuable property, or shall
be found in any of the aforesaid buildings with intent to steal any
money, goods, and chattels, every person so offending shall, on convic-
tion thereof, be imprisoned in the county jail not more than two years;
and if any person shall have upon him any pistol, gun, knife, dirk,
bludgeon, or other offensive weapon, with intent to assault any per-
son, every such person, on conviction, shall be fined not more than
one hundred dollars or imprisoned in the county jail not more than
three months.

*Refusing to join the posse comitatus, etc.* SEC. 128. Every male person above eighteen years of age who
shall neglect or refuse to join the *posse comitatus* or power of the
county, by neglecting or refusing to aid and assist in taking or ar-
resting any person or persons against whom there may be issued any
process, or by neglecting to aid and assist in retaking any person or
persons, who, after being arrested or confined, may have escaped from
such arrest or imprisonment, or by neglecting or refusing to aid and
assist in preventing any breach of the peace, or the commission of any
criminal offence, being thereto lawfully required by any sheriff, dep-
uty sheriff, coroner, constable, judge, or justice of the peace or other
officer concerned in the administration of justice, shall, upon convic-
tion, be fined in any sum not less than fifty nor more than one thou-
sand dollars.

## TWELFTH DIVISION.

### OFFENCES COMMITTED BY CHEATS, SWINDLERS, AND OTHER FRAUDULENT PERSONS.

*Fraudulent conveyances to hinder or defraud creditors.* SECTION 129. All and every person who shall be a party to any
fraudulent conveyance of any lands, tenements or hereditaments,
goods or chattels, or any right or interest issuing out of the same, or
to any bond, suit, judgment or execution, contract or conveyance had,
made or contrived with intent to deceive and defraud others, or to
defeat, hinder, or delay creditors or others of their just debts, dam-
ages, or demands ; or who, being parties as aforesaid, at any time
shall wittingly and willingly put in, use, avow, maintain, justify, or
defend the same or any of them as true and done, had or made in
good faith, or upon good consideration, or shall alien, assign, or sell
any of the lands, tenements, hereditaments, goods, chattels, or other
things before mentioned, to him, her, or them conveyed as aforesaid,
or any part thereof, he, she, or they so offending shall, on conviction,
be fined in any sum not exceeding one thousand dollars.

ER-260

EXHIBIT 29



# HEINONLINE

DATE DOWNLOADED: Thu Apr 27 00:27:29 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Theodore H. Hittell. General Laws of the State of California, from 1850 to 1864,
Inclusive (4).

ALWD 7th ed.
Hittell, Theodore H. General Ls of the State of California, from 1850 to 1864,
Inclusive (4).

APA 7th ed.
Hittell, T. (4). General Laws of the State of California, from 1850 to 1864,
Inclusive. San Francisco, A. L. Bancroft and Co.

Chicago 17th ed.
Hittell Theodore H. General Laws of the State of California, from 1850 to 1864,
Inclusive. San Francisco, A. L. Bancroft and Co.

McGill Guide 9th ed.
Theodore H. Hittell, General Ls of the State of California, from 1850 to 1864,
Inclusive (San Francisco: A. L. Bancroft and Co., 4)

AGLC 4th ed.
Theodore H. Hittell, General Laws of the State of California, from 1850 to 1864,
Inclusive (A. L. Bancroft and Co., 4

MLA 9th ed.
Hittell, Theodore H. General Laws of the State of California, from 1850 to 1864,
Inclusive. San Francisco, A. L. Bancroft and Co. HeinOnline.

OSCOLA 4th ed.
Hittell, Theodore H. General Laws of the State of California, from 1850 to 1864,
Inclusive. San Francisco, A. L. Bancroft and Co.          Please note: citations
are provided as a general guideline. Users should consult their preferred citation
format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

CRIMINAL PRACTICE ACT.

CONCEALED WEAPONS.

An Act to prohibit the carrying of concealed weapons.

Approved April 27, 1863, 748.

**1585.** SECTION 1. Every person not being peace-officer, provost-marshal, enrolling- | Carrying weapons concealed, &c. officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not | Punishment. less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars.(*)   *Amendment, approved March* 1, 1864; 1863–4, 115; *took effect from passage.*

[A second section repeals all acts and parts of acts in conflict with the provisions of the above amendment.]

**1586.** SEC. 2. Such persons, and no others, shall be deemed travelers within the | Travelers. meaning of this act, as may be actually engaged in making a journey at the time.

An Act for the protection of growing timber on all possessory claims, and other private property, in certain counties in this State, and on or along public streets or highways and on public grounds, approved April 19, 1862, 307.

An Act to provide for the punishment of persons cutting timber upon or carrying the same, when cut down, from any of the swamp and overflowed, tide, or marsh, or school lands, belonging to this State, approved April 27, 1863, 739.

An Act to prevent the destruction of timber on the public lands of this State, approved March 2, 1864; 1863–4, 136.

See TREES AND TIMBER, post, 7221.

An Act to prevent the arming and equipping, within the jurisdiction of this State, of vessels for piratical or privateering purposes, and other treasonable conduct, approved April 25, 1863, 490.

See TRAITORS and TREASONABLE CONDUCT, post, 7148.

An Act to punish offenses against the peace of the State, approved April 27, 1863, 755.

See TRAITORS and TREASONABLE CONDUCT, post, 7152.

An Act to prevent the fraudulent conveyance or incumbrance of real estate by married women, approved April 27, 1863, 750.

See FRAUDULENT CONVEYANCES and CONTRACTS, post, 3171.

# Criminal Practice Act.

[An Act to regulate proceedings in criminal cases, passed April 20, 1850, 275, amended by act passed April 20, 1850, 382, and by act passed August 23, 1851, 407, was repealed by an Act to regulate proceedings in criminal cases, passed May 1, 1851, 212, given below.]

An Act concerning the costs of criminal actions removed before trial.

Passed April 29, 1851, 185.

**1587.** SECTION 1. In every case where a criminal action may have been or shall be | Costs on removal. removed before trial, the costs accruing upon such removal and trial shall be a charge against the county in which the indictment was or may be found.

**1588.** SEC. 2. The clerk of the county to which such action is or may be removed, | Draft on county whence removed. shall certify the amount of said costs to the auditor of his county, who shall audit the same and issue his draft therefor upon the treasurer of the county from which such action was or may be removed.

An Act to regulate proceedings in criminal cases,

Passed May 1, 1851, 212.

**1589.** SECTION 1. This act is divided into seven parts:

*First.* The first embraces general definitions and provisions.   | Division of act.

*Second.* The second relates to the prevention of public offenses.

*Third.* The third relates to proceedings for the removal of public officers, by impeachment or otherwise.

*Fourth.* The fourth relates to proceedings in criminal actions prosecuted by indictment.

*Fifth.* The fifth relates to proceedings in justices', recorders', and mayors' courts.

*Sixth.* The sixth relates to special proceedings.

*Seventh.* The seventh relates to costs in criminal proceedings.

(*) The original section was the same as the amendment, omitting the officers mentioned between the words "peace officer" and "or traveler."

EXHIBIT 30

# William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources.

## Subject(s):

- Carrying Weapons (https://firearmslaw.duke.edu/subjects/carrying-weapons/)

## Jurisdiction(s):

- California (https://firearmslaw.duke.edu/jurisdictions/california/)

## Year(s):

1878

Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

EXHIBIT 31



A.

# DIGEST

OF THE

# LAWS

OF

## MISSOURI TERRITORY.

COMPRISING :

AN ELUCIDATION OF THE TITLE OF THE UNITED STATES TO LOUISIANA :—
CONSTITUTION OF THE UNITED STATES :—TREATY OF SESSION :—
ORGANIC LAWS :—LAWS OF MISSOURI TERRITORY,
*(alphabetically arranged)* :—SPANISH REGULA-
TIONS FOR THE ALLOTMENT OF LANDS :—
LAWS OF THE UNITED STATES,
FOR ADJUSTING TITLES
TO LANDS, &c.

TO WHICH ARE ADDED,

## A variety of Forms, useful to Magistrates.

BY HENRY S. GEYER.

### ST. LOUIS:

PRINTED FOR THE PUBLISHER, BY JOSEPH CHARLESS,

AT THE MISSOURI GAZETTE OFFICE.

::::::::::

1818.

UNIV. OF MICH. LAW LIBRARY

Digitized by Google

374                                SLAVES.

**Punished by stripes.** ten lashes on his or her bare back for every such offence. *ib. ib. ib.*

**Not to keep gun &c.**

**Arms and ammunition may be seized.**

Sec. 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive ; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor,

**Slave punished by stripes.** for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. *ib. p.* 13–14. *ib.*

**Free negro may carry one gun, &c.**

**And all negro's, &c. may carry guns in certain cases.**

Sec. 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot ; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves. *L. L. T. pt.* 1. *p.* 14.

**Riots, routs, &c.**

**Punished by stripes.**

Sec. 5. All riots, routs unlawful assemblies and seditious speeches by a slave or slaves, shall be punished with stripes, at the discretion of a justice of the peace and he who will may apprehend and carry him, her or them before such justice. *ib. p.* 15. *ib.*

**Meetings of slaves.**

**Persons permitting any slaves to remain, &c.**

**Or at any time not more than 5.**

Sec. 6. To prevent the inconvenience arising from the meetings of slaves, if any master mistress or overseer of a family shall knowingly permit or suffer any slave not belonging to him or her, to be and remain on his or her plantation, above four hours at any one time, without leave of the owner or overseer of such slave, he or she so permitting shall forfeit and pay three dollars for every such offence and every owner or overseer of a plantation, who shall so permit or suffer more than five negroes or slaves, other than his or her own, to be and remain upon his or her plantation, or quarter at any other time, shall forfeit and pay one dollar for each negro or slave above that number, which said several forfeitures shall be to the informer, and be recoverable before any justice of the peace of the district [county,] with costs, where such offence shall be com-

Digitized by Google

ER-268

EXHIBIT 32

*Art. II.*]                    MISDEMEANORS.                    491

any tenement in his possession or under his control, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than fifty nor more than five hundred dollars.

SEC. 7. Any person who shall, in this city, keep a bawdy-house, house of ill-fame or of assignation, or shall harbor, secrete, or permit any girl under the age of seventeen years to remain in such bawdy-house, house of ill-fame or of assignation, without immediately notifying the Chief of Police thereof, or who shall be known to be a frequenter of such house of assignation or house of ill-fame, or who shall be found an inmate of such house or houses, or shall knowingly permit any tenement in his possession or under his control to be used for any such purpose, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than one hundred dollars nor more than five hundred dollars. *Bawdy house, etc. Ibid, § 6.*

SEC. 8. Any person who shall be guilty of sticking or putting up in any street, avenue or alley, or on any wall, fence or other public place in this city, any indecent or gross printed or written advertisement, bill or notice of his professional skill or remedies for the curing of venereal, or what are usually called secret diseases, or causing the same to be stuck or put up, or shall cause any such indecent or gross printed or written advertisement, either as a bill or circular, whether enclosed in an envelope or any other form, to be left in any yard or premises attached to any dwelling house, or to be put under the door, or to be given to any servant or other person in or about such dwelling house, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than fifty nor more than one hundred dollars. *Indecent advertisements. Ibid, § 7.*

SEC. 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, *Concealed weapons. Ibid, § 8.*

Digitized by Google

492                     REVISED ORDINANCE.          [*Chap. XX.*

without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

**Certain officers may carry weapons.**
*Ibid*, § 9.

SEC. 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

**Disturbing peace on Sunday.**
*Ibid*, § 10.

SEC. 11. Any person who shall, on Sunday, disturb the peace by any noisy, riotous or disorderly conduct, in any street or other public place, or in any place of public resort for amusement or other purposes, shall be deemed guilty of a misdemeanor, and upon conviction thereof, be fined not less than five nor more than fifty dollars.

**Permitting disturbance on premises.**
*Ibid*, § 12.

SEC. 12. Any keeper of a dram-shop, beer house or other place of public resort, who shall permit any breach of the peace or disturbance of public order and decorum, by noisy, riotous and disorderly conduct on his premises, when it was in his power to prevent it, or who shall sell any intoxicating drink to any person already intoxicated, shall be deemed guilty of a misdemeanor, and upon conviction thereof, be fined not less than twenty-five nor more than two hundred and fifty dollars.

**Employing "beer-jerker."**
*Ibid*, § 13.

SEC. 13. Any keeper of a dram-shop, beer-house, or other place of public resort, who shall employ a lewd woman, or any woman having the reputation of a prostitute, as a carrier of beer or any other article, either in the day or night time, or to sing or dance in a lewd or indecent manner, or to permit any such lewd woman to act as bar tender in any such house or place, shall be deemed guilty of a misdemeanor, and upon conviction thereof be fined not less than fifty nor more than one hundred dollars.

**Rag-pickers to have permit.**
*Ibid*, § 14.

SEC. 14. No person shall, without first procuring a permit from the Police Commissioners, engage in picking or gathering rags, paper, metal or other articles, and such person shall wear a badge or number, and be

Digitized by Google

# EXHIBIT 33




DATE DOWNLOADED: Fri Apr 28 13:48:24 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
1866-1867 259 .

ALWD 7th ed.
, , 1866-1867 259 .

Chicago 17th ed.
"," Alabama - General Assembly, Regular Session : 259-296


AGLC 4th ed.
" Alabama - General Assembly, Regular Session 259

OSCOLA 4th ed.
" 1866-1867 259          Please note: citations are provided as a general
guideline. Users should consult their preferred citation format's style manual for
proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

1866-7.

260

All religious books kept by ministers of the gospel and colporteurs, for sale or gratuitous distribution, on hand at any one time, to an amount not exceeding in value five hundred dollars' worth in any one year.

All property of literary, scientific and benevolent institutions, actually used for the purposes for which said institutions were created, not exempting, however, any of such property when employed in any other than the regular business of such institutions.

Houses of religious worship, and their appurtenances.

Places and monuments of the dead, and implements of burial.

All tools and implements in actual use of any calling, occupation or trade, to the value of one hundred dollars.

All insane persons and their property, to the value of one thousand dollars.

All disabled or crippled persons, whose taxable property does not exceed five hundred dollars, from any poll tax.

All lands donated by acts of Congress to railroads in this State remaining unsold and uncultivated.

## CHAPTER II—*Subjects of Taxation.*

SEC. 2. *Be it further enacted,* That taxes are to be assessed by the assessor in each county on and from the following subjects, and at the following rates, to-wit:

Poll tax.

1. On every male inhabitant between the ages of eighteen and fifty, (except those persons between the ages of eighteen and twenty-one, the emoluments of whose labor go to parents or masters) the sum of two dollars; and to insure the payment of such tax, it shall be the duty of all partnerships, associations, corporations, officers or individuals to return to the assessor the number and names of persons in their employment on the first day of February of each year. as clerks, book-keepers, overseers, deputies, agents, workmen, journeymen, or laborers subject to such tax, which tax the assessor shall assess against such employer, by them to be deducted out of the hire, wages or salary of such employees as before enumerated; and upon the failure of any employer to make return of such employees when called upon by the assessor to do so, the assessor shall proceed to ascertain the number of such employees from the best sources of information practicable, and such employer so failing shall be held liable in double the amount of the tax.

Corporations, &c., give number of employees.

261                                              1866-7.

2. On all real estate, to be estimated at its market *Real estate,* value in money, according to the best judgment the as-*3-10 of 1 per* sessor can form by information, inspection or otherwise, *cent.* taking into consideration its location, whether in town, city or the country, its proximity to local advantages, its quality of soil, growth of timber, mines, minerals, quarries, or coal beds, and the amount and character of improvements, three-tenths of one per cent. *ad valorem.*

3. On all mills, foundries, forges, mining establishments, quarries, lime or marble works, gin and carriage *Articles taxed 3.10 of 1 per* making shops, tanneries, and other manufacturing estab-*cent.* lishments.

On all wharves and wharf boats, toll bridges and ferries, turnpikes, and all passes, channels or canals, where tolls are charged.

On all stocks of goods, wares and merchandise on hand to be assessed upon not less than the largest amount on hand at any one time during the preceding year, and this shall include all merchandise kept on plantations for sale, or to be dealt out to laborers; *Provided,* That any goods, wares or merchandise offered for sale by any dealear or person, commencing business subsequent to the first day of January of the current tax year, shall become at once liable to the tax levied by this act, and. must be estimated upon the maximum amount thereof.

On all horses and mules not used strictly for agricultural purposes, except studs, jacks and race horses.

On all cattle on the excess over five head.

On all household furniture, on the excess over three hundred dollars.

On all libraries not exempted by law, on the excess over three hundred dollars.

On all clocks kept for use, and

On all other property, real, personal, or mixed, not otherwise specified and taxed herein, or exempted therefrom—and this shall not be construed to tax the crops produced upon lands within this State taxed under the second paragraph of this section, as real estate—three tenths of one per cent. *ad valorem; Provided,* No hogs, sheep, goats, or poultry, kept or raised for the use of any family, or work oxen, or animals used for agricultural purposes exclusively, and no farming tools and implements of husbandry necessary on the farm, shall be taxed by this act.

4. On all vehicles not exclusively used for agricultural purposes.

1866–7.                                    262

On all jewelry, plate and silver ware, ornaments and
Articles taxed articles of taste, pianos and other musical instruments,
¼ of 1 per cent.
and paintings, except family portraits.

On all cotton presses and pickeries.

On all studs, jacks, and race horses.

On all gold and silver watches, and gold safety chains.

On all money hoarded, or kept on deposit subject to
order, either in or out of the State, except funds held
subject to draft in the prosecution of a regular exchange
business, and except also money kept on hand to defray
current family expenses, for a period not exceeding one
year.

On all money loaned, and solvent credits bearing in-
terest, from which credits the indebtedness of the tax
payer shall be deducted, and the excess only shall be
taxed.

On all money employed in buying or trading in paper,
or in a regular exchange business, or invested in paper,
whether by individuals or corporations, except where
the money so employed or invested is otherwise taxed as
capital.

On the capital stock, actually paid in, of all incorpo-
rated companies, created under any law of the State,
whether general or special, (except railroads,) and not
exempted by their charter from such tax. except any
portion that may be invested in property and taxed oth-
erwise as property, one half of one per cent. *ad valorem.*

5. On the gross amount of all sales at auction, made
in or during the tax year preceding the assessment, ex-
Auction sales cept those made by or under the direction of executors,
¼ of 1 per cent.
administrators, and guardians, as such, by order of court
or under legal process, and under any deed, will, or
mortgage, at the rate of one fourth of one per cent *ad
valorem.*

6. On the gross amount of premiums, (after deducting
Premiums 1 threfrom all return premiums,) received from their busi-
per cent.
ness in this State during such tax year, by any insurance
company not chartered by this State, and doing business
herein by agents or otherwise, at the rate of one per
cent.

7. On the gross amount of commissions or sums
Gross commis- charged or received in or during such tax year, by any
sions, &c., 1 per
cent.        factor, commission merchant, or auctioneer, in buying,
selling, or any other act done in the course of their
business.

263                                                      1866–7.

On the gross receipts, during such tax year, of all cotton pickeries, and from the storage of cotton, or other merchandise, or produce, at the rate of one per cent. *Cotton pickeries 1 per cent.*

8. On every pack, or part of a pack of playing cards, sold by wholesale, retail, or otherwise disposed of, during such tax year, fifty cents. *Playing cards 50 cents.*

9. On every legacy, where letters testamentary have not been taken out in this State, received by any person other than the child, adopted child, grandchild, brother, sister, father, mother, husband, or wife, and on all property given by deed or otherwise, to any such person, on the amount or value thereof, to be assessed to the beneficiary, guardian, trustee, or legal representative, at the rate of three per cent. *Bowie knives 3 per cent.*

10. On all pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each, and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and said tax shall be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment, when demanded by the assessor, said pistols, revolvers, bowie knives, or knives of like description, shall be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same shall be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, shall be paid over to the person from whom the said pistol, revolver, bowie knife, or knives of like description, were taken, and the net amount collected by him shall be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto. *Pistols $2 00.* *Bowie knives.* *How collected.*

11. On all steamboats, vessels, and other water crafts plying in the navigable waters of the State, at the rate of one dollar per ton of the registered tonnage thereof, which shall be assessed and collected at the port where such vessels are registered, if practicable; otherwise, at any other port or landing within the State where such vessels may be; but this shall not include flat-bottom *Steamboats $1 00 per ton.*

# CERTIFICATE OF SERVICE

Case Name:  **Baird, Mark v. Rob Bonta**          No.    **2:19-cv-00617-KJM-AC**

I hereby certify that on October 13, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on October 13, 2023, at Los Angeles, California.


| Lara Haddad | *Lara Haddad* |
|---|---|
| Declarant | Signature |

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  LARA HADDAD
   Deputy Attorney General
4  State Bar No. 319630
    300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6250
6    Fax:  (916) 731-2124
    E-mail:  Lara.Haddad@doj.ca.gov
7  *Attorneys for Defendant Attorney General Rob
   Bonta*

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13

14  **MARK BAIRD and RICHARD**          2:19-cv-00617-KJM-AC
    **GALLARDO,**
15                                      **SUR-REBUTTAL EXPERT**
                          Plaintiff,    **REPORT AND DECLARATION**
16                                      **OF BRENNAN RIVAS**
         **v.**
17
18  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
19  **California, and DOES 1-10,**

                        Defendants.
20

21

22

23

24

25

26

27

28

1

## SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

I previously submitted a declaration and expert report in this matter, signed on June 9, 2023.  Everything that I stated in that report is true and accurate to the best of my knowledge.  I am submitting this supplemental declaration and sur-rebuttal expert report to address the rebuttal report prepared by Clayton Cramer and attached as Exhibit 1 to his declaration, signed on July 14, 2023.

### OPINIONS

### I.  INTRODUCTION

Mr. Cramer's rebuttal report does not substantively address or rebut the following points made in my report:

1.      Public carry of concealable weapons has been *regulated* throughout American history. In many instances, that regulation took the form of concealed carry restrictions, while in others it addressed open carry as well. The following are state statutes that regulated the open carrying of knives and pistols in public spaces, which I described in my report. (Rivas Report, 21-23, 25-27, 30, 39, citing 1795 Mass. 2; 1801 Tenn. 22, § 6; 1821 Maine 76, § 1; Code of Massachusetts (1836), Part IV, Ch. 134, § 16; 1837 Ga. 90; - Statutes of Wisconsin (1838-1839), "An Act to prevent the commission of crimes," § 16; Revised Statutes of the State of Maine (1841), Ch. 169, § 16; Revised Statutes of the State of Michigan, (1846), Title 31, Ch. 162, § 16; Code of Virginia (1847-1848), Title 3, Ch. 14, § 16; Revised Statutes of the Territory of Minnesota (1851), Ch. 112, § 18; Revised Statutes of the State of Delaware (1852), Title 15, Ch. 97, § 13; General Laws of Oregon (1853), Ch. 16, § 17; 1870 Tenn. 13, § 1; 1871 Tenn. 90, § 1; 1871 Tex. 34, § 1; Acts of Arkansas (1875), 156, § 1; Compiled Laws of Wyoming (1876), Ch. 52, § 1; 1881 Ark. 96, § 1-2; 1882 W. V. 135, § 7; 1888 Id. Terr. 23, "Carrying Deadly Weapons," § 1; 1889 Ariz. Terr. 13, § 1; 1892 D. C. 159, § 1-2.) This is not an

exhaustive list of open-carry statutes, or of the statutes that I cited in my report. It does not include, for example, sensitive-place restrictions that prohibited deadly weapons and other arms at public assemblies, polling places, schools, etc. (Rivas Report, 34-36), or taxes that discouraged or otherwise disincentivized the public carrying of various deadly weapons. (Rivas Report, 30-34.)

2.     When and where deadly weapons could be carried openly, they were constitutionally protected for lawful defense of oneself, community, and State. (Rivas Report, 17-24.)

3.     Even while protected constitutionally in many circumstances, sources from the historical record question the frequency and commonness of openly carrying deadly weapons outside of emergency situations. Rather, the historical record shows that nineteenth-century Americans strongly opposed going armed with deadly weapons on a regular basis for preemptive self-defense. (Rivas Report, 17-24.)

4.     Public carry regulations (regardless of their form) often worked in conjunction with other regulations pertaining to the sale, use, or possession of deadly weapons. (Rivas Report, 30-36.)

5.     Requiring a license to carry concealed deadly weapons has deep roots in California history. (Rivas Report, 36-37.)

6.     Public carry regulations have at times distinguished between urban and rural locales. (Rivas Report, 37-40.)

Instead, Mr. Cramer's rebuttal takes issue with my report's use of the phrase *deadly weapons*; treatment of revolvers and repeating handguns; focus upon contextualizing public carry laws and public sentiment regarding weapon-carrying as opposed to repeating well-known case law; and use of a particular quotation at p. 8, n. 10 of my report.

Mr. Cramer's rebuttal also misconstrues several points and passages within my report, and at times makes poorly constructed arguments that do not comport

with the standards of historical scholarship. Finally, Mr. Cramer appears to make ad hominem attacks that are both unnecessary and unprofessional. In the remainder of this sur-rebuttal report and declaration, I will take up each of these issues in turn.

## II.   RESPONSE TO POINTS MADE IN MR. CRAMER'S REBUTTAL REPORT

### A.   Deadly Weapons

Mr. Cramer's rebuttal takes issue with my use of the phrase "deadly weapons." (See Cramer Rebuttal, ¶¶ 3-4, 14-15.) In my report, I supported the assertion that Americans distinguished "deadly weapons" from militia or hunting arms in two ways. First, I established that public carry laws generally applied to a particular set of weapons that did not include muskets, shotguns, or rifles; the fact of their being distinguished from the firearms useful for hunting and militia service is an obvious and noteworthy fact for anyone seeking to understand the purpose of public carry laws. (Rivas Report, 4-11.) As my report demonstrates, public carry laws so frequently employed this phrase "deadly weapons"—grouping together large knives, pistols, metal knuckles, sword canes, and the like—that to deny its legitimacy in referring to these weapons in contradistinction from long guns is insupportable. (Rivas Report, pp. 4-11.) Second, I provided examples of state legal codes that used specific phrases like "deadly weapons," "concealed weapons," and "prohibited weapons" to describe the kinds of weapons typically included within public carry laws. (Rivas Report, 5-6.)

While the phrase "deadly weapons" was not employed universally, it was certainly in common usage during the nineteenth century to describe knives, pistols, metal knuckles, and other such devices. (See, e.g., Rivas Report, 4-11.) Thus, this is the most useful, period-appropriate phrase to employ in reference to these weapons because the regulations pertaining to them reached beyond simply restricting the concealed carrying of them in public. It would be difficult to assimilate other kinds of laws pertaining to these weapons—from open-carry restrictions to sales regulations and more—into a historical narrative were the phrase "concealed

weapons" to be used exclusively. To describe sales restrictions and taxes as being assessed upon "concealed weapons" invites confusion; to describe them in relation to "prohibited weapons" is misleading.

Mr. Cramer points to legal cases which used the phrase "deadly weapons" to apply to other items, like a rock or a rifle. (Cramer Rebuttal, ¶¶ 4-5.) These are cases pertaining to assault with a deadly weapon rather than the public carrying of weapons, and are connected to the development of the legal phrase "deadly weapon" as a way of assessing malice and intent in early modern English law.[1] A deadly weapon is one likely to cause death, and even weapons not intrinsically deadly could become so, depending on their use.[2] It is reasonable to conclude that knives, pistols, metal knuckles and other weapons enumerated in public carry laws received the appellation "deadly weapons" by Americans because of their inherent deadliness. One of the cases cited elsewhere by Mr. Cramer says as much about the bowie knife, which was described as "an exceeding destructive weapon" that was "difficult to defend against…by any degree of bravery, or any amount of skill."[3] (Cramer Rebuttal, ¶ 7.) Even though rifles, rocks, and all manner of other firearms, blades, and blunt objects could be considered deadly weapons if they were used in an assault or homicide, it is clear from context that most public carry laws were not intended to apply to rocks or broomsticks.

Mr. Cramer also takes issue with the premise that concealability was a key feature of the deadly weapons regulated by public carry laws. (Cramer Rebuttal, ¶ 6.) To that argument, there is an abundant record of primary sources and newspaper articles that demonstrate Americans using the word "concealed" in

---

[1] Walter E. Oberer, "The Deadly Weapon Doctrine: Common Law Origin," *Harvard Law Review* 75, no. 8 (June 1962), 1565-1576.

[2] Oberer, "The Deadly Weapon Doctrine," 1573 at n 43. ("If a deadly result is likely to follow from the ordinary use of the weapon upon the person of another, the weapon is said to be deadly per se. If the deadly result is not likely to follow from mere ordinary use, but is likely to ensue when the weapon is used in some special way, the weapon so employed is said to be deadly 'as used'.").

[3] *Cockrum v. State*, 24 Tex. 394 (1859).

1 relation to deadly weapons. For example, a law journal synthesizing jurisprudence

2 on the subject in 1886 had this to say about "Deadly and Dangerous Weapons":

3     A statute making it indictable for one to carry concealed about his

4     person any 'pistol, bowie-knife, razor, or other deadly weapon of the

5     like kind,' embraces a butcher's knife. The words 'other deadly

6     weapon of the like kind' imply similarity in the deadly character of

7     weapons, such as can be conveniently concealed about one's person, to

8     be used as a weapon of offence and defense.[4]

9     Mr. Cramer also appears to express doubt as to whether deadly weapons such

10 as pocket pistols and bowie knives were very likely to be carried concealed.

11 (Cramer Rebuttal, ¶¶ 6-7.) The conclusion that they were, based on the research I

12 presented in my report, is well-reasoned: If they were known to be deadly weapons

13 per se; and one of their key characteristics was their concealability; and laws

14 emerged across the United States prohibiting their being carried concealed; and

15 arrests were made and prosecuted across the United States for violations of those

16 laws; and historical sources such as abundant newspapers, political speech, and the

17 like denounced the act of being armed with concealed deadly weapons; then it is

18 reasonable to conclude that these concealable weapons were very frequently being

19 carried concealed with negative effects upon American communities.

20     The fact that weapon-carriers continually chose to conceal their hardware

21 rather than carry openly invites the historian to question the commonness of open-

22 carry of non-militia, non-hunting weapons. If open-carry of deadly weapons were

23 common or typical in the lives and social spheres of Americans, one wonders why

24 so many people denounced the act of being armed with them in public and why so

25 many people chose to carry them concealed. The research in my report supports the

26 proposition that outside of emergency or otherwise unusual circumstances, open-

27

28     [4] "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4
(October 1886), 410. This was quoted in *State v. Erwin*, 91 N. C. 545 (1884).

6

1    carry of deadly weapons was not particularly common or typical because it was

2    inconvenient and/or impolite: this is why so many people chose to carry their

3    weapons concealed. (Rivas Report, 17-24.) I cited several historical sources in my

4    report from newspapers as well as the statements of appellate judges from the body

5    of pertinent case law showing the rejection of constant arming with deadly

6    weapons. (See Rivas Report, 15-24.)

7         Relatedly, there are several places where Mr. Cramer brings up the fact that

8    nineteenth-century case law on the subject of weapons frequently protected the

9    kinds of arms used in warfare. (See Cramer Rebuttal, ¶¶ 8, 73-74, 83). I addressed

10   this in my initial report. (Rivas Report, 22, n. 61.) As my research shows, that

11   nineteenth-century Americans understood the right to bear arms as specifically

12   protecting militia and hunting weapons further illustrates their distinction from

13   pocket pistols, bowie knives, and other concealable weapons.

14   **B.    "Pistols" and "Other Deadly Weapons"**

15        Mr. Cramer takes issue with my overview of the history of revolvers and

16   repeating handguns. (See Cramer Rebuttal, ¶¶ 43-49, 55-57.) In my explication of

17   why pistols and other deadly weapons became targets of regulation, I provided a

18   brief overview of the development of the revolver.

19        First, Mr. Cramer appears to be unsatisfied with my citation of *Pollard's*

20   *History of Firearms* at p. 9, n. 7. (Cramer Rebuttal, ¶¶ 43-45.) I provided a pin cite

21   to pages from a section of the book specifically devoted to flintlock pistols of the

22   eighteenth century that include diagrams. (Rivas Report, 9.) The purpose was to

23   provide a reference to the kinds of pistols that were in circulation prior to revolvers,

24   not to prove that most American pistols conformed to that design. Still, the

25   selection from *Pollard's* which Mr. Cramer included in his rebuttal supports my

26   argument, noting that, in reference to eighteenth-century flintlock technology in

27

28

general, "America normally followed the British or French patterns over the decided time lag of as much as 10 or 20 years."[5]

Mr. Cramer then points to "percussion cap pistols" as evidence that perhaps the majority of American pistols prior to 1836 were something other than "single-shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth century." (See Cramer Rebuttal, ¶ 43.) I declined to include information about percussion caps in my brief overview because—for the purposes of my analysis and report—the notable distinction between the revolver and its predecessors was its firing of multiple rounds (which entailed reloading a detachable cylinder, unlike a muzzle-loader). Mr. Cramer attributes this decision to ignorance or incompetence when my motive was the pursuit of clarity and brevity. (See Cramer Rebuttal, ¶ 45.) His citation to the rapid replacement of flintlocks is to *Pollard's* at p. 62, but that section and chapter discuss innovations in firearm design that long predate percussion caps, like matchlock and wheel-lock ignition systems.[6] No doubt the percussion system replaced flintlocks in the nineteenth century, but another source notes that "by 1830, the percussion cap was the generally accepted system for igniting firearms powder charges,"[7] and elsewhere *Pollard's* describes the period c.1835 – c.1865 as the one "in which percussion system of ignition flourished."[8]

While Mr. Cramer is correct that percussion caps came into existence and use prior to 1836 and ushered in a period of substantial innovation, it is unlikely that most American-owned handguns were of the percussion-cap design by 1836. The

---

[5] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114. Quoted in Cramer Rebuttal, Paragraph 44.
[6] Blair, ed., *Pollard's*, 62-63, quotation at 62.
[7] Edward Clinton Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (New York: Barnes & Noble, 1993), 21.
[8] Blair, ed., *Pollard's*, 181. The percussion lock was invented around the year 1806. Using a percussion cap as part of the percussion system did not emerge in Europe until some time in the mid-to-late 1810s, and in the United States in the 1820s. See also Lewis Winant, *Early Percussion Firearms: A History of Early Percussion Firearms Ignition—from Forsyth to Winchester .44/40* (New York: Bonanza Books, 1954).

first American patent for a percussion cap was issued in 1822.[9] While newly crafted pistols after that time may have used the percussion cap design, it is a stretch to believe that most pistols in circulation as of 1836 did. And even still, they were single-shot, muzzle-loading firearms.

Mr. Cramer then discusses "pepperbox" pistols, arguing that they existed prior to revolvers. (See Cramer Rebuttal, ¶¶ 46-48). While some of these barrel-rotating firearms were manufactured in Europe prior to the year of Colt's patent in 1836, their numbers and influence in the United States during that time were negligible. The earliest pepperbox firearms were designed and made in Europe.[10] The first American patent for a pepperbox-type arm was one that involved a revolving cylinder that was turned by hand, issued to Artemas Wheeler of Boston in 1818.[11] Wheeler likely produced nothing more than prototypes of this gun, because gun collectors apparently did not know about his patent until the mid-twentieth century.[12] A contemporary of Wheeler's patented a similar design in England, but produced no more than 300 between the filing of his patent there in 1819 and the dissolution of his business in 1827.[13] These "Collier guns" were exceedingly rare, and the possibility that Samuel Colt saw one on a trip to India has led to much speculation that he was deeply inspired by the design.[14] It is clear that Collier guns or rotating, pepperbox designs were anything but widespread or common in the United States prior to 1836, when a patent was granted to Benjamin Darling and his brother, Barton Darling, for a pepperbox pistol, and 1837—the year in which a patent was issued to gunmaker Ethan Allen, who included the design in his earliest

---

[9] Blair, ed., *Pollard's*, 166-168 (Discussing advent of the percussion cap.)
[10] Lewis Winant, *Pepperbox Firearms* 12-14.
[11] On the Artemas Wheeler patent, see Ezell, *Handguns of the World* 22-24.
[12] Winant, *Pepperbox Firearms*, 22-24, notation ("Now it is revealed that the Collier gun was patented by Artemas Wheeler in the United States in June 1818, five months before it was patented in England.").
[13] Ezell, *Handguns of the World*, 24.
[14] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020), 53-54.

1   pepperbox pistols. These "Allen pistols" competed with Colt revolvers through
2   about the mid-nineteenth century.[15]

3      My report did not include this additional detail about Allen pistols and
4   European pepperboxes for the same reason that I did not address percussion caps—
5   clarity and brevity. Although Allen's pistol was a competitor to Colt's for a short
6   time, it was soon eclipsed by the revolver. The popularity of the Colt designs from
7   1848-1851 (particularly the Baby Dragoon, Pocket, and Navy models) were
8   manufactured in significant numbers. The expiration of Colt's patent in 1857, and
9   the United States military contracts with Colt and others for revolvers, consigned
10  Allen pistols to the status of curiosa.

11     Neither the Allen pistol nor the Darling pistol predated the Colt revolver. The
12  Wheeler patent, which did, was apparently not manufactured in any notable
13  quantity in the United States; we know that its English counterpart, the Collier gun,
14  was exceedingly rare. When Mr. Cramer accused me of submitting contradictory
15  statements (Cramer Rebuttal, ¶¶ 49), he makes reference to the fact that the
16  declaration which I submitted in another case briefly mentioned the rare, pre-1836
17  pepperbox pistols which were (as has been shown here) not available in the United
18  States in significant numbers.

19     **C.   "Right To Keep and Bear Arms Decisions"**
20     Much of Mr. Cramer's rebuttal consists of a repetition of case law surrounding
21  concealed-carry regulations: he appears to take issue with the fact that my report
22  focused on contextualizing public carry laws and public sentiment regarding
23  weapon-carrying, as opposed to repeating well-known cases. (Cramer Rebuttal, ¶¶
24  6, 24-26, 50, 68-84, 86-95.)

25     Among other things, I was asked by the State of California to identify
26  historical laws that regulated the public carrying of weapons, with a special focus

27     [15] Winant, *Pepperbox Firearms*, 28. (Winant describes the Allen pistol, not
28  as the first American repeating handgun, but as "the first immediately successful American multishot firearm.").

upon those that implicated open-carry. I found historical laws that regulated the
open carrying of weapons. (See Rivas Report, 17-36.) As a historical expert in this
case, I provided a detailed, multi-part history of these and other public carry laws
which explained the kinds of weapons regulated by them, and why they emerged
when and where they did. My report is a work of primary-source-based history that
begins with the understanding that the Court is the expert in all matters of law,
including the public-carry case law that has been evaluated at length by the
Supreme Court of the United States. Mr. Cramer attributes the absence of this
information in my report to ignorance when nothing can be further from the truth; I
am fully aware of the nineteenth-century appellate record regarding open and
concealed carry laws, and had I been writing for a different audience, I would have
included it.

Mr. Cramer describes these cases as upholding concealed-carry statutes
because open-carry remained legal. He ignores that the distinction was based on
defense of oneself and the State in times of armed conflict, as opposed to
preemptive self-defense, as I argued in my report. (Rivas Report, 15-24.) The cases
which Mr. Cramer cites say the following about protecting open carry for defense
purposes:

- *State v. Reid*, 1 Ala. 612 (1840): "The constitution in declaring that,
  'Every citizen has the right to bear arms in defence of himself and the
  State,' has neither expressly nor by implication, denied to the
  Legislature, the right to enact laws in regard to the manner in which
  arms shall be borne. The right guarantied to the citizen, is not to bear
  arms upon all occasions and in all places, but merely 'in defence of
  himself and the State'."

- *Owen v. State*, 31 Ala. 387 (1858): A concealed carry statute was "a
  regulation, the object of which was to promote personal security, and to
  advance public morals." By regulating "the manner in which certain

weapons are to be borne," the law did not "require them to be so borne as to render them useless for the purpose of defense."

- *Nunn v. State*, 1 Ga. 243 (1846): The protection for "bearing arms openly" was directly tied to the citizen's "*natural* right of self-defence" and "his constitutional right to keep and bear arms." (Emphasis in original.)

- *State v. Chandler*, 5 La. Ann. 489 (1850): A man's "right to carry arms . . . 'in full open view' . . . is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

- *State v. Smith*, 11 La. Ann. 633 (1856): The Second Amendment "was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke." This decision upheld a concealed-carry statute.

- *State v. Jumel*, 13 La. Ann. 399 (1858): This case did not specifically address defensive arming and hardly even addressed the question of the statute's constitutionality, instead referring to *Chandler* and *Smith* (above). As Mr. Cramer's rebuttal stated, the judge in this case upheld the statute in question as "a measure of police" prohibiting behavior that endangered the public. (Cramer Rebuttal, ¶ 25.)

- *Amyette v. State*, 21 Tenn. 154 (1840): This court said: "They say, there can be no difference between a law prohibiting the wearing concealed

1  weapons, and one prohibiting the wearing them openly. We think there
2  is a *manifest* distinction. In the nature of things, if they were not allowed
3  to bear arms openly, they could not bear them in their defence of the
4  State at all. To bear arms in defence of the State, is to employ them in
5  war, as arms are usually employed by civilized nations. The arms,
6  consisting of swords, muskets, rifles, &c., must necessarily be borne
7  openly; so that a prohibition to bear them openly, would be a denial of
8  the right altogether."

9      A series of cases from Arkansas and Tennessee, dated in the 1870s and 1880s,
10 chart a back-and-forth between legislature and judiciary in each of those states that
11 resulted in public carry laws that tightly constricted permissible open-carry of
12 deadly weapons.[16] I addressed these laws in my report and cited some of the
13 pertinent case law. (Rivas Report, 21-23.) In each state, a sweeping public carry law
14 that did not confine itself to the wearing of deadly weapons concealed was struck
15 down by an appellate court on the basis that such a rule prohibited the open
16 carrying of the kinds of pistols used in warfare—specifically the revolvers issued
17 by the United States military and appropriate for militia use.[17] In each state, the
18 legislature responded by updating the public carry law, not to replicate the typical
19 prohibition against carrying "concealed weapons," but to provide an open-carry
20 exception that was: 1) exclusively reserved for army/navy pistols; and 2) only
21 applicable to openly carrying army/navy pistols in one's hand.[18] Both states then
22 also prohibited the sale of pistols that were not army/navy models—in other words,
23 they specifically supplemented their strict public carry laws with sales prohibitions

24

25          [16] Rivas Report, 22 (citing 1870 Tenn. 13).
26          [17] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557
    (1878). Mr. Cramer cites *Wilson* positively, but its holding reversed course from
27  *Fife v. State* (1876) and was subsequently reversed by *Haile v. State* (1881). See
    also *Fife v. State*, 31 Ark. 455, and *Haile v. State*, 38 Ark. 564.
28          [18] Rivas Report, 22-23 (citing 1871 Tenn. 90; 1881 Ark. 96, §1; 1881 Ark.
    96, §2.)

upon pocket pistols.[19] The sensible takeaway from the policy evolution in Arkansas and Tennessee is that bowie knives and pocket pistols were not appropriate for defensive use in public, and that proper defensive use of an army/navy pistol would entail carrying it openly in a way that was both inconvenient and certain to draw attention.[20]

As I noted in my report, state appellate judges regularly made clear that public-carry laws addressed habitual arming for preemptive self-defense. (See, e.g., Rivas Report, 23 (citing *Haile v. State*, 38 Ark. 564 (1882), 24 (quoting *Huntley v. State*, 25 N.C. 418 (1843)). My report also addressed numerous examples of historical evidence that Americans opposed going armed for preemptive self-defense. (Rivas Report, 15-24.) Meanwhile, Mr. Cramer has not provided any social history sources demonstrating that open-carry of deadly weapons on an everyday basis was common or socially acceptable.

Mr. Cramer also questions my assertion that having deadly weapons on one's person "raises a presumption of guilt." (See Cramer Rebuttal, ¶ 65). The quotation was taken directly from a North Carolina case[21] and aptly expresses the predicament of deadly weapon carriers, who were expected to prove that their behavior fell within a public-carry exception. I discussed how several laws made this requirement explicit in my report.  (Rivas Report, 20-21.)

As my report and this sur-rebuttal make clear, exclusive reliance upon caselaw without exploring local sentiment and practice, and without bearing in mind the

---

[19] Rivas Report, 23 (citing 1881 Ark. 96.)

[20] I have written a scholarly essay on these statutes and their associated case law. See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Duke Ctr. For Firearms L.: Second Thoughts Blog* (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee.

[21] *State v. Reams*, 121 N.C. 556 (1897).

1  deep well of police power exercised by local officials, is not standard practice for

2  legal historians.[22]

3      In my own research and for the purposes of my report, I have placed public

4  carry laws within their social and cultural context. Numerous sources from social

5  history which I have cited—including statements of judges in some of these very

6  cases—beg the question of what permissible open-carry of deadly weapons looked

7  like, what meaning it conveyed in the public sphere, and whether it encompassed

8  the everyday open-carrying of deadly weapons for preemptive self-defense. Thus,

9  though they may not satisfy Mr. Cramer, my conclusions that 1) in many

10  circumstances the possession of a deadly weapon (which was very likely to be

11  carried concealed) was prima facie evidence of some malintent; and 2) that openly

12  carried weapons invited the intervention or questioning of local authorities, are

13  supported by ample evidence.

14      **D.   Citation to San Francisco Evening Bulletin**

15      Mr. Cramer stated that he was unable to confirm a footnote in my report—at

16  p. 8, n. 10, referring to the *San Francisco Evening Bulletin*. He takes issue with my

17  use of this source based upon his inability to confirm it, and asserts it is inaccurate.

18  (See Cramer Rebuttal, ¶ 28).

19      The *San Francisco Evening Bulletin* did indeed publish the words which I

20  quoted on the date and under the title which I cited at p. 8, n. 10. I have provided a

21  copy of the article, appended as EXHIBIT 1. Mr. Cramer stated that he checked two

22  digital repositories, *Chronicling America* and the *California Digital Newspaper*

---

23      [22] The "new" legal history, which embraces sources from social and cultural

24  history and interprets the law in a broader sense than statutes and case law, is no
   longer new. Examples include: Hendrik Hartog, "Pigs and Positivism," *Wisconsin
   Law Review* (1985); Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten

25  Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June
   1997), 67-96; Laura F. Edwards, *The People and Their Peace: Legal Culture and

26  the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill:
   University of North Carolina Press, 2009), 3-10. For a brief application of this

27  method to the local regulation of weapons in early America, see Edwards,
   "Weapons and the Peace," *Second Thoughts*, Duke Center for Firearms Law (July

28  25, 2023), https://firearmslaw.duke.edu/2023/07/weapons-and-the-peace/.

*Collection*, but was unable to locate this particular newspaper. There are a great many more repositories of digitized newspapers than these two open-access databases. At my home institution of Texas Christian University, the Mary Couts Burnett Library offers access to dozens of subscription-only newspaper, periodical, and primary-source databases which I use in my research.[23]

Mr. Cramer also questions the accuracy of the quotation as a result of its being published in a British magazine. The original article, a lengthy travel account entitled "Colonel Bowie and His Knife," appears to be a distillation of the kind of travel literature that was popular during the nineteenth century.[24] The original piece measures ten pages in length and presents a first-person telling of stories and encounters in the American South circa 1860. It captures the stereotypes of southern culture quite well, including the popularity of bowie knives, the penchant for carrying deadly weapons, and the tendency to satisfy manly honor with violence. Though British-written and probably not based on the writer's own firsthand experiences, the account describes southern men in terms familiar to students of southern history. Since the latter twentieth century, historians have presented a view of southern male culture as one preoccupied with appearances and committed to a violent defense of honor.[25] The essay is certainly in line with this history in its description of the perceived attitudes and behaviors of white southern men.

The *San Francisco Evening Bulletin* then reprinted a short segment of this travelogue under a different title, "The Bowie Knife in the South," in autumn 1861. Mr. Cramer offers nothing to dispute the well-documented fact that bowie knives were popular in southern states.  (See, e.g., Rivas Report, 8.)

---

[23] https://library.tcu.edu/.

[24] "Colonel Bowie and His Knife," *Temple Bar Magazine* 2 (July 1861), 120-130.

[25] This is a large and growing field of historical scholarship. See, e.g., Angela M. Hornsby-Gutting, "Manning the Region: New Approaches to Gender in the South," *Journal of Southern History* 75, no. 3 (August 2009), 663-676; see especially 664, 667-668.

The reprinted excerpt from the *San Francisco Evening Bulletin* aptly expressed that connection and is one of countless sources demonstrating its veracity.

### E.    Rebuttal's Arguments

Mr. Cramer's claims about American history do not comport with the standards of historical scholarship.  (See, e.g., Cramer Rebuttal, ¶¶ 20, 20-21, 60-64.)

First, Mr. Cramer questions my assertion that violence and weapon-carrying "rose in tandem" during the nineteenth century, and insists on an answer to the question, "Which caused which?" (Cramer Rebuttal, ¶ 20.) The study of history generally cannot produce demonstrative results like those which can be replicated in a lab, therefore historians "must base their arguments upon the interpretation of partial primary sources that frequently offer multiple explanations for a single event."[26] It is impossible to know with certainty the extent to which rising violence prompted Americans to carry deadly weapons, versus the extent to which their carrying of these weapons produced yet more violence. But it is clear that Americans of the nineteenth century lived through a more violent period of American history than their eighteenth-century predecessors, that they were more likely to carry deadly weapons concealed about them, and that their deadly weapons (especially pistols) were more lethal than eighteenth-century analogues.[27] I make

---

[26] Thomas Andrews and Flannery Burke, "What Does It Mean to Think Historically?" *Perspectives on History* (January 2007); https://www.historians.org/research-and-publications/perspectives-on-history/january-2007/what-does-it-mean-to-think-historically

[27] Roth analyzes the southern tendency to carry knives and pistols, and that behavior's connection to underlying social problems in the South in Roth, *American Homicide*, 217-220 (On p. 218: "Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became more popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent. The proportion of homicides committed with such weapons is uncertain, since most records did not specify the kind of gun or knife used, but guns and knives accounted for a growing share of the known weapons that whites used to kill other whites."). Roth then goes on to cite statistical information drawn from his robust analysis, which can be found in the

(continued…)

this point throughout my report, including by citing to the work of historian Randolph Roth, an eminent scholar, professor, and co-director of the well-respected Historical Violence Database, whose monograph, *American Homicide*, is the most thorough exploration of the subject to date and the standard reference work for regionally specific conclusions driven by quantitative analysis.[28] The historian's question as to the connection between carrying deadly weapons and violence is not "Which caused which?" but *how are they related?* Throughout my report, I endeavored to place the development of deadly weapons, their proliferation within American communities, and the regulatory efforts focused upon them within this context of American violence.

I also presented evidence showing that the availability and popularity of deadly weapons made them more likely to be carried and/or used. (See Rivas Report, 5-6, 11-15.) Sources previously cited in my report speak to their conviction that going armed was a temptation. (See Rivas Report, 15.) Whether that sense among historical people comports with current statistics (as Mr. Cramer disputes, at ¶¶ 62-64) is irrelevant to the historian, whose mission is to understand historical actors in their historical context. His attempt to take a recent statistical study pertaining to mentally ill persons and superimpose its conclusions upon nineteenth-century Americans without accounting for differences in social mores, conceptions of mental illness, or availability of sources defies some of the most fundamental principles to the practice of history. (Cramer Rebuttal, ¶ 64.) Moreover, it defies common sense to believe that exceptionally lethal deadly weapons were more available to nineteenth-century consumers and more likely to be owned or carried by them, but reject the idea that their presence or market saturation had a role to play in measurably rising rates of violence during the nineteenth century. We

American Homicide Supplemental Volume, "Weapons," available at https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf
    [28] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009).

cannot quantify the influence of weapon-carrying upon violence, and we cannot make unilateral statements about causality, but we can reasonably conclude that access to deadly weapons was related to growing violence.

Mr. Cramer's rebuttal also questions my synthesis of the root causes of rising rates of homicide in the nineteenth century. (See Cramer Rebuttal, ¶ 60). He takes issue with my assertion that "[r]ates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors." (Rivas Report, 11.) This statement was made in a section of my report entitled "Context of American Violence" (*id.* at pp. 11-15). I listed the four factors which have been shown to correlate to homicide rates: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy.[29] (Rivas Report, p. 12, n. 25.) These overarching factors are found in widely accepted scholarship about the history of violence in America, which Mr. Cramer questions.[30] (Cramer Rebuttal, ¶¶ 20-21, 60.)

### F.   Rebuttal's Misreading of My Report

Mr. Cramer's assessment of my statements relating to the larger atmosphere of violence in the nineteenth century seems to have been informed by a misreading on his part. He appears to have read my report to argue that the availability of deadly weapons was solely responsible for rising rates of violence in nineteenth-century America. (Cramer Rebuttal, ¶ 60.) At no point in my report did I argue that "handgun availability alone" caused the rising violence. In explaining causes, as previously stated, I referred to *American Homicide* and its four correlating factors. What I argued about the connection between deadly weapons and violence during the nineteenth century was that "[t]he proliferation of revolvers during [the nineteenth century] exacerbated these problems, rendering armed encounters even

---

[29] Roth, *American Homicide*, 17-26.
[30] Mr. Cramer's rebuttal includes two separate paragraphs bearing the number 20.

1    more deadly than they had been before." (Rivas Report, 12-13.) This is an argument

2    which even Mr. Cramer admits "seems logical." (Cramer Rebuttal, ¶ 61.)

3         This is just one of several instances where Mr. Cramer appears to have

4    misconstrued points and passages within my report:

5         He misreads a statement in my report's "Summary of Opinions" to apply

6    exclusively to the state of California which is instead a general statement: in states

7    that provided a travel exception—whether their public carry laws implicated open

8    carry or not—the existence of that exception speaks to "the idea that population

9    density was a factor in developing and enforcing weapon policies in the nineteenth

10   century." (Rivas Report, 4.)

11        At Paragraph 70, Mr. Cramer takes the opening sentence of a paragraph

12   beginning with the phrase "In the early nineteenth century" to mean that every fact

13   listed in the paragraph occurred during the early nineteenth century. The paragraph

14   in question is from a section entitled "Approaches to Public Carry Regulation in the

15   Nineteenth Century" and addressed "Restrictions on Public Carry" throughout the

16   entire nineteenth century, as my writing makes clear. (See Rivas Report, 17.)

17        At Paragraph 97, Mr. Cramer seems to believe that I am unaware that Hawaii

18   was an independent nation prior to its being made a United States Territory, even

19   though I stated as much in my report and accompanying citation. (See Rivas

20   Report, 30.) The fact that Hawaiian people had lived for approximately fifty years

21   with public carry regulation prior to their joining the United States is significant to

22   a thorough examination of public carry laws in American history.

23        At Paragraphs 29-30 and 41-42, Mr. Cramer misinterprets a footnote

24   providing citations to numerous public carry laws that "regulated the presence of

25   knives larger than a pocket knife in public places." (Rivas Report, 8, n. 11.) I

26   quoted the regulated weapons within each statute, showing that the laws aimed to

27   apply to fighting knives as distinguished from pocket knives. The notation's

28   purpose of describing regulated knives was clear from the sentence, and was yet

more clear from the report section title "Large Knives," printed on the previous page. He accuses me of "dishonest editing" and misrepresenting concealed-carry laws as open-carry laws, when in fact he misread my report.

Mr. Cramer's misconstruction in Paragraph 42 reveals his most serious misreading of my report—that a "public carry regulation" indicates an open-carry restriction. It is unclear where or how Mr. Cramer arrived at the false conclusion that every time I used the phrase "public carry regulation" in my report, I intended to convey the idea of "open-carry ban."[31] Concealed-carry laws are a form of public carry regulation, and I treated them as such in my report.

### G.    Rebuttal's Unprofessionalism

Finally, Mr. Cramer at various points attacks my integrity and intelligence in ways that are both unnecessary and unprofessional. (See Cramer Rebuttal, ¶¶ 28-30, 41-42, 45, 56, 71, 96-97.) Such attacks are inconsistent with the manner in which historians engage in disagreements about history.

As a member of the historical profession and its preeminent organization in the United States, the American Historical Association (AHA), I abide by the AHA Statement on Standards of Professional Conduct.[32] Professional historians are part of a community "collectively engaged in investigating and interpreting the past as a matter of disciplined learned practice," and even though historians "believe in vigorous debate…they also believe in civility."[33]

Mr. Cramer's attacks at times seem to arise from misreading my report. Perhaps Mr. Cramer did not read the document with sufficient care to engage substantively with the issues I addressed. Indeed, it seems as though Mr. Cramer did not read with much care at all beyond page 27 of my report—consolidating his

---

[31] See also Paragraph 50: "If by 'regulated' Rivas means states *prohibited concealed carry*, this was *generally true*, but by no means universal."
[32] https://www.historians.org/jobs-and-professional-development/statements-standards-and-guidelines-of-the-discipline/statement-on-standards-of-professional-conduct
[33] Id.

unstated criticisms into a single accusation that the remainder of my report was nothing more than "misleading 'evidence'." (Cramer Rebuttal, ¶ 97.) Professional historians often disagree about how to interpret the past, and Mr. Cramer is free to disagree with the conclusions I drew based upon my research for this report. But it is inappropriate to denigrate another's work and attack it without engaging substantively on the issues of significance that were presented and substantiated with primary sources. Mr. Cramer's rebuttal adds nothing to the question of how common the open carrying of deadly weapons was, or whether nineteenth-century Americans approved of openly carrying deadly weapons for preemptive self-defense; it does not contextualize public carry laws, and in fact, rejects the contextualization I provided without constructing a reasonable alternative; his rebuttal mounts no argument other than a repetition of well-known case law pertaining to public carry regulations.

## III. CONCLUSION

Overall, Mr. Cramer has failed to rebut or undercut the arguments I have made in my initial report:

1. The public carrying of deadly weapons has been regulated throughout American history.

2. When laws prohibited the concealed carrying of deadly weapons, the open carrying which they implicitly protected was generally reserved to emergency or unusual situations—not everyday arming for the purpose of preemptive self-defense.

3. Sources from American history demonstrate strong public sentiment against being armed on a regular basis for the purpose of preemptive self-defense.

4. Public carry regulations often worked in conjunction with other statutes affecting the sale, use, and possession of weapons; at times these other

regulations acted to disincentivize or discourage the public carrying of deadly weapons.

5. Requiring a license to carry concealed weapons is a longstanding regulatory policy in California.

6. Public carry regulations have at times distinguished between urban and rural locales.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  8/3/ 2023, at Fort Worth, Texas.

Dr. Brennan Rivas

*Brennan Rivas*

ER-301

EXHIBIT 1

**Early American Newspapers**

## The Bowie-Knife in the South

San Francisco Bulletin (published as Evening Bulletin) (San Francisco, California) | October 18, 1861

Page [1]    Page 1 of 4

View Full Page    Search Issue    View Details

Find text on this page    Highlight

THE BOWIE-KNIFE IN THE SOUTH.—So certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow. So much so is this the case, that in a violent argument with a Memphis or Vicksburg man, it would be unsafe to scratch the back of your neck, for it is down the back that the bowie-knife is often kept; to pull out your watch, for in the waistcoat pocket often lurks the miniature Derringer pistol; to take out your pocket handkerchief from your coat-tail pocket, because there is the den of the "five-shooter." Indeed, it is the rule, when you quarrel with suspicious characters, rowdies or gamblers, as one of them himself told me, to fire the Derringer from the trowsers pocket the very instant you have called your opponent "darned thief," "scoundrel," or flung whatever mud of curses and abuses you choose to pelt at him. If you do not, ten to one three bullets and a bowie-knife will be in you before you can draw your pistol and fire, and there you will be dead and gouged on the bar-room floor. To draw the Derringer would be dangerous, but by firing it from the trowsers or paletot pocket, you gain a move in the game; and if the "blue pill" go right through brain or artery, the result to your enemy is unmistakably "checkmate," or, as rowdy would say in

Case 2:19-cv-00617-KJM-AC   Document 98-4   Filed 10/13/23   Page 26 of 28

billiard-room jargon, "one loft."—*Temple Bar Magazine.*

©2023 Readex.

Contact Customer Service: 1-800-243-7694 or custservice@readex.com

Share Your Feedback     Privacy Policy     Terms of Use

So certain, ... this case, that in a violent argument with a Memphis or Vicksburg man, it would be unsafe to feel at the back of your neck, for there is down the back that the bowie-knife is often kept; to pull out your watch, for in the waistcoat pocket often lurks the miniature Derringer pistol; to take out your pocket handkerchief from your coat-tail pocket, because there is the den of the "five-shooter." Indeed, it is the rule, when you quarrel with suspicious characters, rowdies or gamblers, as one of them himself told me, to fire the Derringer from the trowsers pocket the very instant you have called your opponent "darned thief," "scoundrel," or flung whatever mud of curses and abuses you choose to pelt at him. If you do not, ten to one three bullets and a bowie-knife will be in you before you can draw your pistol and fire, and there you will be dead and gouged on the bar-room floor. To draw the Derringer would be dangerous, but by firing it from the trowsers or paletot pocket, you gain a score in the game; and if the "blue pill" go right through brain or artery, the result to your enemy is unmistakably "checkmate," or, as rowdy would say in billiard-room jargon, "one love."—*Temple Bar Magazine.*