No. 24-565

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD
*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee,*

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 3 of 7

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
LARA HADDAD
Deputy Attorney General
State Bar No. 319630
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6250
 Fax:  (916) 731-2124
 E-mail:  Lara.Haddad@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his official*
*capacity as Attorney General of California[1]*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK BAIRD and RICHARD GALLARDO,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,**<br><br>Defendants. | Case No. 2:19-cv-00617-KJM-AC<br><br>**SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF ROBERT J. SPITZER** |

---

[1]Each defendant currently holds the position of the former respective named defendants.  *See* Fed. R. Civ. P. 25(d).

1

I.      INTRODUCTION

I previously submitted a declaration and expert report in this matter, signed on June 8,

2023. Everything that I stated in that report is true and accurate to the best of my knowledge. I

am submitting this sur-rebuttal expert report and declaration to address the rebuttal report

prepared by Clayton Cramer and attached as Exhibit 2 to his declaration, signed on July 14,

2023.

In my Report and Declaration,[2] I examine an array of historical weapons restrictions to

show that the carrying of weapons of all sorts, but especially guns, fighting knives (long, thin-

bladed knives), and various types of clubs have been subject to wide-ranging regulation and

restriction from the seventeenth century through the early twentieth century. I do this by

examining the regulatory history of weapons carrying, extending to concealed carry laws

(enacted by essentially every state), open carry restrictions (at least 29 states enacted at least 53

laws restricting or extending to the open carrying of weapons), and laws that restricted any kind

of firearm carrying (at least 22 states enacted 36 laws specifically restricting the carrying of long

guns or any kind of firearm). I then examine laws penalizing weapons brandishing and display,

defined this way: "brandishing of weapons—that is, to display them in the presence of others and

to do so in a menacing or threatening manner; and the mere display or wearing of weapons (i.e.

that they simply can be seen) in the presence of others." (Spitzer Report, 11) In all, I identify 21

states that enacted brandishing laws, and 19 states that enacted weapons display laws, totaling 40

such laws enacted in 36 states. (4 states enacted both types.) I then examine several categories of

weapons licensing laws.

---

[2] Signed June 8, 2023.

2

In his Rebuttal to my Report, which I have reviewed, Clayton Cramer (hereafter Cramer) makes numerous errors, misstatements, and assertions that are unrelated to the content of my report.  None of Cramer's contentions undercut, minimize, or otherwise negate my analysis, evidence, and information. Of the hundreds of old laws I examine, Cramer disputes a relative handful. His contentions are inaccurate, and he attributes statements and assertions that I did not write. In addition, Cramer's declaration demonstrates a deficient understanding of the nature and history of constitutional law and early lawmaking in America. Cramer alleges that my Report exhibits "either confirmation bias or misrepresentation." (Cramer Rebuttal, 2, ¶6.) It does neither, as the account below will demonstrate.

## II.    CRAMER REBUTTAL – CONCEALED WEAPON REGULATION

Cramer first discusses a 1686 New Jersey law I cite as an early example of a law restricting both concealed and open weapons carrying. Cramer says that the *Bruen* Supreme Court decision "discounted" this law. (Cramer Rebuttal, 1-2, ¶4.) But the Supreme Court acknowledged that the 1686 New Jersey statute did indeed punish the concealed or "private. . .wear" of "pocket pistols" and open weapons carrying of pistols by planters.[3] That is the point that I raised in my report (Spitzer Report, 6): the law curtailed both concealed and open firearm and other weapons carrying as early as the 17th century.

Cramer next questions a 1750 Massachusetts law I cite, first saying that there was no such law (Cramer Rebuttal, 2, ¶ 7);  then citing a law with a slightly different citation (dated 1749-51) which he assumes I meant to cite (*id.*, 3, ¶ 8); and then asserts that the law "does not prohibit carrying of arms except if they 'shall be unlawfully riotously or tumultuously assembled,'" (*id.*, 3, ¶9), attributing to me the claim that this law "prohibit[ed] carrying of arms"

---

[3] *NYSRPA v. Bruen*, 97 U. S. ____ (2022), 39.

(*id.*). But he misstates my report. I stated that the Massachusetts law "penalize[d] any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, 'being armed with clubs or other weapons.'" (Spitzer Report, 6.) This, indeed, is what the law says.

Cramer is also incorrect about the citation to the 1750 Massachusetts law in my report. My original cite to the Massachusetts law when I first encountered it was: 1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1. The original law was indeed dated 1750[4] but was apparently published separately as a notice later, in 1751.[5] The second citation is: 1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12, dated 1751. The law as I presented it is correct, as was my brief comment on it.

Cramer then comments on a Virginia law from 1786 and a North Carolina law from 1792, (Cramer Rebuttal, 3, ¶ 10), both of which I briefly discuss. (Spitzer Report, 7) Regarding the Virginia 1786 law, while Cramer is correct that it traces back to English law, the law is particularly relevant to this case because it was then adopted and passed as good law in the state of Virginia (as is true of the 1792 North Carolina law). (Spitzer Report, 7.) Much of American law is traceable back to earlier British law, as the colonies were mostly settled by British immigrants and the entire thirteen colonies were part of the British Empire until they rebelled successfully, winning independence in 1781, formalized by treaty in 1783.

The Virginia 1786 law was good law because it was adopted as such by the Virginia legislature. (See Spitzer Report, 7.) The same is true of the North Carolina law from 1792, about

---

[4] https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1749-51-Mass.-Acts-339.pdf
[5] https://firearmslaw.duke.edu/laws/1749-51-mass-acts-339-an-act-for-preventing-and-suppressing-of-riots-routs-and-unlawful-assemblies-chap-12-%c2%a7-1/

which he erroneously asserts, "As the title makes clear, this was not a statute passed by the North Carolina Legislature." (Cramer Rebuttal, 3, ¶11.) But the title makes clear the opposite point: that it *was* a statute in full force and effect within the state in 1792, as the law is titled "A Collection of Statutes of the Parliament of England **in Force in the State of North Carolina**" [emphasis added]. (See Spitzer Report, Exhibit E) Cramer's quote from Francis Martin (Cramer Rebuttal, 3, ¶11) confirms that it was, in fact, adopted as good law for the state by its state legislature. Martin's words, as quoted by Cramer, say this very thing: "'I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression.'" (Cramer Rebuttal, 3, ¶11.)

Cramer also refers to an 1801 Tennessee law that I cite (Spitzer Report, 13) by saying that it was "a vagrancy law for 'persons of ill fame or suspicious character.'" (Cramer Rebuttal, 4, ¶13.) He notes that the text harkens to earlier English law, thereby somehow suggesting that it was not valid. Again, he fails to understand that this law, regardless of its provenance, was enacted by the Tennessee legislature, and it was therefore in full force and effect in Tennessee. Further, while the act's title does call it a law for "persons of ill fame or suspicious character" (see text below), legislative acts, both then and now, often combine different provisions, some or many of which may address a purpose not mentioned in the title. And here, the title suggests that individuals engaged in the proscribed conduct would have been considered disorderly.  =The Tennessee law below is an exemplar. The relevant portion, Section 6, makes clear that it applies to "*any person or persons* [emphasis added]" (see text below), language that reaches far beyond the narrow categories of "persons" used in the title. This is a common trait for laws in this period (no less than it is today), as this very law illustrates. Section 6 applies to any and all persons in the state, not just the "idle and disorderly" as described in the title:

An Act for the Restraint of Idle and Disorderly Persons § 6. Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.[6]

Cramer then refers to an 1831 Tennessee compilation of laws (Cramer Rebuttal, 4, ¶13 & fn. 11) seemingly to imply that the 1801 Tennessee law does not exist; it does exist, as the citation above demonstrates, and as its inclusion in the compilation of laws shows.

Cramer next quotes my Report (Cramer Rebuttal, 5, ¶ 14)[7] where I summarize the enactment of concealed carry laws by the states: "In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list [of states adopting concealed carry laws]; 3 more did so in the early 1900s." (Spitzer Report, 7.) Cramer then adds, "This is an amazing claim that deserves actual evidence, not just a citation to work by himself and others." (Cramer Rebuttal, 5, ¶ 14.) But this ignores the evidence and citations I cite in support of this fact in the footnote attached at the end of this statement. (See Spitzer Report, 7) Specifically, I cite my own historical article published in an academic journal in 2017, and three Exhibits I attached to my Report that provide the texts and years of each of the concealed carry laws in question. (Spitzer Report, 7, citing Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80 (2017): 63-67; see also Exhibits B, C, and E.)

---

[6] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801.
[7] Cramer has two paragraphs listed as 14 in his report. (Cramer Rebuttal, 5, ¶ 14; 5-6, ¶ 14) I am discussing his first paragraph 14 here.

Cramer then makes the assertion that it is questionable whether the laws I cite to were constitutional. Referring to various carry laws, he states that the "passage of such laws are no more evidence that they were constitutional than laws racially segregating public schools before Brown v. Board of Education (1954) are evidence of the constitutionality of the latter laws." (Cramer Rebuttal, 5, ¶14)[8] But he offers no evidence that the Virginia or North Carolina laws discussed above were declared unconstitutional (and I know of no case that does so).[9]

Cramer then discusses an array of state court cases spanning the twentieth century (and as late as 1990) concerning rulings on the carrying of weapons (Cramer Rebuttal,  5-9, ¶¶14-26) that are not relevant to the laws I discuss, which are all about state and local public policy from the 1600s to the early 1900s.

Cramer next criticizes my quotation of an 1837 Georgia anti-carry law without also mentioning the case of *Nunn v. Georgia* in my report, which was a challenge to that law. (Cramer Rebuttal, 9, ¶ 27.) I am very familiar with the *Nunn* decision, but did not cite the case in my expert report, because the discussion in that report is about state statutory enactment of weapons carrying laws as state-enacted public policy, to demonstrate their prolific and varied nature throughout the country. Moreover, Cramer is mistaken that the 1837 Georgia "law [was] overturned on Second Amendment grounds." (Cramer Rebuttal, 9, ¶27.) Only a portion of the law was overturned.

*Nunn* involved a Georgia man who was prosecuted for carrying a pistol (apparently openly, not concealed). The state law (which is reprinted in full in my Report Exhibit E)

---

[8] This paragraph is the second paragraph 14 in Cramer's Rebuttal.  (Cramer Rebuttal, 5-6, ¶ 14)
[9] Further, laws that enforced racial segregation in public schools and accommodations were upheld by the Supreme Court from the end of the nineteenth century, in *Plessy v. Ferguson* upholding the racial doctrine of "separate but equal" in 1896, until the 1954 *Brown* case.

criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision of the law allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list. Noting the "great vagueness" in the statute's wording, the court reversed the defendant's conviction and wrote that there was a constitutional right to open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State."[10] By contrast, the court upheld the constitutionality of the concealed carry restrictions and noted that those restrictions were enacted "to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*."[11] *Nunn* only overturned the portion of the law that might be construed as restricting the open carrying of weapons. It did not overturn the entire law, as Cramer erroneously says.

Finally, Cramer's assertion that the laws that I have included that were passed after 1868 are "irrelevant" ignores two facts. First, the *Bruen* court said no such thing, as the majority opinion and Justice Barrett's concurrence makes clear. Both emphasized that the relative merits of Founding-era laws versus Reconstruction-era laws was an unresolved question.[12] Second, these laws show the wide array and *sustained* tradition of restrictions on the public carry of weapons, to the end of the nineteenth century.

### III.        CRAMER REBUTTAL - BRANDISHING LAWS

Turning to laws that I discuss concerning regulation of the brandishing and display of weapons, the Cramer declaration fails to recognize the distinction between open weapons carrying restrictions and brandishing and display laws, even though I treat them as separate

---

[10] *Nunn v. State*, 1 Ga. 243, 246, 251(1846).
[11] *Nunn v. State*, 1 Ga. 243, 246 (1846). Italics in original.
[12] *NYSRPA v. Bruen,* 29 and Barrett concurrence.

categories. (See Cramer Rebuttal, 10-13, ¶¶ 30-41.) And while he offers some commentary on brandishing laws, he makes no mention of the second category that I discuss in my Report, weapons display laws. As I discuss in my Report, brandishing laws involve the display of weapons in the presence of others and to do so in a menacing or threatening manner. Weapons display laws criminalize the mere display of weapons in public—that is, they simply can be seen by and in the presence of others in public. (Unlike open carry law restrictions, display laws involve public carry but only come in to play with others present.) Brandishing laws do not punish the carrying of weapons per se, but do punish their public presence when combined with menace or threats. Display laws punish their mere public appearance or wearing in the presence of others. (*Id.*)

Cramer first quotes my discussion of brandishing and display laws where I begin by quoting a 1642 law from New Netherland/New York (Spitzer Report, 11), and then he writes: "[T]he statute 'that no one shall presume to draw a knife much less to wound any person,' prohibits not the open carry of a knife, but drawing it. In conjunction with any threat or hostilities, this would be assault with a deadly weapon under California law. Allowing open carry of a firearm changes this not at all." (Cramer Rebuttal, 10, ¶31.) But I never characterized this 1642 law as "prohibit[ing] the open carrying of a knife." I instead stated that the law "allowed for penalties for merely drawing or displaying a weapon, even if no brandishing or wounding occurred." (Spitzer Report, 11.) Cramer appears to conflate a law restricting open weapons carrying with brandishing/display laws. I treat these as separate categories of laws in my Report, and explain the differences. (See Spitzer Report, 11-16.)

Cramer next criticizes my Report for not citing more of the text of a 1786 Massachusetts law pertaining to thirty or more persons "unlawfully, routously, riotously or tumultuously

assembled." (Cramer Rebuttal, 10, ¶32.) He asserts that I "misrepresented the statute" (*id.*) but I provided the full text of that law in Exhibit E of my Report. Moreover, Cramer's criticism that I misrepresented the law is incorrect. First, the law states:

> if any persons to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff or Deputy-Sheriff of the county, or Constable of the town, shall, among the rioters, or as near to them as he can safely come, command silence while proclamation is making. . . .[13]

A semi-colon appears after the word "weapons," followed by the word "or." That punctuation separates the description of "twelve, or more, being armed with clubs or other weapons," from the text that follows referring to thirty or more people that says nothing about them being armed, but with the added wording of them behaving "unlawfully, routously, riotously or tumultuously assembled." In other words, the law contemplates two sets of misdeeds: the first is twelve or more people armed with clubs or other weapons; the second is thirty or more people (no mention of them being armed) who behave in a riotous manner. Cramer appears to ignore this distinction.

Second, Cramer implies that I take this law to mean that "[b]eing armed was…unlawful." (Cramer Rebuttal, 10, ¶33) Not so, as explained above. (See also Spitzer Report, 11-12.) Third, he fails to acknowledge that in the same paragraph I observe that "other provisions of the act also penalized such groups who also behaved in a threatening manner." (Spitzer Report, 11)

For the portion of my Report (Spitzer Report, 12) that he critiques in paragraph 36 of his declaration, Cramer again argues that he cannot find the statutes—in this case, New Hampshire laws from 1699 and 1708. (Cramer Rebuttal, 11, ¶ 36)  The 1699 law was cited in an amicus

---

[13] 1786 Mass. Sess. Laws 502, §§ 1-2, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof. (Spitzer Report, Exhibit E)

brief submitted by professors of English and American history and law, to the U.S. Supreme

Court in *Bruen*.[14]

This law is nearly identical to the following New Hampshire law from 1701:[15]

New Hampshire - Acts and Laws June 1701:
That every justice of the peace within this province, may cause to be stayed and arrested all affrayers, rioters, disturbers or breakers of the peace, or any other that shall go armed offensively, to put his Majesty's subjects in fear by threatening speeches; and upon view of such justice, confession of the Party, or legal proof of any such offence, the justice may commit him to prison, until he the offender find such sureties as is requited for his good behavior, and cause his arms or weapons to be taken away, and apprized and answered to his Majesty, as forfeited: And may further punish the breach of the peace, in any person that shall smite or strike another by fine to the King, not exceeding twenty shillings, or require bond for their good behavior, and to pay all just costs; as also may make out hue and cry after run-away-servants, thieves, and other criminals.[16]

The New Hampshire 1708 law, which Cramer was unable to find, is as follows:

New Hampshire Public Carry Prohibition (1708)
And every justice of the peace within this province, may cause to be stayed and arrested, all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches : And upon view of such justice, confession of the offender, or legal proof of any such offence, the justice may commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required, according to the aggravations of the offence ; and cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use. And may also punish the breach of the peace in any person, who shall smite, or strike another, by fine to the King, not exceeding twenty shillings ; and require bond with sureties for the peace, till the next court of

---

[14] The brief cites 1699 N.H. Laws 1, and states that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches."  Amicus Brief at 11, available at https://www.supremecourt.gov/DocketPDF/20/20-843/193309/20210921191001002_20-843%20bsacProfessorsOfHistoryAndLaw.pdf. This 1699 law is also cited in *Young v. Hawaii*, 992 F.3d 765, 794-95 (9th Cir. 2021).

[15] It is possible that the aforementioned amicus brief and the *Young v. Hawaii* decision intended to cite the 1701 law.

[16] Available at https://heinonline-org.proxy.wm.edu/HOL/Page?handle=hein.ssl/ssnh0240&id=1&collection=ssl&index=ssl/ssnh

ER-317

general sessions of the peace, or may bind the offender over to answer for said offence at said court, as the nature and circumstances of the offence may require.[17]

In addition, below is a very similar New Hampshire law from 1744:

> New Hampshire - Acts and Laws, 1744, 9-10:[18]
> That if twelve persons or more, being armed with clubs, or other weapons; or that if fifty persons or more, whether armed or not, shall be unlawfully, riotously, tumultuously or routerously assembled, any of the officers aforesaid, shall make a proclamation, in manner and form aforesaid; and if such persons so unlawfully assembled, shall not thereupon immediately disperse themselves, according to said proclamation, each of them, and every one who shall wilfully hinder any such officer (who shall be known, or shall openly declare himself to be such) making the said proclamation, shall forfeit and pay a fine not exceeding the sum of five hundred pounds, at the discretion of the said superior court, (which only shall have cognizance of the offense,) considering the aggravations attending the same, and shall be whipt thirty stripes on the naked back at the publick whipping-post, and suffer twelve months imprisonment, and once every three months, during said twelve months, receive the same number of stripes aforesaid.[19]

Another law that I cite from Massachusetts 1795 that Cramer could not find (Cramer Rebuttal,

12, ¶37), is as follows:

> 1795 Mass. Laws 436, ch. 2, An Act for Repealing an Act, made and passed in the year of our Lord, one Thousand six Hundred and ninety-two, entitled, "An Act for punishing Criminal Offenders," and for reenacting certain provisions therein.
> And it is further enacted by the authority aforesaid, That every Justice of the Peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the Peace, and being of the good behavior; and in want therof, to commit him to prison until he shall comply with such requisition: and may further punish the breach of the Peace in any person that shall

---

[17] New Hampshire 1708, "Laws of New Hampshire," available at https://heinonline.org/HOL/Page?handle=hein.ssl/ssnh0244&id=68&collection=ssl.  Also available at https://firearmslaw.duke.edu/laws/new-hampshire-public-carry-prohibition-1708/
[18] This law was dated by this phrase: "made and passed in the Seventeenth Year of His present Majesty's Reign," which would calculate to be in the reign of King George II (1727-1760) as the year 1744.
[19] Available at https://heinonline-org.proxy.wm.edu/HOL/Print?collection=ssl&handle=hein.ssl/ssnh0244&id=10.

assault or strike another, by fine to the Commonwealth, not exceeding twenty shillings, and require sureties as aforesaid, or bind the offender, to appear and answer for his offence, at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require.[20]

Thus, Cramer's implied assertions that the many laws I reference do not exist are plainly wrong.

Next, Cramer references a Maine 1821 law I cite that, as I describe in my Report, outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens."[21] (Spitzer Report, 13.) Cramer asserts that the law "is not a ban on open carry" (Cramer Rebuttal, 12, ¶39)—but I do not represent that it is a ban on open carry. It is a brandishing law, as I plainly state. (Spitzer Report, 13-14.)

Cramer again makes this statement about my general examination of brandishing and display laws in my Report: "Somehow, Spitzer imagines that these brandishing laws prohibited open carry." (Cramer Rebuttal, 13, ¶41.) Even a casual reading of my Report shows that I make no such claim. As is clear from my Report, I treat brandishing laws in a category separate from, but nevertheless related to, open carry prohibitions, just as display laws are. (See above; Spitzer Report, Part II, Weapons Carrying, 6-11; Part III, Brandishing and Display, 11-17.)

Cramer also notes that I include in my tabulation of licensing laws those pertaining to enslaved persons and free Blacks but objects to my inclusion of them, calling the laws' inclusion "an odd defense of a law today." (Cramer Rebuttal, 13, ¶43.) Such laws are abhorrent, but we cannot and should not ignore them when reviewing licensing laws because they are part of the history and tradition of arms regulation. And contrary to Cramer's assertion, licensing laws

---

[20] 1795 Mass. Laws 436, ch. 2. Available at https://firearmslaw.duke.edu/laws/1795-mass-laws-436-ch-2-an-act-for-repealing-an-act-made-and-passed-in-the-year-of-our-lord-on-ethousand-six-hundred-and-ninty-two-entitled-an-act-for-punishing-criminal-offenders-and-for-r/
[21] 1821 Me. Laws 285, ch. 76, § 1.

13

actually allowed African Americans to carry weapons in the pre-Civil War period subject to the issuance of a license to do so; 18 such laws were enacted by Southern and border states, out of a total of 266 licensing laws in all categories. (See Spitzer Report, Exhibit G.). That is, race-based licensing laws comprise about 6.8% of all licensing laws.

## IV. CRAMER REBUTTAL - CONCLUSION

Finally, the conclusions in Cramer's final Summary are each incorrect. (Cramer Rebuttal, 14, ¶¶46-48.) As the above discussion shows, the laws I cited did indeed exist, even if he was unable to locate them himself. He repeats his error of not understanding the distinction between various types of carry law restrictions (open carry, concealed carry, any gun carrying), which I discussed in Part II of my Report, and brandishing/display laws, which I discussed separately in Part III of my Report. In sum, the Cramer declaration contains numerous critical errors and misstatements (as well as ad hominem attacks), including misrepresentations, and even invention, of statements that I made in my Report. These problems reflect a misunderstanding of historical constitutional law and of early lawmaking.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on August 3, 2023, at Williamsburg, Virginia

/s/ Robert Spitzer

Robert Spitzer

14

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Rob Bonta**          No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>October 13, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF ROBERT J. SPITZER

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 13, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |



1 ROB BONTA, State Bar No. 202668
Attorney General of California
2 MARK R. BECKINGTON, State Bar No. 126009
Supervising Deputy Attorney General
3 LARA HADDAD, State Bar No. 319630
Deputy Attorney General
4   300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
5   Telephone:  (213) 269-6250
  Fax:  (916) 731-2124
6   E-mail:  Lara.Haddad@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his*
7 *official capacity as Attorney General of*
*California*

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13 **MARK BAIRD and RICHARD**                    2:19-cv-00617-KJM-AC
**GALLARDO,**
14                                              **SUR-REBUTTAL REPORT AND**
                                   Plaintiffs,   **DECLARATION OF SAUL CORNELL**
15
                                                Date:
16            **v.**                             Time:
                                                Courtroom:
17 **ROB BONTA, in his official capacity as**    Judge:
**Attorney General of the State of California,** Trial Date:
18 **and DOES 1-10,**                            Action Filed:   April 10, 2019

19                                Defendants.

20

21

22

23

24

25

26

27

28

                                        1

**SUR-REBUTTAL REPORT AND DECLARATION OF SAUL CORNELL**

1.      I previously submitted an updated declaration and expert report in this matter, signed on June 8, 2023.  I am submitting this sur-rebuttal expert report and declaration to address the rebuttal report prepared by Clayton Cramer attached as Exhibit 3 to his declaration, signed on July 14, 2023.

**OPINIONS**

2.      Everything that I stated in my previous report is true and accurate to the best of my knowledge.  Mr. Cramer asserts that I have made "multiple errors" in my report (Cramer Rebuttal, ¶ 1.)  That assertion, itself, erroneous.

3.      At paragraphs 7 and 8, Cramer takes issue with my assertion that the Founding-era states adopted multiple aspects of English common law.  He concludes that if a right was codified in a state constitution, then all aspects of the common law were effectively nullified. No serious scholar would make such a claim.   For example, the codification of the First Amendment did not wipe traditional English views of libel law from the books, as the controversy over the Alien and Sedition Acts demonstrates.[1] Historically, states did not have to choose between adopting the common law in toto or abandoning the common law.

4.      At paragraph 11, Cramer challenges a case that I cite, *Commonwealth v. Leach*, 1 Mass. 59 (1804), arguing that only some parts of the English common law were adopted by Massachusetts law.  But this was exactly my point. In particular, the case I cite discussed the continuity between the powers of the justice of peace under common law and the powers they enjoyed under Massachusetts law.

5.      At paragraph 13, Cramer asserts that I have attributed the carryover of English law in 1776 to only three sources, and that I do not understand those sources.  But what I discuss in my report are examples of the way aspects of the common law were absorbed at the Founding.

---

[1]  See Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246,254 (2017). ("Federalists in the late 1790s, for instance, typically invoked the English common law to defend the constitutionality of sedition prosecutions, while many Republicans appealed to practical experience and common sense to reach the opposite conclusion.")

2

1    Additional evidence of this is in the scholarly citations in my report, which Cramer does not

2    acknowledge. Nor does he acknowledge the voluminous scholarly literature on the influence of

3    the common law on early American legal development.[2]

4         6.    In general, Cramer assumes that absorption of the common law was a simple either-or

5    choice: either total incorporation of the common law or none. But at paragraph 15, Cramer

6    himself cites to a 1795 case that acknowledges that English law is "from whence most of our

7    legal principles and legislative notions are derived."  His view is inconsistent with the last century

8    of legal scholarship; it should not be credited.

9         7.    At paragraph 18, Cramer asserts that Blackstone, in Commentaries on the Laws of

10   England, "listed the absolute rights that every Englishman enjoyed," but failed to include the

11   peace as a basic right. However, the passage he quotes discussed retained *natural* rights.  The

12   "peace" was by definition not a retained natural right.  Only by parting with part of natural

13   liberty, could one acquire the benefits of living in civil society under the rule of law.[3]

14   Preservation of the peace was only possible once one left the state of nature and created political

15   society.[4] This is one of the most basic legal and constitutional ideas from the Founding era.

16        8.    At paragraph 23, Cramer asserts that if I believe in "popular sovereignty," I would

17   end up defending laws permitting segregation, discrimination, and the like.  I have never made

18   any of these claims—I opined instead on what Founding era laws meant at the time they were

19   passed.  Cramer's speculation about the legal consequences of applying Founding era law to the

20   modern world is a legal question and not one not within the purview of historians.

21   ───────────
     [2] Lauren Benton & Kathryn Walker*, Law for the Empire: The Common Law in Colonial America
22   and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014); Bernadette Meyler,
     *Towards a Common Law Originalism* 59 STANFORD LAW REVIEW 551 (2006).
23   [3]  William Blackstone observed that  "every man, when he enters into society, gives up a part of
     his natural liberty," 9. 1 WILLIAM BLACKSTONE, COMMENTARIES *125.  Gouverneur
24   Morris, Political Enquiries, ("Natural Liberty absolutely excludes the Idea of political Liberty
     since it implies in every man the Right to do what he pleases. So long, therefore, as it exists
25   Society cannot be established. And when Society is established natural Liberty must cease. It
     must be restricted" http://press-pubs.uchicago.edu/founders/documents/v1ch16s8.html
26        [4] Blackstone's makes this point expressly in his discussion of the advantages of civil
     society over the state of nature:  "For the principal aim of society is to protect individuals in the
27   enjoyment of those absolute rights, which were vested in them by the immutable laws of nature;
     but which could not be preserved in peace without that mutual assistance and intercourse, which
28   is gained by the institution of friendly and social communities." 1 COMMENTARIES *119-123.

3

ER-324

9.      At paragraph 26, Cramer cites to *Heller* to dispute my statement that the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. But in <u>Federalist 29</u>, Hamilton wrote: "If a well-regulated militia be the most natural defense of a free country, it ought certainly to be under the regulation and at the disposal of that body which is constituted the guardian of the national security."[5]

10.      Over several paragraphs, Cramer engages in hyperbolic argument regarding my reasoning, again asserting that taking my statements to their conclusion would result in support for laws permitting discrimination and the like.  (See Cramer Rebuttal, ¶¶ 29-30.)  This is not historical argument and does not rebut any of my historical points.  Nor is he stating claims that I have made or support.

11.      At paragraph 46, Cramer makes an argument about modern day gun violence to rebut my claims and Randolph Roth's research, on which I rely.  Cramer appears to believe that evidence he cites showing low levels of gun violence in modern-day portions of America challenges Roth's evidence about low levels of gun violence in 1791.  This is not only illogical, it also does not undermine Roth's research or the statements I make in reliance on that research.

12.      At paragraphs 46 and 47, Cramer contends that there was a civilian market for pistols before the Revolution.  However, he ignores my citation to the work of Kevin Sweeney documenting low levels of pistol ownership at the time that the Second Amendment passed.  I never stated that there was "no market" for pistols: I pointed out that ten percent of the arms owned by American were pistols at the time of the Second Amendment's ratification.  (Cornell, 12.)Moreover, his impressionistic use of newspaper citations does not conform to accepted historical practice, which requires greater quantitative rigor.

13.      At paragraph 59, Cramer contends that I claimed that there was a scarcity of pistols outside of those used by the elite for dueling.  My claim was not that duels were the only use, but that in general there was little utility for pistols in a largely rural and agrarian society.  (Cornell,

---

[5] See Alexander Hamilton, *Federalist No. 29*, https://avalon.law.yale.edu/18th_century/ fed29.asp.

4

12.) He does not challenge the fact that 90% of guns at this time were long guns, a fact that underscores my point about the utility of pistols in 1791.  (Cornell, 13.)

14.   At paragraph 74, Cramer states that I take a view of "the nearly unlimited authority of the state," and logically this would somehow lead the state to justify criminalization of sodomy and divorce.  Not only do I not assert this, but this is speculation about modern legal applications of claims about eighteenth century law. Such claims are not only speculative, but are they are not historical at all.  Cramer's speculations are not based on any sound historical method.

Sur-Rebuttal Report and Declaration of Saul Cornell  (2:19-cv-00617-KJM-AC)

1        I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct to the best of my knowledge.

3

4        Executed on August 4, 2023, at Redding, CT.

5

6                      Dr. Saul Cornell

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sur-Rebuttal Report and Declaration of Saul Cornell  (2:19-cv-00617-KJM-AC)

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Rob Bonta**          No.     **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>October 13, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## SUR-REBUTTAL EXPERT REPORT AND DECLARATION OF SAUL CORNELL

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 13, 2023</u>, at Los Angeles, California.


|                      |                      |
|----------------------|----------------------|
| Lara Haddad          | *Lara Haddad*        |
| Declarant            | Signature            |

1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  LARA HADDAD, State Bar No. 319630
   Deputy Attorney General
4    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
5    Telephone:  (213) 269-6250
     Fax:  (916) 731-2124
6    E-mail:  Lara.Haddad@doj.ca.gov
   *Attorneys for Defendant Rob Bonta in his official*
7  *capacity as Attorney General of California*

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **MARK BAIRD and RICHARD**            2:19-cv-00617-KJM-AC
    **GALLARDO,**
14                                         **DECLARATION OF LARA HADDAD IN**
                            Plaintiffs,    **SUPPORT OF DEFENDANT'S**
                                           **COMBINED OPPOSITION TO**
15         v.                              **PLAINTIFFS' MOTION FOR**
                                           **SUMMARY JUDGMENT AND REPLY**
16                                         **IN SUPPORT OF DEFENDANT'S**
    **ROB BONTA, in his official capacity as**  **MOTION FOR SUMMARY JUDGMENT**
17  **Attorney General of the State of California,**
    **and DOES 1-10,**                     Date:        November 3, 2023
18                                         Time:        10:00 a.m.
                            Defendants.    Courtroom:   3
19                                         Judge:       Hon. Kimberly J. Mueller
                                           Trial Date:  None set.
20                                         Action Filed: April 10, 2019

21

22

23

24

25

26

27

28

                                    1

I, Lara Haddad, hereby declare and state the following:

1.      I am a Deputy Attorney General at the California Department of Justice and serve as counsel to Defendant Rob Bonta, in his official capacity as Attorney General of the State of California ("Defendant"), in the above-titled matter.  I make this declaration in support of Defendant's Motion for Summary Judgment.  Unless otherwise stated, I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2.      On June 9, 2023, which was the deadline for expert disclosures set by this Court, I served expert disclosures and accompanying reports on Plaintiffs' counsel, by email.  These included reports from Dr. Brennan Rivas, Dr. Robert Spitzer, and Dr. Saul Cornell (in addition to a report from Police Chief Kim Raney).  *See* ECF 90-5, ECF 90-6, ECF 90-7, and ECF 90-8. Plaintiffs did not serve their own expert reports.

3.      On July 14, 2023, Plaintiffs' counsel served rebuttal expert disclosures which included a declaration with expert rebuttal reports from Clayton Cramer.  A true and accurate copy of the email from Plaintiffs' counsel attaching the rebuttal expert disclosures is attached as Exhibit 1.  A true and accurate copy of the rebuttal declarations and reports that she served as one document, is attached as Exhibit 2.

4.      On August 4, 2023, I served sur-rebuttal reports responding and rebutting Mr. Cramer's rebuttal reports.  *See* Sur-Rebuttal Reports of Dr. Brennan Rivas, Dr. Robert Spitzer, and Dr. Saul Cornell.

5.      On September 29, 2023, Plaintiffs filed their cross-motion for summary judgment and opposition to Defendant's motion for summary judgment.  This included an expert declaration and attached reports from Mr. Clayton Cramer, to rebut the reports of Dr. Rivas, Dr. Spitzer, and Dr. Cornell.  *See* ECF 96-3.  I reviewed the declaration and reports, and realized that they were different than what had been served on July 14, 2023.  They do not include many of the same arguments Mr. Cramer had raised in his July 14 declaration and reports, and instead raises new arguments that had not previously been raised.  For example, his previous expert report devoted nine pages to the discussion of Dr. Spitzer's analysis of concealed weapons regulations.  Ex. 2 at pp. 43-51.  His newly-filed report only contains one page of discussion.  ECF 96-3 at 14.

2

1     I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3     Executed on October 13, 2023, at Los Angeles, California.

4

5                                                   */s/ Lara Haddad*
                                                    Lara Haddad
6                                                   Deputy Attorney General

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

**Lara Haddad**

| | |
|---|---|
| **From:** | Amy L. Bellantoni <abell@bellantoni-law.com> |
| **Sent:** | Friday, July 14, 2023 4:49 PM |
| **To:** | Lara Haddad |
| **Cc:** | Mark Beckington |
| **Subject:** | RE: Baird v. Bonta |
| **Attachments:** | 2023 Plaintiffs' Expert Disclosures.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

---

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Lara,

Thank you, I believe the August 18 would be the correct date for service of the summary judgment motions. Is that the date that you are intending to file/serve the State's motion?

Also please find attached hereto the plaintiffs' Expert Disclosures in rebuttal.

Amy



This Electronic Mail transmission and any attachments contain information belonging to the sender and such transmission is confidential and legally privileged.  This information is intended only for the intended recipient of this transmission.  If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please reply to the sender at the telephone number above or return e-mail and delete this message and all attachments from your electronic storage files.
=========================================================================

**From:** Lara Haddad <Lara.Haddad@doj.ca.gov>
**Sent:** Monday, July 3, 2023 1:45 PM
**To:** Amy L. Bellantoni <abell@bellantoni-law.com>
**Cc:** Mark Beckington <Mark.Beckington@doj.ca.gov>
**Subject:** RE: Baird v. Bonta

Amy,

Thanks very much for reaching out.  The district court's minute order on 11/4/2022 (ECF 77) states that all dispositive motions must be heard by September 22, 2023.  The local rules provide for at least 35 days' notice; I calculate August 18 as the last day by which the parties can file any motion for summary judgment.

Please let us know if you have a different understanding.

Thank you,

Lara

Lara Haddad
Deputy Attorney General
Government Law Section
California Department of Justice
Tel.: (213) 269-6250
Fax: (213) 897-5775
Lara.Haddad@doj.ca.gov

---

**From:** Amy L. Bellantoni <abell@bellantoni-law.com>
**Sent:** Friday, June 30, 2023 2:06 PM
**To:** Lara Haddad <Lara.Haddad@doj.ca.gov>
**Subject:** Baird v. Bonta

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Lara,

For scheduling (and planning) purposes, on what date will you be filing your summary judgment motion?



This Electronic Mail transmission and any attachments contain information belonging to the sender and such transmission is confidential and legally privileged.  This information is intended only for the intended recipient of this transmission.  If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited.  If you have received this transmission in error, please reply to the sender at the telephone number above or return e-mail and delete this message and all attachments from your electronic storage files.

========================================================================

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

EXHIBIT 2

COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
Telephone: 914-367-0090
Facsimile:  888-763-9761
*Pro Hac Vice*

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

-------------------------------------------------------x

MARK BAIRD and                           Case No.: 2:19-cv-00617-KJM-AC
RICHARD GALLARDO,

              Plaintiffs,

      v.                            **PLAINTIFFS' EXPERT DISCLOSURES**
                                         **PURSUANT TO FRCP 26(a),(b)**.

ROB BONTA, in his official capacity
as Attorney General of the State of California,

              Defendant.

-------------------------------------------------------x

Plaintiffs make the following expert disclosures pursuant to and consistent with the requirements of Federal Rule of Civil Procedure 26(a) and (b).

The expert declaration of Clayton Cramer with accompanying written expert report is annexed hereto as Exhibit 1.[1]

The curriculum vitae of Clayton Cramer is annexed hereto as Exhibit 2.

The expert declaration of Charles "Chuck" Haggard with accompanying written expert

---

[1] Plaintiffs also intend to rely on the testimony taken at the defendant's deposition of Clayton Cramer on October 20, 2021.

1  report and curriculum vitae is annexed hereto as Exhibit 3.[2]

2  Dated:  July 14, 2023

3

4                                              THE BELLANTONI LAW FIRM, PLLC

5                                              ___/s/ Amy L. Bellantoni, Esq._____
                                               Amy L. Bellantoni
6                                              *Attorney for Plaintiffs*
                                               *Pro Hac Vice*
7                                              Email: abell@bellantoni-law.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                2

26

27  _____
    [2] Plaintiffs also intend to rely on the testimony taken at the defendant's deposition of Charles "Chuck" Haggard on
28  October 19, 2021.

PLAINTIFFS' EXPERT DISCLOSURES PURSUANT TO FRCP(a)(2)

# EXHIBIT   1

1  COSCA LAW CORPORATION
   CHRIS COSCA   SBN 144546
2  1007 7th Street, Suite 210
3  Sacramento, CA 95814
   916-440-1010
4
5  AMY L. BELLANTONI
   THE BELLANTONI LAW FIRM, PLLC
6  2 Overhill Road, Suite 400
   Scarsdale, NY 10583
7  Telephone: 914-367-0090
   Facsimile:  888-763-9761
8  *Pro Hac Vice*

9  Attorneys for Plaintiffs

10
                    **UNITED STATES DISTRICT COURT**
11
                   **EASTERN DISTRICT OF CALIFORNIA**
12

13
   MARK BAIRD and                       Case No. 2:19-CV-00617
14 RICHARD GALLARDO,

15
                 Plaintiffs,            **EXPERT DECLARATION AND REPORT**
16                                      **OF CLAYTON CRAMER IN REBUTTAL**
          v.
17                                      Judge:      Hon. Kimberly J. Mueller
   ROB BONTA, in his official capacity as   Room:       3
18 Attorney General of the State of California,
   and DOES 1-10,                       Trial Date:  None set
19                                      Action Filed:  April 9, 2019

20               Defendants.

21

22

23

24

25

26

27

28
                                        1

         EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

# DECLARATION OF CLAYTON CRAMER

I, Clayton Cramer, declare pursuant to 28 U.S.C. § 1746 that:

1.      I have been asked to offer an expert opinion in the above-entitled case in rebuttal to the expert reports and declarations of Brennan Rivas, Robert J. Spitzer, and Saul Cornell proffered by Defendant Rob Bonta.

2.      I have personal knowledge of each fact stated in this declaration, and if called as a witness I could and would testify competently thereto.

3.      · Attached hereto as Exhibit 1 is my expert rebuttal to the report of Brennan Rivas.

4.      Attached hereto as Exhibit 2 is my expert rebuttal to the report of Robert J. Spitzer.

5.      Attached hereto as Exhibit 3 is my expert rebuttal to the report of Saul Cornell.

## I. BACKGROUND AND QUALIFICATIONS

6.      I attended Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

7.      I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

8.      I am employed by College of Western Idaho where I teach history.

9.      My publications include:

- *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press, 2018;
- *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;
- *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;
- *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;
- "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;
- *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;

2

---

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

- *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;
- *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;
- *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;
- *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;
- *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, Editor, Library Research Associates, Inc., 1990.

10.     My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesiles' book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reversed the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesiles resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

## II. MATERIALS REVIEWED

11.     I have reviewed the following documents in connection with this matter, which were provided to me by counsel for the plaintiffs: the complaints, preliminary injunction submissions, and the Expert Declarations and Reports of Brennan Rivas, Robert J. Spitzer, and Saul Cornell.

12.     In addition to the above documents, I have also relied upon materials cited within the text of this Declaration and the exhibits annexed hereto.

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

III.   OPINIONS

13.   Plaintiffs' counsel has asked me to provide an opinion on the accuracy of the historical representations declared in the aforementioned expert reports.

14.   I have identified errors and omissions of fact as set forth herein.

15.   I am being compensated at a rate of $75 per hour for my time in the above-captioned matter. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 14, 2023

Clayton Cramer

4

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER IN REBUTTAL

**Exhibit 1 the Declaration of Cramer Clayton**

Cases

Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840). ................................... 22

Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822). ........................................................ 21

Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892)........................................ 2

Cockrum v. State, 24 Tex. 394, 396 (1859) ............................................................. 16

Cockrum v. State, 24 Tex. 394, 403 (1859). ............................................................ 3

Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891) ...................................... 2

Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882)................................. 27

District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008). ...................................... 16

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857) .................................................... 25

English v. State, 35 Tex. 473, 476 (Tex. 1872) ......................................................... 3

Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876) ........................................... 25

Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876) ................................................... 4

Holland v. State, 33 Ark. 560, 561 (1878) ............................................................... 27

In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902) ................... 28

New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022). ............... 10

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022) ........... 28

New York v. Miln, 36 U.S. 102, 103 (1837). ............................................................. 17

Nunn v. State, 1 Ga. 243 (1846)...................................................................... 8, 21

Nunn v. State, 1 Ga. 243, 248 (1846)..................................................................... 5

Owen v. State, 31 Ala. 387, 388, 389 (1858). ......................................................... 22

Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871) ........................................... 25

Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833)................................................ 22

i

Smith v. State, 11 La. An. 633, 634 (1856) ................................................... 24

*State* v. *Chandler*, 5 La. An. 489, 490, 491 (1850) ..................................... 24

State v. Chandler, 5 La. An. 489, 491 (1850) ................................................ 23

State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850) ................... 3

State v. Duke, 42 Tex. 455, 458 (1875) ........................................................... 8

State v. Duke, 42 Tex. 455, 458, 459 (1875) ................................................... 8

State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893) ..................... 2

State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843) .......... 23

State v. Jumel, 13 La. An. 399, 400 (1858) ................................................... 24

State v. Mitchell, 3 Blackford 229 (Ind. 1833) ............................................. 21

State v. Reid, 1 Ala. 612 (1840) .................................................................... 21

State v. Reid, 1 Ala. 612, 615, 616, 617 (1840) .............................................. 8

State v. Wilburn, 7 Tenn. 61 (1872). ............................................................ 20

Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878) .................... 26

### Statutes

1 Ohio Stats. Ch. 6 § 6 (1833) ........................................................................ 5

1 Penn. Penal Code 207 n.1 (1883) ................................................................. 2

1871 Tex. Laws ch. 34. .................................................................................. 14

Black Code Of The District Of Columbia 11 (1848) ....................................... 5

Cal. Laws ch. 385 (1863). ............................................................................... 4

Fla. Acts ch. 75 § 3 (1846). .......................................................................... 10

Ga. Acts 90-91 (1838) .................................................................................... 5

ii

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in
Force in this State: From the Year 1715 to the Year 1820 ch. 22 § 6 at 710 (1801). .................. 9

Laws of Maryland Ch. 44, § 32 (1715).................................................................................... 5

Louisiana Terr. Laws ch. 1 § 6 (1804) .................................................................................... 5

State v. Reams, 27 S.E. 1004 (N.C. 1897) ............................................................................ 18

Va. Acts ch. 101 § 1 (1838)................................................................................................. 10

Va. Laws ch. 41, § 8 (1792). ................................................................................................ 6

### Other Authorities

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg,
London, circa 1781-87, Bonham's,..........................................................................11

Antique Pepperbox Pistol 1850's Washington Arms Co,............................................................ 12

Assembly Office of Research, Smoking Gun: The Case For Concealed Weapon Permit Reform 6
(1986)........................................................................................................................... 4

Bill Barring Loaded Weapons In Public Clears Senate 29-7, Sacramento Bee, Jul. 27, 1967, A6. 4

Capitol Is Invaded, Sacramento Bee, May 2, 1967, A1, A10 ....................................................... 4

Colonel Bowie and His Knife, 2 Temple Bar 124 (Jul. 1861) ...................................................... 9

Concealed Weapons, 8:4 *Criminal Law Magazine and Reporter* 409, 412 (Oct. 1886). ............. 18

David A. Hounshell, From the American System to Mass Production 1800-1932: The
Development of Manufacturing Technology in the United States 47 (1984). .......................... 14

English Transitional Pepperbox Revolver, Forgotten Weapons,................................................... 12

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker,
Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates
....................................................................................................................................11

iii

Immigration and Nationality Act (104th Cong., 1st sess.) 581 (10th ed. May 1995)...................... 6

James E. Serven, Colt Firearms: 1846-1954 13, 30 (1954). ......................................................... 14

Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, Characteristics of Persons with
    Severe Mental Illness Who Have Been Incarcerated for Murder, 36 J. Am. Acad. Psychiatry &
    Law 82 (2008).................................................................................................................. 17

Philip J. Cook, Jens Ludwig, and Anthony Braga, Criminal Records of Homicide Offenders,
    294(5) JAMA 598-601 (Sep. 2005). ...................................................................................... 17

Pollard's History of Firearms 114 (1983). ...................................................................................11

Raymond L. Cohn, Mass Migration Under Sail: European Immigration to the Antebellum United
    States 15 (2009). .............................................................................................................. 16

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec.
    22, 1838, 1....................................................................................................................... 12

Studies in History, Economics, And Public Law 20 (1899) .......................................................... 7

The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to
    Use It iii (1875).................................................................................................................. 16

# Rivas Rebuttal

1.  My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.  In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

## I. Deadly Weapons

3. Rivas at pp. 4-5 claims that there was a distinction between deadly weapons and "hunting knives, rifles, muskets, and shotguns."  Even her n.1 on p. 5 admits that "There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols…" She then gives what she considers an exceptional case that established "a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." The phrase "other firearm" is pretty general, and would include all "rifles, muskets, and shotguns."  The supposed exceptions are *not* exceptions.  There is no shortage of laws that include firearms of all types in a list of deadly weapons to be regulated.

1

Act 10 April, 1873, Sec. 1, P. L., 659. -Any person within the limits of the county of Northampton, who shall carry *any firearms*, slung- shot, dirk-knife, or other deadly weapon, concealed upon his person, with intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed. guilty of a misdemeanor…[1] [emphasis added]

Act 18 March, 1875, Sec. 1, P. L., 33.-Any person within this Commonwealth who shall carry *any firearms*, slung-shot, hand-billy, dirk-knife, razor, or other deadly weapon, concealed upon his person, with the intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed guilty of a misdemeanor…[2] [emphasis added]

4. State supreme court decisions are also at variance with Dr. Rivas' supposed distinction:

"It is not questioned but *a loaded rifle is a deadly weapon*. In this case a rifle was used."[3]  A

Kentucky Supreme Court decision decided that a rock was a *deadly weapon* as would a shot-gun*:*

The statute does not say what shall constitute a deadly weapon. It merely punishes for a wilful and malicious wounding with one. If one man maliciously wounds another with a rock, with which he might have killed him, there exists no reason why the same punishment should not be meted out to him *as if he had done it with a shot-gun*; and undoubtedly the Legislature, in enacting this statute, so intended.[4] [emphasis added]

The offense of which appellant was convicted and sentenced to the penitentiary for four years is maliciously beating and wounding Charles Brown with a car coupling-pin, a deadly weapon, with intention to kill him.[5]

5. Rivas' claim is so counterlogical that citing hundreds of statutes and decisions seems

unnecessary.  A search of the phrase "deadly weapons" in published 19th century books and cases

rapidly demonstrates that the term did not have such a precise meaning.

6. There *were* distinctions by weapons type in 19th century law but not such a simple

distinction as Rivas claims on p. 3: "Nineteenth-century public carry laws explicitly prohibited

concealed weapons because the primary mode of carrying bowie knives, pocket pistols, brass

knuckles, and other deadly weapons was concealed in one's pocket."  Decisions repeatedly

accepted the constitutionality of bans on concealed carry of a variety of weapons because those

laws banned only *concealed* carry and left open carry legal:

---

[1] 1 Penn. Penal Code 207 n.1 (1883).
[2] Id.
[3] State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893).
[4] Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891).
[5] Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892).

2

The act of the 25th of March, 1813, makes it a misdemeanor to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full view." This law became absolutely necessary counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. *It interfered with no man's right to carry arms (to use its words) "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.[6] [emphasis added]

7. When the Texas Supreme Court heard a challenge to a sentence enhancement law for manslaughter committed with a Bowie-knife, the question of whether it was concealed or openly carried was not relevant: "The right to carry a bowie-knife for lawful defense is secured, and must be admitted. It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill."[7]

8. There were distinctions similar to Rivas' but I doubt California wishes to follow that tangent. The Texas Supreme Court a few years later decided that:

The word "arms" "in the connection we find it in the Constitution of the United States, *refers to the arms of a militiaman or soldier*, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.[8] [emphasis added]

9. The Arkansas Supreme Court similarly defined arms as "arms as are *used for purposes of war*; and does not prevent the legislature from prohibiting the wearing of such weapons as are not used in civilized warfare…"[9]  If California wishes to argue that the Second Amendment protects possession and carry of weapons of war, go for it!

10. Regardless, Rivas' attempt to distinguish handguns from long guns as protected arms is a waste of time.  Handguns as protected arms left the station with D.C. v. Heller; denying a right carry them was the train whistle of Bruen.

---

[6] State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850)
[7] Cockrum v. State, 24 Tex. 394, 403 (1859).
[8] English v. State, 35 Tex. 473, 476 (Tex. 1872).
[9] Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876).

11. Rivas at p. 4 seeks to establish that open carry was restricted by California law in the 19th century:

> Public carry laws, for both concealed weapons and the open-carry of weapons, have often reserved special exemptions for "travelers" as defined under state law, reinforcing the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century.

12. The problem with this argument is that the "travelers" exemption appeared in California's 1863 ban on *concealed* carry of deadly weapons:

> Section 1.  Every person, not being a peace officer or *traveller*, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars.

> Sec. 2.  Such persons, and no others, *shall be deemed travellers within the meaning of this Act, as may be actually engaged in making a journey at the time.*[10] [emphasis added]

13. California imposed no ban on open carry of loaded firearms in cities until 1967.  The legislature passed the ban in response to a series of confrontations between Oakland Police and the Black Panthers.  The Panthers attending a State Senate hearing carrying loaded shotguns and pistols certainly sped up the debate.[11]

14. Rivas asserts on p. 6 that:

> The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.

15. Yet her following quote claims that "prohibited weapons… were not to be carried upon the person or concealed."  Few states attempted to ban possession of deadly weapons in one's home and only a few banned open carry.  One that did was Georgia's 1837 law that prohibited sale

---

[10] Cal. Laws ch. 385 (1863).
[11] Assembly Office of Research, *Smoking Gun: The Case For Concealed Weapon Permit Reform 6* (1986); *Capitol Is Invaded*, SACRAMENTO BEE, May 2, 1967, A1, A10; *Bill Barring Loaded Weapons In Public Clears Senate 29-7*, SACRAMENTO BEE, Jul. 27, 1967, A6.

4

of pocket pistols; the Georgia Supreme Court overturned it as contrary to the Second Amendment.[12]

16. The act which Nunn overturned was also quite explicit that it only prohibited *concealed* carry: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view."[13] [emphasis in original]

17. Few states until the 20th century prohibited open carry of pistols or most other *deadly weapons*. The laws that prohibited carry either banned concealed carry or banned carrying a weapon while committing some other criminal act. Two examples of laws banning being armed while committing another crime. Ohio (1833):

> Burglary with theft…. If the person or persons *so breaking and entering any dwelling-house*, shop , store or vessel and violence, as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or *shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention*…[14] [emphasis added]

18. Louisiana Territory (1804):

> If any person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall actually steal and purloin therefrom any money, goods or chattels and shall commit or attempt to commit any personal abuse, force or violence, or *shall be so armed with any dangerous weapon or weapons*, or clearly to indicate a violent intention …[15] [emphasis added]

19. One set of laws that broadly prohibited possession or carry were explicitly aimed at slaves and free blacks:

> No negro or other slave within this province shall be permitted to carry any gun or any other offensive weapon from off their master's land, without license from their said master, and if any negro or other slave shall presume to do so, he shall be liable to be carried before a Justice of the Peace and be whipped, and his gun or other offensive weapon shall be forfeited to him that shall seize the same and carry such negro so offending before a Justice of the Peace.[16]

---

[12] Nunn v. State, 1 Ga. 243, 248 (1846).
[13] Ga. Acts 90-91 (1838).
[14] 1 Ohio Stats. Ch. 6 § 6 (1833).
[15] Louisiana Terr. Laws ch. 1 § 6 (1804).
[16] Laws of Maryland Ch. 44, § 32 (1715) quoted in BLACK CODE OF THE DISTRICT OF COLUMBIA 11 (1848).

> No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive…[17]

The 13th and 14th Amendments preclude such laws today.

20. On p. 4: "A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem."  Rose in tandem?  Which caused which?  The normal response of people who feel as though they are at risk is to arm for self-defense.  Establishing the direction of causality for two events except in a controlled laboratory environment is difficult.  When Rivas says a "series of socio-economic and political factors," she really should say, "A huge number of social changes took place simultaneously, and which ones might be factors in rising violent crime rates is uncertain."  The 19th century had many major social changes that likely contributed to rising violent crime rates.  Large-scale immigration is the most obvious:

> The mass migration of the 19th century was the result of a near perfect match between the needs of a new country and overcrowded Europe. Europe at this time was undergoing drastic social change and economic reorganization, severely compounded by overpopulation. An extraordinary increase in population coincided with the breakup of the old agricultural order which had been in place since medieval times throughout much of Europe. Commonly held lands were broken up into individually owned farms, resulting in landless status for peasants from Ireland to Russia. At approximately the same time, the industrial revolution was underway, moving from Great Britain to Western Europe, and then to Southern and Eastern Europe. *For Germany, Sweden, Russia, and Japan, the highest points of emigration coincided with the beginnings of industrialization and the ensuing general disruption of employment patterns.* The artisans joined the peasants evicted from their land as immigrants to the United States. Population pressure and related economic problems, sometimes in the extreme form of famine, are generally cited as being the major causes of the mass migration of this long period, followed by religious persecution and the desire for political freedom.[18] [emphasis added]

20. America was also changing from a nation of small towns to one of big cities:

> The urban population is defined in the United States census reports as the population of cities or towns having at least 8,000 inhabitants. Table II, column 3, shows the growth of the urban population from 210,873 persons residing in six cities in 1800 , to 18,284,385 inhabitants of 448

---

[17] Va. Laws ch. 41, § 8 (1792).

[18] IMMIGRATION AND NATIONALITY ACT (104th Cong., 1st sess.) 581 (10th ed. May 1995).

6

cities in 1890. That is, the urban population has increased eighty-seven fold in the century, while the population of the entire country has increased only twelve-fold.[19]

21. The transition from largely self-employed farmers and craftsmen to employees is another obvious factor, as was the increasing political polarization concerning the abolition of slavery. A detailed examination of other social changes in the 19th century would make this declaration a book. It seems at least as plausible that fear of violent crime increased demand for and carry of concealed weapons as Rivas' version.

22. Throughout p. 6, Rivas conflates *deadly weapons* with their ease of concealment by citing laws that prohibited *concealed* carrying of weapons. It was not the weapons that these laws tried to eliminate, but the *concealed* carry of deadly weapons. In n.5: "It is worth noting that these provisions prohibited not only carrying concealed, but carrying about the person generally. See *Ex parte Thomas*, 1908 OK 155." While this statement accurately describes Oklahoma at the start of the 20th century, it misrepresents the state of American law in the 19th century.

23. Other decisions classified some of Rivas' putative *deadly weapons* with Rivas' unconcealable and therefore apparently protected arms:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State. *If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection. But beyond question, the dragoon or holster pistol is part of the arms of a soldier in that branch of the service.* (Coldwell v. The State, 3 Heiskell, 166,[20] and English v. The State, 35 Texas, 476). [21] [emphasis added]

24. Decisions throughout the 19th century recognized that concealed carry could be prohibited only if open carry remained lawful. An 1840 Alabama Supreme Court decision:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. *A statute which, under*

---

[19] STUDIES IN HISTORY, ECONOMICS, AND PUBLIC LAW 20 (1899).
20 State v. Duke, 42 Tex. 455, 458 (1875). *Coldwell* v. *The State* is incorrect; the location cited is *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 8 Am. Rep. 8 (1871).
[21] State v. Duke, 42 Tex. 455, 458, 459 (1875).

*the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.* But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[22] [emphasis added]

An 1846 Georgia Supreme Court decision:

We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[23] [emphasis in the original]

An 1850 Louisiana Supreme Court decision:

This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's *right to carry arms (to use its own words), "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[24] [emphasis added]

25. Again, in 1858:

The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society.[25]

26. With enough time and space, I could provide many other decisions that upheld *concealed* carry regulation because *open* carry remained lawful.

27. In Dred Scott, the U.S. Supreme Court acknowledged that *whites* at least enjoyed a right to carry weapons:

It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might

[22] State v. Reid, 1 Ala. 612, 615, 616, 617 (1840).
[23] Nunn v. State, 1 Ga. 243, 250, 251 (1846).
[24] State v. Chandler, 5 La. An. 489, 490 (1850).
[25] State v. Jumel, 13 La. An. 399, 400 (1858).

8

speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went.*[26] [emphasis added]

### A. Knives

28. Rivas' discussion of knives contains one fascinating quote… from somewhere, but not apparently from where she claims: "This was especially notable in southern areas, where 'so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow." Her citation is to "'The Bowie-Knife In the South,' *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861." I attempted to find that article, but the SAN FRANCISCO EVENING BULLETIN does not appear in either the Library of Congress' Chronicling America[27] or the California Digital Newspaper Collection.[28] That article does appear in a London magazine in 1861.[29] The truth or falsity of the claim could be questioned in either publication, but a reader might have a bit more skepticism of such a claim in a British publication that was still skeptical of Americans as a bunch of uncouth colonials. It should also make you wonder about the accuracy are Rivas' other citations.

29. Rivas on p.8 n.11 cites "Tenn. 1801 ch. 22 § 6 (prohibiting 'privately; carrying 'any dirk, large knife, pistol or any other dangerous weapon.')." But that is a carefully selected quote. What § 6 prohibits is "That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person…"[30] This prohibition on riding "to the terror of the people" is directly

---

[26] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).

[27] Chronicling America, https://chroniclingamerica.loc.gov/, last accessed Jul. 5, 2023.

[28] *Browse by title,* California Digital Newspaper Collection , https://cdnc.ucr.edu/?a=cl&cl=CL1&e=-------en--20--1--txt-txIN-------#E, last accessed Jul. 5, 2023.

[29] *Colonel Bowie and His Knife*, 2 TEMPLE BAR 124 (Jul. 1861).

[30] Judge Edward Scott, LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820 ch. 22 § 6 at 710 (1801).

contradictory to the ban on concealed carry.  IF you cannot see that someone is armed, how does this cause terror?  Bruen specifically rejects the relevance of such laws:

> As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.[31]

30. The rest of her list of statutes in n.11 regulating the carrying of knives in public places are not as she represents bans of carrying of knives in public places, but bans on *concealed* carry. Rivas misrepresents these laws by quoting bits and pieces.  Examples: "Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ('any dirk, pistol or other arm or weapon, except a common pocket knife . . . .'"  The full text:

> That hereafter it shall not be lawful for any person in this State to carry arms of any kind whatsoever secretly, on or about their person, and if any dirk, pistol or other arm or weapon, except a common pocket knife, shall be seen or known to be secreted upon the person of any one in this State, such person so offending, shall on conviction, be fined not exceeding five hundred dollars and not less than five dollars, or imprisoned not exceeding six months and not less than ten days, at the discretion of the court: Provided, however, That this law shall not be so construed *as to prevent any person from carrying arms openly, outside of all their clothes* …[32] [emphasis added]

41. Still in n.11: "Virginia, *see* 1838 Vir., ch. 101 ('any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . .');"  The full text which shows Rivas' dishonest editing:

> That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, *and the same be hidden or concealed from common observation.*[33] [emphasis added]

42. This misrepresentation of laws banning *concealed* carry as being bans on open carry should cast serious doubts as to the accuracy and scholarship of Rivas' work.

---

[31] New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022).
[32] Fla. Acts ch. 75 § 3 (1846).
[33] Va. Acts ch. 101 § 1 (1838).

10

B. Pistols

43. On p. 9: "Another weapon that came to be associated with lawless violence in the antebellum period was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzleloading pistols modeled after designs that appeared in the eighteenth century."  Her supposed source: "Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116."

44. The only text referencing the United States and pistols in that page range:

> "America normally followed the British or French patterns over the decided time lag of perhaps as much as 10 or 20 years. There are also many other details of design and craftsmanship on these and other features of firearms which enable a specialist to identify the area and area of origin of a given specimen.[34]

> Probably the most unusual of all the special flint locks, however, with those the cock under the barrel. The theory, apparently, was to remove the cock from the line of sight and to shift the flash from the priming to a position where it would be of less of a distraction to the shooter. Both German and American versions of this unusual arrangement are known, and the date ranges from the mid 18th century to the early years of the 19th.[35]

45. That is it: every paragraph that references America in that page range.  Nothing that she claims appears in those pages of Pollard's.  Even then, she is wrong.  Percussion cap handguns were an innovation of the 19th century that rapidly replaced flintlock firearms.[36]  An "expert" knows this.

46. From the late 18th century, gun makers made repeating handguns called pepper-boxes. The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[37]  The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be

---

[34] POLLARD'S HISTORY OF FIREARMS 114 (1983).
[35] Id. at 116.
[36] Id. at 62.
[37] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

11

detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.

47. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[38]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[39]

48. While pepper-box pistols had a poor reputation for being more hazard to the shooter than the target, perhaps based on the necessarily dangerous flintlock method of firing, you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[40]

49. Rivas has offered seemingly contradictory expert declarations to this in other cases. See DECLARATION OF BRENNAN G. RIVAS in OREGON FIREARMS FEDERATION, INC., v. Kotek (D.Ore. 2023).  In that expert declaration Rivas' p. 16: "Some multishot pistols were in existence prior to the patenting of Samuel Colt's revolver in 1836, but they were not widely available in the United States."  On p. 16, n. 32 tells us "Pepperbox pistols had multiple rotating barrels. See Blair, Pollard's History, 210."  Rivas in p. 16, n.31 points to an ad offering pepperboxes for sale.  Clearly, they could not have been terribly rare if Rivas can find ads for them and there are surviving American pepperboxes in use in YouTube videos.

---

[38] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.
[39] *English Transitional Pepperbox Revolver*, FORGOTTEN WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.
[40] *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

12

50. On p. 10: "While pocket pistols were less frequently the targets of popular outrage in the early nineteenth century, they were still regulated alongside other deadly weapons like bowie knives." If by "regulated" Rivas means states *prohibited concealed carry*, this was *generally* true, but by no means universal. There were no general prohibitions on open carry or possession in the antebellum period. I notice Rivas cites none.

51. Tennessee is one exception to Rivas' claim about "regulated alongside." The legislative journal shows that a variety of amendments were proposed to the law that prohibited sale of Bowie knives and Arkansas toothpicks.[41] It also prohibited concealed carry but did not prohibit open carry.[42] These amendments reveal that the bill at that point was narrowly focused, applying only to Bowie knives, and extreme in its goals: it made criminal *any* use against a person, and not just concealed carrying. Senator Anderson attempted to amend the bill to allow the use of a Bowie knife for self-defense, but this amendment was rejected.[43]

52. Amendments that were accepted that day broadened the ban on sale or use to cover not only Bowie-knives, but also Arkansas toothpicks and Spanish stilettos. Any use, "whether for self-defense or otherwise," subjected the offender to three to five years in prison.[44] The following day, the Senate gave the bill its third reading, the "Spanish stilettos" were removed, and the bill passed, 17-8.[45]

---

[41] "That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick…" 1838 Tenn. Laws ch. 138 § 1.

[42] "That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person…" 1838 Tenn. Laws ch. 138 § 2. § 3 criminalized drawing from concealment such knives and § 4 criminalized cutting or stabbing someone with such knives.

[43] *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2.

[44] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2; *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 2, 1837, 2.

[45] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 30, 1837, 2.

13

53. The Bowie knife bill received its first reading in the Tennessee House on December 28 and its second reading on January 12. At the second reading, Representative Warner added dirks to the prohibited weapons, but Representative Dean's attempt to add "sword canes and *pistols*" to the prohibited weapons failed.[46]  [emphasis added]

54. On p. 10, Rivas again claims: "Public carry laws generally included 'pistols' within their purview, and other regulatory strategies attempted to discourage their presence in public spaces." She cites no laws to support this claim. I am aware of no laws until Texas' 1871 statute that prohibited open carry.[47]

55. On p. 10, Rivas makes a rather curious claim: "The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century," and claims this year was because "Samuel Colt patented his first revolver design." Colt's production at his Paterson, N.J. factory was never huge before bankruptcy in 1843; Colt made 1,189 pistols by March of 1839. Colt only sold 441 by that date.[48]  Many of these early sales appear to have been to military units, some U.S., others the Republic of Texas.[49]  Colt made revolvers for the commercial market starting in 1848.[50]

56. If Rivas had used 1848 as the turning point, there might be some argument as to the effect of Colt's revolvers. Starting at 1836 simply shows that Rivas is no expert.

---

[46] *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 29, 1837, 2; *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Jan. 13, 1838, 2.
[47] 1871 Tex. Laws ch. 34.
[48] James E. Serven, COLT FIREARMS: 1846-1954 13, 30 (1954).
[49] Id. at 9-12.
[50] David A. Hounshell, FROM THE AMERICAN SYSTEM TO MASS PRODUCTION 1800-1932: THE DEVELOPMENT OF MANUFACTURING TECHNOLOGY IN THE UNITED STATES 47 (1984).

14

57. Rivas also distinguished the Colt revolver as "it provided …" multiple shots without reloading…" As discussed previously, multishot pistols were already for sale before Colt started commercial sales of revolvers in 1848.

## C. Other Deadly Weapons

58. Rivas on p. 11 discusses several other deadly weapons of the era and how they were "associated with crime and interpersonal violence rather than militia service or communal policing; they were typically concealed when worn." She provides no source for this claim. Even if true, the Heller decision identified that arms are protected by the Second Amendment "for the lawful purpose of self-defense."[51] The association with criminal behavior might well describe a perception that indicated an economic class distinction between weapons that a poor person might carry for self-defense and a middle-class American's choice of a pistol. Cockrum's defense attorney in Cockrum v. State (Tex. 1859) crisply argued this discrepancy.

> A bowie-knife, or dagger, as defined in the Code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.[52]

59. All of these lower class weapons, like the pistol were intended for short-range use where a person under physical attack most needs a deadly weapon.

60. At p. 11: "Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors." There were profound social changes during this time, with rapid expansion to the West, large factories employing workers far removed from the traditional and more paternalistic employer/employee arrangements of colonial America, and increasing immigration from Europe (803,158 non-slave immigrants between 1790 and

---

[51] District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008).
[52] Cockrum v. State, 24 Tex. 394, 396 (1859).

15

1835.[53]  Many of these immigrants arrived so destitute that New York passed a law requiring ship captains to report all immigrant arrivals; the law was "intended to prevent the state's being burdened with an influx of foreigners and to prevent their becoming paupers, and who would be chargeable as such."[54]  This dramatic wave of immigration, some of it quite poor, would seem to qualify as "profound social changes."  It hardly seems sensible to explain an increase in violence (gun or non-gun), as caused by handgun availability alone with so many other moving parts.

61. At pp. 11-12: "The proliferation of revolvers during the same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before."  While it seems logical to make this assumption, Rivas provides no source for this claim.  Homicide includes both criminal deaths (murder and manslaughter) but also lawful killings (justifiable and excusable homicide).  That some of this increase in homicides might be in the latter category because victims were more likely to successfully defend themselves against multiple attackers, or even stronger individual criminals, is at least as plausible explanation as Rivas' claim.  One of Rivas' source on p. 12 argues this will sometimes be the case:

> But let us look at the other aspect of the case. The house of one man is attacked, and because he either has no weapons, or does not know how to use them, his property is carried off and his wife, perhaps, outraged [raped] before his eyes. Under very different circumstances the same ruffians, emboldened by previous impunity, attack another house.[55]

62. At p. 14, Rivas attributes the carrying of pocket pistols to rising homicide rates because "having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families."  This is the "finger pulls the trigger" model of gun homicide causation: otherwise normal people "lose it" in a moment of anger.  The evidence from the modern era shows that murderers are disproportionately people with histories of antisocial

---

[53] Calculated from Raymond L. Cohn, MASS MIGRATION UNDER SAIL: EUROPEAN IMMIGRATION TO THE ANTEBELLUM UNITED STATES 15 (2009).
[54] New York v. Miln, 36 U.S. 102, 103 (1837).
[55] THE PISTOL AS A WEAPON OF DEFENCE IN THE HOUSE AND ON THE ROAD: HOW TO CHOOSE IT AND HOW TO USE IT iii (1875).

behavior or mental illness. One study of Illinois "homicide offenders" found "For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls."[56]

63. A study of Indiana murder convicts found that 18 percent were severely mentally ill, suffering from "schizophrenia or other psychotic disorder, major depression, mania, or bipolar disorder."[57] Of the Indiana murder convicts "73 percent of offenders had diagnoses of major depression, bipolar disorder, or mania, while a psychotic disorder including schizophrenia, was diagnosed in only 41 percent, although there was some overlap among the diagnoses."[58] Furthermore, "studies that used hospitalized samples tended to have a higher proportion of persons with a diagnosis of schizophrenia and persons who were experiencing psychotic symptoms at the time of the murder than was found in the present study."[59]

64. It seems unlikely that 19th century murderers were fundamentally different than today. Availability of pocket pistols is an unlikely proximate cause of 19th century homicides.

65. At p. 14 Rivas claims: "Eventually, legal opinion coalesced around the idea that having deadly weapons upon one's person "raises a presumption of guilt," regardless of whether they were openly carried or concealed, and regardless of whether the carrier intended to use them in an assault or not. Review of the sources cites shows a different story. Her evidence of legal opinion is one decision, State v. Reams (N.C. 1897). One decision is hardly evidence that "legal opinion coalesced" around this idea. A citation to a standard legal text, or even a dozen similar decisions would be a *lot* more persuasive.

---

[56] Philip J. Cook, Jens Ludwig, and Anthony Braga, *Criminal Records of Homicide Offenders*, 294(5) JAMA 598-601 (Sep. 2005).
[57] Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, *Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder*, 36 J. AM. ACAD. PSYCHIATRY & LAW 82 (2008).
[58] *Id.* at 80.
[59] Id. at 83-84.

66. Even then, Reams is clear that it was the carrying of a *concealed* weapon that raised a presumption of guilt: "The offense of carrying a *concealed* weapon about one's person and off his own premises consists in the guilty intent to carry it *concealed* and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt."[60] [emphasis added]  In n.35 Rivas does actually cite a legal journal in defense of her claim. The title of the article clearly states the concern: "Concealed Weapons."  Along with the discussion on p. 412 of mischievous intent for carrying concealed weapons, that article on p. 409 refers to a decision upholding open carry:

> In Stockdale v. State, carrying a pistol in the waist-band, with butt and cock exposed, was held not within the statute. This, however, is put upon the ground that it is lawful to bear arms openly, and impossible to carry a pistol without part of it concealed.[61]

67. Most of Rivas' other sources in n.35 condemned *concealed* carry.  Many are newspaper articles.  While Rivas may be correct that the chattering classes supported banning at least concealed carry, they are not evidence that support for bans on open carry enjoyed widespread support.

## D. Right to Keep and Bear Arms Decisions

68. At pp. 16-17, Rivas claims that modern interpretations of 19th century open carry are wrong because: "This idea is largely a result of simplified interpretations of the nineteenth-century case law surrounding public carry statutes that emphasize judges' protection of openly carrying deadly weapons without considering the narrow context in which such behavior would have occurred."  Yet even the more restrictive decisions, such as State v. Wilburn (Tenn. 1872) acknowledged that a *complete* prohibition on carrying revolvers had some constitutional limits. The 1871 Tennessee statute prohibited carrying various weapons included "belt or pocket pistol,

---

[60] State v. Reams, 27 S.E. 1004 (N.C. 1897).
[61] *Concealed Weapons*, 8:4 Criminal Law Magazine and Reporter 409, 412 (Oct. 1886).

or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[62]

69. The Wilburn decision involved a clearly spurious indictment. The first count charged him with carrying "a belt and pocket pistol and revolver pistol, the same being an arm such as is not commonly carried and used in the United States army." The second count charged that Wilburn did "unlawfully and willfully carry an *army pistol* privately and concealed, and not openly in his hands..."[63] [emphasis added] which contradicts the claim in the first charge, since the Act of 1871 had defined an "army pistol" to be something other than "a belt or pocket pistol." Yes, this was a mandatory brandishing law, which would seem especially effective as causing terror. This demonstrates that both the Tennessee Legislature and Tennessee Supreme Court recognized that the bearing arms could not be completely extinguished by statute even if it required something absurdly dangerous. Importantly, this decision was made based on the Tennessee Constitution's "for the common defence" right to keep and bear arms provision which included authorization for legislative regulation of "the wearing of arms,"[64] not the broader guarantee of the Second Amendment.

70. At p. 17, Rivas argues that the dominant view of in the early 19th century was "that concealed carry laws were constitutional because the Second Amendment and state analogues protected appropriate uses of militia arms, not the carrying of deadly weapons." She cites Aymette v. State (Tenn. 1840); State v. Buzzard (Tex. 1872); Hill v. State (1874); and Ex parte Thomas (Okla. 1908). (Only one of these is even in the first half of the 19th century, and one is in the 20th

---

[62] State v. Wilburn, 7 Tenn. 61 (1872).
[63] Id. at 58, 59.
[64] Id. at 58, 59.

century.)  She dismissed three decisions: one that recognized a right to carry concealed[65] and two decisions upholding concealed carry bans because open carry remained lawful.[66]  For some reason four decisions that agree with her claim are the dominant view vs. three decisions that disagree with her.

71. It would appear that Rivas has no knowledge of the enormous variety of decisions in this period concerning both state constitutional and Second Amendment guarantees of the right to keep and bear arms.  Most do indeed acknowledge that the state had authority to regulate concealed carry of arms, but often not for Rivas' explanation.

72. Some are silent as to why.[67]  Some recognize that the state constitution protected the right to carry deadly weapons (even while "then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make.")  The Simpson v. State (Tenn. 1833) decision is quite interesting and utterly contrary to Rivas' supposed consensus.  Denying the validity of the Statute of Northampton banning the carrying of "dangerous and unusual arms," Simpson found:

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence."  Article 11, sec. 26.  It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous and unusual weapons," as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment.  By this clause of the constitution, an express power is given and *secured to all the free citizens of the state to keep and bear arms for their defence*, without any qualification what-ever as to their kind or nature. [68] [emphasis added]

73. Rivas represents Aymette v. State (Tenn. 1840) as guaranteeing "appropriate uses of militia arms, not the carrying of deadly weapons."  The decision is a bit more *interesting* than that:

> [E]very free white man may keep and bear arms.  But to keep and bear arms for what?  If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove that doubt.  It is declared that they may keep and bear

---

[65] Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822).
[66] Nunn v. State, 1 Ga. 243 (1846); State v. Reid, 1 Ala. 612 (1840).
[67] State v. Mitchell, 3 Blackford 229 (Ind. 1833).
[68] Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833).

arms for their common defence... The object, then, for which the right of keeping and bearing arms is secured is the defence of the public. *The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution.*[69] [emphasis added]

74. What sort of arms?  "[T]he *arms the right to keep which is secured are such as are usually employed in civilized warfare*, and that constitute the ordinary military equipment." [emphasis added]  Weapons of war.  If Rivas wants to cite Aymette as an authority, I look forward to her defense of the right to keep and bear semiautomatic detachable magazine rifles.

75. Owen v. State (Ala. 1858) upheld a conviction for carrying a concealed pistol.  While doing so, the decision analyzed the meaning of the Alabama Constitution's arms guarantee:

> That section was not designed to destroy the right, guarantied by the constitution to every citizen, "to bear arms in defense of himself and the State"; *nor to require them to be so borne, as to render them useless for the purpose of defense*.  It is a mere regulation of the manner in which certain weapons are to be borne...[70] [emphasis added]

76. State v. Buzzard (Ark. 1842) is as Rivas describes it, denying a right to carry arms, holding that the state constitution's guarantee was a guarantee that the state militia would be armed.

77. State v. Huntley (N.C. 1843) involved prosecution of a bully:

> His Honor instructed the jury, that if the facts charged in the indictment were proven to their satisfaction, the defendant had been guilty of a violation of the law, and that they ought to render their verdict accordingly. In the investigation before the jury it appeared, among other things, that *the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barrelled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him"*; on some, that "he had waylaid the house of James H. Ratcliff in the night about daybreak, and if he had shown himself he would have killed him; that he showed himself once, but for too short a time to enable him to do so, and that *he mistook another man for him, and was very near shooting him*."[71] [emphasis added]

78. Huntley was not simply armed, but also making death threats; he came close to shooting someone he mistook for the object of his wrath.  To call this "to the terror of the people" seems

---

[69] Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840).
[70]  Owen v. State, 31 Ala. 387, 388, 389 (1858).
[71] State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843).

21

quite clear.  Yet the North Carolina Supreme Court while upholding the conviction made it clear that riding around armed violated no laws:

> [I]t is to be remembered that the carrying of a gun per se constitutes no offence.  *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun*.  It is the wicked purpose—and the mischievous result—which essentially constitute the crime.  He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.[72]  [emphasis added]

79. Nunn v. State (Ga. 1846) struck down a poorly written statute as contrary to the Second Amendment:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[73] [emphasis in the original]

80. State v. Chandler (La. 1850) involved a defendant convicted of manslaughter.  The prosecution appears to have used his concealed carry of a Bowie knife to suggest criminal intent.  In response to Chandler's claim that the Constitution protected his right to carry concealed, the Louisiana Supreme Court ordered a new trial for manslaughter, based on errors related to the charge to the jury with respect to the law of self-defense.[74]

81. Chandler explained the reason Louisiana banned concealed carry in 1813:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons.  It interfered with *no man's right to carry arms (to use its own words), "in full open view,"* which places men upon an equality.  This is the right guaranteed by the *Constitution of the United States*, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[75]  [emphasis added]

82. The Smith v. State (La. 1856) decision continues to recognize that open carry was protected by the Second Amendment:

---

[72] State v. Huntly, 3 Iredell 418, 420, 421, 422, 423 (N.C. 1843).  This case has been frequently miscited as State v. Huntley, perhaps because the name is spelled both ways in the decision
[73] *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).
[74] State v. Chandler, 5 La. An. 489, 491 (1850).
[75] State v. Chandler, 5 La. An. 489, 490, 491 (1850).

22

> The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States. The arms there spoken of are such as are borne by a people in war, *or at least carried openly*. The article explains itself. It is in these words: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[76] [emphasis added]

83. Again, the idea is that military weapons were protected arms, and openly carried arms were lawful.

84. State v. Jumel (La. 1858) again involved a Second Amendment challenge to a concealed weapon ban. Again, the Louisiana Court argued: "The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."[77] The Louisiana Supreme Court then cited the *State* v. *Chandler* (1850) and *State* v. *Smith* (1856) decisions. The *Jumel* decision implied that *because* "only a particular mode of bearing arms" (concealed) was restricted, it was not an infringement on the right protected by the Second Amendment.

85. Dred Scott v. Sandford (1857) clearly recognized a right to carry arms. Contrasting the status of free blacks to white citizens:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, … *and to keep and carry arms wherever they went.* [emphasis added][78]

86. Rivas cites Bishop's claim that "dirks, bludgeons, revolvers and other weapons which are not used in war," and were therefore not protected arms. This ignores that revolvers by the time of the Civil War *were* used in military service. This is why decisions such as Page v. State

---

[76] Smith v. State, 11 La. An. 633, 634 (1856).
[77] State v. Jumel, 13 La. An. 399, 400 (1858).
[78] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).

23

(Tenn. 1871) recognized the right to carry at least military revolvers, even if the law required them to be carried in a manner that would be called brandishing today.[79]

87. Similarly, *Fife v. State* (Ark. 1876) decided that only weapons:

> What then, is he protected in the right to keep and thus to use?  Not every thing that may be useful for offense or defense, *but what may properly be included or understood under the title of "arms," taken in connection with the fact that the citizen is to keep them, as a citizen.*  Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State.  *Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater* [revolver]*, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the legislature.*[80]  [emphasis added]

88. Two years later, in *Wilson* v. *State of Arkansas* (Ark. 1878), the Arkansas Supreme Court once again defined what arms the state arms provision protected.  Chancy Wilson was indicted on the grounds that he did "unlawfully carry a pistol as a weapon, contrary to the statute such case made and provided, and against the peace and dignity of the State..."  Wilson had borrowed "a large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting.  Upon reaching his destination, Wilson spoke with his host, "pulled the pistol out of his boot, cocked it a few times to see if it would revolve, and then put it around under his coat, and went into dinner."  It is not clear if the revolver was concealed in his boot, but it certainly was concealed under his coat.  The trial court refused to allow a statement either by the owner of the pistol or Wilson as to the purpose of having the revolver, and refused to charge the jury that "an army size pistol" was not subject to the restriction of the Arkansas law.

89. The Arkansas Supreme Court, citing *Fife*, agreed that regulation was acceptable, but:

> No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc.  *Andrews* v. *State*, 3 *Heiskell*, 182.

---

[79] Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871).
[80] Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.
>
> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[81]

90. In the same session, the Arkansas Supreme Court decided another weapons case,

*Holland* v. *State* (1878):

> James Holland was indicted in the Circuit Court of Yell county, for carrying a pistol as a weapon.
>
> On the trial but one witness was examined.  He stated, in substance, that the first time he ever saw defendant, was on the 1st of October, 1875, in Yell county.  He had two large sized six shooting pistols, one of them a Remington, navy size and loaded, and the other a Colt's army pistol.  The pistols were such as are commonly used in the United States military and naval service.  Defendant was carrying them in his saddle-bags, and stated he was from Texas.  Witness did not know whether he was on a journey or not.

91. Not surprisingly, Holland

> asked the court to charge the jury that if they found from the evidence that the pistols, proven to have been carried, were army sized pistols, and were such as are commonly used in the United States military and naval service, they must acquit defendant.
>
> The court refused this instruction, defendant was convicted, a new trial refused him, he took a bill of exceptions and appealed.[82]

92. Chief Justice English again delivered the opinion of the Arkansas Supreme Court: "The court erred in refusing to instruct the jury as moved by appellant."  After citing *Fife* v. *State* (1876) and *Wilson* v. *State of Arkansas* (1878), the Arkansas Supreme Court reversed the conviction, and ordered a new trial.  The pistols in question were apparently concealed "in his saddle-bags," but the defense of the pistols being standard U.S. military models was sufficient to justify their concealed carriage.

93. In Dabbs v. State (Ark. 1882), the Arkansas Supreme Court upheld the third section of the Act of April 1, 1881, which prohibited the sale of any pistol other than those "used in the army

---

[81] Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878).
[82] Holland v. State, 33 Ark. 560, 561 (1878).

25

or navy of the United States and known as the navy pistol."  The heart of the dispute is addressed in the last paragraph of the decision:

> The law was enacted as a measure of precaution for the prevention of crimes and calamities.  It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person.  It does not abridge t*he constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare.*  Fife v. State, 31 Ark., 455.[83] [emphasis added]

94. Other 19th century and early 20th century decisions recognized a right to carry handguns. *In Re Brickey* (Ida. 1902) involved a man named Brickey who was convicted of carrying a loaded revolver within the city limits of Lewiston, Idaho.  On appeal, the Idaho Supreme Court raised federal and state constitutional provisions:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."  The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law."  Under these constitutional provisions, *the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho*, whether within or without the corporate limits of cities, towns, and villages.  The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it.  A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state.  But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages.  We are compelled to hold this statute void.[84] [emphasis added]

95. There is overwhelming evidence of later decisions recognizing a right to carry handguns, even if the state could prohibit *concealed* carry.

96. Why this lengthy discussion of obscure early 19th century decisions?  To emphasize that Rivas' expertise on this subject is limited, and her conclusions are therefore flawed.

97. Rivas at pp. 25-27 discusses surety bond laws which Bruen specifically rejects as irrelevant.[85]  Much of the rest of Rivas' declaration consists of similarly misleading "evidence"

---

[83] Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882).
[84] In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).
[85] Bruen op cit. at 2144, 2145.

including such marvels as, "Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852."  In 1852, Hawaii was a *kingdom*, not under U.S. law.

98. Even if Rivas' alternate reality version was correct, Bruen recognized a right to bear arms in public places.[86]  All previous decisions taking a narrower view are obsolete.

III. Summary:

99. The evidence presented by Rivas:

- makes extensive misrepresentation of 19th century laws that prohibited *concealed* carry as being bans on all forms of public carry;

- purports expert knowledge of early 19th century case law on this subject that she fails to show;

- pretends that there was a consistent definition of deadly weapons to include all concealable weapons (including handguns) but excluding the far more deadly rifle and shotgun;

- attempts to tie rising murder rates to the introduction of the revolver, while admitting that there was a long list of other factors that might explain this problem in part or perhaps even in full.

---

[86] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022).

27

**Exhibit 2 to the Declaration of Clayton Cramer**

Cases

Dano v. Collins, 166 Ariz. 322, 323, 324 (Ariz.App. 1990) ........................................... 9

In re Brickey, 8 Idaho 597, 70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902) ................... 5

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2140 (2022) .................. 3, 11

Nunn v. State of Georgia, 1 Ga. 243 (1846) ................................................... 9

*People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927, 928 (1922) ....................................... 7

Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833) ............................................... 5

Simpson v. State, 13 Tenn. (5 Yer.) 356, 359, 360 (1833). ........................................ 5

*State* v. *Blocker*, 291 Or. 255, 257, 258, 259, 260 (1981) ........................................ 7

*State* v. *Delgado*, 298 Or. 395, 692 P.2d 610, 613, 614 (1984) .................................... 8

State v. Huntly, 418, 420 (N.C. 1843) ........................................................ 4

State v. McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986) ........................................... 9

*State* v. *Rosenthal*, 75 Vt. 295, 55 Atl. 610, 611 (1903) ........................................ 6

State v. Smoot, 97 Or. App. 255, 258, 775 P.2d 344, 345 (1989). ................................. 8

Statutes

1 *The Statute Laws of the State of Tennessee, of a Public and General Nature* (1831) ................. 4

14 Mass. Acts 1747 – 1752 339 or any of the Chapter 12s (1907) ................................. 3

14 Mass. Acts and Resolves 1747 – 1752 544 and ch. 17 (1907) ................................... 2

1692 Mass. Acts ch 18, § 6 at 52 ............................................................ 12

1692-3 Mass. Laws ch. 18, § 6 at 52-53 ..................................................... 11

1786 Mass. Acts ch. 38 at 88 ............................................................... 10

1786 Va. Laws ch. 49 at 334 ................................................................ 3

1795 Mass. Acts ch. 2 at 464 ............................................................... 12

i

1801 Tenn. Laws 259, 260-261, ch. 22, § 2 .................................................... 4

1801 Tenn. Laws 259, 260-261, ch. 22, § 6 .................................................... 4

1821 Me. Laws ch. 17 at 95 ........................................................................... 12

1821 Me. Laws ch. 76 at 352-53 ................................................................... 12

2 Laws Of New Hampshire Including Public And Private Acts And Resolves And The Royal

    Commissions And Instructions With Historical And Descriptive Notes, And An Appendix:

    Volume Two Province Period 1702-1745 82-87 (1913) .......................................... 12

Cal. PC § 245(a).............................................................................................. 10

### Other Authorities

T. Gordon, The History of New Jersey 49 (1834). ....................................... 2

W. Whitehead, East Jersey Under the Proprietary Governments 150-151 (1875)......................... 2

W. Whitehead, East Jersey Under the Proprietary Governments 151 (1846)................................ 2

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of

    North Carolina, iii (1792). ...................................................................... 3

ii

# Spitzer Rebuttal

1. My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons regulation. My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2. In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

3. Spitzer includes among his qualifications: "For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence)." With NRA membership you get a magazine and continual fund-raising calls and letters. It is difficult to see how NRA membership, which costs $45 per year, adds to one's qualifications. My membership in NRA since 1982 adds nothing to *my* qualifications.

## I. Concealed Weapon Regulation

4. Spitzer at p. 6 points to a 1686 New Jersey statute that prohibited both concealed carry of "any pocket pistol, skeines, stilladers. daggers or dirks, or other unusual or unlawful weapons" as well as what appears to have been a ban on open carry: "no planter shall ride or go armed with

1

sword, pistol, or dagger." Bruen discussed and discounted this statute's significance as applying to only one class of the population (farmers) who "may have been targeted because colonial-era East New Jersey was riven with 'strife and excitement' between planters and the Colony's proprietors 'respecting titles to the soil.'"

5. Examining the Court's sources for this claim[1] is not terribly illuminating; the 1846 edition of EAST JERSEY UNDER THE PROPRIETARY GOVERNMENTS provides a bit more interesting possible reason: "The truth became manifest that their [proprietors] private emoluments were curtailed, even their title to the soil endangered by the deranged state of the province, and the threatened procedure to test their right to its government gave little promise of repose for some years."[2] The relatively small number of wealthy beneficiaries of royal favor might well have sought to intimidate the planters who they perceived as the source of their difficulties.

6. When Spitzer moves past the 1686 New Jersey law, he moves from the realm of certainty to what is either confirmation bias or misrepresentation. "Massachusetts followed in 1750, penalizing any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, 'being armed with clubs or other weapons.'" Spitzer has the statute in Exhibit E, described as "1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1."

> If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled…

7. There are three problems here. The first is that there is no such law in Massachusetts provincial laws at Mass. Acts and Resolves p. 544 or chapter 17.[3]

---

[1] W. Whitehead, EAST JERSEY UNDER THE PROPRIETARY GOVERNMENTS 150-151 (1875); T. Gordon, THE HISTORY OF NEW JERSEY 49 (1834).
[2] W. Whitehead, EAST JERSEY UNDER THE PROPRIETARY GOVERNMENTS 151 (1846).
[3] 14 Mass. Acts and Resolves 1747 – 1752 544 and ch. 17 (1907).

8. Secondly, It also appears that Spitzer had copied this text from the Duke Center for Firearms Law Repository of Historical Gun Laws, where this text appears as "1749-51 Mass. Acts 339, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 12." But as I have found typical of the Duke repository, that law is not at Massachusetts Acts and Resolves p. 339 nor at any Chapter 12 for these years.[4]

9. Third, assuming that Duke University Law School actually found this statute in some non-canonical edition of Massachusetts Acts and Resolves, their version does not prohibit carrying of arms except if they "shall be unlawfully riotously or tumultuously assembled."

10. "Virginia and North Carolina passed similar laws incorporating penalties for openly carrying weapons in 1786 and 1792, respectively." Spitzer cites the Virginia law as "1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays." The law Spitzer quotes is actually 1786 Va. Laws ch. 49 at 334.[5] This is the Statute of Northampton (1328), specifically rejected by Bruen as primarily about the wearing of armor or threats to breach the peace.[6]

11. "Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)". As the title makes clear, this was not a statute passed by the North Carolina Legislature. The North Carolina Legislature tasked Martin to sift through all *existing* British statutes that might have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[7]

---

[4] 14 Mass. Acts 1747 – 1752 339 or any of the Chapter 12s (1907).
[5] 1786 Va. Laws ch. 49 at 334.
[6] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2140 (2022).
[7] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).

12. Curiously, when the North Carolina Supreme Court decided State v. Huntly (N.C. 1843), a case which charged the defendant under the Statute of Northampton, the opinion held that "whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here."[8] One might expect that if this statute had been adopted legislatively, as Spitzer claims, that it might have merited mention.

13. "In 1801, Tennessee enacted a law saying that no one was to "go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person." There is indeed "An Act for the restraint of idle and disorderly persons.'"[9] This was a vagrancy law for "persons of ill fame or suspicious character." Section 6 does indeed contain the text of the Statute of Northampton.[10] However a search of an 1831 compilation of Tennessee laws for the phrase "ride armed" found no matches.[11] Even more curiously, Simpson v. State (Tenn. 1833) involves a case where the defendant was indicted for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land." Yet when the defendant appealed, alleging "the record does not present any charge that is known to the law, as cognizable in our courts by indictment," the Tennessee Supreme Court ruled in Simpson's favor because

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them, this English statute, or portion of the common law, our constitution has completely

---

[8] State v. Huntly, 418, 420 (N.C. 1843).
[9] 1801 Tenn. Laws 259, 260-261, ch. 22, § 2.
[10] 1801 Tenn. Laws 259, 260-261, ch. 22, § 6.
[11] 1 *The Statute Laws of the State of Tennessee, of a Public and General Nature* (1831).

4

abrogated it; it says , " that the freemen of this State have a right to keep and to bear arms for their common defence. " Article 11, sec . 26. [12]

While the Statute of Northampton was cited as the basis for this charge, there was no reference to any Tennessee statute in the decision.[13]

14. At 6: "In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list; 3 more did so in the early 1900s." This is an amazing claim that deserves actual evidence, not just a citation to work by himself and others. In most states, *concealed* carry was banned but *open* carry was not. Multiple court cases have recognized a right to carry arms, although not a right to carry concealed. While many states passed various restrictions on open carry, many did not survive judicial review. In re Brickey (Ida. 1902):

> The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it. *A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state. But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages.* We are compelled to hold this statute void. [14] [emphasis added]

14. As the following decisions demonstrate, passage of such laws are no more evidence that they were constitutional than laws racially segregating public schools before Brown v. Board of Education (1954) are evidence of the constitutionality of the latter laws. State v. Rosenthal (Vt. 1903) involved Andrew Rosenthal who was convicted in Rutland City Court of violating city ordinance No. 10, "prohibiting a person from carrying within the city any brass knuckles, pistol, slung shot, or weapon of similar character, or any weapon concealed on his person, without permission of the mayor or chief of police." The Vermont Supreme Court struck down the ordinance based on Vermont Constitution's "art. 16, [which] declares that the people have a

---

[12] Simpson v. State, 13 Tenn. (5 Yer.) 356, 359, 360 (1833).
[13] Simpson v. State, 13 Tenn. (5 Yer.) 356 (1833).
[14] In re Brickey, 8 Idaho 597, 70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902).

right to bear arms for the defense of themselves and the state," and that the ordinance in question "so far as it relates to the carrying of a pistol under any circumstances without such consent, is repugnant to the Constitution, and to that extent void."

15. While Vermont Statutes §4922 prohibited the carrying of arms, "with the intent or avowed purpose of injuring a fellow man":

> Under the general laws, therefore, a person not a member of a school may carry a dangerous or deadly weapon, openly or concealed, unless he does it with the intent or avowed purpose of injuring another; and a person who is a member of a school, but not in attendance upon it, is at liberty, in a similar way, to carry such weapons.[15]

16. In People v. Zerillo (Mich. 1922), the Court explains in a subtle manner that the defendant was likely a disreputable person, perhaps a criminal:

> It was made to appear in evidence that, about 5 o'clock in the morning of the 25th day of September, 1921, at the corner of Chase and Russell streets in the city of Detroit, defendant was seated at the wheel of a Marmon touring car, with four or five men in the car with shotguns. Defendant had no shotgun, but in the pocket of the door of the automobile was found a .38-caliber revolver, and this is the firearm the possession of which led to his conviction…
>
> The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which the prosecution was planted is not one of regulation, but is one of prohibition and confiscation. *It is not regulation to make it a crime for an unnaturalized foreign-born resident of the state to possess a revolver, unless permitted to have one by the sheriff of the county where he resides.*[16] [emphasis added]

17. Several Oregon decisions are reminders that many laws passed in the 19th and early 20th centuries have since failed judicial review, as should the California law at the heart of this case. *State* v. *Blocker* (Ore. 1981) involved a Michael Blocker who was convicted of possession of a billy club in his car. Much of the decision involved defining what constitutes "vague" and "overbroad" laws, but the opinion of the Oregon Supreme Court held that while the Legislature could prohibit the carrying of a concealed weapon, they had not done so in this case—the statute in question had banned possession of a billy club anywhere—and had apparently neglected to ban concealed carry of such a weapon. The Court did acknowledge that some types of regulation

---

[15] *State* v. *Rosenthal*, 75 Vt. 295, 55 Atl. 610, 611 (1903).
[16] *People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927, 928 (1922).

6

of the bearing of arms was legal, and gave some examples of then current Oregon statutes that

were constitutional:

> This state has several such regulatory statutes, with which we are not concerned in this case:
> ORS 166.220(1) prohibiting possession of a dangerous weapon with intent to use such weapon
> unlawfully against another; ORS 166.240, prohibiting carrying certain weapons concealed
> about one's person; ORS 166.250, prohibiting carrying any firearm concealed upon the person
> or within any vehicle without a license to do so.
>
> On the other hand, ORS 166.510, with which we are here concerned, is not, nor is it apparently
> intended to be, a restriction on the manner of possession or use of certain weapons.  The statute
> is written as a total proscription of the mere possession of certain weapons, and that mere
> possession, insofar as a billy is concerned, is constitutionally protected.[17]

19.  Carrying arms with some criminal intent could be prohibited; carrying concealed

could be prohibited; but some form of carry was protected, or the statute would be contrary to the

constitutional protection to bear arms for self-defense.

20.  Three years later, in *State* v. *Delgado* (1984), the Oregon Supreme Court used very

similar reasoning in a switchblade case.  Joseph Luna Delgado was stopped on October 3, 1983,

by police, since he "appeared disorderly."  During a pat down search, the officer found a switch-

blade knife in the defendant's back pocket, and Delgado was convicted of possessing a switch-

blade knife, a prohibited weapon.

21.  On appeal, the conviction was reversed, based on the *Blocker* decision; the

prosecution asked the Oregon Supreme Court to review the question of whether switch-blades

were constitutionally protected arms.  Since the *Kessler* decision had recognized that "hand-

carried weapons commonly used by individuals for personal defense" were constitutionally

protected, the state argued that switch-blades were not commonly used for defense, and were

therefore outside the protection of the Oregon Constitution.

---

[17] *State* v. *Blocker*, 291 Or. 255, 257, 258, 259, 260 (1981).

7

22. The Oregon Supreme Court rejected the prosecution's evidence that switch-blade knives are "almost exclusively the weapon of the thug and delinquent," calling the material "no more than impressionistic observations on the criminal use of switch-blades."

> This court recognizes the seriousness with which the legislature views the possession of certain weapons, especially switch-blades.  The problem here is that ORS 166.510(1) absolutely proscribes the mere possession or carrying of such arms.  This the constitution does not permit.[18]

23. The last of the Oregon decisions is *State* v. *Smoot* (1989), and answered the questions raised by *State* v. *Delgado* (1984), concerning the limits of the right to bear switch-blade knives. Dayne Arthur Smoot was convicted in Lane County, Oregon, of carrying a switch-blade knife concealed in a trouser pocket.  The Oregon Court of Appeals upheld the conviction, since only the manner of carrying this constitutionally protected arm was regulated: "A person may possess and carry a switchblade as long as it is not concealed."[19]

24. In State v. McAdams (Wyo. 1986), police stopped a cocktail waitress for a vehicle code violation, and saw that "had a knife in a sheath inside the right breast pocket of her jacket." The Wyoming Supreme Court upheld the concealed weapon violation as a legitimate use of the state's police powers but nonetheless:

> The police power cannot, however, be invoked in such a manner that it amounts to the destruction of the right to bear arms. *People v. Brown,* 253 Mich. 537, 235 N.W. 245, 82 A.L.R. 341 (1931); *State v. Dawson,* 272 N.C. 535, 159 S.E.2d 1 (1968). This precept is well stated in the case of *State v. Wilforth,* 74 Mo. 528, 530 (1881):
>
>> "A statute which, under the pretense of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for purposes of defense, would be clearly unconstitutional."[20]

25. In *Dano* v. *Collins* (Ariz. App. 1990), Franklin Dano and Paul Huebl brought suit against Tom Collins, the Maricopa County Attorney, and Richard G. Godbehere, the Maricopa County Sheriff, requesting that the "state statute which prohibits the carrying of concealed

---

[18] *State* v. *Delgado*, 298 Or. 395, 692 P.2d 610, 613, 614 (1984).
[19] State v. Smoot, 97 Or. App. 255, 258, 775 P.2d 344, 345 (1989).
[20] State v. McAdams, 714 P. 2d 1236, 1238 (Wyo. 1986).

8

weapons be declared in violation of the State Constitution."   The Maricopa Superior Court dismissed the complaint.   It was appealed to the Arizona Court of Appeals, where the "police power" was again cited as the basis for regulating, though not prohibiting, the carrying of arms:

> Arizona's prohibition on the carrying of concealed weapons does not frustrate the purpose of the constitutional provision.  We do not read the Arizona constitutional guarantee as granting an absolute right to bear arms under all situations.  *The right to bear arms in self-defense is not impaired by requiring individuals to carry weapons openly.  Appellants are free to bear exposed weapons for their defense.*[21] [emphasis added]

26. These are seven examples of the irrelevance of post-1868 laws that Spitzer claims banned open carry of arms.  Bruen has also rendered any such laws irrelevant.

27. At p. 7, Spitzer cites the 1837 Georgia law "restricting both the carrying and sale" of various weapons and somehow neglects to mention that Nunn v. State (Ga. 1846) struck down that law as contrary to the Second Amendment.[22] This was the first gun control law overturned on Second Amendment grounds rather than a state constitutional arms clause.   This is not the sign of an expert; leaving out contrary evidence is a mistake that in an undergraduate history class would cause me to make some sharp remarks and take away some points, but then again Spitzer is not a historian.

28. At p. 8: "An 1852 Hawaii law criminalized the carrying or 'found armed with' any of a list of deadly weapons."  Laws of the *Kingdom* of Hawai'i have no relevance to American law.  Why Spitzer would bother with this obviously irrelevant law eludes me.

29. Starting at p. 8, Spitzer lists many laws passed after 1868 and thus irrelevant to the standard adopted by Bruen.

---

[21] Dano v. Collins, 166 Ariz. 322, 323, 324 (Ariz.App. 1990).
[22] Nunn v. State of Georgia, 1 Ga. 243 (1846).

## Brandishing Laws

30. Starting at p. 11, Spitzer lists "Weapons Brandishing and Display Laws." If there was any challenge to brandishing laws, this might be relevant. Spitzer claims these laws

> penalized the mere public appearance of weapons (short of their actual use), including but not limited to firearms, in two circumstances: the brandishing of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere display of weapons (i.e. that they simply can be seen) in the presence of others. A 1642 provision in the colony of New Netherland (soon to be New York) stated: 'No one shall presume to draw a knife much less to wound any person, under . . . penalty."

31. As should be obvious, the statute "that no one shall presume to draw a knife much less to wound any person," prohibits not the open carry of a knife, but drawing it. In conjunction with any threat or hostilities, this would be assault with a deadly weapon under California law.[23] Allowing open carry of a firearm changes this not at all.

32. At p. 11: "Similarly, a 1786 Massachusetts law criminalized the mere assemblage of 'any persons to the number of twelve, or more, being armed with clubs or other weapons.' If they did not disperse within an hour of being warned, they could be subject to arrest." Unfortunately, Spitzer's citation is useless: "1786 Mass. Sess. Laws, § 1." Nonetheless, I found it. The full text shows that Spitzer has misrepresented the statute:

> if any persons to the number or twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, *shall be unlawfully, routously, riotously or tumultuously assembled*…[24] [emphasis added]

33. Being armed was not unlawful. Twelve or more armed and riotously assembled was unlawful. This is not a minor misreading of the statute.

34. Spitzer claims: "A 1694 Massachusetts law subjected to arrest any who "shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere." The cited statute: "1694 Mass. Laws 12, no. 6, An Act for the

---

[23] Cal. PC § 245(a).
[24] 1786 Mass. Acts ch. 38 at 88.

10

Punishing of Criminal Offenders."   The actual text is a bit broader than Spitzer's careful selection:

> That every justice of the peace in the county where the justice of peace, offence is committed, may cause to be staid and arrested all *affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively before any of their majesties' justices* or other their officers or ministers doing their office or elsewhere by night or by day, in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches; and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find *sureties for the peace and good behaviour, … and require bond with sureties for the peace*, or bind the offender over to answer it at the next sessions of the peace, as the nature or circumstance of the offence may be; and may make enquiry of forcible entry and detainer, and cause the same to be removed, and make out hue and crys after runaway servants, thiefs and other criminals.[25] [emphasis added]

35. The punishment of affrayers, rioters, and disturbers of the peace has no relevance to the challenged California law. The "ride, or go armed offensively before any of their majesties' justices" provision is yet another variant of the Statute of Northampton rejected by Bruen.[26]  At most, this might be an argument for prohibiting going armed into a courthouse or legislative body, which would qualify as a sensitive place under Heller.  Bruen also rejects the "surety bond" laws as irrelevant.[27]

36. Spitzer at p. 12: "New Hampshire enacted a law in 1699 (and in 1708) that punished anyone who 'went armed offensively' or 'put his Majesty's subjects in fear.'"  Spitzer's citation: "1699 N.H. Laws, 1. Quoted in Young v. Hawaii, 794–795; New Hampshire Public Carry Prohibition (1708)."  He seems not to have bothered checking the primary source: ACTS AND LAWS, PASSED BY THE GENERAL COURT OR ASSEMBLY OF HIS MAJESTIES PROVINCE OF NEW HAMPSHIRE IN NEW ENGLAND (1699).  It is only 10 pages long.  There is no such law there. What about the "New Hampshire Public Carry Prohibition (1708)"?  The session laws for 1708 took several minutes to find: LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS

---

[25] 1692-3 Mass. Laws ch. 18, § 6 at 52-53.
[26] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2140 (2022).
[27] Id. at 2149, 2150.

11

AND RESOLVES AND THE ROYAL COMMISSIONS AND INSTRUCTIONS WITH HISTORICAL AND DESCRIPTIVE NOTES, AND AN APPENDIX: VOLUME TWO PROVINCE PERIOD 1702-1745.  There are six chaptered laws between two sessions for 1708.[28]  None of them have that content or title.

37.  "Massachusetts added to its existing firearms regulations in a 1795 law that authorized justices of the peace to arrest those who 'ride or go armed offensively, to the fear or terror of the good citizens.'"  Cited to "1795 Mass. Acts 436, ch. 2. Quoted in Young v. Hawaii, 799. See also 1692 Mass. Acts 10, 11–12."  Again, Spitzer has not checked the readily available primary source:

> 1795. - Chapter 2. [ May Session , ch . 2. ) An act to change the name of William Shelden of hadley in the county of Hampshire, to the name of Giles Crouch Kellogg.[29]

Nor is there a match at p. 436.

38.  In the footnote: "See also 1692 Mass. Acts 10, 11–12."  This is nearly identical to 1694 Mass. Laws 12, no. 6, discussed above.  It is on pp. 52-53.[30]  There is nothing at pp. 10-12 of any relevance, suggesting that he did not read it before citing it.

39.  "Maine's 1821 law outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens" cited as "1821 Me. Laws 285, ch. 73 § 1."  Actually it is ch. 76 at 353. Like the similar 1694 Mass. Laws 12, no. 6, it is limited to a small number of criminal acts and is not a ban on open carry except if you "go armed offensively, to the fear or terror of the good citizens."[31]  What he missed was ch. 17 which is identical to 1786 Mass. Acts ch. 38 at 88.  Again, it only prohibits being armed while "unlawfully, riotously, or tumultuously assembled."[32]

---

[28] 2 LAWS OF NEW HAMPSHIRE INCLUDING PUBLIC AND PRIVATE ACTS AND RESOLVES AND THE ROYAL COMMISSIONS AND INSTRUCTIONS WITH HISTORICAL AND DESCRIPTIVE NOTES, AND AN APPENDIX: VOLUME TWO PROVINCE PERIOD 1702-1745 82-87 (1913).
[29] 1795 Mass. Acts ch. 2 at 464.
[30] 1692 Mass. Acts ch 18, § 6 at 52.
[31] 1821 Me. Laws ch. 76 at 352-53.
[32] 1821 Me. Laws ch. 17 at 95.

12

40. Spitzer at pp. 12-13 repeats his earlier misrepresentations of N.C. (1792) and 1801 Tenn. Pub. Acts 260, ch. 22, § 6.  He also contends that widespread brandishing laws that by his own admission required:

> Note the two key elements: the "exhibit" or display of the weapon combined with doing so "in a rude, angry and threatening manner," revealing a criminal intent as invoked by the terms "rude, angry, and threatening."

41. Somehow, Spitzer imagines that these brandishing laws prohibited open carry.

## Licensing Laws

42. Spitzer's licensing laws section is a bit mystifying.  He includes laws that licensed hunting with firearms, commercial sales, and firearms discharge.  None of these laws are challenged in this case.

43. Spitzer acknowledges there was "licensing on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks."  If Spitzer believes racist laws provide evidence of an American tradition of restrictive gun laws, then he may want to read the 14th Amendment.  Again, pointing to these laws as justification for current licensing is something that might play well at a KKK meeting, but it seems an odd defense of a law today.

44. Spitzer at pp. 19-26 gives a history of gun licensing that starts in 1871, three years after the 14th Amendment incorporated the Second Amendment on to the states, and thus after the date Bruen sets for determining whether a law is constitutional or not.

45. Subsequent sections of his declaration discuss firearms discharge licensing, and dealer recording of sales.  To what purpose Spitzer does this for Baird v. Bonta is utterly mystifying

13

## Summary

46. Spitzer's claims about general bans on carrying of firearms disappear when you look up his cited sources, some of which do not exist, some of which he misrepresents, and many of which Bruen specifically rejected as controlling.  His use of brandishing laws to justify bans on open carry make no sense; even his own summary of those laws admit that there needed to be more than just the visibility of a weapon to constitute a crime.  Allowing open carry in no way impairs California's current assault with a deadly weapon law.

47. The quality of Spitzer's scholarship (citing non-existent laws, relying on secondary sources when primary sources are readily available, misrepresenting the laws that are actually present) should raise serious questions about his conclusions.

58. His attempt to justify current licensing laws by using racially motivated licensing laws is the most mystifying part of this whole declaration.  As I said earlier, this would be a strong selling point to a bench filled with Klansmen.

14

**Exhibit 3 to the Declaration of Clayton Cramer**

## Table of Authorities

### Cases

Brown v. Maryland, 25 US 419, 436 (1827) ............................................................... 21

Commonwealth v. Leach, 1 Mass. 59 (1804). .............................................................. 3

Franchise Tax Bd. of Cal. v. Hyatt, 139. S.Ct. 1485, 1498 (1019)................................. 7

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2120 (2022) ..................... 23

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022). ............ 2

State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844). ................................................... 3

Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).... 4

### Statutes

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) ................................. 9

5 *Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay* 479 (1886)*, ch. 21*..................................................................................................... 10

9 Statutes at Large of Pennsylvania 30 (1903) ............................................................. 2

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From 1638 To 1649  25-26 (1857).................................................................................... 9

U.S. Const., Art. I, § 9, cl. 3.................................................................................. 10

### Other Authorities

2 Massachusetts Digest: Being a Digest of the Decisions of the SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863)......... 3

An ACT to suppress the disorderly practice of FIRING GUNS, &c., Pennsylvania Gazette, Dec. 28, 1774............................................................................................. 17

i

Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999)..................................................... 21

FBI, Crime in the United State: 2019, Table 4 ........................................... 13

FBI, Crime in the United States 2019, Expanded Homicide Data Table 2 (2019)...................... 11

FBI, Crime in the United States: 2017, Table 4................................................ 12

FBI, Crime in the United States: 2019, Table 4................................................ 12

Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870 34 (1948).......................... 14

Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972).......................... 14

Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209 (1956)......................................................................................... 14

John M. Dawson and Patrick A. Langan, Murder in Families, Bureau of Justice Statistics Special Report 1 (Jul. 1994) .......................................................... 12

John Winthrop, 2 Winthrop's Journal: "History of New England", 27, 153, 180, 275 (1908). ... 15

John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.................................................................... 19

Last Friday one Hunt, a lime seller in this…, Pennsylvania Gazette, Apr. 20, 1749. ................. 16

Last Monday Capt. Tyng in the Massachusetts…, Pennsylvania Gazette, Aug. 15, 1745.......... 16

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980)................................................................................ 14

Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina iii (1792)..................................................................... 2

Monday Evening last a very melancholy…,  Pennsylvania Gazette, Oct. 31, 1745 ................... 16

ii

Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840) ...................................................... 14

Randolph Roth, American Homicide xii (2009) .......................................................................... 12

Richard Maxwell Brown, The South Carolina Regulators 35, 40, 54 (1963) ............................. 16

Robert V. Wells, Population of the British colonies in America Before 1776: A Survey of Census

Data Table 1-1 at 9 (1975). ................................................................................................. 11

William M. Burwell, Address Delivered Before the Society of Alumni of the University of

Virginia 446-47 (1847) ...................................................................................................... 10

## I.    Introduction

1.      This Rebuttal Declaration to Prof. Cornell demonstrates multiple errors that demonstrate a limited knowledge of the colonial period and legal history.

## II.   Qualifications

2.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

3.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

## III.   Carrying Over English Common Law

At p. 3, Cornell asserts "Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations."  His footnote lists "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804)."

1

7. "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30" carried over English law but with the important provision:

> all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require *until the said laws or acts of general assembly respectively, shall be repealed or altered* or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.[1]  [emphasis added]

8. Certainly, the Pennsylvania Constitution of 1790, with its guarantee of a right to keep and bear arms,[2] qualifies as alteration of English common law concerning arms.

9. "FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792)."  The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[3]  North Carolina's 1776 Constitution guarantees "That the people have a right to bear arms, in defense of the State"[4]  Again, this guarantee concerning the right to bear arms overrode English common law.  Furthermore pp. 60-61 in Martin's collection is the Statute of Northampton disqualified for relevance by Bruen.[5]

10. When the North Carolina Supreme Court heard State v. Newsom (1844), one of the claims made by the black defendant was that the 17th article the Bill of Rights of North Carolina protected his right to carry a shotgun.  The North Carolina Supreme Court in deciding in this

---

[1] 9 STATUTES AT LARGE OF PENNSYLVANIA 30 (1903).
[2] Penn. Const., Art. IX, § 21 (1790).
[3] Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA iii (1792).
[4] North Carolina Const. Art. XVII (1776).
[5] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022).

2

case, did not question whether the right to keep and bear arms was individual in nature.  Instead, they ruled that the defendant's color was the deciding principle, taking precedence over the text. Referring to the authors of the North Carolina Constitution: "They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require."[6]

11. "*Commonwealth v. Leach*, 1 Mass. 59 (1804)": The decision did nothing to make English common law applicable in Massachusetts:

> Hooker, for the prosecution, conceded that justices of the peace were officers created by statute, and that their jurisdiction and powers were wholly dependent upon the statutes; 2 Hawk. P. C. c. 8, 13 , &c. But he contended that their jurisdiction here was not limited to those offences which are expressly, and by name in our own statutes, made cognizable by them; on the contrary, that it extended to all cases in which justices of the peace in *England* had jurisdiction by any of the statutes of that country which were passed previous to the emigration of our ancestors; which were to be considered as a part of our common law; that this was strongly implied in the act for establishing Courts of General Sessions of the Peace, passed July 3, 1782, (stat. 1782, c. 14 ,) by the first section of which" they are empowered to hear and determine all matters relative to the conservation of the peace, and the punishment of such offences as are cognizable* by them at common law, or by the acts and laws of the legislature, and to give judgment, &c.

> In this act, the term *common law* cannot mean the common law of *England*, because justices of the peace there are not common law officers; it must, therefore, mean our common law; and on this subject, our common law must be precisely what the *statute* law of *England* was at the time of the emigration of our ancestors from that country. The statutes which were previous to that time enacted in England, and which define or describe the authorities, powers, and jurisdiction of justices of the peace, give to them, expressly, cognizance of divers offences which were offences at common law; among which are trespasses.[7] [emphasis in original]

Clearly, only *some* parts of English law were common with Massachusetts law.  Where Massachusetts law had differed, English law was no longer valid.

12. A later digest of Massachusetts decisions includes "*Commonwealth v. Leach*, 1 Mass. 59 (1804)" in its list of "English Statutes Adopted Here."[8]   Only individual s*tatutes*, not

---

[6] State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844).
[7] Commonwealth v. Leach, 1 Mass. 59 (1804).
[8] 2 MASSACHUSETTS DIGEST: BEING A DIGEST OF THE DECISIONS OF THE SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863).

3

necessarily all of common law applied in Massachusetts, or there would be no need to have a detailed list.

13. Cornell has attributed this carryover of English law as it was in 1776 to sources from three states, none of which fits his claim. Cornell does not understand his sources.

15. The U.S. Supreme Court has also emphasized how little significance English common law has compared to a constitution: "Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no controul. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendant and has no bounds."[9]

## IV.    Conserving the Peace

16. Prof. Cornell on p. 3 quotes Blackstone's COMMENTARIES about how the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."   True enough, but Blackstone's quote is from a discussion of:

> [S]ubordinate magistrates, whom I am to consider justices of the peace… Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[10]

17. While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective description, and irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

---

[9] Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).
[10] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).

4

18. When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence…"[11]  Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

> The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[12]

19. If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

20. Next, Cornell quotes Justice Kavanaugh from D.C. v. Heller (2008): "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."  I am unsure why Cornell claims these are Kavanaugh's words.  While Kavanaugh joined in Justice Thomas' opinion in Bruen, Kavanaugh was not on the Court in 2008.[13]  Cornell is here quoting no from any Justice of the Supreme Court, but from the Syllabus for Heller, which carefully footnotes, "The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader."[14]  Any serious legal scholar knows the syllabus or headnotes on any federal or state court decision are not part of the opinion, nor precedential; Cornell is obviously not a legal scholar.

21. On p. 4:

> The right of the people to pass laws to promote public health and safety is one of the most fundamental rights in the pantheon of American rights. The idea of popular sovereignty, a core

---

[11] Id., at 143.
[12] Id., at 121.
[13] D.C. v. Heller, 554 U.S. 570 (2008).
[14] D.C. v. Heller, 554 U.S. 570 (2008).

5

> belief of the Founding generation, included a right of legislatures to enact laws to promote the common good. Although modern lawyers and jurists are accustomed to thinking of this concept under the rubric of state police power, the Founding generation viewed it as a right, not a power.

22. What the people, and ideally the legislature as well, consider "laws to promote public health and safety" has been restrained by both state constitution bills of rights and the U.S. Bill of Rights from the very beginning. Rep. James Madison, author of the Bill of Rights, is also remembered for his MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN arguing that Virginia should disestablish the Anglican Church:

> Either then, we must say that the will of the Legislature is the only measure of their authority, and that, in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: either we must say that they may control the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary powers of the State; nay, that they may despoil us of our right of suffrage, and erect themselves into an independent and hereditary assembly: or, we must say, that they have no authority to enact into law the bill under consideration.[15]

23. If Cornell really believes in "popular sovereignty,… included a right of legislatures to enact laws to promote the common good," I look forward to his stalwart defense of state laws mandating racially segregated public schools and public accommodations, censorship of dirty books, prohibitions on sodomy, one man/one woman marriage laws, and bans on transgender sports. It is hard to consider a person a legal scholar or historian who does not understand that the American experiment in democracy has always been restrained by a recognition that majorities can and do make mistakes. This is the reason that every state constitution today, many of the Revolutionary state constitutions, and the U.S. Constitution has a Bill of Rights.

24. At p. 5, Cornell appears to trot out another decision by Justice Thomas to argue against his decision in Bruen: "In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history,

---

[15] James Madison, A MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN; WRITTEN IN 1784-5, AT THE REQUEST OF THE RELIGIOUS SOCIETY OF BAPTISTS IN VIRGINIA 41 (1828).

6

text, and tradition with an 'ahistorical literalism.'"   Cornell then cites "*Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019)"   But Thomas' decision actually is attacking "ahistorical literalism" and in a way that Bruen's arguments about interpreting text with analogous laws today:

> Hyatt argues that we should find no right to sovereign immunity in another State's courts because no constitutional provision explicitly grants that immunity. But this is precisely the type of "ahistorical literalism" that we have rejected when "interpreting the scope of the States' sovereign immunity since the discredited decision in Chisholm ."[16]

25. At pp. 6-7, Cornell quotes the Second Amendment and asserts, "Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state."   The first clause of the Second Amendment references not well-regulated arms but a "well-regulated militia."

26. Heller pointed out that, "The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose."[17]   Either Cornell is misreading the Second Amendment's text or he is unfamiliar with the Heller decision.   In either case, he has demonstrated his lack of expertise in this subject.

27. Cornell at pp. 7-8 cites the Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term.   If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[18]

28. At p. 7:

---

[16] Franchise Tax Bd. of Cal. v. Hyatt, 139. S.Ct. 1485, 1498 (1019).
[17] D.C. v. Heller, 554 U.S. 570, 577 (2008).
[18] Richard Burn and John Burn, A NEW LAW DICTIONARY 79 (1792).

> In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding-era American English, the word "infringement" meant to "violate" or "destroy." In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying *right*. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment….

29. Cornell makes a strong claim but it is a distinction without a difference. In what way is limiting free speech *just a bit* (e.g., prohibiting criticism of the U.S. Government) different from limiting the right to bear arms *just a bit* (e.g., prohibiting the open carry of knives). Of course *just a bit* has a non-boolean aspect to it. In 1863, California banned concealed carry, but open carry was lawful. In 1967, California banned carrying *loaded* firearms in cities without a license, rendering them useless for self-defense.[19] You could still carry a loaded handgun in most of the state without a license. Now even that is gone. Has not this right been destroyed?

30. At p. 8, quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a destitution of all law, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property." [emphasis in original] The relevance of this quote to this case seems confused. The plaintiffs are not arguing for no government or a "destitution of all law," but a disagreement about *this* law. Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

31. Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."

---

[19] *Capitol Is Invaded*, SACRAMENTO BEE, May 2, 1967, A1, A10.

8

What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power.  The recent consequences of panic after 9/11 should be a reminder that even well-intentioned polity's can blow it.

32.  Cornell continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order."  Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed.  They imposed a duty to be armed and to show up with those arms on muster day or face fines for failure.[20]  I am unaware of any safe storage laws of this period.

33.  At p. 10: "The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties."

34.  In 1777, Pennsylvania responded to concerns that Loyalists might be a fifth column by passing a law that provided that those of militia age refusing to swear an oath of loyalty to the Revolutionary governments were prohibited from "holding any office or place of trust in this state, serving on juries, suing for any debts, electing or being elected, buying, selling or transferring any lands, tenements or hereditaments, and shall be disarmed by the lieutenant or sub-lieutenant of the city or counties respectively."

---

[20] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall beare Armes that are above the age of sixteene yeeres except they doe tender a sufficient excuse [to] the Corte & the Cort allowe the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649  25-26 (1857) ("It is ordered that every one that beares armes shall be compleatly furnished with armes (viz), a muskett, a sworde, bandaleers, a rest, a pound of powder, 20 bullets fitted to their muskett, or 4 pound of pistoll shott or swan shott att least, and be ready to show them in the markett place upon Munday the 16th of this Month before Captaine Turner and Leiutennant Seely under the penalty 20 s fine for every default or absen[ce].")

9

35. Massachusetts' similar Test Act:

> That every male person above sixteen years of age, resident in any town or place in this
> colony, who shall neglect or refuse to subscribe a printed or written declaration, of the form
> and tenor hereinafter prescribed, upon being required thereto by the committee of
> correspondence, inspection and safety, shall be disarmed, and have taken from him, in manner
> hereafter directed, all such arms, ammunition and warlike implements, as, by the strictest
> search, can be found in his possession or belonging to him…[21]

36. Like its cousins in other states, refusing the oath disqualified one for any public
office, work as a minister, voting, or teaching.[22]   Cornell could easily use these wartime
emergency acts as justification today for restrictions on transferring property, voting, teaching, or
preaching the gospel.

37. Abuses of civil liberties were widespread during the chaos of the Revolution.
Thomas Jefferson drafted a bill of attainder passed by the Virginia Legislature in 1778.[23]   In
Cornell's model, the U.S. Constitution's prohibition on Bills of Attainder[24] can be safely
ignored.

## V.   Colonial America

### A. Murder Rates

38. Cornell at p. 11:

> Although it is hard for many modern Americans to grasp, there was no comparable societal ill
> to the modern gun violence problem for Americans to solve in the era of the Second
> Amendment. A combination of factors, including the nature of firearms technology and the
> realities of living life in small, face-to-face, and mostly homogenous rural communities that
> typified many parts of early America, militated against the development of such a problem. In
> contrast to modern America, homicide was not the problem that government firearm policy
> needed to address at the time of the Second Amendment…. Levels of gun violence among
> those of white European ancestry in the era of the Second Amendment were relatively low
> compared to modern America. These low levels of violence among persons of European
> ancestry contrasted with the high levels of violence involving the tribal populations of the

---

[21] 5 *Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay* 479 (1886), ch. 21.
[22] *Ibid.*, 481.
[23] William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847).
[24] U.S. Const., Art. I, § 9, cl. 3.

10

region. The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth.

39. There is no Figure 1 in Cornell's declaration.  He likely means "Figure 2.3 Unrelated-adult homicide rates by race, 1677-1797 (per 100,000 persons per year)" on p. 13.  While Cornell does not cite a source for this Figure, he *implies* that it comes from Roth's AMERICAN HOMICIDE (2009).

40. This figure is full of problems.  Cornell's Figure 2.3 shows New England European-American unrelated-adult murder rates.  (The graph needs some horizontal lines to more easily determine rates in various years.  I have used a T-square to deduce that murder rates for European-American unrelated-adult varied from 4.5/100,000 to 1.5/100,000 over the specified years.)

41. How Roth calculated these rates is a bit mystifying.  Figure 2.3 shows murder rates by race for 1677-1797, yet the earliest census in Massachusetts appears to be 1754.  Connecticut's first census was in 1756; Maine 1764-65; New Hampshire, 1772; Rhode Island, 1768; Vermont, 1771.[25]   How censuses would have counted often unfriendly Indians before 1700 is a mystery.

42. The title of Figure 2.3 says "Unrelated-adult homicides."  There are three separate problems when comparing this data to modern murder rates.  About 6% of murder victims in 2019 were under 18.[26]  Yet, Roth tells us they are not included.  Elsewhere, Roth has insisted that children killed in mass murders should not be counted.[27]  It would appear that he did not consider their murders worth counting here, either.

---

[25] Robert V. Wells, Population of the British colonies in America Before 1776: A Survey of Census Data Table 1-1 at 9 (1975).
[26] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).
[27] Randolph Roth,  Supplemental Sur-Rebuttal Expert Report and Declaration of Randolph Roth, Rupp v. Bonta (C.D.Cal. 2023) ("The two club-wielding robbers in Washington, Connecticut, in 1780, managed to kill only two adults. The other three victims

11

43. "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[28]

44. About 6% of recent civilian homicides are either initially classified as justifiable or excusable.   Justifiable homicides are killings of a person engaged in a felony; excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[29]  Roth tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[30]   Roth's measure of New England homicide even if there is census data somewhere that supports his rates is likely an undercount of actual murder rates (+6% for children; +16% for family murders; -6% for lawful killings).

45. Yet today, with access to modern firearm technology, including semiautomatic, magazine-fed firearms, Vermont's 2019 murder rate was 1.8/100,000;[31] in 2017, the year before they adopted a Large Capacity Magazine ban, it was 2.2/100,000.[32]   Other fairly laissez faire states with respect to gun regulation have similarly low murder rates.   Maine 1.5/100,000; New Hampshire: 2.4.   My home state, Idaho, which does not even require a license to carry, and has

---

were children. The husband who attacked his family with an axe in Clarksburg, Virginia, in 1805 killed only one adult, his wife. His other eight victims were his children. And the husband who attacked his family with a knife in Hallowell, Maine, in 1806 killed only one adult, his wife. His other 7 victims were his children.")
[28] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).
[29] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).
[30] Randolph Roth, AMERICAN HOMICIDE xii (2009).
[31] FBI, Crime in the United States: 2019, Table 4.
[32] FBI, Crime in the United States: 2017, Table 4.

12

no machine gun regulation, is 2.0/100,000; South Dakota (1.9); Wyoming (2.2).[33]   And these 2019 murder rates include related adults and children but no justifiable homicides.  If the lack of modern firearms explains low murder rates in the colonial period, why are murder rates in some New England states and other states awash in modern firearms still so low?  Perhaps Cornell is refusing to face that other factors might be more important than firearms technology?

### B. Pistols in Colonial America

46. At p. 12: "Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates."  Bayonets are not a firearms technology, nor does this case involve bayonet regulation.  (Perhaps Cornell copied this whole paragraph from a declaration related to assault weapons bans, where bayonet lugs have become a basis for prohibition, in spite of a lack of bayonet charges in recent American History.) Cornell's assumption of who owned pistols and why reflects, I think, Cornell's single source, a book about dueling by people in national politics.

47. How common were pistols before the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was a civilian market for them in at least some cities; and that pistol ownership was unremarkable.  An analysis of all Plymouth Colony probate

---

[33] FBI, Crime in the United State: 2019, Table 4.

13

inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[34]

48. On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Calvarymen were obligated to provide themselves with "a case of pistols. . and a carabine." Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols." [35] (How many pistols were in one case? At least one.)

49. While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige. Only a few pre-Revolutionary War American-made pistols have survived.[36] Surviving pistols made for William Smith of Farmington, Connecticut by Medad Hills in 1771, were equipped with American-made barrels, and apparently English locks.[37]

50. Advertising and news reports show that merchants offered pistols for sale in Colonial America. Such ads appear in the *Boston Gazette* as early as 1720. Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[38]

51. A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749. A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having

---

[34] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.
[35] Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840).
[36] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792 312 (1980); Frank Klay, THE SAMUEL E. DYKE COLLECTION OF KENTUCKY PISTOLS 4-15 (1972); Felicia Johnson Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 34 (1948).
[37] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).
[38] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742¸ May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

14

as they said, got the six Pair at some other Place."[39]  In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[40] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."  Philadelphia merchants advertised pistols for sale repeatedly from 1744 onward.[41]  A 1745 ad in the PENNSYLVANIA GAZETTE, offered "ship muskets, *pistols* , cutlashes and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[42] [emphasis added]

52. Pistols appear in journals and newspaper articles throughout the colonial period—and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable.  Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers.  One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march, at least one member identified as armed with a pistol.  There were murders with pistols at Stamford, Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[43]  Pistols appear in other places in Winthrop's Journal.[44]  Winthrop never expressed any surprise over the presence of pistols.

53. An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was

---

[39] PENNSYLVANIA GAZETTE, August 31, 1749.
[40] September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).
[41] *Pennsylvania Gazette*, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.
[42] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA GAZETTE, Sep. 26, 1745, Oct. 3, 1745.
[43] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).
[44] Id., at 95, 151,

15

found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[45]

54. Many eighteenth century accounts also mention pistols.  Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[46]  In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopt on the Road, and his Money demanded, by two Men with Pistols…."[47] There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse of and accidental deaths from pistols; they are never described as surprising.[48]  Pistols appear among the South Carolina Regulators and the criminals to whom they administered frontier justice.[49] Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians…."[50]

55. Pistols appear in news reports: This came from New York in 1775, describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused him; and whilst struggling to enter the door, he received a blow upon his head, which leveled him with the ground: Having recovered a little, he arose and discharged a *pistol* among the opposers, and commanded the Court party to fire also; when, as Mr. Langdon supposes, about five of them fired. Mr. French, one of the opposers, was killed by a ball's being lodged in his head,

---

[45] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.

[46] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).

[47] *By the last Post from New York…*, PENNSYLVANIA GAZETTE, Aug. 31, 1749.

[48] *Monday Evening last a very melancholy…*,  PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.

[49] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).

[50] *Last Monday Capt. Tyng in the Massachusetts…,* PENNSYLVANIA GAZETTE, Aug. 15, 1745.

16

and two more of the same party were also wounded. The sheriff and the Court party then entered the courthouse. The populace without discharged a gun and two *pistols* .[51] [emphasis added]

56. Many news accounts report pistols being used by people far removed from "wealthy, powerful, and influential."[52]

57. A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[53]  A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[54]

58. Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities.  This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off any handgun, pistol, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province…."[55]

---

[51] *MR. Mark Langdon, from Westminster, in the…,* VIRGINIA GAZETTE, Apr. 22, 1775.
[52] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[53] *To the Publick,*  SOUTH CAROLINA GAZETTE, DEC. 26, 1743.
[54] *GUERIN & WILLIAMSON,Have just imported in the London,* SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL, Jun. 24, 1766,  Jul. 1, 1766, Jul. 8, 1766
[55] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.

17



PAUL REVERE'S VERY COMPACT POCKET PISTOL [56]

59. My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[57]   Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers, still it is pretty apparent that Cornell's claim about the scarcity of pistols outside of those being used by the elite for dueling is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

**B. Black Powder**

60. At pp. 12-14:

> Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons

---

[56] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[57] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

18

> was not only corrosive, but it attracted moisture like a sponge…. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

61. This is a perfectly logical statement, but the documents left by colonial Americans show that they did not follow it very consistently.  As mentioned above, people tried to unload firearms in public places with tragic results.  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

> At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[58]

62. And:

> Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.[59]

63. And with reference to Cornell's claim at p. 14: "The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge":

> It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[60] [emphasis added]

And:

> One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do,

---

[58] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.
[59] Id. 2:55.
[60] Id., 2:317.

and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[61]

64. These four incidents of firearms kept loaded when not in active use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in books that I have not read?

65. Finally, there is one more piece of evidence that Americans had loaded firearms when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

66. The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

67. You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

68. Cornell knows about this ordinance; he first brought it to my attention by email some years back.

## VI.    Firearms Regulation in Antebellum America

---

[61] Id., 2:72.

69. At p. 14, Cornell claims that the perceived Southern lead in firearms regulation ignores the regulatory development in the other states.  "Southern slavery was an important contributing factor to this process of regional differentiation. Indeed, many gun-rights advocates focus primarily on a string of Southern cases decided by slave-holding judges to ascertain the public meaning of the right to bear arms."  That such cases were in slave states overstates the role of slavery in this development.

70. When I started research on my master's thesis[62] my hypothesis was that slavery played some part in the process of concealed weapon regulation.  This would be unsurprising: some antebellum decisions overtly identified firearms regulation with race;[63] as did many postbellum Southern statutes and decisions.[64]  As I researched the antebellum statutes legislative hearings and state constitutional debates, it became increasingly clear that these statutes were aimed at the violent Scots-Irish honor culture of the upland South, not blacks.

71. Cornell rambles towards his goal with a misleading reference to Brown v. Maryland, (1827): "[t]he power to direct the removal of gunpowder is a branch of the police power." The decision involved not gunpowder or even police power, but a state requirement

> [T]hat all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spiritous liquors, &c. and other persons selling the same by wholesale, bale or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license, as by the original act is directed, for which they shall pay fifty dollars…[65]

---

[62] Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999).

[63] State v. Newsom, 27 N.C. 250 (1844) ("The defendant is not indicted for carrying (254) arms in defense of the State, nor does the act of 1840 prohibit him from so doing. Its only object is to preserve the peace and safety of the community from being disturbed by an indiscriminate use, on ordinary occasions, by free men of color, of firearms or other arms of an offensive character." at 253, 254)

[64] Clayton E. Cramer, Nicholas James Johnson, and George A. Mocsary, *'This Right Is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 GEORGE MASON LAW REVIEW 823 (2010) cited in McDonald v. Chicago (2010).

[65] Brown v. Maryland, 25 US 419, 436 (1827).

21

72. The Brown decision was based on the Dormant Commerce Clause.  The reference to gunpowder was in response to a hypothetical by Maryland: "He may sell by retail, at auction, or as an itinerant pedlar. He may introduce articles, as gunpowder, which endanger a city, into the midst of its population; he may introduce articles which endanger the public health, and the power of self-preservation is denied."  Chief Justice Marshall's decision quoted by Cornell was: "The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States."[66]  The hazard of storing gunpowder in a crowded city is clear; it may explode without human agency and represents an enormous risk to persons perhaps far removed from the gunpowder.  If Cornell wants to liken the risk of open carry to gunpowder storage, then all forms of open carry deserve this same treatment, including the licensed open and concealed carry that California law allows.

73. Cornell also quotes from the License Cases (1847) to justify what seems to be a nearly unlimited police power of the state:

> When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied. Under the pretense of a police regulation, a state cannot counteract the commercial power of Congress. And yet, as has been shown, to guard the health, morals, and safety of the community, the laws of a state may prohibit an importer from landing his goods, and may sometimes authorize their destruction.[67]

74. This understanding of the nearly unlimited authority of the state by invoking the magic incantation "health, morals, and safety of the community" makes the entire Bill of Rights null and void.  If a state decided that sodomy and divorce impaired the morals of the community, gun possession impaired its health and safety, the state would enjoy unlimited power to criminalize these actions.

---

[66] Id. at 443.
[67] License Cases, 46 U.S. 504, 592 (1847).

22

75. Cornell at 16 quotes selectively from State v. Reid (Ala. 1840) to claim that "the *Reid* Court rejected the idea of permissive public carry," and then quotes from Reid that the state's arms guarantee "neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places …"

76. The following paragraph admits

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, *under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.*[68] [emphasis added]

I do not see how Cornell missed this utter rejection of his claim, two sentences later.

77. Also at 16:

> *Reid* acknowledged a fact that many modern gun rights activists and some judges have ignored—the imposition of a peace bond was central to the powers of justices of the peace, constables, and sheriffs, who all continued to function as conservators of the peace under American law. The appropriate legal response to the danger posed by someone traveling armed in public was to impose a peace bond, a surety of the peace.

78. *Bruen* specifically rejected peace bonds as "the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of 'reasonable cause to fear an injury, or breach of the peace.'"[69]   At p. 1, Cornell claims: "this report is a shorter version of that previous report, and is updated in light of the U.S. Supreme Court's decision last year."   Yet he continues citing laws that Bruen specifically rejected in its analysis.

## VII.   Post-1868 Evidence

---

[68] State v. Reid, 1 Ala. 612, 616, 617, 35 Am. Dec. 44 (1840).
[69] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2120 (2022).

23

79. At pp. 17-25, Cornell throws a pile of post-1868 statutes against the wall, hoping some of it will stick, even though Bruen is clear: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right."[70]

## VIII.  Summary

80. Cornell misrepresents the broadness of the carryover of English law to the American colonies.  He lists three states that apparently must stand in for all thirteen former colonies and even these two of these three are clear that later statutes (presumably including post-Revolutionary state constitutions) take precedence.  In Massachusetts, only a few aspects of English law carried over to the new state.

64. He misrepresents Blackstone about the importance of conserving the peace; quotes decisions by a Supreme Court justice not yet on the Court; argues for a unlimited democracy that the Bill of Rights exists to prevent; quotes an English lawyer who defends privilege over equal protection of the law (which to be fair, is California's position on the challenged law).  He misrepresents how the militia laws and the Test Acts worked.

65. He uses a tendentious understanding of colonial murder rates; shows ignorance of the widespread possession and use of pistols; and accepts too readily what appears to be a false understanding of how black powder firearms were stored in colonial America.

66. He engages in a straw-man argument about Southern firearms regulation exceptionalism; misrepresents State v. Reid (Ala. 1840); misuses Dormant Commerce Clause

---

[70] Id. at 2119.

24

cases to argue for an unlimited power of the states to regulate everything with no power of the Bill of Rights to counter such abuses of majority power.

67. Cornell attempts to use post-1868 laws contrary to Bruen's clear instructions.

ER-421

# EXHIBIT  2

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

## EDUCATION:

|  |  |
|---|---|
|  | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

## AWARDS:

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
|---|---|
|  | First Place, Undergraduate Division |

## TEACHING EXPERIENCE:

| Fall, 2017 – present | ***Adjunct Faculty:*** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
|---|---|
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | ***Adjunct Faculty:*** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | ***Adjunct Faculty:*** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | ***Adjunct Faculty:*** Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

1996            ***Teaching Assistant***: Assisted Professor Peter Mellini in his course
                "Twentieth Century World."  I graded quizzes, exams, and answered
                weekly written questions from students.  I also prepared and lectured
                about the rise of totalitarianism in the period between the world wars.


**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian
Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological
and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the
Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns
Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern
Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent
and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel
McIlvaine,* editor
Library Research Associates, Inc., 1990

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming
"

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995.

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002.  "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

*"*Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester*, 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien*, 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.

# EXHIBIT  3

1   CHRIS COSCA   SBN 144546
2   COSCA LAW CORPORATION
    1007 7th Street, Suite 210
3   Sacramento, CA 95814
    916-440-1010
4
5   AMY L. BELLANTONI
    THE BELLANTONI LAW FIRM, PLLC
6   2 Overhill Road, Suite 400
    Scarsdale, NY 10583
7   914-367-0090
    *Pro Hac Vice*
8
9   Attorneys for Plaintiffs
10
11                 **UNITED STATES DISTRICT COURT**

12                 **EASTERN DISTRICT OF CALIFORNIA**
13

14  MARK BAIRD and                          Case No.  2:19-cv-00617-KJM-AC
    RICHARD GALLARDO,
15                                           **EXPERT DECLARATION AND REPORT**
              Plaintiffs,                    **OF CHARLES "CHUCK" HAGGARD**
16
         v.
17                                           Judge:        Hon. Kimberly J. Mueller
    ROB BONTA, in his official capacity as   Room:         3
18  Attorney General of the State of California,
    and DOES 1-10,                           Trial Date:   None set
19                                           Action Filed: April 9, 2019
20            Defendants.
21
22
23
24
25
26
27
28
                                 1

## DECLARATION OF CHARLES "CHUCK" HAGGARD

1.      I, Charles "Chuck" Haggard, am over the age of 18, and submit this declaration in further support of the plaintiffs' motion for a preliminary injunction.

2.      Counsel for the plaintiffs requested my expert opinion in response to the declaration of Kim Raney submitted by the defendant, Attorney General Rob Bonta, in connection with the above-captioned matter. I have personal knowledge of each fact stated in this declaration, and if called as a witness I could and would testify competently thereto. A copy of my most recent resume is attached hereto as "Exhibit 1".

## I. LAW ENFORCEMENT AND PROFESSIONAL EXPERIENCE

3.      I served as a law enforcement officer with the Topeka Police Department from 1987 to 2014 in the following capacities: Patrol Officer (1987 – 1999); Field Training Officer (1989 – 1999); Sergeant (1999 - 2008 [Zone supervisor, Acting Watch Commander in absence of Lieutenant, squad leader and acting team leader for the Response Team]); Field Training Supervisor (1999 – 2006); Rangemaster (2006 – 2008); Lieutenant/Deputy Watch Commander (2008 - 2014 [LT/Watch Commander on all three Field Operations shifts, including Acting Commander during a period of manpower shortage/promotion freeze in which I was the LT for 1st and 2nd shift, along with the SROs and Motor Unit, supervising 56 officers and Sgts, Co-chair of Department Shooting Review and Use of Force Review Board]).

4.      As a member of the Topeka Police Department, I served as an instructor at the Police Academy, lead Defensive Tactics Instructor, Firearms Instructor, and SWAT/Officer Survival Tactics, car stop tactics; Response Team member, Breacher, Chemical Munitions officer, Sniper, and Supervisor; Honor Guard team member and supervisor; FTO Program Development Committee, Shooting Review Board/Use of Force Review Board member; Use of Force General Orders Development Committee.

2

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

5.　　I developed the following protocols for the Topeka Police Department: Use of Force Continuum and General Orders; Defensive Tactics Program; Active Shooter Response Training; Force on Force scenario and decision-making training; and Handgun, Shotgun, Patrol Rifle Training and Policy.

6.　　I received specialized training in: Control/Defensive Tactics, Police Baton, Firearms, Reasonable Use of Force, Taser, OC Spray, Handcuffing, SWAT Tactics, High Risk Patrol Tactics, Low Light Tactics, Active Shooter/Rapid Response, Police Defensive Tactics (empty hand control, weapon retention, LVNR, ground control and defense), Excited Delirium, Force of Force scenario training, investigation of police use of force and officer involved shooting events.

7.　　I also served as a Team Member of the North East Kansas Incident Management Team in the capacity of Liaison Officer and Public Information Officer.

8.　　My faculty appointments include: National Trainer, National Law Enforcement Training Center; Adjunct Instructor, Strategos International; Instructor/Board of Directors, Survival Operations System, Inc.

9.　　From 2015 to 2018, I served in a part-time capacity as a Deputy Sheriff and in-service instructor with the Jackson County Sheriff's Office.

10.　　Since December 2015, I have served with the Metro Topeka Airport Authority as a police officer/air crash rescue fire fighter/fire fighter, use of force instructor, firearms Instructor, and policy writer for police operations.  I am currently assigned as the Patrol Captain for MTAA. In that capacity, I supervise three shift lieutenants, all patrol operations, as well as law enforcement training for the agency.

11.　　Since 2019, I have also served as a part-time Deputy and in-service instructor with the Shawnee County Sheriff's Office.

3

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

12.     My military service and Officer Safety/Field Operations Training is detailed in my annexed CV, which includes Understanding and Investigating Officer Actions in Deadly Force Encounters; Officer Survival, Winning Mindset; Winning Mind/Physical and Emotional Survivability.

13.     My weapons and defensive tactics training are detailed in my annexed CV, which includes Advanced Combat Pistol, Levels 1 and 2 (Defensive Shooting Academy of Tulsa); HK International Law Enforcement Training Conference; Tactical Pistol; Officer Survival; Tactical Sub-Machinegun; Tactical Pistol Course (HSS International); National Law Enforcement Training Center Certifications; Control/Defensive Tactics; Handcuffing, Handgun/Long Gun Retention and Disarming; Knife Defense and Disarming; Trainer Development; Legal/Medical Implications of Use of Force; Instinctive Shooting Course (Israeli Shooting International); Officer Survival and Advanced Handgun Course (Jim Cirillo); Advanced Handgun Skills Course (Lethal Force Institute); Immediate Action counter–assault courses (Immediate Action Combatives). My advanced tactics, leadership, and specialized training is detailed in my annexed CV, which includes Weapons of Mass Destruction Tactical Commander's Course (Louisiana State University); Tactical Supervision of Critical Incidents Course (DanCor Ltd.); LE Counter-Terrorism Course (Direct Action Resource Center); GSG 9 Counter-Terrorist Tactics Course (HSS International); High Risk Entry Course (HSS International);  Weapons of Mass Destruction, Tactical Response and Hostage Rescue (Louisiana State University/U.S. Department of Homeland Security); Hostage Rescue Course (National Tactical Officer's Association); Response to the Active Shooter Instructor Courses (Strategos International); Officer Survival in Low Light Conditions Instructor Courses (Sure-Fire Institute/Strategos International); Hostage Rescue/High Risk Warrant Course (Tactical Explosive Entry School); Basic SWAT Course (Topeka Police Department); US Army: Police SWAT (SRT) Course; US Army: Police Sniper Course;

4

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

AAFT/Sioux City PD: Two Man Team Tactics; Crisis Communications and Media Response for Today's Leaders; Fair and Impartial Law Enforcement Train the Trainer course, KLETC/University of South Florida; Lexipol, Risk Management for Law Enforcement Supervisors; FLETC TCCC emergency medical training; Emergency Management/FEMA/Fire Service.

14.     My Instructor and Instructor-Trainer Certifications are detailed in my annexed CV, which include Active Countermeasures Systems: Defensive Tactics Instructor; American Society of Law Enforcement Trainers (ASLET): Use of Force Training Seminars; Live interactive Use of Force Training; Bullet Proof Mind; Firearms Confrontation Course; Flashlight as an Emergency Defense Tool; Casco System: Expandable Police Baton Instructor-Trainer; Defense Technology (Safariland Training Group): Less Lethal Munitions Instructor Courses; International Association of Law Enforcement Firearms Instructors (IALEFI) Regional Training Conferences; Low-Light Shooting; Defensive Tactics Instructor Course (assisted with course development, content and instruction); Defensive Tactics Review; Midwest Law Enforcement Trainers Association: Winning Lethal Confrontations Course; Monadnock Defensive Tactics System (MDTS) Instructor Course; Oklahoma Council on Law Enforcement Education & Training (CLEET); Shawnee County Sheriff's Department: Defensive Tactics Instructor Course; Strategos International: Low Light Tactics Instructor Certification Course; Strategos International: Law Enforcement Response to Active/School Shooter Instructor Course; Strategos International: Physical Conflict Resolution System Instructor; Strategos International: Active Shooter/Intruder Response Instructor; Rangemaster Advanced Instructor course

15.     My Instructor and Instructor-Trainer Certifications are detailed in my annexed CV, which include High Risk Entry; Vehicle Assault; Defensive Tactics; Defensive Tactics Instructor Course; Excited Delirium Recognition and Response; Narcotics Entries; High Risk Warrants;

5

Kansas City MO Police Department: Defensive Tactics/Use of Force and Instructor Certification Classes/Seminars (annually since 1994); St. Louis Police Department: Defensive Tactics Instructor Certification Course; LEO Response to the Active Shooter-Instructor Course; Prevailing in Low-Light Conditions-Instructor Course; Patrol Response to High Risk Incidents; Physical Conflict Resolution Instructor courses; Building Search Tactics; Crowd Control; Use of Force Continuum; Taser; Ponca City OK, Solo Officer Response to the Active Shooter; Kansas Transportation Safety Conference, LE Recognition and Response to Excited Delirium. I am a member or past member of the following organizations: American Society of Law Enforcement Trainers; International Association of Law Enforcement Firearms Instructors; International Defensive Pistol Association (Expert ranking); International Law Enforcement Educators and Trainers Association; International Wound Ballistics Association; Kansas Narcotics Officers Association; Metro Area Tactical Officers Association; National Field Training Officers Association; National Tactical Officers Association; and United States Practical Shooting Association.

**II. PUBLICATIONS and POLICY WRITING**

16.     I have written several articles and policies including: Concealed Carry and the 'Pea Shooter', The Outdoor Wire, Fall 2012 Special Edition; Gunlights, Switching and Gunpoint: Analysis – Part II, Tactical Wire, April 7, 2011; Gunlights, Switching and Gunpoint: An Analysis – Part I, Tactical Wire, April 5, 2011; Single Officer Response in Active Shooter Events, Tactical Wire, July 3, 2008; He Who Ignores History: Epic-scale Gunfights … Lessons for Law Enforcement, Police Magazine, April 20, 2011; Use of Force and Firearms policy author for Topeka PD General Orders; Assisted TPD legal advisor is authoring City of Topeka Municipal Code 9.40.050; Authored MTAA Use of Force, Racial Profiling and Domestic Response policy; and Assisted with IACP Response to Excited Delirium position paper and model policy.

6

### III.  EXPERT WITNESS SERVICES

17.     I have testified or served as an expert witness in the following subjects: firearms (mechanics/operation/deployment/safety), control/defensive tactics, less lethal/less than lethal tools, physical skills training, reasonable use of force, police training/SOP, tactical training. I have provided expert testimony or opinion in the following venues: Kansas State District Court (multiple cases, criminal and civil); Federal District Court, Kansas; Plano, Texas; and the Court of Military Justice, Ft. Riley.

18.     I am being compensated at a rate of $75 per hour for my time, which includes reviewing materials, communications with counsel, preparing reports, appearing for depositions, court appearances, and the like. My compensation is not dependent in any way on the outcome of this or any other proceeding or on the substance of the opinion(s) provided.

### IV.  MATERIALS REVIEWED

19.     Counsel for Plaintiffs has provided, and I have reviewed, the complaints, the preliminary injunction submissions, both Declarations of Kim Raney submitted in this action, San Mateo County Sheriff's Office, "Unloaded Open Carry" (January 14, 2010), Manny Fernandez, Alan Blinder, and David Montgomery, "Texas Open-Carry Laws Blurred Lined Between Suspects and Marchers," N.Y. Times, July 10, 2016.  Any other materials that I have relied upon are cited herein.

### V.  OPINIONS

20.     Counsel for Plaintiff has asked me to express an opinion on what effect the open carry of firearms has on public safety. The implementation of laws that allow open carry in public does not have a negative impact on public safety. The act itself – a lawful person openly carrying a firearm in public – does not have any negative or detrimental effect on public safety, does not itself create a 'safety hazard', and is not the cause of accidental or mistake-of-fact shootings of

7

civilians by police officers.

21.     The lack of proper police training creates or can lead to a public safety hazard and the accidental shooting of civilians – whether unarmed, carrying concealed, or carrying exposed (open carry).

22.     I have reviewed the Declaration of Kim Raney, which was submitted by the defendant in opposition to Plaintiffs' motion for a preliminary injunction.

23.     Mr. Raney has no law enforcement experience in a jurisdiction where individuals are legally permitted to open carry, nor does he have experience in a jurisdiction that legalized open carry virtually overnight.

24.     Mr. Raney's opinions are based on speculation and a generalized fear that law-abiding individuals – simply by the act of carrying their firearm exposed – will cause panic among police officers and the public, waste police resources, and ultimately lead to police officers shooting civilians carrying exposed.

25.     The open carry of a firearm in public was legalized in Kansas in 2011, leaving open the ability of the state's cities to 'regulate' the manner of carry in its jurisdiction. An example of this would be requiring that handguns openly carried be in a holster. In 2013, however, Attorney General opinion 2011-24 clarified that no city in Kansas could ban the open carriage of firearms.

26.     In 2008, the constitutional open carry [no permit required] of firearms in public went into effect immediately in Kansas. At the time, I was a Lieutenant/Watch Commander in the Topeka Police Department. No 'instant mayhem' was created. Our police officers were not spontaneously shooting members of the public they observed carrying a firearm exposed on their body in public.

8

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

27.     Public awareness of the passage of open carry laws through the media and public service announcements alerted the public to the changes in the law and reduced the possibility of confusion and/or alarm. The non-carrying public quickly grew accustomed to seeing their friends, neighbors, and other residents openly carrying firearms and the novelty faded.

28.     Banning open carry does not greatly enhance public safety, nor does it cure deficiencies in departmental training of police officers. Police shootings of innocent civilians – whether unarmed, carrying concealed, or carrying exposed – will continue to occur absent proper training or in those situations where the armed person is willfully forcing a confrontation with officers. This can and will happen regardless of the legalities of open or concealed carry.

29.     Topeka PD officers were instructed on the changes in the law. It was emphasized that open carry was now legal and that they should expect to see members of the public carrying firearms. Specific communication-based training was provided to our police officers for properly dealing with the public – how to respond to and interact with individuals who openly carried firearms, if necessary, and how to respond to members of the public who were reporting other people openly carrying firearms.

30.     I should note that Kansas went from being a state with no legal method of concealed or open carry, except for hunting or active-duty law enforcement officers (even retired officers were not exempt), to a state where concealed carry was allowed with a license, to a state where open and concealed carry was allowed with no license, in a relatively short period of time.

31.     Mr. Raney attempts to demonstrate that open carry creates a "public safety threat" by using terms that attempt to create panic: an officer "must rapidly assess" a person's behavior (¶22), "split-second decisions sometimes have to be made" (¶24), where the "results could be deadly" (¶22).

9

EXPERT DECLARATION AND REPORT OF CHARLES "CHUCK" HAGGARD

32.     The very nature of police work is the constant ability to rapidly assess what is going on and forming the proper response. A properly trained officer should be in a constant state of situational assessment and observation. Open carry by citizens in no way changes this fact. Training to enhance tactical situational awareness creates effective, skilled, and disciplined police officers through the use of repetition, "muscle memory", and situational cognition, which fosters confidence, decisiveness, and greatly heightens accuracy in decision-making. Communication, tactical scenarios and range training, and force-on-force drills are imperative generally to avoid accidental shootings of innocent individuals irrespective of open carry laws.

33.     If, as Mr. Raney urges, open carry should be banned because of some speculative 'havoc' that will result, then everyone outside of on duty uniformed officers should be banned from carrying in public as well – including off-duty officers, detectives, federal agents, undercover officers, concealed firearm carriers, retired officers, as well as armed home- and business-owners awaiting police response in the face of a past burglary or robbery because, as Mr. Raney reasons, the officers may "rush in" and shoot the first person they see with a gun. Inadequate and/or improper police training leads to mistakes and tragedy – irrespective of whether the public is permitted to openly carry firearms.

34.     With proper training, officers will not be surprised to see members of the public carrying a firearm openly. Open carry in fact places the officer in a more advantageous position than concealed carry. When an individual is carrying openly, the officer knows the person possesses a firearm because the officer can see the gun in plain, open view.  This scenario is more advantageous to the officer than where an individual reaches for something unknown – a phone, gun, their waistband to pull their pants up or while making furtive movements such as to hide drugs.

10

35.     Those situations, not the act of legal open carry, force police officers to make a split-second decision regarding how to react. When a handgun is carried openly, the officer can plainly observe the movements and actions of the individual, knowing exactly where the firearm is located in relation to the individual's movement. Where the Department has provided training and repeated notice and education regarding open carry laws, officers will be equipped with the knowledge and training to effectively deal with the public.

36.     Situational awareness training for officers, enforcing a broad view approach when responding to an event and/or interacting with the public, decreases the likelihood of an accidental shooting. Training officers to see the totality of the circumstances and contextual cues, then to observe whether the subject they are dealing with is armed, greatly reduces, if not eliminates, the possibility of an accidental or mistake of fact shooting.

37.     The very phrase, "Law-enforcement officers are taught that guns can be a dangerous and deadly threat to their safety and the safety of the public they serve" is a degrading depiction of trained police officers. (¶22). The portrayal of police officers immediately going to panic mode and/or shooting anyone openly carrying a firearm [basically] 'on sight' is inaccurate, reckless, and insulting to fellow law enforcement officers.

38.     Mr. Raney comments that "officers may have no idea about the armed person's motives, intent, mental condition, or emotional stability. The armed person's behavior and ability or failure to comply with law enforcement's instructions will have great bearing on the outcome of the contact. Should the armed person fail to comply with an officer's instructions or move in a way that could be construed as threatening, the results could be deadly". (Raney Dec. at ¶22). It should go without saying that every single encounter where the police interact with the public falls into this "no idea" area.  Modern officer survival training has for decades worked under the premise that officers should assume that everyone is armed with a weapon and act accordingly.

11

1    Just because the officer does not see a gun, does not mean the individual is unarmed. Further,

2    officers must always be aware that on any call for service their gun is also in play, due to the

3    history of weapon retention issues in law enforcement. Officers are commonly murdered or

4    assaulted by "unarmed" suspects. Every time an officer arrives at a location, s/he must assess the

5    'person's motives, intent, mental condition, and emotional stability".

6

7    39.    The San Mateo County Sheriff's Office "Unloaded Open Carry" publication dated

8    January 14, 2010, presents important information with respect to the importance of officer

9    training. Comments like, "[o]pen carry advocates create a potentially very dangerous situation"

10   and "[o]fficers may have no idea [when responding to a man with a gun call] that these people are

11   simply 'exercising their rights'" have no practical use. The message here is either that their police

12   officers lack proper training and rush to judgment [and shoot] without properly assessing the

13   situation or that open carry creates panic, fear, and a public safety danger. Either way, this is

14   editorial opinion, not a statement of facts.

15

16   40.    The behavior and demeanor of a person "exercising his right to open carry" will be

17   markedly different than that of an individual posing a threat to the public. Any experienced,

18   honest, law enforcement officer knows that to be the truth.

19

20   41.    Assessment of a person's demeanor, compliance or non-compliance with

21   commands, furtive or threatening movements – are all factors that officers must assess -

22   independent of whether the person is openly carrying a firearm or not, or whether open or

23   concealed carry is legal or not.

24   42.    With respect to the matter of responding to an active shooter event where lawful

25   gun owners are carrying openly, Mr. Raney provides no evidence (even anecdotal) that the

26   presence of civilians openly carrying firearms delays first responders from stopping the shooter

27   and saving lives.  There is however historical precedent to note that citizen/non law enforcement

28

12

interdiction of active shooter suspects happens more frequently than interdiction by law enforcement officers.  In any event, inadequate police training, speculatively playing out every possible scenario that may or may not happen in life (¶30) – nothing represented by Mr. Raney establishes that open carry itself creates a danger to public safety.

43.     Allowing open carry will not create a danger to public safety; failure to properly train police officers does endanger the public.

44.     There are only 5 states that ban open carry in the United States: New York ("shall not issue" concealed carry unless "proper cause"); Florida ("shall issue" concealed carry; Illinois ("shall issue" concealed carry); California ("may issue" concealed carry if "good cause"); D.C. ("shall issue" concealed carry).[1]  According to US News and World Report[2], 6 of the top 10 states for public safety are constitutional carry states (open carry or concealed, no permit required); the top 3 states being Maine, New Hampshire, and Idaho.[3]

45.     People who legally possess and carry firearms are generally compliant and law-abiding, statistically speaking among the most law-abiding group of persons in our country. Gang members and other criminals, on the other hand, do not carry firearms openly, as concealment provides an advantage over their victims. Criminals are also more likely to engage in furtive or non-compliant behavior for reasons including fear of being arrested, secreting drugs and/or weapons, and/or contemplating a physical attack or flight to avoid apprehension.

46.     In other words, the conduct, behavior, and mental and emotional reaction of a criminal will differ greatly from that of a law-abiding gun owner.

---

[1] https://www.usconcealedcarry.com/resources/terminology/carry-types/open-carry/?link=LearnTerminologyGuide_Grid1_Text_ConcealedCarry/
[2] https://www.usnews.com/news/best-states/rankings/crime-and-corrections/public-safety
[3] https://www.usconcealedcarry.com/resources/terminology/carry-types/open-carry/?link=LearnTerminologyGuide_Grid1_Text_ConcealedCarry/

13

1    I declare under penalty of perjury under the laws of the United States of America that the
2    foregoing is true and correct.

3    Dated: September 27, 2021

4    Charles "Chuck" Haggard

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

## Charles "Chuck" Haggard

---

520 SW Garfield Ave. • Topeka, Kansas 66606 • 785-221-0260 • tpd223@gmail.com chuck@agiletactical.com

*Curriculum Vitae*

### LAW ENFORCEMENT and PROFESSIONAL EXPERIENCE

- Police officer/air crash rescue fire fighter/fire fighter, Use of force and firearms instructor, policy writing for police operations, Metro Topeka Airport Authority, Dec 2015 to present, currently serving as the patrol Captain overseeing three shift LTs, all patrol operations and law enforcement training for the agency.
- Shawnee County Sheriff's Office, part time Deputy and in-service instructor, 2019 to present.
- Jackson County Sheriff's Office, part time Deputy, in-service instructor, 2015 to 2018
- Topeka Police Department:  1987 to 2014
  - o Patrol Officer 1987-1999
  - o FTO 1989 to 1999
  - o Honor Guard, team member and supervisor
  - o Sergeant 1999-2008 (Zone supervisor, acting WC in absence of LT, squad leader and acting team leader for the Response Team)
  - o Field Training Supervisor 1999 to 2006
  - o Rangemaster 2006-2008
- Lieutenant/Watch Commander 2008-2014 (serve as LT/Watch Commander on all three Field Operations shifts, including acting commander during a period of manpower shortage/promotion freeze in which I was the LT for 1st and 2nd shift, along with the SROs and motor unit, supervising 56 officers and SGTs), co-chair of department shooting review and Use of Force review board.
- Academy and In-service Instructor for Defensive Tactics, Range/Firearms, SWAT/Officer Survival Tactics.  Response Team member, Sniper and Supervisor.  Honor Guard member.  FTO Program Development Committee.
- Shooting Review Board/Use of Force Review Board member.  Use of Force General Orders Development Committee.
- Topeka Police Department Letters of Commendation, Medal of Merit for actions taken during flood rescue event
- Topeka Police Medal of Merit, Letter of Commendation
- Developed Topeka Police Department Use of Force Continuum
- Developed Topeka Police Department Defensive Tactics Program
- Developed Topeka Police Department Active Shooter Response Training
- Developed patrol rifle training and policy
- Specialties: Defensive Tactics, Police Baton, Field Force/crowd control operations and training, Firearms, Reasonable Use of Force, Taser, OC Spray, SWAT Tactics, High Risk Patrol tactics, Low Light tactics, Active Shooter/Rapid Response, police defensive tactics (empty hand control, weapon retention, LVNR, ground control and defense), Excited Delirium recognition and response, investigation of police use of force and officer involved shooting events, VIP security
- Team member, North East Kansas Incident Management Team, command staff, serving as Liaison Officer and Public Information Officer
- Faculty Appointments:
  - o National Law Enforcement Training Center — National Trainer
  - o Strategos International — Adjunct Instructor, VIP security
  - o Survival Operations System, Inc. — Instructor/Board of Directors

Case 2:19-cv-00617-KJM-AC   Document 98-7   Filed 10/13/23   Page 117 of 123

**Chuck Haggard**

## MILITARY SERVICE

- Kansas Army National Guard; 1982, 1985-1998, E Troop 114 Cav, Det2 1/635 Armor, 19Delta
- Reconnaissance Specialist 19Delta
- Left service at rank of Staff Sergeant
- Positions Held — Scout, Driver, Armorer, Track Commander, NBC NCO, Squad Leader, Platoon Sergeant, Platoon Leader (acting Lieutenant's position)
- Duties— Marksmanship instructor, machinegun range instructor, grenade launcher range instructor, demolitions instructor, Claymore instructor, LAW/AT4 range instructor, first aid instructor, Officer Candidate School assistant instructor, squad/platoon tactics instructor, nuclear/biological/chemical instructor, battalion rifle and pistol team
- Commendations:
  - Army Achievement Medal (3 awards) for outstanding service and performance of duties
  - Army Excellence in Marksmanship Award (overall winner of Adjutant General's Combat Match on three occasions)
  - Expert badge awarded for M16, pistol, hand grenade, M203 grenade launcher

## ACADEMIC EDUCATION

- Junction City High School, graduate 1982
- Kansas State University, 1986-1987 (courses in general studies, geology, Spanish, and criminal justice)
- US Army Schools:
  - Basic and Advanced Training
  - Primary Leadership Development Course
  - Basic Non-Commissioned Officer's Course (SMG's academic honor graduate)
- City of Topeka: 16-week Leadership Development course
- Leadership training courses; Kansas City MO Police Leadership training series, including classes taught by LtCol. Randy Watt, and risk management classes by Gordon Graham.  Leadership training classes by SGM Kyle Lamb USARSF (ret)
- Force Science Research Center, Force Science Analyst Certification

## OFFICER SAFETY / FIELD OPERATIONS (PATROL) TRAINING

- Calibre Press: Street Survival Seminars (numerous)
- Kansas Highway Patrol: Felony Car Stop Class
- Kansas Highway Patrol: Prisoner Transport Class
- Sioux City Regional Training Center: Understanding and Investigating Officer Actions in Deadly Force Encounters
- Topeka Police Department: Field Training Officer Course
- Topeka Police Department: Officer Basic Academy
- Topeka Police Department: Pepperball Launcher Class
- Washburn University: Field Training Officer Seminar
- Washburn University: Officer Survival, Winning Mindset
- Wichita State University: Winning Mind/Physical and Emotional Survivability

**Chuck Haggard**

## WEAPON SYSTEMS & DEFENSIVE TACTICS TRAINING

- Beretta USA Pistol Armorer
- Berretta USA Shotgun Armorer
- Colt AR/M16/M4 Series Rifle/Carbine/SMG Armorer
- Defensive Shooting Academy of Tulsa: Advanced Combat Pistol, Levels 1 and 2
- Glock Armorer
- HK International Law Enforcement Training Conference
  - Tactical Pistol
  - Tactical Shotgun
  - Liability Issues
  - Officer Survival
  - Breeching Fortified Targets
  - Tactical Sub-Machinegun
- HSS International: Tactical Pistol Course
- National Law Enforcement Training Center Certifications:
  - Control/Defensive Tactics
  - Ground Control and Defense
  - OC Spray and Counter-Assault Course
  - Handcuffing, Handgun/Long Gun Retention and Disarming
  - Universal Baton
  - Knife Defense and Disarming
  - LVNR
  - Trainer Development
  - Legal/Medical Implications of Use of Force
- Israeli Shooting International: Instinctive Shooting Course
- Jim Cirillo: Officer Survival and Advanced Handgun Course
- Kansas Highway Patrol/FAA: Officers Flying Armed Course
- Lethal Force Institute: Advanced Handgun Skills Course
- Mossberg Shotgun Armorer
- Remington Police Shotgun Armorer
- Remington Sniper Rifle Armorer
- Smith & Wesson Pistol Armorer
- Systema Russian Martial Arts System
- Strategos International: Physical Conflict Resolution Instructor courses
- Craig Douglas/Shivworks Armed Movement in Structures and Extreme Close Quarters Concepts
- Immediate Action Combatives; Immediate Action jujitsu/counter–assault courses

## ADVANCED TACTICS, LEADERSHIP & SPECIALIZED TRAINING

- Louisiana State University: Weapons of Mass Destruction Tactical Commander's Course
- DanCor Ltd.: Tactical Supervision of Critical Incidents Course
- Direct Action Resource Center: LE Counter-Terrorism Course
- HSS International: GSG 9 Counter-Terrorist Tactics Course
- HSS International: High Risk Entry Course
- Kansas Bureau of Investigation: Clan Lab First Responder Course
- Louisiana State University/U.S. Department of Homeland Security: Weapons of Mass Destruction, tactical response and hostage rescue
- National Tactical Officer's Association: Hostage Rescue Course

**Chuck Haggard**

- New Mexico Institute of Mining and Technology: Prevention and Response to Suicide Bombing Incidents
- Strategos International: Ballistic Shield Instructor Course
- Strategos International: Response to the Active Shooter Instructor courses
- Sure-Fire Institute/Strategos International: Officer Survival in Low Light Conditions Instructor Courses
- Tactical Explosive Entry School: Hostage Rescue/High Risk Warrant Course
- Topeka Police Department: Basic SWAT Course
- US Army: Police SWAT (SRT) Course
- US Army: Police Sniper Course
- US Army: Counter Drug Commander's Course
- AAFT/Sioux City PD: Two Man Team Tactics
- Kansas Narcotics Association Training Conferences
- Crisis Communications and Media Response for Today's Leaders
- Fair and Impartial Law Enforcement Train the Trainer course, KLETC/University of South Florida
- Lexipol, Risk Management for Law Enforcement Supervisors
- FLETC TCCC emergency medical training
- Emergency Management/FEMA/Fire Service;
  - Public Information Officer, G290
  - Liaison Officer (LOFR) L-956
  - NIMS ICS All-Hazards Position Specific: Finance/Administration Section Chief (FSC) Course
  - National Fire Academy Health and Safety Officer
  - ICS 100, 200, 300, 400, 700, 800
  - MGT 315 Enhanced Threat and Risk Assessment
  - Command and General Staff Functions for Local Incident Management Teams Course (CGSFLIMT)
  - NE KS IMT/KDEM yearly training seminars
  - Traffic Incident Management (TIM) Train the Trainer course
  - MAFT/ARF certification, 2016, 2017, 2018
  - SCAFFA seminars, including fire fighter skills training, live burn, Reading Smoke,
  - Using Thermal Imaging and Modern Fire Dynamics to Improve Fireground Operations,
  - HazMatIQ; Above The Line/Below The Line Training Course

## INSTRUCTOR & INSTRUCTOR-TRAINER CREDENTIALS

- Active Countermeasures Systems: Defensive Tactics Instructor
- American Society of Law Enforcement Trainers (ASLET): Use of Force Training Seminars
  - Live interactive Use of Force Training
  - Bullet Proof Mind
  - Firearms Confrontation Course
  - Flashlight as an Emergency Defense Tool
- Casco System: Expandable Police Baton Instructor-Trainer
- Defense Technology (Safariland Training Group): Less Lethal Munitions Instructor Courses
- Glock Pistol Transition Instructor Course
- Inayan Systems: Reactive Knife Defense Instructor
- International Association of Law Enforcement Firearms Instructors (IALEFI) Regional Training Conferences:
  - Instructor Development

**Chuck Haggard**

- o  Working With Problem Shooters
- o  Tactical Carbine
- o  Injured Officer Shooting Techniques
- o  Low-Light Shooting
- o  Tactical Shotgun
- o  Range Safety
- o  Less-Lethal Munitions
- o  OC/Firearms Deployment
- o  Back-up Gun Deployment
- Kansas Law Enforcement Training Center (KLETC):
  - o  Defensive Tactics Instructor Course (assisted with course development, content and instruction)
  - o  Defensive Tactics Review
- Midwest Law Enforcement Trainers Association: Winning Lethal Confrontations Course
- Monadnock Defensive Tactics System (MDTS) Instructor Course
- Monadnock International (now Safariland Training Group): Instructor Trainer
  - o  PR-24 (straight baton)
  - o  MEB (Monadnock Expandable Baton)
- NRA Police Firearms Instructor School
- NRA Patrol Rifle Instructor School
- NRA Tactical Shooting Instructor School
- ODV Incorporated: NarcoPouch and Narcotest, Field Drug Test Kit Instructor
- Offshoots Training Institute: Tactical Rifle Instructor
- Oklahoma Council on Law Enforcement Education & Training (CLEET)
  - o  Defensive Tactics System Instructor
  - o  Ground Control System Instructor
- One-On-One Control Tactics System Instructor
- Police Training Division: Auto Pistol Transition Instructor
- PPCT Training Systems: Instructor
- Shawnee County Sheriff's Department: Defensive Tactics Instructor Course
- Strategos International: Low Light Tactics Instructor Certification Course
- Strategos International: Law Enforcement Response to Active/School Shooter Instructor Course
- Strategos International: Physical Conflict Resolution System Instructor
- Strategos International: Active Shooter/Intruder Response Instructor
- Taser International: Taser M26 and X26 Instructor
- Topeka Police Department: Train the Trainer Course
- Tom Givens/Rangemaster Firearms Instructor course (Top Gun award)
- Rangemaster Advanced Instructor course
- Tactical Treatment of Gunshot Wounds Train the Trainer course
- KLETC/University of South Florida: Biased Based Policing Instructor course
- FLETC TCCC instructor course
- Force Science Research Center De-escalation Instructor

**PRESENTATIONS / CLASSES TAUGHT**

- Kansas Army National Guard CDSOG Group, Forbes Field
  - o  High Risk Entry
  - o  Vehicle Assault
  - o  Defensive Tactics
  - o  OC Courses

**Chuck Haggard**

- o Field force/riot control
- Kansas Law Enforcement Training Center
  - o Defensive Tactics Instructor Course
  - o Excited Delirium Recognition and Response
- Kansas Narcotics Officers Association
  - o Narcotics Entries
  - o High Risk Warrants
  - o Defensive Tactics Course
- National Law Enforcement Training Center
  - o Kansas City MO Police Department: Defensive Tactics/Use of Force and Instructor Certification Classes/Seminars (annually since 1994)
  - o St. Louis Police Department: Defensive Tactics Instructor Certification Course
  - o Johnson County Community College Regional Police Training Academy: Handcuffing and Handgun/Long Gun Retention and Disarming Instructor Certification Courses
- Osage County Sheriff's Department/Scranton Police Department
  - o High Risk Warrant
  - o Defensive Tactics Course
- Salina Police Department/Kansas Highway Patrol
  - o Lateral Vascular Neck Restraint (LVNR) Instructor Certification Course
- Strategos International
  - o LEO Response to the Active Shooter-Instructor Course
  - o Prevailing in Low-Light Conditions-Instructor Course
  - o Patrol Response to High Risk Incidents
  - o Physical Conflict Resolution Instructor courses
  - o Teacher/School Response to Intruders and Active Shooter
- Topeka Police Department (In-Service and Recruit Academy Classes)
  - o Defensive Tactics
  - o Baton/PR 24 Certification
  - o Firearms Range Instruction
  - o Active Shooter Class
  - o Low-Light Tactics
  - o Felony/Unknown Risk Car Stops
  - o Building Search Tactics
  - o Prisoner Transport
  - o Crowd Control
  - o SWAT Tactics
  - o Use of Force Continuum
  - o In-Custody Death Issues/Liability/Avoidance
  - o CIT academy, Excited Delirium recognition and response
  - o Counter Knife
  - o Taser
- US Army, Ft. Riley (various units)
  - o CQB/Room Entries/Raid Class
  - o OC Certification Class
  - o PR 24 Class
- Rangemaster Tactical Conference presenter, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019
- Presenter for Paul-E-Palooza training conferences
- Kansas Emergency Management, instructor for state POI course
- Blue Cell/Kansas IMT Liaison Officer (LOFR) course, Kansas City
- Ponca City OK, Solo Officer Response to the Active Shooter
- Kansas Transportation Safety Conference, LE Recognition and Response to Excited Delirium

**Chuck Haggard**

- Girl and a Gun organization presenter, national conference 2021
- KLETC, Shawnee Sheriff's Office, Atchison KS PD, Topeka PD Academy, LE recognition and response to Excited Delirium, Realistic De-escalation, avoiding in-custody deaths.
- Washburn University
  - o  Intro to SWAT Classes
  - o  Excited Delirium recognition and response

## PROFESSIONAL MEMBERSHIPS

- American Society of Law Enforcement Trainers
- International Association of Law Enforcement Firearms Instructors
- International Defensive Pistol Association (Expert ranking)
- International Law Enforcement Educators and Trainers Association
- International Wound Ballistics Association
- Kansas Narcotics Officers Association
- Metro Area Tactical Officers Association
- National Field Training Officers Association
- National Tactical Officers Association
- United States Practical Shooting Association

## PUBLICATIONS and POLICY WRITING

- "Concealed Carry and the 'Pea Shooter.'" *The Outdoor Wire*, Fall 2012 Special Edition
- "Gunlights, Switching and Gunpoint: Analysis – Part II." *Tactical Wire*, April 7, 2011
- "Gunlights, Switching and Gunpoint: An Analysis – Part I." *Tactical Wire*, April 5, 2011
- "Single Officer Response in Active Shooter Events." *Tactical Wire*, July 3, 2008
- "He Who Ignores History: Epic-scale Gunfights … Lessons for Law Enforcement" *Police Magazine*, April 20, 2011
- Recoil magazine, multiple articles
- The Tactical Wire, multiple articles
- Primary and Secondary site; military and law enforcement leadership series
- Use of Force and Firearms policy author for Topeka PD General Orders
- Assisted TPD legal advisor is authoring City of Topeka Municipal Code 9.40.050
- Authored MTAA Use of Force, Racial Profiling and Domestic Violence Response policy
- Assisted with IACP Response to Excited Delirium position paper and model policy

## EXPERT WITNESS SERVICES

- Areas of expertise: firearms (mechanics/operation/deployment/safety), defensive tactics, less lethal/less than lethal tools, physical skills training, reasonable use of force, police training/SOP, tactical training
- Testimony or Consultation provided in the following jurisdictions (civil and criminal):
  - o  Kansas state court (multiple cases, criminal and civil)
  - o  Kansas district US federal court
  - o  Texas state court
  - o  Court of Military Justice, Ft. Riley

## CERTIFICATE OF SERVICE

Case Name:  **Baird, Mark v. Rob Bonta**          No.    **2:19-cv-00617-KJM-AC**

I hereby certify that on <u>October 13, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF LARA HADDAD IN SUPPORT OF DEFENDANT'S COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 13, 2023</u>, at Los Angeles, California.

| Lara Haddad | *Lara Haddad* |
|:---:|:---:|
| Declarant | Signature |

1  COSCA LAW CORPORATION
2  CHRIS COSCA   SBN 144546
   1007 7th Street, Suite 210
3  Sacramento, CA 95814
   916-440-1010
4
5  AMY L. BELLANTONI
   THE BELLANTONI LAW FIRM, PLLC
6  2 Overhill Road, Suite 400
   Scarsdale, NY 10583
7  Telephone: 914-367-0090
   Facsimile:  888-763-9761
8  *Pro Hac Vice*
9  Attorneys for Plaintiffs
10                 **UNITED STATES DISTRICT COURT**
11              **EASTERN DISTRICT OF CALIFORNIA**
12
13  MARK BAIRD and              | Case No. 2:19-CV-00617
14  RICHARD GALLARDO,           |
15                              | **EXPERT DECLARATION AND REPORT**
                 Plaintiffs,    | **OF CLAYTON CRAMER**
16       v.                     |
17  ROB BONTA, in his official capacity as | Judge:        Hon. Kimberly J. Mueller
18  Attorney General of the State of California, | Room:         3
19                 Defendants.   | Trial Date:   None set
                                | Action Filed:  April 9, 2019
20
21
22
23
24
25
26
27
28                              1

# DECLARATION OF CLAYTON CRAMER

I, Clayton Cramer, declare pursuant to 28 U.S.C. § 1746 that:

1.      I have been asked to offer an expert opinion in the above-entitled case in response to the Expert Reports of Robert Spitzer, Saul Cornell, and Brennan Rivas offered by the State of California. I have personal knowledge of each fact stated in this declaration, and if called as a witness, I could and would testify competently thereto.

2.      My background and qualifications, employment, publications, and awards are provided in the attached Expert Reports, which incudes my attendance and graduation from Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic." I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

3.      I teach history at the College of Western Idaho, Nampa. My publications include:

- *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press, 2018;
- *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;
- *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;
- *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;
- "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;
- *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;
- *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;
- *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;
- *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;
- *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;
- *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, Editor, Library Research Associates, Inc., 1990.

2

4.      My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesile's book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reversed the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesile resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

II. MATERIALS REVIEWED

5.      I am fully familiar with this litigation, having offered previous Expert Reports and Declarations in connection with the plaintiffs' previous applications for a preliminary injunction, and my deposition, which was taken by the State of California. Specific to this Declaration and Report, I have reviewed the following documents in connection with this matter, which were provided to me by counsel for the plaintiffs: the Expert Declarations and Reports of Robert J. Spitzer, Saul Cornell, and Brennan Rivas.

6.      In addition to the above documents, I have also relied upon materials cited within the text of this Declaration.

EXPERT DECLARATION AND REPORT OF CLAYTON CRAMER

III.    OPINIONS

7.    Plaintiffs' counsel has asked me to provide an opinion on the accuracy of the historical representations declared in the Expert Declarations and Reports of Robert J. Spitzer, Saul Cornell, and Brennan Rivas submitted by Attorney General Rob Bonta in the above-referenced matter.

8.    I have identified errors and omissions of fact in such Expert Reports, as set forth in the annexed Expert Report.

9.    I am being compensated at a rate of $150 per hour for my time. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

10.    Following are my Expert Reports, consisting of a Table of Contents, Table of Authorities, substantive text of my report and findings and analysis, and dated signature.

Dated: September 29, 2023

Clayton Cramer

4

# REBUTTAL TO EXPERT REPORT OF

# ROBERT J. SPITZER

# Table of Authorities

### Cases

McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.) ....................................... 1

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022). ..................................... 3

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2156 (2022). ..................................... 8

New York State Rifle & Pistol Assn, Inc. v. Bruen 142 S.Ct. 2111, 2143 (2022). ...................... 12

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2138 (2022). ...................... 2

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022). .................... 13

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2145 (2022). .................... 16

New York State Rifle & Pistol Assn., Inc. v. Bruen, 142. S.Ct. 2111, 2124 (2022). ...................... 3

*Nunn* v. State, 1 Ga. 243 (1846)................................................................. 7

### Statutes

1 William B. Webb The Laws of the Corporation of Washington Digested and Arranged under
   Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18,
   1858................................................................. 8

12 Statutes at Large of Pennsylvania From 1682-1801 ch. 1248 at 313-314 (1786). ................. 12

1801 Tenn. Laws 259, 260-261, ch. 22, § 2 ................................................. 12

1801 Tenn. Laws 259, 260-261, ch. 22, § 6 ................................................. 12

1851 Pa. Laws 381-2, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To
   Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of
   Said Borough. ................................................................. 7

3 A Compilation of the Statute Laws of the State of Tennessee 89-91 (1872) ............................. 9

A Manual of the Laws of North-Carolina ch. 14 § 3 at 264 (1814)................................11

Acts and Laws of the Commonwealth of Massachusetts ch. 38 at 87-88 (1893). .........................11

Acts of the General Assembly of Virginia, Passed at the Session of 1838 Ch. 101 at 76-77
(1838); ............................................................................................................... 4

Acts Passed at the Annual Session of the General Assembly of the State of Alabama ch. 77 at 67-
68 (1838 [1839]). ................................................................................................. 4

An Act For Preventing and Suppressing of Riots, Routs, and Unlawful Assemblies, Charters and
General Laws of the Colony and Province of Massachusetts Bay. ch. 239, at 574 (1814). ....... 3

Cal. P.C. § 417(a)(1). ............................................................................................. 13

Colony of Massachusetts, Charters and General Laws of the Colony and Province Of
Massachusetts Bay ch. 11 § 1 at 237 (1814). ...........................................................11

Compilation of the Statutes of Tennessee, of a General and Permanent Nature ch. 14 at 549
(1836). ...............................................................................................................11

Laws and Ordinances of New Netherland, 1638-1674 33 (1868). ............................................... 10

State of Georgia, Acts of the General Assembly of the State of Georgia Passed in Milledgeville at
an Annual Session in November and December, 1837 90-91 (1838) ........................................ 4

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of
North Carolina, iii (1792). ............................................................................. 3, 12

Other Authorities

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg,
London, circa 1781-87, Bonham's, ...................................................................... 5

Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence,
and Moral Reform (1999). ................................................................................ 4

Declaration of Randolph Roth, 19-20, submitted in National Association for Gun Rights v. City of Highland Park, Ill. (N.D.Ill. 2023). ...................................................................... 5

English Transitional Pepperbox Revolver, Forgotten Weapons,..................................................... 6

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates 5

From the pages of The Bee, 1967: Armed Black Panthers invade Capitol, Sacramento Bee, May 2, 1967.................................................................................................................................. 13

Hawai'i became a U.S. territory in 1898.  Hawaii's long road to statehood, National Archives ... 7

House of Representatives, Nashville Daily Republican, Dec. 29, 1837, 2..................................... 4

House of Representatives, Nashville Daily Republican, Jan. 13, 1838, 2...................................... 4

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1..................................................................................................................... 6

# Spitzer Rebuttal

1.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by Young v. Hawaii, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); Senna v. Florimont, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).  My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]

3.      I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## I.      Why Dates Matter

4.      Throughout Spitzer's declaration, he lists laws in many categories (concealed carry bans, concealed carry licenses, hunting regulations, gunpowder powder regulations) across

---

[1] McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

several centuries in the attempt to demonstrate that firearms regulation is an integral part of the American tradition of gun regulation, apparently in the hope that the courts will accept the idea that because *some* types of gun regulation in *some* centuries were present, then almost *any* regulation meets the standards of Bruen.

5.    While the Bruen opinion held that "[W]e have generally assumed that the  scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791,"[2] they also admitted that "that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope."[3]  In the dispute adjudicated in Bruen, the difference did not matter: "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[4]  There is at least, a plausible argument that laws adopted between 1791 and 1868 *might* have some relevance to decisions controlled by Bruen; laws passed after 1868 not at all.

## II.    Restrictions on Concealed Carrying of Weapons

6.    Spitzer on pp. 6-7 purports to list "Restrictions on Concealed Carrying of Weapons."  He begins his list with a New Jersey statute that Bruen considered and rejected as irrelevant.[5]  Spitzer then starts listing open carry laws even though his next section claims to be about "Open Carry Weapons Restrictions."

7.    "Massachusetts followed in 1750, penalizing any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, "being armed with clubs or

---

[2] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2138 (2022).
[3] Id., at 2139.
[4] Id.
[5] New York State Rifle & Pistol Assn., Inc. v. Bruen, 142. S.Ct. 2111, 2124 (2022).

other weapons."  The actual statute "If twelve or more persons, being armed with clubs or other dangerous weapons, or if thirty or more persons, whether armed or not, are unlawfully, riotously or tumultuously assembled in a city or town…"[6]  One person, or even eleven persons could lawfully be armed.  Even twelve armed persons was lawful unless "unlawfully, riotously or tumultuously assembled."

8.     Spitzer claims "Virginia and North Carolina passed similar laws incorporating penalties for openly carrying weapons in 1786 and 1792, respectively."  Virginia's law was not similar; it was the Statute of Northampton (1328).  Bruen rejected its relevance: "To be sure, the Statute of Northampton survived both Sir John Knight's Case and the English Bill of Rights, but it was no obstacle to public carry for self-defense in the decades leading to the founding"[7]

9.     North Carolina passed no such law.  His footnote for that claim "Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)" is not a list of statutes passed by North Carolina.  The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[8]

10.     Martin included the Statute of Northampton (1328), already rejected as inapposite in Bruen.  (It appears that Spitzer is inviting the inferior courts to overrule the Supreme Court.)

---

[6] *An Act For Preventing and Suppressing of Riots, Routs, and Unlawful Assemblies*, Charters and General Laws of the Colony and Province of Massachusetts Bay. ch. 239, at 574 (1814).
[7] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022).
[8] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).

11.     "In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list; 3 more did so in the early 1900s."  Some of these laws might qualify by the pre-1868 standard set by Bruen, but 1800s includes a lot of post-1868 laws, and the early 1900s laws, all of which are irrelevant by Bruen's standards.

12.     "The rise in the circulation of handguns in society, along with the increased circulation of fighting knives (most notoriously the Bowie knife) and certain types of clubs was accompanied by the rapid spread of concealed carry restrictions, beginning in the early 1800s but then escalating in the post-Civil War period with the spread of multi-shot handguns, precisely because of their contribution to increasing interpersonal violence."  This is somewhat misleading.  The misuse of Bowie knives certainly provoked a burst of concealed weapon laws in the 1830s which often included other deadly weapons[9] but in some cases were narrowly focused on knives.

13.     The Bowie knife bill received its first reading in the Tennessee House on December 28 and its second reading on January 12.  At the second reading, Representative Warner added dirks to the prohibited weapons, but Representative Dean's attempt to add "sword canes and pistols" to the prohibited weapons list failed.[10]  There is a more complex history to these laws and why they were primarily Southern and concentrated in a narrow date range than Spitzer's portrayal.[11]  It appears Spitzer's knowledge is somewhat limited with respect to the literature on this subject.

---

[9] State of Georgia, ACTS OF THE GENERAL ASSEMBLY OF THE STATE OF GEORGIA PASSED IN MILLEDGEVILLE AT AN ANNUAL SESSION IN NOVEMBER AND DECEMBER, 1837 90-91 (1838); REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A.D. 1837 Div. VIII, Art. I, § 13, at. 280 (1838); ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, PASSED AT THE SESSION OF 1838 Ch. 101 at 76-77 (1838); ACTS PASSED AT THE ANNUAL SESSION OF THE GENERAL ASSEMBLY OF THE STATE OF ALABAMA ch. 77 at 67-68 (1838 [1839]).
[10] *House of Representatives*, NASHVILLE DAILY REPUBLICAN, Dec. 29, 1837, 2; *House of Representatives*, NASHVILLE DAILY REPUBLICAN, Jan. 13, 1838, 2.
[11] Generally, see Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999).

14.     His claim that "the spread of multi-shot handguns" contributed to the rise of interpersonal violence may well come from his cited sources, but one of them, Randolph Roth, has elsewhere attributed the rise in homicide rates to not only "the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading" and "As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust."[12]

15.     The revolver was not particularly new with respect to multiple shot handguns. From the late 18th century, gun makers made repeating handguns called pepper-boxes. The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[13] The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.

16.     47. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each

---

[12] Declaration of Randolph Roth, 19-20, submitted in National Association for Gun Rights v. City of Highland Park, Ill. (N.D.Ill. 2023).

[13] *Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820*, ANTIQUE ASSOCIATES, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; *An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87*, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, last accessed March 8, 2023;

with the ordinary pocket pistol."[14]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[15]

17.    Roth at least acknowledges that there were other factors in play besides advancing firearms technology.  Roth also describes an enormous range of increases in homicide rates by region with some regions suffering a 12x increase.  He fails to explain why murder rates rose so dramatically in some regions, but not others.  Roth also argues that Americans "were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own."[16]  Yet somehow, Roth and Spitzer know that the availability of revolvers was the important change.

18.    Most baffling is Roth's apparent indifference to the role of population density. "By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year."  New York City had 123,706 people at the 1820 census; Philadelphia 63,802.  These were the two largest cities in America.[17]  The anonymity of large cities makes it far easier for a murderer to escape justice; this is such a large oversight as to make me scratch my head in wonder that Roth could compare areas of such radically different densities with no apparent awareness that this might explain these murder rate differences.

19.    If Spitzer wants to rely on Roth, he should explain why Roth seems to have at best a single factor explanation for something that Roth acknowledges has many other contributions.

---

[14] *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] THE MADISONIAN, Dec. 22, 1838, 1.
[15]    *English    Transitional    Pepperbox    Revolver*,    FORGOTTEN    WEAPONS, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.
[16] Id., at 20.
[17]    U.S.    Census,    *1820    Fast    Facts*, https://www.census.gov/history/www/through_the_decades/fast_facts/1820_fast_facts.html, last accessed February 6, 2023.

## III.    Open Carry Weapons Restrictions

20.    Spitzer in his "Open Carry Weapons Restrictions" section from p. 7 lists an 1837

Georgia law but neglects to mention that the Georgia Supreme Court struck it down:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the [U.S.] Constitution.  *Nunn* v. State, 1 Ga. 243, 250, 251 (1846).

21.    Bruen observed that a small number of laws that a small number of outliers may

exist and these do not override the broad tradition of openly carrying firearms:

> "Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. " [18]

22.    Spitzer then proceeds to find *one* outlier.  Spitzer cites a very curiously titled law:

"1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To

Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said

Borough, § 4."  This prohibition of carrying deadly weapons is in between authorizing transfer of

real estate in §§ 1-3 and amending the charter of York to allow widening of sidewalks in § 5.[19]

At first glance, you might wonder if this was a publishing error.

23.    Spitzer cites an 1852 law from the independent Kingdom of Hawai'i.  It is hard to

see how a nation still four decades from being part of the United States can be considered part of

the American historical tradition.[20]

24.    Spitzer cites an 1858 D.C. law as prohibiting open carry.  But it does no such

thing.  "It shall not be lawful for any person or persons to carry or have *concealed* about their

persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or

---

[18] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2156 (2022).

[19] 1851 Pa. Laws 381-2, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough.

[20] Hawai'i became a U.S. territory in 1898.  *Hawaii's long road to statehood*, National Archives, https://prologue.blogs.archives.gov/2017/08/21/hawaiis-long-road-to-statehood/, last accessed September 29, 2023/

dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington."[21] [emphasis added]   Did they perhaps mean unlawful to carry at all or carry concealed?   The margin notes describe the law as: "Unlawful to carry concealed weapons."[22]

25.   "In a pattern similar to the enactment of concealed carry laws, open carry restrictions increased in frequency in the latter half of the nineteenth century. From 1860 to 1900, 24 states enacted anti-open carry laws (see Exhibits E and H), and 9 states did so in the early 1900s (a few states enacted laws in both centuries)."   The states that did so in the 1900s are of course, irrelevant.   Looking through Spitzer's Exhibit H shows the misrepresented 1858 D.C. law, the overturned 1837 Georgia law, the 1852 law from a foreign country.   Spitzer cites an 1838 Florida law that he claims taxed open carry.   Review of the statute tells a different story.   It is primarily a tax on sellers of "dirks, pocket pistols, sword canes, or bowie knives."   There was a $200 per tax on vendors, so high as to be nearly prohibitive.   You were free to carry such weapons openly, but with a very high $10 tax per year.[23]   The purpose of this law was to discourage sale or possession of one class of weapons.   A full-sized pistol or long gun was perfectly legal to openly carry.

26.   Reading through Spitzer's Exhibit H and Exhibit E (a laborious process probably intended to discourage busy judges from actually reading the statutes) finds a number of difficulties.   Most of these laws are after 1868.   Going through Exhibit H and looking up the pre-1868 laws in Exhibit E finds many problems, some of which seem to be misrepresentations and others lazy "scholarship."

---

[21] 1 William B. Webb THE LAWS OF THE CORPORATION OF WASHINGTON DIGESTED AND ARRANGED UNDER APPROPRIATE IN ACCORDANCE WITH A JOINT RESOLUTION OF THE CITY 418 (1868), Act of Nov. 18, 1858.

[22] Id.

[23] Fla. Laws no. 24 at 36 (1838).

27.     Tennessee 1867: Spitzer p. 78 says this is "William H. Bridges, DIGEST OF THE CHARTERS AND ORDINANCES OF THE CITY OF MEMPHIS, FROM 1826 TO 1867, INCLUSIVE, TOGETHER WITH THE ACTS OF THE LEGISLATURE RELATING TO THE CITY." Comparing his supplied text to A COMPILATION OF THE STATUTE LAWS OF THE STATE OF TENNESSEE is an exact match.[24] This is why serious scholars look up primary sources.

28.     § 4746: "Any person who *carries under his clothes or concealed about his person*, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size…" emphasis added]  refers to concealed carry so irrelevant to Spitzer's claims about open carry.

29.     § 4753 restates the Statute of Northampton that Bruen termed irrelevant.

30.     § 4757 requires some categories of weapons to be openly carried both in public and private.  "No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

## IV.   No Carry Long Guns

31.     Spitzer p. 9 referencing Exhibit H provides us with a long list of states that supposedly restricted carry of long guns.  Only a very few are before 1868, and a number are not even what Spitzer misrepresents them as.

32.     As we saw previously, the 1858 D.C. law banned *concealed* carry only.

33.     The 1852 Hawai'i law is not from the U.S.

34.     The 1868 Kansas law prohibited carry by "Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who

---

[24] 3 A COMPILATION OF THE STATUTE LAWS OF THE STATE OF TENNESSEE 89-91 (1872).

has ever borne arms against the government of the United States…"  This is a restriction on Confederates, persons under the influence and what sounds like a vagrancy law.

35.    The odd 1851 York Borough ban previously discussed at ¶ 22.

36.    That is it.  Four laws; one that did not apply to long guns, only concealed carry; one from another nation; one applicable to drunks and traitors; one that is a clear outlier.

## V.    Weapons Brandishing and Display Laws

37.    Spitzer p. 11 next attempts to justify bans on open carry by laws prohibiting "the brandishing of weapons—that is, to display them in the presence of others and to do so in a menacing or threatening manner; and the mere display of weapons (i.e. that they simply can be seen) in the presence of others."  He quotes from a 1642 New Netherlands law: "No one shall presume to draw a knife much less to wound any person, under . . . penalty."  Spitzer asserts "This reference did not mention firearms but allowed for penalties for merely drawing or displaying a weapon, even if no brandishing or wounding occurred."

38.    The context matters.  The preceding paragraph:

> WHEREAS We hear daily, God help us, of many. Accidents, caused for the most part by quarrels, drawing of knives and fighting, and the multitude of Taverns and low Groggeries, badly conducted, together with the favorable opportunities which all turbulent persons, Murderers and other Lawless people have for running away and consequently escaping condign punishment, wherein we would willingly make provision so as to prevent, as much as possible, all harm;[25]

39.    Drawing a knife in a bar seems like brandishing to me, not merely "displaying a weapon."

40.    "Similarly, a 1786 Massachusetts law criminalized the mere assemblage of 'any persons to the number of twelve, or more, being armed with clubs or other weapons.' If they did not disperse within an hour of being warned, they could be subject to arrest."  What Spitzer left

---

[25] LAWS AND ORDINANCES OF NEW NETHERLAND, 1638-1674 33 (1868).

out is that being armed was only an issue if the group "shall be unlawfully, routously, riotously or tumultuously assembled."[26]

41.     "For example, the 1686 New Jersey "Act against wearing Swords, &c" was adopted as a reaction to "great complaints by the inhabitants of [the] Province, that several persons [were] wearing swords, daggers, pistols, dirks, stilladoes, skeines [small Irish-derived swords], or any other unusual or unlawful weapons."  Bruen rejected its significance:

> The law restricted only concealed carry, not all public carry, and its restrictions applied only to certain "unusual or unlawful weapons," including "pocket pistol[s]." *Ibid.* It also did not apply to all pistols, let alone all firearms. "Pocket pistols" had barrel lengths of perhaps 3 or 4 inches, far smaller than the 6-inch to 14-inch barrels found on the other belt and hip pistols that were commonly used for lawful purposes in the 1600s. [27]

42.     Spitzer again overrules the Court by citing a 1694 Massachusetts law that rephrases the Statute of Northampton.  That same "An Act for the Punishing of Criminal Offenders" also provides for punishment in the stocks "if any person or persons shall profanely swear or curse in the hearing of any justice of the peace, or shall be thereof convicted by the oaths of two witnesses, or confession of the party."[28]  Massachusetts was not an outlier on this: see Tennessee's identical 1741 statute,[29] and North Carolina's identical 1741 statute.[30]  Pennsylvania's 1786 statute is similar: "Be it further enacted by the authorities aforesaid, That if any person of the age of six teen years and upwards from and after the first day of August next shall profanely swear or curse by the name of God, Christ Jesus, or the Holy Ghost, every person so offending being thereof convicted shall forfeit and pay the sum of five shillings for every

---

[26] ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS ch. 38 at 87-88 (1893).
[27] New York State Rifle & Pistol Assn, Inc. v. Bruen 142 S.Ct. 2111, 2143 (2022).
[28] Colony of Massachusetts, CHARTERS AND GENERAL LAWS OF THE COLONY AND PROVINCE OF MASSACHUSETTS BAY ch. 11 § 1 at 237 (1814).
[29] COMPILATION OF THE STATUTES OF TENNESSEE, OF A GENERAL AND PERMANENT NATURE ch. 14 at 549 (1836).
[30] A MANUAL OF THE LAWS OF NORTH-CAROLINA ch. 14 § 3 at 264 (1814).

profane oath or curse…"[31]   I look forward to Spitzer's reinterpretation of the First Amendment based on this historical tradition.

43.     Spitzer cites a 1699 New Hampshire version of the Statute of Northampton, a 1795 Massachusetts version, and a Maine 1821 version.  Bruen rejected the relevance of these statutes: "Respondents, their amici, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."[32]

44.     "North Carolina enacted a very similar measure in 1792, saying that no man shall 'go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere.'"  As discussed in ¶9, North Carolina passed no such law, which would have been obvious to anyone who actually read the work Spitzer cited.[33]

45.     "In 1801, Tennessee enacted a law saying that no one was to 'go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person.'"  This is "An Act for the restraint of idle and disorderly persons…  Whereas it becomes necessary for the welfare of the community, to suppress wandering, disorderly and idle persons… endeavoring to maintain himself by gaming or other undue means,"[34]  they passed a vagrancy law for "persons of ill fame or suspicious character."  Section 6 does indeed contain the text of the Statute of Northampton.[35]  Spitzer cited this as "1801 Tenn. Pub. Acts 260, ch. 22, § 6.  Quoted in Young v. Hawaii, 798."  Why not go to

---

[31] 12 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801 ch. 1248 at 313-314 (1786).
[32] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022).
[33] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).
[34] 1801 Tenn. Laws 259, 260-261, ch. 22, § 2.
[35] 1801 Tenn. Laws 259, 260-261, ch. 22, § 6.

the actual source?  In any case, it is clearly a brandishing statute, which requires more than open carry of arms.

46.      "Note that Virginia, Massachusetts, Tennessee, and Maine all invoked some version of the old British phrase 'to the terror of the people' with New Hampshire's law referencing the similar 'fear' of the public. And in the Tennessee law, concealed weapons carrying was also identified as a source of 'terror.'"  Brandishing necessarily involves more than the appearance of a weapon.  California defines this crime as "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner,"[36]

47.      The open carry of a firearm alone does not meet this definition.  The historical tradition of California law, which allowed open carry of firearms in cities until 1967 and in unincorporated areas of most counties, demonstrates this:

> Two dozen armed Negroes entered the state Capitol at noon today and 10 made their way to the back of the Assembly Chamber before they were disarmed and marched away by the state police…. After the state police questioned the men, they returned the weapons to them because the intruders had broken no law.[37]

48.      Spitzer p. 17 claims "The mere act of display is sufficient to warrant prosecution." However on p. 13 he admits that "Note the two key elements: the 'exhibit' or display of the weapon combined with doing so 'in a rude, angry and threatening manner,' revealing a criminal intent as invoked by the terms 'rude, angry, and threatening.'"  Why he made a point of listing brandishing laws in this context is mystifying, especially because he already acknowledged that more than the sight of a weapon is necessary to constitute brandishing.  No one is arguing for a right to wave a gun around in "a rude, angry and threatening manner."

---

[36] Cal. P.C. § 417(a)(1).
[37] *From the pages of The Bee, 1967: Armed Black Panthers invade Capitol*, Sacramento Bee, May 2, 1967, https://www.sacbee.com/news/local/history/article148667224.html, last accessed September 22, 2023.

## VI.    Weapons Licensing

49.    Spitzer under "Weapons Licensing" starting on p. 17 asserts "At least 48 states (including D.C.) utilized some type of weapons licensing or equivalent policy technique (see Exhibit G)." But what was licensed? By Spitzer's own words "firearms discharging," hunting, "the commercial sale, transport, or firing of weapons at locations like shooting galleries." All of these are actions separate from "keep and bear arms."

50.    Examining Exhibit G for laws that pre-date 1868 finds few matches.

### A.  Ownership

51.    P. 7 "At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time.", the 'keep' of 'keep and bear arms'. Spitzer's 100+ page Exhibit F lists none that predate 1868. Spitzer Exhibit G does have laws that predate 1868, exclusively to disenfranchise blacks.

### B.  Licensing of Weapons Carrying or Possession

52.    Spitzer p. 19 also again seeks to overturn the Supreme Court by claiming "With regard to concealed carry of pistols and other dangerous weapons, as noted earlier, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying." Bruen's retort:

> Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime.[38]

53.    Spitzer's list of laws under "Licensing of Weapons Carrying or Possession" starting on p. 19 are entirely post-1868 laws and therefore meaningless by the Bruen standards.

---

[38] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2145 (2022).

14

### C. Permits for Firearms Discharge or Use of Explosives

54.     Spitzer starting at p. 26 lists "Permits for Firearms Discharge or Use of Explosives." The challenged law in Baird v. Bonta does not regulate discharge of firearms. Also importantly, as Spitzer's own characterization of these laws admits, these laws licensed "firing and fireworks 'at times of public rejoicing' and at specified locations." This suggests that licensing was not a common practice but a general ban from which infrequent exceptions might be allowed.

### D. Commercial Licensing

55.     Spitzer p. 29 provides a single law pre-dating 1868, "an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans, including guns or other weapons, unless they obtained a license from the governor." The challenged law does not regulate commercial, sale, or transport.

### E. Licensing Restrictions on Gunpowder

56.     The challenged law does not regulate storage of gunpowder.

### F. Weapons Sellers Recording Purchases

57.     The challenged law does not regulate weapons sellers recording purchases. Even then, Spitzer's examples pp 30-31 are all post-1868.

### G. Licensing Pertaining to Named Groups

58.     Spitzer at pp. 31-32 seems to regard the racism of licensing of gun possession as a positive model for California, claiming that licensing possession by Indians and black Americans "reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited, controlled circumstances." It would appear that Spitzer believes that California

15

should use this racist model as a method for controlling California gun owners who might at any moment, raise the scalping knife or flee to Canada.

## VII.  Summary

59.   Spitzer cites at least one carry law as "passed" by a legislature that was not. See ¶9.

60.   Spitzer cites one outlier from York Borough, Pennsylvania that is so disconnected in its title and sections as to make me wonder if this was a clerical error. See para 20.

61.   Spitzer cites laws from the Kingdom of Hawai'i as indicative of American historical tradition. See ¶21.

62.   Spitzer claims that a D.C. law that prohibited concealed carry prohibited all carry of firearms. See para 22.

63.   Spitzer cites a restrictive Georgia law but neglects to mention that the Georgia Supreme Court overturned the carry ban as violating the Second Amendment. See para 23.

64.   Spitzer brings in brandishing laws, admits that brandishing requires more than just visibility of a weapon, then claims that visibility alone, such as open carry, qualifies as brandishing. See § V

65.   Spitzer lists a variety of forms of regulation that have no connection to the challenged law: permits for firearms discharge or use of explosives, commercial activity, recording weapons sales, licensing of gunpowder storage.

66.   Spitzer points to racist weapon regulations as a model to justify licensing of open carry.

67.     Spitzer cites laws that the Bruen decision specifically rejected as irrelevant to the Second Amendment.  Perhaps Spitzer imagines that at least five of the occupiers of the Supreme Court are named Robert Spitzer, and he therefore gets to overrule the Bruen decision.

# REBUTTAL TO EXPERT REPORT

# OF SAUL CORNELL

# Table of Authorities

## Cases

Browne, Report of the Debates, 47...........................................................................23

Cockrum v. State, 24 Tex. 394, 396, 401 (1859) ...................................................22

McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.) ..............................1

Nunn. v. State, 1 Ga. 243, 250 (1846)......................................................................22

State v. Chandler, 5 La. Ann. Rep. 489, 490 (1850) ...............................................22

State v. Jumel, 13 La. Ann. Rep. 399, 400 (1858) ..................................................22

State v. Smith, 11 La. Ann. Rep. 638 (1856) ..........................................................22

## Statutes

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) .................6

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From 1638 To
    1649  25-26 (1857)..............................................................................................6

Clayton          E.          Cramer,          Militia          Statutes,
    https://claytoncramer.com/primary/primary.html#MilitiaLaws..............................7

## Other Authorities

"The Immigration and Nationality Act of 1952 (The McCarran-Walter Act)," U.S. Department of
    State,...................................................................................................................25

1 American State Papers. Class V. Military Affairs. 159-62 (1832). ............................6

An ACT to suppress the disorderly practice of FIRING GUNS, &c., Pennsylvania Gazette, Dec.
    28, 1774..............................................................................................................14

i

Bernard E. Harcourt, From the Asylum to the Prison: Rethinking the Incarceration Revolution, 84 Texas Law Review 1766-75 (2006). ................................................................. 27

Browne, Report of the Debates in the Convention of California, on the Formation of the State Constitution… 47 (1850). .......................................................................................... 21

California        Assembly        Concurrent        Resolution        No.        42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42 ....... 20

Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database........................ 27

Clayton E. Cramer, Concealed Weapon Laws Of The Early Republic: Dueling, Southern Violence, And Moral Reform 52-62 (1999)............................................................... 21

Clayton E. Cramer, Mental Illness and the Second Amendment, 46 Conn. L.R. 4:1301 (2014) . 26

Clayton E. Cramer, My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill (2012)............................................................................ 26, 27

David Alan Johnson, FOUNDING THE FAR WEST: CALIFORNIA, OREGON, AND NEVADA, 1840-1890, 129 (1992) .................................................................................................... 23

David M. Chalmers, HOODED AMERICANISM: THE HISTORY OF THE KU KLUX KLAN 124 (1981, 3ʳᵈ ed.). ................................................................................................................ 25

Davis McEntire, RESIDENCE AND RACE: FINAL AND COMPREHENSIVE REPORT TO THE COMMISSION ON RACE AND HOUSING 269 (1960). ..................................................... 23

E.B. Willis and P.K. Stockton, 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA… 285 (1880). ........................................ 24

Emily J. Zackin, Looking for Rights in All the Wrong Places: Why State Constitutions Contain America's Positive Rights 200 (2013). .......................................................................... 23

ii

FBI, Crime in the United States 2019, Expanded Homicide Data Table 2 (2019) ........................ 8

Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the
    Economic Development of the Small Arms Industry, 1798-1870 34 (1948) .......................... 10

Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972) .......................... 10

H. Richard Uviller & William G. Merkel, The Militia And The Right To Arms, Or, How The
    Second Amendment Fell Silent 150 (2002). ............................................................... 6

Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209
    (1956) ..................................................................................................... 10

J. Ross Browne, Report Of The Debates In The Convention Of California, On The Formation Of
    The State Constitution… 47 (1850). ..................................................................... 20

Jean Isaac Rael and Virginia C. Armat, Madness In The Streets: How Psychiatry And The Law
    Abandoned The Mentally Ill (1990) ....................................................................... 27

John M. Dawson and Patrick A. Langan, Murder in Families, Bureau of Justice Statistics Special
    Report 1 (Jul. 1994) ....................................................................................... 8

John Robert Soennichsen, The Chinese Exclusion Act of 1882 127-128 (2011). ........................ 23

John Winthrop, 2 Winthrop's Journal: "History of New England", 27, 153, 180, 275 (1908)..... 12

John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England"*
    *1630-1649* (1908), 83 ..................................................................................... 15

Last Friday one Hunt, a lime seller in this…, Pennsylvania Gazette, Apr. 20, 1749 ................... 12

Last Monday Capt. Tyng in the Massachusetts…, Pennsylvania Gazette, Aug. 15, 1745. .......... 13

Laurie Goodstein and William Glaberson, The Well-Marked Roads to Homicidal Rage, New
    York Times, Apr. 10, 2000 ................................................................................ 26

Letter From Sacramento, [San Francisco] Daily Alta California, February 19, 1856, 2. ............. 24

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980) ......................................................................................................... 10

Monday Evening last a very melancholy…,  Pennsylvania Gazette, Oct. 31, 1745 ................... 12

Nelson Kempsky, A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings 19 (October, 1989), .......................................... 26

*New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July 15, 1923, at  3, col. 1 ....................................................................................................................... 25

Oregon, JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF OREGON: HELD AT SALEM 125 (1882) ........................................................................................ 23

Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840) ..................................... 10

Randolph Roth, American Homicide xii (2009) ............................................................. 8

Ricardo Romo, EAST LOS ANGELES: HISTORY OF A BARRIO 157 (1983). ..................................... 25

Richard Burn and John Burn, A New Law Dictionary 79 (1792) ..................................... 5

Richard Maxwell Brown, The South Carolina Regulators 35, 40, 54 (1963) ............................ 12

Samuel Charles Wiel, 2 Water Rights in the Western States: The Law of Prior Appropriation .. 1166 (3d ed. 1911) ......................................................................................... 23

Steven P. Segal, Civil Commitment Law, Mental Health Services, and US Homicide Rates, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011 ................................... 28

Theodore H. Hittell, 4  HISTORY OF CALIFORNIA 615-17 (1897). ............................................... 23

Win Blevins, Dictionary of the American West 166 (2001). ......................................... 24

# Cornell Rebuttal

1.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by Young v. Hawaii, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); Senna v. Florimont, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004).  A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.      In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).  My work was also cited in the *McDonald* v. *Chicago* (2010) dissent.[1]

3.      I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## I.      Misrepresenting Common Law

4.      On p. 3: Cornell asserts:

---

[1] McDonald v. Chicago, 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

No legal principle was more important to the common law than the concept of the peace. As one early American justice of the peace manual noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury." Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society.""

5.      Blackstone's quote is from a discussion of:

[S]ubordinate magistrates, whom I am to consider justices of the peace… Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[2]

6.      While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective description, already irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

7.      When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence…"[3] Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[4]

8.      If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

9.      "In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a 'well established

---

[2] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).
[3] Id., at 143.
[4] Id., at 121.

historical tradition of prohibiting the carrying of dangerous and unusual weapons.'"  The footnote cites this to Heller not Bruen.  (Kavanaugh was not on the Court for Heller.)  Cornell is careless in his scholarship.

10.    Bruen quotes this phrase as part of *guaranteeing* the carrying of handguns:

> For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'"[5]

# II.    Misunderstanding Limits on Governmental Power

11.    Cornell next asserts:

> The right of the people to pass laws to promote public health and safety is one of the most fundamental rights in the pantheon of American rights. The idea of popular sovereignty, a core belief of the Founding generation, included a right of legislatures to enact laws to promote the common good. Although modern lawyers and jurists are accustomed to thinking of this concept under the rubric of state police power, the Founding generation viewed it as a right, not a power. The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms. Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."

12.    The Pennsylvania Constitution included a guarantee of a right to keep and bear arms,[6] a guarantee "[N]o part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives"[7] and a guarantee of "a right to freedom of speech, and of writing, and publishing their sentiments."[8]  These seem to be pretty large exceptions to Cornell's imagined right "to legislate for the common good."  Why bother including limits on the state's powers if "popular sovereignty,… included a right of legislatures to enact laws to promote the common good"?  Perhaps Cornell's understanding of state police power is wrong or at least more limited than he imagines?  Popular sovereignty would include the right of the people to criminalize whatever forms of sexual behavior they

---

[5]).
[6] Penn. Const. Art. 11 (1776).
[7] Penn. Const. Art. 8 (1776).
[8] Penn. Const. Art. 12  (1776).

abhorred, limit marriage to one man, one woman; prohibit abortions; prohibit contraception;

prohibit obscene material; allow police to torture confessions out of suspects.  All of these would

be constitutional under Cornell's expansive police powers as long as they met what the public

believed was "for the common good."

13.    On pp. 6-7:

> Although "free-standing balancing" by judges is precluded by *Heller*, the plain meaning of the
> Second Amendment's text recognizes a role for regulation explicitly and further asserts that
> actions inimical to a free state fall outside of the scope of the right instantiated in the text.21
> The Second Amendment states: "A well regulated Militia, being necessary to the security of a
> free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const.
> amend. II. Thus, from its outset, the Second Amendment recognizes both the right to keep and
> bear arms and the right of the people to regulate arms to promote the goals of preserving a free
> state. Although rights and regulation are often cast as antithetical in the modern gun debate, the
> Founding generation saw the two goals as complimentary.

14.    Heller is very clear that "well-regulated" means nothing like Cornell's

misreading: "Finally, the adjective "well-regulated" implies nothing more than the imposition of

proper discipline and training."[9]  Cornell's attempt to read this adjective as justifying strict

regulation of arms might be an easy mistake for a person with limited knowledge of the subject

(*e.g.,* someone just assigned the topic in high school debate club), but for an "expert" to think

this is part of the discussion is embarrassing.

15.    Cornell continues down this mistaken path with the claim that "infringe" in the

Second Amendment means something quite different from "abridge" in the First Amendment.  In

defense of this supposed difference Cornell pp. 7-8:

> John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept
> of infringement in the context of his discussion of violations of rights protected by the
> common law. Liberty, according to Burns, was not identical to that "wild and savage liberty"
> of the state of nature. True liberty, by contrast, only existed when individuals created civil
> society and enacted laws and regulations that promoted *ordered* liberty. Regulation was the
> indispensable correlate of rights in Founding era constitutionalism.

---

[9] D.C. v. Heller, 554 U.S. 570, 597 (2008).

16. In support of this claim, Cornell's incomplete footnote 23 cites Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term. If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[10]

17. I suppose Burns' privilege idea fits well with California's defense of the challenged law in the same way that an aristocrat's privileges grant him advantages over the hoi polloi.

18. At pp. 8-9, Cornell quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [sic] our persons and property." The relevance of this quote to this case seems confused. The plaintiffs in this case are not arguing for no government or a "destitution of all law," but a disagreement about *this* law. Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

19. At p. 9, Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic." What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power. The recent panic after 9/11 should be a reminder that even well-intentioned polities can blow it. The internment of Americans of Japanese ancestry during World War II is another example. Miscegenation laws and the segregation of public schools and public accommodations in many

---

[10] Richard Burn and John Burn, A NEW LAW DICTIONARY 79 (1792).

parts of America were done with "consent of the body politic." This is why we have a Bill of

Rights, as a restraint on majority abuse of power.

### III.   Misrepresenting His Sources

20.      Cornell on pp. 9-10 continues: "In fact, without robust regulation of arms, it

would have been impossible to implement the Second Amendment and its state analogues.

Mustering the militia required keeping track of who had weapons and included the authority to

inspect those weapons and fine individuals who failed to store them safely and keep them in

good working order."   Cornell's source for this claim is: "H. RICHARD UVILLER &

WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE

SECOND AMENDMENT FELL SILENT 150 (2002)." That page makes no such claim. It is a

discussion of the meaning of the Second Amendment that directly contradicts Cornell's claims.

Review of militia censuses cited in UVILLER & MERKEL,[11] shows that these militia censuses

show the number of militiamen by state, broken down by rank.[12] There is no record of who was

a member or what arms each person possessed. Cornell is just making this stuff up.

21.      Mustering the militia required no such recordkeeping. Colonial and state militia

laws did not keep track of who was armed. They imposed a duty to be armed and to show up

with those arms on muster day or face fines.[13] I am unaware of any safe storage laws of this

period, and Cornell cites only a secondary source for a rather important claim. I have a pretty

---

[11] H. Richard Uviller & William G. Merkel, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)

[12] 1 American State Papers. Class V. Military Affairs. 159-62 (1832).

[13] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall beare Armes that are above the age of sixteene yeeres except they doe tender a sufficient excuse [to] the Corte & the Cort allowe the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 25-26 (1857) ("It is ordered that every one that beares armes shall be compleatly furnished with armes (viz), a muskett, a sworde, bandaleers, a rest, a pound of powder, 20 bullets fitted to their muskett, or 4 pound of pistoll shott or swan shott att least, and be ready to show them in the markett place upon Munday the 16th of this Month before Captaine Turner and Leiutennant Seely under the penalty 20 s fine for every default or absen[ce].")

complete collection of colonial and Revolutionary militia laws[14] and there are no such provisions that I can find.

22.     Cornell's next strawman argument starting on p. 11: "The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework. The entire body of the common law was designed to preserve the peace and the right of self-defense existed within this larger framework." Nor do the plaintiffs argue otherwise. This challenge is not about the laws of self-defense, only about whether open carry may be subject to a license requirement.

### IV.     Misrepresenting Supreme Court Decisions

23.     Cornell at p. 11: "Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety." His citation is to McDonald v. Chicago (2010) quoting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'"). The actual quote is from the Brief for State of Texas et al. which was filed on behalf of the petitioner seeking overturn of Chicago's firearms regulations. McDonald decided they were not only not "reasonable" but contrary to the Second Amendment.[15]

### V.     Misunderstanding Colonial Homicide

24.     Cornell tries to establish on pp. 11-12 that there was "no comparable societal ill to the modern gun violence problem for Americans" to solve. His explanation: "A combination of

---

[14] Clayton E. Cramer, *Militia Statutes*, https://claytoncramer.com/primary/primary.html#MilitiaLaws, last accessed July 15, 2023.

[15] McDonald v. Chicago, 561 U.S. 742, 785 (2010).

factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment." Spitzer relies heavily on the work of Randolph Roth. There are a host of problems with Roth's claims upon which Spitzer's claims piggyback.

25.      We need to examine Roth's definitions. In this section, I am analyzing Roth's claims from his expert declaration in Association Of New Jersey Rifle & Pistol Clubs, Inc., et al., v. Platkin (D.N.J. 2023) and Roth's book AMERICAN HOMICIDE. Roth's homicide rates are not *murder* rates, which makes comparison to current murder rates inapposite. Roth repeatedly indicates that he is looking at homicides by "unrelated adults."[16] About 6% of murder victims in 2019 were under 18.[17] It seems likely that of minor murder victims (which at that time would have included all under 21 years) would have been similarly common in colonial times. "A survey of murder cases disposed in 1988 in the courts of large urban counties indicated that 16% of murder victims were members of the defendant's family."[18] This alone makes his homicide rates *at least* 16% below not only current *murder* rates, but even *homicide* rates (because every murder is also a homicide).

26.      Roth also tells us that his homicide numbers include "assaults that were legally justified or not meant to cause death."[19] About 6% of recent civilian homicides are either initially or subsequently (as the case moves from arrest through indictment and trial) classified as justifiable or excusable. Justifiable homicides are killings of a person engaged in a felony;

---

[16] Roth, AMERICAN HOMICIDE 61, Figure 2.3 at p. 95 (2009).
[17] FBI, CRIME IN THE UNITED STATES 2019, Expanded Homicide Data Table 2 (2019).
[18] John M. Dawson and Patrick A. Langan, *Murder in Families*, BUREAU OF JUSTICE STATISTICS SPECIAL REPORT 1 (Jul. 1994).
[19] Randolph Roth, AMERICAN HOMICIDE xii (2009).

excusable homicide includes a variety of both unintentional killings ("committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent") and a surprisingly catch-all category of intentional killings: "When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.")[20] Roth's homicide rates are thus likely at least 6% higher than murder rates.

27.    Roth's declaration at ¶17: "By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England." These are rates not terribly different from current U.S. murder rates; we will return to this question later. Roth's numbers thus understate murder rates relative to today. This gives a warmer and cozier picture of colonial America than it was.

## VI.    Ignorance of Colonial Firearms Technology

28.    Cornell on p. 12 claims:

> Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region…. Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.

29.    This single quote demonstrates how limited Cornell's expertise is. Bayonets are not a firearms technologyThis case involve bayonet regulation.

---

[20] Clayton E. Cramer, *Why the FBI's Justifiable Homicide Statistics Are a Misleading Measure of Defensive Gun Use*, 27 U. FLA. J.L. & PUB. POL'Y 505 (2016).

30.     Cornell's assumption of who owned pistols and why reflects, I think, Cornell's single source, a book about dueling by people in national politics.  How common were pistols before the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was a civilian market for them in at least some cities; and that pistol ownership was unremarkable.

31.     An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[21]

32.     On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Cavalrymen were obligated to provide themselves with "a case of pistols, and a carabine."  Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols." [22]

33.     While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige.  Only a few pre-Revolutionary War American-made pistols have survived.[23]  Surviving pistols made for William Smith of Farmington, Connecticut by Medad Hills in 1771, were equipped with American-made barrels, and apparently English locks.[24]

---

[21] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.
[22] Peter Force, ed., 3 AMERICAN ARCHIVES, 4th ser., 665-6 (1840).
[23] Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980); Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972); Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870 34 (1948).
[24] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).

10

34.     Advertising and news reports show that merchants offered pistols for sale in Colonial America.  Such ads appear in the *Boston Gazette* as early as 1720.  Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[25]

35.     A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749.  A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as they said, got the six Pair at some other Place."[26]  In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[27] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."  Philadelphia merchants advertised pistols for sale repeatedly from 1744 onward.[28]  A 1745 ad in the PENNSYLVANIA GAZETTE, offered "ship muskets, *pistols* , cutlasses and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[29] [emphasis added]

36.     Pistols appear in journals and newspaper articles throughout the colonial period— and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable.  Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers.  One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march, at least one member identified as armed with a pistol.  There were murders with pistols at Stamford,

---

[25] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742¸ May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

[26] PENNSYLVANIA GAZETTE, August 31, 1749.

[27] September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).

[28] PENNSYLVANIA GAZETTE, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.

[29] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA GAZETTE, Sep. 26, 1745, Oct. 3, 1745.

Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[30]  Pistols appear in other places in Winthrop's Journal.[31]  Winthrop never expressed any surprise over the presence of pistols.

37.     An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[32] [emphasis in original]

38.     Other eighteenth century accounts mention pistols.  Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[33]  In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopt on the Road, and his Money demanded, by two Men with Pistols…."[34] There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse of and accidental deaths from pistols; they are never described as surprising.[35]  Pistols appear among the South Carolina Regulators and the criminals to whom they administered frontier justice.[36] Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a

---

[30] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).
[31] Id., at 95, 151,
[32] *NEW YORK, October 28. Monday Evening last a very melancholy,* PENNSYLVANIA GAZETTE, OCT. 31, 1745.
[33] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).
[34] *By the last Post from New York…,* PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[35] *Monday Evening last a very melancholy…,* PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.
[36] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).

description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians...."[37]

39.     Pistols appear in news reports: This came from New York in 1775, describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused him; and whilst struggling to enter the door, he received a blow upon his head, which leveled him with the ground: Having recovered a little, he arose and discharged a *pistol* among the opposers, and commanded the Court party to fire also; when, as Mr. Langdon supposes, about five of them fired. Mr. French, one of the opposers, was killed by a ball's being lodged in his head, and two more of the same party were also wounded. The sheriff and the Court party then entered the courthouse. The populace without discharged a gun and two *pistols* .[38] [emphasis added]

40.     Many news accounts report pistols being used by people far removed from "wealthy, powerful, and influential."[39]

41.     A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[40] A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[41]

42.     Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities. This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off

---

[37] *Last Monday Capt. Tyng in the Massachusetts...,* PENNSYLVANIA GAZETTE, Aug. 15, 1745.

[38] *MR. Mark Langdon, from Westminster, in the..., Virginia Gazette,* Apr. 22, 1775.

[39] BY THE LAST POST FROM NEW YORK..., PENNSYLVANIA GAZETTE, Aug. 31, 1749.

[40] *To the Publick,* SOUTH CAROLINA GAZETTE, DEC. 26, 1743.

[41] *GUERIN & WILLIAMSON,Have just imported in the London,* SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL, Jun. 24, 1766,  Jul. 1, 1766, Jul. 8, 1766

any handgun, pistol, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province…."[42]



Paul Revere's Very Compact Pocket Pistol   [43]

43.     My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[44]  Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers.  Still it is pretty apparent that Cornell's claim about the scarcity of pistols outside of those being used by the elite for dueling is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

## VII.  Ignorance of Colonial Sources

44.     66. At pp. 12-13:

---

[42] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.
[43] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[44] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge…. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

45.     A preference for storing firearms unloaded seems sensible, but the documents left by colonial Americans show that they did not follow it very consistently.  As mentioned above, people sometimes unloaded firearms in public places with tragic results.  (The successful unloads would not have made the newspapers; "Three Million Children Made it to School Today Without Injury," is a headline you will never see.)  Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[45]

46.     More evidence that black powder arms were often kept loaded, and not just when ready for use:

Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one man within one inch of his belly, yet missed the bone, then the shot (being goose shot) scattered a little and struck the second man under his right side upon his breast, so as above 40 shot entered his body, many into the capacity of his breast.46

It is observable that this man had gathered some providences about such as were against them, as that Mr. Winslow's horse died, as he came riding to Boston; that *his brother's son (a child of eight years old) had killed his own sister (being ten years of age) with his father's piece*, etc., and his great trouble was, least this providence which now befell him, should be imputed to their cause.[47] [emphasis added]

47.     And:

One Richard Sylvester, having three small children, he and his wife going to the assembly, upon the Lord's day, left their children at home. The eldest was without doors looking to some cattle ; the middle-most, being a son about five years old, seeing his father's fowling piece, (being a very great one, ) stand in the chimney, took it and laid it upon a stool, as he had seen

---

[45] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.

[46] Id. 2:55.

[47] Id., 2:317.

his father do, and pulled up the cock, (the spring being weak,) and put down the hammer, then went to the other end and blowed in the mouth of the piece, as he had seen his father also do, and with that stirring the piece, being charged, it went off, and shot the child into the mouth and through his head.[48]

48.    These four incidents of firearms kept loaded when not in active use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in books that I have not read?  Perhaps Cornell was as well-should read more colonial documents before declaring himself an expert on colonial practices.   The relevance of this claim to the proposed law is unclear.  Did Cornell just copy and paste this section from a declaration where this was relevant?

49.    Finally, there is one more piece of evidence that Americans kept firearms loaded when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.  The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

Sect. 2. And be it further enacted by the authority aforesaid, That all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town… [49]

50.    The  law  clearly  believed  that  private  parties  kept  small  arms,  cannon,  small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

---

[48] Id., 2:72.
[49] City of Boston, CHARTER OF THE CITY OF BOSTON, AND ORDINANCES MADE AND ESTABLISHED BY THE MAYOR, ALDERMEN, AND COMMON COUNCIL, WITH SUCH ACTS OF THE LEGISLATURE OF MASSACHUSETTS, AS RELATE TO THE GOVERNMENT OF SAID CITY. ch. 24 at 137 (1827).

# VIII. Credulous Acceptance of Roth's Claims

51. Back to Cornell and Roth's claims about low homicide rates. At p. 13 "As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment." Cornell's Figure 2.3 shows "Unrelated-adult homicide rates in New England by race, 1677-1797 (per 100,000 persons per year)." New England European-American unrelated-adult homicide rates from 1750 to 1797 are below 2/100,000. This figure itself is a bit mystifying. It shows murder rates by race, yet the earliest census in Massachusetts appears to be 1754.[50] Connecticut's first census was in 1756; Maine 1764-65; New Hampshire, 1772; Rhode Island, 1768; Vermont, 1771.[51] How censuses would have counted often unfriendly Indians before 1700 is a mystery.

52. Keep in mind that Roth's homicide rates include only "unrelated adults." Yet today, with access to all the evils of modern firearm technology, Vermont's 2019 *murder* rate (which includes minor victims and victims related to the murderer) was 1.8/100,000; in 2018 an LCM Ban was adopted; in 2017, the year before the LCM Ban, it was 2.2/100,000. Other fairly laissez faire states with respect to gun regulation have similarly low murder rates. My home state, Idaho, which does not even require a license to carry and has no machine gun regulation is 2.0/100,000; South Dakota (1.9); Wyoming (2.2).[52] And these 2019 murder rates include related adults and minor victims. If the lack of modern firearms explains low murder rates in the colonial period, why are murder rates in some New England states and other states awash in modern firearms still so low? Perhaps Cornell and Roth are refusing to face that other factors might be more important than firearms technology?

---

[50] Robert V. Wells, Population of the British colonies in America Before 1776: A Survey of Census Data Table 1-1 at 9 (1975);

[51] Historical Statistics of the United States, Colonial Times to 1970, Bicentennial Edition, Part 1 Series Z 24-132 at 1170 (1975).

[52] FBI, Crime in the United State: 2019, Table 4; FBI, Crime in the United State: 2017, Table 4.

## IX. Misreading of Nineteenth Century Court Decisions

53.     At p. 15: "[T]he application of the police power to regulating firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*." There are multiple difficulties with Cornell's argument. The first is that these gunpowder storage laws refer to gunpowder not firearms. If a state wishes for fire safety reasons to prohibit storing *large* quantities of gunpowder or smokeless powder in residential or commercial districts, the Second Amendment does not impair such laws. Gunpowder is not an "arm." These storage laws regulated substantial quantities: 30 pounds in Pennsylvania; [53] 28 pounds in New York; such limits imposed no barrier to use of firearms for self-defense. A pound of black powder provides hundreds of shots. Would a law prohibiting storage of a thousand gallons of gasoline in a residential neighborhood imply authority to prohibit gasoline powered lawnmowers?

54.     Cornell's quote from Brown v. Maryland (1827) is also severely out of context. The dispute in that case involved a state requirement for a license to import "foreign articles or commodities, of dry goods, wares, or merchandise, by bale or package, or of wine, rum, brandy, whiskey and other distilled spiritous liquors." "The principle, then, for which the plaintiffs in error contend, that the importer acquires a right, not only to bring the articles into the country, but to mix them with the common mass of property, does not interfere with the necessary power of taxation which is acknowledged to reside in the States…" Cornell's quote from Brown is *dictum*, far removed from the meaning of the decision.

55.     At p. 16:

One case featured in *Heller*, *State v. Reid* offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and

---

[53] 11 Pennsylvania Statutes at Large 209-12; 12 Pennsylvania Statutes at Large 416-23.

18

the right of the people to regulate.  The *Reid* Court observed that the state's concealed carry prohibition was a legitimate exercise of police power authority. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."

56.     This is a major misrepresentation of Reid:

We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. *A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence*, would be clearly unconstitutional.[54] [emphasis added]

57.     Cornell at p. 22:

By the end of the century, Americans residing in urban areas, particularly those dwelling in the nation's most populous cities, were likely to be living under some form of restrictive public carry  legal regime: bans on concealed carry, good cause permit schemes, or broad restrictions on  public carry with good cause and affirmative self-defense exceptions.

58.     As Bruen observed:

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State v. Reid* , 1 Ala. 612, 616, 619–621 (1840). It was also true in Louisiana. See *Statev . Chandler* , 5 La. 489, 490 (1850). Kentucky, meanwhile, went one step further—the  State  Supreme  Court *invalidated* a  concealed-carry  prohibition.  See *Bliss  v. Commonwealth* , 12 Ky. 90 (1822).[55] [emphasis added]

# X. Local Concealed Weapon Laws Irrelevant to This Case

59.     Cornell's discussion of California gun laws starting on p. 20 is largely an exercise in distraction.  That many local governments banned concealed carry is of no relevance to this case.

# XI. Ignorance of the Racist Roots of California Gun Law

60.     Cornell at p. 27 claims that "Perhaps the most well-known and controversial example of such a regulation was the adoption of the Mulford Act shortly after the Black Panther Party  staged a high-profile protest that included a prominent open carry display. In response to

---

[54] State v. Reid, 1 Ala. 612, 616, 617, 35 Am. Dec. 44 (1840).
[55] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2146, 2147 (2022).

this action, California adopted a new more restrictive law prohibiting open carry." Cornell has

reversed the order here. The Mulford Act was already under debate; their arrival was in protest

of the proposed Mulford Act. The Black Panthers demonstrated their finely honed political skills

by a dozen armed "with loaded rifles pistols and shotguns," barging "in a 'flying wedge' into the

Assembly while debate was in process."[56]

61. Cornell at p. 27 claims: "Some gun-rights advocates have cited this incident to

argue that all gun regulation is inherently racist, a dubious historical claim that conflates different

periods of gun regulation from different regions of the nation with the history of the Jim Crow

South and the experience of the Black Panthers during the tumultuous social unrest of the

1960s." Without question, arms regulation sometimes had other motivations, as my book

Concealed Weapon Laws of the Early Republic demonstrates.[57] California's history on this is so

blatant that the California State Assembly formally apologized in 2009:

> Among other things, these laws denied the Chinese in California the right to own land or
> property, the right to vote, and the right to marry a white person, denied children of Chinese
> descent access to public schools, denied Chinese immigrants *the right to bear arms...*[58]
> [emphasis added]

## A. The 1849 Convention

62. California's two state constitutional conventions are also interesting. When

delegates met at the 1849 Convention, they debated what individual rights should be listed in the

state constitution's bill of rights. Delegate Ord proposed, "Every person has a right to bear arms

for the defence of himself and the State." Delegate McCarver wanted to add, "provided that they

are not concealed arms."[59] This is not surprising; in the period before the Civil War, many states

---

[56] Capitol Security Hearing, San Bernadino County Sun, May 5, 1967, 3.
[57] Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999).
[58] California Assembly Concurrent Resolution No. 42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42
[59] J. Ross Browne, REPORT OF THE DEBATES IN THE CONVENTION OF CALIFORNIA, ON THE FORMATION OF THE STATE CONSTITUTION... 47 (1850).

passed laws either prohibiting or restricting the *concealed* carrying of deadly weapons. State constitutional conventions often added such restrictions to existing arms guarantees to make sure that the legislature could ban what was increasingly regarded as a cowardly way of fighting—the use of "secret arms."[60]

63. Delegate McCarver, however, also believed that it would be best if there were *no* provision preventing "the Legislature from regulating matters of this kind." He thought guaranteeing a right to bear arms was not "a proper subject for the Constitution." Other delegates agreed with McCarver that there should be no arms provision in the state bill of rights—but not because the state should have the power to regulate the carrying of weapons. Delegate Sherwood argued that denying an individual the right to bear arms "would be null and void, inasmuch as it would be in opposition to the Constitution of the United States," and then quoted the Second Amendment. Sherwood thought an arms guarantee was unnecessary because the Second Amendment already protected such a right. [61] This may seem a pretty astonishing claim, because only with the *McDonald* v. *Chicago* (2010) decision did the U.S. Supreme Court hold that the Second Amendment restricted the power of the states to regulate the keeping and bearing of arms. And then only through incorporation of the Second Amendment via the 14th Amendment. The 14th Amendment was ratified in 1868, almost twenty years after the California constitutional delegates debated the applicability of the Second Amendment to state law. However, the notion that states were bound by the Second Amendment directly was a minority

---

[60] Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM 52-62 (1999).
[61] Browne, REPORT OF THE DEBATES IN THE CONVENTION OF CALIFORNIA, ON THE FORMATION OF THE STATE CONSTITUTION… 47 (1850).

viewpoint endorsed by several state supreme courts in the antebellum period, so this is not as anachronistic as it first sounds.[62]

64.      Delegate Botts argued against adding the arms guarantee to the state constitution's bill of rights because he feared that it might not be a strong enough protection; such a guarantee belonged in the section that specified the powers of the legislature.

65.      Even Delegate Sherwood was persuaded by this argument, admitting that the arms provision "directly touches the rights of every citizen."[63]  When the convention voted on both Ord's proposal for a right to bear arms, and McCarver's amendment that the right should not apply to concealed weapons, both proposals died—and with it, any possibility of adding a right to keep and bear arms to the California Constitution's bill of rights.

66.      You cannot draw too strong a message from this series of back-and-forth discussions, but it appears that some delegates argued that there was no need for an individual right to keep and bear arms in California's Constitution, because the Second Amendment already protected such a right; other delegates argued that the right needed to be located elsewhere than in the bill of rights to be better protected.[64]

67.      The only delegate who clearly spoke against a right to bear arms was McCarver. Today, he is most remembered for another proposal he made a few minutes later: that blacks would be forever banned from living in California.[65]  (Such provisions were added to many other

---

[62] Nunn. v. State, 1 Ga. 243, 250 (1846) (striking down a ban on open carrying of horseman's pistols); State v. Chandler, 5 La. Ann. Rep. 489, 490 (1850) (upholding a ban on concealed carry while observing that the "right to carry arms" is a "right guaranteed by the Constitution of the United States.); State v. Smith, 11 La. Ann. Rep. 638 (1856) (upholding a ban on concealed carry because that law "does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are.. at least carried openly."); State v. Jumel, 13 La. Ann. Rep. 399, 400 (1858) (rejecting a Second Amendment challenge to a concealed weapon law because the laws prohibited "only a particular mode of bearing arms…."); Cockrum v. State, 24 Tex. 394, 396, 401 (1859) (appears to have accepted defendant's argument that the Second Amendment "is applicable to state legislation.")

[63] Browne, REPORT OF THE DEBATES, 47.

[64] *Id*.

[65] *Id.*, 49-50.

state constitutions of the period; McCarver even played a part in Oregon adopting such a ban; he

got around.[66])  In spite of considerable support from other delegates, this proposal did not pass.

## B.  The 1878 Convention

68.    California held another constitutional convention in 1878.  The 1849 Constitution

seemed increasingly inadequate because of questions about water rights and the "Chinese

problem."[67]   The 1878 convention seems not to have even discussed the question of a right to

keep and bear arms—except for one startling provision.  The convention was divided between a

conservative, generally wealthy group, and what became known as "the Workingmen," who

represented a populist collection of white laborers, intent on driving Asian immigrants from

California.[68]    They had several proposals that are shocking in their racism today (but

nevertheless were made part of the 1879 California Constitution).

69.    Of most relevance to gun control was the Workingmen's demand that aliens who

could not become citizens would be prohibited from bearing arms.[69]   Delegate O'Donnell

introduced this request as a constitutional provision: "No alien who cannot become a citizen of

the United States shall be allowed to bear arms."  What sort of aliens could not become citizens

of the United States?  Until 1952, no "Oriental" (as persons of East Asian ancestry were then

described) could become a naturalized citizen.[70] If you were born in the United States, you were

a natural-born citizen, but an immigrant from the Far East would always be an alien.

---

[66] David Alan Johnson, FOUNDING THE FAR WEST: CALIFORNIA, OREGON, AND NEVADA, 1840-1890, 129 (1992); Oregon, JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF OREGON: HELD AT SALEM 125 (1882).

[67] Samuel Charles Wiel, 2 WATER RIGHTS IN THE WESTERN STATES: THE LAW OF PRIOR APPROPRIATION .. 1166 (3d ed. 1911); John Robert Soennichsen, THE CHINESE EXCLUSION ACT OF 1882 127-128 (2011).

[68] Emily J. Zackin, LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS 200 (2013).

[69] Theodore H. Hittell, 4  HISTORY OF CALIFORNIA 615-17 (1897).

[70] Davis McEntire, RESIDENCE AND RACE: FINAL AND COMPREHENSIVE REPORT TO THE COMMISSION ON RACE AND HOUSING 269 (1960).

O'Donnell's proposed was "Referred to Committee on Chinese" where it seems to have silently died.[71]

## C. Legislative Acts

70.     The California Legislature debated a ban on concealed carry throughout the 1850s.  Even those who supported such laws often had a narrow notion of who needed to be restricted.  During debates in February of 1856, the state senator who represented Nevada County (appropriately, a derringer-shaped county in California's foothills) indicated that he was in support of a bill to ban concealed carry if it were for the purpose of disarming "Greasers."[72] ("Greasers" was a slang term used throughout the nineteenth and early twentieth century for Mexicans[73]).

71.     The direct ancestor of California's current concealed weapon license law was a variant of the Uniform Revolver Act passed in several American states in the 1920s; the 1923 California law enhanced the punishments for various crimes committed with a handgun,[74] made carrying a handgun without a permit evidence of intention to commit a felony,[75] required a concealed weapon permit anywhere in the state (not just in cities),[76] and also prohibited possession of concealable handguns by anyone who was not a U.S. citizen.[77]

72.     What motivated passage of this law?  Legislative documents are astonishingly sparse on the reasons, but as is often the case, newspaper coverage is more forthcoming. Governor Friend W. Richardson signed the law after R. T. McKissick, "president of the Sacramento Rifle and Revolver Club," argued that this law preserved the "rights of those using

---

[71] E.B. Willis and P.K. Stockton, 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA… 285 (1880).
[72] *Letter From Sacramento*, [San Francisco] DAILY ALTA CALIFORNIA, February 19, 1856, 2.
[73] Win Blevins, DICTIONARY OF THE AMERICAN WEST 166 (2001).
[74] Stats. 1923, ch. 339, § 3.
[75] *Id.*
[76] Stats. 1923, ch. 339, § 5.
[77] Stats. 1923, ch. 339, § 2.

firearms for competition or hunting or for protection in outing trips."  McKissick was concerned that a more stringent gun control law might be passed if Governor Richardson vetoed this one. McKissick admitted that the provision prohibiting handgun ownership by non-citizens was of questionable constitutionality, but that he believed that if it was upheld, it would have a beneficial effect "in checking *tong* [gang] wars among the Chinese and vendettas among our people who are Latin descent."[78]

73.      Why did Richardson sign a law with racist intentions?   When Governor Richardson ran for re-election in 1922, he would not answer the question of whether he was a member of the Ku Klux Klan—but the Klan enthusiastically endorsed Richardson.[79]

74.      With such blunt statements of racist intent, not surprisingly, the discriminatory effect of the new law was immediately recognized.   The Mexican consul in Los Angeles protested the alien handgun ban, since "a large proportion of the foreigners in California were of Mexican descent."[80]   Mexican immigrants, being white, could at least apply for citizenship. Asian immigrants were ineligible for naturalization[81]—and therefore were breaking the law if they owned a handgun.

## XII. Ignorance (Or Willful Blindness) to the Mental Illness Part of the Problem

75.      Cornell on p. 23: "The next major turning point in the debate over firearms regulation in California was the ban on "assault weapons" enacted after the Stockton School Massacre."   While true, this is irrelevant to this case.   What makes this incident important in a

---

[78] *New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July 15, 1923, at  3, col. 1.
[79] David M. Chalmers, HOODED AMERICANISM: THE HISTORY OF THE KU KLUX KLAN 124 (1981, 3rd ed.).
[80] Ricardo Romo, EAST LOS ANGELES: HISTORY OF A BARRIO 157 (1983).
[81] *The Immigration and Nationality Act of 1952 (The McCarran-Walter Act)*, U.S. Department of State, https://history.state.gov/milestones/1945-1952/immigration-act, last accessed January 17, 2023.

larger sense was, why did this tragedy happen?  The mass murder at Cleveland School, Stockton in 1989 that started the current focus on assault weapons and LCMs involved a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment.  As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference. However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[82]

76.    This unfortunately is at the core of the mass murder problem that drove and still drives much of the current contentious gun ban debate.  Untreated severe mental illness is at the core of most of the recent mass murders.  These problems have often been ignored, or laws or policies made involuntary commitment impossible.[83]

77.    A 2000 New York Times examination of mass murderers concluded:

> The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

> Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population.

> However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [84]

---

[82] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings* 19 (October, 1989), https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

[83] See Clayton E. Cramer, *Mental Illness and the Second Amendment*, 46 CONN. L.R. 4:1301 (2014) for an examination of this problem and Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012*)* for how we got here.

[84] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, NEW YORK TIMES, Apr. 10, 2000.

78.     Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[85]

79.     Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s, correlated with the change in the percentage of the population that was institutionalized.  (The institutionalized include those who were confined to either a mental hospital or prison.)    According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization: mental hospitals.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[86]

80.     Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[87] more access to beds is clearly quite important in reducing homicide

---

[85] See Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) and Jean Isaac Rael and Virginia C. Armat, MADNESS IN THE STREETS: HOW PSYCHIATRY AND THE LAW ABANDONED THE MENTALLY ILL (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

[86] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution*, 84 TEXAS LAW REVIEW 1766-75 (2006).

[87] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

rates; "poorly rated mental health systems" matter, but not as dramatically.  This *might* affect suicides after release, although that problem was not in the scope of Segal's work.)

81.     Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with 1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[88]

82.     Of course, California's politicians would rather focus on guns rather than ask how deinstitutionalization in the 1960s created cities awash in homeless often mentally ill drug addicts, sidewalks with discarded hypodermic needles and human feces and random acts of mass murder.

## XIII. Summary

83.     Cornell repeatedly misrepresents his sources.

84.     Cornell fails to understand what we were supposed to have learned in high school Civics classes: Constitutions have bills of rights because majorities make mistakes, sometimes out of malice, more often by ignorance.

85.     Cornell misreads court decisions to fit his desired outcome.

86.     Cornell attacks strawmen to deflect attention from his failure to provide sources that actually match what he claims.

87.     Cornell's ignorance of the limitations of Roth's study of American homicide leads him into the false conclusion that firearms technology explains why colonial New England had

---

[88] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, SOCIAL PSYCHIATRY AND PSYCHIATRIC EPIDEMIOLOGY, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.

28

homicide rates comparable to many American states today.  He is also unaware that many states have similar homicide rates with modern firearms and few gun regulations of any sort.

88.    Cornell's ignorance of California gun control history lets him create a rosier picture of its origins than newspaper reports show.

# REBUTTAL TO EXPERT REPORT OF

# BRENNAN RIVAS

# Table of Authorities

### Cases

Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840). ................................................ 22

Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822). ........................................................................ 21

Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892)...................................................... 2

Cockrum v. State, 24 Tex. 394, 396 (1859) ................................................................................ 16

Cockrum v. State, 24 Tex. 394, 403 (1859). ................................................................................ 3

Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891) ...................................................... 2

Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882)................................................. 28

District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008). ..................................................... 16

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857) ....................................................................... 25

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857). ....................................................................... 9

English v. State, 35 Tex. 473, 476 (Tex. 1872) ............................................................................. 4

Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876) ............................................................ 26

Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876) ...................................................................... 4

Holland v. State, 33 Ark. 560, 561 (1878) .................................................................................. 28

In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902) ................................ 29

N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2146, 2147 (2022) ........................... 8

New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022). ..............................11

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022) ...................... 30

New York v. Miln, 36 U.S. 102, 103 (1837). ............................................................................... 17

Nunn v. State, 1 Ga. 243 (1846)........................................................................................... 9, 21

Nunn v. State, 1 Ga. 243, 248 (1846)........................................................................................ 5

Owen v. State, 31 Ala. 387, 388, 389 (1858). ................................................. 23

Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871) ............................... 26

Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833). .................................. 22

Smith v. State, 11 La. An. 633, 634 (1856) ..................................................... 25

State v. Chandler, 5 La. An. 489, 490 (1850). ................................................... 9

*State* v. *Chandler*, 5 La. An. 489, 490, 491 (1850) ......................................... 24

State v. Chandler, 5 La. An. 489, 491 (1850) ................................................... 24

State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850) ..................... 3

State v. Duke, 42 Tex. 455, 458 (1875) .............................................................. 8

State v. Duke, 42 Tex. 455, 458, 459 (1875) ...................................................... 8

State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893) ........................ 2

State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843) ........... 23

State v. Jumel, 13 La. An. 399, 400 (1858) ................................................. 9, 25

State v. Mitchell, 3 Blackford 229 (Ind. 1833) ............................................... 21

State v. Reid, 1 Ala. 612 (1840) ...................................................................... 21

State v. Reid, 1 Ala. 612, 615, 616, 617 (1840) ................................................ 8

State v. Wilburn, 7 Tenn. 61 (1872). ............................................................... 20

Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878) .................... 27

## Statutes

1 Ohio Stats. Ch. 6 § 6 (1833) ........................................................................... 5

1 Penn. Penal Code 207 n.1 (1883) ................................................................... 2

1871 Tex. Laws ch. 34. ................................................................................... 14

Black Code Of The District Of Columbia 11 (1848) ........................................ 6

Cal. Laws ch. 385 (1863)...................................................................................... 4

Compilation of the Public Acts of the Legislative Council of the Territory of Florida , Passed Prior
    to 1840 423 (1839).............................................................................. 29

Fla. Acts ch. 75 § 3 (1846)................................................................................. 10

Ga. Acts 90-91 (1838)........................................................................................ 5

Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in
    Force in this State: From the Year 1715 to the Year 1820 ch. 22 § 6 at 710 (1801). ............... 10

Laws of Maryland Ch. 44, § 32 (1715)...................................................................... 6

Louisiana Terr. Laws ch. 1 § 6 (1804) .................................................................... 5

State v. Reams, 27 S.E. 1004 (N.C. 1897) ................................................................ 18

Va. Acts ch. 101 § 1 (1838)................................................................................11

Va. Laws ch. 41, § 8 (1792)............................................................................... 6

### Other Authorities

An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg,
    London, circa 1781-87, Bonham's,.................................................................. 12

Antique Pepperbox Pistol 1850's Washington Arms Co,................................................ 12

Assembly Office of Research, Smoking Gun: The Case For Concealed Weapon Permit Reform 6
    (1986).................................................................................................. 4

Bill Barring Loaded Weapons In Public Clears Senate 29-7, Sacramento Bee, Jul. 27, 1967, A6. 4

Capitol Is Invaded, Sacramento Bee, May 2, 1967, A1, A10 ......................................... 4

Colonel Bowie and His Knife, 2 Temple Bar 124 (Jul. 1861)....................................... 9

Concealed Weapons, 8:4 *Criminal Law Magazine and Reporter* 409, 412 (Oct. 1886). ............ 18

David A. Hounshell, From the American System to Mass Production 1800-1932: The Development of Manufacturing Technology in the United States 47 (1984). ......................... 15

English Transitional Pepperbox Revolver, Forgotten Weapons,.................................................... 12

Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber, Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates ...................................................................................................................................... 12

Immigration and Nationality Act (104th Cong., 1st sess.) 581 (10th ed. May 1995)...................... 7

James E. Serven, Colt Firearms: 1846-1954 13, 30 (1954). ......................................................... 14

Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder, 36 J. Am. Acad. Psychiatry & Law 82 (2008)..................................................................................................................... 17

Philip J. Cook, Jens Ludwig, and Anthony Braga, Criminal Records of Homicide Offenders, 294(5) JAMA 598-601 (Sep. 2005). ...................................................................................... 17

Pollard's History of Firearms 114 (1983). .....................................................................................11

Raymond L. Cohn, Mass Migration Under Sail: European Immigration to the Antebellum United States 15 (2009). .................................................................................................................... 16

Self-Cocking and Revolving Six Barrel Pocket Pistol [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1.......................................................................................................................... 12

Studies in History, Economics, And Public Law 20 (1899) .......................................................... 7

The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It iii (1875)..................................................................................................................... 16

# Rivas Rebuttal

1.     My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons regulation. My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2.     In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

3.     I am being compensated for services performed in the above-entitled case at an hourly I rate of $150 for expert declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## I. Deadly Weapons

4. Rivas at pp. 4-5 claims that there was a distinction between deadly weapons and "hunting knives, rifles, muskets, and shotguns." Even her n.1 on p. 5 admits that "There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols…" She then gives what she considers an exceptional case that established "a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." The phrase "other firearm" is pretty general, and would include all "rifles, muskets, and shotguns." The supposed exceptions are *not*

1

exceptions.  There is no shortage of laws that include firearms of all types in a list of deadly weapons to be regulated.

> Act 10 April, 1873, Sec. 1, P. L., 659. -Any person within the limits of the county of Northampton, who shall carry *any firearms*, slung- shot, dirk-knife, or other deadly weapon, concealed upon his person, with intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed. guilty of a misdemeanor…[1] [emphasis added]
>
> Act 18 March, 1875, Sec. 1, P. L., 33.-Any person within this Commonwealth who shall carry *any firearms*, slung-shot, hand-billy, dirk-knife, razor, or other deadly weapon, concealed upon his person, with the intent therewith unlawfully and maliciously to do injury to any other person, shall be deemed guilty of a misdemeanor…[2] [emphasis added]

5. State supreme court decisions are also at variance with Dr. Rivas' supposed distinction: "It is not questioned but *a loaded rifle is a deadly weapon*. In this case a rifle was used."[3]  A Kentucky Supreme Court decision decided that a rock was a *deadly weapon* as would a shot-gun*:*

> The statute does not say what shall constitute a deadly weapon. It merely punishes for a wilful and malicious wounding with one. If one man maliciously wounds another with a rock, with which he might have killed him, there exists no reason why the same punishment should not be meted out to him *as if he had done it with a shot-gun*; and undoubtedly the Legislature, in enacting this statute, so intended.[4] [emphasis added]
>
> The offense of which appellant was convicted and sentenced to the penitentiary for four years is maliciously beating and wounding Charles Brown with a car coupling-pin, a deadly weapon, with intention to kill him.[5]

6. Rivas' claim is so counterlogical that citing hundreds of statutes and decisions seems unnecessary.  A search of the phrase "deadly weapons" in published 19th century books and cases rapidly demonstrates that the term did not have such a precise meaning, as the following paragraphs demonstrate.

7. There *were* distinctions by weapons type in 19th century law but not such a simple distinction as Rivas claims on p. 3: "Nineteenth-century public carry laws explicitly prohibited *concealed* weapons because the primary mode of carrying bowie knives, pocket pistols, brass

---

[1] 1 Penn. Penal Code 207 n.1 (1883).
[2] Id.
[3] State v. Herron, 12 Mont. 230, 13 Am.St.Rep. 576, 577 (1893).
[4] Commonwealth v. Duncan, 13 Ky.Law.Rep. 162, 163 (1891).
[5] Carlton v. Commonwealth, 13 Ky.Law.Rep. 162, 163 (1892).

knuckles, and other deadly weapons was concealed in one's pocket." [emphasis in original] Decisions repeatedly accepted the constitutionality of bans on concealed carry of a variety of weapons because those laws banned only *concealed* carry and left open carry legal:

> The act of the 25th of March, 1813, makes it a misdemeanor to be "found with a concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or any other place about him, that does not appear in full view." This law became absolutely necessary counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. *It interfered with no man's right to carry arms (to use its words) "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.[6] [emphasis added]

8. When the Texas Supreme Court heard a challenge to a sentence enhancement law for manslaughter committed with a Bowie-knife, the question of whether it was concealed or openly carried was not relevant: "The right to carry a bowie-knife for lawful defense is secured, and must be admitted. It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill."[7]

9. There were distinctions similar to Rivas' but I doubt California wishes to follow that tangent. The Texas Supreme Court a few years later decided that: the arms protected by the Second Amendment are weapons of war:

> The word "arms" "in the connection we find it in the Constitution of the United States, *refers to the arms of a militiaman or soldier*, and the word is used in its military sense. The arms of the infantry soldier are the musket and bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms.[8] [emphasis added]

10. The Arkansas Supreme Court similarly defined arms as "arms as are *used for purposes of war*; and does not prevent the legislature from prohibiting the wearing of such weapons as are

---

[6] State v. Chandler, 5 La. Ann. 489, 490, 52 Am. Dec. 599 (1850).
[7] Cockrum v. State, 24 Tex. 394, 403 (1859).
[8] English v. State, 35 Tex. 473, 476 (Tex. 1872).

not used in civilized warfare…"[9]  If California wishes to argue that the Second Amendment protects possession and carry of weapons of war, go for it!

11. Regardless, Rivas' attempt to distinguish handguns from long guns as protected arms is a waste of time.  Handguns as protected arms left the station with D.C. v. Heller; denying a right carry them was the train whistle of Bruen.

12. Rivas at p. 4 seeks to establish that open carry was restricted by California law in the 19th century:

> Public carry laws, for both concealed weapons and the open-carry of weapons, have often reserved special exemptions for "travelers" as defined under state law, reinforcing the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century.

13. The problem with this argument is that the "travelers" exemption appeared in California's 1863 ban on *concealed* carry of deadly weapons:

> Section 1.  Every person, not being a peace officer or *traveller*, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars.
>
> Sec. 2.  Such persons, and no others, *shall be deemed travellers within the meaning of this Act, as may be actually engaged in making a journey at the time*.[10] [emphasis added]

14. California imposed no ban on open carry of loaded firearms in cities until 1967.  The legislature passed the ban in response to a series of confrontations between Oakland Police and the Black Panthers.  The Panthers attending a State Senate hearing carrying loaded shotguns and pistols certainly sped up the debate.[11]

15. Rivas asserts on p. 6 that:

---

[9] Fife v. State, 31 Ark. 455, 25 Am.Rep. 556 (1876).

[10] Cal. Laws ch. 385 (1863).

[11] Assembly Office of Research, *Smoking Gun: The Case For Concealed Weapon Permit Reform 6* (1986); *Capitol Is Invaded*, SACRAMENTO BEE, May 2, 1967, A1, A10; *Bill Barring Loaded Weapons In Public Clears Senate 29-7*, SACRAMENTO BEE, Jul. 27, 1967, A6.

> The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.

16. Yet her following quote claims that "prohibited weapons… were not to be carried upon the person or concealed." Few states attempted to ban possession of deadly weapons in one's home and only a few banned open carry. One that did was Georgia's 1837 law that prohibited sale of pocket pistols; the Georgia Supreme Court overturned it as contrary to the Second Amendment.[12]

17. The act which Nunn overturned was also quite explicit that it only prohibited *concealed* carry: "*Provided, also*, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view."[13] [emphasis in original]

18. Few states until the 20th century prohibited open carry of pistols or most other *deadly weapons*. The laws that prohibited carry either banned concealed carry or banned carrying a weapon while committing some other criminal act. Two examples of laws banning being armed while committing another crime. Ohio (1833):

> Burglary with theft…. If the person or persons *so breaking and entering any dwelling-house*, shop , store or vessel and violence, as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or *shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention*…[14] [emphasis added]

Louisiana Territory (1804):

> If any person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall actually steal and purloin therefrom any money, goods or chattels and shall commit or attempt to commit any personal abuse, force or violence, or *shall be so armed with any dangerous weapon or weapons*, or clearly to indicate a violent intention …[15] [emphasis added]

---

[12] Nunn v. State, 1 Ga. 243, 248 (1846).
[13] Ga. Acts 90-91 (1838).
[14] 1 Ohio Stats. Ch. 6 § 6 (1833).
[15] Louisiana Terr. Laws ch. 1 § 6 (1804).

5

19. One set of laws that broadly prohibited possession or carry were explicitly aimed at slaves and free blacks:

> No negro or other slave within this province shall be permitted to carry any gun or any other offensive weapon from off their master's land, without license from their said master, and if any negro or other slave shall presume to do so, he shall be liable to be carried before a Justice of the Peace and be whipped, and his gun or other offensive weapon shall be forfeited to him that shall seize the same and carry such negro so offending before a Justice of the Peace.[16]

> No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive…[17]

The 13th and 14th Amendments preclude such laws today.

20. On p. 5: "A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem."  Rose in tandem?  Which caused which?  The normal response of people who feel as though they are at risk is to arm for self-defense. Establishing the direction of causality for two events except in a controlled laboratory environment is difficult.  When Rivas says a "series of socio-economic and political factors," she really should say, "A huge number of social changes took place simultaneously, and which ones might be factors in rising violent crime rates is uncertain."  The 19th century had many major social changes that likely contributed to rising violent crime rates.  Large-scale immigration is the most obvious:

> The mass migration of the 19th century was the result of a near perfect match between the needs of a new country and overcrowded Europe. Europe at this time was undergoing drastic social change and economic reorganization, severely compounded by overpopulation. An extraordinary increase in population coincided with the breakup of the old agricultural order which had been in place since medieval times throughout much of Europe. Commonly held lands were broken up into individually owned farms, resulting in landless status for peasants from Ireland to Russia. At approximately the same time, the industrial revolution was underway, moving from Great Britain to Western Europe, and then to Southern and Eastern Europe. *For Germany, Sweden, Russia, and Japan, the highest points of emigration coincided with the beginnings of industrialization and the ensuing general disruption of employment patterns.* The artisans joined the peasants evicted from their land as immigrants to the United States.

---

[16] Laws of Maryland Ch. 44, § 32 (1715) quoted in BLACK CODE OF THE DISTRICT OF COLUMBIA 11 (1848).
[17] Va. Laws ch. 41, § 8 (1792).

Population pressure and related economic problems, sometimes in the extreme form of famine, are generally cited as being the major causes of the mass migration of this long period, followed by religious persecution and the desire for political freedom.[18] [emphasis added]

21. America was also changing from a nation of small towns to one of big cities:

The urban population is defined in the United States census reports as the population of cities or towns having at least 8,000 inhabitants. Table II, column 3, shows *the growth of the urban population from 210,873 persons residing in six cities in 1800 , to 18,284,385 inhabitants of 448 cities in 1890*. That is, the urban population has increased eighty-seven fold in the century, while the population of the entire country has increased only twelve-fold.[19] [emphasis added]

22. The transition from largely self-employed farmers and craftsmen to employees is another obvious factor, as was the increasing political polarization concerning the abolition of slavery. A detailed examination of other social changes in the 19th century would make this declaration a book. IIt seems at least as plausible that fear of violent crime in an increasingly urban America increased demand for and carry of concealed weapons.

23. Throughout p. 6, Rivas conflates *deadly weapons* with their ease of concealment by citing laws that prohibited *concealed* carrying of weapons. It was not the weapons that these laws tried to eliminate, but the *concealed* carry of deadly weapons. In n.5: "It is worth noting that these provisions prohibited not only carrying concealed, but carrying about the person generally. See *Ex parte Thomas*, 1908 OK 155." While this statement accurately describes Oklahoma at the start of the 20th century, it misrepresents the state of American law in the 19th century. According to Bruen:

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State v. Reid* , 1 Ala. 612, 616, 619–621 (1840). It was also true in Louisiana. See *Statev . Chandler* , 5 La. 489, 490 (1850). Kentucky, meanwhile, went one step further— the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss v. Commonwealth* , 12 Ky. 90 (1822).[20] [emphasis in original]

---

[18] IMMIGRATION AND NATIONALITY ACT (104th Cong., 1st sess.) 581 (10th ed. May 1995).
[19] STUDIES IN HISTORY, ECONOMICS, AND PUBLIC LAW 20 (1899).
[20] N.Y.S. Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2146, 2147 (2022).

7

24. Other decisions classified some of Rivas' putative *deadly weapons* with Rivas' arms apparently protected because they could not be concealed:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State. *If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection. But beyond question, the dragoon or holster pistol is part of the arms of a soldier in that branch of the service.* (Coldwell *v.* The State, 3 Heiskell, 166,[21] and English *v.* The State, 35 Texas, 476). [22] [emphasis added]

25. Decisions throughout the 19th century recognized that concealed carry could be prohibited only if open carry remained lawful. An 1840 Alabama Supreme Court decision:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. *A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.* But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[23] [emphasis added]

An 1846 Georgia Supreme Court decision:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void...*[24] [emphasis in the original]

An 1850 Louisiana Supreme Court decision:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's *right to carry arms (to use its own words), "in full open view,"* which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[25] [emphasis added]

---

21 State v. Duke, 42 Tex. 455, 458 (1875). *Coldwell* v. *The State* is incorrect; the location cited is *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 8 Am. Rep. 8 (1871).
22 State v. Duke, 42 Tex. 455, 458, 459 (1875).
23 State v. Reid, 1 Ala. 612, 615, 616, 617 (1840).
24 Nunn v. State, 1 Ga. 243, 250, 251 (1846).
25 State v. Chandler, 5 La. An. 489, 490 (1850).

26. Again, in 1858:

> The statute in question does not infringe the right of the people to keep or bear arms.  It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society.[26]

27. With enough time and space, I could provide many other decisions that upheld *concealed* carry regulation because *open* carry remained lawful.   The quote from Bruen above demonstrates that Rivas is making a claim already rejected by the Court.

28. In Dred Scott, the U.S. Supreme Court acknowledged that *whites* at least enjoyed a right to carry weapons:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went.*[27] [emphasis added]

## A. Knives

29. Rivas' discussion of knives contains one fascinating quote… from somewhere, but not apparently from where she claims: "This was especially notable in southern areas, where 'so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow."  Her citation is to "'The Bowie-Knife In the South,' *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861."  I attempted to find that article, but the SAN FRANCISCO EVENING BULLETIN does not appear in either the Library of Congress' Chronicling America[28] or the California Digital Newspaper Collection.[29]  That article does appear in a London magazine in 1861.[30]  The truth or falsity of the

---

[26] State v. Jumel, 13 La. An. 399, 400 (1858).
[27] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).
[28] Chronicling America, https://chroniclingamerica.loc.gov/, last accessed Jul. 5, 2023.
[29] Browse by title, California Digital Newspaper Collection , https://cdnc.ucr.edu/?a=cl&cl=CL1&e=-------en--20--1--txt-txIN--------#E, last accessed Jul. 5, 2023.
[30] Colonel Bowie and His Knife, 2 TEMPLE BAR 124 (Jul. 1861).

claim could be questioned in either publication, but a reader might have a bit more skepticism of such a claim in a British publication that was still skeptical of Americans as a bunch of uncouth colonials.  It should also make you wonder about the accuracy are Rivas' other citations.

30. Rivas on p.8 n.11 cites "Tenn. 1801 ch. 22 § 6 (prohibiting 'privately' carrying 'any dirk, large knife, pistol or any other dangerous weapon.')."  But that is a carefully selected quote. What § 6 prohibits is "That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person…"[31]  This prohibition on riding "to the terror of the people" is directly contradictory to the ban on concealed carry.  If you cannot see that someone is armed, how does this cause terror?  Bruen specifically rejects the relevance of such laws:

> As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.[32]

31. The rest of her list of statutes in n.11 regulating the carrying of knives in public places are not as she represents bans of carrying of knives in public places but bans on *concealed* carry. Rivas misrepresents these laws by quoting bits and pieces.  Examples: "Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ('any dirk, pistol or other arm or weapon, except a common pocket knife . . . .'"  The full text:

> That hereafter it shall not be lawful for any person in this State to carry arms of any kind whatsoever secretly, on or about their person, and if any dirk, pistol or other arm or weapon, except a common pocket knife, shall be seen or known to be secreted upon the person of any one in this State, such person so offending, shall on conviction, be fined not exceeding five hundred dollars and not less than five dollars, or imprisoned not exceeding six months and not less than ten days, at the discretion of the court: Provided, however, That this law shall not be so construed *as to prevent any person from carrying arms openly, outside of all their clothes* …[33] [emphasis added]

---

[31] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820 ch. 22 § 6 at 710 (1801).

[32] New York State Rifle & Pistol Assn v. Bruen 142 S.Ct. 2111,  2121. (2022).

[33] Fla. Acts ch. 75 § 3 (1846).

32. Still in n.11: "*Virginia, see* 1838 Vir., ch. 101 ('any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . .');" The full text which shows Rivas' dishonest editing:

> That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, *and the same be hidden or concealed from common observation.*[34] [emphasis added]

33. This misrepresentation of laws banning *concealed* carry as being bans on open carry should cast serious doubts as to the accuracy and scholarship of Rivas' work.

### B. Pistols

34. On p. 9: "Another weapon that came to be associated with lawless violence in the antebellum period was the 'pocket pistol.' Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzleloading pistols modeled after designs that appeared in the eighteenth century." Her supposed source: "Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116."

35. The only text referencing the United States and pistols in that page range:

> "America normally followed the British or French patterns over the decided time lag of perhaps as much as 10 or 20 years. There are also many other details of design and craftsmanship on these and other features of firearms which enable a specialist to identify the area and area of origin of a given specimen.[35]

> Probably the most unusual of all the special flint locks, however, with those the cock under the barrel. The theory, apparently, was to remove the cock from the line of sight and to shift the flash from the priming to a position where it would be of less of a distraction to the shooter. Both German and American versions of this unusual arrangement are known, and the date ranges from the mid 18th century to the early years of the 19th.[36]

36. That is it: every paragraph that references America in that page range. Nothing that she claims appears in those pages of Pollard's. Even then, she is wrong. Percussion cap handguns

---

[34] Va. Acts ch. 101 § 1 (1838).
[35] POLLARD'S HISTORY OF FIREARMS 114 (1983).
[36] Id. at 116.

11

were an innovation of the 19th century that rapidly replaced flintlock firearms.[37]  An "expert" knows this.

37. From the late 18th century, gun makers made repeating handguns called pepper-boxes. The flintlock firing mechanism made them prone to "chain fire" as flame from the first detonation would sometimes spread to the others, limiting their commercial value.[38]  The development of the percussion cap certainly made them more practical; while a percussion cap could certainly be detonated accidentally by flame, it was less likely than gunpowder in the pan of a flintlock mechanism.  On YouTube you can see examples of antique percussion pepperboxes being fired without any injuries or death to the shooter.[39]

38. Pepper-boxes used multiple barrels that usually required the user to rotate the barrel assembly for each shot; at least one ad from 1838 offers what (if accurately described) would have put it ahead of Colt's early revolvers: "SELF-COCKING AND REVOLVING SIX BARREL POCKET PISTOL…. This pistol revolves the six barrels, cocks itself and discharges merely by pulling the trigger, placing a man with but one hand on an equality with six men, each with the ordinary pocket pistol."[40]  Some transitional pepperboxes built to avoid infringing on the Colt patents fit this description (double-action trigger that also indexes the barrels).[41]

39. Rivas has offered seemingly contradictory expert declarations to this in other cases. See DECLARATION OF BRENNAN G. RIVAS in OREGON FIREARMS FEDERATION, INC.,

---

37 Id. at 62.

38 Flintlock Pepperbox, Hand Rotated Four Barrel Cluster, .24-Claiber [*sic*], Four Shot Unknown Maker, Likely Experimental, American, English or Continental Circa 1780-1820, Antique Associates, https://www.aaawt.com/html/firearms/f1117.html, last accessed March 8, 2023; An Exceptional 88-Bore Flintlock Seven-Barrel Box-Lock Pepperbox Revolver By John Twigg, London, circa 1781-87, Bonham's, https://www.bonhams.com/auction/26792/lot/348/an-exceptional-88-bore-flintlock-seven-barrel-box-lock-pepperbox-revolver/, , last accessed March 8, 2023;

39 *Antique Pepperbox Pistol 1850's Washington Arms Co*, https://www.youtube.com/watch?v=jiSkuUmKW5E, last accessed March 9, 2023.

40 *Self-Cocking and Revolving Six Barrel Pocket Pistol*, [Washington, D.C.] The Madisonian, Dec. 22, 1838, 1.

41 *English Transitional Pepperbox Revolver*, Forgotten Weapons, https://www.youtube.com/watch?v=w3MZJsnqy6E, last accessed March 9, 2023.

12

v. Kotek (D.Ore. 2023).  In that expert declaration Rivas' p. 16: "Some multishot pistols were in existence prior to the patenting of Samuel Colt's revolver in 1836, but they were not widely available in the United States."  On p. 16, n. 32 tells us "Pepperbox pistols had multiple rotating barrels. See Blair, Pollard's History, 210."  Rivas in p. 16, n.31 points to an ad offering pepperboxes for sale.  Clearly, they could not have been terribly rare if Rivas can find ads for them and there are surviving American pepperboxes in use in YouTube videos.

40. On p. 10: "While pocket pistols were less frequently the targets of popular outrage in the early nineteenth century, they were still regulated alongside other deadly weapons like bowie knives."  If by "regulated" Rivas means states *prohibited concealed carry*, this was *generally* true, but by no means universal.  There were no general prohibitions on open carry or possession in the antebellum period.  I notice Rivas cites none.

41. Tennessee is one exception to Rivas' claim about "regulated alongside."  The legislative journal shows that a variety of amendments were proposed to the law that prohibited sale of Bowie knives and Arkansas toothpicks.[42]  It also prohibited concealed carry but did not prohibit open carry.[43]  These amendments reveal that the bill at that point was narrowly focused, applying only to Bowie knives, and extreme in its goals: it made criminal *any* use against a person, and not just concealed carrying.  Senator Anderson attempted to amend the bill to allow the use of a Bowie knife for self-defense, but this amendment was rejected.[44]

---

[42] "That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick…" 1838 Tenn. Laws ch. 138 § 1.

[43] "That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person…" 1838 Tenn. Laws ch. 138 § 2.  § 3 criminalized drawing from concealment such knives and § 4 criminalized cutting or stabbing someone with such knives.

[44] *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2.

42. Amendments that were accepted that day broadened the ban on sale or use to cover not only Bowie-knives, but also Arkansas toothpicks and Spanish stilettos. Any use, "whether for self-defense or otherwise," subjected the offender to three to five years in prison.[45]  The following day, the Senate gave the bill its third reading, the "Spanish stilettos" were removed, and the bill passed, 17-8.[46]

43. The Bowie knife bill received its first reading in the Tennessee House on December 28 and its second reading on January 12. At the second reading, Representative Warner added dirks to the prohibited weapons, but Representative Dean's attempt to add "sword canes and *pistols*" to the prohibited weapons list failed.[47]  [emphasis added]

44. On p. 10, Rivas again claims: "Public carry laws generally included 'pistols' within their purview, and other regulatory strategies attempted to discourage their presence in public spaces." She cites no laws to support this claim. I am aware of no laws until Texas' 1871 statute that prohibited open carry.[48]

45. On p. 10, Rivas makes a rather curious claim: "The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century," and claims this year was because "Samuel Colt patented his first revolver design." Colt's production at his Paterson, N.J. factory was never huge before bankruptcy in 1843; Colt made 1,189 pistols by March of 1839. Colt only sold 441 by that date.[49]  Many of these early sales appear to have

---

[45] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 29, 1837, 2; *Senate*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 2, 1837, 2.

[46] *General Assembly*, NASHVILLE DAILY REPUBLICAN BANNER, Nov. 30, 1837, 2.

[47] *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Dec. 29, 1837, 2; *House of Representatives*, NASHVILLE DAILY REPUBLICAN BANNER, Jan. 13, 1838, 2.

[48] 1871 Tex. Laws ch. 34.

[49] James E. Serven, COLT FIREARMS: 1846-1954 13, 30 (1954).

been to military units, some to the U.S., others to the Republic of Texas.[50]  Colt made revolvers for the commercial market starting in 1848.[51]

46. If Rivas had used 1848 as the turning point, there might be some argument as to the effect of Colt's revolvers.  Starting at 1836 simply shows that Rivas is no expert.

47. Rivas also distinguished the Colt revolver as "it provided … multiple shots without reloading…"  As discussed previously, and in an ad cited by Rivas, multishot pistols were already for sale before Colt started commercial sales of revolvers in 1848.

### C. Other Deadly Weapons

48. Rivas on p. 11 discusses several other deadly weapons of the era and how they were "associated with crime and interpersonal violence rather than militia service or communal policing; they were typically concealed when worn."  She provides no source for this claim.  Even if true, the Heller decision identified that arms are protected by the Second Amendment "for the lawful purpose of self-defense."[52]  The association with criminal behavior might well describe a perception that indicated an economic class distinction between weapons that a poor person might carry for self-defense and a middle-class American's choice of a pistol.  Cockrum's defense attorney in Cockrum v. State (Tex. 1859) crisply argued this discrepancy.

> A bowie-knife, or dagger, as defined in the Code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen.  *A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger*, being very frequently worn on the person.  To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.[53] [emphasis added]

49. All of these lower-class weapons, like the pistol, were intended for short-range use where a person under physical attack most needs a deadly weapon.

---

[50] Id. at 9-12.
[51] David A. Hounshell, FROM THE AMERICAN SYSTEM TO MASS PRODUCTION 1800-1932: THE DEVELOPMENT OF MANUFACTURING TECHNOLOGY IN THE UNITED STATES 47 (1984).
[52] District of Columbia v. Heller, 128 S.Ct. 2783, 2788 (2008).
[53] Cockrum v. State, 24 Tex. 394, 396 (1859).

50. At p. 11: "Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors." There were profound social changes during this time, with rapid expansion to the West, large factories employing workers far removed from the traditional and more paternalistic employer/employee arrangements of colonial America, and increasing immigration from Europe (803,158 non-slave immigrants between 1790 and 1835).[54] Many of these immigrants arrived so destitute that New York passed a law requiring ship captains to report all immigrant arrivals; the law was "intended to prevent the state's being burdened with an influx of foreigners and to prevent their becoming paupers, and who would be chargeable as such."[55] This dramatic wave of immigration, some of it quite poor, would seem to qualify as "profound social changes." It hardly seems sensible to explain an increase in violence (gun or non-gun), as caused by handgun availability alone with so many other plausible causes.

51. At pp. 12-13: "The proliferation of revolvers during the same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before." While it seems logical to make this assumption, Rivas provides no source for this claim. Homicide includes both criminal deaths (murder and manslaughter) but also lawful killings (justifiable and excusable homicide). That some of this increase in homicides might be in the latter category because victims were more likely to successfully defend themselves against multiple attackers, or even stronger individual criminals, is at least as plausible explanation as Rivas' claim. One of Rivas' sources on p. 13, n. 29 argues this will sometimes be the case:

> But let us look at the other aspect of the case. The house of one man is attacked, and because he either has no weapons, or does not know how to use them, his property is carried off and his wife, perhaps, outraged [raped] before his eyes. Under very different circumstances the same ruffians, emboldened by previous impunity, attack another house.[56]

---

[54] Calculated from Raymond L. Cohn, MASS MIGRATION UNDER SAIL: EUROPEAN IMMIGRATION TO THE ANTEBELLUM UNITED STATES 15 (2009).

[55] New York v. Miln, 36 U.S. 102, 103 (1837).

[56] THE PISTOL AS A WEAPON OF DEFENCE IN THE HOUSE AND ON THE ROAD: HOW TO CHOOSE IT AND HOW TO USE IT iii (1875).

16

52. At p. 14, Rivas attributes the carrying of pocket pistols to rising homicide rates because "having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families." This is the "finger pulls the trigger" model of gun homicide causation: what are otherwise normal people "lose it" in a moment of anger. The evidence from the modern era shows that murderers are disproportionately people with histories of antisocial behavior or mental illness. One study of Illinois "homicide offenders" found "For 1990-2000, 42.6% of 884 cases had at least 1 felony conviction compared with 3.9% of nearly 7.9 million controls."[57]

53. A study of Indiana murder convicts found that 18 percent were severely mentally ill, suffering from "schizophrenia or other psychotic disorder, major depression, mania, or bipolar disorder."[58] Of the Indiana murder convicts "73 percent of offenders had diagnoses of major depression, bipolar disorder, or mania, while a psychotic disorder including schizophrenia, was diagnosed in only 41 percent, although there was some overlap among the diagnoses."[59] Furthermore, "studies that used hospitalized samples tended to have a higher proportion of persons with a diagnosis of schizophrenia and persons who were experiencing psychotic symptoms at the time of the murder than was found in the present study."[60]

54. It seems unlikely that 19th century murderers were fundamentally different than today. Availability of pocket pistols is thus an unlikely proximate cause of 19th century homicides.

55. At p. 14 Rivas claims: "Eventually, legal opinion coalesced around the idea that having deadly weapons upon one's person 'raises a presumption of guilt,' regardless of whether they were

---

[57] Philip J. Cook, Jens Ludwig, and Anthony Braga, *Criminal Records of Homicide Offenders*, 294(5) JAMA 598-601 (Sep. 2005).
[58] Jason C. Matejkowski, Sara W. Cullen & Phyllis L. Solomon, *Characteristics of Persons with Severe Mental Illness Who Have Been Incarcerated for Murder*, 36 J. AM. ACAD. PSYCHIATRY & LAW 82 (2008).
[59] *Id.* at 80.
[60] Id. at 83-84.

openly carried or concealed, and regardless of whether the carrier intended to use them in an assault or not". Review of the sources she cites shows a different story. Her evidence of legal opinion is one decision, State v. Reams (N.C. 1897). One decision is hardly evidence that "legal opinion coalesced" around this idea. A citation to a standard legal text, or even a dozen similar decisions would be a *lot* more persuasive.

56. Even then, Reams is clear that it was the carrying of a *concealed* weapon that raised a presumption of guilt: "The offense of carrying a *concealed* weapon about one's person and off his own premises consists in the guilty intent to carry it *concealed* and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt."[61] [emphasis added] In n.35 Rivas does actually cite a legal journal in defense of her claim. The title of the article clearly states the concern: "Concealed Weapons." Along with the discussion on p. 412 of mischievous intent for carrying concealed weapons, that article on p. 409 refers to a decision upholding open carry:

> In Stockdale v. State, carrying a pistol in the waist-band, with butt and cock exposed, was held not within the statute. This, however, is put upon the ground that it is lawful to bear arms openly, and impossible to carry a pistol without part of it concealed.[62]

57. Most of Rivas' other sources in n. 35 condemned *concealed* carry. Many are newspaper articles. While Rivas may be correct that the chattering classes supported banning at least concealed carry, they are not evidence that support for bans on open carry enjoyed widespread support.

### D. Right to Keep and Bear Arms Decisions

58. At pp. 16-17, Rivas claims that modern interpretations of 19th century open carry are wrong because: "This idea is largely a result of simplified interpretations of the nineteenth-century

---

[61] State v. Reams, 27 S.E. 1004 (N.C. 1897).

[62] *Concealed Weapons*, 8:4 CRIMINAL LAW MAGAZINE AND REPORTER 409, 412 (Oct. 1886).

case law surrounding public carry statutes that emphasize judges' protection of openly carrying deadly weapons without considering the narrow context in which such behavior would have occurred." Yet even the more restrictive decisions, such as State v. Wilburn (Tenn. 1872) acknowledged that a *complete* prohibition on carrying revolvers had some constitutional limits. The 1871 Tennessee statute prohibited carrying various weapons included "belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[63] So, only the most terrifying way to carry a handgun was lawful, because open carry was protected.

59. The Wilburn decision involved a clearly spurious indictment. The first count charged him with carrying "a belt and pocket pistol and revolver pistol, the same being an arm such as is not commonly carried and used in the United States army." The second count charged that Wilburn did "unlawfully and willfully carry an *army pistol* privately and concealed, and not openly in his hands..."[64] [emphasis added] which contradicts the claim in the first charge, since the Act of 1871 had defined an "army pistol" to be something other than "a belt or pocket pistol." Yes, this was a mandatory brandishing law, which would seem especially effective as causing terror. This demonstrates that both the Tennessee Legislature and Tennessee Supreme Court recognized that the bearing arms could not be completely extinguished by statute even if it required something absurdly dangerous. Importantly, this decision was made based on the Tennessee Constitution's "for the common defence" right to keep and bear arms provision which included authorization for

---

[63] State v. Wilburn, 7 Tenn. 61 (1872).
[64] Id. at 58, 59.

legislative regulation of "the wearing of arms,"[65] not the broader guarantee of the Second Amendment.

60. At p. 17, Rivas argues that the dominant view of in the early 19th century was "that concealed carry laws were constitutional because the Second Amendment and state analogues protected appropriate uses of militia arms, not the carrying of deadly weapons." She cites Aymette v. State (Tenn. 1840); State v. Buzzard (Tex. 1872); Hill v. State (1874); and Ex parte Thomas (Okla. 1908). (Only one of these is even in the first half of the 19th century, and one is in the 20th century.) She dismissed three decisions: one that recognized a right to carry concealed[66] and two decisions upholding concealed carry bans because open carry remained lawful.[67] For some reason four decisions that agree with her claim are the dominant view vs. three decisions that disagree with her.

61. It would appear that Rivas has no knowledge of the enormous variety of decisions in this period concerning both state constitutional and Second Amendment guarantees of the right to keep and bear arms, some of which I will now list. Most do indeed acknowledge that the state had authority to regulate concealed carry of arms, but often not for Rivas' reasons.

62. Some decisions are silent as to why the legislature had the authority to ban concealed carry in spite of state constitutional guarantees of a right to keep and bear arms.[68] Some, such as Simpson v. State (Tenn. 1833) recognize that the state constitution protected the right to carry deadly weapons (even while "then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make.") The Simpson v. State (Tenn. 1833) decision is quite

---

[65] Id. at 58, 59.
[66] Bliss v. Commonwealth, 3 Littel 90 (Ky. 1822).
[67] Nunn v. State, 1 Ga. 243 (1846); State v. Reid, 1 Ala. 612 (1840).
[68] State v. Mitchell, 3 Blackford 229 (Ind. 1833).

interesting and utterly contrary to Rivas' supposed consensus.  Denying the validity of the Statute

of Northampton banning the carrying of "dangerous and unusual arms," Simpson found:

> But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence."  Article 11, sec. 26.  It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous and unusual weapons," as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment.  By this clause of the constitution, an express power is given and *secured to all the free citizens of the state to keep and bear arms for their defence*, without any qualification what-ever as to their kind or nature. [69] [emphasis added]

63. Rivas represents Aymette v. State (Tenn. 1840) as guaranteeing "appropriate uses of

militia arms, not the carrying of deadly weapons."  The decision is a bit more *interesting* than that:

> [E]every free white man may keep and bear arms.  But to keep and bear arms for what?  If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove that doubt.  It is declared that they may keep and bear arms for their common defence...  The object, then, for which the right of keeping and bearing arms is secured is the defence of the public.  *The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution.*[70] [emphasis added]

64. What sort of arms?  "[T]he *arms the right to keep which is secured are such as are*

*usually employed in civilized warfare*, and that constitute the ordinary military equipment."

[emphasis added]  The arms protected are weapons of war.  If Rivas wants to cite Aymette as an

authority, I look forward to her defense of the right to keep and bear semiautomatic detachable

magazine rifles.

65. Owen v. State (Ala. 1858) upheld a conviction for carrying a concealed pistol.  While

doing so, the decision analyzed the meaning of the Alabama Constitution's arms guarantee:

> That section was not designed to destroy the right, guarantied by the constitution to every citizen, "to bear arms in defense of himself and the State"; *nor to require them to be so borne, as to render them useless for the purpose of defense.*  It is a mere regulation of the manner in which certain weapons are to be borne...[71] [emphasis added]

---

[69] Simpson v. State, 5 Yerg. 356, 359, 360 (Tenn. 1833).
[70] Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840).
[71] Owen v. State, 31 Ala. 387, 388, 389 (1858).

66. State v. Buzzard (Ark. 1842) is as Rivas describes it.  It denied a right to carry arms, and held that the state constitution's guarantee was a guarantee that the state militia would be armed.

67. State v. Huntley (N.C. 1843) involved prosecution of a bully:

> His Honor instructed the jury, that if the facts charged in the indictment were proven to their satisfaction, the defendant had been guilty of a violation of the law, and that they ought to render their verdict accordingly. In the investigation before the jury it appeared, among other things, that *the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barrelled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him"*; on some, that "he had waylaid the house of James H. Ratcliff in the night about daybreak, and if he had shown himself he would have killed him; that he showed himself once, but for too short a time to enable him to do so, and that *he mistook another man for him, and was very near shooting him*."[72] [emphasis added]

68. Huntley was not simply armed, but also making death threats; he came close to shooting someone he mistook for the object of his wrath.  To call this "to the terror of the people" seems quite clear.  Yet the North Carolina Supreme Court while upholding the conviction made it clear that riding around armed violated no laws:

> [I]t is to be remembered that the carrying of a gun per se constitutes no offence.  *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun.*  It is the wicked purpose—and the mischievous result—which essentially constitute the crime.  He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.[73]  [emphasis added]

69. Nunn v. State (Ga. 1846) struck down a poorly written statute as contrary to the Second Amendment:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*...[74] [emphasis in the original]

---

[72] State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843).
[73] State v. Huntly, 3 Iredell 418, 420, 421, 422, 423 (N.C. 1843).  This case has been frequently miscited as State v. Huntley, perhaps because the name is spelled both ways in the decision.
[74] Nunn v. State, 1 Ga. 243, 250, 251 (1846).

22

70. State v. Chandler (La. 1850) involved a defendant convicted of manslaughter.  The prosecution appears to have used his concealed carry of a Bowie knife to suggest criminal intent. In response to Chandler's claim that the Constitution protected his right to carry concealed, the Louisiana Supreme Court ordered a new trial for manslaughter, based on errors related to the charge to the jury with respect to the law of self-defense.[75]

71. Chandler explained the reason Louisiana banned concealed carry in 1813:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons.  It interfered with *no man's right to carry arms (to use its own words), "in full open view,"* which places men upon an equality.  This is the right guaranteed by the *Constitution of the United States*, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[76]  [emphasis added]

72. The Smith v. State (La. 1856) decision continues to recognize that open carry was protected by the Second Amendment:

> The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are borne by a people in war, *or at least carried openly.*  The article explains itself.  It is in these words: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."  This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[77]  [emphasis added]

73. Again, military weapons were protected arms, and openly carried arms were lawful.  Rivas p. 19 also misrepresents Smith: "In 1856, a Louisiana court reasoned that partially exposed weapons were 'the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes.'"

---

[75] State v. Chandler, 5 La. An. 489, 491 (1850).
[76] State v. Chandler, 5 La. An. 489, 490, 491 (1850).
[77] Smith v. State, 11 La. An. 633, 634 (1856).

23

What was unusual was not open carry, but a person carrying a "weapon in full open view, and partially covered by the pocket or clothes."[78]

74. State v. Jumel (La. 1858) again involved a Second Amendment challenge to a concealed weapon ban. Again, the Louisiana Supreme Court argued: "The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."[79] The Louisiana Supreme Court then cited the *State* v. *Chandler* (1850) and *State* v. *Smith* (1856) decisions. The *Jumel* decision implied that *because* "only a particular mode of bearing arms" (concealed) was restricted, it was not an infringement on the right protected by the Second Amendment.

75. Dred Scott v. Sandford (1857) clearly recognized a right to carry arms. Contrasting the status of free blacks to white citizens:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, … *and to keep and carry arms wherever they went.* [emphasis added][80]

76. Rivas p. 18 cites Bishop's claim that "dirks, bludgeons, revolvers and other weapons which are not used in war," were therefore not protected arms. This ignores that revolvers by the time of the Civil War *were* used in military service. Shortly into the Civil War, the Ordnance Department gave Colt their first order for the 1860 army models, later they received contracts for the same revolvers and eventually delivered over one hundred thousand before losing the

---

[78] Id., at 634.
[79] State v. Jumel, 13 La. An. 399, 400 (1858).
[80] Dred Scott v. Sandford, 60 U.S. 393, 417 (1857).

contract."[81]  Pictures of the Colt Model 1851 Navy Revolver, Model 1861 Revolver, 1860 Army

Revolver can be found in works describing Civil War equipment.[82]

77. This is why decisions such as Page v. State (Tenn. 1871) recognized the right to carry

at least military revolvers, even if the law required them to be carried in a manner that would be

called brandishing today.[83]

78. Similarly, Fife v. State (Ark. 1876) decided that only weapons:

> What then, is he protected in the right to keep and thus to use?  Not every thing that may be
> useful for offense or defense, *but what may properly be included or understood under the title
> of "arms," taken in connection with the fact that the citizen is to keep them, as a citizen.*  Such,
> then, as are found to make up the usual arms of the citizen of the country, and the use of which
> will properly train and render him efficient in defense of his own liberties, as well as of the State.
> *Under this head, with a knowledge of the habits of our people, and of the arms in the use of
> which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the
> musket and repeater* [revolver]*, are such arms, and that, under the Constitution, the right to
> keep such arms cannot be infringed or forbidden by the legislature.*[84]  [emphasis added]

79. Two years later, in *Wilson* v. *State of Arkansas* (Ark. 1878), the Arkansas Supreme

Court once again defined what arms the state arms provision protected.  Chancy Wilson was

indicted on the grounds that he did "unlawfully carry a pistol as a weapon, contrary to the statute

such case made and provided, and against the peace and dignity of the State..."  Wilson had

borrowed "a large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel,

such as is commonly used in warfare" for the purpose of pig hunting.  Upon reaching his

destination, Wilson spoke with his host, "pulled the pistol out of his boot, cocked it a few times to

see if it would revolve, and then put it around under his coat, and went into dinner."  It is not clear

if the revolver was concealed in his boot, but it certainly was concealed under his coat.  The trial

court refused to allow a statement either by the owner of the pistol or Wilson as to the purpose of

---

[81] Donald L. Ware, REMINGTON ARMY AND NAVY REVOLVERS: 1861-1888 xvii (2007).
[82] Eric Fein, WEAPONS, GEAR, AND UNIFORMS OF THE CIVIL WAR 18-19 (2012).
[83] Page v. State, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871).
[84] Fife v. State, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).

having the revolver.  The trial court also refused to instruct the jury that "an army size pistol" was

not subject to the restriction of the Arkansas law.

80. The Arkansas Supreme Court, citing *Fife*, agreed that regulation was acceptable, but:

> No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc.  *Andrews* v. *State*, 3 *Heiskell*, 182.

> But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with baggage, or when acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.

> *If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.*[85] [emphasis added]

81. In the same session, the Arkansas Supreme Court decided another weapons case,

*Holland* v. *State* (1878):

> James Holland was indicted in the Circuit Court of Yell county, for carrying a pistol as a weapon.

> On the trial but one witness was examined.  He stated, in substance, that the first time he ever saw defendant, was on the 1st of October, 1875, in Yell county.  He had two large sized six shooting pistols, one of them a Remington, navy size and loaded, and the other a Colt's army pistol.  The pistols were such as are commonly used in the United States military and naval service.  Defendant was carrying them in his saddle-bags, and stated he was from Texas.  Witness did not know whether he was on a journey or not.

82. Not surprisingly, Holland

> asked the court to charge the jury that if they found from the evidence that the pistols, proven to have been carried, were army sized pistols, and were such as are commonly used in the United States military and naval service, they must acquit defendant.

> The court refused this instruction, defendant was convicted, a new trial refused him, he took a bill of exceptions and appealed.[86]

83. Chief Justice English again delivered the opinion of the Arkansas Supreme Court: "The

court erred in refusing to instruct the jury as moved by appellant."  After citing *Fife* v. *State* (1876)

and *Wilson* v. *State of Arkansas* (1878), the Arkansas Supreme Court reversed the conviction, and

ordered a new trial.  The pistols in question were apparently concealed "in his saddle-bags," but

---

[85] Wilson v. State of Arkansas, 33 Ark. 557, 558, 559, 560 (1878).
[86] Holland v. State, 33 Ark. 560, 561 (1878).

the defense of the pistols being standard U.S. military models was sufficient to justify their concealed carriage.

84. In Dabbs v. State (Ark. 1882), the Arkansas Supreme Court upheld the third section of the Act of April 1, 1881, which prohibited the sale of any pistol other than those "used in the army or navy of the United States and known as the navy pistol."  The heart of the dispute is addressed in the last paragraph of the decision:

> The law was enacted as a measure of precaution for the prevention of crimes and calamities.  It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person.  It does not abridge t*he constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare.*  Fife v. State, 31 Ark., 455.[87] [emphasis added]

85. Other 19th century and early 20th century decisions recognized a right to carry handguns. *In Re Brickey* (Ida. 1902) involved a man named Brickey who was convicted of carrying a loaded revolver within the city limits of Lewiston, Idaho.  On appeal, the Idaho Supreme Court raised federal and state constitutional provisions:

> The second amendment to the federal constitution is in the following language: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed."  The language of section 11, article 1 of the constitution of Idaho is as follows: "the people have the right to bear arms for their security and defense, but the legislature shall regulate the exercise of this right of law."  Under these constitutional provisions, *the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho*, whether within or without the corporate limits of cities, towns, and villages.  The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it.  A statute prohibiting the carrying of concealed deadly weapons would be a proper exercise of the police power of the state.  But the statute in question does not prohibit the carrying of weapons concealed, which is of itself a pernicious practice, but prohibits the carrying of them in any manner in cities, towns, and villages.  We are compelled to hold this statute void.[88] [emphasis added]

86. There is overwhelming evidence of later decisions recognizing a right to carry handguns, even if the state could prohibit *concealed* carry.

---

[87] Dabbs v. State, 39 Ark. 353, 356, 357, 43 Am. Rep. 275 (1882).
[88] In Re Brickey, 8 Ida. 597, 70 Pac. 609, 101 Am. St. Rep. 215, 216 (1902).

87. Why this lengthy discussion of obscure 19th century decisions?  To emphasize that Rivas' expertise on this subject is limited, and her conclusions are therefore flawed.

88. On p. 19 n. 51, Rivas quotes from the *Phrenological Journal and Science of Health* that, "It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket."  Either this suggests that concealed carry was common enough and considered sufficiently respectable behavior that clothes were made anticipating the practice.  Or if Rivas had read a couple sentences beyond:

> But the pistol pocket has grown into favor for other and more benign purposes than carrying a deadly weapon. Friends tell us it is a very safe repository for the wallet or memorandum book, and we have noticed on certain rare holiday outings that some of our youth who affect short jackets or fancy shirts as becoming warm-day recreations, use the back pocket for their handkerchiefs, commonly permitting a liberal section of colored border to dangle loosely outside.[89]

89. Rivas at pp. 25-27 discusses surety bond laws which Bruen specifically rejects as irrelevant.[90]  Much of the rest of Rivas' declaration consists of similarly misleading "evidence" including such marvels as, at p.30: "Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852."  In 1852, Hawaii was a *kingdom*, not under U.S. law.  Its laws as an independent kingdom are of no relevance to the American tradition of gun rights.

90. Even if Rivas' alternate reality version was correct, Bruen recognized a right to bear arms in public places.[91]  All previous decisions taking a narrower view are obsolete.

## E. Misrepresenting Statutes

91. At p. 31: "Sometimes taxes were straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its

---

[89] *The Hygiene Of Pockets*, PHRENOLOGICAL JOURNAL AND SCIENCE OF HEALTH 176 (March 1886).
[90] Bruen op cit. at 2144, 2145.
[91] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2122 (2022).

territorial phase and remained a policy option for much of the nineteenth century.89 In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for 'carrying arms openly, outside of all their clothes.'"  What Rivas missed in the paragraph on the same page: "Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes."[92]  This understanding was confirmed in Sutton v. Florida (Fla. 1869):

> The statute was not intended to infringe upon the rights of any citizen to bear arms for the "common defense."  It merely directs how they shall be carried, and prevents individuals from carrying *concealed weapons* of a dangerous and deadly character, on our about the person, for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary."[93] [emphasis added]

## II. Summary

92. The evidence presented by Rivas:

- makes extensive misrepresentation of 19th century laws that prohibited *concealed* carry as being bans on *all* forms of public carry;

- purports expert knowledge of early 19th century case law on this subject that she fails to demonstrate;

- pretends that there was a consistent definition of deadly weapons to include all concealable weapons (including handguns) but excluding the far more deadly rifle and shotgun;

- attempts to tie rising murder rates to the introduction of the revolver, while admitting that there was a long list of other factors that might explain this problem in part or perhaps even in full.

---

[92] COMPILATION OF THE PUBLIC ACTS OF THE LEGISLATIVE COUNCIL OF THE TERRITORY OF FLORIDA , PASSED PRIOR TO 1840 423 (1839).
[93] Sutton v. Florida, 12 Fla. 135, 136 (1869).

CHRIS COSCA   SBN 144546
COSCA LAW CORPORATION
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
914-367-0090
*Pro Hac Vice*

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARK BAIRD and
RICHARD GALLARDO,

          Plaintiffs,

    v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

          Defendants.

Case No.  2:19-cv-00617-KJM-AC

**DECLARATION OF MARK BAIRD
IN OPPOSITION TO DEFENDANT'S
MOTION, AND ISO PLAINTIFFS'
CROSS-MOTION, FOR SUMMARY
JUDGMENT**

Date:    November 3, 2023
Time:    10:00 a.m.
Room:   3
Judge:   Hon. Kimberly J. Mueller

### DECLARATION OF MARK BAIRD

    1.    I, Mark Baird, am a plaintiff in the above-captioned matter. I submit this Declaration in support of the plaintiffs' motion for a preliminary injunction to enjoin California Penal Codes §§ 25850 and 26350 and their enforcement by Defendant Bonta, his officers, agents, servants, employees, and all persons acting in concert with him who receive actual notice of the injunction. I make this declaration of my own personal knowledge and, if called as a witness, I

1

could and would testify competently to the truth of the matters set forth herein.

2.      I am over the age of 18 and a resident of Siskiyou County, California, located in the Eastern District of California. Siskiyou County has a population of less than 200,000.

3.      I am not prohibited from possessing, purchasing, receiving, or transferring firearms under state or federal law.

4.      I possess firearms in my home for self-defense, which does not require a license or any other government permission under the California Penal Code.

5.      I intend to carry a firearm open and exposed on my person ("open carry"), loaded, or unloaded, for self-defense outside of my home and throughout California.

6.      While the right to carry a handgun for self-defense outside of one's home is presumptively protected by the Second and Fourteenth Amendments, under California Penal Code sections 25850 and 26350, I face arrest, prosecution, incarceration up to one year, fines up to $1,000, and other criminal penalties simply for exercising the rights protected by the Second and Fourteenth Amendments.

7.      I do not presently hold a California concealed carry handgun license, and I do not fall within any of the exemptions to those sections of the California Penal Code that criminalize the possession of firearms, including Penal Code sections 25850 and 26350.

8.      I do not hold an open carry license in California, and there is no process for obtaining an open carry license in California. On more than one occasion, I have tried to apply for an open carry license in Siskiyou County, but the only application form published by Defendant's California Department of Justice ("DOJ") is for obtaining a concealed carry license. Under State law, licensing officers cannot use any licensing form other than that published by the DOJ, there is no Open Carry license application available from the DOJ and, even if there were an Open

2

Carry application, no Open Carry licenses are issued anywhere in California. I was previously advised by the licensing authority in my county that no Open Carry licenses will be issued.

9.      Between 2012 and the present date, no Open Carry license have been issued in California. Defendant/the State have produced no evidence that any Open Carry license has ever been issued in California.

10.     Even if I were issued an Open Carry License, under California law such a license would only be valid in the county of issuance. Once I stepped over the county line, I would be guilty of a crime under Penal Code sections 25850 and/or 26350.

11.     Peaceable Open Carry in California was lawful prior to its becoming a state in 1850 and remained lawful until 1968; its practice was largely unremarkable.

12.     Motivated by racial animus, California criminalized the open carriage of a loaded handgun with the passage of the Mulford Act in 1967. See, California Penal Code § 25850. From that point on, to lawfully carry a loaded handgun the people were required to apply to the government for a license, which could be granted or denied at the discretion of a government employee.

13.     Despite the enactment of Penal Code section 25850, it remained legal to Open Carry handguns on one's person – unloaded - with the ammunition in close proximity to use for self-defense, if necessary.

14.     But in 2012, an absolute ban on Open Carry was instituted with the passage of Penal Code section 26350, which criminalized the open carriage of unloaded handguns.

15.     Criminalizing the peaceable open carriage of a handgun for self-defense is repugnant to the plain text of the Second Amendment, which declares that "the right to keep and bear Arms shall not be infringed."

3

DECLARATION OF MARK BAIRD IN OPPOSITION TO DEFENDANT'S MOTION, AND ISO PLAINTIFFS' CROSS-MOTION, FOR SUMMARY JUDGMENT

16.     There is no historical analogue whereby criminal sanctions were imposed on one's ~~peaceable open carriage of handgun. Doc. entry 16-4 – FRAP 8(a)(2)(B), 18:08:23, under Fed. R. 4~~ of 4 any historical analogue whereby the citizenry was required to seek and obtain permission from the government in order to lawfully possess and/or carry weapons, including firearms, for self-defense.

17.     As the Supreme Court recognized in *Bruen*, when post-ratification regulations conflict with the plain text of the Second Amendment, "the text controls." *NYSRPA v. Bruen*, 142 S.Ct. 2111, 2137 (2022).

18.     I am suffering, and will continue to suffer actual and concrete constitutional harms by the ongoing violation of conduct presumptively protected by the Second and Fourteenth Amendments – the guaranteed individual right to bear arms for self-defense – my exercise of which will subject me to criminal penalties under Penal Code sections 25850 and 26350.

19.     Based on the continuing violation of my constitutional rights, and the State's failure to identify an historical analogue to the challenged regulations, summary judgment in favor of Plaintiffs is required under the Second and Fourteenth Amendments and Supreme Court precedent, as is the permanent injunction of the enforcement of California Penal Code sections 25850 and 26350 by defendant Rob Bonta, his successors, officers, agents, servants, employees, and all persons acting in concert with him who receive actual notice of the injunction, against individuals who peaceably carry a handgun open and exposed, loaded or unloaded, for self-defense.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 28, 2023

_____
Mark Baird

4

CHRIS COSCA   SBN 144546
COSCA LAW CORPORATION
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
914-367-0090
*Pro Hac Vice*

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK BAIRD and<br>RICHARD GALLARDO,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as<br>Attorney General of the State of California,<br><br>Defendant. | Case No.  2:19-cv-00617-KJM-AC<br><br>**DECLARATION OF RICHARD GALLARDO IN OPPOSITION TO DEFENDANT'S MOTION, AND ISO PLAINTIFFS'CROSS-MOTION, FOR SUMMARY JUDGMENT**<br><br>Date:   November 3, 2023<br>Time:   10:00 a.m.<br>Room:  3<br>Judge:  Hon. Kimberly J. Mueller |

## DECLARATION OF RICHARD GALLARDO

1.     I, Richard Gallardo, am a plaintiff in the above-captioned matter. I submit this Declaration in opposition to the defendant's motion, and in support of the plaintiffs' cross-motion, for summary judgment. I make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

1

2.     I am over the age of 18 and a resident of Shasta County, California, located in the Eastern District of California. Shasta County has a population of less than 200,000.

3.     I am not prohibited from possessing, purchasing, receiving, or transferring firearms under state or federal law.

4.     I possess firearms in my home for self-defense, conduct which is not prohibited under the California Penal Code.

5.     I intend to carry a firearm open and exposed on my person, loaded, or unloaded, for self-defense outside of my home and throughout California. While the right to carry a handgun for self-defense is presumptively protected by the Second and Fourteenth Amendments, under Penal Codes §§ 25850 and 26350, I will still face arrest, prosecution, incarceration, fines, and other criminal penalties simply for exercising the rights protected by the Second Amendment.

6.     I do not hold a license to carry a firearm in California and I do not fall within any of the exemptions to those sections of the California Penal Code that criminalize the possession of firearms, whether loaded or unloaded, under Penal Codes §§ 26350 and 25850.

7.     I have attempted to obtain an open carry license in Shasta County, but there is no avenue for obtaining an open carry license in Shasta County or any other county in California.

8.     During this litigation, Defendant/the State of California have presented no evidence that any open carry licenses have been issued anywhere in the State since open carry became illegal in 2012.

9.     Even if there were an avenue to obtain an open carry license and the Shasta Sheriff would issue one (which all indications reveal he will not), open carry licenses are only valid within the county in which they are issued – my ability to lawfully open carry would end at the border of Shasta County.

2

DECLARATION OF RICHARD GALLARDO IN OPPOSITION TO DEFENDANT'S MOTION,
AND ISO PLAINTIFFS' CROSS-MOTION, FOR SUMMARY JUDGMENT

10.     Even if there were an avenue to obtain an open carry license and the Shasta Sheriff would issue one (which all indications reveal he will not), requiring an ordinary citizen, like myself, to apply for and obtain a license *before* I can legally carry a firearm open and exposed for self-defense violates the plain text of the Second Amendment, which states that the right to bear arms "shall not be infringed."

11.     I am suffering, and will continue to suffer actual and concrete constitutional harms by the ongoing deprivation of my preexisting and guaranteed individual right to bear arms for self-defense, the exercise of which will subject me to criminal penalties under Penal Code sections 25850 and 26350.

12.     It is no justification to the enforcement of Penal Code sections 25850 and 26350 that I am able to carry a handgun concealed on my person under the federal Law Enforcement Officers Safety Act (LEOSA). There are various personal and tactical reasons for choosing to carry a handgun open and holstered, as opposed to concealed carry. The plain text of the Second Amendment makes no distinction between the two manners of carrying a weapon, and it is the State's burden – not mine – to justify the existence of its regulations by pointing to an historical analogue, which they have failed to do.

13.     Based on the continuing enforcement of statutes criminalizing the peaceable open carriage of handguns for self-defense, and the State's failure to identify an historical analogue, summary judgment in favor of Plaintiffs should be entered and a permanent injunction of the enforcement of California Penal Code sections 25850 and 26350 against individuals peaceably carrying handguns open and holstered, loaded and unloaded, for self-defense should be ordered.

DECLARATION OF RICHARD GALLARDO IN OPPOSITION TO DEFENDANT'S MOTION, AND ISO PLAINTIFFS'CROSS-MOTION, FOR SUMMARY JUDGMENT

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3    Dated:  September 27, 2023

4                                                                Richard Gallardo

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DECLARATION OF RICHARD GALLARDO IN OPPOSITION TO DEFENDANT'S MOTION,
AND ISO PLAINTIFFS' CROSS-MOTION, FOR SUMMARY JUDGMENT

COSCA LAW CORPORATION
CHRIS COSCA   SBN 144546
1007 7th Street, Suite 210
Sacramento, CA 95814
916-440-1010

AMY L. BELLANTONI
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, NY 10583
Telephone: 914-367-0090
Facsimile:  888-763-9761
*Pro Hac Vice*

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK BAIRD and RICHARD GALLARDO, | Case No. 2:19-CV-00617 |
| Plaintiffs, v. ROB BONTA, in his official capacity as Attorney General of the State of California, Defendant. | **DECLARATION OF AMY L. BELLANTONI IN OPPOSITION TO DEFENDANT'S MOTION, AND ISO PLAINTIFFS' CROSS-MOTION, FOR SUMMARY JUDGMENT**<br><br>Date:    November 3, 2023<br>Time:    10:00 a.m.<br>Room:   3<br>Judge:  Hon. Kimberly J. Mueller |

1

## DECLARATION OF AMY L. BELLANTONI

1.      I am an attorney with The Bellantoni Law Firm, PLLC, attorneys for Plaintiffs, Mark Baird and Richard Gallardo. I am admitted to practice law before the United States District Court for the Eastern District of California, *pro hac vice*. I am also admitted to practice law before the United States District Courts for the Southern, Eastern, and Northern Districts of New York, the District of Columbia, the Second Circuit Court of Appeals,  the Ninth Circuit Court of Appeals, and the United States Supreme Court. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.      This Declaration is submitted in opposition to Defendant's motion, and in support of Plaintiffs' cross-motion, for Summary Judgment.

3.      Attached hereto as Exhibit 1 is a true and accurate copy of Smith, Mark W., *"Not All History Is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868*,  October 1, 2022

4.      Attached hereto as Exhibit 2 is a true and accurate copy of the 1786 Acts Passed a at a General Assembly of the Commonwealth of Virginia.

5.      Attached hereto as Exhibit 3 is a true and accurate copy of Kopel, David, *How the British Gun Control Program Precipitated the American Revolution*, Charleston Law Review, Vol. 2, Winter 2012, NO. 2.

6.      Attached hereto as Exhibit 4 is a true and accurate copy of "Bureau of Justice Statistics Special report, Survey of Inmates in State and Federal Correctional Facilities *Firearm Use By Offenders*," November 2001, NCJ 189369.

7.      Attached hereto as Exhibit 5 is a true and accurate copy of portions of the deposition transcript of Richard Gallardo taken on August 31, 2021.

2

DECLARATION OF AMY L. BELLANTONI IN OPPOSITION TO DEFENDANT'S MOTION,
AND ISO PLAINTIFFS' CROSS-MOTION, FOR SUMMARY JUDGMENT

8.     Attached hereto as Exhibit 6 is a true and accurate copy of the Order Sustaining Demurrer in the matter of *People v. Tony Diaz*, Superior Court of California, County of Sacramento, Case No. 21FE019850 Dept. 40.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 29, 2023

*Amy L. Bellantoni*

Amy L. Bellantoni, Esq.
*Attorney for Plaintiffs*
*Pro Hac Vice*
abell@bellantoni-law.com

3

DECLARATION OF AMY L. BELLANTONI IN OPPOSITION TO DEFENDANT'S MOTION,
AND ISO PLAINTIFFS' CROSS-MOTION, FOR SUMMARY JUDGMENT