No. 24-565

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD
*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee,*

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 4 of 7

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

**WORKING DRAFT – Subject to change**

# "Not all History is Created Equal":

## In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868

Mark W. Smith

***

Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, Oxford University; Presidential Scholar and Senior Fellow in Law and Public Policy, The King's College; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law. He also hosts the Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and issues. He is the author of multiple books including *First They Came for the Gun Owners: The Campaign to Disarm You and Take Your Freedoms* (Bombardier Books 2019) and *#Duped: How the Anti-gun Lobby Exploits the Parkland School Shooting—and How Gun Owners Can Fight Back* (Post Hill Press 2018).

Electronic copy available at: https://ssrn.com/abstract=4248297

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 1

I.   1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL
     UNDERSTANDING OF THE SECOND AMENDMENT. .............................. 7

     A.   The meaning and scope of each provision in the Bill of Rights is the same whether
          applied against the states or against the federal government. ....................................... 7

     B.   The meaning of a constitutional provision is fixed when it is adopted. ........................ 9

     C.   The public understanding of the Bill of Rights by ratifiers in the Founding period
          controls the meaning of its provisions. ...................................................................... 10

     D.   All three of the Supreme Court's substantive interpretations of the Second
          Amendment assess its meaning and scope by looking at the Founding period. ......... 15

     E.   Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the
          Founding Period, not 1868. ....................................................................................... 17

     F.   If later understandings contradict the original understanding of the text, the original
          understanding controls. .............................................................................................. 27

     G.   The Court of Appeals' decisions cited to support 1868 as the determinative year have
          been abrogated or rely on an obvious misreading of McDonald. ............................... 31

II.  1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE
     BILL OF RIGHTS. ....................................................................................... 33

     A.   It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they
          were incorporating against the states all of the provisions of the first eight
          amendments. .............................................................................................................. 33

     B.   The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill
          of Rights through the Privileges or Immunities Clause. ............................................. 40

     C.   The individual right to bear arms in the Second Amendment was understood the same
          way in 1868 as in 1791. ............................................................................................. 41

III. THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES
     NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION
     JURISPRUDENCE......................................................................................... 45

     A.   Professor Lash's approach is theoretically unsound and unlikely to be adopted. ...... 46

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

B.   Professor Amar's approach contains similar flaws and his theories have been rejected by Heller................................................................................................. 51

CONCLUSION........................................................................................................................ 57

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

## INTRODUCTION

In June of 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*,[1] its most significant case interpreting the scope of the Second Amendment since the landmark decision in *District of Columbia v. Heller* in 2008.[2]  *Bruen* was a major victory for the constitutional right to keep and bear arms.  One consequence of the decision has been to send the gun control movement scrambling for new ways to undercut the right to bear arms in a post-*Bruen* world.  Opponents of the Second Amendment have seized upon a short passage by Justice Thomas, author of the *Bruen* opinion, to argue in the lower courts that an originalist interpretation requires courts to look at the meaning of the Second Amendment (and thus, logically, all provisions of the Bill of Rights) when the Fourteenth Amendment was ratified in 1868, not in 1791 when the Bill of Rights was ratified.  This approach, if accepted, would revolutionize not only Second Amendment law, but also the Court's entire Bill of Rights jurisprudence.  It is nonsensical, contrary to the Supreme Court's precedents, and contradicts the express text of *Bruen*.

Before looking at what the *Bruen* opinion said (or did not say) on that subject, *Bruen* itself needs to be placed in context.  *Heller* held that the Second Amendment confirms an individual right to keep and bear arms for lawful purposes such as self-defense.  It also rejected the use of a means-ends balancing test, such as levels of scrutiny, and instead relied on a "text, history, and tradition" test.

In the fourteen years between *Heller* and *Bruen*, most of the lower federal courts largely disregarded *Heller*'s historical methodology and instead applied a two-part interest balancing

---

[1] 142 S.Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

test. The first part of the test looked at whether a particular ban or restriction fell within the scope of the Second Amendment. If it did, the second part of the test was invoked, and the lower courts usually applied an "intermediate scrutiny" balancing test to render the Second Amendment's protections ineffectual. That remained true even after the Court held in *McDonald v. City of Chicago*[3] that the Second Amendment is a fundamental individual right that is incorporated against states and localities by the Fourteenth Amendment's Due Process Clause.

*Bruen* changed all of that. The Court expressly rejected balancing tests. In the words of the Court, the second step was "one step too many."[4] *Heller* and *McDonald*, the Court stated, "do not support applying means-end scrutiny in the Second Amendment context."[5] Rather, Second Amendment cases must be firmly rooted in the text and history of that Amendment. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," the Court held. To overcome that presumption, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[6] That means that the government has the burden of showing that there were reasonably close historical analogues to the present-day restriction that is challenged.[7]

But at what point in history should courts look to determine if there were laws or restrictions analogous to those being challenged? Immediately after *Bruen* was decided,

---

[3] 561 U.S. 742 (2010).

[4] *Bruen*, 142 S.Ct. at 2127.

[5] *Id.*

[6] *Id.* at 2127, 2130.

[7] *Bruen* established several important principles for the Second Amendment. In addition to striking down the two-part test for the Second Amendment, it established that the Second Amendment protects the carrying of weapons outside the home. It held that carry permit or license systems are unconstitutional if they vest discretion in state or local officials instead of being based on objective criteria. It also outlined the proper methodology for applying the Second Amendment based upon reasoning by historical analogy.

2

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

government defendants (and their anti-gun amici) in Second Amendment cases began to argue

that in litigation against states and localities, as opposed to litigation against the federal

government, the relevant time period is not 1791, when the Second Amendment was ratified, but

1868, when the Fourteenth Amendment was ratified.[8]

Here is the passage in *Bruen* on which they base this argument.  After reviewing the

historical methodology to be employed by courts in future Second Amendment cases, the Court

made a final observation that:

> Strictly speaking, New York is bound to respect the right to keep and bear arms
> because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel.
> Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies
> only to the Federal Government). Nonetheless, we have made clear that individual
> rights enumerated in the Bill of Rights and made applicable against the States
> through the Fourteenth Amendment have the same scope as against the Federal
> Government. [citations omitted] And we have *generally assumed* that the scope of
> the protection applicable to the Federal Government and States is pegged to the
> public understanding of the right *when the Bill of Rights was adopted in 1791*.
> See, *e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth
> Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth
> Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125
> (2011) (First Amendment).

> We also *acknowledge* that there is an *ongoing scholarly debate* on whether courts
> should primarily rely on the prevailing understanding of an individual right when
> the Fourteenth Amendment was ratified in 1868 when defining its scope (as well
> as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The
> Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-
> Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021)
> (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917
> ("When the people adopted the Fourteenth Amendment into existence, they

---

[8] See, *e.g.*, Br. of Def. John Harrington in Support of his Motion for Summary Judgment 24, *Worth v. Harrington*,
No. 0:21-CV-01348,  Doc. 49 (D. Minn. Aug. 4, 2022) ("Especially relevant … are laws that were in effect around
the time the Fourteenth Amendment, which made the Second Amendment applicable to the States, was ratified);
Electronic Amicus Letter Br. of Everytown for Gun Safety 2, *Lara v. Commissioner Pennsylvania State Police*,
No. 21-1832, Doc. 61 (3d Cir. Aug. 2, 2022) ("the most relevant time period centers on 1868, when the Fourteenth
Amendment was ratified and made the Second Amendment applicable to the states."); [Proposed] Amicus Br. of
Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiffs' Motion for a Preliminary Injunction
7, *Antonyuk v. Bruen*, No. 1:22-cv-00734, Doc. 33 (N.D.N.Y. Aug. 18, 2022) ("Thus, when the people chose to
extend the Bill of Rights to the states in 1868, their understanding of the scope of each right should control the
originalist analysis today.").  The specific arguments made in these and similar cases are discussed in Part G, below.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings").[9]

That portion of the opinion concluded that: "We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."[10]

That has led gun control advocates to treat the issue of whether 1791 or 1868 is the relevant time period as an open question and to argue for 1868. Undoubtedly that is because there were more laws concerning firearms on the books in 1868 than there were in 1791, and thus more opportunities to find historical "analogues" to restrict individual rights. Also, the Reconstruction period is unusual in American history because the North was occupying the South with military force, and the South was trying to disarm the newly freed blacks. Such actions during that period are therefore not representative of either the Founding period or of the American historical tradition.

But 1791 vs. 1868 is not an open question. That the Founding period is the correct time to determine the original public meaning of an individual right is not a mere "assumption," as Justice Thomas stated in his respectful nod to the "ongoing scholarly debate." It is an integral and controlling part of the Court's Bill of Rights jurisprudence. As shown in this article, when history must be consulted to determine meaning, it has been the universal practice of the Court to look at the Founding period and relevant antecedents to determine original public understanding. No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it

---

[9] *Bruen*, 142 S.Ct. at 2137-38 (emphasis added). The SSRN article by Professor Lash has now been published as Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (Summer 2022).

[10] *Id*. at 2138.

Electronic copy available at: https://ssrn.com/abstract=4248297

(9 of 300), Page 9 of 300     Case: 24-565, 04/17/2025, Entry: 10.5, Page 9 of 300
ER-563
Case 2:19-cv-00617-KJM-AC   Document 96-7   Filed 09/29/23   Page 9 of 62

**WORKING DRAFT – Subject to change**

is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791.

The Supreme Court has held that the meaning of the Constitution, including the Bill of Rights, is fixed at the time it was adopted, not later. A provision of the Bill of Rights has only one meaning, whether applied against the federal government or the states. And the time period for determining that single meaning, when history must be examined, is 1791. That is true of the three cases cited in the passage quoted above from *Bruen;* it is true of all of the Supreme Court's Second Amendment cases beginning with *Heller*, including *Bruen* itself; and it is true of Supreme Court cases examining other rights provisions of the Bill of Rights. The Court has also clearly stated that if a later interpretation differs from the original meaning at the time of ratification of the Bill of Rights, the later interpretation must yield.

As shown in detail below, the cases cited by post-*Bruen* defendants or amici in Second Amendment litigation were either abrogated by *Bruen* itself, resulted from a misreading (later corrected) of the *McDonald* decision by a single Circuit Court of Appeals, or were those which cited to that mistaken decision.

Even if one examines the period of ratification of the Fourteenth Amendment, there is no evidence that the ratifiers thought the existing rights in the Bill of Rights somehow changed in meaning. Rather, the Fourteenth Amendment's purpose was to include African Americans within the protections granted to citizens and to protect their rights against encroachments by the states. In fact, it did not take long for the Supreme Court to decide that "privileges or immunities" of citizens of the United States were a very limited set of rights indeed.

This article concludes with a description of the scholarly positions of Professors Lash and Amar regarding use of the year 1868 to determine the meanings of the Bill of Rights. Professor

5

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Lash's position would require a complete overturning of Supreme Court's Bill of Rights jurisprudence.  Professor Amar's position is different, and his concerns, especially regarding the Second Amendment, may have been resolved by *Heller*, which was decided ten years after his cited book was published.

6

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

## I.      1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT.

### A.   *The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or against the federal government.*

The key to understanding why *only* 1791 is the proper year for determining the original public meaning of the Second Amendment, or of any other right of individuals enumerated in the Bill of Rights, is found in *Bruen* itself: "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."[11]  The Court does not apply two different versions of the Second Amendment, or two versions of other incorporated provisions of the first eight amendments in the Bill of Rights.  Specifically, it does not apply one meaning when invoked against potential federal infringement and a different meaning when invoked against a potential state or locality infringement.

This has been a fundamental principle of Bill of Rights jurisprudence for more than five decades.[12]  That an incorporated right has only a single meaning was made crystal clear in *McDonald*, which quoted *Malloy v. Hogan* as establishing that the Court has:

> abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court."[13]

Instead, as *McDonald* noted, the *Malloy* Court "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment

---

[11] *Bruen*, 142 S.Ct. at 2137 (emphasis added).

[12] The concept that the federal government and state governments are restrained equally by the First Amendment, and by the incorporated First Amendment, appears to go back even further. "The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states *as incompetent as Congress* to enact such laws." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (emphasis added).

[13] *McDonald*, 561 U.S. at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 5–6 (1964)).

7

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

according to the same standards that protect those personal rights against federal encroachment.'"[14]  The meaning of a provision of the Bill of Rights is *identical* whether applied against the states or the federal government.  Similarly, the Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."[15]

 *McDonald* discussed one anomalous case, *Apodaca v. Oregon*,[16] which when *McDonald* was decided allowed state criminal defendants to be convicted of a serious crime by a 10-2 vote rather than only by a unanimous jury as the Sixth Amendment requires in federal trials.  That case has since been overruled in *Ramos v. Louisiana*, with the Court noting that it has "long explained … that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government."[17]  As a case decided just one year earlier stated, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."[18]  That means, however it is interpreted, the Second Amendment must apply *equally* against the states and the federal government.

---

[14] *McDonald*, 561 U.S. at 765-66 (quoting *Malloy*, 378 U.S. at 10, and further citing *Mapp v. Ohio*, 367 U.S. 643, 655–656 (1961); *Ker v. California*, 374 U.S. 23, 33–34 (1963); *Aguilar v. Texas*, 378 U.S. 108, 110 (1964); *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Duncan v. Louisiana*, 391 U.S. 145, 149, 157–158 (1968); *Benton v. Maryland*, 395 U.S. 784, 794–795 (1969); and *Wallace v. Jaffree*, 472 U.S. 38, 48–49 (1985)).

[15] *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

[16] 406 U.S. 404 (1972).

[17] *Ramos v. Louisiana,* 140 S.Ct. 1390, 1397 (2020).

[18] *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (incorporating the Excessive Fines Clause).

8

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

*B. The meaning of a constitutional provision is fixed when it is adopted.*

*Bruen* explained that the Constitution's "meaning is fixed according to the understandings of those who ratified it…."[19]  Since the Bill of Rights is part of the Constitution and was ratified just three years after the unamended Constitution went into effect, its meaning was fixed as of that time.  Noting that the "Constitution can, and must, apply to *circumstances beyond those the Founders* specifically anticipated,"[20] *Bruen* quoted from *United States v. Jones*,[21] which concluded that installation of a tracking device on a vehicle was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*") (emphasis added).[22] Circumstances may change, but the central meaning is fixed.

The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence.  As Justice Thomas noted in his concurrence in *McIntyre v. Ohio Elections Comm'n*:[23]

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions* ... in the several states." *Rhode Island v. Massachusetts,* 37 U.S. (12 Pet.) 657, 721 (1838).

---

[19] *Bruen,*142 S.Ct. at 2132.

[20] *Id.*

[21] 565 U.S. 400, 404–405 (2012).

[22] *Id*. (emphasis added).

[23] 514 U.S. 334, 359 (1995) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

Thus, as long ago as 1838, the concept of a "historically fixed meaning" was an accepted proposition.  It remained an accepted proposition in 1905 when *South Carolina v. United States* was decided and has remained so to the present day.

> C. *The public understanding of the Bill of Rights by ratifiers in the Founding period controls the meaning of its provisions.*

As the above passages demonstrate, the relevant time period for ascertaining the *single* meaning of a provision of the Bill of Rights, as applied to the states and to the federal government, is the ratification of those amendments at the time of the Founding, not the time of incorporation of the right into the Fourteenth Amendment.  *Bruen* recognized that the "Second Amendment's *historically fixed meaning*" must date, like the Amendment itself, to 1791, when the Court reaffirmed *Heller*'s finding that the right applies to new circumstances, specifically that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence *in the 18th century.*'"[24]

In the passage from *Bruen* quoted above regarding the "assumption" that 1791 is the relevant time period, the Court cited three cases, all of which looked to the time of ratification of specific amendments in 1791 to determine their original public meaning:  *Crawford v. Washington*, 541 U.S. 36 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) (First Amendment).  Those cases all involve applications against the states of incorporated provisions of the Bill of Rights.  The *Bruen* opinion stated that the Court had "assumed" in those cases that the Founding was the relevant time period.  But, as those cases show, the Founding period is

---

[24] *Bruen*, 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added).

10

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

expressly stated to be the period to be examined to determine the meaning of the provisions in question.[25]

*Crawford* is a Confrontation Clause case.  Finding that the text alone did not resolve the specific meaning and purposes of that Clause, the Court observed that "[w]e must therefore turn to the historical background of the Clause to understand its meaning."[26]  The Court then examined pertinent English legal history, colonial laws and practices, the common law as understood at the time of the Founding, comparable provisions in eighteenth century state constitutions, and some early nineteenth century cases and commentary to determine its meaning.  Throughout its historical review, the Court repeatedly used expressions such as:

- "…*the Framers* would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify..."

- "The *founding generation's* immediate source of the concept, however, was the common law..."

- referring to certain evils "…that English law's assertion of a right to confrontation was meant to prohibit; and that the *founding-era rhetoric* decried. The Sixth Amendment must be interpreted with this focus in mind."

- "…ex parte examinations might sometimes be admissible under modern hearsay rules, but *the Framers* certainly would not have condoned them."

---

[25] See also *Heller*, 554 U.S. at 576-77 (stating that the normal meaning of the words in the Second Amendment excludes meanings "that would not have been known to ordinary citizens *in the founding generation.*" (emphasis added).

[26] *Crawford*, 541 U.S. at 43.

11

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

- [the Sixth Amendment] "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established *at the time of the founding...*"

- "…the *common law in 1791* conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations."

- "We do not infer from these that *the Framers* thought exceptions would apply even to prior testimony."

- "Our cases have thus remained faithful to *the Framers' understanding:*"

- "…we do not think *the Framers* meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence..." [27]

There is no indication whatsoever in *Crawford* that when the Sixth Amendment is applied through the Fourteenth Amendment to a state, the public understanding of the Sixth amendment at the time of ratification of the Fourteenth Amendment determines its meaning or changes the 1791 meaning.  And the Supreme Court's reliance on Founding-era history in *Crawford* was not a mere "assumption"; it was inseparable from its holding.

The second case cited is *Virginia v. Moore,*[28] a Fourth Amendment case, where the protection of that Amendment was asserted against a state's actions.  The issue was whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law.[29]  The Court looked to the Founding era for guidance:

---

[27] *Id.* at 36, 43, 50, 51, 54, 56, 59, 61 (emphasis added).

[28] 553 U.S. 164 (2008).

[29] *Id.* at 166 (2008).

12

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

In determining whether a search or seizure is unreasonable, we begin with history. We look to the *statutes and common law of the founding era* to determine the norms that the Fourth Amendment was meant to preserve.[30]

The Court stated that it was "aware of no historical indication that *those who ratified the Fourth Amendment* understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."[31]  Instead, the "immediate object of the Fourth Amendment was to prohibit the general warrants and writs of assistance that *English judges had employed against the colonists*."[32]  Emphasizing the focus on the Founding period, the Court continued, "[n]o early case or commentary, to our knowledge, suggested the Amendment was intended to incorporate subsequently enacted statutes," and "[n]one of the early Fourth Amendment cases that scholars have identified sought to base a constitutional claim on a violation of a state or federal statute concerning arrest."[33]

According to the Court, this is "not a case in which the claimant can point to 'a clear *answer [that] existed in 1791* and has been generally adhered to by the traditions of our society ever since.'"[34]  As with *Crawford*, there was no indication in *Virginia v. Moore* that the understanding of the ratifiers of the Fourteenth Amendment was relevant or should even be considered.

In the third case, *Nevada Comm'n on Ethics v. Carrigan*,[35] the issue was whether a provision of the state's Ethics in Government Law requiring legislators to recuse themselves from voting on certain measures violated the First Amendment.  The Court held that it did not

---

[30] *Id.* at 168 (emphasis added).

[31] *Id.* (emphasis added).

[32] *Id.* at 166-69 (citations omitted) (emphasis added).

[33] *Id.* at 169.

[34] *Id.* at 170-71 (quoting *Atwater v. Lago Vista*, 532 U.S. 318, 345 (2001) (cleaned up) (emphasis added).

[35] 564 U.S. 117 (2011).

13

Electronic copy available at: https://ssrn.com/abstract=4248297

ER-372

**WORKING DRAFT – Subject to change**

because voting by legislators does not implicate a personal right of free speech, but is an exercise of legislative power on behalf of the citizenry.  One of the arguments in support of that conclusion was that such recusal laws had existed at the time of the Founding and were not considered to be restraints on speech.

As with *Crawford* and *Moore*, the Court never even considered whether the scope of the First Amendment meaning should be determined by the understanding of the ratifiers of the Fourteenth Amendment.  Instead, it looked to the Founding period to determine whether a law requiring recusal violated the right to freedom of speech or expression.  The Court noted that "Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws *existed in 1791* and have been in place ever since."[36]  The Court found that recusal rules like the one at issue in the case have existed since the founding of the Republic:

> "*[E]arly congressional enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning,*'" *Printz v. United States*, 521 U.S. 898, 905 (1997) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723–724 (1986)). *That evidence is dispositive here. Within 15 years of the founding*, both the House of Representatives and the Senate adopted recusal rules. The House rule—to which no one is recorded as having objected, on constitutional or other grounds, see D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 10 (1997)—was adopted within a week of that chamber's first achieving a quorum.[37]

The Court observed that "The first Senate rules did not include a recusal requirement, but Thomas Jefferson adopted one when he was President of the Senate" in 1801.[38]  It also looked to recusal requirements for federal judges as early as 1792.[39]

---

[36] *Id*. at 122 (emphasis added).

[37] *Id.* (emphasis added).

[38] *Id.* at 123.

[39] *Id.*

14

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

When the Supreme Court looks at history to determine the intent of ratifiers, it always

looks to the Founding era as the period of sole or primary relevance.  In addition to the three

cases cited by *Bruen*, decisions under the Second Amendment, and all of the other amendments

that have been incorporated, look to the Founding period.[40]

> D.  *All three of the Supreme Court's substantive interpretations of the Second*
>     *Amendment assess its meaning and scope by looking at the Founding period.*

There have been three Supreme Court cases—*Heller*, *Caetano*, and *Bruen*—that have

applied the substantive meaning of the Second Amendment.  *McDonald* surveyed the importance

of the right to keep and bear arms over our nation's history to determine if it should be

incorporated through the Fourteenth Amendment.  But *McDonald* did not attempt to expound on

its exact substantive meaning because Chicago's handgun ban was clearly unconstitutional under

*Heller* if the Second Amendment was incorporated.  *Heller*, *Caetano*, and *Bruen* all used the

Founding period to determine the scope and meaning of the Second Amendment.

*Heller* first analyzed the meaning of the text of the Second Amendment by examining

sources that either preceded 1791 or were close enough in time thereafter to validly ascertain

what the language meant to the Founding generation.[41]

While it is unnecessary to review every citation by *Heller* as evidence of meaning in the

Founding era, a few examples will illustrate the point.  The Court stated that in interpreting the

Second Amendment's text, "we are guided by the principle that '[t]he Constitution was written

to be understood by the voters; its words and phrases were used in their normal and ordinary as

distinguished from technical meaning.'  Normal meaning may of course include an idiomatic

---

[40] The Seventh Amendment has not been incorporated generally against the states because it is a provision
governing trials in federal courts.

[41] *Heller*, 554 U.S. 577-592.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

meaning, but it excludes secret or technical meanings that would not have been known to *ordinary citizens in the founding generation*."[42]

To ascertain the meaning of "militia," the Court stated: "As we will describe below, the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range."[43]  *Heller* looked at the *colonial* militia, not the militia as it existed in 1868 or some later period.

For the meaning of "arms," *Heller* looked exclusively at mid- to late eighteenth-century dictionaries and sources, such as Samuel Johnson's famed dictionary.[44]  It concluded that "The term was applied, *then as now*, to weapons that were not specifically designed for military use…."[45]  "Then" refers to the Founding period.  The Court concluded that "Although one *founding-era* thesaurus limited 'arms' (as opposed to 'weapons') to 'instruments of offence generally made use of in war,' even that source stated that all firearms constituted 'arms.'"[46]

Regarding the meaning of "keep," the Court again cited Johnson's Dictionary, with a confirmatory reference to the early Webster definition.  The opinion noted that "The phrase 'keep arms' was not prevalent in the written documents *of the founding period* that we have found," but cited three examples, all of which preceded 1791.[47]  The Court construed "bear" in the same way, stating, "from our review of *founding-era sources*, we conclude that this natural meaning [which the Court had adopted] was also the meaning that 'bear arms' had in the 18th

---

[42] *Id.* at 576-77 (citations omitted) (emphasis added).

[43] *Id.* at 580.

[44] The opinion did contain a "see also" reference to Noah Webster's 1828 dictionary, but it was merely cited as "similar."  It also cited *State v. Duke*, 42 Tex. 455, 458 (1874), but noted only that that case cited state court decisions construing "arms."

[45] *Heller*, 554 U.S. at 581 (emphasis added).

[46] *Id.* (emphasis added).

[47] *Id.* at 583 (emphasis added).

16

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

century."[48] In the end, the Court concluded that it was "adopt[ing] . . . the original understanding of the Second Amendment" as its definitive interpretation.[49] That can only mean the understanding that prevailed at its ratification.

*Caetano* applied the Second Amendment against the Commonwealth of Massachusetts.[50] Although this *per curiam* opinion did not itself engage in historical analysis, it expressly relied on *Heller*'s language and reasoning, which were rooted in the Founding period. There was no suggestion by the Court that 1868 was the proper date, or that the understanding of the ratifiers of the Fourteenth Amendment was even pertinent, much less controlling.

*Bruen* again confirmed that the time of ratification of the Bill of Rights is the pertinent period. Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[51] The Second Amendment was adopted in 1791, so that should be conclusive.

> E. *Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868.*

As described in *Bruen*, the meaning of a constitutional provision is fixed when adopted. That includes the provisions of the Bill of Rights, which have the same meaning when incorporated against the states as when they apply directly to the federal government. In numerous cases involving all of the amendments in the Bill of Rights that have been incorporated, the relevant time period has been held to be the Founding period. None has looked

---

[48] *Id.* at 584 (emphasis added).

[49] *Id.* at 625.

[50] *Caetano v. Massachusetts*, 577 U.S. 411 (2016).

[51] *Bruen*, 142 S.Ct. at 2136.

Electronic copy available at: https://ssrn.com/abstract=4248297

(22 of 300), Page 22 of 300  Case: 24-565, 04/17/2025, DktEntry: 10.5, Page 22 of 300
ER-576
Case 2:19-cv-00617-KJM-AC   Document 96-7   Filed 09/29/23   Page 22 of 62

**WORKING DRAFT – Subject to change**

primarily to the post-Civil War period to determine the scope of a provision within the Bill of Rights.  To the extent late 19th century interpretations have been discussed in these cases, it was never because the understandings of the ratifiers of the Fourteenth Amendment were found to prevail over those of the Founders in 1791.  Instead, discussions of late 19th century history are treated as confirmation of the 1791 understanding.  While the list here cannot be exhaustive, some examples will illustrate.

*First Amendment:*

The *Nevada Commission on Ethics* case was one of the three cases cited by Justice Thomas as showing that the Court had "assumed" that 1791 is the proper period for determining the scope and meaning of a provision of the Bill of Rights.[52]  As described above, it was alleged in that case that Nevada had infringed on respondent's right of freedom of speech.  The Court looked to the Founding period, and an unbroken tradition since then, to determine that the conduct in question was not speech protected by the First Amendment.

In *Near v. Minnesota*,[53] applying the principles of the First Amendment regarding freedom of the press against a state, the Court heavily emphasized the historical understanding of freedom of the press in 1791 when striking down a state law that imposed prior restraint on a publication deemed a "public nuisance."  The Court stated that "The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as *historically conceived and guaranteed.*"[54]  It alluded to the struggle in England over prior restraints before the Founding era, quoted from Blackstone's *Commentaries* on the nature of the right, cited an early Massachusetts case regarding the meaning of the right, relied on

---

[52] *Id.* at 2137-38.

[53] 283 U.S. 697 (1931).

[54] *Near*, 283 U.S. at 713.

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

Madison's Report on the Virginia Resolutions to show differences between the right in England

and in America, and included an extensive excerpt from that Report.[55]  This was, of course, a

case relying on incorporation against a state, but there was no mention of 1868 as purportedly

being the relevant time period for ascertaining the meaning of freedom of the press.

The famous case of *Reynolds v. United States*[56] presented the question of whether a

federal statute governing the Territory of Utah could prohibit bigamy without violating the Free

Exercise Clause.  Although the case was purely federal, the Supreme Court turned to history at

the time of the Founding and before, to determine the meaning of religion and the scope of the

right.  The Court noted that:

> The word 'religion' is not defined in the Constitution. We must go elsewhere,
> therefore, to ascertain its meaning, and nowhere more appropriately, we think,
> than to *the history of the times in the midst of which the provision was adopted*.
> The precise point of the inquiry is, what is the religious freedom which has been
> guaranteed.[57]

The Court then reviewed some colonial history in which religious freedom was

circumscribed, and considered in detail a dispute concerning a bill in Virginia in 1784, regarding

which James Madison:

> prepared a 'Memorial and Remonstrance,' which was widely circulated and
> signed, and in which he demonstrated 'that religion, or the duty we owe the
> Creator,' was not within the cognizance of civil government. [citation omitted].
> At the next session the proposed bill was not only defeated, but another, 'for
> establishing religious freedom,' drafted by Mr. Jefferson, was passed.[58]

The Court considered Jefferson's bill and his views about religious freedom and reviewed

the treatment of that subject in the Constitutional Convention and during the period of

---

[55] *Id*. at 713-17.

[56] 98 U.S. 145 (1878).

[57] *Reynolds*, 98 U.S. at 163.

[58] *Id*.

19

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

ratification of the Bill of Rights.[59]  There was no hint that the public understanding of the First Amendment in 1868 was important, let alone that passage of the Fourteenth Amendment somehow retroactively changed the meaning of the Free Exercise Clause.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,[60] a case involving a dispute between a religious school and a teacher who was a "minister" at the school, the EEOC brought suit against the school, alleging that the minister had been unlawfully terminated because she had threatened litigation under the Americans with Disabilities Act.[61] The Court reviewed English, colonial, and Founding era evidence as to the extent to which American governments could be involved in personnel decisions in religious institutions.[62]  It noted that "It was against this background that the First Amendment was *adopted*."[63]  Among other things, "the *founding generation* sought to foreclose the possibility of a national church…."[64] "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."[65]

In a recent free exercise case, *Fulton v. City of Philadelphia*,[66] the Court's majority opinion found it unnecessary to perform a historical analysis to determine the meaning of the First Amendment's text because the case could be decided under existing precedents.  However,

---

[59] *Id.*

[60] 565 U.S. 171 (2012).

[61] *Id.* at 179-80.

[62] *Id.* at 182-83.

[63] *Id*. at 183

[64] *Id*.

[65] *Id*. at 184.

[66] 141 S.Ct. 1868 (2021).

20

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

Justice Alito, joined by Justices Thomas and Gorsuch, concurred in the judgment, and wrote a lengthy analysis of the text and historical meaning of the Free Exercise Clause, which focused nearly entirely on the meaning in 1791.[67]  After quoting key words from the First Amendment, the concurrence noted that those "words had essentially the same meaning *in 1791* as they do today."[68] Justice Alito wrote that, following *Heller*'s lead, "we must ask whether the Free Exercise Clause protects a right that was known *at the time of adoption to have defined dimensions*."[69]  He noted that "critical state ratifying conventions approved the Constitution on the understanding that it would be amended to provide express protection for certain fundamental rights, and the right to religious liberty was unquestionably one of those rights."[70] Because of deeper constitutional scholarship in recent years, "we are now in a good position to examine how the free-exercise right was understood *when the First Amendment was adopted*."[71]

   *Lynch v. Donnelly*, a case involving whether a municipality could include a creche as part of its Christmas display, said that interpretation of the Establishment Clause should comport with "what history reveals was the contemporaneous understanding of its guarantees."[72]  It looked to the actions of the First Congress in 1789 in determining the meaning of that clause:  "In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid chaplains for the House and

---

[67] *Fulton*, 141 S.Ct. at 1894-912.

[68] *Id*. at 1896.

[69] *Id*. at 1899.

[70] *Id*. at 1901.

[71] *Id.* at 1899.

[72] *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984).

21

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Senate."[73]  The time of the ratification of the Fourteenth Amendment played no such role in interpreting the right.

*Fourth Amendment:*

As described above, another of the three cases cited by Justice Thomas in support of the Court's looking to the time of the Founding was *Virginia v. Moore*, a Fourth Amendment case. As noted, that case relied on the "statutes and common law of the founding era," and sought to determine the understanding of "those who ratified the Fourth Amendment."[74]  Other cases applying the Fourth Amendment against the states have similarly looked to the Founding period, not the time of ratification of the Fourteenth Amendment.

In *Wyoming v. Houghton*, the Court said that to determine whether government action violates Fourth Amendment rights, "we inquire first whether the action was regarded as an unlawful search or seizure under the common law *when the Amendment was framed.*"[75]  Similarly, in *Wilson v. Arkansas*,  the Court stated that in evaluating the scope of Fourth Amendment rights, "we have looked to the traditional protections against unreasonable searches and seizures afforded by the common law *at the time of the framing*."[76]  *Houghton* and *Wilson*, like *Moore*, both applied the Fourth Amendment to states, but not a word was mentioned regarding 1868 being the proper time for assessing the scope or meaning of the right.

---

[73] *Id.* at 674.

[74] *Virginia v. Moore*, 553 U.S. at 168.

[75] 526 U.S. 295, 299 (1999) (emphasis added).

[76] 514 U.S. 927, 931 (1995) (emphasis added).

22

Electronic copy available at: https://ssrn.com/abstract=4248297

ER-581

**WORKING DRAFT – Subject to change**

*Fifth Amendment:*

In *Benton v. Maryland*,[77] the case that incorporated the Fifth Amendment's Double

Jeopardy Clause against the states, the Court performed a brief review of the history of that

concept's inclusion in American law, especially noting the Founding period.  The right to be free

of multiple prosecutions:

> became established in the *common law of England long before this Nation's*
> *independence*. [citations omitted].  As with many other elements of the common
> law, it was carried into the jurisprudence of this Country through the medium of
> Blackstone, who codified the doctrine in his Commentaries…. Today, every State
> incorporates some form of the prohibition in its constitution or common law….
> [The underlying principle against double jeopardy] has *from the very beginning*
> *been part of our constitutional tradition*.[78]

Similarly, in *Gamble v. United States*,[79] the Court recently examined the meaning of the

"dual-sovereignty" doctrine in Fifth Amendment double jeopardy jurisprudence.  The text of the

Fifth Amendment protects individuals from being twice put in jeopardy "for the same offence."

Accordingly, the Court looked at the meaning of the word "offence" in the Founding period and

found that it "was commonly understood *in 1791* to mean 'transgression,' that is, 'the Violation

or Breaking of a Law.'"[80]  The Court continued, "As *originally understood*, then, an 'offence' is

defined by a law, and each law is defined by a sovereign. So where there are two sovereigns,

there are two laws, and two 'offences.'"[81]  Although *Gamble* was a federal case, the Court

---

[77] 395 U.S. 784 (1969).

[78] *Id.* at 795-96 (emphasis added).

[79] 139 S.Ct. 1960 (2019) (citations omitted, emphasis added).

[80] *Id.* at 1965 (emphasis added).

[81] *Id*.

23

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

recognized that through incorporation the very same principles applied to the state court

proceedings under which Gamble had already been convicted.[82]

*Sixth Amendment:*

*Crawford v. Washington*,[83] described above, was a Sixth Amendment Confrontation

Clause case and one of the three cases noted by Justice Thomas in *Bruen* to have "assumed" that

the Founding period is the relevant time for determining the scope of provisions of the Bill of

Rights.  It repeatedly relied on evidence regarding the Framers, 1791, and the Founding period.

In *Ramos v. Louisiana*,[84] the Court considered whether the incorporated Sixth

Amendment right to a jury trial in state criminal cases requires a unanimous verdict.  The Court

looked at precedents arising from before the Founding period, and practices around the time the

Sixth Amendment was ratified:

> The requirement of juror unanimity emerged in 14th century England and was
> soon accepted as a vital right protected by the common law. As Blackstone
> explained, no person could be found guilty of a serious crime unless "the truth of
> every accusation ... should ... be confirmed by the unanimous suffrage of twelve
> of his equals and neighbors...."[85]

> This same rule applied in the *young American States.* Six State Constitutions
> explicitly required unanimity. Another four preserved the right to a jury trial in
> more general terms. But the variations did not matter much; consistent with the
> common law, state courts appeared to regard unanimity as an essential feature of
> the jury trial.[86]

The Court further recognized that it was the original time of ratification that was pertinent for

determining the meaning of trial by jury, explaining that:

---

[82] *Gamble*, 139 S.Ct. at 1963, 1979.

[83] *Crawford v. Washington*, 541 U.S. 36 (2004).

[84] 140 S.Ct. 1390 (2020).

[85] *Id*. at 1395.

[86] *Id*. at 1396 (emphasis added).

24

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

It was against this backdrop that James Madison drafted and *the States ratified the Sixth Amendment in 1791*. By that time, unanimous verdicts had been required for about 400 years. If the term "trial by an impartial jury" carried any meaning at all, it surely included a requirement as long and widely accepted as unanimity.[87]

In other Sixth Amendment cases, the Court has also looked to the Founding period to determine the scope, meaning, or importance of various provisions of that Amendment. *See, e.g.*, *Powell v. Alabama,*[88] (right to counsel; examining scope of right at English law in Founding period, Blackstone's rejection of English limitations on the right, and inclusion of right to counsel in early American constitutions); *Klopfer v. North Carolina*[89] (right to speedy trial; reviewing early English law, Magna Carta, Coke's *Institutes* and the American familiarity with them at the time of the Founding, Virginia's 1776 Declaration of Rights, and early state constitutions); *In re Oliver,*[90] (right to public trial; relying on "our English common law heritage" and state constitutions in most of the original states); *Duncan v. Louisiana,*[91] (right to jury trial in all state criminal cases in which such right would exist in federal court; reviewing early English history and English Bill of Rights, Blackstone, Stamp Act Congress, First Continental Congress, Declaration of Independence, and constitutions of original states); *Washington v. Texas,*[92] (Compulsory Process Clause; stating that the Framers included this clause to overcome certain limits on who could testify at common law).

---

[87] *Id*. (emphasis added).

[88] 287 U.S. 45, 60-67 (1932).

[89] 386 U.S. 213, 223-25 (1967).

[90] 333 U.S. 257, 266–268 (1948).

[91] 391 U.S. 145, 151-54 (1968).

[92] 388 U.S. 14, 20, 23 (1967).

25

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

*Eighth Amendment:*

In *Timbs v. Indiana*, to determine whether the Excessive Fines Clause was incorporated against the states, the Court examined early English legal history from the time of Magna Carta, Blackstone, the abuses by the Stuart kings, the English Bill of Rights, and colonial and state constitutions.[93] It noted that the statements in the English Bill of Rights that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted," were adopted almost verbatim first by the Virginia Declaration of Rights and then in the Eighth Amendment itself.[94] The Court did discuss the period around ratification of the Fourteenth Amendment, but only to note that then 35 of the 37 states had prohibitions against excessive fines, but that abuses of fines to control black people nevertheless continued.[95] As in *McDonald*, the inclusion of post-bellum nineteenth century developments in the Court's historical review was aimed only at determining that the right is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition."[96] There was no suggestion that 1868 was the primary period to determine the meaning of the clause, or that its meaning was somehow changed by the process of incorporation. Indeed, given the deep roots into English and American history not only of the principle but the very language prohibiting excessive fines, that would have been an untenable exercise.

The author has not found, and litigants in post-*Bruen* litigation have so far not pointed to, a *single* Supreme Court case in which in which the Supreme Court has looked to the time of ratification of the Fourteenth Amendment as the principal period for determining the scope or

---

[93] 139 S.Ct. 682, 687-88 (2019).

[94] *Timbs,* 139 S. Ct. at 688.

[95] *Id*. at 688-99.

[96] *Id.* at 687 (quoting *McDonald*).

26

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

meaning of a provision of the Bill of Rights. [97]   The Second Amendment is not a "second class right"[98] and there is no reason for it to be treated differently from the other provisions of the Bill of Rights in this respect.  In addition, adoption of 1868 as the proper focus for determining the meaning of the Second Amendment would mean that the Supreme Court was utterly wrong in looking to the Founding period in *Heller*, *Caetano*, and *Bruen*.

    F.   *If later understandings contradict the original understanding of the text, the original understanding controls.*

*Heller*, *McDonald*, and *Bruen* all considered some amount of 19th century history. *McDonald* did so not to discern the meaning or scope of the right to keep and bear arms, but rather to determine whether it has historically been considered "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."[99]  *Caetano* relied on the Founding-era research and principles announced in *Heller*.  But both *Heller* and *Bruen* engaged in extensive historical analysis and provided some clear guideposts regarding the proper uses of post-Civil War history.

    The post Founding-era history examined by *Heller* and *Bruen* was used by the Court only to confirm rather than to contradict the Founding era understanding. Regarding *Heller*, the *Bruen* Court observed that:

> we made clear in *Gamble*[100] that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century

---

[97] Litigants have cited lower court decisions that they claim have done this, and I discuss the errors in those claims in Part IG.

[98] *McDonald*, 561 U.S. at 780, 781-87.

[99] *McDonald*, 561 U.S. at 767.

[100] *Gamble v. United States,* 139 S.Ct. 1960 (2019).

27

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

evidence was "treated as mere confirmation of what the Court thought had already been established."[101]

*Bruen* itself found that the text of the Second Amendment plainly covers the right to carry arms in public.[102]  It also carefully noted that "to the extent later history contradicts what the text says, the text controls."[103]  It adopted the view of then-Judge Kavanaugh in a D.C. Circuit Second Amendment case that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text."[104]  And, obviously, the insistence by some scholars and advocates that 1868 should control, is only of importance if they believe they can show that the 1868 understanding was *different* from the 1791 understanding.  But if the 1868 understanding is different from that of 1791, it must be rejected because it is inconsistent with the text and the original meaning that "is fixed according to the understandings of those who ratified it."[105]

But even if the arguments that 1868 trumps 1791 did not conflict with *Heller*, *Caetano*, and *Bruen*, and the Court's entire incorporation jurisprudence—which they plainly do—the Court would give them little weight in any event, due to the sheer remoteness in time of any post-Civil War statements, understandings, or legal developments.  The Court warned against giving "post-enactment history more weight than it can rightly bear," and reaffirmed *Heller*'s observation that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much

---

[101] *Bruen*, 142 S.Ct. at 2137 (quoting *Gamble*, 139 S.Ct. at 1975-76).

[102] *Id.* at 2134.

[103] *Id*. at 2137.

[104] *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

[105] 142 S. Ct. at 2132.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

insight into its original meaning as earlier sources."[106]  In fact, faced with twentieth-century

evidence that *did* contradict the Founding-era evidence, the *Bruen* Court rejected that evidence,

stating that the Court will not:

> address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.[107]

Justice Barrett, concurring in *Bruen*, also cautioned that "today's decision should not be

understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th

century to establish the original meaning of the Bill of Rights."[108]  That is quite right—*Bruen*'s

analysis forecloses that type of reasoning.

An example of the errors that can occur when courts engage in such "freewheeling

reliance" on mid-to late 19th century analogues is contained in a recent temporary restraining

order enjoining enforcement of some of New York State's new restrictions on carry enacted after

the *Bruen* decision.[109]  In that case, the District Court let stand a ban on carrying concealed

firearms in places of worship, with some exceptions for keeping the peace, despite the fact that

*Bruen* did not include places of worship in its list of "sensitive places."[110]  The District Court

relied on only six "analogues," which were state statutes enacted between 1870 and 1890.[111] But

these alleged analogues come far too late, as indicated by *Bruen* itself and by Justice Barrett's

concurrence in *Bruen*.  To illustrate, in 1740, South Carolina required that "every white male

---

[106] *Id.* at 2136–37 (quoting *Heller*, 554 U.S. at 614).

[107] *Id.* at 2154 n.28.

[108] *Id.* at 2163 (Barrett, J., concurring).

[109] *Antonyuk v. Hochul*, No. 1:22-CV-0986, Doc. 27 (N.D.N.Y. Oct. 6, 2022) ("*Antonyuk II*").

[110] *Bruen*, 142 S.Ct. at 2133.

[111] *Antonyuk II* at 33 n.25.

29

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

inhabitant of this Province, (except travelers and such persons as shall be above sixty years of age,) who…is…liable to bear arms in the militia of this Province," who shall "go and resort to any church or any other public place of divine worship," must "carry with him a gun or a pair of horse-pistols…with at least six charges of gunpowder and ball."[112]  In 1770, Georgia required that "every male white inhabitant of this province, (the inhabitants of the sea port towns only excepted who shall not be obliged to carry any other than side arms) who is or shall be liable to bear arms in the militia…and resorting…to any church…shall carry with him a gun, or a pair of pistols." Each man was required to "take the said gun or pistols with him to the pew or seat," and these arms were to "be fit for immediate use and service."[113]

As discussed, all Supreme Court cases on the Bill of Rights have looked to the Founding Period for determining meaning, not to the late 19th century.  If there is no analogue in the Founding period, one cannot jump—as the New York court did—to the late 19th century to look for analogues in the first place.  Justice Barrett in her concurrence pointedly quoted from *Espinoza v. Montana Dept. of Revenue,* 140 S.Ct. 2246, 2258-2259 (2020), which stated that a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment.[114]  If such a practice cannot establish a pertinent American tradition for the First Amendment, it cannot do so for the Second Amendment, either.

---

[112] 7 David J. McCord, Statutes at Large of South Carolina 417-19 (Columbia, S.C.: A.S. Johnston, 1840) (enacted 1740, re-enacted 1743).

[113] Horatio Marbury and William A. Crawford, Digest of the Laws of the State of Georgia, 241-42 (1802) (law of Feb. 27, 1770, § 1).

[114] *Bruen*, 142 S.Ct. at 2163.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

> G. *The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of McDonald.*

The briefs supporting the pro-gun control litigants in the *Worth*, *Lara*, and *Antonyuk* cases, *supra* n.8, rely on Court of Appeals cases that supposedly establish that the time of ratification of the Fourteenth Amendment is the key time period for determining the scope and meaning of the Second Amendment.  Even a cursory review of those cases belies that contention.

The amicus brief by Everytown for Gun Safety in *Lara* offers a more robust argument than the defendant's brief in *Worth*.  It contends that for the historical inquiry:

> the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Several circuits reached this conclusion in applying the first step of the pre-*Bruen* framework.[115]

For this proposition, it provides the following footnote:

> *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is [to] a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *criticized on other grounds by Bruen,* 142 S. Ct. at 2124, 2126-27; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp*., 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments' ratifiers approved [the challenged] regulations …." (emphasis added)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments) (quoting *Ezell*).[116]

Taking these in order, *Gould* was not "criticized on other grounds" by *Bruen*.  *Gould* was entirely abrogated by *Bruen*.  It is a legal nullity.  The *Ezell* quote is accurate.  The problem there is that *McDonald* did not state that if the claim involves a state or local law where the "scope"

---

[115] Amicus Letter Br. of Everytown for Gun Safety, *Lara v. Comm'r Pa. State Police*, No. 21-1832, Doc. 61, at 2 (3d Cir. Aug. 2, 2022).

[116] *Id.* at 2–3.

31

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

question asks how the right was understood when the Fourteenth Amendment was proposed and

ratified.  The Seventh Circuit in *Ezell* simply got it wrong.  For this proposition, it cites

"*McDonald*, 130 S.Ct. at 3038–47."[117]  But there is no such holding in those pages of *McDonald*.

They are simply part of the Court's historical survey of why the right is "fundamental," and do

not specify 1868 as the time period to determine the extent of the right.  *Bruen* certainly did not

read *McDonald* that way and instead focused on 1791 in an approach that it asserted was

consistent with all its other Second Amendment precedents, *McDonald* included.  And the

Seventh Circuit changed course shortly after *Ezell* was decided, observing that "1791, the year

the Second Amendment was ratified—[is] the critical year for determining the amendment's

historical meaning, according to *McDonald v. City of Chicago*."[118]

    *Greeno* simply quoted the mistaken language in *Ezell*, apparently without investigating

its accuracy.[119]  It was also a somewhat cursory "plain error" review in a criminal case because

the defendant had not raised the Second Amendment issue at trial.[120]  The *Drummond* case did

not hold that 1868 is the proper date.  It merely stated, without any elaboration or citation of

authority, that "[f]or the rim-fire rifle rule, the question is if the Second and Fourteenth

Amendments' ratifiers approved regulations barring training with common weapons in areas

where firearms practice was otherwise permitted."[121]  It then cited authorities from 1825, 1885,

and 1895 as part of its analysis, but did not attempt to determine what the ratifiers of the

Fourteenth Amendment may have understood the right's scope to be in 1868.[122]  The citation to

---

[117] *Ezell*, 651 F.3d at 702.

[118] *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012).

[119] 679 F.3d at 518.

[120] *Id*. at 516.

[121] 9 F.4th at 227.

[122] *Id*.

32

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

*Binderup* is to a concurrence, not the Court's opinion, and it, too, merely recites the mistaken language of *Ezell*.[123]

In short, litigants arguing for 1868 as the proper date for historical inquiry in incorporation cases would have the lower courts overlook the unbroken line of Supreme Court cases that the right must be the same against both the federal government and the states; that the right is fixed when the relevant Bill of Rights provision is adopted; and that the Founding period is the relevant period for determining the meaning of the Constitution generally and for particular provisions of the Bill of Rights.  In opposition to these firm and consistent holdings by the Supreme Court, they offer one abrogated opinion by one Court of Appeals, a single Court of Appeals opinion that clearly made a mistake that was later corrected, and a series of cases that relied on that mistake apparently without further investigation.

## II.    1791 IS THE CRITICAL PERIOD FOR DETERMINING THE MEANING OF THE BILL OF RIGHTS.

A.  *It is unclear at best that the ratifiers of the Fourteenth Amendment believed that they were incorporating against the states all of the provisions of the first eight amendments.*

If those who advocate for 1868 as the proper year for determining the meaning of the Second Amendment were to prevail, an important consequence must be faced.  There is no reason for the Second Amendment to be different from any other provision of the Bill of Rights in this respect.  It is not a "second class right" as *McDonald* pointedly observed.[124]  So, if those advocates were to be successful, consistent application of the doctrine of incorporation must look to 1868 for the public meaning of all of the provisions of the Bill of Rights, not just the Second

---

[123] 836 F.3d at 362.

[124] 561 U.S. at 780, 781–87.

33

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

Amendment.  Furthermore, those meanings must displace the original understandings of 1791. As shown above, both of these propositions are flatly contradicted by well-settled Supreme Court lines of precedent.

But there is a further problem.  If the understanding of the ratifiers of the Fourteenth Amendment of each provision of the Bill of Rights must take precedence, then we must be certain that those ratifiers understood that they were incorporating all of the provisions of the Bill of Rights against the states, and that those rights had a particular, different meaning to them at the time.  This is not only contrary to logic and precedent, but as a practical matter impossible, or nearly so.

The Fourteenth Amendment does not state that it is applying the first eight amendments against the states.  It does not even mention the Bill of Rights. Furthermore, the Due Process Clause was not the principal or stated means by which the Fourteenth Amendment sought to give protection to black freedmen to exercise the right to keep and bear arms.  The operative language considered critical at the time was the Citizenship Clause in the first sentence of Section 1 of the Fourteenth Amendment, coupled with the Privileges or Immunities Clause in the second sentence.  Together, they read:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States….[125]

The first sentence was arguably necessary to overcome the holding of the infamous *Dred Scott* case, which held that African Americans were not citizens of the United States and

---

[125] U.S. CONST. AMEND. XIV, § 1.

34

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

therefore could not bring suit in federal courts, among other things.[126]  The second sentence was

to protect the privileges or immunities of citizens against state infringement.

   But what did "privileges or immunities of citizens of the United States" mean?

Throughout the Congressional debates on the Fourteenth Amendment, the Civil Rights Act of

1866, and other Congressional enactments for which the Fourteenth Amendment was intended to

provide constitutional authority, contradictory and vague accounts were given by members of

Congress and others of the Amendment's meaning and effect.

   Let us recall the state of the law regarding the Bill of Rights then.  In *Barron v.

Baltimore*, the Supreme Court held that the Fifth Amendment's Takings Clause provided a limit

only on the federal government and not on actions by state or local governments.[127]  It was

widely, though not universally, assumed thereafter that none of the provisions of the first eight

amendments in the Bill of Rights applied against the states.  In fact, that had been the prevailing

view even before *Barron*.  At the time of ratification of the Fourteenth Amendment, was it clear

that that Amendment was meant to reverse *Barron* and apply all of the protections in the Bill of

Rights against the states? If that was not clear at the time, the ratifiers of the Fourteenth

Amendment would have had no occasion to reconsider their understandings of the Bill of Rights,

including the Second Amendment.

   The first difficulty in looking at the likely understanding of the ratifiers of 1868 is that

"privileges and immunities" already had a widely accepted meaning.  Article IV, Sec. 2, the

Comity Clause of the Constitution, provides that "[t]he Citizens of each State shall be entitled to

---

[126] *Dred Scott v. Sandford*, 60 U.S. 393 (1857).  Also, had African Americans been considered citizens, *Dred Scott* presented a parade of horribles that would have ensued, including that it would give them the right "to keep and carry arms wherever they went." *Id.* at 417. As Justice Thomas observed for the Court in *Bruen*, "even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America." *Bruen*, 142 S.Ct. at 2151.

[127] *Barron ex rel. Tiernan v. City of Baltimore*, 32 U.S. 243, 250–51 (1833).

35

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

all Privileges and Immunities of Citizens in the several States."[128]  The opinion of Supreme

Court Associate Justice Bushrod Washington, sitting as a member of a circuit court, was widely

quoted to interpret the meaning of "privileges and immunities."  In *Corfield v. Coryell* he wrote:

> The inquiry is, what are the privileges and immunities of citizens in the several
> states? We feel no hesitation in confining these expressions to those privileges
> and immunities which are, in their nature, fundamental; which belong, of right, to
> the citizens of all free governments; and which have, at all times, been enjoyed by
> the citizens of the several states which compose this Union, from the time of their
> becoming free, independent, and sovereign. What these fundamental principles
> are, it would perhaps be more tedious than difficult to enumerate. They may,
> however, be all comprehended under the following general heads: Protection by
> the government; the enjoyment of life and liberty, with the right to acquire and
> possess property of every kind, and to pursue and obtain happiness and safety;
> subject nevertheless to such restraints as the government may justly prescribe for
> the general good of the whole. The right of a citizen of one state to pass through,
> or to reside in any other state, for purposes of trade, agriculture, professional
> pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to
> institute and maintain actions of any kind in the courts of the state; to take, hold
> and dispose of property, either real or personal; and an exemption from higher
> taxes or impositions than are paid by the other citizens of the state; may be
> mentioned as some of the particular privileges and immunities of citizens, which
> are clearly embraced by the general description of privileges deemed to be
> fundamental: to which may be added, the elective franchise, as regulated and
> established by the laws or constitution of the state in which it is to be exercised.
> These, and many others which might be mentioned, are, strictly speaking,
> privileges and immunities….[129]

Notably absent from this list is any direct reference to the provisions making up the Bill

of Rights.  Of course, the Bill of Rights was not written or ratified until after the adoption of the

Constitution.  But Justice Washington wrote this passage in 1823. If "privileges and immunities"

encompassed all of the provisions in the first eight amendments, it seems at least somewhat

---

[128] U.S. CONST. art. IV, § 2.

[129] 6 F. Cas. 546, 551–52 (E.D. Pa. 1823).

36

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

strange that he did not describe any of the specific rights named in the Bill of Rights or state analogues to those rights.[130]

In debating the Civil Rights Bill of 1866, 42 U.S.C. § 1981, Senator Lyman Trumbull of Illinois (co-author of the Thirteenth Amendment and Chairman of the Senate Judiciary Committee) quoted the portion of the *Corfield* decision set forth above. [131]  The Fourteenth Amendment, of course, was thought by some to be necessary to provide constitutional authority for the Civil Rights Act.  Trumbull described the first section of the bill, which declared all persons of African descent to be citizens of the United States, and noted that there "shall be no discrimination in civil rights or immunities" among the inhabitants of any state "on account of race, color, or previous condition of slavery," as "the basis for the whole bill."[132]  The other provisions contained only "necessary machinery" for enforcement.  After reading aloud the passage from *Corfield*, Trumbull stated that it enumerates "the very rights belonging to a citizen of the United States which are set forth in the first section of this bill."[133]  It was anything but clear from Trumbull's speech that "privileges or immunities" or "civil rights or immunities" was meant to include wholesale the first eight amendments in the Bill of Rights.

When the Fourteenth Amendment itself was presented to the Senate on behalf of a Joint House and Senate Committee, Senator Jacob Howard took a contrasting position.  He again quoted the passage from *Corfield* as constituting "privileges and immunities," but then said that "to these should be added the personal rights guaranteed and secured by the first eight

---

[130] The Comity Clause of Art. IV, Sec. 2, was meant to preclude states from denying to citizens of other states the rights, processes, and privileges afforded its own citizens within its boundaries. That would mean only those privileges or rights held by citizens as part of state law and would not include provisions such as those in the federal Bill of Rights that were designed to prevent federal overreach.

[131] CONG. GLOBE, 39th Cong., 1st Sess. 474–75 (1866).

[132] *Id.*

[133] *Id.*

37

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

amendments of the Constitution; such as the freedom of speech and of the press; the right of the people to peaceably assemble and petition the government for a redress of grievances; … the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner," and so forth down through the remaining amendments.[134]  He continued:  "The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees."[135]

Howard's opinion that "privileges or immunities" embraced the first eight amendments was by no means universal.[136]  Sen. Thomas Hendricks of Indiana stated that he had not "heard any Senator accurately define, what are the rights and immunities of citizenship" or that "any statesman has very accurately defined them."  He described the terms as "not very certain" and "vague."[137]  Senator Reverdy Johnson of Maryland favored the citizenship and due process clauses, but stated that "I think it quite objectionable to provide that 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' simply because I do not understand what will be the effect of that."[138]  Rep. Benjamin Boyer of Pennsylvania found Section 1 "objectionable also in its phraseology, being open to ambiguity and admitting of conflicting constructions."[139]

---

[134] *Id*. at 2765.

[135] *Id*. at 2766.

[136] Indeed, that was news to Justice Felix Frankfurter in 1947.  In his concurring opinion in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 467–68 (1947), Justice Frankfurter wrote: "Not until recently was it suggested that the Due Process Clause of the Fourteenth Amendment was merely a compendious reference to the Bill of Rights whereby the States were now restricted in devising and enforcing their penal code precisely as is the Federal Government by the first eight amendments."

[137] CONG. GLOBE, 39th Cong., 1st Sess. 3039 (1866).

[138] *Id.* at 3041.

[139] *Id*. at 2467.

38

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

If the very members of Congress that were debating the Fourteenth Amendment disagreed as to its meaning, or found it "vague" and open to "conflicting constructions," then determining how the ratifiers in the states in 1868 understood the meanings of each of the provisions of the first eight amendments in 1868, particularly when it was unclear that those eight amendments were being incorporated wholesale against the states, is a very fraught endeavor (as well as an unjustified one).

There is also a practical difficulty in determining what the state ratifiers in 1868 may have understood. There were thirty-seven states in 1868. Few records exist on the ratification of the Fourteenth Amendment. What little exists is found in messages of governors who submitted the Fourteenth Amendment to their state legislatures, legislative debates (which were recorded in only Pennsylvania and Indiana), and committee reports (Massachusetts, Texas, and Wisconsin). One controversy was whether the Constitution already protected basic rights versus whether the Fourteenth Amendment was necessary. Voting rights were discussed, which had generally been held to be a political right conferred by a constitution or statute, rather than a natural civil right.[140]

Finally, whatever the meaning of "privileges or immunities," it is clear that the Fourteenth Amendment, and legislation that preceded and followed it, were meant to curb abuses of the rights of African Americans. It is also clear that the drafters and ratifiers of the Fourteenth Amendment wanted to enforce those rights *against the states*. They were not inventing new rights or changing what those rights meant. The proponents of the Fourteenth Amendment simply wanted the same civil rights that white people already had to be extended to African

---

[140] See STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS 67–70 (Updated ed. 2010).

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Americans and to prevent states from denying or infringing those rights or applying the laws in a

discriminatory fashion.

None of this is intended to cast doubt on the doctrine of incorporation, the Court's

incorporation through the Due Process clause, or incorporation of the Second Amendment, all of

which have been decided.  It is only to point out that anyone seeking to determine the specific

understanding by ratifiers of the Fourteenth Amendment in 1868 of each provision of Bill of

Rights is likely to be chasing a chimera.  Using a time period so long after the Founding should

not be done for the Second Amendment or for any other specific rights in the first eight

amendments.

B.  *The Supreme Court disagreed that the Fourteenth Amendment incorporated the Bill of Rights through the Privileges or Immunities Clause.*

Although there was disagreement in Congress about what "privileges or immunities"

meant, the biggest disagreement was with the Supreme Court.  In fact, the Supreme Court

rejected the proposition that the Amendment incorporated the Bill of Rights at the first

opportunity it had to do so.  In the *Slaughter-House Cases*, the Court held that the "privileges or

immunities" language in the Fourteenth Amendment included only rights that depended on

federal citizenship, including:

> to come to the seat of government to assert any claim he may have upon that
> government, to transact any business he may have with it, to seek its protection, to
> share its offices, to engage in administering its functions. He has the right of free
> access to its seaports, through which all operations of foreign commerce are
> conducted, to the subtreasuries, land offices, and courts of justice in the several
> States.[141]

The Court further stated that:

> Another privilege of a citizen of the United States is to demand the care and
> protection of the Federal government over his life, liberty, and property when on

---

[141] *Slaughter-House Cases*, 83 U.S. 36, 79 (1872).

40

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

> the high seas or within the jurisdiction of a foreign government. Of this there can
> be no doubt, nor that the right depends upon his character as a citizen of the
> United States. The right to peaceably assemble and petition for redress of
> grievances, the privilege of the writ of habeas corpus, are rights of the citizen
> guaranteed by the Federal Constitution. The right to use the navigable waters of
> the United States, however they may penetrate the territory of the several States,
> all rights secured to our citizens by treaties with foreign nations, are dependent
> upon citizenship of the United States, and not citizenship of a State. One of
> these privileges is conferred by the very article under consideration. It is that a
> citizen of the United States can, of his own volition, become a citizen of any State
> of the Union by a bona fide residence therein, with the same rights as other
> citizens of that State.[142]

Although the First Amendment right to peaceably assemble and petition for redress of grievances is included, no other rights under the Bill of Rights are mentioned, and the Court did not suggest that all of the rights in the first eight amendments are protected from violation by the states.

Even though there was widespread agreement in Congress that the Fourteenth Amendment and contemporaneous legislation was meant to prevent the disarming of African Americans, there is little evidence that the ratifiers of that amendment had in mind specific meanings for all of the first eight amendments, much less that those meanings differed from the original meanings of 1791.  There wasn't even agreement on which rights in the Bill of Rights would be incorporated.  Thus, any attempt to shift the relevant period for determining the meaning of the Bill of Rights from 1791 to 1868 will be fraught with difficulty, as well as having no basis in logic or in the Supreme Court's incorporation jurisprudence.

>    C.  *The individual* right *to bear arms in the Second Amendment was understood the same way in 1868 as in 1791.*

The debate about whether 1791 or 1868 is the critical year ultimately only has significance if there were important differences in the understandings of the ratifiers between those two time periods.  But in the discourse that led to the Fourteenth Amendment, the right to

---

[142] *Id.* at 79–80.

41

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding.  The focus of the discourse was the need to ensure that newly freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states.

Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866.  Rep. Thomas Eliot, sponsor of the former, explained that the bill would invalidate laws like that of Opelousas, Louisiana, providing that no freedman "shall be allowed to carry fire-arms" without permission of his employer and as approved by the board of police.[143]  He noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms…."[144]  Accordingly, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms."[145]

Senator Garret Davis said that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[146]  Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[147]  The Amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[148]

---

[143] CONG. GLOBE, 39th Cong., 1st Sess. 517 (1866).

[144] *Id.* at 657.

[145] *Id.* at 654.

[146] *Id.* at 371.

[147] *Id.* at 1182.

[148] *Id.* at 3210.

42

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

A common theme in the media was that freedmen had the right to bear arms because they were part of "the people."  The *American Citizen*, a Pennsylvania newspaper, quoted the Second Amendment and wrote: "Now what is here meant by 'the people' – Webster defines it as 'the body of persons who compose a community, town, city or nation….'"  So defined, "not a black person in the South, or anywhere else in the country, can be excluded under it from the right to bear arms," and "if the negro be not included in the militia, they are peculiarly the 'people' of the nation, and under the words of the Constitution are entitled to bear arms."[149]

Far from changing the meaning of the right to keep and bear arms, the Civil Rights Act and the Freedmen's Bureau Act, precursors of the Fourteenth Amendment, used phraseology taken from Blackstone with which the Founders were familiar.  Representative James Wilson, Chairman of the Judiciary Committee, explained the background to the Civil Rights Bill's phraseology "civil rights and immunities" and "full and equal benefit of all laws and proceedings for the security of person and property …."[150]  He equated those rights and immunities with those enumerated by Blackstone, on which the Founders also relied:

> Blackstone classifies them under three articles, as follows:
>
> 1.      The right of personal security; which, he says, "Consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."
>
> 2.      The right of personal liberty; and this, he says, "Consists in the power of locomotion, of changing situation, or moving one's person to whatever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law."
>
> 3.      The right of personal property; which he defines to be, "The free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the law of the land."[151]

---

[149] *The Right to Bear Arms*, AMERICAN CITIZEN (Butler, Pa.), Nov. 7, 1866, at 4.

[150] CONG. GLOBE, 39th Cong., 1st Sess. 1117 (1866).

[151] *Id*. at 1118.

43

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

Representative Wilson had the Second Amendment partly in mind when he stated that every right enumerated in the federal Constitution is "embodied in one of the rights I have mentioned, or results as an incident necessary to complete defense and enjoyment of the specific right."[152]  Indeed, the Freedmen's Bureau Act explicitly declared that:

> the right…to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.[153]

The same Blackstonian concepts basic to the Founders, including the right to bear and use arms, were thus inherited and applied by the drafters of the Fourteenth Amendment.  There was no change in the meaning of the right itself; instead, there was a change to who could exercise the right and who was prevented from restricting its exercise.

That the nature of the right was viewed as unchanging in 1868 is well illustrated by the Supreme Court's nearly contemporaneous decision in *United States v. Cruikshank*.[154]  There the Court explained that private infringement of the right to assemble was not a subject for federal enforcement:

> The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States. In fact, it is, and always has been, one of the attributes of citizenship under a free government…. It was not, therefore, a right granted to the people by the Constitution. The government of the United States when established found it in existence, with the obligation on the part of the States to afford it protection. As no direct power over it was granted to Congress, it remains … subject to State jurisdiction.[155]

---

[152] *Id*. at 1118–19.

[153] Freedmen's Bureau Act of 1866, §14, 14 Stat. 173, 176–77 (1866) (emphasis added).

[154] 92 U.S. 542 (1875).

[155] *Id*. at 551.

44

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

The Court found the counts of the indictment alleging private infringement of the right to

bear arms under the Second Amendment to be "equally defective," explaining:

> The right there specified is that of 'bearing arms for a lawful purpose.' This is not
> a right granted by the Constitution. Neither is it in any manner dependent upon
> that instrument for its existence. The second amendment declares that it shall not
> be infringed; but this, as has been seen, means no more than that it shall not be
> infringed by Congress. This is one of the Amendments that has no other effect
> than to restrict the powers of the national government....[156]

Like the right to assemble, the right to bear arms was a pre-existing and unchanged right not

"granted" by the Constitution but guaranteed against infringement.

Thus, the Supreme Court in 1875 viewed the right to keep and bear arms as having the

same contours as at the Founding period, which saw the right in the same terms.  Just as the

authors or ratifiers of the Second Amendment sought to guarantee a pre-existing right, the

ratifiers of the Fourteenth Amendment sought only to *extend* that protection, not change the right

itself.

## III.   THE "SCHOLARLY DEBATE" REFERENCED IN THE *BRUEN* OPINION DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE.

As previously noted, the *Bruen* opinion stated that the Court has "assumed" that the

scope of the protection applicable to the Federal Government and States is pegged to the public

understanding of the right when the Bill of Rights was adopted in 1791.  The opinion went on to

acknowledge that "there is an ongoing scholarly debate on whether courts should primarily rely

on the prevailing understanding of an individual right when the Fourteenth Amendment was

ratified in 1868 when defining its scope (as well as the scope of the right against the Federal

Government)."[157]  The only two sources cited for the existence of this debate were Kurt Lash,

---

[156] *Id*. at 553.

[157] *Bruen*, 142 S. Ct. at 2138.

45

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

*Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022) and A. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

As described below, Professor Lash frankly seeks to use 1868 as the definitive period for determining the meaning and scope of all incorporated provisions of the Bill of Rights.  His proposal is not just a radical departure from the Supreme Court's incorporation jurisprudence that has been so carefully fought over and eventually worked out over a period of many decades.  Instead, it candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights.

Professor Amar's approach is more nuanced.  In the work cited, he proposes to rely more heavily on what he believes to be the changed 1868 meaning of the Second Amendment in particular.  But any necessity for that is undermined by the decision in *Heller* (2008), a decade after Professor Amar's book was published (1998).

   A.  *Professor Lash's approach is theoretically unsound and unlikely to be adopted.*

Professor Lash believes that if a provision of the Bill of Rights meant something different to the ratifiers of the Fourteenth Amendment than it did to the ratifiers of the Bill of Rights, the 1868 meaning must control.  At the outset of his article, he describes the conundrums that positing a different meaning in 1868 would create.  "Do incorporated rights have the same meaning and scope as their counterparts in the 1791 amendments, or does the original Free Speech Clause have a different meaning and scope than the 'incorporated' Free Speech Clause?"[158]  He contends that if the meanings are different, originalists "seem forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable

---

[158] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1440 (2022).

46

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings."[159]  This is simply not the case.  If it turns out that a later meaning has ostensibly departed from the original meaning, one must reject the later meaning, as Supreme Court principles discussed above instruct, and apply the original meaning to the states.

Noting, as set forth in Part IA, above, that the Supreme Court has definitively and repeatedly held that the rights against the federal government and the states must be the same, Lash inquires:  If the meanings must be the same, "are the original 1791 meanings carried *forward* into the 1868 amendment, or are the understandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal government by way of 'reverse incorporation'?"[160] But as just explained, this is a problem exclusively of Lash's own making, which is divorced from the actual intentions of the ratifiers of the Fourteenth Amendment. They did not intend to alter the content of the Second Amendment—they just wanted to extend its protections to all citizens against encroachments by state governments.

Lash's answer to his own question is that rights as understood in 1868 must be "reverse incorporated" into the Bill of Rights.  He states that there is only "one Freedom of Speech Clause—the one the people spoke into existence in 1791 but then *respoke* in 1868."[161]  The drafters' views are secondary at best, according to Lash, because "the legally operative understanding must be that of the ratifiers.  Only the latter counts as the voice of the people."[162] He argues that "[w]hen the people adopted the Fourteenth Amendment, they readopted the

---

[159] *Id.* at 1441.

[160] *Id.* at 1440 (emphasis in original).

[161] *Id.* at 1441.

[162] *Id.* at 1443.

47

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."[163]

There are many issues with this approach.  Until now, "reverse incorporation" has never involved using 1868 meanings of incorporated Bill of Rights provisions to revise or replace the original meanings of the Bill of Rights at the time of the Founding.  In *Brown v. Bd. of Educ. of Topeka, Kan.*,[164] the Court declared school segregation unconstitutional based on the Fourteenth Amendment's Equal Protection Clause.  But a companion case, *Bolling v. Sharpe,*[165] concerned school segregation in the District of Columbia, a federal enclave.  The original Bill of Rights lacked an equal protection clause.  So, the Warren Court read the Fourteenth Amendment's Equal Protection Clause back into the Due Process Clause of the Fifth Amendment.  It was, plainly, a limited, *ad hoc* device for sidestepping a constitutional impediment to reaching the desired result.[166]  So, "reverse incorporation" doesn't have much of a pedigree and it has not been applied in other contexts.

There are at least five major problems with Professor Lash's approach.

First, his analysis is completely contrary to Supreme Court precedents.  As noted in Part IB, above, constitutional meanings are fixed when they are ratified, and that includes the Bill of Rights, which was ratified in 1791.  Further, when it has been necessary to consult history to determine the meaning of incorporated provisions of the Bill of Rights, every Supreme Court case has considered the Founding era to be the determinative period even though later evidence

---

[163] *Id.* at 1441.

[164] 347 U.S. 483 (1954).

[165] 347 U.S. 497 (1954).

[166] Note that the Equal Protection Clause of the Fourteenth Amendment was an express protection spelled out in Section 1.  The Court did not use the ostensible meaning of an incorporated provision of the Bill of Rights to change the original meaning of that provision.  Reverse incorporation has not extended past inserting "equal protection" into the Fifth Amendment's Due Process Clause.  See *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200 (1995).

48

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

is sometimes examined for confirmation.  And if later practice or understanding conflicts with the original understanding, the original understanding must prevail.

Second, there is no compelling, principled basis for concluding that the 1868 meaning, if different, ought to prevail.  Is it just because 1868 is later in time than 1791?  That does not preclude using the original meaning of the Bill of Rights, and simply applying those meanings to additional persons and entities: that is, in favor of African Americans, and against the states.  And in fact, that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate.  See Part IIC, above.

Third, it is untrue that the ratifiers "spoke into existence" Bill of Rights provisions in 1791, but then "respoke" them in 1868.  Although "spoke into existence" and "respoke" are intriguing metaphors, that is not what happened.  Most of the provisions of the first eight amendments were either considered natural rights or rights inherited by Englishmen at common law and then carried forward, possibly somewhat modified, into the new Republic.  The Bill of Rights was largely a confirmation of existing rights, not an original grant of rights.  And the drafters of the Fourteenth Amendment did not "respeak" them; they extended their protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

In fact, "speaking" is a particularly inapt metaphor for Lash to choose, when there is *no* textual evidence in the Fourteenth Amendment that it was revising the Bill of Rights.  As the Court explained in *Heller*, constitutional provisions must be given their "normal and ordinary" meaning, which "may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation."[167]

---

[167] 554 U.S. at 576–77.

49

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

Lash is essentially arguing for a secret, unspoken meaning, hidden in the Fourteenth Amendment.

    Fourth, Lash's "reverse incorporation" relies on the Privileges or Immunities Clause of the Fourteenth Amendment to incorporate the provisions of the Bill of Rights against the states. The *Slaughterhouse Cases*[168] relegated the Privileges or Immunities Clause to a relative backwater, and *Cruikshank*[169] declined to use that Clause to incorporate First and Second Amendment rights.  Although there is respectable opinion that regards the Privileges or Immunities Clause as a better vehicle for incorporation than the Fourteenth Amendment Due Process Clause, the Court has refused the invitation to recast its incorporation jurisprudence under the rubric of the Privileges or Immunities Clause.  When counsel proposed during oral argument in *McDonald* that the Privileges or Immunities Clause was the proper vehicle for incorporation, Chief Justice Roberts warned that, "Of course, this argument is contrary to the Slaughter-House Cases, which have been the law for 140 years … it's a heavy burden for you to carry to suggest that we ought to overrule that decision."[170]

    Finally, Lash himself suggests the reason his proposal is unlikely to find acceptance.  He writes that the "1868 respeaking of the Bill of Rights…transforms 'reverse incorporation' from a proposition about equal protection and a single clause of the Fifth Amendment into a proposition about the entire content of the Bill of Rights."[171]  One suspects that the Supreme Court will not want to have the entirety of its Bill of Rights jurisprudence "transformed" retroactively based

---

[168] 83 U.S. at 79.

[169] 92 U.S. at 554–57.

[170] Transcript of Oral Argument at 4, *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ( No. 08-1521).

[171] Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1441–42 (2022).

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

upon an unnecessary, unjustified, and unprecedented reliance on 1868 as the focus for determining meaning and scope of the Bill of Rights.

   B.  *Professor Amar's approach contains similar flaws and his theories have been rejected by Heller.*

Turning to Professor Amar's book,[172] his emphasis on 1868[173] is more subtle and less drastic than the wholesale reverse incorporation proposed by Lash.  Amar proposes a theory of "refined incorporation" that would allegedly reconcile the different approaches to incorporation proposed by Justices Hugo Black, William Brennan, and Felix Frankfurter.[174]  He commends Justice Black's view "that *all* of the privileges and immunities of citizens recognized in the Bill of Rights" are incorporated through the Fourteenth Amendment.[175]  But he does not recognize all of the provisions of the Bill of Rights as "privileges or immunities of citizens," stating that some are more akin to rights of states, and others are "alloyed provisions," part citizen right and part state right, that may have to undergo "refinement and filtration" before their citizen-right elements can be "absorbed" by the Fourteenth Amendment.[176]  He also contends that other provisions of the Bill of Rights may become "less majoritarian and populist, and more libertarian, as they are repackaged in the Fourteenth Amendment as liberal civil rights— 'privileges or immunities' of individuals—rather than republican political 'right[s] of the people' as in the original Bill."[177]  He disagrees with the formulation by Justice Brennan that the key

---

[172] A. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998).

[173] Professor Amar typically refers to 1866, the year the Fourteenth Amendment was drafted and proposed by Congress to the states for ratification.

[174] Amar at xiv.

[175] Amar at xiv (emphasis in original).

[176] *Id.*

[177] *Id.* at xiv-xv.

51

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

question for incorporation is whether the right is "fundamental."[178]  He also disagrees with

Justice Frankfurter's "insistence" that incorporation turned on "abstract conceptions of

'fundamental fairness' and 'ordered liberty' as the sole litmus tests for incorporation."[179]  Thus,

his "refined incorporation" differs in critical respects from the Court's current test, as stated in

*McDonald*: whether the right "is fundamental to our scheme of ordered liberty, or as we have

said in a related context, whether this right is 'deeply rooted in this Nation's history and

tradition.'"[180]

Amar observes that a "particular principle in the Bill of Rights may change its shape in

the process of absorption into the Fourteenth Amendment," that provisions in the Bill of Rights

may be "transformed when they come into contact with the Fourteenth Amendment," and that in

some cases, "the gravitational pull of the Fourteenth Amendment has altered the trajectory of the

original Bill."[181]  This is contrary to *Bruen*'s asseverations that the Constitution's "meaning is

fixed according to the understandings of those who ratified it."[182]

Moreover, Amar's book was written ten years before *Heller* was decided, and his specific

analysis of the Second Amendment rests on foundations that were rejected by *Heller*.  In his

book, Amar spends eighteen pages summarizing his view on "the military amendments" (Second

and Third Amendments) as he thinks they were seen at the time of the Founding.  He writes that:

> As with our First Amendment, the text of the Second is broad enough to protect
> rights of private individuals and discrete minorities; but, as with the First, the
> Second's core concerns are populism and federalism. At heart, the amendment
> reflects a deep anxiety about a potentially abusive federal military….[183]

---

[178] *Id*. at xiv.

[179] *Id.*

[180] 561 U.S. at 767 (citations omitted) (emphasis omitted).

[181] Amar at xv.

[182] 142 S. Ct. at 2132.

[183] Amar at 46.

52

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

He goes on to discuss standing armies and the Founders' distrust of them.  He states unequivocally that "[t]he ultimate right to keep and bear arms belongs to 'the people,' not the states," and that "'the people' at the core of the Second Amendment are the same people at the heart of the Preamble and the First Amendment."[184]  Thus, he recognizes the individual right to arms, but claims that at the time of the Founding protection of such rights was not the main purpose.  Indeed, "to see the un-Reconstructed amendment as primarily concerned with an individual right to hunt or to protect one's home is like viewing the heart of the speech and assembly clauses as the right of persons to meet to play bridge or to have sex."[185]  The contrast between *Heller*'s conclusion that protecting one's home was a central component of the right, and Amar's view, is stark.

Like Lash, he believes that the meaning of the right to keep and bear arms had been transformed by the time of the Fourteenth Amendment.  Originally, the right was "intimately connected with federalism concerns about a federally controlled standing army that might seek to overawe state-organized militias."[186]  He observes that, "By contrast, in 1866, John Bingham, Jacob Howard, Thaddeus Stevens and company were hardly in the mood to rail against a federal standing army; these men, after all, wanted to use precisely such an army to reconstruct recalcitrant southern states."[187]  Furthermore, "the people" in Amar's view corresponded roughly with the militia, and "political rights" such as voting rights, service on juries, and eligibility for public office, were (like service in the militia) largely limited to white males.  But the Privileges

---

[184] Amar at 51.

[185] Amar at 49.

[186] Amar at 216.

[187] *Id*.

53

Electronic copy available at: https://ssrn.com/abstract=4248297

ER-042

**WORKING DRAFT – Subject to change**

or Immunities Clause "spoke of all citizens, pointedly including women and children…."[188]

Thus, the rights protected by the Privileges or Immunities Clause focused on "civil rights," not

"political rights."  Even though the right to keep and bear arms was a paradigmatic "privilege" of

"citizens of the United States," the "right in 1789 and the right in 1866 meant different things,"

according to Amar.[189]

> He concludes:
>
> Indeed, as the Second Amendment illustrates, the very same words "the right…to keep and bear arms" take on a different coloration and nuance when they are relabeled "privileges or immunities of citizens" rather than "the right of the people," and when they are severed from their association with a well-regulated militia.  To recast the textual point as a historical one, the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789.  Mechanical incorporation [Amar's term for due process incorporation as advocated by Justice Black] obscured all this and, indeed, made it easy to forget *that when we "apply" the Bill of Rights against the states today, we must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the Bill of 1789.*[190]

Thus, in a more subtle and less extreme way, Amar agrees with Lash that the time of the

Fourteenth Amendment is more important than the Founding period for determining the meaning

of incorporated provisions of the Bill of Rights.

It is unclear, at best, whether Amar's distinction between 1868's relabeling the right as a

privilege or immunity of citizens, and 1791's the "right of the people" in connection with the

militia, has any continuing relevance in Second Amendment interpretation.  At the time of

Amar's book, the Second Amendment had not been incorporated, and was generally held by

lower courts to relate only to militia service.  The Court's opinion in *Heller* carefully recognized

the role of the citizen militia in the colonies and early Republic, but it accurately determined that

---

[188] *Id.*

[189] Amar at 257.

[190] Amar at 223 (emphasis added).

54

Electronic copy available at: https://ssrn.com/abstract=4248297

the right was an individual right for self-defense as well, the position for which Amar seems to be contending.  Thus, *Heller* may have largely dispelled Amar's concerns about the nature of the right.  Critically, however, these findings in *Heller* did not depend in any way on the understandings of the ratifiers in 1868, but looked to that general time period only as confirmation of the nature of the right as both militia-related and individual, just as it considered some antebellum interpretations as confirmation.

Amar's analysis may be rejected on grounds similar to (though not identical with) those on which Lash's may be rejected:  he relies on the Privileges or Immunities Clause for incorporation; that reliance leads him to differ from the Supreme Court as to what, exactly, is incorporated; and the test for incorporation is different from the Supreme Court's test.  He does not directly address whether the provisions of the Bill of Rights differ in substance when applied against the federal government or against the states, though he seemingly believes that they may be different, stating that it is "[h]arder to understand" Brennan's "insistence that once a provision of the Federal Bill was deemed incorporated, it applied identically in state and federal proceedings."[191] But that question has long ago been resolved by the Court.

So both Lash and Amar would shift the focus to 1868 rather than 1791, though Amar doesn't expressly state, as Lash does, that the 1868 understanding must displace the 1791 understanding.  Gun control proponents will undoubtedly latch on to these positions, as the briefs cited above do, to argue that more extensive restrictions on firearms in 1868 (and no doubt thereafter) as opposed to the Founding are the proper historical analogues when evaluating the constitutionality of present-day gun laws.  But the reasoning behind the approaches of both of these scholars flies in the face of many decades of settled Supreme Court precedent.  The Court

---

[191] Amar at 222.

Electronic copy available at: https://ssrn.com/abstract=4248297

**WORKING DRAFT – Subject to change**

is unlikely to reverse itself on its fundamental incorporation doctrine principles and case law, and the lower courts are bound by those decisions.  The alleged "scholarly dispute" about the proper time for determining the meaning of an incorporated provision of the Bill of Rights really consists of one scholarly dissent and one partial scholarly dissent from Supreme Court jurisprudence that has definitively resolved this issue.

56

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

**CONCLUSION**

The Supreme Court has held that provisions of the Bill of Rights have only a single

meaning, whether applied against the federal government or against the states.  That meaning is

fixed at the time of adoption; that is, in 1791.  What a provision of the Constitution meant then, it

means now, even though circumstances might change.

The three cases cited by the *Bruen* opinion for the "assumption" that 1791 is the critical

period all relied on Founding era history extensively and as an integral part of their analyses.  All

Supreme Court cases that have engaged in historical review of the Second Amendment to

determine its meaning have looked to 1791 as the primary period.  Any examination of later

periods has been done only to confirm the conclusion already reached regarding the original

meaning at the Founding.  As the review in this article of Supreme Court cases construing other

provisions of the Bill of Rights shows, the Founding period is the exclusive period for

determining meaning.  The Supreme Court has never looked to 1868 as the primary period for

determining the meaning of provisions of the Bill of Rights, and its decisions generally do not

even mention that period.  Neither litigants nor the scholars mentioned in the Court's reference to

the "ongoing scholarly debate" have pointed to a single Supreme Court case which determined

the meaning of a provision of the Bill of Rights based primarily on the time of ratification of the

Fourteenth Amendment, and to the exclusion of the 1791 understanding.

The lower court cases cited by litigants in current litigation were either abrogated by

*Bruen* or relied on a mistake (later corrected) in the Seventh Circuit's *Ezell* decision.

Reliance on the ostensible public understanding of the Fourteenth Amendment when it

was ratified—even if such an approach did not contradict existing Supreme Court precedent

regarding the determinative period—is fraught with difficulty.  It is unclear that the ratifiers of

the Fourteenth Amendment thought that they were incorporating all of the first eight

57

Electronic copy available at: https://ssrn.com/abstract=4248297

WORKING DRAFT – Subject to change

amendments against the states.  The Fourteenth Amendment doesn't mention the Bill of Rights, and there were conflicting interpretations at the time regarding what that amendment meant and did.  Most notably, the Supreme Court in the *Slaughterhouse Cases* and the *Cruikshank* case immediately disagreed with what some of the proponents of the Fourteenth Amendment believed to be its effect.  In any event, there is little or no evidence that the ratifiers of the Fourteenth Amendment believed that the Second Amendment meant anything different than it had meant since the Founding.

The "ongoing scholarly debate" about whether 1868 is the proper year amounts to little.  Professor Lash's approach, in addition to being theoretically unsupported, would upset the entire Supreme Court jurisprudence on the Bill of Rights.  Professor Amar's approach has likely been rendered unnecessary by *Heller.*

In short, it can be said with confidence that the Supreme Court will not adopt 1868 as the primary or determinative period for construing the meaning of the Second Amendment or any other provisions of the Bill of Rights.  For that reason, it is inadvisable, to say the least, for the lower courts to look to 1868 --rather than 1791-- when searching for historical analogues to justify modern-day gun control laws.

58

Electronic copy available at: https://ssrn.com/abstract=4248297

**EXHIBIT   2**

# A C T S

PASSED AT A

# General Affembly

OF THE

# COMMONWEALTH

O F

# V I R G I N I A.

BEGUN and held at the PUBLIC BUILDINGS in the CITY
of RICHMOND, on *Monday* the fixteenth Day of *Octo-
ber*, in the Year of our LORD, One Thoufand Seven
Hundred and Eighty-fix.



RICHMOND:

PRINTED BY DIXON, HOLT, NICOLSON AND DAVIES.

fame offenders convicted or not convicted : And the proclamation made and returned, they shall be convict and at-
tainted of the riot, assembly, or rout aforesaid : And moreover the Justices of Peace in every county or corporation,
where such riot, assembly, or rout of people shall be made, in case the same be made in their presence, or if none be
present, then the justices having notice thereof, together with the sheriff, under sheriff, or serjeant, of the same
county or corporation, shall do execution of this act, every one upon pain of twenty pounds, to be paid to the
Commonwealth, as often as they shall be found in default of the execution of the said act ; and on such default of
the justices and sheriff, under sheriff, or serjeant, a commission shall go from the General Court at the instance
of the party grieved, to enquire as well of the truth of the case, and of the original matter for the party complain-
ant, as of the default or defaults of the said justices, sheriff, under sheriff, or serjeant, in this behalf supposed, to be
directed to sufficient and indifferent persons at the nomination of the Judges ; and the said commissioners presently
shall return into the General Court the inquests and matters before them in this behalf taken and found : But no
persons convicted of a riot, rout, and unlawful assembly, shall be imprisoned for such offence by a longer space of
time than one year. Persons legally convicted of a riot, rout, or unlawful assembly, otherwise than in the manner
directed by this act, shall be punished by imprisonment and amercement, at the discretion of a jury, under the
like limitation.

## C H A P.  XLIX.

### *An* ACT *forbidding and punishing* AFFRAYS.

BE it enacted by the General Assembly, That no man, great nor small, of what condition soever he be, except
the Ministers of Justice in executing the precepts of the courts of justice, or in executing of their office, and
such as be in their company assisting them, be so hardy to come before the justices of any court, or either of their
Ministers of Justice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth,
and their bodies to prison, at the pleasure of a court; nor go nor ride armed by night nor by day, in fairs or markets,
or in other places, in terror of the county, upon pain of being arrested and committed to prison by any Justice on his
own view, or proof by others, there to abide for so long a time as a jury, to be sworn for that purpose by the said
Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth; but no person shall be impri-
soned for such offence by a longer space of time than one month.

## C H A P.  L.

### *An* ACT *against* CONSPIRATORS.

BE it declared and enacted by the General Assembly, That conspirators be they that do confederate and bind
themselves by oath, covenant, or other alliance, that every of them shall aid and bear the other falsely and ma-
liciously, to move or cause to be moved any enticement or information against another on the part of the Common-
wealth, and those who are convicted thereof at the suit of the Commonwealth, shall be punished by imprisonment
and amercement, at the discretion of a jury.

## C H A P.  LI.

### *An* ACT *against conveying or taking* PRETENSED TITLES.

BE it enacted by the General Assembly, That no person shall convey or take, or bargain to convey or take, any
pretensed title to any lands or tenements, unless the person conveying or bargaining to convey, or those under
whom he claims shall have been in possession of the same, or of the reversion or remainder thereof one whole year next
before ; and he who offendeth herein knowingly, shall forfeit the whole value of the lands or tenements; the one
moiety to the Commonwealth, and the other to him who will sue as well for the Commonwealth : But
any person lawfully possessed of lands or tenements, or of the reversion or remainder thereof, may nevertheless take
or bargain to take the pretensed title of any other person, so far and so far only as it may confirm his former estate.

## C H A P.  LII.

### *An* ACT *to punish* BRIBERY *and* EXTORTION.

BE it enacted by the General Assembly, That no Treasurer, Keeper of any Public Seal, Councillor of State,
Counsel for the Commonwealth, Judge, or Attornies at law, practising either in the General Court, High Court
of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner,
Escheator, nor any officer of the Commonwealth, shall, in time to come, take, in any form, any manner of
gift, brokage, or reward for doing his office, other than is, or shall be allowed by some act of General Assembly,
passed after the institution of the Commonwealth, that is to say, after the fifteenth day of May, in the year of our
Lord, one thousand seven hundred and seventy six ; and he that doth, shall pay unto the party grieved, the treble value
of that he hath received, shall be amerced and imprisoned at the discretion of a jury, and shall be discharged from his office
forever; and he who will sue in the said matter, shall have suit as well for the Commonwealth as for himself, and the
third part of the amercement.

LLMC DIGITAL

ER-620

# EXHIBIT  3

# CHARLESTON
# LAW REVIEW

Volume 6    Winter 2012    Number 2



*General Issue*

The Contingent Ethics of Market Transactions:   *M. Neil Browne &*
Linking the Regulation of Business to Specific   *Facundo Bouzat*
Forms of Markets

How West Law Was Made: The Company,   *Ross E. Davies*
Its Products, and Its Promotions

How the British Gun Control Program   *David B. Kopel*
Precipitated the American Revolution

Troy Davis, Lawrence Brewer, and Timothy   *Patrick S. Metze*
McVeigh Should Still Be Alive:
Certainty, Innocence, and the High Cost of
Death and Immorality

A Robust Individual Right to Bear Arms   *Katherine L. Record &*
Versus the Public's Health: The Court's   *Lawrence O. Gostin*
Reliance on Firearm Restrictions on the
Mentally Ill

Who Owns the Soul of the Child?:   *Jeffery Shulman*
An Essay on Religious Parenting Rights and
the Enfranchisement of the Child

Electronic copy available at: http://ssrn.com/abstract=1967702

# HOW THE BRITISH GUN CONTROL PROGRAM PRECIPITATED THE AMERICAN REVOLUTION

*David B. Kopel*[*]

I.    FROM THE TEA PARTY TO THE IMPORT BAN ......... 286
      A. The Intolerable Acts..................................... 286
      B. The Powder Alarm ....................................... 291
      C. Disarmament Orders from London ............................ 296
      D. The Import Ban ............................................ 297
II.   COERCIVE DISARMAMENT AND AMERICAN DEFIANCE.................................................. 301
      A. Patrick Henry Calls Virginia to Arms.......................... 302
      B. The Independent Militia Arise .................................. 306
      C. Gun Confiscation at Lexington and Concord .............. 308
III.  THE UNDECLARED WAR TO CONFISCATE ARMS.... 312
      A. Gun Confiscation in Boston ......................................... 312
      B. Declaration of Causes and Necessity of Taking up Arms .............................................................. 317
      C. The Independent Militia Spread ................................. 320
      D. Falmouth Destroyed ................................................. 322
IV.   EPILOGUES.................................................................. 324
V.    SOME LESSONS FOR TODAY ........................................ 326

Understanding the United States Constitution requires understanding the British practices that drove the Americans to armed revolution. For example, Supreme Court Justices have looked at the British government's violation of the right of confrontation,[1] the use of general warrants,[2] unrepresentative

---

[*] Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Kopel is the author of fourteen books and over eighty scholarly journal articles, including the first law school textbook on the Second Amendment. NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY, & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012). This Article is a

283

government as exemplified by taxation without representation,[3] unrepresentative government as exemplified by the grotesquely malapportioned "rotten boroughs" which elected the Members of Parliament,[4] and the violation of the right to trial by jury via use of vice-admiralty courts.[5] Similarly, the enumeration of the right to petition in the First Amendment is in part a result of the Royal Governors denying towns their right to send them petitions of complaint.[6]

As a general rule, Justice Harlan's oft-cited[7] dissenting opinion in *Poe v. Ullman* explained that judges engaged in "the supplying of content" to the constitutional concept of "liberty" should do so "having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke."[8]

Like the First Amendment in the 1930s, the Second Amendment today is at an early stage of judicial exposition. The Supreme Court's decisions in *District of Columbia v. Heller* and

revised and extended version of a portion of the textbook written by Kopel. Kopel's website is http://www.davekopel.org.

Thanks to David Young, Clayton Cramer, Adam Winkler, and readers of the Volokh Conspiracy weblog for helpful suggestions. Any errors are the fault of King George III and his nefarious ministers.

1. *See* Crawford v. Washington, 541 U.S. 36, 47 (2004) ("Controversial examination practices [had been] used in the Colonies.").

2. *See* Henry v. United States, 361 U.S. 98, 101 (1959).

3. *See* Texas v. Johnson, 491 U.S. 397, 435 (1989) (Rehnquist, C.J., dissenting).

4. *See* Wesberry v. Sanders, 376 U.S. 1, 15 (1964).

5. *See* Parklane Hosiery Co. v. Shore, 439 U.S. 322, 340–41 (1979) (Rehnquist, J., dissenting). For background on the vice-admiralty courts, see CARL UBBELHOHDE, THE VICE-ADMIRALTY COURTS AND THE AMERICAN REVOLUTION (1961) (arguing that the Americans overstated the alleged problems with those courts).

6. *See, e.g.*, RICHARD D. BROWN, REVOLUTIONARY POLITICS IN MASSACHUSETTS: THE BOSTON COMMITTEE OF CORRESPONDENCE AND THE TOWNS: 1772–1774, at 57 (1970).

7. *See, e.g.*, Washington v. Glucksburg, 521 U.S. 702, 765 (1997) (Souter, J., concurring); Montana v. Egelhoff, 518 U.S. 37, 74 n.1 (1996) (Souter, J., dissenting); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 847 (1992) (plurality opinion); Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 780 n.10 (1986) (Stevens, J., concurring); Moore v. City of E. Cleveland, 431 U.S. 494, 502 (1977) (plurality opinion).

8. 367 U.S. 497, 542 (1961) (Harlan, J., dissenting).

*British Gun Control*

*McDonald v. City of Chicago* both treated history and tradition as extremely important in determining the legal meaning of the Second Amendment, and its enforcement by the Fourteenth Amendment.[9] Federal courts have differed in exactly how to use history and tradition, but there is little doubt that history and tradition are crucial to resolving modern gun control issues.[10]

This Article chronologically reviews British gun control which precipitated the American Revolution: the 1774 import ban on firearms and gun powder; the 1774–1775 confiscation of firearms and gun powder from individuals and from local governments; and the use of violence to effectuate the confiscations. It was these events which changed a situation of rising political tension into a shooting war.

Each of these British abuses provide insight into the scope of the modern Second Amendment. Although these abuses are not being repeated precisely in their original form, they are examples of a general type of abuse—just as criminal trials of Americans in vice-admiralty courts were one way in which the right to trial by jury could be denied.

From the events of 1774–1775, we can discern that import restrictions or bans on firearms or ammunition are constitutionally suspect—at least if their purpose is to disarm the public, rather than for the normal purposes of import controls (e.g., raising tax revenue, or protecting domestic industry). We can discern that broad attempts to disarm the people of a town,

---

9. District of Columbia v. Heller (*Heller*), 554 U.S. 570 (2008); McDonald v. City of Chicago, 561 U.S. ___, 130 S. Ct. 3020 (2010).

10. *E.g.*, Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011) (describing the "original public meaning as both a starting point and an important constraint on the analysis" of the Second Amendment); Heller v. District of Columbia (*Heller II*), No. 10-7036, 2011 WL 4551558, at *23–27 (D.C. Cir. Oct. 4, 2011) (Kavanaugh, J., dissenting) (arguing that courts should look to history and tradition in assessing the constitutionality of particular gun controls.).

The most complete legal history narrative of the Founding Era and the right to arms is STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS (2008). Many of the original sources cited in this Article are reprinted in THE ORIGIN OF THE SECOND AMENDMENT: A DOCUMENTARY HISTORY OF THE BILL OF RIGHTS IN COMMENTARIES ON LIBERTY, FREE GOVERNMENT AND AN ARMED POPULACE: 1787–1792 (David E. Young ed., 2d ed. 1995).

ER-625

or to render them defenseless, are anathema to the Second Amendment; such disarmament is what the British tried to impose, and what the Americans fought a war to ensure could never again happen in America. Similarly, gun licensing laws that have the purpose or effect of allowing only a minority of the people to keep and bear arms would be unconstitutional. Finally, we see that government violence—which should always be carefully constrained and controlled—should be especially discouraged when it is used to take firearms away from peaceable citizens. Use of the military for law enforcement is particularly odious to the principles upon which the American Revolution was based.

## I. FROM THE TEA PARTY TO THE IMPORT BAN

### A. The Intolerable Acts

In 1773, Parliament enacted the Tea Act, reinforcing a tax which the Americans considered flagrantly unlawful.[11] They believed that taxation without consent was simply theft, for only through a representative legislature could the people consent to taxation.[12]

Moreover, the tea tax was to be used to pay for the support of royal governors and other royal dependents in America, thus

---

11. Tea Act, 13 Geo. 3, c. 44 (1773) (Eng.). The Tea Act was a scheme to get rid of excess tea owned by the British East India Company. The tea tax itself was not new but, rather, was the last remnant of the 1767 Townshend Duties, all of which (except for tea) had been repealed in 1770. While the taxes were supposed to raise some revenue, their essential point was to affirm the principle that Parliament could tax the American colonies without their consent. In the mainstream British view, the Americans had "virtual representation" in Parliament, even though the Americans had not voted to elect any of the Members of Parliament.

12. *E.g.*, *Letters from a Farmer in Pennsylvania to the Inhabitants of the British Colonies*, *in* 2 The Political Writings of John Dickinson 309 (Paul Leicester Ford ed., Philadelphia 1895) (Parliament cannot tax New Yorkers by requiring that the New York legislature pay for the quartering of British soldiers in New York. New Yorkers cannot "be legally taxed but by their own representatives." Therefore, Parliament's suspension of the New York legislature was punishment for what New Yorkers legally had a right to do.). In the American view, Americans could only be taxed by their own colonial legislatures.

making the royal administration entirely dependent on the crown and independent of the people whom it was governing.[13]

The Tea Act required Americans to buy their tea solely from the East India Company, a monopoly created by Parliament.[14] As Americans were well aware, the East India Company had turned itself into the actual government of east India, and there, the Company's irresponsible, ruthless, and inhumane greed had been directly responsible for millions of deaths in the Bengal famine of 1770.[15]

So, to many Americans, the issues were simple: Would the Americans surrender their natural right of self-government—a right guaranteed by the colonial charters? Would they submit to the tea tax—the tip of the spear for the principle that Parliament could tax, govern, and impose its rule without American consent? Would they allow England to press down upon America the corrupt class of royal toadies who would rule America by force, as they did east India? Would they allow England to siphon off the productive wealth of Americans and gladly watch Americans die in order to enhance their own corrupt profits?[16]

Mass opposition by the people of Boston prevented the unloading of three tea ships moored in the Boston harbor.[17] The Royal Governor, Thomas Hutchinson, decided that the ships must be unloaded on December 17, 1773.[18] So on the evening of December 16, about a hundred Bostonians—supported by a crowd of thousands who safeguarded them—disguised themselves with war paint and Indian clothing, boarded the three ships carrying East India Company cargo, and dumped forty-six tons of tea into the water.[19]

---

13. Tea Act, 13 Geo. 3, c. 44 (1773) (Eng.).

14. *Id.*

15. *See generally* BENJAMIN L. CARP, DEFIANCE OF THE PATRIOTS: THE BOSTON TEA PARTY & THE MAKING OF AMERICA (2010).

16. *Id.* at 13–24.

17. ROBERT J. ALLISON, THE AMERICAN REVOLUTION 17 (2011).

18. *Id.*

19. CARP, *supra* note 15, at 13–24. Earlier that day, a meeting of several thousand men from Boston and nearby towns had voted that the tea ships must leave the harbor that day. *Id.*

   Among the participants in the Tea Party was the physician Elisha

Furious about the Boston Tea Party, Parliament in 1774 passed the Coercive Acts, known in the Colonies as the Intolerable Acts.[20] The Acts included several harsh measures:

- The Boston Port Act shut the port of Boston until the damages from the Tea Party were repaid;[21]
- The Massachusetts Government Act put most of the colonial government under the direct control of the crown-appointed Royal Governor appointed by the King, and abolished the rights that had been recognized by the colonial charter.[22] The Act also forbade holding town meetings, a common form of municipal self-government, more than once a year;[23]
- The Administration of Justice Act authorized the Royal Governor to move trials of royal officials outside of Massachusetts[24]—a law that George Washington denounced as the "Murder Act" because he feared it would allow British officials to commit crimes with impunity;[25]
- The Quartering Act authorized the Governors of every colony to designate unoccupied buildings or public accommodations (e.g., inns) for quartering British soldiers.[26] The 1774 Quartering Act was a response to the colonial legislatures' general neglect of their obligation (imposed by Parliament's 1765 Quartering

---

Story. *Id*. at 239. His son, Joseph Story, became one of the greatest Justices of the United States Supreme Court and the preeminent legal scholar of early nineteenth century America. His treatises explained the Second Amendment as an individual right whose main purpose was to deter tyranny and to restore constitutional government in case a tyrant seized power. *See* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359, 1388–97.

20. *The Coercive Acts*, U.S. HIST., http://www.u-s-history.com/pages/ h647.html (last visited Feb. 10, 2012).

21. Port Act, 14 Geo. 3, c. 19, § 1 (1774) (Eng.).

22. *Id.*

23. American Rebellion Act, 14 Geo. 3, c. 45 (1774) (Eng.).

24. *Id.* at c. 39.

25. David L. Ammerman, *The Tea Crisis and Its Consequences through 1775, in* A COMPANION TO THE AMERICAN REVOLUTION 204 (Jack P. Greene & J. R. Pole eds., 2004).

26. Quartering Act, 14 Geo. 3, c. 54 (1774) (Eng.).

*British Gun Control*

Act)[27] to provide quarters for British soldiers in North America. Once the French had been driven out of North America by the 1763 Anglo-American victory in the French and Indian War, the Americans expected the British troops who had been sent to fight the war to be sent back home.[28] Parliament decided to keep the troops in North America after the war ended, and many Americans regarded the presence of a standing army as a plot to intimidate and oppress the colonists;[29]

- The Quebec Act defined the Quebec colony as extending far down into the Allegheny Mountains, thereby negating many American land claims in the West.[30]

The Intolerable Acts were offensive, but it was the possibility that the British might deploy the army to enforce them that primed many colonists for armed resistance. The Patriots of Lancaster County, Pennsylvania, resolved: "[t]hat in the event of Great Britain attempting to force unjust laws upon us by the strength of arms, our cause we leave to heaven and our rifles."[31]

A South Carolina newspaper essay, reprinted in Virginia, urged that any law that had to be enforced by the military was necessarily illegitimate:

> When an Army is sent to enforce <u>Laws</u>, it is always an Evidence that either the Law makers are conscious that they had no clear and indisputable right to make those Laws, or that they are bad [and] oppressive. Wherever the People themselves have had a hand in making Laws, <u>according to the first principles of our Constitution</u> there is no danger of Non-submission, Nor can there be need of an Army to enforce

---

27. Importation Act, 5 Geo. 3, c. 5 (1765) (Eng.) ("An act for punishing mutiny and desertion, and for better payment of the army and their quarters.").

28. AMERICAN MILITARY HISTORY 22 (Brad Lookingbill ed., 2011).

29. *Id.*

30. Quebec Act, 14 Geo 3, c. 83 (1774) (Eng.).

31. Horace Kephart, *The Birth of the American Army*, 98 HARPER'S NEW MONTHLY MAG., Dec. 1898–May 1899, at 963 (quoting the Hanover Resolves (June 4, 1774)).

them.[32]

The Royal Governor of Massachusetts, General Thomas Gage, dispatched the Redcoats to break up an illegal town meeting in Salem.[33] But when large numbers of armed Americans appeared in response, the British retreated.[34] Gage's aide John Andrews explained:

> [T]here was upwards of three thousand men assembled there from the adjacent towns, with full determination to rescue the Committee if they should be sent to prison, Even if they were Oblig'd to repel force by force, being sufficiently provided for such a purpose; as indeed they are all through the country— every male above the age of 16 possessing a firelock with double the quantity of powder and ball enjoin'd by law.[35]

Military rule would be difficult to impose on an armed populace. Gage had only 2,000 troops in Boston.[36] There were thousands of armed men in Boston and more in the surrounding area.[37] One response to the problem was to deprive the Americans of gunpowder.

---

32. William Tennent, Letter to the Editor, *Some of the Blessings of Military Law, or the Insolence of Governor Gage*, S.C. GAZETTE, Aug. 23, 1774, *available at* http://digital.tcl.sc.edu/cdm/compoundobject/collection/wtj/id/320/rec/4 (The letter was published in the South Carolina Gazette, August 23, 1774, under the pseudonym "A Carolinian.").

33. RAY RAPHAEL, A PEOPLE'S HISTORY OF THE AMERICAN REVOLUTION: HOW COMMON PEOPLE SHAPED THE FIGHT FOR INDEPENDENCE 55 (Howard Zinn ed., 2001).

34. *Id*.

35. *Id*. at 44 The essay also argued for the superiority of a well-regulated militia to a standing army, the former being no threat to liberty. *Id.*

36. ROBERT P. RICHMOND, POWDER ALARM: 1774, at 82 (1971).

37. *Id*. at 82–83, 86–87.

290

*British Gun Control*

### B. The Powder Alarm

Modern smokeless gunpowder is stable under most conditions.[38] The black powder of the eighteenth century was far more volatile.[39] Accordingly, large quantities of black powder were often stored in a town's powder house, typically a reinforced brick building.[40] The powder house would hold merchants' reserves—large quantities stored by individuals—as well as powder for use by the local militia.[41] Although colonial laws generally required militiamen (and sometimes every householder, as well) to supply their own firearm and a minimum quantity of powder, not everyone could afford it.[42] Consequently, the government sometimes supplied public arms and powder to individual militiamen.[43] Policies varied on whether militiamen who had been given public arms would keep them at home.[44] Public arms would often be stored in a special armory, which might also be the powder house.[45]

The British became concerned that Massachusetts towns had been withdrawing their gunpowder from the powder houses.[46] Before dawn on September 1, 1774, 260 Redcoats acting on General Gage's order sailed up the Mystic River and seized hundreds of barrels of powder from the Charlestown powder house (next to the present site of Tufts University, in what is now Somerville).[47] The only powder that was left to take belonged to the colonial government, so Gage was within his legal rights to seize it. But the seizure still incensed the public.[48]

The "Powder Alarm," as it became known, was a serious

---

38. Stephen P. Halbrook, *Encroachments of the Crown on the Liberty of the Subject: Pre-Revolutionary Origins of the Second Amendment*, 15 U. DAYTON L. REV. 91, 103 (1989) [hereinafter Halbrook Origins of the Second Amendment].

39. *Id.*

40. *Id.*

41. *Id.*

42. *Id.*

43. *Id.* at 104.

44. *Id.*

45. *Id.*

46. *See* DAVID HACKETT FISCHER, PAUL REVERE'S RIDE 44–51 (1994).

47. *Id.* at 44–45.

48. *Id.* at 45.

CHARLESTON LAW REVIEW                    [Volume 6

provocation. By the end of the day on September 1, 20,000 militiamen had mobilized and started marching toward Boston.[49] In Connecticut and western Massachusetts, rumors quickly spread that the Powder Alarm actually involved fighting in the streets of Boston.[50] More accurate reports reached the militia companies before those militia reached Boston, and so the war did not begin in September.[51] The militia message, though, was unmistakable: if the British used violence to seize arms or powder, the Americans would treat that seizure as an act of war, and the militia would fight. And that is exactly what happened several months later, on April 19, 1775.

The people of Worcester County, Massachusetts, had already been meeting in county convention, with delegates sent by the towns.[52] Five days after the Powder Alarm, on September 6, the militia of the towns of Worcester County assembled on the Worcester Common.[53] Backed by the formidable array, the Worcester Convention took over the reins of government, and ordered the resignations of all militia officers, who had received their commissions from the Royal Governor.[54] The officers promptly resigned, and then received new commissions from the Worcester Convention.[55]

That same day that Worcester County ended all royal authority over the militia, the people of Suffolk County (which includes Boston) assembled and adopted the Suffolk Resolves.[56]

---

49. ALLEN FRENCH, THE DAY OF CONCORD AND LEXINGTON: THE NINETEENTH OF APRIL, 1775, at 19 (1925).

50. BROWN, *supra* note 6, at 225–27.

51. *Id.*

52. *Id.* at 216.

53. *Id.*

54. *Id.*

55. *Id.* at 217. Shortly before the Powder Alarm, Gage had written to Lord Dartmouth, warning that "In Worcester, they keep no Terms, openly threaten Resistance by Arms, preparing them, casting Ball and providing Powder, and threaten to attack any Troops who dare to oppose them." Letter from Gen. Gage to Lord Dartmouth (Aug. 27, 1774), *in* 1 THE CORRESPONDENCE OF GENERAL THOMAS GAGE WITH THE SECRETARIES OF STATE, AND WITH THE WAR OFFICE AND THE TREASURY: 1763–1775, at 366 (Clarence Edwin Carter ed., Archon Books 1969) (1931).

56. Joseph Warren, *The Suffolk Resolves*, AMERICA'S HOME PAGE (Sept. 6, 1774), http://ahp.gatech.edu/suffolk_resolves_1774.html.

292

The nineteen points of political principle, grievance, and plans for action included:

> 9. That the fortifications begun and now carrying on upon Boston Neck[57] are justly alarming to this county, and gives us reason to apprehend some hostile intention against that town, more especially as the commander in chief has, in a very extraordinary manner, removed the powder from the magazine at Charlestown, and has also forbidden the keeper of the magazine at Boston, to deliver out to the owners, the powder, which they had lodged in said magazine . . . .[58]

> 11. That whereas our enemies have flattered themselves that they shall make an easy prey of this numerous, brave and hardy people, from an apprehension that they are unacquainted with military discipline; we, therefore, for the honour, defence and security of this county and province, advise, as it has been recommended to take away all commissions from the officers of the militia, that those who now hold commissions, or such other persons, be elected in each town as officers in the militia, as shall be judged of sufficient capacity for that purpose, and who have evidenced themselves the inflexible friends to the rights of the people; and that the inhabitants of those towns and districts, who are qualified, do use their utmost diligence to acquaint themselves with the art of war as soon as possible, and do, for that purpose, appear under arms at least once every week.[59]

In other words, the people of Suffolk County, aggrieved at the seizure of gun powder, took control of the local militia away from the Royal Governor (by replacing the Governor's appointed officers with officers elected by the militia), and resolved to engage in group practice with arms at least weekly.

The Suffolk Resolves were distributed across the colonies;

---

57. An isthmus connecting Boston to the mainland. The surrounding waters were later filled in by development.

58. Warren, *supra* note 56. According to Richmond, the only powder left on September 1, 1774, belonged to the state government, of which the Royal Governor was the chief executive. RICHMOND, *supra* note 36, at 5. However, the Suffolk Resolves indicate that merchants still had some of their own powder in the Charleston Powder House. *See* Warren, *supra* note 56.

59. Warren, *supra* note 56.

Paul Revere rode them down to the First Continental Congress, which had just assembled in Philadelphia.[60] The Congress unanimously condemned Britain's "wicked ministerial measures," endorsed the course of action that had been adopted by the Suffolk Resolves, and urged all the other colonies to send supplies to help the Bostonians.[61]

Governor Gage directed the Redcoats to begin general, warrantless searches for arms and ammunition.[62] Many of these searches were conducted when people tried to enter Boston by ship, or by the narrow land "neck" which led to the city.[63] Nearby Worcester County sent a complaint to General Gage:

> This county are constrained to observe, they apprehend the people justifiable in providing for their own defence, while they understood there was no passing the neck without examination, the cannon at the north battery spiked up, and many places searched, where arms and ammunition were suspected to be, and if found, seized; yet as the people have never acted offensively, nor discovered any disposition so to do, till as above related, the county apprehend this can never justify the seizure of private property.[64]

According to the *Boston Gazette*, of all General Gage's offenses, "what most irritated the People" was "seizing their Arms and Ammunition."[65]

When the Massachusetts Assembly convened, General Gage declared it illegal, so the representatives reassembled as the "Provincial Congress," with the wealthy merchant John Hancock presiding.[66] On October 26, 1774, the Massachusetts Provincial Congress adopted a resolution condemning military rule and

---

60. RICHMOND, *supra* note 36, at 78.

61. 1 JOURNALS OF THE CONTINENTAL CONGRESS: 1774–1789, at 39 (Washington Chancy Ford ed., 1904) (adopted Sept. 10, 1774). The full text of the Suffolk Resolves was entered in the Congress's official journal. *Id*. at 9–14.

62. RICHMOND, *supra* note 36, at 81–87.

63. *Id*.

64. THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS 645 (1838) (cataloging the Worcester Convention of September 21, 1774).

65. *See* Halbrook Origins of the Second Amendment, *supra* note 38, at 105 (quoting BOS. GAZETTE, Dec. 5, 1774, at 4, col. 1).

66. *Id*. at 104.

*British Gun Control*

criticizing Gage for "unlawfully seizing and retaining large quantities of ammunition in the arsenal at Boston."[67] The Provincial Congress urged all militia companies to organize and elect officers.[68] The new elections would mean removal of officers who had been appointed by the Royal Governor.[69] At least a quarter of the militia (the famous Minute Men) was directed to "equip and hold themselves in readiness to march at the shortest notice."[70] The Provincial Congress further declared:

> That, as the security of the lives, liberties and properties of the inhabitants of this province depends, under Providence, on their knowledge and skill in the art military, and in their being properly and effectually armed and equipped, it is therefore recommended, [if any of the inhabitants have not provided themselves with arms and ammunition according to law,] that they immediately provide themselves therewith; and [that] they use their utmost diligence to perfect themselves in military skill . . . .[71]

That is, everyone who did not already have a gun should get one, and start practicing with it diligently. So as one historian put it, "one of the anxieties of every citizen was to get a good gun and keep in repair."[72]

In flagrant defiance of royal authority, the Provincial Congress appointed a Committee of Safety and vested it with the power to call forth the militia.[73] The militia of Massachusetts no longer answered to the British government. It was now the instrument of what was becoming an independent government of Massachusetts.

---

67. THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS 31 (1838) (detailing the First Provincial Congress of Massachusetts on October 26, 1774).

68. *Id*. at 33.

69. *Id*.

70. *Id*.

71. *Id*. at 34.

72. FRENCH, *supra* note 49, at 24.

73. BERNHARD KNOLLENBERG, GROWTH OF THE AMERICAN REVOLUTION: 1766–1775, at 219–21 (1975).

ER-656

### C. Disarmament Orders from London

Information traveled across the Atlantic at the speed of a sailing ship. The average trip was two months, so it is unknown precisely when the British government learned of the Powder Alarm and the American response. But we do know that the British government generally approved of Gage's policies. Lord Dartmouth, the royal Secretary of State for America, sent Gage a letter on October 17, 1774, urging him to disarm New England, to the extent reasonably possible:

> Amongst other things which have occurred on the present occasion as likely to prevent the fatal consequence of having recourse to the sword, that of disarming the Inhabitants of the Massachusetts Bay, Connecticut and Rhode Island, has been suggested. Whether such a Measure was ever practicable, or whether it can be attempted in the present state of things you must be the best judge; but it certainly is a Measure of such a nature as ought not to be adopted without almost a certainty of success, and therefore I only throw it out for your consideration.[74]

Gage received Dartmouth's letter on December 3.[75] His reply explained that the only way to take guns away from the Americans would be to use force: "Your Lordship's Idea of disarming certain Provinces would doubtless be consistent with Prudence and Safety, but it neither is nor has been practicable without having Recourse to Force, and being Masters of the Country."[76]

Gage's letter was made public by a reading in the British House of Commons.[77] It was then picked up and publicized in

---

74. Letter from Lord Dartmouth to Gen. Gage (Oct. 17, 1774), *in* 2 THE CORRESPONDENCE OF GENERAL THOMAS GAGE WITH THE SECRETARIES OF STATE, AND WITH THE WAR OFFICE AND THE TREASURY: 1763–1775, at 175 (Clarence Edwin Carter ed., Archon Books 1969) (1933).

75. Letter from Gen. Gage to Lord Dartmouth (Dec. 15, 1774), *in* 1 THE CORRESPONDENCE OF GENERAL THOMAS GAGE WITH THE SECRETARIES OF STATE, AND WITH THE WAR OFFICE AND THE TREASURY: 1763–1775, at 386 (Clarence Edwin Carter ed., Archon Books 1969) (1931).

76. *Id.* at 387.

77. 18 WILLIAM COBBETT, THE PARLIAMENTARY HISTORY OF ENGLAND, FROM THE EARLIEST PERIOD TO THE YEAR 1803, at 106 (London, T.C. Hansard,

America as proof of Britain's malign intentions.[78]

### D. The Import Ban

Two days after Lord Dartmouth dispatched his disarmament recommendation to General Gage, King George III and his ministers blocked importation of arms and ammunition to America.[79] The six-month decree was repeatedly renewed, remaining in effect until the Anglo-American peace treaty in 1783.[80]

Read literally, the order only required a government permit to export arms or ammunition from Great Britain to America. In practice, no permits were granted. The Crown sent orders to the colonial governors (via Gage, for distribution), and to the British navy, to immediately block all arms and ammunition shipments

---

Peterborough-Court, Fleet-Street 1813).

78. *See* 1 Mercy Otis Warren, History of the Rise, Progress and Termination of the American Revolution 159 (Lester H. Cohen ed., Liberty Fund 1994) (1805).

79. The proclamation imposing the ban stated:

And His Majesty judging it necessary to prohibit the Exportation of Gunpowder, or any sort of Arms or Ammunition, out of this Kingdom, doth therefore, with the advice of his Privy Council, hereby order, require, prohibit and command that no Person or Persons Whatsoever (except the Master General of the Ordnance for his Majesty's Service) do, at any time during the space of Six Months from the date of this Order in Council, presume to transport into any parts out of this Kingdom, or carry coastways any Gunpowder, or any sort of Arms or Ammunition, on board any Ship or Vessel, in order to transporting the same to any part beyond the Seas or carrying the same coastways, without Leave and Permission in that behalf, first obtained from his Majesty or his Privy Council, upon Pain of incurring and suffering the respective Forfeitures and Penalties inflicted by the aforementioned Act . . . .

5 Acts Privy Council 401, *in* Brief of the National Shooting Sports Foundation, Inc., as Amicus Curiae in Support of Respondent at 13–14 n.31, *Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008) (No. 07-290) [hereinafter Brief in Support of Respondent], *available at* http://rkba.org/judicial/heller/07-290_ RespondentAm CuNSSFound.pdf. The proclamation was based on the powers specified in 29 Geo. 2, c. 16 (Eng.).

80. James Truslow Adams, Revolutionary New England: 1691–1776, at 412 (1923).

297

into the thirteen colonies.[81]

Letters from other British officials sent along with the orders raised concerns about the thriving illegal (from the British perspective) arms trade between North America and the Netherlands.[82] The concerns were well founded. Benjamin Franklin was masterminding the import of arms and ammunition from the Netherlands, France, and Spain.[83]

The Boston Committee of Correspondence[84] learned of the arms embargo, and promptly dispatched Paul Revere to New Hampshire, with the warning that two British ships were headed to Fort William and Mary, near Portsmouth, New Hampshire, to seize firearms, cannons, and gunpowder.[85] On December 14, 1774, four hundred New Hampshire patriots preemptively captured all the material at the fort.[86] A New Hampshire newspaper argued that the capture was prudent and proper, reminding readers that the ancient Carthaginians had consented to "deliver up all their Arms to the Romans," and were decimated by the Romans soon after.[87] The parallels with America seemed

---

81. KNOLLENBERG, *supra* note 73, at 204–05.

82. *E.g.*, Letter from Lord Dartmouth to Gen. Gage (Oct. 19, 1774), *in* 2 THE CORRESPONDENCE OF GENERAL THOMAS GAGE WITH THE SECRETARIES OF STATE, AND WITH THE WAR OFFICE AND THE TREASURY: 1763–1775, at 176–77 (Clarence Edwin Carter ed., Archon Books 1969) (1933).

83. RICHMOND, *supra* note 36, at 95.

84. Historically in the colonies, Committees of Correspondence had been informal organizations that took over some of the functions of local government when the formal government was unable to function properly, or was hostile to the public will. A common function was to organize public objection or action against a problem, or a threat to liberty. In response to rising tensions with Great Britain, a Boston town meeting in 1772 created Committee of Correspondence, consisting of twenty-one men. Similar committees formed in other colonies. *See generally* BROWN, *supra* note 6.

85. *Id.*

86. ADAMS, *supra* note 80, at 412.

87. Halbrook Origins of the Second Amendment, *supra* note 38, at 110 (1989) (quoting N.H. GAZETTE & HIST. CHRON., Jan. 13, 1775, at 1, col. 1, *available at* http://www.guncite.com/journals/Rev-hal.html). In 149 B.C., the Romans ordered the conquered Carthaginians to surrender all their weapons. 1 DAVID DEMING, SCIENCE AND TECHNOLOGY IN WORLD HISTORY: THE ANCIENT WORLD AND CLASSICAL CIVILIZATION 156 (2010). Once the Carthaginians did so, the Roman destroyed the city and slaughtered approximately ninety percent of the inhabitants. *Id.*

plain:

> Could they [the Ministry] not have given up their Plan for
> enslaving *America* without seizing . . . all the Arms and
> Ammunition? and without soliciting and finally obtaining an
> Order to prohibit the Importation of warlike Stores in the
> Colonies? . . . And shall we like the *Carthaginians*, peaceably
> surrender our Arms to our Enemies, in Hopes of obtaining in
> Return the Liberties we have so long been contending for?
>
> . . . .
>
> I . . . hope that no person will, at this important Crisis, be
> unprepared to act in his own defence, should he, by necessity,
> be driven thereto. And I must here beg leave to recommend
> consideration to the people on this Continent, whether, when
> we are by an arbitrary decree prohibited the having Arms and
> Ammunition by importation, we have not by the law of self-
> preservation, a right to seize upon all those within our power,
> in order to defend the liberties which God and Nature have
> given us.[88]

Edmund Burke, the intellectual founder of conservative
political thought, was among the minority of Members of
Parliament who urged accommodation of American concerns.[89]
He introduced the "Speech on Conciliation with the Colonies,"
which proposed to stop British taxation of domestic commerce in
the thirteen colonies.[90] Speaking in support of the Resolutions,
Burke compared the attempt to disarm America with the
previous disarmament of the Welsh:

> Sir, during that state of things, Parliament was not idle. They
> attempted to subdue the fierce spirit of the Welsh by all sorts
> of rigorous laws. They prohibited by statute the sending all
> sorts of arms into Wales, as you prohibit by proclamation (with
> something more of doubt on the legality) the sending arms to

---

88. *A Watchman*, N.H. Gazette & Hist. Chron., Jan. 13, 1775, at 1,
*reprinted in* 1 American Archives, 4th ser. 1064–65 (Peter Force ed.,
Washington, D.C. 1846).

89. Speech on Moving His Resolution for Conciliation Colonies (Mar. 22,
1775), *in* Edmund Burke: Selected Writings and Speeches 180–222 (Peter J.
Stanlis ed., 1963).

90. *Id.*

ER-689

America. They disarmed the Welsh by statute, as you attempted (but still with more question on the legality) to disarm New England by an instruction.[91]

Another moderate, the Duke of Manchester, "cautioned the House to proceed with deliberation, as America had now three millions of people, and most of them were trained to arms, and he was certain they could now produce a stronger army than Great-Britain."[92]

The British government, however, was in no mood for conciliation. The October-November 1774 elections for the House of Commons had strengthened the ruling Tories so that they could ignore the Whigs' opposition to Tory determination to subdue America speedily and by force.[93]

The Massachusetts Provincial Congress took steps to accelerate domestic arms manufacture. The Congress offered to purchase "so many effective arms and bayonets as can be delivered in a reasonable time upon notice given to this congress at its next session."[94] Massachusetts also urged American

91. *Id.* at 208. Burke was probably referring to the Penal Laws against Wales which were enacted by Parliament in response to the Welsh Revolt (1400–15), led by Owain Glyndŵr (in English, Owen Glendower). The laws were little enforced after 1440, and are widely thought to have been repealed by the Laws in Wales Acts (1535 and 1542). However, formal repeal was not accomplished until 1624. 4 & 5 Jac. 1, c. 1 (1624) (Eng.); 21 Jac. 1, c. 10, 28 (1624) (Eng.). Similar laws were imposed at various times against Ireland and against Scotland, for the purpose of suppressing national independence movements. *See, e.g., Heller*, 554 U.S. at ___, 128 S. Ct. 2783, 2795 n.10 (describing laws to disarm the Scottish Highlanders); An Act for the Better Securing the Government, by Disarming Papists, 7 Will. 3, c. 5 (1695) (Eng.) (stating that no Irish Catholics may have arms, or ammunition, or be instructed in how to manufacture them; all Irish Catholic homes may be searched for arms); An Act for the Preservation of the Game, 10 Will. 3, c. 8 (1698) (Eng.) ("No papist shall be employed as a fowler for any protestant, or under colour thereof keep fire arms."); An Act to Explain, Amend, and Make More Effectual an Act . . . Disarming Papists, 13 Geo. 2, c. 6 (1739) (Eng.) (stating that justices of the peace, magistrates, and other local officials must conduct annual searches for Irish Catholic arms).

92. Brief in Support of Respondent, *supra* note 79, at 12  n.28 (quoting PA. REP., April 17, 1775, at 2, col. 3).

93. THOMAS WRIGHT, CARICATURE HISTORY OF THE GEORGES 332–33 (London, John Camden Hotten, Piccadilly 1860).

94. 2 WILLIAM VINCENT WELLS, THE LIFE AND PUBLIC SERVICES OF SAMUEL ADAMS 273 (Boston, Little, Brown, & Co, 1865).

300

gunsmiths and other "such persons as are skilled in the manufacturing of firearms and bayonets, diligently to apply themselves thereto, for supplying such of the inhabitants as may still be deficient."[95] A few weeks earlier, the Congress had resolved: "That it be recommended . . . to all the inhabitants of this Colony, that they be diligently attentive in learning the use of arms . . . ."[96]

## II. COERCIVE DISARMAMENT AND AMERICAN DEFIANCE

The ideology underlying all forms of American resistance to British usurpations and infringements was explicitly premised on the right of self-defense of all inalienable rights; from the self-defense foundation was constructed a political theory in which the people were the masters and government the servant, so that the people have the right to remove a disobedient servant. The philosophy was not novel, but was directly derived from political and legal philosophers such as John Locke, Hugo Grotius, and Edward Coke.[97]

The British government was not, in a purely formal sense, attempting to abolish the Americans' common law right of self-defense. Yet in practice, that was precisely what the British were attempting. First, by disarming the Americans, the British were attempting to make the practical exercise of the right of personal self-defense much more difficult. Second, and more fundamentally, the Americans made no distinction between self-defense against a lone criminal or against a criminal government.[98] To the Americans (and to their British Whig

95. THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS 103 (William Lincoln ed., Boston, Dutton & Wentworth 1838).

96. Resolution of the Continental Congress (Jan. 17, 1775), *reprinted in* DANIEL R. GOODLOE, THE BIRTH OF THE REPUBLIC 331 (Chicago, New York, & San Francisco, Belford, Clarke & Co. 1889).

97. *See, e.g.*, BROWN, *supra* note 6, at 68–74 (1976) (explaining the Boston Committee of Correspondence's first letter to the other towns in Massachusetts in these terms); David B. Kopel et al., *The Human Right of Self-Defense*, 22 BYU J. PUB. L. 43 (2008) (explaining personal self-defense as the foundation of the political philosophy of Grotius, Puffendorf, Vattel, Burlamaqui, and other European scholars on whom the Americans relied).

98. *See* Don B. Kates, *The Second Amendment and the Ideology of Self-*

ancestors), the right of self-defense necessarily implied the right of armed self-defense against tyranny.

### A. Patrick Henry Calls Virginia to Arms

The troubles in New England inflamed the other colonies. The day after Burke proposed his "Resolutions for Conciliation with America" to Parliament, the Virginia legislature witnessed one of the most famous speeches of the Revolution.[99] The Virginia House of Burgesses was meeting as a special Convention in Richmond, because the Royal Governor, Lord Dunmore, had suspended the Virginia Assembly.[100]

Patrick Henry's great speech to the convention on March 23, 1775, used an escalating series of rhetorical questions, climaxed by a call to arms.[101] Although there is no extant text of Henry's speech, the version that became well-known by succeeding generations was compiled by U.S. Attorney General (1817–29) William Wirt in his biography *Sketches of the Life and Character of Patrick Henry*.[102] He explained that the British plainly meant

---

*Protection*, 9 CONST. COMMENT 96 (1992).

    99. WILLIAM S. WIRT, SKETCHES OF THE LIFE AND CHARACTER OF PATRICK HENRY 121–23 (Philadelphia, James Webster 1817).

    100. *Id*. at 113–14.

    101. *Id*. at 121–23.

    102. *Id*. Patrick Henry was an Anglican, but his Presbyterian mother often took him to hear the brilliant Virginia Presbyterian minister Samuel Davies, who directly influenced Henry on the necessity of manly resistance to tyranny, and whose evangelical, emotional, dramatic, and direct style of preaching greatly influenced Henry's oratory as a lawyer and then as a politician. *See* HENRY MAYER, A SON OF THUNDER: PATRICK HENRY AND THE AMERICAN REVOLUTION 36–39 (1991). For example, during the French & Indian War, Davies had preached:

> Must peace then be maintained? Maintained with our perfidious and cruel invaders? Maintained at the expense of property, liberty, life, and everything dear and valuable? Maintained when it is in our power to vindicate our right and do ourselves justice? Is the word of peace then our only business? No; in such a time even the God of Peace proclaims by His providence, "To arms!"

Samuel Davies, The Curse of Cowardice, Sermon Before the Militia of Hanover County, Virginia (May 8, 1758), *in* ON FAITH AND FREE GOVERNMENT 93 (Daniel C. Palm ed., 1997).

*British Gun Control*

to subjugate America by force of arms.[103] Every attempt by the Americans at peaceful reconciliation had been rebuffed.[104] The only remaining alternatives for the Americans were to accept slavery or to take up arms.[105] If the Americans did not act soon, the British would soon disarm them, and all hope would be lost.[106] The numerous Americans in their vast land, "armed in the holy cause of liberty," would be invincible:

> I ask gentlemen, sir, what means this martial array if its purpose be not to force us to submission? Can gentlemen assign any other possible motive for it? Has Great Britain any enemy, in this quarter of the world to call for all this accumulation of navies and armies? No, sir, she has none. They are meant for us: they can be meant for no other. They are sent over to bind and rivet upon us those chains which the British ministry have been so long forging.

> Sir, we have done everything that could be done to avert the storm which is now coming on. We have petitioned—we have remonstrated—we have supplicated—we have prostrated ourselves before the throne, and have implored its interposition to arrest the tyrannical hands of the ministry and Parliament. Our petitions have been slighted; our remonstrances have produced additional violence and insult; our supplications have been disregarded; and we have been spurned, with contempt, from the foot of the throne!

> In vain, after these things, may we indulge the fond hope of peace and reconciliation. There is no longer any room for hope. If we wish to be free—if we mean to preserve inviolate those inestimable privileges for which we have been so long contending—if we mean not basely to abandon the noble struggle in which we have been so long engaged, and which we have pledged ourselves never to abandon until the glorious object of our contest shall be obtained—we must fight! I repeat it, sir, we must fight! An appeal to arms and to the God of Hosts is all that is left us!

---

103. WIRT, *supra* note 99, at 121–23.
104. *Id.*
105. *Id.*
106. *Id.*

They tell us, sir, that we are weak—unable to cope with so formidable an adversary. But when shall we be stronger? Will it be the next week, or the next year? Will it be when we are totally disarmed, and when a British guard shall be stationed in every house? Shall we gather strength by irresolution and inaction? Shall we acquire the means of effectual resistance by lying supinely on our backs, and hugging the delusive phantom of Hope, until our enemies shall have bound us hand and foot?

Sir, we are not weak, if we make a proper use of those means which the God of nature hath placed in our power. Three millions of people, armed in the holy cause of liberty, and in such a country as that which we possess, are invincible by any force which our enemy can send against us.

Besides, sir, we shall not fight our battles alone. There is a just God who presides over the destinies of nations, and who will raise up friends to fight our battles for us. The battle, sir, is not to the strong alone; it is to the vigilant, the active, the brave. Besides, sir, we have no election. If we were base enough to desire it, it is now too late to retire from the contest. There is no retreat but in submission and slavery! Our chains are forged, Their clanking may be heard on the plains of Boston! The war is inevitable—and let it come! I repeat it, sir, let it come!

It is in vain, sir, to extenuate the matter. Gentlemen may cry, Peace, Peace—but there is no peace. The war is actually begun. The next gale that sweeps from the north will bring to our ears the clash of resounding arms! Our brethren are already in the field! Why stand we here idle? What is it that gentlemen wish? What would they have? Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty, or give me death![107]

The Convention adopted various resolutions proposed by Henry, including: "That a well regulated Militia, composed of Gentlemen and Yeomen, is the natural Strength, and only

---

107. Patrick Henry, Liberty or Death, Speech at the Second Revolutionary Convention of Virginia (Mar. 23, 1775), *available at* http://patrickhenrycenter. com/speeches.aspx.

*British Gun Control*

Security, of a free Government."[108] In contrast, a standing army is "always subversive of the quiet, and dangerous to the liberties of the people."[109] A well-regulated militia would "secure our inestimable rights and liberties from those further violations with which they are threatened."[110]

The Convention formed a committee—including Patrick Henry, Richard Henry Lee, George Washington, and Thomas Jefferson—"to prepare a plan for the embodying, arming, and disciplining such a number of men as may be sufficient" to defend the commonwealth.[111] The Convention urged "that every Man be provided with a good Rifle" and "that every Horseman be provided . . . with Pistols and Holsters, a Carbine, or other Firelock."[112] When the Virginia militiamen assembled a few weeks later, many wore canvas hunting shirts adorned with the motto "Liberty or Death."[113]

In South Carolina, patriots established a government, headed by the "General Committee."[114] According to the Committee:

> [B]y the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them; it was therefore recommended, to all persons, to provide themselves immediately, with at least twelve and a half rounds of powder, with a proportionate quantity of bullets.[115]

---

108.  WIRT, *supra* note 99, at 116.

109.  *Id.*

110.  L. CARROLL JUDSON, BIOGRAPHY OF THE SIGNERS OF THE DECLARATION OF INDEPENDENCE: AND OF WASHINGTON AND PATRICK HENRY 255 (Philadelphia, J. Dobson, & Thomas, Coperthwait & Co. 1839).

111.  J.N. BRENAMAN, A HISTORY OF VIRGINIA CONVENTIONS 19 (1902) (quoting resolutions proposed by Patrick Henry).

112.  WIRT, *supra* note 99, at 145.

113.  MAYER, *supra* note 102, at 251.

114.  JOHN DRAYTON, EYEWITNESS ACCOUNTS OF THE AMERICAN REVOLUTION: MEMOIRS OF THE AMERICAN REVOLUTION AS RELATING TO THE STATE OF SOUTH CAROLINA 166 (1969)

115.  *Id.* (internal quotations omitted).

### B. The Independent Militia Arise

Americans no longer recognized the royal governors as the legitimate commanders-in-chief of the militia.[116] As noted above, Worcester County, Massachusetts, and the Massachusetts Provincial Congress had acted first, in September 1774, by terminating the commissions of all royally-appointed militia officers and providing officers chosen by the people.[117]

The First Continental Congress, assembling that same month, soon learned what Massachusetts had done.[118] Congress's plan was to urge a complete economic boycott of trade with Great Britain.[119] But what if the boycott failed to solve the problem? Virginia's Patrick Henry and Richard Henry Lee introduced a resolution urging mobilization of the militia and preparation for war, since "America is not Now in a State of Peace."[120] With some changes in wording to soften the language (such as putting it in the subjunctive tense, thereby making it less direct), the resolution was adopted by the unanimous vote of all the colonies' delegations.[121] However, the message that Congress sent to the American people in October did not mention the militia, but simply set forth the details of the boycott, and announced the formation of the Continental Association (comprised of the colonies' governments) to coordinate the boycott.[122]

So without formal legal authorization, Americans began to form independent militia, outside the traditional chain of command of the royal governors. In Virginia, George Washington and George Mason organized the Fairfax Independent Militia Company.[123] Other independent militia embodied in Virginia

---

116. BROWN, *supra* note 6, at 216.
117. *Id.*
118. MAYER, *supra* note 102, at 223–27; 1 JOURNALS OF THE AMERICAN CONGRESS: FROM 1774 TO 1788, at 23–26 (Washington, D.C., Way & Gideon 1823).
119. MAYER, *supra* note 102, at 223–27.
120. *Id.* at 223.
121. *Id.* at 223–27.
122. *Id.* at 226.
123. *Id.* at 242.

2012]                                British Gun Control

along the same model.[124] The volunteer militiamen pledged that "we will, each of us, constantly keep by us" a firelock, "six pounds of Gunpowder [and] twenty pounds of Lead."[125]

In 1775, George Mason drafted the *Fairfax County Militia Plan for Embodying the People*.[126] The *Plan* affirmed that "a well regulated Militia, composed of the Gentlemen, Freeholders, and other Freemen" was needed to defend "our ancient Laws & Liberty" from the Redcoats.[127]

> And we do each of us, for ourselves respectively, promise and engage to keep a good Fire-lock in proper Order, & to furnish Ourselves as soon as possible with, & always keep by us, one Pound of Gunpowder, four Pounds of Lead, one Dozen Gun Flints, & a pair of Bullet-Moulds, with a Cartouch Box, or powder-horn, and Bag for Balls.[128]

Later, in *Remarks on Annual Elections for the Fairfax Independent Company*, Mason explained that "all men are by nature born equally free and independent."[129] Because government creates "the most arbitrary and despotic powers this day upon earth," liberty can only be protected by "frequently appealing to the body of the people."[130] Roman history, argued Mason, showed that freedom could not be maintained if the government relied on mercenaries.[131] Rather, the people must be taught "the use of arms and discipline" so they can "act in defence of their invaded liberty."[132]

Independent militia also formed in Connecticut, Rhode Island, New Hampshire, Maryland, and South Carolina.[133] They chose their own officers and rejected the authority of officers who

---

124. *See generally* E.M. SANCHEZ-SAAVEDRA, A GUIDE TO VIRGINIA MILITARY ORGANIZATIONS IN THE AMERICAN REVOLUTION: 1774–1787 (1978).
125. 1 THE PAPERS OF GEORGE MASON 211 (Robert A. Rutland ed., 1970).
126. *Id*. at 215.
127. *Id*.
128. *Id*. at 216.
129. *Id*. at 229.
130. *Id*. at 230.
131. *Id*.
132. *Id*. at 229.
133. KNOLLENBERG, *supra* note 73, at 214–16.

had been appointed by the royal governors.[134]

John Adams firmly defended the newly constituted Massachusetts militia:

> "The new-fangled militia," as the specious Mass-achusettensis[135] calls it, is such a militia as he never saw. They are commanded through the province, not by men who procured their commissions from a governor as a reward for making themselves pimps to his tools, and by discovering a hatred of the people but by gentlemen whose estates, abilities and benevolence have rendered them the delight of the soldiers . . . . [I]n a land war, this continent might defend itself against all the world.[136]

### C. Gun Confiscation at Lexington and Concord

The American War of Independence—as it was commonly called at the time—began on April 19, 1775, when 700 Redcoats under the command of Major John Pitcairn left Boston to seize American arms at Lexington and Concord.

The militia that assembled at the Lexington Green and the Concord Bridge consisted of able-bodied men aged sixteen to sixty.[137] They supplied their own firearms, although a few poor men had to borrow a gun.[138] Warned by Paul Revere and Samuel Dawes of the British advance, the young women of Lexington assembled cartridges late into the evening of April 18.[139]

At dawn, the 700 British regulars confronted about 200

---

134. *Id*.

135. The young Loyalist lawyer Daniel Leonard, who wrote a series of anti-revolution essays in the *Massachusetts Gazette* and *Boston Post-Boy* in 1774–1775.

136. Letter from Novanglus to the Inhabitants of the Colony of Massachusetts Bay (Feb. 6, 1775), *republished in* JOHN ADAMS & JONATHAN SEWALL, NOVANGLUS AND MASSACHUSETTENSIS; OR POLITICAL ESSAYS, PUBLISHED IN THE YEARS 1774 AND 1775, ON THE PRINCIPAL POINTS OF CONTROVERSY, BETWEEN GREAT BRITAIN AND HER COLONIES 32 (Applewood Books 2009) (1819).

137. ROBERT A. GROSS, THE MINUTEMEN AND THEIR WORLD 61, 70 (1976).

138. *Id*. at 61–70. The Lexington militia included at least one black man. DENNIS FRADIN, SAMUEL ADAMS 110 (1998); ALICE HINKLE, PRINCE ESTABROOK: SLAVE AND SOLDIER 25–30 (2001). He was freed after serving in the Continental Army. *Id*.

139. GROSS, *supra* note 137, at 61–70.

*British Gun Control*

militiamen at Lexington. "Disperse you Rebels—Damn you, throw down your Arms and disperse!" ordered Major Pitcairn.[140] American folklore remembers the perhaps apocryphal words of militia commander Captain John Parker: "Don't fire unless fired upon! But if they want to have a war, let it begin here!"[141] It does seem to have been the established American policy to put the onus of firing first on the British. Yet someone pulled a trigger, and although the gun did not go off, the sight of the powder flash in the firing pan instantly prompted the Redcoats to mass fire.[142] The Americans were quickly routed.[143]

With "huzzah" of victory, the Redcoats marched on to Concord, where one of Gage's spies had told him that the largest Patriot reserve of gunpowder was stored.[144] By one account, the first man in Concord to assemble after the sounding of the alarm was the Reverend William Emerson, gun in hand.[145]

At Concord's North Bridge, the town militia met with some of the British force, and after a battle of two or three minutes, drove off the British.[146] As the Reverend's grandson, Ralph Waldo Emerson, later recounted:

> By the rude bridge that arched the flood,
> Their flag to April's breeze unfurled,
> Here once the embattled farmers stood,
> And fired the shot heard round the world.[147]

Notwithstanding the setback at the bridge, the Redcoats had sufficient force to search the town for arms and ammunition. But

---

140. *See* Halbrook Origins of the Second Amendment, *supra* note 38, at 112.

141. FISCHER, *supra* note 46, at 189.

142. *Id*. at 191–97.

143. *See* Halbrook Origins of the Second Amendment, *supra* note 38, at 112; FRENCH, *supra* note 49, at 98 n.5, 106–13, 118–23. Parker's musket today hangs in the chamber of the Massachusetts Senate. A trigger lock was attached to the musket in 1998 under a gun control law enacted that year. The next year, the legislature repealed the trigger lock mandate for antique firearms, and the trigger lock was removed. Act of July 23, 1998, ch. 180, 1998 Mass. Acts, *amended by* Act of March 5, 1999, ch. 1, § 4 1999 Mass. Acts.

144. FRENCH, *supra* note 49, at 59.

145. *Id*. at 150.

146. *Id*. at 164.

147. RALPH WALDO EMERSON, *Hymn: Sung at the Completion of the Concord Monument*, *in* COLLECTED POEMS AND TRANSLATIONS 125 (1994).

the main powder stores at Concord had been hauled to safety before the Redcoats arrived.[148]

When the British began to withdraw back to Boston, things got much worse for them. Armed Americans were swarming in from nearby towns. They would soon outnumber the British two-to-one.[149] Although some of the Americans cohered in militia units operating under a unified command, a great many of them fought on their own, taking sniper positions at whatever opportunity presented itself.[150] Rather than fight in open fields, like European soldiers, the Americans hid behind natural barriers, fired from ambush positions, and harried the Redcoats all the way back to Boston.[151] Only British reinforcements dispatched from Boston saved the British expedition from annihilation—and the fact that the Americans started running out of ammunition and gun powder.[152]

One British officer complained that the Americans acted like "rascals" and fought as "concealed villains" with "the cowardly disposition . . . to murder us all."[153] One British officer reported: "These fellows were generally good marksmen, and many of them used long guns made for Duck-Shooting."[154]

British Lieutenant-General Hugh Percy, who had led the rescue of the beleaguered expeditionary force, recounted:

> Whoever looks upon them as an irregular mob, will find himself much mistaken. They have men amongst them who

---

148. Henry J. Sage, *The American Revolution 1775–1777*, ACAD. AM. (2010), http://www.academicamerican.com/revolution/topics/Amrev1775-1777.html.

149. *Id.*

150. FRENCH, *supra* note 49, at 220.

151. *Id.* at 220–70.

152. *Id.* The British expedition was well aware as they marched towards Lexington that the Americans were getting ready to fight. *Id.* Thanks to warnings from Paul Revere and William Dawes, the word had been spread that the British were coming. *Id.* The news was further disseminated by the ringing of church bells, and firing of guns as a signal alarm. *Id.* The sounds of the American guns and bells evidently led Pitcarin to send a request for reinforcements, as the number of armed Americans in the area was far larger than Pitcarin's force, or, indeed, the entire British army stationed in Boston.

153. GROSS, *supra* note 137, at 129.

154. FREDERICK MACKENZIE, A BRITISH FUSILIER IN REVOLUTIONARY BOSTON 67 (Allen French ed., 1926) (quoting an unnamed officer).

*British Gun Control*

> know very well what they are about, having been employed as Rangers [against] the Indians & Canadians, & this country being much [covered with] wood, and hilly, is very advantageous for their method of fighting.
>
> Nor are several of their men void of a spirit of enthusiasm, as we experienced yesterday, for many of them concealed themselves in houses, & advanced within [ten yards] to fire at me & other officers, tho' they were morally certain of being put to death themselves in an instant.[155]

Among the American fighters that day were several women and men who were too old for the militia, including a group of elderly men led by David Lamson—a "mulatto."[156]

At day's end, there were fifty Americans killed, thirty-nine wounded, and five missing.[157] Among the British sixty-five were killed, 180 wounded, and twenty-seven missing.[158] On a per-shot basis, the Americans inflicted higher casualties than the British regulars.[159]

That night, the American militiamen began laying siege to Boston where General Gage's standing army was located.[160]

Two days later in Virginia, Britain again moved to disarm the Americans. On April 21, 1775, Royal authorities confiscated twenty barrels of gunpowder from the public magazine in the capital city of Williamsburg and destroyed the public firearms there by removing their firing mechanisms.[161] In response to complaints, manifested most visibly by the mustering of a large

155. Letter from Earl Percy to Gen. Edward Harvey (Apr. 20, 1775), *in* HUGH PERCY, LETTERS OF HUGH EARL PERCY FROM BOSTON AND NEW YORK: 1774–1776, at 52–53 (Charles Knowles Bolton ed., 1902).

156. *See* PETER OLIVER'S ORIGIN & PROGRESS OF THE AMERICAN REBELLION: A TORY VIEW (Douglass Adair & John A. Schutz eds., Stanford University Press 1967) (1781); *see also* FISCHER, *supra* note 46, at 170–71, 243–44; FRENCH, *supra* note 49, at 158; J.E. Tyler, *An Account of Lexington in the Rockingham Mss. at Sheffield*, 10 WM. & MARY Q. (3d ser.) 99, 106 (1953) (letter to Lord Rockingham from Massachusetts, probably written by a high-ranking naval officer; "even Weamin had firelocks").

157. ALLISON, *supra* note 17, at 21.

158. FISCHER, *supra* note 46, at 321.

159. *Id.* at 408 n.61.

160. FRENCH, *supra* note 49, at 265.

161. VA. GAZETTE, Aug. 5, 1775, at 2, *available at* http://research.history.org/DigitalLibrary/VirginiaGazette/VGIssueThumbs.cfm?IssueIDNo=75.DH.37.

CHARLESTON LAW REVIEW                    [Volume 6

independent militia led by Patrick Henry, Governor Dunmore
explained he was surprised to hear the people were under arms
on this occasion, and that he should not think it prudent to put
powder into their hands in such a situation.[162] The confrontation
ended peacefully when emissaries of the Governor delivered a
legal note promising to pay restitution.[163]

## III. THE UNDECLARED WAR TO CONFISCATE ARMS

### A. Gun Confiscation in Boston

At Lexington and Concord, coercive disarmament had not
worked out for the British. Back in Boston, General Gage
recognized that British troops there were heavily outnumbered
by armed Bostonians. "[K]nowing that many of the Boston
householders had arms, he was afraid the town would rise at his
back."[164] So Gage set out to disarm the Bostonians, but through a
strategy that avoided direct force.

On April 23, 1775, Gage offered the Bostonians the
opportunity to leave town if they surrendered their arms.[165]

The Boston Selectmen voted to accept the offer, and a
massive surrender of arms began.[166] Within days, 2,674 guns
were deposited.[167] They consisted, according to one historian, of
"1778 fire-arms" (muskets or rifles), "634 pistols, 973 bayonets"

---

162. MAYER, *supra* note 102, at 256–57.

163. *Id.*

164. FRENCH, *supra* note 49, at 56.

165. Directing

> that upon the inhabitants in general lodging their arms in Faneuil
> Hall, or any other convenient place, under the care of the selectmen,
> marked with the names of the respective owners, that all such
> inhabitants as are inclined, may depart from the town . . . . and that
> the arms aforesaid at a suitable time would be return'd to the owners.

RICHARD FROTHINGHAM, HISTORY OF THE SIEGE OF BOSTON AND OF THE BATTLES
OF LEXINGTON, CONCORD, AND BUNKER HILL 94 (Boston, Charles C. Little &
James Brown 1849).

166. JAMES THACHER, A MILITARY JOURNAL DURING THE AMERICAN
REVOLUTIONARY WAR, FROM 1775 TO 1783, at 35 (Boston, Cottons & Barnard
1827).

167. JOHN ROWE, LETTERS AND DIARY OF JOHN ROWE: BOSTON MERCHANT,
1759–1762, 1764–1779, at 293–94 (Anne Row Cunningham ed., 1902).

*British Gun Control*

(bayonets attached to the long guns), and "38 blunderbusses" (short-barreled shotguns).[168]

Based on an estimate of 15,000 Bostonians, there was one gun surrendered for every 5.6 residents. [169] Historian Page Smith estimates the Boston population to have been somewhat higher.[170] Still, he concludes that the surrendered guns "were a very substantial armory for a city of some 16,000, many of whom were women and children."[171] If we take into account those weapons that had already been taken out of the city by Patriots, it is probably not far off the mark to say that "every other male Bostonian over the age of eighteen possessed some type of firearm."[172] These estimates do not, of course, take into account any firearms that the Bostonians secreted away or otherwise refused to surrender.

Having collected the arms, Gage then refused to allow the Bostonians to leave.[173] He claimed that many more arms had been secreted away than surrendered. Indeed, a large proportion of the surrendered guns were "training arms"—large muskets with bayonets that would be difficult to hide. Eventually, a system of passes was set up, allowing Bostonians to leave town. But the passes were difficult to obtain, and even then, Bostonians were often prohibited from taking their household goods or food. After several months, food shortages in Boston convinced Gage to allow easier emigration from the city.[174]

Gage's Boston disarmament program incited other Americans to take up arms. Benjamin Franklin, returning to Philadelphia after an unsuccessful diplomatic trip to London, "was highly pleased to find the Americans arming and preparing for the worst events, against which he thinks our spirited

---

168.  FROTHINGHAM, *supra* note 165, at 95.
169.  DOUGLAS SOUTHALL FREEMAN, 3 GEORGE WASHINGTON: A BIOGRAPHY 576 n.161 (1951).
170.  PAGE SMITH, 1 A NEW AGE NOW BEGINS: A PEOPLE'S HISTORY OF THE AMERICAN REVOLUTION 506 (1976).
171.  *Id.*
172.  *Id.*
173.  THACHER, *supra* note 166, at 35.
174.  HALBROOK, *supra* note 10, at 85–91.

313

ER-655

exertions will be the only means under God to secure us."[175]

A letter on behalf of the Massachusetts Provincial Congress warned the Provincial Congress of New York of:

> [T]he breach of a most solemn treaty with respect to the inhabitants of Boston when they had surrendered their arms and put themselves wholly in the power of a military commander. [New Yorkers should avail] yourselves of every article which our enemies can improve with the least advantage to themselves for effecting the like desolation, horrors and insults on the inhabitants of your city and Colony, or which might enable you to make the most effectual defence. . . . If you should delay securing them until they should be out of your power, and within a few days you should behold these very materials improved in murdering you, and yourselves perishing for the want of them, will not the chagrin and regret be intolerable.[176]

The government in London dispatched more troops and three more generals to America—William Howe, Henry Clinton, and John Burgoyne.[177] The generals arrived on May 25, 1775, with orders from Lord Dartmouth:

> That all Cannon, Small Arms, and other military Stores of every kind that may be either in any public Magazine, or secretly collected together for the purpose of aiding Rebellions, should also be seized and secured, and that the persons of all such as, according to the Opinions of His Majesty's Attorney and Solicitor General, have committed themselves in Acts of Treason & Rebellion, should be arrested & imprisoned.[178]

Per Dartmouth's orders, Gage imposed martial law on June

---

175. *New York, May 11*, 37 SCOTS MAG. 308 (Edinburgh, A. Murray & J. Cochran 1775).

176. Letter from Hon. Joseph Hawley to the Provincial Congress of New York (May 26, 1775), *in* 2 JOURNALS OF THE PROVINCIAL CONGRESS, PROVINCIAL CONVENTION, COMMITTEE OF SAFETY AND COUNCIL OF SAFETY OF THE STATE OF NEW YORK: 1775-1776-1777, at 10 (1842).

177. ALLISON, *supra* note 17, at 22.

178. Letter from Lord Dartmouth to Gen. Gage (Apr. 15, 1775), *in* 2 THE CORRESPONDENCE OF GENERAL THOMAS GAGE WITH THE SECRETARIES OF STATE, AND WITH THE WAR OFFICE AND THE TREASURY: 1763–1775, at 191 (Clarence Edwin Carter ed., Archon Books 1969) (1933).

*British Gun Control*

12 and offered a general pardon to all rebels; except for Samuel Adams and John Hancock, provided they would immediately desist and submit.[179] The Americans declined.[180]

The war underway, Americans continued to show their skill at arms. They captured Fort Ticonderoga in upstate New York.[181] At the June 17, 1775, Battle of Bunker Hill, the militia held their ground against the British regulars and inflicted heavy casualties, until they ran out of gunpowder and were finally

---

179. The declaration of martial law by a general or a governor, rather than by a legislature, was itself considered illegal, and another justification for revolution. As U.S. Supreme Court Justice Levi Woodbury later recounted:

> In the Annual Register for 1775, p. 133, June 12th, it may be seen that General Gage issued his proclamation, pardoning all who would submit, except Samuel Adams and John Hancock, and further declaring, "that, as a stop was put to the due course of justice, martial law should take place till the laws were restored to their due efficacy."
>
> Though the engagements at Lexington and Concord happened on the 19th of April, 1775, though Parliament had in February previous declared the Colonies to be in a state of rebellion, and though thousands of militia had assembled near Bunker Hill before the 12th of June, no martial law had been established by Parliament, and not till that day did General Gage, alone and unconstitutionally, undertake, in the language of our fathers, to "supersede the course of the common law, and, instead thereof, to publish and order the use and exercise of martial law."
>
> Another of these outrages was by Lord Dunmore, in Virginia, November 7th, 1775, not only declaring all the slaves of rebels free, but "declaring martial law to be enforced throughout this Colony." This was, however, justly denounced by the Virginia Assembly as an "assumed power," which the king himself cannot exercise," as it "annuls the law of the land and introduces the most execrable of all systems, martial law." It was a return to the unbridled despotism of the Tudors, which, as already shown, one to two hundred years before, had been accustomed, in peace as well as war, to try not only soldiers under it, but others, and by courts-martial rather than civil tribunals, and by no settled laws instead of the municipal code, and for civil offences no less than military ones.

Luther v. Borden, 48 U.S. (7 How.) 1, 65 (1849) (Woodbury, J., dissenting) (citations omitted).

180. CHARLES J. CAES, LEGEND OF THE THIRD HORSEMAN 268 (2009).

181. Cannons from Fort Ticonderoga were hauled down to Boston. George Washington's deployment of those cannons outside Boston in 1776 forced Gage to evacuate his troops from Boston without a fight. ALLISON, *supra* note 17, at 27.

driven back.[182] Had Gage not confiscated the gunpowder from the Charleston Powder House the previous September, the Battle of Bunker Hill probably would have resulted in an outright defeat of the British.[183] General Gage acknowledged that the Americans were not mere rabble. He asked London for more troops and mercenaries.[184]

On June 19, Gage renewed his demand that the Bostonians surrender their arms, and he declared that anyone found in possession of arms would be deemed guilty of treason.[185]

Meanwhile, the Continental Congress had voted to send ten companies of riflemen from Pennsylvania, Maryland, and Virginia to aid the Massachusetts militia.[186]

---

182. *See* FRENCH, *supra* note 49, at 62.

183. *Id*.

184. *Id*.

185. Proclamation by Governor Thomas Gage (June 19, 1775), *available at* http://www.lincoln.lib.niu.edu/cgi-bin/amarch/getdoc.pl?/var/lib/philologic/databases/amarch/.3851. The proclamation stated:

> Whereas, notwithstanding the repeated assurances of the Selectmen and others, that all the inhabitants of the town of *Boston* had *bona fide* delivered their Fire–Arms unto the persons appointed to receive them, though I had advices at the same time of the contrary; and whereas I have since had full proof that many had been perfidious in this respect, and have secreted great numbers; I have thought fit to issue this Proclamation, to require of all persons who have yet Fire–Arms in their possession immediately to surrender them at the Court–House, to such persons as shall be authorized to receive them; and hereby to declare that all persons in whose possession any fire arms may hereafter be found, will be deemed enemies to His Majesty's Government.

*Id*.

> General Gage promised to return the Bostonians' guns if they gave him temporary custody of them. In 1972, the Provisional Irish Republican Army was waging a terrorist campaign in Northern Ireland—which is part of the United Kingdom. The PIRA was arming itself in part by stealing guns from registered gun owners in the independent Republic of Ireland, to the south. The Republic's legislature enacted a temporary custody order, which required the surrender of certain types of firearms for a thirty day period when a person's license for that gun expired. (Licenses were for a term of years, not lifetime.) The police then kept the guns, and refused to renew the licenses. The guns remained in police custody for thirty-four years, until a High Court lawsuit forced their return.

186. *See* Letter from John Hancock to Elbridge Gerry, *in* 1 LETTERS OF MEMBERS OF THE CONTINENTAL CONGRESS 135 (Edmund C. Burnett ed., 1921).

316

*British Gun Control*

## B. Declaration of Causes and Necessity of Taking up Arms

On July 6, 1775, the Continental Congress adopted the Declaration of Causes and Necessity of Taking Up Arms.[187] The Declaration was written by Thomas Jefferson and the great Pennsylvania lawyer John Dickinson.[188] Among the grievances were General Gage's efforts to disarm the people of Lexington, Concord, and Boston.[189]

---

187. *See* John Dickinson, The Declaration by the Representatives of the United Colonies of North America (July 6, 1775), *in* 2 THE POLITICAL WRITINGS OF JOHN DICKINSON, ESQUIRE, LATE PRESIDENT OF THE STATE OF DELAWARE, AND OF THE COMMONWEALTH OF PENNSYLVANIA 38–43 (Wilmington, Del., Bonsal & Niles 1801).

188. *Id*.

189. *Id*.

    Soon after intelligence of these proceedings [a new British tax plan] arrived on this Continent, general *Gage* who in the course of the last year had taken possession of the town of Boston, in the Province of *Massachusetts-Bay*, and still occupied it as a garrison, on the 19th day of *April* sent out from that place a large detachment of his army, who made an unprovoked assault on the inhabitants of the said Province, at the Town of *Lexington*, as appears by the affidavits of a great number of persons, some of whom were officers and soldiers of that detachment, murdered eight of the inhabitants, and wounded many others. From thence the troops proceeded in warlike array to the Town of *Concord*, where they set upon another party of the inhabitants of the same province, killing several and wounding more, until compelled to retreat by the country people suddenly assembled to repel this cruel aggression. Hostilities, thus commenced by the *British* Troops, have been since prosecuted by them without regard to faith or reputation.—The inhabitants of *Boston*, being confined within that town by the general their governour, and having, in order to procure their dismission, entered into a treaty with him, it was stipulated that the said inhabitants having deposited their arms with their own magistrates, should have liberty to depart, taking with them their other effects. They accordingly delivered up their arms, but in open violation of honour, in defiance of the obligation of treaties, which even savage nations esteemed sacred, the governour ordered the arms deposited as aforesaid, that they might be preserved for their owners, to be seized by a body of soldiers; detained the greatest part of the inhabitants in the town, and compelled the few who were permitted to retire, to leave their most valuable effects behind.

    By this perfidy, wives are separated from their husbands, children from their parents, the aged and the sick from their relations and friends, who wish to attend and comfort them; and those who have been used to live in plenty, and even elegance, are reduced to

In an earlier draft, Dickinson had written that "the Governor ordered the Arms deposited as aforesaid that they might be preserved for their Owners, to be seized by a Body of soldiers . . . ."[190] Drafts by Jefferson complained that "their arms . . . deposited with their own magistrates to be preserved as their property were immediately seised by a body of armed men under

deplorable distress . . . .

Our cause is just. Our union is perfect. Our internal resources are great, and, if necessary, foreign assistance is undoubtedly attainable.—We gratefully acknowledge, as signal instances of the Divine favour towards us, that His providence would not permit us to be called into this severe controversy until we were grown up to our present strength, had been previously exercised in warlike operations, and possessed of the means of defending ourselves. With hearts fortified with these animating reflections, we most solemnly, before God and the world, DECLARE, that, exerting the utmost energy of those powers which our beneficent Creator hath graciously bestowed upon us, the arms we have been compelled by our enemies to assume, we will, in defiance of every hazard, with unabating firmness and perseverance, employ for the preservation of our liberties; being, with one mind, resolved to die freemen rather than live slaves.

. . . .

We have not raised armies with ambitious designs of separating from *Great–Britain*, and establishing independent states. We fight not for glory or for conquest. We exhibit to mankind the remarkable spectacle of a people attacked by unprovoked enemies, without any imputation or even suspicion of offence.—*They* boast of their privileges and civilization, and yet proffer no milder conditions than servitude or death.

In our own native land, in defence of the freedom that is our birth-right, and which we ever enjoyed till the late violation of it—for the protection of our property, acquired solely by the honest industry of our forefathers and ourselves, against violence actually offered, we have taken up arms. We shall lay them down when hostilities shall cease on the part of the aggressors, and all danger of their being renewed shall be removed, and not before.

With an humble confidence in the mercies of the supreme and impartial Judge and Ruler of the universe, we most devoutly implore his divine goodness to protect us happily through this great conflict, to dispose our adversaries to reconciliation on reasonable terms, and thereby to relieve the empire from the calamities of civil war.

*Id.*

190. 2 JOURNALS OF THE CONTINENTAL CONGRESS: 1774–1789, at 151 (1905).

318

*British Gun Control*

orders from the [said General]."[191]

On July 8, the Continental Congress followed up with an open letter to the people of Great Britain complaining that "your Ministers (equal Foes to *British* and *American* freedom) have added to their former Oppressions an Attempt to reduce us by the Sword to a base and abject submission."[192] As a result:

> On the Sword, therefore, we are compelled to rely for Protection. Should Victory declare in your Favour, yet Men trained to Arms from their Infancy, and animated by the Love of Liberty, will afford neither a cheap or easy Conquest. Of this at least we are assured, that our Struggle will be glorious, our Success certain; since even in Death we shall find that Freedom which in Life you forbid us to enjoy.[193]

One observer pressed the patriots' cause in a publication that commented on the American gun culture.[194] John Zubly, an immigrant from Switzerland who was serving as a Georgia delegate to the Continental Congress, wrote a pamphlet entitled *The Law of Liberty*, which was published in London and Philadelphia.[195] It excoriated Gage for "[d]etaining the inhabitants of Boston, after they had, in dependance on the General's word of honour, given up their arms, to be starved and ruined . . ."[196] He warned that "in a strong sense of liberty, and the use of fire-arms almost from the cradle, the Americans have vastly the advantage over men of their rank almost every where else."[197] Indeed, children were "shouldering the resemblance of a gun before they are well able to walk."[198] "The Americans will fight like men, who have every thing at stake," and their motto was "DEATH OR FREEDOM."[199] The town of Gorham, Massachusetts (now part of the state of Maine), sent the British

---

191. *Id*. at 136.
192. *Id*. at 169.
193. *Id*.
194. *See generally* JOHN JOACHIM ZUBLY, THE LAW OF LIBERTY (Philadelphia 1775).
195. *Id*.
196. *Id*. at 12.
197. *Id*. at 14.
198. *Id*.
199. *Id*.

government a warning that even "many of our Women have been used to handle the Cartridge, and load the Musquet . . . ."[200]

It was feared that the Massachusetts gun confiscation was the prototype for confiscation throughout America. For example, according to a newspaper article published in three colonies:

> It is reported, that on the landing of the General Officers, who have sailed for America, a proclamation will be published throughout the provinces, inviting the Americans to deliver up their arms by a certain stipulated day; and that such of the colonists as are afterwards proved to carry arms shall be deemed rebels, and be punished accordingly.[201]

### C. The Independent Militia Spread

Independent militia had been forming before Lexington and Concord, but the events of April 19 convinced many more Americans to arm themselves and to embody militia independent of royal control.[202] A report from New York City observed that "the Inhabitants . . . [have] seized the city arms . . . ; have taken the keys of the Custom House by military force; [and] shut up the port."[203] Further, "the whole city and province are subscribing an association, forming companies, and taking every method to defend our rights. The like spirit prevails in the province of New Jersey, where a large and well disciplined militia are now fit for action."[204] The New York General Committee (a Patriot organization) resolved "that it be Recommended to every Inhabitant, to perfect himself in Military Discipline, and be provided with Arms, Accoutrements, and Ammunition, as by Law directed."[205]

---

200.  BROWN, *supra* note 6, at 118 (containing the letter of Jan. 7, 1773).

201.  *London, April 24*, VA. GAZETTE, June 24, 1775, at 1 (also published in *New York Journal* on the same date, and in the *Maryland Gazette* on July 20).

202.  *See* ALLISON, *supra* note 17, at 21 (discussing John Adams' call for Congress to adopt the militiamen around Boston as a Continental Army after the events at Lexington and Concord).

203.  MARIUS SCHOONMAKER, THE HISTORY OF KINGSTON, NEW YORK 167 (New York, Burr Printing House 1888).

204.  N.Y.J., May 5, 1775, http://files.usgwarchives.net/nj/statewide/news papers/1775news3.txt.

205.  2 THE MEMORIAL HISTORY OF THE CITY OF NEW-YORK 482 (James G.

320

*British Gun Control*

General Gage sent the news to London: "[Massachusetts], Connecticut, and Rhode Island are in open Rebellion and I expect the same Accounts of New-Hampshire. They are arming at New-York and as we are told, in Philadelphia, and all the Southern Provinces . . . ."[206]

In Virginia, Lord Dunmore already knew the trouble that Patrick Henry's independent militia could cause.[207] Henry's example was being copied everywhere: "Every County is now Arming a Company of men whom they call an independent Company for the avowed purpose of protecting their Committee, and to be employed against Government if occasion require."[208] Henry's militia seized the public arms in Williamsburg.[209]

North Carolina's Royal Governor, Josiah Martin, issued a proclamation against "endeavouring to engage the People to subscribe papers obliging themselves to be prepared with Arms, to array themselves in companies, and to submit to the illegal and usurped authorities of Committees."[210] Martin complained that "[t]he Inhabitants of this County on the Sea Coast are . . . arming men, electing officers and so forth. In this little Town [New Bern] they are now actually endeavoring to form what they call independent Companies under my nose . . . ."[211]

North Carolina's three delegates to the Continental Congress[212] sent a message to the Committees of Safety (local Patriot organizations) declaring:

> It is the Right of every English Subject to be prepared with Weapons for his Defense. We conjure you . . . to form

---

Wilson ed., New York, New York History Co. 1892).

206. Letter from Gen. Gage to Lord Dartmouth, (May 25, 1775), in 1 THE CORRESPONDENCE OF GENERAL THOMAS GAGE WITH THE SECRETARIES OF STATE, AND WITH THE WAR OFFICE AND THE TREASURY: 1763–1775, at 401 (Clarence Edwin Carter ed., Archon Books 1969) (1931).

207. WILLIAM C. RIVES, HISTORY OF THE LIFE AND TIMES OF JAMES MADISON 89–95 (Boston, Little, Brown & Company 1859).

208. *Id*. at 65.

209. *See Williamsburg, May 6*, VA. GAZETTE, May 6, 1775, at 3.

210. R.D.W. CONNER, 1 HISTORY OF NORTH CAROLINA 360 (1919).

211. *Id*. at 362.

212. The delegation consisted of Richard Caswell, William Hooper, and Joseph Hewes.

> yourselves into a Militia . . . . Carefully preserve the small
> Quantity of Gunpowder which you have amongst you, it will be
> the last Resource when every other Means of Safety fails you;
> Great-Britain has cut you off from further supplies . . . . We
> cannot conclude without urging again to you the necessity of
> arming and instructing yourselves, to be in Readiness to
> defend yourselves against any Violence that may be exerted
> against your Persons and Properties.[213]

Furious, Governor Martin issued a "Fiery Proclamation" condemning the attempt "to excite the people of North Carolina to usurp the prerogative of the Crown by forming a Militia and appointing officers thereto and finally to take up arms against the King and His Government."[214] Independent militia were banned, and Martin declared that "persons who hath or have presumed to array the Militia and to assemble men in Arms within this Province without my Commission or Authority have invaded His Majesty's just and Royal Prerogative and violated the Laws of their Country to which they will be answerable for the same."[215]

A Virginia gentleman wrote a letter to a Scottish friend explaining what was happening in America:

> We are all in arms, exercising and training old and young to
> the use of the gun. No person goes abroad without his sword, or
> gun, or pistols . . . . Every plain is full of armed men, who all
> wear a hunting shirt, on the left breast of which are sewed, in
> very legible letters, "*Liberty or Death.*"[216]

### D. Falmouth Destroyed

In the summer of 1775, Lord Dartmouth relieved General Gage of his American command, replacing him with General

---

213. William Hooper, et al., *To the Committees of the Several Towns and Counties of the Province of North Carolina*, N.C. GAZETTE, July 7, 1775, at 2.

214. Governour Josiah Martin, Proclamation (Aug. 15, 1775), *available at* http://lincoln.lib.niu.edu/cgi-bin/amarch/getdoc.pl?/var/lib/philologic/databases/amarch/.5927.

215. *Id.*

216. Letter from a Gentleman in Virginia to His Friend in Edinburgh, Scotland (Sept. 1, 1775), *in* 3 AMERICAN ARCHIVES, ser. 4, at 620 (Peter Force ed., Washington, D.C., 1846).

*British Gun Control*

Howe.[217] This was no gesture of conciliation. Americans' refusal to surrender their firearms now prompted a different response. Royal Admiral Samuel Graves ordered that all seaports north of Boston be burned.[218]

When the British navy showed up at Falmouth, Massachusetts (today's Portland, Maine)[219], the town attempted to negotiate.[220] British "Captain Mowat informed the Committee at Falmouth, there had arrived orders from England, about ten days since, to burn all the seaport Towns on the Continent, that would not lay down and deliver up their arms, and give hostages for their future good behaviour."[221] Falmouth would avoid destruction only if "we would send off four carriage guns[222] deliver up all our small arms, ammunition & c. and send four gentlemen of the town as hostages, which the town would not do."[223] The townspeople gave up eight muskets, which was hardly sufficient, and so Falmouth was destroyed by naval bombardment.[224] George Washington (whom the Continental Congress had recently appointed Major General and Commander-in-Chief of the just-created Continental Army on June 14), urged colonial newspapers to print stories on the destruction, highlighting British brutality.[225]

The next year, the thirteen colonies would adopt the Declaration of Independence. The Declaration listed the tyrannical acts of King George III, including his methods for carrying out gun control: "He has plundered our seas, ravaged our Coasts, burnt our Towns, and destroyed the Lives of our

---

217. ALLISON, *supra* note 17, at 22.

218. FISCHER, *supra* note 46, at 284.

219. Maine was split from Massachusetts in the Compromise of 1820.

220. *America: Falmouth Destroyed*, 37 SCOTS MAG. 659 (Edinburgh, A. Murray & J. Cochran 1775).

221. *Id.*

222. Cannons mounted on a wheeled carriage, so that they can be moved from place to place.

223. *America: Falmouth Destroyed*, 37 SCOTS MAG. 659 (Edinburgh, A. Murray & J. Cochran 1775).

224. *Id.*

225. *See* N.Y.J., Nov. 2, 1775, at 3; Letter from George Washington to Esek Hopkins (Oct. 21, 1775), *in* 6 REVOLUTIONARY CORRESPONDENCE FROM 1775 TO 1782, at 132 (1867).

323

people."[226]

## IV. EPILOGUES

The British never lost sight of the fact that without their gun control program, they could never control America. In 1777, with British victory seeming likely, Colonial Undersecretary William Knox drafted a plan entitled "What Is Fit to Be Done with America?"[227] The plan aimed to ensure that there would be no future rebellions.[228] It provided that the Church of England would be established in every one of the thirteen colonies as the state church.[229] Parliament would have power to tax within America.[230] A hereditary aristocracy would be established.[231] There would be a permanent standing army, and

> The Militia Laws should be repealed and none suffered to be re-enacted, [and] the Arms of all the People should be taken away . . . nor should any Foundery or manufactuary of Arms, Gunpowder, or Warlike Stores, be ever suffered in America, nor should any Gunpowder, Lead, Arms or Ordnance be imported into it without Licence . . . .[232]

The first Congress under the 1789 U.S. Constitution enacted a comprehensive tariff, with taxes of up to 12.5% on some goods; ten percent on certain other goods, including gunpowder, printing paper, writing paper, and unbound books; at fiver percent on everything else.[233]

After the Revolution, independent or semi-independent

---

226. THE DECLARATION OF INDEPENDENCE (U.S. 1776).

227. William Knox, Considerations on the Great Question, What Is Fit to be Done with America, Memorandum to the Earl of Shelburne (1763), *in* 1 SOURCES OF AMERICAN INDEPENDENCE: SELECTED MANUSCRIPTS FROM THE COLLECTIONS OF THE WILLIAM L. CLEMENTS LIBRARY 140 (Howard H. Peckham ed., 1978).

228. *Id*.

229. *Id*.

230. *Id*. at 146.

231. *Id*.

232. *Id*. at 176.

233. There were also taxes specified at a particular amount, rather than an ad valorem percentage, on many other goods. 1 Stat. 24 (1789). The Hamilton Tariff was the second law enacted by the new Congress.

324

*British Gun Control*

militia became an accepted feature of American life.[234] The federal Militia Act of 1792 recognized independent militia, and incorporated them into the federal militia:

> And whereas sundry corps of artillery, cavalry and infantry now exist in several of the said states, which by the laws, customs, or usages thereof have not been incorporated with, or subject to the general regulation of the militia.
> Sec. 11. Be it further enacted, That such corps retain their accustomed privileges, subject, nevertheless, to all other duties required by this act, in like manner with the other militia.[235]

After the end of the War of 1812, most states did little to train their militia.[236] Accordingly, some civic-minded men founded new volunteer militia organizations.[237] The movement started in the 1830s.[238] By 1850 it had expanded nationwide.[239] Typically, these independent militia would receive a corporate charter from the state, and the Governor would issue commissions to the officers.[240] Some of the militia organizations were purely local, while others had chapters in several states.[241] The quality of training varied widely.[242] Some companies sported fancy uniforms and excelled in complicated marches.[243] But few developed much skill in combat shooting or tactics.[244] Mass enlistments from the volunteer militia filled the ranks of the U.S. Army during the Mexican-American War (1846–1848), and these volunteers at least had more military training than raw recruits.[245] In the chaotic early days of the American Civil War

---

234. *See* MARCUS CUNLIFFE, SOLDIERS AND CIVILIANS: THE MARTIAL SPIRIT IN AMERICA: 1775–1865 (1968).

235. 1 Stat. 271 (1792).

236. CUNLIFFE, *supra* note 234, at 205–12.

237. *See generally* JERRY M. COOPER, THE RISE OF THE NATIONAL GUARD: THE EVOLUTION OF THE AMERICAN MILITIA: 1865–1920 (2002); CUNLIFFE, *supra* note 234.

238. CUNLIFFE, *supra* note 234, at 205–12.

239. *Id.*

240. *Id.*

241. *Id.*

242. *Id.*

243. *Id.*

244. *Id.*

245. *Id.*

325

ER-665

(1861–1865), volunteer militia saved Washington, D.C. from Confederate conquest.[246] The National Guard, which first arose in some states near the end of the Civil War, was in its earliest incarnations an independent militia.[247] However, the Guard eventually traded independence for state and then federal funding, and today is almost entirely under the control of the federal Department of Defense.[248]

The Posse Comitatus Act was enacted in 1878, forbidding use of the Army in domestic law enforcement, and providing a formal rule against one of the practices that had spurred the Revolution.[249] However, beginning in 1981, enormous loopholes were created in the Posse Comitatus Act, allowing extensive military participation in domestic enforcement of drug laws.[250] Among the consequences was military participation in the deadly attack on the Branch Davidian compound at Waco, Texas, in February 1993, which had the purported purpose of enforcing federal laws against the untaxed manufacture of machine guns.[251]

## V. SOME LESSONS FOR TODAY

To the Americans of the Revolution and the Founding Era, the late twentieth century claim that the Second Amendment is a collective right and not an individual right might have seemed incomprehensible. The Americans owned guns individually, in their homes. They owned guns collectively, in their town armories and powder houses. They would not allow the British to confiscate their individual arms, or their collective arms; and when the British tried to do both, the Revolution began. The Americans used their individual arms and their collective arms to fight against the confiscation of any arms. Americans fought to

---

246. *Id.*

247. *Id.*

248. *See* Cooper, *supra* note 237, at 11–22.

249. 18 U.S.C. § 1385 (2006).

250. Stephen P. Halbrook, *Military Enforcement of Drug Laws Under the Posse Comitatus Act*, 1 Drug L. Rep. 1 (1984).

251. *See generally* David B. Kopel & Paul H. Blackman, No More Wacos: What's Wrong with Federal Law Enforcement and How to Fix It (1997).

2012]                                    *British Gun Control*

provide themselves a government that would never perpetrate the abuses that had provoked the Revolution.

What are modern versions of such abuses? The reaction against the 1774 import ban for firearms and gunpowder (via a discretionary licensing law) indicates that import restrictions are unconstitutional if their purpose is to make it more difficult for Americans to possess guns. Conversely, the 1789 Tariff Act shows that moderate taxes, such as a protective tariff of ten percent, may be applied to arms or ammunition, and that one legitimate purpose of tariffs is to foster the health of the American firearms industry[252]. The federal Gun Control Act of 1968 prohibits the import of any firearm which is not deemed suitable for "sporting" purposes by federal regulators.[253] That import ban seems difficult to justify based on the historical record of 1774–1776, or on *District of Columbia v. Heller* and *McDonald v. City of Chicago*, both of which hold that, while sporting uses such as hunting are part of the Second Amendment, the "core" and "central component" of the Second Amendment is self-defense.[254]

Laws which attempt to disarm people who have proven themselves to be a particular threat to public safety are not implicated by the 1774–1776 experience. In contrast, laws which aim to disarm the public at large are precisely what turned a political argument into the American Revolution. Sometimes, legislative history will frankly reveal that the purpose of an anti-gun law was to discourage gun ownership in general, or that the law was based on hostility to gun ownership.[255] This is the case for New York City's pistol licensing fees.[256] Everywhere in New

---

252. *See* 1 Stat. 24 (1789).

253. 18 U.S.C. § 925(d)(3) (2006).

254. *Heller*, 554 U.S. at 599, 628, 630; 561 U.S. ___, 130 S. Ct. at 3036, 3041, 3044, 3048.

255. *See generally* Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment, Kwong v. Bloomberg, No. 1:11-cv-02356 (S.D.N.Y. June 22, 2011) (explaining that the sponsor of the 1947 law allowing New York City to charge higher license fees explicitly intended to discourage people from owning handguns), *available at* http://ia700608.us.archive.org/24/items/gov.uscourts.nysd.377535/ gov.uscourts.nysd.377535.docket.htm.

256. *Id.*

CHARLESTON LAW REVIEW [Volume 6

York State, the fee for the issuance or revision of a handgun permit is ten dollars (plus a separate ninety-five dollar fee for a fingerprint check for first-time applications).[257] But in New York City, the fee is over $340, payable every three years.[258] The explicitly stated purpose of allowing the New York City government to charge extra fees was to discourage handgun ownership in the City.[259]

In Alameda County, California, the five-person county board of supervisors banned gun shows on county property at the behest of a supervisor who complained that her previous efforts to ban gun shows had "gotten the run around from spineless people hiding behind the constitution."[260] She explained that the county should not "provide a place for people to display guns for worship as deities for the collectors who treat them as icons of patriotism."[261] Nevertheless, the Ninth Circuit upheld the ban because the other supervisors who voted for the ordinance might have had legitimate motives. (Supposedly, banning gun shows on county property would prevent violence on county property, although there was and is not a shred of evidence of supporting fears of violence at gun shows.)[262]

Generally speaking, courts tend to be highly sensitive to evidence of illicit motives in cases alleging violation of the Equal Protection Clause's ban on racial discrimination, but not in other cases.[263] Given that the Constitution does not establish a hierarchy between enumerated rights,[264] it is difficult to see why

---

257. *Id*.

258. *Id*.

259. *Id*. at 7–8.

260. Nordyke v. King, 563 F.3d 439, 443 (9th Cir. 2009).

261. *Id*.

262. *Id*. at 463.

263. *See* Alan E. Brownstein, *Illicit Legislative Motive In The Municipal Land Use Regulation Process*, 57 U. CIN. L. REV. 1, 5 (1988).

264. *See* Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 484 (1982) (Rejecting the idea that different parts of the Constitution deserve different degrees of judicial protection. Rather, "[e]ach establishes a norm of conduct which the Federal Government is bound to honor—to no greater or lesser extent than any other inscribed in the Constitution . . . . [W]e know of no principled basis on which to create a hierarchy of constitutional values . . . .").

*British Gun Control*

a legislator's explicit and illicit purpose to deny constitutional rights—especially the rights whose similar denial led to the American Revolution—should be irrelevant to judicial review. In heightened scrutiny, the actual (not purported, or post-hoc) purpose of the legislation is a fact of the greatest importance.

The most important lesson for today from the Revolution is about militaristic or violent search and seizure in the name of disarmament. As Hurricane Katrina bore down on Louisiana, police officers in St. Charles Parish confiscated firearms from people who were attempting to flee.[265] After the hurricane passed, officers went house-to-house in New Orleans, breaking into homes and confiscating firearms at gunpoint.[266] The firearms seizures were flagrantly illegal; the Louisiana state emergency law at the time had a provision allowing, after a formal declaration by the appropriate official, government action to "prohibit" some items (such as alcohol) and to "control" other items (such as firearms).[267] The emergency powers were never invoked, and even if they had been, they did not authorize gun prohibition.[268] A federal district judge properly issued an order finding the gun confiscation to be illegal.[269] Eventually, local governments accepted a Consent Decree ordering them to return the illegally-taken firearms.[270] St. Charles has complied with the

---

265. *See generally* GORDON HUTCHINSON & TODD MASSON, THE GREAT NEW ORLEANS GUN GRAB (2007); Stephen P. Halbrook, *Only Law Enforcement Will be Allowed to Have Guns: Hurricane Katrina and the New Orleans Firearm Confiscations*, 18 GEO. MASON U. C.R. L.J. 339 (2008) [hereinafter Halbrook New Orleans].

266. *Id.*

267. LA. REV. STAT. ANN. § 14:329.6 (2005) (allowing the "regulating and controlling" but not the "prohibiting" of firearms and ammunition in emergencies, following appropriate official notices and declarations, none of which were made); David Kopel, *New Orleans Gun Confiscation is Blatantly Illegal*, THE VOLOKH CONSPIRACY (Sept. 9, 2005, 9:57 PM), http://www.volokh.com/archives/archive_2005_09_04-2005_09_10.shtml#1126317466.

268. *See* Kopel, *supra* note 267.

269. Consent Order, Nat'l Rifle Ass'n v. Nagin, No. 05-20,000 A (E.D. La., Sept. 23, 2005) (temporary injunction based on violation of the Second Amendment and other constitutional rights; defendants denied confiscating guns), *available at* http://www.stephenhalbrook.com/lawsuits/nagin-order.pdf.

270. Consent Order Granting Permanent Injunction and Dismissal of Remaining Claims Against Defendants, C. Ray Nagin and Warren Riley, Nat'l Rifle Ass'n v. Nagin, No. 05-4234 J (2) (E.D. La., Oct. 9, 2008) (ordering

Decree, while New Orleans continues to defy it.[271]

A vigorously-enforced Fourth Amendment might be sufficient to provide all the necessary protection against such abuses in modern times. But the Fourth Amendment has been one of the casualties in the war on drug users, and police militarization has been one of the war's consequences.[272] Even so, courts should be especially vigilant in policing the use of violence or militarism in the course of searches and seizures relating to items whose possession is a core American freedom. The Bill of Rights provides special protection to two types of manmade tools which the Founders believed that people had a natural right to possess and use: printing presses and firearms.[273] Certainly books, newspapers, other reading materials (including electronic ones), and religious objects, are also within a zone of special constitutional protection.[274]

When there is genuine evidence of potential danger—such as evidence that guns are in the possession of a violent gang—then the Fourth Amendment properly allows no-knock raids, flash-bang grenades, and similar violent tactics to carry out a search.[275] Conversely, if there is no real evidence of danger—for example, if it is believed that a person who has no record of violence owns guns but has not registered them properly—then militaristically violent enforcement of a search warrant should never be allowed. Gun ownership *simpliciter* ought never be a pretext for government violence. The Americans in 1775 fought a

---

defendants to return the firearms they had confiscated), *available at* http://www.stephenhalbrook.com/lawsuits/Consent_Order_Final_NRA-Nagin.pdf.

271. HUTCHINSON & MASSON, *supra* note 265; Halbrook New Orleans, *supra* note 265.

272. *See, e.g.*, Silas J. Wasserstrom, *The Incredible Shrinking Fourth Amendment*, 21 AM. CRIM. L. REV. 257 (1984); MILITARIZING THE AMERICAN CRIMINAL JUSTICE SYSTEM: THE CHANGING ROLES OF THE ARMED FORCES AND THE POLICE (Peter B. Kraska ed., 2001); David B. Kopel & Paul M. Blackman, *Can Soldiers Be Peace Officers? The Waco Disaster and the Militarization of Law Enforcement*, 30 AKRON L. REV. 619 (1997).

273. Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 WM. & MARY BILL RTS. J. 1037, 1048–53 (2009).

274. *See* U.S. CONST. amend. I.

275. *See* Richards v. Wisconsin, 520 U.S. 385, 394 (1997).

330

*British Gun Control*

war because the king did not agree. Americans of the twenty-first century should not squander the heritage of constitutional liberty bequeathed by the Patriots.

# EXHIBIT   4

U.S. Department of Justice
Office of Justice Programs    Case 2:19-cv-00617-KJM-AC    Document 96-10    Filed 09/29/23    Page 2 of 16

Revised 2/04/02 th



## Bureau of Justice Statistics
# Special Report

November 2001, NCJ 189369

*Survey of Inmates in State and Federal Correctional Facilities*

# Firearm Use by Offenders

By Caroline Wolf Harlow, Ph.D.
BJS Statistician

Approximately 203,300 prisoners serving a sentence in a State or Federal prison in 1997 were armed when they committed the crime for which they were serving time. An estimated 18% of State prison inmates and 15% of Federal inmates reported using, carrying, or possessing a firearm during the crime for which they were sentenced. In 1991, 16% of State inmates and 12% of Federal inmates said they were armed at the time of their offense.

Among all inmates in 1997, 9% of those in State prisons and 2% of those in Federal prisons said they fired a gun while committing their current offense. Of violent offenders, 18% of State inmates and 9% of Federal inmates discharged a firearm. Less than 2% of inmates serving time for a drug, property, or public-order offense fired a gun during the crime that resulted in their prison sentence.

Among prisoners who carried a firearm during the offense for which they were serving time in 1997, 14% had bought or traded for the gun from a store, pawnshop, flea market, or gun show. The 1997 percentage who had acquired their firearm at a retail outlet represented a significant drop from 21% in 1991. The percentage of inmates receiving their gun from family or friends rose from 34% in 1991 to 40% in 1997.

## Highlights

| Type of firearm | Percent of prison inmates | |
|---|---|---|
| | State | Federal |
| Total | 18.4% | 14.8% |
| Handgun | 15.3 | 12.8 |
| Rifle | 1.3 | 1.3 |
| Shotgun | 2.4 | 2.0 |

| Characteristic of inmates who carried firearms | Percent of prison Inmates possessing a firearm | |
|---|---|---|
| Offense | State | Federal |
| Violent | 30.2% | 35.4% |
| Property | 3.1 | 2.9 |
| Drug | 8.1 | 8.7 |
| Public-order | 19.1 | 27.3 |
| Gender | | |
| Male | 19.1% | 15.5% |
| Female | 7.3 | 6.2 |
| Age | | |
| 24 or younger | 29.4% | 19.1% |
| 25-34 | 16.5 | 15.5 |
| 35 or older | 14.8 | 13.6 |
| Criminal history | | |
| First-time offender | 22.3% | 9.5% |
| Recidivist | 17.2 | 18.4 |

| Source of gun | Percent of State inmates possessing a firearm | |
|---|---|---|
| | 1997 | 1991 |
| Total | 100.0% | 100.0% |
| Purchased from – | 13.9 | 20.8 |
| Retail store | 8.3 | 14.7 |
| Pawnshop | 3.8 | 4.2 |
| Flea market | 1.0 | 1.3 |
| Gun show | 0.7 | 0.6 |
| Friends or family | 39.6 | 33.8 |
| Street/illegal source | 39.2 | 40.8 |

| Use of firearm | Percent of prison inmates possessing a firearm | |
|---|---|---|
| | State | Federal |
| Total | 100.0% | 100.0% |
| Fired | 49.1 | 12.8 |
| Killed/injured victim | 22.8 | 5.0 |
| Other | 26.3 | 7.8 |
| Brandished to – | 73.2 | 46.2 |
| Scare someone | 48.6 | 29.3 |
| Defend self | 41.1 | 24.9 |

• During the offense that brought them to prison, 15% of State inmates and 13% of Federal inmates carried a handgun; about 2% had a military-style semiautomatic gun or machine gun.

• Among inmates in prison for homicide, a sexual assault, robbery, assault or other violent crime, 30% of State offenders and 35% of Federal offenders carried a firearm when committing the crime. Almost a fourth of State inmates and almost a third of Federal inmates serving a sentence for a violent crime had carried a handgun during the offense.

• 29% of State inmates under age 25 at the time of the survey were carrying a gun when they committed their current offense compared to 15% of those 35 or older.

• In 1997 among State inmates possessing a gun, fewer than 2% bought their firearm at a flea market or gun show, about 12% from a retail store or pawnshop, and 80% from family, friends, a street buy, or an illegal source.

• On average, State inmates possessing a firearm received sentences of 18 years, while those without a weapon had an average sentence of 12 years.

• Among prisoners carrying a firearm during their current offense, 40% of State inmates and 56% of Federal inmates received a sentence enhancement because of the firearm.

Data for this report are based primarily on personal interviews with large nationally representative samples of State and Federal prison inmates.  In the 1997 and 1991 Surveys of Inmates in State and Federal Correctional Facilities, inmates were questioned about any firearms they may have used when committing a crime and asked to specify the type of weapon, its source, and its use in committing crimes.  In addition, inmates were queried about the types of both current and past offenses for which they were sentenced, including any weapons offenses.

**Almost a fifth of prison inmates carried a gun during their crime**

An estimated 18% of State prison inmates and 15% of Federal inmates reported that they used, carried, or possessed a firearm when they committed the crime for which they were serving a sentence to prison (table 1).[1]

When asked if they had ever been armed while committing a crime, about a quarter of State prison inmates and a fifth of Federal inmates reported that they had carried a gun while committing at least one crime.

Almost half of both State and Federal inmates said that they had owned or possessed a firearm at some time in their lives.  Equivalent measures for lifetime gun ownership among adults in the general population are difficult to find.  Personal or telephone interviews and polls provide estimates for persons in the general population owning a firearm at the time of the survey.  An estimated 25% to 29% of the adult population reported currently owning a firearm when surveyed.[2]  According to public opinion polls, members of 4 in every 10 U.S. households have access to a gun.

**Less than 2% of inmates reported carrying a fully automatic or military-style semiautomatic firearm**

Fewer than 1 in 50 State and Federal inmates used, carried, or possessed a

military-style semiautomatic gun or a fully automatic gun during their current offense (table 2).  These guns, as used in the questions and definitions for the personal interviews with prison inmates, include the following:

• *military-style semiautomatic pistol* — similar to a conventional semiautomatic pistol except that the magazine or clip is visible[3]

• *military-style semiautomatic rifle* — a semiautomatic rifle with military features such as a pistol grip, folding stock, flash suppressor, or bayonet mount

• *military-style semiautomatic shotgun* — a semiautomatic shotgun with military features such as a pistol grip, folding stock, flash suppressor, or bayonet mount

• *machine gun* — a fully automatic gun which, if the trigger is held down, will fire rapidly and continuously.

[3]The survey interview included in the operational definition of a military-style semiautomatic pistol the phrase "can hold more than 19 bullets."

Some examples of these firearms are the UZI, TEC-9, and MAC10 for hand-guns; the AR-15 and AK-47 for rifles; and the "Street Sweeper" for shotguns. Possession of these models meeting criteria specified in Federal statutes can be unlawful.

To be understood by inmate respondents who were asked about their gun use, the questions and definitions in the survey reflect terminology commonly used by prisoners to describe types of  weapons.  If questioned by respondents, interviewers read to them the definitions included on pages 14 and 15 of this report.  Of necessity, this language is similar in concept but may differ in wording from technical descriptions in Federal statutes pertaining to firearms.

The Violent Crime Control and Law Enforcement Act of 1994 made it unlawful, with certain exceptions, to manufacture, transfer, or possess military-style semiautomatic weapons,

**Table 1. Possession of firearms by State and Federal prison inmates, by type of firearm, 1997**

| | Percent of prison inmates — | | | | | |
| | Armed during current offense | | Ever armed while committing offense | | Ever used or possessed firearm | |
| Type of firearm | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Firearm | 18.4% | 14.8% | 25.1% | 20.0% | 46.9% | 48.9% |
| Handgun | 15.3 | 12.8 | 21.3 | 17.2 | 36.0 | 38.6 |
| Rifle | 1.3 | 1.3 | 2.0 | 1.9 | 12.4 | 14.6 |
| Shotgun | 2.4 | 2.0 | 3.5 | 3.0 | 13.7 | 15.6 |
| Other | 0.5 | 0.6 | 1.1 | 0.9 | 2.7 | 2.3 |
| No firearm | 81.6% | 85.2% | 74.9% | 80.0% | 53.1% | 51.1% |

Note: Detail do not add to total because inmates may have had more than one firearm.

**Table 2. Possession of firearms by State and Federal prison inmates, by whether the firearm was single shot, conventional semiautomatic, or military-style semiautomatic or fully automatic, 1997**

| | Percent of prison inmates — | | | | | |
| | Armed during current offense | | Ever armed while committing offense | | Ever used or possessed firearm | |
| Specific type of firearm | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Single shot | 9.9% | 7.3% | 14.2% | 10.6% | 31.0% | 31.4% |
| Conventional semiautomatic | 7.9 | 7.7 | 10.9 | 9.8 | 22.6 | 26.0 |
| Military-style semiautomatic or fully automatic | 1.5 | 1.7 | 2.5 | 2.3 | 5.6 | 5.6 |

Note: Columns do not add to total percent with firearms because inmates may have possessed more than one firearm. See text above and pages 14 and 15 for definitions.

[1]For definitions of firearms, see *Methodology* on pages 14 and 15.
[2]Phillip J. Cook and Jens Ludwig, *Guns in America: Summary Report*, Washington, DC, Police Foundation, 1996, table 2.3.

if not lawfully possessed on September 13, 1994.[5]

**Of inmates who carried a firearm during their offense, 8 in 10 had a handgun**

Inmates reported that a handgun was their preferred firearm; of those carrying a firearm, 83% of State inmates and 87% of Federal inmates said that they carried a handgun during the offense for which they were serving their longest sentence.  About 8% of State inmates who had carried a firearm during the commission of their crime reported having a military-style semiautomatic (7%) or fully automatic (2%) firearm, with some carrying both.

| Type of firearm | Percent of prison inmates carrying a firearm during current offense | |
|---|---|---|
| | State | Federal |
| Handgun | 83.2% | 86.7% |
| Rifle | 7.3 | 8.9 |
| Shotgun | 13.1 | 13.7 |
| Single shot | 53.9% | 49.2% |
| Conventional semiautomatic | 43.2 | 51.8 |
| Military-style semiautomatic | 6.8 | 9.3 |
| Fully automatic | 2.4 | 3.8 |
| Number of inmates | 190,383 | 12,936 |

Note: Inmates could report carrying more than one type of firearm. For definitions of weapon categories, see pages 2, 14, and 15.

**Firearm use during crimes increased from 1991 to 1997**

Over the 6 years between surveys of inmates, 1991-97, possession of a firearm during a crime increased from 16% to 18% of State inmates and from 12% to 15% of Federal inmates (table 3).  Because of the growth in the prison population, the estimated number of inmates carrying a firearm increased dramatically — from 114,100 in 1991 to 190,400 in 1997 in State prisons and from 6,300 in 1991 to 12,900 in 1997 in Federal prisons.  These estimates were based on inmates who reported carrying a firearm during the offense for which they received their longest sentence.

[5]See P.L. 103-22 and *Commerce in Firearms in the United States*, Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, February 2000, page C-5.

**Table 3.  Possession of firearms, by type of offense, by State and Federal prison inmates, 1997 and 1991**

| | Prison inmates | | | |
|---|---|---|---|---|
| | 1997 | | 1991 | |
| Current offense | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| **State** | | | | |
| All inmates | 1,037,241 | 18.4% | 700,050 | 16.3% |
| Violent offense | 483,713 | 30.2 | 323,653 | 29.1 |
| Property offense | 227,726 | 3.1 | 171,749 | 3.2 |
| Drug offense | 213,974 | 8.1 | 148,743 | 4.1 |
| Public-order offense | 99,396 | 19.1 | 47,001 | 16.1 |
| **Federal** | | | | |
| All inmates | 87,466 | 14.8% | 53,348 | 11.8% |
| Violent offense | 12,604 | 35.4 | 9,113 | 38.0 |
| Property offense | 5,811 | 2.9 | 7,011 | 2.1 |
| Drug offense | 54,561 | 8.7 | 30,788 | 3.9 |
| Public-order offense | 12,708 | 27.3 | 4,964 | 28.5 |

**Table 4.  Firearm possession during current offense, by type of offense, for State and Federal prison inmates, 1997**

| | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| Current offense | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| Violent offense | 483,713 | 30.2% | 12,604 | 35.4% |
| Homicide | 135,493 | 42.9 | 1,273 | 39.3 |
| Sexual assault | 87,687 | 2.9 | 679 | 0.0 |
| Robbery | 145,318 | 34.5 | 8,554 | 40.3 |
| Assault | 95,756 | 31.2 | 1,108 | 26.0 |
| Other violent | 19,459 | 27.1 | 989 | 22.4 |
| Property offense | 227,726 | 3.1% | 5,811 | 2.9% |
| Burglary | 111,198 | 4.0 | 279 | 10.1 |
| Other property | 116,528 | 2.3 | 5,531 | 2.5 |
| Drug offense | 213,974 | 8.1% | 54,561 | 8.7% |
| Possession | 91,511 | 7.8 | 9,959 | 7.0 |
| Trafficking | 116,578 | 8.6 | 39,769 | 9.1 |
| Other drug | 5,885 | 3.1 | 4,834 | 8.7 |
| Public-order offense | 99,396 | 19.1% | 12,708 | 27.3% |
| Weapons | 25,257 | 64.9 | 5,905 | 51.9 |
| Other public-order | 74,139 | 3.5 | 6,803 | 5.9 |

**8% of drug offenders and 3% of property offenders armed while committing their crimes**

Fewer than 1 in 10 offenders serving a sentence for selling or carrying illegal drugs and 1 in 30 inmates in prison for a property crime — burglary, larceny, fraud, or destruction of property — had a firearm with them while committing their current offense (table 4).

Inmates who had been sentenced for violent crimes used firearms more often than other prisoners.  They were more likely than property, drug, or

public-order offenders to have used or possessed a gun during their crime.  An estimated 30% of violent offenders in State prisons and 35% in Federal prisons had a firearm at the time of the offense.

Offenders sentenced for homicide or for robbery reported the most extensive use of firearms. Among inmates sentenced for homicide, about 43% in State prisons and 39% in Federal prisons said they were carrying a firearm when they committed the offense.  About 35% serving time for robbery in State prisons and 40% in Federal prison had a gun.

**Table 5. Possession of a firearm during current offense, by selected characteristics for State and Federal prison inmates, 1997**

| Selected characteristic | Prison inmates | | | |
| | State | | Federal | |
| | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
|---|---|---|---|---|
| **Gender** | | | | |
| Male | 972,572 | 19.1% | 81,102 | 15.5% |
| Female | 64,669 | 7.3 | 6,364 | 6.2 |
| | | | | |
| **Race/Hispanic origin** | | | | |
| White | 346,188 | 14.8% | 25,977 | 16.7% |
| Black | 482,302 | 21.1 | 33,100 | 17.7 |
| Hispanic | 176,089 | 17.6 | 24,040 | 8.1 |
| Other | 32,662 | 19.3 | 4,349 | 17.9 |
| | | | | |
| **Age** | | | | |
| 20 or younger | 61,663 | 35.5% | 935 | 23.0% |
| 21-24 | 143,533 | 26.8 | 6,865 | 18.6 |
| 25-34 | 396,166 | 16.5 | 31,970 | 15.5 |
| 35-44 | 305,765 | 13.3 | 26,636 | 12.8 |
| 45-54 | 100,133 | 17.4 | 14,393 | 15.3 |
| 55 or older | 29,980 | 21.7 | 6,667 | 13.0 |
| | | | | |
| **Educational attainment** | | | | |
| Some high school or less | 445,479 | 16.8% | 25,642 | 13.9% |
| GED | 260,743 | 23.6 | 17,150 | 19.2 |
| High school diploma | 190,805 | 16.7 | 21,292 | 14.5 |
| Some college | 110,122 | 16.5 | 15,233 | 15.1 |
| College graduate | 27,649 | 12.1 | 7,963 | 8.3 |
| | | | | |
| **Citizenship** | | | | |
| United States | 983,876 | 18.5% | 71,307 | 16.9% |
| Latin America | 47,257 | 14.5 | 14,638 | 5.7 |
| Other | 4,609 | 22.0 | 1,376 | 2.4 |
| | | | | |
| **Military service** | | | | |
| Served | 129,913 | 16.4% | 12,746 | 17.2% |
| Did not serve | 907,142 | 18.6 | 74,676 | 14.4 |

## Male inmates and young inmates carried firearms

Male State and Federal offenders were more likely than their female counterparts to have carried a firearm when committing their offense. About 19% of men in State prison and 16% in Federal prison reported using or possessing a firearm when committing their most serious offense, compared to 7% of women in State prison and 6% in Federal prison (table 5).

An estimated 21% of black non-Hispanic inmates in State prison, 18% of Hispanics, and 15% of white non-Hispanics said they had a gun with them while committing their most serious offense. About 18% of black and white inmates in Federal facilities and 8% of Hispanics had carried a firearm.

Young State inmates were more likely than older inmates to use firearms. About 29% of inmates under the age of 25 at the time of the survey were carrying a gun when they committed their current offense, compared to 15% of those 35 or older. Among Federal inmates, about 19% under age 25 and 14% age 35 or older said they had a gun with them.

## Weapon offenses and offenders

Weapon offenses include unlawful distribution, sale, manufacture, alteration, transport, possession, or use of a deadly or dangerous weapon or accessory. In 1998 an estimated 195,000 persons were arrested by State or local law enforcement or referred to a U.S. attorney for prosecution for a weapon offense — counting only the most important offense and no secondary offenses. Over 35,000 persons were convicted of a weapon offense. About 49,000 persons were in a local jail or State or Federal prison for a weapon offense in 1998. An additional 100,000 were serving a sentence in the community on probation, parole, or supervised release.

An estimated 12% of State prison inmates and 19% of Federal inmates were either currently serving a sentence for a weapon offense or had been sentenced for a weapon offense in the past.

**Weapons as the most serious offense or charge in the criminal justice system, 1998**

| | Number | Percent of total |
|---|---|---|
| **State/local jurisdictions** | | |
| Arrested | 190,600 | 1.3% |
| Defendants at initial filing | -- | 2.8 |
| Convicted of a felony | 31,904 | 3.4 |
| In local jails | 13,630 | 2.3 |
| In State prisons | 26,730 | 2.4 |
| On probation/parole | 100,440 | 2.3 |
| **Federal jurisdiction** | | |
| Received by U.S. attorneys as suspects | 4,907 | 4.3% |
| Prosecuted | 3,347 | 5.1 |
| Convicted | 3,413 | 5.6 |
| In Federal prison | 8,742 | 8.0 |
| On probation/supervised release/parole | 4,038 | 4.4 |

Note: The weapon offense is the offenders' most serious offense. Statistics on persons in Federal jurisdiction are for fiscal year 1998.
--Not available.

Sources: Data on weapon offenders come from the FBI's *Crime in the United States, 1998,* table 29; from BJS' *Compendium of Federal Justice Statistics, 1998;* from BJS' Survey of Inmates in Local Jails, 1996, and Survey of Inmates in State and Federal Correctional Facilities, 1997, and from the following BJS reports available through <www.ojp.usdoj.gov/pubalp2.htm>: *Felony Defendants in Large Urban Counties, 1998; Felony Sentences in the United States, 1998; Prisoners in 1999;* and the press release for probation and parole surveys 2000.

**Current and past sentences for a weapon offense, for State and Federal prison inmates, 1997**

| Any current or past offense | Percent of prison inmates | |
| | State | Federal |
|---|---|---|
| Total | 100.0% | 100.0% |
| | | |
| Current or past weapon offense | 12.2% | 18.6% |
| Current and past weapon offenses | 1.3 | 2.2 |
| Current weapon/past other offenses | 4.1 | 8.5 |
| Current weapon/no past offenses | 1.1 | 2.7 |
| Current other/past weapon offenses | 5.8 | 5.1 |
| | | |
| Other current and/or past offenses | 87.8% | 81.4% |

**Table 6. State and Federal prison inmates possessing a firearm during their most serious offense, by characteristics of their family and background, 1997**

| Inmates' family of origin and other background characteristics | State Number | State Percent who possessed a firearm during current offense | Federal Number | Federal Percent who possessed a firearm during current offense |
|---|---|---|---|---|
| Lived with growing up | | | | |
| Both parents | 455,313 | 16.3% | 47,279 | 13.2% |
| Single parent | 438,741 | 19.7 | 30,146 | 16.2 |
| Other | 137,253 | 20.7 | 9,452 | 18.8 |
| Parent ever incarcerated | 188,166 | 22.7% | 9,843 | 18.0% |
| Parent never incarcerated | 833,005 | 17.4 | 76,382 | 14.5 |
| Parent received welfare | 374,340 | 20.8% | 20,328 | 20.0% |
| Parent did not receive welfare | 634,795 | 17.0 | 65,146 | 13.2 |
| Inmate lived in public housing | 186,847 | 21.1% | 11,807 | 17.9% |
| Inmate did not live in public housing | 835,540 | 17.8 | 74,656 | 14.5 |
| Parent abused alcohol or drugs | 327,404 | 18.5% | 18,041 | 17.6% |
| Alcohol | 241,521 | 16.6 | 14,541 | 17.8 |
| Drugs | 18,618 | 27.5 | 735 | 17.7 |
| Both | 66,986 | 22.9 | 2,752 | 17.0 |
| Parent did not abuse alcohol or drugs | 698,716 | 18.3 | 68,424 | 14.1 |
| Peers engaged in illegal activity while growing up | 780,234 | 19.6% | 49,941 | 19.0% |
| Used drugs | 688,497 | 19.7 | 42,764 | 18.5 |
| Damaged/stole/sold property* | 616,874 | 21.1 | 33,793 | 22.6 |
| Drug trafficking | 395,042 | 24.3 | 20,731 | 22.4 |
| Robbery | 203,745 | 30.4 | 8,400 | 32.5 |
| Peers did not engage in any illegal activity | 249,739 | 14.6 | 36,718 | 9.3 |

*Includes vandalism, shoplifting, stealing motor vehicles or parts, selling stolen property, and breaking and entering.

## Background characteristics account for relatively small differences in firearm use

When inmates were interviewed for the 1997 Surveys, they were asked about their family background and experiences they had when growing up. Characteristics about which the inmates reported include parental upbringing, parental incarceration, welfare assistance to their family, parental use of alcohol and drugs, and peer participation in criminal behavior.

Inmates who grew up living with both parents were less likely to be using or carrying a firearm than those who grew up primarily living with one parent, grandparents, other relatives, friends, or a foster family. An estimated 16% of State inmates and 13% of Federal inmates living with both parents had a gun with them, compared to 20% of State inmates and 17% of Federal inmates living in some other arrangement while growing up (table 6).

A higher percentage of State inmates with a parent who had served a sentence to incarceration carried a gun (23%) than those whose parents had never been in prison or jail (17%). For Federal inmates, 18% of inmates who had incarcerated parents and 15% of those who did not carried a firearm.

Inmates who lived in families receiving welfare or living in publicly-subsidized housing while growing up were more likely than those who did not live under these types of government programs to be carrying a weapon. About 1 in 5 inmates whose family received welfare or who lived in publicly financed housing carried a firearm. About 1 in 6 State inmates and 1 in 7 Federal inmates whose parents were not receiving welfare benefits or living in publicly-financed housing had a gun.

A quarter of State inmates who said they had a parent who had abused drugs reported that they were carrying a gun while committing their current offense. In contrast, less than a fifth of those whose parents did not abuse substances had a firearm.

About 20% of State and Federal inmates whose friends while growing up used or traded drugs, stole, destroyed or damaged property, broke or entered private property, or robbed someone reported that they had a firearm with them when they committed their controlling offense. An estimated 15% of State inmates and 9% of Federal inmates who did not have friends involved in illegal activities

## Inmates who had ever been shot at

As one measure of violence in inmates' lives, inmates were asked if they had ever been shot at. This experience could have been at any time in their lives, including when they were committing the crime for which they were in prison. About half of State prisoners reported that in the past they had been shot at by someone, and more than a fifth had actually been wounded by gunfire. A quarter of State and Federal inmates who had been shot at were carrying a firearm during their current offense, compared to a tenth of those who had never been shot at.

| | State prison inmates Number | State prison inmates Percent carrying a firearm | Federal prison inmates Number | Federal prison inmates Percent carrying a firearm |
|---|---|---|---|---|
| Ever shot at with a gun | 516,194 | 24.6% | 30,064 | 24.0% |
| Wounded | 213,429 | 26.7 | 12,933 | 24.4 |
| Shot at but not wounded | 302,765 | 23.1 | 17,131 | 23.6 |
| Never shot at | 514,676 | 12.1 | 56,679 | 10.1 |

used or possessed a firearm during their current offense.

**Violent recidivists were as likely as first time violent offenders to have carried a gun**

Recidivism does not appear to be related to whether inmates were carrying guns when the type of current offense is taken into account. Violent offenders who had served a prior sentence and first time violent offenders were about equally likely to be carrying a firearm when committing their current offense — about 30% of violent offenders in State prisons carried a firearm (table 7). About a third of violent Federal offenders, whether recidivist or first time, carried a firearm.

Less than 10% of both first time and repeat State offenders serving time for property, drug, and public-order offenses carried a gun. Drug offenders who were recidivists were more likely to be carrying a firearm than first-time drug offenders (9% versus 6% of State inmates and 11% versus 5% of Federal inmates).

Inmates who had served prior sentences as a juvenile were more likely to have had a gun than those who did not have a juvenile record. For State offenders 22% who had a juvenile record and 13% with only an adult record had a firearm while committing their current offense; for Federal offenders 27% with a juvenile record and 14% with only an adult record possessed a firearm.

**Inmates' retail purchase of firearms fell between 1991 and 1997**

In 1997, 14% of State inmates who had used or possessed a firearm during their current offense bought or traded for it from a retail store, pawnshop, flea market, or gun show (table 8). Nearly 40% of State inmates carrying a firearm obtained the weapon from family or friends. About 3 in 10 received the weapon from drug dealers, off the street, or through the black market. Another 1 in 10 obtained their gun during a robbery, burglary, or other type of theft.

From 1991 to 1997 the percent of State inmates with guns who acquired them at a retail outlet fell from 21% to 14%. At the same time the percentage reporting that they used firearms furnished by family or friends increased from 34% to 40%. Between the two surveys the Brady Handgun Violence Prevention Act of 1993 was enacted. The act requires background checks for persons purchasing firearms from federally licensed firearm dealers. Changes in how inmates obtained firearms, when the two surveys are compared, may or may not reflect the requirements in the Brady Act. Inmates may have procured their firearm or entered prison before the Brady Act became effective in 1994.

**Table 8. Source of firearms possessed during the current offense of State prison inmates, 1997 and 1991**

| | Percent of State prison inmates who possessed a firearm during current offense | |
|---|---|---|
| Source of firearms | 1997 | 1991 |
| Total | 100.0% | 100.0% |
| | | |
| Purchased or traded from retail outlet | 13.9% | 20.8% |
| Retail store | 8.3 | 14.7 |
| Pawnshop | 3.8 | 4.2 |
| Flea market | 1.0 | 1.3 |
| Gun show | 0.7 | 0.6 |
| | | |
| Family or friend | 39.6% | 33.8% |
| Purchased or traded | 12.8 | 13.5 |
| Rented or borrowed | 18.5 | 10.1 |
| Other | 8.3 | 10.2 |
| | | |
| Street/illegal source | 39.2% | 40.8% |
| Theft or burglary | 9.9 | 10.5 |
| Drug dealer/off street | 20.8 | 22.5 |
| Fence/black market | 8.4 | 7.8 |
| | | |
| Other | 7.4% | 4.6% |

**Table 7. Possession of firearm during current offense, by criminal history, prior sentences, and criminal justice status at arrest, for State and Federal prison inmates, 1997**

| | Prison inmates | | | |
|---|---|---|---|---|
| | State | | Federal | |
| Criminal justice characteristic | Number | Percent who possessed a firearm during current offense | Number | Percent who possessed a firearm during current offense |
| **Criminal history** | | | | |
| No previous sentence | 247,287 | 22.3% | 33,731 | 9.5% |
| Current offense | | | | |
| Violent | 155,195 | 31.1 | 3,952 | 31.8 |
| Drug | 44,744 | 5.8 | 20,425 | 4.8 |
| Other | 47,347 | 9.1 | 9,354 | 10.2 |
| | | | | |
| Recidivists | 783,178 | 17.2 | 52,619 | 18.4 |
| Current offense | | | | |
| Violent | 360,564 | 28.4 | 9,866 | 38.4 |
| Drug | 177,922 | 9.0 | 32,706 | 11.2 |
| Other | 244,692 | 6.5 | 10,047 | 22.3 |
| | | | | |
| **Prior sentences** | | | | |
| Juvenile only | 66,742 | 34.4% | 2,835 | 25.8% |
| Adult only | 404,646 | 12.7 | 34,294 | 13.5 |
| Both juvenile and adult | 309,002 | 19.4 | 15,897 | 27.3 |
| | | | | |
| **Criminal justice status at arrest** | | | | |
| New court commitment | 543,238 | 21.8% | 63,320 | 13.7% |
| On status | 489,320 | 14.6 | 23,628 | 17.8 |
| Probation | 229,952 | 15.0 | 11,644 | 14.0 |
| Parole | 252,355 | 14.1 | 11,736 | 21.3 |
| Escape | 7,013 | 17.9 | 248 | 32.9 |

## Victims of violent offenders possessing firearms

About 30% of State inmates and 35% of Federal inmates sentenced for a violent offense — homicide, sexual assault, robbery, or assault — used or possessed a firearm when committing their current offense.   A quarter of violent State prisoners and almost a third of Federal prisoners carried a handgun.  Fewer than 1 in 10, however, carried a long gun — a rifle or shotgun — or a military-style semiautomatic or fully automatic weapon.

Inmates serving time for violent crimes were more likely to use a firearm when their victims were male rather than female, 18 or older rather than under age 18, and strangers, known by sight, or known casually rather than persons the inmates knew well.

• About 40% of violent State offenders who victimized a male had a gun compared to 17% of offenders when the victim was female.

• 39% of violent State inmates with a black victim and 33% of those with a Hispanic victim used a firearm, significantly more than the 25% with a white victim.

**Possession of a firearm, by type of firearm, for State and Federal prison inmates sentenced for a violent offense, 1997**

| Type of firearm | Percent of prison inmates who possessed a firearm during current violent offense | |
| --- | --- | --- |
| | State | Federal |
| Total | 100% | 100% |
| **Any firearm** | 30.2% | 35.4% |
| Handgun | 24.7 | 30.4 |
| Rifle | 2.0 | 2.4 |
| Shotgun | 4.1 | 3.6 |
| Other | 0.7 | 1.2 |
| | | |
| Type of firearm | | |
| Single shot | 17.0% | 18.0% |
| Conventional semiautomatic | 12.1 | 16.3 |
| Military-style semi-automatic or fully automatic | 2.1 | 4.0 |

• Less than 10% of those who victimized persons 17 or younger, compared to over 33% of those who victimized persons 18 or older, possessed a firearm.

• Over a third of violent offenders used guns when their victims were strangers and casual acquaintances, compared to a fifth who used guns against persons they knew.

• 27% of offenders who victimized a current or former spouse, boyfriend, or girlfriend were armed while committing the crime.  About 8% used guns against other relatives, including children, siblings, and other family members.

**Characteristics of victims of violent crime, by whether the State prison inmate possessed a firearm, 1997**

| Characteristics of victim | Percent of violent State prison inmates who possessed a firearm during current offense |
| --- | --- |
| Gender | |
| Male | 39.8% |
| Female | 16.8 |
| | |
| Race/Hispanic origin | |
| White | 25.4% |
| Black | 38.6 |
| Hispanic | 32.8 |
| Other | 29.1 |
| | |
| Age | |
| 17 or younger | 8.2% |
| 18-24 | 40.9 |
| 25-34 | 37.0 |
| 35 or older | 33.8 |
| | |
| Relationship to offender | |
| Stranger | 35.6% |
| Known by sight or casually | 36.2 |
| Well known | 20.6 |
| Intimate* | 27.0 |
| Other relative | 8.2 |
| Friend | 26.3 |
| Other | 23.9 |

*Includes spouse, ex-spouse, boyfriend, girlfriend, ex-boyfriend, and ex-girlfriend.

## Recidivists less likely than first timers to buy their gun from a retail establishment

Although existence of a prior record did not change inmates' likelihood of having carried a gun while committing their current crime, it did influence where they acquired their gun. Recidivists were less likely than those who were first time offenders to have purchased their gun from a retail store, pawnshop, flea market, or gun show. About a tenth of recidivists and a fifth of first timers purchased their gun from a retail establishment (table 9).

A larger percentage of recidivists than first time offenders obtained their weapon through illegal activities or from the street or a black market source — 42% of recidivists and 31% of first timers.

Recidivists with firearms were as likely as first time offenders to obtain their gun from a family member or friends in 1997— about 40% acquired their guns from either family or friends.

The percentage of inmates who purchased or traded from a retail outlet, such as a store or pawnshop, fell during this period for both those with prior sentences and those without them. For repeat offenders, purchasing from retail fell from 17% to 11%, and for first time offenders from 33% to 20%.

For recidivists the percentage of inmates with firearms who obtained them from family or friends rose from 1991 to 1997 — for recidivists from 33% in 1991 to 39% in 1997 and for first timers from 36% in 1991 to 41% in 1997.

Table 9. Source of firearms possessed during current offense, by criminal history, for State prison inmates, 1997 and 1991

| | Percent of State prison inmates possessing a firearm who were — | | | |
| | First timers | | Recidivists | |
| Source of firearms | 1997 | 1991 | 1997 | 1991 |
|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% |
| Purchased or traded from a retail outlet | 20.1% | 32.9% | 11.4% | 16.8% |
| Retail store | 14.2 | 25.5 | 6.0 | 11.0 |
| Pawnshop | 4.2 | 5.4 | 3.7 | 3.9 |
| Flea market | 0.9 | 1.0 | 1.1 | 1.4 |
| Gun show | 0.8 | 1.0 | 0.7 | 0.4 |
| Family or friend | 40.5% | 36.1% | 39.2% | 33.1% |
| Purchased or traded | 11.0 | 11.5 | 13.5 | 14.0 |
| Rented or borrowed | 20.0 | 12.9 | 17.9 | 9.3 |
| Other | 9.5 | 11.6 | 7.8 | 9.9 |
| Street/illegal source | 30.9% | 26.7% | 42.4% | 45.7% |
| Theft or burglary | 7.6 | 4.7 | 10.9 | 12.4 |
| Drug dealer/off street | 15.7 | 14.7 | 22.8 | 25.2 |
| Fence/black market | 7.6 | 7.3 | 8.8 | 8.1 |
| Other | 8.5% | 4.4% | 6.9% | 4.3% |
| Number of prison inmates | 51,152 | 22,444 | 127,664 | 70,728 |

## Victim, police, and inmate reports of gun use during violent crime

The FBI reports that over two-thirds of homicide victims were killed with a firearm. About 4 in 10 inmates serving a sentence for murder or manslaughter in State and Federal correctional facilities said that they had used a gun in committing the crime.

About 23% of robbery victims and 28% of aggravated assault victims told the National Crime Victimization Survey that the offender used a gun.

Possession of firearms during violent crime, as reported by victims, police, and prison inmates, 1997

| | Percent of victimizations in the National Crime Victimization Survey | Percent of offenses in the FBI's Supplemental Homicide Reports/ Uniform Crime Reports | Percent of offenders possessing a firearm during a violent crime | |
| | | | Survey of Inmates in State Correctional Facilities | Survey of Inmates in Federal Correctional Facilities |
| Violent crime | | | | |
|---|---|---|---|---|
| Homicide | | 67.8% | 42.9% | 39.3% |
| Sexual assault | 2.4% | | 2.9 | 0.0 |
| Robbery | 23.0 | 39.7 | 34.5 | 40.5 |
| Aggravated assault | 28.4 | 20.0 | 31.2 | 26.0 |

**Table 10. Source of firearms possessed during current offense, by whether the firearm was single shot, conventional semiautomatic, or military-style semiautomatic or fully automatic, for State prison inmates, 1997**

| Source of firearms | Percent of State prison inmates who possessed a firearm | | |
| | Military-style semiautomatic or fully automatic | Conventional semiautomatic | Single shot |
|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% |
| Purchased or traded | | | |
| from a retail outlet | 19.3% | 16.5% | 12.2% |
| Retail store | 10.6 | 9.2 | 7.5 |
| Pawnshop | 6.7 | 4.7 | 3.4 |
| Flea market | 0.0 | 1.2 | 0.9 |
| Gun show | 1.9 | 1.4 | 0.4 |
| Family or friend | 25.2% | 35.6% | 43.8% |
| Purchased or traded | 11.1 | 13.0 | 12.7 |
| Rented or borrowed | 10.6 | 15.7 | 21.5 |
| Other | 3.5 | 6.9 | 9.5 |
| Street/illegal sources | 48.5% | 42.1% | 36.4% |
| Theft or burglary | 9.8 | 8.0 | 11.4 |
| Drug dealer/off street | 23.4 | 23.6 | 18.4 |
| Fence/black market | 15.4 | 10.6 | 6.7 |
| Other | 7.0% | 5.8% | 7.6% |
| Number of prison inmates | 14,896 | 79,031 | 96,531 |

Note: See note on table 2 and definitions on page 14.

**Table 11. Source of firearms possessed during current offense, by gender and age, for State prison inmates, 1997**

| Source of firearms | Percent of State prison inmates who possessed a firearm during their current offense, by gender and age | | | | |
| | Male | Female | 24 or younger | 25-34 | 35 or older |
|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Purchased or traded | | | | | |
| from a retail outlet | 13.8% | 16.5% | 6.6% | 12.7% | 21.9% |
| Retail store | 8.3 | 10.6 | 2.6 | 7.0 | 15.0 |
| Pawnshop | 3.8 | 5.5 | 2.9 | 4.0 | 4.5 |
| Flea market | 1.0 | 0.4 | 0.1 | 0.9 | 1.9 |
| Gun show | 0.8 | 0.0 | 0.9 | 0.8 | 0.4 |
| Family or friend | 39.4% | 46.4% | 40.1% | 38.9% | 39.8% |
| Purchased or traded | 12.9 | 5.9 | 13.0 | 12.1 | 13.3 |
| Rented or borrowed | 18.3 | 28.4 | 20.3 | 18.8 | 16.6 |
| Other | 8.2 | 12.1 | 6.8 | 8.1 | 9.9 |
| Street/illegal sources | 39.4% | 30.5% | 46.8% | 41.2% | 29.9% |
| Theft or burglary | 9.9 | 13.1 | 10.0 | 9.8 | 10.1 |
| Drug dealer/off street | 21.0 | 13.0 | 27.8 | 22.9 | 12.1 |
| Fence/black market | 8.5 | 4.3 | 9.0 | 8.6 | 7.8 |
| Other | 7.4% | 6.6% | 6.5% | 7.1% | 8.5% |
| Number of prison inmates | 174,488 | 4,421 | 57,194 | 60,818 | 60,897 |

**1 in 5 military-style semiautomatic or fully automatic guns bought from retail store**

About a fifth of inmates with a military-style semiautomatic or fully automatic weapon bought it retail — at a store, flea market, or gun show (table 10). About a sixth of inmates with a conventional semiautomatic weapon and an eighth with a single-shot gun also had made a retail purchase.

While family and friends provided a quarter of military-style semiautomatic or fully automatic firearms, they gave inmates over a third of the conventional semiautomatic weapons and just under half of the single-shot guns.

Almost half of inmates possessing military-style semiautomatic or fully automatic weapons, about two-fifths of those with conventional semiautomatic firearms, and over a third of offenders having single-shot guns had got their firearm in a theft or burglary, or from a drug dealer, fence, or black market.

**Young offenders less likely than older ones to have bought a firearm from a retail source**

Young offenders were less likely than older inmates to have bought their gun from a retail outlet (table 11). About 7% of inmates 24 or younger and 22% of those 35 or older obtained their gun from a retail outlet.

About half of inmates who were 24 or younger, compared to less than a third of those 35 or older, acquired their gun through illegal activities, a drug dealer, or a black market.

Among those possessing a firearm during their current offense, an estimated 17% of women and 14% of men purchased their guns from a retail establishment. About 3 in 10 women offenders and 4 in 10 male inmates acquired their firearms from a theft, burglary, drug dealer, fence, or black market. Family and friends provided guns to about 46% of female inmates with firearms and 39% of male inmates.

(127 of 300), Page 127 of 300 Case: 24-565, 04/17/2025, DktEntry: 10.5, Page 127 of 300
Revised 2/04/02, th
Case 2:19-cv-00617-KJM-AC   Document 96-10   Filed 09/29/23   Page 11 of 16

## Federal law may have disqualified over 8 in 10 inmates from buying a firearm

The Gun Control Act of 1968, as amended, and other Federal statutes list conditions which disqualify an individual from possessing a firearm or purchasing it from a licensed dealer. Some of these conditions include a prior felony conviction or indictment, current illegal drug use or addiction, dishonorable discharge from the Armed Forces, or being a fugitive from justice, a mental incompetent, or a nonresident alien. The Brady Act,

effective in 1994, mandated that federally licensed firearm dealers obtain background checks of potential purchasers, based on the conditions of eligibility.

A slightly lower percentage of State prisoners who had a gun, compared to those who did not, reported having a characteristic which may have disqualified them, as defined by Federal law. About 84% of State inmates who had possessed a gun and 88% who did not have a gun may have met at least one of the conditions, as measured in the inmate survey (table 12).

Among State inmates, those with and without guns answered differently on only two conditions. About 50% of those with a firearm and 56% without had a prior sentence to incarceration; about 37% with a gun and 49% without were on probation or parole. On other factors, about the same percentages reported meeting a condition that could have made them ineligible to purchase a firearm. Almost 6 in 10 said they had used illegal drugs before their controlling offense, about 1 in 10 had stayed in a mental health facility overnight, and 1 in 20 was a noncitizen.

Higher percentages of Federal inmates with guns than without them reported meeting at least one of the conditions of the Federal laws. About 83% with a firearm and 78% without one may have been disqualified from purchasing a gun. Higher percentages of inmates using guns compared to those without a gun had a prior incarceration (55% versus 37%), were on probation or parole when arrested (32% versus 26%), or had used illegal drugs shortly before committing their current offense (56% versus 43%).

## 9% of all State prison inmates and 2% of all Federal inmates shot a gun while committing their current offense

In total, about 1 in 10 State inmates and 1 in 50 Federal inmates fired their gun while committing their current offense (table 13). Among inmates serving a sentence for a single violent crime incident, 18% of State inmates and 9% of Federal inmates said they fired the gun they were carrying.

### Table 12. Selected characteristics that may make a gun purchase illegal under Federal law, by possession of firearm during current offense, for State and Federal prison inmates, 1997

| | Percent of inmates during current offense | | | |
| | State inmates | | Federal inmates | |
| Selected characteristic | Possessed firearm | Did not possess firearm | Possessed firearm | Did not possess firearm |
|---|---|---|---|---|
| Total meeting at least one condition which may have made inmates ineligible to purchase a firearm | 84.1% | 87.7% | 83.1% | 77.7% |
| Prior incarceration for serious offense | 49.8 | 55.9 | 55.1 | 36.9 |
| On probation or parole when arrested | 37.0 | 48.9 | 32.0 | 26.0 |
| On escape when arrested | 0.7 | 0.7 | 0.6 | 0.2 |
| Illegal drug use in month before or at time of offense | 58.8 | 56.3 | 56.0 | 43.0 |
| Ever treated overnight in mental health facility | 10.7 | 10.7 | 6.7 | 4.2 |
| Not a U.S. citizen | 5.2 | 6.0 | 7.8 | 22.6 |
| Dishonorable discharge from U.S. military | 0.3 | 0.3 | 0.7 | 0.2 |

### Table 13. Extent of weapon use during current offense, for State and Federal prison inmates, 1997

| | Percent of prison inmates | | | | | |
| | All inmates | | Violent offenders | | Other offenders | |
| Firearm use | State | Federal | State | Federal | State | Federal |
|---|---|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Used firearm | 20.4% | 8.9% | 38.5% | 35.1% | 4.3 | 3.5 |
| Discharged | 8.9 | 2.0 | 17.7 | 8.5 | 1.1 | 0.6 |
| Did not discharge | 11.5 | 6.9 | 20.7 | 26.6 | 3.2 | 2.9 |
| Possessed but did not use | 3.6 | 8.2 | 3.0 | 7.2 | 4.1 | 8.4 |
| Possessed other weapon | 1.0 | 0.5 | 1.4 | 2.7 | 0.6 | 0.1 |
| Did not possess weapon | 75.0 | 82.4 | 57.2 | 55.0 | 91.0 | 88.0 |
| Number | 993,305 | 71,325 | 468,757 | 12,249 | 515,532 | 58,266 |

Note: Table excludes prison inmates serving a sentence for multiple incidents.

**Table 14.  Extent of firearm use during current offense for State and Federal prison inmates possessing a firearm, 1997**

| | Percent of prison inmates possessing a firearm | |
|---|---|---|
| Firearm use | State | Federal |
| Total | 100.0% | 100.0% |
| Used firearm | 80.2% | 48.6% |
| Discharged | 49.1 | 12.8 |
| Killed victim | 14.6 | 3.0 |
| Injured victim | 15.4 | 3.5 |
| Neither killed nor injured | 26.3 | 7.8 |
| Brandished/displayed | 73.2 | 46.2 |
| To scare someone | 48.6 | 29.3 |
| To defend self | 41.1 | 24.9 |
| To "get away" | 18.9 | 11.6 |
| Did not actively use firearm | 19.8% | 51.4% |
| Number | 178,646 | 11,250 |

Note:  Percents of subtotals do not add to totals because inmates may have used a firearm in more than one way.  Table excludes prison inmates serving a sentence for multiple incidents.

About 1% of inmates serving a sentence for a single property, drug, or public-order incident discharged a gun.

Fewer than 1 in 20 State inmates and 1 in 10 Federal inmates, regardless of type of offense, said they possessed a firearm but did not use it.  Another 2% reported they had another weapon, including a knife, scissors, ax, rock, club or other sharp or blunt object.

**Table 15.  Extent of firearm use during current offense, for State prison inmates possessing a firearm, 1997**

| | Percent of State prison inmates possessing a firearm | | |
|---|---|---|---|
| Firearm use | Military-style semiautomatic or fully automatic | Conventional semiautomatic | Single-shot |
| Total | 100.0% | 100.0% | 100.0% |
| Used firearm | 74.6% | 78.9% | 80.8% |
| Discharged | 42.9 | 46.3 | 50.6 |
| Killed victim | 11.2 | 13.5 | 15.7 |
| Injured victim | 14.2 | 15.1 | 15.3 |
| Neither killed nor injured | 23.4 | 24.0 | 27.3 |
| Brandished/displayed | 70.5 | 72.1 | 73.2 |
| To scare someone | 45.3 | 48.0 | 49.6 |
| To defend self | 39.7 | 42.4 | 39.9 |
| To "get away" | 20.4 | 18.5 | 18.7 |
| Did not actively use firearm | 25.4% | 21.1% | 19.2% |
| Number | 14,280 | 76,010 | 96,810 |

Note:  Percents of subtotals do not add to totals because inmates may have used a firearm in more than one way. Table excludes prison inmates serving a sentence for multiple incidents. See pages 2, 14, and 15 for definitions of firearms.

**About half of inmates carrying a gun during their offense fired it and half of those injured or killed someone**

If inmates carried a firearm, they tended to use it.  Among inmates possessing a firearm and committing only one incident, four-fifths of State inmates and half of Federal inmates either fired the weapon or brandished or displayed it while committing the crime (table 14).

An estimated 23% of State inmates and 5% of Federal inmates with a gun either killed or injured their victim.  Another 26% of State inmates and 8% of Federal inmates with a gun discharged the gun but did not injure or kill anyone with it.

Besides firing their weapon, inmates used their guns for other purposes.  About half of State inmates said they used it to scare someone, about two-fifths to defend themselves, and a fifth to "get away."

About 81% of State inmates with a single-shot gun,  79% with a conventional semiautomatic, and 75% with a military-style semiautomatic weapon or a fully automatic  weapon either fired or brandished it (table 15).  About 51% with a single-shot gun, 46% with a conventional semiautomatic firearm, and 43% with a military-style semiautomatic weapon or a fully automatic weapon discharged their firearm.  About a fifth either injured or killed their victim, regardless of the type of firearm.

About a quarter of inmates carrying military-style semiautomatic weapon or a fully automatic  weapon and a fifth of those with a conventional semiautomatic or single-shot weapon did not actively use the gun in any way, discharging it or displaying it to scare someone, defend oneself, or "get away."

**Table 16. Sentence length and time to be served, by possession of a firearm and type of offense, for State prison inmates, 1997**

| Current offense | Sentence length in months | | | | Time expected to be served | | | |
| | Possessed firearm | | Did not possess firearm | | Possessed firearm | | Did not possess firearm | |
| | Mean | Median | Mean | Median | Mean | Median | Mean | Median |
|---|---|---|---|---|---|---|---|---|
| Total | 220 mo | 180 mo | 150 mo | 96 mo | 126 mo | 91 mo | 83 mo | 52 mo |
| | | | | | | | | |
| Violent offense | 252 | 240 | 216 | 180 | 147 | 115 | 126 | 87 |
| Homicide | 330 | 480 | 352 | 600 | 196 | 172 | 209 | 182 |
| Sexual assault | 444 | 480 | 232 | 180 | 212 | 206 | 131 | 97 |
| Robbery | 232 | 180 | 192 | 120 | 125 | 94 | 102 | 72 |
| Assault | 177 | 120 | 133 | 96 | 101 | 75 | 83 | 59 |
| | | | | | | | | |
| Property offense | 177 | 120 | 123 | 72 | 87 | 72 | 64 | 44 |
| | | | | | | | | |
| Drug offense | 143 | 108 | 107 | 60 | 60 | 48 | 49 | 36 |
| | | | | | | | | |
| Public-order offense | 98 | 60 | 78 | 48 | 55 | 40 | 46 | 28 |

## Possession of a firearm during an offense increased sentences and expected time served of inmates

On average, inmates possessing a firearm had longer sentences and expected to serve a longer time than those who had not used or possessed a firearm while committing their offense. Sentences for State inmates with firearms had an average of about 18 years, while those for inmates without a firearm were about 12 years (table 16). Those who had carried a firearm expected to serve about 10 years on their sentence, and those without a firearm, 7 years.

Violent offenders with firearms had on average a sentence of over 20 years and those without firearms, about 18 years. Violent offenders who had carried a gun also expected to serve 12 years on average and those who did not carry them, 10 years.

Significantly higher percentages of inmates who possessed firearms, compared to those who did not, received a sentence enhancement, generally for possessing a firearm. About 40% of State inmates who carried a firearm during their current offense and 6% who were not carrying a firearm were given an enhancement to their sentence because of a firearm offense (table 17). About 56% of Federal inmates who carried a firearm and 14% who did not carry one received a weapons offense enhancement.

## Methodology

The U.S. Census Bureau conducted the 1997 Survey of Inmates in State Correctional Facilities (SISCF) for the Bureau of Justice Statistics (BJS) and the 1997 Survey of Inmates in Federal Correctional Facilities (SIFCF) for BJS and the Bureau of Prisons. From June through October, 1997, inmates were interviewed about their current offense and sentences, criminal histories, family and personal backgrounds, gun possession and use, prior drug and alcohol use and treatment, educational programs, and other services provided while in prison. Similar surveys of State prison inmates were conducted in 1974, 1979, 1986, and 1991. Federal inmates were surveyed for the first time in 1991.

*Sample design*

The samples for the SISCF and SIFCF were taken from a universe of 1,409 State prisons and 127 Federal prisons enumerated in the 1995 Census of State and Federal Adult Correctional Facilities or opened between completion of the census and June 30, 1996. The sample design for both surveys was a stratified two-stage selection; first, selecting prisons, and second, selecting inmates in those prisons.

In the first stage correctional facilities were separated into two sampling frames: one for prisons with male inmates and one for prisons with female inmates. Prisons holding both genders were included on both lists.

**Table 17. Sentence enhancements, by possession of a firearm during current offense, for State and Federal prison inmates, 1997**

| Enhancements to sentence | Percent of inmates during current offense | | | |
| | State inmates | | Federal inmates | |
| | Possessed firearm | Did not possess firearm | Possessed firearm | Did not possess firearm |
|---|---|---|---|---|
| Total | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | |
| No enhancement | 49.6% | 70.3% | 31.1% | 57.7% |
| | | | | |
| Any enhancement | 50.4% | 29.7% | 68.9% | 42.3% |
| Firearm offense | 39.9 | 5.5 | 55.7 | 13.7 |
| 2nd or 3rd strike | 16.4 | 20.0 | 26.0 | 18.5 |
| Type of drug offense* | 7.0 | 9.8 | 23.3 | 25.7 |

*Type of drug offense includes type of drug, quantity of drug, or activity involved with the drug offense.

In the sampling of State facilities, the 13 largest male prisons and 17 largest female prisons were selected with certainty. The remaining 1,265 male facilities and 261 female facilities were stratified into 14 strata defined by census region (Northeast except New York, New York, Midwest, South except Texas, Texas, West except California, and California). Within each stratum facilities were ordered by facility type (confinement and community-based), security level (maximum, medium, minimum, and none), and size of population. A systematic sample of prisons was then selected within strata with probabilities proportionate to the size of each prison.

For the sample of Federal prisons, one male prison and two female prisons were selected with certainty. The remaining 112 male facilities were classified into 5 strata defined by security level (administrative, high, medium, low, and minimum). The 20 remaining female facilities were stratified into 2 strata by security level (minimum and not minimum). Within security level, facilities were ordered by size of population and then selected with probability proportionate to size.

For the State survey 280 prisons were selected, 220 male facilities and 60 female facilities. Of the 280 facilities 3 refused to allow interviewing and 2 closed before the survey could be conducted. Overall, 32 male facilities and 8 female facilities were selected for the Federal survey, and all participated.

In the second stage, inmates were selected for interviewing. For State facilities interviewers selected the sample systematically using a random start and a total number of interviews based on the gender of the inmates and the size of the facility. For Federal facilities, a sample of inmates was selected for each facility from the Bureau of Prisons central list, using a random start and predetermined sampling interval.

All selected drug offenders were then subsampled so that only a third were eligible for interview. As a result, approximately 1 in every 75 men and 1 in 17 women were selected for the State survey, and 1 in every 13 men and 1 in every 3 women were selected for the Federal survey.

A total of 14,285 interviews were completed for the State survey and 4,041 for the Federal survey, for overall response rates of 92.5% in the State survey and 90.2% in the Federal survey.

The interviews, about an hour in length, used computer-assisted personal interviewing (CAPI). With CAPI, computers provide questions for the interviewer, including follow-up questions tailored to preceding answers. Before the interview, inmates were told verbally and in writing that participation was voluntary and that all information provided would be held in confidence. Participants were assured that the survey was solely for statistical purposes and that no individual who participated could be identified through use of survey results.

*Estimates of prisoner counts*

Based on the completed interviews, estimates for the entire population were developed using weighting factors derived from the original probability of selection in the sample. These factors were adjusted for variable rates of nonresponse across strata and inmates' characteristics and offenses. The sample for the State survey was adjusted to midyear custody counts for June 30, 1997, from data obtained in the National Prisoner Statistics series (NPS-1A). The sample from the Federal facilities was weighted to the total known sentenced custody population at midyear 1997.

Excluded from the estimate of Federal inmates were unsentenced inmates and those prisoners under Federal jurisdiction but housed in State and private contract facilities. Those prisoners who were under State jurisdiction, yet held in local jails or private-facilities, were excluded from the estimated number of State prisoners. As a result, the estimated prisoner counts do not match those in other BJS data series. The estimated prisoner counts vary according to the particular data items analyzed. Estimates are based on the number of prisoners who provided information on selected items.

*Accuracy of the estimates*

The accuracy of the estimates presented in this report depends on two types of error: sampling and nonsampling. Sampling error is the variation that may occur by chance because a sample rather than a complete enumeration of the population was conducted. Nonsampling error can be attributed to many sources, such as nonresponses, differences in the interpretation of questions among inmates, recall difficulties, and processing errors. In any survey the full extent of the nonsampling error is never known. The sampling error, as measured by an estimated standard error, varies by the size of the estimate and the size of the base population.

Estimates of the standard errors have been calculated for the 1997 surveys. (See appendix tables 1 and 2.) For example, the 95-percent confidence interval around the percentage of State inmates who carried a firearm during current offense is approximately 18.4% plus or minus 1.96 times 0.42% (or 17.6% to 19.2%).

These standard errors may also be used to test the significance of the difference between two sample statistics by pooling the standard errors of the two sample estimates. For example, the standard error of the difference between violent and drug offenders carrying firearms when committing their current offense would be 1.0% (or the square root of the sum of the squared standard errors for each group). The 95%-confidence interval around the difference would be 1.96 times 1.0% or 1.9%. Since the difference, 22.1% (30.2% - 8.1%) is greater than 1.9%, the difference would be considered statistically significant.

The same procedure can be used to test the significance of the difference between estimates from the two surveys. For example, the standard error of the difference between Federal and State prison inmates carrying a firearm would be 0.9%. The 95-percent confidence interval around the difference would be 1.96 times .9% (or 1.7%). Since the difference of 3.6% (18.4% minus 14.8%) is greater than 1.6%, the difference would be considered statistically significant.

All comparisons discussed in this report were statistically significant at the 95-percent confidence level.

## Definitions

The survey questionnaire used the following definitions in language and terms familiar to the respondents. Interviewers read the definitions to the inmates when needed.

**Handguns** include both pistols and revolvers. They are firearms held and fired with one hand and include the following:

— *Revolver* is a handgun with a revolving cylinder with several cartridge chambers. The chambers are successively lined up with the barrel and then discharged. (Classified as *single shot* for analysis.)

— *Derringer* is a short-barreled, single shot pocket pistol. A pistol has a chamber integral with the barrel. (Classified as *single shot* for analysis.)

— A *conventional semiautomatic pistol* uses a shell which is ejected and the next round of ammunition is loaded automatically from a magazine or clip internal to the pistol grip or handle. The trigger must be pulled for each shot.[5] (Classified as *conventional semiautomatic* for analysis.)

— *Military-style semiautomatic pistol* is similar to a conventional semiautomatic pistol except that the magazine or clip is visible.[5] Primary examples are the UZI, TEC-9, and MAC-10.

[5]The survey interview included in the operational definition of a conventional semiautomatic pistol "can hold a maximum of 19 bullets" and of a military-style semiautomatic pistol "can hold more than 19 bullets."

(Classified as *military-style semiautomatic* for analysis.)

A **rifle** is a firearm intended to be shot from the shoulder. It has a long barrel which shoots bullets. Types include:

— *Bolt-action, pump-action, lever-action, or single-shot rifles* require physical movement by the operator of some part of the rifle — a bolt, lever, or pump — to reload. A single shot rifle must be loaded after each shot. (Classified as *single shot* for analysis.)

— *Semiautomatic hunting-style rifle* is a rifle in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. (Classified as *conventional semiautomatic* for analysis.)

— *Semiautomatic military-style rifle* has the characteristics of a semiautomatic hunting-style rifle. It also has military features such as a pistol grip, folding stock, flash suppressor, and bayonet mount. (Classified as *military-style semiautomatic* for analysis.)

A **shotgun** is a firearm intended to be shot from the shoulder with either a single- or double-barrel for firing shot

---

**Appendix table 1. Standard errors for type of firearm during current offense, for State and Federal prison inmates, 1997**

| Type of firearm | Standard error for estimated percent armed during current offense | |
|---|---|---|
| | State | Federal |
| Any firearm | 0.42% | 0.75% |
| Handgun | 0.39 | 0.70 |
| Rifle | 0.12 | 0.24 |
| Shotgun | 0.17 | 0.29 |
| Single shot | 0.33 | 0.55 |
| Semiautomatic | | |
| Conventional | 0.30 | 0.56 |
| Military-style | 0.13 | 0.27 |

Note: See tables 1 and 2 for survey estimates.

---

**Appendix table 2. Standard errors for firearm possession during current offense, for State and Federal prison inmates, 1997**

| Current offense | Standard error for estimated percent armed during current offense | |
|---|---|---|
| | State | Federal |
| Violent offense | 0.74% | 2.66% |
| Homicide | 1.50 | 8.52 |
| Sexual assault | 0.63 | 0.00 |
| Robbery | 1.39 | 3.31 |
| Assault | 1.67 | 8.21 |
| Other violent | 3.55 | 8.26 |
| Property offense | 0.41% | 1.37% |
| Burglary | 0.66 | 11.23 |
| Other property | 0.49 | 1.31 |
| Drug offenses | 0.65% | 0.73% |
| Possession | 0.98 | 1.59 |
| Trafficking | 0.90 | 0.86 |
| Other drug | 2.52 | 2.52 |
| Public-order offenses | 1.39% | 2.46% |
| Weapons | 3.35 | 4.05 |
| Other public-order | 0.75 | 1.78 |

Note: See table 4 for survey estimates.

(a concentration of small pellets) at short ranges. Types include:

— *Bolt-action, pump-action, lever-action, or single shot shotgun* requires physical movement by the operator of some part of the shotgun — a bolt, lever, or pump — to reload. A single shot shotgun must be loaded after each shot. (Classified as *single-shot* for analysis.)

— *Semiautomatic hunting-style shotgun* is a shotgun in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. (Classified as *conventional semiautomatic* for analysis.)

— *Semiautomatic military-style shotgun* has the characteristics of a semiautomatic hunting-style shotgun.

In addition, the shotgun has military features, such as a pistol grip, folding-stock, and detachable magazine or clip. It looks like a semiautomatic military-style rifle. (Classified as *military-style semiautomatic* for analysis.)

A **semiautomatic gun** is a firearm in which a shell is ejected and the next round of ammunition is loaded automatically from a magazine or clip. The trigger must be pulled for each shot. Semiautomatic guns may be classified as handguns, rifles, or shotguns.

A **machine gun** is an automatic gun which, if the trigger is held down, will fire rapidly and continuously. It is not a semi-automatic gun for which the trigger must be pulled for each shot. (Classified as *fully automatic* for analysis.)

A **BB gun** shoots a single pellet, using air rather than an explosive to propel the pellet. (Excluded from analysis, as were toy guns.)

This report in portable document format and in ASCII, its tables, and related statistical data are available at the BJS World Wide Web Internet site:

**http://www.ojp.usdoj.gov/bjs/**

The data for this report may be obtained from the National Archive of Criminal Justice Data at the University of Michigan. The archive may be accessed through the BJS website.

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Lawrence A. Greenfeld is the acting director.

BJS Special Reports address a specific topic in depth from one or more datasets that cover many topics. Caroline Wolf Harlow wrote this report.

Tom Bonczar and Lara Reynolds provided statistical assistance and verification. Terry Austin, Chief, National Tracing Center Division of the Bureau of Alcohol, Tobacco and Firearms, provided comments. Tom Hester and Tina Dorsey edited the report. Jayne Robinson administered final production.

November 2001, NCJ 189369

# EXHIBIT   6

1

2     FILED / ENDORSED

3

4     JUL 2 7 2022

5

6     By J. Bredberg, Deputy Clerk

7

8                 **SUPERIOR COURT OF CALIFORNIA**

9                   **COUNTY OF SACRAMENTO**

10

11    The People of the State of California,

         Plaintiff,                          Case No. 21FE019850    Dept. 40

12

13    v.                                      **ORDER SUSTAINING DEMURRER**

14    **TONY DIAZ,**

         Defendant.

15

16         The defense demurs to four felony firearm charges, including three alleged violations of

17    Penal Code section 25400, subdivision (a)(3)[1] and one alleged violation of section 25850,

18    subdivision (a). After careful review, the Court concludes the demurrer must be sustained.

19                                  *I. Introduction*

20         The facts of the case are largely irrelevant to the legal analysis, so the Court will provide

21    only a brief synopsis.

22         Defendant was one of three individuals in a vehicle smoking marijuana when they were

23    contacted by law enforcement. Defendant was patted down and a loaded unregistered handgun

24    was found in his waistband. Officers also located a key on defendant's person. The key opened a

25    safe that contained two more firearms. Both were unregistered and one was reported stolen.

26

27

28    [1] All future statutory references are to the Penal Code unless otherwise noted.

                                          1

*II. The Demurrer and the People's Response*

1

2    On July 11, 2022, the defense filed a demurrer challenging the charges. The defense

3    maintains that in light of *New York State Rifle & Pistol Assoc., Inc. v. Bruen* (2022) 142 S.Ct.

4    2111 (*Bruen*), violations of sections 25400 and 25850 are no longer public offenses. (§ 1004,

5    subd. (4).) The defense maintains *Bruen* invalidated California's concealed carry licensing

6    statutes (§§ 26150, 26155), meaning individuals can no longer be punished for concealed carry of

7    a firearm. Critically, the defense argues an individual need not have attempted to obtain a

8    concealed carry license before invoking *Bruen*. The People disagree.

9    The People make several arguments that attempt to distinguish *Bruen* and demonstrate the

10   defense's interpretation of *Bruen* is overbroad. The People argue that, under *Bruen*, a state may

11   impose statutory prohibitions so long as those prohibitions do not "altogether prohibit the *public*

12   carry of arms protected by the Second Amendment or state analogues." (Peop. Resp. at p. 5 citing

13   *Bruen*.) The People then point out that sections 25400 and 25850 do not "contain any language

14   regarding a licensing scheme" and that section 25400 prohibits various forms of concealed carry

15   but that *Bruen* was concerned with "licensing scheme that involved public or open carry laws."

16   The People contend section 25850 is still valid because "it does not ban, altogether, public carry."

17   The People go on to cite pre-*Bruen* cases holding sections 25400 and 25850 are constitutional.

18   Finally, the People maintain defendant is not the "law-abiding" citizen that *Bruen* approved for

19   public carry.

20   *III. California's Public Carry Laws*

21   Section 25400, read by itself, completely prohibits carrying a concealed firearm in a

22   vehicle or on one's person. The offense is either a misdemeanor or a felony depending on the

23   circumstances. Section 25850, read by itself, completely prohibits carrying a loaded firearm on

24   one's person or in a vehicle "while in any public place." Like section 25400, the offense is a

25   misdemeanor or a felony depending on the circumstances. Per sections 25655 and 26010, an

26   individual may, however, avoid prosecution for these offenses by obtaining a license under

27   section 26150 or section 26155.

28   Sections 26150 and 26155 outline the requirements for obtaining a concealed carry

2

1    license.[2] The two statutes are essentially identical with one (§ 26150) applying when the sheriff is

2    the licensing authority and the other (§ 26155) applying when the city chief of police is the

3    licensing authority. For the remainder of this order the Court will refer to section 26150 as the

4    relevant statute. To obtain a license an applicant must meet four criteria:

5         (1)    The applicant is of good moral character;

6         (2)    Good cause exists for issuance of the license;

7         (3)    The applicant is a resident of the county, or the applicant's principal place of

8                employment is in the county and the applicant spends a substantial period of time

9                in that place of employment;

10        (4)    The applicant has completed a course of training as described in Section 26165.

11        Compliance with section 26150 is the only legal means by which the majority of

12   individuals can legally carry a concealed firearm[3].

13                    *IV. Bruen and its Effect on California Law*

14                              *a. Bruen*

15        *Bruen* holds that the "Second and Fourteenth Amendments protect an individual's right to

16   carry a handgun for self-defense outside the home." (*Bruen, supra,* 142 S. Ct. at p. 2122.) The

17   "Second Amendment's plain text [] presumptively guarantees" the right to " 'bear' arms in public

18   for self-defense." (*Id.* at p. 2635.) The decision allows for objective regulations only if they are

19   "consistent with the Nation's historical tradition of firearm regulation." (*Id.*)

20        *Bruen* addressed New York's concealed carry licensing law, which required an applicant

21   to convince a licensing officer that he is "of good moral character" and that "proper cause" exists

22

23   [2] Sections 26150 and 26155 provide a narrow exception that allows open carry in counties with populations under 200,000 people. Other than this exception, open carry is completely banned in California.

24   [3] Obtaining a license under section 26150 is not the *only* exemption from prosecution for carrying a concealed

25   firearm. Other exemptions, however, depend on a person's place of employment, or the activity they are engaged in. For the vast majority of individuals, compliance with section 26150 is their only legal path to exercising their right to

26   public carry. (§ 25620 [members of the Armed Forces permitted to public carry when on duty] § 25645 [transportation of unloaded firearms permitted for a person operating a licensed common carrier]; § 25640 [licensed

27   hunters and fisherman permitted to carry concealed weapon while engaged in hunting or fishing]; § 25630 [exemption for any guard or messenger of any common carrier, bank, or other financial institution].)

28

                                          3

1    to issue it. An individual caught with a concealed firearm and without a license, was punishable

2    by four years in prison for a felony or one year in jail for a misdemeanor. Possession of a loaded

3    firearm without a license was punishable by up to 15 years in prison. The two petitioners in *Bruen*

4    each sought a license to carry a concealed weapon and each was denied. The petitioners sued for

5    declaratory and injunctive relief, alleging New York's statute violated the Second Amendment by

6    denying their license applications on the basis that they had failed to show "proper cause."

7    (*Bruen, supra,* at pp. 2122-2126.) The Supreme Court agreed.

8          The Court began its analysis by rejecting the two-step approach appellate courts had taken

9    to analyze firearm regulations in the wake of *District of Columbia v. Heller* (2008) 554 U.S. 570

10   (*Heller*) and *McDonald v. City of Chicago* (2010) 561 U.S. 742. The specifics of the two-step

11   approach are not relevant here. Suffice it to say, the Court rejected the two-step analysis and

12   concluded that to justify a regulation of the Second Amendment, the state must demonstrate that

13   the regulation "is consistent with this Nation's historical tradition." Only then, will the

14   individual's conduct fall "outside the Second Amendment's 'unqualified command.' [Citation.]"

15   (*Bruen, supra,* at p. 2126.) The Court then conducted a painstaking review of historical firearm

16   regulations. At the end of their journey, the Court concluded New York did not meet "their

17   burden to identify an American tradition justifying the State's proper-cause requirement." (*Id.* at

18   p. 2156.) The Court stated, "we know of no other constitutional right that an individual may

19   exercise only after demonstrating to government officers some special need." (*Id.*) Though it

20   struck down New York's licensing statute, the Court made it clear that regulations consistent with

21   historical precedent are permitted.

22                                    *b. Effect on California Law*

23         California's concealed carry licensing scheme is the same as New York's. *Bruen*

24   specifically identified California as one of seven states (including New York) that utilize a

25   "proper cause" standard. (*Bruen, supra,* 142 S. Ct. at p. 2124.) In a "Legal Alert," the California

26   Attorney General expressed his view that "that the Court's decision renders California's 'good

27   cause' standard to secure a permit to carry a concealed weapon in most public places

28                                              4

1  unconstitutional." [4] The Attorney General also states he believes the other requirements of section
2  26150 remain valid and recommends licensing authorities should "continue to apply and enforce
3  all other aspects of California law with respect to public-carry licenses and carrying of firearms in
4  public." The Legislature is currently considering a bill that would amend California's licensing
5  scheme to comply with *Bruen*. (Sen. Bill 918, 2021-2022 Reg. Sess.)

*V. Discussion*

*a. The People's Arguments*

8  The Court recognizes that *Bruen* addressed a licensing statute, but the demurrer challenges
9  a punishment/criminal statute. But the People's attempt to separate the licensing scheme from the
10 criminal statutes is untenable. The licensing scheme (§ 26150) and criminal statutes (§§ 25400,
11 25850) are two sides of the same coin. Charging a violation of either section 25400 or 25850 is
12 implicitly and functionally an allegation that the defendant failed to comply with section 26150.
13 When the licensing statute and criminal statutes are considered together, and in light of the
14 caselaw cited by defense, the defendant cannot be punished for exercising his right to public
15 carry.

16 *Bruen* unequivocally holds that public carry is *presumptively legal*. States may regulate
17 public carry, but the regulation must be rooted in our Nation's history of gun regulation as
18 interpreted by *Bruen*. If the regulation is not constitutional, then the state returns to the default
19 position – that public carry is legal, at least until the unconstitutional portions of the licensing
20 scheme are excised or amended. The People's arguments do not counter this conclusion.

21 The Court identified five arguments in the People's response. First, the People contend
22 section 25400 "specifically prohibits various forms of *concealed* carry," but that *Bruen* "was
23 concerned with a licensing scheme that involved public or open carry laws." (Peop. Resp. at p. 5
24 (Italics in original).) The People are incorrect.  The opening paragraphs of *Bruen* cite the New
25 York law prohibiting concealed carry. The Court observed: "If he wants to carry a
26 firearm outside his home or place of business for self-defense, the applicant must obtain an

27

28 [4] The Legal Alert can be found at https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf

5

1   unrestricted license to 'have and carry' a *concealed* 'pistol or revolver.' § 400.00(2)(f). To secure

2   that license, the applicant must prove that 'proper cause exists' to issue it." (*Bruen, supra,* 142 S.

3   Ct. at p. 2123 (Italics added).) Clearly, *Bruen* is as applicable to laws related to concealed carry as

4   it is laws concerning open carry.

5       Related to their first argument, the People's second argument posits that section 25850 "is

6   also appropriate under the *Bruen* analysis as it does not ban, altogether, public carry. Therefore,

7   contrary to Defendant's best efforts to incorrectly expand *Bruen*, Penal Code sections 25400 and

8   25850 are constitutional statutory prohibitions." (Peop. Resp. at p. 5.) This argument is

9   impossible to square with the statute's plain language. Section 25850 subjects anyone in a public

10  place "carrying a loaded firearm" on the person or in a vehicle to criminal prosecution. This

11  amounts to a total ban on public carry. The validity of the statute depends on individuals having a

12  legal means to exercise their right to public carry. This argument is emblematic of the People's

13  failure to connect the licensing scheme to criminal statutes.

14      The People's third argument is that *Bruen* only applies to the licensing statutes. To

15  support this argument, the People cite a footnote in a United States District Court case that states

16  "the Supreme Court decision in [*Bruen*], calls into question the constitutionality of California

17  Penal Code § 26150." The Court fails to see the relevance of this case. As noted above and

18  explained more fully below, the invalidation of the only legal means by which an individual can

19  exercise the right to public carry has significant ramifications on the ability to punish an

20  individual for the exercise of this constitutional right. The People's fourth argument is that two

21  pre-*Bruen* California decisions have already found sections 25400 and 25850 are constitutional.

22  *Bruen*, however, renders both of these decisions obsolete.

23      In *People v. Yarbrough* (2008) 169 Cal.App.4th 303, the defendant was convicted of

24  carrying a concealed and loaded firearm (fmr. §§ 12025 (now § 25400), § 12031 (now § 25850)).

25  The defendant argued these convictions violated the Second Amendment. Relying on *Heller*, the

26  court held the two statutes do "not broadly prohibit or even regulate the possession of a gun in the

27  home for lawful purposes of confrontation or self-defense, as did the law declared constitutionally

28  infirmed in *Heller*." (*Id.* at p. 313.) The court also found that "carrying a firearm concealed on the

6

1    person or in a vehicle in violation of section 12025, subdivision (a), is not in the nature of a

2    common use of a gun for lawful purposes which the court declared to be protected by the Second

3    Amendment in *Heller*." (*Id.* at p. 313-314.) The court's conclusions do not survive *Bruen*'s

4    holding that public carry is presumptively legal. Further, the court's reliance on *Heller* (a case

5    that decided whether possession of firearms in the home was protected by the Second

6    Amendment), is superseded by *Bruen*. As it was with *Yarbrough*, the People's faith in *People v.*

7    *Flores* (2008) 169 Cal.App.4th 568 (*Flores*) is misplaced.

8         In *Flores*, the defendant was convicted of being a felon in possession of a firearm,

9    carrying a concealed firearm and carrying a loaded firearm in a public place. The defendant

10   argued the convictions violated his Second Amendment rights under *Heller*. The court found that

11   "[g]iven [*Heller's*] implicit approval of concealed firearm prohibitions, we cannot read *Heller* to

12   have altered the courts' longstanding understanding that such prohibitions are constitutional."

13   (*Flores, supra,* at p. 575.)

14        *Flores'* conclusion that *Heller* approved concealed firearm prohibitions turned out to be

15   erroneous. *Heller* stated, "the majority of the 19th-century courts to consider the question held

16   that prohibitions on carrying concealed weapons were lawful under the Second Amendment or

17   state analogues." (*Heller, supra,* 554 U.S. at p. 626.) However, *Heller* also made clear they "do

18   not undertake an exhaustive historical analysis today of the full scope of the Second

19   Amendment." (*Ibid.*)  The Supreme Court completed its exhaustive analysis in *Bruen*. The *Bruen*

20   court acknowledged *Heller's* dicta on concealed carry laws and stated, "we cautioned that we

21   were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second

22   Amendment' and moved on to considering the constitutionality of the District of Columbia's

23   handgun ban." (*Bruen, supra,* 142 S. Ct. at p. 2128.) *Flores* is no longer good law.

24        The People's fifth, and final argument, is that the facts of the present case distinguish it

25   from *Bruen*. The People argue (1) the charges involve unregistered firearms; (2) "these statutory

26   prohibitions fall short of the blanket bans discussed in *Bruen*; and (3) defendant is not the "law-

27   abiding" citizen using the firearm for self-defense that the Supreme Court approved for concealed

28   carry. The Court fails to see the import of the firearms not being registered, or even stolen. The

7

1   defendant is not charged with possession of an unregistered firearm and is not charged with

2   possession of stolen property. The question is whether the charges defendant is facing are still

3   public offenses, and those charges do not depend on whether the gun was registered or stolen.

4   The Court acknowledges sections 25400 and 25850 have provisions that affect the *punishment* for

5   public carry of an unregistered or stolen firearm, but those provisions do not change the

6   fundamental question before the Court. The People's contention that *Bruen* does not apply

7   because defendant is not the type of person entitled to public carry under *Bruen* is similarly

8   unpersuasive.

9         None of the People's arguments find traction. The People are correct that the Supreme

10   Court repeatedly states the Second Amendment protects the right of "law-abiding" citizens to

11   public carry for "self-defense." However, *Bruen* does not define law-abiding or give any guidance

12   on how lower courts should determine whether a weapon is carried for self-defense or for some

13   other purpose. The People also decline to offer a definition of these ambiguous terms, and the

14   Legislature has not yet addressed these questions. Do the criminal allegations themselves mean

15   someone is not law-abiding? Does carrying a concealed firearm while possibly engaged in

16   uncharged criminal conduct mean someone is no longer law-abiding? Does a prior conviction of

17   any kind mean someone is no longer law-abiding? What if the prior conviction is stale? How does

18   a court determine whether a firearm in a waistband is possessed for self-defense or not? Is a

19   firearm locked in a safe possessed for self-defense or some other purpose? Denying someone's

20   constitutional right by teasing through nebulous questions like these is not the Court's role.

21         The best argument for sustaining the demurrer is found in caselaw cited by the defense.

22   The People never address these cases in their brief.

23                    *b. Defendant May Exercise his Right with Impunity*

24         A critical question in deciding whether to overrule or sustain the demurrer is whether

25   defendant needed to attempt to comply with section 26150 before possessing the firearm in

26   public. The petitioners in *Bruen* chose to challenge the licensing law *after* they applied and were

27   denied, but did they *have to* apply for the license first? The cases cited by the defense are

28   unequivocal – the answer is no.

8

1      In *Shuttlesworth v. City of Birmingham, Ala.* (1969) 394 U.S. 147 (*Shuttlesworth*), the

2 petitioner was convicted of violating a city ordinance that prohibited participation in a "parade or

3 procession or any other public demonstration" without first obtaining a permit. The defendant

4 was sentenced to 90 days imprisonment at hard labor and fined. The Alabama Court of Appeals

5 initially reversed the conviction, but it was reinstated by the Alabama Supreme Court. The

6 Supreme Court then reviewed the ordinance and easily determined it was unconstitutional.

7      *Shuttlesworth* stated the ordinance was an unlawful prior restraint on the First Amendment

8 because it "conferred upon the City Commission virtually unbridled and absolute power to

9 prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways."

10 (*Shuttlesworth, supra,* at p. 150.) Critically, the Court then stated:

11

12     *And our decisions have made clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free*

13     *expression for which the law purports to require a license.*

14 (*Id.* at p. 151.) The Court cited six prior opinions in support of this conclusion, including *Staub v.*

15 *City of Baxley* (1958) 355 U.S. 313 and *Freedman v. Maryland* (1965) 380 U.S. 51. The defense

16 cites both cases in the demurrer. At least one California appellate court has also held that

17 individuals faced with an unconstitutional license scheme may exercise their right without fear of

18 prosecution.

19      In *Aaron v. Municipal Court* (1977) 73 Cal.App.3d 596, the petitioners sought a writ of

20 prohibition to prevent their prosecution for violation of a municipal ordinance which outlawed

21 soliciting without a license. The petitioners argued the ordinance violated their First Amendment

22 rights. Application for the writ was necessary because the trial court had overruled the petitioners'

23 demurrers. The appellate court agreed, and reversed the judgment of the trial court and

24 "remanded with directions to issue a peremptory writ of prohibition commanding the respondent

25 municipal court to refrain from further proceedings in the actions specified in the petition,

26 pending against petitioners, *other than to dismiss the same.*" (*Id.* at p. 610 (Italics added).)

27                      *c. Conclusions*

28

                                      9

1    *Aaron* and *Shuttlesworth* provide a powerful argument for sustaining the demurrer. In

2    *Shuttlesworth*, the defendant's conviction was overturned because the licensing scheme was

3    unconstitutional. In *Aaron*, the court did not even allow the prosecution to proceed because it was

4    based on an invalid restraint on a constitutional right. Read together, the cases hold that an

5    individual cannot be prosecuted for exercising a constitutionally protected right. There is no

6    reason to believe these holdings do not apply when the Second Amendment is at issue. As *Bruen*

7    stated: "The constitutional right to bear arms in public for self-defense is not a 'second-class

8    right, subject to an entirely different body of rules than the other Bill of Rights Guarantees.'

9    [Citation.]" (*Bruen, supra,* 142 S. Ct. at p. 2156.)

10   At the time of defendant's arrest California provided one legal means by which an

11   individual could exercise their right to public carry – to get a license under section 26150. That

12   path was unconstitutional. According to *Shuttlesworth,* faced with an unconstitutional restriction

13   on his constitutional right, defendant was free to engage "with impunity in the exercise of the

14   right..."

15   The Court does not relish the conclusion reached here and understands its ramifications.

16   But this result cannot be avoided in light of *Bruen* and *Shuttlesworth* and the arguments presented

17   by the parties.

18                                  *VI. Disposition*

19   The demurrer is SUSTAINED. The People may attempt to remedy the complaint by filing

20   an amended complaint within ten calendar days of the issuance of this order. (§ 1007.) If an

21   amended complaint is not timely filed, the case will be dismissed. (§ 1008.)

22

23   DATED: 7/27/22

24

25                                    HON. STEVE WHITE
                                      JUDGE OF THE SUPERIOR COURT
26

27

28

                                        10

ER-698

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF CALIFORNIA
 3
 4    MARK BAIRD and RICHARD
      GALLARDO,
 5
                  Plaintiff(s),
 6
                  vs.                    CASE NO.
 7                                       2:9-cv-00617-KJM-AC
      ROB BONTA, in his official
 8    capacity as Attorney
      General of the State of
 9    California, et al.,
10              Defendant(s).
11
12
      _____
13
14
15          DEPOSITION OF CHARLES D. HAGGARD
16       Appearing Remotely From Topeka, Kansas
17            Tuesday, October 19, 2021
18                  Volume I
19
20
21    Reported by:
      Carrie Pederson
22    CSR No. 4373, RMR, CRR
23    Job No. 4838109
24    Pages 1 - 104
25
```

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF CALIFORNIA
3
4    MARK BAIRD and RICHARD
     GALLARDO,
5
              Plaintiff(s),
6
              vs.                     CASE NO.
7                                     2:9-cv-00617-KJM-AC
     ROB BONTA, in his official
8    capacity as Attorney
     General of the State of
9    California, et al.,
10            Defendant(s).
11
12   _____
13
14
15
16            Deposition of CHARLES D. HAGGARD, Volume I,
17   taken on behalf of the defendants, at Topeka, Kansas,
18   beginning at 9:06 a.m. and ending at 11:31 a.m. on
19   Tuesday, October 19, 2021, before Carrie Pederson,
20   Certified Shorthand Reporter No. 4373.
21
22
23
24
25
                                                Page 2
```

```
 1    APPEARANCES:

 2

 3    For Plaintiff(s):

 4              THE BELLANTONI LAW FIRM, PLLC

 5              BY:  AMY L. BELLANTONI

 6              Attorney at Law

 7              2 Overhill Road

 8              Suite 400

 9              Scarsdale, New York 10583

10              914-367-0090

11              abell@bellantoni-law.com

12

13    For Defendant(s):

14              ATTORNEY GENERAL OF CALIFORNIA

15              BY:  R. MATTHEW WISE

16              Attorney at Law

17              1300 I Street

18              Suite 125

19              P.O. Box 944255

20              Sacramento California

21              94244-2550

22              Matthew.Wise@doj.ca.gov

23

24    Also Present:

25              Mark Baird
```

Page 3

```
 1                        INDEX
      WITNESS:

 2
         CHARLES D. HAGGARD
 3
         Volume I
 4

 5
                                                    PAGE
 6
            Examination By Mr. Wise                   7
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                              Page 4
```

```
 1                          EXHIBITS
 2     DEFENDANT'S
 3                        DESCRIPTION              PAGE
 4     Exhibit 1      Expert Declaration and Report of      11
                      Charles "Chuck" Haggard
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5
```

```
 1                    CERTIFIED QUESTIONS/INSTRUCTED NOT TO ANSWER

 2                              PAGE         LINE

 3                               82            8

 4                               96           19

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          Page  6
```

```
 1              Topeka, Kansas, Tuesday, October 19, 2021

 2                    9:06 a.m. - 11:31 a.m.

 3

 4              CHARLES D. HAGGARD,

 5      having been administered an oath, was examined and

 6      testified as follows:

 7                         --o0o--

 8                       EXAMINATION

 9      BY MR. WISE:

10         Q.   Good morning.

11         A.   Morning.

12         Q.   My name's Matthew Wise.  I represent the

13      California Attorney General in this case which is

14      known as Baird v. Bonta.  Would you state your full

15      name and spell your last name for the record.

16         A.   My name is actually Charles, D as in David,

17      Haggard, H-a-g-g-a-r-d.  I go by Chuck.

18         Q.   Do you understand that you're testifying

19      here under the same oath that you would be testifying

20      under in a courtroom?

21         A.   I do.  Yes, I do.

22         Q.   You've been retained as an expert for

23      plaintiffs in this case?

24         A.   Yes, sir.

25         Q.   Have you ever had your deposition taken?
```

Page 7

```
 1        A.    Not in this case, but previously in life,
 2   yes, I have.
 3        Q.    The court reporter's recording everything
 4   that we say, so we need to try to have only one
 5   person speak at a time.
 6        A.    Sure.
 7        Q.    I'll try to let you finish your answer when
 8   I ask a question and before I ask another one.  I
 9   just ask that you try to let me finish asking my
10   question before you start to give your answer.
11        A.    Certainly.
12        Q.    If you need to take a break at any time,
13   just let me know.  The only thing I'd ask is that if
14   there's a question pending, that you'd answer that
15   question before we take our break.
16        A.    Okie-doke.
17        Q.    After I ask a question, it's possible that
18   your attorney might have an objection to the
19   question.  You should still answer the question
20   unless your attorney advises you not to answer the
21   question.
22        A.    Okay.
23        Q.    If you don't understand a question, please
24   let me know, and I'll try to rephrase the question.
25   Do you understand that?
```

Page 8

```
 1        A.    Yep, I do.
 2        Q.    You'll have an opportunity, after the
 3   deposition, to review the transcript that was made
 4   here today, and you'll be able to make corrections to
 5   the transcript, but you should know that there will
 6   be a record of the corrections that were made, and
 7   I'll be allowed to comment on any corrections that
 8   you make.
 9        A.    Okay.
10        Q.    Is there anything affecting you today that
11   would prevent you from thinking clearly and
12   testifying truthfully?
13        A.    No.
14        Q.    How did you prepare for today's deposition?
15        A.    I actually did not do any real formal
16   preparation for this deposition.  Ms. Bellantoni and
17   I had a casual phone conversation a couple of days
18   ago and wasn't -- actually hasn't been much more than
19   that.  Read through -- I forget the -- I don't have
20   it in front of me on the email.
21              There was the other expert that has been
22   retained.  He's a chief of police or former chief of
23   police.  I was able to read his declaration or his
24   statement and -- but that's been -- you know, this
25   has been set up for a few weeks now, so I was able to
```

Page 9

```
 1    read that in the meantime, but that's about it.
 2         Q.   Is that the declaration of Kim Raney?
 3         A.   Yes.
 4         Q.   And other than Ms. Bellantoni, did you speak
 5    with anyone about this deposition?
 6         A.   No, sir.
 7         Q.   When did you first become involved in this
 8    case?
 9         A.   It's been awhile.  As far as pulling a date
10    up, I'd have to defer to Ms. Bellantoni for when she
11    first contacted me to talk about this.  It would be
12    really hard for me to say.  It seems like a year or
13    two now.
14         Q.   Okay.  And was it Ms. Bellantoni who
15    contacted you or someone else?
16         A.   Yes, she did.
17         Q.   Did anyone tell you what they wanted you to
18    do as an expert in this case?
19         A.   We had a conversation, Ms. Bellantoni and I,
20    on she was looking for an expert witness to speak
21    towards police training and practices as it pertained
22    to this case, so my understanding of my input, like,
23    here today would be as a law enforcement expert.
24         Q.   Have you reviewed the complaint in this
25    matter?
```

Page 10

1       A.    Yes, sir.

2       Q.    Did you have a role in drafting the

3    complaint?

4       A.    No, I did not.

5       Q.    Are you being compensated for your work in

6    this case?

7       A.    I am, although I have yet to send a bill in

8    for anything, so, no, I have not been paid, but we --

9    Ms. Bellantoni and I agreed on a price.  Truthfully,

10   I volunteered to do this one pro bono, and she

11   insisted that I not do that, and so I believe it's in

12   my statement or in my declaration, I think we agreed

13   to 75 an hour or something like that.

14      Q.    Okay.  Let me share my screen.  I will try

15   to show you an exhibit here.  Could we go off the

16   record for just a moment?

17           (Discussion off the record)

18           MR. WISE:  Can we go back on the record now?

19   BY MR. WISE:

20      Q.    Okay.  We're back on the record.

21   Mr. Haggard, can you see Exhibit 1 on your screen?

22           (Exhibit 1 marked)

23           THE WITNESS:  Yes.

24   BY MR. WISE:

25      Q.    Okay.  Do you recognize this document?

Page 11

```
 1        A.    I do.

 2        Q.    What --

 3        A.    This would be the declaration that you asked

 4   me, in my preparation, what I had read.

 5        Q.    Did you prepare this declaration?

 6        A.    I did not.  I spoke to Ms. Bellantoni at

 7   length and wrote up my thoughts, and then she made it

 8   look real pretty on this document.

 9        Q.    Does this declaration reflect your thoughts?

10        A.    Yes, sir.

11        Q.    Okay.  And did you sign a copy of this

12   declaration?

13        A.    Yes, I did, and then because of the nature

14   of what we're doing, I had to sign and then scan that

15   and then send that in so that you guys would have a

16   legal copy.

17        Q.    Okay.  Let's look just at page 14 here.  I

18   notice that the declaration that I have is not

19   signed, but you do have a signed version?

20        A.    Yes, sir, I do.

21        Q.    Okay.  Would you work with plaintiff's

22   counsel to provide me a signed copy of this

23   declaration?

24        MS. BELLANTONI:  Yeah, I'll get that over to

25   you, Matthew.
```

Page 12

```
 1            MR. WISE:  Terrific.
 2     BY MR. WISE:
 3        Q.   Your declaration cites a number of
 4     documents.  Besides the documents that you've cited,
 5     did you rely on any other documents in reaching your
 6     opinion on this case?
 7        A.   I read the original -- my legal training is
 8     failing me here -- the filing, the case that was put
 9     forward, and then the other expert, Chief Raney, I
10     read those documents.
11        Q.   Did you conduct research to locate the
12     documents that form the basis of your opinion?
13        A.   I'm not sure how you mean that.  Which part
14     are you referring to?
15        Q.   Anything in the declaration itself.  Did you
16     conduct any research to try to come up with documents
17     that would support your opinion?
18        A.   Not really.  A big part of my declaration
19     would be personal observation and experience.
20        Q.   Did anyone else provide you with documents
21     that would support the basis of your opinion?
22        A.   I don't believe so.  Besides the documents
23     that Ms. Bellantoni provided to me that I've talked
24     about reading as far as, like, what's already
25     pertinent to this case, I don't believe so.  Like I
```

Page 13

```
 1    say, we've been doing this for quite awhile.  I will
 2    tell you that I do, you know, like, on a regular
 3    basis, read up on things like news, gun control
 4    issues, crime issues, things like that.  All of that
 5    is still pertinent to my life.  I am still an active
 6    duty police officer, so those are all things that I
 7    pay attention to, but I don't recall being provided,
 8    or, you know, anything like that, anything specific
 9    for this case, no, sir.
10       Q.    Anyone other than plaintiff's counsel
11    assisted you in preparing this declaration?
12       A.    No.  Huh-uh.
13       Q.    Have you ever served as an expert witness?
14       A.    Yes, sir, I have.
15       Q.    How many times?
16       A.    It's hard to say.  Probably a good dozen.
17    I've been retained as an expert witness on police use
18    of force both in civil court and in criminal court.
19    I have been retained as a defense expert on firearms
20    and firearms training in a murder trial.  I have been
21    retained as an expert witness on firearms in a
22    series.  We had kind of a gang robbery homicide thing
23    that turned into a series of probably eight separate
24    trials because of the nature of that one, so I don't
25    have an -- I'd say probably 10 to 12 times at least.
```

Page 14

1      Q.    Have you ever testified as an expert on the

2      public carry of firearms?

3      A.    No, I have not.

4      Q.    Did you attend college?

5      A.    I did.

6      Q.    What college?

7      A.    Kansas State University.

8      Q.    Did you graduate?

9      A.    I did not.  The police department decided to

10     hire, and I had to weigh my options, so ended up

11     taking the job.

12     Q.    Besides college experience you had, did you

13     complete any other formal education courses?

14     A.    I've completed courses, Kan State

15     University, and then other courses through the

16     military that were adjunct to other colleges such as

17     Washington University, Emporia State, couple of those

18     that were out-of-state things like Louisiana State

19     University that were part of the course that I was

20     doing.  That was both in a police capacity and a --

21     or, when I was in the military, military capacity,

22     and those were classes that if you did that, you

23     could gain college credit for that.

24          I've also -- not pertinent to this, but also

25     completed Kansas -- not Kansas State University --

Page 15

```
 1    Kansas University classes through things like fire
 2    science and that sort of thing that all count
 3    towards -- you know, so I've earned college credit in
 4    a whole bunch of places but never coalesced that into
 5    a degree as it were.
 6        Q.   Any other formal education that we haven't
 7    touched on?
 8        A.   Quite a bit.  I'm assuming that you have a
 9    copy of my CV.  A whole lot of what I've done is
10    things like Force Science Research Center as a force
11    analyst, training on excited delirium and things that
12    are pertinent to police use of force, human dynamic
13    factors, deescalation, verbal judo, etc., etc., as
14    all is preparation and, you know, on-the-job
15    improvement for the jobs that I was doing mainly at
16    the Topeka Police Department, which since I've
17    retired from, but then in my current roles, I'm still
18    a national trainer for National Law Enforcement
19    Training Center.  I have my own business.  I'm an
20    adjunct instructor for Strategos International,
21    adjunct instructor for Hardwire Tactical, and then
22    I'm a police captain here at my current job.
23        Q.   You mentioned that you served in the
24    military.  When did you serve in the military?
25        A.   It would have been 1982 to -- it's been
```

Page 16

```
 1     awhile.  19 -- I'm going to -- I believe 1998, but I
 2     might be off on that, but definitely started in '82.
 3        Q.   What positions did you hold in the military?
 4        A.   So I was a reconnaissance specialist, and
 5     that's a fancy word for -- or fancy term for we go
 6     out and find the bad guys and tell everybody else
 7     where they are at.  So in those roles, I was vehicle
 8     driver, I was a machine gunner, I was a squad leader,
 9     I was a platoon sergeant.  At one point, I was an
10     acting platoon commander when we did not have a
11     lieutenant on who was assigned to our unit.
12        Q.   I think you just mentioned this, but did you
13     become familiar with firearms while in the military?
14        A.   Oh, yes.
15        Q.   Can you describe your experience with
16     firearms in the military?
17        A.   So actually in that role, in the job that I
18     had, we were required to train with and qualify on a
19     yearly basis more than most of the Army jobs.  If
20     you're, like, a truck driver or something like that,
21     it's very minimal.  Infantrymen, obviously you're
22     going to be more that, but just as an example, when I
23     first got into the job that I was in, I was required
24     to qualify -- train with, qualify with a .45 pistol,
25     M16a1 rifle, M60 machine gun, M2 50 caliber machine
```

Page 17

```
 1    gun, the M203 40 millimeter grenade launcher, the LAW
 2    antitank rocket, Claymore antipersonnel mines.
 3            I'm probably leaving something out of the
 4    list, but -- and then that -- as firearms changed
 5    within the military, like they upgraded pistol, they
 6    upgraded rifles, they added grenade launching machine
 7    guns and things like that, we all got -- we got
 8    trained on those as well.
 9    Q.   You mentioned that you've had a career in
10    law enforcement.  At what point did you begin that
11    career?
12    A.   1987.
13    Q.   What department did you work for?
14    A.   The Topeka, Kansas Police Department.
15    Q.   What were your roles there?
16    A.   I started out as a patrolman.  I was a
17    patrol officer and eventually a patrol sergeant.  I
18    ended my career.  The last six years of my career, I
19    was a shift commander as a lieutenant, and then in
20    the interim, I was a member of our SWAT team for
21    little over 17 years, and so I was a breacher, I was
22    a sniper, I was a squad leader.
23            At one point I was the team leader when we
24    did not have a lieutenant assigned.  I was a firearms
25    trainer for the unit, a gas guy utilizing the grenade
```

Page 18

1    launchers, and in the wider role for the department,

2    I was a field training officer.  Then when I

3    promoted, I was a field training sergeant supervising

4    field training officers.

5         I was a firearms instructor, use of force

6    instructor on things like batons, taser, Pepper

7    Spray, handcuffing, arrest and control tactics,

8    things like that, ground fighting, weapon retention.

9         So we had a regional academy that was

10   approved through our state CPOST, so we had -- we did

11   recruit training and in-service training.  At one

12   point, I was responsible for all of the use of force

13   and firearms training for the department, and for

14   about -- it was just about three years there, I was

15   the range master where my primary job was to do all

16   of the recruit in-service firearms training,

17   Maintenance, and then my role as a defensive tactic

18   instructor, I was basically in charge of our use of

19   force program where I had officers working for me who

20   assisted with that training.

21   Q.   Did you ever develop protocols on how to

22   respond to an incident involving a firearm?

23   A.   Yes, actually, and some of it very specific.

24   Right after Columbine, we had -- you know, there was

25   kind of a watershed event in law enforcement where

Page 19

```
 1    people were like, "Oh, my God, we can't do that"
 2    because the perception was that the officers there
 3    kind of waited around, so you had to have what we
 4    call a rapid response to an active shooter, and then,
 5    of course, I don't know if you've ever seen pictures
 6    coming outline of Columbine, but there was a wide
 7    variety of officers.  There were detectives, there
 8    were officers in plainclothes, there were officers
 9    who showed up off duty, things like that, uniformed
10    police officer from multiple different departments.
11          So, you know, a big part of that would be
12    training the officers on what -- it's often called
13    PID or positive identification.  The last thing we
14    want to do is replicate tragedies that have happened
15    in the past in places like New York City where you
16    have a blue-on-blue, you have, like, say, a uniformed
17    officer shooting a plainclothes officer or something
18    like that, so a big part of our training was
19    responding to threat recognition and then proper
20    response, you know, to the scenario as you find it.
21    Q.   And what was your role in developing that
22    training?
23    A.   I actually developed it from scratch.  I was
24    given the job of -- because we wanted to have a rapid
25    response program, I was given the job of, "Hey, we
```

Page 20

```
 1   need to come up with something for that."

 2        So in my role as the primary firearms

 3   trainer at that point, or one of the primary firearms

 4   trainers at that point, I was given the role of

 5   coming up with an in-service training package so that

 6   we could run all our people through rapid response.

 7        I would say Columbine was a watershed event

 8   for law enforcement in recognition of this, but in my

 9   career, I had already responded to two active shooter

10   events, so that was something that was, you know, the

11   type of training that, taken seriously, was really

12   near and dear to my heart, that I'm glad they finally

13   got the -- the command staff finally got the message

14   that that needed to happen.

15   Q.   After working at the Topeka Police

16   Department, did you work in any other capacity as a

17   law enforcement officer?

18   A.   Yes, sir.  Shortly after retiring, because

19   we have a -- we have a technicality in our

20   retirement, you can't do anything for 60 days for a

21   paycheck, otherwise it screws up, you know, the --

22   how the retirement fund works.  We have to take

23   60 days off before you're allowed to do anything else

24   or you get paid, so I took short vacation, and then

25   the county north of me, Jackson County Sheriff's
```

Page 21

```
 1    Department, was shortly of people, so I became a
 2    part-time deputy for them and was helping them out
 3    with road patrol and training, and then approximately
 4    almost exactly a year after I retired, I took the
 5    current job that I have now with Metropolitan Topeka
 6    Airport Authority Police and Fire.  I know that's a
 7    mouthful.
 8            And then since then, I am also -- I have --
 9    I'm no longer working for Jackson County part-time,
10    but -- this is one of those you know, "You're getting
11    old when."  One of my recruit officers is now the
12    sheriff of the county that I live in, and he asked me
13    to come onboard as a part-time deputy, so I'm a sworn
14    deputy with the Shawnee County, Kansas Police
15    Department as well, and I'm currently doing that.
16        Q.   Got it.  Any other law enforcement roles
17    that we haven't touched on?
18        A.   No, sir.
19        Q.   Do you have any other current forms of
20    employment?
21        A.   Just my side business, and I do consulting.
22    Friend of mine's a retired officer, he has a security
23    company, so every once in awhile, I'll do the
24    qualifications for his guys and things like that, but
25    primarily my Agile Training consulting business.
```

Page 22

1      Q.   What is Agile Training and Consulting?
2   Would you describe it?
3      A.   So my business model is I try to meet
4   clients' needs instead of having a cookie cutter type
5   package like, you know, basic -- I have Basic
6   Pistol 1, Basic Pistol 2 or something like that.  I
7   kind of customize classes for people's needs.  I've
8   had people hit me up for things like -- I'm currently
9   going -- about to do a in-service package for
10  University Police Department over in Kansas City,
11  Missouri, and they want to have two hours of Pepper
12  Spray update, two hours of weapon retention update
13  and then four hours of arrest and control and a
14  handcuffing package just as an eight-hour day, "Can
15  you do" -- "Yeah, I can, you know, put together a
16  training package for your needs."
17       Much of what I've done lately has been
18  firearms training, and, quite frankly, the business
19  has been a lot better for civilian capacity training
20  than law enforcement training as far as people who
21  are paying for training.
22      Q.   Do you conduct any trainings that involve
23  how to respond to a person armed with a firearm?
24      A.   Yes.
25      Q.   An how do you train your clients to respond?

Page 23

1    A.   Are you talking a -- I'm assuming you mean a
2    nonsworn -- a non-police officer type person.
3    Q.   Yes.
4    A.   So part of the training I do is -- what we
5    look for in behavioral aspects of pre-criminal
6    assault behavior.  One of my friends put a very good
7    label on there, his name is Craig Douglas, and he
8    calls it MUC, M-U-C, managing unknown contacts.
9         Say you are approached by someone on the
10   street that you don't know.  How do you read that
11   type of encounter?  Is it threatening?  Are they
12   setting you up for, like, a mugging or a carjacking
13   or something like that?  And talk about the
14   behavioral aspects of what criminal assault looks
15   like.
16        So it comes as some surprise to some people
17   that bad guys can be very sneaky, and, you know,
18   they're not going to have a big sign or, you know,
19   something on the T-shirt that says "I'm a bad guy,"
20   so a big part of mine is the pre-criminal assault
21   behavior-type things, the recognition of what type of
22   scenario you may have found yourself in to -- and
23   then the how to respond correctly in those scenarios,
24   and I will do that with verbal skills, verbal
25   deescalation.

Page 24

```
 1              Very popular part of my training has been
 2     Pepper Spray, how to do something that's not -- you
 3     know, what I call something between a harsh word and
 4     a gun, and then recognition of is -- you know, in my
 5     end of scenario that actually requires a firearms
 6     response, you know and, if so, how to do that, what
 7     that might that look like.
 8        Q.   In those classes, do you recommend that your
 9     clients carry a firearm?
10        A.   I never recommend to anybody that they carry
11     a firearm.  That's a very personal decision.  I can
12     speak to the pluses and minuses of carrying a
13     firearm, but I have clients that I have worked with
14     who -- like, one friend of mine who used to be an
15     ADA, and, as you can imagine, in that capacity
16     putting people in prison, you can -- you know, she
17     picked up a stalker, and then I helped her with a
18     security package as a friend, how to harden her house
19     and have some defensive options.
20              She was adamant she did not want a gun.  She
21     was just not a gun person.  I'm not going to push a
22     gun on her.  So we came up with non-gun home defense
23     options for her that made her feel more comfortable.
24              So if people want firearms training, I will
25     offer firearms training.  If people are adamant that
```

Page 25

1      they don't want firearms training, that they're

2      looking for something else, then, you know, that's

3      like anything else, like whether you drink or not,

4      that's an extremely personal decision.

5          Q.   And just for the record, when you said

6      "ADA," what were you referring to?

7          A.   Assistant district attorney.  I'm sorry.

8          Q.   Do you believe that carrying a gun in and of

9      itself makes a person safer?

10             MS. BELLANTONI:  Objection.

11             You can answer.

12             THE WITNESS:  Excuse me.  I've been talking

13     awhile.  My throat is dry.

14             I believe it can.  I have personally been

15     involved in scenarios where I was just another dude

16     off duty in which I know that if I had not had a

17     firearm, I would have been a victim of a violent

18     criminal assault or, you know, armed robbery, that

19     sort of thing.  I believe that having a firearm gives

20     one the option of being able to not leave oneself at

21     the other guy's mercy.

22     BY MR. WISE:

23         Q.   Would you consider a gun a tool of limited

24     utility in most situations?

25         A.   It is definitely a tool of deadly force,

```
 1    and, you know, one of the things that people need to
 2    know is you can't legally shoot people a little bit.
 3    It is a tool for managing situations that require a
 4    deadly force option.
 5         Q.   I think you were mentioning this earlier,
 6    but are there particular steps that you recommend
 7    that your clients take before they carry a firearm in
 8    public?
 9              MS. BELLANTONI:  Objection.
10              You can answer.
11              THE WITNESS:  I would -- it sounds
12    self-serving because I am in a training business, but
13    I obviously counsel people that they need to have
14    some sort of training and education both how to
15    safely handle firearms -- I mean, something as
16    simple -- even in a hunting capacity, most people
17    would want to go through -- like we -- here in
18    Kansas, we have a hunter safety course, you know,
19    that just seems like a very logical thing, but going
20    through some -- both the mechanics of how the firearm
21    works and then how to effectively mechanically shoot
22    the gun, what you would think of as marksmanship
23    training and then having some sort of education on
24    when that's appropriate.
25              I suppose smart people can do things like
```

Page 27

```
 1    here in Kansas, you can pull up the state law, and
 2    it's very clearly stated when defense of a person or
 3    your domicile is allowed, but I counsel people that
 4    they probably want to get some education, probably
 5    want to get some training just like anything else.  I
 6    counsel driver's ed before you get behind the wheel
 7    of a car.  It just seems to make sense.
 8    BY MR. WISE:
 9        Q.   Before your clients carry a firearm in
10    public, do you recommend that they get physically
11    fit?
12            MS. BELLANTONI:  Objection.
13            You can answer.
14            THE WITNESS:  Was that, "Go ahead and
15    answer" or --
16            MS. BELLANTONI:  Go ahead and answer.
17            THE WITNESS:  Actually, I recommend
18    everybody get as physically fit as they can because
19    we know heart attacks kill a lot more people than
20    virtually anything else, you know, lifestyle.  I
21    don't want to get too deep in the whole COVID thing,
22    but when you look at what makes you susceptible to
23    COVID, the comorbidities are a very big deal.
24            However, comma, the most vulnerable
25    populations are the people who are elderly, less
```

Page 28

1   physically fit, you know, and I have some sympathy to

2   that.  In my prime when I was in my 30s and I could

3   run two miles in 12 and a half minutes and pick up

4   600 pounds off of the ground any time I felt like it

5   and I was a judo and Jujitsu guy, I could handle

6   virtually any grown man that I ran into.

7          Now I'm 57, and I have a bad knee, and I've

8   jumped out of too many airplanes, and I've

9   rub-marched too many times.  I have no cartilage in

10  one of my knees and little cartilage in the other,

11  and I need a hip replacement according to -- two out

12  of three orthos say I need a hip replacement.

13         So the thought occurs to me that people who

14  are less physically capable need more means to defend

15  themselves, and that often means that they need tools

16  to solve that problem.

17  BY MR. WISE:

18     Q.   Before your clients carry a firearm, would

19  you recommend that they carry other items to defend

20  themselves?

21     A.   So part of my training is -- I've obviously

22  already mentioned that I'm a big proponent of Pepper

23  Spray, I have taught it for a long time, and I've

24  used it in a law enforcement capacity hundreds of

25  times.  I'm a big believer in that as a less than

Page 29

```
 1     lethal tool, and I point out that there are
 2     situations -- like, I know as a police officer, there
 3     are situations where if you use sufficient force
 4     early, that you could interdict having to use more
 5     force later.
 6              The case of Kyle Dinkheller, who was a
 7     deputy who was famously murdered on his -- on car
 8     camera in a gun fight is one of those cases that's a
 9     glaring example.  But Pepper Spray is a less than
10     deadly force option for in a case where you find
11     yourself subject to physical force.  Guns are a tool
12     of deadly force, and those are two different
13     scenarios.
14        Q.   Why do you train your clients to take these
15     other steps before when they carry a firearm in
16     public?
17              MS. BELLANTONI:  I'm going to ask for some
18     clarification on what other steps you're referring
19     to.
20              THE WITNESS:  I was about to do the same,
21     so --
22     BY MR. WISE:
23        Q.   Sure.  And the other steps I mean are
24     getting training, carrying Pepper Spray, reading up
25     on the law, the steps that you just mentioned.
```

Page 30

```
1          MS. BELLANTONI:  I'm going to object to that
2     as well because I don't believe there was testimony
3     that he recommends they carry Pepper Spray, but maybe
4     we could get clarification on that.
5          THE WITNESS:  So I'm a big believer in human
6     beings being as capable as possible, and that may be
7     an artifice of my time as a police officer.  I
8     believe that, as a cop, you're in the lifesaving
9     business, and now, you know, I'm also a firefighter
10    on the side, so I'm in another lifesaving business,
11    you should be as capable as you possibly can, so my
12    counsel to human beings in general is that we should
13    be working to be better human beings this week than
14    we were last week, if you will, and that's kind of an
15    off-take of that.
16          Also, the more capability -- the more
17    training, education and capability you have, the more
18    situations you are going to be able to overcome if
19    you find yourself in a bad place.  I think we could
20    agree if you were an Olympic class swimmer, when your
21    sailboat sinks, you're going to be a lot better off
22    than your average dude that falls off a sailboat.
23          So if looking at my experience with street
24    crime, things like muggings, purse snatchings,
25    carjackings, person robberies, things like that,
```

Page 31

1    those can have a -- they can be a large range of
2    circumstances, so recognition of the problem,
3    figuring out ways to try to deescalate that, if
4    possible, having options if it's not a deadly force
5    scenario, and then having options if it is a deadly
6    force scenario is my counsel to people on how to best
7    cover the range of possibilities that people find
8    themselves in.
9    BY MR. WISE:
10        Q.   Do you have concerns that some persons that
11   carry openly don't know how to properly handle their
12   firearm in public?
13        A.   I'm not sure how to tactfully word this, but
14   I have concerns, and I don't mean just the public, I
15   mean the police and the military.  I have concerns
16   about the quality and quantity of training available
17   to the human race in general.
18             I'm currently in a bit of a dispute with our
19   state academy over what I believe is not -- the
20   training they're offering could be better, I'll just
21   say that.  Do I worry about other people carrying
22   guns?  I've been around other people carrying guns my
23   entire life, so not that much.
24        Q.   You have already responded in part to this,
25   but would you agree that a factor that affects

                                              Page 32

1    whether a person uses a firearm safely is their

2    training?

3        A.    Probably, yeah, yeah, I'd say that.  Just

4    like anything else, I mean, if you were to -- if

5    you've never used a chainsaw before and you go pick

6    one up and start it up, you know, that might not be

7    the safest way to do business.

8        Q.    Would you agree that a factor that affects

9    whether a person uses a firearm safely is their

10   ability to deescalate a situation?

11            MS. BELLANTONI:  Objection.

12            You can answer.

13            THE WITNESS:  I don't know that I'd agree

14   per se with that.  Deescalation is a two-way

15   communication process, and the other person has a say

16   in what you are doing.  We have to deal with that in

17   depth right now in law enforcement, "deescalation"

18   has been a whole big ugly buzz word, but let's say I

19   have somebody in a state of excited delirium or very

20   high on drugs.  You know, I can't communicate or

21   deescalate with another person who isn't -- doesn't

22   even realize I'm on the same planet with them.

23            I've had to deal with people who are -- you

24   know, you try verbal deescalation, and you realize

25   you're dealing with somebody who's profoundly

Page 33

1  paranoid schizophrenic on a psychotic break, can't

2  really talk to that person, so the onus, the -- you

3  know, the weight of the deescalation on the person

4  carrying the gun, I think, is only -- you can only do

5  so much.

6  BY MR. WISE:

7     Q.   Are there certain situations, though, when

8  the ability to deescalate a situation allows a person

9  to carry a firearm more safely?

10        MS. BELLANTONI:  Objection.

11        You can answer.

12        THE WITNESS:  So I would argue that in some

13  scenarios, like I was in a case where I was off duty,

14  and I was with my girlfriend, we missed the last

15  Metro, we missed the last subway back to our hotel,

16  had to walk back in the dark, got confronted for what

17  would have been a street robbery by three dudes who

18  were all my size, so that's a fight I cannot win,

19  can't fight three guys empty-handed.

20        I ended up pulling a snub nose revolver on

21  them, and a combination of having a gun and then

22  verbal commands was what allowed me to deescalate

23  that scenario and kept it from turning into -- either

24  into a robbery where I got beat down or a situation

25  where I had to shoot one or more of them.

Page 34

```
 1              So I would say with a gun, that the use of
 2     the gun can be part -- or the availability of the gun
 3     can be in fact part of the deescalation process
 4     where, if you have a criminal, they realize that you
 5     have the capability to defeat their means of
 6     assaulting you, and that becomes part of the
 7     deescalation process whereas if you did not have that
 8     with you, they would go ahead and carry on.
 9     BY MR. WISE:
10        Q.   And so in that situation, your ability to
11     deescalate the situation prevented you from having to
12     fire your gun, for example?
13        A.   Well, in that case, the display of the gun
14     and then the verbal -- you know, my commands to them
15     to stop what they were doing was what allowed me --
16     those in concert was what allowed me to keep that
17     from turning into either a beat-down on my part or a
18     shooting on their part.
19        Q.   Let me just circle back again and just make
20     sure I'm understanding correctly.
21        A.   Okay.
22        Q.   So are there any situations where a person's
23     ability to deescalate a situation allows them to
24     carry a firearm more safely?
25              MS. BELLANTONI:  I just want to just
```

Page 35

```
 1     clarify, I should have a couple of questions ago, but
 2     when we talk about deescalation, are we talking in
 3     terms of a uniformed police officer attempting a
 4     deescalation or civilian?
 5            MR. WISE:  Yeah.  I was talking about a
 6     civilian.  Thanks for clarifying.
 7            MS. BELLANTONI:  I object.
 8            But you can go ahead and answer.
 9            THE WITNESS:  I'm having trouble thinking of
10     a scenario where that would fit.
11     BY MR. WISE:
12        Q.   Okay.  Do you agree that a factor that
13     affects whether a person uses a firearm safely is
14     their decision making process under stress?
15        A.   I could agree with that.
16        Q.   Would you agree that a factor that affects
17     whether a person uses a firearm safely is their
18     marksmanship?
19            MS. BELLANTONI:  I'm going to object to
20     that, and I'm going to ask for clarification on
21     distance, if you can provide more of a scenario-based
22     circumstance because there's a lot of factors that go
23     into that decision.
24            THE WITNESS:  May I interject on that?  So
25     my answer was going to be not as much as people would
```

Page 36

```
 1    suspect.  So in an overall view of most nonpolice
 2    defensive shootings, if you take anecdotal databases
 3    like the one that -- the ones we get off of the news
 4    that go into the NRA magazine that's out every
 5    month -- and they have an article called The Armed
 6    Citizen.
 7              The vast majority of the people involved in
 8    these cases where you see, like, "78-year-old Grandma
 9    Shoots Burglar Used Alleging .22 rifle."  Vast
10    majority of those people have very little or no
11    formal training.
12              And then the marksmanship issue that we see
13    in a -- on the street -- I'm not talking about a home
14    defense scenario, although that could -- it's pretty
15    similar, but in a street, what I would consider a
16    civilian street encounter or street crime encounter,
17    let's say a mugging or carjacking or something like
18    that, these encounters tend to be incredibly close.
19              The vast majority of bad guys, when they go
20    to do things like mug you or car jack you, things
21    like that, are within touching distance of the
22    victim.  Even in police encounters, we see that the
23    vast majority of police officers, when they're
24    feloniously killed with a firearm or killed within
25    three feet to three yards of the suspect, so if we
```

Page 37

1    look at the -- there's an old saying in pistol fights

2    that it's three yards, three shots, three seconds,

3    and if you look at a lot of these encounters, they

4    fit right into what we're talking about, is the

5    marksmanship issue actually isn't that tough.

6    BY MR. WISE:

7      Q.   Would you agree that a factor that affects

8    whether a civilian uses a firearm safely is their

9    mental state?

10         MS. BELLANTONI:  Objection.

11         You can answer.

12         THE WITNESS:  So I'm going to assume -- by

13   "mental state," do you mean their mental health or,

14   like, their emotional state at the moment, or what do

15   we mean?

16   BY MR. WISE:

17     Q.   Sure.  Let's just take that one-by-one then.

18   Their mental health.

19     A.   Well, I would hope that people who have

20   significant mental health issues would not be running

21   around with a gun.  We're kind of supposed to screen

22   for that.  But then as far as their current mental

23   state, having been in that scenario, being criminally

24   victimized is obviously a very exciting, and, you

25   know, it's an event in which it's going to be

Page 38

1    emotionally charged, so I don't think that you can

2    put somebody in a scenario like that and not have a

3    significant emotional response out of just human

4    beings in general.

5        Q.   Let's assume that they're not being

6    victimized by just their carrying a firearm, okay,

7    and so my question is would you agree that a factor

8    that affects whether a person uses a firearm safely

9    is, let's just say, their emotional state?

10           MS. BELLANTONI:   Objection.   So using a

11   firearm, but they're not being victimized, so if I

12   could just get more clarity on that question.

13   BY MR. WISE:

14       Q.   Let's say that -- I'm sorry.  I should just

15   say carrying a firearm.

16       A.   I'm not sure exactly how to quantify that

17   one.  I think like a lot of things that human beings

18   do like driving cars, you should probably --

19   utilizing chainsaws, you should probably be a mature

20   adult if you will.  There's a reason why we, you

21   know, don't give 13-year-olds driver's licenses and

22   things like that.  So that, I guess, emotional

23   stability or emotional maturity kind of comes with

24   that, so I guess I'm kind of agreeing with you.

25       Q.   Would you agree that a factor that affects

1    whether a civilian uses a firearm safely is whether

2    they're intoxicated?

3       A.   Certainly.

4       Q.   Would you agree that in general, an off duty

5    officer is more likely to be prepared to use a

6    firearm safely than the average civilian?

7          MS. BELLANTONI:  Objection.

8          You can answer.

9          THE WITNESS:  I'm on the fence on that one.

10   I'm really on the fence on that one.  It's hard for

11   me to mentally average law enforcement officers.

12   It's also hard for me to mentally average non- -- I

13   know -- I can think of quite a few people who are not

14   cops that I would rather have backing me up on

15   something bad happening than some of the cops that I

16   know, and, of course, the flip side is also there, so

17   that would be one I would have to ponder.  I really

18   can't give you an answer on that one.

19   BY MR. WISE:

20      Q.   Would you agree that in general, an

21   undercover officer is more likely to be prepared to

22   use a firearm safely than the average person?

23         MS. BELLANTONI:  Objection.

24         You can answer.

25         THE WITNESS:  I'd have to have the caveat of

Page 40

```
 1    having to know what some of their training is.  Like,
 2    here in my state, unfortunately, there's no
 3    requirement for police officers to do anything but
 4    shoot the qualification course from their police duty
 5    belt, so there's no formal instruction in the police
 6    system here in my state on, like, how to carry a gun
 7    concealed or how to deploy a gun concealed.
 8            Officers who are doing those things and are
 9    very competent at them are either working that
10    problem themselves or seeking training outside of
11    their department to get that, or they have a very
12    progressive training department who is offering that
13    sort of training to their people.  So, again, I'm not
14    sure I can say that I agree with that.
15    BY MR. WISE:
16       Q.  Would you agree that in general, a retired
17    officer is more likely to be prepared to use a
18    firearm safely than the average person?
19            MS. BELLANTONI:  Objection.
20            You can answer.
21            THE WITNESS:  I would say that if you've got
22    a good street cop and they've had a lot of years on
23    the job, what they're going to be good at, because
24    they've been in a bunch of them, is handling critical
25    incidents, so potentially, yes.
```

Page 41

```
 1    BY MR. WISE:
 2        Q.   Would you agree that in general, a person
 3    who a law enforcement agency has determined to have
 4    good cause to possess a firearm is more likely to be
 5    prepared to use a firearm safely than the average
 6    civilian?
 7            MS. BELLANTONI:  Objection.
 8            You can answer.
 9            THE WITNESS:  So I'm assuming, like, in a,
10    you know, show cause type of state, if -- like, in
11    New York, I know you have to prove that you have a
12    good reason to have a gun before they'll give you a
13    permit or something like that, so I assume you're
14    speaking to that type of paradigm.
15    BY MR. WISE:
16        Q.   That's right.
17        A.   I can't say that's the case.  You know, it
18    would entirely depend upon the criteria.  You know,
19    they could make a -- depending on the criteria, but
20    generally I disagree with that.  I know a lot of the
21    people who get permits, and I'll pick on New York.  I
22    have a little bit of knowledge of that, particularly
23    New York City.
24            Your cause has to do with things like, you
25    know, you're a high end jeweler and you carry a lot
```

Page 42

1   of cash or you do cash transports or jewelry

2   transports or things like that, so the official

3   perception of your threat level wouldn't really have

4   anything to do with your ability to respond to that.

5       Q.   Do you train your clients on how to prevent

6   their firearm from being stolen?

7       A.   Yes, I do.

8            MS. BELLANTONI:  Objection.  Can I just get

9   more clarification on what you mean by "stolen"?

10  Like, from the person?  From their home?

11  BY MR. WISE:

12      Q.   Stolen from their person, from their home,

13  their car, wherever.

14      A.   Actually, all of the above.  I talk about --

15  let's say you have a concealed carry, but you go to

16  some someplace that has one of those no gun signs.

17  Like, here in my state, you can lock your gun up in

18  your car legally in the parking lot of that property,

19  but, you know, you're not supposed to go -- like,

20  let's say it's a department store.  You're not

21  supposed to go in the store with a gun, but you can

22  lock your gun up legally on the parking lot, so they

23  clarified that in the law.

24           You don't just want to leave your gun in

25  someplace like the glove box, that's ill-advised, so

Page 43

```
1     I advise things on like how to secure a gun in a car,
2     how to secure a gun in the home, how to avoid having,
3     like, your toddler get ahold of your gun or something
4     like that, but then also one of my specialties is
5     weapon retention and disarming skills.  I've been
6     teaching that for a very long time.  So how to keep
7     your gun from being taken away from you.
8          Q.   Why is it important for your clients not to
9     allow their firearms to be stolen?
10         A.   You don't want the bad guys to have your
11    guns, or, you know, something like leaving it out
12    where a toddler can get it or, you know, whatever the
13    case may be.  I can point to specific cases.  One
14    of -- the last officer that was killed on my old job
15    was a friend of mine, and he was shot in a gun stolen
16    out of a home burglary.  So somebody had an unsecured
17    loaded pistol laying around their house, and he was
18    shot dead with it during the course of a speeding --
19    a car stopped for speeding.
20              So those are the type of things that, you
21    know, I never -- I've worked a couple of cases where
22    small children were shot over playing with guns, and
23    those are pictures that are stuck in my head that are
24    never going to go away, so I counsel people on the
25    importance of things like safe storage but then also,
```

Page 44

1    you know, if you have the gun on your person, how to
2    go about safely doing that as well.
3         Q.   Have you ever published any articles on
4    topics related to the public carry of firearms?
5         A.   I have.
6         Q.   What articles did you publish?
7         A.   It's been a few.  So I've written for Recoil
8    Magazine which is a paper, you know, type magazine.
9    I have written for the Tactical Wire, which is a
10   strictly online type of thing, and I have talked
11   about, like, carriage of smaller guns, utilizing
12   revolvers, things like that.  So, yeah, I've dabbled
13   in that.
14        Q.   Were any of these articles based on
15   independent research that you conducted?
16        A.   I can't say formal research.  Like, I did
17   not do a scholarly-type paper or something like that,
18   no, sir.  It would be more things that I've read,
19   things that I've studied up on and then personal
20   observation and experience through my travels.
21        Q.   Do you have any academic background in
22   conducting research?
23        A.   Minimal.
24        Q.   Besides what we've discussed today, do you
25   have any other experience that informs your views on

Page 45

```
 1     the public carry of firearms?
 2          A.   I have quite a bit of experience with being
 3     around it.  My state, of course, with Kansas, if you
 4     go back, we had Wyatt Earp, Bat Masterson, things
 5     like that, we had the Frontier Days, the cattle
 6     drives, Oregon-California Trail, things like that
 7     going on.  I'm a big history buff.
 8               And then if you go back to when I started my
 9     time in law enforcement, there was no way for anyone
10     besides a commissioned law enforcement officer to
11     carry a gun in the State of Kansas outside of, like,
12     hunt -- they had an exception for hunting and
13     fishing, you could carry a concealed handgun, and,
14     obviously, if you're hunting, you could do things
15     like carry your shotgun or your deer rifle, things
16     like that, but that's -- it was allowed -- the state
17     allowed individual cities to ban carry of firearms,
18     things like that.
19               It was legal to have a loaded gun in your
20     car but not on your person, weirdly enough, but then
21     a lot of the cities banned loaded guns in cars.  So
22     that's where I started my time in law enforcement,
23     and then since then, there's been decisions, legal
24     precedents, things like that, particularly after
25     Heller, the Kansas attorney general who came down
```

Page 46

1    with an opinion that certain Kansas laws were

2    unconstitutional.  Some of those laws were changed.

3        There were several court cases where cities

4    tried to go back to the old way of doing business,

5    and they were disallowed from that, so in my time as

6    a cop, we went from nobody could carry, and including

7    retired law enforcement officers could not carry a

8    gun.  The only people who could carry was on duty

9    cops or off duty cops but only with the permission of

10   their chief law enforcement officer, so some off duty

11   cops couldn't carry.

12       And then we went to a rather strict conceal

13   carry permit system, then a much looser conceal carry

14   permit system and then an attorney general's opinion

15   that allowed what people would call the

16   constitutional carry, if you will, where you could

17   carry concealed or open carry without a license, and

18   there were several lawsuits over -- like, I know

19   Overland Park, Kansas tried to ban open carry, and

20   the attorney general's office took them to court over

21   that or was at least part of those proceedings.

22       And so in my state, it is legal to carry

23   concealed, it is legal to carry unconcealed, it is

24   legal to -- you can get a conceal carry permit which

25   a lot of people do if that allows reciprocity.  Like,

Page 47

```
 1    if you have a Kansas permit, you can carry in
 2    Missouri, Nebraska, Oklahoma, Colorado, Texas.
 3    There's a litany of places you could carry.
 4         So some -- a lot of people will get the
 5    permit because, you know, you can travel, but also a
 6    lot of people don't.  So it's very common for me to
 7    deal with nonpolice firearms carriers or to see
 8    people carrying a gun in public.
 9    Q.   Over the course of your career, have you
10    served in any law enforcement command positions?
11    A.   Yes, sir.  I was a lieutenant shift
12    commander for my department.  At one point, we had a
13    hiring freeze, and we had a promotion freeze, so I
14    was simultaneously the first shift and second shift
15    patrol commanders, and I was in charge of the
16    motorcycle unit and the school resource officers.
17    Q.   And what department were you working for?
18    What timeframe?
19    A.   That was Topeka, Kansas PD, and that would
20    have been approximately -- I'm doing the math here.
21    So I retired in December of 2014, and that would have
22    been about -- I believe I got promoted in 2008 to
23    lieutenant.  I'm going to have to look that one up.
24    It might have been '06, but it could have been '08,
25    but I did approximately right about -- would be about
```

Page 48

```
 1      eight years, just under eight years as a lieutenant.

 2            And then my current job, I'm the captain for

 3      the Airport Police and Fire here in the south part of

 4      Topeka at the airport, and so I'm in charge of all

 5      three of the lieutenants.  I have all three of the

 6      shifts that we have.  We have 24-hour shifts, so we

 7      have an A, B and C shift, I'm in charge of them, and

 8      then I'm also in charge of all of our firearms and

 9      other police training.  We have another captain

10      that's in charge of all the fire part of the

11      organization.

12         Q.   How long have you served in that role as

13      captain?

14         A.   About a year.

15         Q.   Have you ever served as a deputy chief of

16      police?

17         A.   No, sir.

18         Q.   Have you ever served as a chief of police?

19         A.   No, sir.

20         Q.   And I should go to the sheriff's department

21      too.  Have you served in any similar capacity,

22      sheriff?

23         A.   No.  Just as a deputy.

24         Q.   Do you have any background in public policy?

25         A.   I have a background in police policy.  I
```

Page 49

```
 1    have written a number of policy papers, what you
 2    would think of as general orders, things like that,
 3    but if you mean a larger -- like, the grandest thing
 4    I have done is written a municipal ordinance as far
 5    as, like, an overarching public policy.
 6        Q.   What was that municipal ordinance?
 7        A.   It was a Topeka city code on -- had to do
 8    with protests, and it bans masks and body armor while
 9    you're in the middle of a protest.  I could pull up
10    the number for you if you ever want to look at it.
11        Q.   That's okay for now.  Any other work that
12    you've done creating a municipal ordinance or similar
13    work?
14        A.   Not on that.  Mainly I -- I was the author
15    of some of the general orders that we had at Topeka
16    Police Department.  My current department, I have
17    written general orders, use of force policy, things
18    like that.  I have assisted in policy writing for the
19    IACP.
20            Like, I was part of the model policy for
21    response to excited delirium for International
22    Association for Chiefs of Police organization.  So
23    the vast majority of the stuff I've done in that
24    regard has all been cop stuff.
25        Q.   Have you ever worked with a policy maker in
```

Page 50

1    the creation of public safety policy?

2       A.    If you mean like state laws or something

3    like that, not more than lobbying or that sort of

4    thing, no.

5       Q.    Have you ever worked with a community

6    stakeholder in the creation of public safety policy?

7       A.    On the police level, yes, we had input.

8    Like, things like our chase policy and our police use

9    of force, things like that, we did take -- that

10   wasn't all in-house.  There was other people involved

11   in that, mayor's office, city council members, other

12   community -- I'll use the "stakeholder" word.

13      Q.    Any other examples besides what you've just

14   reviewed?

15      A.    No, sir, none that I can think of.

16      Q.    Have you ever worked with a researcher in

17   the creation of public safety policy?

18      A.    No, not really, no.

19      Q.    Okay.  Let's turn to your opinions.  What

20   field would you consider yourself an expert in?

21           MS. BELLANTONI:  Objection.

22           You can answer.

23           THE WITNESS:  Personally, I think the term

24   "expert" is overused, but the courts have said I'm an

25   expert in police use of force, use of force decision

Page 51

```
 1    making, firearms, firearms training and ballistics,
 2    terminal ballistics, firearms identification, police
 3    use of force other than firearms, Pepper Spray,
 4    taser, arrest and control tactics.  I've been
 5    utilized as an expert on police response tactics.  At
 6    any rate, those are the things that I've been
 7    court-recognized as an expert.
 8    BY MR. WISE:
 9       Q.   What is the basis for your opinions in this
10    case?
11       A.   Basically the totality of my training and
12    experience as a police officer.
13       Q.   Okay.  Let's look at page seven of your
14    report.
15       A.   I have to find my glasses for this one.
16       Q.   Can you see the screen okay?
17       A.   Yes, sir.
18       Q.   Okay.  Great.
19       A.   I can now.
20       Q.   Let's look at paragraph 20.  You state "The
21    implementation of laws that allow open carry in
22    public does not have a negative impact on public
23    safety.  The act itself, a lawful person openly
24    carrying a firearm in public does not have any
25    negative or detrimental effect on public safety, does
```

Page 52

```
 1    not itself create a safety hazard, and is not the
 2    cause of accidental or mistake-of-fact shootings of
 3    civilians by police officers."  Is this your opinion?
 4        A.   Yes.
 5        Q.   Okay.  Would you explain what you mean?
 6        A.   So just the mere fact that somebody's
 7    carrying a gun -- and I'll go with a holstered
 8    handgun, let's say, in and of itself.  It just is
 9    what it is.  It isn't a negative or doesn't have an
10    effect on public safety.
11            The idea that the police would show up and
12    be, "Oh, my God, that guy's got a gun, we better
13    shoot him" borders on the ridiculous in my mind, that
14    -- and a bunch of that is personal observation.
15            Both here in Kansas and part of the business
16    that I do both as a police trainer and in my own
17    business as a -- we'll just say civilian firearm
18    trainer, is travelling to other states.  You know,
19    just this year, I've been to -- I've conducted
20    training or been at training in Texas, Oklahoma,
21    Missouri, Utah, Wyoming.  I'm leaving something out.
22            But at any rate, I see -- I go to a lot of
23    places, see a lot of stuff, and this is something
24    that -- part of the reason in conversation when I
25    talk to Ms. Bellantoni, you know, what's my personal
```

Page 53

```
 1      observations, like I guarantee you I can walk out of
 2      here now and go to someplace like Walmart here in my
 3      town and find somebody carrying a pistol in a holster
 4      visible on their belt or, quite frankly, carrying
 5      concealed poorly where everybody can tell that
 6      they're carrying a pistol, but, you know, you can see
 7      that there's an obvious bulge and things like that.
 8              I can find somebody -- I can walk out of
 9      here and find somebody in 15 or 20 minutes, and it's
10      just -- it just is what it is.  It's like saying,
11      "It's a sunny day out, that guy's carrying a gun."
12      It's not a positive, it's not a negative, it just is.
13              I haven't noted, in observation in my time
14      as a cop in dealing with people on the street, that
15      open carry does anything that doesn't bring any
16      detriment to the public safety realm.
17      Q.   Besides your personal observations, what
18      else did you rely on to reach this opinion?
19      A.   Primarily, that was it.  One of my big
20      things that I do is every chance that I get, I delve
21      into anything that involves the police.  A lot of
22      things that are out there in the police world get
23      write-ups.  There are famous things that we have to
24      look at.
25              Obviously, you know, the George Floyd thing
```

Page 54

```
 1    last year, that was a botched arrest and control
 2    scenario, and that's right in the middle of my
 3    bailiwick on, you know, teaching cops how to avoid
 4    things like in custody deaths; and then, you know,
 5    less well known but pretty famous, the bad shooting
 6    that turned into a riot that came out of Atlanta PD,
 7    which was, you know, basically another arrest and
 8    control scenario with a taser.
 9              So I try to stay on top of those trends
10    absolutely as much as I can, and I also pay attention
11    to anything in the police publications or any of the
12    newsletters, any of the stuff that comes through my
13    email.  My email lists are fairly extensive.
14              So I'm always looking for after actions on
15    incidents as much as possible, both to support my
16    business and helping, you know, regular people not be
17    the victims of crime, look for criminal, crime
18    trends, look for trends in law enforcement.  We know
19    in the past couple of years, ambushes has been a
20    thing that has been up, so trying to stay on top of
21    that sort of thing as well.
22       Q.   Did you rely on any research to support your
23    opinion?
24              MS. BELLANTONI:  Other than what he
25    testified to?
```

Page 55

```
 1              THE WITNESS:  I can't point you to a
 2     specific paper or anything like that, no, sir.
 3     BY MR. WISE:
 4          Q.   You continue on page eight, paragraph 21 --
 5          A.   Uh-huh.
 6          Q.    -- stating "The lack of proper police
 7     training creates or can lead to a public safety
 8     hazard and the accidental shooting of civilians,
 9     whether unarmed, carrying concealed, or carrying
10     exposed open carry."  Would you explain what you
11     mean?
12          A.   So if you don't have -- you know, and this
13     is something that is deep in the training that good
14     law enforcement firearms instructors find themselves
15     in.  If we look at some of the court cases that are
16     out there like, you know, the places lost big
17     lawsuits, Zuchel v. Denver is an example that is
18     glaring in the police world that is brought up.
19              If you look at Popow v. Margate and we look
20     at what do the courts say valid police training
21     should look like versus what had happened -- you
22     know, if you look at the Popow case, they were
23     shooting at a man that was running, and gentleman
24     came out on his porch to see what was going on, and
25     then as the suspect was running past the gentleman on
```

                                        Page 56

```
 1    his porch, he got shot by the police because he was
 2    downrange of where the bad guy was.
 3           So that would be a glaring historical
 4    example of incorrect or improper or nonexistent
 5    police training contributing to a public safety
 6    hazard that, quite frankly, didn't exist before the
 7    police showed up.  So avoiding mistake-of-fact
 8    shootings is a big deal in the police world and the
 9    training that is done right.
10    Q.   Is it your opinion that proper law
11    enforcement training is the most important factor to
12    prevent civilian shootings by law enforcement
13    officers?
14    A.   If you mean mistake-of-fact or not shooting,
15    shooting the wrong people, then I would say yes.
16    Q.   Incidentally, is that one of the reasons you
17    founded your company, Agile Tactical?
18    A.   So I founded the company because I was
19    getting -- I had been a police trainer for so long,
20    and then that was mainly what I did, and as I reached
21    retirement, I had so many people asking me outside of
22    the police world for training, I thought, well, I
23    should kind of formalize this thing.
24    Q.   Do you believe that a person who is carrying
25    a firearm in public, a civilian who's carrying a
```

Page 57

1    firearm in public is more likely, all things being
2    equal, to be shot than a civilian is who is unarmed?
3              MS. BELLANTONI:  Objection.
4              You can answer if you can.
5              THE WITNESS:  So historically, if you look
6    at people who are big crime victims according to --
7    and this is according to national stats, which, of
8    course, fluctuate every -- year to year, things like
9    that, but if you look at people who resist things
10   like robberies, that sort of thing, the safest way to
11   do that is to utilize a firearm.  Statistically,
12   that's the case, and that's been the case for quite
13   some time.
14        So I'm not exactly sure how to quantify your
15   question on are they more likely to be shot or not be
16   shot, but I think it's pretty clear statistically if
17   they resist being a crime victim through the use of a
18   firearm, then they're less likely to suffer any
19   injury at all.  That's been the running statistic
20   coming from the feds every year.
21   BY MR. WISE:
22        Q.   And when you're referring to the statistics,
23   what in particular are you referring to?
24        A.   The national -- so I'm going to look up the
25   formal name of that so I don't -- it's Bureau of

                                        Page 58

 1   Justice Statistics.  I don't want to misstate the
 2   name of what I'm talking about.  I'm firing up my
 3   other magic Google box.
 4      Q.   If that would refresh your recollection, go
 5   ahead.
 6      A.   Okay.  So the formal name for that page is
 7   Bureau of Justice Statistics.  I was having a little
 8   Alzheimer's on the name of that one.
 9      Q.   Thank you.  Okay.  Do you believe that a
10   civilian who's carrying a firearm in public is more
11   likely, all things being equal, to be shot by a law
12   enforcement officer than a person or a civilian who's
13   unarmed?
14           MS. BELLANTONI:  Objection.
15           You can answer if you can.
16           THE WITNESS:  I don't because a lot of the
17   mistake-of-fact shootings, particularly the ones that
18   are very high profile, we can point to demonstrate
19   they did not have a firearm on their person, and they
20   were shot in a mistake-of-fact shooting because they
21   had something as innocuous as a cellphone or
22   something else.
23           If you look at the famous case out of NYPD,
24   I can't pronounce the gentleman's name or -- well,
25   it's something like Diallo, where their street crimes

1    unit fired the -- you know, the famous 47 rounds that

2    Bruce Springsteen spoke of, he had a wallet in his

3    hand when he was shot.

4    BY MR. WISE:

5        Q.    I just want to make sure I'm understanding

6    you because you mentioned a few examples.  Are you

7    talking in general or just examples that come to

8    mind?  And what I'm trying to --

9        A.    I --

10       Q.    Yeah.

11       A.    I don't believe that you would be more

12   likely to be mistakenly shot by the police, and I'm

13   assuming someone who is not a criminal actor, but,

14   you know, just an average Joe, I don't think you're

15   more likely to be shot by the police whether you have

16   a gun or you don't have a gun.

17       Q.    Let's look at paragraph 24, still on

18   page eight.

19       A.    Okay.

20       Q.    You state "Mr. Raney's opinions are based on

21   speculation and a generalized fear that law-abiding

22   individuals, simply by the act of carrying their

23   firearm exposed, will cause panic among police

24   officers and the public, waste political" -- excuse

25   me -- "waste police resources and ultimately lead to

Page 60

1    police officers shooting civilians carrying exposed."

2    A.    Okay.

3    Q.    Is that your opinion?

4    A.    Yes.

5    Q.    Okay.  Do you understand Mr. Raney to have

6    the opinion that police officers will panic when

7    responding to a call about a person who is carrying a

8    firearm openly?

9    A.    What he describes in his declaration sure

10   appears to color it that way.

11   Q.    Do you understand Mr. Raney to have the

12   opinion that police officers are likely to shoot a

13   person simply because they are carrying a firearm

14   openly?

15   A.    He also seemed to hint at that in his

16   opinion.

17   Q.    Do you understand those things to be his

18   opinion, or are you saying that --

19   A.    That's what I believe I read from his

20   opinion.

21   Q.    Okay.  Let's look at page 26.  We're still

22   on page eight.  I'm sorry.  Paragraph 26.  You state

23   that "When open carry without a permit became allowed

24   in Kansas, no instant mayhem was created"; is that

25   right?

Page 61

```
 1        A.    Yes.
 2        Q.    Okay.  Do you understand Mr. Raney to have
 3    the opinion that instant mayhem will result if open
 4    carry were allowed in California?
 5        A.    Without rereading his opinion on the spot,
 6    I'm not sure that I would -- I could say he said
 7    those exact words, but his opinion that I read, the
 8    impression of his opinion that I got from him was
 9    people couldn't open carry because it would make
10    things much more chaotic, you know, the police would
11    have all kinds of problems differentiating good guys
12    from bad guys for, you know, cops and robbers, from
13    want of a better term, and that it would cause -- you
14    know, he'd almost colored it as though it would cause
15    some sort of mass public hysteria.
16        Q.    Let's look at page nine, paragraph 28.  You
17    state that "When open carry became allowed in Kansas,
18    our police officers were not spontaneously shooting
19    members of the public they observed carrying a
20    firearm exposed on their body in public;" is that
21    right?
22        A.    Was that a -- I'm assuming that was the
23    upper part.  You said -- 28 now talks about banning
24    open carry.
25        Q.    Yeah.  Let me see here.  One second.
```

Page 62

```
 1          A.    I think you were on the previous --
 2          Q.    Oh, sorry.  I meant paragraph 26 on
 3     page eight still.
 4          A.    Sure.
 5          Q.    Is that your opinion in paragraph 26?
 6          A.    That police officers were not shooting
 7     members of the public?
 8          Q.    Correct.
 9          A.    Absolutely.
10          Q.    Do you understand Mr. Raney had the opinion
11     that if open carry were allowed in California, police
12     officers would spontaneously shoot members of the
13     public who were openly carrying firearms?
14          A.    His opinion read to me as though he believed
15     that open carry could not be allowed in the State of
16     California because it would pose too great of risk of
17     police officers shooting the wrong people merely for
18     carrying a gun in the open.  That is what I took from
19     part of his opinion.
20          Q.    Okay.  Now let's go to paragraph 28.
21          A.    Okay.
22          Q.    You state "Banning open carry does not
23     greatly enhance public safety, nor does it cure
24     deficiencies in departmental training of police
25     officers."  Would you explain what you mean?
```

Page 63

```
 1        A.   Well, as I said, in my experience in the
 2   world, I went from a place where nobody could carry
 3   except the cops legally.  A lot of people did it, but
 4   nobody could legally carry a gun beside the cops, and
 5   you certainly couldn't run around open carrying to a
 6   world where you could get a permit to a world to
 7   where you could open carry or conceal carry as you
 8   see fit.
 9        During that period of time, we actually had
10   a great -- quite a bit of a -- and I cannot point to
11   a statistical cause and effect relationship, but I
12   did note that locally, you know, when I first started
13   in the police world with things like gang violence
14   and that sort of thing, our crime was significant.
15        There was a port in my career where I looked
16   up crime stats for the United States early in the
17   '90s, and that's when things were still banned, and
18   Topeka had a per capita crime rate greater than
19   Los Angeles, and now we come to a point where you can
20   carry a gun as you see fit, if you want to be open
21   carry or conceal carry without a permit, or you can
22   get a permit, and there was -- you know, that
23   coincided with no uptick in crime.
24        In fact, for the longest time, we had a
25   Leave It to Beaver era level crime where it was so --
```

Page 64

```
 1    crime had dropped so much, everybody kind of forgot
 2    what that was like, but there was certainly no uptick
 3    in things like police shootings or, you know, other
 4    crimes relevant to -- I see -- and I guess I'm -- I
 5    don't know if I'm speaking out of turn here because
 6    it's more of a larger than this case, but there's
 7    people who push the opinion that if you allow people
 8    to carry guns, they're just going to run around
 9    killing people over things like parking lot disputes
10    or, you know, "You took my parking space" or
11    something like that.  We just didn't see it.  We
12    didn't see any of that.
13        Q.   When you state that "Banning open carry does
14    not cure deficiencies in law enforcement training,"
15    are you emphasizing, as we've discussed before, the
16    critical importance of training in public safety?
17        A.   Yes, and whether or not you're going to have
18    mistake-of-fact shootings, things like that.
19        Q.   Setting aside training for the moment, does
20    banning open carry enhance public safety at least to
21    some extent?
22        A.   I don't believe so.  I don't believe so.
23        Q.   When you state that banning open carry does
24    not, quote, "greatly enhance public safety," do you
25    mean that banning open carry improves public safety
```

Page 65

```
 1    to some degree?
 2        A.   I don't believe it does.  I don't believe it
 3    does.  I see no -- I have personally noticed no cause
 4    and effect relationship.  I have noticed no
 5    difference in police-citizen encounters.
 6             One could argue that there's a possibility,
 7    although it's always -- it's impossible to measure in
 8    negative.  Have people with an open carry firearm not
 9    been targeted for a crime because a criminal could
10    see that that person is armed?  We won't know.  Those
11    things are nebulous.
12             So I can't point to an exact cause and
13    effect relationship or put statistics on that, but
14    what I haven't noticed is we had open carry, and
15    then, oh, my God, all of this bad stuff started
16    happening.  That was clearly not the case and hasn't
17    been the case, and it hasn't been the case for years
18    now.  I know I'm kind of generalizing on that.
19        Q.   I appreciate that.  And the reason I'm
20    asking is I'm just looking at your language, your
21    report that says "Banning open carry does not greatly
22    enhance public safety."  It doesn't say, for example,
23    banning open carry does not enhance public safety.
24    That's why I was asking whether it enhances public
25    safety to some extent.
```

Page 66

```
 1        A.   I totally get where you're coming from, and
 2   I don't believe it does either way, either one of
 3   those ways of wording that sentence.
 4        Q.   Let's look at page nine, paragraph 31.
 5             (Discussion off the record)
 6             (Recess)
 7   BY MR. WISE:
 8        Q.   Okay.  Let's go back on the record and look
 9   at page nine, paragraph 31.  You observed that Kim
10   Raney's report states that when an officer comes upon
11   a scene where a person is carrying openly, the
12   officer must rapidly assess a person's behavior,
13   paragraph 22?
14        A.   Yes.
15        Q.   Split-second decisions sometimes have to be
16   made, paragraph 24, where the results could be
17   deadly, paragraph 22; is that right?
18        A.   Yes.
19             MS. BELLANTONI:  I'm going to ask that you
20   read that back.  Are you saying that that's what
21   Mr. Haggard is saying or that's what he's referring
22   to Mr. Raney's declaration?
23             MR. WISE:  Yeah.
24   BY MR. WISE:
25        Q.   You're referring to Mr. Raney's declaration;
```

Page 67

```
 1      correct?
 2          A.   Yes.
 3          Q.   Okay.  Do you understand Mr. Raney to have
 4      the opinion that it is uncommon in police work for an
 5      officer to have to rapidly assess a person's
 6      behavior?
 7          A.   I can't say that exactly, but it appears as
 8      though he tries to paint a picture that if you don't
 9      have open carry, then you won't have all of that
10      going on.
11          Q.   Do you understand Mr. Raney to have the
12      opinion that it is uncommon in police work for an
13      officer to have to make a split-second decision where
14      the results could be deadly?
15          A.   I can't say that he would have that opinion.
16      Again, he appears to color his opinion as though if
17      we were to eliminate open carry, that that would
18      somehow solve that problem.
19          Q.   Do you understand Mr. Raney to have the
20      opinion that allowing open carry would increase the
21      circumstances in which an officer would have to
22      rapidly assess a person's behavior and make a
23      split-second decision where the results could be
24      deadly?
25          A.   He appears to have that opinion to me.
```

Page 68

```
 1      That's what I gather from reading his opinion.
 2         Q.   Do you agree that an officer that comes upon
 3      a scene where a civilian is carrying openly is more
 4      likely to have to rapidly assess that person's
 5      behavior?
 6              MS. BELLANTONI:  Objection.
 7              You can answer.
 8              THE WITNESS:  I do not.
 9      BY MR. WISE:
10         Q.   Why not?
11         A.   So something that is standard practice in
12      the police world and has been by progressive
13      departments who train hard since, if we get into the
14      history of very tragic incidents, late '60s, early
15      '70s, events such as the Newhall massacre there in
16      California, the incidents that were written up in the
17      famous book "Officer Down, Code 3," what we look at
18      is that officers should be assessing, "Just because I
19      can't see a gun doesn't mean somebody should have
20      one."
21              Standard officer safety practice is if you
22      pull somebody over for speeding or if you pull
23      somebody -- you make a stop for whatever, the only
24      safe assumption is to assume that a person is armed
25      and that you comport yourself and your tactics and
```

Page 69

1    your approach and things like that with the

2    assumption that a person could pull out a concealed

3    weapon and utilize that weapon, and then, you know,

4    if you run with that assumption, your tactics, your

5    decision making, things like that, that it keeps you

6    in the best frame of mind for good officer safety.

7              So in my mind, if we think that we're

8    solving a problem by banning open carry -- so let's

9    say I could push a magic button and there was no open

10   carry.  I've never had to deal with that problem.

11   That doesn't solve the problem that we see in police

12   work.

13   Q.   Let's go to your example of the routine

14   traffic stop.  Would the presence of a firearm

15   heighten the danger for the officer?

16            MS. BELLANTONI:  Objection.

17            Can I get more -- can you be more specific

18   in that scenario?

19            MR. WISE:  I can ask the question again.

20   BY MR. WISE:

21   Q.   In a routine traffic stop, would the

22   presence of a firearm by the civilian in a car

23   heighten the danger for the officer?

24            MS. BELLANTONI:  Objection.

25            You can answer it if you can.

```
 1              THE WITNESS:  It would depend on that
 2     person's intent.  I can tell you personally I've
 3     never really had to worry about the guns that I could
 4     see.  I've walked up on car stops where I've had
 5     people with shotguns and rifles in the back window of
 6     a pickup truck, guns in consoles, guns laying on
 7     seats, I've dealt with people who are wearing
 8     holstered guns on their hip, that sort of thing, and,
 9     quite frankly, the guns that I can see, the weapons
10     that I can see, I was never very worried about.
11              I was worried about the behavior of the
12     people who were, you know, literally being furtive,
13     who were trying to conceal what they were up to.  It
14     was more behavior-focused, you know, "Is this person
15     in the middle of a crime and, thus, might try to take
16     me out because they want to make an escape and
17     utilize a weapon as part of that escape process?"
18              And literally the guns that I could see, I
19     was never worried about.  It's what you don't know
20     that is a problem.
21     BY MR. WISE:
22        Q.   In a routine traffic stop, would the
23     presence of a firearm in the car make it more likely
24     that an officer would have to make a split-second
25     decision where the results could be deadly?
```

Page 71

```
1              MS. BELLANTONI:  Objection.
2              You can answer it if you can.
3              THE WITNESS:  Again, I don't believe so.  I
4       have seen people do things like reach under the seat
5       of the car, reach into a glove compartment, reach
6       into a console in between the seats, bags, things
7       like that.
8              Again, it's the things you don't know, it's
9       the things you can't see that are the most worrisome,
10      and that's where the split-second decision really
11      comes into play, and then that becomes a
12      behavioral -- reading the behavior of the person
13      versus if they have, you know, a visible firearm or
14      not, you know, and then it becomes reading the
15      behavior and the scenario that you find yourself in.
16             Quite frankly, if I know -- let's say I have
17      an actual bad guy, I know he's a bad guy, he's a
18      suspect that we -- say we have a picture of the guy
19      or video of the guy and I know that's the guy and I
20      see he's got a gun on him, that's kind of a gimme on
21      the decision making process.
22             It's when you don't know and you have to
23      make those split second decisions because is he
24      armed?  Is he not armed?  I don't know.  That's where
25      things become very worrisome.
```

```
 1    BY MR. WISE:
 2       Q.  Let me just drill down on that for a moment
 3    then.  So what if you don't know the person's a bad
 4    guy, as you were saying, and they have a firearm?
 5    Does that affect the way that you approach that
 6    person?
 7            MS. BELLANTONI:  Objection.
 8            You can answer if you can.
 9            THE WITNESS:  It --
10            MS. BELLANTONI:  Can we get more clarity on
11    where this firearm is?  Very situational thing.  It's
12    very, like, amorphous scenario without much detail.
13            MR. WISE:  Sure.  I was going off the
14    scenario he was talking about.
15            THE WITNESS:  So I can point to -- I think
16    more pertinent to what we're talking about, I can
17    point to after we legalized the conceal carry, we had
18    a gentleman come into the state who believed he was
19    going to -- he was kind of antipolice, and he was
20    going to do a conceal carry, what he called an
21    audit -- or I mean a gun rights audit -- and see how
22    we would react.
23            So he was wearing a visible -- a very large
24    handgun in a holster visible, and he was walking up
25    and down the sidewalk, on a public sidewalk in front
```

Page 73

```
 1    of a very well-to-do subdivision, small gated
 2    community, and somebody thought he was acting kooky,
 3    so they called police.
 4          We made contact with the guy.  He was
 5    carrying a gun.  We could see he had a gun, you know.
 6    I would instruct the gentleman, you know, "Don't
 7    reach for the gun that's clearly there," you know.
 8    "What's going on?  We got a call."
 9          And basically he was trying to turn it into
10    a, "See, the police are antigun" confrontation type
11    of thing, and the whole thing diffused because, you
12    know, quite frankly, we didn't overreact.  We had a
13    guy pacing back and forth on a sidewalk, you know, so
14    we have to ascertain, "is this a guy -- maybe he's
15    suffering from mental illness, or, you know, why is
16    he here?"
17          Because his behavior, his pacing back and
18    forth did alarm people more than anything, you know,
19    "Why is that guy acting kooky out here?"
20          And then when it turned out to be a
21    specific -- kind of a public, you know, "We're going
22    to get gotcha video on the police" type of a stunt
23    that he was pulling and he didn't get the reaction he
24    was hoping for, then the whole thing was over with.
25          And I've had to deal with a few things like
```

```
 1   that, but overall, you know, if I were to have to
 2   make an approach on somebody, part of that approach
 3   would be, "What are the circumstances?" you know.
 4          Is this guy in an alley behind a business in
 5   the middle of the night, or is this guy just walking
 6   down the sidewalk or -- you know, I guarantee you,
 7   like I say, I could go someplace in town here, like
 8   go to our Walmart, and I could find somebody with a
 9   gun on their hip, and, you know, they're in the green
10   bean aisle and it's just an innocuous thing.
11   BY MR. WISE:
12       Q.   Let's go to page 12, paragraph 40.
13       A.   Again, it's silly, but every time you start
14   to do that, I reach for my own mouse, and I feel like
15   an idiot.
16       Q.   Okay.  Paragraph 40, you state "The behavior
17   and demeanor of a person exercising his right to open
18   carry will be markedly different than that of an
19   individual posing a threat to the public.  Any
20   experienced honest law enforcement officer knows that
21   to be the truth."  Would you explain what you mean?
22       A.   So it's a whole behavioral package.  If you
23   have a guy who's got a gun on his hip walking his
24   dog, you got a guy, gun on his hip, shopping for
25   groceries, whatever the case may be, there's no
```

Page 75

```
 1    criminalistic behavior involved in any of those
 2    activities that would lead you -- like, whether he
 3    had a gun on his hip or not, this is not something
 4    that I could have probable cause for a stop, it is
 5    not something that I could do a Terry stop on a
 6    person over, you know, because it doesn't -- they're
 7    not -- if they're -- if they just exist and they
 8    happen to be carrying a gun and are going about their
 9    business and there's no behavioral indicators that
10    would indicate criminal activity is afoot, then it
11    just isn't an issue.
12            If you look at -- well, if you look at the
13    classic case of Terry v. Ohio that speaks exactly
14    what I'm talking about, the criminals in that case
15    had handguns that were deeply concealed, but whether
16    they saw -- whether Detective McFadden saw the guns
17    or didn't see the guns, he obviously did not, it was
18    the behavior manifest that they were displaying in
19    that that led to the stop, the classic what we know
20    as a Terry stop nowadays.  Somebody just having a gun
21    on their hip isn't -- it's -- the totality of the
22    behavior is what a good cop is going to look at.
23    Q.   And what is the behavior that you're looking
24    for to be able to determine whether a person carrying
25    openly does not pose a threat to the public?
```

Page 76

```
 1              MS. BELLANTONI:  Objection.
 2              You can answer.
 3              THE WITNESS:  That's wide open.  You know,
 4      it has everything to do with the location, is their
 5      activity congruent with the location, the time of
 6      day, things like that.  You know, I mentioned
 7      previously do I have a guy behind a business after
 8      dark after it's closed?  You know, that would be a
 9      guy that I'm going to take a second look at.  Is this
10      guy up to no good?  You know, is he looking to
11      burglarize this establishment?  That sort of thing.
12      So it's, you know, demeanor, their actual activity,
13      the time of day, the location.  All of that goes into
14      play.
15      BY MR. WISE:
16          Q.   And what's the basis for your opinion?
17              MS. BELLANTONI:  Which one?
18      BY MR. WISE:
19          Q.   In paragraph 40.
20          A.   Thirty-four years of law enforcement and
21      dealing with people both pre- and post-open carry
22      being legal, that's just -- I would call that good
23      police work at the street level is being able to read
24      human beings and then evaluate their behavior.
25          Q.   Let's talk about active shooter events.
```

Page 77

```
 1    What is an active shooter event?
 2        A.   I'm actually not a big -- so that's a term
 3    of common usage that so many people utilize now.  I'm
 4    not a fan of it, but if we want to talk about -- you
 5    know, something I prefer is, like, a mass murder or
 6    serial murder in progress where you have somebody
 7    actively -- you know, and I know of cases where they
 8    have been -- instead of an active shooter, they're an
 9    active stabber, you know.
10            You know, we've had cases in the literature
11    of knives, swords.  They just had one in Norway the
12    other day that he was -- the dude was killing people
13    with a bow and arrow.  So I would call it a rabid
14    serial murder in progress if you want a more precise
15    term.
16        Q.   So during such an event, an active shooter,
17    mass shooting event, is the shooter always easily
18    identifiable?
19        A.   Well, at both of the ones that I went to, he
20    sure was.  Often if you don't know exactly where the
21    person is, then what we teach our tactics for
22    movement to contact, but the important part of an
23    active shooter is it's active.
24            You have some -- if you don't see that's the
25    guy shooting people or that's the guy stabbing
```

Page 78

1     people, or in one case I was involved in, the guy

2     was -- he was an active shooter, active bomber.  He

3     was throwing pipe bombs, what you would think of

4     nowadays as IEDs, inside the building.  If.

5          You don't see that or hear some stimulus to

6     draw you where the person is, then it's not really an

7     active shooter if you will.

8     Q.   So in the scenario where you're not

9     immediately able to identify where the shooting is

10    coming from, what is the -- can you describe the

11    atmosphere at such an event?

12         MS. BELLANTONI:  I'm going to object.

13         You can answer, but I think we're going

14    outside the scope of this case and causes of action

15    that are being brought.  But you can go ahead and

16    answer.

17         THE WITNESS:  In a word, it's going to be

18    pretty tense.  At the attack on our federal

19    courthouse here in Topeka, we had a gentleman that

20    was doing an active shooting, active bombing.  He was

21    throwing IEDs all over the building when I showed up.

22    Things had gotten real quiet, and we had to

23    transition from what you would think of now as a

24    rapid response to what we believed we had was a

25    hostage scenario in progress.

Page 79

1          So that's part of what we do in the training

2     is classically things like dealing with hostage

3     negotiations, dealing with barricaded gunmen, things

4     like that.  You want to slow the scenario down and

5     then utilize things like SWAT teams and negotiators

6     and things like that.

7          So part of what you do in police training is

8     a recognition of has the situation transitioned from

9     one type of scenario to another, because that's

10    entirely possible, but what you're looking for is

11    either identifying the suspect or a stimulus that

12    draws you to a location to where you can try to

13    identify the suspect.

14    BY MR. WISE:

15       Q.   In a scene like that, can the sensation be

16    chaotic or, you know, distort your perception, I

17    guess?

18       A.   Well, any --

19          MS. BELLANTONI:  Objection.  I'm going to

20    object again.  Same objection, that this is outside

21    the scope of the causes of action that are being

22    brought.

23          You can answer.

24          THE WITNESS:  Any critical incident I've

25    been involved in has been tense, and human beings are

Page 80

```
 1    subject to their perceptions under duress.
 2    BY MR. WISE:
 3        Q.    If a person who's not immediately
 4    identifiable as a cop is openly carrying a firearm
 5    during an active shooter event, how are the on duty
 6    law enforcement officers likely to react to that
 7    person?
 8            MS. BELLANTONI:  Objection.
 9            You can answer if you can.
10            THE WITNESS:  Well, I would hope that they
11    were extraordinarily well trained because in my
12    experience, every cop that knows about it is going to
13    go regardless of their equipment and their mode of
14    dress.
15            So if you look at photos of Columbine as an
16    example, you have people with guns wearing suit and
17    ties, you have people with guns -- there was one
18    gentleman wearing gym shorts.  If you look at video
19    of the very famous North Hollywood event, one of the
20    SWAT guys is wearing gym shorts and carrying an M-16.
21            So part of my assertion and my opinion on
22    this paper was if you're going to have well-trained
23    officers, they're going to have to allow for positive
24    identification of -- you know, have some training on
25    can't just see a gun and start shooting at that
```

Page 81

1     person because odds are pretty good it could be an

2     off duty or undercover cop or some other person who

3     is not in uniform who is not in fact your problem.

4     BY MR. WISE:

5         Q.   What if that civilian is openly carrying

6     their truck gun, let's say an AR-15?  How are the on

7     duty law enforcement officers likely to react?

8             MS. BELLANTONI:  I'm going to object and ask

9     you not to respond to that because we're not talking

10    about the open carriage of ARs and long guns.

11    Specifically about handguns here, so that's

12    completely outside the scope of this case and this

13    deposition.

14    BY MR. WISE:

15        Q.   You may recall that Dallas Chief of Police

16    David Brown, in the aftermath of an active shooter

17    event at a community protest that included the

18    presence of openly carrying civilians, stated, "We

19    don't know who the good guy is versus the bad guy

20    when everyone starts shooting."  Do you recall that?

21        A.   I do.

22        Q.   Do you agree with Chief Brown?

23        A.   I do not.

24        Q.   Why not?

25        A.   So I have a little bit of insider baseball

Page 82

```
 1    on the Dallas Police Department, and they used to be,

 2    used to be one of the most extraordinarily

 3    well-trained police departments on the planet, and I

 4    can't say that that is any longer the case.

 5            Their firearms training, their use of force

 6    training, their defensive tactics training, in my

 7    opinion and observation, has suffered from politics

 8    and neglect.  He may have found it to be problematic,

 9    or he may have been making it as a political

10    statement for it to be problematic, but everything

11    that I have seen -- and I have studied that incident

12    at length because part of that incident was there was

13    a lot of controversy on the manner in which they took

14    that bad guy out, you know.

15            They utilized a police bomb to kill the

16    gunman in that case, delivered by a robot, so there

17    was a lot of controversy about that.  I think the

18    police officers who were right there on the scene

19    immediately knew who the bad guy was.

20            If you see people running away who happen to

21    be carrying -- and I know I'm dangerously segueing

22    into what Ms. Bellantoni stated she didn't want me to

23    answer because I knew people had long guns at that

24    event as part of their -- the political part of the

25    protest.  If you have people leaving the vicinity in
```

Page 83

1    a hurry, you can tell by demeanor and their carriage,

2    how they're acting, that, "Yeah, that's not the guy

3    I'm looking for."

4        Q.   And by "demeanor" and "carriage," are you

5    talking about the same factors you were saying

6    earlier, behavior and demeanor, or are there other

7    factors that we haven't discussed?

8        A.   People who look like they're trying to kill

9    you don't look like people who are afraid and trying

10   to get out of someplace.  That's been my experience.

11       Q.   What if somebody is running toward the scene

12   instead of away from the scene?

13       A.   Well, then you'd have to evaluate, "Is that

14   a good guy?  Is that a bad guy?  Is that an off duty

15   SWAT cop that had his gear in the car and he hasn't

16   had time to change clothes?  Etc., etc.

17       Q.   And how can you go about evaluating that?

18       A.   It's going to be right there in the moment,

19   you know.  If the guy is running towards the scene,

20   then I know he's not -- he hasn't been part of the

21   scene.  Is he -- do I look at that guy?  What is his

22   demeanor?  What is his body posture?  How does his

23   facial expressions look?  What is his movement like?

24   Is he trying to get -- you know, is he putting a

25   muzzle on people that are perceived to be victims?

Page 84

```
 1    That sort of thing.  It all plays into that.
 2         Q.   Let's look at pages 12 and 13, paragraph 42.
 3    You state "There is, however, historical precedent to
 4    note that citizen non-law enforcement interdiction of
 5    active shooter suspects happens more frequently than
 6    interdiction by law enforcement officers."  Would you
 7    explain what you mean?
 8         A.   So post-Columbine, the trend was to have
 9    what we would call a rapid response team approach
10    where you would get -- depending on who was doing the
11    training, typically it was a four-officer team, would
12    gather together and then move in.
13              Let's take, for an example, because
14    everybody's familiar with the Columbine event, that
15    if you showed up at Columbine in the middle of that
16    event, that you would wait for three other officers
17    to show up, and then you would move in as a team in a
18    particular set of tactics and then attempt to make
19    contact with the suspects and do that as rapidly as
20    possible.
21              What we found -- so -- excuse me.  Sorry.
22    Ragweed is bad right now, and my allergies are acting
23    up.
24              So I wrote an article on solo response by
25    officers to an active shooter event because I'm a big
```

Page 85

1    believer that you don't have time to wait for a team.

2    One of the active shooter events that I went to, I

3    had to respond by myself.  I didn't have anybody who

4    was there, going to be there in a timely manner to

5    assist me.  I couldn't wait for backup.

6              So in doing my research for these events,

7    what we find is is that more often than a law

8    enforcement officer -- in any kind of team or normal

9    police response that you would think of, more often

10   than not, that there's more events that are

11   interdicted by armed citizens than there are teams of

12   police officers showing up on the scene.

13             If you extrapolate that paradigm to include,

14   like, the Trolley Square mall shooting in Utah where

15   it was an off duty officer on his own time,

16   plainclothes, carrying a gun just like anybody else

17   would be carrying, that was another event where we

18   have off duty officer, but there are many events

19   where we have civilian.

20             And I use a generic term "conceal carrier"

21   but a civilian with a gun that's not -- somebody who

22   is not a cop is the person that is right there on the

23   scene and successfully interdicts or stops the bad

24   guy versus a law enforcement response putting an end

25   to it.

```
 1        Q.   Are the events that you just mentioned the
 2   historical precedent you're referring to, or are you
 3   referring to other historical precedent?
 4        A.   If you take a history of active shooters in
 5   the United States as a modern study, that's what I'm
 6   referring to.
 7        Q.   And are you aware of research that supports
 8   this opinion?
 9        A.   I am.
10        Q.   Okay.  What is that research?
11        A.   There's going to be a little bit of a pile
12   of that.  What we're talking about is -- what we're
13   talking about is when you actually quantify active
14   shooter events, you know, beyond the famous ones like
15   Columbine, etc., and you look at the factors involved
16   in those events, what has been successful, what has
17   not been successful, which has led to things like my
18   advocacy for police solo response versus waiting for
19   a team approach.
20             You know, one of the reasons, and I'm a big
21   advocate of that, is that's where the research,
22   that's where the data points to is what is
23   successful, what is not successful.  Team approach
24   takes too long.  It hasn't been successful.
25             The last I checked into that, there was one,
```

Page 87

```
 1    maybe two of these events that were successful by the
 2    team approach.  Vast majority of the time, the cops
 3    show up too late if they utilize that model.
 4           So one of the reasons I'm a big advocate for
 5    solo response on the police part is because that's
 6    been the model for success because it's more rapid,
 7    and if you look at these incidents on an anecdotal
 8    basis, if you have an armed good guy, whether they
 9    have a badge or not, immediately on the scene that
10    takes action, that tends to be a successful
11    interdiction.
12           As far as, like, titles to papers like a
13    specific paper on the subject, I would definitely
14    have to get back to you on that.
15    Q.   Yeah.  If there's any specific research you
16    have in mind, would you work with Ms. Bellantoni to
17    provide that to me?
18    A.   Absolutely.
19    Q.   Thank you.  I appreciate that.
20           Do you mind if we go off the record for just
21    a moment?  I'm going to need 30 seconds to make sure
22    my computer does not turn off.
23           (Discussion off the record)
24           MR. WISE:  Thank you.  I appreciate that.
25    We can go back on the record.
```

Page 88

```
 1                    THE WITNESS:  Okay.
 2       BY MR. WISE:
 3            Q.   Let's look at page 13, paragraph 43.  You
 4       state "Allowing open carry will not create a danger
 5       to public safety"; is that right?
 6            A.   Yes, sir.
 7            Q.   Are you familiar with research finding that
 8       right to carry laws are associated with higher
 9       aggregate violent crime rates?
10                    MS. BELLANTONI:  Objection.
11                    You can answer.
12                    THE WITNESS:  I have read some of that, yes,
13       sir.
14       BY MR. WISE:
15            Q.   And what is your view of those studies in
16       terms of your opinion on whether open carry of
17       firearms in public --
18            A.   It directly contradicts my firsthand
19       observation in multiple states.  I believe that those
20       papers -- it is easy to utilize statistics to come to
21       a prearranged opinion and to make opinion -- or to
22       push an opinion towards a political end.
23            Q.   And so have you evaluated the basis for that
24       research?
25                    MS. BELLANTONI:  I'm going to object.
```

Page 89

```
 1          You can answer.
 2          THE WITNESS:  Depends on how you mean
 3    "evaluate," but in my opinion of observing -- and I
 4    don't know specifically which one you're -- which --
 5    because there's been a couple of such studies that
 6    have been pushing that idea.  I put it up there with
 7    the same research that people like Kellerman were
 8    pushing that if you have a gun in your home, you're
 9    43 times more likely to be killed than if you don't
10    have a gun in your home which was statistically
11    cooking the books.
12          If you look at the realities of crime and
13    street crime and the people -- people will talk.
14    They'll push an alarming statement like, "You're more
15    likely to be killed by somebody you know than
16    somebody you don't."
17          Well, that's certainly my experience as far
18    as, like, gang crime because most people don't just
19    up and kill people they don't know.  They have a
20    specific beef with them.  You know, your rival drug
21    dealer whom you know by name, you're going to go
22    whack because he's coming -- he's, like, selling in
23    your territory, things like that.
24          So you have to take -- you have to look at
25    these things in context and, you know, look at the
```

Page 90

```
 1   numbers, where the numbers come from, what's the
 2   context of the numbers and that sort of thing because
 3   it's very, very easy to come to false conclusions on
 4   this sort of thing.
 5   BY MR. WISE:
 6     Q.   You've reviewed the preliminary injunction
 7   submissions in this case?
 8     A.   Okay.  I think so.  I believe that's part of
 9   the -- Amy, was that all part of the paperwork that
10   you gave me, or was that not?
11         MS. BELLANTONI:  I'm not entirely sure.  I'd
12   have to look and see what I sent over.
13         THE WITNESS:  Okay.  I guess --
14         MS. BELLANTONI:  We could refer to your
15   declaration.  It says that there's something that was
16   turned over that you relied on.
17         MR. WISE:  I believe it does.  That's why I
18   was asking the question.
19   BY MR. WISE:
20     Q.   And the reason I'm asking is you had
21   mentioned you're familiar with a few of the studies.
22   Are you familiar with the peer reviewed studies
23   conducted by Professor John Donahue about right to
24   carry laws and the association with higher aggregate
25   violent crime rates?
```

Page 91

```
 1              MS. BELLANTONI:  I'm going to object because
 2      he's not a statistical expert, so that wouldn't have
 3      been in the purview of what he reviewed.
 4              MR. WISE:  He just mentioned he was familiar
 5      with a few studies, so I was trying to know which
 6      studies those might be.
 7              MS. BELLANTONI:  And I'm going to object
 8      because he's not a statistician, so I'm not going to
 9      have him giving testimony on -- it's not his
10      expertise.
11              MR. WISE:  Uh-huh.
12              MS. BELLANTONI:  He's not a statistician,
13      so --
14      BY MR. WISE:
15         Q.   So just so I'm clear on what your opinion
16      is, then, you're indicating that the findings of
17      those studies are not consistent with your personal
18      observations in the field; is that right?
19         A.   Yes.
20         Q.   But to be clear, you haven't relied on
21      studies that -- for your opinion in this case at
22      least, that support your opinion or that contradict
23      the studies that we were just discussing?
24         A.   So a big part of why I am here is both to
25      speak to the law enforcement part of this and
```

1    personal experience that I can point to in living in

2    the reality of an open carry state and not only my

3    state but other states that I travel to, other states

4    that I do business in and, you know, states where I

5    am commonly in an open carry environment, if you

6    will.

7           So a big part of why I'm here and we're

8    talking is that firsthand observation and experience

9    over a number of years as it deals with the open

10   carry and the dynamic of police involvement with open

11   carry people.

12   Q.   Let's look at paragraph 44.  We're still on

13   page 13.  You refer to U.S. News and World Reports

14   public safety rankings and note that the top three

15   states, in terms of public safety, Maine,

16   New Hampshire and Idaho, allow a broader right to

17   public carry than California; is that right?

18   A.   That was certainly true at that time, yes,

19   and then it's easy to look that up, the U.S. News and

20   World Report part of that.

21   Q.   Are you aware of how U.S. News and World

22   Report determined these rankings?

23   A.   I am not.  Again, I can't say, you know, did

24   they hire a statistician, did they look up Bureau of

25   Justice Statistics or what their research methodology

Page 93

1    was.

2    Q.   Do you know whether U.S. News and World

3    Report compared factors such as population density

4    that might account for the difference in crime rates

5    between states such as Maine versus California?

6    A.   I don't, nor do I know if they looked at

7    things like sentencing guidelines or a variety of

8    other factors.

9    Q.   Do you agree that regional differences are

10   an important factor to consider in developing an

11   effective public safety response?

12        MS. BELLANTONI:  Objection.  And

13   specifically what public safety response are you

14   referring to?

15        MR. WISE:  Well, response that includes open

16   carry policy.

17        MS. BELLANTONI:  Could you be more specific?

18   I'm not understanding the question.

19        MR. WISE:  Sure.  Well, this case is about

20   California, and the expert here is from Kansas, and

21   I'm asking if he agrees.  Let me restate the

22   question.

23   BY MR. WISE:

24   Q.   Do you agree that regional differences are

25   an important factor to consider in developing an

Page 94

1    effective public safety response with regard to

2    firearms?

3      A.   And --

4          MS. BELLANTONI:  I object.

5          You can go ahead and answer.

6          THE WITNESS:  I'm going to say in this case,

7    it does not, just as, you know, if we look at police

8    use of force, everybody in the United States is bound

9    by things like Graham v. Conner, Garr versus

10    Tennessee.  It is what it is.  Is my First Amendment

11    right to free speech different in the State of

12    California versus the State of Kansas?  It is not.

13          Is my freedom of religion different in the

14    State of California versus the State of Kansas?  It

15    is not.  So as far as that context, we're still

16    talking about the United States of America.  So, no,

17    I don't believe so.

18    BY MR. WISE:

19      Q.   Do you agree that demographic differences

20    are an important factor to consider in developing an

21    effective public safety response, again, with regard

22    to firearms?

23          MS. BELLANTONI:  Objection.

24          You can answer.

25          THE WITNESS:  I don't.  I don't because I

(240 of 300), Page 240 of 300    Case: 24-565, 04/17/2024, DktEntry: 10.5, Page 240 of 300
Case 2:19-cv-00617-KJM-AC   Document 73-3   Filed 10/21/22   Page 97 of 135
ER 794

```
 1    believe that public safety factors response policy
 2    are all far, far, far broader than that.
 3    BY MR. WISE:
 4        Q.   Have you ever been to California?
 5        A.   Yes.
 6        Q.   Have you ever served as a law enforcement
 7    officer in California?
 8        A.   I have not.
 9        Q.   Are you familiar with open carry laws in
10    California?
11        A.   Just from what I have been able to read as
12    far as what is publicly available and then what I
13    have been briefed on in this case by Ms. Bellantoni.
14        Q.   Would you describe your understanding of
15    where, if at all, open carry is permitted in
16    California?
17            MS. BELLANTONI:  Objection.  He's not
18    testifying as an expert in that area.  I'm going to
19    ask him not to answer that question.
20            MR. WISE:  So is he an expert in open carry
21    in Kansas only?  I'm confused.
22            MS. BELLANTONI:  He's an expert and a law
23    enforcement officer in open carry jurisdiction.  It's
24    kind of irrelevant since it's banned in California
25    anyway, so --
```

Page 96

```
 1    BY MR. WISE:
 2       Q.   Are you aware that open carry is allowed in
 3    certain circumstances in the State of California?
 4            MS. BELLANTONI:  Objection.  That's actually
 5    not true.
 6    BY MR. WISE:
 7       Q.   Are you aware that there are laws permitting
 8    open carry in certain circumstances in California?
 9            MS. BELLANTONI:  Objection.
10            THE WITNESS:  Frankly, at this point, with
11    the two attorneys arguing about that, I believe that
12    that would be the type of thing that you guys would
13    be the experts in.  It appears that you guys are at
14    an impasse on whether it's legal or not.  That would
15    certainly leave a layperson at a disadvantage to know
16    whether they were breaking the law or not.
17    BY MR. WISE:
18       Q.   Let's look at paragraph 45, same page, still
19    on page 13.  You state "People who legally possess
20    and carry firearms are generally compliant and
21    law-abiding, statistically speaking among the most
22    law-abiding group of persons in our country."  Would
23    you explain what you mean?
24       A.   So if you take people with -- and I'm going
25    to go with the statistics because we can nail those
```

Page 97

```
 1    down on persons with a concealed carry license
 2    because we can actually quantify that because, quite
 3    frankly, on a day-to-day basis, if nobody tells
 4    anybody that they're carrying a gun, we're not --
 5    who's going to know about it?
 6           So if we look at statistically people with a
 7    concealed carry license, they are more law-abiding
 8    than virtually any other demographic in the United
 9    States, and that includes police officers.
10           When you look at things like -- even minor
11    things like DUI arrests, that sort of thing, they
12    tend to have a far lower criminal rate than any other
13    demographic you would pluck out of whatever pool you
14    want to look at, if you want to look at a certain
15    profession or whatever the case may be.
16           And then, you know, the rest of that
17    paragraph, if you will, my experience is is that
18    people who are going to unlawfully do things don't
19    look for permission, they don't get concealed carry,
20    whether it's banned or not, you know.
21           In Kansas, when we banned all carry, even
22    retired officers could not carry a gun, and that
23    didn't slow down the gang members one little bit, you
24    know.  My belief, what we're talking about here is
25    law-abiding citizens trying to gain access to the
```

Page 98

```
 1   ability to open carry legally within your state,
 2   clearly trying to go about doing thing the right way
 3   and stay within the boundaries of the law.
 4        Q.   What is the basis for your opinion?
 5        A.   Again, 34 years of street level police work
 6   and then some consultation of things like, you know,
 7   research that has been done in this area as far as,
 8   you know -- in particular, one of the things I look
 9   at is police use of force, and then I have been
10   involved extensively in internal affairs
11   investigations on police officers and then
12   investigation on, like, officer-involved shootings,
13   use of force, things like that.
14           So I've had occasion to look at the
15   statistics that are out there that are available
16   on -- if you look at how my profession stacks up to
17   other professions where actually, you know, we do a
18   lot better than a lot of other professions that are
19   out there even though we -- you know, we are commonly
20   demonized for violating people's rights and that sort
21   of thing.
22           And then having looked into that as somebody
23   in the past who I actually advocated for concealed
24   carry in Kansas, which was -- didn't make me real
25   popular in some law enforcement circles, but you have
```

Page 99

```
1   to make sure you have your ducks in a row if you're
2   going to advocate for something and make statements
3   like that.
4        And in other places before Kansas had
5   concealed carry, like Florida was very famous for
6   that beginning in the '80s, the states of
7   New Hampshire and Vermont were very, very liberal,
8   and, in fact, my belief is Vermont has always had no
9   permit carry within the state.  I may have switched
10  that with New Hampshire, but one of those two has
11  always, like, historically had no permit carry, and
12  if you look at the demographics of people with
13  concealed carry, they tend to be extraordinarily
14  law-abiding.
15  Q.   And I think you were mentioning research
16  this supports your opinion.  What is that research
17  specifically?
18  A.   Some of it would be -- I can point to John
19  Lott, the famous gun rights researcher, but then to
20  another of -- pardon me -- a number of other sources
21  as far as, like, the actual titles of that, again, I
22  would have to research that and get back with you.
23  Q.   Yeah, that'd be great if you could work with
24  plaintiff's counsel to provide me any research that
25  supports that opinion.  I'd appreciate it.
```

Page 100

```
 1              Do you agree that there are incidents in
 2      which a previously law-abiding person engages in
 3      criminal behavior?
 4         A.   Well, I would argue, counselor, that
 5      everybody that doesn't have a criminal record who
 6      becomes a criminal was previously not, I mean,
 7      law-abiding.
 8         Q.   That's all the questions.
 9              Ms. Bellantoni, are you on mute?
10              MS. BELLANTONI:  Yeah, I was.  I'm sorry.
11      Can we just take a brief break?  Just need to -- is
12      that okay?
13              MR. WISE:  Of course.  I'm done with my
14      questions.  That was my last one.
15              MS. BELLANTONI:  Can we just hold on one
16      second before we wrap up?
17              MR. WISE:  Of course.
18              MS. BELLANTONI:  All right.  Thanks.
19              THE WITNESS:  I'm over here making myself a
20      note on looking back at what we've been talking about
21      so I can get back to Amy.
22              MR. WISE:  Thank you.
23              (Recess)
24              MS. BELLANTONI:  So I guess we're done.  I
25      don't have any questions.
```

```
1              MR. WISE:  Let's go back on the record
2    briefly.
3              Okay.  I am done with my questions.
4              THE REPORTER:  And, Ms. Bellantoni, do you
5    want a copy?
6              MS. BELLANTONI:  Mr. Wise, will you be
7    sending a copy to the witness for him to review?
8              THE REPORTER:  That's why I got his email.
9    Veritext will send him a locked PDF.
10             MS. BELLANTONI:  That's fine.  I'll take a
11   copy.
12             And also, Mr. Wise, can you just put some
13   requests -- I know there were some requests made.
14   Can you just put them in writing for me so I can
15   refer to them and properly have whatever additional
16   documents provided to you?
17             MR. WISE:  Sure, of course.  How formal
18   would you like me to make the request?
19             MS. BELLANTONI:  Email.
20             MR. WISE:  Email?  Okay.
21             MS. BELLANTONI:  Email.
22             MR. WISE:  Thank you.
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
1

2

3

4

5

6

7

8

9

10          I, CHARLES D. HAGGARD, do hereby declare

11    under penalty of perjury that I have read the

12    foregoing transcript; that I have made any

13    corrections as appear noted, in ink, initialed by me,

14    or attached hereto; that my testimony as contained

15    herein, as corrected, is true and correct.

16               EXECUTED this _____ day of _____,

17    20_____, at _____  _____,_____.
                      (City)              (State)

18

19

20

21               _____

                 CHARLES D. HAGGARD

22

23

24

25

                                          Page 103
```

```
 1              I, the undersigned, a Certified Shorthand

 2     Reporter of the State of California, do hereby

 3     certify:

 4              That the foregoing proceedings were taken

 5     before me at the time and place herein set forth;

 6     that any witnesses in the foregoing proceedings,

 7     prior to testifying, were duly sworn; that a record

 8     of the proceedings was made by me using machine

 9     shorthand which was thereafter transcribed under my

10     direction; that the foregoing transcript is a true

11     record of the testimony given.

12              Further, that if the foregoing pertains to

13     the original transcript of a deposition in a Federal

14     Case, before completion of the proceedings, review of

15     the transcript [  ] was [  ] was not requested.

16              I further certify I am neither financially

17     interested in the action nor a relative or employee

18     of any attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21

22     Dated: 10/30/2021

23                              Carrie Pederson
       _____

                                CARRIE PEDERSON

24                              CSR No. 4373

25
```

                                                Page 104

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 1 of 108
**Appendix 1:** *Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

## I. DANGEROUS WEAPONS LAWS

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 1 | 1383 | England | 7 Rich. 2, ch. 13 (1383) | Prohibited possession of launcegays. Punished by forfeiture of the weapon. | Launcegay | |
| 2 | 1396 | England | 20 Rich. 2, ch. 1 (1396) | Prohibited possession of launcegays. Punished by forfeiture of the weapon. | Launcegay | |
| 3 | 1541 | England | 33 Hen. 8, ch. 6 §§ 1, 2, 18 (1541) | Prohibited possession of any crossbow, handgun, hagbutt, or demy hake. Exempted subjects living within 12 miles of the Scottish border. Punishable by forfeiture or payment of 10 pounds. | Pistol; Crossbow | |
| 4 | 1606 | England | 4 Jac. 1, ch. 1 (1606) | Repealed exemption for subjects living with 12 miles of the Scottish border for the keeping of crossbows, handguns, and demy hakes. | Club; Other weapon | |
| 5 | 1686 | New Jersey | *Grants, Concessions, and Original Constitutions of The Province of New Jersey* 289–90 (1881) | Prohibited the carrying "privately" of any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons. Punishable by fine of 5 pounds for first conviction, and punishable by imprisonment for 6 months and a fine of 10 pounds. | Pistol; Skeines; Stilettoes; Dagger; Dirk; Other unusual or unlawful weapons | |
| 6 | 1689 | England | English Bill of Rights of 1689, 1 Wm. & Mary 2d Sess., ch. 2, § 6 | Provided a right for Protestants to have "Arms for their Defense . . . as allowed by law." | Arms for defense | |
| 7 | 1694 | Massachusetts | 1694 Mass. Laws 12, no. 6, An Act for Punishing of Criminal Offenders | Prohibited riding or going "armed Offensively" before colonial authorities. Punishable by arrest. | Arms | |

1

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 8 | 1713 | Pennsylvania | Pennsylvania Archives: Selected and Arranged from Original Documents In the Office Of The Secretary Of The Commonwealth, Conformably to Acts Of The General Assembly, February 15, 1851 & March 1, 1852, Page 160 | Penalized "firing a Gun without license." | Firearms | |
| 9 | 1721 | Pennsylvania | Act of 26th August 1721 [An Act of 9th of February, 1750-51], § 1 | Imposed "penalties and forfeitures" to anyone who engaged in, among other activities, firing "any gun or other fire arm" "without the governor's special license." | Firearms; other items | |
| 10 | 1730 | New York | William Livingston (Editor), *The Laws of New York* 199 (1752), ch. 560, § 20[1] | Prohibited a slave from possessing or using a gun, pistol, sword, club, or other kind of weapon unless in the | Gun; Pistol; Sword; Club; | |

2

---

[1] Some of the surveyed laws applied certain weapons restrictions on the basis of race, nationality, or enslaved status and were drafted before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause. The Attorney General notes his strong disagreement with racial and other improper discrimination that existed in some such laws, which stands in stark contrast to California's commonsense firearm laws that are generally applicable and designed to justly and equitably protect all Californians. These historical laws are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws. The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See Bruen*, 142 S. Ct. at 2150–51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party). Reference to a particular historical analogue does not endorse the analogue's application in the past; rather, it can confirm the existence of the doctrine and corresponding limitation on the Second Amendment right. *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past doctrine, not to that doctrine's

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 3 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | presence and at the direction of their Master or Mistress. | Other kind of weapon | |
| 11 | 1750 | Massachusetts | 1750 Mass. Acts 544, ch. 17, § 1 | Prohibited the carrying of a club or other weapon while unlawfully, riotously, or tumultuously assembling. Punishable by seizing the weapon and a hearing before the court. | Club; Other weapon | |
| 12 | 1765 | England | 1 William Blackstone, *Commentaries* 139, ch. 1 (1765) | Recognized the "fifth and last auxiliary right," which provided that Protestant subjects had the right to "arms for their defence" "such as are allowed by law." | Arms for defense | |
| 13 | 1771 | New Jersey | 1763–1775 N.J. Laws 346, ch. 539, § 10 | Prohibited the setting of any trap gun intended to discharge by any string, rope, or other contrivance. Punishable by forfeiture of the firearm and fine of 6 pounds. | Trap gun | |
| 14 | 1771 | New Hampshire | *Acts and Laws of His Majesty's Province of New-Hampshire* 9–10 (1771), ch. 6, § 2 | Prohibited any persons numbering twelve or more being armed with "clubs or other weapons," or any group numbering thirty or more, from unlawfully, routously, riotously, or tumultuously assembling. | Club; Other weapons | |
| 15 | 1786 | Massachusetts | 1786 Mass. Acts 87, ch. 38 | Prohibited being armed with a club or other weapon while rioting. | Club; Other weapon | |

role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide some basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

3

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 4 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 16 | 1786 | Virginia | 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays, chap. 17, § 1 | Imposed penalties for openly carrying weapons. | Arms | |
| 17 | 1788 | Ohio [Territory] | 1788–1801 Ohio Laws 20, ch. 6 | Prohibited the carrying of any "dangerous weapon" that indicates a violent intention while committing a burglary. Punishable by imprisonment for up to 40 years. | Any dangerous weapon | |
| 18 | 1792 | Virginia | *Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are Now in Force* 187 (1803), ch. 103, §§ 8–9 | Prohibited any "negro or mulatto" from possessing or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | |
| 19 | 1797 | Delaware | 1 Del. Laws 104 (1797), ch. 43, § 6 | Prohibited "any Negro or Mulatto slave" from carrying guns, swords, pistols, fowling pieces, clubs, or other arms and weapons without the master's special license. | Gun; Sword; Pistol; Fowling pieces; Club; other arms and weapons | |
| 20 | 1798 | Kentucky | 1798 Ky. Acts 106, ch. 54, § 5 | Prohibited "negro, mulatto, or Indian" from possessing or carrying a gun, powder, shot, club, or other weapon or ammunition. | Gun; Powder; Shot; Club; Other weapon | |

4

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 21 | 1799 | Mississippi [Territory] | 1799–1800 Miss. Laws 44 | Prohibited any "Negro or mulatto" from carrying gun, powder, shot, club, or other weapon. Also prohibits a "negro or mulatto" from possessing a gun, weapon, or ammunition. | Gun; Powder; Shot; Cub; Other weapon; Ammunition | |
| 22 | 1799 | New Jersey | Charles Nettleton (Editor), *Laws of the State of New Jersey* 474 (1821), § 2 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | |
| 23 | 1801 | Tennessee | 1801 Tenn. Laws 259–60, ch. 22, § 6 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person," unless a surety is posted. Punishable as for "breach of the peace, or riot at common law." | Dirk; Large knife; Pistol; Other dangerous weapon | |
| 24 | 1802 | Charleston, South Carolina | Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) | License required for gun firing and fireworks, and only "at times of public rejoicing" and at specified locations. | Firearms, fireworks. | |

5

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 25 | 1804 | Arkansas [Territory] | J. Steele (Editor), *Laws of the Arkansas Territory* 521 (1835), § 3 [Slaves] | Prohibited any "slave or mulatto" from keeping or carrying a gun, powder, shot, club, or other weapon. | Firearm; Powder; Shot; Club; Other weapon | |
| 26 | 1804 | Indiana [Territory] | 1804 Ind. Acts 108, § 4 | Prohibited a "slave or mulatto" from carrying or possessing a gun, powder, shot, club or other weapon and ammunition. | Gun; Powder; Shot; Club; Other weapon | |
| 27 | 1804 | Mississippi [Territory] | 1804 Miss. Laws 90, § 4 | Prohibited a "Slave" from keeping or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | |
| 28 | 1805 | Massachusetts | 1805 Mass. Acts 111–13, ch. 81 | Authorized the appointment of firearm provers to ensure that musket components were safe and to stamp the barrels confirming the proof. Prohibited the sale of any firearm that was not proved and stamped. Punishable by a fine of $10. | Unsafe firearms | |
| 29 | 1809 | Maryland | Virgil Maxey (Editor), *Laws of Maryland, with the Charter, the Bill Of Rights, the Constitution of the State, and Its Alterations, the Declaration of* | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment for 3 months to 2 years. | Pistol; Hanger; Cutlass; Bludgeon; Other | |

6

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 7 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *Independence, and the Constitution of the United States, and Its Amendments* 465 (Vol 3, 1811), § 4 | | offensive weapon | |
| 30 | 1812 | Kentucky | William Littell (Editor), *Statute Law of Kentucky; with Notes, Praelections, and Observations on the Public Acts* 64 (1812–1816), ch. 89 | Prohibited the wearing of "a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey." Punishable by a fine of not less than $100. | Pocket pistol; Dirk; Large knife; Sword cane | *Bliss v. Commonwealth*, 2 Littell 90 (Ky. 1822) (held unconstitutional). |
| 31 | 1813 | Louisiana | 1812 La. Acts 172, 174, § 1 | Prohibited the carrying of any concealed weapon, including a dirk, dagger, knife, pistol, or any other deadly weapon. | Dirk; Dagger; Knife; Pistol; Other deadly weapon | *State v. Chandler*, 5 La. Ann. 489 (1850) (upholding concealed carry restrictions); *State v. Smith*, 11 La. Ann. 633 (1856) (same). |
| 32 | 1814 | Massachusetts | 1814 Mass. Acts. 464, ch. 192, §§ 1–2 | Required all musket and pistol barrels manufactured in Massachusetts to be proved by an appointed person and properly marked and stamped. | Unsafe firearms | |
| 33 | 1816 | Georgia | Lucius Q.C. Lamar (Editor), *A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all* | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment with hard labor for a period of time to be determined by a jury. | Picklock; Key; Crow; Jack; Bit or other implement; Pistol; | |

7

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 8 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions* 599 (1821), div. 10, § 19 | | Hanger; Cutlass; Bludgeon; Other offensive weapon | |
| 34 | 1818 | Missouri [Territory] | Henry S. Geyer (Editor), *A Digest of the Laws of Missouri Territory* 374 (1818) § 3 [Slaves] | Prohibited "slave or mulatto" from carrying a gun, powder, shot, club or other weapon and from possessing a gun or ammunition. | Gun; Powder; Shot; Club; Other weapon; Ammunition | |
| 35 | 1820 | Indiana | 1820 Ind. Acts 39, ch. 23, § 1 | Prohibited any person, "not being a traveler," from wearing or carrying "any dirk, pistol, sword in a cane, or other dangerous weapon." Punishable by a fine of no more than $100. | Dirk; Pistol; Cane sword | |

8

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 9 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 36 | 1821 | Maine | Revised Statutes of the State of Maine 683 (1840), tit. 12, ch. 159, § 5 | Prohibited any persons numbering twelve or more being armed with "clubs or other weapons," or any group numbering thirty or more, from unlawfully, routously, riotously, or tumultuously assembling. | Club; Other weapons | |
| 37 | 1821 | Maine | Revised Statutes of the State of Maine 709 (1840), tit. 12, ch. 169, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to six months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | |
| 38 | 1821 | Tennessee | Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present Time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) | Prohibited carrying "dirk, sword cane, Spanish stiletto, belt or pocket pistol, either public or private" and ordering fine. | Pistols; Dirk; sword cane; Spanish stiletto | |
| 39 | 1831 | Indiana | 1831 Ind. Rev. Stat. 192, ch. 26, § 58 | Prohibited the concealed carrying of "any dirk, pistol, bowie knife, dagger, | Dirk; Pistol; | *State v. Mitchell,* 3 Blackf. 229 |

9

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | sword in cane or any other dangerous or deadly weapon," unless "being a traveler." Punishable by fine of up to $100. | Bowie knife; Dagger; Cane sword; Other dangerous or deadly weapon | (Ind. 1833) (upholding statute). |
| 40 | 1835 | Florida [Territory] | John P. Duval (Editor), *Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840* 423 (1839), ch. 860 | Prohibited concealed carry of "arms of any kind whatsoever" including "dirk, pistol, or other arm, or weapon, except a common pocket-knife." Punishable by fine from $50–100 and/or 1 to 6 months imprisonment. | Dirk; Pistol; Other arm or weapon | |
| 41 | 1835 | Massachusetts | Theron Metcalf (Editor), *Revised Statutes of the Commonwealth of Massachusetts Passed November 4, 1835 to which are Subjoined, as Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, both Passed in February 1836* 750 (1836) ch. 134, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Punishable by finding sureties for keeping the peace for a term up to 6 months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | |
| 42 | 1837 | Alabama | 1837 Ala. Laws 7, No. 11, §§ 1, 2 | Imposed tax of $100 on any person selling, giving, or disposing of any Bowie knife or Arkansas toothpick. Failure to pay the tax was subject to penalty of perjury. | Knife | |

10

(259 of 300), Page 259 of 300    Case: 24-565, 04/17/2024, DktEntry: 10.5, Page 259 of 300

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 11 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

ER-810

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 43 | 1837 | Arkansas | William McK. Ball (Editor), *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.O.1837* 280 (1838), ch. 44, div. 8, art. 1, § 13 | Prohibited the concealed carrying of any pistol, dirk, butcher or large knife, sword cane, unless "upon a journey." | Pistol; Dirk; Butcher knife; Sword cane | *State v. Buzzard*, 4 Ark. 18 (1842) (upholding law under the Second Amendment and state constitution); *Fife v. State*, 31 Ark. 455 (1876). |
| 44 | 1837 | Georgia | 1837 Ga. Laws 90–91, §§ 1–5 | Prohibited any merchant, or "any other person or persons whatsoever," to sell, offer to sell, keep, or have on their person or elsewhere any Bowie knife or "any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence," pistols, swords, sword canes, or spears. Exempted "such pistols as are known as horseman's pistols" from these restrictions.  Punishable by a fine of up to $100–500 for the first offense and $500–1,000 for subsequent offenses. | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear | *Nunn v. State*, 1 Ga. 243 (1846) (held unconstitutional under Second Amendment). |
| 45 | 1837 | Mississippi | 1837 Miss. Laws 290–92, § 6 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, dirk knife, Bowie knife, or any other deadly weapon in a fight in which one of the combatants was killed, and the exhibition of any dirk, dirk knife, | Rifle; Shotgun; Sword cane; Pistol; Dirk; Dirk knife; | |

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 12 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | Bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense. Punishable by liability to decedent and a fine of up to $500 and imprisonment for up to 3 months. | Bowie knife; Sword; Sword cane; Other deadly weapon | |
| 46 | 1837 | Mississippi – Town of Sharon | 1837 Miss. Laws 294, § 5 | Authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | |
| 47 | 1837 | Tennessee | 1837–1838 Tenn. Pub. Acts 200, ch. 137, § 1 | Prohibited any merchant from selling a Bowie knife or Arkansas tooth pick. Punishable by fine of $100–500 and imprisonment for $1–6 months. | Bowie knife; Arkansas toothpick | *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) (upheld under state constitution). |
| 48 | 1837 | Tennessee | 1837–1838 Tenn. Pub. Acts 200–201, ch. 137, § 2 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon. Punishable by fine of $200–500 and imprisonment for 3–6 months. | Bowie knife; Arkansas toothpick; Other knife or weapon | *Haynes v. Tennessee*, 24 Tenn. 120 (1844) (upheld conviction for unlawful carrying of a Bowie knife). |
| 49 | 1837 | Tennessee | 1837–1838 Tenn. Pub. Acts 201, ch. 137, § 4 | Prohibited the stabbing or cutting of another person with any knife or weapon known as a "Bowie knife, Arkansas tooth pick, or any knife or | Bowie knife; Arkansas toothpick; Any knife or | |

12

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 13 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | weapon that shall in form, shape or size resemble a Bowie knife," regardless of whether the person dies. Punishable by imprisonment for 3–15 years. | weapon that resembles a bowie knife | |
| 50 | 1838 | Florida [Territory] | 1838 Fl. Acts 36, No. 24, § 1 | Imposed tax on those selling and purchasing dirks, pocket pistols, sword canes, and bowie knives. Vendors paid a tax of $200/year, and buyers paid a tax of $10/year. | Dirk; Pocket pistol; Sword cane; Bowie knife | |
| 51 | 1838 | Virginia | 1838 Va. Acts 76–77, ch. 101, § 1 | Prohibited "habitually or generally" carrying any concealed pistol, dirk, Bowie knife, or any other weapon of like kind. | Pistol; Dirk; Bowie knife; Other similar weapon | |
| 52 | 1839 | Alabama | 1838 Ala. Acts 67, § 1 | Prohibited the concealed carrying of "any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." Punished by fine of $50–100 and imprisonment not to exceed 3 months. | Knife; Deadly weapon | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 53 | 1839 | Mississippi – Town of Emery | 1839 Miss. Laws 385–86, ch. 168, § 5 | Authorized the town of Emery to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | |
| 54 | 1840 | Mississippi – Town of Hernando | 1840 Miss. Laws 180–81, ch. 111, § 5 | Authorized the town of Hernando to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | |

13

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 55 | 1841 | Alabama | 1841 Ala. Laws 148–49, ch. 7, § 4 | Prohibited the concealed carrying of "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun," unless the person is threatened with an attack or is traveling or "setting out on a journey." Punished by a fine of $50–100. | Knife; Pistol; Air gun; Other deadly weapon | *Sears v. State*, 33 Ala. 347 (1859) (reversing conviction where knife was not "of the like kind or description"); *Lockett v. State*, 47 Ala. 42 (1872) (reversing conviction and holding that defendant was "traveling"). |
| 56 | 1841 | Mississippi | 1841 Miss. Laws 51–52, ch. 1, § 1 | Imposed an annual property tax of $1 on each Bowie knife. | Bowie knife | |
| 57 | 1842 | Louisiana | Henry A. Bullard & Thomas Curry (Editors), 1 *A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841* 252 (1842), § 59 | Prohibited the carrying of "any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Punishable by fine of $20–50. | Dirk; Dagger; Knife; Pistol; Other deadly weapon | |
| 58 | 1845 | Illinois | Mason Brayman (Editor), *Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years* | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other | |

14

**Baird v. Bonta, Case No. 2:19-cv-00617-KJM-AC**
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *A.D. 1844–45*, 176 (1845), § 139 [Criminal Jurisprudence] | | offensive weapon | |
| 59 | 1847 | Maine | *The Revised Statutes of the State of Maine, Passed October 22, 1840*, 709 (1847), tit. 12, ch. 169, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to one year. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | |
| 60 | 1847 | North Carolina | 1846–1847 N.C. Sess. Laws 107, ch. 42 | Prohibited "any slave" from receiving any sword, dirk, Bowie knife, gun, musket, firearms, or "any other deadly weapons of offense" without written permission. | Sword; Dirk; Bowie knife; Gun; Musket; Firearms; Other deadly weapons of offense | |
| 61 | 1849 | California – City of San Francisco | 1849 Cal. Stat. 245, div. 11, § 127 | Prohibited the carrying, with intent to assault any person, any pistol, gun, knife, dirk, bludgeon, or other offensive weapon with the intent to assault another person.. Punished by fine of up to $100 and imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | |

15

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 62 | 1850 | California | S. Garfielde (Editor), *Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850–51–52–53*, 643–44 (1853), ch. 125, div. 4, §§ 40–41 | Provided that a person who challenged another in a duel with a deadly weapon that could result in the death of either participant shall be punished by imprisonment for 1–3 years. Also punishable by a fine of up to $1000. | Deadly weapons | |
| 63 | 1850 | California | S. Garfielde (Editor), *Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850–51–52–53*, 663–64 (1853), ch. 125, div. 11, § 127 | Prohibited carrying of pistol, gun, knife, dirk, bludgeon, or other offensive weapon with intent to assault. Punishable by fine of up to $100 or imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | |
| 64 | 1850 | Massachusetts | William A. Richardson (Editor), *General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860*, 816 (1873), ch. 164, § 10 | Prohibited the possession of a dangerous weapon when arrested for committing a criminal offense. | Dangerous weapon | *Commonwealth v. O'Connor*, 7 Allen. 583 (1863); Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling,* |

16

ER-819

**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | | *Southern Violence, and Moral Reform* 3 (1999) ("Massachusetts did prohibit any possession of a slungshot or brass knuckles from 1850 onward, but does not appear to have prohibited concealed carrying of a deadly weapon."). |
| 65 | 1850 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, § 1, as codified in Mass. Gen. Stat. 816 (1873), ch. 164, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, bills, or other dangerous weapon if arrested pursuant to a warrant or while committing a crime.  Punishable by fine. | Slungshot; Metallic knuckles; Billy; Other dangerous weapon | |
| 66 | 1850 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, § 2 as codified in Mass. Gen. Stat. 816 (1873), ch. 164 § 11 | Prohibited manufacturing or selling a slungshot or metallic knuckles. Punishable by fine up to $50 or imprisonment up to 6 months. | Slungshot; Metallic knuckles | |
| 67 | 1850 | Mississippi | 1850 Miss. Laws 43, ch. 1, § 1 | Imposed an annual property tax of 50 cents on each Bowie knife. | Bowie knife | |

17

(266 of 300), Page 266 of 300 Case: 24-565, 04/17/2024, ER-820, Entry: 10.5, Page 266 of 300

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 18 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 68 | 1850 | North Carolina | 1850 NC, ch. 121 | Taxation on ownership of pistols, knives, bowie knives, dirks, and sword canes, that were "used, worn or carried about the person of the owner." | Pistols; Knives; Bowie knives; Dirks; Sword Canes | |
| 69 | 1851 | Pennsylvania – City of Philadelphia | 1851 Pa. Laws 382, No. 239, § 4 | Prohibited the willful and malicious carrying of any pistol, gun, dirk, knife, slungshot, or deadly weapon. Punishable by imprisonment for 6 months to 1 year and security for future good behavior. | Pistol; Gun; Dirk; Slungshot; Deadly weapon | |
| 70 | 1852 | Alabama | 1851–1852 Ala. Laws 3, ch. 1, § 1 | Tax of $2 on "every bowie knife or revolving pistol." | Bowie knife; Pistol | |
| 71 | 1852 | Hawaii | 1852 Haw. Sess. Laws 19, § 1 | Prohibited the unauthorized carry of any bowie knife, sword-cane, pistol, air gun, slung-shot, or deadly weapon. Punishable by fine of $10–30 or up to 2 months of hard labor. | Bowie knife; Sword-cane; Pistol; Air Gun; Slung-shot; Deadly Weapon | |
| 72 | 1852 | New Mexico [Territory] | 1852 N.M. Laws 67, § 1 | Prohibited the concealed carrying of short arms such as pistols, daggers, knives, and other deadly weapons. Punishable by a fine up to $10 or imprisonment up to 15 days. | Pistols; Daggers; Knives; Other deadly weapons. | |
| 73 | 1854 | Kentucky | 1853 Ky. Acts 186, ch. 1020, §§ 1, 2 | Prohibited the concealed carry of "any deadly weapons, other than an ordinary pocket knife," unless (1) "the person has reasonable grounds to believe his person, or the person of | Deadly weapons | |

18

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
|     |                   |              |          | some of his family, or his property, is in danger from violence or crime," (2) the person is a sheriff, constable, marshal, or policeman in discharge of official duties, or (3) the person is "required by their business or occupation to travel during the night, the carrying concealed deadly weapons during such travel," with limited exceptions |                        |                 |
| 74  | 1854              | Mississippi  | 1854 Miss. Laws 49–50, ch. 1, § 1 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Arkansas toothpick; Sword cane |                 |
| 75  | 1854              | Washington [Territory] | 1854 Wash. Sess. Law 80, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon |                 |
| 76  | 1855              | California   | 1855 Cal. Stat. 152–53, ch. 127, §§ 1–3 | Provided that a person who killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon" would pay the decedent's debts and be liable to the decedent's family for liquidated damages. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon |                 |

19

(268 of 300), Page 268 of 300 Case: 24-565, 04/17/2024, DktEntry: 10.5, Page 268 of 300

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 20 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

ER-822

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|------|------|------|------|------|------|
| 77 | 1855 | California | William H. R. Wood (Editor), *Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858, 334 (1861)*, art. 1904 | Prohibited the display of any dirk, dirk-knife, Bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of such weapon in a fight. Punishable by a fine of $100–500 or imprisonment for 1–6 months. | Dirk; Bowie knife; Sword; Sword cane; Pistol; Gun; Other deadly weapon | |
| 78 | 1855 | Indiana | 1855 Ind. Acts 153, ch. 79, §§ 1–2 | Prohibited the use of any gun, stone, stick, club, or any other weapon while on board, or directed at, a train; Punishable by up to 3 months' imprisonment and a fine up to $100. | Gun; Stone; Stick; Club; Other weapon | |
| 79 | 1855 | Louisiana | 1855 La. Acts 148, ch. 120, § 115 | Prohibited the concealed carrying of "pistols, bowie knife, dirk, or any other dangerous weapon." Punishable by imprisonment up to 3 months and a fine not to exceed $1000. | Pistol; Bowie knife; Dirk; Other dangerous weapon | *State v. Jumel,* 13 La. Ann. 399, 399 (1858) (holding that restrictions are not unconstitutional, noting that they are "a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society"). |

20

(269 of 300), Page 269 of 300 Case: 24-565, 04/17/2024, ER-826, Entry: 10.5, Page 269 of 300

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 21 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 80 | 1856 | Mississippi | 1856–1857 Miss. Laws 35 – 36, § 3, art. 10 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Arkansas toothpick; Sword cane; | |
| 81 | 1856 | Tennessee | 1855–56 Tenn. Pub. Acts 92, ch. 81, §§ 1–2 | Prohibited the sale or transfer of any pistol, Bowie knife, dirk, Arkansas toothpick, or hunter's knife to a minor. Excepted the transfer of a gun for hunting. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife | |
| 82 | 1856 | Texas | Tex. Penal Code ch. 14, arts. 611–12 (1857) | Provided that the use of a Bowie knife or a dagger in manslaughter is to be deemed murder. | Bowie knife; Dagger | *Cockrum v. State*, 24 Tex. 394 (1859) (upheld under Second Amendment and Texas Constitution). |
| 83 | 1858 | District of Columbia | 1 William B. Webb, The Laws of the Corporation of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858 | Prohibited "any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles." | Firearms; Other weapons | |
| 84 | 1858 | Nebraska [Territory] | 1858 Neb. Laws 69, ch. 1, § 135 | Prohibited the carrying of a pistol, gun, knife, dirk, bludgeon or other offensive weapon with the intent to | Pistol; Gun; Knife; | |

21

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 22 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|----------------------|-----------------|
| | | | | assault a person. Punishable by up to 3 months' imprisonment or a fine up to $100. | Dirk; Bludgeon; Other offensive weapon | |
| 85 | 1859 | Indiana | 1859 Ind. Acts 129, ch. 78, § 1. | Prohibited the carrying of any dirk, pistol, Bowie knife, dagger, sword in cane, or any other dangerous or deadly weapon with the intent of injuring another person.  Exempted any person who was a "traveler."  Punishable by fine up to $500. | Dirk; Pistol; Bowie knife; Dagger; Sword-cane; Other dangerous or deadly weapon | *Burst v. State*, 89 Ind. 133 (1883) (holding that there was sufficient evidence that the defendant was a "traveler" and exempt from the law), *overruled by State v. Smith*, 157 Ind. 241 (1901) (narrowing scope of "traveler" exception). |
| 86 | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, ch. 33, § 23 | Prohibited the selling, giving, or loaning of a concealed pistol, dirk, Bowie knife, brass knuckles, slungshot, colt, cane-gun, or other deadly weapon to a "minor, slave, or free negro."  Punishable by fine of $50. | Pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Colt; Cane-gun; | |

22

ER-824

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 23 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Other deadly weapon | |
| 87 | 1859 | New Mexico | 1859 N.M. Laws 94–96, §§ 1–5 | Prohibited the carrying of a concealed pistol, Bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon. | Pistol; Bowie knife; Cuchillo de cinto (belt buckle knife); Arkansas toothpick; Spanish dagger; Slungshot; Other deadly weapon | |
| 88 | 1859 | Ohio | 1859 Ohio Laws 452, § 210 | Prohibited the concealed carrying of any pistol, Bowie knife, or any other "dangerous weapon." Punishable by fine of up to $200 or imprisonment of up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | |
| 89 | 1859 | Washington [Territory] | 1859 Wash. Sess. Laws 109, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | |
| 90 | 1860 | Georgia | 1860 Ga. Laws 56, No. 63, § 1 | Prohibited the sale or furnishing of any gun, pistol, Bowie knife, slungshot, sword cane, or other | Gun; Pistol; Bowie knife; | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | weapon to a "slave or free person of color." Punishable by fine up to $500 and imprisonment up to 6 months. | Slungshot; Sword cane; Other weapon | |
| 91 | 1861 | Nevada [Territory] | 1861 Nev. Stat. 61, § 35 | Provided that the killing of another in a duel with a rifle, shotgun, pistol, Bowie knife, dirk, small-sword, back-sword, or other "dangerous weapon" in the killing of another in a duel is to be deemed murder. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon | |
| 92 | 1862 | Colorado [Territory] | 1862 Colo. Sess. Laws 56, § 1 [Concealed weapons] | Prohibited the concealed carrying in any city, town, or village any pistol, Bowie knife, dagger, or other deadly weapon. Punished by fine of $5–35. | Pistol; Bowie knife; Dagger; Other deadly weapon | |
| 93 | 1863 | Kansas – City of Leavenworth | C. B. Pierce, *Charter and Ordinances of the City of Leavenworth, with an Appendix* 45 (1863), § 23 | Prohibited the carrying of any concealed "pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city." Punishable by a fine of $3–100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Brass; lead or iron knuckles; Other deadly weapon | |

24

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 25 of 108
*Baird v. Bonta,* Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 94 | 1863 | Tennessee – City of Memphis | William H. Bridges (Editor), *Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix* 190 (1863), art. 3, § 3 | Prohibited the carrying of a concealed pistol, Bowie knife, dirk, or any other deadly weapon. Punishable by fine of $10–50. | Pistol; Bowie knife; Dirk; Other deadly weapon | |
| 95 | 1864 | California | Theodore H. Hittell (Editor), *The General Laws of the State of California, from 1850 to 1864, Inclusive* 261 (1872), § 1585 [§ 1] | Prohibited the concealed carrying of any dirk, pistol, sword cane, slingshot, or "other dangerous or deadly weapon." Exempted any peace officer or officer acting under the law of the United States. Punishable by imprisonment for 30–90 days or fine of $20–200. | Dirk; Pistol; Sword cane; Slingshot; Other deadly or dangerous weapon | |
| 96 | 1865 | Montana [Territory] | 1864 Mont. Laws 355, § 1 [Deadly weapons] | Prohibited the carrying of a concealed "any pistol, bowie-knife, dagger, or other deadly weapon" within any town or village in the territory. Punishable by fine of $25–100. | Pistol; Bowie knife; Dagger; Other deadly weapon | |
| 97 | 1865 | Utah [Territory] | Henry McEwan (Editor), *Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah* 59 (1866), ch. 22, tit. 8, § 102 | Prohibited the "set[ting] of any gun." Punishable by imprisonment of up to 1 year or a fine of up to $500. | Trap gun | |
| 98 | 1866 | New York | Montgomery H. Throop (Editor), *Revised Statutes* | Prohibited using, attempting to use, concealing, or possessing a slingshot, | Slingshot; Billy; | |

25

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *of the State of New York, Vol. 3*, at 2512 (1882), ch. 716, §§ 1–2 | billy, sandclub or metal knuckles, and any dirk or dagger, or sword cane or air-gun. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Sandclub; Metal knuckles; Dirk; Dagger; Sword cane; Air gun | |
| 99 | 1866 | North Carolina | 1866 N.C. Sess. Laws 30 & 33–34, ch. 21, § 1, sched. A(11) | Imposed a $1 tax on every dirk, Bowie knife, pistol, sword cane, dirk cane, and rifle cane used or worn during the year. | Dirk; Bowie knife; Pistol; Sword cane; Dirk cane; Rifle cane | |
| 100 | 1867 | Alabama | 1866–1867 Ala. Laws 260 & 263, ch. 2, § 2(10) | Tax of $2 on pistols or revolvers in the possession of private persons, excluding dealers, and a tax of $3 on "all bowie knives, or knives of the like description." Non-payment was punishable by seizure and, unless payment was made within 10 days with a penalty of an additional 50%, subject to sale by public auction. | Pistol; Bowie knife | |
| 101 | 1867 | Arizona | An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. In Coles Bashford, The Compiled Laws of the | Prohibiting drawing or exhibiting any deadly weapon in presence of two or more persons "in a rude, angry or threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel," punishable by fine or imprisonment. | Deadly weapons | |

26

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | Territory of Arizona, page 96, Image 102 (1871). | | | |
| 102 | 1867 | Colorado [Territory] | 1867 Colo. Sess. Laws 229, § 149 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon within any city, town, or village in the territory. Punishable by fine of $5–35. Exempted sheriffs, constables, and police officers when performing their official duties. | Pistol; Bowie knife; Dagger; Other deadly weapon | |
| 103 | 1867 | Tennessee – City of Memphis | William H. Bridges (Editor), *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix*, 44 (1867), §§ 4746, 4747, 4753, 4757 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon; and restricted the concealed or public carry of a dirk, sword cane, Spanish stiletto, belt or pocket pistol. Also prohibited selling such a weapon or using such a weapon to threaten people. | Bowie knife; Arkansas toothpick; Dirk; Sword cane; Spanish stiletto; Belt; Pocket pistol; Other knife or weapon | |
| 104 | 1867 | Tennessee – City of Memphis | William H. Bridges (Editor), *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with* | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self-defense in traveling. Punishable by fine of minimum $25 and imprisonment. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | |

27

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 28 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *an Appendix*, 50 (1867), § 4864 | | | |
| 105 | 1868 | Alabama | Wade Keyes & Fern Wood (Editors), *Code of Alabama* 883 (1876), ch. 3, § 4111 | Prohibited the carrying of any rifle or "shot-gun walking cane." Punishable by fine of $500–1,000 and imprisonment of no less than 2 years. | Rifle; Shotgun walking cane | |
| 106 | 1868 | Florida | W. A. Blountet al. (Editors), *The Revised Statutes of the State of Florida* 782–83 (1892), tit. 2, art. 5, § 2423 | Prohibited the concealed carrying of slungshot, metallic knuckles, billies, firearms, or other dangerous weapons if arrested for committing a criminal offense or disturbance of the peace. Punishable by imprisonment up to 1 year and a fine up to $50. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon | |
| 107 | 1868 | Florida | W. A. Blountet al. (Editors), *The Revised Statutes of the State of Florida* 782–83 (1892), tit. 2, art. 5, § 2425 | Prohibited the manufacture or sale of slungshots or metallic knuckles. Punishable by imprisonment for up to 6 months or a fine up to $100. | Slungshot; Metallic knuckles | |
| 108 | 1868 | Florida | 1868 Fla. Laws 95, ch. 7, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, billies, firearms or other dangerous weapon if arrested for committing a criminal offence or disturbance of the peace. Punishable by imprisonment up to 3 months or a fine up to $100. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon | |
| 109 | 1868 | Florida | James F McClellan (Editor), *A Digest of the Laws of the State of* | Prohibited the carrying "about or on their person" any dirk, pistol or other arm or weapon, except a "common | Dirk; Pistol; | |

28

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 29 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|-----------------|
| | | | *Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive* 403 (1881), § 13 | pocket knife." Punishable by fine up to $100 or imprisonment up to 6 months. | Other arm or weapon | |
| 110 | 1868 | Kansas | The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) Crimes and Punishments, § 282 | Any person who is "not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon" is subject to arrest and fine or imprisonment. | Firearms; Other deadly weapons. | |
| 111 | 1869 | Minnesota | 1869 Minn. Laws 50–51, ch. 39, §§ 1–3 | Prohibited "the setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon." Punishable by fine up to $500 and/or imprisonment up to 6 months, if no injury resulted. | Trap gun | |
| 112 | 1869 | New Mexico [Territory] | 1868–69 N.M. Session Laws 72–73, ch. 32, §§ 1–3 | Prohibited any carry of deadly weapons, including pistols (revolver, repeater, derringer), Bowie knives, | Pistol; Bowie knife; Dagger; | |

29

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | daggers, poniards, butcher knives, dirk knives, sword canes, and slung shot. Punishable by fine up to $50 and/or imprisonment up to 50 days. | Poniard; Butcher knife; Dirk; Sword cane; Slung shot; Other deadly weapon | |
| 113 | 1869 | Tennessee | 1869–70 Tenn. Pub. Acts 23–24, ch. 22, § 2 | Prohibited the carrying of any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." | Pistol; Dirk; Bowie knife; Arkansas toothpick; Other "deadly or dangerous weapon" | *Andrews v. State*, 50 Tenn. 165 (1871) (upheld under state constitution). |
| 114 | 1869 | Washington [Territory] | 1869 Wash. Sess. Laws 203–04, ch. 2, § 32 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | |
| 115 | 1870 | Georgia | 1870 Ga. Laws 421, tit. 16, ch. 285, §§ 1–3 | Prohibited the open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters. Punishable by imprisonment up to 20 days and/or a fine up to $50. | Dirk; Bowie knife; Pistol; Revolver; Any kind of deadly weapon | *Hill v. State*, 53 Ga. 472 (1874) (upheld under state constitution). |

30

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 116 | 1870 | Louisiana | 1870 La. Acts 159–60, § 73 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife or other dangerous weapon on an election day during the hours the polls are open or during registration. Punishable by fine of minimum $100 and imprisonment of minimum 1 month. | Gun; Pistol; Bowie knife; Other dangerous weapon | |
| 117 | 1870 | Tennessee | 1869–1870 Tenn. Pub. Acts 28, ch. 13, § 1 | Prohibited the carrying of a "dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver." Punishable by a fine of up to $50, imprisonment up to 6 months, and imposition of a $1,000 bond "to keep the peace" for 6 months after conviction. | Dirk; Sword-cane; Stiletto; Belt; Pocket pistol; Revolver | |
| 118 | 1870 | Texas | 1870 Tex. Gen. Laws 63, ch. 46, § 1 | Prohibited the carrying of a Bowie knife, dirk or butcher knife, or firearms in any school room or any place where persons are assembled for educational, literary, or scientific purposes, or a ballroom, social party, or other social gathering, or any election precinct during an election. | Bowie knife; Dirk; Butcher knife | |
| 119 | 1871 | Arkansas – City of Little Rock | John H. Cherry (Editor), *Digest of the Laws and Ordinances of the City of Little Rock* 168 (1882), §399 | Prohibited carrying of a pistol, revolver, Bowie knife, dirk, rifle, shot gun, slungshot, colt, or metal knuckles while engaged in a breach of the peace. Punishable by a fine of $25–500. | Pistol; Revolver; Bowie knife; Dirk; Rifle; Shotgun; Slungshot; | |

31

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC

**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Colt; Metal knuckles | |
| 120 | 1871 | District of Columbia | 1871–1872 D.C. Laws, Part II, ch. 33, ch. 25 | Prohibited the carrying or having concealed "any deadly or dangerous weapons, such as daggers, air-guns, pistols, Bowie knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slungshots, or brass or other metal knuckles." Punishable by forfeiture of the weapon and a fine of $20–50. | Dangerous weapon; Dagger; Air-guns; Pistols; Bowie knife; Dirk; Razor; Sword-cane; Slungshot; Metal knuckles | *Brown v. United States*, 58 App. D.C. 311 (1929) (affirming conviction for concealed carrying of a pistol in automobile). |
| 121 | 1871 | Mississippi | 1871 Miss. Laws 819–20, ch. 33, art. 3, § 1 | Imposed property tax on pistols, dirks, Bowie knives, and sword canes. | Pistol; Dirk; Bowie knife; Sword cane | |
| 122 | 1871 | Missouri – City of St. Louis | Everett W. Pattinson (Editor), *Revised Ordinance of the City of St. Louis* 491 (1871), art. 2, § 9 | Prohibited the carrying of a concealed pistol, or revolver, colt, billy, slungshot, cross knuckles, or knuckles of lead, brass or other metal, Bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon without written permission from the Mayor. Punishable by fine of $10–500. | Pistol; Revolver; Colt; Billy; Slungshot; Cross knuckles; Metal knuckles; Bowie knife; Razor; | |

32

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | |
| 123 | 1871 | New Jersey – City of Jersey City | *Order of the Board of Aldermen. Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto* 41 (1874), §§ 1–4 | Prohibited concealed carry of any "slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon." Punishable by fine up to $20. | Slung-shot; Billy; Sand-club; Metal knuckles; Dirk; Dagger; Pistol; Other dangerous weapon | |
| 124 | 1871 | Texas | 1871 Tex. Laws 25, ch. 34, § 1 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any other kind of knife used for offense or defense, unless carried openly for self-defense. Punishable by fine of $20–100, forfeiture of the weapon, and for subsequent offenses, imprisonment up to 60 days. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any other | *English v. State*, 35 Tex. 473 (1872) (upheld as constitutional under Second Amendment and Texas Constitution); *State v. Duke*, 42 Tex. 455 (1875) |

33

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 34 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | kind of knife used for offense or defense | (upheld as constitutional under Texas Constitution). |
| 125 | 1871 | Texas | 1871 Tex. Laws 25, ch. 34, § 3 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife, or other dangerous weapon within a half mile of a polling site on an election day. Also prohibited generally carrying a pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or other kind of knife used for offense or defense. Punishable by fine and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass-knuckles; Bowie knife; Other dangerous weapon; Other knife used for offense or defense | |
| 126 | 1872 | Maryland – City of Annapolis | 1872 Md. Laws 57, ch. 42, § 246 | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slungshot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon. Punishable by a fine of $3–10. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Razor; Brass; Metal knuckles; | |

34

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 35 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Other deadly weapon | |
| 127 | 1872 | Nebraska – City of Nebraska | Gilbert B. Scolfield (Editor), *Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska*, 36 (1872), No. 7, § 1 | Prohibited the carrying openly or concealed of a musket, rifle, shot gun, pistol, sabre, sword, Bowie knife, dirk, sword cane, billy, slungshot, brass or other metallic knuckles, or any other dangerous or deadly weapons. | Musket; Rifle; Shot gun; Pistol; Sabre; Sword; Bowie knife; Dirk; Sword cane; Billy; Slungshot; Metal knuckles; Other dangerous or deadly weapons | |
| 128 | 1873 | Alabama | Wade Keyes & Fern Wood (Editors), *Code of Alabama, 1876*, 883 (1877), ch. 3, § 4110 | Prohibited the concealed carrying of any brass knuckles, slungshots, or "other weapon of like kind or description." Punishable by a fine of $20–200 and imprisonment or term of hard labor not to exceed 6 months. | Metal knuckles; Slungshot | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 129 | 1873 | Minnesota | A.H. Bissell (Editor), *Statutes at Large of the* | Prohibited the setting of any spring or trap gun. Punished by imprisonment | Spring gun; Trap gun | |

35

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 36 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *State of Minnesota* 993 (Vol. 2, 1873), ch. 54, §§ 64–65 | for at least 6 months or a fine of up to $500 if no injury results; imprisonment for up to 5 years if non-fatal injury results; and imprisonment for 10–15 years if death results. | | |
| 130 | 1873 | Nevada | M.S. Bonnifield & T.W. Healy (Editors), *Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive*, 563 (Vol. 1, 1873), §§ 35–36 | Prohibited dueling and killing a person with a rifle, shotgun, pistol, Bowie knife, dirk, small sword, backsword, or other dangerous weapon. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other dangerous weapon | |
| 131 | 1873 | Tennessee | Seymour D. Thompson & Thomas M. Steger (Editors), *Compilation of the Statute Laws of the State of Tennessee*, 125 (Vol. 2, 1873), ch. 9, art. 2, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment for a term determined by the court. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | |
| 132 | 1874 | Alabama | 1874–1875 Ala. Laws 41, § 102, pt. 27 | Imposed $25 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | |
| 133 | 1874 | Illinois | Harvey Bostwick Hurd (Editor), *Revised Statutes of the State of Illinois. A.D.* | Prohibited the carrying a concealed weapon, including a pistol, knife, slungshot, brass, steel, or iron | Pistol; Knife; Slungshot; | |

36

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *1874, 360 (1874), ch. 38, § 56* | knuckles, or other deadly weapon while disturbing the peace. Punishable by fine up to $100. | Other deadly weapon | |
| 134 | 1874 | Virginia | 1874–1875 Va. Acts 282–83, ch. 239, § 6, sched. B(18) | Included the value of all "rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind" in list of taxable personal property. | Rifle; Musket; Other firearm; Bowie knife; Dirk | |
| 135 | 1875 | Alabama | 1875–1876 Ala. Acts 46, Rev. Code, ch. 1, § 1(5) | Imposed tax rate of 0.75% of the value of any pistols, guns, dirks, and Bowie knives. | Pistols; Guns; Dirks; Bowie knives | |
| 136 | 1875 | Alabama | 1875–1876 Ala. Acts 82, Rev. Code, ch. 9, § 7(15) | Imposed $50 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | *Porter v. State*, 58 Ala. 66 (1877) (affirming conviction). |
| 137 | 1875 | Arkansas | 1874–1875 Ark. Acts 156, § 1 | Prohibited the carrying in public of any "pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by a fine of $25–100. | Pistol; Dirk; Butcher knife; Bowie knife; Sword cane; Metal knuckles | *Wilson v. State*, 33 Ark. 557 (1878) (held unconstitutional to extent the law applied to a "war arm"). |
| 138 | 1875 | Idaho [Territory] | *Compiled and Revised Laws of the Territory of Idaho*, 354 (1875), § 133 | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by imprisonment for up to 3 months or a fine up to $100. | Pick-lock; Crow-key; Bit; Other instrument or tool; | |

37

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 38 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | |
| 139 | 1875 | Indiana | 1875 Ind. Acts 62, ch. 17, § 1 | Prohibited the drawing or threatening to use a pistol, dirk, knife, slungshot, or any other deadly or dangerous weapon. Punishable by fine of $1–500, and potentially imprisonment up to 6 months. | Pistol; Dirk; Knife; Slungshot; Other deadly or dangerous weapon | |
| 140 | 1875 | Michigan | 1875 Mich. Pub. Acts 136, ch. 97, § 1 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | |
| 141 | 1875 | Pennsylvania | 1875 Pa. Laws 33, ch. 38, § 1 | Prohibited the concealed carrying of any "fire-arms, slung-shot, handy-billy, dirk-knife, razor or other deadly weapon" with intent to injure another. | Firearms; Slungshot; Billy; Dirk; Razor; Other deadly weapon | |
| 142 | 1876 | Alabama | 1876–77 Ala. Code 882, § 4109 | Prohibited the carrying of a Bowie knife, pistol, or air gun, or any other weapon of "like kind or description," unless threatened with or having good cause to fear an attack or while traveling or setting out on a journey. | Bowie knife; Pistol; Air gun; Other similar weapon | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State,* |

38

(287 of 300), Page 287 of 300 Case: 24-565, 04/17/2024, Entry: 10.5, Page 287 of 300

ER-841

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 39 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | Punishable by a fine of $50–300 and imprisonment or hard labor for no more than 6 months. | | 49 Ala. 355 (1947) (necessity required). |
| 143 | 1876 | Alabama | Wade Keyes (Editor), *Code of Alabama 1876* 882 (1877), ch. 3, § 4109 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon, unless the person was threatened with, or had good reason to apprehend, an attack, or "while traveling, or setting out on a journey." Punishable by fine of $50–300 and imprisonment of not more than 6 months. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon | |
| 144 | 1876 | Alabama | Wade Keyes (Editor), *Code of Alabama 1876* 901 (1877), ch. 6, § 4230 | Prohibited the sale, giving, or lending of any pistol, Bowie knife, or "like knife" to any boy under the age of 18. | Pistol; Bowie knife | *Coleman v. State*, 32 Ala. 581 (1858) (affirming conviction of letting minor obtain a pistol). |
| 145 | 1876 | Sacramento, California | Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in Chapter and Ordinances of the City of Sacramento 173 (R.M. Clarken ed., 1896) (Sacramento, California) | Prohibited any person aside from public officers or travelers to wear or carry concealed a firearm or deadly weapon without a permit. Punishable by fine. Permits may be issued "to any peaceable person, whose profession or occupation may require him to be out at late hours of the night, to carry | Firearms, Deadly weapons | |

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 40 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | concealed deadly weapons for his protection. | | |
| 146 | 1876 | Colorado | 1876 Colo. Sess. Laws 304, § 154 | Prohibited the carrying with intent to assault another any pistol, gun, knife, dirk, bludgeon, or other offensive weapon. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | |
| 147 | 1876 | Georgia | 1876 Ga. L. 112, ch. 128, § 1 | Prohibited the gift, transfer, or sale of any pistol, dirk, Bowie knife, or sword cane to a minor. | Pistol; Dirk; Bowie knife; Sword cane | |
| 148 | 1876 | Illinois – Village of Hyde Park | Consider H. Willett, *Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments*, 64 (1876), § 39 | Prohibited the carrying a concealed pistol, revolver, slungshot, knuckles, Bowie knife, dirk knife, dirk, dagger, or any other dangerous or deadly weapon without written permission from the Captain of Police. Exempted peace officers. | Pistol; Revolver; Slungshot; Knuckles; Bowie knife; Dirk; Dagger; Other dangerous or deadly weapon | |

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 41 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 149 | 1876 | Wyoming [Territory] | John W. Blake et al. (Editors), *Revised Statutes of Wyoming in Force January 1, 1887*, 306 (1887), § 1027 | Prohibited the carrying of a pistol, knife, dirk, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by fine up to $500 or imprisonment up to 6 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | |
| 150 | 1877 | Colorado – Town of Georgetown | Edward O. Wolcott (Editor), *Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877*, 100 (1877), § 9 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon. Punishable by a fine of $5–50. | Pistol; Bowie knife; Dagger; Other deadly weapon | |
| 151 | 1877 | New Jersey | *Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871*, 304 (1877), § 2 | Prohibited the carrying of "any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." Punishable as a "disorderly person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | |
| 152 | 1877 | South Dakota [Territory] | G.C. Moody (Editor), *Revised Codes, 1903, State of South Dakota* 1150 (1903), §§ 470–471. | Prohibited the carrying, "whether concealed or not," of any slungshot, and prohibited the concealed carrying of any firearms or sharp or dangerous weapons. | Slungshot; Firearm; Sharp or dangerous weapon | |
| 153 | 1877 | Utah – City of Provo [Territory] | *Revised Ordinances Of Provo City [Utah], Containing All The Ordinances In Force On the First Day of February, A.D. 1877, and the Rules* | Prohibited carrying a pistol, or other firearm, slungshot, false knuckles, Bowie knife, dagger or any other "dangerous or deadly weapon." Punishable by fine up to $25. | Pistol; Other firearm; Slungshot; Metal knuckles; Bowie knife; | |

41

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *and Order of Business of Provo City Council* 106–07 (1877), ch. 6, § 182 | | Dagger; Other dangerous or deadly weapon | |
| 154 | 1878 | Alabama – City of Uniontown | 1878–1879 Ala. Laws 437, ch. 314, § 14 | Authorized Uniontown to license dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | |
| 155 | 1878 | California – Los Angeles | Ordinances of the City of Los Angeles, § 36, William M. Caswell, *Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles* 85 (1878) | Prohibited all persons "except peace officers and persons actually traveling and immediately passing through Los Angeles city" from carrying or wearing any deadly weapon, "concealed or otherwise, within the corporate limits of said city." Punishable by fine and imprisonment. | Dirk; Pistol; Sword in a cane; Slung-shot; Other weapons | |
| 156 | 1878 | Mississippi | 1878 Miss. Laws 175, ch. 46, § 1 | Prohibited the carrying of a concealed Bowie knife, pistol, brass knuckles, slungshot or other deadly weapon. Excepted travels other than "a tramp." Punishable by fine of $5–100. | Bowie knife; Pistol; Brass knuckles; Slungshot; Other deadly weapon | |
| 157 | 1879 | Alabama – City of Montgomery | William S. Thorington (Editor), *Code of Ordinances of the City Council of Montgomery [Alabama]* 225 (1888), Pen. Code, Ch. 43, § 5188 | Prohibited carrying of a concealed Bowie knife, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon. Punishable by a fine of $1–100. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly | |

42

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 43 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | or dangerous weapon | |
| 158 | 1879 | Idaho – City of Boise [Territory] | *Charter and Revised Ordinances of Boise City, Idaho, in Effect April 12, 1894*, 118–19 (1894), § 36 | Prohibited the carrying a concealed Bowie knife, dirk knife, pistol or sword in cane, slungshot, metallic knuckles, or other dangerous or deadly weapon, unless traveling or setting out on a journey. Punishable by fine up to $25 and/or imprisonment up to 20 days. | Bowie knife; Dirk; Pistol; Sword cane; Slungshot; Metallic knuckles; Other dangerous or deadly weapons | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution). |
| 159 | 1879 | Louisiana | La. Const. of 1879, art. III | Provided the right to bear arms, but authorized the passage of laws restricting the carrying of concealed weapons. | Concealed weapons | |
| 160 | 1879 | Montana [Territory] | 1879 Mont. Laws 359, div. 4, § 23 | Prohibited dueling and killing a person involved with a rifle, shot-gun, pistol, Bowie knife, dirk, small-sword, back-sword, or other dangerous weapon. Punishable by death by hanging. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other dangerous weapon | |
| 161 | 1879 | North Carolina | 1879 N.C. Sess. Laws 231, ch. 127, §§ 1–5 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, dagger, slungshot, loaded case, metal | Pistol; Bowie knife; Dirk; | |

43

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | knuckles, razor, or other deadly weapon. Exemption for carrying on the owner's premises. Punishable by fine or imprisonment at the discretion of the court. | Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | |
| 162 | 1879 | Tennessee | 1879 Tenn. Pub. Acts 135–36, ch. 46, §§ 1–6 | Prohibited the sale of belt or pocket pistols, or revolvers, or other kind of pistol, except Army or Navy pistols. | Pistol | |
| 163 | 1879 | Tennessee | W.A. Milliken and John J. Vertrees (Editors), *Code of Tennessee, Being a Compilation of the Statute Laws of the State of Tennessee, of a General Nature, in Force June 1, 1884*, 1060–61 (1884), § 5533 | Prohibited the carrying, "publicly or privately," of any dirk, razor, sword cane, loaded cane, slungshot, brass knuckles, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol. | Dirk; Razor; Sword cane; Loaded cane; Slungshot; Metal knuckles; Spanish stiletto; Pistol; Revolver | |
| 164 | 1880 | Ohio | Michael A. Daugherty, et al. (Editors), *Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880*, 1633 (Vol. 2, 1879), tit. 1, ch. 5, § 6892 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, or other dangerous weapon. Punishable by a fine of up to $200 or imprisonment for up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | |

44

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 45 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 165 | 1880 | South Carolina | 1880 S.C. Acts 447–48, No. 362, § 1 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, metal knuckles, razor, or other deadly weapon. Punishable by fine up to $200 and/or imprisonment up to 1 year. | Pistol; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | |
| 166 | 1881 | Alabama | 1880–1881 Ala. Laws 38–39, ch. 44, § 1 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, or firearm of "any other kind or description," or air gun. Punishable by fine of $50–300 and imprisonment of not more than 6 months. Further provided that fines collected under the statute would be monetary and not in-kind payments. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon | *Terry v. State*, 90 Ala. 635 (1890) (affirming conviction for concealed carrying of pistol and Bowie knife). |
| 167 | 1881 | Arkansas | 1881 Ark. Acts 191–92, ch. 96, §§ 1–2 | Prohibited the carrying of any dirk, Bowie knife, sword, spear cane, metal knuckles, razor, or any pistol (except pistols that are used in the Army or Navy if carried openly in the hand). | Dirk; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Pistol | *Dabbs v. State*, 39 Ark. 353 (1882) (upheld as constitutional). |
| 168 | 1881 | Colorado | 1881 Colo. Sess. Laws 74, § 1 | Prohibited concealed carry of any pistol, Bowie knife, dagger, or other | Pistol; Bowie knife; Dagger; | |

45

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 46 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | deadly weapon in any city, town, or village. | Other deadly weapon | |
| 169 | 1881 | Delaware | 1881 Del. Laws 716, ch. 548, § 1 | Prohibited the carrying of concealed deadly weapons or selling deadly weapons other than an ordinary pocket knife to minors. Punishable by a fine of $25–200 or imprisonment for 10–30 days. | Deadly weapon | |
| 170 | 1881 | Illinois | 1881 Ill. Laws 73, §§ 1, 4 | Prohibited the possession, selling, loaning, or hiring for barter of a slungshot or metallic knuckles or other deadly weapon. Punishable as a misdemeanor. | Slungshot; Metallic knuckles; Other deadline weapon | *People v. Horan*, 293 Ill. 314 (1920) (holding that statute exceeded scope of the title). |
| 171 | 1881 | Illinois | 1881 Ill. Laws 73, § 2 | Prohibited selling, giving, loaning, hiring for barter any minor a pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon. Punishable by fine of $25–200. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Other deadly weapon | |
| 172 | 1881 | Indiana | 1881 Ind. Acts 191, ch. 37, § 81 | Prohibited drawing or threatening to use any pistol, dirk, knife, slungshot, or other deadly weapon on any other person. Punishable by $1-$500 fine and/or imprisonment up to 6 months. | Pistol; Dirk Knife Slungshot Other deadly weapon | |
| 173 | 1881 | Indiana | 1881 Ind. Acts 191, ch. 37, § 82 | Prohibited concealed carry of any dirk, pistol, Bowie knife, dagger, | Dirk; Pistol; | |

46

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 47 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | sword in cane, or other dangerous or deadly weapon. Excepted travelers. Also prohibited open carry of same with intent of injuring another. Punishable by fine up to $500. | Bowie knife; Dagger; Sword in cane; Other dangerous or deadly weapon | |
| 174 | 1881 | Indiana | *Revised Statues of the State of Indiana, Embracing the Revision of 1881 and All General Laws Enacted Subsequent to That Revision* 366 (1881), § 1957 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol, or other missile or weapon, or throwing a stone, stick, club, or other substance at a vehicle. Punishable by imprisonment for 30 days to 1 year and a fine of $10–100. | Gun; Rifle; Pistol; Other missile or weapon; Stone; Stick; Club; Other substance | |
| 175 | 1881 | Missouri – City of Boonville | J. H. Johnston (Editor), *Revised Charter and Ordinances of the City of Boonville, Mo.* 91 (1881), No. 17, art. 1, § 6 | Prohibited concealed carry of any pistol, revolver, dirk, dagger, slunshot, metallic knuckles, or other deadly or dangerous weapon. Punishable by fine of $5–90. | Pistol; Revolver; Dirk; Dagger; Slunshot; Brass knuckles; Other deadly or dangerous weapon | |
| 176 | 1881 | Nebraska | Guy A. Brown (Editor), *Compiled Statutes of the* | Prohibited concealed carry of any pistol, bowie knife, dirk, or other | Pistol; Bowie knife; | |

47

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *State of Nebraska, Comprising All Laws of a General Nature in Force July 1, 1881,* 666 (1881), ch. 5, § 25 | dangerous weapon. Punishable by fine up to $100 and/or up to 30 days imprisonment for first offense, and fine up to $100 and/or up to 3 months imprisonment for second offense. | Dirk; Other dangerous weapon | |
| 177 | 1881 | Nevada | David E. Baily & John D. Hammond (Editors), *General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive, With Citations of the Decisions of the Supreme Court Relating Thereto,* 1077 (1885), § 4844 | Prohibited a minor from carrying a concealed dirk, pistol, sword in case, slungshot, or other dangerous or deadly weapon.  Punishable by fine of $20–200 and/or imprisonment of 30 days to 6 months. | Dirk; Pistol; Sword in case; Slungshot; Other dangerous or deadly weapon | |
| 178 | 1881 | Tennessee – City of Nashville | William K. McAlister (Editor), *Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix,* 340–41 (1881), ch. 108, § 1 | Prohibited the carrying of pistol, Bowie knife, dirk, slungshot, brass knuckles, or other deadly weapon. Punishable by fine of $10–50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Metal knuckles; Other deadly weapon | |
| 179 | 1881 | Washington [Territory] | *Code of Washington, Containing All Acts of a General Nature, Revised and Amended by the Legislative Assembly of the Territory of Washington, During the Eighth Biennial* | Prohibited the carrying of "any concealed weapon." Punishable by fine up to $100 or imprisonment up to 30 days. | Concealed weapon | |

48

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 49 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
|  |  |  | *Session, and the Extra Session, Ending December 7, 1881, the Constitution of the United States, and the Amendments Thereto, the Acts of Congress Applicable to the Territory of Washington, and the Naturalization Laws 181* (1881), ch. 73, § 929 |  |  |  |
| 180 | 1881 | Washington [Territory] | Richard A. Ballinger (Editor), *Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897* 1956 (Vol. 2, 1897), § 7082 | Prohibited exhibiting a dangerous weapon in a manner likely to cause terror. Punishable by fine up to $25. | Dangerous weapon |  |
| 181 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Concealed deadly weapon; Gun; Pistol; Firearm |  |
| 182 | 1882 | Georgia | 1882–1883 Ga. Laws 37, ch. 18, § 2, pt. 18 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife |  |
| 183 | 1882 | Iowa – City of Sioux City | S. J. Quincy (Editor), *Revised Ordinances of the* | Prohibited the carrying a concealed pistol, revolver, slingshot, cross- | Pistol; Revolver; |  |

(298 of 300), Page 298 of 300 Case: 24-565, 04/17/2024 ER-852 ntry: 10.5, Page 298 of 300

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 50 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *City of Sioux City, Iowa 62* (1882), Public Safety, § 4 | knuckles, knuckles of lead, brass or other metal, or any Bowie knife, razor, billy, dirk, dirk knife or Bowie knife, or other dangerous weapon. | Slungshot; Cross-knuckles; Metal Knuckles; Bowie knife; Razor; Billy; Dirk; Other dangerous weapon | |
| 184 | 1882 | Minnesota – City of Saint Paul | W. P. Murray (Editor), *Municipal Code of Saint Paul, Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council, Revised to December 1, 1884* 289 (1884) art. 18, § 1 | Prohibited the carrying of a concealed pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, Bowie knife, dirk knife or razor, or any other dangerous or deadly weapon. Punishable by seizure of the weapon. | Pistol; Dirk; Dagger; Sword; Slungshot; Cross-knuckles; Metal knuckles; Bowie knife; Dirk; Razor; Other dangerous or deadly weapon | |
| 185 | 1882 | West Virginia | 1882 W. Va. Acts 421–22, ch. 135, § 1 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, | Pistol; Dirk; | *State v. Workman*, 35 W. |

50

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|----------------------|-----------------|
| | | | | billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling any such weapon to a minor. Punishable by fine of $25–200 and imprisonment of 1–12 months. | Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | Va. 367 (1891) (upheld under the Second Amendment), *abrogated by New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2153 (2022). |
| 186 | 1883 | Georgia | 1882–1883 Ga. Laws 48–49, No. 93, § 1 | Prohibited the concealed carrying of any "pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense." | Pistol; Dirk; Sword cane; speak Bowie knife; Other kind of knife | |
| 187 | 1883 | Illinois – City of Danville | E. R. E. Kimbrough & W. J. Calhoun (Editors), *Revised Ordinances of the City of Danville, Illinois* 179 (1892), § 23 | Prohibited the carrying of a concealed pistol, revolver, derringer, Bowie knife, dirk, slungshot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon. Also prohibited displaying the weapon in a threatening or boisterous manner. Punishable by fine of $1–100 and forfeiting the weapon, if ordered by the magistrate. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Slungshot; Metallic knuckles; Razor; Other deadly weapon | |
| 188 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, ch. 105, §§ 1–2 | Prohibited the selling, trading, giving, or loaning of a pistol, revolver, or toy | Pistol; Revolver; | *Parman v. Lemmon*, 120 |

51

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 52 of 108
Baird v. Bonta, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
|  |  |  |  | pistol, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind. Also prohibited the possession of such weapons by any minor. Punishable by fine of $5–100. Also prohibited a minor from possessing a pistol, revolver, toy pistol by which cartridges may be exploded, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapon. Punishable by fine of $1–10. | Toy pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Other dangerous weapons | Kan. 370 (1925) (holding on rehearing that a shotgun did not fall under the terms of the statute because shotguns are "habitually employed for such useful and ordinary purposes as protecting crops and procuring game" and are "such a common implement that, if the lawmakers intended to include it in the prohibited list, it is extremely unlikely they would have failed to mention it"). |
| 189 | 1883 | Missouri | 1883 Mo. Laws 76, Concealed Weapons, § 1 | Prohibited the carrying of a concealed fire arms, Bowie knife, dirk, dagger, slungshot, or other deadly weapon to a | Fire arms; Bowie knife; Dirk; | |