No. 24-565

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD
*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee,*

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME 5 of 7

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

ER-850

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 53 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | church, school, election site, or other public setting or carrying in a threatening manner or while intoxicated. Punishable by fine of $25–200 and/or by imprisonment up to 6 months. | Dagger; Slungshot; Other deadly weapon | |
| 190 | 1883 | Washington – City of Snohomish [Territory] | 1883 Wash. Sess. Laws 302, ch. 6, § 29, pt. 15 | Authorized City of Snohomish to regulate and prohibit carrying concealed deadly weapons and to prohibit using guns, pistols, firearms, firecrackers, bombs, and explosives. | Deadly weapon; Gun; Pistol; Firearm; Firecracker; Bomb | |
| 191 | 1883 | Wisconsin – City of Oshkosh | 1883 Wis. Sess. Laws 713, ch. 6, § 3, pt. 56 | Prohibited the carrying of a concealed pistol or colt, or slungshot, or cross knuckles or knuckles of lead, brass or other metal or Bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon. Punishable by confiscation of the weapon. | Pistol; Colt; Slungshot; Cross knuckles; Knuckles of lead; Metal knuckles; Bowie knife; Dirk; Dagger; Any other dangerous or deadly weapon | |

53

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 54 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|
| 192 | 1884 | Georgia | 1884–1885 Ga. Laws 23, ch. 52, § 2, pt. 18 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | |
| 193 | 1884 | Maine | *The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 928,* (1884), ch. 130, § 10 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | |
| 194 | 1884 | Maryland – City of Baltimore | John Prentiss Poe (Editor), *The Maryland Code: Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888, Including Also the Public Local Acts of the Session of 1888 Incorporated Therein 522–23* (Vol. 1, 1888), ch. 187, § 742 | Provided for $5–25 fine and confiscation of weapon whenever a person charged with any crime or misdemeanor was "found to have concealed about his person any pistol, dirk-knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever." | Pistol; Dirk; Bowie knife; Slingshot; Billy; Metal knuckles; Razor; Other deadly weapon | |
| 195 | 1884 | Vermont | 1884 Vt. Acts & Resolves 74, No. 74. § 1 | Prohibited the setting of any spring gun trap. Punishable by a fine of $50–500 and liability for twice the amount of any damage resulting from the trap. | Spring gun | |
| 196 | 1884 | Wyoming [Territory] | John W. Blakeet al. (Editors), *Revised Statutes of Wyoming, In Force* | Prohibited exhibiting in a threatening manner a fire-arm, Bowie knife, dirk, dagger, slingshot or other deadly | Pistol; Bowie knife; Dirk; | |

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 55 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *January 1, 1887, Including the Declaration of Independence, the Articles of Confederation, the Constitution of the United States, the Organic Act of Wyoming, and All Laws of Congress Affecting the Territorial Government* 297 (1887), § 983 | weapon. Punishable by fine of $10–100 or imprisonment up to 6 months. | Dagger; Slungshot; Other deadly weapon | |
| 197 | 1885 | Florida | W. A. Blount et al. (Editors), *The Revised Statutes of the State of Florida* 782 (1892), tit. 2, art. 5, § 2421 | Prohibited secretly carrying "arms of any kind" or concealing any "dirk, pistol or other weapon." Punishable by imprisonment up to 6 months or fine up to $100. | Dirk; Pistol; Other weapon | |
| 198 | 1885 | Montana [Territory] | 1885 Mont. Laws 74–75, § 1 | Prohibited possessing, carrying, or purchasing a dirk, dirk-knife, sword, sword cane, pistol, gun, or other deadly weapon, and from using the weapon in a threatening manner or in a fight. Punishable by fine of $10–100 and/or imprisonment for 1–3 months. | Dirk; Sword; Sword cane; Pistol; Gun; Other deadly weapon | |
| 199 | 1885 | New York | George R. Donnan (Editor), *Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882–85* 172 (1885), § 410 | Prohibited using or attempting to use, carrying, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, or a dagger, dirk or dangerous knife. Punishable as a felony, and as a misdemeanor if a minor. | Slungshot; Billy; Sandclub; Metal knuckles; Dagger; Dirk; | |

55

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 56 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Dangerous knife | |
| 200 | 1885 | New York – City of Syracuse | *Charter and Ordinances of the City of Syracuse, as Revised in 1885, and as Amended from 1885 to 1893 Inclusive, Together With Special Legislative Enactments Affecting the City of Syracuse 331* (1894), ch. 27, § 5 | Prohibited the carrying or using with the intent to do bodily harm a dirk, Bowie knife, sword or spear cane, pistol, revolver, slungshot, jimmy, brass knuckles, or other deadly or unlawful weapon. Punishable by a fine of $25–100 and/or imprisonment for 30 days to 3 months. | Dirk; Bowie knife; Sword; Spear cane; Pistol; Revolver; Slungshot; Jimmy; Metal knuckles; Other deadly or unlawful weapon | |
| 201 | 1885 | Oregon | 1885 Or. Laws 33, §§ 1–2 | Prohibited the concealed carrying of any revolver, pistol, or other firearm, or any knife (other than an "ordinary pocket knife"), or any dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury. Punishable by a fine of $10–200 or imprisonment for 5–100 days. | Revolver; Pistol; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles | |
| 202 | 1886 | Alabama | 1886 Ala. Laws 36, No. 4, § 5, pt. 17 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridges; Bowie knife; Dirk | |

56

ER-360

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 57 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 203 | 1886 | Colorado – City of Denver | Isham White (Editor), *Laws and Ordinances of the City of Denver, Colorado* 369 (1886), § 10 | Prohibited the carrying of any slungshot, colt, or metal knuckles while engaged in any breach of the peace. Punishable by a fine of $25–300. | Slungshot; Colt; Metal knuckles | |
| 204 | 1886 | Georgia | 1886 Ga. Laws 17, tit. 2, § 2, pt. 18 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and "pistol or revolver cartridges." | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | |
| 205 | 1886 | Maryland | 1886 Md. Laws 602, ch. 375, § 1 | Prohibited the carrying of "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or other dangerous or deadly weapon" concealed or, with an intent to injure another, openly. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Sandclub; Metallic knuckles; Razor; Other dangerous or deadly weapon | *Lawrence v. State*, 475 Md. 384, 402 (2021). |
| 206 | 1886 | Maryland | John Prentiss Poe (Editor), *Maryland Code: Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888,* | Prohibited the carrying of a concealed pistol, dirk knife, Bowie knife, slungshot, billy, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon. | Pistol; Dirk; Bowie knife; Slungshot; Billy; | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *Including Also the Public Local Acts of the Session of 1888 Incorporated Therein* 468–69 (Vol. 1, 1888), art. 27, ch. 375, § 30 | Punishable by fine of up to $500 or imprisonment of up to 6 months. | Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | |
| 207 | 1886 | Maryland – County of Calvert | 1886 Md. Laws 315, ch 189, § 1 | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day. Punishable by a fine of $10–50. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | |
| 208 | 1887 | Iowa – City of Council Bluffs | A. S. Hazelton & Frank J. Capell (Editors), *Compiled Ordinances of the City of Council Bluffs Iowa* 203–04 (1920), § 75 | Prohibited the carrying of a concealed pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sandbag, air guns of any description, dagger, Bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | |

58

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 209 | 1887 | Kansas – City of Independence | O. P. Ergenbright (Editor), *Revised Ordinances of the City of Independence, Kansas, Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council* 162 (1887), § 27 | Prohibited using a pistol or other weapon in a hostile or threatening manner. Also prohibited carrying a concealed pistol, dirk, Bowie knife, revolver, slungshot, billy, brass, lead, or iron knuckles, or any deadly weapon. Punishable by fine of $5–100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Metal knuckles; Any deadly weapon | |
| 210 | 1887 | Michigan | *Laws of the State of Michigan Relating to the Public Health in Force in the Year 1890* 145 (1889), § 1 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sandbag, skull cracker, slungshot, razor or other offensive and dangerous weapon or instrument. | Dirk; Dagger; Sword; Pistol; Air gun; Stiletto; Metallic knuckles; Billy; Sand bag; Skull cracker; Slungshot; Razor; Other offensive and dangerous weapon or instrument | *People v. Pendleton*, 79 Mich. 317 (1890) (reversing conviction where prosecution failed to establish the requisite elements, noting that respondent waived the argument that the law was unconstitutional). |
| 211 | 1887 | Montana [Territory] | 1887 Mont. Laws 549, § 174 | Prohibited the carrying of any pistol, gun, knife, dirk-knife, bludgeon, or | Pistol; Knife; | |

59

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|------|------|------|------|------|------|
| | | | | other offensive weapon with the intent to assault a person.  Punishable by fine up to $100 or imprisonment up to 3 months. | Dirk; Bludgeon; Other offensive weapon | |
| 212 | 1887 | New Mexico [Territory] | *Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session* 55 (1887), ch. 30, § 1 | Defined "deadly weapons" as including pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, Bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slungshots, bludgeons or any other deadly weapons. | Pistol; Dagger; Bowie Knife; Poniard; Butcher Knife; Dirk | |
| 213 | 1887 | Virginia | *The Code of Virginia: With the Declaration of Independence and the Constitution of the United States, and the Constitution of Virginia* 897 (1887), § 3780 | Prohibited the carrying of a concealed pistol, dirk, Bowie knife, razor, slungshot, or any weapon of the like kind.  Punishable by fine of $20–100 and forfeiture of the weapon. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Any weapon of the like kind | |
| 214 | 1888 | Georgia | 1888 Ga. Laws 22, ch. 123, § 2, pt. 17 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; | |

60

(10 of 300), Page 10 of 300  Case: 24-565, 04/17/2025, Entry: 10.6, Page 10 of 300

ER-364

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 61 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
| 215 | 1888 | Maryland – City of Baltimore | John Prentiss Poe, *The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, With a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and Also the Ordinances of the Mayor and City Council, Passed at the Session of 1891–92, and of 1892–1893, Up To the Summer Recess of 1893* 522–23 (Vol. 1, 1888), § 742 | Prohibited the carrying of a pistol, dirk knife, Bowie knife, slingshot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon if arrested for being drunk and disorderly. Punishable by fine of $5–25, and confiscation of the weapon. | Pistol or revolver cartridges Pistol; Dirk; Bowie knife; Slingshot; Billy; Metal knuckles; Razor; Other deadly weapon | |
| 216 | 1888 | Maryland – County of Kent | John Prentiss Poe (Editor), *The Maryland Code: Public Local Laws, Adopted by the General* | Prohibited carrying, on days of an election, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon. Punishable by a fine of $5–20. | Gun; Pistol; Dirk; Razor; | |

61

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 62 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *Assembly of Maryland March 14, 1888, Including Also the Public Local Acts of the Session of 1888 Incorporated Therein 1457* (Vol. 2, 1888), § 99 | | Billy; Bludgeon | |
| 217 | 1888 | Minnesota | George Brooks Young (Editor), *General Statutes of the State of Minnesota in Force January 1, 1889* 1006 (Vol. 2, 1888), §§ 333–34 | Prohibited manufacturing, selling, giving, or disposing of a slungshot, sandclub, or metal knuckles, or selling or giving a pistol or firearm to a minor without magistrate consent.  Also prohibited carrying a concealed slungshot, sandclub, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon. | Slungshot; Sandclub; Metal knuckles; Dagger; Dirk; Knife; Pistol; Any dangerous weapon | *State v. Simon*, 163 Minn. 317 (1925) (reversing conviction where prosecution failed to establish all elements of the offense). |
| 218 | 1888 | Utah – City of Salt Lake City [Territory] | Joseph Lippman (Editor), *The Revised Ordinances Of Salt Lake City, Utah, Embracing All Ordinances of a General Nature in Force December 20, 1892, Together With the Charter of Salt Lake City, the Amendments Thereto, and Territorial Laws of a General Nature Applicable to Salt Lake City, and the* | Prohibited carrying a slingshot or any concealed deadly weapon without permission of the mayor.  Punishable by fine up to $50. | Slingshot; Deadly weapon | |

62

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 63 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *Constitution of the United States* 283 (1893), § 14 | | | |
| 219 | 1889 | Arizona [Territory] | 1889 Ariz. Sess. Laws 16, No. 13, § 1 | Prohibited carrying of any pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any knife manufactured to offensive or defensive purposes.  Punishable by a fine of $25–100 and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass knuckles; Bowie knife; Other offensive or defensive knife | |
| 220 | 1889 | Idaho [Territory] | 1888–1889 Idaho Sess. Laws 23, § 1 | Prohibited private persons from carrying "deadly weapons" within any city, town or village. | Deadly weapons | *In re Brickey*, 8 Idaho 597 (1902) (held unconstitutional under the Second Amendment and state constitution). |
| 221 | 1889 | Minnesota | George Brooks Young (Editor), *General Statutes of the State of Minnesota in Force January 1, 1889* 1006 (Vol. 2, 1888), § 334 | Prohibited manufacture and sale of slungshots, sand-clubs, and metal knuckles.  Prohibited sale of "any pistol or fire-arm to any person under the age of | Slungshot; Sand club; Brass knuckles; Pistol; Firearm | |

63

(13 of 300), Page 13 of 300  Case: 24-565, 04/17/2024, DktEntry: 10.6, Page 13 of 300

ER-867

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 64 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | eighteen years'" in any city without written consent of a magistrate. | | |
| 222 | 1889 | Pennsylvania – City of Johnstown | *Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions* 86 (1897), No. 2, § 12 | Prohibited the concealed carrying of any pistol, razor, dirk, Bowie knife, blackjack, handy billy, or other deadly weapon. Punishable by fine of $5–50. | Pistol; Razor; Dirk; Bowie knife; Blackjack; Billy; Other deadly weapon | |
| 223 | 1890 | Connecticut – City of New Haven | *Charter and Ordinances of the City of New Haven, Together With Legislative Acts Affecting Said City* 164 (1890), § 192 | Prohibited the concealed carrying of any metal knuckles, pistol, slungshot, stiletto, or similar weapons, absent written permission of the mayor or superintendent of police. Punishable by a fine of $5–50. | Metal knuckles; Slungshot; Stiletto | |
| 224 | 1890 | Georgia | 1890 Ga. Laws 38, ch. 131, § 2, pt. 16 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | |
| 225 | 1890 | Louisiana | 890 La. Acts 39, ch. 46 | Prohibiting the transfer of any pistol, dirk, Bowie knife, or "any other dangerous weapon, which may be | Pistol; Dirk; Bowie knife; Other | |

64

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 65 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | carried concealed on a person to any person under the age of 21. | dangerous weapon | |
| 226 | 1890 | Maryland – City of Baltimore | John Prentiss Poe (Editor), *The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, With a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and Also the Ordinances of the Mayor and City Council, Passed at the Session of 1891–92, and of 1892–1893, Up To the Summer Recess of 1893* 297–98 (1893), § 742A | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, sandclub, metal knuckles, razor or any other dangerous or deadly weapon, or who openly carries with the intent to injure a person. Punishable by fine of up to $500 and imprisonment up to 6 months. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | |
| 227 | 1890 | Nebraska – City of Omaha | W. J. Connell (Editor), *The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890,* | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any | Pistol; Revolver; Colt; Billy; Slungshot; Metal | |

65

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *Together With the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska* 344–45 (1890), § 10 | other dangerous or deadly weapon. Punishable by fine up to $100. | knuckles Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | |
| 228 | 1890 | Oklahoma [Territory] | Will T. Little et al. (Editors), *The Statutes of Oklahoma, 1890*, 475–76 (1891), §§ 18–19 | Prohibited the manufacture, sale, giving, or disposing of any instrument or weapon usually known as a slungshot, and prohibited the carrying any slungshot or similar weapon. | Slungshot | |
| 229 | 1890 | Oklahoma [Territory] | Will T. Little et al. (Editors), *The Statutes of Oklahoma, 1890*, 495–96 (1891), art. 47, §§ 1–2, 10 | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or any other knife or instrument manufactured or sold solely for defense. Also prohibited the carrying of any pistol, revolver, Bowie knife, dirk knife, loaded cane, billy, metal knuckles, or "any other offensive or defense weapon." Punishable by a fine of $50–500 and imprisonment for 3–12 months. | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Other knife; Loaded cane; Billy; Other offensive or | |

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 67 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | defensive weapon | |
| 230 | 1890 | Oklahoma – Town of Checotah [Territory] | *General Laws Relating to Incorporated Towns of Indian Territory* 49 (1890), No. 11, § 3 | Prohibited the carrying of any pistol; dirk; butcher knife; Bowie knife; sword; spear-cane, metal knuckles, razor, slungshot, sandbag, or a switchblade. | Pistol; Dirk; Butcher knife; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Slungshot; Sandbag; Switchblade | |
| 231 | 1891 | California – City of Fresno | Jener W. Nielson (Editor), *Charter and Ordinances of the City of Fresno, California* 52 (1916), No. 221, § 8 | Prohibited the concealed carrying of any pistol or firearm, slungshot, dirk, Bowie knife, or other deadly weapon, absent written permission. | Pistol; Firearm; Slungshot; Dirk; Bowie knife; Other deadly weapon | |
| 232 | 1891 | California – City of Fresno | Jener W. Nielson (Editor), *Charter and Ordinances of the City of Fresno, California* 58 (1916), No. 221, § 53 | Prohibited the transfer to any minor under the age of 18 any gun, pistol or other firearm, dirk, Bowie knife, powder, shot, bullets, or any combustible or dangerous material, absent written consent of parent or guardian. | Gun; Pistol; Dirk; Bowie knife; Powder; Shot; Bullets | |
| 233 | 1891 | Michigan | 1891 Mich. Pub. Acts 408–09, No. 257, § 15 | Prohibited the carrying of a concealed pistol, revolver, Bowie knife, dirk, slungshot, billie, sandbag, false | Pistol; Revolver; Bowie; | |

67

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 68 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | knuckles, or other dangerous weapon. Also prohibited lurking or being concealed with the intent to injure a person or property, or threatening to beat or kill a person or property. Punishable by fine up to $100 and the costs of prosecution, and in default of payment, imprisonment. | Dirk; Slungshot; Billy; Sandbag; False knuckles; Other dangerous weapon | |
| 234 | 1891 | North Dakota | 1891 N.D. Laws 193–94, ch. 70, § 1 | Prohibited the setting of any gun or gun trap to be discharged at certain animals. | Trap gun | |
| 235 | 1891 | West Virginia | John A. Warth (Editor), *Code of West Virginia (Third Edition)* 915–16 (1891), ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon.  Also prohibited selling such a weapon to a minor.  Punishable by fine of $25–200 and imprisonment for 1–12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | |
| 236 | 1892 | Alabama | 1892 Ala. Laws 183, No. 95 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives, and clarified that cartridges that can be used in a pistol shall be deemed pistol cartridges. | Pistol; Pistol cartridges; Bowie knife; Dirk | |

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 69 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
| 237 | 1892 | Georgia | 1892 Ga. Laws 25, ch. 133, § 2, pt. 16 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and metal knuckles. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges; Metal knuckles | |
| 238 | 1892 | Washington – City of Tacoma | Albert R. Heilig (Editor), *Ordinances of the City of Tacoma, Washington* 333–34 (1892), No. 134 | Prohibited the carrying of a concealed a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, slingshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person. | Revolver; Pistol; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Instrument that causes injury | |
| 239 | 1893 | Arizona [Territory] | 1893 Ariz. Sess. Laws 3, § 1 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use). | Pistol; Other firearm; Dirk; Dagger; Slungshot; Sword-cane; Spear; Metal knuckles; Bowie knife; | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Any kind of knife (other than pocket knife) | |
| 240 | 1893 | Delaware | *Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two, As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two, to the Year of Our Lord One Thousand Eight Hundred and Ninety-Three, to Which Are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix* 987 (1893), ch. 548 | Prohibited the concealed carrying of deadly weapons or selling deadly weapons other than an ordinary pocket knife, and prohibited discharging any firearm in any public road. Punishable by fine of $25–100 or by imprisonment for 10–30 days. | Deadly weapon | *State v. Iannucci*, 4 Penne. 193 (1903) (affirming conviction for concealed carrying of a razor). |
| 241 | 1893 | North Carolina | 1893 N.C. L. 468–69, ch. 514 | Prohibiting the transfer of any pistol, pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane, or slingshot to a minor. | Pistol; Pistol cartridge; Metal knuckles; Bowie knife; | |

70

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 71 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Dirk;<br>Loaded cane;<br>Slingshot | |
| 242 | 1893 | Rhode Island | 1893 R.I. Pub. Laws 231, ch. 1180, § 1 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slungshot, pistol, or firearm of any description. | Dirk;<br>Bowie knife;<br>Butcher knife;<br>Dagger;<br>Razor;<br>Sword Cane;<br>Air gun;<br>Billy;<br>Metal knuckles;<br>Slungshot;<br>Pistol;<br>Other firearm | |
| 243 | 1893 | Tennessee – City of Nashville | Claude Waller (Editor), *Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, With an Appendix Containing Various Grants and Franchises* 364–65 (1893), § 738 | Prohibited the carrying of a pistol, Bowie knife, dirk knife, slungshot, brass knucks, or other deadly weapon. Punishable by fine of $10–50 for a first offense and $50 for subsequent offenses. | Pistol;<br>Bowie knife;<br>Dirk;<br>Slungshot;<br>Brass knuckles;<br>Other deadly weapon | |
| 244 | 1893 | Wyoming – City of Rawlins | A. McMicken (Editor), *The Revised Ordinances of the City of Rawlins, Carbon* | Prohibited a person from possessing or carrying a pistol, revolver, knife, slungshot, bludgeon or other lethal | Pistol;<br>Revolver;<br>Knife;<br>Slungshot; | |

71

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 72 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *County, Wyoming* 131–32 (1893), § 1 | weapon.  Punishable by fine up to $100 or imprisonment up to 30 days. | Bludgeon; Other lethal weapon | |
| 245 | 1895 | North Dakota | *The Revised Codes of the State of North Dakota, 1895, Together with the Constitution of the United States and of the State of North Dakota With the Amendments Thereto* 1259 (1895), § 7094 | Prohibited the setting of any spring or trap gun. | Trap gun | |
| 246 | 1895 | North Dakota | *The Revised Codes of the State of North Dakota, 1895, Together with the Constitution of the United States and of the State of North Dakota With the Amendments Thereto* 1293 (1895), §§ 7312–13 | Prohibited the carrying of any slungshot or similar weapon, and the concealed carrying of any firearm or any "sharp or dangerous weapon." | Slungshot; Firearm; Sharp or dangerous weapon | |
| 247 | 1895 | Vermont – City of Barre | *Charter and Ordinances of the City of Barre, Vermont* 53 (1904), ch. 16, § 18 | Prohibited discharging a gun, pistol, or other loaded firearm, firecracker, serpent, or other explosive, unless on a person's own property or with the permission of the property owner.  Also prohibited making a bonfire in the street except with city council permission and the carrying of concealed steel or brass knuckles, a pistol, slungshot, stiletto, or weapon of similar character. | Steel or brass knuckles; Pistol; Slungshot; Stiletto; Weapon of similar character; Gun; Loaded firearm; | |

72

(22 of 300), Page 22 of 300  Case: 24-565, 04/17/2025, DktEntry: 10.6, Page 22 of 300

ER-876

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 73 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Firecracker; Serpent | |
| 248 | 1896 | Hawaii [Territory] | *Penal Laws of the Hawaiian Islands, 1897, Compiled From the Penal Code of 1869 and the Session Laws of 1870 to 1896 Inclusive* 251 (1897), ch. 54 | Prohibited the carrying or being "found armed with" any "bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon," unless authorized by law. Punishable by fine of $10–30. Exemption for individuals with good cause to carry the weapon, or for individuals with a license to "possess, carry or use a pistol, rifle, carbine, shotgun or other fire-arm." Act 64 of the Session Laws of 1896. | Bowie knife; Sword cane; Pistol; Air gun; Slungshot; Other deadly weapon | *Republic of Hawaii v. Clark*, 10 Haw. 585 (1897) (reversing conviction where individual carrying a pistol had a license to carry and thus was authorized by law). |
| 249 | 1896 | Mississippi | 1896 Miss. L. 109–10, ch. 104 | Prohibited the carrying of a concealed Bowie knife, dirk, butcher knife, pistol, brass or metallic knuckles, slingshot, sword, or other deadly weapon "of like kind or description." | Bowie knife; Dirk; Butcher knife; Pistol; Metal Knuckles; Slingshot; Sword; Other deadly weapon of like kind | |
| 250 | 1896 | Rhode Island | *General Laws of the State of Rhode Island and Providence Plantations to Which Are Prefixed the Constitutions of the United States and of the State* | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slungshot, pistol, or firearm of any description. Exempted officers or watchmen whose duties required | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword cane; | |

73

(23 of 300), Page 23 of 300  Case: 24-565, 04/17/2024, DktEntry: 10.6, Page 23 of 300

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 74 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
|  |  |  | 1010–11 (1896), ch. 282, §§ 23–24, 26 | them to make arrests or guard prisoners or property. | Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm |  |
| 251 | 1896 | Washington – City of Spokane | Rose M. Denny (Editor), *The Municipal Code of the City of Spokane, Washington, Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896* 309–10 (1896), No. A544, § 1 | Prohibited the carrying of a concealed revolver, pistol or other firearms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property.  Punishable by fine of $25–100, cost of prosecution, and imprisonment until fines/costs are paid. | Revolver; Pistol; Other firearms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury |  |
| 252 | 1897 | Alabama | William L. Martin (Editor), *The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897* 1137 (Vol. 1 1897), § 27 | Tax of $300 on the sale of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridge; Bowie knife; Dirk |  |

(24 of 300), Page 24 of 300  Case: 24-565, 04/17/2025, DktEntry: 10.6, Page 24 of 300

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 75 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 253 | 1897 | Missouri – City of Saint Joseph | Charles S. Shepherd (Editor), *The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing All Ordinances of General Interest In Force July 15, 1897, Together With the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph 508* (1897), § 7 | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, Bowie knife, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. | Pistol; Revolver,; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Razor; Bowie knife; Any knife resembling a bowie knife; Other dangerous or deadly weapon | |
| 254 | 1897 | Texas | 1897 Tex. Gen. Laws 221–22, ch. 155 | Prohibited the selling or giving to a minor a pistol, dirk, dagger, slungshot, sword cane, spear or knuckles made of any metal or hard substance, Bowie knife or any other knife manufactured or sold for the purpose of offense or defense without the consent of their parent or guardian.  Punishable by fine of $25–200 and/or imprisonment for 10–30 days. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Knuckles; Bowie knife; Any other knife used for offense or defense | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
| 255 | 1897 | Washington | Richard A. Ballinger (Editor), *Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897* 1956–57 (Vol. 2, 1897), § 7084 | Prohibited the carrying of a concealed revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person. Punishable by fine of $25–100 and/or imprisonment for 30 days. | Revolver; Pistol; Other fire-arms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | |
| 256 | 1898 | Georgia | 1898 Ga. Laws 60, No. 106 | Prohibited the concealed carry of any pistol, dirk, sword cane, spear, Bowie knife, other kind of knife "manufactured and sold for purpose of offense and defense," and any "kind of metal knucks." | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear; Metal knuckles | |
| 257 | 1898 | Oregon – City of Oregon City | *The Charter of Oregon City, Oregon, Together with the Ordinances and* | Prohibited the carrying of any slingshot, billy, dirk, pistol, or "any concealed deadly weapon," and the | Slingshot; Billy; Dirk; | |

76

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
| | | | *Rules of Order 259* (1898), § 2 | discharge of any firearm, air gun, sparrow gun, flipper, or bean shooter, unless in self-defense. | Pistol; Concealed deadly weapon; Firearm; Air gun; Sparrow gun; Flipper; Bean shooter | |
| 258 | 1899 | Alaska | Fred F. Barker (Editor), *Compilation of the Acts of Congress and Treaties Relating to Alaska From March 30, 1867, to March 3, 1905* 139, ch. 6, § 117 | Prohibited concealed carrying in any manner any revolver, pistol, other firearm, knife (other than an "ordinary pocket knife"), dirk, dagger, slingshot, metal knuckles, or any instrument that could cause injury to a person or property. | Pistol; Revolver; Other firearm; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Other instrument | |
| 259 | 1899 | Nebraska – City of Fairfield | *Compiled Ordinances of the City of Fairfield, Clay County, Nebraska* 34 (1899), No. 20, § 1 | Prohibited the carrying of a concealed pistol, revolver, dirk, Bowie knife, billy, slingshot, metal knuckles, or other dangerous or deadly weapons. Punishable by forfeiture and "shall be so adjudged." | Pistol; Revolver; Dirk; Bowie knife; Billy; Slingshot; Metal knuckles; Other dangerous or | |

77

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 78 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | deadly weapons | |
| 260 | 1899 | Texas – City of San Antonio | Theodore Harris (Editor), *Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th 220* (1899), ch. 22, § 4 | Prohibited drawing in a threatening manner a pistol, gun, knife, sword cane, club or any other instrument or weapon that may cause death. | Pistol; Gun; Knife; Sword cane; Club; Any other instrument or weapon that causes death | |
| 261 | 1900 | Iowa – City of Des Moines | William H. Baily (Editor), *The Revised Ordinances of the Nineteen Hundred of the City of Des Moines, Iowa* 89–90 (1900), § 209 | Prohibited the carrying of a concealed pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sandbag, air guns of any description, dagger, Bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | |
| 262 | 1900 | New York | 1900 N.Y. Laws 458–59, ch. 222, § 1 | Prohibited manufacturing or selling a slungshot, billy, sandclub or metal knuckles, and prohibited selling a | Slungshot; Billy; Sandclub; | |

78

(28 of 300), Page 28 of 300  Case: 24-565, 04/17/2025, DktEntry: 10.6, Page 28 of 300

ER-382

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 79 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | firearm to a minor in any city or incorporated village without written consent of police magistrate. Exempted any officer of the United States or peace officer when necessary and proper to discharge official duties. | Metal knuckles; Pistol; Other firearm | |
| 263 | 1901 | Arizona [Territory] | 1901 Ariz. Sess. Laws 1251–53, §§ 381, 385, 390 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use). Exempted peace officers in discharge of official duties. Punishable by a fine of $25–100 and forfeiture of the weapon. | Pistol; Other firearm; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | |
| 264 | 1901 | Utah | 1901 Utah Laws 97–98, ch. 96, §§ 1–3 | Prohibited the construction and possession of any "infernal machine," defined as a device with a loaded firearm that is capable of igniting when moved, handled, or opened. | Trap gun (infernal machine) | |
| 265 | 1903 | Oklahoma [Territory] | W. F. Wilson (Editor), *Wilson's Revised & Annotated Statutes of Oklahoma* 643 (1903), ch. 25, art. 45, § 583 | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or other kind of knife manufactured for defense. | Pistol; Revolver; Bowie knife; Dirk; Dagger; | |

79

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Slungshot; Sword Cane; Spear; Metal knuckles; Other knife | |
| 266 | 1903 | South Dakota | G. C. Moody et al. (Editors), *The Revised Codes, State of South Dakota* 1150 (1903) §§ 470, 471 | Prohibited the carrying of a concealed slungshot, firearm, or sharp or dangerous weapon. | Slungshot; Firearm; Sharp or dangerous weapon | |
| 267 | 1905 | Indiana | 1905 Ind. Acts 677, ch. 169, § 410 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol or other weapon, or throwing a stone, stick, club or any other substance at a vehicle. Punishable by imprisonment for 30 days to 1 year and a fine of $10–100. | Gun; Rifle; Pistol; Other weapon; Stone; stick; Club; Any other substance | |
| 268 | 1905 | Indiana | 1905 Ind. Acts 687, ch. 169, § 448 | Prohibited drawing or threatening to use "any pistol, dirk, knife, slung-shot or other deadly or dangerous weapon," unless in defense of person or property. | Pistol; Dirk; Knife; Slung shot; Other deadly or dangerous weapon | |
| 269 | 1905 | Indiana | 1905 Ind. Acts 687–88, ch. 169, § 449 | Prohibited the concealed carrying of "any dirk, pistol, bowie knife, dagger, sword in cane or any other dangerous | Dirk; Pistol; Bowie knife; | *Carr v. State*, 175 Ind. 241 (1911) |

80

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 81 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|-----------------|
|     |                   |              |          | or deadly weapon," unless "being a traveler." Punishable by fine of up to $500. | Dagger; Cane sword; Other dangerous or deadly weapon | (observing that "the law in its entirety has long been upheld" (citing *McIntyre v. State*, 170 Ind. 163 (1908)). |
| 270 | 1905 | New Jersey | 1905 N.J. Laws 324–25, ch. 172, § 1 | Prohibited the carrying of a concealed revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor. Punishable by fine up to $200 and/or imprisonment with hard labor up to 2 years. | Revolver; Pistol; Other deadly; offensive or dangerous weapon or firearm or any stiletto; Dagger; razor | |
| 271 | 1908 | New York | 1908 N.Y. Laws 242, ch. 93, § 1 | Prohibited the possession of any instrument or weapon commonly known as a slungshot, billy, sandclub, or metal knuckles. | Slungshot Billy; Sandclub; Metal knuckles | |
| 272 | 1908 | Rhode Island | 1908 R.I. Pub. Laws 145, ch. 1572, § 1 | Prohibited the carrying of any dirk, dagger, razor, sword cane, Bowie knife, butcher knife, air-gun, billy, metal knuckles, slungshot, pistol, other firearm. Exempted officers and watchmen. | Dirk; Dagger; Razor; Sword cane; Bowie knife; Butcher knife; Air gun; Billy; | |

81

ER-385

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Metal knuckles; Slungshot; Pistol; Other firearm. | |
| 273 | 1909 | Idaho | 1909 Idaho Sess. Laws 6, No. 62, § 1 | Prohibited the carrying a concealed dirk, Bowie knife, dagger, slungshot, pistol, revolver, gun, or any other deadly or dangerous weapon in any public setting. | Dirk; Bowie knife; Dagger; Slungshot; Pistol; Revolver; Other deadly or dangerous weapon | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution). |
| 274 | 1909 | South Dakota | 1909 S.D. Sess. Laws 450, ch. 240, §§ 21–22 | Prohibited the setting or possession of any "set gun." | Set gun | |
| 275 | 1909 | Washington | 1909 Wash. Sess. Laws 972–73, ch. 249, § 265 | Prohibited manufacturing, selling, disposing of, or possessing any "slung shot, sand club, or metal knuckles." Prohibited concealed carry of "any dagger, dirk, knife, pistol, or other dangerous weapon." Prohibited using "any contrivance or device for suppressing the noise of any fire arm." Punishable as a misdemeanor. | Slung shot; Sand club; Brass knuckles; Dagger; Dirk; Knife; Pistol; Dangerous weapon Silencing device | |

82

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 83 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 276 | 1909 | Washington | 1909 Wash. Sess. Laws 973, ch. 249, § 266 | Prohibited the setting of any trap, spring pistol, rifle, or other deadly weapon.  Punishable by imprisonment for up to 1 year or a fine of up to $1,000.  Further punishable by imprisonment for up to 20 years for non-fatal or fatal injuries resulting. | Trap gun | |
| 277 | 1911 | New York | 1911 N.Y. Laws 442, ch. 195, § 1 | Prohibited the manufacture, sale, giving, or disposing of any weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, and the offering, sale, loaning, leasing, or giving of any gun, revolver, pistol, air gun, or spring-gun to a person under the age of 16. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Gun; Revolver; Pistol; Air gun; Spring gun | |
| 278 | 1911 | New York | 1911 N.Y. Laws 442–43, ch. 195, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, or bludgeon, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instrument | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Dagger; | |

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 84 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | or weapon" with intent to use the weapon unlawfully against another. | Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | |
| 279 | 1912 | Vermont | 1912 Vt. Acts & Resolves 261, No. 201, § 17 | Prohibited the setting of any spring gun. Punishable by a fine of $50–500 and liability for twice the amount of damage resulting from the trap. | Spring gun | |
| 280 | 1913 | Florida – Marion County | 1913 Fla. Laws 117, ch. 6621, § 8 | Prohibited hunting wild game with automatic guns. | Machine guns | |
| 281 | 1913 | Hawaii [Territory] | 1913 Haw. Sess. Laws 25, Act 22 | Prohibited the carrying a Bowie knife, sword cane, pistol, air-gun, slungshot, or other deadly weapon. Punishable by fine of $10–250 or imprisonment for 3–12 months, unless good cause can be shown for carrying the weapon. | Bowie knife; Sword cane; Pistol; Air gun; Slungshot; Other deadly weapon | |
| 282 | 1913 | Iowa | 1913 Iowa Acts 307, ch. 297, §§ 1, 2 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sandbag, skull cracker, slungshot, or other offensive and dangerous weapons or instruments.  Also prohibited the selling, keeping for | Dirk; Dagger; Sword; Pistol; Revolver; Stiletto; Metallic | |

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 85 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | sale, offering for sale, loaning, or giving away any dirk, dagger, stiletto, metallic knuckles, sandbag, or "skull cracker." Exempted the selling or keeping for sale of "hunting and fishing knives." | knuckles; Picket; Billy; Sand bag; Skull cracker; Slungshot; Other offensive and dangerous weapons or instruments | |
| 283 | 1913 | New York | 1913 N.Y. Laws 1627–30, ch. 608, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb, or bombshell, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instruments or weapon." | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Bomb; Bombshell; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or | |

85

ER-889

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 86 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | deadly weapon | |
| 284 | 1915 | New Hampshire | 1915 N.H. Laws 180–81, ch. 133, pt. 2, § 18 | Prohibited the setting of a spring gun. Punished by a fine of $50–500. | Spring gun | |
| 285 | 1915 | North Dakota | 1915 N.D. Laws 96, ch. 83, §§ 1–3, 5 | Prohibited the concealed carrying of any instrument or weapon usually known as a blackjack, slingshot, billy, sandclub, sandbag, bludgeon, metal knuckles, or any sharp or dangerous weapon, any gun, revolver, pistol, or "other dangerous fire arm," nitroglycerin, dynamite, or any other dangerous or violent explosive. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Any sharp or dangerous weapon; Any Gun; Revolver; Pistol; Dangerous firearm; Explosive | |
| 286 | 1917 | California | 1917 Cal. Stat. 221, ch. 145, § 1 | Prohibited the manufacture, leasing, keeping for sale, offering, giving, or disposing of any instrument or weapon of the kind commonly known as a blackjack, slingshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dirk, or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; | |

86

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 87 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Dirk; Dagger | |
| 287 | 1917 | California | 1917 Cal. Stat. 221, ch. 145, § 2 | Prohibited the possession of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, bomb, or bombshells, and the carrying of any dirk or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Bomb; Bombshells; Dirk; Dagger | |
| 288 | 1917 | California | 1917 Cal. Stat. 222, ch. 145, § 5 | Prohibited the use, or carrying or possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or other "dangerous or deadly instrument or weapon." | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Loaded pistol; Revolver; Other firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; | |

ER-391

Baird v. Bonta, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | Bomb; Bombshell; Other deadly or dangerous weapon | |
| 289 | 1917 | Missouri – City of Joplin | Hugh McIndoe, Editor, *Joplin Code of 1917* 550 (1917), art. 67, § 1201 | Prohibited the carrying of a concealed firearm, Bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slungshot, or other similar deadly weapons in a church, school, election site, court, or other public setting.  Also prohibits using the weapon in a threatening manner, using while intoxicated, or selling to a minor. | Firearms; Bowie knife; Spring-back knife; Razor; Knuckle; Billy; Sword cane; Dirk; Dagger; Slungshot; Other deadly weapons | |
| 290 | 1917 | North Carolina – Harnett County | 1917 N.C. Sess. Laws 309, ch. 209, § 1 | Prohibited killing quail with a gun that shoots over two times before reloading. | Gun that shoots over two times before reloading (machine gun) | |
| 291 | 1917 | Oregon | 1917 Or. Sess. Laws 807-08, ch. 377, § 7 | Prohibited the attempted use, or the carry and possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, or any instrument or | Dagger; Dirk; Dangerous knife; Razor; | *Oregon v. Blocker*, 291 Or. 255 (1981) (struck down the ban on clubs as |

88

ER-392

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or any other "dangerous or deadly weapon." Punishable by a fine of $50–500 or imprisonment for 1–6 months. | Stiletto; Pistol; Revolver; Other Firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; Bombshell; Other dangerous or deadly weapon | contrary to Oregon Constitution). |
| 292 | 1920 | New Jersey | 1920 N.J. Laws 67, ch. 31, § 9 | Prohibits hunting with shotgun or rifle "holding more than two cartridges at one time, or that may be fired more than twice without reloading" | Shot gun; Rifle | |
| 293 | 1923 | California | 1923 Cal. Stat. 696, ch. 339, § 1 | Prohibited the manufacture, importation, keeping for sale, offering or exposing for sale, giving, lending, or possession of any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, and the concealed carrying of any dirk or | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; | |

89

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 90 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | dagger.  Punishable by imprisonment for 1–5 years. | Dirk; Dagger | |
| 294 | 1923 | Missouri | 1923 Mo. Laws 241–42, § 17 | Prohibited the carrying, while a passenger or operating a moving vehicle, of a revolver, gun or other firearm, or explosive, any Bowie knife, or other knife having a blade of more than two and one-half inches in length, any slingshot, brass knucks, billy, club or other dangerous weapon.  Punishable by imprisonment of minimum 2 years. | Revolver; Gun; Explosive; Bowie knife; Other knife having a blade of more than two and one-half inches in length; Slingshot; Metal knuckles; Billy; Club; Other dangerous weapon | |
| 295 | 1923 | South Carolina | 1923 S.C. Acts 221 | Prohibited the selling or giving to a minor a pistol or pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane or slingshot.  Also prohibited a parent from giving such a weapon to their child under 12 years old.  Punishable by fine up to $50 or imprisonment up to 30 days. | Pistol; Pistol cartridge; Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | |

90

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 91 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 296 | 1923 | Vermont | 1923 Vt. Acts & Resolves 127, No. 130, § 1 | Prohibited using, carrying, or possessing a machine gun or automatic rifle while hunting. | Machine gun; Automatic rifle | |
| 297 | 1925 | Nevada | 1925 Nev. Stat., ch. 47, § 1 | Prohibited the possession of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles | |
| 298 | 1925 | Oregon | 1925 Or. Laws 42, ch. 31, §§ 1–2 | Prohibited the setting of any loaded spring gun.  Punishable by a fine of $100–500 or imprisonment for 30 days to 6 months.  Exception for setting of trap gun to destroy burrowing rodents. | Spring gun; Set gun | |
| 299 | 1925 | West Virginia | 1925 W. Va. Acts 25–30, ch. 3, § 7, pt. a | Prohibited unlicensed carrying of a pistol, dirk, Bowie knife, slungshot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon.  Punishable by imprisonment for 6–12 months for the first offense, and for 1–5 years for subsequent offenses, and in either case, a fine of $50–200. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | *City Of Princeton v. Buckner*, 180 W. Va. 457, 462 (1988) (held unconstitutional under state constitution); *Application of Metheney*, 182 W. Va. 722 (1990). |
| 300 | 1925 | West Virginia | 1925 W. Va. Acts 30–31, ch. 3, § 7, pt. b | Prohibited publicly displaying for rent or sale any revolver, pistol, dirk, | Revolver; Pistol; | |

91

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 92 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | Bowie knife, slungshot, other dangerous weapon, machine gun, submachine gun, or high powered rifle. Requires dealers to keep a register.  Prohibited selling, renting, giving, or lending any of these weapons to an unnaturalized person. | Dirk; Bowie knife; Slungshot; Machine gun; Other dangerous weapon; Submachine gun; High powered rifle | |
| 301 | 1925 | West Virginia | 1925 W. Va. Acts 30–31, ch. 3, § 7, pt. b | Prohibited carrying, transporting, or possessing a machine gun, submachine gun, or high-powered rifle except on their own premises and with a permit. Also provides guidelines for such a permit. | Machine gun; Submachine gun; High powered rifle | |
| 302 | 1927 | California | 1927 Cal. Stat. 938, ch. 552, §§ 1–2 | Prohibited a person, firm, or corporation possessing a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | |
| 303 | 1927 | Georgia | 1927 Ga. Laws 83, No. 398, § 2, ¶ 86 | Levied a tax on dealers "in or near towns or cities" who deal "in pistols or in toy pistols which shoot cartridges, or who deals in pistol cartridges, or rifle cartridges, dirks, bowie knives, or metal knucks." | Pistol; Toy pistol | *Beck & Gregg Hardware Co. v. State Revenue Comm'n*, 176 Ga. 896 (1933) (holding the term "near" to be vague and that the tax on |

(42 of 300), Page 42 of 300 Case: 24-565, 04/17/2025, Page 42 of 300

Case 2:19-cv-00617-KJM-AC Document 90-3 Filed 08/18/23 Page 93 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | | dealers "in" cities did not treat dealers in the same class uniformly). |
| 304 | 1927 | Indiana | 1927 Ind. Acts 469, ch. 156, § 1 | Prohibited owning or possessing a machine gun or bomb in an automobile. Punishable by imprisonment for 1–5 years. | Machine gun; Bomb | |
| 305 | 1927 | Indiana | 1927 Ind. Acts 469, ch. 156, § 2 | Prohibited discharging a machine gun or bomb. Punishable by imprisonment for 2–10 years. | Machine gun; Bomb | |
| 306 | 1927 | Iowa | 1927 Iowa Acts 201, §§ 1–2 | Prohibited possession of a machine gun. | Machine gun | |
| 307 | 1927 | Maryland | 1927 Md. Laws 156, ch. 117, § 388-B | Prohibited possession of liquor in an automobile that also carries a gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon. | Gun; Pistol; Revolver; Machine gun; Other dangerous or deadly weapon | |
| 308 | 1927 | Massachusetts | 1927 Mass. Acts 416, ch. 326, § 5 | Prohibited the carrying of a pistol, revolver, machine gun, stiletto, dagger, dirk knife, slungshot, metallic knuckles, or sawed off shotgun, billy, or dangerous weapon if arrested upon a warrant for an alleged crime. Punishable by imprisonment of 6 months to 2.5 years. | Pistol; Revolver; Machine gun; Stiletto; Dagger; Dirk; Slungshot; Metallic | |

ER-397

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 94 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | | knuckles; Sawed-off shotgun; Billy; Dangerous weapon | |
| 309 | 1927 | Massachusetts | 1927 Mass. Acts 413, ch. 326, §§ 1–2 | Prohibited selling, renting, or leasing a pistol, revolver, or machine gun to a person without a license to possess the same. | Pistol; Revolver; Machine gun | |
| 310 | 1927 | Michigan | 1927 Mich. Pub. Acts 888–89, No. 372, § 3 | Prohibited manufacturing, selling, or possessing a bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, bludgeon. Punishable by fine up to $1,000 or imprisonment. | Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub; Bludgeon | |
| 311 | 1927 | Michigan | 1927 Mich. Pub. Acts 888–89, No. 372, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also prohibited the same for a muffler or silencer. Punishable by fine of $1,000 and/or imprisonment up to 5 years. | Machine gun; Silencer | |
| 312 | 1927 | New Jersey | 1927 N.J. Laws 180–81, ch. 95, §§ 1–2 | Prohibited selling, giving, loaning, delivering or furnishing, or possessing a machine gun or automatic rifle to another person without a license. | Machine gun; Automatic rifle | |

94

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 95 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 313 | 1927 | New Jersey | 1927 N.J. Laws 742, ch. 321, § 1 | Prohibited a pawnbroker from selling or possessing for sale, loan, or to give away a machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Punishable as a high misdemeanor. | Machine gun; Automatic rifle; Revolver; Pistol; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Dagger; Dirk; Dangerous knife; Stiletto; Bomb; Other high explosive | |
| 314 | 1927 | New Jersey | 1927 N.J. Laws 743, ch. 321, § 2 | Prohibited being armed with or possession any "revolver, pistol, or other firearm" or "blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive" while commiting "assault, robbery, larceny, burglary, or breaking or entering." | Revolver; Pistol; Other firearm; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal | |

95

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 96 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | Punishable by an additional imprisonment for 5, 10, 15, or 20 years to life depending on whether first, second, third, or fourth offense. | knuckles; Dagger; Dirk; Dangerous knife; Stiletto; Bomb; Other high explosive | |
| 315 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, ch. 1052, §§ 1, 4, 5, 6 | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun. | Pistol; Machine gun | |
| 316 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, ch. 1052, §§ 1, 4, 7, 8 | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun or silencer. | Pistol; Machine gun; Silencer | |
| 317 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, ch. 1052, §§ 1, 3 | Prohibited a person who has previously been convicted of a violent crime from owning, carrying, or possessing any firearm (including machine gun or pistol). | Machine gun; Pistol | |
| 318 | 1929 | Indiana | 1929 Ind. Acts 139, ch. 55, § 1 | Prohibited being armed with a pistol, revolver, rifle shotgun, machine gun, or any other firearm or dangerous weapon while committing or attempting to commit a crime of rape, robbery, bank robbery, or larceny. Punishable by imprisonment for 10– | Pistol; Revolver; Rifle; Shotgun; Machine gun; Dangerous or deadly weapon | |

96

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 97 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | 20 years, in addition to the punishment for the original crime. | | |
| 319 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, No. 206 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, sandbag, bludgeon, or any gas-ejecting device. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub, Sandbag, Bludgeon, Gas ejecting device | |
| 320 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, No. 206 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also prohibited the same for a muffler or silencer. | Machine gun; Silencer | |
| 321 | 1929 | Missouri | 1929 Mo. Laws 170 | Prohibited selling, delivering, transporting, and possessing a machine gun. P unishable by imprisonment of 2–30 years and/or fine up to $5,000. | Machine gun | |
| 322 | 1929 | Nebraska | 1929 Neb. Laws 673–74, ch. 190, §§ 1–2 | Prohibited selling or otherwise disposing of a machine gun. Punishable by fine of $1,000–$10,000. Also prohibited transporting or | Machine gun | |

97

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 98 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | possessing a machine gun. Punishable by imprisonment for 1–10 years. | | |
| 323 | 1929 | Pennsylvania | 1929 Pa. Laws 777–78, No. 329, §§ 1, 4 | Prohibited selling, giving, transferring, or possessing a machine gun. Punishable by fine up to $1,000 and imprisonment by separate or solitary confinement at labor up to 5 years. Also prohibited using a machine gun during an attempted crime. Punishable by separate and solitary confinement at labor for up to 10 years. | Machine gun | |
| 324 | 1929 | Pennsylvania | 1929 Pa. Laws 777–78, No. 329, § 3 | Prohibited being armed with a machine gun while committing a crime. Punishable by imprisonment with solitary confinement up to 10 years. | Machine gun | |
| 325 | 1929 | Wisconsin | 1928–1929 Wis. Sess. Laws 157, ch. 132, § 1 | Prohibited owning, using, or possession a machine gun. Punishable by imprisonment of 1–15 years. | Machine gun | |
| 326 | 1931 | Delaware | 1931 Del. Laws 813, ch. 249, § 1 | Prohibited a person from possessing a machine gun. Punishable by fine and/or imprisonment. | Machine gun | |
| 327 | 1931 | Illinois | 1931 Ill. Laws 452–53, Machine Guns, §§ 1–2 | Prohibited selling, loaning, or giving away, purchasing, possessing, carrying, or transporting any machine gun. | Machine gun | |
| 328 | 1931 | Illinois | 1931 Ill. Laws 454, Machine Guns, § 7 | Prohibited being armed with a machine gun while committing arson, assault, burglary, kidnapping, larceny, | Machine gun | |

98

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 99 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

ER-302

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | rioting, or robbery.  Punishable by imprisonment for 5 years to life. | | |
| 329 | 1931 | Michigan | 1931 Mich. Pub. Acts 671, ch. 37, § 236 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | |
| 330 | 1931 | New York | 1931 N.Y. Laws 1033, ch. 435, § 1 | Prohibited using an imitation pistol and carrying or possessing a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or ay other dangerous or deadly weapon. | Imitation pistol; Blackjack; Slungshot; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Machine gun; Sawed-off shot gun; Other dangerous or deadly weapon | |
| 331 | 1931 | North Dakota | 1931 N.D. Laws 305-06, ch. 178, §§ 1–2 | Prohibited selling, giving, loaning, furnishing, or delivering a machine gun, submachine gun, automatic rifle, or bomb (without a license). Punishable by imprisonment up to 10 years and/or fine up to $3,000. | Machine gun; Submachine gun; Automatic rifle; Bomb | |

99

(49 of 300), Page 49 of 300  Case: 24-565, 04/17/2025, DktEntry: 10.6, Page 49 of 300

ER-303

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 100 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 332 | 1931 | South Carolina | 1931 S.C. Acts 78, No. 58, § 1 | Prohibited the setting of any loaded trap gun or spring gun. Punishable by a fine of $100–500 or imprisonment of 30 days to 1 year. | Trap gun; Spring gun | |
| 333 | 1932 | District of Columbia | An Act To Control The Possession, Sale, Transfer And Use Of Pistols And Other Dangerous Weapons In The District Of Columbia, To Provide Penalties, To Prescribe Rules Of Evidence, And For Other Purposes, 47 Stat. 650 (1932), ch. 465, §§ 1, 8 | Prohibited being armed with or having readily available any pistol or other firearm while committing a violent crime. In addition to being punished for the crime, will also be punished with imprisonment (various terms depending on the number of previous convictions). Additionally, Prohibited people convicted of violent crimes from owning or possessing a pistol. Prohibited carrying a concealed deadly or dangerous weapon. Regulated the sale and transfer of pistols. | Pistol; Deadly or dangerous weapon | |
| 334 | 1932 | Louisiana | 1932 La. Acts 337–38, No. 79, §§ 1–2 | Prohibited selling, loaning, giving, purchasing, possession, carrying, or transporting a machine gun. | Machine gun | |
| 335 | 1933 | California | 1933 Cal. Stat. 1170, ch. 450, § 2 | Prohibited a person, firm, or corporation from selling, possessing or transporting a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | |
| 336 | 1933 | Florida | 1933 Fla. Laws 623, ch. 16111, § 1 | Prohibited throwing a bomb or shooting a machine gun across or along a street or highway, any public park or place where people assemble | Bomb; Machine gun | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | with the intent to do bodily harm. Punishable by death. | | |
| 337 | 1933 | Hawaii | 1933 Haw. Sess. Laws 117, No. 120, § 2 | Prohibited a person, firm, or corporation from owning, possessing, selling, or transporting a machine gun, shell cartridge, or bomb containing or capable of emitting tear gas or other noxious gas. | Machine gun; Shell cartridge; Bomb | |
| 338 | 1933 | Kansas | 1933 Kan. Sess. Laws 76, ch. 62, §§ 1–3 | Prohibited possession of a machine rifle, machine gun, or submachine gun. | Machine gun | |
| 339 | 1933 | Minnesota | 1933 Minn. Laws 231–33, ch. 190, §§ 1–3 | Prohibited owning, controlling, using, possessing, selling, or transporting a machine gun. | Machine gun | |
| 340 | 1933 | New York | 1933 N.Y. Laws 1638–39, ch. 805, §§ 1, 3 | Prohibited selling, giving, disposing of, transporting, or possessing a machine gun or submachine gun to a person guilty of a felony. | Machine gun | |
| 341 | 1933 | Ohio | 1933 Ohio Laws 189–90, No. 64, § 1 | Prohibited owning, possessing, and transporting a machine gun, light machine gun, or submachine gun without a permit. Punishable by imprisonment of 1–10 years. | Machine gun; Light machine gun; Submachine gun | |
| 342 | 1933 | Oregon | 1933 Or. Laws 489, ch. 315, §§ 3–4 | Prohibited possession of a machine gun. Also prohibited carrying a concealed machine gun, pistol, revolver, or other firearm. | Machine gun; Pistol; Revolver; Other firearm | |
| 343 | 1933 | Oregon | 1933 Or. Laws 488, ch. 315, § 2 | Prohibited a unnaturalized person and person convicted of a felony against another person or the government | Pistol; Revolver; | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | from owning or possessing a pistol, revolver, other firearm, or machine gun. Punishable by imprisonment for 1–5 years. | Other firearm; Machine gun | |
| 344 | 1933 | South Dakota | 1933 S.D. Sess. Laws 245–47, ch. 206, §§ 1–8 | Prohibited possession of a machine gun during a violent crime. Punishable by imprisonment up to 15 years. Prohibited using a machine gun offensively or aggressively; punishable by imprisonment up to 15 years. Requires manufacturers to keep a register of machine guns and for owners to converted their machine guns to pistols to register the weapon. | Machine gun | |
| 345 | 1933 | Texas | 1933 Tex. Gen. Laws 219–20, ch. 82, §§ 1–4, 6 | Prohibited possession of a machine gun; punishable by imprisonment up to 10 years. Prohibited selling, leasing, giving, bartering, exchanging, or trading a machine gun; punishable by imprisonment for 2 months to 10 years. | Machine gun | |
| 346 | 1933 | Washington | 1933 Wash. Sess. Laws 335–36, ch. 64, §§ 1–5 | Prohibited manufacturing, owning, buying, selling, loaning, furnishing, transporting, or possessing a machine gun. | Machine gun | |
| 347 | 1933 | Wisconsin | 1931–1933 Wis. Sess. Laws 245–47, ch. 76, § 1, pts. 164.01–164.06 | Prohibited using or possessing a machine gun during an attempted violent crime; punishable by imprisonment of minimum 20 years. Prohibited use of a machine gun for | Machine gun | |

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | offensive or aggressive purposes; punishable by imprisonment of minimum 10 years. | | |
| 348 | 1933 | Wisconsin | 1931–1933 Wis. Sess. Laws 778, ch. 359, § 1 | Prohibited selling, possessing, using, or transporting a machine gun, automatic firearm, bomb, hand grenade, projectile, shell, or other container that can contain tear or other gas. Punishable by imprisonment for 1–3 years. | Machine gun; Automatic firearm; Bomb; Hand grenade; Projectile; Shell; Other container that can contain gas | |
| 349 | 1934 | Federal | National Firearms Act of 1934, 48 Stat. 1236 (1934) | Provided for taxation of manufacturers, importers, and dealers in certain firearms and machine guns. | Machine gun | |
| 350 | 1934 | New Jersey | 1934 N.J. Laws 394–95, ch. 155, §§ 1–5 | Declares a person who possesses a machine gun or submachine gun a "gangster," and therefore, enemy of the state. Also declares a person who carries a deadly weapon without a permit a "gangster." If convicted a "gangster," punishable by fine up to $10,000 and/or imprisonment up to 20 years. | Machine gun; Submachine gun; Deadly weapon | |
| 351 | 1934 | South Carolina | 1934 S.C. Acts 1288, No. 731, §§ 1–6 | Prohibited transporting, possessing, selling, renting, or giving a firearm or machine gun. Punishable by fine up | Firearm; Machine gun | |

103

(53 of 300), Page 53 of 300  Case: 24-565, 04/17/2025, DktEntry: 10.6, Page 53 of 300

ER-007

Case 2:19-cv-00617-KJM-AC  Document 90-3  Filed 08/18/23  Page 104 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | | to $1,000 and imprisonment with solitary confinement up to 20 years. | | |
| 352 | 1934 | Virginia | 1934 Va. Acts 137–39, ch. 96, §§ 1–7 | Prohibited possession or use of a machine gun during a violent crime; punishable by death or imprisonment for a minimum of 20 years. Prohibited unlawful possession or use of a machine gun for offensive or aggressive purposes; punishable by imprisonment for a minimum of 10 years.  Requires manufacturers to keep a register of machine guns. | Machine gun | |

## II.  GUNPOWDER STORAGE LAWS

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| 353 | 1783 | Massachusetts – City of Boston | 1782–1783 Mass. Acts 120, ch. 46 | Prohibited the possession of any "fire arms," and among other devices, loaded with any gun powder.  Punishable by forfeiture and sale at public auction. | Gunpowder | |
| 354 | 1784 | New York – City of New York City | 1784 N.Y. Laws 627, ch. 28 | Prohibited any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers.  Punishable by forfeiture and fine. | Gunpowder | |
| 355 | 1792 | New York | Thomas Greenleaf (Editor), *Laws of the State of New York,* | Regulated the storage of gunpowder in New York City. | Gunpowder | |

104

(54 of 300), Page 54 of 300   Case: 24-565, 04/17/2025, Entry: 10.6, Page 54 of 300

Case 2:19-cv-00617-KJM-AC   Document 90-3   Filed 08/18/23   Page 105 of 108
*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC
Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | | *Comprising the Constitution, and the Acts of the Legislature, since the Revolution, from the First to the Fifteenth Session, Inclusive 191–92 (1792)* | | | |
| 356 | 1821 | Maine | 1821 Me. Laws 98, ch. 25, § 1 | Prohibited any person from possessing any gunpowder, in any quantity, unless permitted by local rules and regulations. | Gunpowder | *Barnes v. Hathorn*, 54 Me. 124 (1866) (noting that "the keeping of large quantities of gunpowder near inhabited dwellings" is a nuisance). |
| 357 | 1823 | Ohio – Town of Marietta [Territory] | *The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio 17–18 (1837)* | Regulated the discharge and explosion of gunpowder. Punishable by fine of $1–5 for first offense and $5–10 for all subsequent offenses. | Gunpowder | |
| 358 | 1836 | Connecticut – Cities of Hartford, New Haven, New London, | 1836 Conn. Acts 105, ch. 1, § 20 | Authorizing the local court of common counsel to prohibit and regulate the storage of gun powder. | Gunpowder | |

*Baird v. Bonta,* Case No. 2:19-cv-00617-KJM-AC

Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|---|---|---|---|---|---|---|
| | | Norwich, and Middletown | | | | |
| 359 | 1851 | Illinois – City of Chicago | Joseph E. Gary (Editor), *Laws and Ordinances Governing the City of Chicago* 239 (1866), ch. 11, § 1 | Prohibiting the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent written permission of the authorities. Punishable by a fine of $25 per offense. | Gunpowder | |
| 360 | 1858 | Minnesota – City of St. Paul | Henry John Horn, (Editor), *The Charter and Ordinances of the City of St. Paul, Together with Legislative Acts Relating to the City, and the State Constitution, in an Appendix* 113 (1858), ch. 21, §§ 1–5 | Prohibited the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent payment of $5 to the City Treasurer and written permission of the authorities. Authorized any person to "keep for his own use" no more than 1 pound of gun powder or gun cotton at any one time. Punishable by a fine not to exceed $50 per offense. | Gunpowder | |
| 361 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate transporting, storing, or selling gunpowder, giant powder, dynamite, nitroglycerine, or other combustibles without a license, as well as the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Gunpowder; Giant powder; Dynamite; Nitroglycerine | |
| 362 | 1917 | Federal | An Act To Prohibit the Manufacture, Distribution, Storage, Use, and Possession in | Prohibited the manufacture, distribution, storage, use, and possession during time of war of | Powder; Explosives; Blasting supplies | |

106

ER-340

*Baird v. Bonta*, Case No. 2:19-cv-00617-KJM-AC

Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|-----------------|
|     |                   |              | Time of War of Explosives, Proving Regulations for the Safe Manufacture, Distribution, Storage, Use, and Possession of the Same, and for Other Purposes, 40 Stat. 385 (1917), ch. 83 | powder, explosives, blasting supplies, or ingredients thereof. |                       |                 |

107

# CERTIFICATE OF SERVICE

Case Name: __**Baird, Mark v. Rob Bonta**__          No. __**2:19-cv-00617-KJM-AC**__

I hereby certify that on August 18, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## APPENDIX OF LAWS

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on August 18, 2023, at Los Angeles, California.


| Lara Haddad | *Lara Haddad* |
| --- | --- |
| Declarant | Signature |

SA2019101934
66168946.docx

ER-942

1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  LARA HADDAD, State Bar No. 319630
   Deputy Attorney General
4    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013-1230
5    Telephone:  (213) 269-6250
     Fax:  (916) 731-2124
6    E-mail:  Lara.Haddad@doj.ca.gov
   *Attorneys for Defendant Rob Bonta in his official*
7  *capacity as Attorney General of California*

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **MARK BAIRD and RICHARD**          2:19-cv-00617-KJM-AC
    **GALLARDO,**
                                        **DECLARATION OF LARA HADDAD IN**
14                       Plaintiffs,    **SUPPORT OF DEFENDANT'S MOTION**
                                        **FOR SUMMARY JUDGMENT**
15           v.
                                        Date:          September 22, 2023
16                                      Time:          10:00 a.m.
    **ROB BONTA, in his official capacity as**   Courtroom:   3
17  **Attorney General of the State of California,**   Judge:   Hon. Kimberly J. Mueller
    **and DOES 1-10,**                  Trial Date:    None set.
18                                      Action Filed:  April 10, 2019
                         Defendants.
19

20

21

22

23

24

25

26

27

28

                                    1

Case 2:19-cv-00617-KJM-AC   Document 90-4   Filed 08/18/23   Page 2 of 49

1     I, Lara Haddad, hereby declare and state the following:

2         1.    I am a Deputy Attorney General at the California Department of Justice and serve as

3 counsel to Defendant Rob Bonta, in his official capacity as Attorney General of the State of

4 California ("Defendant"), in the above-titled matter.  I make this declaration in support of

5 Defendant's Motion for Summary Judgment.  Unless otherwise stated, I have personal knowledge

6 of the facts set forth herein and am competent to testify thereto.

7         2.    Attached as Exhibit 1 is a true and accurate copy of Legal Alert No. OAG-2022-02,

8 issued by the California Attorney General on June 24, 2022.  A copy is also available at

9 https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf.

10         3.    Attached as Exhibit 2 is a true and accurate copy of portions of a sworn deposition of

11 Plaintiff Mark Baird, taken by Deputy Attorney General Matthew Wise on August 31, 2021.

12         4.    Attached as Exhibit 3 is a true and accurate copy of portions of a sworn deposition of

13 Plaintiff Richard Gallardo, taken by Deputy Attorney General Matthew Wise on August 31, 2021.

14         5.    Submitted concurrently with this declaration is an appendix of laws; these laws are

15 also referenced or detailed in the expert declarations and reports submitted in support of

16 Defendant's Motion for Summary Judgment.

17
18     I declare under penalty of perjury under the laws of the United States of America that the

19 foregoing is true and correct.

20     Executed on August 18, 2023, at Los Angeles, California.

21

22

23                  /s/ Lara Haddad
                   Lara Haddad

24                  Deputy Attorney General

25

26

27

28

Haddad Decl. ISO Defendant's MSJ  (2:19-cv-00617-KJM-AC)

ER-354

# EXHIBIT 1

| **California Department of Justice**<br><br>**OFFICE OF**<br>**THE ATTORNEY GENERAL**  | *Legal Alert* | |
|---|---|---|
| Subject:<br><br>U.S. Supreme Court's Decision in *New York State Rifle & Pistol Association v. Bruen*, No. 20-843 | No.<br>OAG-2022-02 | Contact for information:<br><br>CCWinfo@doj.ca.gov |
| | Date:<br>June 24, 2022 | |

**TO:  All California District Attorneys, Police Chiefs, Sheriffs, County Counsels, and City Attorneys**

On June 23, 2022, the United States Supreme Court issued its decision in *New York State Rifle & Pistol Association v. Bruen*, No. 20-843 (*Bruen*).[1]  In that case, the Court concluded that the State of New York's requirement that "proper cause" be demonstrated in order to obtain a permit to carry a concealed weapon in most public places violates the Second and Fourteenth Amendments.  Although *Bruen* concerns a New York law, the *Bruen* majority specifically identifies California as one of six States that has an analogue to New York's "proper cause" standard.  *Bruen*, slip op. 5-6.  Accordingly, it is the Attorney General's view that the Court's decision renders California's "good cause" standard to secure a permit to carry a concealed weapon in most public places unconstitutional.  Permitting agencies may no longer require a demonstration of "good cause" in order to obtain a concealed carry permit.  However, local officials can and should continue to apply and enforce all other aspects of California law with respect to issuing public-carry licenses.  In particular, the requirement that a public-carry license applicant provide proof of "good moral character" remains constitutional.  Law enforcement agencies that issue licenses to carry firearms in public should consult with their own counsel, carefully review the decision in *Bruen*, take the following guidance into account, and continue protecting public safety while complying with state law and the federal Constitution.

California law authorizes local law enforcement officials—sheriffs and chiefs of police—to issue licenses allowing license holders to "carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person."  Cal. Pen. Code §§ 26150, 26155.  In counties where the population is less than 200,000, local officials are also authorized to issue licenses permitting open carry in only that jurisdiction.  *Id.* §§ 26150(b)(2); 26155(b)(2).  These licenses, whether for concealed carry or open carry, exempt the holder from many generally applicable restrictions on the carrying of firearms in public.  Local officials are only authorized to issue such licenses, however, upon proof that (1) "the applicant is of good moral character," (2) "[g]ood cause exists for issuance of the license," (3) the applicant is a resident of the relevant county or city (or has their principal place of business or employment in that county or city), and (4) the applicant has completed a course of training.  *Id.* §§ 26150(a), 26155(a).

Although California law was not directly at issue in the *Bruen* decision, the decision makes clear that "good cause" requirements such as those in California Penal Code sections 26150(a)(2) and 26155(a)(2) are inconsistent with the Second and Fourteenth Amendments.  Under the Supremacy

---

[1] The decision is available at https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf.

Clause of the United States Constitution, state and local officials must comply with clearly established federal law.

In accordance with *Bruen*, the Attorney General now considers the "good cause" requirements set forth in California Penal Code sections 26150(a)(2) and 26155(a)(2) to be unconstitutional and unenforceable. The immediate implications for law enforcement agencies that issue public-carry licenses ("issuing authorities") are as follows:

First, effective immediately, issuing authorities should no longer require proof of good cause for the issuance of a public-carry license. Issuing authorities may still inquire into an applicant's reasons for desiring a license to the extent those reasons are relevant to other lawful considerations, but denial of a license for lack of "good cause" now violates the Second and Fourteenth Amendments under the Supreme Court's decision in *Bruen*.

Second, issuing authorities should continue to apply and enforce all other aspects of California law with respect to public-carry licenses and the carrying of firearms in public. Issuing authorities are still required to take an applicant's fingerprints and to wait for the results of the background check that is run by the California Department of Justice (DOJ). Licenses "shall not be issued if the [DOJ] determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm." Cal. Pen. Code § 26195(a). Moreover, because the Court's decision in *Bruen* does not affect the other statutory requirements governing public-carry licenses, issuing authorities must still require proof that (1) "the applicant is of good moral character," (2) the applicant is a resident of the relevant county or city (or has their principal place of business or employment in that county or city), and (3) the applicant has completed a course of training. *Id.* §§ 26150(a), 26155(a). Issuing authorities may also still require psychological testing. *Id.* § 26190(f).

*Bruen* recognizes that States may ensure that those carrying firearms in their jurisdiction are "'law-abiding, responsible citizens.'" *Bruen*, slip op. p. 30 n.9; *see also id.* slip op. p. 2 (Kavanaugh, J., concurring) (States may "require a license applicant to undergo a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements"). Accordingly, in assessing whether an applicant has established "good moral character," issuing authorities should recognize that *Bruen* does not eliminate the duty or authority of local officials to protect the communities that they know best by ensuring that licenses are only issued to individuals who—by virtue of their character and temperament—can be trusted to abide by the law and otherwise ensure the safety of themselves and others. The investigation into whether an applicant satisfies the "good moral character" requirement should go beyond the determination of whether any "firearms prohibiting categories" apply, such as a mental health prohibition or prior felony conviction. Those categories, which may be found to apply during the DOJ-conducted background check (including the many categories pertaining to an applicant's criminal history), simply determine whether the applicant is even eligible to own or possess firearms under state and federal law. When it comes to evaluating an applicant's moral character, however, the issue is not whether the applicant meets the minimum qualifications to own or possess firearms under other statutory criteria. "Good moral character" is a distinct question that requires an independent determination.

Existing public-carry policies of local law enforcement agencies across the state provide helpful examples of how to apply the "good moral character" requirement. The Sacramento County Sheriff's Office, for example, currently identifies several potential reasons why a public-carry license may be denied (or revoked), which include "[a]ny arrest in the last 5 years, regardless of the disposition" or

"[a]ny conviction in the last 7 years."[2]  It is reasonable to consider such factors in evaluating an applicant's proof of the requisite moral character to safely carry firearms in public.  *See, e.g., Bruen*, slip op. p. 63 (referencing "law-abiding citizens").  Other jurisdictions list the personal characteristics one reasonably expects of candidates for a public-carry license who do not pose a danger to themselves or others.  The Riverside County Sheriff's Department's policy, for example, currently provides as follows: "Legal judgments of good moral character can include consideration of honesty, trustworthiness, diligence, reliability, respect for the law, integrity, candor, discretion, observance of fiduciary duty, respect for the rights of others, absence of hatred and racism, fiscal stability, profession-specific criteria such as pledging to honor the constitution and uphold the law, and the absence of criminal conviction."[3]

As a starting point for purposes of investigating an applicant's moral character, many issuing authorities require personal references and/or reference letters.  Investigators may personally interview applicants and use the opportunity to gain further insight into the applicant's character.  And they may search publicly-available information, including social media accounts, in assessing the applicant's character.  Finally, we note that it remains reasonable—and constitutional—to ask applicants why they are interested in carrying their firearms in public.  Although applicants do not need to demonstrate good cause for the issuance of a license, an applicant's reasons for seeking a license may alert authorities to a need for psychological testing, be considered as part of the "good moral character" requirement, or provide information relevant to other statutory requirements.

---

[2] Sacramento County Sheriff's Office, *CCW Application/Permit Denials/Revocations*, <https://www.sacsheriff.com /documents/ccw/REVO-DENIAL-REASONS.pdf> [last visited June 23, 2022].)
[3] Riverside County Sheriff's Department, *Riverside County Sheriff's Department Standards Manual (DSM)*, <https://www.riversidesheriff.org/DocumentCenter/View/6791/Department-Standars-Manual-5222> [last visited June 23, 2022].

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF CALIFORNIA
 3                        --o0o--
 4   MARK BAIRD and RICHARD
     GALLARDO,
 5
          Plaintiffs,
 6
     vs.                        No. 2:19-cv-00617-KJM-AC
 7
     ROB BONTA, in his official
 8   capacity as Attorney General
     of the State of California,
 9   and DOES 1-10,
10        Defendants.
                              /
11
12
13
14            VIDEOCONFERENCE DEPOSITION OF MARK BAIRD
15                    August 31, 2021
16
17
18
19
20
21
22   Stenographically Reported by:
23   Janice L. Belcher, CSR No. 12342
24   Job No. 4782562
25   Pages 1 - 41
```

Page 1

```
1                        I N D E X

2                                              PAGE

3    EXAMINATION BY MR. WISE                      4

4

5

6

7

8

9

10                     E X H I B I T S

11                                             PAGE

12   EXHIBIT 1   2/21/19 Letter                  10

13   EXHIBIT 2   6/20/21 Email                   22

14   EXHIBIT 3   9/3/18 Letter                   23

15   EXHIBIT 4   9/3/18 Letter                   25

16   EXHIBIT 5   8/31/21 Email                   28

17

18

19

20

21

22

23

24

25

                                          Page  2
```

```
 1              VIDEOCONFERENCE DEPOSITION OF MARK BAIRD

 2

 3        BE IT REMEMBERED, that pursuant to Notice, and on

 4    the 31st day of August, 2021, commencing at the hour of

 5    9:02 a.m., Pacific Standard Time, via videoconference

 6    before me, JANICE L. BELCHER, a Certified Shorthand

 7    Reporter, appeared MARK BAIRD, produced as a witness in

 8    said action, and being by me first duly sworn, was

 9    thereupon examined as a witness in said cause.

10

11                          --o0o--

12

13    APPEARANCES VIA VIDEOCONFERENCE:

14    For Plaintiffs:

15              AMY BELLANTONI

                Bellantoni Law Firm

16              2 Overhill Road, Suite 400

                Scarsdale, New York  10583

17              (914)367-0090

                info@bellantoni-law.com

18

19    For Defendant Attorney General Rob Bonta:

20              R. MATTHEW WISE

                Deputy Attorney General

21              1300 I Street, Suite 125

                P.O. Box 944255

22              Sacramento, California  94244

                (916)210-6046

23              matthew.wise@doj.ca.gov

24    Also Present:

25              RICHARD GALLARDO


                                              Page  3
```

```
 1                          MARK BAIRD,

 2                     sworn as a witness,

 3                    testified as follows:

 4

 5                        EXAMINATION

 6   BY MR. WISE:

 7        Q    Good morning.  My name is Matthew Wise.  And I

 8   represent the California Attorney General in this case,

 9   with which is Baird vs. Bonta.

10           Would you state your full name and spell your

11   last name for the record.

12        A    Mark Allen Baird, B-A-I-R-D.

13        Q    Do you understand that you're testifying here

14   today under the same oath that you would as if you were

15   testifying in a courtroom?

16        A    I do.

17        Q    Have you ever had your deposition taken?

18        A    Yes.

19        Q    And how many times?

20        A    I don't know.

21        Q    Approximately?

22        A    I don't know.

23        Q    So you're familiar with the deposition rules?

24        A    Well, I don't know that I'm familiar with them.

25   I've been on one side of the table before.
```

Page 4

1    BY MR. WISE:

2        Q    How many times approximately have you applied

3    for a concealed firearm?

4        A    I don't know.  Three, maybe.

5        Q    Do you know approximately when you did so most

6    recently?

7        A    It was 2021.  I believe it was January.

8        Q    What was the result of that application?

9        A    It was successful.

10       Q    Why did you apply?

11       A    Why did I apply?  Because you can be arrested

12   for carrying a firearm if you don't have government

13   permission here.

14       Q    And why did you want government permission to

15   carry a firearm?

16       A    I don't want government permission.  I want to

17   exercise my Second Amendment right, but if you don't ask

18   government permission you can be arrested for carrying

19   your firearm.

20       Q    When you applied, did you need to give a reason

21   for wanting to carry a firearm?

22       A    Of course you do.

23       Q    What was the reason that you gave?

24       A    You know, I don't have that form in front of

25   me, but I believe it was that we haul animals, we have a

                                                Page 14

1   business, we carry large amounts of cash.  We have

2   received threats based upon our business and my

3   political activities, something like that.

4        Q   Are there any other reasons that you want to

5   carry a firearm?

6        A   I have the right to do so.  And I have the

7   absolute right to defend myself and my family.

8        Q   Have you ever applied in another county for a

9   permit to carry a concealed firearm?

10        A   No.

11        Q   Not sharing private conversations with your

12   attorney, would you tell me how you became a plaintiff

13   in this case?

14        A   I initiated the case.

15        Q   What motivated you to initiate the case?

16        A   The fact that the California Department of

17   Justice and the California legislature have

18   legislatively and statutorily banned the exercise of

19   Second Amendment guarantees through Penal Code 261 -- or

20   25850, 26400 and 26350.  And they refuse to issue open

21   carry permits as allowed by Penal Code 26150 (b)(2) and

22   155 (b)(2).  So in effect, there is no Second Amendment

23   in California.  That's unconstitutional, and that's why

24   I initiated the case.

25        Q   When you say they refuse to issue these

Page 15

```
 1    licenses, who are you referring to by "they"?
 2        A    Every sheriff in every jurisdiction in
 3    California.
 4        Q    What are you hoping to achieve through this
 5    lawsuit?
 6        A    I am hoping to achieve the unpermitted and
 7    unrestricted open carry of a loaded firearm in the state
 8    of California as guaranteed to me by the Second
 9    Amendment of the United States Constitution and
10    Article 3, Section 1 of the California Constitution.
11        Q    Are you seeking the right to carry a firearm
12    openly in public without limitation?
13        A    I didn't say that, without limitation.
14            MS. BELLANTONI:  Objection.
15            You can answer.
16            THE WITNESS:  No, I'm not.
17            (Technical difficulties.)
18            THE WITNESS:  Are you talking to me or my
19    attorney?
20            I think I was finished.
21            MS. BELLANTONI:  I simply stated, objection.
22            You can answer.
23            THE WITNESS:  Okay.  I'll continue then.
24            We're not asking to carry the firearm in
25    sensitive buildings or sensitive places.  The court, the
```

Page 16

```
 1   required of me to follow up with anyone, hopefully.

 2        Q   So in the meantime, you do not plan to follow

 3   up with Sheriff LaRue to try to get an open carry

 4   license?

 5        A   I find it unprofitable to beat a dead horse,

 6   so, no, I do not plan to follow up.

 7             MR. WISE:  Thank you.  I don't have any further

 8   questions.

 9             MS. BELLANTONI:  I don't of any follow-up

10   questions, so I think we're done with Mr. Baird.

11             MR. WISE:  Thank you.

12             MS. BELLANTONI:  I would like counsel to

13   provide me with a copy that so my client can review the

14   transcript and make any necessary corrections under the

15   federal rules.

16             MR. WISE:  Ms. Belcher, I provided all the

17   exhibits to you, but obviously I have not been able to

18   provide you this last one, so I will forward this last

19   exhibit to Richard, and he can get it to you, I'm

20   assuming.

21             (Off the record at 9:56 a.m.)

22                          --o0o--

23

24

25
```

Page 36

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, JANICE L. BELCHER, do hereby certify:

 4        That MARK BAIRD, in the foregoing deposition named,

 5   was present and by me sworn as a witness in the

 6   above-entitled action at the time therein specified;

 7        That said deposition was taken before me at said

 8   time, and was taken down in shorthand by me, a

 9   Certified Shorthand Reporter of the State of California,

10   and was thereafter transcribed into typewriting, and

11   that the foregoing transcript constitutes a full, true

12   and correct report of said deposition and of the

13   proceedings that took place;

14        That before completion of the proceedings, review

15   of the transcript was requested.

16        IN WITNESS WHEREOF, I have hereunder subscribed my

17   hand this 22nd day of September, 2021.

18

19

20

21

22        JANICE L. BELCHER, CSR No. 12342

          State of California

23

24

25

                                              Page 38
```

[& - article]

**&**

**&**   39:23 40:9

**0**

**00617**   1:6

**1**

**1**   1:25 2:12 10:6,7
  16:10 40:1
**1-10**   1:9
**10**   2:12
**10583**   3:16
**12163**   38:21
**12342**   1:23 38:22
**125**   3:21
**1300**   3:21
**155**   15:22
**18**   23:13

**2**

**2**   2:13 3:16 15:21
  15:22 19:22 21:8
  21:25 22:1 23:22
  27:6 29:14 30:4
  30:10,24 31:8
**2/21/19**   2:12
**200,000**   11:10
  30:12
**2012**   10:19
**2018**   22:8 26:13
  28:5 29:4
**2021**   1:15 3:4 8:17
  14:7 38:17 39:3,5
**2025.520**   39:9,12
**210-6046**   3:22
**22**   2:13 39:3
**22nd**   38:17
**23**   2:14
**25**   2:15
**25850**   15:20
**261**   15:19
**26150**   15:21 21:8
  23:22 27:6 29:14

**30:4,10,24 31:8**
**26350**   15:20
**26400**   15:20
**28**   2:16
**2:19**   1:6

**3**

**3**   2:14 16:10 23:5
  23:6,13 26:13
**30**   8:24 9:1 40:1
**31**   1:15 39:5
**31st**   3:4
**367-0090**   3:17

**4**

**4**   2:3,15 25:13,14
**400**   3:16
**41**   1:25
**46**   19:21
**4782562**   1:24 39:5
  41:2
**4th**   22:16

**5**

**5**   2:16 28:20,21
**58**   27:19,21 28:1,4
**5th**   22:8

**6**

**6**   29:4
**6/20/21**   2:13

**8**

**8/31/21**   2:16

**9**

**9/3/18**   2:14,15
**914**   3:17
**916**   3:22
**94244**   3:22
**944255**   3:21
**9:02**   3:5
**9:56**   36:21

**a**

**a.m.**   3:5 36:21
**ability**   31:22 33:14
**able**   6:5,7 17:10
  17:18 19:24,25
  20:2 21:17 34:24
  36:17
**absolute**   15:7
  19:12
**absolutely**   10:3
  18:12,19
**ac**   1:6
**accurate**   37:5
**achieve**   16:4,6
**act**   12:17
**action**   3:8 38:6
**actions**   24:1,3 28:8
  28:14
**activities**   15:3
**actor**   19:14
**additional**   28:19
**administrator**
  29:23 30:6
**advantage**   19:25
  35:23
**advice**   11:23
**advised**   11:8
**affiliation**   32:8
**agencies**   11:9
**agency**   11:15 12:3
  19:14 20:16 21:15
**agent**   19:14
**ago**   8:24 9:1 13:15
  27:2
**agrees**   29:11
**ahead**   17:20
**allen**   4:12
**allow**   34:9
**allowed**   15:21
  18:21

**allows**   32:22
**amendment**   14:17
  15:19,22 16:9
  19:22 28:13 31:10
**amounts**   15:1
**amy**   3:15 39:1
**analyzed**   29:9
**animals**   14:25
**answer**   5:6,8,12
  5:16,18,20 11:1
  16:15,22 17:21
  18:4 25:11 27:19
  31:3 35:17
**answered**   27:3
**answers**   5:25
**anybody**   6:22
**anymore**   20:13
**apologize**   25:18
**appeal**   19:14 20:9
**appearances**   3:13
**appeared**   3:7
**appearing**   39:18
  40:7
**application**   14:8
  26:7 28:1,3
**applied**   7:19 13:19
  14:2,20 15:8 21:2
  25:7
**apply**   14:10,11
  21:5,6,7,10,12,17
  21:20 26:6 27:6
**appreciate**   24:19
  24:21
**approximately**
  4:21 8:15,23 14:2
  14:5 33:22
**area**   20:23
**areas**   17:7
**arrested**   14:11,18
**article**   16:10

[asked - concerns]

**asked** 12:11,15,19 12:25 13:1 19:19 21:7,19 26:9 27:10 33:16 34:1
**asking** 5:7 6:20 12:15 16:24 17:7 31:11
**assume** 23:18
**assuming** 22:13 30:7 36:20
**attempts** 31:5
**attorney** 1:8 3:19 3:20 4:8 5:16,17 6:21 15:12 16:19
**august** 1:15 3:4 39:5
**authority** 18:20 29:14,24 30:6,11 32:1
**avail** 28:12
**aware** 8:2

**b**

**b** 2:10 4:12 15:21 15:22 21:8 23:22 27:6 29:14 30:4 30:10,24 31:8 40:1
**back** 23:3 28:18
**badge** 31:21,25
**baird** 1:4,14 3:1,7 4:1,9,12 25:25 28:24 36:10 37:3 37:25 38:4 39:4,5 41:1,2
**banned** 15:18
**based** 15:2 29:12
**bates** 24:17
**bay** 20:23
**bear** 27:11
**beat** 36:5

**belcher** 1:23 3:6 36:16 38:3,22
**believe** 8:17 9:4 14:7,25 17:9 20:22 23:11,24 29:11 30:23,25
**believed** 29:17
**bellantoni** 3:15,15 3:17 16:14,21 17:13,19,21 18:3 24:13,15,22,24 25:3,17,22 36:9,12 39:1,2
**best** 29:17
**better** 32:20
**bit** 29:8
**black** 12:2
**board** 29:18
**bonta** 1:7 3:19 4:9 39:4 41:1
**bound** 21:14 27:22
**box** 3:21
**boy** 33:18
**break** 5:10,13 24:24
**buildings** 16:25 17:3,4,15
**business** 15:1,2
**busy** 33:25 35:2

**c**

**ca** 39:9,12,20
**california** 1:2,8 3:22 4:8 7:4,5,5 7:14,17 8:13 9:22 10:4,17,19,25 11:12,14,20 15:16 15:17,23 16:3,8,10 19:16,18 20:18,19 20:21 27:11,14 28:11 31:9 35:10 38:9,22

**call** 20:11 28:20
**calls** 10:1 29:12
**capacity** 1:8
**carry** 7:19 8:14 9:8,11,16,19,22 10:4,18 11:13,16 11:19 12:3,10,12 12:16 13:4,20 14:15,21 15:1,5,9 15:21 16:7,11,24 17:7,10,18,24 18:10,16,17,22,22 18:23 19:2,5,21,24 20:2,5,7,17,19,20 20:24 21:3,17,20 21:22,23,24 22:19 23:10 24:2 25:7 26:3,7,9 27:6,9,12 27:17,20 28:1,2,9 29:13,24 30:7,11 31:14,20,25 32:17 33:8,14 34:1,5,7 34:10,20,24 35:7,9 35:23 36:3
**carrying** 9:3 14:12 14:18
**case** 4:8 7:6 15:13 15:14,15,24
**cases** 5:25
**cash** 15:1
**catch** 8:25
**cause** 3:9 18:16,20
**ccp** 39:9,12
**certain** 20:23
**certainly** 29:20
**certificate** 38:1
**certified** 3:6 38:9
**certify** 37:3 38:3
**chain** 32:25 33:2
**chambers** 29:13

**change** 37:7 41:4,7 41:10,13,16,19
**changed** 31:4 32:23
**character** 18:2,9 18:14 20:12
**check** 24:20
**cities** 20:23
**city** 19:1,3
**civil** 39:19,20
**clarify** 34:23
**clear** 5:24 10:22 12:14 27:4,15 35:17
**clearly** 6:11 30:13 30:20
**client** 36:13
**code** 7:5,6 11:14 11:20,21,22,24 12:2 15:19,21 25:9 29:22 30:9 30:10,16,23 31:7,8 32:21 39:9,12,19 39:20
**codes** 28:12
**command** 33:1
**commencing** 3:4
**comment** 6:8 33:1
**committed** 8:3
**complete** 28:7
**completed** 39:7,17 40:6
**completion** 38:14 40:10
**concealed** 8:14 9:11 13:20 14:3 15:9 19:25 20:3,7 20:18,21 21:22,23 27:25
**concerns** 32:7

Page 2

ER-330

[conclude - existed]

conclude  35:15
concluded  25:1
  35:14,22,25
consider  22:22
constitutes  38:11
constitution  7:4,5
  16:9,10 19:22
  20:14
constitutional
  35:12
contact  11:8,11
  12:8 39:9
continue  16:23
conversation
  13:13 32:19 33:19
  33:22 35:2,3
conversations
  6:21 15:11 32:15
  33:7,11,20
convicted  7:22,24
convince  31:6
copy  24:11,12,14
  36:13
correct  10:21 20:5
  26:16 38:12
corrections  6:5,7,8
  36:14 37:6 39:14
  39:15 40:3,4
correctly  34:17
correspondence
  13:9
counsel  36:12
  39:18,21 40:7
counties  11:9,11
  25:8,10 27:6
  30:12
county  8:21 9:7
  12:8,9,11,16 13:20
  15:8 17:25 18:8
  18:12,15,19,24
  20:22 21:2,16

22:9 23:14 24:2,8
  25:8,12 26:2,3,7,8
  26:8,8,15,18,24
  28:9,10 31:6 33:3
county's  9:2
course  7:1 13:22
  14:22
court  1:1 5:3
  16:25 17:1,6,16
  25:19
courthouses  17:5
courtroom  4:15
covers  25:12
creating  29:16
crime  19:10
csr  1:23 38:22
current  7:9
cv  1:6

d
d  2:1 4:12
date  13:8,16 22:7
  23:12 26:5,12,14
  29:3 37:25 39:16
  40:5 41:24
day  3:4 38:17
dead  36:5
decide  20:10
decided  19:17
decision  17:6
decisions  17:16
declares  27:25
defend  15:7 19:12
defendant  3:19
defendants  1:10
definitely  24:17
demanding  20:13
demonstrate  26:2
  27:5
denied  7:20 24:4
department  10:2
  10:16,18,22,25

11:17,18 12:4
  15:16 19:17 21:13
  27:11,16,23,24
  31:6 32:8
dependent  19:13
  20:15
deponent  37:1
deposition  1:14
  3:1 4:17,23 6:4,15
  6:22,25 25:1,3
  37:4 38:4,7,12
  39:19,22,24 40:8
  40:10
deputy  3:20 31:18
  32:25
describe  8:10
determine  11:12
  12:9 18:1,9,13,16
  20:12 26:23 27:16
  32:13
determined  39:18
  39:22 40:7
developed  29:10
difficulties  16:17
directly  31:3
disagree  30:15
district  1:1,2
document  10:12
  25:25
documents  6:24
  7:2,7 24:17
doing  24:6 33:17
doj.ca.gov  3:23
double  24:20
drop  32:24
duly  3:8
duty  19:10 31:20

e
e  2:1,10 39:9,12
  40:1 41:3,3,3

eastern  1:2
effect  15:22
either  27:23
elaborate  22:21
eligible  7:13,17
email  2:13,16 13:7
  13:17 21:9 22:7,9
  22:12,14,15 23:24
  24:8,11
emailed  24:10
ended  35:2
enforcement  8:12
  11:9,15 29:23
  30:5 31:22 32:8
enforcing  29:15
entitled  38:6
errata  39:14,16
  40:3,5
error  31:8
essentially  32:22
exact  13:8,16
examination  2:3
  4:5
examined  3:9
example  12:17
  19:1
exception  20:22
excuse  29:5
exercise  14:17
  15:18 35:12
exercising  32:1
exhibit  12,13,14
  2:15,16 10:6,7
  21:25 22:1 23:5,6
  25:13,14 28:19,20
  28:21,24 36:19
exhibits  25:18
  36:17
exist  34:20,22
existed  34:13

Page 3

[exists - january]

**exists**  21:13

**f**

**facility**  8:4
**fact**  15:16 19:16
**familiar**  4:23,24
 9:2 10:12
**family**  15:7 19:12
**far**  9:10,14,18
**federal**  36:15 40:1
 40:8,9
**federalist**  19:21
**feels**  30:8
**fees**  12:5
**felony**  7:22
**fill**  21:17
**find**  28:2 36:5 37:4
**finish**  5:5,7 35:16
**finished**  16:20
**fire**  7:10
**firearm**  7:13,17,20
 7:25 8:5,8,19 9:8
 9:11,16 13:21
 14:3,12,15,19,21
 15:5,9 16:7,11,24
 17:10,18,24 18:10
 18:17,18,22,22,23
 19:3,5,24 20:2,5,7
 20:17,20,24 21:3
**firearms**  9:3
**fired**  8:18
**firm**  3:15
**first**  3:8
**foia**  9:25
**follow**  26:23 27:8
 30:22 35:6,8,11,22
 36:1,2,6,9
**following**  29:10
 37:6
**follows**  4:3 39:8
**foregoing**  37:4
 38:4,11

**form**  14:24 21:13
 21:17,20,21,21,22
 21:23 27:24,25
 34:13,20,22
**formal**  23:10
**formally**  21:6
 25:19 26:6
**format**  12:20,24
**forms**  19:18 21:15
 27:20,22 34:9,17
**forth**  29:16 32:3
**forward**  36:18
**found**  27:20
**frame**  28:5
**francisco**  20:22
**frcp**  40:1
**friend**  22:17,20,23
**front**  14:24
**full**  4:10 38:11
**further**  32:15 36:7

**g**

**gallardo**  1:4 3:25
**general**  1:8 3:19
 3:20 4:8
**generally**  13:2
 22:18
**gist**  31:12
**give**  5:8,25 10:6
 14:20 29:14 30:5
**given**  19:24 20:2
**gives**  30:10
**go**  5:1 17:20 19:21
 28:16,18
**goes**  32:2
**going**  13:24 19:23
 20:3 25:18 33:1
**good**  4:7 18:1,9,13
 18:16 20:12
**government**  7:6
 9:8 14:12,14,16,18
 19:9,20 20:6,15

**25:11 31:20**
**grant**  26:9
**grappling**  32:2
**great**  24:19 25:2
**greatest**  32:7
**grounds**  8:2
**guarantee**  35:12
**guaranteed**  16:8
 20:14
**guarantees**  15:19
 28:13 31:10
**gun**  31:23

**h**

**h**  2:10 41:3
**hand**  38:17
**handled**  39:8
**happy**  22:16 25:4
**haul**  14:25
**hawaii**  29:11
**health**  8:4
**hereunder**  38:16
**hopefully**  24:13
 36:1
**hoping**  16:4,6
**horse**  36:5
**hour**  3:4
**hours**  19:9

**i**

**identification**  10:7
 22:1 23:6 25:14
 28:21
**immediately**  11:16
**inclined**  35:4
**included**  39:14
 40:3
**indicate**  30:23
 34:6,8
**indicated**  29:21
**indicates**  5:17
 34:9

**indicating**  34:4
**indicative**  13:17
 35:4
**individual**  27:16
**info**  3:17 39:2
**information**  10:1
 10:2,16 11:10
 27:10
**informed**  7:16
**initiate**  15:15
**initiated**  15:14,24
**intellectually**  6:17
**interdiction**  31:19
**interpretation**
 11:24 12:1,6
 29:22 30:16,17,21
**interrupt**  25:17
 29:19
**involuntarily**  8:3
**issuance**  10:24
 11:17 12:6
**issue**  9:11,15,19
 12:12 13:1,3,4
 15:20,25 21:8,19
 23:22 29:11,15,24
 30:6,11 31:14,17
 32:16,22 33:8,14
 34:5,7,10,14,14,18
 34:20,21,21
**issued**  10:19 11:12
 11:20 12:10,16
 26:3 27:13,17
**issues**  9:22 11:16
 12:3 32:3
**issuing**  10:3 12:2
 32:16 33:8

**j**

**janice**  1:23 3:6
 38:3,22
**january**  8:17 14:7

Page 4

[jeremiah - occur]

**jeremiah** 33:6
**job** 1:24 7:9,11
  39:5 41:2
**jon** 13:3
**july** 22:8,17
**jurisdiction** 16:2
  18:13,20 27:13
**jurisdictions**
  27:21,21 28:2
  35:10
**justice** 10:2,16,18
  10:25 11:18,18
  12:5 15:17 19:17
  21:14 27:11,23,24
**justice's** 10:23

**k**

**keep** 19:23
**kind** 8:10
**kjm** 1:6
**know** 4:20,22,24
  5:11,21 6:6 9:18
  9:21,24 11:3
  12:19 13:7,15
  14:4,5,24 22:11,13
  23:17 26:20,21,25
  27:18 30:19,19
  31:16 33:15 35:18
**knowing** 23:18
**known** 22:22

**l**

**l** 1:23 3:6 38:3,22
**language** 30:8,18
  30:21
**large** 15:1
**larue** 33:6,8,20
  34:1,25 35:6,11,23
  36:3
**law** 3:15 7:6 8:12
  9:15,17 11:8,15
  29:16,16,23 30:5

**31:21**
**law.com** 3:17 39:2
**lawsuit** 16:5 33:17
  34:15 35:3,9,13,15
  35:21,25
**laying** 20:1
**legal** 20:17,20 39:7
**legally** 7:25 8:4
**legislatively** 15:18
**legislature** 15:17
  19:18,19
**letter** 2:12,14,15
  11:6 22:6,7 23:14
  23:20 26:1,5,12,14
  26:17,24 27:4,8
  29:25 31:11,13,18
  32:11
**license** 7:19 10:4
  11:13 12:10,12,16
  20:5 21:18,20
  24:2 25:7 27:9,17
  28:9 31:14,17
  32:22 34:2,5,7,18
  34:24 35:7 36:4
**licenses** 9:11,15,19
  9:23 10:19 16:1
  25:10 32:17 33:9
  34:10
**light** 19:16
**limitation** 16:12
  16:13
**line** 37:7 39:15
  40:4 41:4,7,10,13
  41:16,19
**link** 27:24
**little** 29:8
**live** 8:21 26:10
**loaded** 16:7
**local** 11:8,15
**locked** 39:12 40:1

**long** 7:11 28:6
**look** 10:5 11:6
  21:25 23:5 24:25
  25:13 28:23 33:15
**looks** 22:8
**lopey** 13:3,6,13
  22:6,11,20,24 29:2
  29:5 30:22 32:16
**lopey's** 30:16
  31:13 33:13
**lot** 19:8
**lots** 32:3
**luck** 33:18 34:14
  35:3

**m**

**mail** 23:14 26:17
  26:22
**making** 10:17
**marijuana** 31:19
**mark** 1:4,14 3:1,7
  4:1,12 37:3,25
  38:4 39:4,5 41:1,2
**marked** 10:7 22:1
  23:6 25:14,18,19
  28:21
**matter** 19:11
**matthew** 3:20 4:7
  24:15
**matthew.wise**
  3:23
**mean** 18:6 35:1
**mental** 8:3
**mentally** 6:16
**method** 6:19
**military** 8:12
**mine** 22:17
**misdemeanor** 7:24
**misread** 30:23
**misreading** 30:18
**missed** 24:20

**misspoke** 21:6
**moment** 10:6 20:8
  29:19
**month** 28:7
**months** 30:25
**moral** 18:1,9,13
  20:12
**morning** 4:7
**motivated** 15:15
**motivation** 31:16
  32:14
**move** 8:23
**multiple** 33:20

**n**

**n** 2:1
**name** 4:7,10,11
**named** 38:4
**necessary** 36:14
  39:14 40:3
**need** 5:4,10 14:20
**new** 3:16 5:6 33:3
**nose** 19:17
**notating** 39:15
  40:4
**notice** 3:3
**number** 10:18
  39:15 40:4

**o**

**o0o** 1:3 3:11 36:22
**oath** 4:14
**object** 19:15
**objection** 5:16
  16:14,21 17:13,19
  18:3
**obtain** 24:2 28:9
  35:7
**obvious** 31:19
**obviously** 36:17
**occur** 33:23

Page 5

[occurred - reach]

**occurred** 33:12
**office** 32:1 33:24
  39:11
**officer** 31:22,24
**official** 1:7 20:16
**okay** 5:1,2,8,9,14
  5:19 6:9,14,20
  10:5 11:7,7,23
  12:22 13:19 16:23
  17:10,18 21:25
  23:4,7 25:5,13,22
  28:16 29:21 30:2
  35:19
**once** 35:25
**open** 9:19,22 10:4
  10:18 11:13 12:10
  12:12,16 13:4
  15:20 16:7 21:17
  21:19,24 22:19
  23:10 24:2 25:7
  26:3,7,9 27:6,9,12
  27:17,20 28:2,9
  29:13,24 30:7,11
  30:11,20 31:14,25
  32:16 33:8,14
  34:1,5,7,10,20,24
  35:7,23 36:3
**opened** 35:2
**opening** 17:18
**openly** 9:16 16:12
  17:11,25 18:11,18
  18:24 19:3,5,20
  20:19,24 21:3
  31:23 35:9
**opportunity** 6:3
  32:23
**order** 26:2
**original** 39:10,21
**outline** 19:9
**outlined** 17:6

**outside** 18:24 33:1
**overhill** 3:16
**owning** 7:25 8:5

**p**

**p.o.** 3:21
**pacific** 3:5
**packet** 24:16
**page** 2:2,11 10:11
  29:8 37:7 39:15
  40:4 41:4,7,10,13
  41:16,19
**pages** 1:25 39:14
  39:17,17 40:3,6,6
**paper** 11:3,3
**partial** 10:10
**particular** 6:19,19
**parts** 20:22
**pc** 30:4
**pdf** 39:12 40:1
**penal** 7:5 11:14,20
  11:21,22,24 12:1
  15:19,21 25:9
  28:12 29:22 30:9
  30:10,16,23 31:7,8
  32:21
**penalty** 39:16 40:5
**pending** 5:12
**people** 30:12
**period** 28:6 33:13
  39:18 40:7
**perjury** 39:17
  40:6
**permission** 9:8
  14:13,14,16,18
  19:20 20:6,7
  25:11 31:20
**permit** 11:16,19
  12:3,6 13:20 15:9
  21:3,7,10,12 22:19
  26:2,3,10 27:12
  28:1,3 29:15,24

30:6 34:20
**permits** 13:4
  15:21 27:20 30:8
  30:12 33:14
**permitted** 9:15,17
**person** 5:5 19:20
**phone** 20:11
**physically** 6:16
**pilot** 7:10
**place** 38:13
**places** 16:25 17:3
  17:4,5,8,9,16,17
**plain** 30:8,17,21
**plaintiff** 15:12
**plaintiffs** 1:5 3:14
**plan** 35:6,8,13,15
  35:21 36:2,6
**please** 5:12,21
  18:5
**pleasure** 32:24
**point** 25:19
**pointed** 32:21
**policies** 32:9
**policy** 9:2,6,7
**political** 15:3
**politics** 32:4,4,6
  32:10
**populations** 11:9
**possess** 7:13,17
**possible** 5:15 12:4
**preferable** 5:25
**preparation** 6:24
**prepare** 6:14
**present** 3:24 38:5
**pretty** 33:24 35:1
**prevail** 35:8
**prevent** 6:11 8:4
**prior** 13:12,17
**private** 6:20 15:11
**probable** 18:20

**procedure** 39:19
  39:20
**procedures** 32:9
**proceedings** 20:11
  38:13,14
**process** 21:7,11,13
  26:7 30:19
**processes** 19:15
**produce** 19:18,19
**produced** 3:7
  21:14,15 27:23
**prohibit** 7:25
**prohibited** 25:9
**protect** 19:10
**provide** 36:13,18
**provided** 28:20
  36:16 39:19 40:8
**provision** 31:7
**public** 12:17 16:12
  17:25 18:11,18,24
**purpose** 22:15
**pursuant** 3:3
**pursue** 29:17

**q**

**question** 5:6,8,12
  5:12,15,17,18,20
  5:21,22 10:23
  11:1 12:13,20
  29:12 31:3 35:16
**questions** 12:25
  36:8,10
**quickly** 12:3
**quite** 28:6
**quote** 30:6
**quoting** 32:11

**r**

**r** 3:20 4:12 41:3,3
**r&s** 40:1,9
**reach** 27:15

Page 6

[read - similar]

read  11:2 12:1 29:7 37:4
reading  31:7 39:23 40:9
really  27:1
reason  14:20,23 34:18 41:6,9,12,15 41:18,21
reasonable  18:21
reasons  15:4 19:7 19:8
recall  12:21 13:16 27:1
receive  9:8 12:5 22:24 23:23
received  8:7,11,16 10:1,15 11:23 15:2 22:11,13,14 23:17 26:20,24
receives  26:21
recess  28:17
recognize  32:25
recollection  11:5
record  4:11 5:24 6:6 10:3 27:12 28:16,18 36:21
recording  5:3
records  10:24 11:17,19 12:4,17 13:22
reference  25:20
referenced  17:16 39:6
referring  16:1 29:12 30:7
refresh  11:5
refuse  15:20,25
regarding  10:16
released  39:21
remember  11:2,4 12:19,23 13:8

23:2 26:25
remembered  3:3
remind  33:5
reminded  33:13
rephrase  5:22 18:5
report  27:14 38:12
reported  1:22
reporter  3:7 5:3 25:19 38:9
reporter's  38:1
represent  4:8
request  9:25 10:1 10:16,17 12:18 23:10,12 24:4,4 27:9 29:9
requested  38:15 40:1,9,10
requesting  25:9
required  8:13 11:15 35:11 36:1
reread  31:11
reserve  31:18,24 32:25
reside  25:10,12 26:4 27:7
respond  31:2
response  10:15,23 13:1,12 21:9 22:24 23:1,21,23 23:24 24:7,8 29:2 29:3,6
responsibility  19:10
rest  31:12
restore  31:10
result  14:8
return  39:17 40:6
review  6:4,24 36:13 38:14 39:8 39:10,13 40:2

reviewing  7:3
revocable  20:8
richard  1:4 3:25 36:19
right  5:23 10:20 14:17 15:6,7 16:11 17:24 18:10 18:17,23 19:2,6,12 19:13,14 20:8,13 20:19 21:1
rights  20:1 35:24
road  3:16
rob  1:7 3:19 39:4 41:1
ruled  17:1
rules  4:23 36:15 40:8

**s**

s  2:10 41:3
sacrament  26:8
sacramento  3:22 19:2 26:1,17,24
san  20:22
saying  13:10 24:9 30:13 34:17
says  11:3 12:7 23:11 29:8 30:4 30:14,20 33:17
scarsdale  3:16
schedule  39:10
search  28:4
second  14:17 15:19,22 16:8 28:13 31:10
section  16:10 30:23 31:8
see  10:9,10 22:3 28:24 31:12 32:7
seeking  10:18 16:11 17:24 18:10 18:17,23 19:2

20:19,24
sense  6:16
senses  6:18
sensitive  16:25,25 17:3,15
sentence  11:6
september  23:13 26:13 28:5 29:4 38:17 39:3
serve  32:24
serving  33:13
sharing  13:24 15:11
sheriff  9:11,15,18 9:21,22 10:3 12:9 12:11,16,20 13:3,6 13:13,20 16:2 17:25 18:8,12,15 18:19 20:11 21:3 21:8,16,22 22:6,9 22:11,20,24 23:15 24:8 26:2,9,15,18 26:24 27:20 29:2 29:5,14,22 30:5,15 30:22 31:6,13 32:16,25 33:3,8,12 33:13,20 34:1,25 35:6,11,23 36:3
sheriff's  27:13,16
sheriffs  21:14 27:19,21 30:11
short  33:21
shorthand  3:6 38:8,9
side  4:25
sign  39:16 40:5
signature  37:1 38:21 39:21,23,23 40:9
similar  12:17

Page 7

[simply - use]

| | | | |
|---|---|---|---|
| simply 16:21 26:9 | stating 30:3 | tanker 7:10 | totality 29:9 |
| single 19:13 20:21 | statutorily 15:18 | tasked 29:15 | training 8:7,10,12 |
| 28:2 33:19,21 | stenographically | team 31:19 | 8:12,13,16 |
| siskiyou 8:22 9:2,7 | 1:22 | technical 16:17 | transcribed 38:10 |
| 9:10,14,18 12:8,9 | step 33:1 | tell 9:5 13:6 15:12 | transcript 6:4,6 |
| 12:11,15 13:19 | stepping 35:18 | 33:11 | 36:14 38:11,15 |
| 17:25 18:8,12,15 | stipulation 39:20 | testified 4:3 | 39:6,8,10,13,13,21 |
| 18:19,24 21:2,16 | stop 13:24 | testifying 4:13,15 | 40:2,2 |
| 22:9 23:14 24:2,8 | street 3:21 | 6:11 | transcription 37:5 |
| 25:8 26:8,15 | stricken 28:12 | testimony 37:5 | tricky 35:19 |
| 28:10 31:6 33:3 | subject 31:4 32:23 | thank 24:23 25:22 | true 37:5 38:11 |
| situation 29:9 | subscribed 38:16 | 25:23 36:7,11 | truthfully 6:12 |
| six 7:12 | successful 14:9 | thing 5:11 29:7 | try 5:5,7,21 24:1 |
| slip 25:12 | sue 24:5 | things 5:1 | 28:8 31:5 34:23 |
| solutions 39:7 | sued 31:9 | think 16:20 17:17 | 35:7 36:3 |
| sorry 8:25 21:6 | suggest 11:1 12:21 | 24:10 27:1 28:15 | turn 11:16 12:4 |
| 25:17 35:18 | suggests 13:4 | 29:13 36:10 | turned 24:16 |
| sort 12:17 | suing 28:11 | thinking 6:11 | two 10:10 |
| sounds 32:15 | suite 3:16,21 | 31:13 | typewriting 38:10 |
| speak 5:5 6:21 | supervisors 29:18 | thirds 10:10 | |
| speaking 13:2 | supposed 24:5 | thought 30:19 | u |
| 32:12 | supreme 17:1,6,16 | thoughts 29:10 | u.s. 29:13 |
| specific 17:12 | sure 6:18 17:15 | threats 15:2 | unconstitutional |
| specifically 27:9 | 18:6,8 20:3 24:12 | three 14:4 | 15:23 |
| 30:4,10 31:25 | 34:16 35:16 | thumb 19:17 | undersigned 37:3 |
| 34:17,19 | surround 32:7 | thursday 29:4 | understand 4:13 |
| specified 38:6 | suspicion 18:21 | time 3:5 5:5,10 | 5:21 6:1,2 9:5,10 |
| spell 4:10 | swear 35:5 | 8:15,18 11:15 | 9:14 11:25 17:5 |
| stamped 24:17 | sworn 3:8 4:2 38:5 | 20:8 28:5,6 31:18 | 18:6 20:3 31:13 |
| standard 3:5 8:13 | | 31:25 33:13,25 | 32:5,20 |
| start 5:6,8 | t | 38:6,8 39:10,18,24 | understanding |
| state 1:8 4:10 9:15 | t 2:10 41:3,3 | 40:7 | 9:12 11:21 29:25 |
| 9:17 10:1,4,19 | table 4:25 | times 4:19 8:9 | 30:2 34:16 |
| 11:11,17,18 12:4 | take 5:10,13 10:5 | 12:12 14:2 | united 1:1 7:4 16:9 |
| 16:7 19:13 24:5 | 11:5 19:9,25 | today 4:14 6:5,10 | 19:22 |
| 27:11,13,22 28:11 | 24:24 28:23 32:19 | 20:6,10 24:18 | unpermitted 16:6 |
| 29:5 31:9 35:9 | 35:23 | today's 6:14 | unprofitable 36:5 |
| 38:9,22 39:9,12 | taken 4:17 24:1,3 | told 33:12,17 34:3 | unrestricted 16:7 |
| stated 16:21 | 28:7,8 38:7,8 | tomorrow 20:9 | use 8:7 21:15 |
| states 1:1 7:4 16:9 | talk 22:17,18 | top 10:10 | 27:22 |
| 19:22 31:19 | talking 16:18 | | |

Veritext Legal Solutions
866 299-5127

[v - young]

| v | |
|---|---|
| **v**  29:11 39:4 41:1 | 21:25 22:2 23:5,8 |
| **verbally**  13:11 | 24:19,23 25:2,5,6 |
| 30:25 | 25:13,15,21,23,24 |
| **veritext**  39:7,9,11 | 28:16,18,22 36:7 |
| **video**  35:19 | 36:11,16 |
| **videoconference** | **wish**  22:16 33:18 |
| 1:14 3:1,5,13 | **wished**  34:14 |
| **violence**  19:11 | **wishes**  9:13 |
| **visited**  19:1 | **wishing**  35:3 |
| **vs**  1:6 4:9 29:13 | **witness**  3:7,9 4:2 |

| w | |
|---|---|
| | 16:16,18,23 17:20 |
| **wait**  35:13,21 | 17:22 18:5 23:7 |
| **waived**  39:23,23 | 38:5,16 39:13,16 |
| **waiving**  39:20 | 40:2,5 41:24 |
| **want**  11:25 14:14 | **words**  30:15 |
| 14:16,16 15:4 | **work**  24:13 |
| 19:5 24:24,25 | **worried**  32:3,4,5 |
| 34:16 | 32:10 |
| **wanted**  22:16,18 | **wow**  33:16 |
| 23:21 27:5 | **write**  23:20 27:4 |
| **wanting**  14:21 | **writing**  23:21,23 |
| **way**  19:15 21:12 | **written**  13:9,12 |
| 23:18 26:21 29:17 | **wrote**  26:1,15 |
| 32:13 | |

| x | |
|---|---|
| **weapons**  28:1 | |
| **wear**  31:22,24 | **x**  2:1,10 40:1 |

| y | |
|---|---|
| **wearing**  31:21 | |
| **website**  27:19 | **yeah**  23:24 24:10 |
| **websites**  27:22 | 24:15 |
| 28:4 | **year**  13:15 |
| **went**  27:19 | **years**  7:12 8:24 |
| **whereof**  38:16 | 9:1 22:22 27:2 |
| **whim**  19:13 | **yesterday**  8:20 |
| **white**  12:2 | **york**  3:16 |
| **wife**  22:16 | **young**  29:11 |
| **willing**  34:5,6 | |
| **wise**  2:3 3:20 4:6,7 | |
| 10:5,8 13:24 14:1 | |
| 17:2,14,23 18:7 | |

Page 9

1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  LARA HADDAD, State Bar No. 319630
   Deputy Attorney General
4   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
5   Telephone:  (213) 269-6250
    Fax:  (916) 731-2124
6   E-mail:  Lara.Haddad@doj.ca.gov
   *Attorneys for Defendant Attorney General*
7  *Rob Bonta*

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **MARK BAIRD and RICHARD**          2:19-cv-00617-KJM-AC
    **GALLARDO,**
                                        **EXPERT REPORT AND**
14                        Plaintiffs,   **DECLARATION OF BRENNAN**
                                        **RIVAS**
15            **v.**

16

17  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
18  **California, and DOES 1-10,**

19                        Defendants.

20

21

22

23

24

25

26

27

28

## EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

### BACKGROUND AND QUALIFICATIONS

I am a Ph.D. historian and independent scholar. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly* and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research.

I have provided expert witness declarations or reports in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C.); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, Case No. 21 Civ. 5334 (NSR) ( S.D. N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek* No. 2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Weise v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Nguyen v.*

2

1   *Bonta*, No. 3:20-cv-02470-WQH-BGS (S.D. Cal.); *Nichols v. Bonta*, No. 11-cv-
2   09916-SJO-SS (C.D. Cal.): and *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D.
3   Cal.). I am currently working on potential expert witness reports and declarations that
4   may be provided in other jurisdictions. I have been deposed and testified at trial in
5   one matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D.
6   Or.).

7       A true and correct copy of my current curriculum vitae is attached as **Exhibit A**
8   to this declaration. It contains all publications that I have authored within the last ten
9   years. I am currently being paid a rate of $130/hour for research, $150/hour for
10  document preparation, and $200/hour for deposition and trial testimony.

11                                   **OPINIONS**

12      Throughout the nineteenth century, Americans defined *deadly weapons* in
13  contradistinction to militia arms and regulated their presence in public spaces. Laws
14  regarding the carrying or concealment of such weapons in public spaces were
15  statutory enactments derived from longstanding English common law customs.
16  Nineteenth-century Americans enacted these laws to preserve order, protect the
17  peace, and reduce violent crime. Rates of homicide and crime fluctuated over time
18  and by locale, but were generally made worse by easier access to inexpensive
19  weapons like bowie knives and pocket pistols that were not only conducive to
20  concealment, but designed for it. The proliferation of these weapons, and particularly
21  pocket pistols, in the post-Civil War era unleashed a staggering wave of gun crime
22  which American communities tried to staunch through a host of regulatory measures.
23  Public carry laws were foundational to their efforts and often coexisted with other
24  regulations pertaining to taxing and selling deadly weapons.

25      Nineteenth-century public carry laws explicitly prohibited *concealed* weapons
26  because the primary mode of carrying bowie knives, pocket pistols, brass knuckles,
27  and other deadly weapons was concealed in one's pocket. These were weapons
28  designed for concealment, not open-carry akin to the militiaman's musket, rifle, or

                                        3

1  cavalry sabre. But the existence of these laws should not be interpreted to mean that
2  Americans have historically approved of open-carry. Primary source evidence from
3  the period strongly shows that Americans generally condemned the habitual carrying
4  of weapons for preemptive self-defense—even if those weapons were carried openly.
5  To carry a pistol or knife openly was to invite the intervention of local officers of the
6  law and would have been an indication of an emergency, as is described further
7  below.

8      It has not been uncommon in American history for towns and cities to be subject
9  to different deadly weapon policies than the state more broadly. There are examples
10  of cities enacting local public carry ordinances within states that lacked a public carry
11  law. Many of these examples come from the state of California and involve licensing
12  requirements for carrying deadly weapons. Public carry laws, for both concealed
13  weapons and the open-carry of weapons, have often reserved special exemptions for
14  "travelers" as defined under state law, reinforcing the idea that population density
15  was a factor in developing and enforcing weapon policies in the nineteenth century.

16      This report identifies the various knives and pistols referred to as *deadly*
17  *weapons* during the nineteenth century, and explains how they were typically carried,
18  and how their development and accessibility affected rates of interpersonal violence,
19  such that regulatory responses were needed. It then turns to various regulatory
20  measures, including public carry laws that targeted open- as well as concealed-carry
21  of weapons, and licensing laws, and examines stronger restrictions in more populated
22  areas as compared to more rural jurisdictions.

### DEFINING DEADLY WEAPONS & THE CONTEXT OF AMERICAN VIOLENCE

**Deadly Weapons and Their Uses**

25      Americans living in the nineteenth century generally distinguished between two
26  types of weapons: arms suitable for militia service or hunting, and concealable

4

weapons associated with interpersonal violence and known as *deadly weapons*.[1] In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*; but otherwise, they would have much more frequently used such weapons for hunting—be it killing predatory animals, driving birds away from their crops, or hunting for meat. Firearms borne for these purposes were carried openly, by a shoulder strap or attached to a saddle. Various accoutrements necessary for them to function, such as powder flasks, were also visible. Rifles, muskets, and shotguns that could not readily be concealed on a person were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.[2]

A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem. The greater prevalence of deadly weapons in public spaces, and the bloody consequences of it, prompted American people across the country to turn to weapon regulations as

---

[1] There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* Ohio 1880 at 79–80, establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." *See also* John A. Hockaday, et al, *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Regan, State Printers, 1879), 224 § 1274, prohibiting the carrying of "any firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblages." Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

[2] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 115.

5

a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols rather than the firearms used for militia and hunting purposes, which were openly carried. Unlike militia arms, deadly weapons tended to be carried concealed—in fact, they were designed for such a purpose. A characteristic feature of deadly weapons was their association with crime and needless bloodshed; as a result, the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law. Some states listed and defined deadly weapons by code or statute. An 1892 edition of the Mississippi Penal Code carried forward a public carry law from 1888 as Sec. 1026, entitled "Deadly weapons; carrying of concealed."[3] The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.[4] For example, Article 47, Chapter 25 of the Oklahoma Territory Penal Code was titled "Concealed Weapons" and its first two sections enumerated "prohibited weapons" that were not to be carried upon the person or concealed.[5]

During this time "deadly weapons" primarily included large knives, "pocket pistols," and, later, revolvers ranging from 4-shot to 6-shot. They are addressed below.

---

[3] R. H. Thompson, et al, *Annotated Code of the General Statute Laws of the State of Mississippi* (Nashville: Marshall & Bruce, 1892), 326 § 1026.

[4] For example, see "What They Think of It: The State Press on the Carrying of Concealed Weapons," *Daily Constitution* (Atlanta, Georgia), April 11, 1879, 4; and "Concealed Weapons: What Is Thought of the Practice by the Press of the State," *Daily Constitution* (Atlanta, Georgia), March 27, 1879, 1. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons.

[5] Will T. Little et al, compilers, *Statutes of Oklahoma, 1890* (Guthrie, OK: State Capital Print Co., 1891), Art. 47, "Concealed Weapons," 495 § 1–2. It is worth noting that these provisions prohibited not only carrying concealed, but carrying about the person generally. See *Ex parte Thomas*, 1908 OK 155. A later section within Article 47 (§ 5) even went so far as to specify the circumstances in which rifles and shotguns could be carried publicly in the Territory of Oklahoma: "for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise."

## A.   Large Knives

Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were considered the most dangerous weapon around. There were so many different styles and names of knives that Americans sometimes struggled to define them and distinguish them from one another. The "dirk knife" originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having a straight blade. "Dagger" is an older word, and generally connotes a double-edged blade. Bowie knives were often associated with long blades that curved and became double-edged near the tip. An "Arkansas toothpick," on the other hand, was more likely to be a knife that was as long as a bowie, double-edged, and sharply tapered. The narvaja was of Spanish origin and tended to refer to a large folding blade.[6]

By far the Bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. These knives could be easily concealed within a pocket or tucked into a waistband, notwithstanding their length. In 1827, Jim Bowie, for whom the blade is named, used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[7] His death at the Alamo in 1836 cemented the legend of his namesake knife,[8] which became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

Fighting knives were certainly not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for

---

[6] To make matters even more complicated, these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century. Worthen, *Arkansas Made*, I:267–268.

[7] "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up The same article was also reprinted here: https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/.

[8] William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowie-james. Published by the Texas State Historical Association.

Expert Report and Declaration of Brennan Rivas

Americans to discuss and address the growing problem of knife-violence. As rates of violence rose during the nineteenth century, people were more likely to carry and use large knives, both concealed and openly carried; the increased presence of knives—even if ostensibly carried for personal defense—had the regrettable consequence of exacerbating the problem.[9] This was especially notable in southern areas, where "so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow."[10]

The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated the presence of knives larger than a regular pocket knife in public places, as described in the footnote and further below in this report.[11] As homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives, as described further below in this report.[12]

---

[9] *See* "Another Victim of the Bowie Knife," *Cheraw Gazette* (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/.

[10] "The Bowie-Knife In the South," *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861.

[11] Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ."; Virginia, *see* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."); Alabama, *see* 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun…"; Indiana, *see* 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); Mississippi, *see* 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); Kentucky, *see* 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; Louisiana, *see* 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,") Wisconsin, *see* Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); and Michigan, *see* Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[12] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well. *See infra*, pp. 17–24, 29, 36–39.

8

## B.   Pocket Pistols Pre-1836

Another weapon that came to be associated with lawless violence in the antebellum period was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth century.[13] Reloading took upwards of fifteen seconds.[14] The largest of these muzzle-loading pistols were called "horse" pistols, measuring a foot or more in length and carried in holsters attached to a saddle; they had been adapted to cavalry and dragoon[15] service and were not designed to be carried on the person.[16] Mid-sized pistols, on the other hand, were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[17] The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[18] The most famous of these was the deringer pistol, named for its designer, Henry Deringer, and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as "derringers") were capable of firing large calibers, which made them exceedingly lethal at close range—often more lethal than mid-sized navy revolvers.[19]

---

[13] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116.

[14] For example, see the websites: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/; and https://www.quora.com/How-long-did-it-take-to-load-a-flintlock-pistol.

[15] Dragoons emerged in the early modern era as a type of unit that could fight both mounted and dismounted. In many instances, they rode to battle on horseback but fought on foot. Dragoon units within the US Army were organized in 1833 and stationed in the West (initially Fort Smith, Arkansas) where Indian conflicts necessitated mounted warfare. *See* https://www.nps.gov/fosc/learn/education/dragoon5.htm

[16] Blair, *Pollard's History*, 104, 119.

[17] *Id.* at 117–118. In most instances, these weapons would have been at least partially obscured by coats, waistcoats, pockets, etc.

[18] *Id.* at 116–118; *id.* at 117 ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire.").

[19] Lee A. Silva, "Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.," *Wild West* (April 2002), 12–13.

9

1    While pocket pistols were less frequently the targets of popular outrage in the
2  early nineteenth century, they were still regulated alongside other deadly weapons
3  like bowie knives. Small, concealable pistols lent themselves to the same violent ends
4  as fighting knives, and it was a single-shot, muzzle-loading pocket pistol used in the
5  assassination of Abraham Lincoln in 1865. Public carry laws generally included
6  "pistols" within their purview, and other regulatory strategies attempted to
7  discourage their presence in public spaces.

8  **C.    Revolvers and Pocket Pistols Post-1836**

9    The year 1836 proved to be a turning point in the history of firearm development
10  and a major catalyst for both a proliferation of interpersonal violence and
11  intensification of firearm regulation in the nineteenth century. That was the year that
12  Samuel Colt patented his first revolver design. The patent extended until 1857, by
13  which time his revolvers had received U.S. military contracts and penetrated
14  American consumer markets. Other manufacturers pounced upon the opportunity to
15  manufacture revolvers, and the Civil War Era stretching from 1850 to 1870 saw a
16  dramatic rise in the availability of these weapons. Even though it took several decades,
17  the revolver eventually overtook dirks and bowie knives as the weapon considered
18  most problematic in American communities.[20]

19    The Colt revolver diverged from pistols widely available at the time in two
20  critical ways. First, it was breech-loading, meaning that ammunition did not need to
21  be inserted through the end of the barrel (muzzle-loading). Second, it provided
22  multiple shots without reloading; the standard design eventually settled at six
23  rounds.[21]

24    Revolvers were produced in the three historical sizes or styles: "horse," "belt,"
25  and "pocket" models. By Colt's era, "horse" pistols tended to be called "army" or

26    ───────────────
    [20] On the life of Samuel Colt and the history of his firearm manufacturing companies, *see*
27  Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York:
    Scribner, 2020).
        [21] Revolvers' firing capacity could range anywhere from four to seven shots depending on
28  the manufacturer and design of the firearm in question.

10

"holster" pistols because they were used by mounted soldiers and kept in saddle holsters. Army pistols became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras, including civilian models that circulated widely. The "belt" or midsized pistol would have been worn in a hip holster attached to the belt, usually concealed. The first pocket pistol produced by Colt was released in 1848 and had five shots.[22] In later decades, pocket revolvers could be purchased in small sizes and calibers and at a relatively low cost.[23]

## D.  Slung Shots and Other Deadly Weapons

There were other deadly weapons which Americans tended to regulate in the nineteenth century. These included sword-canes and loaded canes, as well as metal knuckles (often referred to as "knucks") and slung shots. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was "a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."[24] Like large knives and pocket pistols, slung shots, sword-canes, and metal knuckles were weapons associated with crime and interpersonal violence rather than militia service or communal policing; they were typically concealed when worn.

## CONTEXT OF AMERICAN VIOLENCE

Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite

---

[22] Haven and Belden, *Colt Revolver*, 63–73.

[23] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[24] This is the definition of the nineteenth-century American phrase from the *Oxford English Dictionary*.

11

together based upon common interests and principles, and where they viewed governing institutions with skepticism, violence tended to rise.[25] The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Across the nineteenth century, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[26]

The American Civil War was a time of violence, turmoil, and political instability. It coincided with the United States' divergence from the rest of the Western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. The most severe violence occurred in the former Confederate States, where military defeat, emancipation, and reconstruction inflamed white supremacism and set the stage for racist paramilitaries, lynchings, and widespread electoral fraud. Even northern and midwestern areas that had previously been relatively peaceful saw more murders and violent assaults during the era of the war than earlier in the century. A lack of faith in governing institutions and a failure to become a cohesive citizenry drove both the war itself and the coinciding bloodshed.[27] The proliferation of revolvers during the

---

[25] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. *See* Roth, *supra* note 2, at 17–26 (2009).

[26] On homicide in American history, particularly as broken down into northern and southern regions, *see* Roth, *supra* note 2, at 297–326, 386–88 (for trends in northern areas); at 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); at 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[27] On homicide in American history, particularly as broken down into northern and southern

12

same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before. War Department patronage of gun-maker companies grew exponentially during the Civil War. By the time the conflict was over, gun-makers like Colt, Smith & Wesson, and Remington had achieved a tremendous capacity to manufacture firearms in staggering numbers. Some of their factories were producing thousands of guns per month.[28]

But when the armies stopped fighting, the chief buyer of these firearms—the United States military—no longer needed such a large supply. Manufacturers turned to the civilian market, promoting revolvers to potential buyers across the country. They marketed pocket pistols, which were primarily carried concealed, heavily. For instance, Colt produced both a "ladies' model" as well as a "house" pistol.[29] The explosion in production was all the more pronounced by the entry of imitation brands of pocket pistols sold at much lower prices.[30]

But the structural forces driving Americans to be more violent and homicidal did not go away in the post-Civil War period. Northern states experienced a brief reduction in homicide rates immediately following their victory (inspired largely by renewed faith in the American experiment), but socio-economic forces subsequently turned the tide once again toward instability, violence, and homicide. Industrialization, class stratification, urban living conditions, labor unrest, and ethnic division all combined to make American cities and manufacturing centers more

regions, see Roth, *American Homicide*, 297–326, 386–388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[28] Bridesburg, a smaller company, produced 5,000 muskets per month during a part of the war. *See* Smith, *Warman's Civil War Weapons*, 128–29. On firearms and revolvers as critical to industrialization and the American System of Manufacture, see Rasenberger, *Revolver*, 113–15, 287–88.

[29] For example, *see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It* (1875), 23 (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of [robber baron Jim] Fisk").

[30] *See supra*, n. 30.

13

1  dangerous places than in the antebellum era. Poverty begat crime, and the ease with

2  which the criminally inclined could acquire pocket pistols led to more armed

3  robberies and armed assaults.[31] In the southern states, rates of violence and homicide

4  remained high throughout the Reconstruction and the Jim Crow eras.[32]

5      The introduction of pocket revolvers into these political, racial, personal, and

6  criminal conflicts was profound. The causes and kinds of violence were largely the

7  same—racism, classism, desperation, manly honor, etc.—but the ease with which

8  pocket pistols could be acquired made these conflicts more likely to be *armed*

9  conflicts. Low prices, easy access, and concealable sizes also acted to encourage men

10 to carry a revolver in public (often contrary to law) even when they had not done so

11 previously; having it about one's person was a great temptation to use it in a moment

12 of anger, which ruined the lives of the combatants as well as their families.[33] The

13 situation had a significant impact upon the justice system by forcing jurists,

14 lawmakers, and even jurors to reevaluate the law of self-defense and the "heat of

15 passion" defense. Eventually, legal opinion coalesced around the idea that having

16 deadly weapons upon one's person "raises a presumption of guilt,"[34] regardless of

17 whether they were openly carried or concealed, and regardless of whether the carrier

18 intended to use them in an assault or not.[35]

---

[31] Roth, *American Homicide*, 386–88.
[32] Roth, *American Homicide*, 386–88.
[33] *See* "The Deadly Revolver," *Stephenville Empire* (Stephenville, Texas) April 5, 1884, 2; reprinted from *Houston Post* (Houston, Texas) (that "the law of the land cannot afford to make the distinction" between "a murderer with a malice aforethought, and a homicide, whose hand in an unguarded moment pulls the trigger and discharges the contents of a deadly weapon into an adversary, even before the nature of the act is realized.").
[34] *State v. Reams* 121 N.C. 556 (1897) ("The offence of carrying a concealed weapon about one's person and off his own premises consists in the guilty intent to carry it concealed and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt, which presumption may be rebutted by the defendant.").
[35] Some legal guidebooks asserted that intent or motive for carrying deadly weapons was immaterial, while other commentators advocated inferring malicious intent from the act of carrying weapons in much the same way that carrying lockpicks and other tools of burglary were evidence of intent to burglarize. *See* "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 412; "Entirely Too Many Revolvers," *Albany News* (Albany, Texas), August 22, 1884, 5 ("The man who, while drunk, shoots and kills another may not be hanged, because he was not competent to premeditate. He was, however, competent to premeditate against all mankind

Expert Report and Declaration of Brennan Rivas

1    The post-Civil War period became the country's first experience with rampant

2    gun violence, leading Americans to discourage the carrying and use of guns through

3    state and local regulations, as discussed below.

4    **NINETEENTH CENTURY VIEWS ON CARRYING DEADLY WEAPONS**

5    Nineteenth-century Americans (North and South) criticized the everyday

6    carrying of deadly weapons. Even though they were particularly opposed to the

7    concealment of them beneath one's clothes, there was an overarching opposition to

8    having weapons in public at all—even when carried openly. The habitual carrying of

9    deadly weapons on one's person (openly or concealed) was the behavior of

10   "ruffians"—bullies who imposed their will on others through force or intimidation,

11   and who engaged in unforgivably brutal behavior in order to do so. Ruffians carried

12   bowie knives and used them to stab someone who insulted them, and ruffians turned

13   a minor conflict into a melee by drawing a pocket revolver and shooting their

14   opponents.[36] To carry weapons was also described as a relic of barbarism—"that

15   most barbarous of all customs, the habit of wearing concealed weapons." [37]

16   Commentators later in the century described pistol-toting as a "relic of barbarism"[38]

17   and rallied the cry, "The revolver must go!"[39] Denunciations of carrying deadly

---

18   when he armed in sober moment with a weapon which could be intended for no other purpose than
     to kill or seriously injure."); "Toy Pistols and Concealed Weapons," *The Sun* (Baltimore,
19   Maryland), July 19, 1881, 2 ("but the mayor contends that any man carrying a concealed deadly
     weapon in Philadelphia 'carries it for a purpose not self-defense'."); "War on the Pistol,"
20   *Philadelphia Enquirer* (Philadelphia, Pennsylvania), July 25, 1881, 2 (Mayor's proclamation
     stating, "Whosoever carries *concealed* deadly weapons carries also the *concealed* thought of
21   murder.").
     [36] For example, see *The 'Science of Defence*,*'* Public Ledger (Philadelphia, PA) August 5,
22   1840 (carrying swords as "refined ruffianism."); *The Ruffian Foote*, Barre Patriot (Boston, MA)
     April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate
23   chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); *Shocking
     Outrage*, The Miners' Express (Dubuque, Iowa) September 24, 1851, at 2 ("some ruffian or ruffians
24   unknown" stabbed a pair of stabled horses, killing one). *See*
     https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/.
25   [37] *Concealed Weapons*, Daily Picayune (New Orleans, Louisiana) February 28, 1845, at 2.
     [38] *The Cattlemen*, Fort Worth Daily Democrat, March 5, 1883. *See also Brenham Daily*
26   *Banner* (Texas), March 7, 1883.
     [39] *See* "The Revolver Must Go," *Clarksville Weekly Chronicle* (Tennessee) May 24, 1884,
27   at 1 (reprinted from *Gainesville Register* (Texas)): https://chroniclingamerica.loc.
     gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ ; *Personals*, Chicago Daily Tribune,
28

15

1 weapons were widespread, with critics comparing the practice to "barbarism" and
2 evil intent.[40] Commentators opposed the idea of preemptively arming oneself—the
3 "vicious custom of going armed so as to be 'ready for an emergency'."[41] In the words
4 of a Georgia resident: "The habitual carrying of deadly weapons on the ground of
5 self-defense in a peaceful and enlightened community of the nineteenth century is
6 simply nonsense. The thousands who do not choose to load themselves down with
7 weapons need protection on the other hand from the few who are at once a terror, a
8 disgrace and a nuisance to the community."[42] To the retort that the right to bear arms
9 protected such behavior, the response was that "it is certain that in no sense was that
10 provision [the Second Amendment] intended to authorize a wanton disregard of the
11 sacredness of human life and defiance of the laws and peacefulness of an orderly and
12 well-disposed community," and that "such a construction of the necessary right to
13 bear arms in defense of home and country should not be tolerated."[43]

14 The fact that nineteenth-century Americans discussed *concealed* weapons and
15 legislated specifically against *concealing* weapons has invited some modern readers
16 to interpret them as de facto protecting the open carrying of pistols, knives, and other
17 deadly weapons. This idea is largely a result of simplified interpretations of the
18 nineteenth-century case law surrounding public carry statutes that emphasize judges'

19 _____

20 March 29, 1879, at 5 (mocking the movement developing in the South by saying, "Southern papers
say the revolver must go—go off?"), https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-
21 03-29/ed-1/seq-5/; *Current Opinion*, Rocky Mountain News (Colorado) March 26, 1879 ("If the
west and south would rally around the sentiment, 'The revolver must go,' it would be one more
step in the interests of civilization.").
22 [40] For example, see "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22,
23 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881,
17, ("The man who arms himself with a concealed weapon and carries it with him as he mingles
24 with others assumes a quasi-belligerent position toward human society. He prepares himself for a
combat beforehand.").
[41] "Carrying Deadly Weapons," *Washington Post* (Washington, D.C.) January 20, 1887, 2.
25 [42] "Carrying Deadly Weapons," *Daily Constitution* (Atlanta, Georgia) February 13, 1879,
2. The author associates weapon carrying with barbarism saying, "Let the cowardly barbaric
26 practice be stamped out."
[43] "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2. This
27 writer also stated that: "It is simply inexcusable for men in civilized communities, and where they
have police authorities, courts and juries, and intercourse with newspapers and railroads and
28 telegraphs . . . to wear pistols or bowie-knives as part of their daily raiment."

16

protection of openly carrying deadly weapons without considering the narrow context in which such behavior would have occurred.

### APPROACHES TO PUBLIC CARRY REGULATION IN THE NINETEENTH CENTURY

### 1. Restrictions on Public Carry and Exceptions for Self-Defense and Emergencies

In the early nineteenth century, state legislatures began enacting new statutes against the carrying of weapons in response to rising levels of violence, as discussed above, often focused on the regulation of carrying concealed weapons. Some of these statutes were challenged in state courts as violations of either the Second Amendment or an analogous state right. With a few exceptions[44], the case law that developed held that concealed carry statutes did not violate the right to bear arms. There were two strains of thought leading to this conclusion. One, which was invoked much less frequently, held that the open carrying of deadly weapons was permissible within the context of self-defense, and that statutes prohibiting such activity violated a person's right to self-defense.[45] The other strain of thought, which was far more common across the country, held that concealed carry laws were constitutional because the Second Amendment and state analogues protected appropriate uses of militia arms, not the carrying of deadly weapons.[46] This second strain of thought gained ground across the nineteenth century as the societal problems posed by ready access to

---

[44] The most significant of these few exceptions was *Bliss v. Commonwealth*, 12 Ky. 90 (1822) ("…there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.").

[45] An excellent example of this strain of thought is *Nunn v. State*, 1 Ga. 243 (1846) ("…so far as the act [contested] seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms." Emphasis in original). See also *State v. Reid*, 1 Ala. 612 (1840) ("…the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.").

[46] For example, see *Amyette v. State*, 21 Ten. 154 (1840); *State v. Buzzard*, 4 Ark. 18 (1842); *English v. State*, 35 Tex. 473 (1872); *Hill v. State*, 53 Ga. 472 (1874); *Ex parte Thomas*, 21 Okla. 770 (1908).

pocket pistols accelerated in the post-Civil War era. Especially influential were the writings of legal scholar Joel Prentiss Bishop, who explained that "the keeping and bearing of arms has reference only to war, and possibly also to insurrections wherein the forms of war are as far as practicable observed," and "not to broils, bravado and tumult, disturbing the public repose, or to private assassination and secret revenge."[47] He observed that such behavior was not necessary to the security of a free state, and "[n]or yet are dirks, bludgeons, revolvers and other weapons which are not used in war, 'arms'."[48] Bishop's explication of the right to bear arms, and his explanation as to why deadly weapon statutes did not violate it, aligned with the reigning view that such laws were an acceptable strategy to reduce gun violence.

Even though nineteenth-century case law generally coalesced around the principle that concealed weapon laws were constitutional, that did not mean that people wishing to *openly* carry deadly weapons as a form of preemptive self-defense were engaging in what was considered constitutionally protected behavior—or acceptable behavior at all. The text of public carry laws themselves, when taken together, show quite plainly that nineteenth-century Americans did not understand concealed carry laws to de facto allow everyday open-carrying of deadly weapons. Some states specifically prohibited open carry, and others tailored open-carry exceptions to be as narrow as possible in order to prevent people engaging in everyday open carry as a mode of preemptive self-defense.[49] But more importantly,

---

[47] Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* (Boston: Little, Brown & Co., 1873), § 793. Bishop's following point is worth quoting: "Moreover, there is no species of property, and no private right, the 'keeping' and 'bearing' of which may not be *regulated* by legislation for the public good. Hence, in reason, statutes [about carrying weapons] do not violate any of our constitutions."

[48] *Ibid.*

[49] For example, see 1882 West Virginia ch. 110, 317 § 8; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; 1870 Tenn. 13, p. 28-29. In response to appellate court decisions, lawmakers in Arkansas and Tennessee enacted public carry laws with an open-carry exception that was as tightly restricted as possible. Their "open in his hands" exception allowed open-carry only in a real emergency (not preemptive armed self-defense as a matter of course) and only applied to certain kinds of firearms (not pocket pistols). *See* 1871 Tenn. 90, p. 81-82; Ark. 1881 ch. 96. A public carry law from the Florida Territory (1835) allowed for open carry, but the legislation proved to be ineffective—presumably because so many people

18

1  the everyday open carrying of deadly weapons was not particularly common in the

2  nineteenth century, and primary source evidence shows that it was not socially

3  acceptable outside of emergency circumstances.

4      Deadly weapons like knives and pistols were designed to be carried concealed,

5  so concealed carry regulations struck at the primary, preferred mode of carrying

6  them. A commentator writing in 1877 said, "The very fact that men are careful to

7  conceal their revolvers argues that they are doubtful as to the propriety of carrying of

8  them," and that if a young man were to walk along the street "with his silver-mounted

9  deringer hanging from his waist belt, he would expose himself to unlimited

10  ridicule."[50] The tendency toward concealing deadly weapons rather than carrying

11  them openly was in fact so strong that in the latter nineteenth century, men's trousers

12  were often sold with a *pistol pocket* sewn into the rear hip.[51]

13      In 1856, a Louisiana court reasoned that partially exposed weapons were "the

14  result of accident or want of capacity in the pocket to contain, or clothes fully to cover

15  the weapon, and not the extremely unusual case of the carrying of such weapon in

---

16  

17  were choosing to avail themselves of the open carry exception. In 1838, lawmakers enacted a
prohibitively high tax upon anyone wishing to engage in open carry, showing that Floridians and

18  their elected lawmakers did not view unrestrained open carry as a benign activity and indeed tried
to discourage the behavior as much as possible. 1835 Florida ch. 860, "An Act to prevent any

19  person in this Territory from carrying arms secretly," 318; 1838 Florida, ch. 24. The title of the
1838 tax was "An Act in addition to An Act, (approved January 30, 1835) entitled "An Act to
prevent any person in this Territory from carrying arms secretly."

20  [50] "Carrying Concealed Weapons: True Comment on an Almost Universal American
Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1. Reprinted from *Baltimore*

21  *American*. Some of the manners and etiquette books of the nineteenth century also addressed the
impropriety of carrying deadly weapons. For example, see William A. Alcott, *Advice to a Young*

22  *Gentleman on Entering Society* (Philadelphia: Lea and Blanchard, 1839),
147-149, https://books.google.com/books?id=430_rAHEPn8C&newbks=1&newbks_redir=0&so

23  urce=gbs_navlinks_s.

24  [51] Scott Way, "A Few Random Remarks about Pockets," *Puck* 16 (January 1885), 294 ("We
will merely glance at the pistol-pocket, in which a concealed deadly weapon is often carried,

25  especially in Prohibition districts, and then pass on to the coat-tail pocket."); "The Pistol Pocket,"
*Chicago Daily Tribune* (Chicago, Illinois), February 11, 1885, 3 ("An important step toward

26  securing an abolition of the practice of pistol-carrying, a Galveston (Tex.) paper suggests that the
pistol-pocket should be prohibited by law."); "The Hygiene of Pockets," *Phrenological Journal*

27  *and Science of Health* (March 1886), 176 ("It is common now-a-days for trousers to be made with
a pocket placed little below the band in the back part of the garment. It is commonly termed the hip

28  or pistol pocket.").

Expert Report and Declaration of Brennan Rivas

full open view, and partially covered by the pocket or clothes."[52] An Arkansas case from 1879 upheld the idea that a partially exposed weapon constituted an attempt at concealment.[53]

There was some acceptance of the idea that a true emergency situation might justify the open carrying of a deadly weapon temporarily. A version of Delaware's 1881 concealed carry law provides some insight into what nineteenth-century Americans understood their concealed carry laws to allow in terms of open carry. The law as-passed ended up being substantially different from the version summarized by a newspaper while the legislature was still debating and amending the bill, and that earlier bill version contained a level of detail and context rarely found in historical public carry laws.[54] The bill prohibited concealed carry and also prohibited anyone "to carry a gun or other deadly weapon in the street, except in a vertical position, and with the muzzle pointed toward the zenith."[55] This is the kind of open carry which certain drafters of the bill envisioned—one that prioritized public safety and precluded habitual open carry as an acceptable mode of preemptive self-defense. Other elements of the bill, some of which ended up in the law that passed, addressed other impermissible ways of using, carrying, and handling firearms. "It is likewise unlawful for any person to point a gun or other firearm at any person, either in jest or earnest," and there were specific penalties for anyone who might draw a concealed weapon in a crowd or display one in public.[56]

Nineteenth-century public carry laws were also understood to coexist with the right defend oneself. In Texas, where deadly weapons could not be carried in public

---

[52] *State v. Smith*, 11 La. Ann. 633 (1856).
[53] *Carr v. State*, 34 Ark. 448 (1879).
[54] Text of a bill in the Delaware legislature, quoted in "Doings of the Legislature," *Smyrna Times* (Smyrna, Delaware), March 30, 1881, 2, https://chroniclingamerica.loc.gov/lccn/sn84020422/1881-03-30/ed-1/seq-2/.
[55] *Id.*
[56] *Id.* For the law as passed, see 1881 Delaware ch. 548 "Of Offenses Against Public Justice: An Act providing for the punishment of persons carrying concealed deadly weapons," 716-717.

at all, a self-defense exception was actually written into the law.[57] A weapon-carrier who was technically breaking the law simply by carrying could plead self-defense, show a judge or jury that his/her circumstances justified the behavior, and receive an acquittal or dismissal. Public carry laws were designed to stop individuals from preemptively going out armed on a habitual basis, not foreclose people in deadly emergencies from defending themselves in accordance with the law of self-defense.

Where gun-toters were convicted despite a plea of self-defense, it typically resulted from a failure to demonstrate that they had actually engaged in lawful self-defense—such as occasions where personal conflicts and wounded pride led to violence. Appellate rulings and legislative enactments aimed to preclude men in such circumstances from pleading self-defense. This happened to an Alabama man in 1840 who argued that he needed to conceal a weapon in order to defend himself from an attack; the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[58] The nineteenth-century tendency toward not specifically outlawing the open carrying of deadly weapons is more a byproduct of that era's persistent and torturous acceptance of a violent male honor culture than it is evidence of widespread acceptance of the open-carry of weapons for preemptive armed self-defense.

In Arkansas and Tennessee, post-Civil War public carry restrictions were part of a back-and-forth between legislatures and appellate courts, illustrating a commitment to restricting public carry that understood open-carry to be primarily

---

[57] 1871 Texas, ch. 34, § 2 ("Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.").

[58] *State v. Reid*, 1 Ala. 612 (1840).

related to militia service and secondarily reserved for emergency situations. Both states enacted laws that prohibited the public carrying of pistols with very limited exceptions.[59] Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[60] But the respective legislatures of Arkansas and Tennessee quickly changed the rule to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand. By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms were to be regulated differently than deadly weapons.[61] The revised Tennessee law held that "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[62] Arkansas's

---

[59] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[60] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

[61] Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited. This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic weapons (capable of firing repeatedly with a single pull of the trigger) and select-fire weapons (capable of either automatic or semiautomatic fire) for military use.

[62] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872). It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand. The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.

22

replacement statute was similar to that of Tennessee.[63] Tennessee and Arkansas courts did not strike down these revised public carry statutes as they had done previously.[64]

Interpreted within the context of rising levels of gun violence and political instability in the American South in the post-Civil War era, these laws and their tightly restricted open-carry exceptions illustrate a widespread social contempt for publicly carrying deadly weapons. These statutes represented the best efforts of lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[65] while also respecting the parameters set forth by their state supreme courts. The amendatory statutes did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand. Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

---

[63] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[64] See *State v. Wilburn*, 66 Tenn. 57, 61 (1872); *Haile v. State*, 38 Ark. 564 (1882).

[65] Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871). The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception. *See English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

23

Concealed carry laws did not automatically protect open carry as a mode of being preemptively armed in public. In fact, preemptive arming is precisely what nineteenth-century Americans condemned. An 1838 Virginia statute prohibited "habitual" carrying of deadly weapons—its purpose was to penalize those who carried weapons as an everyday matter of course.[66] An 1813 Louisiana statute included a lengthy preamble explaining why the legislature was taking this action. It is worth quoting in full:

> Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same [public places] armed in an unnecessary manner . . . .[67]

An appellate judge in North Carolina went so far as to say that "there is scarcely a man in the community who does not own and occasionally use a gun of some sort," but that "No man amongst us carries it about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[68] Public carry laws, whether they used the terms "concealed" or "open," were fundamentally about protecting public spaces by keeping deadly weapons away from them.

---

[66] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1 ("That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . .").

[67] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[68] *State v. Huntley*, 25 N.C. 418 (1843).

24

## 2.    Regulation of Public Carry Through Penal Code and Criminal Code Enactments

Even though the English common law inherited by the colonies had provided an avenue for disarming public spaces through the Statute of Northampton, nineteenth-century Americans chose to address the problem of weapon-carrying through new criminal enactments. Some of the earlier statutes and ordinances originated in southern and southwestern[69] areas and spread across much of the country by the Civil War Era. Regulations carried on unabated in the postbellum era.

An early example of an American state government translating a common law violation of the Statute of Northampton into a state-level statute occurred in Massachusetts in 1795. Justices of the peace were empowered to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[70] Much of the statute's text repeated phrasing and clauses from within the Statute of Northampton, and prohibited the carrying of arms into public spaces without a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was itself part of the common law inheritance.[71] Decades later,

---

[69] In the antebellum era, the Old Southwest stretched from Louisiana to Missouri, Kentucky, and Alabama.

[70] 1795 Mass. Ch. 2, 436; from *Acts and Laws Passed by the General Court of Massachusetts: Begun and held at Boston, in the County of Suffolk, on Wednesday the Twenty-eighth Day of May, Anno Domini 1794; and from thence continued by adjournment, to Wednesday, the Fourteenth of January, 1795.* The act was passed on January 29, 1795.

[71] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the

25

Delaware adopted a nearly identical policy.[72]

The 1795 Massachusetts law, which addressed going armed within the context of riot, affray, and disturbing the peace, was translated into a penal code edition published in 1836, and in that process the "going armed" portion was isolated into its own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided."[73] The statute clarified the law by showing that "going armed" was a separate offense from disturbing the peace, riot, and affray.

The early nineteenth century was a time when many states were drafting legal codes—making the law known and accessible to the people, which was part of the democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law. It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853).[74] Much like Massachusetts, Maine had a

---

amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

[72] *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852* (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace may allow cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."

[73] *Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. ch. 2, 436; *see also supra*, n. 41.

[74] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes*

preexisting statute vesting justices of the peace with necessary powers to arrest and penalize affrayers and disturbers of the peace.[75] But for Wisconsin, Michigan, Minnesota, and Oregon, this was their first public carry law.

Virginia, like Maine, had previously enacted a public carry law; but unlike Maine, that statute was not identical to the Massachusetts approach adopted in 1836. In 1838, Virginia had enacted a different type of law—one that explicitly prohibited the carrying of concealed weapons and punished such behavior by fine and/or jail time.[76] The extent to which this 1838 statute coexisted and overlapped with the 1847 statute remains unknown[77], but the example of Virginia highlights the fact that there were different approaches to public carry legislation during the antebellum nineteenth century. The other approach—which was more common in southern states—also grew out of the Statute of Northampton, but tended to prohibit *concealed* weapons and require criminal penalties for violation rather than sureties to keep the peace.

A good example of the southern, concealed-carry approach to public carry legislation comes from Tennessee. An 1801 public carry law made use of longstanding common law language and phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large

---

*of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.

[75] 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1.

[76] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."

[77] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.

27

1    knife, pistol or any other dangerous weapon, to the fear or terror of any person" would

2    be required to post a bond, go to jail, or "be punished as for a breach of the peace, or

3    riot at common law." [78] An updated statute from 1821 read: "Every person so

4    degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket

5    pistols, either public or private, shall pay a fine of five dollars for every such

6    offence."[79] The language had been simplified substantially, and the list of prohibited

7    weapons (a deviation from the traditional Statute of Northampton and common law

8    phrasing) formed the basis for the statute.

9         Tennessee was not the only state to adopt this language to regulate public carry

10    during the early nineteenth century. Corresponding weapon restrictions were enacted

11    in Louisiana and Kentucky in 1813, at a time when both states were experiencing

12    dramatic population growth and economic expansion as a result of river

13    transportation.[80] Like Tennessee, their statutes provided a list of prohibited deadly

14    weapons that could not be concealed on the person and penalized violators with a

15    fine and/or jail time.[81] States and territories following this model included: Indiana

16

---

17    [78] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina
18    Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714
(Vol. 1, 1821), The Making of Modern Law: Primary Sources.

19    [79] Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and
Permanent Nature, from the Commencement of the Government to the Present time: With
20    References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page
100, Image 105 (1836) available at The Making of Modern Law: Primary Sources.

21    [80] See 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed
in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed
22    weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom,
coat, or in any other place about him that do not appear in full open view . . ."); 813 Ky. Acts 100,
23    An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in
Certain Cases, ch. 89 § 1 (" any person in this Commonwealth, who shall hereafter wear a pocket
24    pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a
journey, shall be fined in any sum, not less than one hundred dollars . . . .");.

25    [81] Kentucky mandated a fine of not less than $100, half of which to go to the informer.
26    Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring
before a court received a find of not less than $100 and imprisonment up to six months. See 1813
27    Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms,
Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed
Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

28

Expert Report and Declaration of Brennan Rivas

(1819), Florida (1835), Georgia (1837), Virginia (1838), Alabama (1839), Ohio (1859), and New Mexico (1859).[82]

In the post-Civil War period, when access to pistols and political instability were fostering a rise in gun violence, a first step in many communities was to enact or strengthen public carry laws. Jurisdictions that did not already have such laws began enacting them, and those using the older mechanism of sureties to keep the peace often transitioned toward the implementation of criminal statutes mandating fines and/or jail time for violators.[83] The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and generally attempted to eliminate small, easily concealable weapons from the public sphere.[84] By the turn of the twentieth century, no fewer than sixteen more states and territories had enacted public

---

[82] 1819 Indiana ch. 23, "An Act to prohibit the wearing of concealed weapons," 39; 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318; 1837 Georgia, "An Act to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons," 90; 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76; 1838 Alabama ch. 77, "An Act to suppress the evil practice of carrying weapons secretly," 67-68; 1859 Ohio "An Act to prohibit the carrying or wearing of concealed weapons," 3:56; 1859-1860 New Mexico "An Act prohibiting the carrying of Weapons, concealed or otherwise," 94–99 (English and Spanish).

[83] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century. *See* https://firearmslaw.duke.edu/repository/search-the-repository/.

[84] In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes. For example, see 1883 Ariz., ch. 36 ("dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol . . ."); 1882 W.V., ch. 85 ("revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of the like kind or character . . ."); 1871 Tex., ch. 34 ("any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense . . ."; 1886 Md., ch. 375 ("any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) . . ."); 1873 Penn., ch. 810 ("any pistol, dirk-knife, slung-shot or deadly weapon . . ."); 1879 N.C., ch. 127 ("any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind . . ."); 1866 N.Y., ch. 716 ("any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun . . ."). This is not an exhaustive list.

carry laws—in other words, at least 35 of the 50 states and territories (including the District of Columbia) in existence as of 1899 had public carry laws.[85] Hawaii, which became a territory in 1900, had enforced public carry regulations since 1852.[86] Those states which did not have public carry laws generally had local ordinances on the subject in the larger towns or had other statutes pertaining to carrying weapons with intent to assault, burglarize, etc.[87]

### 3. Taxation and Sensitive Places Statutes as Regulations on Public Carry

Other methods of gun and weapon regulation than public carry existed in the nineteenth century, including taxation policies and disarmament requirements at certain sensitive places. These laws often coexisted with public carry laws, adding

---

[85] *See supra*, pp. 17–24 and corresponding citations; 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1863 California ch. 485, "An Act to prohibit the Carrying of Concealed Weapons," 748-749; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1864 Dakota Territory *Penal Code* § 455; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; Harvey B. Hurd, editor, *Revised Statutes of the State of Illinois* (Springfield: Illinois Journal Co., 1874), ch. 38 § 56, "Disturbing the Peace"; 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76; Guy A. Brown, compiler, *Compiled Statutes of the State of Nebraska* (Omaha: Gibson, Miller & Richardson, 1881), ch. 5, "Offenses Against Public Peace and Justice," § 25; Washington (State), *Code of Washington* (Olympia: C. B. Bagley, 1881), 181 § 929; 1882 West Virginia ch. 110, 317 § 8; 1883 Missouri 76; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31; 1890 Oklahoma "Crimes and Punishment," ch. 25, Art. 38, "Of Crimes Against the Public Health and Safety," 476 § 20; "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch. 159, 52 Congress, Public Law 52–159, 27 Stat. 116 (1892), 116-117; *Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1895), "Penal Code: Public Health and Safety," 1293 § 7313; Fred F. Barker, *Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867 to March 3, 1905* (Washington, D.C.: U.S. Gov. Print. Off., 1906), "Appendix A.," ch. 6, "Offenses Against the Public Peace," 139–140 § 118.

[86] "An Act to Prevent the Carrying of Deadly Weapons," *Hawaii: Kingdom of Kamehameha*, III-V, Regular Sessions (1852), 19.

[87] Jersey City, New Jersey had local public carry and registration laws, illustrating the approach of using ordinances in the larger cities of states without a public carry statute. See *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), 41, 86–87. California also pursued what was essentially a local option for license-to-carry programs. See *infra*, pp. 47–48 and corresponding citations. New York used the approach of penalizing being in possession of certain weapons with intent to commit a crime. See John W. Edmonds, editor, *Statutes at Large of the State of New York* (Albany: Weed, Parsons & Company, 1874), ch. 716, "An Act to prevent the furtive possession and use of slung-shot and other dangerous weapons," 810–811.

30

another regulatory layer to Americans' relationships to their weapons and their communities. These policies were designed to protect the public by discouraging people from being armed in public spaces, or established standards for dealers in firearms that could appropriately regulate the trade in and access to deadly weapons within American communities.

### a.  Taxation

One mode of regulating weapons during the antebellum nineteenth century involved taxation.[88] The taxing power exists to raise revenue, but it has also historically been exercised as part of the police power. Sometimes taxes were straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[89] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes."[90] Unsatisfied with the public carry law, leaders established a new series of prohibitive

---

[88] The Duke Repository of Historical Gun Laws identifies more than one hundred "taxation/registration" laws across the colonial period to 1930. Further research has uncovered (and will likely continue to uncover) additional laws, at both the state and local level. *See, e.g.*Dave Kopel, "Bowie Knife Statutes," *The Volokh Conspiracy* (November 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/ (describing personal taxes upon weapons not in Repository). But some example regulations from the Repository include: Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149–50, Image 149–150 (1856) available at The Making of Modern Law: Primary Sources (taxing shooting batteries within the city); 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement §§ 1, 2 (levying an annual tax of no more than $200 on anyone owning rifle galleries or pistol galleries in the city); John W.A. Sanford, The Code of the City of Montgomery, Prepared in Pursuance of an Order of the City Council of Montgomery Page 7–9, Image 12 (1861) available at The Making of Modern Law: Primary Sources (levying an annual tax of unspecified value upon pistol galleries within the city).

[89] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. See infra, n. 124; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1, https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[90] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources. *See supra*, nn. 53, 57.

taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay…a tax of ten dollars annually."[91] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[92] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[93]

Some southern states also placed annual taxes upon the owners of deadly weapons. Real property exceeding certain thresholds would be taxed, "intangible" property like investments were taxed, and moveable property (especially luxury goods or items associated with vices) could be taxed at standard rates as well.[94] Bowie knives, dirks, and pistols sometimes made their way into the lists of taxable items.[95] A North Carolina revenue measure from 1850 provides an example of moveable property taxes in the antebellum South. The law spanned nine pages and included nineteen sections spelling out which forms of property could be taxed, at

---

[91] 1838 Fla., ch. 24.

[92] The amounts reach $319.14 and $6,382.73. *See*: https://www.in2013dollars.com/us/inflation/1838?amount=200.

[93] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly." *See supra*, n. 68.

[94] Brian Sawers, "The Poll Tax before Jim Crow," *American Journal of Legal History* 57, no. 2 (June 2017),175–78.

[95] For example, see 1850 NC, ch. 121; 1856 N.C., ch. 34; 1866 N.C. ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting in the Civil War. 1861 Miss. Ch. 125.

what rates, how they were to be paid, the manner in which tax information should be reported, and the penalties for failure to comply with the law.[96] Section 5 provided for ad valorem taxes upon "plate, jewelry, vehicles, &c.," a category that included items like buggies, pianofortes, watches, billiard tables, and playing cards alongside pistols and bowie knives.[97] The items on the list were decidedly *not* necessities, and they included accoutrements associated with gambling, drinking, sumptuous living, and the reckless carrying of weapons—in other words, items associated with extravagance, vice, and irresponsibility.[98] The rate of tax upon pistols and knives was relatively high: $1 on all pistols ("except such as shall be used exclusively for mustering") and bowie knives, and $0.50 on all dirks and sword canes.[99] One dollar was the same rate of taxation as that for buggies and carriages valued at $100-200. The relatively high tax rate on knives and pistols seems to have prompted the addition of a proviso that limited its scope to "only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner."[100] In other words, a person wanting to avoid the tax upon these deadly weapons need only leave them at home rather than carry them habitually. This North Carolina tax was not necessarily prohibitive, but it certainly incentivized public disarmament through potential tax savings. In this way, the 1850 North Carolina possession tax functioned much like the 1835 Florida open carry tax in its purpose of discouraging the public carry of deadly weapons.

Occupation taxes and sales taxes were another taxation method employed by

---

[96] 1850 North Carolina, ch. 121.

[97] *See id.* § 5.

[98] Law and policy scholars writing about taxation have historically understood the tax power as being invoked sometimes for the raising of revenue and at other times for the discouragement of problematic activities or behaviors. *See supra*, n. 65.

[99] There was an exception for these weapons that were "kept in shops and stores for sale." *See supra*, n. 75.

[100] *Id.*

postbellum lawmakers. For instance, an occupation tax in Alabama applied to "dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not." The dealer had to pay an annual licensing fee of $300 in order to legally conduct business, which amounts to nearly $10,000 today.[101] In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons." A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business—which would be nearly $900 today.[102]

In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business.[103] The intention of the measure was to make pistols prohibitively expensive. Dealers and buyers found loopholes, which the lawmakers did not attempt to close. But a trade organization representing gun dealers opposed the law and challenged it in state court. A Texas appellate court upheld the stringent sales tax, describing the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory

---

[101] *See* 1892 Alabama ch. 95, 183; and Robert C. Brickwell, et al, *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

[102] Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; *see* https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc. Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet. Twenty-five dollars in 1894 would be $874.53 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1894?amount=25.

[103] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.

34

thereof, but could go further and absolutely prohibit any one from engaging therein."[104]

### b.   Sensitive Places

Statutes disarming certain sensitive places date to the colonial era and were already longstanding by the 1870s, but the escalating gun violence prompted an overt expansion of that policy to meet the needs of the day. Where historical laws had protected polling places and court buildings (which were the major occasions for public gatherings in rural early America—not just sites of government activity), updated laws added theaters, open-air presentations, and even private parties to the assemblies protected through disarmament. In 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[105] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[106] A law from Texas prohibited all deadly weapons, including "fire-arms, wither known as a six shooter, gun or pistol of any kind" at a host of events ranging from churches to polling places "or other social gathering composed of ladies and gentlemen."[107] Laws in

---

[104] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. App. 1912).

[105] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," § 2 (Ex. M). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§ 3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."

[106] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20–50), imprisonment (10–20 days), or both.

[107] 1870 Tex. Gen. Laws 63, ch. 46 § 1.

35

effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to it.[108] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[109] Other laws prohibited the carrying of weapons within the general vicinity of polling places, churches, and parks.[110]

## LICENSING PUBLIC CARRY IN CALIFORNIA HISTORY

As structural forces like industrialization and urbanization propelled the growth of more sophisticated governmental administration in the United States, gun policies evolved in ways that increased official oversight of weapon sales and carrying. The

---

[108] *Revised Statutes of the State of Missouri* (1879), ch. 24 § 1274; 1890 Okla. Stat. 495–96.

[109] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," § 1030. "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85 § 2. "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars." It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time. For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[110] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks).

sales registries enumerated above placed special requirements on dealers, but their intention was to empower police and other officials to solve crimes by providing them with information.[111] In a similar way, licensing either for purchase of a pistol or for public carry of one grew out of American traditions of regulating deadly weapons.

One of the earliest proponents of licensing as a way of regulating the carrying of pistols was California. The state had enacted a public carry law that prohibited concealed deadly weapons, but residents grew frustrated that it did not seem to be effective. In 1866, members of the state legislature divided over what to do about the problem.[112] One camp proposed issuing licenses to people who needed a pistol for personal protection. The state did not adopt their proposal and instead repealed the public carry law. In the aftermath of that decision, California municipal governments began passing ordinances that provided for licensing in order to carry a pistol in public.[113] The policy proved popular, and by the turn of the twentieth century a majority of California residents lived in municipalities that had implemented a permitting process for the public carry of concealed weapons.[114] Municipalities elsewhere during the nineteenth century implemented licensing policies: Jersey City,

---

[111] The examples cited above (*supra*, n. 151, n. 152) included requirements that registries be open for the review of police and others.

[112] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive* (1868), "An Act to prohibit the carrying of concealed weapons," 261 § 1–2. On frustration among the public, see "Concealed Weapons," *Morning Union* (Grass Valley, California), February 20, 1869 ("The object was to prevent indiscriminate shooting among a class about whose welfare there need not have been any extraordinary solicitude; but the result has been to place the law-abiding portion of the community at the mercy of night-prowlers, footpods, and garroters.").

[113] For example, *see* Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in R. M. Clarken, editor, *Charter and Ordinances of the City of Sacramento* (1896), 173; Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in *General Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco* (1884), 8; "Concealed Weapons," *Napa Daily Register* (Napa, California), November 10, 1880, 2. This is not an exhaustive list.

[114] Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment," *UC Davis Law Review Online* 55 (September 2021), 84.

New Jersey did so in 1873 and the District of Columbia in 1892.[115]

## NINETEENTH-CENTURY DISTINCTIONS BETWEEN URBAN AND RURAL LOCALES

In American history, it has been common for people to draw distinctions about the relative dangers of deadly weapons in urban versus rural locales. Public carry laws often featured modified rules for long-distance travelers venturing beyond the safety of their local communities. When exposed to the dangers of the highway bushwhacker or the prowling coyote that went along with nineteenth-century horseback travel, laws generally allowed the carrying of weapons—including those statutorily restricted as deadly weapons.[116] But these travel exceptions were closely guarded by appellate courts, who typically required the travel to last overnight, cross county lines (which was a much more significant marker of distance in then than it is now), or otherwise take a person beyond his "circle of neighbors."[117] Another requirement was often that a traveler check his weapons upon arriving to a town or to depart town as soon as his business was finished without visiting shops or restaurants.

[115] *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), "An Ordinance in Relation to the Carrying of Dangerous Weapons," § 3 (*supra*, n. 116); *supra*, n. 115 § 2.

[116] 1840 Ala., ch. 7, "Of Miscellaneous Offenses," 148-149 ("Every one who shall hereafter carry concealed about his person, a bowie knife…or any other deadly weapon, pistol or any species of fire arms, or air gun, unless such person be…setting out on a journey…"); 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76 ("That any person not…traveling (not being a tramp) or setting out on a journey…who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon…"); 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27, § 1 ("Provided, that this section shall not be so construed as…to prohibit persons traveling in the State from keeping or carrying arms with their baggage."); 1831, Indiana – Revised Laws, 15th Session, Chapter 26, "An Act relative to Crime and Punishment, 180-199 at 192, §58 ("That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed…"); 1871Tenn., ch. 90, "An Act to preserve the peace and prevent homicide," 81-82, § 3 ("That the provisions of the first section of this Act shall not apply to…any person who is on a journey out of his county or State.").

[117] *Carr v. State*, 34 Ark. 448 (1879); *Eslava v. State*, 49 Ala. 355 (1873); *Smith v. State*, 50 Tenn. 511 (1872); *Darby v. State*, 23 Tex. Ct. App. 407 (1880). See also, John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," *Arkansas Law Review* 66, no. 2 (2013): 463-484.

There are examples of cities and towns, many of them in California, enacting local public carry ordinances in jurisdictions that did not have statewide laws. Between 1870 and 1917, California did not have a statewide public carry law. Instead, municipalities themselves—ranging in size from Los Angeles and San Francisco to Lompoc and St. Helena—issued licenses to applicants who could show that they were particularly vulnerable to attack and therefore in need of a weapon for self-defense.[118] In the immediate aftermath of the Civil War, several towns of varying size within Texas enacted ordinances against the carrying of weapons.[119] At that time, the state did not have a public carry law; rather than try to stop the cities from pursuing policies that promoted safety, the legislature provided protection to their public carry laws. For instance, Galveston's public carry law went into effect in 1865[120], and the following year state lawmakers issued a new charter to the City of Galveston, granting its leadership the power "To regulate the carrying of weapons, and prevent the carrying of the same concealed."[121] It was not until 1870-1871 that Texas pursued a statewide gun-safety policy by enacting a sensitive places law along with a public carry law. Kansas's deadly weapon policy specifically authorized towns to regulate the carrying of weapons "concealed or otherwise."[122]

And in the American West more broadly, different rules often applied in organized towns than in the expansive countryside beyond their borders. Colorado,

---

[118] See Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America," *US Davis Law Review Online* 55 (September 2021), 65-90 at 84-85 (see Table 3: Municipalities with Permit Schemes in Post-Civil War California).

[119] "Proceedings of the City Council," *Flake's Bulletin* (Galveston, Texas), December 28, 1865; "Ordinances Passed," *Goliad Intelligencer* (Goliad, Texas) March 17, 1866; "Ordinance Concerning Deadly Weapons," *Texas Countryman* (Hempstead, Texas) August 10, 1867.

[120] Ibid.

[121] 1866 Texas ch. 173, "An Act to Reincorporate the City of Galveston," Title 4: Of the City Council—Its General Powers and Duties, § 27, 13th,320, quoted in H. P. N. Gammel, ed., *The Laws of Texas, 1822-1897*, vol. 5 (Austin: Gammel Book Company, 1898),1540.

[122] See *Salina v. Blaksley*, 72 Kan. 230 (1905); 1881 Kan. Sess. Laws 92, c. 37, § 24.

39

Idaho, Montana, Arizona, New Mexico, and Wyoming explicitly prohibited the carrying of concealed weapons in towns and settlements.[123] Dodge City, Kansas and some of the other cattle towns at western railheads famously prohibited the carrying of guns within city and town limits.[124] While it may be tempting to interpret these laws as allowing an "anything goes" attitude toward deadly weapons outside of towns and cities, such a conclusion would be a mistake. People traveling in isolated areas may have carried a bowie knife or pistol on their belt for protection, and such behavior would be in line with the longstanding travel exceptions that had been in force in much of the country for decades. But more importantly, a person traveling long distances and subject to attack from bushwhackers or wild animals would be much more likely to turn to a rifle for self-preservation than a pistol. Breech-loading rifles were becoming the national standard in the post-Civil War period and could fire several shots before needing to reload. The Winchester rifles of the late 1860s and early 1870s could hold upwards of ten rounds in their fixed magazines attached below the barrel of the gun. These firearms could shoot farther and more accurately than a pistol, and generally carried a higher caliber. Though not commonly possessed in the US during Reconstruction, Americans venturing into the rural West as immigrants or hunters would certainly have turned to a rifle for protection, and their exemption for carrying deadly weapons in uninhabited or sparsely inhabited zones was essentially a recapitulation of the exemption for travelers that had taken root in some Old Southwest states (Texas, Arkansas, Missouri, etc.).

---

[123] 1852 New Mexico, "An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls," 67-70 (in English and Spanish); 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31.

[124] For the famous photo and a brief explanation of Dodge City and other western ordinances, see Matt Jancer, "Gun Control Is as Old as the Old West," *Smithsonian Magazine*, February 5, 2018, https://www.smithsonianmag.com/history/gun-control-old-west-180968013/ .

When considering how nineteenth-century Americans viewed the urban-rural distinction and its consequences for gun policy, sensitive places laws are particularly helpful. They identified as protected spaces those spaces of gathering and assembly that define life in an organized, incorporated community—meeting halls, entertainment venues, educational facilities, city parks, and social parties. These laws often prohibited *all firearms* in addition to deadly weapons, and effectively turned any gathering space into a de facto disarmed zone; they show us that nineteenth-century Americans believed that gatherings—the quintessential feature of town or city life—and guns simply did not go together.

## CONCLUSION

Public carry laws are an integral part of the American tradition of regulating the presence of deadly weapons in public spaces—those carried openly as well as those carried concealed. These weapons were generally defined by law and had in common the fact that they were not only concealable, but designed to be carried concealed. The term *deadly weapons* generally referred to pocket pistols, bowie knives, metal knuckles, slung shots, and other weapons that were associated with crime rather than civic service. Technological developments made pistols simultaneously smaller and more lethal, and socio-political events encouraged Americans to view one another and their institutions with suspicion rather than respect. This confluence of events created an increase in weapon-carrying and crime which Americans addressed by enacting public carry statutes.

In addition, weapon policies might distinguish between urban versus rural locales, and these differences speak to a nineteenth-century understanding of towns and cities as areas deserving of special protection. When considered in conjunction with overlapping sensitive places requirements and municipal ordinances, public carry laws demonstrate that Americans have historically recognized that assemblies, entertainment venues, and other social gatherings are intrinsic to community life and endangered by the presence of weapons. Exemptions for persons outside of settled

41

areas, which were fairly common in the American West, operated like the traveler exemptions that were in force in other states. Those travel exemptions were about providing some security to people who were exposing themselves to potentially lethal situations involving bushwhackers or predatory animals, not an unmitigated license to engage in behaviors that were customarily condemned and otherwise prohibited by law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 9, 2023, at Fort Worth, Texas.

*Brennan Rivas*

Dr. Brennan Rivas

Exhibit A

# Brennan Gardner Rivas
## Curriculum Vitae · Oct 2022

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
     University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
     2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
     Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
     the Lone Star State, 1836-1930"
     Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
     Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
     1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
     on the Place of Guns in American Law and Society* (New York: Oxford University Press,
     forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
     (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
     Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
     Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
     Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
     *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
     by History Blog* (Jun 2022)

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
  ~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas History at TCU (Nov 2020)
  ~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
  ~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
  ~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
  ~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
  ~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
  ~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
  ~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights

Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"

Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West

Status: Research and writing in progress

## University Teaching Experience
*Instructor of Record*

Lecturer in American History, Texas Christian University                    2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                    2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
    ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
    ~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
    ~ Informal departmental program designed to ease the transition for incoming graduate students

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

**Languages**
Spanish (Proficient)
Latin (Proficient)

# CERTIFICATE OF SERVICE

Case Name:   **Baird, Mark v. Rob Bonta**          No.   **2:19-cv-00617-KJM-AC**

I hereby certify that on August 18, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on August 18, 2023, at Los Angeles, California.

| | |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |

SA2019101934
66168116.docx

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   LARA HADDAD
    Deputy Attorney General
4   State Bar No. 319630
     300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6250
6     Fax:  (916) 731-2124
      E-mail:  Lara.Haddad@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his official*
    *capacity as Attorney General of California[1]*

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12

13  **MARK BAIRD and RICHARD**          Case No. 2:19-cv-00617-KJM-AC
    **GALLARDO,**
14                                       **EXPERT REPORT AND**
                              Plaintiff,  **DECLARATION OF ROBERT J.**
15                                       **SPITZER**

16            v.

17  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
18  **California, and DOES 1-10,**

19                            Defendants.

20

21

22

23

24

25

26

27  _____

28  [1]Each defendant currently holds the position of the former respective named
    defendants.  *See* Fed. R. Civ. P. 25(d).

                                        1

**EXPERT REPORT AND DECLARATION OF ROBERT J. SPITZER**

I, Robert Spitzer, have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report on the history of firearms restrictions pertaining to the regulatory history of weapons carrying, including restrictions on concealed weapons carrying, on open weapons carrying, restrictions extending to long guns, weapons brandishing and display, and weapons licensing. This report is based on my own personal knowledge, research, and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this report.

## PROFESSIONAL QUALIFICATIONS

I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland and am an adjunct professor at the College of William and Mary School of Law. I was also a visiting professor at Cornell University for thirty years. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my curriculum vitae is attached as Exhibit A to this Report.

I have been studying and writing about gun policy for over thirty years. My first publication on the subject appeared in 1985. Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The eighth edition of the book was published in 2021 by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023),

1   both deal extensively with the study of historical gun laws. A complete list of my

2   publications, including those publications authored by me within the last ten years,

3   is included in my CV, attached to this report as Exhibit A. I am frequently

4   interviewed and quoted in the national and international media on gun-related

5   matters. For over twenty years, I have been a member of the National Rifle

6   Association and of Brady (formerly, the Brady Campaign to Prevent Gun

7   Violence).

8        I have been retained to submit written testimony and serve as an expert

9   witness in the following cases, including the instant matter: *Worman v. Healey*, No.

10   1:17-10107-WGY (D. Mass.), which concerned the constitutionality of

11   Massachusetts' restrictions on assault weapons; *Miller v. Bonta*, No. 3:19-cv-

12   01537-BEN-JLB (S.D. Cal.), which concerns the constitutionality of California's

13   restrictions on assault weapons; *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB

14   (S.D. Cal.), which concerns the constitutionality of California's restrictions on

15   large-capacity magazines; *Fouts v. Bonta*, No. 3:19-cv-01662-BEN-JLB (S.D.

16   Cal.), which concerns the constitutionality of California's restrictions on billy

17   clubs; *Hanson v. District of Columbia*, No. 1:22-cv-02256-RC (D.D.C.); *Brumback

18   v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-

19   05403-DGE (W.D. Wash.); *Rupp v. Bonta*, No. 8:17-cv-00746-JSL-JDE (C.D.

20   Cal.); *Gates et al. v. Polis*, No. 1:22-cv-01866-NYW-SKC (D. Colo.); *Oakland

21   Tactical Supply LLC v. Howell Township*, No. 18-cv-13443 (E.D. Mich.); *State v.

22   Misch*, No. 173-2-19 Bncr (Vt. Sup. Ct.); *National Association for Gun Rights, Inc.

23   v. City of Highland Park*, 22-cv-4774 (N.D. Ill.); *National Association for Gun

24   Rights & Capen v. Campbell*, No. 22-cv-11431-FDS (D. Mass.); *Abbott et al. v.

25   Connor*, No. 20-00360 (RT) (D. Haw.); *National Association for Gun Rights v.

26   Shikada*, No. 1:22-cv-00404-DKW-RT (D. Haw.); *Santucci v. Honolulu*, No. 1:22-

27   cv-00142-DKW-KJM (D.C. Haw.); *Yukutake* v. Shikada, No. 1:22-cv-00323-JAO-

28   KJM (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404-DKW-

1  RT (D. Haw.); *Abbot v. Lopez,* No. 20-00360-RT (D. Haw.); *Santucci v. City &*

2  *County of Honolulu* No. 1:22-cv-00142-DKW-KJM (D. Haw.); *Yukutake v. Lopez*,

3  No. 1:22-cv-00323-JAO-KJM (D.C. Haw.); *Nichols v. Newsom*, No. 11-cv-00916-

4  SJO-SS (C.D. Cal.); *Delaware State Sportsmen's Association, Inc. v. Delaware*

5  *Department Of Safety And Homeland Security et al.*, No. 1:22-cv-00951-RGA (D.

6  Del.); *Mark Fitz, Grayguns, Inc. v. Ellen Rosenblum, Attorney General of the State*

7  *of Oregon*; *Harrel v. Raoul*, No. 23-141-SPM, Southern District of Illinois;

8  *Mitchell, et al. v. Atkins, et al.,* No.: 3:22-cv-5403; 1:22-cv-03093; *Gates et al. v.*

9  *Polis* (U.S.D.C. Colo. Case No. 1:22-cv01866-NYW-SKC); *Keneally et al., v.*

10  *Raoul, et al*., 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, No. 2:23-cv-

11  01130 (E.D. N.Y.); and *Wiese v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.).

12  In the last four years I have been deposed in the case(s) of: *Oregon Firearms*

13  *Federation v. Kotak*, Case No. 2:22-cv-01815-IM; *Fitz v. Rosenblum*, 3:22-cv-

14  01859-IM; *Eyre v. Rosenblum*, 3:22-cv-01862-IM (trailing case); and *Azzopardi v.*

15  *Rosenblum*, 3:22-cv-01869-IM.

16       I have co-authored amicus briefs in numerous cases, including *Nordyke v.*

17  *King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq*

18  *et al. v. Beaty et. Al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v.*

19  *Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court

20  of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of*

21  *Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012).

22       I have also presented written testimony to the U.S. Congress on "The Second

23  Amendment: A Source of Individual Rights?," submitted to the Judiciary

24  Committee, Subcommittee on the Constitution, Federalism, and Property Rights,

25  U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand

26  Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee

27  on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington,

28  D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun

Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $500 per hour.

## I.    INTRODUCTION

The carrying of weapons of all sorts, but especially guns, fighting knives (long, thin-bladed knives), and various types of clubs has been subject to wide-ranging regulation and restriction from the seventeenth century through the early twentieth century. It is now well known that restrictions on the concealed carrying of these weapons were ubiquitous in America. Less well known, however, is that the open carrying of weapons was often restricted, even extending to long guns. In addition, the states also restricted the public carrying of weapons through laws criminalizing the brandishing and display of weapons. Further, a variety of weapons licensing laws were enacted in the nineteenth and early twentieth centuries that allowed for conditional carrying, subject to a valid license issued by the government. The rise of licensing as a regulatory technique as examined later in this report often followed instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a more flexible form of government regulation of the activities and weapons in question, though carry restrictions also persisted.

Taken together, these numerous and varied laws make clear that the default in American history was weapons regulation and restriction, especially once individuals left their domiciles. Perhaps most significant (and surprising) is the extensive regulation of open weapons carrying, in that more than half of the states restricted, partially or completely, open weapons carrying or any weapons carrying, as discussed below.

## II.    REGULATORY HISTORY OF WEAPONS CARRYING

### A.    Restrictions on Concealed Carrying of Weapons

Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries. As early as 1686, New Jersey enacted a law against wearing weapons "privately" because they induced "great Fear and Quarrels." But this law also penalized open weapons carrying as well saying: "no planter shall ride or go armed with sword, pistol or dagger, upon the penalty."[2] Massachusetts followed in 1750, penalizing any assemblage of twelve or more persons, whether the weapons were concealed or openly carried, "being armed with clubs or other weapons."[3] Virginia[4] and North Carolina[5] passed similar laws incorporating penalties for openly carrying weapons in 1786 and 1792, respectively. (See Exhibits B, C, and E.) In the 1800s, as interpersonal violence and gun carrying spread, 43 states (including the District of Columbia) joined the list; 3 more did so in the early 1900s. The rise in the circulation of handguns in society, along with the increased circulation of fighting knives (most notoriously the Bowie

---

[2] The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686). An Act Against Wearing Swords, Etc.

[3] 1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

[4] 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays.

[5] Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792).

knife) and certain types of clubs was accompanied by the rapid spread of concealed carry restrictions, beginning in the early 1800s but then escalating in the post-Civil War period with the spread of multi-shot handguns, precisely because of their contribution to increasing interpersonal violence.[6] By the start of the twentieth century, every state in the country (with the apparent sole exception of New Hampshire) prohibited or severely restricted concealed gun and other weapons carrying.[7]

### B.    Open Carry Weapons Restrictions

Ubiquitous restrictions on concealed weapons carrying are now well-known. Less well-known, however, is that many of the laws enacted to restrict concealed weapons carrying also extended restrictions to open weapons carrying, or simply barring any weapons carrying. In all, at least 29 states enacted at least 53 laws restricting or extending to the open carrying of weapons (see Exhibits E and H).

From the early 1800s up to 1860, at least 5 states (including D.C.) enacted laws barring or restricting the carrying of named weapons, whether concealed or open. Georgia enacted a law in 1837 restricting both the carrying and sale of named weapons:

> [I]t shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c.[8]

---

[6] Dickson D. Bruce, Violence and Culture in the Antebellum South (Austin, TX: University of Texas Press, 1979); Randolph Roth, American Homicide (Cambridge, MA: Belknap Press, 2012), 218-19.

[7] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 63-67; see also Exhibits B, C, and E.

[8] The very title of this law proclaims the justification for its enactment: 1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

Florida enacted an 1838 law that criminalized the concealed carrying of named weapons, but also added that "all persons carrying said weapons openly shall pay" a then-considerable regulatory tax of "ten dollars per annum."[9]

An 1851 Pennsylvania law for the borough of York defined as a felony the willful and malicious carrying of "any pistol, gun, dirk knife, slung shot, or deadly weapon."[10] (Note that this law applied to any firearm, not just handguns.)

An 1852 Hawaii law criminalized the carrying or "found armed with" any of a list of deadly weapons.[11] An 1858 measure for the District of Columbia made it unlawful "for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles."[12]

In a pattern similar to the enactment of concealed carry laws, open carry restrictions increased in frequency in the latter half of the nineteenth century. From 1860 to 1900, 24 states enacted anti-open carry laws (see Exhibits E and H), and 9 states did so in the early 1900s (a few states enacted laws in both centuries).

In 1871, Texas enacted this anti-carry law: "any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife" unless for provable self-defense or in service to the government was guilty of a crime.[13] Another typical law was an 1875

---

[9] 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838); $10 in the 1830s would equal $327 in 2023 dollars. https://www.officialdata.org/us/inflation/1830?amount=10.

[10] 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

[11] 1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons.

[12] 1 William B. Webb The Laws of the Corporation of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.

[13] 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons; § 1.

8

Arkansas statute that said "any person who shall wear or carry any pistol of any

kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane,

brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a

misdemeanor."[14] An 1871 Jersey City, New Jersey law made it unlawful for any

person "to carry, have, or keep concealed on his or her person any instrument or

weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and

any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or

other dangerous weapon."[15] Similarly, an 1872 Nebraska City, Nebraska law

declared it to be "unlawful for any person to carry, openly or concealed, any

musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy

slung shot, brass or other metallic knuckles, or any other dangerous or deadly

weapons."[16]

## C.    Long Gun/Any Gun Carry Restrictions

In addition to anti-concealed weapons carrying laws and open weapons

carrying restrictions, at least 22 states enacted 36 laws during this period

specifically restricting the carrying of long guns or any kind of firearm (such as the

1851 Pennsylvania law cited above; see Exhibits E and H). Obviously, this meant

that long guns, by their nature, could not be carried in any concealed manner either.

Some of these laws were limited by applying, for example, to times and places of

elections, other public gatherings, or to any who might be intoxicated. Other laws

imposed no such limitations. Some applied only to cities and towns, but others were

statewide measures. These laws generally cited exceptions for travelers, law

---

[14] Act of Feb. 16, 1875,1874-75 Ark. Acts 156; § 1.

[15] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.

[16] Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources. Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.

enforcement, the military, or justifiable instances of self-defense. Of the 22 such laws in this category, 19 of them were passed from the 1850s to 1899; another 7 were passed in the early 1900s (a few states passed laws in both periods). Generally speaking, these states and laws also restricted concealed weapons carrying as well (though, as noted earlier, concealed carry was restricted by every state in the country except for one).

An 1868 Florida law subjected to criminal penalties anyone who "shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon."[17] An 1878 Los Angeles, California law said that, except for travelers, no person "shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city."[18] An 1881 Kansas state law required cities to "prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise."[19]

An 1890 Oklahoma law made it unlawful for anyone "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon."[20] Some of the laws did not specifically bar the carrying of every type of firearm, but included a phrase like "or any other dangerous or deadly weapon of like kind or character."[21] One may

---

[17] James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]. Offences Against Public Peace, § 13.

[18] William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. Ordinances of the City of Los Angeles, § 36.

[19] 1881 Kan. Sess. Laws 92, c. 37, § 24.

[20] 1890 Okla. Laws 495, art. 47; § 2.

[21] E.g., William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The

1    reasonably assume that a long gun was and is a "dangerous or deadly weapon."

2    **III.    WEAPONS BRANDISHING AND DISPLAY LAWS**

3    Two types of laws penalized the mere public appearance of weapons (short

4    of their actual use), including but not limited to firearms, in two circumstances: the

5    brandishing of weapons—that is, to display them in the presence of others and to do

6    so in a menacing or threatening manner; and the mere display of weapons (i.e. that

7    they simply can be seen) in the presence of others. A 1642 provision in the colony

8    of New Netherland (soon to be New York) stated: "No one shall presume to draw a

9    knife much less to wound any person, under . . . penalty."[22] This reference did not

10   mention firearms but allowed for penalties for merely drawing or displaying a

11   weapon, even if no brandishing or wounding occurred. Similarly, a 1786

12   Massachusetts law criminalized the mere assemblage of "any persons to the number

13   of twelve, or more, being armed with clubs or other weapons." If they did not

14   disperse within an hour of being warned, they could be subject to arrest.[23] That is,

15   the mere appearance of such an armed assemblage in public was sufficient to justify

16   legal action against them, although other provisions of the act also penalized such

17   groups who also behaved in a threatening manner.

18   Some of these American laws mirrored the British Statute of Northampton,

19   where "[t]he very fact of carrying a firearm was considered to be in terror of the

20   people and was therefore prohibited by that statute."[24] For example, the 1686 New

21

22   Making of Modern Law: Primary Sources. 1878; Ordinances of the City of Los
     Angeles, § 36; 1882 W. Va. Acts 421–22.

23   [22] 1642 N.Y. Laws 33. *Young v. Hawaii*, 992 F.3d 765, 794–795 (9th Cir.
     2021); Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public

24   Carry Laws," *Harvard Journal of Law & Public Policy* 43 (Spring 2020): 353.

25   [23] 1786 Mass. Sess. Laws, § 1.

26   [24] Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public
     Carry Laws," *Harvard Journal of Law & Public Policy*, 43(Spring 2020): 353. See
     also Joseph Blocher and Reva B. Siegel, "When Guns Threaten the Public Sphere:

27   A New Account of Public Safety Regulation Under Heller," *Northwestern
     University Law Review* 116 (2021): 164–172.

28

11

Jersey "Act against wearing Swords, &c" was adopted as a reaction to "great complaints by the inhabitants of [the] Province, that several persons [were] wearing swords, daggers, pistols, dirks, stilladoes, skeines [small Irish-derived swords], or any other unusual or unlawful weapons."[25] As noted earlier, this law penalized the "private" wearing of weapons but also their open carrying. A 1694 Massachusetts law subjected to arrest any who "shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere."[26] New Hampshire enacted a law in 1699 (and in 1708) that punished anyone who "went armed offensively" or "put his Majesty's subjects in fear."[27] Virginia enacted a measure in 1786 saying that no man was to "go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison."[28] North Carolina enacted a very similar measure in 1792, saying that no man shall "go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere."[29] Massachusetts added to its existing firearms regulations in a 1795 law that authorized justices of the peace to arrest those who "ride or go armed offensively, to the fear or terror of the good citizens."[30] In 1801, Tennessee enacted a law saying that no one was to "go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous

---

[25] An Act against Swords, &c, 1686 N.J. Laws 289, 289, ch. IX. Quoted in *Young v. Hawaii*, 992 F.3d 765, 794 (9th Cir. 2021).

[26] 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders.

[27] 1699 N.H. Laws, 1. Quoted in *Young v. Hawaii*, 794–795; New Hampshire Public Carry Prohibition (1708).

[28] 1786 Va. Acts 33, ch. 21.

[29] Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60–61 (Newbern 1792).

[30] 1795 Mass. Acts 436, ch. 2. Quoted in *Young v. Hawaii*, 799. See also 1692 Mass. Acts 10, 11–12.

weapon, to the fear or terror of any person."[31] Maine's 1821 law outlawed "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens."[32]

Note that Virginia, Massachusetts, Tennessee, and Maine all invoked some version of the old British phrase "to the terror of the people" with New Hampshire's law referencing the similar "fear" of the public. And in the Tennessee law, concealed weapons carrying was also identified as a source of "terror."

These laws, it turns out, were ubiquitous. Between the late 1600s and the early 1930s, a total of at least 36 states and territories enacted laws that penalized weapons brandishing or display (see Table 1, below). Of these, 21 states criminalized weapons brandishing[33] by combining two elements: the display of the weapon plus the manner of the display. For example, an 1840 Mississippi law said that "any person having or carrying any . . . deadly weapon" who "shall, in the presence of three or more persons, exhibit the same in a rude, angry and threatening manner, not in self-defense" shall be subject to prosecution.[34] Note the two key elements: the "exhibit" or display of the weapon combined with doing so "in a rude, angry and threatening manner," revealing criminal intent as invoked by the terms

---

[31] 1801 Tenn. Pub. Acts 260, ch. 22, § 6. Quoted in *Young v. Hawaii*, 798.

[32] 1821 Me. Laws 285, ch. 73 § 1. Quoted in *Young v. Hawaii*, 798–799.

[33] The Statutes of the State of Mississippi, 1840, § 55; 1854 Wash. Sess. Law 80, ch. 2, §30; Digest of the Laws of California, 1858; A Digest of the Laws of Pennsylvania, 1860, page 250; 1867 Ariz. Sess. Laws 21–22, § 1; 1901 Ariz. Acts 1253, Crimes Against the Public Peace, §392; 1868 Ark. Acts 218, § 12–13; 1864 Id. Sess. Laws 304, An Act Concerning Crimes and Punishments, § 40; 1870 Id. Sess. Laws 21; 1873 Nev. Stat. 118, ch. 62, § 1; A Digest of the Laws of Texas, 1873; 1875 Ind. Acts 62, § 1; The Revised Charter and Ordinances of the City of Boonville, MO., 1881, § 6; Joplin Code of 1917, Art. 67, § 1201; The General Laws of New Mexico, 1882 Page 313; The Revised Statutes of the State of Illinois, 1883; 1884 Wyo. Sess. Laws 114, ch. 67, § 1; 1885 Mont. Laws 74; 1897 Fla. Laws 59, chap. 4532, § 1; Annotated Code of the State of Iowa, 1897, Page 1898, § 4775; 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32; The Session Laws (Washington) of 1897, Page 1956; Annotated Statutes of the Indian Territory (Oklahoma), 1899; 1925 W.Va. Acts 25–30, ch. 3, § 7, pt. a; 1931 Mich. Pub. Acts 670, ch. 37, § 233.

[34] The Statutes of the State of Mississippi, 1840, § 55.

1  "rude, angry, and threatening." Of the 21 states with these laws, 11 used the

2  identical "in a rude, angry and threatening manner" phrase; 5 used the word

3  "threaten," and the others used wording including "for the purpose of frightening or

4  intimidating," "in a manner likely to cause terror," or simply "point."

5      (Table 1 follows on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE 1**

COLONIAL, STATE, AND TERRITORIAL WEAPONS BRANDISHING AND

DISPLAY LAWS IN 36 STATES, 1642-1931*

| BRANDISHING LAWS IN 21 STATES AND JURISDICTIONS | DISPLAY LAWS IN 19 STATES AND TERRITORIES |
|---|---|
| -The Statutes of the State of Mississippi, 676, 1840, § 55<br>-1854 Wash. Sess. Law 80, ch. 2, §30; 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30<br>-Digest of the Laws of California, 1858: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858, and Page 34, Image 340 (1855)<br>-A Digest of the Laws of Pennsylvania, 1860, page 250<br>-1864 Id. Sess. Laws 304, An Act Concerning Crimes and Punishments, § 40; 1870 Id. Sess. Laws 21; 1909 Id. Sess. Laws 6, § 1<br>-1867 Ariz. Sess. Laws 21-22, § 1; 1901 Ariz. Acts 1253, Crimes Against the Public Peace, § 392<br>-1868 Ark. Acts 218, § 12-13<br>-1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32; The Session Laws (Washington) of 1897, Page 1956<br>-1873 Nev. Stat. 118, ch. 62, § 1<br>-A Digest of the Laws of Texas, 1873, Annotated Page 1321, Image 291 (Vol. 2, 1873)<br>-1875 Ind. Acts 62, § 1<br>-The Revised Charter and Ordinances of the City of Boonville, MO., 1881, § 6; Joplin Code of 1917, Art. 67, § 1201<br>-The General Laws of New Mexico, 1882 Page 313<br>-The Revised Statutes of the State of Illinois, 1883, Page 453, Image 512 (1884)<br>-1884 Wyo. Sess. Laws 114, ch. 67, § 1<br>-1885 Mont. Laws 74<br>-1897 Fla. Laws 59, chap. 4532, § 1<br>-Annotated Code of the State of Iowa, 1897, Page 1898, § 4775<br>-Annotated Statutes of the Indian | -1642 N.Y. Laws 33<br>-1686 N.J. Laws 289, ch. IX<br>-1692 Mass. Acts 10, 11-12; 1694 Mass. Laws 12, no. 6, An Act for the Punishing of Criminal Offenders; 1786 Mass. Sess. Laws (included Maine); 1795 Mass. Acts 436, ch. 2; 1836 Mass. Acts 748, 750, ch. 134<br>-1699 N.H. Laws 1, 1–2; New Hampshire Public Carry Prohibition (1708)<br>-1786 Va. Acts 33, ch. 21<br>-Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina*, 60-61 (Newbern 1792); 1889 N.C. Sess. Laws 502, ch. 527, § 1<br>-1801 Tenn. Pub. Acts 260, ch. 22 § 6<br>-1821 Me. Laws 285, ch. 73 § 1<br>-Revised Statutes of the State of Delaware, 1852, § 3<br>-1880 Ga. Laws 151<br>-1883 Ind. Acts 1712, chap. 87, § 6678; 1905 Ind. Acts 687, Weapon--Drawing Dangerous, § 448<br>-1886 N.M. Laws 56, ch. 30, § 4<br>-1893 Or. Laws 29-30, § 1; 1925 Or. Laws 172-73, ch. 117, § 1<br>-The Code of Alabama, 1897, § 4342<br>-Book of Ordinances of the City of Wichita, Kansas, 1899, § 1<br>-Revised Statutes of Wyoming, 1899, Page 1252-1253, Image 1252-1253<br>-1907 Ark. Acts 810, § 1<br>-1910 S.C. Acts 694<br>-1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17. |

| Territory (Oklahoma), 1899, Second Session of the Fifty-fifth Congress, Page 228, Image 312 -1925 W.Va. Acts 25-30, ch. 3, § 7, pt. a -1931 Mich. Pub. Acts 670, ch. 37, § 233 | |

\*Sources: Duke Center for Firearms Law digital archive of gun laws, https://firearmslaw.duke.edu/repository/search-the-repository/; *Young v. Hawaii,* 992 F.3d 765, 794-95 (9th Cir. 2021); Jonathan E. Taylor, "The Surprisingly Strong Originalist Case for Public Carry Laws," *Harvard Journal of Law & Public Policy,* 43(Spring 2020): 347-56. Note that four states, Arkansas, Indiana, New Mexico, and Wyoming, appear in both lists totaling 40 laws in 36 states.

A total of 19 states enacted laws that penalized the mere display or wearing of firearms and other "deadly weapons."[35] (While 36 states enacted one of these types of laws, four states—Arkansas, Indiana, New Mexico, and Wyoming—enacted both display and brandishing laws, for a total of 40 laws in 36 states.) Several state laws in this category used the phrase "to point," as was true for a couple of laws in the brandish category, but the laws here had additional language that made clear that the intent of the person was irrelevant. Bearing in mind that the definition of brandishing is "to shake or wave (something, such as a weapon) menacingly,"[36] these latter laws contemplate a violation for the act of pointing without any evidence of malice, and to forestall possible excuses. An 1880 Georgia law, for example, made it a crime to "point or aim" a gun but added "loaded or

[35] 1642 N.Y. Laws 33; 1686 N.J. Laws 289, ch. IX; 1692 Mass. Acts 10, 11–12; 1786 Mass. Sess. Laws (included Maine); 1795 Mass. Acts 436, ch. 2; 1836 Mass. Acts 748, 750, ch. 134; 1699 N.H. Laws 1, 1–2; 1786 Va. Acts 33, ch. 21; Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina,* 60–61 (Newbern 1792): 1801; 1889 N.C. Sess. Laws 502, ch. 527, § 1; Tenn. Pub. Acts 260, ch. 22 § 6; 1821 Me. Laws 285, ch. 73 § 1; Revised Statutes of the State of Delaware, 1852, § 3; 1880 Ga. Laws 151; 1883 Ind. Acts 1712, chap. 87, § 6678; 1905 Ind. Acts 687, Weapon--Drawing Dangerous, § 448; 1886 N.M. Laws 56, ch. 30, § 4; 1893 Or. Laws 29-30, § 1; The Code of Alabama, 1897, § 4342; Book of Ordinances of the City of Wichita, Kansas, 1899, § 1; Revised Statutes of Wyoming, 1899; 1907 Ark. Acts 810, § 1; 1910 S.C. Acts 694; 1927 Haw. Sess. Laws 209-217.

[36] https://www.merriam-webster.com/dictionary/brandish

16

unloaded,"[37] a distinction not made in the brandishing laws. Another criminalized gun pointing "in jest or otherwise";[38] another added "with or without malice";[39] a fourth said "in fun or otherwise."[40] The thrust of these laws is that intent does not matter. The mere act of display is sufficient to warrant prosecution. Invariably, these laws made exceptions for justifiable arms carrying including weapons transport, travelers carrying weapons who are passing through an area, law enforcement, the military, militias, and cases of self-defense.

## IV.   WEAPONS LICENSING

Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal. . . ."[41] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today. At least 48 states (including D.C.) utilized some type of weapons licensing or equivalent policy technique (see Exhibit G).

State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances became wide-ranging and widespread in the 1800s and early 1900s. These laws mostly addressed those weapons (discussed above) that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention).

At least 29 states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time (see Exhibits F and G); 17 of those states did so in the 1800s. At least 26 states enacted laws to regulate

---

[37] 1880 Ga. Laws 151.

[38] Revised Statutes of Delaware, 1852, § 3.

[39] 1893 Or. Laws 29–30, § 1.

[40] 1889 N.C. Sess. Laws 502, ch. 527, § 1.

[41] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

17

firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

At least 14 states imposed licensing on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks.

Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder possession, handling, and transport, generally were applied to populated areas, since misuse of weapons and gunpowder posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other, as compared to sparsely populated rural areas.

These licensing categories were instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc., as examined elsewhere in this document. In some instances, licensing schemes replaced carry bans, though in other instances not. The jurisdictions enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a more flexible form of government regulation of the activities and weapons in

question.

With regard to concealed carry of pistols and other dangerous weapons, as noted earlier, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying.[42] With the spread of licensing requirements in the post-Civil War nineteenth century, however, jurisdictions were now allowing legal weapons carrying, subject to the review criteria and discretionary judgment of local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[43] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below. All of these types of laws are detailed in Exhibits F and G.

A.   **Licensing of Weapons Carrying or Possession**

In 1871, Missouri enacted a measure to license the otherwise illegal practice

_____

[42] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67. See also Exhibits B and E.

[43] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[44] St. Louis enacted its own municipal version of this law in 1892.[45] A similar measure was enacted for Kansas City, Missouri, in 1880.[46] Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[47] As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[48]).

Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[49]

---

[44] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).

[45] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

[46] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[47] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[48] https://www.thefreedictionary.com/fowling+piece.

[49] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[50]

Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission of the Captain of Police."[51] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[52]

New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[53]

This provision also allowed for non-residents who had occasional business in the city to apply for permits as well. An 1884 New York state law barred the carrying or possession of named weapons, including fighting knives and types of

1873.

[50] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

[51] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[52] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[53] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

1   clubs, from those under eighteen, unless they possessed a license to do so. Licenses

2   could only be granted for up to one year and were subject to revocation "at the

3   pleasure of the mayor."[54] A year later, the law was extended to all cities in the state

4   and included "any pistol or other firearms of any kind."[55] (This would have

5   included long guns as it did not specify only concealed carry.) In 1891, the state

6   extended permitting to Buffalo covering handguns and other dangerous weapons.[56]

7       Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any

8   person to carry" various named weapons, including a "colt" revolver, or to "carry

9   about his person, hid from common observation" any pistol or other named weapon

10  without a permit from the mayor.[57] Under the heading "License," an 1882 law

11  applying to St. Paul, Minnesota criminalized any concealed weapons carrying,

12  absent such licensing.[58]

13      An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed

14  weapon" unless the person obtained a permit from the city mayor.[59] New Haven,

15  Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless

16

17

18  [54] George R. Donnan, Annotated Code of Criminal Procedure and Penal

19  Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885)
    available at The Making of Modern Law: Primary Sources. 1884.

20      [55] George R. Donnan, Annotated Code of Criminal Procedure and Penal

21  Code of the State of New York as Amended 1882-5. Fourth Edition Page 298,
    Image 824 (1885) available at The Making of Modern Law: Primary Sources.

22      [56] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of
    Buffalo, ch. 105, tit. 7, ch. 2, § 209.

23      [57] Laws and Ordinances for the Government of the City of Wheeling, West

24  Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

25      [58] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of
    the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the
    Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884)

26  available at The Making of Modern Law: Primary Sources. 1882.

27      [59] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI,
    Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC.

28  14.

1   the person first obtained a permit either from the mayor or police superintendent.[60]

2   Oakland, California enacted a similar law in 1890 making it unlawful "to wear or

3   carry concealed about his person" a pistol or other listed weapon unless the person

4   obtained a permit from the mayor. The permit was good for up to a year and could

5   be granted to "any peaceable person whose profession or occupation may require

6   him to be out at late hours of the night to carry a concealed deadly weapon upon his

7   person."[61] The California cities of Stockton (1891)[62] and Fresno (1896)[63] did the

8   same.

9        A law passed by the U.S. Congress in 1892 for the District of Columbia

10   criminalized the concealed carry of "any deadly or dangerous weapons," including

11   pistols, unless granted a permit by a judge of the police court "for a period of not

12   more than one month at any one time, upon satisfactory proof to him of the

13   necessity for the granting thereof. . . ."[64] Florida's 1893 law made it "unlawful to

14   carry or own a Winchester or other repeating rifle or without first taking out a

15   license from the County Commissioner. . . ." In addition, the law specified that the

16   applicant "shall give a bond running to the Governor of the State in the sum of one

17   hundred dollars, conditioned on the proper and legitimate use of the gun with

18   sureties to be approved by the County Commissioners," along with "a record of the

19   name of the person taking out such license, the name of the maker of the firearm so

---

[60] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[61] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[62] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[63] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[64] Washington D.C. 27 Stat. 116 (1892), Ch. 159.

23

1  licensed to be carried and the caliber and number of the same."[65]

2  Montana enacted a wide-ranging state licensing law in 1895 that threatened

3  imprisonment and fines for anyone "who brings into this state an armed person or

4  armed body of men for the preservation of the peace or the suppression of domestic

5  violence, except at the solicitation and by the permission of the legislative assembly

6  or of the governor. . . ."[66]

7  A state law in Nebraska granted the mayor of Lincoln the authority to issue

8  concealed carry weapons licenses good for a year "at his pleasure" in 1895.[67] The

9  city of Spokane, Washington criminalized the concealed carrying of "either a

10  revolver, pistol or other fire-arms" unless persons obtained a "special written permit

11  from the Superior Court" to do so.[68] Milwaukee, Wisconsin enacted a permitting

12  system in 1896 for persons to carry otherwise barred various dangerous weapons

13  including "any pistol or colt" if the city police chief granted a license if "it is

14  necessary for the personal safety of such person or for the safety of his property or

15  of the property with which he may be entrusted, to carry such weapon." The chief

16  could also "revoke such permit at any time."[69]

17  In the twentieth century, permitting accelerated, spread, and broadened. In

18
19  [65] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

20  [66] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal
21  Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available
22  at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

23  [67] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.
24
25  [68] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-310, Ordinance No. A544, Sec. 1. 1895.

26  [69] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix
27  (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.
28

1905 New Jersey enacted a state law licensing concealed weapons carrying for a
year "unless sooner revoked by the officer or body granting the same."[70] Licensing
was extended to long guns—machine guns and automatic rifles—in New Jersey in
1927[71] and 1934.[72] (A number of the 32 states that enacted anti-machine gun laws
in the 1920s and 1930s made exceptions for possession via licensing. See Exhibit
D.)

　　　In 1906 a Massachusetts state law noted that prosecution for carrying "a
loaded pistol or revolver" did not apply to those with a license.[73] It extended
licensing to a variety of guns in 1927.[74] In 1908 Virginia enacted a dangerous
weapons concealed carry permit law, with permits granted for one year "upon a
written application and satisfactory proof of the good character and necessity of the
applicant to carry concealed weapon."[75] It extended the permitting process in
1926.[76] Georgia enacted a detailed handgun permitting system in 1910.[77]
Thereafter, permitting was enacted in states (not including those that enacted
permitting in the 1800s, most of which also enacted permitting laws in the 1900s as

---

[70] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[71] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[72] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[73] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[74] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[75] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[76] 1926 Va. Acts. 285-87, Ch. 158.

[77] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

1   well) including Hawaii,[78] Indiana,[79] Michigan,[80] New Hampshire,[81] North

2   Carolina,[82] North Dakota,[83] Ohio,[84] Oregon,[85] Pennsylvania,[86] Rhode Island,[87] and

3   South Carolina.[88]

4   **B.    Permits for Firearms Discharge or Use of Explosives**

5          As noted above, at least 26 states enacted licensing mechanisms to allow

6   firearms and like discharges under certain circumstances. Generally speaking,

7   firearms discharging licensing pertained to any firearm, not just handguns. From

8   the 1700s to 1860, at least 13 states enacted discharge licensing authority to local

---

[78] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[79] 1925 Ind. Acts 495, 495-98.

[80] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[81] 1923 N.H. Laws 138.

[82] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[83] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[84] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[85] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[86] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[87] 1927 (January Session) R.I. Pub. Laws 256.

[88] 1934 S.C. Acts 1288.

officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various city activities including "firing a Gun without license."[89] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[90] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[91] A 1750 law did the same for the District of Southwark,[92] as did a colony-wide law also in 1750.[93] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[94]

Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun

---

[89] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[90] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[91] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[92] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[93] 1750 Pa. Laws 208.

[94] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

1  firing and fireworks "at times of public rejoicing" and at specified locations.[95] New

2  Hampshire enacted a discharge permit system for Portsmouth in 1823.[96] New York

3  State enacted a law in 1824 that allowed the Schenectady mayor or other city

4  officials to grant permission for discharge of any gun or various fireworks.[97]

5  Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that

6  "the quiet of any of the inhabitants may be disturbed, or their lives and safety

7  endangered."[98]

8  　　New London, Connecticut singled out "some public day of review" in an 1835

9  law as a permissible reason for issuing a discharge permit,[99] and New Haven

10  enacted a similar law in 1845.[100] The same was enacted for Quincy, Illinois in

11  1841,[101] Jeffersonville, Indiana in 1855,[102] and Richmond, Virginia in 1859.[103]

12  ─────────────

13  [95] Alexander Edwards, Ordinances of the City Council of Charleston, in the
State of South-Carolina, Passed since the Incorporation of the City, Collected and
14  Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802)
available at The Making of Modern Law: Primary Sources. 1802.

15  [96] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the
Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

16  [97] Laws of the State of New-York, Relating to the City of Schenectady: And
17  the Laws and Ordinances of the Common Council of the City of Schenectady Page
58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

18  [98] The Act of Incorporation, and the Ordinances and Regulations of the Town
19  of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at
The Making of Modern Law: Primary Sources. 1823.

20  [99] The By-Laws of the City of New London, with the Statute Laws of the
21  State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855)
available at The Making of Modern Law: Primary Sources. 1835.

22  [100] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire
Arms in the City of New Haven, chap. 10.

23  [101] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to
24  Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto
Page 47, Image 47 (1841) available at The Making of Modern Law: Primary
25  Sources. 1841.

[102] W. G. Armstrong, The Ordinances and Charter of the City of
26  Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern
Law: Primary Sources. 1855.

27  [103] The Charters and Ordinances of the City of Richmond, with the
28  Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859)

Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits F and G).

## C.   Commercial Licensing

As noted, a total of at least 21 states enacted commercial licensing laws for firearms-related commercial activities with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries). The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans, including guns or other weapons, unless they obtained a license from the governor.[104] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[105] An 1854 law for San Francisco, California licensed commercial shooting galleries.[106] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements.

## D.   Licensing Restrictions on Gunpowder

Gunpowder was widely and extensively regulated in the colonies and states.

available at The Making of Modern Law: Primary Sources. 1859.

[104] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[105] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[106] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

1   In fact, with one exception, every state in the country enacted one or more

2   gunpowder laws from the seventeenth century through the start of the twentieth

3   century.[107] One element of this regulation was gunpowder licensing, extending

4   either to its sale or its transport, acquisition, handling , or storage, or sometimes all

5   of these; at least 21 states enacted such licensing from the 1700s through the early

6   1900s.

7   **E.     Weapons Sellers Recording Purchases**

8          Aside from direct licensing of weapons purchasers by a government official or

9   entity, at least 15 states required those who sold or otherwise transferred guns

10  (mostly handguns) or other weapons to others to record information about the

11  buyer, with that information to be maintained and subject to possible later

12  examination. This regulatory mechanism put the burden of information collection

13  and maintenance on the seller or dealer, rather than directly on the government,

14  though it served the same purpose: to acquire and maintain information about those

15  who obtained the weapons in question and when, for future reference or inspection

16  by government officials or others. In some instances these requirements existed

17  along with direct governmental licensing.

18         In 1885, Illinois enacted this registration requirement for weapons dealers:

19         All persons dealing in deadly weapons, hereinbefore mentioned, at retail
           within this State shall keep a register of all such weapons sold or given away
20         by them. Such register shall contain the date of the sale or gift, the name and
           age of the person to whom the weapon is sold or given, the price of the said
21         weapon, and the purpose for which it is purchased or obtained. The said
22         register shall be in the following form. [Form of Register] Said register is to
23

24         [107] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law,
           Fire Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8,
25         in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in
           American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller)
26         (Oxford University Press, Forthcoming), Available at SSRN:
           https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491; Saul
27         Cornell and Nathan DeDino, "A Well Regulated Right: The Early American
           Origins of Gun Control," *Fordham Law Review* 73(2004): 510.
28

be kept open for inspection of the public. . . .[108]

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

> Every individual, firm or corporation engaged . . . in the retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[109]

A 1911 New York law required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[110] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.

## F.   Licensing Pertaining to Named Groups

The licensing of "Named Groups" referenced in Exhibit G includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of weapons to Native Americans might seem

---

[108] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

[109] 1911 Colo. Sess. Laws 408, Section 3.

[110] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

31

paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also traded arms with Natives throughout this entire period, as they sought profitability, access to highly desired goods made available by Indians, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[111]

As for licensing related to enslaved persons and free persons of color (listed separately in Exhibit G), it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons. The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited, controlled circumstances.

## G.   The Lessons of Licensing

The foregoing analysis demonstrates that licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons, extending to gun ownership as well as every aspect of sales. With some exceptions, the primary focus was on handguns for the obvious reason that they

---

[111] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

1   were the weapons that posed the most significant threat to public safety and good

2   order from the 1700s through the early 1900s. Long guns posed no similar threat

3   during this time, even though some anti-carry/licensing laws extended to all

4   firearms, not just concealable handguns. (Note that firearm discharge licensing laws

5   generally applied to all guns, not just handguns.)

6       Moreover, when long guns did appear in appreciable numbers in civil society

7   and began to pose a criminal and public safety problem, prohibitions and licensing

8   were rapidly enacted. The long guns in question—the Tommy gun, the BAR, and

9   sawed-off shotguns (i.e. long guns modified after purchase)—were restricted in at

10  least 32 states in the 1920s and early 1930s, and between 8 and 11 states imposed

11  similar restrictions on semi-automatic long guns during this same time (see Exhibits

12  B and D). Given the wide-ranging and extensive nature of licensing in America in

13  the 1800s and early 1900s, the notion of extending licensing to long guns when the

14  need or demand to do so arose is, in regulatory terms, an incrementally small step.

15  **V.   CONCLUSION**

16      This report examines three broad types of laws, spanning nearly 300 years of

17  American history: laws that restricted weapons carrying (including concealed carry

18  in 50 states, open carry in at least 29 states, and long gun carry in at least 22 states);

19  laws that criminalized weapons brandishing and display in at least 36 states; and

20  laws providing for the licensing of some of these activities enacted in 47 states.

21  These numerous and varied laws, and types of laws, make clear that the default in

22  American history was weapons regulation and restriction, especially once

23  individuals left their domiciles with a weapon.

24  ///

25  ///

26  ///

27  ///

28  ///

1   ///

2 I declare under penalty of perjury under the laws of the United States of America

3 that the foregoing is true and correct.

4                        Executed on June 8, 2023, at Williamsburg, Virginia.

5

6

7

8

9                               Robert Spitzer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ER-1019

# Exhibit A

October 2022

## Curriculum Vitae

### Robert J. Spitzer

### Distinguished Service Professor, Emeritus
### SUNY Cortland

Address:    5333 Center St.
Alexandria, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

Education:    A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

Positions Held:

Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-2021.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, Administrative Science Quarterly, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

1

Honors:

> Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
>
> Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
>
> Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
>
> Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
>
> Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
>
> Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
>
> Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
>
> Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
>
> SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
>
> Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
>
> Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
>
> Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
>
> Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
>
> Who's Who in the World, 1996.
>
> Dictionary of International Biography, 1995.
>
> Who's Who in the East, 1995-96; 1997-98
>
> Ex officio member, Cortland County Bicentennial Committee, 1987-89.
>
> Chair, SUNY Cortland Bicentennial Committee, 1987-89.
>
> Phi Eta Sigma, SUNY Cortland, 1994.
>
> Phi Kappa Phi, SUNY Cortland, 1990.
>
> Men of Achievement (1986)
>
> Contemporary Authors, vol. 112 (1985) and subsequent updates.
>
> International Authors and Writers Who's Who, 1985-present.
>
> International Who's Who in Education, Winter 1985-86.
>
> Herbert H. Lehman Graduate Fellowship, 1975-79.
>
> Who's Who Among Students in American Universities and Colleges, 1974-75.
>
> Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

4

<u>Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning</u> (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

<u>We the People: Essentials Edition</u>, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

<u>Gun Control: A Documentary and Reference Guide</u> (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

<u>The Gun Debate: An Encyclopedia of Gun Rights and Gun Control</u>, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

<u>Guns across America: Reconciling Gun Rules and Rights</u> (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

<u>The Gun Dilemma: How History Is Against Expanded Gun Rights</u> (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, <u>Series on American Constitutionalism</u>, SUNY Press, 1996-present. Books include:
    Daniel Hoffman, <u>Our Elusive Constitution</u>, (1997)
    Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment</u>, (1999)
    Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture</u>, (1999)
    Robert Spitzer, ed., <u>Politics and Constitutionalism</u>, (2000)
    Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
    Ian Brodie, <u>Friends of the Court</u> (2002)
    Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)
    Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).

Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).

Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).

Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).

Clyde H. Ray, John Marshall's Constitutionalism (2019).

Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).

Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
Mary Stuckey, <u>Political Rhetoric</u> (2015)
Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
Nancy Maveety, <u>Picking Judges</u> (2016)
Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
Andrew L. Stigler, <u>Governing the Military</u> (2019)
Graham G. Dodds, <u>The Unitary Presidency</u> (2020)

Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.

<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar,

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in <u>The Executive Office of the President</u>, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the <u>Oxford Historical Guide to American Government</u> (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in <u>Liberty Under Law</u>, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

"Multi-Party Politics in New York," in <u>Multi-Party Politics and American Democracy</u>, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, <u>We the People</u> (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in <u>Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in <u>The Encyclopedia of American Third Parties</u>, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in <u>Prayers in the Precincts</u>, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in <u>The Clinton Scandal and the Future of American Politics</u>, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in <u>Politics and Constitutionalism</u>, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the <u>Encyclopedia of American Political History</u>, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in <u>The Constitution and Its Amendments</u>, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in <u>The Second Amendment in Law and History</u>, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in <u>The Oxford Companion To United States History</u> ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in <u>The Presidency and the Law: The Clinton Legacy</u>, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

9

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," <u>Gun Violence: Opposing Viewpoints</u>, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," <u>Presidential Power in America</u>, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," <u>Encyclopedia of American Government and Civics</u> ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," <u>Encyclopedia of Political Communication</u> ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in <u>Leadership at the Crossroads</u>, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in <u>Encyclopedia of Issues in U.S. Public Policy</u>, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in <u>Winning the Presidency 2008</u>, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in <u>Debating Reform: Conflicting Perspectives on How to Fix the American Political System</u>, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in <u>Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi</u>, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New

11

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian

12

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Gun Control (Baltimore: Johns Hopkins University Press, 2023, forthcoming).


Articles:

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985):

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Public Policy Theories, Models, and Concepts, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," NEWS for Teachers of Political Science, 53 (Spring, 1987).

"But for A Single Vote...," New York Delegate, July, 1987. Abridged version appeared on editorial page of the Rochester Times Union, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", Election Politics, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS:  Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS:  Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

14

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15. Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," <u>Gonzaga Law Review</u> 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," <u>Government, Law and Policy Journal</u> 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," <u>Presidential Studies Quarterly</u> 42(September 2012): 637-55.

"Gun Laws," <u>New York State Bar Association Journal</u> 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," <u>Presidents and Executive Politics Report</u> 35(Fall 2012).

"Writing the Gun Debate," <u>Los Angeles Review of Books</u>, February 10, 2013.

"A Historical Look at Gun Control in America," <u>WCNY Magazine</u>, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," <u>PS: Political Science and Politics</u> 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," <u>The Islamic Monthly</u>, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," <u>White House Studies</u> 12(October 2013): 125-46.

"A Look at the 2014 Elections," <u>WNCY Magazine</u>, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," <u>Albany Law Review</u>, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," <u>Social Science Docket</u>, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," <u>The Critique</u> (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," <u>Law and Contemporary Problems</u> 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" <u>Items: Insights from the Social Sciences</u>, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.


Op-Ed Articles

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

"Assault Weapons Ban," Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

17

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

19

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

20

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

21

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

23

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

24

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs,*" *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-*

26

*Standard,* November 4, 2022.

<u>Testimony, Briefs, and Reports</u>:
"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and <u>Sine</u> <u>Die</u> Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA,

February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

Papers and Presentations (not including those given on the Cortland campus):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington,

30

D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the <u>Washington Post</u>, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in <u>The Politics of Gun Control</u>," Gettysburg College, Gettysburg,

31

PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute

32

for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

33

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

34

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

35

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

36

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.


Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans: An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

39

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

40

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA,

41

Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

42

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

43

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, in PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H.

Richard Uviller and William G. Merkel, <u>Journal of American History</u>, March 2004.

<u>Power Without Persuasion: The Politics of Direct Presidential Action</u>, by William G. Howell, <u>Perspectives on Politics</u>, June 2004.

<u>The George W. Bush Presidency: An Early Assessment</u>, ed. By Fred Greenstein, <u>Perspectives</u>, Spring 2004.

<u>The Invention of the United States Senate</u>, by Daniel Wirls and Stephen Wirls, <u>Perspectives</u>, Summer 2004.

<u>The Mythic Meanings of the Second Amendment</u>, by David C. Williams, <u>Law and Politics Book Review</u>, April 2004.

<u>Empowering the White House</u>, by Karen M. Hult and Charles E. Walcott, <u>Rhetoric and Public Affairs</u>, Fall 2005.

<u>Defining Americans:  The Presidency and National Identity</u>, by Mary E. Stuckey, <u>Perspectives</u>, Spring 2005.

<u>Presidential Leadership: Rating the Best and Worst in the White House</u>, ed. By James Taranto and Leonard Leo, <u>Rhetoric and Public Affairs</u>, Summer 2006.

<u>A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America</u>, by Saul Cornell, <u>American Journal of Legal History</u>, October 2006.

<u>The Founders' Second Amendment: Origins of the Right to Bear Arms</u>, by Stephen Halbrook, <u>Law and Politics Book Review</u> 18(October 2008).

<u>Out of the Shadow: George H.W. Bush and the End of the Cold War</u>, by Christopher Maynard, <u>Journal of American History</u> (September 2009).

<u>Guns, Democracy, and the Insurrectionist Idea</u>, by Joshua Horwitz, <u>Law and Politics Book Review</u> 19(June 2009).

<u>Talking Together</u>, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

<u>Accidental Presidents</u>, by Philip Abbott, <u>Presidential Studies Quarterly</u>, June 2010.

<u>The Co-Presidency of Bush and Cheney</u>, by Shirley Anne Warshaw, <u>Congress and the Presidency</u>, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post,

47

Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.


Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.


Teaching Areas:

American Government:  courses taught include Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

48

<u>Teaching-Related Awards</u>:

> Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

<u>Other Professional Activities</u>

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, <u>PRG Report</u>, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st
Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics,
American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-
Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press,
University of Chicago Press, University of California Press, Princeton University Press, Cornell
University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan,
University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press,
HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of
Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge,
University of Alabama Press, American Political Science Review, PS, Comparative Politics,
American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political
Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science
Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative
Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal,
Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics
and Policy, and the National Science Foundation.

Selected Community Service

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present;
for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County,
2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010
Project, 1996.

Case 2:19-cv-00617-KJM-AC   Document 90-6   Filed 08/18/23   Page 86 of 347

Exhibit B

ER-1072

**EXHIBIT B**

EXHIBIT B

FIREARM HARDWARE RESTRICTIONS TABLE
(YEARS OF ENACTMENT)

| STATE | TRAP GUNS[1] | CONCEALED CARRY RESTRICT[2] | OPEN/ ANY CARRY BARRED | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | 1837 | | | |
| Alaska | | 1896 | | | | |
| Arizona | | 1889 | 1867, 1889, 1901 | | | |
| Arkansas | | 1820, 1837 | 1875, 1881 | | | |
| California | | 1850, 1864 | 1861, 1878, 1917 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | | |
| Connecticut | | 1890, 1923 | 1890 | | | |
| Delaware | | 1852 | | 1931 | | |
| District of Columbia | | 1857, 1871 | 1858 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1838, 1868 | 1913[3], 1933 | | |
| Georgia | | 1837 | 1837, 1873 | | | |
| Hawaii | | 1913 | 1852, 1913 | 1933 | | 1933 |

[1] Sometimes trap guns were also referred to as "infernal machines."

[2] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[3] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

| State | | | | | | |
|---|---|---|---|---|---|---|
| Idaho | | 1909 | | | | |
| Illinois | | 1881 | | 1931 | 1931† | 1931 |
| Indiana | | 1820 | | 1927, 1929 | | 1927, 1929 |
| Iowa | | 1882, 1887, 1897, 1929 | | 1927 | | |
| Kansas | | 1901 | 1868, 1881, 1899 | 1933 | | 1933 |
| Kentucky | | 1812, 1813 | | | | |
| Louisiana | | 1813 | 1870 | 1932 | 1932† | 1932 |
| Maine | | 1840 | | | | |
| Maryland | 1910 | 1872 | 1874, 1886 | 1927 | 1927 | 1927 |
| Massachusetts | | 1751 | 1891, 1903, 1927 | 1927 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | 1927, 1929 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | | 1933 | 1933 | 1933, 1933 |
| Mississippi | | 1878 | 1878 | | | |
| Missouri | 1891[4] | 1873 | 1923 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | | |
| Nebraska | | 1881 | 1872 | 1929 | | |
| Nevada | | 1881, 1925 | | | | |
| New Hampshire | 1915 | | | | | |
| New Jersey | 1686 | 1771 | 1871, 1873 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | | |

[4] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

| State | | | | | | |
|---|---|---|---|---|---|---|
| New York | 1870[5] | 1891 | | 1931, 1933 | | |
| North Carolina | | 1792 | | | | 1917 |
| North Dakota | 1891, 1895 | 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | 1890, 1891 | | | 1933 |
| Oregon | 1925 | 1853 | 1898, 1917 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1901 | 1934 | 1934[†] | 1934 |
| South Dakota | 1909 | 1877 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | 1867, 1869, 1879, 1881, 1893 | | | |
| Texas | | 1870 | 1871, 1879, 1879 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | 1877 | | | |
| Vermont | 1884, 1912 | 1892, 1895, 1897 | 1895 | 1923 | | 1923 |
| Virginia | | 1794, 1838, 1847, 1870, 1877, 1884 | | 1934 | 1934 | 1934 |

[5] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

Case 2:19-cv-00617-KJM-AC   Document 90-6   Filed 08/18/23   Page 92 of 347

| | | | | | | |
|---|---|---|---|---|---|---|
| Washington State | 1909 | 1887, 1908 | | 1933 | | 1933 |
| West Virginia | | 1881 | 1870 | 1882, 1891, 1925 | 1925 | |
| Wisconsin | 1872, 1921 | 1858 | | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1893 | 1933 | | |
| NUMBER OF STATES | 16 | 50 (inc. D.C.) | 30 | 32 | 8–11 | 23 |
| NUMBER OF LAWS | 24 | 65 | 55 | 39 | 12 | 26 |

Exhibit C

**EXHIBIT C**

1

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)

| STATE[1] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871, 1875 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |
| District of Columbia | 1858,1871, 1892 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,[†]1838 ,1847,1868 ,1893[†] | | 1888 | | 1868, 1888 | | 1887 | |

2

[1] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | 1864 |
| Idaho | 1864† 1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | | | 1812, 1813 | |
| Louisiana | 1870 | | | | 1859 | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884† | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874, 1884, 1886, 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836† | 1927, 1929 | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838, 1878 | |
| Missouri | 1871,1897, 1917,1923 | | 1871, 1897, 1923 | 1818, 1923 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

| | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
|---|---|---|---|---|---|---|---|---|
| Nevada | | | | | | | | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905† | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852†1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

Case 2:19-cv-00617-KJM-AC   Document 90-6   Filed 08/18/23   Page 98 of 347

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1892,1895† | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854,1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1870,1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883,1896 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884,1890 1899,1925 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 136 | 25 | 44 | 17 | 79 | 21 | 66 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

# Exhibit D

# EXHIBIT D

EXHIBIT D

MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

## CALIFORNIA:

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

 § 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

1

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## DELAWARE:

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.

On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

## DISTRICT OF COLUMBIA:

District of Columbia 1932:

1932, Public-No. 275-72D Congress

CHAPTER 465

H.R. 8754

AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.

DEFINITIONS

2

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

## ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - off shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,
machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,
or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

6

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

**FLORIDA:**

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

## HAWAII:

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And
Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation
shall own, possess, sell, offer for sale or transport any firearm of the kind
commonly known as a machine gun or any shell cartridge or bomb containing or
capable of emitting tear gas or any other noxious gas. Provided, however, that
nothing in this Act contained shall prohibit the sale to, purchase by, or possession
of such firearms by any city and county, county, territorial or federal officer where
such firearms are required for professional use in the discharge of his duties, nor to
the transportation of such firearms for or on behalf of police departments and
members thereof, sheriffs, or the military or naval forces of this Territory or of the
United States and "Provided, further that nothing in this Act shall prohibit police
departments and members thereof, sheriffs, or the military or naval forces of the
territory or of the United States from possessing or transporting such shells,
cartridges or bombs for professional use in the discharge of their duties. "The term
'shell, cartridge or bomb', as used in this Act shall be construed to apply to and
include all shells, cartridges, or bombs capable of being discharged or exploded
through or by the use of percussion caps, fuses, electricity, or otherwise, when such
discharge or explosion will cause or permit the release or emission of tear gases.
The term 'machine gun' as used in this Act shall be construed to apply to and
include machine rifles, machine guns and submachine guns capable of
automatically and continuously discharging loaded ammunition of any caliber in
which the ammunition is fed to such guns from or by means of clips, disks, drums,
belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of
Firearms and Ammunition, § 2.
Definitions. "Firearm" as used in this Act means any weapon, the operating force
of which is an explosive. This definition includes pistols, revolvers, rifles,
shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs,
cannon and sub-machine guns. The specific mention herein of certain weapons
does not exclude from the definition other weapons operated by explosives.
"Crime of violence" as used in this Act means any of the following crimes,
namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those
certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol"
or "revolver" as used in this Act, means and includes any firearm of any shape
whatsoever with barrel less than twelve inches in length and capable of discharging
loaded ammunition or any noxious gas. "'Person" as used in this Act includes

8

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

9

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

**INDIANA:**

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.
Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

**IOWA:**

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.
§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.
§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

**KANSAS:**

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.
§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

12

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

14

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW YORK:

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

**NORTH CAROLINA:**

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

**NORTH DAKOTA:**

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO:

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

21

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.

§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz. murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as
follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or
similar weapon with overall less than twenty-six inches, but shall not include any
pistol without a magazine or any pistol or revolver designed for the use of blank
cartridges only. "machine gun" shall include any weapon which shoots
automatically and any weapon which shoots more than twelve shots semi-
automatically without reloading. "Firearm shall include any machine gun or pistol.
. . "Crime of violence" shall mean and include any of the following crimes or any
attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem,
assault or battery involving grave bodily injury, robbery, burglary, and breaking
and entering. "sell" shall include let or hire, give, lend and transfer, and the word
"purchase" shall include hire, accept and borrow, and the expression "purchasing"
shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of
violence shall purchase own, carry or have in his possession or under his control
any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns:
§§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State
of South Carolina: For the purposes of this Act the word "machine gun" applies to
and includes all firearms commonly known as machine rifles, machine guns and
sub-machine guns of any caliber whatsoever, capable of automatically discharging
more than eight cartridges successively without reloading, in which the
ammunition is fed to such gun from or by means of clips, disks, belts or other
separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or
persons in any manner to transport from one place to another in this State, or from
any railroad company, or express company, or other common carrier, or any
officer, agent or employee of any of them, or any other person acting in their
behalf knowingly to ship or to transport form one place to another in this State in
any manner or by any means whatsoever, except as hereinafter provided, any
firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for
any person to store, keep, possess, or have in possession, or permit another to store,

26

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

27

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

## TEXAS:

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

29

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**<u>VIRGINIA:</u>**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

31

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## WEST VIRGINIA:

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b. It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b. (b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

32

powered rifle, or any gun of a similar kind or character, or any ammunition
therefor, except on his own premises or premises leased to him for a fixed term,
until such person shall have first obtained a permit from the superintendent of the
department of public safety of this state, and approved by the governor, or until a
license therefore shall have been obtained from the circuit court as in the case of
pistols and all such licenses together with the numbers identifying such rifle shall
be certified to the superintendent of the department of public safety. Provided,
further, that nothing herein shall prevent the use of rifles by bona fide rifle club
members who are freeholders or tenants for a fixed term in this state at their usual
or customary place of practice, or licensed hunters in the actual hunting of game
animals. No such permit shall be granted by such superintendent except in cases of
riot, public danger, and emergency, until such applicant shall have filed his written
application with said superintendent of the department of public safety, in
accordance with such rules and regulations as may from time to time be prescribed
by such department of public safety relative thereto, which application shall be
accompanied by a fee of two dollars to be used in defraying the expense of issuing
such permit and said application shall contain the same provisions as are required
to be shown under the provisions of this act by applicants for pistol licenses, and
shall be duly verified by such applicant, and at least one other reputable citizen of
this state. Any such permit as granted under the provisions of this act may be
revoked by the governor at his pleasure upon the revocation of any such permit the
department of public safety shall immediately seize and take possession of any
such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and
character, held by reason of said permit, and any and all ammunition therefor, and
the said department of public safety shall also confiscate any such machine gun,
sub-machine gun and what is commonly known as a high powered rifle, or any gun
of similar kind and character and any and all ammunition therefor so owned,
carried, transported or possessed contrary to the provisions of this act, and shall
safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to
Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be
punished by imprisonment in the state prison for a term the minimum of which
shall be one year and the maximum fifteen years. Nothing in this section shall be
construed as prohibiting police officers, national guardsmen, sheriffs and their
deputies from owning, using or having in their possession a machine gun while
actually engaged in the performance of their lawful duties; nor shall any person or

33

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

34

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.
No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## WYOMING:

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.
§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.
§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.
§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

35

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

Exhibit E

ER 1122

**EXHIBIT E**

**EXHIBIT E**

**DANGEROUS WEAPONS LAWS**

## ALABAMA

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources.  1805
Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife,

2

by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1

That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.

Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed

3

by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.
Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which

4

the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such

5

Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other

7

kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).

Race and Slavery Based | Arkansas | 1835

§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and

8

receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

9

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.

That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.

[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | California | 1853

Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

10

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .


Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

11

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

12

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

13

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

14

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## **CONNECTICUT**

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. Good Order and Decency § 192.

Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

16

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858.
It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures.

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons || 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

Washington D.C. 27 Stat. 116 (1892)
CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

17

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment

18

in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

19

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.

An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

20

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.

Passed 5th February 1838.—Approved 10th Feb. 1838.

https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]
Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the

21

public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.
If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.
§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.
§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum

22

not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided, nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or

23

imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more

24

than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or
her, any pick-lock, crow, key, bit, or other instrument or tool, with intent
feloniously to break and enter into any dwelling house, store, warehouse, shop or
other building containing valuable property, or shall be found in any of the
aforesaid buildings with intent to steal any goods and chattels, every such person
so offending, shall, on conviction, be deemed a vagrant, and punished by
confinement in the penitentiary, for any term not exceeding two years. And if any
person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive
weapon, with intent to assault any person, every such person, on conviction, shall
be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding
three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874.
Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other
General Statutes of the State, in Force on the First Day of July, 1874 Page 360,
Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously
disturbs the peace and quiet of any neighborhood or family, by loud or unusual
noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling,
challenging to fight or fighting, or whoever shall carry concealed weapons, or in a
threatening manner display any pistol, knife, slungshot, brass, steel or iron
knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park
[Illinois] Together with Its Charter and General Laws Affecting Municipal
Corporations; Special Ordinances and Charters under Which Corporations Have
Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court
Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64
(1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or
concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-
knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by
written permission of the Captain of Police.

26

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of
Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments
Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882,
Being All the General Statutes of the State, in Force on the First Day of December,
1882 Page 375, Image 392 (1882) available at The Making of Modern Law:
Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named,
by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give,
loan, hire or barter to any minor within this state, any pistol, revolver, derringer,
bowie knife, dirk or other deadly weapon of like character, capable of being
secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in
any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883)
available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver,
derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon,
or any other deadly weapon of like character, capable or being concealed upon the
person, or whoever shall in a threatening or boisterous manner, flourish or display
the same, shall be fined not less than one dollar, nor more than one hundred
dollars; and in addition to the said penalty shall, upon the order of the magistrate
before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38
(1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General
Assembly. That whoever shall have in his possession, or sell, or give or loan, hire
or barter, or whoever shall offer to sell, give loan, have or barter, to any person
within this state, any slung shot or metallic knuckles, or other deadline weapon of
like character, or any person in whose possession such weapons shall be found,
shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry
any gun, powder, shot, club or other weapon whatsoever, offensive or defensive,
but all and every gun weapon and ammunition found in the possession or custody

27

of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach,

28

locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that

29

this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.

## **KANSAS**

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

30

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon

31

conviction thereof before the police court, be fined in any sum not less that twenty-five nor more than one hundred dollars.

1881 Kan. Sess. Laws 92, c. 37, § 24.
The Council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise, and cause to be arrested and imprisoned, fined or set to work, all vagrants, tramps, confidence men and persons found in said city without visible means of support or some legitimate business.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and

32

Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887
Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

Bruce L. Keenan, Book of Ordinances of the City of Wichita Published by Authority of a Resolution Adopted by the City Council April 24, 1899, under the Direction of Judiciary Committee and City Attorney, and Formally Authorized by Ordinance No. 1680 Page 46, Image 70 (1900) available at The Making of Modern Law: Primary Sources. 1899
Ordinances of the City of Wichita, Carrying Unconcealed Deadly Weapons, § 2. Any person who shall in the city of Wichita carry unconcealed, any fire-arms, slungshot, sheath or dirk knife, or any other weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined not less than one dollar nor more than twenty-five dollars. Using or Carrying Bean Snapper, § 3. Any person who shall, in the city of Wichita, use or carry concealed or unconcealed, any bean snapper or like articles shall upon conviction be fined in any sum not less than one dollar nor more than twenty-five dollars. Carrying Concealed Deadly Weapons, § 4. Any person who shall in the city of Wichita, carry concealed about his person any fire-arm, slung shot, sheath or dirk knife, brass knuckles, or any weapon, which when used is likely to produce death or great bodily harm, shall upon conviction, be fined in any sum not exceeding one hundred dollars.

## **KENTUCKY**

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every

33