No. 24-565

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD
*Plaintiff-Appellant*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee*,

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## OPENING BRIEF OF APPELLANT

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................... i

INTRODUCTION ................................................................................ 1

JURISDICTION.................................................................................... 2

ISSUE PRESENTED............................................................................. 2

CONSTITUTIONAL AND STATUTORY PROVISIONS...................................... 3

STATEMENT OF THE CASE.................................................................. 4

ARGUMENT ..................................................................................... 7

Standard of Review........................................................................... 7

I. California's Tradition of Unregulated Open Carry ............................... 7

II. California's Handgun Licensing Scheme........................................... 8

III. Effect on Appellant ...................................................................... 9

IV. Procedural History ....................................................................... 9

Summary of the Arguments ................................................................ 13

I. APPELLANT SATISFIED HIS BURDEN UNDER THE *BRUEN* TEST ........ 16

     A. Standard to be Applied in Second Amendment Challenges............ 16

     B. Appellant's Conduct is Covered by the Plain Text......................... 16

II. CALIFORNIA FAILED TO IDENTIFY AN HISTORICAL TRADITION OF IMPOSING CRIMINAL PENALTIES FOR PEACEFUL OPEN CARRY ....... 17

    A. The Supreme Court Rejected 'Nuanced Judgments' From Inferior Federal Courts .................................................................. 18

    B. Penal Code sections 25850 and 26350 Are Overbroad Means of Addressing The Same Perceived Societal Problem in *Heller*, *McDonald* and *Bruen*: Firearm Violence in Urban Areas ............ 21

    C. The District Court Attempts to Turn a Molehill into a Mountain ...................................................................................... 23

    D. Imposing Criminal Penalties For 'Peaceful Carry' Was Never a 'Tradition' ................................................................................ 24

III. *HELLER* LAID THE DEFINITION OF THE TERM 'BEAR' TO REST; THE PLAIN TEXT ENCOMPASSES OPEN AND CONCEALED CARRY ............ 25

IV. MODERN DAY LICENSING REQUIREMENTS DO NOT CONSTITUTE AN HISTORICAL TRADITION ......................................................... 26

    A. Licensing a Pre-Existing Right Is Repugnant To The Constitution ............................................................................. 26

    B. California's Historians Identify No Tradition of Licensing Open Carry .......................................................................... 29

    C. *Bruen* Did Not Apply its Own Test to Licensing Requirements ......................................................................... 30

V. SUPREME COURT JURISPRUDENCE LOOKS TO THE FOUNDING ERA TO DETERMINE THE SCOPE AND MEANING OF THE BILL OF RIGHTS; 1868 IS MERELY TO CONFIRM WHAT THE COURT KNOWS ................. 31

    A. "Not All History is Created Equal" ......................................... 31

    B. The District Court Cites No Supreme Court Case That Looks to 1868 to Interpret the Bill of Rights ........................................... 34

C. The Bill of Rights' Scope and Meaning Remain the Same in 1868 ...................................................................... 34

VI. POST-RATIFICATION DISCRIMINATORY LAWS ARE NOT HISTORICAL ANALOGUES FOR REGULATING 'THE PEOPLE' ............ 36

VII. FORCING ALTERNATIVES TO A PROTECTED RIGHT IS UNCONSTITUTIONAL ............................................................... 38

A. *Heller* Rejected an 'Either or' Approach to the Second Amendment ...................................................................... 39

B. The First Amendment Does Not Tolerate Forced Alternatives, The Second Amendment Does Not Either ................................ 40

VIII. HANDGUNS ARE NOT 'DANGEROUS' OR 'UNUSUAL' WEAPONS. 41

IX. THE DISTRICT COURT ORDER REFLECTS AN ACTIVIST POLITICAL AGENDA, NOT AN INTELLECTUALLY HONEST CONSTITUTIONAL ANALYSIS ................................................................... 42

A. Erroneously Argues: Second Amendment is Not an Individual Right ...................................................................... 43

B. Adopts Rogue Positions Previously Rejected by the Supreme Court ...................................................................... 44

C. An Advocate for California, Not a Neutral Arbiter ................... 46

D. Misrepresented and/or Ignored Material and Undisputed Facts. 49

E. Flatly Ignored Appellant's Law Enforcement Expert in Favor of the Speculative Opinions of Kim Raney ................................ 50

F. Restricts the Scope of Pre-Existing Rights Based on the Distorted Opinions of a Vocal Minority ................................ 52

CONCLUSION ................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tradition P'ship, Inc. v. Bullock,*
565 U.S. 1187 (2012) ............................................................ 20

*Animal Legal Def. Fund v. U.S. Food & Drug Admin.,*
836 F.3d 987 (9th Cir. 2016).............................................. 7

*Baird v. Bonta,*
2023 WL 5763345 (9th Cir. Sept. 7, 2023) ................... Passim

*Barker v. Wingo,*
407 U.S. 514 (1972) ............................................................ 19

*Benton v. Maryland,*
395 U.S. 784 (1969) ............................................................ 33

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ............................................................ 13

*Crawford v. Washington,*
541 U.S. 36 (2004) ........................................................ 32, 49

*D.C. v. Heller,*
554 U.S. 570 (2008) ....................................................... Passim

*Douglass v. Nippon Yusen Kabushiki Kaisha,*
46 F.4th 226 (5th Cir. 2022) ................................. 31, 34, 35

*Dred Scott v. Sandford,*
60 U.S. 393 (1857) ........................................................ 32, 36

*Duncan v. Louisiana,*
391 U.S. 145 (1968) ............................................................ 33

*Fulton v. City of Philadelphia,*
141 S.Ct. 1868 (2021) ......................................................... 33

i

*Gamble v. United States*,
139 S.Ct. 1960 (2019) ........................................................... 33

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001)................................................. 42

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
565 U.S. 171 (2012) .............................................................. 33

*Hudson v. Michigan*,
547 U.S. 586 (2006) .............................................................. 19

*In re Oliver*,
333 U.S. 257 (1948) .............................................................. 33

*Klopfer v. North Carolina*,
386 U.S. 213 (1967) .............................................................. 33

*Lynch v. Donnelly*,
465 U.S. 668 (1984) .............................................................. 33

*Mapp v. Ohio*,
367 U.S. 643 (1961) .............................................................. 19

*McClearn v. Duncan*,
94 F.3d 652 (9th Cir. 1996)..................................................... 48

*McCulloch v. Maryland*,
4 Wheat. 316, 4 L.Ed. 579 (1819)............................................ 23

*McDonald v. City of Chicago, Ill.*,
561 U.S. 742 (2010) ........................................................Passim

*Miranda v. Arizona*,
384 U.S. 436 (1966) .............................................................. 19

*Muscarello v. United States*,
524 U.S. 125 (1998) .............................................................. 26

*Myers v. United States,*
    272 U.S. 52 (1926) ............................................................... 15

*Near v. Minnesota,*
    283 U.S. 697 (1931) ............................................................. 33

*Nevada Comm'n on Ethics v. Carrigan,*
    564 U.S. 117 (2011) ....................................................... 33, 49

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) .........................................................Passim

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) ............................................................. 15

*Ortega v. United States,*
    861 F.2d 600 (9th Cir. 1988) ............................................... 42

*Powell v. Alabama,*
    287 U.S. 45 (1932) ............................................................... 33

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................. 15

*Ramos v. Louisiana,*
    140 S.Ct. 1390 (2020) ......................................................... 33

*Reynolds v. United States,*
    98 U.S. 145 (1878) ............................................................... 33

*Rhode Island v. Massachusetts,*
    37 U.S. (12 Pet.) 657 (1838) ............................................... 32

*Rogers v. Grewal,*
    140 S. Ct. 1865 (2020) ........................................................ 40

*Silveira v. Lockyer,*
    328 F.3d 567 (9th Cir. 2003) ............................................... 24

*South Carolina v. United States*,
    199 U.S. 437 (1905) ........................................................................ 32

*State v. Huntly*,
    25 N.C. 418 (1843) ........................................................................ 29

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ................................................................ 37, 38

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019) .................................................................... 33

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ................................................................ 40, 41

*Young v. Haw.*,
    2021 WL 1114180 (9th Cir. March 24, 2021) (en banc) ................... 10

*United States v. Cruikshank*,
    92 U.S. 542 (1876) ........................................................................ 43

*United States v. Leon*,
    468 U.S. 897 (1984) ...................................................................... 19

*Virginia v. Moore*,
    553 U.S. 164 (2008) ................................................................ 32, 49

*Washington v. Texas*,
    388 U.S. 14 (1967) ........................................................................ 33

*Wilson v. Arkansas*,
    514 U.S. 927 (1995) ...................................................................... 33

*Wyoming v. Houghton*,
    526 U.S. 295 (1999) ...................................................................... 33

**Statutes**

18 U.S.C. 922(g) ............................................................................. 23
28 U.S.C. § 1291 .............................................................................. 2

iv

28 U.S.C. § 1331 ................................................................................... 2

28 U.S.C. § 1343 ................................................................................... 2

42 U.S.C. § 1983 ................................................................................... 2

42 U.S.C. § 1988 ................................................................................... 2

Cal. Penal Code § 12031 ....................................................................... 1

Cal. Penal Code § 26350 .................................................................... 4, 8

Cal. Penal Code § 25850.1 .................................................................... 1

Cal. Penal Code § 25850 .............................................................. Passim

Cal. Penal Code § 26350 .............................................................. Passim

U.S. Const. amend. II ............................................................................ 3

U.S. Const. amend. XIV ........................................................................ 3

## INTRODUCTION

Appellant seeks to restore the citizens of California to the constitutionally aligned position that existed prior to the state's enactment of the Mulford Act of 1967. Up until that time, the free exercise of the right to carry a handgun open and exposed on one's person for self-defense in California was unregulated and largely unremarkable.

With the passage of the Mulford Act of 1967, the right to open carry a loaded firearm in public for self-defense was banned under threat of criminal sanctions. California Penal Code section 25850.[1] Open carry was eliminated altogether in 2013 with the enactment of Penal Code section 26350[1], which banned the open carriage of an unloaded handgun for self-defense. While both criminal statutes provide some narrow exemptions[2], no exemption brings the regulations into constitutional compliance, nor do the exemptions apply to Appellant [3-ER-545, ¶ 7].

Sections 25850 and 26350 criminalize conduct that is "presumptively protected" by the plain text of the Second Amendment – the public carriage of handguns for self-defense. See e.g., *New York State Rifle & Pistol Ass'n, Inc. v.*

---

[1] See, Cal. A.B. 1591 (April 5, 1967) (amending Cal. Penal Code § 12031 repealing law that allowed for open carry of loaded firearms).

1

*Bruen*, 597 U.S. 1, 32 (2022) (holding that New York's 'proper cause' requirement banned ordinary individuals from bearing arms).

Because Appellant's conduct is presumptively protected by the Second Amendment, California had the burden of justifying its criminal statutes by demonstrating that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if California met its burden, was the district court authorized to conclude that Appellant's conduct "falls outside the Second Amendment's 'unqualified command'." *Bruen*, 597 U.S. at 17.

California fell far short of clearing the bar. There is no American tradition of criminalizing the peaceful open carriage of weapons for self-defense. The district court order should be reversed, judgment in favor of Appellant should be entered, and California Penal Code sections 25850 and 26350 should be permanently enjoined.

## JURISDICTION

The lower court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether California Penal Code sections 25850 and 26350, which criminalize the open carriage of handguns for self-defense, violate the Second Amendment to

the United States Constitution, as applied to the states through the Fourteenth Amendment.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

This case implicates the Second and Fourteenth Amendments to the United States Constitution.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

The Fourteenth Amendment provides, in pertinent part: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV.

California Penal Code 25850 provides, in pertinent part: A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory.

California Penal Code 26350 provides, in pertinent part: A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun.

## STATEMENT OF THE CASE

Appellant, Mark Baird, is a resident of Siskiyou County, California and a lawful firearm owner. For several years, Appellant has sought to lawfully exercise his right to carry a handgun exposed and holstered on his person ("open carry") for self-defense throughout the State of California. But the open carriage of a handgun in California is a crime -- whether loaded (Cal. Penal Code § 25850) or unloaded (Cal. Penal Code § 26350), and Appellant does not fall within any of the statutory exceptions to prosecution [3-ER-544-547].

From before California became a state in 1850 until the Mulford Act of 1967, open carry in California was unregulated and largely unremarkable [3-ER-546].

Motivated by racial animus, California criminalized the peaceful carriage of a loaded handgun [Penal Code § 25850]. Still, it remained legal to open carry an unloaded handgun, with the ammunition in close proximity to use for self-defense, if necessary [3-ER-546].

But in 2012, an absolute ban on open carry was instituted with the passage of Penal Code section 26350, which criminalized the open carriage of an unloaded handgun [3-ER-546].

From that point on, the right to bear arms in California required government permission by way of a discretionary license [3-ER-546].

On its face, California's licensing scheme appears to authorize concealed carry and, in counties with a population less than 200,000, open carry licenses [Penal Code sections 26150, 26155].

In practice, however, the only type of license available to be issued is concealed carry. On more than one occasion, Appellant has tried to apply for an open carry license in Siskiyou County, but the only application form published by California Department of Justice ("DOJ") is strictly for obtaining a concealed carry license. Under California State law, licensing officers can only use the licensing form published by the DOJ [Penal Code § 26175], and the DOJ has never published an open carry license application [3-ER-545].

Even if imposing a licensing requirement for open carry was consistent with the plain text of the Second Amendment, which it is not, no such license has been issued by California since open carry was foreclosed by the State in 2012 [3-ER-545-546] – approximately 12 years ago.

Indeed, during the 5 years of litigation below, California has produced no evidence of an open carry license ever having been issued anywhere in the state [3-ER-546]; see also, *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) (noting California's licensing regime "establishes a statewide ban on open

5

carry by ordinary law-abiding Californians,' roughly 95% of state residents may not apply for an open-carry license due to geographical restrictions, and California "provided no evidence that any such license has ever been issued"). A FOIL response from the DOJ revealed no record of any open carry license having been issued since the practice was banned approximately 12 years ago [7-ER-1475].

Even if Appellant could obtain an open carry license, which [if issued] would only be available in counties with a population of less than 200,000, the license would only be valid in the county of issuance. Stepping over the county line extinguishes the right to open carry.

Appellant's conduct is presumptively protected by the plain text of the Second Amendment. California failed to meet its burden of identifying an American tradition of criminalizing – or licensing – the open carriage of weapons in common use, which should have resulted in the grant of Appellant's motion for summary judgment.

By denying Appellant's motion, and granting California's motion for summary judgment, the district court was disloyal to the Constitution, failed to adhere to Supreme Court jurisprudence generally and regarding the Second Amendment, and abdicated her role as a neutral and impartial jurist of the inferior courts.

6

The district court order should be reversed, judgment in favor of Appellant should be entered, and Penal Code sections 25850 and 26350 should be permanently enjoined.

## ARGUMENT

### Standard of Review

The review of a grant of summary judgment is *de novo. Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 988 (9th Cir. 2016).

## I. California's Tradition of Unregulated Open Carry

Unregulated open carry was an integral and largely unremarkable part of California's history for over 162 years[2] - substantially longer than the 12 years it has been banned.[3]

Until the enactment of the Mulford Act of 1967, which criminalized the public carriage of loaded firearms[4], California had no regulations on the open carriage of

---

[2] Since becoming a state in 1850, open carry was legal in California until 2012. https://www.latimes.com/socal/la-canada-valley-sun/news/tn-vsl-xpm-2011-10-12-tn-vsl-1013-opencarry-story.html

[3] When California first contemplated restrictions on public carry, it was a concealed carry ban, intended to apply only to Mexicans, that was debated in the legislature in 1856. It was not until 1863 that California banned *concealed* carry altogether only to repeal the ban 7 years later. NRA Institute for Legislative Action, Tuesday January 1, 2013, citing, "Three Years in California", Borthwick, J.D. (1857); Gunfighters, Highwaymen, & Vigilantes", McGrath, Roger (1984). https://d97yz4wvpgciz.cloudfront.net/articles/20130101/the-rise-and-fall-of-californias-first-concealed-carry-law

[4] Penal Law section 25850.

7

handguns for self-defense. Between 1967 and 2012, Californians were free to carry unloaded handguns open and holstered for self-defense, without penalty. But in 2012, California criminalized the open carriage of unloaded firearms for self-defense[5], banning the open carriage of handguns entirely.

Today, close to 30 states are "constitutional carry" states, meaning that no license is required.[6]

Open carry is legal in 45 states[7] and, of the states in the Ninth Circuit, California is the only state that bans open carry.[8]

## II. California's Handgun Licensing Scheme

In California, no license is required to possess a handgun in one's home but possessing a handgun in public is a crime. Penal Code §§ 25850, 26350.

To lawfully carry a handgun outside the home for self-defense requires applying for and obtaining a license from a statutorily defined licensing authority under Penal Code sections 26150 and 26155.

On paper, the licensing regime appears to authorize a license for open carry[9], but no open carry licenses have been issued in the State of California since open

---

[5] Penal Code section 26350.
[6] https://worldpopulationreview.com/state-rankings/constitutional-carry-states
[7] https://worldpopulationreview.com/state-rankings/open-carry-states/
[8] https://worldpopulationreview.com/state-rankings/constitutional-carry-states
[9] Penal Code sections 26150 and 26155 also apply to concealed carry licenses.

carry was banned in 2012[10] – a fact uncontested by California. Nor can an open carry license be issued. Under Penal Code section 26175, entitled "Statewide Uniformity of Applications," all licensing authorities are required to use the statewide handgun licensing application created and published by the DOJ. The DOJ's statewide application is solely for *concealed* carry; there is no process for obtaining an open carry license [3-ER-545, at ¶ 7].

Even if one could be sought, open carry licenses may only be issued in counties with a population under 200,000 and are void outside of the county of issuance.[11]

## III.    Effect on Appellant

Appellant seeks a return to pre-1967 California where the peaceful, unlicensed open carriage of a handgun for self-defense was legal.

## IV.    Procedural History

Appellant, who is an ordinary citizen with no prohibitors to the possession of firearms under state or federal law [3-ER-545], filed a complaint on April 9, 2019 challenging both sets of criminal (25850 and 26350) and licensing (26150 and 26155) statutes [7-ER-1551]. On July 8, 2019, Appellant moved to preliminarily

---

[10] See, California Department of Justice Response to FOIL request at 7-ER1468; see also, Penal Code section 26225, which requires that a copy of all firearms licenses issued (open carry and concealed carry) be "filed immediately" with the California Attorney General's Office.

[11] 26150(b)(2); 26155(b)(2).

9

enjoin all four statutes [7-ER-1556]. On August 31, 2020, the district court denied the motion without prejudice because, "Though plaintiffs have raised 'serious question' going to the merits of their Second Amendment claim, the balance of equities does not tip 'sharply' in their favor" [ECF Doc. 33 at 10]. The district court found that the balance of hardships weighed in the state's favor because "…the state would suffer harm from being enjoined from enforcing a law intended to increase public safety." [ECF Doc. 33 at 10].[12]

On April 13, 2021, following this Court's en banc decision in *Young v. Haw.*, 2021 U.S. App. LEXIS 8571, *142, __ F.3d __, 2021 WL 1114180 (9th Cir. March 24, 2021) (en banc), Appellant filed a second motion for a preliminary injunction, which the lower court never decided [7-ER-1559, ECF Doc. 40].

At the conclusion of fact and expert discovery, and on November 19, 2021, California filed a motion for summary judgment [7-ER-1560, ECF Doc. 56].

On December 2, 2021, by So Ordered stipulation of the parties, the proceedings were stayed pending the Supreme Court's ruling in *Bruen* [7-ER-1560, ECF Doc. 58]. The district court lifted the stay on July 7, 2022 [7-ER-1560, ECF Doc. 59].

---

[12] Appellant's Second Amendment challenges survived California's June 6, 2019 motion to dismiss [ECF Doc. 33], and Appellant filed a first amended complaint on September 21, 2020 [7-ER-1476].

On August 8, 2022, Appellant filed a third motion for a preliminary injunction [7-ER-1561, ECF Doc. 65], which was opposed by California on September 30, 2022 [7-ER-1561, ECF Doc. 69]; Appellant's reply was filed on October 11, 2022 [7-ER-15551, ECF Doc. 73]. On September 27, 2022, Appellant filed a second amended complaint, which narrowed his challenge to Penal Code Sections 25850 and 26350[13] [7-ER-1561, ECF Doc. 68; 6-ER-1441]. Oral argument on Appellant's third preliminary injunction motion was held on November 4, 2022 during which the district court *sua sponte* reopened expert discovery, unilaterally providing California with close to a year of additional time to 'gather' historical evidence; the court also floated the idea of appointed its own historical expert [6-ER-1396].

On November 18, 2022, Appellant filed objections to the district court's *sua sponte* extension of discovery [7-ER-1563, ECF Doc. 81], which were unopposed, yet overruled by the district court four days later [7-ER-1563, ECF Doc. 82].

By Order dated December 7, 2022, the lower court denied Appellant's third motion for a preliminary injunction and ordered the parties to Show Cause why the court should not appoint its own historical expert [7-ER-1563, ECF Doc. 83].[14]

---

[13] Appellant's challenge to the licensing statute [Penal Codes 26150 and 26155] was not incorporated into the second amended complaint [6-ER-1441].

[14] Both parties objected to the court's appointment of its own historical exert [7-ER-1563, ECF Docs. 87, 88].

Appellant timely filed a Notice of Interlocutory Appeal on January 3, 2023 [7-ER-1552, ECF Doc. 84].

On September 7, 2023, this Court reversed the district court's denial of Appellant's third motion for a preliminary injunction of Penal Code sections 25850 and 26350 based on an abuse of discretion, and remanded with instructions for the district court to complete its reevaluation pf Appellant's motion "expeditiously." *Baird v. Bonta*, 81 F.4th 1036, 1048 (9th Cir. 2023).

Both parties filed motions for summary judgment [7-ER-1563-1564, ECF Docs. 90, 96, 98, 100].

On December 29, 2023, the district court issued an Order on the parties' respective motions for summary judgment, which denied Appellant's motion, granted California's motion, and denied Appellant's motion for a preliminary injunction as moot [7-ER-1565, ECF Doc. 111, 1-ER-3]. Appellant filed a Notice of Appeal on January 24, 2024 [7-ER-1550].

This appeal follows.

## Summary of the Arguments

I. The plaintiffs in *Heller*[15], *McDonald*[16], *Caetano*[17], and *Bruen*[18] each challenged laws that banned conduct that is presumptively protected by the plain text of the Second Amendment – the possession and/or carriage of weapons in common use for self-defense. Binding precedent, therefore, requires a finding that banning the right to possess and/or carry commonly used weapons is unconstitutional.

Public safety justifications for regulating weapons were consistently rejected in *Heller*, *McDonald*, *Caetano*, and *Bruen*, because "[a]ll of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. *McDonald*, 561 U.S. at 783 ("The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications") (citing examples).

The Supreme Court made clear that laws imposing penalties for criminal conduct, like terrorizing, brandishing, and the oft-cited 'affray' fall outside of the

---

[15] *D.C. v. Heller*, 554 U.S. 570, 574–75 (2008) (D.C. banned the possession of handguns. "Wholly apart from that prohibition, no person may carry a handgun without a license, but the chief of police may issue licenses for 1–year periods").

[16] *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 750 (2010) (the city of Chicago made it a crime to possess a firearm without a valid registration certificate, then prohibited the registration of most handguns, "thus effectively banning handgun possession by almost all private citizens who reside in the City").

[17] *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curium) (Massachusetts banned the possession of stun guns).

[18] *Bruen*, 597 U.S. at 1 (New York's "proper cause" requirement "bann[ed] the public carriage of handguns by ordinary citizens").

13

scope of the Second Amendment – criminal laws are not historical analogues to laws prohibiting the peaceful carriage of weapons for self-defense. *Bruen*, 597 U.S. at 47 ("Respondents, their amici, and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself").

And because "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," "post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment…[and] do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. 36 quoting *Heller*, 554 U.S. at 614.

At the very least, "to the extent later history contradicts what the text says, the text controls…[because] liquidating indeterminacies in written laws is far removed from expanding or altering them. Thus, post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (cleaned up) (citations omitted).

"In other words, we recognize that where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the

practice should guide our interpretation of an ambiguous constitutional provision." *Bruen*, 597 U.S. at 36 (cleaned up) quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment); *Myers v. United States*, 272 U.S. 52, 174 (1926); *Printz v. United States*, 521 U.S. 898, 905 (1997).

Naturally then, Appellant's challenge to California Penal Code sections 25850 and 26350 should have resulted in a similar outcome below, particularly because California failed to unearth any 'new' history to justify the criminalization of open carry.

Not surprisingly, the district court went in the opposite direction.[19]

The issue in this case is straightforward: is it unconstitutional to criminalize conduct that is covered by the plain text of the Second Amendment? The plain text, America's historical traditions, and Supreme Court jurisprudence demand a resounding 'yes.'

II.    The district court erroneously applied the same 'interest balancing' that the Supreme Court has rejected multiple times. *Bruen* reconfirmed that that the "Second Amendment is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Bruen*, at 2131 quoting, *D.C. v. Heller*, 554

---

[19] 1-ER-28 (opining, albeit incorrectly, "this is a new and a different case than *Heller*, *McDonald* and *Bruen*").

15

U.S. 570, 635(2008). "It is this balance - struck by the traditions of the American people - that demands our *unqualified deference*."[20] Public safety justifications are "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Bruen*, 597 U.S. at 24.

# I.  APPELLANT SATISFIED HIS BURDEN UNDER THE *BRUEN*  TEST

## A. Standard to be Applied in Second Amendment Challenges

In keeping with *Heller*, the test to be applied in Second Amendment challenges is as follows: when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 17.

## B.  Appellant's Conduct is Covered by the Plain Text

The district court correctly found that Appellant's conduct, carrying handguns in public for self-defense, is covered by the plain text of the Second Amendment and, thus, presumptively protected by the Constitution [1-ER-38]. See *Bruen*, 597

---

[20] *Bruen*, 597 U.S. at 26 (emphasis added).

16

U.S. at 32. (having "little difficulty concluding" that "the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct - carrying handguns publicly for self-defense."

## II. CALIFORNIA FAILED TO IDENTIFY AN HISTORICAL TRADITION OF IMPOSING CRIMINAL PENALTIES FOR PEACEFUL OPEN CARRY

Appellant having satisfied his burden of demonstrating that his conduct is presumptively protected by the Constitution, the burden immediately shifts to California to come forward proof that criminalizing the peaceful open carriage of handguns for self-defense was an American tradition. The plain text of the Second Amendment forecloses California's chances of success – by a neutral jurist.

In *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) this Circuit instructed the district court that, to satisfy its burden under *Bruen*, California must identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a comparable blanket enforcement to California's open-carry ban; a "well-established and representative historical analogue" to its open carry ban that was in force when the Second or Fourteenth Amendment was ratified. *Baird*, at *8 citing, *Bruen*, 142 S.Ct. at 2130-31, 2133, 2136-38.

California cannot satisfy the requirement for a closely analogous historical regulation by reference to "any general firearm regulation California might unearth." *Baird*, at *8.

17

### A. The Supreme Court Rejected 'Nuanced Judgments' From Inferior Federal Courts

*McDonald* and *Bruen* prohibit inferior courts from "making nuanced judgments about which evidence to consult and how to interpret it." *Bruen*, 597 U.S. at 25 quoting *McDonald*, 561 U.S. at 803–804 (2010) (Scalia, J., concurring).

Like *Bruen*, *Heller*, and *McDonald*, the historical analogies in this case "are relatively simple to draw" and do not implicate "unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27.

This case did not require protracted analytical reasoning to decide "whether a historical regulation is a proper analogue" because there is no "distinctly modern firearm regulation" to be analyzed [*Bruen*, 597 U.S. at 28-29].

California's criminal statutes do not involve a "distinctly modern" concept nor were there any "relevantly similar" laws at or near the ratification.

*Heller* and *McDonald* involved a ban on firearms in the home, *Bruen* involved a ban on public carry – as is the case here. Each involved 'straightforward' historical inquiries. *Bruen*, at 597 U.S. 27-28.

> When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.

*Bruen*, 597 U.S. at 26.

18

The Founders considered - and rejected - public safety balancing when drafting the Second Amendment [*Heller*, 554 U.S. at 634-35] which

> "is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category."

*McDonald*, 561 U.S. at 783.[21]

'Balancing' tests, like the intermediate scrutiny tripartite test formerly applied in this Circuit, were affirmatively rejected by *Heller*[22], *McDonald*[23], and *Bruen*.

---

[21] See, e.g., *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs,' *United States v. Leon*, 468 U.S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large"); *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona*, 384 U.S. 436, 517 (1966) (Harlan, J., dissenting); *id.*, at 542, 86 S.Ct. 1602 (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases ... will return a killer, a rapist or other criminal to the streets ... to repeat his crime"); *Mapp*, 367 U.S., at 659, 81 S.Ct. 1684.

[22] "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35.

[23] "In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing…and this Court decades ago abandoned 'the notion that the Fourteenth Amendment

19

"But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference."

*Bruen*, 597 U.S. at 26(citation omitted).

Interest balancing is not part of the *Bruen* test, and the lower courts are without any authority to alter it. See, *Am. Tradition P'ship, Inc. v. Bullock*, 565 U.S. 1187 (2012) (lower courts are bound to follow the decisions of the Supreme Court until they are withdrawn or modified).

Neither California nor the district court cite any case in which the Supreme Court has "refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications." *McDonald*, 561 U.S. at 783.

The lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment [*Bruen*, 597 U.S at 26-28], as is the case here.

---

applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights'." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785–86 (2010) (internal citations omitted).

**B. Penal Code sections 25850 and 26350 Are Overbroad Means of Addressing The Same Perceived Societal Problem in *Heller, McDonald* and *Bruen*: Firearm Violence in Urban Areas**

California conceded below that Penal Codes 25850 and 26350 were enacted to address the "same alleged societal problem addressed in *Heller*,"[24] *McDonald* and *Bruen* – firearm violence in urban areas. See, *Bruen*, 597 U.S. at 27 (noting that the "perceived societal problem" in *Heller* was "firearm violence in densely populated communities").

In *Heller*, the District of Columbia "employed a regulation—a flat ban on the possession of handguns in the home—that the Founders themselves could have adopted to confront that problem," but chose not to. *Bruen*, 597 U.S. at 27.

The handgun ban in *McDonald* was enacted by Chicago to "protect its residents from the loss of property and injury or death from firearms," notwithstanding that the handgun ban left the petitioners "vulnerable to criminals" and the Chicago Police Department statistics revealed that "the City's handgun murder rate has actually increased since the ban was enacted" and "Chicago residents now face one of the highest murder rates in the country and rates of other

---

[24] "The modest burdens imposed by California's open-carry laws and its analogues are comparably justified by pressing public-safety concerns…potential interpersonal violence, population growth, and rapid technological advances in firearms [and] the threats posed by the open-carry of weapons, when not worn by government officials or officers" [ECF Doc. 90-1 at 19].

violent crimes that exceed the average in comparable cities." *McDonald*, 561 U.S. at 750–51 (citations omitted).

In *Bruen*, New York's proper-cause requirement, which banned public carry for ordinary people, "concerns the same alleged societal problem addressed in *Heller*: "handgun violence…in urban areas." *Bruen*, 597 U.S. at 27 (cleaned up) (citation omitted).

*Heller* exemplifies a "straightforward historical inquiry" concerning D.C.'s total ban on handgun possession in the home. *Bruen,* 597 U.S. at 27. After considering "founding-era historical precedent," including "various restrictive laws in the colonial period," and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional." *Bruen,* 597 U.S. at 27 citing *Heller*, 554 U.S. at 631; see also *Heller,* 554 U.S. at 634 (describing the claim that "there were somewhat similar restrictions in the founding period" as a "false proposition").

Likewise, the historical inquiry below was "straightforward," particularly considering the historical deep dive undertaken in *Heller*, *McDonald*, and *Bruen*.

Because Appellant challenges criminal statutes enacted to address "handgun violence" in "urban areas," as was the case in *Heller, McDonald,* and *Bruen* - and not statutes to address "circumstances beyond those the Founders specifically anticipated," the absence of an identical national tradition is determinative.

22

To be sure, sections 25850 and 26350 are unconstitutionally overbroad – sweeping non-prohibited citizens into a punitive net. Other federal and state statutes sufficiently provide an avenue to arrest and prosecute the criminal use of a firearm, as well as the possession of firearms by a disqualified and dangerous individuals. See e.g., 18 U.S.C. 922(g).

## C. The District Court Attempts to Turn a Molehill into a Mountain

To justify upholding California's laws, the district court spent considerable time trying to distance this case from *Heller, McDonald*, and *Bruen*: "this is not an obviously straightforward case," "California has persuasively demonstrated how difficult it is to draw parallels between the modern and historical problems," "Comparisons between the modern and historical responses to the general societal problem defy simple analysis as well" [1-ER-65]; see also, [1-ER-28] (opining, albeit incorrectly, "this is a new and a different case than *Heller*, *McDonald* and *Bruen*").

"Fortunately, the Founders created a Constitution—and a Second Amendment - intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *Bruen*, 597 U.S. at 27-28 citing *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819)..

That said, no historical adaptation is required because violence is as old as time. Most importantly, violence by a tyrannical government against its unarmed

23

citizenry was the very reason for codifying the Second Amendment in the first instance.

**D. Imposing Criminal Penalties For 'Peaceful Carry' Was Never a 'Tradition'**

Equating the right to bear arms with prohibited criminal acts such as affray, terrorizing, and brandishing is "worthy of the Mad Hatter." Carrying arms for self-defense is a Natural Right of resistance and self-preservation - not a crime. *Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 51-54.

In 1765, Blackstone explained the right of every Englishman "of having arms for their defence" arose from "the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." As Blackstone describes the "natural right" of an Englishman to keep and bear arms, the arms are for personal defense as well as resistance to tyranny. *Silveira v. Lockyer*, 328 F.3d 567, 576 (9th Cir. 2003) (Kleinfeld, Circuit Judge, Kozinski, O'Scannlain, and T.G. Nelson) (dissenting from denial of rehearing en banc because "the Second Amendment secures an individual, and not collective, right to keep and bear arms").

Laws against criminal conduct do not implicate the Second Amendment. *Bruen*, 597 U.S. at 43-57 (common-law offenses of 'affray' or 'going armed to the terror of the people' did not impair the right of the general population to peaceable public carry).

'Manner of carry' restrictions involve punishing criminal behavior, i.e., brandishing, affray, and threatening conduct, not prohibiting a recognized modality of carrying a firearm for self-defense [*Bruen*, 597 U.S. at 59 ("The historical evidence from antebellum America does demonstrate that the *manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others"], not *how* an individual chooses to bear their arms.

Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate and generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes, none of which imposed a substantial burden on public carry analogous to the criminalization of open carry created by Penal Code sections 25850 and 26350. *Bruen*, 597 U.S. at 50.

## III. *HELLER* LAID THE DEFINITION OF THE TERM 'BEAR' TO REST; THE PLAIN TEXT ENCOMPASSES OPEN AND CONCEALED CARRY

California arbitrarily tears the right to bear arms in half by creating two artificial classes of public carry. Such a delineation is not only inconsistent with the plain text of the Second Amendment, it is at odds with the definition of term 'bear,' settled by *Heller*, which envelopes open and concealed carry.

*Heller* confirmed that the right to 'bear arms' refers to the right to "wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with

another person.' *Bruen*, 597 U.S. at 32, quoting *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting) (internal quotation marks omitted).

Carrying a weapon "upon the person" (open carry) "or in the clothing or in a pocket" (concealed carry) are each decidedly included within the word 'bear.'

The first American dictionary, published by Noah Webster in 1806, "A Compendious Dictionary of the English Language" defines the word 'bear' as "carry" making no distinction between concealment or exposure.

The absence of a distinction in the plain text of the Second Amendment prohibits the government from dictating to 'the People' how they may lawfully establish their readiness for armed self-defense. Thus, the Second Amendment right to bear arms is violated by regulations that ban exactly half of that right.

## IV. MODERN DAY LICENSING REQUIREMENTS DO NOT CONSTITUTE AN HISTORICAL TRADITION

### A. Licensing a Pre-Existing Right Is Repugnant To The Constitution

Neither the district court nor California identified any historical tradition requiring an individual to seek a license, prove one's eligibility for, or take any action at all before being able to exercise a pre-existing right to possess and carry weapons for self-defense.

Really, licensing requires an individual to place his pre-existing and Natural right to be armed and ready to defend his life in the event of a violent confrontation

26

– generally unexpected – on a shelf while he completes an application, pays a fee (for permission to exercise the pre-existing right) proves to the government that he is eligible to exercise the right, and waits for an answer.

"Shall not be infringed" means the Right is exercisable *at the will of the individual.* Just as no license is required to attend church or hand out political flyers on the public sidewalk, imposing such a requirement on Second Amendment-protected conduct is unconstitutional.

> The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780, 130 S.Ct. 3020 (plurality opinion).
>
> That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

*Bruen,* 597 U.S. at 70-71.

Considering that America had just won independence from an oppressive ruling force, it is beyond cavil that the Framers intended to cement the individual right to be armed into this Nation's core.

As *Heller* recognized, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Heller*, 554 U.S. at 598. The Framers would not have accepted – to any degree – the government's control

27

over the people's access to, and possession and carriage of Arms.

Immediately prior to the commencement of the Revolutionary War, England had begun seizing the colonists gun powder[25]; when the armed colonists began to revolt, the Redcoats began "general warrantless searches for arms and ammunition" prompting England to block all arms and ammunition shipments to the colonies [4-ER-632; 4-ER-635-636].

> The ideology underlying all forms of American resistance to British usurpations and infringements was explicitly premised on the right of self-defense of all inalienable rights; from the self-defense foundation was constructed a political theory in which the people were the masters and government the servant, so that the people have the right to remove a disobedient servant.
>
> First, by disarming the Americans, the British were attempting to make the practical exercise of the right of personal self-defense much more difficult. Second, and more fundamentally, the Americans made no distinction between self-defense against a lone criminal or against a criminal government.
>
> To the Americans (and to their British Whig ancestors), the right of self-defense necessarily implied the right of armed self-defense against tyranny.

[4-ER-639]. Those who forget history are doomed to repeat it.

While a great deal of state overreach took place after the Civil War, there are currently 29 "constitutional carry states" upholding the rights codified in the Second

---

[25] Kopel, David, *How the British Gun Control Program Precipitated the American Revolution*, Charleston Law Review, Vol. 2, Winter 2012, NO. 2, at p. 291 [4-ER-621].

Amendment.[26]

### B. California's Historians Identify No Tradition of Licensing Open Carry

California's historians failed to identify any National historical tradition of requiring the People to seek and obtain permission from the government before being able to lawfully exercise the right to bear arms, including open carry.

The post-ratification licensing regulations proffered by California apply to *concealed carry*, not open carry. Rivas, Cornell, and Spitzer cite licensing laws from the late 1800s-1900s –well-past the ratification and lacking insight into the original meaning. Spitzer identifies *concealed carry* licensing regulations between 1871 through the early 1900s; Cornell identifies *concealed carry* licensing requirements in some towns in California beginning in 1876 and a 1917 statewide limit on *concealed carry* in urban areas. And Rivas, who had great difficulty distinguishing between criminal conduct and peaceful carry, identified no relevant licensing requirements.[27]

---

[26] https://worldpopulationreview.com/state-rankings/constitutional-carry-states
[27] The district court misconstrues *State v. Huntly,* 25 N.C. 418 (1843), cited by Rivas [1-ER-61] to imply that societal norms exclude carrying handguns. To the contrary, "consistent with the Statute's long-settled interpretation, the North Carolina Supreme Court acknowledged that 'the carrying of a gun' for a lawful purpose 'per se constitutes no offence'…Only carrying for a 'wicked purpose' with a 'mischievous result ... constitute[d a] crime.'" *Bruen*, 597 U.S. at 51 quoting *Huntly*, 25 N.C. at 422-23.

Because licensing requirements are inconsistent with the mandate that Second Amendment right "shall not be infringed," 19th- and 20th -century licensing requirements are no "confirmation" of the meaning and scope of the Second Amendment. See, e.g., *Bruen*, 597 U.S. at 37 (19th-century evidence was "treated as mere confirmation of what the Court thought had already been established").

### C. *Bruen* Did Not Apply its *Own* Test to Licensing Requirements

*Bruen* did not involve a challenge to licensing requirements generally, but only a portion of New York's licensing scheme: the 'proper cause' requirement. The Court took the time to chastise "6 outlier states," including New York and California, which imbue broad discretion and subjectivity allowing the "appraisal of facts, the exercise of judgment, and the formation of an opinion" as opposed to objective determinative criteria. *Bruen*, 597 U.S. at 39, n. 9.

The Court did not undertake an historical analysis of licensing requirements – and identified no historical analogue. Rather, for some reason the petitioners in *Bruen* conceded that "shall-issue licensing regimes are constitutionally permissible" [*Bruen*, 597 U.S. at 80] after which the Court sought to encourage the 'outlier' states to transition to "narrow, objective, and definite standards." *Bruen*, 597 U.S. at 39, n. 9.

Appellant makes no such concession about the legitimacy of licensing; and neither California nor the district court have identified any National tradition supporting such an infringement – particularly on open carry.

## V. SUPREME COURT JURISPRUDENCE LOOKS TO THE FOUNDING ERA TO DETERMINE THE SCOPE AND MEANING OF THE BILL OF RIGHTS; 1868 IS MERELY TO CONFIRM WHAT THE COURT KNOWS

### A. "Not All History is Created Equal"

Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (emphasis supplied) citing, *Heller*, 554 U.S. at 634–635 (2008); see also, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 245 (5th Cir. 2022) (Ho, J. concurring) ("Bill of Rights protections like the Second Amendment must be enforced against the States under the Fourteenth Amendment according to the *same standards* that protect those personal rights against federal encroachment") quoting *McDonald*, 561 U.S. at 765 (cleaned up) (emphasis supplied), *Bruen*, 597 U.S. 1 (same).

Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding Period, not 1868.[28] The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence [4-ER-566]. The Court has always been guided by the Amendments' "original meaning [which]

---

[28] Smith, Mark W., "Not All History Is Created Equal": In the Post-*Bruen* World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868; October 1, 2022 [4-ER-556, *et seq.*].

does not alter. That which it meant when adopted, it means now." *South Carolina v. United States*, 199 U.S. 437, 448 (1905) (interpreting Free Speech and Press Clauses).[29]

> We have long recognized that the meaning of the Constitution "must necessarily depend on the words of the constitution [and] the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions ... in the several states." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838).[30]

"Any other rule of construction would abrogate the judicial character of this court, and make it the mere reflex of the popular opinion or passion of the day." *Dred Scott v. Sandford*, 60 U.S. 393, 426 (1857), superseded (1868).

Recognizing that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," the Supreme Court pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553

---

[29] *Smith*, at 4-ER-567; see also, 575 (emphasis supplied) ("*Bruen* again confirmed that the time of ratification of the Bill of Rights is the pertinent period. Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." The Second Amendment was adopted in 1791, so that should be conclusive.").

[30] *Smith,* at 4-ER-567.

U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment). *Bruen*, 597 U.S. at 37.

Just a few of the "numerous cases involving all of the amendments in the Bill of Rights that have been incorporated" in which the Founding Period was the temporal focal point – and not when the amendments were incorporated into the Fourteenth Amendment in 1868 - are <u>First Amendment</u>: *Near v. Minnesota*, 283 U.S. 697 (1931), *Reynolds v. United States*, 98 U.S. 145 (1878), *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012), *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), *Lynch v. Donnelly*, 465 U.S. 668 (1984); <u>Fourth Amendment</u>: *Wyoming v. Houghton*, 526 U.S. 295 (1999), *Wilson v. Arkansas*, 514 U.S. 927 (1995); <u>Fifth Amendment</u>: *Benton v. Maryland*, 395 U.S. 784 (1969), *Gamble v. United States*, 139 S.Ct. 1960 (2019); <u>Sixth Amendment</u>: *Ramos v. Louisiana*,140 S.Ct. 1390 (2020), *Powell v. Alabama*, 287 U.S. 45 (1932), *Klopfer v. North Carolina*, 386 U.S. 213 (1967), *In re Oliver*, 333 U.S. 257 (1948), *Duncan v. Louisiana*, 391 U.S. 145 (1968), *Washington v. Texas*, 388 U.S. 14 (1967); <u>Eighth Amendment</u>: *Timbs v. Indiana*, 139 S. Ct. 682 (2019).[31]

"[I]n the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding. The focus of the discourse was the need to ensure that newly

---

[31] *Smith*, at 4-ER-574-588.

freed slaves had the same right to possess firearms in their homes and to carry them on the person as citizens in general and to prevent them from being disarmed by the states. Second Amendment deprivations were debated in connection with bills leading to the enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866."

### B. The District Court Cites No Supreme Court Case That Looks to 1868 to Interpret the Bill of Rights

Much ink is spilled by California and its historians to press the same post-ratification agendas that *Bruen* deemed unreliable for determining the original meaning of the Bill of Rights. The district court echoes their representations.

### C. The Bill of Rights' Scope and Meaning Remain the Same in 1868

The Bill of Rights does not have one meaning at its ratification but another, different meaning in 1868. The post-ratification/1868 theory "candidly contradicts and seeks to overturn, at least in principle and methodology, every case in which history has been used to determine the meaning of an incorporated provision of the Bill of Rights.[32]

The Supreme Court held, on numerous occasions, that whether we define the right as it existed in 1791 or in 1868, the right is the same against the federal government and the states alike. *Douglass*, 46 F.4th at 245. "[W]e have made clear

---

[32] *Smith,* at 4-ER-603-614.

that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Ibid.* (citing cases).

Indeed, *McDonald* observed that the Supreme Court "decades ago abandoned the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights." *McDonald*, 561 U.S. at 785–86. Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *McDonald*, 561 U.S. at 765 (internal quotation marks omitted).

The Supreme Court has "[n]ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."[33] "But to the extent later history contradicts what the text says, the text controls…post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (citation omitted).

---

[33] *Smith*, at 4-ER-615.

And while *Bruen* acknowledged an 'ongoing scholarly debate' between two historians concerning 1868, the Court adhered to Supreme Court jurisprudence of looking to the Founding era as the period of sole or primary relevance.[34]

According to the Supreme Court, the right to public carry was the same in 1791 as it was in 1868. *Bruen*, 597 U.S. at 38.

## VI. POST-RATIFICATION DISCRIMINATORY LAWS ARE NOT HISTORICAL ANALOGUES FOR REGULATING 'THE PEOPLE'

The peaceful carriage of weapons for self-defense was an unfettered right for 'the People' until it became apparent that freedmen would soon be part of 'the People' as well. See e.g., *Bruen*, 597 U.S. at 60 (noting Chief Justice Taney's discussion of "'the parade of horribles' that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right "to keep and carry arms *wherever they went*") quoting *Dred Scott v. Sandford*, 19 How. 393, 417 (1857) (emphasis supplied).

Licensing schemes arose after the Black Codes and Jim Crow laws were abrogated by the Fourteenth Amendment. So, if the elites could not ban firearms, they would 'soften the blow' with a promise of 'licenses,' which were doled out to 'preferred' groups.

---

[34] *Smith*, at 4-ER-559-564.

36

Requiring a license before one may lawfully possess and/or carry firearms ensured that the elites could continue to prevent blacks and other minorities from possessing firearms, which smoothly coincides with the governments' united desire to "prevent gun violence in urban areas" – areas traditionally populated by minority groups.

Imposing criminal penalties against individuals who were not considered part of 'the People' for whom the Constitution was enacted is not an historical analogue for taking the same action against 'ordinary citizens.'

With the ratification of the Fourteenth Amendment, however, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof" were now considered "citizens of the United States and of the State wherein they reside" and therefore, entitled to the same privileges and immunities as citizens of the United States and equal protection under the law. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 240 (2023) (Thomas, J., concurring).

Misunderstanding the impact of the Fourteenth Amendment, the district court erroneously accepted California's post-1868 criminal laws and licensing requirements as historical analogues justifying §§ 25850 and 26350.

But the Fourteenth Amendment had no effect on the existing Amendments. The scope of enumerated rights remained the same. The Fourteenth Amendment

enlarged the membership of "the People" entitled to the protections of the Constitution, including the Second Amendment – it did not shrink the rights.

The idea that the states would only have agreed to ratify the Fourteenth Amendment if that meant narrowing the scope of the Second Amendment (because blacks and Native Americans were now protected thereunder) is bigotry seeping back into the discussion.

The Fourteenth Amendment definitively overruled Chief Justice Taney's opinion in *Dred Scott* that blacks "were not regarded as a portion of the people or citizens of the Government" and "had no rights which the white man was bound to respect" and "clarified that American citizenship conferred rights not just against the Federal Government but also the government of the citizen's State of residence." *Students for Fair Admissions*, 600 U.S. at 242 (also recognizing that the Amendment employed a wholly race-neutral text, extending privileges or immunities to all "citizens"—even if its practical effect was to provide all citizens with the same privileges then enjoyed by whites. That citizenship guarantee was often linked with the concept of equality").

## VII. FORCING ALTERNATIVES TO A PROTECTED RIGHT IS UNCONSTITUTIONAL

Either an individual's conduct fits within the scope of the Second Amendment right or it does not. Like the freedom of religious expression and political speech

under the First Amendment, the government cannot prevent individuals from exercising the full panoply of Natural rights protected thereunder.

The district court's 'take it or leave it' approach to the right to bear arms is odious to the plain text of the Second Amendment and defeated under the weight of *Heller*.

### A. *Heller* Rejected an 'Either or' Approach to the Second Amendment

*Heller* rejected the government's claim that it is "permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed" *Heller*, 554 U.S. at 629 (acknowledging that handguns are the quintessential self-defense weapon).

Just as there are "many reasons that a citizen may prefer a handgun for home defense" there are many tactical reasons that an individual may prefer to carry openly than concealed: deterrent to threats, quicker and more ready access to your firearm in an emergency, it is easier to draw from an open holster than from underneath layers of clothing, and other considerations such as weather and expected surroundings/circumstances.

Emboldening California's 'take it or leave it' approach, the district court applied a "made up" test[35] and wrongly placed a burden on Appellant to prove that California's open carry ban unreasonably burdened his Second Amendment rights:

> "Nor can the court agree with Baird['s]…contention that California has deprived people of an effective right to self-defense in public. Baird argue[s] some weapons might be difficult to conceal in tight clothing, but they do[es] not explain why those who wish to defend themselves with handguns cannot choose not to wear tight clothing, if that is their position. Baird…also argue[s] handguns might be difficult to remove quickly from wherever they are concealed, but the record here as well includes no evidence to suggest handguns are ineffective for self-defense when concealed."

[1-ER-70].

The district court's defiance to the rule of law should not be countenanced.

## B. The First Amendment Does Not Tolerate Forced Alternatives, The Second Amendment Does Not Either

The Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions. As the Court put it more than 50 years ago, "it is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). The government cannot require the People to pray in a certain way or

---

[35] See e.g., *Rogers v. Grewal*, 140 S. Ct. 1865, 1867 (2020) (Thomas, J. Dissenting from denial of certiorari) (confirming that the courts of appeals' test later abrogated in *Bruen*, was "entirely made up").

mandate that they "subscribe to a certain view of the Gospel." C.f., *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017).

Nor can the government ban one type of protected First Amendment activity so long as it 'allows' another. For instance, it would be obviously unconstitutional to justify a ban of political speech by arguing that religious freedoms remained.

Penalizing the way in which individuals choose to bear arms for self-defense violates the plain text and intent of the Second Amendment.

*Heller* defined 'bearing Arms' as encompassing open carry ('carry upon the person') and concealed carry ('in the clothing or in a pocket') equally. *Bruen*, 597 U.S. at 32 quoting, *Heller*, 554 U.S. at 584. And the *Bruen* Court had "little difficulty concluding the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct -- carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32. It was immaterial to the Court's opinion that the "proposed course of conduct" was concealed carry and not open carry. The plain text of the Amendment makes no such distinction.

## VIII. HANDGUNS ARE NOT 'DANGEROUS' OR 'UNUSUAL' WEAPONS

As a matter of law, regulations banning 'dangerous and unusual weapons' cannot be considered an analogue for California's statutes. The Second Amendment protects all weapons in "common use," which includes handguns. The Supreme Court has already distinguished pistols and revolvers from 'dangerous and unusual

41

weapons.' *Bruen*, 597 U.S. at 47 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today…[and] provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

## IX. THE DISTRICT COURT ORDER REFLECTS AN ACTIVIST POLITICAL AGENDA, NOT AN INTELLECTUALLY HONEST CONSTITUTIONAL ANALYSIS

The district court violated her duty to uphold the Constitution and to follow the Supreme law of the Land.

Inferior courts must follow directly applicable Supreme Court precedent that has not been overruled or modified. "Obviously, binding authority is very powerful medicine. A decision of the Supreme Court will control that corner of the law unless and until the Supreme Court itself overrules or modifies it." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001).

Judges of the inferior courts may voice their criticisms, but follow it they must. *Id.* citing *Ortega v. United States*, 861 F.2d 600, 603 & n. 4 (9th Cir.1988) ("This case is squarely controlled by the Supreme Court's recent decision…. [We] agree[ ] with the dissent that [appellant] deserves better treatment from our Government. Unfortunately, legal precedent deprives us of discretion to do equity.").

42

A loss for judicial integrity, the district court steered this litigation far adrift from her duty to uphold the Constitution and adhere to Supreme Court rule.

## A. Erroneously Argues: Second Amendment is Not an Individual Right

The district court's analysis begins with an unrestrained attack on the very foundation of the Second Amendment – the protection of a pre-existing individual right. As far back as 1876, the Supreme Court acknowledged that the "text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "this is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed." *Heller*, 554 U.S. at 592 (cleaned up).

In addition to *Heller* and the Supreme Court cases that followed, the Founders intended to codify a pre-existing, individual right. Thomas Jefferson, in his letter to John Cartwright on June 5, 1824, commented on the English constitution, informing that the American revolution afforded the Founders a blank slate "on which we were free to write what we pleased," and "had no occasion to …hunt up musty Royal parchments, or investigate laws & institutions of a semi-barbarous ancestry…"[36]

---

[36] https://founders.archives.gov/documents/Jefferson/98-01-02-4313

43

Rather, the Founders "appealed to those of nature, and found them engraved in our hearts." *Id.* The Bill of Rights codifies the laws of Nature including man's

> "right and duty to be at all times armed; that they are entitled to freedom of person; freedom of religion; freedom of property; and freedom of the press… nothing then is unchangeable but the inherent and unalienable rights of man."

Apparently, the district court believes that *Heller* 'got it wrong' and should be overturned [1-ER-31] (making bold assertions of what "most historians" believe and perhaps hoping that her dissertation will spur the castration of the Second Amendment). However, the court was obligated to follow the Supreme Court, not her own path. The district court's defiance to existing Supreme Court precedent requires reversal.

### B. Adopts Rogue Positions Previously Rejected by the Supreme Court

The district court unhesitatingly adopts the outlier opinions urged by California's "historians," two of whom "have expressed disagreement with the Supreme Court's historical reasoning in *Heller*[37] and a third who "also has publicly criticized the reasoning the Supreme Court ultimately adopted in *Bruen* [1-ER-29][38].

---

[37] Referencing Robert Spitzer and Saul Cornell [1-ER-29].
[38] Referencing Brennan Rivas [1-ER-29].

The district court goes on to reject, out-of-hand, the analysis and opinion of Appellant's expert, Clayton Cramer, who she admits "embraces the [Supreme] Court's historical conclusions and publicly favors a broad interpretation of the Second Amendment" [1-ER-29-30].

The district court was more interested in overturning *Heller, McDonald, Caetano,* and *Bruen* (and, in doing so, turning the pre-existing right into a privilege to be allocated by the "police power" of the government) than searching the record for a national tradition of imposing criminal penalties on the peaceful open carriage of handguns  [1-ER-49-55].

The "Discussion" portion of the order, which begins on page 37, consists mainly of adopting subjective, speculative, and/or anecdotal narratives from California's historians, rather than reviewing the actual statutes submitted by California to ascertain whether a tradition of criminalizing open carry existed, as required by *Bruen* [1-ER-49-55].

 Interestingly, the district court, Rivas and Cornell admit that "hunting knives, rifles, muskets, and shotguns" were "carried openly" while "ruffians, burglars, and assassins" carried "smaller weapons, like knives and pistols" because "carrying concealed weapons in public was a dastardly and cowardly practice to most

Americans in antebellum America" [1-ER-55] establishing that the open carriage of weapons was the norm.[39]

The plain text of the Second Amendment, this Nation's historical traditions, and the precedent laid down by *Heller, McDonald, Caetano,* and *Bruen* paved a clear roadway for the district court to follow. The product of the court's refusal to comply requires reversal.[40]

## C. An Advocate for California, Not a Neutral Arbiter

The district court's disregard of the rule of law in favor of ensuring a "win" for California can be seen in several areas of this litigation.

First, despite the well-settled principle in this Circuit that the most important factor when considering a motion for a preliminary injunction is a plaintiff's likelihood of success on the merits in a constitutional challenge, the district court "declined to undertake any analysis" of Appellant's likelihood of success on the merits when denying his third such motion in 4 years. *Baird*, 81 F.4th at 1041 ("Because of how a finding that a plaintiff is likely to succeed on the merits of a constitutional claim impacts the other *Winter* factors, a district court necessarily

---

[39] Presumably, if the concern was 'unfair surprise,' the open carriage of "smaller weapons," like pistols, would have also been acceptable.

[40] When disregarding the Constitution and Supreme Court precedent, the district court also disregarded this Court's order to issue a decision on Appellant's third motion for a preliminary injunction "expeditiously." *Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023).

abuses its discretion when it skips analyzing the likelihood of success factor in a case involving such a claim").

By skirting the "merits based" inquiry, the district court shielded California from its failure to identify any historical analogue in defense of Appellant's motion.

The district court went on to justify its denial of the preliminary injunction as the advancement of "public safety" – a means-end tactic flatly rejected by *Heller, McDonald,* and *Bruen*. *Baird*, 81 F.4th at 1041 ("The district court…conducted only an analysis of the last two merged *Winter* factors, on the theory that the public interest disfavoring a preliminary injunction can outweigh a plaintiff's showing that a law likely infringes his constitutional rights and causes him irreparable harm. This was an abuse of discretion").[41]

The district court also disregarded this Court's instruction, taken from *Bruen*, that it "should not try to help the government carry its burden by "sift[ing] ... historical materials" to find an analogue. *Baird*, 81 F.4th at 1041 quoting *Bruen*, 597 U.S. at 60 [1-ER-24]. After announcing the intention to seek her *own* expert historian, a plan abandoned when both parties objected to the idea[42], the district court

---

[41] The district court went on to speculate that issuing a preliminary injunction could endanger public safety because it would temporarily deprive California of its "primary means of limiting public handgun carrying to 'ordinary, law-abiding citizens," though this Court determined "the record raises serious doubts about the soundness of that conclusion." *Baird*, 81 F.4th at 1041, n. 1.

[42] 1-ER-24.

47

admitted to searching outside of the record for historical proof "to inform its assessment of the evidence." This is also troubling.

Under *Bruen*, California was required to produce historical justification for the challenged regulations. As the adjudicator of whether California met its burden of production (did California identify an analogous regulation, law, statute, ordinance), a court should not be supplementing government's evidence or the record. Really, are jurors not firmly instructed – and swear an oath - *not* to conduct their own research and *only* consider the evidence before them?[43] In a declaratory judgment action, there is no jury – the court adjudicates the rights and liabilities of the parties. And particularly here, where the burden shifts entirely to the government to come forward proof that "the regulation is consistent with this Nation's historical tradition of firearm regulation" *any* assistance from the court is patently improper. It is no wonder that the people are losing all confidence in the judiciary.

The district court improperly relied on outside sources to override Supreme Court jurisprudence in constitutional interpretation, casting aside the premise "that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted

---

[43] See e.g., *McClearn v. Duncan*, 94 F.3d 652 (9th Cir. 1996) (jurors attested under oath that they would be fair and impartial and would "base their verdict on the evidence alone").

in 1791" notwithstanding its firmly implanted roots in other areas of constitutional interpretation[44] [1-ER-24-29].

But the analysis in Second Amendment challenges does not involve an esoteric monologue of how different the "intellectual universe" between us and "the people" who ratified the Bill of Rights is [1-ER-25-29]. The proper focus of judicial inquiry is whether California identified a Nationwide tradition of banning open carry – it did not.

### D. Misrepresented and/or Ignored Material and Undisputed Facts

Conspicuously, the district court's persistent recitation of the 'availability' of an open carry license is belied by uncontroverted evidence.

California ***does not*** have "two types of licenses available" [1-ER-4]. Appellant's sworn allegation that no open carry license has ever been issued in California, supported by a February 21, 2019 acknowledgment by California's DOJ in a FOIL response that there is no record of any open carry license having been issued, is uncontroverted by California [7-ER-1475].

---

[44] *Bruen*, 597 U.S. at 37 citing, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).

The district court goes on to shift blame to the local licensing authorities for the open carry ban [1-ER-70][45] but they are bound to use the statewide handgun licensing application published by California's DOJ. See, Penal Code § 26175, entitled "Statewide Uniformity of Applications." The only license application California provides is for a concealed carry license. [46] There is no avenue for Californians to apply for or obtain (or for a licensing authority to issue) an open carry license [3-ER-545 at ¶ 7]. California has never disputed the fact that no open carry license has ever been issued [*Id.*].[47]

Even if an open carry license could be obtained, its validity is extinguished at the county line, which would also violate the Second Amendment.

### E. Flatly Ignored Appellant's Law Enforcement Expert in Favor of the Speculative Opinions of Kim Raney

The lower court abused its discretion by applying the very interest balancing rejected by *Heller*, *McDonald*, and *Bruen*, as it did when denying Appellant's motion for a preliminary injunction, to justify California's interests in "public safety" and "crime prevention."

---

[45] It is not true that "Local authorities also may issue licenses to carry guns openly to those who live and work in counties with populations below 200,000" [1-ER-50].
[46] https://oag.ca.gov/system/files/media/bof-4012.pdf
[47] The district court also claims that Appellant "cannot prevail by claiming licenses are not actually available…nothing prevents [him] from arguing in a future case that licenses are practically unavailable or that local officials do not accept or process license applications" [1-ER-70]. This is not a 'local' option – California bans open carry by foreclosing their issuance.

In addition to relying on post-ratification firearm regulations laws that implicitly balanced purported 'public safety' interests over individual rights, the lower court credited California's police witness, former Covina police chief Kim Raney.

While ensuring that California is not offering Raney's opinion for the prohibited purpose of arguing that the challenged laws "satisfy [a] 'means–ends' test," but to "compare[] the justifications and burdens [of the challenged firearm regulations] to…historical regulations" [1-ER-15].

But the district court did just that: "Today, by contrast, the open carrying of firearms by those who are not law enforcement officers is threatening or intimidating, especially in more heavily populated places" [1-ER-68] citing *inter alia*, Raney's Declaration, Rivas' Declaration, the California's Brief.

Raney offered only speculation and anecdotes when opining that, among other things, "the restrictions on the open carry of firearms in California have been critical to the safety of law-enforcement officers, our communities, and those people who would want to openly carry firearms in public." [6-ER-1385].

The district court flatly ignored Appellant's expert law enforcement officer and firearms instructor Charles Haggard. Haggard, who served in an open carry jurisdiction before, during, and after Kansas' transition from banning open carry to Constitutional permitless carry virtually overnight [4-ER-699-802]. Based on his

personal and professional experience, Haggard advised that banning open carry does not enhance public safety to any extent, lawful open carry does not cause an increase in crime, nor does banning public carry enhance public safety [4-ER-749-763] (i.e., "the idea that the police would show up and be, "Oh, my God, that guy's got a gun, we better shoot him" borders on the ridiculous…"; "…in my time as a cop in dealing with people on the street…[open carry] doesn't bring any detriment to the public safety realm"); "lack of proper police training creates or can lead to a public safety hazard and the accidental shooting of civilians, whether unarmed, carrying concealed, or carrying exposed (open carry)"; "statistically if [a person] resists being a crime victim through the use of a firearm, then they're less likely to suffer any injury at all…That's been a running statistic from the feds every year (Bureau of Justice Statistics)"; "most mistake-of-fact shootings…demonstrate [the victim] did not have a firearm on their person"; "Mr. Raney's opinions are based on speculation and a generalized fear that law-abiding individuals, simply by the act of carrying their firearm exposed, will cause panic among police officers"; "[the idea] that if you allow people to carry guns, they're just going to run around killing people over things like parking lot disputes….we just didn't see it. We didn't see any of that").

## F. Restricts the Scope of Pre-Existing Rights Based on the Distorted Opinions of a Vocal Minority

The district court's holding, "In sum, California has proven an historical tradition of imposing categorical limits on how guns are carried in public based on

categorical cultural and societal expectations, including limits derived from the differences between urban and rural areas" turns the Constitution into a political football, subject to the whim of judicial activists.

This rationale conflicts with over a century of Supreme Court jurisprudence in constitutional interpretation, as discussed above. And, while later generations can reach a legislative consensus to increase the scope of the rights, like the modern view that pistols are 'common weapons' and no longer perceived as 'dangerous and unusual,' the government cannot restrict the scope of a codified enumerated right.

So, the fact that the open carriage of weapons was 'the norm' at the Founding Era and concealed carry may not have been (because pistols were in the 'dangerous and unusual' category) does not support the outlier view pressed by the district court that open carry can now be eliminated in favor of concealed carry. Apart from violating the plain text of the Second Amendment, this aberrant view of the 'societal norm' is belied by the 45 other states in which open carry is quite normal – as it was in California just 12 years ago.

## CONCLUSION

The district court order should be reversed, summary judgment in favor of Appellant should be entered, and California Penal Code §§ 25850 and 26350 should be permanently enjoined by this Court.

Dated: April 17, 2024

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*

By:  _____
Amy L. Bellantoni
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-565

I am the attorney or self-represented party.

**This brief contains** | 11,889 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Amy L. Bellantoni | **Date** | 4/17/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

**Page**

U.S. CONST. amend. II. .............................................................Addendum 1

U.S. CONST. amend. XIV ..........................................................Addendum 1

CAL. PENAL CODE § 25850...........................................................Addendum 1

CAL. PENAL CODE § 25850 EXEMPTIONS ...................................Addendum 3

CAL. PENAL CODE § 26350...........................................................Addendum 8

CAL. PENAL CODE § 26350 EXEMPTIONS ...................................Addendum 9

CAL. PENAL CODE § 26150.........................................................Addendum 15

CAL. PENAL CODE § 26155.........................................................Addendum 16

CAL. PENAL CODE § 26175.........................................................Addendum 17

CAL. PENAL CODE § 26225.........................................................Addendum 19

### U.S. CONST. amend. II.

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

### U.S. CONST. amend. XIV.
#### (in pertinent part)

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal
protection of the laws. U.S. Const. amend. XIV.

### CAL. PENAL CODE § 25850

(a) A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory.

(b) In order to determine whether or not a firearm is loaded for the purpose of enforcing this section, peace officers are authorized to examine any firearm carried by anyone on the person or in a vehicle while in any public place or on any public street in an incorporated city or prohibited area of an unincorporated territory. Refusal to allow a peace officer to inspect a firearm pursuant to this section constitutes probable cause for arrest for violation of this section.

(c) Carrying a loaded firearm in violation of this section is punishable, as follows:

(1) Where the person previously has been convicted of any felony, or of any crime made punishable by a provision listed in Section 16580, as a felony.

(2) Where the firearm is stolen and the person knew or had reasonable cause to believe that it was stolen, as a felony.

(3) Where the person is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22, under the Street Terrorism

### ADDENDUM 1

Enforcement and Prevention Act (Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1), as a felony.

(4) Where the person is not in lawful possession of the firearm, or is within a class of persons prohibited from possessing or acquiring a firearm pursuant to Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, as a felony.

(5) Where the person has been convicted of a crime against a person or property, or of a narcotics or dangerous drug violation, by imprisonment pursuant to subdivision (h) of Section 1170, or by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

(6) Where the person is not listed with the Department of Justice pursuant to Section 11106 as the registered owner of the handgun, by imprisonment pursuant to subdivision (h) of Section 1170, or by imprisonment in a county jail not to exceed one year, or by a fine not to exceed one thousand dollars ($1,000), or both that fine and imprisonment.

(7) In all cases other than those specified in paragraphs (1) to (6), inclusive, as a misdemeanor, punishable by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

(d)

(1) Every person convicted under this section who has previously been convicted of an offense enumerated in Section 23515, or of any crime made punishable under a provision listed in Section 16580, shall serve a term of at least three months in a county jail, or, if granted probation or if the execution or imposition of sentence is suspended, it shall be a condition thereof that the person be imprisoned for a period of at least three months.

(2) The court shall apply the three-month minimum sentence except in unusual cases where the interests of justice would best be served by granting probation or suspending the imposition or execution of sentence without the minimum imprisonment required in this section or by granting probation or

**ADDENDUM 2**

suspending the imposition or execution of sentence with conditions other than those set forth in this section, in which case, the court shall specify on the record and shall enter on the minutes the circumstances indicating that the interests of justice would best be served by that disposition.

(e) A violation of this section that is punished by imprisonment in a county jail not exceeding one year shall not constitute a conviction of a crime punishable by imprisonment for a term exceeding one year for the purposes of determining federal firearms eligibility under Section 922(g)(1) of Title 18 of the United States Code.

(f) Nothing in this section, or in Article 3 (commencing with Section 25900) or Article 4 (commencing with Section 26000), shall preclude prosecution under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a greater penalty than this section.

(g) Notwithstanding paragraphs (2) and (3) of subdivision (a) of Section 836, a peace officer may make an arrest without a warrant:

(1) When the person arrested has violated this section, although not in the officer's presence.

(2) Whenever the officer has reasonable cause to believe that the person to be arrested has violated this section, whether or not this section has, in fact, been violated.

(h) A peace officer may arrest a person for a violation of paragraph (6) of subdivision (c), if the peace officer has probable cause to believe that the person is carrying a handgun in violation of this section and that person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner of that handgun.

(Amended by Stats. 2011, Ch. 15, Sec. 544. (AB 109) Effective April 4, 2011. Amending action operative October 1, 2011, by Sec. 636 of Ch. 15, as amended by Stats. 2011, Ch. 39, Sec. 68. Section operative January 1, 2012, pursuant to Stats. 2010, Ch. 711, Sec. 10.)

**ADDENDUM 3**

## CAL. PENAL CODE § 25850 EXEMPTIONS

**26000.** Section 25850 does not apply to members of the military forces of this state or of the United States engaged in the performance of their duties. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26005**. Section 25850 does not apply to either of the following: (a) Persons who are using target ranges for the purpose of practice shooting with a firearm. (b) Members of shooting clubs while hunting on the premises of those clubs. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26010**. Section 25850 does not apply to the carrying of any handgun by any person as authorized pursuant to Chapter 4 (commencing with Section 26150) of Division 5. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26015.** Section 25850 does not apply to any armored vehicle guard, as defined in Section 7582.1 of the Business and Professions Code, if either of the following conditions is satisfied: (a) The guard was hired prior to January 1, 1977, and is acting within the course and scope of employment. (b) The guard was hired on or after January 1, 1977, has received a firearms qualification card from the Department of Consumer Affairs, and is acting within the course and scope of employment. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26020**. (a) Upon approval of the sheriff of the county in which the retiree resides, Section 25850 does not apply to any honorably retired federal officer or agent of any federal law enforcement agency, including, but not limited to, the Federal Bureau of Investigation, the United States Secret Service, the United States Customs Service, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives, the Federal Bureau of Narcotics, the United States Drug Enforcement Administration, the United States Border Patrol, and any officer or agent of the Internal Revenue Service who was authorized to carry weapons while on duty, who was assigned to duty within the state for a period of not less than one year, or who retired from active service in the state. (b) A retired federal officer or agent shall provide the sheriff with certification from the agency from which the officer or agent retired certifying that person's service in the state, stating the nature of that person's retirement, and indicating the agency's concurrence that the retired federal officer or agent should

**ADDENDUM 4**

be accorded the privilege of carrying a loaded firearm. (c) Upon approval, the sheriff shall issue a permit to the retired federal officer or agent indicating that the retiree may carry a loaded firearm in accordance with this section. The permit shall be valid for a period not exceeding five years, shall be carried by the retiree while carrying a loaded firearm, and may be revoked for good cause. (d) The sheriff of the county in which the retired federal officer or agent resides may require recertification prior to a permit renewal, and may suspend the privilege for cause. The sheriff may charge a fee necessary to cover any reasonable expenses incurred by the county. (Amended by Stats. 2011, Ch. 296, Sec. 231. (AB 1023) Effective January 1, 2012.)

**26025.** Section 25850 does not apply to any of the following who have completed a regular course in firearms training approved by the Commission on Peace Officer Standards and Training: (a) Patrol special police officers appointed by the police commission of any city, county, or city and county under the express terms of its charter who also, under the express terms of the charter, satisfy all of the following requirements: (1) They are subject to suspension or dismissal after a hearing on charges duly filed with the commission after a fair and impartial trial. (2) They are not less than 18 years of age or more than 40 years of age. (3) They possess physical qualifications prescribed by the commission. (4) They are designated by the police commission as the owners of a certain beat or territory as may be fixed from time to time by the police commission. (b) Animal control officers or zookeepers, regularly compensated in that capacity by a governmental agency, when carrying weapons while acting in the course and scope of their employment and when designated by a local ordinance or, if the governmental agency is not authorized to act by ordinance, by a resolution, either individually or by class, to carry the weapons. (c) Persons who are authorized to carry the weapons pursuant to Section 14502 of the Corporations Code, while actually engaged in the performance of their duties pursuant to that section. (d) Harbor police officers designated pursuant to Section 663.5 of the Harbors and Navigation Code. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26030.** (a) Section 25850 does not apply to any of the following who have been issued a certificate pursuant to subdivision (d): (1) Guards or messengers of common carriers, banks, and other financial institutions, while actually employed in and about the shipment, transportation, or delivery of any money, treasure, bullion, bonds, or other thing of value within this state. (2) Guards of contract carriers operating armored vehicles pursuant to California Highway Patrol and Public Utilities Commission authority, if they were hired prior to January 1, 1977. (3) Guards of

contract carriers operating armored vehicles pursuant to California Highway Patrol and Public Utilities Commission authority, if they were hired on or after January 1, 1977, and they have completed a course in the carrying and use of firearms that meets the standards prescribed by the Department of Consumer Affairs. (4) Private investigators licensed pursuant to Chapter 11.3 (commencing with Section 7512) of Division 3 of the Business and Professions Code, while acting within the course and scope of their employment. (5) Uniformed employees of private investigators licensed pursuant to Chapter 11.3 (commencing with Section 7512) of Division 3 of the Business and Professions Code, while acting within the course and scope of their employment. (6) Private patrol operators licensed pursuant to Chapter 11.5 (commencing with Section 7580) of Division 3 of the Business and Professions Code, while acting within the course and scope of their employment. (7) Uniformed employees of private patrol operators licensed pursuant to Chapter 11.5 (commencing with Section 7580) of Division 3 of the Business and Professions Code, while acting within the course and scope of their employment. (8) Alarm company operators licensed pursuant to Chapter 11.6 (commencing with Section 7590) of Division 3 of the Business and Professions Code, while acting within the course and scope of their employment. (9) Uniformed security guards or night watch persons employed by any public agency, while acting within the scope and course of their employment. (10) Uniformed security guards, regularly employed and compensated in that capacity by persons engaged in any lawful business, and uniformed alarm agents employed by an alarm company operator, while actually engaged in protecting and preserving the property of their employers, or on duty or en route to or from their residences or their places of employment, and security guards and alarm agents en route to or from their residences or employer-required range training. (b) Nothing in paragraph (10) of subdivision (a) shall be construed to prohibit cities and counties from enacting ordinances requiring alarm agents to register their names. (c) A certificate under this section shall not be required of any person who is a peace officer, who has completed all training required by law for the exercise of the person's power as a peace officer, and who is employed while not on duty as a peace officer. (d) The Department of Consumer Affairs may issue a certificate to any person referred to in this section, upon notification by the school where the course was completed, that the person has successfully completed a course in the carrying and use of firearms and a course of training in the exercise of the powers of arrest, which meet the standards prescribed by the department pursuant to Section 7583.5 of the Business and Professions Code. (Added by Stats. 2010, Ch.

**ADDENDUM 6**

711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26035.** Nothing in Section 25850 shall prevent any person engaged in any lawful business, including a nonprofit organization, or any officer, employee, or agent authorized by that person for lawful purposes connected with that business, from having a loaded firearm within the person's place of business, or any person in lawful possession of private property from having a loaded firearm on that property. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26040**. Nothing in Section 25850 shall prevent any person from carrying a loaded firearm in an area within an incorporated city while engaged in hunting, provided that the hunting at that place and time is not prohibited by the city council. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26045**. (a) Nothing in Section 25850 is intended to preclude the carrying of any loaded firearm, under circumstances where it would otherwise be lawful, by a person who reasonably believes that any person or the property of any person is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property. (b) A violation of Section 25850 is justifiable when a person who possesses a firearm reasonably believes that person is in grave danger because of circumstances forming the basis of a current restraining order issued by a court against another person who has been found to pose a threat to the life or safety of the person who possesses the firearm. This subdivision may not apply when the circumstances involve a mutual restraining order issued pursuant to Division 10 (commencing with Section 6200) of the Family Code absent a factual finding of a specific threat to the person's life or safety. It is not the intent of the Legislature to limit, restrict, or narrow the application of current statutory or judicial authority to apply this or other justifications to a defendant charged with violating Section 25850 or committing another similar offense. Upon trial for violating Section 25850, the trier of fact shall determine whether the defendant was acting out of a reasonable belief that the defendant was in grave danger. (c) As used in this section, "immediate" means the brief interval before and after the local law enforcement agency, when reasonably possible, has been notified of the danger and before the arrival of its assistance. (Amended by Stats. 2018, Ch. 185, Sec. 7. (AB 2176) Effective January 1, 2019.)

**ADDENDUM 7**

**26050**. Nothing in Section 25850 is intended to preclude the carrying of a loaded firearm by any person while engaged in the act of making or attempting to make a lawful arrest. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26055**. Nothing in Section 25850 shall prevent any person from having a loaded weapon, if it is otherwise lawful, at the person's place of residence, including any temporary residence or campsite. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**26060**. Nothing in Section 25850 shall prevent any person from storing aboard any vessel or aircraft any loaded or unloaded rocket, rocket propelled projectile launcher, or similar device designed primarily for emergency or distress signaling purposes, or from possessing that type of a device while in a permitted hunting area or traveling to or from a permitted hunting area and carrying a valid California permit or license to hunt. (Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

## CAL. PENAL CODE § 26350

(a) (1) A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following:

> (A) A public place or public street in an incorporated city or city and county.

> (B) A public street in a prohibited area of an unincorporated area of a county or city and county.

> (C) A public place in a prohibited area of a county or city and county.

(2) A person is guilty of openly carrying an unloaded handgun when that person carries an exposed and unloaded handgun inside or on a vehicle, whether or not on his or her person, while in or on any of the following:

> (A) A public place or public street in an incorporated city or city and county.

> (B) A public street in a prohibited area of an unincorporated area of a county or city and county.

> (C) A public place in a prohibited area of a county or city and county.

**ADDENDUM 8**

(b) (1) Except as specified in paragraph (2), a violation of this section is a misdemeanor.

(2) A violation of subparagraph (A) of paragraph (1) of subdivision (a) is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment, if both of the following conditions exist:

(A) The handgun and unexpended ammunition capable of being discharged from that handgun are in the immediate possession of that person.

(B) The person is not in lawful possession of that handgun.

(c) (1) Nothing in this section shall preclude prosecution under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a penalty greater than is set forth in this section.

(2) The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by different provisions of law shall not be punished under more than one provision.

(d) Notwithstanding the fact that the term "an unloaded handgun" is used in this section, each handgun shall constitute a distinct and separate offense under this section.

(Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)


## CAL. PENAL CODE § 26350 EXEMPTIONS

**26351**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by any peace officer or any honorably retired peace officer if that officer may carry a concealed firearm pursuant to Article 2 (commencing with Section 25450) of Chapter 2, or a loaded firearm pursuant to Article 3 (commencing with Section 25900) of Chapter 3. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26362**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by any person to the extent that person may openly carry a loaded handgun

**ADDENDUM 9**

pursuant to Article 4 (commencing with Section 26000) of Chapter 3. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26363**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun as merchandise by a person who is engaged in the business of manufacturing, importing, wholesaling, repairing, or dealing in firearms and who is licensed to engage in that business, or the authorized representative or authorized agent of that person, while engaged in the lawful course of the business. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26364**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a duly authorized military or civil organization, or the members thereof, while parading or while rehearsing or practicing parading, when at the meeting place of the organization. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26365**. Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a member of any club or organization organized for the purpose of practicing shooting at targets upon established target ranges, whether public or private, while the members are using handguns upon the target ranges or incident to the use of a handgun at that target range. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26366**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a licensed hunter while engaged in hunting or while transporting that handgun when going to or returning from that hunting expedition. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26366.5**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a licensed hunter while actually engaged in training a dog for the purpose of using the dog in hunting that is not prohibited by law, or while transporting the firearm while going to or returning from that training. (Added by Stats. 2012, Ch. 700, Sec. 9. (AB 1527) Effective January 1, 2013.)

**26367**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to transportation of a handgun by a person operating a licensed common carrier, or by an authorized agent or employee thereof, when transported in conformance with applicable federal law. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**ADDENDUM 10**

**26368**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a member of an organization chartered by the Congress of the United States or a nonprofit mutual or public benefit corporation organized and recognized as a nonprofit tax-exempt organization by the Internal Revenue Service while on official parade duty or ceremonial occasions of that organization or while rehearsing or practicing for official parade duty or ceremonial occasions. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26369**. Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun within a gun show conducted pursuant to Article 1 (commencing with Section 27200) and Article 2 (commencing with Section 27300) of Chapter 3 of Division 6. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26370**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun within a school zone, as defined in Section 626.9, if that carrying is not prohibited by Section 626.9. (Amended by Stats. 2017, Ch. 779, Sec. 2. (AB 424) Effective January 1, 2018.)

**26371.** Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun when in accordance with the provisions of Section 171b. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26372**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by any person while engaged in the act of making or attempting to make a lawful arrest. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26373.** Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to loaning, selling, or transferring that handgun in accordance with Article 1 (commencing with Section 27500) of Chapter 4 of Division 6, or in accordance with any of the exemptions from Section 27545, so long as that handgun is possessed within private property and the possession and carrying is with the permission of the owner or lessee of that private property. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26374**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person engaged in firearms-related activities, while on the premises of a fixed place of business that is licensed to conduct and conducts, as a regular course of its business, activities related to the sale, making, repair, transfer, pawn, or the

use of firearms, or related to firearms training. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26375.** Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26376**. Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to obtaining an identification number or mark assigned for that handgun from the Department of Justice pursuant to Section 23910. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26377**. Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun at any established target range, whether public or private, while the person is using the handgun upon the target range. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26378**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person when that person is summoned by a peace officer to assist in making arrests or preserving the peace, while the person is actually engaged in assisting that officer. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26379**. Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to any of the following: (a) Complying with Section 27560 or 27565, as it pertains to that handgun. (b) Section 28000, as it pertains to that handgun. (c) Section 27850 or 31725, as it pertains to that handgun. (d) Complying with Section 27870 or 27875, as it pertains to that handgun. (e) Complying with Section 26556, 27915, 27920, 27925, 29810, or 29830, as it pertains to that handgun. (f) Complying with paragraph (2) of subdivision (e) of Section 32000, as it pertains to that handgun. (g) Complying with Section 6389 of the Family Code, as it pertains to that handgun. (Amended by Stats. 2021, Ch. 685, Sec. 10. (SB 320) Effective January 1, 2022.)

**ADDENDUM 12**

**26380.** Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to, and in the course and scope of, training of or by an individual to become a sworn peace officer as part of a course of study approved by the Commission on Peace Officer Standards and Training. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26381**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to, and in the course and scope of, training of or by an individual to become licensed pursuant to Chapter 4 (commencing with Section 26150) as part of a course of study necessary or authorized by the person authorized to issue the license pursuant to that chapter. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26382.** Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to and at the request of a sheriff or chief or other head of a municipal police department. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26383.** Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person when done within a place of business, a place of residence, or on private property, if done with the permission of a person who, by virtue of subdivision (a) of Section 25605, may carry openly an unloaded handgun within that place of business, place of residence, or on that private property owned or lawfully possessed by that person. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26384.** Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun if all of the following conditions are satisfied: (a) The open carrying occurs at an auction, raffle, or similar event of a nonprofit public benefit or mutual benefit corporation, at which firearms are auctioned or otherwise sold to fund the activities of that corporation or the local chapters of that corporation. (b) The unloaded handgun is to be auctioned or otherwise sold for that nonprofit public benefit or mutual benefit corporation. (c) The unloaded handgun is to be delivered by a person licensed pursuant to, and operating in accordance with, Sections 26700 to 26915, inclusive. (Amended by Stats. 2019, Ch. 738, Sec. 8. (SB 376) Effective January 1, 2020.)

**26385**. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun pursuant to paragraph (3) of subdivision (b) of Section 171c. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**ADDENDUM 13**

**26386**.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun pursuant to Section 171d. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26387**.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun pursuant to subparagraph (F) of paragraph (1) subdivision (c) of Section 171.7. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26388**.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun on publicly owned land, if the possession and use of a handgun is specifically permitted by the managing agency of the land and the person carrying that handgun is in lawful possession of that handgun. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26389**.  Section 26350 does not apply to, or affect, the carrying of an unloaded handgun if the handgun is carried either in the locked trunk of a motor vehicle or in a locked container. (Added by Stats. 2011, Ch. 725, Sec. 14. (AB 144) Effective January 1, 2012.)

**26390**.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun in any of the following circumstances: (a) The open carrying of an unloaded handgun that is regulated pursuant to Chapter 1 (commencing with Section 18710) of Division 5 of Title 2 by a person who holds a permit issued pursuant to Article 3 (commencing with Section 18900) of that chapter, if the carrying of that handgun is conducted in accordance with the terms and conditions of the permit. (b) The open carrying of an unloaded handgun that is regulated pursuant to Chapter 2 (commencing with Section 30500) of Division 10 by a person who holds a permit issued pursuant to Section 31005, if the carrying of that handgun is conducted in accordance with the terms and conditions of the permit. (c) The open carrying of an unloaded handgun that is regulated pursuant to Chapter 6 (commencing with Section 32610) of Division 10 by a person who holds a permit issued pursuant to Section 32650, if the carrying is conducted in accordance with the terms and conditions of the permit. (d) The open carrying of an unloaded handgun that is regulated pursuant to Article 2 (commencing with Section 33300) of Chapter 8 of Division 10 by a person who holds a permit issued pursuant to Section 33300, if the carrying of that handgun is conducted in accordance with the terms and conditions of the permit. (Added by Stats. 2012, Ch. 700, Sec. 10. (AB 1527) Effective January 1, 2013.)

**26391**.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun when done in accordance with the provisions of subdivision (d) of Section

**ADDENDUM 14**

171.5. (Added by Stats. 2012, Ch. 700, Sec. 11. (AB 1527) Effective January 1, 2013.)

**26392**. Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun in any of the following circumstances: (a) By a person who finds that handgun, if the person is transporting the handgun in order to comply with Article 1 (commencing with Section 2080) of Chapter 4 of Title 6 of Part 4 of Division 3 of the Civil Code as it pertains to that firearm, and, if the person is transporting the firearm to a law enforcement agency, the person gives prior notice to the law enforcement agency that the person is transporting the handgun to the law enforcement agency. (b) By a person who finds that handgun and is transporting it to a law enforcement agency for disposition according to law, if the person gives prior notice to the law enforcement agency that the person is transporting the firearm to the law enforcement agency for disposition according to law. (c) By a person who took the firearm from a person who was committing a crime against the person and is transporting it to a law enforcement agency for disposition according to law, if the person gives prior notice to the law enforcement agency that the person is transporting that handgun to the law enforcement agency for disposition according to law. (Added by Stats. 2019, Ch. 110, Sec. 4. (AB 1292) Effective January 1, 2020.)

## CAL. PENAL CODE § 26150

(a) When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the sheriff of a county may issue a license to that person upon proof of all of the following:

(1) The applicant is of good moral character.

(2) Good cause exists for issuance of the license.

(3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business.

(4) The applicant has completed a course of training as described in Section 26165.

**ADDENDUM 15**

(b) The sheriff may issue a license under subdivision (a) in either of the following formats:

(1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

(2) Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person.

(c) (1) Nothing in this chapter shall preclude the sheriff of the county from entering into an agreement with the chief or other head of a municipal police department of a city to process all applications for licenses, renewals of licenses, or amendments to licenses pursuant to this chapter, in lieu of the sheriff.

(2) This subdivision shall only apply to applicants who reside within the city in which the chief or other head of the municipal police department has agreed to process applications for licenses, renewals of licenses, and amendments to licenses, pursuant to this chapter.

(Amended by Stats. 2015, Ch. 785, Sec. 2. (AB 1134) Effective January 1, 2016.)

## CAL. PENAL CODE § 26155

(a) When a person applies for a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person, the chief or other head of a municipal police department of any city or city and county may issue a license to that person upon proof of all of the following:

(1) The applicant is of good moral character.

(2) Good cause exists for issuance of the license.

(3) The applicant is a resident of that city.

(4) The applicant has completed a course of training as described in Section 26165.

(b) The chief or other head of a municipal police department may issue a license under subdivision (a) in either of the following formats:

**ADDENDUM 16**

(1) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

(2) Where the population of the county in which the city is located is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person.

(c) Nothing in this chapter shall preclude the chief or other head of a municipal police department of any city from entering an agreement with the sheriff of the county in which the city is located for the sheriff to process all applications for licenses, renewals of licenses, and amendments to licenses, pursuant to this chapter.

(Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

## CAL. PENAL CODE § 26175

(a) (1) Applications for licenses and applications for amendments to licenses under this article shall be uniform throughout the state, upon forms to be prescribed by the Attorney General.

(2) The Attorney General shall convene a committee composed of one representative of the California State Sheriffs' Association, one representative of the California Police Chiefs Association, and one representative of the Department of Justice to review, and, as deemed appropriate, revise the standard application form for licenses. The committee shall meet for this purpose if two of the committee's members deem that necessary.

(3) (A) The Attorney General shall develop a uniform license that may be used as indicia of proof of licensure throughout the state.

(B) The Attorney General shall approve the use of licenses issued by local agencies that contain all the information required in subdivision (i), including a recent photograph of the applicant, and are deemed to be in substantial compliance with standards developed by the committee described in subparagraph (C), if developed, as they relate to the physical dimensions and general appearance of the licenses. The Attorney General shall retain exemplars of approved licenses and shall maintain a

list of agencies issuing local licenses. Approved licenses may be used as indicia of proof of licensure under this chapter in lieu of the uniform license developed by the Attorney General.

(C) A committee composed of two representatives of the California State Sheriffs' Association, two representatives of the California Police Chiefs Association, and one representative of the Department of Justice shall convene to review and revise, as the committee deems appropriate, the design standard for licenses issued by local agencies that may be used as indicia of proof of licensure throughout the state, provided that the design standard meets the requirements of subparagraph (B). The committee shall meet for this purpose if two of the committee's members deem it necessary.

(b) The application shall include a section summarizing the requirements of state law that result in the automatic denial of a license.

(c) The standard application form for licenses described in subdivision (a) shall require information from the applicant, including, but not limited to, the name, occupation, residence, and business address of the applicant, the applicant's age, height, weight, color of eyes and hair, and reason for desiring a license to carry the weapon.

(d) Applications for licenses shall be filed in writing and signed by the applicant.

(e) Applications for amendments to licenses shall be filed in writing and signed by the applicant, and shall state what type of amendment is sought pursuant to Section 26215 and the reason for desiring the amendment.

(f) The forms shall contain a provision whereby the applicant attests to the truth of statements contained in the application.

(g) An applicant shall not be required to complete any additional application or form for a license, or to provide any information other than that necessary to complete the standard application form described in subdivision (a), except to clarify or interpret information provided by the applicant on the standard application form.

(h) The standard application form described in subdivision (a) is deemed to be a local form expressly exempt from the requirements of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code).

ADDENDUM 18

(i) Any license issued upon the application shall set forth the licensee's name, occupation, residence and business address, the licensee's age, height, weight, color of eyes and hair, and the reason for desiring a license to carry the weapon, and shall, in addition, contain a description of the weapon or weapons authorized to be carried, giving the name of the manufacturer, the serial number, and the caliber. The license issued to the licensee may be laminated.

(Amended by Stats. 2016, Ch. 645, Sec. 1. (AB 2510) Effective January 1, 2017.)

## CAL. PENAL CODE § 26225

(a) A record of the following shall be maintained in the office of the licensing authority:
    (1) The denial of a license.
    (2) The denial of an amendment to a license.
    (3) The issuance of a license.
    (4) The amendment of a license.
    (5) The revocation of a license.

(b) Copies of each of the following shall be filed immediately by the issuing officer or authority with the Department of Justice:

    (1) The denial of a license.
    (2) The denial of an amendment to a license.
    (3) The issuance of a license.
    (4) The amendment of a license.
    (5) The revocation of a license.

(c) (1) Commencing on or before January 1, 2000, and annually thereafter, each licensing authority shall submit to the Attorney General the total number of licenses issued to peace officers pursuant to Section 26170, and to judges pursuant to Section 26150 or 26155.

(2) The Attorney General shall collect and record the information submitted pursuant to this subdivision by county and licensing authority.

(Added by Stats. 2010, Ch. 711, Sec. 6. (SB 1080) Effective January 1, 2011. Operative January 1, 2012, by Sec. 10 of Ch. 711.)

**ADDENDUM 19**