No. 24-565

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

MARK BAIRD,
*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California
*Defendant-Appellee.*

_____

On Appeal from the United States District Court for the Eastern District of
California, Case No. 2:19-cv-00617-KJM-AC, The Honorable Kimberly J. Mueller

_____

BRIEF OF *AMICUS CURIAE* MOUNTAIN STATES LEGAL
FOUNDATION'S CENTER TO KEEP AND BEAR ARMS IN SUPPORT OF
PLAINTIFF-APPELLANT AND REVERSAL

_____

Michael D. McCoy
D. Sean Nation
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
mmccoy@mslegal.org

*Attorneys for Amicus Curiae
Mountain States Legal Foundation's
Center to Keep and Bear Arms*

## CORPORATE DISCLOSURE STATEMENT[1]

The undersigned attorney certifies that amicus curiae Mountain States Legal Foundation ("MSLF") is a nonprofit corporation, formed and in good standing in the state of Colorado under Section 501(c)(3) of the Internal Revenue Code. MSLF is not publicly traded and has no parent corporation. There is no publicly held corporation that owns ten percent or more of its stock.

---

[1] Pursuant to Fed. R. App. P. 29, both parties have consented to the filing of this *amicus curiae* brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned affirms that no counsel for a party authored this brief in whole or in part, and no person or entity other than Mountain States Legal Foundation, or its counsel, made a monetary contribution specifically for the preparation or submission of this brief.

## **<u>TABLE OF CONTENTS</u>**

CORPORATE DISCLOSURE STATEMENT ...................................... i

TABLE OF CONTENTS .......................................................... ii

TABLE OF AUTHORITIES....................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ......................... 1

INTRODUCTION ................................................................. 2

SUMMARY OF THE ARGUMENT ...................................... 3

ARGUMENT ...................................................................... 4

I.     Attorneys and judges are well-equipped to use history. .............. 4

II.    If history is indeterminate, the Plaintiff wins under *Bruen*. ......... 12

III.   When courts precede their *Bruen* analysis with statements expressing disdain for its ruling, they should be held to a higher level of scrutiny.   14

Conclusion ....................................................................... 20

CERTIFICATE OF SERVICE ................................................. 22

Certificate of Compliance for Briefs ...................................... 23

# <u>TABLE OF AUTHORITIES</u>

*Alden v. Maine*,
    527 U.S. 706 (1999) ................................................................. 9

*American Tradition Partnership, Inc. v. Bullock*,
    567 U.S. 516 (2012) ............................................................... 18

*Baird v. Bonta*,
    2023 WL 9050959 (E.D. Cal. 2023) ................................... 3, 4, 5, 15

*Baird v. Bonta*,
    2022 WL 17542432 (E.D. Cal. 2022) ................................... 15

*Bevis v. City of Naperville*,
    657 F. Supp. 3d 1052 (N.D. Ill. 2023) ................................. 14

*Citizens United v. Federal Election Comm'n*,
    558 U.S. 310 (2010) ............................................................... 18

*Crawford v. Washington*,
    541 U.S. 36 (2004) .................................................................. 8

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ............................................................ 1, 2, 9

*Fisher v. Haldeman*,
    61 U.S. 186 (1857) ................................................................. 10

*Giles v. California*,
    554 U.S. 353 (2008) ................................................................ 8

*Gonyo v. D.S.*,
    2024 WL 296876 (N.Y. Sup. Ct. 2024) ................................. 5

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ................................................................ 6

*Marsh v. Chambers*,
    463 U.S. 783 (1983) ................................................................ 7

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................ 1

iii

*McDougall v. County of Ventura*,
  23 F.4th 1095 (9th Cir. 2022) ................................................................. 20

*Miller v. Bonta*,
  2023 WL 6929336 (S.D. Cal. 2023)....................................................... 13

*Moore v. East Cleveland*,
  431 U.S. 494 (1977) ................................................................................ 7

*Moore v. Harper*,
  600 U.S. 1 (2023) .................................................................................... 6

*N.L.R.B. v. Noel Canning*,
  573 U.S. 513 (2014) ................................................................................ 7

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) ...................................................... 1, 2, 6, 7, 8, 13, 15, 19

*Nguyen v. Bonta*,
  675 F. Supp. 3d 1065 (S.D. Cal. 2023) ................................................ 12

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ............................................................................... 18

*Ocean State Tactical, LLC v. Rhode Island*,
  95 F.4th 38 (1st Cir. 2024)..................................................................... 19

*Ocean State Tactical, LLC v. Rhode Island*,
  646 F. Supp. 3d 368 (D.R.I. 2022) ....................................................... 18

*Parker v. District of Columbia*,
  478 F. 3d 370 (D.C. Cir. 2007) ............................................................. 19

*Pavan v. Smith*,
  582 U.S. 563 (2017) ........................................................................... 9, 18

*Rocky Mountain Gun Owners v. Polis*,
  2023 WL 8446495 (D. Colo. 2023)....................................................... 17

*Rogers v. Grewal*,
  140 S. Ct. 1865 (2020) ........................................................................... 19

iv

*State v. Wilson*,
543 P.3d 440 (Hawai'i 2024)................................................................. 3, 18

*Sullivan v. Ferguson*,
3:22-cv-05403 (W.D. Wash. 2023)....................................................... 1, 15

*Teter v. Connors*,
76 F. 4th 938 (9th Cir. 2023) ................................................................. 1

*United States v. Brown*,
2023 WL 8794641 (N.D. Miss. 2023)..................................................... 5

*United States v. Bullock*,
2022 WL 16649175 (S.D. Miss. 2022) ................................................... 16

*United States v. Daniels*,
77 F.4th 337 (5th Cir. 2023) ................................................................. 12

*United States v. Pierret-Mercedes*,
2024 WL 1672034 (D. P.R. 2024) ......................................................... 11

*United States v. Stevens*,
559 U.S. 460 (2010) ............................................................................... 8

*United States v. Texas*,
599 U.S. 670 (2023) ............................................................................... 9

*VanDerStok v. Garland*,
633 F. Supp. 3d 847 (N.D. Tex. 2022) ................................................. 1

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ............................................................................... 7

**Rules**

Fed. R. App. P. 29................................................................................... i

Fed. R. App. P. 29(a)(4)(E) .................................................................... i

Fed. R. App. P. 29(a)(5) ......................................................................... 23

Fed. R. App. P. 32(a)(5) and (6)............................................................. 23

Fed. R. App. P. 32(f)............................................................................... 23

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Center to Keep and Bear Arms ("CKBA") is a project of Mountain States Legal Foundation ("MSLF"), a Colorado-based non-profit, public interest legal foundation. MSLF was founded in 1977 to defend the Constitution, protect private property rights, and advance economic liberty. CKBA was established in 2020 to continue MSLF's litigation to protect Americans' natural and fundamental right to self-defense. CKBA represents individuals and organizations challenging infringements on the constitutionally protected right to keep and bear arms. *See, e.g.*, *VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022), *cert. granted* Apr. 22, 2024 (No. 23-852); *Sullivan, et al. v. Ferguson, et al.*, W.D. Wash. 3:22-cv-05403; *Garcia v. Polis*, D. Colo. 1:23-cv-02563-JLK.

CKBA also files *amicus curiae* briefs with the U.S. Supreme Court and circuit courts across the nation. *See, e.g.*, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (representing amicus curiae CKBA); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (representing amici curiae Rocky Mountain Gun Owners and National Association for Gun Rights); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (representing amicus curiae MSLF); *Teter v. Connors*, 76 F. 4th 938 (9th Cir. 2023), *reh'g en banc granted*, 2024 WL 719051 (9th Cir. Feb. 22, 2024) (representing amicus curiae MSLF). The Court's decision will directly impact CKBA's current clients and litigation.

# INTRODUCTION

In 2022, the Supreme Court announced its landmark decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The opinion held that a New York concealed carry law violated the Second Amendment because it required citizens to establish a special need before they could be licensed to carry a concealed firearm in public. The Supreme Court reaffirmed and significantly expanded the precedent it set nearly 15 years earlier in *District of Columbia v. Heller*, 554 U.S. 570 (2008). By extending the right to possess a firearm for self-defense to areas outside of the home, the Court indicated that the Second Amendment protects a wide swath of conduct that courts had not previously considered secured by the people. This decision also represented a sea change in the way that lower courts are required to evaluate and address cases involving Second Amendment-protected rights. Put simply, means-ends scrutiny is dead. Instead, courts must put the government to the stringent test of proving that a regulation is consistent with the nation's historical tradition of firearm regulation.

Nevertheless, the District Court granted summary judgment below in favor of the State. The Court went out of its way to claim courts struggled with applying Supreme Court precedent in the Second Amendment context, criticized the Court for offering "sparse practical guidance" with respect to historical laws in *Bruen*, and explained its view that "understanding and faithfully comparing these historical laws

to our own a daunting if not impossible task for a generalist judge." *Baird v. Bonta*, — F.Supp.3d —, 2023 WL 9050959, \*10-\*12 (E.D. Cal. Dec. 29, 2023).

With all due respect to the District Court, these statements—and other similar ones—ought to be rejected when reviewing challenges to firearms restrictions. Instead, courts need only apply *Bruen* by putting the government to its burden of proof: has the state met its substantial burden by presenting an analogous historical restriction on firearms that fairly encompasses the "how" and "why" of the restriction that it seeks to defend? If not, the statute is unconstitutional.

Moreover, the District Court reached its conclusion only after attempting to undermine *Bruen* itself. Such a practice is in vogue. *See, e.g.*, *State v. Wilson*, 543 P.3d 440, 453 (Hawai'i 2024) ("History is prone to misuse. In the Second Amendment cases, the Court distorts and cherry-picks historical evidence. It shrinks, alters, and discards historical facts that don't fit."). But when district courts reach their conclusions after significant hand-wringing regarding *Bruen*—as the District Court did here—appellate courts ought to closely scrutinize those decisions to ensure that the District Court faithfully applied Supreme Court precedent.

## SUMMARY OF THE ARGUMENT

Attorneys and judges frequently use historical reasoning, historical analogues, and historical precedents as underpinnings for their arguments. From an early point in their careers, members of the legal profession are equipped with the necessary

tools to engage in historical argumentation and reasoning. And whether it be the Federalist Papers, Blackstone, the debates surrounding ratification of the Constitution, judges frequently look to history to judge the meaning of words as they apply to modern facts.

Nevertheless, after *Bruen*, there is a disturbing trend of courts discounting their own ability to interpret history. Courts freely express concerns about whether *Bruen* is workable or correct, before purporting to faithfully apply it. But when courts do this, they (1) undermine the public's confidence in the judiciary, (2) undermine the parties' faith in the outcome of the matter; and (3) should be subject to a higher level of scrutiny by reviewing courts like this one.

## ARGUMENT

### I. Attorneys and judges are well-equipped to use history.

The District Court cast doubt on its own ability—and the ability of all district courts—to consistently review history and tradition in the context of firearms regulation. Most prominently, it stated "That the relevant history pointed to by the Supreme Court is hundreds of years behind us makes understanding and faithfully comparing these historical laws to our own a daunting if not impossible task for a generalist judge." *Baird v. Bonta*, 2023 WL 9050959 at *12. It further offered its take that the Supreme Court offered little more than "sparse guidance" for how lower courts ought to interpret history. *Id.* at *12. Another four paragraphs follow, which

marshal statements from Justice Barrett's concurrence and Justice Breyer's dissent in *Bruen*, along with making other analytical arguments as to why the court will have difficulty applying *Bruen* to the facts at hand. *Id.* at *12-13.

Later in its opinion, the District Court returned to this theme, to further cast doubt on the reliability of the historical record in *Bruen*, *Heller*, and *McDonald*, stating:

> In sum, although the Supreme Court's decisions in *Heller*, *McDonald* and *Bruen* settle the law this court must and will follow, these decisions did not settle the debate among historians of England, of colonial America, of firearms regulation, or of linguistics about what the Second Amendment meant to the people who adopted it in the founding era or, indirectly, in the reconstruction era.

*Baird*, 2023 WL 9050959, at *20. Other courts have expressed similar concerns in different contexts. *See United States v. Brown*, — F. Supp. 3d —, 2023 WL 8794641, *4 (N.D. Miss. Dec. 20, 2023) ("In this Court's view, 'historical tradition' is an unwieldy analytical tool."); *Gonyo* v. *D.S.*, —N.Y.S.3d —, 2024 WL 296876 (N.Y. Sup. Ct. Jan. 19, 2024) ("In the submissions before this Court, the experts retained by the parties do not only disagree on the law, but on the history and context of that history. Thus, the Court is put in the position of a factfinder of American and English legal history. Approaching the analysis as one in which historical facts must be determined — the Court as a fact-finder — presents myriad potential unresolvable issues."). So the District Court below certainly built on this narrative—although to what end is difficult to discern.

While *amicus* has tremendous respect for Article III judges, and recognizes the difficulties inherent in judging any case involving extensive factual and historical evidence, the concerns expressed by the District Court and by other courts are misplaced.

Instead, using and applying historical precedents is a crucial tool for federal judges. Courts often look several hundred years into the past to glean insights from our Founding documents, the words of the Framers of the Constitution, contemporary writings of prominent authors, and the basic traditions of our country. *See generally*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 536 (2022) ("The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers.") (cleaned up); *Moore v. Harper*, 600 U.S. 1, 22 (2023) (citing the Alexander Hamilton's words in Federalist No. 78 to support the proposition that the Framers intended for state courts to exercise judicial review over state legislatures).

Generalist judges are not scientists, yet they frequently evaluate scientific evidence when a person's liberty is at stake in criminal cases. Judges are not economists, but they can capably evaluate economic evidence in antitrust cases. It is the very role of the judiciary in the adversarial process to evaluate competing evidence and provide a reasoned rationale for decisions. Indeed, in *Bruen* itself, the

6

Court pointed to other contexts in which the government bears the burden of using history to establish the constitutionality of its restrictions on liberty. *See Bruen*, 597 U.S. at 24-25 ("[T]o carry that burden, the government must generally point to historical evidence about the reach of the First Amendment's protections."); *see also N.L.R.B. v. Noel Canning*, 573 U.S. 513, 523 (2014) (citing Federalist No. 76 for the proposition that Senate approval of presidential nominees is a critical part of the constitutional system).

In context after context, courts look to history without thinking twice, or engaging in extensive handwringing about how experts may disagree over the meaning or weight of various sources. For instance, in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court held that the right of parents to be the primary decision-makers for their own children was a "right recognized because it reflects a 'strong tradition' founded on the 'history and culture of Western civilization.'" *Moore v. East Cleveland,* 431 U.S. 494, 504 (1977) (quoting *Yoder*, 406 U.S. at 232). Indeed, the Supreme Court has held that "history and tradition" was sufficient rational basis to overcome a challenge to a prayer delivered at the outset of a legislative session. *See Marsh v. Chambers*, 463 U.S. 783, 790 (1983).

*Bruen*'s history and tradition test is thus well within the judicial norms of constitutional analysis. As noted in *Bruen*:

And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims. If a litigant asserts the right in court to "be confronted with the witnesses against him," U.S. Const., Amdt. 6, we require courts to consult history to determine the scope of that right. *See, e.g., Giles v. California*, 554 U.S. 353, 358, 128 S. Ct. 2678, 171 L.Ed.2d 488 (2008) ("admitting only those exceptions [to the Confrontation Clause] established at the time of the founding" (internal quotation marks omitted)). Similarly, when a litigant claims a violation of his rights under the Establishment Clause, Members of this Court "loo[k] to history for guidance."

597 U.S. at 25 (some citations omitted); *accord Crawford v. Washington*, 541 U.S. 36, 43 (2004) ("The right to confront one's accusers is a concept that dates back to Roman times."); *id.* at 44 ("Suspecting that [Lord] Cobham would recant, [Sir Walter] Raleigh demanded that the judges call him to appear, arguing that "the Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face.'") (cleaned up). This approach also comports with the Supreme Court's approach to other rights. *See, e.g. United States v. Stevens*, 559 U.S. 460, 468–471 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

The act of judging itself relies on applying historical antecedents to unique situations. Just last year, the Supreme Court relied on history and tradition in another context to reject Texas's ability to challenge federal immigration policy. In support of the majority's opinion that Texas lacked standing, Justice Kavanaugh noted: "In adhering to that core principle [of hearing cases only where an asserted injury is

redressable], the Court has examined 'history and tradition,' among other things, as a meaningful guide to the types of cases that Article III empowers federal courts to consider." *United States v. Texas*, 599 U.S. 670, 676 (2023); *see id.* at 677 ("The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions."). Notably, two of the dissenters in *Bruen* signed onto the opinion.

And long before Texas's challenge to federal immigration policy, the Supreme Court relied on the famed English scholar William Blackstone for its jurisprudence surrounding sovereign immunity. *See Alden v. Maine*, 527 U.S. 706, 715 (1999) ("Blackstone—whose works constituted the preeminent authority on English law for the founding generation—underscored the close and necessary relationship understood to exist between sovereignty and immunity from suit."). In *Heller* itself, the Court cited to Blackstone's Commentaries on the Laws of England, dated 1769. *Heller*, 554 U.S. at 582 ("The phrase 'keep arms' was not prevalent in the written documents of the founding period that we have found, but there are a few examples, all of which favor viewing the right to "keep Arms" as an individual right unconnected with militia service.") (relying on Blackstone, among other treatises).

Indeed, the heart of legal decision-making involves evaluating whether prior decisions and precedents, as well as long-established legal principles and cannons,

apply to the case at hand. Federal judges frequently rely on decisions from many years ago to guide their interpretations of the law, ensuring consistency, predictability, and respect for established norms. *See, e.g.*, Ketanji Brown Jackson, *Questions for the Record Upon Nomination as an Associate Justice of the Supreme Court of the United States*, at 1 (Undated) ("I look at history and practice at the time the document was created to understand what those who created the text intended; I also look at precedent to understand how the text has been previously interpreted and applied."); *id.* at 4 ("[A]s a general matter, due process protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.") (cleaned up).[2]

And while some district courts have taken the liberty of expressing their particular hostility towards *Bruen*, as the District Court below did, all Courts use history as part of their everyday operations. A Westlaw search reveals the term "history and tradition" in thousands of cases, used in a similar manner since at least 1857. *See, e.g.*, *Fisher v. Haldeman*, 61 U.S. 186, 193 (1857) (evaluating Pennsylvania's history and tradition as it related to property rights, all the way back to the mid-1700s); *id.* at 194 ("This doctrine has continued to be recognized as settled

---

[2]https://www.judiciary.senate.gov/imo/media/doc/Judge%20Ketanji%20Brown%2 0Jackson%20Written%20Responses%20to%20Questions%20for%20the%20Recor d.pdf

law in Pennsylvania for half a century."). All of this is to say that judges use history on a regular and continuous basis to justify their conclusions.

Much of this is intuitive to lawyers and judges. Of the current Supreme Court, at least four have degrees in history from elite universities. (Roberts, Sotomayor, Kagan, and Kavanaugh). An undergraduate coursework in history is often a pathway to law school and legal practice.[3] Using historical sources, evidence, and American traditions is often in the bones of attorneys across the country.[4] The adversarial process brings out the relevant examples of potentially analogous laws, traditions,

---

[3] According to the United States Bureau of Labor Statistics, more than ten percent of undergraduate history majors enter legal occupations.
https://www.bls.gov/ooh/field-of-degree/history/history-field-of-degree.htm

[4] One District Court recently commented on how it had still managed to comport with *Bruen*'s test despite its limited judicial resources. *See United States v. Pierret-Mercedes*, — F. Supp. 3d —, 2024 WL 1672034, *14 (D. P.R. Apr. 18, 2024) ("[T]he Court has benefited from the well-researched opinions of other district and circuit courts and from numerous works by legal scholars dedicated to the history of firearms regulation. For good measure, the Court has also made use of a well-known historical gun law repository maintained by the Duke Center for Firearms Law to verify the primary sources.").

and precedents that Courts can use to determine whether or not a given law fits within the history and tradition of American firearms regulation.[5]

Honest minds may disagree about history. That's especially true when the question is whether a challenged statute is sufficiently analogous to a prior statute. But the process itself—of analogizing and distinguishing—is intuitive to the bar, and a skill that attorneys start learning in their 1L year. In sum, history isn't as hard as many lower courts have made it out to be.[6]

## II. If history is indeterminate, the Plaintiff wins under *Bruen*.

One short additional point must be made here. A common criticism surrounding *Bruen* is that history often flows in contradictory directions, and that experts can disagree about how much weight to put on various datapoints. But even crediting all of these types of statements as true, the answer is not to throw up one's hands and declare that the task of judging is "daunting if not impossible," as the

---

[5] In a concurrence, Judge Higginson of the Fifth Circuit Court of Appeals noted that in cases where historical precedents may be in tension, a public call for amicus briefs may be of value to a lower court. *United States v. Daniels*, 77 F.4th 337, 360 n. 15 (5th Cir. 2023) (Higginson, J., concurring) ("Accordingly, in this case, we found it helpful to publish a court directive inviting briefs from amici curiae who wish to supply relevant information regarding the history and tradition of the issues presented in this case.") (cleaned up).

[6] And of course, a rigorous discovery process involving expert depositions and evidentiary hearings is likely to be valuable to any court. *See Nguyen v. Bonta*, 675 F. Supp. 3d 1065, 1070-71 (S.D. Cal. 2023) (reopening discovery to give the government a chance to defend a gun restriction in light of the new *Bruen* standard).

District Court did below. Instead, it is simply to strike down the law being challenged.

As one District Court recently noted, quoting from its own earlier opinion before *Bruen*, but reiterating once more the point regarding the government's heavy burden under the Second Amendment:

> The constitutional imperative is on the government to *not infringe*. The correct starting orientation is that no arm may be prohibited. If a plaintiff challenges the government's prohibition, it is on the government first to prove the banned arm is dangerous and unusual, and if not, that it is not commonly possessed, or not commonly possessed by law-abiding citizens, or not commonly possessed for lawful purposes or militia readiness. If the state cannot so prove, the challenged prohibition must be struck down. *The presumption in favor of rightfully possessing a citizen's arm was made during the adoption of the Second Amendment.*

*Miller v. Bonta*, — F. Supp. 3d — 2023 WL 6929336, *36 (S.D. Cal. Oct. 19, 2023) (quotation marks omitted and emphasis added).

In other words, the fact that history may be contradictory or indeterminate is not cause to mourn the Supreme Court's decision in *Bruen*. It simply means that the plaintiff has prevailed, because the government has failed to satisfy its heavy burden of defending its restriction on the constitutionally protected right to keep and bear arms. *Accord Bruen*, 597 U.S. at 26 ("The Second Amendment is the very product of an interest balancing by the people" and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this

13

balance—struck by the traditions of the American people—that demands our *unqualified deference*.") (emphasis added); *id.* at 34 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation.").

The Second Amendment context is no different than other areas where constitutional rights are squarely at issue—unless the government can persuade the Court that it has met its burden, it hasn't. *Accord Bevis v. City of Naperville, Ill.*, 657 F. Supp. 3d 1052, 1066 n.6 (N.D. Ill. 2023) ("*Bruen* indicates that judges, not party-selected experts, will assess the Second Amendment's history."). Thus, in cases where courts publicly decry the contradictory and equally relevant evidence in the historical record, the correct answer is merely to enter judgment for the plaintiff.

## III. When courts precede their *Bruen* analysis with statements expressing disdain for its ruling, they should be held to a higher level of scrutiny.

In *Bruen*, the Court elaborated exactly how Second Amendment jurisprudence must proceed. Most importantly, recognizing the unqualified command of the Second Amendment's text, the Court in *Bruen* held that lower courts may not use "means-ends" scrutiny.

14

When the Second Amendments plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24. As noted above, some courts have resisted *Bruen*, even if they acknowledge that they are bound by it.

While lower courts will never agree with everything that the Supreme Court says in its opinions, *Bruen* has inspired particular expressions of skepticism and disagreement. In one case, for instance, a district court ordered the parties to show cause as to why the court should not appoint its own expert witness—a special master of sorts—in order to "assist the Court in evaluating historical sources in this matter to avoid cherry-picking the historical record." *Sullivan v. Ferguson*, 3:22-cv-05403 (W.D. Wash. Jan. 9, 2023) [ECF 82].[7] In so doing, that court relied on one case where a court disclaimed the power to apply *Bruen* adequately, noting that "this

---

[7] Notably, the court in *Sullivan* also cited an earlier opinion by the District Court in this very case, where the District Court issued a show cause order. *See Baird v. Bonta*, No. 2:19-CV-00617, 2022 WL 17542432, *9 (E.D. Cal. Dec. 8, 2022) ("[T]o facilitate the court's considerations of any obligations it has following *Bruen*, the parties are ordered to show cause within thirty days why the court should not appoint its own expert witness to collect and survey evidence of the historical tradition that delimits the outer bounds of the right to keep and bear arms, as relevant to this case.") (cleaned up). To its credit, the District Court discharged that order. *Baird*, 2023 WL 9050959, at *13 ("Having reviewed the parties' responses and the current record, the court discharges its previous order to show cause.").

Court is not a trained historian and that there is a serious disconnect between the legal and historical communities as to firearms history." *Id.* at 2 (citing *United States v. Bullock*, No. 3:18-CR-165, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

And in *United States v. Bullock*, the District Court gathered extensive academic criticism in order to levy several negative statements about *Bruen*. *See Bullock*, 2022 WL 16649175, *2 ("The problem has gotten more attention since *Bruen*. Historians have been unsparing in their criticism of the decision."); *id.* at *2 ("One expert on the Second Amendment called the Court's historical analysis "an ideological fantasy." … Another historian noted the "growing number of strictures on what the Court counts as historical evidence. There is no method to it, nothing but inconsistency and caprice." … These critiques support an increasingly common attack: that the Court simply "cherry-picked" the historical record to arrive at its ideologically-preferred outcome.") (cleaned up). Indeed, the district court in *Bullock* appeared to go out of its way to gather academic sources that would lambaste the U.S. Supreme Court, so as to include those sources in its opinion.

In other instances, like the court below, federal courts often offer a prologue to their judicial analysis, stating that they would rather not follow *Bruen*, but that they will nevertheless do so faithfully. It is these sorts of prologues that usher in a sense of skepticism among readers, and even the public at large. Are these lower courts truly faithfully applying *Bruen*? Perhaps. But it is unusual for judges to

express such hostility to the law that they must apply, in a publicly available document, which they know will be read by lawyers, journalists, other judges, and academics.

As just one example of judicial modesty with respect to applying *Bruen*, amicus offers the following:

> While I perform the analysis as instructed, I have reservations that turning to a particular historical era should dispositively determine how we conceive of and defend certain rights. The first is practical; I am a judge and not an historian. … The second is that this approach can be self-defeating. Since *Bruen* instructs me to consider the historical evidence the parties present and argue, it is not inconceivable that the parties would present historical accounts inconsistent with the holdings of *Bruen*, *Heller*, or *McDonald*.

*Rocky Mountain Gun Owners v. Polis,* — F. Supp. 3d —, 2023 WL 8446495, *13 n.13 (D. Colo. Nov. 13, 2023).

But some courts go beyond mere reticence to apply *Bruen*. In one recent instance, a state supreme court rejected the idea that *Bruen* applied at all. Specifically, in *State v. Nelson*, the Supreme Court of Hawai'i wrote the following criticism of *Bruen*:

17

> In Hawai'i, the Aloha Spirit inspires constitutional interpretation. … When this court exercises "power on behalf of the people and in fulfillment of our responsibilities, obligations, and service to the people" we "may contemplate and reside with the life force and give consideration to the 'Aloha Spirit.'" …
>
> The spirit of Aloha clashes with a federally-mandated lifestyle that lets citizens walk around with deadly weapons during day-to-day activities.

543 P.3d 440, at 459 (internal citations omitted). The defendant in *Nelson* is likely to file an appeal to the U.S. Supreme Court, requesting summary reversal. The Court has summarily reversed courts that defy its precedents in the past. *Accord American Tradition Partnership, Inc. v. Bullock*, 567 U.S. 516 (2012) (summarily reversing a Montana Supreme Court decision that attempted to carve out an exception to *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010), based on unique state law circumstances); *see also Pavan v. Smith*, 582 U.S. 563, 566 (2017) (summarily reversing the Arkansas Supreme Court's conclusion that *Obergefell v. Hodges*, 576 U.S. 644 (2015), protected only same-sex marriage, and therefore did not protect same-sex couples' rights to be named on their children's birth certificates).

More broadly, anti-*Bruen* skepticism runs across so many recent cases that it is difficult to keep track of them. And strangely, the criticism hardly seems necessary for courts that reach a good-faith result upholding restrictions on the right to keep and bear arms. *Compare, e.g.*, *Ocean State Tactical, LLC v. Rhode Island*, 646 F.

Supp. 3d 368, 377-378 (D.R.I. 2022) (upholding a ban on "large" capacity magazines, while extensively criticizing the Supreme Court's historical analysis in *Bruen*), *with Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) (affirming district court's rejection of challenge to "large" capacity magazine restrictions, without going out of its way to criticize or undermine *Bruen*). So when judges express their personal disagreement or frustration with *Bruen*, when the exact same result the might have been achieved without such commentary, it naturally leads to skepticism among readers that the proper historical analysis was correctly applied, *ab initio*.

Resisting the right to keep and bear arms is an unfortunate but longstanding tradition in the United States. Before *Heller*, numerous lower court judges rejected an individual right to keep and bear arms. *See Parker v. District of Columbia*, 478 F. 3d 370, 403 n.4 (D.C. Cir. 2007) (Henderson, J., dissenting) (collecting circuit court cases and explaining that "[n]ine of our sister circuits have noted that the declaratory clause modifies the guarantee clause" with respect to the Second Amendment). And before *Bruen*, numerous lower courts engaged in loosely tethered means-end scrutiny when determining whether a plaintiff was protected by the Second Amendment. *Bruen*, 597 U.S. at 19 ("Despite the popularity of this two-step approach, it is one step too many."); *see also* see also *Rogers v. Grewal*, 140 S. Ct. 1865, 1866 (2020) (Mem.) (Thomas, J., dissenting from denial of certiorari) ("[A]s

I have noted before, many courts have resisted our decisions in *Heller* and *McDonald*. … Instead of following the guidance provided in *Heller*, these courts minimized that decision's framework."); *McDougall v. County of Ventura*, 23 F.4th 1095, 1119 (9th Cir. 2022) (VanDyke, J., concurring) ("As I've recently explained, our circuit can uphold any and every gun regulation because our current Second Amendment framework is exceptionally malleable and essentially equates to rational basis review."). We now know that the decisions in these cases applied the wrong mode of analysis to the disputes before them. So it is appropriate now for appellate courts to apply a heightened level of skepticism when courts resist their ability or duty to apply *Bruen*'s historical analogue test.

The role of the District Court is to faithfully apply Supreme Court precedent to disputes before it. It is clear that the District Court below paid lip service to *Bruen*, but nevertheless reached a conclusion that conflicts with the history at issue. This reviewing Court should thus be highly skeptical of the lower Court's Order Denying Summary Judgment to the Plaintiff-Appellant.

## Conclusion

California's gun laws aren't consistent with the history and tradition of firearms regulations in the United States. But more broadly, the Court here should particularly scrutinize the District Court's skepticism about *Bruen's* methodology and its correctness. At the same time, it should reject the District Court's modesty—

on behalf of all courts throughout the country—that it is a poor judge of tradition and history.

DATED this 24th day of April 2024.

Respectfully Submitted,

/s/ Michael McCoy
Michael McCoy
D. Sean Nation
MOUNTAIN STATES
LEGAL FOUNDATION
Lakewood, CO 80227
(303) 292-2021
mmccoy@mslegal.org

*Attorneys for Amicus Curiae*
*Mountain States Legal Foundation's*
*Center to Keep and Bear Arms*

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that that on the 24th day of April, 2024, the foregoing Amicus Curiae Brief in Support of Plaintiff-Appellee was served on counsel for appellant by electronically filing the same with the United States Court of Appeals for the Ninth Circuit via their CM/ECF portal.

/s/ Michael McCoy
Michael McCoy
MOUNTAIN STATES
LEGAL FOUNDATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: 24-565_____

I am the attorney or self-represented party.

**This brief contains 4,941 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[] complies with the word limit of Cir. R. 32-1.

[] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [] it is a joint brief submitted by separately represented parties.

    [] a party or parties are filing a single brief in response to multiple briefs.

    [] a party or parties are filing a single brief in response to a longer joint brief.

[] complies with the length limit designated by court order dated_____.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Michael D. McCoy*_____ **Date** April 24, 2024_____

*(use "*s/ [typed name]*" to sign electronically filed documents)*