No. 24-565

**In the**
**United States Court of Appeals for the Ninth Circuit**

—————————

MARK BAIRD,
*Plaintiff-Appellant*,
v.
ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee*.

—————————

**On Appeal from the**
**United States District Court for**
**the Eastern District of California**

—————————

**Brief *Amicus Curiae* of Gun Owners of California, Inc.,**
**Gun Owners of America, Inc., Gun Owners Foundation,**
**Heller Foundation, Tennessee Firearms Association, Tennessee Firearms**
**Foundation, America's Future, Inc., U.S. Constitutional Rights Legal**
**Defense Fund, and Conservative Legal Defense and Education Fund in**
**Support of Plaintiff-Appellant and Reversal**

—————————

JOHN I. HARRIS III
 SCHULMAN, LEROY & BENNETT, P.C.
 3310 West End Avenue
 Suite 460
 Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
 WILLIAM J. OLSON, P.C.
 370 Maple Avenue W., Suite 4
 Vienna, VA 22180-5615
 (703) 356-5070
 *Attorneys for Amici Curiae*

 April 24, 2024
 *Attorney of Record

## DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A).  These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.  THE DISTRICT COURT TWICE MISCONSTRUED APPELLANT'S
    CHALLENGE TO FACILITATE ITS APPROVAL OF THE CALIFORNIA
    LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. THE SECOND AMENDMENT WAS DESIGNED TO SAFEGUARD  THE
    PEOPLE'S MILITIA, WHILE THE DISTRICT COURT DECISION ALLOWS
    CALIFORNIA TO UNDERMINE IT . . . . . . . . . . . . . . . . . . . . . 8

    A.  The District Court Correctly Concluded Open Carry Was
        Protected by the Second Amendment's Plain Text . . . . . . . . . . 8

    B.  The District Court Never Again Analyzed the Second
        Amendment Text, which Guarantees Californians the Right to
        Be Armed Members of Militias . . . . . . . . . . . . . . . . . . . . . 9

    C.  The Challenged California Statutes Criminalize the
        Participation by Americans in a Constitutionally Protected
        People's Militia . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. THE DISTRICT COURT OPINION BOTH CRITICIZED AND REFUSED TO
     FOLLOW THE *BRUEN* METHODOLOGY . . . . . . . . . . . . . . . . . . . 14

ii

A.  The District Court Sought to Undermine the Supreme Court's Decision that the Second Amendment Protects an Individual Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B.  The District Court Relied on Statutes which the Supreme Court Has Already Rejected as Historical Analogues  . . . . . . . . 16

C.  The District Court Uses Racist Historical Analogues to Support an Open Carry Ban Born of Racial Fear . . . . . . . . . . 18

IV.  THE DISTRICT COURT HAS REFUSED TO REIN IN CALIFORNIA'S CONTINUED VIOLATION OF SUPREME COURT SECOND AMENDMENT JURISPRUDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.  California Has Demonstrated Hostility to the Supreme Court and *Bruen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.  *Bruen* Reset the Compass . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C.  California Takes a Narrow View of Self-Defense . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

Page

**UNITED STATES CONSTITUTION**
Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*

**STATUTES**
Cal. Penal Code § 417 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Cal. Penal Code § 25850 . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*
Cal. Penal Code §§ 25900-25925 . . . . . . . . . . . . . . . . . . . . . . . 13
Cal. Penal Code §§ 26000-26060 . . . . . . . . . . . . . . . . . . . . . . . 13
Cal. Penal Code § 26100 . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Cal. Penal Code § 26150 . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4
Cal. Penal Code § 26155 . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4
Cal. Penal Code § 26350 . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**CASES**
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . 10, *passim*
*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . 7
*McDonald v. Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . . . 14, 21
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) . . . . 8, *passim*
*Rocky Mountain Gun Owners v. Polis*, 2023 U.S. Dist. LEXIS 218561
    (Nov. 13, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) . . . . . . . . . . . . . . . 27
*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 959
    F.3d 341 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8
*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . 25
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . . . . . 2

**MISCELLANEOUS**
1694 Massachusetts law . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18
Carol Anderson, The Second: Race and Guns in a Fatally Unequal
    America (Bloomsbury Publishing: 2021) . . . . . . . . . . . . . . . . . . . 19
"Battles of Lexington and Concord," *Britannica* . . . . . . . . . . . . . . . . 12
Stephen Breyer, Reading the Constitution: Why I Chose
    Pragmatism, *Not* Textualism (Simon & Schuster: 2024) . . . . . . . . . . . 11

iv

California Dept. of Justice, California Firearms Laws Summary (2021) . . . . 13

California Senate Joint Resolution 7 (passed Sept. 21, 2023) . . . . . . . . . . . 24

J. Campbell and L. Mascarenhas, "California governor signs gun control measures into law, including nation's first state tax on firearms and ammunition," *CNN* (Sept. 27, 2023) . . . . . . . . . . . . . . . . . . . . . . 23

P. Charles, "The Black Panthers, NRA, Ronald Reagan, Armed Extremists, and the Second Amendment," *Duke Center for Firearms Law* (Apr. 8, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

M. Mortenson, "Scattershot: Guns, Gun Control, and American Politics," *Harvard Law School Journal on Legislation* (May 23, 2022) . . . . . . . 19

Statute of Northampton . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

John Paul Stevens, "Repeal the Second Amendment," *New York Times* (March 27, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

John Paul Stevens, Six Amendments: How and Why We Should Change the Constitution (Little Brown: 2014) . . . . . . . . . . . . . . . . . 10

D. Walters, "Gavin Newsom channels Jerry Brown with constitutional amendment proposal," *Cal Matters* (Aug. 21, 2023) . . . . . . . . . . . . 24

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of California, Inc., Gun Owners of America, Inc., Gun Owners Foundation, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

## STATEMENT OF THE CASE

This case involves a challenge to California's virtual ban on the open carrying of firearms in public. From California statehood until 1967, public open carry of firearms had never been prohibited. *See* Opening Brief of Appellant ("App. Br.") at 1. However, in 1967, California enacted the Mulford Act to prohibit open carry of a loaded firearm in public.[2] *See* Cal. Penal Code

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] *See* section III.C, *infra*.

§ 25850.  Then, in 2013, California banned public carry even of an unloaded handgun.  *See* Cal. Penal Code § 26350.[3]

Appellant challenged the law both facially and as applied.  The district court denied injunctive relief after considering only the third and fourth factors for injunctive relief enunciated in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), concluding Appellant "ha[d] not shown the balance of harms and public interest favor a preliminary injunction" based on public safety considerations.  *Baird v. Bonta*, 644 F. Supp. 3d 726, 732 (E.D. Cal. 2022) ("*Baird I*").  The district court further found that Appellant had standing for his facial challenge, but dismissed his as-applied challenge because he had "brought this case against the wrong defendant," the attorney general, while California gun licensing decisions are the province of local law enforcement officials.  *See id.* at 731 (rev'd and remanded by *Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ("*Baird II*")).

---

[3]  Two statutes provide that, in jurisdictions with populations under 200,000, citizens may seek a license to carry an open and loaded handgun within the limits of that county or municipality, but there are no application forms for such licenses and no such licenses ever have been issued.  *See* Cal. Penal Code §§ 26150 and 26155; App. Br. at 6.

On appeal from the denial of a preliminary injunction, this Court faulted the district court for failing to understand: "when a plaintiff alleges a constitutional violation and injury … [i]f a plaintiff … shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm [and] tips the public interest sharply in his favor." *Baird II* at 1040. Accordingly, this Court found that the district court had "abused its discretion when it deliberately skipped *any* analysis of the first *Winter* factor." *Id.* at 1042. This Court reversed and remanded, with instructions to the district court to "complete its reevaluation of the requested preliminary injunction and issue a decision expeditiously." *Id.* at 1048.

The district court concluded that, although the California laws restrict activities protected by the Second Amendment text, governments have imposed restrictions on **how** people carry guns since the founding era, and granted summary judgment in favor of California. The district court's opinion insisted that open carry licenses are available to residents of small counties and municipalities, despite the record demonstrating that there is no form for such application and no such licenses have ever been issued. Based on its misrepresentation of the record, the district court recast Appellant's challenge in

3

a manner that allowed it to manufacture out of whole cloth an issue relating to

open carry licenses, while never ruling on the merits of Appellant's challenge to

the criminal statutes. *See Baird v. Bonta*, 2023 U.S. Dist. LEXIS 231190, at

*123-124 (E.D. Cal. 2023) ("*Baird III*").

## ARGUMENT

## I. THE DISTRICT COURT TWICE MISCONSTRUED APPELLANT'S CHALLENGE TO FACILITATE ITS APPROVAL OF THE CALIFORNIA LAW.

Appellant initially challenged two distinct aspects of California firearms

law relating to the open carry of firearms. First, he challenged Cal. Penal Code

§§ 25850[4] and 26350[5] which criminalize the open carrying of handguns anywhere

in the State, with some limited exceptions. Additionally, he challenged Cal.

Penal Code §§ 26150[6] and 26155,[7] which ostensibly provide for the licensing of

open carry for persons living in exceedingly small population counties, but only

---

[4] Section 25850 bans the open (and concealed) carry of a loaded firearm in public.

[5] Section 26350 bans the open carry of an unloaded firearm in public.

[6] Section 26150(b)(2) provides for a sheriff to issue an open carry permit in that sheriff's county only if it has less than 200,000 persons.

[7] Section 26155(b)(2) provides for a chief of a municipal police department to issue an open carry permit in that chief's municipality only if it has less than 200,000 persons.

allowing open carry within the county in which the individual is licensed. (Appellant lives in such a small county.) However, during litigation it was discovered that these provisions of California open carry licensing law were a practical nullity, as the State provides no forms for Californians living in those small counties to seek an open carry license of the sort anticipated by the statute, nor have any such licenses ever been issued.

Accordingly, Appellant, through his second amended complaint (filed Sept. 27, 2022, 15 months before the district court's decision), dropped any claims against the meaningless statutory licensing provisions, retaining only the claims against the criminal provisions §§ 25850 and 26350, which ban open carry throughout the state. App. Br. at 11. Consistent with the way in which the case was narrowed in that second amended complaint, this appeal presents only one issue:

> Whether California Penal Code sections 25850 and 26350, which criminalize the open carriage of handguns for self-defense, violate the Second Amendment…. [App. Br. at 2-3.]

Complicating this appeal is the fact that the district court barely addressed and never resolved the only issue that had been before it, which is now the only issue now on appeal — the constitutionality of the California ban on open carry

5

in §§ 25850 and 26350. Rather, the district court assumed the prerogative to recast Appellant's claim to pose a question which the court preferred to answer — albeit a question that was not before the court when it ruled. The court characterized its recasting of the issue as follows:

> First, [plaintiff] contend[s] it is unconstitutional for California to impose criminal liability on people who carry firearms in public. As explained above, however, if people have a license, California law does not impose criminal liability for carrying handguns in public. For that reason, **the court understands Baird['s] first theory** as an argument that the Second Amendment prohibits California from requiring licenses…. [*Baird III* at \*16 (citations omitted) (emphasis added).]

What the district court identified as Appellant's "first theory" was not his claim at the time the district court ruled. Appellant was not arguing that "the Second Amendment prohibits California from requiring licenses…." He was arguing that the Second Amendment prohibits California from banning open carry — a very different matter. By focusing on a matter no longer in dispute as of the second amended complaint, the district court apparently believed itself entitled to avoid addressing the essence of Appellant's challenge, as there was no clear ruling below on the constitutionality of an open carry ban.

The district court then used the same technique a second time to infer the existence of another issue not before the court:

6

> Second, Baird [contends] California cannot dictate how people carry firearms in public, such as openly or concealed — what they refer to as limits on the "modality" of gun carrying. **The court construes this theory** as an argument that California cannot constitutionally require people to conceal any firearms they carry in public in counties with populations larger than 200,000, as Baird … would be required to do if [he was] to enter one of these larger counties. [*Baird III* at *17 (citations omitted) (emphasis added).]

Again, this was not Appellant's claim. Frankly, it is difficult to understand exactly how the district court could "construe" this issue in this way. The court postulated an impossible hypothetical involving a resident of a small county who obtains an open carry license — of the sort never before issued — who then travels outside his home county. The court then discussed California's authority to require licensed persons to conceal firearms when outside their home county. However, this case is not about California's authority to license. This unrealistic hypothetical appears to be an effort to avoid directly addressing whether California can completely ban open carry.

 As to each judicially invented question, the district court committed two errors. First, it refused to carry out its judicial duty to resolve questions presented to it. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803). Second, to the extent it purported to rule on a question that is not before the court as a "case" or "controversy," it acted *ultra vires*. This Court's role "is neither to

issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 959 F.3d 341, 348 (9th Cir. 2020). Plaintiff, not the court, is master of his complaint.

Lastly, because this Court's review is *de novo* (*see* App. Br. at 7), this Court can and should decide the question actually presented by Appellant. It should not require yet another remand to have the district court again seek to avoid resolving the issue actually raised by Appellant. The district court twice failed its duty to "say what the law is," and now that responsibility falls to this Court.

## II. THE SECOND AMENDMENT WAS DESIGNED TO SAFEGUARD THE PEOPLE'S MILITIA, WHILE THE DISTRICT COURT DECISION ALLOWS CALIFORNIA TO UNDERMINE IT.

### A. The District Court Correctly Concluded Open Carry Was Protected by the Second Amendment's Plain Text.

The district court had no problem with deciding — and deciding correctly — the first issue which the *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), analysis requires it to address:

8

> In cases like this one, the Supreme Court has instructed district courts to **decide first** whether the plaintiffs' conduct is protected by the **plain text of the Second Amendment**…. The **plain text** of the Second Amendment **protects** what the Supreme Court has described as the right of "ordinary, law-abiding citizens" to **carry firearms in public** for self-defense. [*Bruen*] at 2122. Here, California's laws place a **burden** on that conduct…. [*Baird III* at \*1-2 (emphasis added).]

> As a threshold matter, the court finds the Second Amendment's **plain text covers** Baird's and Gallardo's conduct, i.e., carrying firearms in public. [*Id*. at \*63 (emphasis added).]

However, those two conclusory "plain text" assertions were the district court's only discussion of the Second Amendment text.

### B. The District Court Never Again Analyzed the Second Amendment Text, which Guarantees Californians the Right to Be Armed Members of Militias.

Although the district court below once quoted the preamble of the Second Amendment in passing (*Baird III* at \*59) — it never even tried to grapple with how the text could control the case it was deciding. Had it bothered to examine the Amendment's text, it likely would have seen the first reason California's ban on open carry is unconstitutional.[8]

---

[8] Although this section focuses on the specific ways the challenged California statutes would impair the operation of the People's Militia, they also violate the Second Amendment's protections in other ways as well, as discussed in sections III and IV, *infra*.

9

By criminalizing virtually all loaded open carry, particularly of long guns, California prevents the People from organizing themselves into a well regulated Militia, and training in the use of arms, a right protected against infringement by the Second Amendment:

> A well regulated **Militia**, being necessary to the security of **a free State**, the right of the **people** to **keep and bear Arms**, shall not be infringed. [Second Amendment (emphasis added).[9]]

From that text, the three following propositions are clear: (i) the objective of the Second Amendment is the preservation of "a free State"; (ii) a People's **Militia** is deemed "necessary" to achieve a "free state"; and (iii) the means to that objective is that the government has no right to "infringe" the People's individual right to "keep and bear Arms." Although the constitutional notion of an armed populace and People's "Militia" seems to have become anathema to many modern jurists,[10] the Second Amendment's protections do not depend on the

---

[9] The *Heller* Court suggested the Second Amendment could be rephrased: "'Because a well regulated **Militia** is necessary to the security of a **free State**, the right of the **people** to **keep and bear Arms** shall not be infringed.'" *D.C. v. Heller*, 554 U.S. 570, 577 (2008) (emphasis added).

[10] *See, e.g.,* Justice John Paul Stevens, "Repeal the Second Amendment," *New York Times* (Mar. 27, 2018) ("The [anti]gun demonstrators should seek more effective and more lasting reform. They should demand a repeal of the Second Amendment."); Justice John Paul Stevens, Six Amendments: How and Why We Should Change the Constitution (Little Brown: 2014); Justice Stephen

preferences of modern judges.[11]  Had the district court examined the text, it would have seen that California's *de facto* ban on open carry was wholly inconsistent with that text.

The *Heller* Court cited <u>Webster</u> for the proposition that:  "'The **militia** of a country are the able bodied men organized into companies, regiments and brigades … and required by law to **attend military exercises** on certain days only, but at other times left to pursue their usual occupations.'"  *Heller* at 595 (emphasis added).  Without question, these exercises would have been conducted outside and often, if not generally, on public property.  The Minutemen who constituted the Militia and withstood the British on Lexington Green most certainly were operating both outside of their homes and businesses as well as on public property.  If the district court's view of the Second Amendment had been

_____

Breyer, <u>Reading the Constitution: Why I Chose Pragmatism, *Not* Textualism</u> (Simon & Schuster: 2024); *Rocky Mountain Gun Owners v. Polis*, 2023 U.S. Dist. LEXIS 218561 (Nov. 13, 2023) (Judge John Kane ruled that the plain text of the Second Amendment does not protect the purchase of a firearm) (pending on appeal to the Tenth Circuit).

[11]  *See Heller* at 634 ("The very enumeration of the right takes **out of the hands of** government — even the **Third Branch of Government** — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.  A constitutional guarantee subject to **future judges'** assessments of its usefulness is no constitutional guarantee at all.") (bold added).

in effect on April 19, 1775, it would not have constrained the British authorities from arresting those Minutemen patriots who brought their firearms outside their homes or places of business to the Lexington Green.[12] The notion that the Patriots — who had defeated the British in a war sparked by British efforts to seize their military in 1776 — would have in 1791 ratified a Second Amendment which did not protect actions of the sort they just took in defending themselves against tyranny is patently unreasonable.

### C. The Challenged California Statutes Criminalize the Participation by Americans in a Constitutionally Protected People's Militia.

Lest there be any doubt that the challenged statutes would impede the operation of the People's Militia, an examination of those statutes is helpful.

Under challenged § 25850(a), carrying a **loaded** firearm "on the person or in a vehicle while in any public place or on any public street in an incorporated city, city and county, or in any public place or on any public street in a prohibited area of an unincorporated area of a county or city and county" is a

---

[12] *See generally*, "Battles of Lexington and Concord," *Britannica* ("General Thomas Gage … ordered his troops to seize the colonists' military stores at Concord. En route from Boston, the British force of 700 men was met on Lexington Green by 77 local minutemen and others…. The march back to Boston was a genuine ordeal for the British, with Americans continually firing on them from behind roadside houses, barns, trees, and stone walls.").

crime. By itself, it is a misdemeanor, but with additional circumstances can be a felony. *See* § 25850(c).[13] And, under challenged § 26350, public carrying of an **unloaded** handgun is criminalized. The California Attorney General's firearms law summary explains some, but not all, of California's restrictions:

> It is illegal to carry a loaded firearm on one's person or in a vehicle while in any public place, on any public street, or in any place where it is unlawful to discharge a firearm…. The prohibition from carrying a loaded firearm in public does not apply to any person while hunting in an area where possession and hunting is otherwise lawful or while practice shooting at target ranges. (Pen. Code, §§ 26005, 26040.) There are also occupational exceptions to the prohibition from carrying a loaded firearm in public, including authorized employees while engaged in specified activities. (Pen. Code, §§ 26015, 26030.) [California Dept. of Justice, California Firearms Laws Summary (2021).][14]

In sum, it is clear that the simple act of peacefully carrying a loaded firearm (not in a threatening manner, which is elsewhere made a crime, *see* § 417) or an unloaded handgun in public is banned. Under such criminal

---

[13] It is a misdemeanor for the driver of a vehicle to knowingly allow another person in the vehicle to violate § 25850. *See* § 26100.

[14] There are a number of other exemptions from the ban on carrying a loaded firearm, including peace officer *(*§§ 25900-25925), military forces (§ 26000), concealed carry licensees (§ 26010), possession at one's place of business or private property (§ 26035), etc. *See* §§ 26000-26060.

sanctions, the Minutemen would never have been permitted to muster on Lexington Green.

## III. THE DISTRICT COURT OPINION BOTH CRITICIZED AND REFUSED TO FOLLOW THE *BRUEN* METHODOLOGY.

### A. The District Court Sought to Undermine the Supreme Court's Decision that the Second Amendment Protects an Individual Right.

Before even beginning to address the challenge before it, the district court felt compelled to launch into an attack against the Supreme Court's central holding in *Heller* — that the Second Amendment protects an individual right. *See Baird III* at *51-63.  Rather than simply apply *Heller, McDonald,* and *Bruen*, the district court sought to undermine all three decisions with its critique of what it termed "the Standard Model" of Second Amendment rights.  *Id*. at *52.

The district court acknowledged that, before *Heller*, there had been significant support of the individual rights view by "many legal scholars, along with some historians," but there was "no consensus."  *Id*. at *54-55.  It asserted that "[m]ore recent scholarship" includes "a number of leading historians rejecting the individual rights theory."  *Id*. at *56.  All of what the court termed the "more recent" articles antedated the *Bruen* decision when the High Court

14

once again confirmed the Second Amendment protection of individual rights. Even though the district court recognized that "'[t]he longer and more intimately involved historians are in a case, the greater the possibility that they may begin unconsciously tailoring the research to fit a predetermined conclusion'" (*id*. at *50), it clearly preferred those historians who disagreed with the Supreme Court. Then, the district court expressed its concern that an important source of historical meaning had been ignored, when only "[t]he dissenting justices in *Bruen* cited the corpus linguistics amicus brief while the justices in the majority did not." *Id*. at *62.

The district court eventually conceded that "the Supreme Court's decisions in *Heller*, *McDonald* and *Bruen* settle the law this court must and will follow." *Id*. at *62. Yet it concluded its historical search with a statement which seems to indicate that its decision in this case followed its favorite historians rather than Supreme Court precedent:

> [n]ewly identified and different historical evidence, and new and different interpretations of that evidence by those who know it best, **might prove decisive in this case** and others even though that evidence and those opinions do not change the law as articulated by the Supreme Court and the federal courts of appeals. [*Id*. at *63 (emphasis added).]

15

It is unclear whether the district court's distaste for the Supreme Court's individual rights theory compelled its decision that the Second Amendment's right to "keep and bear" arms does not include a right to "bear arms" openly, but the district court's unnecessary diversion into a settled issue, and its demonstration of hostility to Supreme Court precedence, does not inspire confidence in its decision.

**B.     The District Court Relied on Statutes which the Supreme Court Has Already Rejected as Historical Analogues.**

To provide a historical analogue of the sort required by *Bruen*, the district court relied on "[a] 1694 Massachusetts law … [which] prohibited riding or going 'armed Offensively' before authorities," which it asserted was "patterned on the Statute of Northampton." *Baird III* at *101. That English Statute, promulgated in 1328, had provided, with some exceptions, that Englishmen could not:

> come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.… [*Bruen* at 40.]

But *Bruen* had earlier considered that same 1694 Massachusetts law and concluded that, rather than "banning the carrying of any class of firearms [it]

16

merely codified the existing common-law offense of bearing arms to terrorize the people." *Bruen* at 47. The district court was undeterred by the Supreme Court's opinion, citing the Massachusetts statute as a historical analogue for California's public carry ban:

> State and colonial governments did not allow people to carry firearms in ways that intimidated or suggested evil purposes.... [L]aws patterned on the **Statute of Northampton** … are examples from this category.... In sum, California has proven an **historical tradition** of imposing categorical limits on how guns are carried in public. [*Baird III* at *121-22 (emphasis added).]

The *Bruen* Court had explained in great detail why the Statute of Northampton was not helpful to understand the Second Amendment. First, the Statute "appears to have been centrally concerned with the wearing of armor." *Bruen* at 41. Second, by the late 1600s, "the Statute of Northampton had … largely become obsolete through disuse." *Id.* at 43. Third, in a 1686 prosecution, Sir John Knight was acquitted of violating the Statute. There, "the Chief Justice … explained that the act of 'go[ing] armed *to terrify* the King's subjects' was 'a great offence at the *common law*' and that the Statute of Northampton 'is but an affirmance of that law.'... Thus, one's conduct 'will come within the Act,' — *i.e.*, would terrify the King's subjects —only 'where the crime shall appear to be malo animo,' with evil intent or malice." *Id.* at 43-44

17

(citations omitted). Fourth, by the early 18th century, "Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that 'no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People.'" *Id.* at 45.

The *Bruen* Court could not have been more clear as to why it deemed the Statute of Northampton and its Massachusetts descendant useless as historical analogues, but the district court relied on those statutes nonetheless.

The *Bruen* Court was clear: "bearing arms in a way that spreads 'fear' or 'terror' among the people ... require[s] something more than merely carrying a firearm in public." *Bruen* at 50. The Supreme Court's analysis is not complicated. The district court not only rejected the Supreme Court's reasoning, but also expressly relied on historical analogues the Supreme Court rejected.

## C. The District Court Uses Racist Historical Analogues to Support an Open Carry Ban Born of Racial Fear.

The racial and political origins of the Mulford Act provide the backdrop for this Court's consideration of this appeal. One version of the story of that law's adoption is as follows:

> In 1967, California codified into law A.B 1591, otherwise known at the Mulford Act. Sponsored by Oakland assemblyman Don Mulford, A.B. 1591 made it a felony to publicly carry any

firearm—either openly or concealed—in public places without a governmental license to do so.  The law came about after the events of May 2, 1967, when a **group of thirty Black Panthers appeared visibly armed** at the California State Capitol building to protest an earlier version of A.B. 1591.  At that time, there was nothing in California law that expressly prohibited the open carriage of firearms, either in public or private.  A.B. 1591 effectively closed this loophole.  [P. Charles, "The Black Panthers, NRA, Ronald Reagan, Armed Extremists, and the Second Amendment," *Duke Center for Firearms Law* (Apr. 8, 2020)[15] (emphasis added).]

It is truly ironic that, to establish the constitutional legitimacy of the Mulford Act, California and the district court have relied heavily on a host of earlier historical analogues in which African Americans and other minorities have been deprived of their Second Amendment rights.  The district court rationalized the use of these analogues:

---

[15]    Another rendition of the story is as follows: That April [1967], Mulford threatened to "get" the Panthers by making their patrols illegal.  He quickly followed through, introducing a bill to prohibit Californians from carrying loaded firearms "in any public place."  The Mulford Act, which remains effective in California, was signed into law by then-governor Ronald Reagan **after the Panthers staged a daring armed protest** of Mulford's proposed bill at the California State Capitol.  [M. Mortenson, "Scattershot: Guns, Gun Control, and American Politics," *Harvard Law School Journal on Legislation* (May 23, 2022) (emphasis added).]

*See also generally* Carol Anderson, The Second: Race and Guns in a Fatally Unequal America (Bloomsbury Publishing: 2021).

> An account of American firearm restrictions inevitably runs into
> historical restrictions based on racial prejudice and ugly biases.....
> The court acknowledges these stains in the historical record and
> faces them head on. [*Baird III* at \*72-73.]

Actually, the district court did not just "face them head on"; it also adopted them

wholesale. First, the court seemed to find it objectionable that California had

relied on what it viewed as discriminatory laws to defend the Mulford Act:

> Some government officials, including **the state in this case, cite**
> **these discriminatory laws as evidence** that modern firearms
> regulations fit a **historical tradition** of making distinctions based on
> status.... Here, the California Attorney General ... emphasizes his
> disagreement with the biased laws of the past, offering them "only
> as additional examples" of restrictions in the historical tradition.
> [*Baird III* at \*73-74 (emphasis added).]

The court stated it: "cannot accept that approach, at least not without significant

qualifications. It simply cannot be the **racist and biased laws** of the past justify

a modern law if similarly discriminatory." *Baird III* at \*74 (emphasis added).

Yet, after distancing itself from the position of the California Attorney General,

the district court went on to rely on that position:

> Despite its reservations, this court is persuaded that in the
> circumstances of this case, at least, it should **take account** of the
> history of discriminatory regulations rather than completely ignore
> it.... For these reasons it is **appropriate to remember** in this case
> that the American tradition of firearms regulations included
> discriminatory restrictions based on class, religion, and race.... But
> the **acceptance of these laws** further demonstrates the Second

20

> Amendment did not prevent **American governments from placing sometimes heavy and often categorical burdens** on the right to keep and bear arms.  [*Id.* at \*74-77 (emphasis added).]

And with that, the district court confirmed that its historical analogues based on racist and discriminatory times in our history helped establish the historical pedigree upon which the Court relied here to uphold the Mulford Act.

The Supreme Court has previously rejected the approach taken by the district court.  In *McDonald*, it made clear that "systematic efforts … to disarm … blacks" through post-Civil War Southern gun control efforts shed no light on the meaning of the Second Amendment.  *McDonald v. Chicago*, 561 U.S. 742, 771-772 (2010).  The Supreme Court made clear that ratification of the Fourteenth Amendment secured the Second Amendment rights of firearms possession to formerly disenfranchised black Americans.  *Id.* at 775-776.  The Court explicitly rejected the idea that post-Civil War gun laws that were facially neutral, but racist in practice, shed any light on the meaning of the Second Amendment.

Again in *Bruen*, the Court devoted several pages to chronicling "Southern abuses violating blacks' right to keep and bear arms."  *Bruen* at 61-63.  As in *McDonald*, the Court cited these abuses as evidence **against** the post-Civil War

21

gun regulations' consistency with the original meaning of the Second

Amendment. Despite all of this guidance, the district court not only rejected the

Supreme Court's reasoning, but also adopted the reasoning the Court rejected.

## IV. THE DISTRICT COURT HAS REFUSED TO REIN IN CALIFORNIA'S CONTINUED VIOLATION OF SUPREME COURT SECOND AMENDMENT JURISPRUDENCE.

The complaint in this case was filed well before *Bruen* was decided, the

case was held by the district court pending a decision in *Bruen*, and the decision

was not issued until December 2023. Thus, California had adequate time to re-

evaluate its ban on open "bearing" of firearms, yet continues to defend its

constitutionality. The district court had 18 months to determine how to apply

*Bruen*, but it not only refused to follow *Bruen*; it also criticized the Supreme

Court's decisions. As this Court undertakes to review the approach used by the

district court in dismissing the challenge to California's total ban on open carry

of firearms in public by citizens, it is instructive to review what has occurred

before, to ensure it is not repeated here.

### A. California Has Demonstrated Hostility to the Supreme Court and *Bruen*.

California continues to demonstrate hostility not just to the Second

Amendment but also to the Supreme Court's Second Amendment decisions

22

beginning with *Heller*.  When *Bruen* was before the Supreme Court on the merits, California joined other states in filing an *amicus* brief urging virtually unlimited latitude for states to restrict gun rights, in stark opposition to the approach eventually taken by the *Bruen* Court.[16]

Since the *Bruen* decision was issued, California Governor Gavin Newsom has roundly criticized it, the Supreme Court generally, and those circuit courts that have followed it:

> Newsom slammed [2022's] landmark US Supreme Court decision expanding gun rights and criticized lower circuit courts that have since overturned gun control measures.[17]

---

[16]  *See* Brief for the States of California, *et al.* as *Amici Curiae*, in Support of Respondents in *New York State Rifle & Pistol Assn. v. Bruen*, No. 20-843 (Sept. 21, 2021).  That *amicus* brief argued:  "[T]here is 'no general right to carry arms into the public square for self-defense....'"  *Id*. at 3.  California continued to urge judicial interest balancing of the sort embraced by Justice Breyer in dissent in *Heller*:  "Intermediate Scrutiny Is the Proper Form of Means-Ends Analysis for Public Carry Regulations."  *Id*. at 23.  The *Bruen* decision reaffirmed the Court's rejection of the interest balancing that California continues to urge.

[17]  J. Campbell and L. Mascarenhas, "California governor signs gun control measures into law, including nation's first state tax on firearms and ammunition," *CNN* (Sept. 27, 2023).

"This Supreme Court is that bad…. The Bruen decision was that bad. When I say code red, this is code red. California's led the nation on common sense gun safety laws."[18]

In fact, Governor Newsom has become so agitated by *Bruen* that he has urged the states to undo that decision by calling for an Article V Constitutional Convention to adopt his Proposed 28th Amendment, *inter alia*, which would limit gun rights. The full contours of the proposed amendment were not identified, but they include a prohibition on the sale, loan, or transfer of so-called "assault weapons" and other pejoratively labeled "weapons of war" to private civilians.[19] Of course, not wanting to wait for the Article V constitutional amendment process to play out, California continues to fight to undermine *Bruen* as it has done with *Heller* in the past.

### B.    *Bruen* Reset the Compass.

The *Heller* decision restored life to a God-given, pre-existing, constitutionally enumerated individual right that the State of California does not trust its citizens to exercise. In the aftermath of *Heller*, many federal judges found it difficult to believe the Second Amendment really protected a robust

---

[18] D. Walters, "Gavin Newsom channels Jerry Brown with constitutional amendment proposal," *Cal Matters* (Aug. 21, 2023).

[19] *See* California Senate Joint Resolution 7 (passed Sept. 21, 2023).

24

individual right. This Court adopted the two-step approach under which many serious restrictions on gun rights were said to not even implicate the Second Amendment. *See United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013). This two-step approach was soundly rejected in *Bruen*.

To the district court's credit, it applied the first test of *Bruen* correctly and ruled that California's total ban on open carry did "burden" Second Amendment protected rights (*Baird III* at *1-2). But then it refused to follow *Bruen*'s guidance in applying the second step of its analysis. Moreover, the district court frontally attacked the Supreme Court's holdings that the Second Amendment protects an individual right. *See* section III.A, *supra*.

In the post-*Bruen* period, we again are at risk that courts of appeals are tempted by litigants to find new ways to evade yet another Second Amendment Supreme Court decision. There is no doubt that many judges favor interest-balancing tests, as such tests empower them to issue decisions based on their personal preferences. Nonetheless, these *amici* urge this Court to accept Justice Scalia's admonition that the Second Amendment is "the very *product* of an interest balancing by the people — which Justice Breyer would now conduct for

them anew," and thus is not "subject to future judges' assessments of its usefulness." *Heller* at 634-35.

## C.    California Takes a Narrow View of Self-Defense.

California takes a very narrow view of the type of self-defense which the Second Amendment protects. Before the district court, California justified its near-complete ban on open carry by claiming:

> There is a focused **self-defense exception** to California's public-carry restrictions, which authorizes the carrying of a loaded firearm by any individual who reasonably believes that doing so is necessary to preserve a person or property from an **immediate, grave danger**, while awaiting the arrival of law enforcement, if it is reasonably possible to **notify them**. [Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment (Aug. 18, 2023) (Dist. Ct. Doc. # 90-1) at 3 (emphasis added).]

California argued that "[b]ecause the challenged statutes exclude instances where a person reasonably believes it necessary to openly carry a loaded firearm for self-defense," Appellant cannot sustain a facial challenge. *Id*. at 7 n.4. Few Californians would be willing to risk open carry in the hope that he would not be arrested and be prosecuted should law enforcement dispute his "reasonabl[e] belief" of an "immediate, grave danger."

26

Before *Heller*, California did not believe the Second Amendment even protected the right of an individual to possess a handgun in the home.[20]  And even then, the self-defense right protected by the Second Amendment is much more robust than allowed in California's exception which involves calling 911 and awaiting a response.  It also includes the right of Americans to defend our government against terrorism or other external threat, and also to resist our government, should it someday become tyrannical, to preserve a "free state." *See Heller* at 597-98.

Effectuating the lawful purpose of defense against tyrannical government and foreign attackers requires the ability to carry — "bear" — arms openly in public.  *Heller* makes this clear.  There are many reasons why the militia was thought to be "necessary to the security of a free State" including that, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Id*. at 598.  California's idea that only "government officials or officers of the law" and "only those with the proper authority" may

---

[20]  Before *Heller*, California apparently took the "collective rights" position that the Second Amendment only authorized arming a state militia, and did not establish any individual right whatsoever. *See Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) (cert. denied).

27

open carry weapons is at direct odds with the purpose and intent of the Second

Amendment.[21]  As Justice Story noted in his Commentaries:

> The **right of the citizens** to keep and bear arms has justly been
> considered as **the palladium of the liberties** of a republic, since it
> offers a strong moral check against the usurpation and **arbitrary
> power of rulers**, and will generally, even if these are successful in
> the first instance, enable the people to **resist and triumph** over
> them.  [Cited in *Heller* at 667-668 (emphasis added).]

The People have a right to be armed — not just those whom Justice Story

called our "rulers."  There is no public policy concern that can empower those

"rulers" serving in government to balance away the People's rights.  As the

Supreme Court has explained, the Second Amendment was the "very *product* of

an interest balancing by the people."  *Heller* at 635.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be

reversed.

Respectfully submitted,

*/s/Jeremiah L. Morgan*

JOHN I. HARRIS III                    JEREMIAH L. MORGAN*
  SCHULMAN, LEROY & BENNETT, P.C.   WILLIAM J. OLSON
  3310 West End Avenue                 WILLIAM J. OLSON, P.C.

---

21  *See* Defendant's Memorandum of Points and Authorities in Support of
Motion for Summary Judgment (Aug. 18, 2023) (Dist. Ct. Doc. # 90-1) at 20.

Suite 460                           370 Maple Avenue W., Suite 4
Nashville, TN  37203                Vienna, VA  22180-5615
                                    (703) 356-5070
                                    wjo@mindspring.com
                                    *Attorneys for Amici Curiae*
                                    *Attorney of Record
                                    April 24, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-565

I am the attorney or self-represented party.

**This brief contains** | 6,306 | **words,** including | 0 | words
manually counted in any visual images, and excluding the items exempted by FRAP
32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
   29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jeremiah L. Morgan | **Date** | 4/24/24
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of California, Inc., *et al.*, in Support of Plaintiff-Appellant and Reversal, was made, this 24th day of April 2024, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

  */s/Jeremiah L. Morgan*
Jeremiah L. Morgan
Attorney for *Amici Curiae*
