No. 24-565

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

MARK BAIRD,

*Plaintiff-Appellant*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF
CALIFORNIA,

*Defendant-Appellee.*

———————————

## On Appeal from the United States District Court
## for the Eastern District of California
No. 2:19-cv-00617-KJM-AC
The Honorable Kimberly J. Mueller, Judge

———————————

## ANSWERING BRIEF

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

AARON D. PENNEKAMP
*Deputy Solicitor General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
*Supervising Deputy Attorneys General*
IRAM HASAN
*Deputy Attorney General*

CALIFORNIA DEPARTMENT OF JUSTICE
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 210-6661
Aaron.Pennekamp@doj.ca.gov
*Attorneys for Defendant and Appellee*

June 17, 2024

# TABLE OF CONTENTS

Page

Introduction ........................................................................................1

Jurisdictional statement ......................................................................3

Statement of the issue ........................................................................3

Addendum of statutory provisions ....................................................3

Statement of the case..........................................................................3

    A.    California's "shall-issue" licensing regime for the public carry of firearms .......................................................................3

    B.    Factual and procedural history ........................................6

Summary of the argument..................................................................12

Standard of review ............................................................................14

Argument............................................................................................14

I.    California's licensing requirements do not burden conduct that is presumptively protected by the Second Amendment...................14

    A.    The plain text of the Second Amendment does not presumptively protect unlicensed open carry.....................14

    B.    Baird's counterarguments are unpersuasive.......................20

II.    California's open-carry licensing regime is consistent with the Nation's tradition of firearms regulation ................................25

    A.    Governments have long regulated the public carry of weapons—including requiring licenses and imposing "manner of carry" restrictions ...................................................25

        1.    Licensing requirements.....................................26

        2.    "Manner of carry" restrictions ................................32

    B.    California's licensing regime is relevantly similar to this historical tradition................................................37

    C.    Baird's historical approach is flawed ..............................41

Conclusion .........................................................................................49

Statement of related cases..................................................................50

i

## TABLE OF CONTENTS
### (continued)

**Page**

Certificate of compliance .......................................................................51

Certificate of service ............................................................................52

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Abed v. United States*
    278 A.3d 114 (D.C. 2022) ...............................................................48

*Antonyuk v. Chiumento*
    89 F.4th 271 (2d Cir. 2023) ........................................................32, 39

*Atkinson v. Garland*
    70 F.4th 1018 (7th Cir. 2023) .........................................................19

*B&L Prods., Inc. v. Newsom*
    __ F.4th __, 2024 WL 2927734 (9th Cir. June 11, 2024) .....................15, 20, 21

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023) ...................................................*passim*

*Calvary Chapel Bible Fellowship v. Cnty. of Riverside*
    948 F.3d 1172 (9th Cir. 2020) .........................................................24

*Children's Hosp. Med. Center of N. Cal. v. Cal. Nurses Ass'n*
    283 F.3d 1188 (9th Cir. 2002) .........................................................14

*Coeur D'Alene Tribe of Idaho v. Hammond*
    384 F.3d 674 (9th Cir. 2004) ..........................................................22

*Cruz v. Int'l Collection Corp.*
    673 F.3d 991 (9th Cir. 2012) ..........................................................24

*Dep't of Fish & Game v. Fed. Subsistence Bd.*
    62 F.4th 1177 (9th Cir. 2023) .........................................................24

*District of Columbia v. Heller*
    554 U.S. 570 (2008)............................................................*passim*

*Doe v. Bonta*
    101 F.4th 633 (9th Cir. 2024) .........................................................15

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Drake v. Filco*
   724 F.3d 426 (3d Cir. 2013) ...................................................48

*Frey v. Nigrelli*
   661 F. Supp. 3d 176 (S.D.N.Y. 2023) ...................................47

*Frlekin v. Apple, Inc.*
   979 F.3d 639 (9th Cir. 2020) .................................................14

*McDonald v. City of Chicago*
   561 U.S. 742 ...................................................................17, 42

*McRorey v. Garland*
   99 F.4th 831 (5th Cir. 2024) .................................................19

*Nat'l Ass'n for Gun Rts. v. Lamont*
   685 F. Supp. 3d 63 (D. Conn. 2023)......................................48

*New York State Rifle & Pistol Ass'n v. Bruen*
   597 U.S. 1 (2022)........................................................*passim*

*Norman v. State*
   215 So.3d 18 (Fla. 2017) ......................................................48

*Nunn v. State*
   1 Ga. 243 (1846) .............................................................36, 37

*Peruta v. Cnty. of San Diego*
   742 F.3d 1144 (9th Cir. 2014) ..............................................48

*Rodriguez v. City of San Jose*
   930 F.3d 1123 (9th Cir. 2019) ..............................................14

*Sinnissippi Rod & Gun Club, Inc. v. Raoul*
   __ N.E.3d __, 2024 WL 886651 (Ill. Ct. App., Mar. 1, 2024).........18, 38, 39, 47

*State v. Jumel*
   13 La.Ann. 399 (1858)..................................................37, 41

# TABLE OF AUTHORITIES
### (continued)

**Page**

*State v. Reid*
  1 Ala. 612 (1840) ...................................................................37

*United States v. Alaniz*
  69 F.4th 1124 (9th Cir. 2023) ...............................................25

*United States v. Duarte*
  101 F.4th 657 (9th Cir. 2024) ........................................16, 20

*United States v. Montero-Camargo*
  208 F.3d 1122 (9th Cir. 2000) ...............................................22

*United States v. Perez-Garcia*
  96 F.4th 1166 (9th Cir. 2024) .............................27, 43, 45

*United States v. Salerno*
  481 U.S. 739 (1987)...............................................................24

*United States v. Vongxay*
  594 F.3d 1111 (9th Cir. 2010) ...............................................22

*Vincent v. Garland*
  80 F.4th 1197 (10th Cir. 2023) .............................................19

STATUTES AND BILLS

United States Code, Title 28
  § 1291......................................................................................3
  § 1331......................................................................................3
  § 1343......................................................................................3

v

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Cal. Penal Code
§ 25400(a) .................................................................................4
§ 25400(b) .................................................................................4
§ 25640 .....................................................................................6
§ 25655 .....................................................................................4
§ 25850 ...............................................................................passim
§ 25850(a) .................................................................................4
§ 26000 .....................................................................................6
§ 26005 .....................................................................................6
§ 26010 .....................................................................................4
§ 26010-26060 ..........................................................................6
§ 26045 ............................................................................2, 6, 40
§ 26050 ..............................................................................6, 40
§ 26150 ...............................................................................passim
§ 26150(a) .........................................................................4, 5, 41
§ 26150(b)(1) .........................................................................1, 5
§ 26150(b)(2) .......................................................................5, 15
§ 26155 ...............................................................................passim
§ 26155(a) .........................................................................4, 5, 41
§ 26155(b)(1) .........................................................................1, 5
§ 26155(b)(2) .......................................................................5, 15
§ 26185 ...................................................................................19
§ 26190 ...................................................................................19
§ 26202 ...............................................................................5, 19
§ 26230 ...................................................................................47
§ 26350 ...............................................................................passim
§ 26350(a) .................................................................................4
§ 26361-26392 ..........................................................................6
§ 26362 .....................................................................................4

Fla. Stat.
§ 790.01 ...................................................................................18
§ 790.06 ...................................................................................38
§ 790.06(1) ...............................................................................18
§ 790.06(12)(a) .........................................................................18
§ 790.053 .................................................................................18

vi

## TABLE OF AUTHORITIES
### (continued)

**Page**

Ill. Comp. Stat.
430 § 66/10 ........................................................................38
720 § 5/24-1(a)(10) ............................................................18
720 § 5/24-1.6(a) ...............................................................18

Senate Bill 2 (2023-2024 Reg. Sess.) .......................................4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amendment II ....................................................16

**COURT RULES**

Ninth Cir. R. 28-2.7 .............................................................3

Fed. R. App. P. 4(a)(1)(A) ....................................................3

**OTHER AUTHORITIES**

1 Blackstone, *Commentaries on the Laws of England* (1765) ................................33

4 *Journals of the Continental Congress 1774-1789* (Worthington Chauncey Ford ed., 1906) ..................................................27

Act of 1776, *in 7 Records of the Colony of Rhode Island & Province Plantations in New England* (Bartlett ed., 1862) .........................27, 28

Act of 1777, ch. 6, *in 24 The State Records of North Carolina* (Clark ed., 1905) ........................................................28

Act of Dec. 1775, *in The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* (Charles J. Hoadly ed., 1890) ................................................27, 28

Act of June 13, 1777, ch. 756, *in 9 The Statutes at Large of Pennsylvania from 1682 to 1801* (1903) ..............................27

Act of May 1, 1776, ch. 21, *in The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* (1886) .................................28

vii

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Act of May 1777, ch. 3, *in 9 The Statutes at Large, being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* (Hening ed., 1821) ..............................................28

Act of Sept. 20, 1777, ch. 40 § 20, *in Acts of the General Assembly of the State of New Jersey* (1777) ...................................................................27, 28

## INTRODUCTION

When the Supreme Court announced its framework for reviewing Second Amendment claims in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), it emphasized that the "'right secured by the Second Amendment is not unlimited'"—it is not "'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* at 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Instead, the Second Amendment protects the right to keep and "bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 70. Those "reasonable regulation[s]" include restrictions placed on "the manner of public carry" of firearms. *Id.* at 59 (emphasis omitted). And the Court has emphasized that "nothing" in its Second Amendment jurisprudence "should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes." *Id.* at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring).

California's "shall-issue" public-carry licensing regime is constitutional under that understanding of the Second Amendment. Under California law, a licensed individual generally may "carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person" throughout the State. Cal. Penal Code §§ 26150(b)(1), 26155(b)(1). In counties with a population of under 200,000 persons, an individual may also secure a license to carry a firearm "loaded and

exposed" within the issuing county.  *Id.* §§ 26150(b)(2), 26155(b)(2).  And individuals may openly carry firearms without a license in certain exigent circumstances—for example, when an individual reasonably believes it necessary to protect a person or property from grave, imminent danger.  *See id.* § 26045.

Plaintiff Mark Baird challenges that regime, contending that he has a right under the Second Amendment to the "unlicensed, open carriage of a handgun for self-defense" throughout California.  OB 9.  He does not challenge any particular aspect of California's licensing regime; rather, he argues that he has a constitutional right to carry firearms openly in public without any licensing or permitting requirements whatsoever.  *See id.* at 26-27.  The district court correctly rejected that claim.  A faithful application of *Bruen* establishes that California's public-carry licensing regime does not burden Baird's Second Amendment right.  Qualified Californians may publicly carry firearms for purposes of self-defense with a license, which is all that the Second Amendment requires.   And even if California's licensing regime imposed some minimal burden on Baird's Second Amendment right, that regime is consistent with our Nation's long tradition of enforcing licensing requirements and regulating the "manner of public carry" of firearms.  *Bruen*, 597 U.S. at 59 (emphasis omitted).  This Court should affirm the judgment of the district court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Baird's constitutional claims under 28 U.S.C. §§ 1331 and 1343. The district court granted the California Attorney General's motion for summary judgment and denied Baird's cross-motion on those constitutional claims on December 29, 2023. 1-ER-2–3; *see also* 7-ER-1565 (final judgment entered on December 29, 2023). Baird timely filed a notice of appeal on January 24, 2024. *See* 7-ER-1550–1551; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the Second Amendment protects the right to unlicensed open carry of firearms in public.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief. *See* Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A. California's "shall-issue" licensing regime for the public carry of firearms

California law recognizes two different methods by which individuals may publicly carry firearms in the State—"concealed" carry and "open" carry. *See* Cal. Penal Code §§ 26150, 26155. "Concealed" carry broadly means that the firearm is carried in such a manner that it is not visible to others (*e.g.*, hidden under a shirt),

while "open" carry refers to the carrying of a firearm such that it is "exposed" to public view (*e.g.*, visible in a holster on a person's hip). *Id.* §§ 26150(b)(2), 26155(b)(2); *see also id.* § 25400(b) (noting that "[a] firearm carried openly in a belt holster is not concealed"). As a general matter, it is unlawful under California law to publicly carry a firearm—whether the firearm is concealed or carried openly—without a license to do so. *See id.* §§ 25400(a), 25850(a), 26350(a); *see also id.* §§ 25655, 26010, 26362.

To manage the issuance of public-carry licenses, California has adopted a "shall-issue" licensing regime. *See* Cal. Penal Code §§ 26150(a), 26155(a). Under California law, individuals may seek and obtain public-carry licenses without first establishing "good cause" or some other special need for a license.[1] Instead, the county sheriff (or designated municipal authorities) "shall issue" concealed-carry licenses to all applicants who are not "disqualified person[s]," and the issuing authority must evaluate applications based on several objective criteria. For

---

[1] California law previously required a showing of "good cause" for the issuance of public-carry licenses. However, after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the California Attorney General announced that the State would "not . . . enforce that part of the state's licensing statute." 1-ER-4; *see* 5-ER-916. Moreover, a new California law became effective on January 1, 2024, which modified California's licensing regime by, among other things, removing the previous "good cause" and "good moral character" requirements for public-carry licenses. *See* Senate Bill 2 (2023-2024 Reg. Sess.) §§ 10, 11 (codified as amended at Cal. Penal Code §§ 26150, 26155).

example, the applicant must be 21 years old and must live (or work) in the relevant county; the applicant must complete a course of firearms training; the applicant must be the registered owner of the "firearm for which the license will be issued"; and the applicant must not be "reasonably likely to be a danger to self, others, or the community at large." *Id.* §§ 26150(a), 26155(a), 26202.

The same objective criteria govern the issuance of open-carry licenses in California—though such licenses are subject to additional geographic restrictions. *See* Cal. Penal Code §§ 26150(b)(2), 26155(b)(2). Specifically, although the relevant county or municipal authority "shall issue" open-carry licenses to applicants who satisfy the criteria described above: (a) such open-carry licenses may be issued only in counties "[w]here the population of the county is less than 200,000 persons according to the most recent federal decennial census"; and (b) open-carry licenses issued in qualifying counties are valid "in only that county." *Id.* §§ 26150(b)(2), 26155(b)(2). By contrast, concealed-carry licenses are available in every California county regardless of population, and those licenses generally allow the holders to carry their firearms in a concealed manner throughout the State. *See id.* §§ 26150(b)(1), 26155(b)(1).

There are exceptions to these concealed- and open-carry licensing requirements. For example, California law provides that broad categories of persons need no license to publicly carry firearms, including peace officers,

5

members of the military, certain government officers, and licensed hunters and fishers who are engaged in those activities. *See* Cal. Penal Code §§ 25640, 26000, 26005, 26010-26060, 26361-26392. The law also recognizes that particular circumstances may warrant unlicensed public carry. *See, e.g.*, *id.* §§ 26045, 26050. There is a self-defense exception, for example, which authorizes the carrying of a loaded firearm by any individual who reasonably believes that doing so is necessary to preserve a person or property from an immediate, grave danger while awaiting the arrival of law enforcement (if it is reasonably possible to notify them). *Id.* § 26045.

### B. Factual and procedural history

Plaintiff Mark Baird is a resident of California who is eligible under state law to publicly carry firearms.[2] He has previously held a license issued by the Siskiyou County Sheriff to carry a concealed firearm, though he has apparently allowed that license to expire. *See* 1-ER-10; 5-ER-923. He also lives in a county in which California law allows open-carry licenses to be issued, although he avers that he has never successfully applied for such a license because "there is no Open Carry license application available from the" Department of Justice, and he has been "advised by the licensing authority in [his] county that no Open Carry

---

[2] Richard Gallardo was also a plaintiff in this litigation. However, he filed a motion to voluntarily dismiss his appeal, and this Court terminated his participation in this case. *See* C.A. Dkt. 4, 5.

licenses will be issued." 3-ER-545–546. He protests that he should not be required to "apply[] for and obtain[] a license" before "carry[ing] a handgun open and exposed for self-defense . . . throughout the State of California." 6-ER-1445. At bottom, what Baird "hop[es] to achieve" through this litigation is "the unpermitted and unrestricted open carry of a loaded firearm in the state of California." 5-ER-925; *see also* 6-ER-1443; OB 9, 26-27.

In 2019, Baird filed a complaint against the California Attorney General, challenging California's prohibition on the unlicensed open carry of firearms under the Second, Fourth, and Fourteenth Amendments to the U.S. Constitution. 7-ER-1555. Baird later amended his complaint, this time alleging that four California laws violated the Second and Fourteenth Amendments: the two laws prohibiting the unlicensed open carry of firearms in public (Penal Code Sections 25850 and 26350); and the two laws imposing a licensing regime for the public carry of firearms (Penal Code Sections 26150 and 26155). *See* 7-ER-1504–1513. Before the district court could resolve the merits of those allegations, however, the parties jointly requested a stay pending the Supreme Court's resolution of *Bruen*, which concerned the constitutionality of New York's concealed-carry licensing scheme. *See* 597 U.S. at 11; 7-ER-1560.

In *Bruen*, the Supreme Court announced a framework for evaluating Second Amendment claims that is "centered on constitutional text and history." 597 U.S.

7

at 22.  Under the *Bruen* framework, the initial inquiry considers whether "the

Second Amendment's plain text covers an individual's conduct."  *Id.* at 17.  If the

plain text covers the proposed conduct, "the Constitution presumptively protects

that conduct," and "[t]he government must then justify its regulation by

demonstrating that it is consistent with the Nation's historical tradition of firearm

regulation."  *Id.* at 17, 24.  "[I]f a firearm regulation is consistent with the Nation's

historical tradition," it is constitutional.  *Id.* at 17.

    After the Supreme Court issued its decision in *Bruen*, the district court lifted

the stay, and Baird filed a motion for a preliminary injunction, along with a second

amended complaint.  *See* 7-ER-1561.  In that operative complaint, Baird

maintained his challenge to the restrictions on unlicensed open carry found in

Penal Code Sections 25850 and 26350, but he abandoned his previous challenges

to particular provisions of Penal Code Sections 26150 and 26155, which set out the

requirements for California's licensing regime.  *See* 6-ER-1451–1454; 7-ER-1456–

1458.  Baird's second amended complaint sought an injunction that would allow

him "to carry a handgun open and exposed for self-defense, loaded or unloaded"

and to do so "without seeking permission from the government, including applying

for and obtaining a license."  7-ER-1456.

    The district court denied Baird's request for a preliminary injunction.  *See* 1-

ER-72.  The court reasoned that Baird had "standing to contest the state law[s]

8

generally in a facial challenge." 1-ER-76. But the court concluded that Baird
lacked "standing to assert" any "as-applied challenges" to local government
officials' failure to approve open-carry permit applications, because he "brought
[his] case against the wrong defendant." 1-ER-77. Baird sued only the California
Attorney General, rather than any statutorily designated licensing authorities, and
thus even a "favorable decision" would not "redress [his] alleged injury." *Id.* The
district court dismissed the as-applied claims without prejudice, and offered Baird
the opportunity to amend his complaint. *See id.* As to Baird's surviving facial
claims, the district court denied the requested injunction without assessing his
likelihood of success on the merits because he had "not shown the balance of
harms and public interest favors a preliminary injunction." 1-ER-81.

      This Court reversed. *See Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023).
Baird did not challenge on appeal (and this Court did not address) the district
court's dismissal of his as-applied claims. Instead, the Court considered the
district court's denial of Baird's preliminary-injunction motion with respect to his
facial challenges to the licensing regime. This Court concluded that the district
court abused its discretion when it "deliberately skipped *any* analysis of" Baird's
likelihood of success on the merits, because the likelihood-of-success factor can
"sharply tilt[]" the court's assessment of other preliminary-injunction factors. *Id.*
at 1042, 1044. The Court remanded the case to the district court, ordering the

9

court to apply the framework set forth in *Bruen* and "expeditiously" assess the merits of Baird's Second Amendment challenge. *Id.* at 1046-1047.

This Court offered the district court instructions to "guide" its "preliminary injunction analysis on remand." *Baird*, 81 F.4th at 1046. It noted that the district court's analysis "must include consideration of the question whether the conduct that California's general open-carry ban regulates is covered by the text of the Second Amendment." *Id.* And "[i]f it is, California bears the burden to identify a 'well-established and representative historical analogue' to its open-carry ban that was in force when the Second or Fourteenth Amendment was ratified." *Id.* The Court explained that "[w]hile California does not need to identify a 'dead ringer' for its open-carry ban," the State "cannot satisfy the requirement for a closely analogous historical regulation by reference to any general firearm regulation California might unearth." *Id.* Rather, "California must provide analogues that are 'distinctly similar'" concerning "'how' and 'why' they curtailed individuals' right to carry firearms." *Id.*

On remand, the district court fully resolved Baird's Second Amendment claims by granting the Attorney General's motion for summary judgment, denying Baird's cross-motion, and denying the motion for preliminary injunction as moot.

10

*See* 1-ER-71.[3]  The court first observed that Baird's as-applied claims remained

dismissed and that Baird had declined to amend his complaint to add any local

government defendants.  *See* 1-ER-10, 70.  With respect to Baird's facial challenge

to California's licensing requirement, the district court concluded that Baird's

claims failed on the merits.  *See* 1-ER-17, 37–71.

Although the court viewed Baird's proposed conduct to be "presumptively

protect[ed]" under the Second Amendment, the court ultimately held that

California's licensing regime is consistent with the Nation's historical tradition of

firearms regulation.  1-ER-39, 37–71.[4]  Specifically, as *Bruen* and other courts had

already concluded, "[S]tates may require people to obtain licenses before they

carry firearms in public," and there is a long "historical tradition" of jurisdictions

imposing such requirements to make "relevant distinctions" concerning "which

---

[3] Before this Court issued its decision in *Baird*, 81 F.4th at 1036, the Attorney
General filed a motion for summary judgment in the district court.  *See* 7-ER-1563.
Baird filed his cross-motion for summary judgment approximately three weeks after
this Court issued its decision reversing the district court's preliminary injunction
order and remanding for further proceedings.  *See* 7-ER-1564.

[4] In conducting the threshold inquiry under *Bruen*, the district court appeared to
address only the "manner of carry" limitations incorporated into California's
licensing regime.  *See* 1-ER-38–39.  The court concluded that because "California
law limits where and how Baird . . . can carry firearms in public[,] the Second
Amendment 'presumptively protects' [his] conduct."  1-ER-39.  The district court
did not separately address the independent argument that the Second Amendment's
text does not presumptively protect *unlicensed* open carry, which is Baird's proposed
conduct in this case.  *See* 5-ER-925; OB 9; *see also infra* pp. 15-16, 22-25.

11

people were not 'ordinary, law-abiding citizens.'"  1-ER-39, 42; *see also Bruen*, 597 U.S. at 38 n.9 ("[S]hall-issue regimes . . . are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"); *id.* at 79 (Kavanaugh, J., concurring) ("[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."); *id.* at 80 ("Going forward . . . the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").  Moreover, the district court surveyed the relevant history and concluded that "American governments have imposed restrictions on how people carry guns since the founding era."  1-ER-69; *see* 1-ER-48–69.

Baird now appeals the district court's summary judgment order.  He asks this Court to "restore" to the "citizens of California . . . the right to carry a handgun open and exposed on one's person for self-defense" free from any government regulation.  OB 1; *see also id.* at 9, 26-27.

## SUMMARY OF THE ARGUMENT

The threshold inquiry under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), is whether Baird has carried his burden to establish that the Second Amendment presumptively protects his proposed conduct.  He has not met that burden.  He does not propose to openly carry firearms in public with a license, and he has not taken issue with any particular restrictions incorporated into

12

California's licensing regime.  Instead, he seeks the ability to openly carry firearms in public without first applying for or obtaining any license at all.  But the Second Amendment's plain text does not require California to allow for unlicensed open carry of firearms.  As the Supreme Court explained in *Bruen*, "shall-issue" licensing regimes like California's are constitutionally permissible because they do not burden the right of the people to carry firearms in public.  *Id.* at 38 n.9.  Instead, they vindicate that right by ensuring that those carrying firearms publicly are among "the people" that the right was meant to protect.  *See id.*

Even assuming that Baird's preference for unlicensed open carry is presumptively protected conduct under the Second Amendment, California's licensing regime is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 597 U.S. at 19.  From the colonial period through the ratification of the Fourteenth Amendment and beyond, governments have sought to preserve public safety by imposing licensing and permitting requirements on firearms and other weapons, and by restricting (or sometimes prohibiting outright) particular means of carrying such weapons in public.  Because California's modern "shall-issue" licensing regime imposes a comparable burden on the right to bear arms that is comparably justified, it passes constitutional muster.

13

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Children's Hosp. Med. Center of N. Cal. v. Cal. Nurses Ass'n*, 283 F.3d 1188, 1191 (9th Cir. 2002). "A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). The Court "may affirm [a grant of summary judgment] on any ground supported by the record, including grounds the district court did not reach." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1130 (9th Cir. 2019).

## ARGUMENT

### I. CALIFORNIA'S LICENSING REQUIREMENTS DO NOT BURDEN CONDUCT THAT IS PRESUMPTIVELY PROTECTED BY THE SECOND AMENDMENT

#### A. The plain text of the Second Amendment does not presumptively protect unlicensed open carry

The threshold question under the *Bruen* framework is whether Baird has met his burden to establish that "the Constitution presumptively protects" his proposed course of conduct—*i.e.*, to carry a firearm openly in public without first obtaining a license to do so. *Bruen*, 597 U.S. at 17; *see* 5-ER-925; 7-ER-1456; OB 9. To answer that question, the Court must address whether "the Second Amendment's plain text covers [the proposed] conduct." *Bruen*, 597 U.S. at 24. That inquiry considers the conduct in light of not just "the normal and ordinary meaning of the Second Amendment," but also the Amendment's "historical background." *Id.* at

14

20 (internal quotation marks omitted).  Baird cannot meet his burden.  *See B&L Prods., Inc. v. Newsom*, __ F.4th __, 2024 WL 2927734, at *7 (9th Cir. June 11, 2024) (noting that "a litigant invoking the Second Amendment must first establish that" the Amendment's plain text covers his conduct).

Before applying the *Bruen* framework, it is important to understand the nature of Baird's claims.  *See Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024) (explaining that the "initial and critical inquiry" is to define the relevant "'proposed course of conduct,'" which is "what the plaintiffs wanted to do and what the challenged law prevented them from doing").  Baird's operative complaint does not challenge the geographic limits on open carriage found in Penal Code Sections 26150(b)(2) and 26155(b)(2), nor does his complaint seek relief in the form of expanded access to open-carry licenses in California.  *See* 7-ER-1456–1458.  Rather, Baird asserts that he has the right to carry firearms in public without any license at all.  As he alleged in the district court, "there is no historical tradition in this Nation of requiring a license or other permission to open carry a handgun outside of one's home for self-defense," and thus "[r]equiring any such license violates the Second" Amendment.  6-ER-1446.  And Baird maintains that argument on appeal:  He "seeks" to change California law such that "peaceful, unlicensed open carriage of a handgun" is "legal."  OB 9.  Given that proposed

15

conduct, this Court need only address whether the Second Amendment's plain text establishes a right to *unlicensed* public carry.

The plain text of the Second Amendment does not protect any such right. The Constitution protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. The Supreme Court has described that right as belonging to "law-abiding, responsible citizens." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). *Bruen* reiterated that limitation numerous times in describing the Second Amendment's scope. *See* 597 U.S. at 9, 15, 26, 29-31, 34, 38, 60, 70-71 & nn.8-9.[5] And the Constitution's text guarantees such people "the right to 'bear arms,'" which "refers to the right to 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive

---

[5] A recent decision issued by a three-judge panel of this Court held that the Second Amendment's reference to "the people" means "all Americans, who are indisputably part of the national community." *United States v. Duarte*, 101 F.4th 657, 672 (9th Cir. 2024) (internal quotation marks omitted). That holding assumes that certain non-Americans (for example, temporary foreign visitors) are not part of "the people." And this Court acknowledged that history would allow the dispossession of individuals convicted of offenses that were, "by Founding era standards, of a nature serious enough to justify permanently depriving" them of firearms. *Id.* at 691. *Duarte* thus confirms that certain individuals fall outside the scope of the Second Amendment's protection; licensing requirements "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens" therefore do not interfere with rights protected by the Second Amendment. *Bruen*, 597 U.S. at n.9.

or defensive action in a case of conflict with another person." *Id.* at 32 (some internal quotation marks omitted).

Examining the text of the Second Amendment, the Supreme Court repeatedly has cautioned that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. And thus the Court repeatedly has explained that the Second Amendment "does not imperil every law regulating firearms," *McDonald v. City of Chicago*, 561 U.S. 742, 786 (plurality opinion); that many "regulatory measures" concerning firearms are, in fact, "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26; and—most relevant here—that "shall-issue" licensing regimes are lawful so long as they are not "put toward abusive ends" (for example, "where [] lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry"), *Bruen*, 597 U.S. at 38 n.9.

Applying those principles, the Supreme Court explained in *Bruen* that governments remain free under the Second Amendment to enact and enforce "'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a permit,'" and there is no requirement for "applicants to show an atypical need for armed self-defense." *Bruen*, 597 U.S. at 38 n.9. The Court reasoned that such licensing regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public

17

carry." *Id.* On the contrary, the Court held that such regimes are consistent with the Second Amendment, because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.*[6] And in joining the opinion, Justice Kavanaugh and the Chief Justice observed that the Second Amendment "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense," *id.* at 79 (Kavanaugh, J., concurring); that the Court's Second Amendment jurisprudence "does not affect the existing licensing regimes . . . that are employed in 43 States," *id.*; and that "[g]oing forward, . . . the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so," *id.* at 80. Courts therefore have understood *Bruen* and *Heller* to indicate that "shall-issue" licensing schemes and background check requirements "are presumptively

---

[6] Notably, the Supreme Court cited with approval the "shall-issue" licensing schemes of 43 States, including the schemes in effect at the time in Florida and Illinois. *See Bruen*, 597 U.S. at 14 n.1, 38 n.9. In Florida, for example, qualifying citizens in 2022 could obtain a license "to carry concealed weapons or concealed firearms" in public, but those licenses did "not authorize any person to openly carry a handgun." Fla. Stat. §§ 790.06(1), (12)(a) (effective June 29, 2021 to June 30, 2022). The same was true in Illinois. *See Sinnissippi Rod & Gun Club, Inc. v. Raoul*, __ N.E.3d __, 2024 WL 886651, at *1 (Ill. Ct. App., Mar. 1, 2024) (explaining that Illinois has a "concealed carry licensing regime" that "does not allow an individual to openly carry a firearm in public"). And like California, Florida and Illinois enforced those limitations through criminal penalties. *See* Fla. Stat. § 790.01 (effective May 21, 2015 to June 30, 2023); *id.* § 790.053 (effective June 17, 2011 to June 30, 2023); Ill. Comp. Stat. 720 §§ 5/24-1(a)(10), 5/24-1.6(a).

18

constitutional." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024); *see also Vincent v. Garland*, 80 F.4th 1197, 1201-1202 (10th Cir. 2023); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

California's current framework regulating the public carry of firearms qualifies as one of those constitutionally sound "shall-issue" licensing regimes. California law does "not grant open-ended discretion to licensing officials and do[es] not require a showing of some special need [for a license] apart from self-defense." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring). Instead, applicants need only satisfy several "objective licensing requirements," including age and residency restrictions, a background check, fingerprinting, and firearms training. *Id.*; *see* Cal. Penal Code §§ 26150, 26155, 26185, 26190, 26202. These are exactly the kinds of criteria that the *Bruen* Court endorsed as constitutionally permissible. *See Bruen*, 597 U.S. at 38 n.9; *id.* at 80 (Kavanaugh, J., concurring).

Indeed, Baird has not taken issue with any of California's statutory requirements for obtaining a license. *Compare* 7-ER-1492–1513 (first amended complaint challenging various aspects of California's licensing regime) *with* 6-ER-1451–1455, 7-ER-1456–1458 (operative complaint abandoning those challenges). Rather, he broadly challenges the State's authority to impose any licensing regime at all. *See, e.g.*, 5-ER-925; 6-ER-1445. Under *Bruen*, however, there is no presumptive right to publicly carry a firearm without satisfying a licensing

19

requirement; instead, such licensing schemes are presumptively lawful—though they are subject to as-applied challenges when the scheme has been "put toward abusive ends." 597 U.S. at 38 n.9; *see id.* at 80 (Kavanaugh, J., concurring).[7]

### B.  Baird's counterarguments are unpersuasive

Baird nevertheless contends that the Second Amendment "presumptively protect[s]" a right to openly carry a firearm in public without first obtaining a license to do so.  OB 6.  His arguments lack merit.

1.  Baird first contends that any California law "requiring [him] to seek a license, prove [his] eligibility for, or take any action at all before being able to exercise [his] pre-existing right to possess and carry weapons for self-defense" is "[r]epugnant [t]o [t]he Constitution."  OB 26 (emphasis omitted).  But that

---

[7] The three-judge panel in *Duarte* held that "'[s]imply repeat[ing] *Heller*'s language' about the 'presumptive[] lawful[ness]' of felon firearm bans will no longer do after *Bruen*."  101 F.4th at 668 (internal quotation marks omitted).  Rather, the decision states that courts must assess whether "*any* regulation infringing on Second Amendment rights . . . is consistent with this nation's historical tradition of firearm regulation."  *Id.* (internal quotation marks omitted).  But *Duarte* involved only prohibitions on the possession of firearms by felons—an issue that is not presented in this case.  And the Court did not address the constitutionality of licensing or background check laws.  *Cf. B&L Prods., Inc.*, 2024 WL 2927734, at *8 (holding that "commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test").  The United States recently filed a petition for rehearing en banc in *Duarte* and asked for "expedite[d] consideration," No. 22-50048, C.A. Dkt. 72 at 7, and the response to that petition has now been filed, *id.*, C.A. Dkt. 74.  To the extent this Court views *Duarte* as controlling the analytical framework for assessing the constitutionality of licensing requirements at the time it considers this appeal, the Attorney General preserves this argument for potential future review.

argument ignores the text of the Second Amendment and the Supreme Court's precedents construing it. *See supra* pp. 16-19; *Bruen*, 597 U.S. at 38 n.9.

Baird responds that *Bruen*'s endorsement of "shall-issue" licensing regimes does not control the outcome in this case because "[t]he Court did not undertake an historical analysis of licensing requirements" before concluding that such regimes were permissible under the Second Amendment. OB 30. But the Supreme Court was not required to conduct an analogical analysis because "shall-issue" regimes are consistent with a proper understanding of the Second Amendment's plain text. *See B&L Prods., Inc.*, 2024 WL 2927734, at *8 ("For any law to be 'presumptively lawful,' it necessarily must not implicate the plain text of the Second Amendment."). That is, "shall-issue" licensing regimes do not "necessarily" burden the "Second Amendment right to public carry"; instead, they are mechanisms to ensure that "those bearing arms in the jurisdiction are" among "the people" to whom the Second Amendment right was meant to extend. *Bruen*, 597 U.S. at 38 n.9.

Baird also argues that *Bruen* is not controlling because its discussion of "shall-issue" licensing regimes is dicta. In his view, "the petitioners in *Bruen* conceded that 'shall-issue licensing regimes are constitutionally permissible'"—a concession that Baird does not make here. OB 30 (quoting *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring)). But the licensing discussion in *Bruen* is not dicta.

"Courts often limit the scope of their holdings, and such limitations are integral to those holdings"—*i.e.*, they are not dicta. *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), *abrogated on other grounds as recognized by Duarte*, 101 F.4th 657, 661-662 (9th Cir. 2024).

Even if the discussion were dicta, "Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, [this Court] do[es] not blandly shrug them off because they were not a holding." *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc); *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004) (Supreme Court dicta warrants "great weight"). The *Bruen* majority did not blindly adopt petitioners' concession that "shall-issue" licensing regimes were constitutional. It carefully considered the issue and concluded that such regimes were permissible because they did not "prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted). And Justice Kavanaugh and the Chief Justice joined the majority opinion only after "underscor[ing]" that "States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so." *Id.* at 79, 80.

2. Baird separately contends that "[e]ven if imposing a licensing requirement for open carry was consistent with the plain text of the Second Amendment,"

California's licensing regime would still be unconstitutional because "[i]n practice . . . the only type of license available to be issued [in California] is concealed carry," and there is "no evidence of an open carry license ever having been issued anywhere in the state." OB 5; *see also id.* at 49-50. In Baird's view, California has functionally "banned" the open carry of firearms in public. *Id.* at 8-9. But that argument does not satisfy Baird's threshold burden.

First, as described above, Baird does not seek in this litigation a right to openly carry firearms in the State *with a license*. Instead, his complaint challenges only Penal Code Sections 25850 and 26350, which together make it unlawful to openly carry firearms in public without a license, and he has declared his intent to carry firearms openly "without seeking permission from the government, including applying for and obtaining a license under California's licensing scheme." 7-ER-1456. The gravamen of his claim is that "requiring a license or other permission to open carry a handgun outside of one's home for self-defense" violates the Second Amendment. 6-ER-1446; *see also* 5-ER-925; OB 9, 26-27. The sole issue for this Court to resolve at *Bruen*'s first step is thus whether Baird's desire to carry a firearm openly in public without first obtaining a license to do so is conduct presumptively protected by the Second Amendment—a question that *Bruen* has already answered. *See* 597 U.S. at 38 n.9.

23

Second, this appeal does not present the question of what does or does not happen "in practice" under California's licensing regime. OB 5. At issue in this appeal is only Baird's *facial* challenge to the constitutionality of Penal Code Sections 25850 and 26350.[8] And "when reviewing a facial challenge, [this Court is] limited to reviewing the text of the [statute] itself," and will not consider "[h]ow the statute has been interpreted and applied by local officials." *Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020). That latter issue "is the province of an as-applied challenge." *Id.* Given the facial availability of open-carry licenses in Baird's county of residence, he cannot attack the statutory scheme on a facial basis by claiming that no open carry is contemplated under California's laws. *See United States v. Salerno*, 481 U.S. 739,

---

[8] As described above, to the extent Baird previously asserted any as-applied challenges to California's open-carry licensing regime, the district court dismissed those claims because Baird did not bring suit against any local licensing authorities. *See supra* p. 9. Although the district court offered Baird the opportunity to amend his complaint, he failed to do so, and Baird does not challenge on appeal the dismissal of his as-applied claims for lack of standing. *See Dep't of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1179 n.1 (9th Cir. 2023) (noting that causes of action not raised on appeal are "forfeited"). Similarly, this Court should not entertain the arguments raised by amici (*e.g.*, that the district court somehow misconstrued Baird's constitutional claim, and that Penal Code Sections 25850 and 26350 violate the Second Amendment's plain text because they prevent the formation of state militias). *See* Br. of Amici Curiae Gun Owners of Cal., Inc., *et al.* at 4-14. Baird did not properly raise those arguments in the district court or in his Opening Brief. *Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 999 (9th Cir. 2012) (declining to resolve summary judgment argument raised "for the first time on appeal").

745 (1987) ("A facial challenge" is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

## II. CALIFORNIA'S OPEN-CARRY LICENSING REGIME IS CONSISTENT WITH THE NATION'S TRADITION OF FIREARMS REGULATION

Even if the Court holds (or assumes) that California's open-carry licensing regime burdens presumptively protected conduct, the challenged scheme is constitutionally sound because it is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S at 19. The historical analysis required by *Bruen* does not impose "a regulatory straightjacket." 597 U.S. at 30. Instead, the government must justify a regulation by establishing that it falls within a historical tradition of laws that are "relevantly similar," in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 29. The government therefore need only "identify a well-established and representative historical *analogue*"—not a "historical *twin*" or "dead ringer"—to the challenged law. *Id.* at 30; *see Baird*, 81 F.4th at 1046; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

### A. Governments have long regulated the public carry of weapons—including requiring licenses and imposing "manner of carry" restrictions

Historical analogues confirm that the challenged provisions comport with the Second Amendment. Baird demands the right to "peaceful, unlicensed open

25

carriage of a handgun for self-defense," and he argues that there is no historical

support for California's decision to prohibit that conduct through Penal Code

Sections 25850 and 26350. OB 9; *see also id.* at 2. But the record assembled in

this case establishes that "licensing and registration requirements were commonly

and ubiquitously applied to guns and other dangerous weapons," 5-ER-1016, and

"that *the manner* of public carry [of firearms] was subject to reasonable

regulation." *Bruen*, 597 U.S. at 59.

### 1.   Licensing requirements

As the district court correctly concluded, the historical record contains ample

evidence supporting licensing restrictions that—like California's licensing

regime—aim to "keep weapons away from people who were not 'ordinary, law-

abiding citizens.'" *See* 1-ER-46; *see also* 1-ER-40 ("If states must not infringe the

rights of 'ordinary, law-abiding citizens' to possess handguns in the home and in

public for self-defense, but may forbid others from possessing the same guns, the

Second Amendment must allow states to distinguish 'ordinary, law-abiding

citizens' from others somehow, including by requiring a license.").

As an initial matter, governments from before the founding identified classes

of persons who were ineligible to possess or carry arms. At the start of the

Revolutionary War, for example, the Continental Congress recommended the

disarmament of loyalists and those "notoriously disaffected to the cause of

26

America." 4 *Journals of the Continental Congress 1774-1789* 205 (Worthington

Chauncey Ford ed., 1906); *see also United States v. Perez-Garcia*, 96 F.4th 1166,

1186-1189 (9th Cir. 2024) (concluding that "legislatures have long disarmed

groups or individuals whose possession of firearms would pose an unusual danger,

beyond the ordinary citizen, to themselves or others").  Many colonies followed

suit and enacted similar disarmament provisions.[9]

To carry out those measures, colonial legislatures also enacted regulatory

requirements that were designed to determine whether individuals were prohibited

from possessing arms.  In 1777, for example, Pennsylvania required all "male

white inhabitants" to "take and subscribe" to a loyalty oath before a justice of the

peace.  Act of June 13, 1777, ch. 756, 9 *The Statutes at Large of Pennsylvania*

*from 1682 to 1801* 111 (1903).  The justices were also required to "keep fair

registers of the names and surnames of the person so sworn or affirmed," and those

---

[9] *See, e.g.*, Act of Dec. 1775, *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* 193 (Charles J. Hoadly ed., 1890) (disarming any person "duly convicted" of "libel or defam[ation]" of "the resolves of the Honorable Congress of the United Colonies, or the acts and proceedings of the General Assembly of this Colony"); Act of Sept. 20, 1777, ch. 40 § 20, *Acts of the General Assembly of the State of New Jersey* 90 (1777) (New Jersey statute authorized officials to seize "all of the Arms, Accoutrements, and Ammunition which they own or possess" from "Persons as they shall judge disaffected"); Act of 1776, 7 *Records of the Colony of Rhode Island & Province Plantations in New England* 567 (Bartlett ed., 1862) (Rhode Island law authorized confiscation of "all arms, ammunition, and war like stores" from loyalists).

who "refus[ed] or neglecte[d] to take and subscribe the said oath" were to be "disarmed by the lieutenant or sub-lieutenants of the cities or counties respectively." 9 *Statutes at Large of Pennsylvania* 112-113. Connecticut, Massachusetts, Rhode Island, North Carolina, New Jersey, and Virginia all required similar oaths and several provided for similar registration lists.[10]

In addition to loyalty oaths, 18th and early-19th century governments also established licensing regimes aimed at regulating activities that posed a danger to the public—including the possession (or use) of firearms and other dangerous items. In 1713, for example, Philadelphia penalized "'firing a Gun without a license,'" and other colonial laws from 1750 imposed criminal penalties on "'shooting . . . guns' or setting off fireworks" without "a 'governor's special license.'" 5-ER-1011. Moreover, gunpowder—an item essential to the use of firearms for purposes of self-defense or otherwise—was extensively regulated through licensing. Those licenses "extended to [gunpowder's] sale or its transport,

---

[10] Act of Dec. 1775, *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* 193; Act of May 1, 1776, ch. 21, §§ 1-2, 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-81 (1886); Act of 1776, 7 *Records of the Colony of Rhode Island & Province Plantations in New England* 567; Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Clark ed., 1905); Act of Sept. 20, 1777, ch. 40 § 20, *Acts of the General Assembly of the State of New Jersey* 90; Act of May 1777, ch. 3, 9 *The Statutes at Large, being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 281-283 (Hening ed., 1821).

28

acquisition, handling, or storage, or sometimes all of these," and "at least 21 states enacted such licensing [requirements] from the 1700s through the early 1900s." 5-ER-1013–1014.

Licensing regimes increased in popularity following the Civil War. *See* 5-ER-1003–1010. That development was spurred in part by the "dramatic rise in the availability" of revolvers, which coincided with "a proliferation of interpersonal violence" in American communities. 5-ER-946; *see also* 5-ER-947–951; 1-ER-60–65 (district court reviewing the historical evidence and concluding that "gun violence grew more prevalent and weapons grew more dangerous" in the mid-19th century, which led to increased restrictions on public carry). Throughout this period, State and local legislatures required residents to acquire licenses after satisfying "review criteria and discretionary judgment of local officials who were empowered to grant carry licenses." 5-ER-1003.[11]

Typically, jurisdictions required licenses if individuals wanted to carry firearms in a concealed manner—a policy choice that reflected the fact that 19th century "deadly weapons" like Bowie knives and pocket pistols "tended to be carried concealed." 5-ER-941–942. For example, Missouri enacted a measure in

---

[11] During this same mid-19th century period, many jurisdictions also adopted surety laws "that required certain individuals to post bond before carrying weapons in public" as a method of insurance for any ensuing breaches of the peace. *Bruen*, 597 U.S. at 55; *see id.* at 55-60 & n.23 (collecting examples).

1871 that required "'written permission from the Mayor'" in order to carry

concealed handguns and other weapons in St. Louis.  5-ER-1003–1004.

Sacramento and Oakland, California adopted similar laws in 1876 and 1890,

respectively.  5-ER-1007; 6-ER-1358.  An 1881 New York City ordinance

criminalized the concealed carry of pistols, but also authorized the issuance of

licenses to carry such pistols, if the individual presented himself to a local officer

for examination, and the local officer was "satisfied that the applicant is a proper

and law abiding person."  5-ER-1005.  And Congress likewise passed a law in

1892 that criminalized the concealed carry of "'any deadly or dangerous

weapons'" in the District of Columbia, unless the holder had a permit that would

last "'for a period of not more than one month at any one time,'" and that would

issue only "'upon satisfactory proof to [a judge of the District's police court] of the

necessity for the granting thereof.'"  5-ER-1007.

Not all licensing schemes during the late-19th century were limited to the

concealed carry of weapons, however.  For example, Montana adopted "a wide-

ranging state licensing law in 1895 that threatened imprisonment and fines for

anyone 'who brings into this state an armed person or armed body of men for the

preservation of the peace or the suppression of domestic violence, except at the

solicitation and by the permission of the legislative assembly or of the governor.'"

5-ER-1008; *see also* 6-ER-1268.  And in 1893, Florida adopted a law that made it

unlawful for any person "to carry around with him on his person and in his manual possession [a] Winchester rifle or other repeating rifle" "without first taking out a license from the County Commissioner of the respective counties." 5-ER-1007; 6-ER-1235–1236.

The number and geographic scope of licensing requirements only accelerated in the early-20th century. 5-ER-1008–1010. Although many of these schemes continued to target the concealed carry of firearms, *see, e.g.*, 5-ER-1009 (describing Virginia's 1908 scheme for the concealed carry of dangerous weapons), some applied more broadly. In 1906, for example, Massachusetts enacted a scheme that required a license for any person who "carries on his person a loaded pistol or revolver," and violators were subject to imprisonment, a fine, or both. *Id.*; *see also* 6-ER-1258. And in 1910, Georgia adopted a similar permitting scheme for the public carry of pistols. *See* 5-ER-1009. The scheme broadly made it "unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the" licensing authority where the person resides. 6-ER-1237. A range of concealed- or public-carry licensing schemes thus became ubiquitous during this time period. *See* 5-ER-1009–1010 (citing licensing laws from Hawaii, Indiana, Michigan, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, and South Carolina).

The widespread adoption of such licensing regimes is particularly notable, because the record contains no evidence that these regimes were ever determined to be unconstitutional—or were even challenged on constitutional grounds. *See* 1-ER-46 ("No evidence in this record shows that licensing laws were successfully challenged on constitutional grounds, if they were even challenged in the first place."); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 320 (2d Cir. 2023) (concluding that licensing schemes "appear to have existed without constitutional qualms or challenges"). This is strong evidence that licensing regimes are "part of the nation's tradition of firearm regulation" and thus constitutionally sound. *Id.* (emphasis omitted); *see Bruen*, 597 U.S. at 36 ("[W]here a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." (internal quotation marks omitted)).

### 2.    "Manner of carry" restrictions

As the district court recognized, California's particular licensing scheme—which broadly authorizes the issuance of concealed-carry licenses, while imposing additional restrictions on open-carry licenses—also has substantial historical support. *See* 1-ER-68 ("California has proven an historical tradition of imposing categorical limits on how guns are carried in public based on categorical cultural and societal expectations."). Indeed, the Supreme Court has concluded that

32

"manner of public carry" restrictions have deep roots in the Nation's tradition of firearm regulation: Not only did historical regulators place restrictions on particular methods of public carry, they often "eliminate[d] one kind of public carry" altogether. *Bruen*, 597 U.S. at 59 (emphasis omitted).

The historical tradition relevant here again dates back to before the founding. In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 597 U.S. at 20 (internal quotation marks omitted). That "'*pre-existing* right'" was "'not unlimited.'" *Id.* at 20, 21 (quoting *Heller*, 554 U.S. at 626). As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace. 1 Blackstone, *Commentaries on the Laws of England* 139 (1765). Indeed, "[i]n England prior to colonization, the public carry of firearms was generally prohibited in populous areas, with limited exceptions for community defense and law enforcement, and with a legally sanctioned exception for the gentry elite." 6-ER-1360.

The English tradition of placing limits on public carry continued in America in the colonial period and the early days of the Republic. *See Bruen*, 597 U.S. at 46 (identifying these periods as relevant to the Second Amendment analysis). For example, a 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives. *See* 5-ER-995. A 1686 New

Jersey law adopted "An Act Against Wearing Swords" and prohibited the wearing
of "pistols" and other specified weapons "privately"—though it also levied
penalties for the open carrying of weapons.  5-ER-990, 995–996.  And several
colonial governments adopted laws that "mirrored the British Statute of
Northampton, where the very fact of carrying a firearm was considered to be in
terror of the people and was therefore prohibited by that statute."  5-ER-995
(internal quotation marks and brackets omitted)).  Those colonial statutes punished
individuals who "'went armed offensively'" in public places like "'fairs,'"
"'markets,'" or "'in the presence of the King's Justices.'"  5-ER-996 (quoting a
1699 New Hampshire law and a 1795 North Carolina law, and citing similar laws
adopted in the 1700s in Virginia and Massachusetts).[12]

    As the Supreme Court has recognized, "public-carry restrictions
proliferate[d]" in the period "after the ratification of the Second Amendment in
1791."  *Bruen*, 597 U.S. at 50.  Those restrictions most often "proscribed the
concealed carry of pistols and other small weapons," *id.* at 52, but certain

---

[12] The Supreme Court in *Bruen* gave little weight to the Statute of Northampton and
its colonial-era progeny, because those laws did not support the idea that
governments could ban public carry altogether.  Instead, the Court read such statutes
as merely proscribing a particular manner of public carry.  *See Bruen*, 597 U.S. at
50.  Those statutes thus remain helpful for the question at issue here, which concerns
whether the Second Amendment is amenable to reasonable "manner of carry"
restrictions.

jurisdictions also imposed restrictions on open carry, *see id.* at 52 n.16; 5-ER-990–993; *see also* 5-ER-963–965; *supra* pp. 29-31.  In 1821, for example, Tennessee adopted a law that prohibited the carrying of "a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private" and subjected violators to a five-dollar fine.  5-ER-964.  Georgia enacted a similar law in 1837.  *See* 5-ER-991.  In 1838, Florida passed a "law that criminalized the concealed carry of certain named weapons, but also added that 'all persons carrying said weapons openly shall pay' a then-considerable regulatory tax of 'ten dollars per annum.'"  5-ER-992.  And in the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other specified deadly weapons, whether they were carried in a concealed manner or openly.  *See id.*

States and territories during this post-ratification period also adopted less direct methods for discouraging the public carry of certain firearms.  For example, an 1850 North Carolina measure imposed a one-dollar tax on all pistols and other weapons "'worn or carried about the person of the owner.'"  *See* 5-ER-968–969.  To avoid that tax, the owner of such weapons "need only leave them at home rather than carry them habitually."  5-ER-969.  And as described above, the territorial government of Florida likewise sought to reduce the presence of firearms in public places, enacting an 1838 law that imposed an annual tax of ten dollars on

"'all persons carrying [vend dirks, pocket pistols, sword canes, or bowie knives] openly.'" 5-ER-967–968.

Public-carry restrictions increased in frequency during the Reconstruction era and through the early-20th century. For example, in 1871, Texas enacted a law making it a crime to "'carry[] on or about [one's] person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, [or] bowie-knife,' unless for provable self-defense or in service to the government." 5-ER-992. Many other States, territories, and cities followed suit, adopting broad prohibitions on the public carry of weapons—including open carry. *See, e.g.*, 5-ER-992–994; 6-ER-1356–1357. Examples include Arkansas' 1875 statute, which said that "'any person who shall wear or carry any pistol of any kind whatever . . . shall be adjudged guilty of a misdemeanor.'" 5-ER-992–993. Provo, Utah adopted a similar ordinance in 1877. *See* 6-ER-1205 (prohibiting the "carry upon his person" of "any pistol, or other firearm," and subjecting offenders to a $25 fine). And a Nebraska City, Nebraska law from 1872 made it "'unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, . . . or any other dangerous or deadly weapons.'" 5-ER-993.

State courts occasionally reviewed the constitutionality of these broad public-carry restrictions. The Georgia Supreme Court's decision in *Nunn v. State*, 1 Ga. 243 (1846), is "particularly instructive." *Bruen*, 597 U.S. at 54. There, the state

court weighed a challenge to the 1837 law mentioned above, which "broadly prohibited 'wearing' or 'carrying' pistols . . . without distinguishing between concealed and open carry." *Id.* The court held that "[a] law which merely inhibits the wearing of certain weapons in a *concealed manner* is valid," "[b]ut so far as it cuts off the exercise of the right of the citizen altogether to *bear arms*, *or*, under the color of prescribing the *mode*, renders the right itself useless," "it is in conflict with the Constitution, and *void*." *Nunn*, 1 Ga. at 243. Other state courts reached similar conclusions. *See State v. Jumel*, 13 La.Ann. 399, 399-400 (1858) ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society."); *State v. Reid*, 1 Ala. 612, 616 (1840) (holding that the right to bear arms did not deny "the Legislature[] the right to enact laws in regard to the manner in which arms shall be borne"). The lesson the Supreme Court took from these and other state-court decisions is that—although "*the manner* of public carry was subject to reasonable regulation"—"it was considered beyond the constitutional pale . . . to altogether prohibit public carry." *Bruen*, 597 U.S. at 54, 59.

## B. California's licensing regime is relevantly similar to this historical tradition

The operative inquiry at *Bruen*'s second step is whether California's licensing regime is "relevantly similar" to the Nation's historical tradition of arms

37

regulation. *Bruen*, 597 U.S. at 29. *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Id.* Instead, it explained that the "*central* considerations" in making historical comparisons are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Id.* (internal quotation marks omitted). In both respects, California's licensing regime is "relevantly similar" to the historical traditions described above. *Id.*

To start, California's licensing regime imposes only a minimal burden on Baird's Second Amendment right. As the Supreme Court observed in *Bruen*, "shall-issue" regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." 597 U.S. at 38 n.9. And in reaching that conclusion, the Court cited with approval licensing regimes that—like California's regime—favored concealed-carry licenses over open-carry licenses. *See id.*; *see also id.* at 13 n.1 (citing Fla. Stat. § 790.06 (which allowed for concealed-carry licenses, but did "not authorize any person to openly carry a handgun"), and Ill. Comp. Stat. 430 § 66/10 (establishing a "concealed carry licensing regime" that "does not allow an individual to openly carry a firearm in public," *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, __ N.E.3d __, 2024 WL 886651, at *1 (Ill. Ct. App., Mar. 1, 2024))).

38

The minimal burden imposed by California's licensing regime is no more severe than the historical licensing and "manner of carry" laws that date back to before the founding. *See supra* pp. 26-37. As to licensing: California's "shall-issue" regime (which relies entirely on objective criteria) imposes far less severe burdens than the licensing schemes adopted in the years immediately following the Civil War. Those schemes relied on criteria that "were generally highly discretionary for the individuals or bodies granting them." 5-ER-1003. "In some laws, no criteria were specified," and thus licenses could be issued (or revoked) "at the pleasure" of the relevant government official. *Id.*; *see also* 5-ER-1006, 1008; *cf. Antonyuk*, 89 F.4th at 320-321 (upholding aspects of New York's post-*Bruen* licensing scheme in part because its historical precursors imposed "lesser constraints" on the licensing authority's subjective, "individualized assessment" of licensing applications).

The "manner of carry" restrictions found in California's licensing regime likewise compare favorably to historical precursors. *See Baird*, 81 F.4th at 1047 (directing the district court to look for analogues for California's scheme that burden the open carry of firearms "to a comparable degree, with a comparable severity, and with a comparable blanket enforcement"). Many of those historical precursors entirely eliminated one form of public carry for all individuals— typically concealed carry. *See Bruen*, 597 U.S. at 52–55; 1-ER-67–68 ("California

39

has proven the burden of [historical "manner of carry"] laws was heavy, including outright bans on specific types of weapons and weapons carrying."). But California has taken a more modest approach to its firearm regulations. Here, the State's statutory scheme allows concealed-carry licenses to issue statewide, open-carry licenses to issue in certain geographic locales, and individuals to carry firearms openly without a license in certain exigent circumstances. *See* Cal. Penal Code §§ 26150, 26155, 26045, 26050.

The minimal burden imposed by California's licensing regime is also comparably justified when held next to its historical precursors. Historically, jurisdictions adopted licensing regimes for reasons of public safety—the licensing authorities sought to restrict possession of arms by individuals deemed to be dangerous or irresponsible, for example, or they sought to curtail activities that were unusually dangerous (like firing weapons in cities or storing gunpowder in populated areas). *See supra* pp. 26-29; 5-ER-1001–1002. Similar concerns animated early Americans' decisions to impose "manner of carry" restrictions. Governments hoping to mitigate the risk of "interpersonal violence" tended to focus their regulatory efforts on "deadly weapons," which were "associat[ed] with crime and needless bloodshed," and which generally were synonymous with "'concealed weapons' for the straightforward reason that they were designed to be carried concealed." 5-ER-941, 942; *see supra* pp. 29-30. Lawmakers therefore

adopted restrictions or outright bans on concealed carry, because it was "*a particular mode* of bearing arms which [was] found dangerous to the peace of society." *Jumel*, 13 La.Ann. at 400.

Those concerns are comparable to California's present concerns. California has adopted a "shall-issue" licensing regime that issues licenses to individuals who are not prohibited from possessing arms based on several objective criteria. *See* Cal. Penal Code §§ 26150(a), 26155(a). And the State has determined that the widespread open carry of firearms "would create a highly stressful and unsafe environment for everyone"—particularly in densely populated "urban and suburban communities." 6-ER-1388. Indeed, "[t]he presence of a firearm carried openly" in such environments "has the high potential to create panic and chaos," *id.*, which is of course "dangerous to the peace of society." *Jumel*, 13 La.Ann. at 400. At the same time, state law authorizes the concealed carry of firearms by licensed individuals and open carriage in certain locations and under certain specified circumstances.

### C.   Baird's historical approach is flawed

Baird does not believe that California's licensing regime is constitutional under *Bruen*, but his approach to the historical analysis is fundamentally flawed. Baird first argues that this Court should give "determinative" weight to historical sources from around the time of the founding and to wholly disregard post-

41

ratification statutes, ordinances, and other sources setting out licensing requirements from, for example, 1868 or later. OB 22; *see also id.* at 31-36. In Baird's view, the Court should assess licensing or permitting regulations only from around the time of the founding in 1791, because that is "the period of sole or primary relevance." *Id.* at 36.

But that argument cannot be squared with the Supreme Court's approach to the Second Amendment analysis. In *Heller*, for example, the Court explained that evidence about "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" is a "critical tool of constitutional interpretation." 554 U.S. at 605. In *McDonald*, the Court engaged in a lengthy analysis of the understanding of the Second Amendment right from around 1868. *See* 561 U.S. at 770-778 (plurality opinion); *id.* at 826-838 (Thomas, J., concurring in part and concurring in the judgment). And in *Bruen*, the Court reiterated that post-ratification evidence can help "settle the meaning" of the Constitution. 597 U.S. at 35-36 (internal quotation marks omitted).

Those cases establish that post-ratification history is very much relevant to this Court's Second Amendment inquiry—so long as that history is not "*inconsistent* with the original meaning of the constitutional text." *Bruen*, 597 U.S. at 36. In this case, as the Supreme Court has explained, "shall-issue" licensing regimes do not contradict the Second Amendment's text. *See id.* at 38

42

n.9.  Because there is no tension between the Second Amendment's text and the numerous mid-to-late-19th century licensing regimes and "manner of carry" restrictions in the historical record, those regimes remain a "critical tool" in this Court's constitutional analysis.  *Heller*, 554 U.S. at 605; *see also Baird*, 81 F.4th at 1046 (explaining that California must identify an analogue "that was in force when the Second *or Fourteenth* Amendment was ratified" (emphasis added)).

Regardless, this Court need not rely exclusively on Reconstruction-era sources, because the evidence from the time of the founding confirms the district court's conclusion that "shall-issue" licensing schemes like California's are constitutional.  Governments have long imposed licensing and permitting requirements as a means of promoting public safety.  During the founding era, for example, several colonies imposed restrictions on the possession of firearms by individuals deemed to be disloyal or dangerous, with some maintaining registries of individuals qualified to possess arms.  *See supra* pp. 26-28 (citing *Perez-Garcia*, 96 F.4th at 1186-1189).  Moreover, Philadelphia during the colonial period penalized activities like "'firing a Gun without a license,'" and numerous other jurisdictions required similar licenses in the late-18th and early-19th centuries.  5-ER-1011–1012.  Early-American governments also required permits or licenses that placed limits on the possession or storage of gunpowder—which was crucial to the operation of firearms during the founding era.  *See* 5-ER-1013–1014.

43

Baird also argues that the "post-ratification licensing regulations proffered by California" are insufficient analogues for California's current licensing regime, because those earlier regulations most often "appl[ied] to *concealed carry*, not open carry." OB 29. In Baird's view, California's licensing regime survives constitutional scrutiny only if the State identifies a "historical tradition of requiring the People to seek and obtain permission from the government before being able to . . . open carry." OB 29. But that is just another way of saying that California has not identified a historical "twin" to its current licensing regime, a proposition the Supreme Court has rejected. *Bruen*, 597 U.S. at 29.

In any event, California has described a rich tradition of regulations that impose licensing requirements on the public carriage of weapons, as well as restrictions on the "manner of carry" of such weapons—including restrictions specifically aimed at open carry. *See supra* pp. 26-37. As far back as 1642, for example, the New Netherland colony prohibited the drawing or displaying of knives. 5-ER-995. "Between the late 1600s and the early 1930s," at least "19 states enacted laws that penalized the mere display or wearing of firearms and other 'deadly weapons.'" 5-ER-997, 1000–1001. And the State has identified historical licensing regimes that—like California's scheme—required licenses for all forms of public carry, not just concealed carry. *See supra* pp. 30-31 (discussing Montana, Florida, Massachusetts, and Georgia licensing schemes from the late-

44

19th and early-20th centuries). This broad historical tradition of licensing and "manner of carry" restrictions is "relevantly similar" to California's current regime—which is all that *Bruen* requires. *See Perez-Garcia*, 96 F.4th at 1191 (rejecting a "divide-and-conquer approach to the historical evidence," and asking, instead, whether "the historical evidence, when considered as a whole, shows a long and broad history" of similar firearms regulations).

Moreover, the alleged absence of any historical "dead ringers" for California's licensing regime says nothing about the constitutionality of that regime. Instead, the record reflects an evolution in technological and social realities that has little to do with the Second Amendment. For example, limitations in weapons technology at the time of the founding meant that "interpersonal violence" tended to involve "deadly weapons"—like knives and pocket pistols— that were designed to be concealed, and that were far more likely to be used by criminals and "ruffians" than long guns (which were difficult to load, which were used primarily for hunting and militia service, and which generally were carried openly). 5-ER-940–941, 942; *see also* 6-ER-1348–1349. Our forebears therefore most often imposed licensing restrictions on the concealed carry of weapons. *Supra* pp. 29-30. But that response to the technological and social realities that confronted historical legislators does not impose a "regulatory straightjacket" on lawmakers responding to current conditions. *Bruen*, 597 U.S. at 30.

45

Finally, Baird claims that there is no longstanding historical tradition of regulating "the manner" of public carry of firearms aside from restrictions on "criminal behavior," such as "brandishing, affray, and threatening conduct." OB 25. But as the Supreme Court observed in *Bruen*, "[t]he historical evidence from antebellum America" establishes "that *the manner* of public carry was subject to reasonable regulation." 597 U.S. at 59. Those regulations included "[s]tatutory [p]rohibitions" that "proscribed the concealed carry of pistols and other small weapons." *Id.* at 52. And those statutory prohibitions focused entirely on the modality of public carry—*e.g.*, if the firearm was concealed, it was illegal—and did not turn on whether the firearm was carried peacefully or in some "criminal" manner. *See id.* at 52-55 & n.16. The Supreme Court reasoned from these and other sources that States could "lawfully eliminate one kind of public carry," so long as they did not "ban public carry altogether." *Id.* at 53, 59.

There is no dispute in this case that California has not "ban[ned] public carry altogether." *Bruen*, 597 U.S. at 53. As Baird rightly concedes, although California law facially limits the availability of open-carry licenses to residents of certain counties, all qualified Californians regardless of their county-of-residence may obtain a concealed-carry license that authorizes the public carry of firearms. *See* OB 5. Indeed, Baird previously has held such a concealed-carry license, which

46

generally allowed him to publicly carry firearms throughout the State for self-

defense purposes.  *See* 5-ER-923.[13]

The post-*Bruen* courts that have examined similar public-carry restrictions

have uniformly concluded that the Second Amendment allows open-carry

restrictions, so long as concealed carry is authorized.  In *Frey v. Nigrelli*, for

example, the district court considered a challenge to New York's statewide

prohibition on the open carry of firearms, whereby "individuals may public carry"

in the State, but only if "they carry their firearm in a concealed manner and if they

have a valid gun permit."  661 F. Supp. 3d 176, 198 (S.D.N.Y. 2023), *appeal*

*docketed sub nom. Frey v. Bruen*, No. 23-365 (2d Cir. Mar. 16, 2023).  The

plaintiffs in that case argued that it was unconstitutional for New York to

"criminaliz[e]" the open carry of firearms in public.  *Id.*  After reviewing *Bruen*,

the court rejected that argument, explaining that "[t]he fact that the manner in

which New York allows public carry—concealed rather than open—is not to

Plaintiffs' liking does not mean that enforcement against open carry is

unconstitutional."  *Id.* at 199; *see also Sinnissippi Rod & Gun Club*, 2024 WL

886651, at *7 (upholding Illinois' prohibition on open carry, because "laws

---

[13] The public carry of firearms is not authorized in places deemed to be sensitive, like courthouses and places of worship.  *See* Cal. Penal Code § 26230.  Baird does not challenge in this litigation California's sensitive-places restrictions on the public carry of firearms.

prohibiting one manner of carriage while allowing another" are consistent with the Second Amendment).

Other courts have likewise held or suggested that open-carry restrictions are constitutional, so long as concealed carry remains available. *See Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023) (discussing *Bruen* and reasoning that "the government . . . can ban different types of carry so long as others are left available"); *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022) ("[N]othing in the [*Bruen*] opinion implies that a State must allow open carry," so long as it does not "broadly prohibit concealed carry."); *Norman v. State*, 215 So.3d 18, 27-28, 41 (Fla. 2017) (holding in a pre-*Bruen* case that Florida's open-carry prohibition is constitutional because the law "does not diminish an individual's ability to carry a firearm for self-defense, so long as the firearm is carried in a concealed manner and the individual has received a concealed-carry license").[14]  Baird offers no persuasive reason for this Court to reach a different conclusion here.

---

[14] *See also Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1170-1173 (9th Cir. 2014), (concluding that "California's favoring concealed carry over open carry does not offend the Constitution, so long as it allows one of the two," and thus a plaintiff's "insistence upon a particular mode of carry" "fall[s] outside the scope of the right to bear arms"), *vacated on reh'g en banc*, 824 F.3d 919 (9th Cir. 2016); *Drake v. Filco*, 724 F.3d 426, 449 (3d Cir. 2013) (Hardiman, J., dissenting) ("[C]ourts have long . . . held that although a State may prohibit the open *or* concealed carry of firearms

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  June 17, 2024                    Respectfully submitted,


            */s/ Aaron D. Pennekamp*


ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
AARON D. PENNEKAMP
*Deputy Solicitor General*
R. MATTHEW WISE
JOHN D. ECHEVERRIA
*Supervising Deputy Attorneys General*
IRAM HASAN
*Deputy Attorney General*
*Attorneys for Defendant and Appellee*

---

[under the Second Amendment], it may not ban *both*."), *abrogated on other grounds by Bruen*, 597 U.S. at 11.

## STATEMENT OF RELATED CASES

The Attorney General is not aware of any related cases.


Dated:  June 17, 2024                    <u>/s/ Aaron D. Pennekamp</u>
                                              Aaron D. Pennekamp

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-565

I am the attorney or self-represented party.

**This brief contains** 11,691 **words,** including [          ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　[ ] it is a joint brief submitted by separately represented parties.
　　[ ] a party or parties are filing a single brief in response to multiple briefs.
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Aaron D. Pennekamp **Date** June 17, 2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on June 17, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  June 17, 2024                    */s/ Aaron D. Pennekamp*
                                         Aaron D. Pennekamp