No. 24-565

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARK BAIRD
*Plaintiff-Appellant,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellee,*

Appeal from United States District Court for the Eastern District of California
Civil Case No. 2:19-cv-00617-KJM-AC (Honorable Kimberly J. Mueller)

## REPLY BRIEF

THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761(f)
*abell@bellantoni-law.com*

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................ i

I. THE STATE NEVER ADDRESSED APPELLANT'S CHALLENGE: CRIMINALIZING PRESUMPTIVELY PROTECTED CONDUCT .................... 1

    A. Affray Laws Are Not Analogous ..................................................... 2

    B. Loyalty Oaths Are Not Analogous.................................................... 3

    C. Bans on 'Dangerous Weapons' Are Not Analogous ...................... 4

II. REGULATING THE "SAME PERCEIVED SOCIETAL PROBLEM" REQUIRES A STRAIGHTFORWARD HISTORICAL INQUIRY ....................... 4

III. THE STATE URGES THE WRONG STANDARD OF REVIEW.................. 6

IV. THE STATE FAILED TO ESTABLISH THAT CRIMINALIZING PUBLIC CARRY IS AN 'AMERICAN TRADITION' ......................................... 8

    A. Statutes Prohibiting 'Dangerous and Unusual' Weapons Should Be Summarily Rejected as Analogues ................................. 10

    B. No Tradition of an Open Carry Ban........................................... 10

    C. Open Carry is Presumptively Protected by the Plain Text .......... 11

    D. California's Open Carry Ban is an Outlier ................................. 12

    E. Open Carry is Not a 'Public Safety Risk' .................................. 12

    F. *Heller* Rejected À La Carte Approaches to the Second Amendment .................................................................. 13

V. THERE IS NO HISTORICAL ANALOGUE FOR LICENSING SCHEMES. 14

    A. Licensing Schemes are Not Analogous to
    "Public Carry Restrictions" .......................................................... 14

    B. Licensing Schemes Ban the Right *First* and (Possibly)
    Restore Later ................................................................................. 15

    C. This Court and the Supreme Court Have Rejected
    Improper Legislative "Public Safety" Interest Balancing,
    Means End Regulations ................................................................. 17

    D. Codifying the Bill of Rights Was Also Intended to Protect
    the Colonists from State Governments ......................................... 19

    E. Licensing Conflicts With the Plain Text and
    'Public Understanding' .................................................................. 23

    F. No Tradition of Requiring the People to Prove They Are
    'Qualified' to Exercise the Right Before Being Able to
    Exercise the Right ......................................................................... 25

    G. *Bruen* Did Not Involve a Challenge to
    'Licensing Regimes' ...................................................................... 26

VI. OPEN CARRY CANNOT BE BANNED IN FAVOR OF LICENSED
CONCEALED CARRY ............................................................................ 26

VII. APPELLANT DID NOT WAIVE HIS AS-APPLIED CHALLENGE……...27

CONCLUSION…………………………………………………………………...28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) ............................................................ 16, 17, 18

*Bliss v. Commonwealth*,
   12 Littell 90 Ky. (1822) ............................................................................ 19, 21

*D.C. v. Heller*,
   554 U.S. 570 (2008) ..................................................................................... Passim

*Dred Scott v. Sandford*,
   19 How. 393 (1857) ............................................................................................ 1

*Husejnovic v. DeProspo*,
   225 A.D.3d 597, 206 N.Y.S.3d 694 .......................................................... 23

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ....................................................................................... 16, 18

*Miller v. Bonta*,
   2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) ......................................... 9

*Muscarello v. United States*,
   524 U.S. 125 (1998) ......................................................................................... 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. (2022) .............................................................................................. Passim

*Nunn v. State*,
   1 Ga. 243 (1846) ................................................................... 10, 11, 16, 21

*People ex rel. Darling v. Warden of City Prison*,
   154 A.D. 413 (App. Div. 1913) ................................................................ 23, 24

*Peruta v. Cnty. of San Diego*,
   824 F.3d 919 (9th Cir. 2016) ...................................................................... 23

i

*United States v. Rahimi*,
144 S. Ct. 1889 (2024) ................................................................... Passim

*Srour v. New York City*,
2023 WL 7005172 (S.D.N.Y.) .............................................................. 3

*State v. Huntly*,
25 N.C. 418 (1843) ............................................................................. 5

*State v. Jumel*,
13 La.Ann. 399 (1858) ...................................................................... 21

*State v. Mitchell*,
3 Blackf. 229 (1833) .......................................................................... 21

*State v. Reid*,
1 Ala. 612 (1840) ............................................................................... 21

## Statutes

18 U.S.C. § 922(g) ............................................................................. 17
Cal. Penal Code § 26225 .................................................................. 15
Cal. Penal Code § 25850 ............................................................ 2, 4, 6
Cal. Penal Code § 26350 ..................................................................... 2

## I. THE STATE NEVER ADDRESSED APPELLANT'S CHALLENGE: CRIMINALIZING PRESUMPTIVELY PROTECTED CONDUCT

The State failed to identify an American tradition that justifies the continued enforcement of laws criminalizing conduct presumptively protected by the plain text of the Second Amendment – bearing arms.

Criminalizing public carry is odious to the Constitution, which presumptively guarantees the right to bear arms for self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. at 1, 32 (2022) (having 'little difficulty' holding that that the plain text "presumptively guarantees…[the] right to 'bear' arms in public for self-defense"). In fact, there is little evidence of an early American practice of regulating public carry by the general public. *Bruen*, 597 U.S. at 46.[1]

The People have readily exercised the right "to keep and carry arms wherever they went." *Bruen*, 597 U.S. at 60 (quoting Chief Justice Taney's decision in *Dred Scott v. Sandford*, 19 How. 393 (1857) opining of the "parade of horribles" that would occur if blacks became part of 'the People').

---

[1] If it were illegal to carry arms in public, as it is under §§ 25850 and 26350, the citizen militia would not have been able to legally carry their guns to the public square. The Militia Act of 1792 required that "every citizen so enrolled…shall appear, so armed, accoutred and provided, when called out to exercise, or into service" and commissioned officers were required to bring their sword and a "pair of pistols" in "holsters covered with bearskin caps." http://americanusconstitution.com/militiaactof5-8-1792.html

1

Cal. Penal Code 25850 and 26350 subject the entire population of California to criminal penalties for engaging in presumptively protected conduct – making no distinction between prohibited persons and the law-abiding. And California's imposition of a licensing scheme to 'soften the blow' of the total ban does not absolve the State from proving that §§ 25850 and 26350 are consistent with America's historical traditions.[2]

In step with the district court, the State misdirects the focus to affray laws, loyalty oaths, and other incongruous regulations, none of which satisfy the State's burden under *Bruen*.

### A. Affray Laws Are Not Analogous

"Affray" laws have been flatly rejected as analogues for regulations on peaceful conduct. The common law did not punish the carrying of deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people." *Bruen*, 597 U.S. at 52 (cite omitted). "People who sought to carry firearms publicly and peaceably in antebellum America

---

[2] Both statutes are overbroad and unconstitutional. Even criminalizing unlicensed concealed carry is unconstitutional, as discussed in detail below. But there is simply no plausible justification for criminalizing open carry. And the State does not even attempt to justify § 26350.

were generally free to do so." *Id.; see also, Bruen*, 597 U.S. at 47–50. The peaceful carriage of a firearm is part of the codified right itself; it cannot also be a crime.[3]

### B. Loyalty Oaths Are Not Analogous

Loyalty oaths fare no better. If an individual refused to swear allegiance to America (immediately after the Revolutionary War), he would be *disarmed.* The presumption being that the public was generally armed in the first instance, but those who refused to swear allegiance to America were considered 'dangerous' and disarmed. See also, *Srour v. New York City,* 2023 WL 7005172 (S.D.N.Y.) ("These historical requirements also seem to have disarmed those who previously had been able to exercise their right to bear arms, rather than serving as a prerequisite to legally obtaining arms in the first place") (citation omitted).

The recent Supreme Court decision in *United States v. Rahimi*, which upheld a statute temporarily disarming individuals "found by a court to pose a credible threat to the physical safety of another"[4] supports the same conclusion: the right to be armed at home and in public is *presumed*. There is no American tradition of disarming *everyone* because *some* people are dangerous. America's history reveals an armed citizenry freely possessing and carrying weapons.

---

[3] Criminal laws against poaching, trespass, fireworks, brandishing, assault, and treason offered by the State are also no analogy to punishing the peaceful carriage of arms for self-defense.
[4] *Rahimi*, 144 S. Ct. 1889, 1903 (2024).

### C. Bans on 'Dangerous Weapons' Are Not Analogous

To the extent that the State attempts to justify its regulations by relying on an historical tradition of banning "dangerous and unusual" weapons, that also fails [State Br. at 34-35].

"Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 597 U.S. at 47 quoting *D.C. v. Heller,* 554 U.S. 570, 629 (2008).

Florida's tax on open carry (1838), while not a ban, still 'infringed' the right. And the penalties for violating the TN, FL, and GA laws was a fine; still an infringement, but not nearly as burdensome as criminal penalties [State Br. at 35]. The laws enacted by Pennsylvania, Hawaii, and the District of Columbia in the 1850s are based on the view of pistols as "dangerous and unusual" weapons.

## II. REGULATING THE "SAME PERCEIVED SOCIETAL PROBLEM" REQUIRES A STRAIGHTFORWARD HISTORICAL INQUIRY

This appeal requires a "straightforward historical inquiry." *Bruen*, 597 U.S. at 27. Sections 25850 and 26350 were enacted to address the same "perceived societal problem - firearm violence in densely populated communities" as were the statutes

challenged in *Heller*[5]*, McDonald*, and *Bruen*[6]*,*

Because any right can be usurped under the guise of "public safety," [7] the Founders shielded the right to "keep and bear Arms" from government usurpation by declaring that it "shall not be infringed."

Indeed, proposals to limit the scope of the right were rejected. *Creating the Bill of Rights: The Documentary Record from the First Continental Congress*, Helen E. Veit, Kenneth R. Bowling, and Charlene Bangs Bickford (hereinafter Veit) at p. 30 ("On August 17 [1789], a motion by [Elbridge] Gerry [of Massachusetts] to insert "trained at arms" at this point failed for want of a second"); at p. 39 (on September 4, 1789 the Senate rejected inclusion of the phrase "for the common defence" after "bear arms"); p. 22 (rejecting the phrase "including the body of the people capable of bearing arms").

Those who sought to "carry firearms publicly and peaceably in antebellum America were generally free to do so." *Bruen*, 597 U.S. at 52. For example, in *State*

---

[5] "One of the District's regulations challenged in *Heller* "totally ban[ned] handgun possession in the home." *Bruen*, 597 U.S. at 27.

[6] New York's "proper cause" requirement was a "ban on public carry." *Bruen*, 597 U.S. at 60 ("None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose").

[7] The "risk of interpersonal violence has persisted since the 18th century, yet was addressed through materially different means." *Rahimi*, 144 S. Ct. at 1933 (Thomas, J. dissenting) (cleaned up) quoting *Bruen*, 597 U.S. at 26.

*v. Huntly*, 25 N.C. 418 (1843) (per curiam), North Carolina's Supreme Court acknowledged "that the carrying of a gun" for a lawful purpose "per se constitutes no offence." *Bruen*, 597 U.S. at 51-52 (citation omitted).

Only carrying weapons for a "wicked purpose" with a "mischievous result" constituted a crime and was punished as such. *Bruen*, 597 U.S. at 51–52 (cleaned up) (citations omitted).

But §§ 25850 and 26350 ban *all* of the People, not just those carrying firearms for a "wicked purpose," and *all* conduct, not only acts with a "mischievous result."

Because California failed to identify any historical tradition justifying the extreme authoritarian measures taken under §§ 25850 and 26350, the statutes must be permanently enjoined. *Bruen,* 597 U.S. at 17 ("only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command").

## III. THE STATE URGES THE WRONG STANDARD OF REVIEW

Pivoting away from its burden to justify imposing criminal sanctions upon law-abiding people, an insurmountable obstacle, the State perverts the *Bruen* test.

Under *Bruen*, where the plain text covers an individual's proposed conduct, the burden shifts to the government to justify its regulations. *Bruen*, 597 U.S. at 17.

According to the State, this Court "need only address whether the Second Amendment's plain text establishes a right to *unlicensed* public carry" [State Br. at

6

16] and improperly shifts the burden to *Appellant* to prove that the State's licensing restrictions are *not* part of the plain text  [State Br. at 12-13 (arguing that Appellant has a burden to establish that the Second Amendment protects the "ability[8] to openly carry firearms in public without first applying for or obtaining any license at all").

Viewed through the State's Looking Glass, the Second Amendment requires the People to apply for and obtain a license from the government *before* the right can be exercised.[9]

"The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood. The text of the Constitution is the "Law of the Land." Art. VI. As a general matter, the text of the Constitution says what it means and means what it says. And unless and until it is amended, that text controls." *United States v. Rahimi*, 144 S. Ct. 1889, 1910–11 (2024) (Kavanaugh, J. concurring).

Of course, there is no 'license requirement' embedded in the Second Amendment. Requiring Appellant to prove that California's regulations are *not* part of the plain text turns *Bruen* on its head. Licensing is a regulation *imposed on* the

---

[8] The State's language highlights its inability to grasp the existence of a right that has been shielded from its reach.

[9] "Baird asserts that he has the right to carry firearms in public without any license at all" State Br. at 15.

right, a.k.a. an "infringement." The plain text, which contains no restrictions at all, declares only that the right "shall not be infringed."

## IV. THE STATE FAILED TO ESTABLISH THAT CRIMINALIZING PUBLIC CARRY IS AN 'AMERICAN TRADITION'

Regulations on public carry in the Founding were virtually nonexistent. *Bruen*, 597 U.S. at 46 ("there is little evidence of an early American practice of regulating public carry by the general public. This should come as no surprise— English subjects founded the Colonies at about the time England had itself begun to eliminate restrictions on the ownership and use of handguns").

"The presumption against restrictions on keeping and bearing firearms is a central feature of the Second Amendment. That Amendment does not merely narrow the Government's regulatory power. It is a barrier, placing the right to keep and bear arms off limits to the Government." *Rahimi*, 144 S. Ct. at 1931 (Thomas, J. dissenting).

"From the adoption of the Second Amendment through the next 50 years, there were no firearm restrictions in any states north of the Mason-Dixon Line. Imagine that. One could live in any of the northern states without restrictions of almost any kind. A gun owner enjoyed freedom with no infringing prohibitions from 1789 to 1845 in Pennsylvania, New York, Connecticut, Massachusetts, New Hampshire, Rhode Island, Vermont, Maine, Ohio, Illinois, Michigan, or Indiana. One might never be subject to a later surety statute in Massachusetts (1836) and

Maine (1841). In fact, if anything, regulations were not about what kind of firearm one was not allowed to keep, but about the kind of firearm one was required to buy and have ready for militia duties." *Miller v. Bonta*, No. 19-CV-01537 BEN (JLB), 2023 WL 6929336, at *14 (S.D. Cal. Oct. 19, 2023), appeal held in abeyance, No. 23-2979, 2024 WL 1929016 (9th Cir. Jan. 26, 2024).

In the Northern States there was no tradition of criminalizing the simple act of keeping or carrying any firearm. There were hardly any firearm laws at all. *Miller*, at *15."

*Bruen*'s discussion of surety laws confirms that "everyone started out with robust carrying rights…[and, even so] *Bruen* saw little evidence that the laws were enforced." *Miller*, at *15; *Bruen*, 597 U.S. at 50.

The Antebellum era regulations cited by *Bruen*: common-law offenses, statutory prohibitions, and surety statutes" do not identify a 'National tradition' of banning public carry – never mind open carry. *Bruen*, 597 U.S. at 50.

"Around 50 years after the Second Amendment, four southern states passed their first firearms regulations taking the form of *concealed* carry prohibitions:" Arkansas prohibited carrying a pistol concealed unless on a journey (1837); Georgia prohibited carrying a pistol concealed (1837), which was upheld because open carry was unregulated; Virginia prohibited carrying a pistol concealed (1838); Alabama prohibited carrying a firearm concealed adding exceptions for self-defense and for

9

travelers (1839). *Miller,* at *16 (cleaned up). In 1868 Florida enacted a prohibition on carrying secretly "arms of any kind whatever" and the outright carrying of a pistol or other arm or weapon, which was not tested in a published court decision. *Miller,* at *16 (cleaned up).

### A.  Statutes Prohibiting 'Dangerous and Unusual' Weapons Should Be Summarily Rejected as Analogues

As noted above, statutes banning pistols as "dangerous and unusual" are no historical analogue for modern handgun regulations.

### B.  No Tradition of an Open Carry Ban

The State failed to identify any tradition of regulating open carry, never mind banning it. The opinions in *Nunn v. State*, 1 Ga. 243 (1846) is "particularly instructive." *Bruen*, 597 U.S. at 54. "Georgia's 1837 statute broadly prohibited 'wearing' or 'carrying' pistols 'as arms of offence or defence,' without distinguishing between concealed and open carry. To the extent the 1837 Act prohibited 'carrying certain weapons secretly,' the court explained, it was 'valid.' But to the extent the Act also prohibited 'bearing arms *openly*,' the court went on, it was 'in conflict with the Constitutio[n] and void.'" *Bruen*, 597 U.S. at 54 (internal citations omitted) (emphasis supplied) citing, *Heller*, 554 U.S. at 612.

*Nunn*'s treatment of Georgia's "general prohibition on the public carriage of handguns indicates that it was considered beyond the constitutional pale in

antebellum America to altogether prohibit public carry" [*Bruen*, 597 U.S. at 54],

which is exactly what § 25850 does.[10]

Because the State failed to identify a National tradition of regulating and/or

banning open carry, and of criminalizing the open carriage of an unloaded handgun,

Penal Law §§ 25850 and 26350 must be declared unconstitutional and permanently

enjoined.

### C. Open Carry is Presumptively Protected by the Plain Text

Open carry falls within the scope of the Second Amendment right to bear arms

– and so does concealed carry. As *Heller* declared:

> At the time of the founding, as now, to "bear" meant to "carry."
> See Johnson 161; Webster; T. Sheridan, A Complete Dictionary of
> the English Language (1796); 2 Oxford English Dictionary 20 (2d
> ed.1989) (hereinafter Oxford).
>
> *When used with "arms," however, the term has a meaning that
> refers to carrying for a particular purpose—confrontation. In
> *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 141
> L.Ed.2d 111 (1998), in the course of analyzing the meaning of
> "carries a firearm" in a federal criminal statute, Justice
> GINSBURG wrote that "[s]urely a most familiar meaning is, as
> the Constitution's Second Amendment ... indicate[s]: 'wear, bear,
> or carry ... upon the person or in the clothing or in a pocket, for the
> purpose ... of being armed and ready for offensive or defensive
> action in a case of conflict with another person.' " *Id.*, at 143, 118

---

[10] *Nunn* banned concealed carry out of a subjective belief that secretly carrying a weapon was "evil." Nunn, 1 Ga. at 249. At best, the State identified a trend toward banning the *concealed* carriage of pistols, which is also inconsistent with the plain text, as discussed further below.

11

S.Ct. 1911 (dissenting opinion) (quoting Black's Law Dictionary 214 (6th ed.1990)).

We think that Justice GINSBURG accurately captured the natural meaning of "bear arms."

*Heller,* 554 U.S. at 584.

Wearing a firearm "upon the person" denotes open carry. Wearing a firearm "in the clothing or in a pocket" denotes concealed carry. The use of "*or*" to separate the two modes of carrying a firearm further establishes that *Heller* defined "bear Arms" to encompass *both* open carry and concealed carry.

### D.  California's Open Carry Ban is an Outlier

California is, again, an outlier when it comes to Second Amendment rights. *Bruen*, 597 U.S. at 15, 79. California is only one of four (4) states – and the only state in the Ninth Circuit – that that criminalizes open carry.[11] And permitless constitutional open carry is legal in thirty-one (31) states. *Id.*

### E. Open Carry is Not a 'Public Safety Risk'

California's "concern" that the "widespread open carry of firearms would create a highly stressful and unsafe environment for everyone - particularly in densely populated urban and suburban communities" [State Br. at 41], as opined by the State's "expert," is rooted in unfounded speculation.

---

[11] https://worldpopulationreview.com/state-rankings/open-carry-states (California, New York, Illinois, and Florida).

The State forgets that unloaded open carry was unregulated in California until 2012; and the ban on carrying a loaded firearm did not take place until 1967. The State cannot upend the norm with unconstitutional laws and then complain that "society" will be in turmoil when the courts return the People to the *status quo*. Nor can 'made up' public safety concerns continue to trump individual rights.

Notwithstanding that 'public safety' justifications must be flatly rejected, the mere fact that someone is carrying a holstered handgun does not negatively impact public safety; open carry itself causes no detriment to public safety [4-ER-744-746; 751-752; 758-775].

### F. *Heller* Rejected À La Carte Approaches to the Second Amendment

*Heller* rejected the government's claim that it is "permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629.

Likewise, it is impermissible to ban 50% of the right to bear arms so long as the other half remains an *option*.[12]

---

[12] Not one open carry license has been issued in the state since unloaded open carry was banned in 2012 [7-ER-1475], nor has the State provide any evidence to the contrary [3-ER-544]. A record of all issued, denied, revoked, and amended licenses must be filed with the DOJ. § 26225.

## V. THERE IS NO HISTORICAL ANALOGUE FOR LICENSING SCHEMES

At the outset, California's licensing regime is inconsequential. While it purports to 'allow' an open carry license under certain circumstances in certain areas of the state, no open carry license has been issued since the right was banned in 2012 [3-ER-546; 7-ER-1475]. The State produced no evidence to the contrary.

Moreover, because §§ 25850 and 26350 are the 'enforcers' of the licensing regime; if they are found to be unconstitutional, the State's licensing requirement falls apart.

### A. Licensing Schemes are Not Analogous to "Public Carry Restrictions"

California attempts to justify its licensing regime by bootstrapping it to "public carry restrictions." *Bruen* noted that "public carry restrictions," which "generally fell into three categories" did not exist until *after* the ratification: common law offenses, statutory prohibitions, and surety statutes. *Bruen*, 597 U.S. at 50.

California opines that its licensing regime fits into this history because it is also a "public carry restriction." To the extent that prohibiting criminal conduct is a form of "public carry restriction" they are no analogue for licensing regimes, which ban first and ask questions later.

Taxing and/or banning the concealed carriage of small weapons may be a plausible analogue for the State's licensing requirement for *concealed* carry [State Br. at 35-36] but they have no connection to open carry. California's licensing

14

scheme is neither "relevantly similar" nor a "minimal burden" on the right to open carry [State Br. at 38].

In the few states where concealed carry was banned, open carry was unregulated. Not only is open carry banned in California, the alternative (concealed carry) is not 'unregulated.' And to the extent that licensing concealed carry is "less restrictive" than a ban, open carry is still not unencumbered.

## B. Licensing Schemes Ban the Right *First* and (Possibly) Restore Later

Licensing is not a "public carry restriction" – it *begins with* banning the right completely. *Then* the People must perform various required acts while they remain disarmed, and remain disarmed *unless and until* the government allows them to have a license. What happened to "shall not be infringed?"

Unless Appellant can wake up, holster his firearm, and be armed and ready for self-defense when he walks out his front door, his Second Amendment rights are nothing more than a privilege. Even in a "shall-issue" jurisdiction.

No other individual enumerated right requires the People to "put it on hold," jump through hoops, pay money, prove you are *not* disqualified from exercising the right, and then wait (in California for a minimum of 90 days) until the government 'allows' you to exercise it. Licensing violates – extinguishes – the free exercise of the right.

The Natural Right is *presumed entitlement.* No other Amendment in the Bill of Rights requires the People to first prove their worth. The Supreme Court has repeatedly emphasized that the Second Amendment "is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Baird,* 81 F.4th at 1041 (9th Cir. 2023) quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); *Bruen*, 597 U.S. at 70.

Licensing – granting a license – means the government is 'granting' permission to exercise what is actually a *pre-existing* right. In the absence of a plastic card, the People are punished as criminals. Absolute nonsense.

Antebellum era "public carry restrictions" punished bad conduct – like the 'affray' laws and surety laws. The handful of states that banned concealed carry did so because it was considered an "evil" practice[13] and a danger to "public safety" (and even those laws violate the plain text).

But there was no "public carry restriction" on open carry. Where concealed carry was banned, open carry was *unregulated* – like it was before California was a state in the union, until 1967 (loaded) and 2012 (unloaded open carry).

Licensing open carry (assuming a license will ever issue) did not exist on California's books until over 220 years after the ratification.

---

[13] *Nunn,* supra.

The burden on open carry is not 'minimal' because the muscle behind the licensing scheme is the enforcement of criminal penalties. There is no 'comparable' burden on open carry to be found in any history book, nor has the State identified one [State Br. at 39 (conceding its analogues eliminated concealed carry only)].

### C. This Court and the Supreme Court Have Rejected Improper Legislative "Public Safety" Interest Balancing, Means End Regulations

The People are *presumed* to freely exercise the right to keep and bear arms. Federal and state statutes exist to disarm individuals who have forfeited that right – the subsequent possession of firearms by prohibited individuals is a crime [18 U.S.C. 922(g)]. California has statutory 'tools' to punish criminal conduct [6-ER-1407]. Criminal laws punish, sometimes they deter, but they do not prevent crime from occurring; and imposing licensing burdens on ordinary people does nothing to prevent criminals from accessing firearms.[14]

In *Baird v. Bonta*, this Court highlighted *Bruen*'s "express rejection of the use of such 'means-end scrutiny in the Second Amendment context'" recognizing that although "judicial deference to legislative interest balancing is understandable -- and, elsewhere, appropriate -- it is not deference that the Constitution demands under

---

[14] For example, California bans the possession of machine guns. But on July 3, 2024, a man opened fire on two LAPD officers with a fully automatic machine gun. https://www.nbclosangeles.com/news/local/machine-gun-attack-lapd-officers-willowbrook/3464456/ Criminals readily obtain and carry firearms.

17

the Second Amendment." 81 F.4th 1036, 1043 (9ᵗʰ Cir. 2023) quoting, *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635).

The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Bruen*, 597 U.S. at 26, quoting *Heller*, 554 U.S. at 635. "It is this balance – "struck by the traditions of the American people – that demands our unqualified deference." Ibid (emphasis added).

The State cites no case where the Supreme Court has "refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications." *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 783 (2010).

The "central message" in *Rahimi* is its reinforcement of "the focus on text, history, and tradition, following exactly the path we described in *Bruen* (Gorsuch concurring opinion). "As a general matter, the text of the Constitution says what it means and means what it says. And unless and until it is amended, that text controls." *Rahimi*, 144 S. Ct. at 1911 (Kavanaugh, J. concurring).

18

### D.  Codifying the Bill of Rights Was Also Intended to Protect the Colonists from State Governments

A codified Bill of Rights was necessary because "the people would never support the government, unless their anxiety was removed."[15] The Founders intended to "quiet the minds of the people" by codifying rights that "limit and qualify the powers of the Government."[16]

Urging adoption of the Bill of Rights, James Madison observed that some of the states had no State bills of rights and "the articles contained in those [states] that [did] have them, are very improper, and infringe upon the rights of human nature, in several respects."[17]

In other words, state statutes that limited or banned peaceful carriage were inconsistent with the plain text, and underscore the drafters' reasons for enacting the Bill of Rights. If any tradition exists, it is the tradition of governmental subversion of Natural rights, beginning just 30 years after the ratification.

Kentucky's *Bliss v. Commonwealth*, 12 Littell 90 Ky. (1822) is the state court opinion closest in time to the ratification. There, the defendant appealed his

---

[15] Veit, at p. 117 (John Page).
[16] Veit, at p. 67 (James Madison).
[17] Veit, at p. 67 (James Madison).

conviction for wearing a concealed weapon (cane sword). The court declared that

open and concealed carry were *legal* when the constitution was adopted[18]:

> "it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and <u>whatever restrains the full and complete exercise</u> of that right, though not an entire destruction of it, is <u>forbidden</u> by the explicit language of the constitution.
>
> ***
>
> <u>The right existed at the adoption of the constitution</u>; <u>it had then no limits</u> short of the moral power of the citizens to exercise it, and it in fact consisted in nothing else but in the liberty of the citizens to bear arms. <u>Diminish that liberty, therefore, and you necessarily restrain the right</u>; and such is the diminution and restraint, which the act in question most indisputably imports, by prohibiting the citizens <u>wearing weapons in a manner which was lawful to wear them when the constitution was adopted</u>.
>
> ***
>
> For in principle, <u>there is no difference</u> between a law prohibiting the <u>wearing concealed</u> arms, and a law forbidding the wearing such as are <u>exposed</u>; and if the former be unconstitutional, the latter must be so likewise.
>
> ***
>
> But it should not be forgotten, that it is not only part of the right that is secured by the constitution; it is the right entire and complete, <u>as it existed at the adoption of the constitution</u>; and if any portion of that right be impaired, immaterial how small the part may be, and immaterial the order of time at which it be done, it is equally forbidden by the constitution. Hence…the act upon which [defendant was indicted] is in conflict with the constitution."

---

[18] Kentucky's constitution was adopted in 1792.

*Bliss*, 12 Ky. at 91-92 (emphasis added).

The flaw in *Nunn* and other post-ratification state cases is that their ban on concealed carry was rooted in subjective, 'public safety' interest balancing. *Nunn* acknowledged (but rejected) the *Bliss* opinion, reasoning that Georgia's law was "intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others [and that] does not come in collision with the Constitution." *Nunn*, 1 Ga. at 249.[19] Accord, *State v. Reid*, 1 Ala. 612, 614 (1840) (upholding the constitutionality of the act of 1838 "to suppress the evil practice of carrying weapons secretly")[20]; *State v. Mitchell*, 3 Blackf. 229, 229 (1833) (one-sentence opinion upholding Indiana's Statute of 1831 prohibiting all persons, except travelers, from wearing or carrying concealed weapons); *State v. Jumel*, 13 La.Ann. 399, 399-400 (1858) ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of

---

[19] The statutes in *Nunn, Bliss, Reid* and other state cases prohibited 'dangerous and unusual' weapons including, *inter alia*, dirks, bowie knives, and pistols which are now commonplace – as is open carry and concealed carry.

[20] The conclusions in *Reid*, in part responding to *Bliss*, were rooted in the judges' subjective opinion that "it is only when carried openly, that [arms] can be efficiently used for defence."

police, prohibiting only a particular mode of bearing arms which is found *dangerous to the peace of society*.") [State Br. at 37 (emphasis added)].

Post-ratification state courts substituted their judgment for that of the drafters who rejected any proposed language that would limit the right. The "framers of the Constitution employed words in their natural sense; and where they are plain and clear, resort to collateral aids to interpretation is unnecessary and cannot be indulged in to narrow or enlarge the text." *Rahimi*, 144 S.Ct. at 1911.

*Heller*'s interpretation of "bearing Arms" encompasses open carry and concealed carry. The drafters did not restrict the mode of bearing arms, they declared it was beyond reproach. Pre-ratification history reflects regulating the manner – no brandishing or terrorizing - not the modality of carry. Criminal acts, not peaceful carriage – however employed by the individual for use in self-defense – is the "evil" that remains unprotected by the Second Amendment.[21]

Today, pistols are common and concealed carry is a prevalent and normal mode of carrying a handgun. There is nothing inherently dangerous about concealed

---

[21] Law-abiding people do not suddenly manifest an "evil" intent by simply carrying a handgun concealed. Just as 'pistols' were considered "dangerous and unusual" weapons but are now the most popular weapon for self-defense, so too has the 'taboo' surrounding concealed carry (if it ever truly existed) dissolved; it is a common and natural mode of being armed for self-defense. To be sure, it was not the "mode" of carry that caused "interpersonal violence" and "endangered the peace," it was criminal intent and conduct [State Br. at 40]. But the rights of the People should not be violated because criminals do bad things.

carry and, in any event, the Supreme Court has explicitly decried 'public safety' as a justification for firearm regulations.

That said, even where concealed carry was banned, there were *no regulations* on open carry.

### E.  Licensing Conflicts With the Plain Text and 'Public Understanding'

*Heller* and *Bruen* reasoned that, because post-ratification laws do not provide as much insight into the original meaning of the text as earlier sources, those that are *inconsistent* with the original meaning of the constitutional text "obviously cannot overcome or alter the text" which "controls." *Bruen*, 597 U.S. at 36.

Licensing regimes were created under the false belief that the Second Amendment protected a "collective right" to keep and bear arms for militia service [*Heller,* 554 U.S. at 577] and did not apply to the states. *People ex rel. Darling v. Warden of City Prison*, 154 A.D. 413, 420 (App. Div. 1913) (upholding the first challenge to New York's Sullivan Law).[22]

---

[22] In New York, concealed carry is still considered a privilege [see, *Husejnovic v. DeProspo*, 225 A.D.3d 597, 599, 206 N.Y.S.3d 694, 696, appeal dismissed, 41 N.Y.3d 1008 (2d Dept. 2024) (licensing statute "does not establish a clear legal right to a pistol license, nor does the statute require the licensing officer to perform any ministerial act…[it] empowers the licensing officer to exercise discretion")], as it was so deemed in *Peruta II*. *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) ("the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public").

Licensing regimes were enacted to preserve "the public peace" under the "police power" to promote "public welfare and safety…even though it imposes restraints and burdens on the individual." *Darling*, 154 A.D. at 423 ("The rights of the individual are subordinate to the welfare of the state").

But the State offers no evidence to prove that licensing "ensures that only the law-abiding" are publicly carrying firearms. They may be "designed" to ensure that result, but prohibited people, gang members, rapists, everyday criminals, don't apply for a license. Regular people should not be disarmed because other people commit crime.

"Public safety" justification do not trump individual rights, but licensing continues to be enforced because judges continue to apply the same interest balancing rejected by the Founders. *Bruen*, 597 U.S. at 23 ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.").

The drafters knew that the Natural rights of the People were not safe from the state or federal governments. They codified the most direct and simply stated of the Amendments to prevent the government from trespassing the individual right to armed defense, rejecting proposed limitations, and mandating it "shall not be infringed."

24

To be sure, Appellant's challenge to California's open carry regulations is unassailable. That said, the improper interest balancing and destruction of the other half of the right to bear arms - concealed carry - cannot continue to be legitimized.

Not only did the State fail to identify a tradition of banning or licensing open carry, it did not provide *one* pre-ratification example of banning the concealed carriage of weapons.

### F. No Tradition of Requiring the People to Prove They Are 'Qualified' to Exercise the Right Before Being Able to Exercise the Right

An enumerated right cannot be both pre-existing and, at the same time, require the People to first prove they are 'qualified' to exercise it. Either carrying a firearm for self-defense is a "guaranteed individual right"[23] – or it's not.

In California, the right to carry a firearm in public is banned unless and until the individual proves that they are 'eligible' to exercise the right – being part of "the People" is not enough. The People must pay a fee, complete an application, and wait for a minimum of 90 days for the State to 'investigate' to determine whether they are a "Qualified Californian" [State Br. at 2; Penal Code § 26202].

The 'investigation' requires the individual to appear for an "in-person interview," produce "at least three character references…and at least one of whom must be the applicant's cohabitant," a review of the individual's "publicly available

---

[23] *Heller*, 554 U.S. at 592.

information…including publicly available statements published or posted by the applicant," and "in determining whether an applicant is a disqualified person…nothing…precludes the licensing authority from engaging in investigative efforts in addition to those listed."  Penal Code § 26202.

Licensing restrictions are inconsistent with the plain text, and arose too far after the ratification to be part of the "public understanding" of the scope of the right, which is "pegged" to 1791. *Bruen*, 597 U.S. at 35, 37 (cases cited).

### G. *Bruen* Did Not Involve a Challenge to 'Licensing Regimes'

While *Bruen* speaks to the continued enforcement of shall-issue licensing schemes, had the question been squarely before the Court and had licensing schemes been subjected to the *Bruen* test, the Court would have reached a different conclusion. And, as noted in Appellant's opening brief, the petitioner in *Bruen* conceded that licensing schemes are constitutional. Appellant does not.

For several reasons, including the absence of any historical tradition of requiring the government's permission *before being able to lawfully* exercise the right to bear arms, licensing requirements are repugnant to the plain text of the Second Amendment.

## VI. OPEN CARRY CANNOT BE BANNED IN FAVOR OF LICENSED CONCEALED CARRY

In conceding that concealed carry is commonplace and no longer considered taboo, the State attempts to transfer the stigma to open carry. In chicken-little

26

fashion, the State's 'expert' speculates that the mere sight of people peaceably carrying handguns holstered on their person, "would create a highly stressful and unsafe environment for everyone" [see, IV(E)]. Appellant's law enforcement expert, of course, swiftly dispels the State's foolishness [IV(E); 4-ER-744-746; 751-752; 758-775].

The State forgets that unloaded open carry was *unregulated* in California until twelve years ago. The State cannot upend the norm with unconstitutional laws and then complain that "society" will be in turmoil when the courts return the People to the *status quo*. Nor can 'made up' public safety concerns continue to trump individual rights.

And progress made on the concealed carry front does not mean that the government may now ban or license open carry. It was not constitutional to regulate open carry in the Antebellum era [see, *Nunn*, *Bliss*] nor is it now.

## VII. APPELLANT DID NOT WAIVE HIS AS-APPLIED CHALLENGE

The State mentions that Appellant did not challenge (and this Court did not address) the dismissal of his as-applied claims within his appeal of the denial of a preliminary injunction [State Br. at 9].

On January 3, 2023, Appellant filed a Notice of Appeal of the district court order dated December 8, 2022 "and each and every part thereof that denied the

plaintiffs' motion for a preliminary injunction, and *sua sponte* dismissed the plaintiffs' as applied challenge, and each and every part thereof that is contrary to and/or prejudiced the plaintiffs' rights, claims, and interests" [7-ER-1552]. Appellant's appeal to this Court of the denial of his motion for a preliminary injunction followed.

Appellant could not have pursued the dismissal of his as-applied claims at that time, which were held in abeyance, because final judgment had not yet been entered. The Notice of Appeal, underlying Order, and transcripts related to the dismissal of Appellant's as-applied challenge are included in and made part of this record on appeal.

### CONCLUSION

The district court opinion should be vacated in its entirety, judgment entered in favor of Appellant, and Penal Code §§ 25850 and 26350 permanently enjoined.

Dated: July 22, 2024

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiff-Appellant*

By: _Amy L. Bellantoni_
Amy L. Bellantoni
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

28

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-565

I am the attorney or self-represented party.

**This brief contains** | 6 411 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [              ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Amy L. Bellantoni | **Date** | 7/22/24

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/22*