No. 24-565

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

MARK BAIRD,
PLAINTIFF-APPELLANT,

V.

ROB BONTA, in his official capacity as
Attorney General of the State of California,
DEFENDANT-APPELLEE.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

**EN BANC AMICUS BRIEF OF THE DISTRICT OF COLUMBIA,
COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS,
MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA,
NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, AND
VIRGINIA IN SUPPORT OF APPELLEE**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ROMINA LILOLLARI
Assistant Attorney General

PERRY R. CAO
Assistant Attorney General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI ................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ................................................................4

    I.     The Second Amendment Allows States To Implement Open-Carry Restrictions To Promote Public Safety ........................................5

          A.     Open-carry restrictions are permitted under *Bruen* ....................5

          B.     Open-carry bans are consistent with the nation's historical tradition of firearm regulation....................................6

    II.    Consistent With Regulations Adopted By Other States, California's Open-Carry Restriction In High Density Areas Promotes Gun Safety And Protects Against Gun Violence................12

CONCLUSION ................................................................19

# TABLE OF AUTHORITIES*

**Cases**          Page(s)

*Abed v. United States*,
278 A.3d 114 (D.C. 2022)................................................................ 6

*Antonyuk v. James*,
120 F.4th 941 (2d. Cir. 2024)......................................................... 5

*Aymette v. State*,
21 Tenn. 154 (1840).................................................................... 9, 11

*Baird v. Bonta*,
163 F.4th 723 (9th Cir. 2026) ........................................................ 8

*Carroll v. State*,
28 Ark. 99 (1872)........................................................................... 9

*Commonwealth v. Murphy*,
44 N.E. 138 (Mass. 1896) ............................................................. 7

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................ 2, 5, 9

*Frey v. City of New York*,
157 F.4th 118 (2d Cir. 2025)............................................... 6, 8, 9, 10

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
471 U.S. 707 (1985)...................................................................... 12

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................. 1, 13

*Md. Shall Issue, Inc. v. Moore*,
116 F.4th 211 (4th Cir. 2024) (en banc) ....................................... 5

*Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985)...................................................................... 12

*\*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022).................................................................... Passim

---

\*     Authorities upon which we chiefly rely are marked with asterisks.

*O'Neil v. Neronha*,
  No. 23-070, 2025 WL 2197313 (D.R.I. Aug. 1, 2025)............................................ 6

*Sinnissippi Rod & Gun Club, Inc. v. Raoul*,
  253 N.E.3d 346 (Ill. Ct. App. 2024) ........................................................ 6

*Slaughter-House Cases*,
  16 Wall. 36 (1873) .................................................................... 12

*State v. Buzzard*,
  4 Ark. 18 (1842) ...................................................................... 9

*State v. Chandler*,
  5 La. Ann. 489 (1850) ................................................................. 9

*State v. Huntly*,
  25 N.C. 418 (1843) ................................................................... 11

*State v. Jumel*,
  13 La. Ann. 399 (1858) ................................................................ 8

*State v. Reid*,
  1 Ala. 612 (1840) ............................................................... 8, 9, 11

*State v. Smith*,
  11 La. Ann. 633 (1856) ............................................................... 11

*State v. Speller*,
  86 N.C. 697 (1882)..................................................................... 7

*United States v. Morrison*,
  529 U.S. 598 (2000) .................................................................. 12

*United States v. Rahimi*,
  602 U.S. 680 (2024) ............................................................... 7, 10

**Statutes**

Cal. Penal Code § 26150................................................................ 1, 2

Cal. Penal Code § 26155................................................................ 1, 2

D.C. Code § 7-2509.07(e) ............................................................... 13

iii

## Other Authorities

Abigail Censky, *Heavily Armed Protestors Gather Again at Michigan Capitol to Decry Stay-At-Home Order*, NPR (May 14, 2020) ........................... 16

Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727 (2018) ...................................................... 17

Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022) .................................. 18

Daniel Villarreal, *Michigan Closes Down Capitol in Face of Death Threats from Armed Protestors Against Gov. Whitmer*, Newsweek (May 15, 2020) ...... 16

Emma Tucker, *Texans Can Now Openly Carry Guns in Public Without a Permit or Training. Police Say the New Law Makes It Harder to Do Their Jobs*, CNN (Sep. 1, 2021) .............................................................................. 14

Everytown Rsch. & Pol'y, *Which states regulate the open carry of firearms?*, everytownresearch.org, (last visited Apr. 30, 2026) .......................................... 13

Everytown Rsch. & Pol'y, *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, everytownresearch.org (Aug. 23, 2021) ............. 16

Julie Bosman, *Man Shot by Kyle Rittenhouse Describes the Encounter on a Kenosha Street*, N.Y. Times (Nov. 8, 2021) ...................................................... 16

Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515 (2022) ..................................................................... 10

Nicholas Corsaro, et al., *The Impact of Concealed and Open Carry Legislation Among Urban Settings in Kentucky and Oklahoma: Final Report to the National Institute of Justice* (2024) ..................................................................... 17

Rachel A. Callcut et al., Trauma Surgery & Acute Care Open, *Banning Open Carry of Unloaded Handguns Decreases Firearm-Related Fatalities and Hospital Utilization* (2018) ............................................................................... 18

Richard Fausset, *A Heavily Armed Man Caused Panic at a Supermarket. But Did He Break the Law?*, N.Y. Times (June 20, 2023) .................................. 13

iv

S. Comm. Pub. Safety, Bill Analysis, A.B. 144 (Portantino),
2011-2012 Leg., Reg. Sess. (Cal. 2011) ........................................................ 9, 15

*Safety Volunteer Charged in the Fatal Shooting of a Utah 'No Kings' Protester*,
Associated Press (Dec. 4, 2025)............................................................ 17

Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting,
Police Say*, N.Y. Times (Apr. 16, 2022)............................................................ 18

1 William Blackstone, *Commentaries on the Laws of England*
(George Chase ed., 3d ed 1894)............................................................ 9

4 William Blackstone, *Commentaries on the Laws of England*
(10th ed. 1787) ............................................................ 10

## INTRODUCTION AND INTEREST OF AMICI

Amici the District of Columbia, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, and Virginia (collectively, "Amici States") submit this brief in support of defendant-appellee Rob Bonta pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a responsibility to ensure the health, safety, and welfare of their communities. That responsibility includes promoting the safe use of firearms and protecting their residents from the harmful effects of gun violence. The Second Amendment permits States to enact a variety of regulations to combat the misuse of firearms and adopt "solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010). This flexibility is an essential element of our federalist system, and it ensures that firearm regulations appropriately and effectively address the specific concerns in each locality.

Amici States have historically fulfilled this responsibility by implementing reasonable measures to regulate firearms. California's "shall-issue" licensing scheme and open-carry restrictions are prime examples of such measures. In California, an individual may "carry a pistol, revolver, or other firearm capable of being concealed" throughout the state if they are licensed to do so. Cal. Penal Code §§ 26150(a), 26155(a). In counties where the population is less than 200,000

persons, a licensed individual may carry a firearm "loaded and exposed" within that county. *Id.* §§ 26150(c)(2), 26155(c)(2). Otherwise, the open carry of firearms is prohibited absent exigent circumstances. *Id.* § 26045. These regulations are fully consistent with the Second Amendment, which permits a wide variety of manner-of-carry regulations.

Although Amici States have taken different approaches to regulating firearms, they share an interest in addressing gun violence in ways that are tailored to the needs of their residents. Amici States seek to maintain their authority to address firearm-related issues through legislation that is consistent with historical tradition and responsive to the unique circumstances in their communities. Amici States therefore file this brief to make two key points. First, the Second Amendment—as understood throughout our nation's history—allows States to adopt manner-of-carry regulations as long as they do not ban public carry altogether. And second, regulations on open carry promote gun safety and protect against gun violence.

## SUMMARY OF ARGUMENT

1. Regulations on open carry are consistent with the Second Amendment. As the Supreme Court has repeatedly recognized, the Second Amendment right to bear arms does not encompass the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570,

626 (2008)).  The Second Amendment right to bear arms protects a general right to public carry—it does not imply an absolute right to carry firearms *openly*.  *Bruen* recognized the States' authority to "lawfully eliminate one kind of public carry" (e.g., concealed carry) so long as they left the other option "open."  *Id.* at 59.  States are therefore free to adopt manner-of-carry restrictions, including open-carry bans, provided they do not "altogether prohibit the public carry" of firearms.  *Id.* at 55.

Open-carry regulations are also consistent with the nation's historical tradition of firearm regulation.  *Bruen* itself acknowledged that the right to public carry had long been "subject to well-defined restrictions" governing the manner of carry, *id.* at 38, and identified several historical examples of lawful statutory prohibitions on manner of carry.  Although these laws generally prohibited concealed—not open— carry, States do not need to identify "a historical twin" for firearm regulations to pass constitutional muster.  *Id.* at 30.  Laws that ban open carry but permit concealed carry thus honor the Second Amendment while hewing to the established principle that individuals cannot carry in "any manner whatsoever and for whatever purpose." *Id.* at 21 (internal quotation marks omitted).  And they are adopted for the same reasons as these historical analogues: to prevent a manner of carry likely to threaten public safety and lead to breaches of the peace.

2. Regulations on open carry promote gun safety and protect against gun violence.  As the Supreme Court has acknowledged, the Second Amendment permits

states to adopt a variety of public safety measures based on local needs. And at least 12 jurisdictions have adopted some manner of open-carry regulation to guard against accidents and the misuse of firearms.

Those open-carry restrictions are grounded in data and real-world experience. For example, open carry can make it more difficult for law enforcement to perform their duties, especially in emergency circumstances—which explains why so many law enforcement leaders support restrictions on the open carry of firearms. As recent events illustrate, open carry can also threaten public safety by spreading fear, enabling intimidation, and escalating conflict. That is particularly true in the context of protests and especially salient in densely populated areas. Empirical evidence demonstrates that open-carry regulations like California's prevent potentially dangerous situations and protect against gun violence.

## ARGUMENT

At the outset, Amici States note that appellant seeks to openly carry a firearm without a license. *See* Appellant Pet. Reh'g En Banc at 2. That is a problem because shall-issue licensing regimes are presumptively constitutional. Indeed, the Supreme Court in *Bruen* affirmatively stated that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." 597 U.S. at 38 n.9. States may therefore require applicants "to undergo a background check or pass a firearms safety course" because these conditions are

4

"designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). In applying these principles, courts have routinely upheld similar shall-issue licensing regimes in the face of constitutional challenges. *See, e.g.*, *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc); *Antonyuk v. James*, 120 F.4th 941 (2d. Cir. 2024). Because the panel accepted this threshold point—that requiring a license to carry is consistent with the Constitution—the Amici States focus instead on California's open-carry law.

**I. The Second Amendment Allows States To Implement Open-Carry Restrictions To Promote Public Safety.**

**A. Open-carry restrictions are permitted under *Bruen*.**

Regulations on open carry, like the one adopted by California, are permitted under *Bruen*. The right to "bear arms" guarantees "a general right to public carry," *Bruen*, 597 U.S. at 32-33—it does not imply a right to carry firearms openly rather than concealed. And the Supreme Court has never suggested that it encompasses the right to carry firearms in any manner one wishes. To the contrary, *Bruen* and *Heller* make clear that the Second Amendment is "*not* a right to keep and carry any weapon whatsoever in any manner whatsoever." *Bruen*, 597 U.S. at 21 (emphasis added); *Heller*, 554 U.S. at 626. This is why many courts that have confronted the issue since *Bruen* have upheld open-carry regulations against similar constitutional challenges. *See, e.g.*, *Frey v. City of New York*, 157 F.4th 118, 139 (2d Cir. 2025);

*Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 253 N.E.3d 346, 354-57 (Ill. Ct. App. 2024), *appeal denied*, 270 N.E.3d 808 (Ill. 2025), *cert. denied*, No. 25-995, 2026 WL 795094 (U.S. Mar. 23, 2026); *O'Neil v. Neronha*, No. 23-070, 2025 WL 2197313, at * 3 (D.R.I. Aug. 1, 2025); *cf. Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022) (observing that "nothing in the [*Bruen*] opinion implies that a State must allow open carry").

States are therefore free to adopt manner-of-carry restrictions, including open-carry bans, provided they do not "altogether prohibit the public carry of 'arms.'" *Bruen*, 597 U.S. at 55. Indeed, *Bruen* expressly acknowledged the States' authority to "lawfully eliminate one kind of public carry . . . so long as they left open the [other] option." *Id.* at 59. That is what California has done here. California has eliminated the kind of public carry that it deems most dangerous to public safety, while leaving open alternative options for public carry that preserve the right to lawfully bear arms for self-defense.

### B. Open-carry bans are consistent with the nation's historical tradition of firearm regulation.

Open-carry regulations are also consistent with the nation's "historical tradition of firearm regulation," and therefore constitutional at *Bruen*'s second step. 597 U.S. at 17. The Second Amendment is not a "regulatory straightjacket" and States do not need to identify "a historical twin" for their firearm regulations to pass constitutional muster. *Id.* at 30. Instead, the critical question is whether the relevant

6

historical practices, "[t]aken together," demonstrate that a law's application is "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692, 698 (2024).

"Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry." *Bruen*, 597 U.S. at 38; *see id.* at 59 ("To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation."). Indeed, nineteenth-century courts consistently recognized that the Second Amendment left legislatures with authority to "regulate and limit the mode of carrying arms." *See, e.g.*, *Commonwealth v. Murphy*, 44 N.E. 138, 138 (Mass. 1896); *State v. Speller*, 86 N.C. 697, 700 (1882) (recognizing that the legislature may "by law regulate" the right to bear arms to "require it to be exercised in a manner conducive to the peace and safety of the public" (emphasis omitted)). *Bruen* itself listed several historical examples of lawful statutory prohibitions on manner of carry, *see* 597 U.S. at 52 n.16 (collecting laws prohibiting concealed carry in Kentucky, Louisiana, Indiana, Arkansas, Virginia, Alabama, Ohio, Tennessee, and the territory of Florida), and the state decisions upholding them against challenges under the Second Amendment and state analogues, *see id.* at 52 nn.17-19 (citing, e.g., *State v. Reid*, 1 Ala. 612, 619 (1840); *State v. Jumel*, 13 La. Ann. 399 (1858)). A key reason these manner-of-carry

7

restrictions were lawful, the *Bruen* Court explained, was because the States did "not ban public carry altogether." 597 U.S. at 53 (emphasis omitted). Manner-of-carry restrictions that "altogether prohibit[ed] the public carry of arms" would run afoul of the Second Amendment, *id.* at 55, but those that still allowed for public carry would not, *id.* at 60.

To be sure, these historical laws restricted concealed, not open, carry of firearms. But a modern-day law "may be analogous enough to pass constitutional muster" even if it is "not a dead ringer for historical precursors." *Id.* at 30. Indeed, the "*central*" considerations are whether the modern and historical laws "impose a comparable burden" on the right and "whether that burden is comparably justified." *Id.* at 29. With respect to the first inquiry, open-carry bans "burden[] the right to carry to a 'similar' degree as these historical laws" banning concealed carry. *Frey*, 157 F.4th at 139 (quoting *Bruen*, 597 U.S. at 29). This is so because they likewise "'eliminate one kind of public carry'" while leaving open "another option of carry that does not hinder the capacity for self-protection." *Id.* at 138-39 (quoting *Bruen*, 597 U.S. at 59). This comports with *Heller*'s understanding that "so long as one may 'bear arms' by carrying 'upon the person *or* in the clothing or in a pocket,' there is no restriction on the Second Amendment right." *Baird v. Bonta*, 163 F.4th 723, 772 (9th Cir. 2026) (N.R. Smith, J., concurring in part and dissenting in part) (quoting *Heller*, 554 U.S. at 584).

8

As for the second inquiry, open-carry prohibitions are adopted "for the same reasons" as historical laws restricting concealed carry. *Frey*, 157 F.4th at 139. Courts and well-regarded legal commentators justified concealed-carry bans so that "those associating with the bearer may guard against injury by accident," *Carroll v. State*, 28 Ark. 99, 101 (1872), and to prevent a manner of carry "likely to lead to breaches of the peace and provoke . . . the commission of crimes," 1 W. Blackstone, *Commentaries on the Laws of England* 84 n.11 (George Chase ed., 3d ed 1894); *see State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed-carry ban adopted "to prevent bloodshed").

Courts also justified these bans because of the broader need to protect "the peace and safety of . . . citizens." *Aymette v. State*, 21 Tenn. 154, 159 (1840). For instance, courts found that States could enact manner-of-carry restrictions "dictated by the safety of the people[,] . . . the advancement of public morals," *Reid*, 1 Ala. at 616, and "the general interests or welfare of the whole community," *State v. Buzzard*, 4 Ark. 18, 19 (1842). These same goals are reflected in modern-day regulations on open carry, including California's law. S. Comm. Pub. Safety, Bill Analysis, A.B. 144 (Portantino), 2011-2012 Leg., Reg. Sess., 9-10 (Cal. 2011) (observing that open carry had "created an increase in problematic instances of guns carried in public, alarm[ed] unsuspecting individuals, . . . caus[ed] issues for local law enforcement," and "create[d] an unsafe environment").

9

Although these historical analogues are sufficient on their own to justify open-carry regulations under *Bruen*'s second step, other historical practices further demonstrate these laws' consistency with the nation's historical tradition of firearm regulation. To start, California has identified several historical examples of statutory prohibitions on open carry. *See* Appellee Br. at 32-37. From 1860 to 1900, 24 States enacted laws regulating open carry. *See Frey*, 157 F.4th at 139 n.13. Furthermore, the "affray" and "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land," further strengthen the validity of such laws. *Rahimi*, 602 U.S. at 697-98 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787)). Such conduct was punishable by forfeiture of the arms and imprisonment because it "disrupted the public order and led almost necessarily to actual violence." *Id.* (citation modified).

Moreover, to the extent States did not enact similar open-carry restrictions at the Founding or during the nineteenth century, that is largely because "openly carrying firearms was shocking and outrageous conduct" used as "a measure of last resort only in extreme circumstances." Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2526 (2022). Because open carry was so "rare" and usually signaled "a breakdown in social order," *id.* at 2518, 2534, States did not feel compelled to regulate "conduct that no one engaged in[] and most deemed

10

unacceptable," *id.* at 2543. Indeed, nineteenth-century courts, including some of the ones relied on by the panel below, repeatedly recognized the "carrying of . . . weapon[s] in full open view" as "extremely unusual." *State v. Smith*, 11 La. Ann. 633, 634 (1856); *see State v. Huntly*, 25 N.C. 418, 422 (1843) ("No man amongst us carries [a gun] with him, as one of his every day accoutrements [and] never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State" (citation modified)). Even when courts acknowledged individuals' ability to openly carry weapons, these courts understood that this manner of carry would be rare and used only in "emergenc[ies]." *Reid*, 1 Ala. at 620; *Aymette*, 21 Tenn. at 159 (acknowledging the legislature's authority to regulate if "it were to suit the whim of a set of ruffians to enter the theater . . . with drawn swords, guns, and fixed bayonets" and "this were to become habitual"); *see* Frassetto, *supra* at 2534-36 (noting that open carry usually only occurred during periods of intense crime or unrest). Early silence on open-carry restrictions therefore does not cast doubt on modern efforts to regulate it. As *Bruen*, *Heller*, and centuries of practice have recognized, manner-of-carry restrictions remain lawful as long as individuals still retain the right to lawfully bear arms for self-defense.

## II. Consistent With Regulations Adopted By Other States, California's Open-Carry Restriction In High Density Areas Promotes Gun Safety And Protects Against Gun Violence.

Since the Founding, States have adopted a variety of locally tailored measures to promote safe firearm use and ensure public safety. California's open-carry restrictions are just one example and fit comfortably within a long line of government regulations that encourage responsible gun ownership. As the Supreme Court has often observed, States "have had great latitude under their police powers to legislate as 'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quoting *Slaughter-House Cases*, 16 Wall. 36, 62 (1873)). Because these issues are "primarily, and historically, . . . matter[s] of local concern," enacting laws to promote public safety falls squarely within the reasonable exercise of a state's police powers. *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). Even as the Court has defined the scope and import of rights conferred by the Second Amendment, States retain both the freedom and the fundamental responsibility to implement reasonable measures designed to protect their residents from the misuse of firearms.

12

The Supreme Court has underscored the importance of federalism in the Second Amendment context. In *McDonald*, for example, the Court emphasized that the Second Amendment "by no means eliminates" the States' "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785 (plurality). Recognizing that "conditions and problems differ from locality to locality," the Court made clear that "state and local experimentation with reasonable firearms regulations" could and should continue "under the Second Amendment." *Id*. at 783, 785 (citation modified). California and ten additional states, along with the District of Columbia, have adopted at least some form of open-carry regulation in response to legitimate local public-safety concerns. *See* Everytown Rsch. & Pol'y, *Which states regulate the open carry of firearms?*, everytownresearch.org, tinyurl.com/5cyc3hfa (last visited Apr. 30, 2026); D.C. Code § 7-2509.07(e).

Several public-safety considerations support open-carry regulations. For example, open carry can make it more difficult for law enforcement officers to perform their duties and protect the public. The executive director of the Police Executive Research Forum, a bipartisan law enforcement policy group, has described the "huge dilemma" that open carry creates for law enforcement officers, who have mere seconds to respond to potential threats. Richard Fausset, *A Heavily Armed Man Caused Panic at a Supermarket. But Did He Break the Law?*, N.Y. Times (June 20, 2023), tinyurl.com/mthhv6pc. Police chiefs across the country have

13

likewise explained that open carry makes it harder for officers to differentiate a "good guy with a gun from a bad guy with a gun," Emma Tucker, *Texans Can Now Openly Carry Guns in Public Without a Permit or Training. Police Say the New Law Makes It Harder to Do Their Jobs*, CNN (Sep. 1, 2021), tinyurl.com/4kxy8xk3, thereby "increas[ing] the potential for loss of life and serious bodily injury," Press Release, Everytown for Gun Safety, *Ahead of Committee Meeting: A Reminder of the Widespread Opposition to Open Carry and Permitless Carry* (Apr. 26, 2021), tinyurl.com/ye2asf46. Unfortunately, this can result in tragic accidents and create confusion, like when officers fatally shot a man near a public protest after mistaking him for an active shooter, Dana Gentry, *Fatal Shooting of Protester Raises Questions About 'Open Carry' Police Response*, Nevada Current (June 12, 2020), tinyurl.com/yckcw8dj, or when police erroneously assumed there was more than one gunman in a mass shooting due to the presence of multiple armed protestors, Manny Fernandez et al., *Texas Open-Carry Laws Blurred Lines Between Suspects and Marchers*, N.Y. Times (July 10, 2016), tinyurl.com/2z45vz5w. It is therefore no surprise that many police chiefs, even in large open-carry states like Texas, generally "oppose[] [the] open carry" of handguns. Tom Benning, *75 Percent of Texas Police Chiefs Responding to Survey Oppose Open Carry*, Dallas News (Feb. 13, 2015), tinyurl.com/yc5s53c7 (roughly 75% out of 194 chiefs opposed open carry).

14

California lawmakers and law enforcement leaders expressed similar sentiments when considering the open-carry prohibition at issue here. The California legislature feared that open carry would "create[] an unsafe environment for all parties involved[:] the officer[s], the gun-carrying individual[s], and for any other people" present. Bill Analysis, A.B. 144 at 9-10. Because even "the slightest wrong move by the gun-carrier could be construed as threatening by the responding officer," legislators feared that law enforcement "may feel compelled to respond in a manner that could be lethal." *Id.* at 10. In addition, the legislature observed an "increase in 'open carry' calls" to already understaffed police departments, which "prevent[ed] them from protecting the public in other ways." *Id.* The Los Angeles Sheriff's Department and the Peace Officers Research Association of California supported the open-carry restriction for these very reasons: to avoid "plac[ing] law enforcement and the public in . . . precarious and possibly dangerous situation[s]." *Id.* at 13.

Regulations on open carry can also promote public safety by preventing accidents and the escalation of violence. Recent events illustrate that open carry often "escalate[s] conflict[]" and "contribute[s] to intimidation" of the public. *Regulations of Public Carry of Firearms*, Johns Hopkins Bloomberg Sch. Pub. Health, tinyurl.com/furhzt (last visited Apr. 22, 2026). Consider how the open carry of weapons can make ordinary demonstrations and protests more violent.

15

Demonstrations in open-carry states are "over five times more likely to have an armed presence." Everytown Rsch. & Pol'y, *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, everytownresearch.org (Aug. 23, 2021), tinyurl.com/ycyzy3e9. And fatalities are significantly more likely to occur at protests with firearms present than at those without. *Id.* ("A fatality was reported at approximately one out of every 2,963 demonstrations where no firearm was identified, compared to about one out of every 62 demonstrations where there was a firearm identified.").

As just one example, in the wake of the COVID-19 shutdowns, armed protestors gathered at the Michigan State Capitol, "entered the Senate gallery[,] and stood above lawmakers," leading one lawmaker to wear a bulletproof vest. Abigail Censky, *Heavily Armed Protestors Gather Again at Michigan Capitol to Decry Stay-At-Home Order*, NPR (May 14, 2020), tinyurl.com/75t22j4w. These armed protests were also accompanied by violent rhetoric, including death threats directed at Michigan's governor. *See* Daniel Villarreal, *Michigan Closes Down Capitol in Face of Death Threats from Armed Protestors Against Gov. Whitmer*, Newsweek (May 15, 2020), tinyurl.com/4fbs76n8. Other protests have tragically turned deadly. *See* Julie Bosman, *Man Shot by Kyle Rittenhouse Describes the Encounter on a Kenosha Street*, N.Y. Times (Nov. 8, 2021), tinyurl.com/s9hc3ccr ("'I thought that the defendant was an active shooter,' said Mr. Grosskreutz[.]"). Recently, in an open-

16

carry state, a protest safety volunteer shot at an openly armed individual "he believed to be a potential mass shooter," resulting in the tragic death of an innocent bystander. *Safety Volunteer Charged in the Fatal Shooting of a Utah 'No Kings' Protester*, Associated Press (Dec. 4, 2025), tinyurl.com/ymy59ct5. The volunteer explained that he had opened fire because the sight of the armed individual "scared the hell out of [him]." *Id.* Reasonable measures can decrease the likelihood of similar, potentially deadly accidents.

The importance of open-carry regulations is particularly heightened in dense, urban settings where human interaction is more frequent and public-safety resources are more thinly stretched. People in crowded public spaces often find themselves jostling or colliding with each other, multiplying the risk that routine disagreements will escalate. Openly displaying a firearm amplifies, rather than reduces, that danger. *See* Brad J. Bushman, *Guns Automatically Prime Aggressive Thoughts, Regardless of Whether a "Good Guy" or "Bad Guy" Holds the Gun*, 9 Soc. Psych. & Personality Sci. 727, 730-31 (2018). Indeed, a 2024 study found that public carry "in urban settings" produced a measurable increase in "reckless firearm activity—such as [the] pointing of firearms and illegal discharges of firearms" and "illegal gun theft." Nicholas Corsaro, et al., *The Impact of Concealed and Open Carry Legislation Among Urban Settings in Kentucky and Oklahoma: Final Report to the National Institute of Justice* 8 (2024). The misuse of firearms in these crowded areas

17

poses a significant threat to innocent bystanders in the line of fire and to countless others who may be injured in a frantic attempt to escape the area. Tyler Fedor et al., *9 People Wounded in South Carolina Mall Shooting, Police Say*, N.Y. Times (Apr. 16, 2022), tinyurl.com/4wsz45pn (noting that nine people were shot and five others were injured in the stampede that ensued during the gunfire); Carlie Porterfield, *10 Injured in Stampede at New York's Barclays Center Amid Shooting Scare, Police Say*, Forbes (May 29, 2022), tinyurl.com/2xeuc7fj.

Open-carry regulations prevent potentially dangerous situations, thereby protecting against gun violence. Indeed, one study researching the effects of California's open-carry regulation concluded that the law "resulted in a significantly lower incident rate of both firearm fatalities and [non-fatal] hospitalizations." Rachel A. Callcut et al., Trauma Surgery & Acute Care Open, *Banning Open Carry of Unloaded Handguns Decreases Firearm-Related Fatalities and Hospital Utilization* 7 (2018), tinyurl.com/4nxa34xn. The study found that the ban "saved an estimated 337 lives . . . and 1285 [non-fatal] visits" in California in the three years after the law's enactment. *Id.* at 3. California's constitutional restriction thus promotes safety, decreases the likelihood that everyday disagreements turn deadly, and helps law enforcement protect the public.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ROMINA LILOLLARI
Assistant Attorney General

PERRY R. CAO
Assistant Attorney General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

May 2026

19

On behalf of:

PHILIP J. WEISER
Attorney General
State of Colorado

WILLIAM TONG
Attorney General
State of Connecticut

KATHLEEN JENNINGS
Attorney General
State of Delaware

ANNE E. LOPEZ
Attorney General
State of Hawaii

KWAME RAOUL
Attorney General
State of Illinois

ANTHONY G. BROWN
Attorney General
State of Maryland

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

DANA NESSEL
Attorney General
State of Michigan

KEITH ELLISON
Attorney General
State of Minnesota

AARON D. FORD
Attorney General
State of Nevada

JENNIFER DAVENPORT
Attorney General
State of New Jersey

LETITIA JAMES
Attorney General
State of New York

DAN RAYFIELD
Attorney General
State of Oregon

PETER F. NERONHA
Attorney General
State of Rhode Island

JAY JONES
Attorney General
Commonwealth of Virginia

20

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** __24-565__

I am the attorney or self-represented party.

**This brief contains** __4237__ **words,** including __0__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**x**] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __/s/ Caroline S. Van Zile__      **Date** __May 6, 2026__

**CERTIFICATE OF SERVICE**

I certify that on May 6, 2026, I electronically filed this brief with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE