No. 24-565

In The

# United States Court of Appeals
# for the Ninth Circuit

MARK BAIRD,

Plaintiff-Appellant,

v.

ROB BONTA, in his Official Capacity as the Attorney General of the State of California,

Defendant-Appellee.

On Appeal from the United States District Court for the Eastern District of California
No. 2:19-cv-00617-KJM-AC
The Honorable Kimberly J. Mueller, Judge

**BRIEF OF GUN VIOLENCE PREVENTION GROUPS AND RESEARCHERS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE**

IAN SIMMONS
DAVID K. ROBERTS
ARJUN A. SHENOY
CATHERINE A. WARD
TIMUR AKMAN-DUFFY
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
isimmons@omm.com
*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Brady Center to Prevent Gun Violence, Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund), and Giffords Law Center to Prevent Gun Violence each has no parent corporation. They have no stock; hence, no publicly held corporation owns 10% or more of their stock.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................i

INTEREST OF *AMICI CURIAE* ..................................................................1

INTRODUCTION ........................................................................................2

ARGUMENT ...............................................................................................4

    I.      Plaintiff-Appellant Baird Misreads Controlling Supreme Court Precedent. ........................................................................................4

    II.     California's Open-Carry Restrictions in Densely Populated Areas Respond to the Same Public Concerns That Have Long Supported Historical Manner-of-Carry Regulations. .........................12

CONCLUSION .........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ............................................................ 3, 6, 7, 21

*Frey v. City of New York,*
157 F.4th 118 (2d Cir. 2025) ................................................... 4, 6, 9

*Kipke v. Moore,*
165 F.4th 194 (4th Cir. 2016) ........................................................17

*New York State Rifle & Pistol Association v. Bruen,*
597 U.S. 1 (2022) ................................................... 2–7, 12, 21, 22

*Sinnissippi Rod & Gun Club, Inc. v. Raoul,*
253 N.E.3d 346 (Ill. App. Ct. 2024) ..............................................9

*State v. Chandler,*
5 La. Ann. 489 (1850) ....................................................................9

*State v. Jumel,*
13 La. Ann. 399 (1858) ...............................................................7, 9

*State v. Mitchell,*
3 Blackf. 229 (Ind. 1833) ..............................................................7

*State v. Reid,*
1 Ala. 612 (1840) ...........................................................................7

*United States v. Rahimi,*
602 U.S. 680 (2024) ...................................... 2, 4–6, 9–11, 13, 15, 21

**Statutes**

Act of July 28, 1967, ch. 960, § 6, 1967 Cal. Stat. 2459 .........................10

**Other Authorities**

4 W. Blackstone, *Commentaries on the Laws of England* (1769).................... 10, 11

Allison Anderman, *Protecting Democracy from Armed Intimidation:  A Guide for States*, Giffords Law Ctr. to Prevent Gun Violence (Sept. 16, 2022).................................................................................18

Assemb. Comm. on Pub. Safety, Analysis of Assemb. A.B. 144 (Portantino), 2011–2012 Reg. Sess. (Cal. Apr. 12, 2011) ............................... 14, 19

iii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Brian Hicks, *SC Lawmakers wisely back away from 'open carry' gun laws*, Post & Courier (Apr. 10, 2019, updated Sept. 14, 2020) ...................................18

Campbell Gibson, *Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990* (June 1998).......................................15

Daniel Horwitz, *Open Carry: Open-Conversation or Open-Threat*, 15 First Amend. L. Rev. 96 (2016) ......................................................................................17

Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 Colum. L. Rev. 1278 (2009) ......................................................13

David B. Kopel & George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's* Young v. Hawaii, 2021 U. Ill. L. Rev. Online 172 (2021) ........................................................................................................................8

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024) ..........................................................8

Emily A. Grimsley et al., *Transition to Permitless Open Carry and Association with Firearm-Related Suicide*, 238 J. Am. Coll. Surg. 681 (2024) ......................................................................................................................15

Giacomo Bologna, *Woman shoots herself in foot with baby in car, Springfield police say*, Springfield News-Leader (Aug. 20, 2016) .....................18

Giffords Law Ctr. to Prevent Gun Violence, *Preventing Armed Voter Intimidation* (Sept. 2020) ....................................................................................18

Giffords Law Ctr. to Prevent Gun Violence, *Protecting Democracy* (Sept. 8, 2025).......................................................................................................................18

Julia Harte, *In Some U.S. Cities, Police Push Back Against "Open-Carry" Gun Laws*, Reuters (July 19, 2016)...................................................................20

Katlyn E. DeBoer, *Clash of the First and Second Amendments: Proposed Regulation of Armed Protests*, 45 Hastings Const. L.Q. 333 (2018)...................17

Laura Cutilletta, *The "Good Guy with a Gun" Myth*, Giffords Law Ctr. to Prevent Gun Violence (Oct. 1, 2020)..................................................................20

Mike McIntire, *At Protests, Guns Are Doing the Talking*, N.Y. Times (Nov. 26, 2022) .............................................................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Molly Hennessey-Fiske, *Dallas Police Chief:  Open Carry Makes Things Confusing During Mass Shootings*, L.A. Times (July 11, 2016) .........................20

Molly Hennessy-Fiske & Neela Banerjee, *Tucson Shooting Fires Up Gun Debate*, L.A. Times (Jan. 14, 2011)........................................................................21

Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2022) .......................................................13

*Quick Facts:  New York City, New York*, U.S. Census Bureau ...............................16

Rachel A. Callcut, Anamaria J. Robles, Matthew W. Mell, *Banning open carry of unloaded handguns decreases firearm-related fatalities and hospital utilization*, Trauma Surgery Acute Care Open, (Oct. 24, 2018)............15

S. Comm. on Pub. Safety, Analysis of Assemb. A.B. 144 (Portantino), 2011–2012 Reg. Sess. (Cal. June 7, 2011) .................................................... 14, 20

San Mateo Cnty. Sheriff's Office, "*Unloaded Open Carry*" (Jan. 14, 2010) .........20

*Table 2.  Population of the 24 Urban Places:  1790*, U.S. Bureau of the Census (June 15, 1998) ...................................................................................15

*Table 10.  Population of the 100 Largest Urban Places:  1870*, U.S. Bureau of the Census (June 15, 1998).................................................................16

Timothy Zick, *Arming Public Protests*, 104 Iowa L. Rev. 223 (2018)...................17

U.S. Dep't of Comm., *United States Summary:  2010 Population and Housing Units Counts* (Sept. 2012), 20 (Table 10. Population by Urban and Rural:  Earliest Census to 2010)................................................................16

William Saletan, *Armed Giffords Hero Nearly Shot Wrong Man*, NBC News (Jan. 11, 2011)...................................................................................................21

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are three non-profit organizations dedicated to ending gun violence through education, research, and advocacy, and a gun violence solution expert. *Amici* have a substantial interest in ensuring that the Constitution is construed properly to allow democratically elected officials to address the nation's gun violence crisis, and to safeguard the interests of everyone—whether they are gun owners or not—in living safe and secure lives in their communities. Numerous courts, including the Supreme Court, have cited the briefs of *amici* on issues involving firearms regulation and constitutional principles concerning the ownership and use of firearms.

Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Everytown for Gun Safety is the nation's largest gun violence prevention organization, with millions of supporters across all fifty states. Giffords Law Center to Prevent Gun Violence is a survivor-led nonprofit policy organization dedicated to researching, writing,

---

[1] *Amici curiae* submit this brief under Circuit Rule 29-2. Defendant-Appellee consents to the filing of this brief; Plaintiff-Appellant takes no position. Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or in part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici curiae* has contributed money for this brief.

enacting, and defending laws and programs proven to reduce gun violence and save lives. Emily Walsh is Law and Policy Advisor at the Johns Hopkins Center for Gun Violence Solutions and joins this amicus brief in her personal capacity.

## INTRODUCTION

As interpreted by the Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, the Second Amendment both protects the right to carry arms in public for purposes of lawful self-defense and permits states to regulate the manner of public carry, which encompasses both concealed and open carry. 597 U.S. 1, 53, 59 (2022) ("To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation.") (emphasis in original). Further, the Court recently confirmed that constitutionally valid firearm regulations must align with the "principles that underpin our regulatory tradition," but need not have a perfect historical match. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). A modern firearm restriction therefore need only be "relevantly similar" to historical regulations in why and how it operates. *Id.* at 691–92.

That controlling guidance resolves this case. California has not forbidden law-abiding citizens from public carry. It has instead permitted public carry in counties with more than 200,000 people through licensed concealed carry rather than through open carry, the latter of which presents particular safety risks and

chilling effects that are especially acute in more crowded areas. In short, California has merely—and permissibly—regulated the *manner* of public carry in these more densely populated areas, not banned public carry.

California's judgment fits comfortably within the historical-tradition analysis set forth in *Bruen* and *Rahimi*. Throughout American history, legislatures routinely regulated the manner of carrying firearms, often limiting or prohibiting concealed carry because, at that time, concealed carry was seen as especially dangerous to public peace. Courts upheld those laws because they regulated one manner of carry while leaving another available. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (collecting cases); *Bruen*, 597 U.S. at 59 (recognizing that historical restrictions regulated "the manner of public carry") (emphasis omitted).

California lawmakers have applied the same principle to the conditions the State now faces. In the more densely populated communities covered by this law—where public spaces are often crowded, dynamic, and occupied by strangers—the open display of firearms creates risks that the Constitution allows lawmakers to address through regulation. Such a display can alarm bystanders, chill speech and assembly, impede law-enforcement responses to firearm violence, and escalate encounters even if no shot is fired.

3

The Second Amendment allows California to consider those realities. The district court's judgment as to California's open-carry law should be affirmed.

## ARGUMENT

### I. Plaintiff-Appellant Baird Misreads Controlling Supreme Court Precedent.

California's open-carry law is valid because it is entirely consistent with the Nation's "historical tradition of firearm regulation," which the Supreme Court instructed courts to consider. *Rahimi*, 602 U.S. at 689 (quoting *Bruen*, 597 U.S. at 24). That tradition allows states to "'eliminate one kind of public carry—[open carry or] concealed carry—so long as they [leave] open' the other option." *Frey v. City of New York*, 157 F.4th 118, 138 (2d Cir. 2025) (quoting *Bruen*, 597 U.S. at 59) (brackets in original). California's decision to bar open carry in counties with populations over 200,000 while allowing law-abiding citizens to obtain permits for the concealed carry of firearms under a shall-issue licensing system is permissible under this framework. In arguing otherwise, Plaintiff-Appellant Baird misapplies the historical approach used in *Bruen* and *Rahimi*. *See* Dkt. No. 11 at 29; Dkt. No. 34 at 9–10.

Significantly for this case, "[t]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691–92. For a firearm regulation to be lawful, it need have only a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*,

597 U.S. at 30 (emphasis in original). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* Indeed, the historical analysis is not meant to be "a regulatory straightjacket," *id.*, nor "suggest a law trapped in amber," *Rahimi*, 602 U.S. at 691. Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added); *see also id.* at 740 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a *principle*, not a mold." (emphasis added)).

Here, then, this Court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692 (quotations omitted). As Justice Barrett explained in her *Rahimi* concurrence, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st century regulations to follow late-18th century policy choices." *Id.* at 739. She further warned that a court must avoid making the "flawed" assumption "that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* at 739–40.

5

*Bruen* itself articulated the relevant principle here: "States could *not* ban public carry altogether," but "*the manner* of public carry"—i.e., open carry or concealed carry—"was subject to reasonable regulation." 597 U.S. at 53, 59 (emphases in original). As the Second Circuit has observed, between 1813 and 1859, at least ten states or territories prohibited one form of public carry—opting to ban concealed carry in particular. *Frey*, 157 F.4th at 138–39 (collecting regulations). And "the majority of the 19th-century courts" recognized that such prohibitions were permissible under the Second Amendment or its state-specific analogues. *Heller*, 554 U.S. at 626. These "well-defined restrictions governing . . . the manner of carry," *Bruen*, 597 U.S. at 38, and the judicial opinions upholding them, demonstrate a strong historical tradition of regulating public carry consistent with California's approach. Put simply, the historical tradition recognized the right to bear arms, but "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 21 (quoting *Heller*, 554 U.S. at 626).

In fact, our Nation has never treated the right to bear arms as a license to carry in whatever manner one pleases, irrespective of the consequences for public order. The Second Amendment right is "not unlimited"; rather, its scope is defined by the Nation's historical tradition of firearm regulation. *Id.* (quoting *Heller*, 554 U.S. at 626). Historical manner-of-carry restrictions prohibited "*a particular*

6

*mode* of bearing arms which is found dangerous to the peace of society" without "infring[ing] the right of the people to keep or bear arms." *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858) (emphasis in original). Thus, a law that is "intended merely to promote personal security . . . and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others," does not "come in collision with the constitution." *State v. Reid*, 1 Ala. 612, 617 (1840).

History confirms that legislatures may limit a mode of public carry that foreseeably produces fear, escalation, and disorder—so long as they preserve a meaningful avenue for law-abiding citizens to carry arms for lawful self-defense purposes. *See, e.g.*, *id*. at 616–17; *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833). California did exactly that here, determining that the open display of firearms in more densely populated areas is the mode of carry most threatening to public safety and civic participation. That is a *regulation of manner*, not a *prohibition on carry*.

Indeed, even attorneys and academics often relied on by those challenging gun laws have recognized that the government may constitutionally prohibit the open carry of firearms. Even David Kopel and Joseph Greenlee, two lawyers closely affiliated with gun-rights organizations, concede that *Bruen* permits that

7

"the government may require that carry be open rather than concealed (in compliance with nineteenth century sensibilities), *or* . . . that carry be concealed rather than open (in compliance with modern sensibilities, in some areas)."  David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 374 (2024) (emphasis added).  Kopel and Professor George Mocsary have likewise recognized that "[a] modern, tradition-based application of the Second Amendment allows for regulation of the mode of carry—open or concealed—but not a carry ban."  David B. Kopel & George A. Mocsary, *Errors of Omission:  Words Missing from the Ninth Circuit's* Young v. Hawaii, 2021 U. Ill. L. Rev. Online 172, 185 (2021).  California's choice here to allow public carry via concealed carry thus falls squarely within the tradition of manner-of-carry regulation that the Second Amendment permits.

Plaintiff-Appellant ignores the controlling regulatory principle and instead erroneously faults California's open-carry restriction for not having a historical twin.  *See* Dkt. No. 11 at 29; Dkt. No. 34 at 9–10.  But as we have shown above (*supra* at 4–5), the Supreme Court has directly rejected such a requirement.  California's regulation must be upheld because it imposes a comparable burden that is comparably justified in relation to historical concealed-carry restrictions.  *Frey*, 157 F.4th at 139 (upholding New York's open-carry regulation after

8

concluding that the ban "burdens the right to carry to a 'similar' degree as . . . historical laws" regulating concealed carry).

California regulates open carry for the same reasons analogous laws throughout Anglo-American history regulated concealed carry:  to address "*a particular mode* of bearing arms which is found dangerous to the peace of society."  *Jumel*, 13 La. Ann. at 400 (emphasis in original); *see Frey*, 157 F.4th at 139 (emphasizing the same with respect to New York's comparable open-carry regulation); *Sinnissippi Rod & Gun Club, Inc. v. Raoul*, 253 N.E.3d 346, 354–57 (Ill. App. Ct. 2024) (same, as to Illinois's open-carry regulation), *cert. denied*, --- S. Ct. ----, 2026 WL 795094 (Mar. 23, 2026).[2]

*Rahimi*'s application of this historical analysis confirms the constitutionality of California's approach today.  There, the Supreme Court upheld 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by those subject to certain domestic violence restraining orders, because the broader reason for the prohibition—mitigating credible threats of physical violence—was consistent with the purpose of certain historical regulatory regimes.  *See* 602 U.S. at 698.

---

[2] *See also, e.g.*, *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850) ("This [ban on concealed carry] became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons.").

This case is no different. Just as with the historical laws prohibiting concealed carry, *see* Op. at 84, the purpose of California's open-carry law is to help ensure that the public carry right is exercised consistent with the "peace and safety of the people," *id.* at 85 (quoting Act of July 28, 1967, ch. 960, § 6, 1967 Cal. Stat. 2459, 2462–63). The analysis does not change simply because California chose to impose regulations on open carry as opposed to concealed carry. Case in point, the Supreme Court upheld the law in *Rahimi* even though the prohibition itself was not exactly the same as any one distinct historical regime. 602 U.S. at 698 ("Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be.").

California's open-carry law is arguably more closely analogous to historical regulations than the prohibition at issue in *Rahimi*. The Supreme Court upheld Section 922(g)(8) by analogizing it to historical surety laws and "going armed" laws. 602 U.S. at 698. Under surety laws, which addressed firearm misuse in relation to preventing violence, magistrates could "require individuals suspected of future misbehavior to post a bond." *Id.* at 695. The bond would be forfeited in the event of the individual breaking the peace. *Id.* "Going armed" laws banned "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." *Id.* at 697 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 149 (1769)).

10

The statute at issue in *Rahimi* had comparable justifications and burdens to those historical laws, but the laws also differed in important ways. Surety laws shared the purpose of reducing interpersonal violence, but they did so by forcing someone to either maintain the peace or forfeit money; by contrast, Section 922(g)(8) prohibits firearm possession for those subject to certain domestic violence restraining orders. And "going armed" laws were broader in scope than Section 922(g)(8), as the former regulated conduct to avoid terrifying the public, without any reference to predicate interpersonal violence. Further, "going armed" laws banned only the "riding or going armed, with dangerous or unusual weapons, [to] terrify[]" others, *id.* at 697 (quoting Blackstone, *supra*, at 149), while Section 922(g)(8) bans firearm possession outright for anyone subject to a qualifying domestic violence restraining order.

Comparatively speaking, the justification for and burden imposed by California's open-carry restriction are thus at least as close if not closer matches to the historical laws barring concealed carry. California's law and those historical analogues reflect policy choices by governments to allow public carry in a manner the legislature determined would best reduce violence, promote public safety, and not disrupt or alarm the public while still respecting Second Amendment rights. Responding to the particular needs of its communities, California chose to bar open carry rather than concealed carry in more densely populated counties. But that

11

distinction is immaterial in comparison to the differences between Section 922(g)(8) and the two standalone regulatory regimes that the Supreme Court held were sufficiently analogous when taken together.  If anything, the public-safety rationale and nature of historical "going armed" laws more closely resemble the open-carry law at issue here:  "Going armed" laws applied to open carry, and the visual display of firearms was one of the means used to "terrify" the public— precisely the problem California addressed.  If surety and going-armed laws make Section 922(g)(8) a permissible regulation under the Second Amendment, then California's open-carry law is certainly "analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30.

## II. California's Open-Carry Restrictions in Densely Populated Areas Respond to the Same Public Concerns That Have Long Supported Historical Manner-of-Carry Regulations.

Our tradition of manner-of-carry regulations establishes that California may address the harms that open carry creates in more densely populated areas. Historically, states regulated the manner of public carry when a particular mode of bearing arms threatened public peace and safety and undermined others' ability to use shared public spaces without fear or intimidation.  California applies that settled principle to modern conditions.  In densely populated communities, the open carry of firearms can chill speech, assembly, voting, commuting, recreation,

12

and ordinary civic participation, as well as risk public safety.[3]  California therefore follows a well-trodden historical path by regulating one *mode* of carry that produces particular harms while preserving another avenue for public carry.

That judgment fits comfortably within the direction in *Bruen* and *Rahimi* to reason by *principle* from historical regulations and to ask whether a modern law applies those principles to contemporary circumstances.  *See supra* at 4–5.  True, early legislatures applied that principle to concealed carry, which "was seen as a dubious practice characteristic only of thugs, robbers, duelers, and other deplorables."  Nicholas J. Johnson et al., *Firearms Law and the Second Amendment:  Regulation, Rights, and Policy* 409 (3d ed. 2022).  But the State's authority to regulate manner of carry does not depend on freezing the factual predicate in a historical "mold."  *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).  Just as the judgment of earlier legislatures reflected the conditions of their era, contemporary and future legislatures remain free to reassess which mode of carry most threatens public peace as circumstances evolve, and to regulate within the bounds of the Second Amendment accordingly.

---

[3] *See, e.g.*, Darrell A.H. Miller, *Guns as Smut:  Defending the Home-Bound Second Amendment*, 109 Colum. L. Rev. 1278, 1309–10 (2009) ("[T]he presence of a gun in public has the effect of chilling or distorting the essential channels of a democracy—public deliberation and interchange.").

13

And in more recent years, California lawmakers have responded to the conditions they have observed and reasonably determined that, in more densely populated areas, open carry undermines public order, raises serious public safety concerns, and chills the exercise of constitutionally protected activities. California lawmakers expressly considered these concerns when debating the open-carry law at issue. For example, the Assembly Public Safety Committee analysis recorded concern that open carry had led to "problematic instances of guns carried in public," "alarming unsuspecting [sic] individuals," and officer responses to "tense situations" in which "the slightest wrong move by the gun carrier could be construed as threatening," creating "an unsafe environment for all parties involved" and "for any other individuals nearby as well." Assemb. Comm. on Pub. Safety, Analysis of Assemb. A.B. 144 (Portantino), 2011–2012 Reg. Sess., at 6 (Cal. Apr. 12, 2011).

This analysis likewise emphasized that open carry "creates an unsafe environment" not only for the carrier and responding officers but also for "any other people who happen to be in the line of fire," while also burdening law enforcement with increased "open carry" calls. S. Comm. on Pub. Safety, Analysis of Assemb. A.B. 144 (Portantino), 2011–2012 Reg. Sess., at 10 (Cal. June 7, 2011). Further still, permitless open carry is associated with increased rates of firearm suicide in certain states, illustrating the broad range of safety concerns with

14

which the California legislature was grappling.[4]  Those are precisely the kinds of

public-peace "principles that underpin" the manner-of-carry "regulation tradition."

*Rahimi*, 602 U.S. at 692.  Research has borne this out:  Following the 2012

enactment of California's open-carry law, the State experienced significantly lower

incident rates of both firearm-related fatalities and nonfatal shooting

hospitalizations.[5]

These longstanding public-peace principles are, particularly in densely

populated areas, even more salient today, with the proliferation of such spaces and

urbanization of the country.  The prevalence of modern city centers and increasing

percentage of the populace residing in urbanized areas represent a significant

change from both the Founding and Reconstruction eras.[6]  In 1790, New York was

the largest city in America with a population of 33,131 people.[7]  By 1870,

---

[4] See Emily A. Grimsley et al., *Transition to Permitless Open Carry and Association with Firearm-Related Suicide*, 238 J. Am. Coll. Surg. 681 (2024).

[5] Rachel A. Callcut, Anamaria J. Robles, Matthew W. Mell, *Banning open carry of unloaded handguns decreases firearm-related fatalities and hospital utilization*, Trauma Surgery Acute Care Open (Oct. 24, 2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC6203141/.

[6] Campbell Gibson, *Population of the 100 Largest Cities and Other Urban Places in the United States:  1790 to 1990* (June 1998), https://www.census.gov/library/working-papers/1998/demo/POP-twps0027.html.

[7] *Table 2.  Population of the 24 Urban Places:  1790*, U.S. Bureau of the Census (June 15, 1998), https://www2.census.gov/library/working-papers/1998/demo/pop-twps0027/tab02.txt.

15

New York City had a population of 942,292 people.[8]  Today, New York's population is estimated at almost 8.5 million people.[9]  And that is just one example.  Nationwide, in 1790, the first census showed less than 10% of people lived in cities—a number that jumped to over 90% of the population by 2010.[10] These growing population numbers have brought along structural and cultural changes in public life.  In modern American cities, the early Nation's concerns about intimidation, disorder, and public safety are not confined to the town market or election precinct.  They extend across all spaces where ordinary public life unfolds.

These harms are not theoretical.  At protests and parades, for example, openly carried firearms are frequently used "to intimidate opponents and shut down debate."[11]  The open presence of firearms "elevates armed conflict over

---

[8] *Table 10.  Population of the 100 Largest Urban Places:  1870*, U.S. Bureau of the Census (June 15, 1998), https://www2.census.gov/library/working-papers/1998/demographics/pop-twps0027/tab10.txt.

[9] *Quick Facts:  New York City, New York*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/PST040224#PST040224.

[10] U.S. Dep't of Comm., *United States Summary:  2010 Population and Housing Units Counts* (Sept. 2012), at 20 (Table 10. Population by Urban and Rural:  Earliest Census to 2010), https://www2.census.gov/library/publications/decennial/2010/cph-2/cph-2-1.pdf.

[11] Mike McIntire, *At Protests, Guns Are Doing the Talking*, N.Y. Times (Nov. 26, 2022), https://www.nytimes.com/2022/11/26/us/guns-protests-open-carry.html.

16

peaceful democratic discourse" and is "repugnant to the premise of peaceful self-government and democratic change that the First Amendment supports."[12]  And because openly displayed guns demand attention, alarm onlookers, and are likely to incite violence, they can suppress public participation even absent an express threat.[13]  That concern has persisted throughout our national experience.  Since the days of the colonies, legislatures have recognized that conduct showing "an intention, or at least an apparent tendency, to engage in violence" threatens civic order.  *Kipke v. Moore*, 165 F.4th 194, 214 (4th Cir. 2016).  Laws and regulations thus reflected that weapons at gatherings posed "a greater threat to the public peace than unarmed assemblies."  *Id.*; *see also id.* at 213 (noting that armed public demonstrations implicate "the interaction between the rights the First and Second Amendments preserve").  In addition, open carry near polling places, vote-count centers, courthouses, and public board meetings likewise poses a serious threat to

---

[12] Timothy Zick, *Arming Public Protests*, 104 Iowa L. Rev. 223, 237–38 (2018).

[13] Katlyn E. DeBoer, *Clash of the First and Second Amendments:  Proposed Regulation of Armed Protests*, 45 Hastings Const. L.Q. 333, 339–40, 343–44 (2018); *see also* Daniel Horwitz, *Open Carry:  Open-Conversation or Open-Threat*, 15 First Amend. L. Rev. 96, 107 (2016).

the workings of our democracy, chilling freedom of speech, assembly, voting, and the right to petition government.[14]

This risk applies to all manner of public settings, especially in densely populated areas, where the visible presence of lethal force can alter who enters a store or who speaks in a crowd. And beyond the risk of intentional intimidation, those open carrying who have poor technique, discipline, or equipment have greater potential to negligently discharge their weapon, or even have it taken from them by a would-be shooter.[15] To address these concerns, California permissibly imposed a general rule of banning open carry in more densely populated areas.

---

[14] *See* Allison Anderman, *Protecting Democracy from Armed Intimidation: A Guide for States*, Giffords Law Ctr. to Prevent Gun Violence (Sept. 16, 2022), https://giffords.org/lawcenter/report/protecting-democracy-from-armed-intimidation-a-guide-for-states/; Giffords Law Ctr. to Prevent Gun Violence, *Protecting Democracy* (Sept. 8, 2025), https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/protecting-democracy/; Giffords Law Ctr. to Prevent Gun Violence, *Preventing Armed Voter Intimidation* (Sept. 2020), https://files.giffords.org/wp-content/uploads/2020/09/Giffords-Law-Center-Preventing-Armed-Voter-Intimidation.pdf.

[15] *See, e.g.*, Giacomo Bologna, *Woman shoots herself in foot with baby in car, Springfield police say*, Springfield News-Leader (Aug. 20, 2016), https://www.news-leader.com/story/news/local/ozarks/2016/08/19/woman-shoots-self-foot-while-baby-car-springfield-police-say/88999320/ (discussing an injury caused by accidentally discharging a firearm while openly carrying); Brian Hicks, *SC Lawmakers wisely back away from 'open carry' gun laws*, Post & Courier (Apr. 10, 2019, updated Sept. 14, 2020), https://www.postandcourier.com/columnists/hicks-column-sc-lawmakers-wisely-back-away-from-open-carry/article_f20516c4-5ad3-11e9-a3ad-e703880ae110.html (collecting examples of accidental discharge firearm accidents in states that allow open carry).

California sensibly chose to focus the law's reach on where the open *display* of firearms predictably has its sharpest effects:  higher-density communities in which strangers repeatedly encounter one another at close range in shared public spaces throughout the day.  In those communities, the same streets and public squares host protests, public meetings, parades, and civic gatherings, while also simply sustaining daily life.  Given that open carry in public places had "shocked Californians statewide" and "intimidate[d] the public," the Legislature determined that allowing licensed concealed carry most effectively preserves residents' Second Amendment rights while simultaneously protecting First Amendment freedoms, public order, and residents' peace of mind.  Assemb. Comm. on Pub. Safety, Analysis of Assemb. A.B. 144 (Portantino), 2011–2012 Reg. Sess., at 6–7 (Cal. Apr. 12, 2011).

Open carry in the more densely populated areas at issue also poses significant public-safety and law-enforcement risks.  Officers responding to a shooting, threat, or protest clash must quickly distinguish between lawful citizens and active threats.  Open carry complicates that task by increasing the number of visibly armed people officers must assess under extreme pressure—a pressure that rises with crowd size.  As the retired chief of police and former president of the California Police Chiefs Association explained, "the open carry of firearms complicates the police response" to calls for service and "unnecessarily divert[s]

critical police resources." *Baird v. Bonta*, No. 2:19-cv-00617, ECF No. 20-1, ¶ 23 (Declaration of Former Covina Chief of Police Kim Raney in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction). The California Senate Committee on Public Safety reached the same conclusion, finding that the absence of an open-carry prohibition had produced law-enforcement problems involving reports of "armed individuals" in public places, creating "tense situations" and "unsafe environment[s]" for officers, gun-carrying individuals, and others. S. Comm. on Pub. Safety, Analysis of Assemb., A.B. 144 (Portantino), 2011–2012 Reg. Sess., at 9–10 (Cal. June 7, 2011).[16]

That risk, too, is real. As just one example, during the shooting of Representative Gabrielle Giffords in Tucson, unarmed bystanders disarmed the shooter, and an injured man grabbed the shooter's gun.[17] Another man who heard

---

[16] *See also* Julia Harte, *In Some U.S. Cities, Police Push Back Against "Open-Carry" Gun Laws*, Reuters (July 19, 2016), https://www.reuters.com/article/world/in-some-us-cities-police-push-back-against-open-carry-gun-laws-idUSKCN0220BPI; San Mateo Cnty. Sheriff's Office, "*Unloaded Open Carry*" (Jan. 14, 2010), http://www.calgunlaws.com/wp-content/uploads/2012/09/San-Mateo-County-Sheriffs-Office_Unloaded-Open-Carry.pdf (discussing the difficulty open carry poses for law enforcement officers in California); Molly Hennessey-Fiske, *Dallas Police Chief: Open Carry Makes Things Confusing During Mass Shootings*, L.A. Times (July 11, 2016), https://lat.ms/2GpxGUw (similar).

[17] Laura Cutilletta, *The "Good Guy with a Gun" Myth*, Giffords Law Ctr. to Prevent Gun Violence (Oct. 1, 2020), https://giffords.org/analysis/the-good-guy-with-a-gun-myth.

20

the gunfire, but did not see the shooting, ran towards the scene with his own gun drawn—nearly shooting the survivor who had already disarmed the shooter.[18] The man later acknowledged that displaying his firearm "with all those people around" could cause "more hysteria,"[19] including his being "confused [for] a second gunman."[20]

An openly carried firearm may deter all manner of socially beneficial activities, from public rallies to morning walks with children to school, even when no threat is intended and no shot is fired. Those are consequences of the *mode* of carry, not of carry itself, and they mirror the historic justification for manner-of-carry rules. Thus, California's measured response to these risks requires public carry—in the places where density makes intimidation and disorder most acute—to take a form less likely to alarm bystanders and destabilize civic life, consistent with the logic of *Heller*, *Bruen*, and *Rahimi*.

The right to bear arms has never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *see also Bruen*, 597 U.S. at 21; *Rahimi*, 602 U.S. at 691. Like

---

[18] *See* William Saletan, *Armed Giffords Hero Nearly Shot Wrong Man*, NBC News (Jan. 11, 2011), https://www.nbcnews.com/id/wbna41018893.

[19] Molly Hennessy-Fiske & Neela Banerjee, *Tucson Shooting Fires Up Gun Debate*, L.A. Times (Jan. 14, 2011), https://www.latimes.com/archives/la-xpm-2011-jan-14-la-na-zamudio-shooting-20110115-story.html

[20] Saletan, *supra* note 18.

21

historical concealed-carry restrictions, California's law channels public carry into the mode the State has judged less threatening to public peace. Law-abiding citizens remain free to carry concealed firearms, preserving the right to bear arms for lawful self-defense purposes while mitigating the chilling and safety effects associated with the open display of firearms in places where ordinary public life so often means moving through a crowd. A state may not "ban public carry altogether," but it may regulate "the manner of public carry." *Bruen*, 597 U.S. at 53, 59. That is what California has done, ensuring that the exercise of one constitutional right does not trample others.

## CONCLUSION

For the foregoing reasons, the judgment of the district court as to California's open-carry law should be affirmed.

Respectfully submitted,

May 6, 2026

*/s/ Ian Simmons*

IAN SIMMONS
DAVID K. ROBERTS
ARJUN A. SHENOY
CATHERINE A. WARD
TIMUR AKMAN-DUFFY
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
isimmons@omm.com

*Attorneys for Amici Curiae*

22

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

1. This brief complies with the type-volume limitation of Circuit Rule 29-2(c)(3), because it contains 4,835 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the format, typeface, and type-style requirements of Fed. R. App. P. 32(a)(4)-(6).

*/s/ Ian Simmons*
Ian Simmons

## CERTIFICATE OF SERVICE

I certify that on May 6, 2026, I filed the foregoing Amicus Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Ian Simmons*
Ian Simmons